# EXHIBIT KK



Shell Exploration and Production Co.
150 N. Dairy Ashford Road
Houston, TX 77079

August 11, 2017

RE: EEOC Charge # 530-2017-02413C Barnes, Jesse v. Shell

Ms Karen McDonough
Equal Employment Opportunity Commission

Dear Ms. McDonough,

This position statement is in response to the charge of sex discrimination, harassment, and retaliation filed by Ms. Jesse Barnes against Shell Exploration and Production Company ("Shell" or the "Company") on April 25, 2017. Ms. Barnes' claim that she was harassed, discriminated, and retaliated against due to her gender is without merit. The facts provided herein will support this position. There have been no violations of Title VII of the Civil Rights Act of 1964 as amended, no violations of the Pennsylvania Human Relations Act as amended, and no violations of the Equal Pay Act, and therefore, this Charge should be dismissed.

**Background Information and Location Description**

Shell's Unconventionals business uses advances in proven technology to tap rich resources of previously inaccessible "tight" gas, including gas locked in shale formations. The Appalachia operations are primarily located in rural northern Pennsylvania, where we drill and produce dry gas from the Marcellus and Utica formations. Shell entered the area in 2010 after acquiring 750,000 leasehold acres from East Resources. We have since grown our acreage leasehold to approximately 850,000 acres primarily in Pennsylvania, with additional acreage in Ohio and New York. The Wellsboro office in Tioga County is the regional hub for the Appalachia operations within Shell's Unconventionals business. Approximately 100 employees are based at this location.

**Equal Employment and Anti-Harassment Policies**

It is the policy of the Company to provide equal opportunity to all persons consistent with employment requirements and individual qualifications.  Further, the policy prohibits discrimination on all employment practices for reason of race, color, sex, national origin, age, religion, disability, sexual orientation, gender identity, protected veteran status, citizenship, genetic information, or other

protected status under federal, state or local laws.  Harassment for any of the above reasons, including any form of sexual harassment, is a discriminatory activity and is strictly prohibited.  Supervisors, managers, and officers are responsible for implementing Shell's Equal Opportunity Policy.  Employees are made aware of the policy via workplace posters and the Company's intranet during orientation and via annual communications with staff.  All employees are expected to support the policy and contribute to an environment of equal opportunity.  (See Exhibits I and II)

There are several avenues available for employees to resolve complaints.  These include notifying their immediate supervisor, notifying another appropriate management representative, notifying their Human Resources Department, contacting the Shell Ombuds office, or contacting the company's Ethics and Compliance Helpline via a toll-free number.  The Helpline can be contacted anonymously if preferred.  Employees are made aware of these reporting avenues via the same methods used to communicate our Equal Opportunity and Harassment policies, and our Code of Conduct. (See Exhibit III)

### Ms. Barnes' Background

Ms. Barnes was an employee of Cenergy working as a contractor at the Wellsboro site in an Administrative Assistant role beginning around November 2010. In late 2014, she assumed responsibilities of a Maintenance Analyst role and was hired directly by Shell to fill this role in September 2015. During her entire time as a Cenergy employee providing services under a contract with Shell and her subsequent employment with Shell Exploration & Production Company, Ms. Barnes has been based at the Wellsboro office.

### Statement of Fact concerning Ms. Barnes' Allegations:

As a Maintenance Analyst, Ms. Barnes was supervised by Will Turney.  In November of 2016, Ms. Barnes raised concerns regarding Mr. Turney via Shell's Ethics and Compliance Helpline.  These concerns were originally raised toward the end of her year-end performance discussion with Mr. Turney on November 21st; she notified him that she thought he was "the problem" leading to her communications issues with the team. Mr. Turney immediately asked his supervisor, Steve Craig, to join the discussion to better understand Ms. Barnes' concerns and provide a neutral perspective. Mr. Craig followed up with Ms. Barnes, who notified him that she had filed a complaint to the Company's Ethics and Compliance Helpline about Mr. Turney the previous week. Mr. Craig notified HR the following morning (November 22nd, 2016), and HR received the formal complaint via the Company's Ethics and Compliance Helpline on November 28th, 2016, which was the first Monday after the Thanksgiving holiday. The Company, including Ms. Barnes' upper management and Human Resources ("HR"), took her concerns seriously and promptly and thoroughly investigated the matter. A representative from HR, Megan Kloosterman, flew from Houston, TX to the Wellsboro office to conduct the investigation in person from December 6-8, 2016. Ms. Kloosterman was selected to conduct this investigation because she had no prior knowledge of or relationship to any of the parties involved. Ms. Kloosterman met with Ms. Barnes in person to understand her concerns and conducted in-person interviews with individuals in the Wellsboro office.

During the investigation, Ms. Barnes raised allegations of harassment, specifically name-calling, belittling, and inappropriate touching and comments by her supervisor, Mr. Turney. The investigation confirmed that Mr. Turney had made comments that were unprofessional and some that were also inappropriate for the workplace, particularly for a supervisor. However, the investigation did not confirm that any sex discrimination, harassment, or retaliation had taken place. As a result of the investigation, the Company disciplined Mr. Turney by issuing him a written warning (See Exhibit V) and significantly reducing his 2016 performance rating. Mr. Turney also received coaching from his leadership and HR regarding expectations on professional conduct and instruction to immediately cease any inappropriate behaviors or comments.

During the investigation, Ms. Barnes also expressed concern about continuing to work for Mr. Turney. The Company offered Ms. Barnes several options, including to remain in the Maintenance Analyst position while reassigning Mr. Turney to a different role or to transfer Ms. Barnes to a new role, giving her the choice of three other positions at the same job grade and pay level she had as a Maintenance Analyst. Ms. Barnes considered these options for approximately one week after they were presented, asking questions about each role during that time. Ms. Barnes chose to become an HSSE (Health, Safety, Security and Environmental) Technician, stating that she believed this would be a good role for her professional development and that she saw it as an opportunity to help her advance further within Shell. Ms. Barnes transferred to this role effective January 1, 2017 and began reporting to the Appalachia HSSE Manager, Steve Ellis, at that time.

In addition to the discipline provided to Mr. Turney and the fulfillment of Ms. Barnes' request to move to a new position, outcomes of the Company's investigation included:
- **Coaching** given to two other employees regarding their unprofessional or inappropriate comments that also did not rise to the level of harassment, and
- **Training** to educate and remind supervisors and staff of their obligations to adhere to Shell's Code of Conduct, which prohibits harassment and discrimination as well as other disrespectful or inappropriate behavior. The training sessions also reminded employees of the various resources or ways to raise concerns in the event of witnessing (or receiving) inappropriate and/or unwelcomed actions in the future. During 2017, training sessions were held in Wellsboro on the following topics:
  - February 8th: Training session for supervisors on the Shell Code of Conduct
  - February 9th: Training session for employees on the Shell Code of Conduct
  - May 16th: Training session for supervisors on Anti-Harassment, Inclusive Leadership, Unconscious Bias, and Interventions/Speaking Up.
  - July 27th: Training session for employees on Anti-Harassment and Interventions/Speaking Up.
  - September 28th (scheduled): Training session for employees on Unconscious Bias.

After the investigation, Ms. Kloosterman and Greg Larsen, Operations Manager, met with Ms. Barnes to inform her of the outcomes of the investigation. On or around December 13, 2016, Ms. Kloosterman and Mr. Larsen stated to Ms. Barnes that the investigation had ended and they let her know that prompt

action had been taken to address those of her concerns that were validated. They stated that the investigation revealed that Shell's Code of Conduct had been violated, specifically regarding inappropriate jokes or comments. While they did not share specific details of the discipline given to Mr. Turney, they did state that the behaviors had been addressed, were expected to stop, and that Shell did not tolerate any action, conduct or behavior which is humiliating, intimidating or hostile. Furthermore, they informed Ms. Barnes that retaliation would also not be tolerated and that she should let HR or management know if she experienced inappropriate or unwelcomed conduct, or if she felt she was being retaliated against for any reason. Finally, Ms. Kloosterman and Mr. Larsen also discussed the four roles being offered to Ms. Barnes so that she could make an informed decision on which to select, and they gave her developmental coaching to help set her up for success for any role. Ms. Barnes seemed to appreciate their career guidance and help with the matter. She also indicated that she was interested in pursuing coursework toward seeking an Associate Degree in Business to further her professional development. To support Ms. Barnes' continued development, her management agreed to sponsor this coursework, and Ms. Barnes has received payment under Shell's Educational Reimbursement policy. Since moving to the position of HSSE Technician, Ms. Barnes verbally indicated to HR Manager, Kelly Soudelier, that she enjoyed the new position, was learning and developing, and that she thought Mr. Ellis was a good supervisor.

**Responses to Allegations:**

Ms. Barnes listed 47 particulars in the Charge of Discrimination. Below are those particulars as listed by Ms. Barnes and the Company's response to each allegation:

**Particular I:**

A.  1.    Relevant Work History

I began working at Respondent as a contractor in or about November 2010, until I was hired by Respondent in or about September 2015 as a Maintenance Analyst. As Maintenance Analyst, I reported to William Turney (male), Maintenance Supervisor. Turney reported to Steve Craig (male), Operations Superintendent. On January 1, 2017, I transferred to the position of Environmental Technician. As Environmental Technician, report to Steve Ellis (male), Health, Safety, Security & Environmental Manager. Ellis reports to Randy Burow (male), US/LA Assets Security & Environmental Manager.

Respondent has discriminated against me because of my sex (female), including subjecting me to a hostile work environment because of my sex, and has retaliated against me because of my complaints of discriminatory conduct. Respondent has failed to promote me to a position for which I applied, interviewed, and was qualified; Respondent instead promoted a male employee to the position.

I have consistently demonstrated excellent performance and dedication to Respondent. I performed my job duties and responsibilities in a highly competent manner. Prior to complaining about discrimination, I received positive performance reviews.

**Response:** Ms. Barnes was assigned to work at Shell as a contract Administrative Assistant around November 2010 while employed by Cenergy. In approximately October 2014, she assumed the responsibilities of a Maintenance Analyst and was hired by Shell to fill this role in September 2015. In November of 2016, Ms. Barnes raised concerns regarding her (now previous) supervisor, Will Turney. The Company took her concerns seriously, and HR promptly and thoroughly investigated the matter. During the investigation, Ms. Barnes expressed concern about continuing employment under Mr. Turney. The Company offered Ms. Barnes several options, including to remain in the Maintenance Analyst position while reassigning Mr. Turney to a different role or to transfer Ms. Barnes to a new role, giving her the choice of three other positions at the same job grade and pay level she had as a Maintenance Analyst. Ms. Barnes chose to become an HSSE (Health, Safety, Security and Environmental) Technician stating that she believed this would be a good role for her professional development and that she saw it as an opportunity to help her advance further within Shell. The transfer took place effective January 1, 2017 and Ms. Barnes remains in the HSSE Technician position today, reporting to the Appalachia HSSE Manager, Steve Ellis.

Ms. Barnes applied for a Scheduler position, which would have represented a promotion for her, around November 2016. She was not selected due to the Company's selection of a candidate with direct Maintenance experience, which was one of the job requirements. (See Attachment IV) Beside Ms. Barnes, there was only one additional applicant. That person was also interviewed for the role. The selected candidate was a male applicant who had direct experience as a Maintenance Mechanic and had also worked in the Warehouse supporting Planners to procure materials for Maintenance work. This made him more qualified than Ms. Barnes because her prior work experience did not include working as a Maintenance Mechanic or any understanding of the job scope or of parts requirements for Maintenance tasks. His selection for the role took place before the Company was first made aware of Ms Barnes' complaint on November 21, 2016.

Ms. Barnes has performed satisfactorily during her employment with Shell. In Shell's performance rating process, employees are rated based on their own performance, and relative to similarly-situated employees in their work groups. Ms. Barnes received a rating that indicated she was meeting expectations in 2015 based on one month in the job. In 2016, Ms. Barnes received feedback during the year and in October 2016, she received a slightly lower rating than in 2015 due to a need to improve in communicating effectively with others. She received this feedback due to several incidents in which she would become angry and raise her voice to her coworkers, negatively impacting the productivity of the Planning and Scheduling department.

It was only <u>after</u> Ms. Barnes had been rated for the year and around the time that she was starting to receive performance feedback associated with this lower rating that she informed the Company of several concerns which she had not reported to her leadership or HR prior to that time. Several of the issues she raised at that time were also raised in her discrimination

charge. These concerns were promptly and thoroughly investigated, and the Company took appropriate action to address those of her concerns that were confirmed.

While Ms. Barnes' 2016 performance had been evaluated fairly by a panel that included HR and two levels of leadership above her supervisor, the Company agreed to retroactively increase Ms. Barnes' 2016 performance rating to the same level as what she'd received during the previous year and allowed her to include her own notes regarding her performance into her 2016 Performance Summary. The reason for this change to Ms. Barnes' 2016 rating was to continue to show Ms. Barnes the Company's support for her in light of the concerns raised in the investigation. Because of this change, Ms. Barnes received the associated pay difference for her 2016 Performance Bonus on June 30th, 2017 and an improved merit increase.

The Company denies that it has discriminated against Ms. Barnes, it has subjected her to a hostile work environment, or it has retaliated against her in any way for complaining of discriminatory treatment, for raising an EEOC charge, or due to her sex, or for any other reason.

**Particular 2:**

**Harm Summary**

I have been discriminated against, including being subjected to a hostile work environment, because of my sex (female), and retaliated against because of my complaints of discriminatory conduct. Evidence of the discriminatory and retaliatory conduct to which I have been subjected includes, but is not limited to, the following:

**Particular 2a:** Out of the approximately one hundred eighty-eight (188) employees at Respondent's Wellsboro location, there are eight (8) full time female employees and approximately one hundred eighty (180) male employees. There is only one (1) female supervisor at Respondent's Wellsboro location.

**Response:** This statement is incorrect. There are currently 100 employees at the Wellsboro location, including 9 full-time female employees and 91 full-time male employees. As of the date of this response, there are 2 female supervisors based at this location and 2 additional female supervisors based out of the Houston, Texas office who manage staff that are based at the Wellsboro location.

**Particular 2b:** For the years that I reported to Turney, I was his only female direct report that did not also report to another supervisor.

**Response:** Ms. Barnes was hired into Shell by Mr. Turney in September 2015. He also had one female Shell employee reporting to him and two female contractors working in his area for part of the time that Ms. Barnes reported to him.

**Particular 2c: On one occasion, Turney showed me a photo he took of himself in his underwear.**

**Response:** Ms. Barnes first informed Human Resources about this incident in November 2016. The Company immediately began an investigation into her complaint. During that investigation, the Company learned that the incident had actually taken place two years prior, in September, 2014 and had gone unreported between that time and when HR received the complaint. The event took place on a business trip during evening social time. In a small group setting with Ms. Barnes and one other employee, Mr. Turney showed a picture of himself that he thought was funny. It is unknown why Ms. Barnes waited to report the matter. The Company took immediate action to discipline Mr. Turney by significantly reducing his 2016 performance rating and placing a formal written warning, effective for 18 months, in his file.

**Particular 2d: Turney regularly touched my arm, stomach, and leg during our one-on-one meetings. Turney continued to touch me even when I ask him to stop. I complained to Turney that I do want him or other male coworkers touching me.**

**Response:** This was one of the concerns raised by Ms. Barnes to HR in November 2016. While Mr. Turney denies touching Ms. Barnes' stomach or legs, Mr. Turney admitted to occasionally touching her arm. Mr. Turney also stated he did this to both men and women, for example, to get their attention during a meeting. Mr. Turney has been clearly instructed to cease this behavior. None of those interviewed during the investigation indicated they had ever observed Turney or other male employees touching Ms. Barnes inappropriately, nor has the Company received complaints or reports of such behavior beyond what was reported by Ms. Barnes. Mr. Turney acknowledged that Ms. Barnes stated she did not want other employees touching her and helped her communicate this to others.

**Particular 2e: Turney has told me I am "a hot blonde."**

**Response:** This is one of the issues raised as a concern by Ms. Barnes to HR in November 2016 and thoroughly investigated. During the investigation, it was confirmed that Mr. Turney had made this statement to Ms. Barnes in or around March 2016, in front of Ms. Barnes and several other employees. Mr. Turney indicated that he meant it to be a compliment to Ms. Barnes. She had shown Mr. Turney a photograph of Mr. Turney and Ms. Barnes' boyfriend, and she referred to the photograph as "two handsome gentlemen." Mr. Turney believed he and Ms. Barnes were on familiar enough terms to compliment each other in such a way.

The Company informed Mr. Turney that his comment was inappropriate, and took immediate action to discipline him. His 2016 performance rating was significantly reduced and a formal written warning was placed in his file, which will be effective until June 2018.  In addition to the written warning, Mr. Turney has also received coaching from his supervisor and HR that he must maintain greater professional boundaries with his direct reports going forward.

**Particular 2f:  Turney regularly asked me about and commented on my personal life and my personal relationships.**

**Response:** During the company investigation, Mr. Turney indicated he often asks questions as a means of getting to know his employees and to inquire about how they are doing.  These questions were not directed toward women or to men in particular.  Ms. Barnes often would mention or bring into discussion details of her personal life and weekend activities at work without being asked. Mr. Turney took this as an indicator that Ms. Barnes was open to discussing her personal life with her colleagues and he believed he and Ms. Barnes were on familiar enough terms to discuss personal matters with each other.

**Particular 2g:  Turney regularly sent me text messages of a personal nature, including but not limited to the following: asking me if I miss him; asking me if I am thinking about him; telling me to smile; and telling me about my coworkers' personal lives and relationships.**

**Response:** During the Company's investigation, Mr. Turney indicated he often uses text messages to communicate with his employees, including asking questions as a means of getting to know his employees and to inquire about how they are doing. He states that this was not directed toward women or men in particular, and this has been corroborated by others interviewed. He stated that Ms. Barnes periodically would send text messages regarding her whereabouts and details of her weekend activities to him without being asked. Mr. Turney thus believed he and Ms. Barnes were on familiar enough terms to send text messages with each other for social reasons. Mr. Turney has been given coaching as part of the written warning he received in 2016 to maintain greater professional boundaries with his direct reports going forward.

**Particular 2h:  Turney told me that he thinks it is funny when I get into a disagreement with female coworkers. If Turney overhears such disagreements, Turney imitates cat claws with his hands and makes hissing noises.  Turney does this in team meetings, in front of my coworkers. I complained to Turney that I do not like when he does this.**

**Response:** During the Company investigation, Mr. Turney indicated he does not think it is funny when Ms. Barnes has gotten into disagreements with female coworkers, and that he found it aggravating when any members of his team had disagreements, which took place on several occasions. However, Mr. Turney acknowledged that he has made gestures of cat claws or a

hissing sound when anyone has a disagreement. He states this was not directed toward women or men in particular. This was corroborated during the Company's investigation. Along with the significant reduction to Mr. Turney's performance rating and the written warning he received in 2016, Mr. Turney has been given coaching from his supervisor and HR to maintain greater professional boundaries with his direct reports going forward.

**Particular 2i:  Turney whispered in my ear during work meetings, in front of my coworkers.**

**Response:** This was a new allegation not previously reported to HR or department leadership. During the Company's investigation, Mr. Turney acknowledged that he may quietly ask Ms. Barnes or another employee a question during a meeting in which they were participating. Mr. Turney would have asked a question to the employee in a quiet voice as an attempt to minimize distracting other meeting attendees. This was not directed at Ms. Barnes or toward women or men in particular, and has been corroborated by others. Mr. Turney has not spoken to Ms. Barnes in this manner in a meeting since she left his team effective 1/1/2017. This is not considered sexual in nature or otherwise inappropriate behavior.

**Particular 2j:  Male coworkers have indicated to me that they believe I use my sexuality to "get what I want." Male coworkers have told me that, maybe if they "wore tight pants and batted [their] eyes, [they] could get what [they] wanted," suggesting that this is what I do.**

**Response:** In November 2016, Ms. Barnes raised this concern to HR, and it was thoroughly investigated. No corroboration of Ms. Barnes' statements was found.

**Particular 2k:  Males coworkers have called me a "bitch" at work.**

**Response:** Ms. Barnes raised this concern to HR in November 2016, and the allegation was thoroughly investigated. One employee acknowledged he had stated to Ms. Barnes "boy, you are being bitchy today." The employee indicated he meant it in a "joking manner" with no malice intended. In his view, Ms. Barnes commonly reciprocated the "banter." He viewed Ms. Barnes as "very outspoken" and expected that she would have let him know if she was upset by his comments. Regardless of this employee's intent and his view of Ms. Barnes' reciprocity in "banter", the Company agrees that these comments were inappropriate.  The employee was informed of this by HR and received coaching to correct such behaviors going forward.

**Particular 2l:  Male coworkers have referred to me as pretty.  Turney has mocked me when I told him that I do not come to work to hear that I am pretty.**

**Response:** In November 2016, Ms. Barnes shared this concern with HR.  This was investigated and no corroboration was found for the event. Ms. Barnes' supervisor, Mr. Turney denies that he made such a comment or that he would mock Ms. Barnes for this.

**Particular 2m:** Kenneth Foreman (male), Scheduler, ran his fingers through my hair without my consent. Turney mocked me when I told Foreman to stop, and that I do not like to be touched.

**Response:** In November 2016, Ms. Barnes shared this concern with HR, which was promptly and thoroughly investigated. During HR's investigation, Mr. Foreman acknowledged that he may have touched her arm or brushed against Ms. Barnes accidentally when in a small space or when they were looking at a computer screen together. He also acknowledged that on one occasion, he brushed her hair aside when it dangled in the path of his vision in front of the computer monitor. Ms. Barnes responded "Don't touch me." Mr. Foreman apologized and has avoided touching or inadvertently brushing against Ms. Barnes when working in a small area or looking at the same computer monitor. Mr. Turney was unaware of this event until it was raised in the investigation and denies that he mocked Ms. Barnes for this.

**Particular 2n:** Foreman told me that I "sound like [his] wife bossing [him] around".

**Response:** This was a new allegation not previously reported to HR or department leadership. During the Company's investigation of this allegation in August 2017, Mr. Foreman acknowledged that he said this to Ms. Barnes prior to her moving out of the Planning and Scheduling team in January 2017. He recalled that Ms. Barnes used a similar tone of voice and line of questioning that his wife has used to gain his attention when he was not focused. Ms. Barnes' tone and language surprised Mr. Foreman, and his intent in making this statement was not meant to be negative or degrading. Mr. Foreman has recently attending training on Harassment including language to be used in a respectful workplace setting, and has also received coaching on being careful about his language.

**Particular 2o:** On or about March 8, 2016, during a required CPR training course at Respondent, the male instructor told me to "pick my ass up" in front of my male coworkers. When I complained to Turney about this comment, following the training, he laughed and asked me, "well, did you pick it up?" I understood these comments to be harassing and discriminatory based on my sex.

**Response:** Ms. Barnes informed HR about this issue in November 2016. HR investigated it at that time, but was unable to corroborate exactly what was said. Mr. Turney recalls the instructor giving Ms. Barnes some coaching when she was practicing CPR during the course, but does not recall specifically what was said. He denies that Ms. Barnes raised a complaint to him about this instructor and denies that he would have responded with this comment ("well, did you pick it up?") if it had been raised as a concern to him by Ms. Barnes or anyone else.

**Particular 2p:** In or about April 2016, Mark Hoover (male), Operations Supervisor, told me

that I was not smart enough to be able to perform a task because I am a woman and have blonde hair.

**Response:** Ms. Barnes raised this concern to HR in November 2016, which was investigated at that time. Mr. Hoover did not recall the specific event in question, but acknowledged he may have jokingly made this or a similar statement to Ms. Barnes. In his view, this would have been clearly joking as part of banter that was taking place in the department among all the staff and that Ms. Barnes reciprocated in this banter on a regular basis. He affirmed that he did not make the statement due to her sex, gender, or hair color. He viewed Ms. Barnes as "very outspoken" and expected that she would have let him know if she was upset by his comments. Regardless of this employee's intent and his view of Ms. Barnes's reciprocity in "banter", the Company believes that such comments are inappropriate in the workplace. The employee received coaching from HR to correct such behaviors going forward.

**Particular 2q:** Turney degrades me and treats me differently than he treats male employees. I complained to Turney that I feel like he criticizes my work, and does not recognize how hard I work, in a way that he does not criticize male employees.

**Response:** Ms. Barnes made similar comments during HR's November 2016 investigation of her complaints, but did not provide any specific examples or instances of when this had occurred. Mr. Turney denies that he treated Ms. Barnes differently based on her gender and denies that he criticized her work differently than how he would criticize male employees. The investigation did not reveal any corroboration of her assertion.

**Particular 2r:** In or about May 2016, I complained of sexual harassment to Hondo Blakley (male), Process Improvement Lead. I asked Blakley for help, and expressed that I was upset at the way I have been treated by Turney and male coworkers because I am female. In response to my complaint, Blakley told me that this was "out of character" for me, and that I needed to "make sure to control [my] emotions."

**Response:** This was a new allegation not previously reported to HR or department leadership. During the November 2016 investigation, Ms. Barnes stated that she had expressed concerns about Mr. Turney to Mr. Blakley. Mr. Blakley confirmed that Ms. Barnes approached him on several occasions in 2016 to discuss her concerns about how she was being treated by Mr. Turney, but the complaints were regarding her view that Mr. Turney was "a micro-manager", and the fact she wanted to perform certain tasks that he had assigned to others on her team rather than the tasks she'd been assigned. At no time did she mention to Mr. Blakley anything about issues relating to sexual harassment or discriminatory treatment. Mr. Blakley stated that he would have immediately escalated the conversation to the Superintendent (his and Mr. Turney's manager) and HR had she complained about any type of discrimination. Mr. Blakley considered himself a "coach" or "mentor" to the staff and invested the time in conversations with Ms. Barnes for her

professional development. In this case, Mr. Blakley told Ms. Barnes she should raise her concerns to Mr. Turney if she felt she was being micro-managed or if she didn't understand why she was being assigned particular tasks. He also suggested that she discuss the matter with the Superintendent if she did not see improvements or if she wanted a third person to sit in on her conversation with Mr. Turney.  Afterward, without sharing the specifics of his coaching session with Ms. Barnes, Mr. Blakely advised Mr. Turney to be clearer about why he wanted Ms. Barnes to perform certain on-the-job tasks.

Regarding his comment to Ms. Barnes that she should try to manage her emotions, Mr. Blakley states that he had witnessed Ms. Barnes yell at two of her teammates, when they made minor mistakes. In his view, Ms. Barnes' yelling and tone of voice in these instances was not appropriate for the workplace. He coached her, telling her she should try to manage her emotions so that she could constructively give feedback to others where it was warranted, rather than to increase her own level of frustration, which he felt led to friction in her working relationships with these teammates.

**Particular 2s: After my complaint to Blakley, Turney excluded me from work-related meetings. Turney became short-tempered with me, and exercised increased control over me and my actions.  He commented that he "need[s] to watch what [he] say[s] around [me]," alluding to my complaint about him to Blakley.**

**Response:** This was a new allegation not previously reported to HR or department leadership. The Company has been unable to corroborate this assertion. Mr. Turney denies making this comment or taking any retaliatory actions toward Ms. Barnes for raising concerns about his management style.

**Particular 2t:  In or about May or June 2016, Turney told me that I work well with male employees because I am a woman.**

**Response:** In November 2016, Ms. Barnes raised this concern to HR, and it was investigated at that time. During the investigation, Ms Barnes stated that she worked on a project with 2 male employees. While discussing the project with her supervisor, Mr. Turney, Ms. Barnes commented that she was "working well with the [other employees] on the project." Mr. Turney agreed that she was working well, and he indicated he believed her gender helped her work effectively with these 2 individuals. Along with the significant reduction to Mr. Turney's performance rating and the written warning he received in 2016, Mr. Turney has been given coaching from his supervisor and HR against making statements of this kind.

**Particular 2u:  On or about June 10, 2016, at an outdoor work event, several male supervisors and male coworkers asked me why I was not wearing shorts, and asked me if Turney could cut my pants into shorts.  Male supervisors then took a picture of my buttocks, without my consent, and saved the photo on their phones. Turney commented**

that another female at the event was wearing shorts and kissed him on the cheek, suggesting that I do the same.

**Response:** In November 2016, Ms. Barnes informed HR of several concerns she alleged took place at this outdoor event; these were investigated at that time. Mr. Turney recalled that Ms. Barnes complained of getting "swamp ass while walking around in her pants" and may have commented that she should have worn shorts or just cut them into shorts to cool down. Mr. Turney denies asking her if he could cut her pants into shorts, and only commented after Ms. Barnes complained about the heat that day. Mr. Turney recalls that it was a particularly hot day, and that shorts seemed like more appropriate attire for the weather.

The Company was unable to confirm if anyone took a picture of Ms. Barnes's buttocks with or without her consent or that Mr. Turney suggested Ms. Barnes kiss him on the cheek. Mr. Turney does recall that another female employee gave him a hug and kiss on the cheek, which surprised him, and he did remark about this to Ms. Barnes, but it was in no way intended to be a suggestion that she do the same.

**Particular 2v:  On or about July 18, 2016, during my mid-year performance review, Turney told me that I " make good money for a woman and should not be upset" with my pay grade. I was the lowest-paid Maintenance Analyst, and the only female Maintenance Analyst at Respondent's Wellsboro location. Despite my repeated requests for an explanation as to why I was the lowest-paid Maintenance Analyst, I did not receive an explanation.**

**Response:** In November 2016, Ms. Barnes raised with HR the allegation that that Mr. Turney informed Ms. Barnes that she "makes good money for a woman and should not be upset". The allegation was promptly investigated. During the investigation, Ms. Barnes stated that she had a "good mid-year review" with Mr. Turney.  She said that during the review, the two had a brief conversation about her current job grade. Mr. Turney had referred to her job as being at a higher job grade and she corrected him. Mr. Turney told her that when he'd hired her, he'd originally asked his manager if the Company could fill the role at a job grade 7, but his manager decided they would fill it at a job grade 8. When Ms. Barnes asked Mr. Turney for clarification about why she'd been hired at a job grade 8 rather than a job grade 7, he told her she should "not be upset" because she "makes good money for a woman."

In May 2015, Mr. Turney had been in discussion with the Superintendents and the Operations Manager (the Superintendents' manager) regarding Mr. Turney's request to post the Maintenance Analyst position as a full-time Shell role. The Operations Manager and HR discussed the appropriate grade level and posting process to follow. They referred to past practice at other assets, and assessed the expectations required of the role and jointly made the decision on what grade level the role should be. Specifically, they established that the

grade level for this position could range from job grade 8 (lowest) to job grade 6 (highest) based on the level of responsibility and work experience of the selected candidate. Since they were willing to consider candidates without much prior experience in this area, they planned for it to be an entry-level position and agreed that job grade 8 was the appropriate level.

Mr. Turney was informed that Company practice required that they post the role internally to search for suitable internal candidates before looking externally. The position was posted internally at the job grade 8 level in May 2015. After no suitable candidate was identified internally, the external recruitment process began.

The Company denies that Ms. Barnes made any "requests for an explanation as to why [she] was the lowest-paid Maintenance Analyst." However, Ms. Barnes was the only Maintenance Analyst, male or female, at the Wellsboro location when she held this position.

**Particular 2w: In or about August 2016, Turney asked me several times if I thought about him over the weekend.**

**Response:** In November 2016, Ms Barnes raised this allegation to HR, and it was promptly investigated. Mr. Turney acknowledged that he has asked both colleagues and those reporting to him "if [they] missed [him] over the weekend". He states that his intent was to lighten the mood in the department. The investigation did not find Mr. Turney's behavior to be discriminatory or to qualify as harassment. However, Mr. Turney was given coaching by HR to maintain professional boundaries with his direct reports and not to ask questions that may have been perceived as probing into their personal lives, whether he was joking or not.

**Particular 2x: In or about September 2016, Turney told me that he thought about me while he was showering.**

**Response:** In November 2016, Ms. Barnes raised this concern to HR.  It was investigated and not found to be true.  Mr. Turney acknowledged he has on occasion told his team that he "had an idea in the shower" or was thinking about a given work matter in the shower. This comment was not as a sexual reference, nor directed to any one individual. Mr. Turney was given coaching to maintain professional boundaries with his direct reports and not to make remarks specific to where he had an idea or thought about a work matter if it happened to be in the shower.

**Particular 2y: In or about October 2016, Foreman asked me what I accomplished in 2016, "other than not dying [my] my hair for a whole year."**

**Response:** This was a new allegation not previously reported to HR or department leadership. The Company investigated in August 2017 and has been unable to corroborate

this assertion. Mr. Foreman denies making this comment, though does recall Ms. Barnes volunteering information to him and another colleague that she would no longer dye her hair because it was so badly damaged due to her dying it for so many years. Because she initiated conversation on the topic, he states that he may have responded that this sounded like a good idea.

**Particular 2z: In or about October 2016, I complained of sex discrimination to Blakley and Turney. In response to my complaint, Blakley and Turney told me that I "need to stop playing the victim."**

**Response:** Ms. Barnes submitted a complaint through Shell's Ethics and Compliance Helpline on November 15th, 2016, related to her belief that she'd been subject to harassment and discrimination by Mr. Turney. Ms. Barnes then mentioned it to her supervisor, Mr. Turney, and Superintendent, Mr. Craig, on November 21st, 2016. HR received the written complaint from Ms. Barnes' call to the Ethics and Compliance Helpline on November 28th, 2016. Mr. Blakley only became aware of the complaint when he was interviewed in December 2016 during the investigation into Ms. Barnes' complaint.

The matter was taken seriously and promptly investigated. Megan Kloosterman, a representative from HR, visited the Wellsboro, PA office on December 6-8, 2016 to conduct the investigation into this matter.

Regarding the allegation that Mr. Blakley and Mr. Turney told Ms. Barnes to "stop playing the victim," Mr. Turney denies making this comment. Mr. Blakley indicated that in previous coaching sessions where Ms. Barnes complained about Mr. Turney's leadership, he did make a similar comment in response to Ms. Barnes indicating that she thought Mr. Turney was "micro-managing" and a "bad boss." Mr. Blakley's advice was: "you can choose to be a player or a victim. If you don't like the situation, be a player and change it." He states that he meant that she should assess what was in her ability to control or influence about the circumstances. He then indicated to Ms. Barnes that she should have a discussion with Mr. Turney if she didn't like some aspects of his working style and that these were important concerns to address if it was an issue to her.

**Particular 2aa: In or about November 2016, I was denied a promotion to a Scheduler position for which I was qualified, applied, and interviewed. This promotion would have provided me with an increased salary.**

**Response:** Ms. Barnes applied for a Scheduler position, which would have represented a promotion for her, around November 2016. She was not selected due to her lack of direct Maintenance experience, which was one of the job requirements. (See Attachment IV) Beside Ms. Barnes, only one other person applied for the role. That person was also interviewed. The selected candidate was a male employee who had direct experience as a Maintenance Mechanic

and had also worked in the Warehouse supporting Planners to procure materials for Maintenance work. This made him more qualified than Ms. Barnes because her prior work experience did not include working as a Maintenance Mechanic or any understanding of the job scope or of parts requirements for Maintenance tasks. The Company believes that a fair and valid selection process led to this selection, which was based on previous work experience. Ms. Barnes had not previously raised a complaint about this selection process, but during the December 2016 discussion with Ms. Kloosterman during the original investigation into her complaints, Ms. Barnes acknowledged she was "perfectly ok with" the selection of the person who had gotten the Scheduler role. Her words were interpreted to mean that she agreed with the decision and thought it was a fair and valid outcome of the selection process and he was the right candidate to be selected for the job.

**Particular 2bb: The Scheduler position for which I had applied and interviewed, was qualified, and was denied, was given to Jeremy Greene (male) instead of me.**

**Response:** Ms. Barnes applied for a Scheduler position. The selected candidate was Jeremy Greene (male). The selected candidate had direct experience as a Maintenance Mechanic and had also worked in the Warehouse supporting Planners to procure materials for Maintenance work. This made him more qualified than Ms. Barnes because her prior work experience did not include working as a Maintenance Mechanic or any understanding of the job scope or of parts requirements for Maintenance tasks. The Company believes that a fair and valid selection process led to this selection, which was based primarily on previous work experience. Ms. Barnes had not previously raised a complaint about this selection process. In fact, during a December 2016 discussion with Ms. Kloosterman who was then investigating her complaints, Ms. Barnes acknowledged she was "perfectly ok with" the selection of Mr. Greene. Ms. Kloosterman interpreted this to mean that Ms Barnes agreed with the decision and thought it was a fair and valid outcome of the selection process and he was the right candidate to be selected for the job.

**Particular 2cc: Turney and Blakley conducted the interviews and made the hiring decision. During my interview, Turney and Blakley laughed when I told them that I wanted the position because I wanted to advance my career at Respondent. During the interview, Turney and Blakley emphasized reasons why they believed I would not do well in the position.**

**Response:** Mr. Turney and Mr. Blakley conducted the interviews for the Scheduler position in November 2016 and jointly agreed on the hiring decision. Ms. Barnes did not raise concerns about this selection process during her November 2016 complaint. This was recently investigated and both Mr. Turney and Mr. Blakley denied that they laughed when Ms. Barnes told them she wanted the position to advance her career at Shell. They both stated that they recalled her comments and thought it to be a reasonable statement. Both Mr. Turney and

Mr. Blakley followed a structured interview process and deny that they emphasized reasons why they believed Ms. Barnes would not do well in the position.

**Particular 2dd: After Greene was promoted to the position, Turney told me that he was "worried" that I might have received the promotion because I had more time in the group than Greene.**

Response: This was a new allegation not previously reported to HR or department leadership. Mr. Turney denies making this statement.

**Particular 2ee: In or about November 2016, I complained to Respondent's Human Resources Department that I was being sexually harassed.**

Response: On November 15th, 2016, Ms. Barnes raised a complaint to HR via Shell's Ethics and Compliance Helpline related to her belief that she'd been subject to harassment and discrimination by Mr. Turney. On November 21st, 2016, Ms. Barnes mentioned her complaint to her manager, Mr. Turney, and his manager, Steve Craig, Superintendent. Mr. Craig immediately notified HR on the morning of November 22nd, 2016. Shell offices were closed for the Thanksgiving holiday November 24-25, 2016, and the written complaint was received by HR on Monday, November 28th, 2016.

**Particular 2ff: In or about November 2016, I complained to Craig that I did not receive the promotion. I was provided no rationale or explanation as to why I was not promoted. I complained to Craig that Turney has been sexually harassing me, and that I have submitted a complaint to Human Resources.**

Response: During a year-end performance discussion with Mr. Turney on November 21st, 2016, Ms. Barnes informed him that she "filed a complaint" about him. He asked Mr. Craig to speak to Ms. Barnes about her concerns. Mr. Craig and Ms. Barnes spoke about her role and how she was not happy working for Mr. Turney. Ms. Barnes indicated that she thought Mr. Turney "micro-managed" her and was a "bad boss." Mr. Craig reports that she also asked questions about the Scheduler position that she had applied to and interviewed for, but she did not specifically ask why she was not promoted. About 40 minutes into this discussion, Ms. Barnes indicated that she registered a complaint via phone call to Shell's Ethics and Compliance Helpline on November 15th, 2016. Mr. Craig indicated that her concerns were serious and he would reach out to HR regarding next steps to investigate her concerns. On the morning of November 22nd, Mr. Craig notified HR regarding the complaints raised by Ms. Barnes, which were promptly and thoroughly investigated.

**Particular 2gg: In or about November 2016, I contacted a doctor because I was experiencing anxiety and crying spells. I was diagnosed with situational anxiety and**

depression. I have continued to experience anxiety, insomnia, and diarrhea because of the sexual harassment and discrimination to which I have been subjected at Respondent.

**Response:** During the 2016 investigation and again in May 2017, Ms. Barnes did mention to HR that she was experiencing general stress and anxiety. Ms. Barnes was provided information regarding Shell's Employee Assistance Program, which is a free and confidential referral service to a licensed clinical professional to provide counseling and guidance. The Company has no knowledge regarding Ms Barnes being diagnosed with any condition as stated.

**Particular 2hh:** Respondent assigned Megan Kloosterman (female), Human Resources Account Manager, to my internal complaint of sexual harassment. Kloosterman met with me in or about the end of November 2016. I provided Kloosterman with a two- (2) page document that included many of the instances of sexual harassment included in this Charge. I also provided this two- (2) page document to Craig.

**Response:** This is correct. These allegations were promptly and thoroughly investigated, and addressed appropriately.

**Particular 2ii:** Kloosterman conducted an investigation, and reported to me in December 2016 that Turney and Hoover, were found to have violated Respondent's Code of Conduct. Kloosterman did not address my complaints of sexual harassment.

**Response:** In November 2016, Ms. Kloosterman conducted an investigation into Ms. Barnes' concerns, and reported to Ms. Barnes in December 2016 that the investigation was concluded and that appropriate action was taken as a result of the investigation findings. The investigation did not confirm that any sex discrimination, harassment, or retaliation had taken place. At the conclusion of the investigation in December 2016, Ms. Kloosterman indicated to Ms. Barnes that the investigation revealed inappropriate jokes or comments had been made, which were specific violations of Shell's Code of Conduct. Ms. Kloosterman also indicated that the Company had taken appropriate response for those violations in response to Ms. Barnes' complaint.

**Particular 2jj:** Following the investigation, Greg Larsen (male), Operations Asset Manager, told me that I "need to think about how [I] present [my]self in the office and what [I] talk about at work." I asked him what he meant by this comment. He responded that I must "make sure [I] think about how [I] may come across." I understood Larsen's comments to be blaming me for the sexual harassment to which I have been subjected at Respondent.

**Response:** After the investigation, Ms. Kloosterman and Greg Larsen, Operations Manager, met with Ms. Barnes to inform her of the outcomes of the investigation. On or around

December 13, 2016, Ms. Kloosterman and Mr. Larsen stated to Ms. Barnes that the investigation had ended and they let her know that prompt action had been taken to address those of her concerns that were validated. They stated that the investigation revealed that Shell's Code of Conduct had been violated, specifically regarding inappropriate jokes or comments. While they did not share specific details of the discipline given to Mr. Turney, they did state that the behaviors had been addressed, were expected to stop, and that Shell did not tolerate any action, conduct or behavior which is humiliating, intimidating or hostile. Furthermore, they informed Ms. Barnes that retaliation would also not be tolerated and that she should let HR or management know if she experienced inappropriate or unwelcomed conduct, or if she felt she was being retaliated against for any reason.

Finally, Ms. Kloosterman and Mr. Larsen also discussed the 4 roles being offered to Ms. Barnes so that she could make an informed decision on which to select, and they gave her developmental coaching to help set her up for success for any role. Specifically, they cautioned Ms. Barnes that her frequent discussions about drinking heavily over the weekend, getting in a "bar fight," or getting arrested did not portray her to be professional. Mr. Larsen and Ms. Kloosterman suggested that Ms. Barnes minimize conversation on these types of weekend activities that she participated in if she did not want people to further inquire into her weekend activities when she raised them for discussion. Ms. Barnes seemed to appreciate their career guidance and help with the matter. She also indicated that she was interested in pursuing coursework toward seeking an Associate Degree in Business to further her professional development. To support Ms. Barnes' continued development, her management agreed to sponsor this coursework, and Ms. Barnes has received payment under Shell's Educational Reimbursement policy. Since moving to the position of HSSE Technician, Ms. Barnes verbally indicated to HR that she enjoyed the new position, was learning and developing, and that she thought Mr. Ellis was a good supervisor.

**Particular 2kk: In December 2016, Respondent transferred me to a new, less-desirable position. Following the outcome of the investigation, I was not provided the option of remaining in my then-current position.**

**Response:** During the November 2016 investigation, Ms. Barnes indicated that she could no longer work directly for Mr. Turney, and asked to be reassigned. At the conclusion of the investigation, Ms. Kloosterman and Mr. Larsen met with Ms. Barnes and offered several options to her. These options included remaining in the Maintenance Analyst position while reassigning Mr. Turney to a different role or to transfer Ms. Barnes to a new role, giving her the choice of 3 other positions at the same job grade and pay level she had as a Maintenance Analyst. Ms. Barnes thoughtfully considered these options for approximately one week after they were presented, while asking questions about each role during that time. Ms. Barnes chose to become an HSSE Technician, stating that she believed this would be a good role for her professional development and that she saw it as an opportunity to help her advance

further within Shell. Ms. Barnes transferred to this role effective January 1, 2017 and began reporting to the Appalachia HSSE Manager, Steve Ellis, at that time.

**Particular 2ll: I am the lowest-paid Environmental Technician, and the only female Environmental Technician.**

**Response:** Ms. Barnes moved to the HSSE Technician position that she currently holds on January 1st, 2017. She was and remains the only HSSE Technician at her grade level and the only female in this team.

**Particular 2mm: I am the only female employee directly reporting to Ellis.**

**Response:** This is correct.

**Particular 2nn: In or about the end of January 2017, I was provided with my 2016 year-end performance review. I was criticized for my performance and my attitude; I had not been criticized for my performance or attitude in my performance reviews before I had complained about sexual harassment.**

**Response:** Around January 23rd, 2017, Mr. Larsen provided Ms. Barnes with her 2016 performance review and performance rating which summarized the feedback provided throughout 2016. This feedback was that Ms. Barnes' overall performance met expectations, but certain behavioral expectations were not met. Specific examples of behaviors where Ms. Barnes did not meet expectations were provided, including: lack of participation in meetings (including not attending, or texting & not paying attention when present), poor communication with the Planning & Scheduling team (including yelling at team members over minor issues), and leaving work early on at least 2 occasions due to her frustrations with other team members. These items were discussed with her management and HR during the October 2016 performance rating session. After that rating session, feedback was given to Ms. Barnes on these matters by Mr. Turney. The performance rating session and feedback given to Ms. Barnes from Mr. Turney both took place prior to the Company receiving her complaint of sexual harassment in November 2016.

**Particular 2oo: I received a smaller bonus as a result of my 2016 year-end performance review.**

**Response:** In February 2016, Ms. Barnes received a total bonus of $1,900 for the 2015 calendar year based on approximately 3.5 months of employment. In February 2017, Ms Barnes received a total bonus of $5,900 for the 2016 calendar year, based on 12 months of employment and made in two payments (in February 2017 and in June, 2017). This bonus was recalculated due to the adjustment made to Ms. Barnes's 2016 performance rating and an additional $700 was paid to Ms Barnes on June 30th, 2017.

**Particular 2pp: On or about April 6th, 2017, Ellis told me that my position is in jeopardy of being eliminated.**

**Response:** Mr. Ellis denies making this statement to Ms. Barnes. As of this writing, Ms. Barnes' position is not in danger of being eliminated nor has it been in danger of being eliminated throughout her employment with Shell.

**Particular 2qq: The continuous sexual harassment and retaliation that I have experienced has caused me physical and emotional distress.**

**Response:** While the Company learned of some clearly inappropriate comments and behavior made by Ms. Barnes' supervisor to both men and women, we do not believe Ms. Barnes has been subject to either sexual harassment or retaliation during her time at Shell. The Company has investigated her allegations and has made every effort to ensure she is being treated fairly, including increasing her 2016 performance rating and moving her to a new position, chosen by Ms. Barnes, at an equal job grade and pay level in January 2017. While Ms. Barnes indicated that she had some stress and anxiety during the time she reported to Mr. Turney, the Company is unaware of any information that suggests Ms. Barnes is under ongoing physical and/or emotional distress.

**Particular 2rr: Respondent has not taken action to remedy or prevent the hostile work environment to which I have been subjected.**

**Response:** This is incorrect. The Company took immediate and appropriate action to address Ms Barnes' complaints.

As a result of the investigation following the receipt of her complaint, the Company disciplined Mr. Turney, by issuing him a written warning and significantly reducing his 2016 performance rating. Mr. Turney also received coaching from his leadership and HR regarding expectations on professional conduct and instruction to immediately cease any inappropriate behaviors or comments.

Additionally, after Ms. Barnes expressed concern about continuing to work for Mr. Turney, the Company offered her several options, including to remain in the Maintenance Analyst position while reassigning Mr. Turney to a different role or to transfer Ms. Barnes to a new role, giving her the choice of 3 other positions at the same job grade and pay level she had as a Maintenance Analyst. Ms. Barnes chose to become an HSSE Technician, stating that she believed this would be a good role for her professional development and that she saw it as an opportunity to help her advance further within Shell. Ms. Barnes transferred to this role effective January 1, 2017 and began reporting to the Appalachia HSSE Manager, Steve Ellis, at that time.

The Company also did the following as a result of Ms. Barnes' complaint and its investigation of her concerns:

- **Coaching** was given to two other employees regarding their unprofessional or inappropriate comments that also did not rise to the level of harassment, and
- **Training** was provided to educate and remind supervisors and staff of their obligations to adhere to Shell's Code of Conduct, which prohibits harassment and discrimination as well as other disrespectful or inappropriate behavior. The training sessions also reminded employees of the various resources or ways to raise concerns in the event of witnessing (or receiving) inappropriate and/or unwelcomed actions in the future. This year, training sessions were held in Wellsboro on the following topics:
  - February 8th: Training session for supervisors on the Shell Code of Conduct
  - February 9th: Training session for employees on the Shell Code of Conduct
  - May 16th: Training session for supervisors on Anti-Harassment, Inclusive Leadership, Unconscious Bias, and Interventions/Speaking Up.
  - July 27th: Training session for employees on Anti-Harassment and Interventions/Speaking Up.
  - September 28th (scheduled): Training session for employees on Unconscious Bias.

Further, Ms. Kloosterman and Greg Larsen, Operations Manager, met with Ms. Barnes to inform her of the outcomes of the investigation on or around December 13, 2016.

**Particular 2ss: Respondent's sexual harassment constitutes a continuing violation going back to my date of hire.**

**Response:** Shell denies that Ms. Barnes has been sexually harassed and is unaware of any additional incidents of inappropriate workplace comments to her or others following her complaint and our investigation of it in November 2016.

**Particular 2tt: Several of my coworkers at Respondent are aware of the sex-based hostile environment and sex discrimination to which I have been subjected at Respondent.**

**Response:** Shell is unaware of any of Ms Barnes' coworkers who have indicated they were aware of any incidents of sex-based hostile environment of any incidents of sex discrimination. During the November 2016 investigation, Ms. Barnes provided names of coworkers who she recommended Ms. Kloosterman speak to regarding the concerns raised. Ms. Kloosterman interviewed each of these coworkers, and none provided evidence of sex-based hostile environment or sex discrimination.

**Particular 2uu: Respondent's comments and conduct evidenced a bias against female employees. In addition to the above, male employees at Respondent regularly make**

comments of a sexual nature, including but not limited to the following: comments about porn; comments about women in bikinis; and comments degrading women.

**Response:** Shell denies any bias against any group of employees. An investigation of Ms. Barnes' November 2016 complaint revealed several instances of inappropriate comments and behaviors that were taking place in the department, that while not elevated to the level of harassment, were simply inappropriate in our workplace. Shell has addressed those issues by providing coaching or discipline to individual employees who made inappropriate comments. Additionally, Shell provided training to educate and remind supervisors and staff of their obligations to adhere to Shell's Code of Conduct, which prohibits harassment and discrimination as well as other disrespectful or inappropriate behavior. The training sessions also reminded employees of the various resources or ways to raise concerns in the event of witnessing (or receiving) inappropriate and/or unwelcomed actions in the future. This year, training sessions were held in Wellsboro on the following topics:
- o February 8th: Training session for supervisors on the Shell Code of Conduct
- o February 9th: Training session for employees on the Shell Code of Conduct
- o May 16th: Training session for supervisors on Anti-Harassment, Inclusive Leadership, Unconscious Bias, and Interventions/Speaking Up.
- o July 27th: Training session for employees on Anti-Harassment and Interventions/Speaking Up.
- o September 28th (scheduled): Training session for employees on Unconscious Bias.

## Particular 3.
**B.**     **1.**     **Respondent's Stated Reasons**

**Particular 3a: Respondent has not offered any explanation for discriminating against me, including subjecting me to a hostile work environment, because of my sex.**

**Response:** The Company has not discriminated against Ms. Barnes, nor subjected her to a hostile work environment because of Ms. Barnes' sex or for any other reason.

**Particular 3b: Respondent has not offered any explanation for retaliating against me because of my complaints of discriminatory conduct.**

**Response:** The Company has not retaliated against Ms. Barnes due to her complaints of discriminatory conduct or for any other reason.

**Particular 3c: Respondent has not offered any explanation for failing to promote me to the Scheduler position.**

**Response:** The Company has provided Ms. Barnes reasons for not selecting her for the Scheduler position, to which she applied and would have represented a promotion for Ms. Barnes.

**Particular 3d:**   Respondent has not offered any explanation for failing to remedy or take corrective action regarding the discrimination against me, including the hostile work environment to which I was subjected, because of my sex, and regarding the retaliation against me because of my complaints of discriminatory conduct.

**Response:** The Company took prompt action to thoroughly investigate Ms. Barnes' concerns that were raised in November 2016. These concerns raised did not include complaints of discrimination against Ms. Barnes or complaints of retaliation for complaints of any discriminatory conduct. There has been no discrimination against Ms. Barnes, no hostile work environment because of sex or any other reasons, and no retaliation against Ms. Barnes for her prior complaints or for any other reason. In December 2016, Ms. Barnes met with Ms. Kloosterman, a representative from HR who conducted the investigation into her concerns, and Mr. Larsen, the Operations Manager, who indicated that they had thoroughly investigated her concerns and taken corrective action for the inappropriate comments or behaviors confirmed, none of which rose to the level of harassment or discrimination.

**Particular 4.**
C.     1.          **Statutes and Basis for Allegations**
I believe that Respondent has discriminated against me, including s ubjecting me to a hostile work environment, because of my sex (female), and r etaliated against me because of my complaints of discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.* ("Title VII) and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq.* ("PHRA") as set forth herein.  Respondent's failure to pay me as much as it pays its male employees is also in violation of 29 U.S.C. § 206, *et seq.* ("Equal Pay Act").

**Response:** The Company has not discriminated against Ms. Barnes, subjected her to a hostile work environment, because of sex or any other reason, or retaliated against Ms. Barnes due to her complaints of discriminatory conduct. Ms. Barnes' claim that she was harassed, discriminated, and retaliated against due to her gender is without merit. The facts provided herein support this position. Allegations regarding her pay had not been raised to the Company prior to the receipt of this charge.  Ms. Barnes received fair compensation based on her work experience. There have been no violations of Title VII of the Civil Rights Act of 1964 as amended, no violations of the Pennsylvania Human Relations Act as amended, and no violations of the Equal Pay Act, and therefore, this Charge should be dismissed.


**Summary/Conclusion:**

In November of 2016, Ms. Barnes raised concerns regarding her then-supervisor, Mr. Turney.  The Company, including Ms. Barnes' upper management and Human Resources ("HR"), took her concerns seriously and promptly and thoroughly investigated the matter.

As a result of the investigation, the Company disciplined Mr. Turney, coached other employees about inappropriate language and behavior, increased Ms. Barnes' performance rating and adjusted her pay accordingly, moved Ms. Barnes into a new role of her choosing at her request, and conducted training to ensure all leaders and employees were aware of what's expected of them by Shell's Code of Conduct and the law.

The Company has supported Ms. Barnes through the complaint process, taking the matter seriously and promptly and thoroughly investigated the concerns she raised in 2016.

The Company denies that it has discriminated against Ms. Barnes, subjected her to a hostile work environment, or has retaliated against her in any way for complaining of discriminatory conduct, for raising an EEOC charge, or due to her sex, or for any other reason.  There have been no violations of Title VII of the Civil Rights Act of 1964 as amended, no violations of the Pennsylvania Human Relations Act as amended, and no violations of the Equal Pay Act, and therefore, this Charge should be dismissed.

Sincerely,

Michelle Priest
HR Account Manager

Exhibits:

Exhibit I:  Shell EO Policy
Exhibit II: Shell Harassment Policy
Exhibit III: Shell Code of Conduct
Exhibit IV:  Scheduler job description
Exhibit V:  Copy of Mr. Turney's written warning