# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
                             :

**JESSE BARNES**                   :
                             :

          **Plaintiff,**   :
                             :    **CIVIL ACTION NO. 18-1497**

     **v.**                  :
                             :

**SHELL EXPLORATION**     :
**AND PRODUCTION COMPANY** :
**APPALACHIA; SHELL**       :
**EXPLORATION AND**        :
**PRODUCTION COMPANY;**   :
**SHELL OIL COMPANY**      :
                             :

                     **Defendants.:**
_____

## INDEX OF PLAINTIFF'S EXHIBITS SUBMITTED IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 1 | Deposition of Plaintiff |
| 2 | Deposition of William Turney |
| 3 | Maintenance Analyst Job Description (Shell 65) |
| 4 | Plaintiff's Resume (Shell 1092-1093) |
| 5 | Interview of Plaintiff (Dep. Ex. P-18) |
| 6 | Plaintiff's Hotline Complaint (Dep. Ex. P-14) |
| 7 | Steve Craig Handwritten Notes (Dep. Ex. P-39) |
| 8 | Deposition of Ken Foreman |
| 9 | Deposition of Hondo Blakley |
| 10 | Interview of Wayne Fletcher (Dep. Ex. P-23) |
| 11 | Interview of Matt Empsen (Dep. Ex. P-20) |
| 12 | Interview of Jeremy Greene (Dep. Ex. P-26) |
| 13 | Interview of Ken Foreman (Dep. Ex. P-22) |
| 14 | Deposition of Steve Craig |
| 15 | Kelly Soudelier Handwritten Notes (Dep. Ex. P-59) |

| 16 | July 2017 emails re Plaintiff's performance review rating (Dep. Ex. P-60) |
|---|---|
| 17 | January 2018 email from Plaintiff re continued discriminatory and retaliatory conduct (Dep. Ex. P-61) |
| 18 | March 2017 emails from Plaintiff re discriminatory and retaliatory conduct (Dep. Ex. P-58) |
| 19 | Plaintiff's April 2017 email forwarding her EEOC Charge (Dep. Ex. P-48) |
| 20 | Deposition of Mark Hoover |
| 21 | Interview of William Turney (Dep. Ex. P-19) |
| 22 | Expert Report of Michael Torchia |
| 23 | Deposition of Megan Kloosterman |
| 24 | Investigation Overview (Dep. Ex. P-32) |
| 25 | December 2016 emails between Plaintiff and Greg Larsen re her job "options" (Dep. Ex. P-35) |
| 26 | Deposition of Greg Larsen |
| 27 | Will Turney Memo re Plaintiff's 2015 Performance (Dep. Ex. P-54) |
| 28 | Deposition of Penny Robbins |
| 29 | Notes of Interviews for Scheduler Position (Dep. Ex. P-12) |
| 30 | Jeremy Greene Resume (Shell 1193-1196) |
| 31 | November 2016 email from Will Turney to Michelle Priest re issues with Plaintiff (Dep. Ex. P-55) |
| 32 | November 2016 email from Michelle Priest to Megan Kloosterman enclosing documents for the investigation (Dep. Ex. P-15) |
| 33 | December 2016 email from Michelle Priest to Megan Kloosterman regarding Plaintiff's previous complaints (Dep. Ex. P-16) |
| 34 | Interview of Shane Sollinger (Dep. Ex. P-28) |
| 35 | Interview of Dan Krise (Dep. Ex. P-24) |
| 36 | Interview of Kelvin Flynn (Dep. Ex. P-27) |
| 37 | Interview of Mark Hoover (Dep. Ex. P-21) |
| 38 | Interview of Hondo Blakley (Dep. Ex. P-5) |
| 39 | February 2017 emails between Plaintiff and Michelle Priest re performance review (Dep. Ex. P-68) |
| 40 | January 2017 emails between Greg Larsen; Steve Craig; Will Turney re Plaintiff's 2016 performance (Dep. Ex. P-47) |
| 41 | March 2017 emails including from Plaintiff re her performance review (Dep. Ex. P-57) |
| 42 | January 2017 email from Plaintiff re her unfair performance review rating (Dep. Ex. P-46) |

Exhibit 1

**In The Matter Of:**

*JESSE BARNES v.*
*SHELL EXPLORATION AND PRODUCTION, et al.*

---

*JESSE BARNES*
*August 2, 2019*

---

*JB Court Reporting, LLC*
*P.O. BOX 650*
*Turnersville, New Jersey 08012*

Min-U-Script® with Word Index

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            MIDDLE DISTRICT OF PENNSYLVANIA
 3                      - - -
 4   JESSE BARNES,
             Plaintiff,        :
 5                             :
        vs.                    :
 6                             :
     SHELL EXPLORATION AND     :
 7   PRODUCTION COMPANY        :
     APPALACHIA, SHELL         :
 8   EXPLORATION AND PRODUCTION :
     COMPANY AND SHELL OIL     :
 9   COMPANY,                  :
             Defendants.  :NO. 4:18-CV-01497-MWB
10                      - - -
11            Friday, August 2, 2019
12                      - - -
13          Videotape deposition of JESSE BARNES,
14   taken at Tucker Law Group, LLC, Ten Penn Center,
15   1801 Market Street, Suite 2500, Philadelphia, PA,
16   commencing at 10:14 a.m., on the above date,
17   before Amy L. Taylor, Court Reporter and Notary
18   Public.
19                      - - -
20
21
22             JB COURT REPORTING, LLC
23                 P.O. BOX 650
              Turnersville, New Jersey 08012
24                 (609)617-9942
              jbreporting@comcast.net
```

Page 2

```
 1   APPEARANCES:
 2
         CONSOLE MATTIACCI LAW
 3       BY: CAREN GURMANKIN, ESQUIRE
         1525 Locust Street
 4       9th Floor
         Philadelphia, Pennsylvania  19102
 5       215.545.7676
         Attorneys for the Plaintiff
 6
 7       TUCKER LAW GROUP, LLC
         BY: JOE TUCKER, ESQUIRE
 8       and KATHLEEN KIRKPATRICK, ESQUIRE
         Ten Penn Center
 9       1801 Market Street
         Suite 2500
10       Philadelphia, Pennsylvania 19103
         215.875.0609
11       Co-counsel for the Defendants
12
13   ALSO PRESENT:
14       Michael Barankovich,
         the videotape technician
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                      - - -
 2                  I N D E X
 3                      - - -
 4   WITNESS:                          PAGE
 5   JESSE BARNES
 6
 7        BY MR. TUCKER                 5
 8                  - - -
 9             E X H I B I T S
10                  - - -
11   NUMBER         DESCRIPTION         PAGE
```

```
12   Barnes-1    Email w/attachments        29
13   Barnes-2    Email w/attachments        29
14   Barnes-3    Online application         73
15   Barnes-4    Notebook and pages        101
16   Barnes-5    Resume                    108
17   Barnes-6    Acknowledgement code of conduct 156
18   Barnes-7    Acknowledgement other policies  156
19   Barnes-8    Shell antiharrassment policy    157
20   Barnes-9    Shell equal employment policy   157
21   Barnes-10   EEOC Charge of Discrimination   178
22
23
24
```

Page 4

```
 1                  - - -
 2        THE VIDEOTAPE TECHNICIAN: We
 3   are here today, August 2nd, 2019 for the
 4   videotape deposition of Jesse Barnes.
 5        This deposition is being taken
 6   in the matter of Jesse Barnes versus
 7   Shell Exploration and Production
 8   Company, which is filed in the U.S.
 9   District Court for the Middle District
10   of Pennsylvania, case number
11   4:18-CV-01497-MWB.
12        I am the videographer, Michael
13   Barankovich, and I represent JB
14   Reporting.  The court reporter is Amy
15   Taylor of JB Reporting.
16        Would counsel please announce
17   their appearance for the record?
18        MS. GURMANKIN: Caren Gurmankin
19   of Console Mattiacci Law for the
20   plaintiff.
21        MR. TUCKER: Joe Tucker and
22   Kathleen Kirkpatrick on behalf of Shell.
23        THE VIDEOTAPE TECHNICIAN: The
24   time is now 10:14.  Will the court
```

Page 5

1 reporter please wear in the witness.
2        - - -
3      JESSE BARNES, having been duly
4 sworn, was examined and testified as
5 follows:
6        - - -
7 BY MR. TUCKER:
8 Q.    Good morning, Ms. Barnes. We met
9 earlier. Again, I'll introduce myself. My name
10 is Joe Tucker and I represent your former
11 employer, Shell Oil, in this action that you have
12 brought against them arising out of your prior
13 employment with them.
14      Today I'm taking your
15 deposition. The young lady to your left and my
16 right just had you raise your hand and swear or
17 affirm that the testimony you're about to give is
18 the truth and the whole truth. Did you understand
19 that?
20 A.    Yes.
21 Q.    So the testimony that you're giving has
22 the a same force and effect as if you were in
23 front of a jury. It carries those same penalties,
24 that if you get give false testimony, that you may

Page 6

1 be subject to some type of penalty. Do you
2 understand that?
3 A.    Yes.
4 Q.    Your counsel is seated to your right; is
5 that correct?
6 A.    Yes.
7 Q.    You've had an opportunity to meet with
8 your counsel prior to coming to this deposition,
9 correct?
10 A.    Yes.
11 Q.    Without telling me what your counsel
12 said, you're counsel generally informed you as to
13 what a deposition is, correct?
14 A.    Yes.
15 Q.    And that is it's my one and only
16 opportunity before trial to sit down and question
17 you about the facts and allegations you made
18 against Shell Oil in this lawsuit. Do you
19 understand that?
20 A.    Yes.
21 Q.    So if at any point in time I ask you a
22 question and you don't understand it, please let
23 me know. Okay?
24 A.    Okay.

Page 7

1 Q.    If I talk too fast, if I use a term that
2 you don't understand, let me know. Okay?
3 A.    Okay.
4 Q.    This -- again, this is my opportunity
5 and my only opportunity prior to trial to find out
6 the nature of your allegations. Okay?
7 A.    Okay.
8 Q.    If you want to take a break at any point
9 in time, you let me know and you can take a break.
10 You can take a break as often as you want for as
11 long as you want. I only ask that you show me the
12 courtesy of answering a question, if a question is
13 pending, that you answer the question first before
14 you take a break. Do you understand that?
15 A.    Yes.
16 Q.    Are you presently on any medications
17 whatsoever?
18 A.    No.
19 Q.    You've been doing good thus far. Again,
20 the woman seated to your left is taking down what
21 we're saying verbatim. So she cannot take down if
22 you just give head shrugs or shoulder gestures.
23 Even though we're on camera, we also have a court
24 stenographer who is taking down everything we say.

Page 8

1 So, therefore, we should not talk at the same
2 time. Secondly, you had try to avoid monosyllabic
3 terms like uh-huh uh-uh and things like that. Do
4 you understand that?
5 A.    Yes.
6 Q.    Definitely, we should not try to talk at
7 the same time because that would really confuse
8 her. I hope to show you the courtesy of allowing
9 you to complete your answer before I ask another
10 question, and I hope that you show me the courtesy
11 of allowing me to complete my question before you
12 answer. Do you understand that?
13 A.    Yes.
14 Q.    Where do you presently live, Ms. Barnes?
15 A.    ███████████████████
16    ███████
17 Q.    How long have you lived there?
18 A.    Roughly, since May 1st of this year.
19 Q.    When you -- where were you living prior
20 to that?
21 A.    ███████████████████████
22 Q.    How far a distance are those two
23 addresses from each other?
24 A.    Three and a half hours.

Page 9

1 Q. Why did move in May of 2019?
2 A. For a job opportunity.
3 Q. Where you are presently employed?
4 A. EIS, Incorporated.
5 Q. What do you do there?
6 A. I'm quality and safety manager.
7 Q. Are you presently living with someone?
8 A. Yes.
9 Q. Who are you living with?
10 A. Duncan Planinshek.
11 Q. Can you his last name, please?
12 A. P-L-A-N-I-N-C-- I'm sorry, S-H-E-K.
13 Q. Do you mind if I call him Duncan? I
14 don't mean to be too familiar with him, but it
15 would be easier to say Duncan. Do you mind if I
16 say that?
17 A. No, that's fine.
18 Q. How long have you and Duncan been living
19 with each other?
20 A. Since May 1st.
21 Q. Did you move to your present address to
22 be with Duncan?
23 A. No, for my job.
24 Q. Where does Duncan work?

Page 10

1 A. He works for the local union.
2 Q. I'm going to apologize ahead of time. A
3 lot of the questions I'm going to ask you today
4 are going to be somewhat intimate. And unless
5 your counsel instructs you not to answer the
6 question, you should answer my question. It's not
7 because I have some *** per interest in your life,
8 but these are important factual things that I need
9 to know. I apologize ahead of time for what seems
10 to be the probing nature of my questions. Okay?
11 A. Okay.
12 Q. When you were living at 50 Apache Lane
13 -- do you and Duncan have a romantic relationship?
14 A. Yes.
15 Q. Are you two engaged?
16 A. No.
17 Q. When did your romantic relationship with
18 Duncan start?
19 A. In July of 2017.
20 Q. Where was he living at that time?
21 A. In Mansfield, Pennsylvania, which is
22 close to Tioga, Pennsylvania.
23 Q. And who moved to -- what town are you in
24 now?

Page 11

1 A. Warrington.
2 Q. Warrington?
3 A. Yes.
4 Q. Who moved to the Warrington area first,
5 you or Duncan?
6 A. Duncan moved back to Warminster I would
7 say in November of 2017. Which Warminster is
8 close to Warrington.
9 Q. Did you and Duncan continue on your
10 romantic relationship when he moved back to
11 Warminster?
12 A. Yes.
13 Q. Did you ever tell anyone that you were
14 moving to Warrington or the Warminster area
15 because you want to be close to Duncan?
16 A. No.
17 Q. When did you first apply for your
18 current job?
19 A. In April of this year.
20 Q. What's your current salary?
21 A. 68,000.
22 Q. Let's step back. Did you graduate from
23 high school?
24 A. Yes.

Page 12

1 Q. When did you graduate from high school?
2 A. 2008.
3 Q. What did you do after you graduated from
4 high school as far as employment?
5 A. I worked at a restaurant called Mark's
6 Brothers.
7 Q. Say that again?
8 A. I worked at a restaurant called Mark's
9 Brothers.
10 Q. M-A-R-X?
11 A. No, apostrophe S. Mark's Brothers.
12 Q. M-A-R-X apostrophe S?
13 A. No, M-A-R-K apostrophe S.
14 Q. Where was that?
15 A. Mansfield, Pennsylvania.
16 Q. How long did you work there,
17 approximately?
18 A. Over a year.
19 Q. What was your salary at the time you
20 left?
21 A. I was making 3.75 an hour waitressing.
22 Q. $3.75 an hour?
23 A. Right.
24 Q. Plus tips?

Page 13

1 A.     Correct.
2 Q.     Have you consistently filed tax returns
3 from 2008 up until the present?
4 A.     Yes.
5 Q.     Do you have any certificates or degrees
6 outside of high school?  Any specialty
7 certificates?
8 A.     I have -- I think that are expired now,
9 but certificates in hazmat and it's called RCRA.
10 Q.     R-E-C-R-A?
11 A.     R-C-R-A.
12 Q.     Did you get that hazmat certificate when
13 you were working with Shell?
14 A.     Yes.
15 Q.     And the RCRA certificate, did you get
16 that when you were working with Shell?
17 A.     Yes.
18 Q.     What was your next job after Mark's
19 Brothers?
20 A.     I continued to work there and for
21 Synergy.  I was contracted through Synergy to do
22 work for Shell.
23 Q.     When did you start working with Synergy?
24 A.     2010.

Page 14

1 Q.     And that's about the time you began
2 working -- did Synergy assign you to work at
3 Shell?
4 A.     Correct.
5 Q.     When you started with Synergy in 2010,
6 how much were you making?
7 A.     $12 an hour.
8 Q.     What did you do at Synergy?
9 A.     I was administrative assistant.
10 Q.     You were a contract employee for Shell
11 at Synergy, correct?
12 A.     Correct.
13 Q.     Did Synergy give you any training
14 whatsoever before you started working at Shell?
15 A.     No.
16 Q.     Did you have any human resources
17 training, any type of job safety, here's how your
18 payroll works or anything like that?
19 A.     I had safety training with Shell,
20 orientation.
21        Any other training that Shell provided
22 to you when you started working with them?  When
23 you started working as a contractor through
24 Synergy?

Page 15

1 A.     I was shadowing some of the other
2 admins, helping out with their work.
3 Q.     Is it fair to say that from 2010 up
4 until, approximately, 2015, you were -- September
5 of 2015, you were an administrative assistant?
6 A.     No.
7 Q.     At some point you were no longer an
8 administrative assistant?
9 A.     Correct.
10 Q.     When did you stop being an
11 administrative assistant?
12 A.     October 2014.
13 Q.     From the time that you started with
14 Synergy in 2010 to 2014, you were an
15 administrative assistant?
16 A.     That's correct.
17 Q.     You were administrative assistant
18 contracted by Shell to Synergy, correct?
19 A.     Correct.
20 Q.     In October 2014, what was your proximate
21 pay rate?
22 A.     I think it was right around $15 an hour.
23 Q.     What were your job duties and
24 responsibilities as an admin?

Page 16

1 A.     Day-to-day, I would help with paperwork,
2 spreadsheets, invoicing.
3 Q.     Anything else?
4 A.     I would take landowner complaints and
5 log them.
6 Q.     Anything else?
7 A.     Basic IT help, office maintenance,
8 scheduling office maintenance jobs.
9 Q.     Anything else?
10 A.     I'm sure there is more, I just can't
11 think of anything right now.
12 Q.     Prior to working at Synergy, had you had
13 any computer training at all?
14 A.     No.
15 Q.     You said you worked with spreadsheets.
16 What type of spreadsheets?  Were these Excel
17 spreadsheets?
18 A.     Correct.
19 Q.     How is it you were able to learn Excel?
20 Were you self-taught or did someone at Shell teach
21 you?
22 A.     I was self-taught.
23 Q.     What other programs did you work with
24 while you -- from the time you started with

Page 17

1  Synergy in 2010 up until October 2014? Did you
2  work with Microsoft Word?
3  A.     Yes.
4  Q.     Did you have -- do you know how to type?
5  A.     Yes.
6  Q.     Have you ever taken a typing test?
7  A.     Not that I recall.
8  Q.     Approximately, how many words per minute
9  do you type? Have you ever been tested at all?
10 A.     No.
11 Q.     You said basic IT help you would
12 provide. What type of basic IT help would you
13 provide?
14 A.     If somebody was having issues with their
15 microphone or setting up their headset for it to
16 play back in meetings, speakers within the
17 conference room, to get it connected to their
18 laptop so it would be clear and work well.
19 Q.     So was that the extent of the IT help
20 you provided?
21 A.     I don't know if it's considered II, but
22 printer assistance.
23 Q.     Like if it got jammed?
24 A.     Entering email address so they would be

Page 18

1  able to scan it, or just any errors that would
2  come up, I would try to solve them for them.
3  Q.     Anything else you did as far as IT help?
4  A.     Not that I can think of right now.
5  Q.     When you said you shadowed the other
6  admins how many -- well, what location were you at
7  from when you started with Synergy in 2010 until
8  October 2014? Was it the Wellsboro location?
9  A.     There wasn't technically a Wellsboro
10 location yet. It was -- the address was
11 Mansfield, but it was between Mansfield and
12 Wellsboro there was an office. And then we moved
13 to Wellsboro eventually.
14 Q.     From 2010 when you started until October
15 2014, where were you physically located?
16 A.     At both locations.
17 Q.     Say that again?
18 A.     At both locations. We --
19 Q.     At both locations, that's what you said?
20 A.     Well, I worked out of Mansfield, and
21 then we moved to Wellsboro during that time.
22 Q.     During the time that you started -- what
23 was your start date again in 2010 as far as you
24 can recall?

Page 19

1  A.     November.
2  Q.     From November 2010 to October 2014, did
3  you have a supervisor?
4  A.     Yes.
5  Q.     And you also had someone at Synergy who
6  you would report to in addition? When I say
7  supervisor, I think we sort of understand a Shell
8  employee was your supervisor?
9  A.     Yes.
10 Q.     Did you also have someone at Synergy you
11 reported to?
12 A.     I had an account manager.
13 Q.     What was his or her name?
14 A.     Her name was Lynn Oakes.
15 Q.     What was Ms. Oakes purpose in being the
16 account manager?
17 A.     I had very little discussions with her,
18 so I don't know if I can an answer that question.
19 Q.     When you originally went to Synergy, did
20 you fill out an application for employment?
21 A.     Yes.
22 Q.     Were you truthful on the application?
23 A.     Yes.
24 Q.     You identified all the skills that you

Page 20

1  had when you filled out your application to the
2  extent it asked?
3  A.     Yes.
4  Q.     Who was your supervisor or was there
5  more than one supervisor from November 2010 to
6  October 2014 at Shell?
7  A.     Danny Eckles or Daniel Eckles is the --
8  he initially hired me and then it transferred to
9  David Summers.
10 Q.     Do you recall the time period from
11 Mr. Eckles hiring to Summers?
12 A.     I don't remember the exact time.
13 Q.     After Mr. Summers, who was your next
14 supervisor?
15 A.     I believe it was Chris Anderson, but I'm
16 not a hundred percent sure about that.
17 Q.     This is still up until October -- just
18 so we're on the same page, I'm only talking about
19 a four-year period --
20 A.     Right.
21 Q.     -- when you say you were an
22 administrative assistant from November 2010 to
23 October 2014. Just that period we're talking
24 being now. Have you understood that to be my

Page 21

1  question?
2  A.    Yes.
3  Q.    Thus far you've indicated three people
4  were your supervisors; is that correct?
5  A.    Yes.
6  Q.    Anyone else during that time period?
7  A.    Not that I recall right now.
8  Q.    Did either of these three individuals
9  ever sexually harass you?
10 A.    No.
11 Q.    Did either of them ever treat you
12 inappropriately?
13 A.    No.
14 Q.    Prior -- did Duncan can ever work for
15 either Synergy or Shell?
16 A.    No.
17 Q.    Did you ever have a romantic
18 relationship with any Shell employee while -- from
19 October -- from November 2010 until the time you
20 left?
21 A.    Yes.
22 Q.    With whom?
23 A.    Clint Slocum.
24 Q.    Spell his name?

Page 22

1  A.    S-L-O-C-U-M.
2  Q.    His first name is Glen?
3  A.    Clint.
4  Q.    C-L-I-N-T?
5  A.    Yes.
6  Q.    Anyone else?
7  A.    Matt Bedrich.
8  Q.    Spell Matt's last name.
9  A.    B-E-D-R-I-C-H.
10 Q.    Anyone else?
11 A.    Not that I can think of.
12 Q.    Is it possible that you did have a
13 romantic relationship with individuals other than
14 these two, but you just can't recall who else?
15 A.    Yes.
16 Q.    At what time period did your romantic
17 relationship with Mr. Slocum, when did that occur?
18 A.    I think it ended in 2012.
19 Q.    When did it start?
20 A.    When I was 19.  So almost three years.
21 Q.    So that would be 2009, January 2009 is
22 when you were 19?
23 A.    Yes.
24 Q.    During the time that you -- was

Page 23

1  Mr. Slocum working consistently with Shell during
2  the time period that you talked about?
3  A.    Yeah.
4  Q.    I'm sorry.  It's 2009 to 2012 you had a
5  romantic relationship with Mr. Slocum, correct?
6  A.    I believe so.
7  Q.    You didn't start Shell until 2010?
8  A.    Correct.
9  Q.    Is Mr. Slocum how you became aware the
10 of the possibility of being hired through Synergy?
11 A.    No, it was vice versa.  So I helped -- I
12 didn't help him, I just gave his resume to a
13 supervisor.
14 Q.    Who did you give his resume to?
15 A.    Shane Sollinger.
16 Q.    How do you spell Shane's last name?
17 A.    S-O-L-L-I-N-G-E-R.
18 Q.    What did you tell Mr. Sollinger about
19 Mr. Slocum?
20 A.    I just knew there was an available
21 position and that he was looking for a different
22 career path.
23 Q.    Why is it that you and Mr. Slocum's
24 relationship ended?

Page 24

1  A.    We just had a mutual agreement that we
2  weren't going to go further in the relationship.
3  Q.    As far as you know, did other employees
4  at Shell know that you and Mr. Slocum had a
5  romantic relationship?
6  A.    Yes.
7  Q.    How is it that they knew?
8  A.    It's not like we were hiding it from
9  anybody.
10 Q.    Did you two live together at that time,
11 too?
12 A.    We lived together at one point, but not
13 the entire time.
14 Q.    At some point up until the ending of the
15 relationship in 2012 which you said was by mutual
16 agreement, you two were living with each other?
17 A.    No.
18 Q.    That was a bad question.  I apologize.
19 I didn't even understand my question.  You
20 indicated that you and Mr. Slocum's relationship
21 ended in 2012, correct?
22 A.    Correct.
23 Q.    By mutual agreement, correct?
24 A.    Correct.

Page 25

1  Q.      During the 2009 to 2012 period, did you
2  and he live with each other at any point in time?
3  A.      Yes.
4  Q.      When did you stop living with each
5  other?
6  A.      2011.
7  Q.      When did you start a relationship with
8  Matt Bedrich?
9  A.      Later in 2012, I believe.
10  Q.      Is it possible that you started a
11  relationship with Mr. Bedrich while you were still
12  having a relationship with Mr. Slocum?
13  A.      I was not in a relationship with Clint
14  when I started.
15  Q.      Were you -- and you were not living with
16  Mr. Slocum at the time you and Mr. Bedrich started
17  a relationship, correct?
18  A.      Correct.
19  Q.      When did you and Mr. Bedrich's
20  relationship end?
21  A.      2013.
22  Q.      Did you ever accuse Mr. Slocum or
23  Mr. Bedrich of sexual harassment?
24  A.      No.

Page 26

1  Q.      Did you ever tell anyone at Shell that
2  either of those two had sexually harassed you?
3  A.      No.
4  Q.      During the time period that you worked
5  under Will Turney, did you have a boyfriend?
6  A.      Yes.
7  Q.      What was his name?
8  A.      Christopher Deming.
9  Q.      How do you spell his last name?
10  A.      D-E-M-I-N-G.
11  Q.      When did you begin your relation with
12  Mr. Deming?
13  A.      2015.
14  Q.      When did your relationship end?
15  A.      2017.
16  Q.      Where did Mr. Deming work?
17  A.      He never held a steady job, so I'm not
18  sure if I know how to answer that question.
19  Q.      Did he ever work for any contractor that
20  worked for Shell?
21  A.      No.
22  Q.      Why did you and Mr. Deming's
23  relationship end?
24  A.      Umm.

Page 27

1  Q.      Do you want to speak to your counsel?
2  A.      No, I'm just -- basically, because he
3  didn't have a job.  That he couldn't hold a job.
4  Q.      Have you ever taken out any court
5  injunctions or court motions or protection from
6  abuse against anyone?
7  A.      I attempted to against Chris.
8  Q.      When was that?
9  A.      This past May, I believe.
10  Q.      That would be may 2019?
11  A.      Correct.
12  Q.      This is when you were living in this
13  area now where we are -- where does Mr. Deming
14  live?
15  A.      Elmira, New York.
16  Q.      And you attempted to take out a
17  protection from abuse or a stay away order from
18  him?
19  A.      Correct.
20  Q.      Where did you file the papers?
21  A.      Doylestown.
22  Q.      Was he coming to the Doylestown area to
23  attempt to visit you or to harass you?
24  A.      No.

Page 28

1  Q.      For what reason did you take this or
2  attempt to take this legal action?
3  A.      He would -- he downloaded apps so he'd
4  be able to text my number and constantly texted,
5  even though I asked him to stop.  And he created a
6  fake social media account about me.
7  Q.      Did that cause you stress and emotional
8  upset?
9  A.      Yes.
10  Q.      In one of your documents that you sent
11  to Ms. Kloosterman back in December of 2016, you
12  indicated that certain things triggered your PTSD.
13  Do you recall writing her that?
14  A.      Yes.
15  Q.      I'm going to hand you two exhibits,
16  which we will mark as Barnes-1 and 2.  Barnes-1 is
17  December 6th, 2016 email to Ms. Kloosterman.
18  Barnes-2 is also -- let me see if I can get the
19  times.
20        Let me he have this.  Barnes-1
21  is a December 6th, 2016 email.  Barnes-2 is a
22  December 7th, 2016 email.  Off the record while we
23  mark these.
24        THE VIDEOTAPE TECHNICIAN: The

Page 29

1    time is now 10:40.  Going off the video
2    record.
3              - - -
4              (Whereupon, Barnes-1 and
5    Barnes-2 were marked for identification
6    and are attached hereto.)
7              - - -
8              THE VIDEOTAPE TECHNICIAN: The
9    time is now 10:47.  Back on the video
10   record.
11   BY MR. TUCKER:
12   Q.    Ms. Barnes, you've had an opportunity to
13   look at the documents that we have marked as
14   Barnes-1 and Barnes-2; is that correct?
15   A.    Yes.
16   Q.    When was the last time you saw these
17   documents?
18   A.    When I worked at Shell.
19   Q.    Have you looked at these documents in
20   preparation for your deposition?
21   A.    No.
22   Q.    Identify for me all the documents, if
23   any, that you have reviewed in preparation for
24   your deposition?

Page 30

1    A.    I reviewed the court documents.
2    Q.    When you say the court documents, do you
3    mean the legal complaint?
4    A.    Yes.
5    Q.    Anything else?
6    A.    Some of the text messages that I
7    supplied.
8    Q.    Text messages between yourself and Will?
9    A.    Yes.
10   Q.    Any other text messages that you
11   reviewed?
12   A.    Not that I -- oh, my sister.
13   Q.    What's your sister's name?
14   A.    I have two sister's, Lori and Stacy.
15   Q.    We have been supplied, I think, just
16   text messages between yourself and Stacy.  Did you
17   also review text messages with Lori?
18   A.    Yes.
19   Q.    Where does Stacy live?
20   A.    Corning, New York.
21   Q.    Do you have -- does your family have
22   some type of relationship with that portion of New
23   York near Corning or Elmira?
24   A.    Relationship?

Page 31

1    Q.    Is that where you're originally from?
2    A.    No.
3    Q.    How is it that your sister is in
4    Corning, New York?
5    A.    She works in Ithaca, New York, which is
6    close to Corning, New York.
7    Q.    Who does she work for in Ithaca, New
8    York?
9    A.    She works for a hospital.
10   Q.    What hospital?
11   A.    I don't recall the name right now.
12   Q.    What is her position there?
13   A.    She's a human resources specialist.
14   Q.    How long has she been a human resources
15   specialist?
16   A.    I'd say over 10 years.
17   Q.    When was the first time -- and don't
18   tell me about your conversation, but when is the
19   first time you contacted a lawyer about the claims
20   that you're making here in this case?
21   A.    2017.
22   Q.    When in 2000 -- I'll represent to you
23   that your EEOC complaint was filed in April of
24   2017.  Did you contact your lawyer before the

Page 32

1    April 25th, 2017 EEOC complaint or after?
2    A.    Before.
3    Q.    How long before?
4    A.    Probably a month or -- a month or two
5    before.
6    Q.    Is that the same law firm who represents
7    you now?
8    A.    Yes.
9    Q.    Did your sister recommend that law firm?
10   A.    No.
11   Q.    Let's go back to the document that we
12   have looked at as Barnes-2.  I'm going to show you
13   the sentence I was referring to -- and also, if at
14   any point in time today, if I'm reaching in your
15   personal space and you feel uncomfortable, please
16   let me know.  It's not my goal to make you feel
17   uncomfortable.
18   A.    I understand.
19   Q.    So do I have permission to reach over
20   towards you?
21   A.    Yes.
22   Q.    You see where it says, he contradicts a
23   lot of his direction.  I think he also has an
24   aggressive personality, which is something that

Page 33

1  triggers my PTSD. Did I read that correctly?
2  A.    Yes.
3  Q.    You had a written this to
4  Mr. Kloosterman back on December 7th, 2016,
5  correct?
6  A.    Yes.
7  Q.    Do you have -- have you ever been
8  diagnosed with PTSD?
9  A.    No. I mean, it's been mentioned with my
10  doctor.
11  Q.    Which doctor is that?
12  A.    Megan Kloosterman -- I'm sorry. Courtney
13  Babcock.
14  Q.    B-A-B-C-O-C-K?
15  A.    Yes.
16  Q.    Where is Dr. Babcock's practice?
17  A.    I'm sorry. Also -- I'll come back to
18  your question. Her name was Mary Laumiller was my
19  counselor.
20  Q.    Mary?
21  A.    I can't remember how to spell her last
22  name now.
23  Q.    When did you start seeing Mary
24  Laumiller?

Page 34

1  A.    2017.
2  Q.    Was it before or after you consulted
3  with a lawyer you started seeing Mary Laumiller?
4  A.    After.
5  Q.    How is it that you learned of Mary
6  Laumiller's name?
7  A.    Google. I just Googled counselors in my
8  area.
9  Q.    Did anyone suggest to you that you see a
10  counselor?
11  A.    Yes.
12  Q.    Who suggested to you that see a
13  counselor?
14  A.    Family members.
15  Q.    Which family members suggested to you
16  that you see a counselor?
17  A.    Lori, my sister.
18  Q.    Who else?
19  A.    My doctor.
20  Q.    Your doctor being Dr. Babcock.
21  A.    Yes.
22  Q.    Anyone else?
23  A.    Not that I can think of right now.
24  Q.    Where is Dr. Babcock's practice located?

Page 35

1  A.    Wellsboro, Pennsylvania.
2  Q.    Has Mary Laumiller told you that she
3  believes you have PTSD?
4  A.    No, she didn't say that.
5  Q.    As a result of your interactions with
6  Mr. Deming, have you sought any type of
7  counselling or therapy?
8  A.    I contacted a therapy group in
9  Doylestown, but I never went there.
10  Q.    What was the name of the therapy group
11  that you contacted?
12  A.    I can't remember the name right now.
13  Q.    Were Mr. Deming's actions towards you
14  upsetting?
15  A.    Yes.
16  Q.    Did they cause you emotional distress?
17  A.    At times.
18  Q.    Did you find yourself crying?
19  A.    Yeah.
20  Q.    How long did you see Mary Laumiller --
21  I'm butchering her last name. Give it to me one
22  more time.
23  A.    I can't even give.
24  Q.    Pronounce it for me one more time?

Page 36

1  A.    I think it's Laumiller.
2  Q.    Laumiller. So you started seeing
3  Ms. Laumiller some time in 2017, correct?
4  A.    Yes.
5  Q.    And it's your testimony you started to
6  seeing her at the recommendation of your sister
7  Lori and Dr. Babcock, that they suggested that you
8  see a therapist, correct?
9  A.    A counselor, yes.
10  Q.    A counselor. For what reason did your
11  sister Lori tell you to see a counselor?
12  A.    To help my anxiety.
13  Q.    Any other reason why your sister told
14  you to see Dr. Laumiller -- or Ms. Laumiller?
15  A.    No.
16  Q.    Why did Dr. Babcock tell you to see a
17  counselor?
18  A.    My anxiety and how to cope with.
19  Q.    Cope with what?
20  A.    Anxiety.
21  Q.    Did Dr. Babcock attribute your anxiety
22  to any triggering event?
23  A.    Yes.
24  Q.    What did Dr. Babcock associate your

Page 37

1 anxiety being caused by?
2 A.     What I was subjected to at Shell.
3 Q.     Did you tell Dr. Babcock what you were
4 subjected to at Shell?
5 A.     Yes.
6 Q.     Did she prescribe you any medications?
7 A.     Yes.
8 Q.     What did she prescribe you?
9 A.     I don't know the technical name for it,
10 but it was a low dosage anxiety medication.
11 Q.     When did she first prescribe this
12 medication to you?
13 A.     I don't remember the exact time.  I
14 think it was in 2017 though.
15 Q.     When is the first time you told
16 Dr. Babcock about what you were being subjected to
17 at Shell?
18 A.     In 2017.
19 Q.     Did you tell her all the things that you
20 were subjected to at Shell?
21 A.     Not everything.
22 Q.     But you were being truthful and honest
23 with her?
24 A.     Yes.

Page 38

1 Q.     And you wanted to be truthful and honest
2 with her so she could make a correct and accurate
3 diagnosis, correct?
4 A.     Correct.
5 Q.     And you wanted her to prescribe
6 medication to you that would help with her
7 accurate diagnosis, correct?
8 A.     If that was her recommendation.
9 Q.     Did you actually take the medication
10 that Dr. Babcock prescribed for you?
11 A.     I did.
12 Q.     Where did you got the prescriptions
13 filled?
14 A.     At a pharmacy.
15 Q.     What pharmacy?
16 A.     CVS.
17 Q.     Which CVS?
18 A.     Mansfield, Pennsylvania.
19 Q.     Is there more than one CVS in Mansfield,
20 PA?
21 A.     I don't believe so.
22 Q.     On what street is the CVS?
23 A.     I guess Main Street.
24 Q.     How many times did you get the

Page 39

1 prescription filled?
2 A.     I don't know the exact number.
3 Q.     Did you pay for it or did your insurance
4 pay for it?
5 A.     My insurance covered some of it.
6 Q.     Who were you insured by at that time
7 Shell?
8 A.     Yes.
9 Q.     When was the last time you took any type
10 of medication for your anxiety?
11 A.     2018.
12 Q.     Was this anxiety related to Shell or was
13 this overall anxiety?
14 A.     It was related to Shell.
15 Q.     Prior to 2017, had anyone ever diagnosed
16 you with having anxiety?
17 A.     No.
18 Q.     Had you ever been treated for any type
19 of mental or psychological issues?
20 A.     No.
21 Q.     Had you ever sought any type of therapy
22 or counselling?
23 A.     No.
24 Q.     Your mother at one time worked at Shell;

Page 40

1 is that correct?
2 A.     Yes, that's correct.
3 Q.     When did your mother work at Shell?
4 A.     She worked there before I started.  So
5 before 2010.
6 Q.     What was her position?
7 A.     She started as an administrative
8 assistant.
9 Q.     What did she leave as?
10 A.     Scheduler.
11 Q.     So she started a similar position that
12 you started as when you were contracted for an
13 administrative assistant?
14 A.     Correct.
15 Q.     Did I ask you how many years did she
16 work there?
17 A.     I think she left in -- well, she was --
18 her position was dissolved in 2015.  I don't know
19 if that is the exact date or year.
20 Q.     So you were working as a contract
21 employee while your mother was also employed at
22 Shell?
23 A.     That's correct.
24 Q.     Did your mother -- when your mother left

Page 41

1  Shell, is it fair to say that she was somewhat
2  unhappy with Shell?
3  A.    Yeah.
4  Q.    Could you tell me he about that, please?
5  From what you know.
6  A.    Her position was dissolved is how they
7  worded it.  And they kept a male scheduler over
8  her.
9  Q.    Did your mother consult with a lawyer?
10  A.    Not that I'm aware of.
11  Q.    Did your mother tell you about her
12  belief that they kept a male scheduler over her?
13  A.    They did keep a male scheduler over her.
14  Q.    She told you about that, correct?
15  Your mother told you that?
16  A.    Yeah.
17  Q.    Was she upset about that?
18  A.    Yeah.
19  Q.    As far as you know, she never consulted
20  a lawyer?
21  A.    Not that I'm aware of.
22  Q.    Do you know who the decision-makers were
23  who decided to keep this male scheduler over your
24  mother?

Page 42

1  A.    Leadership.
2  Q.    Is that person's name, leadership?
3  A.    No.  We have a leadership team that
4  makes those decisions.
5  Q.    Do you know who on the leadership team
6  made that decision?
7  A.    I don't know specifically because I
8  think it was a team.
9  Q.    Do you know who was on the team that
10  reportedly --
11  A.    ▓▓▓▓▓▓▓
12  Q.    -- let me finish.  -- that reportedly
13  made this decision to keep this male scheduler
14  over your mother?
15  A.    I believe it was ▓▓▓▓▓▓
16  Q.    Anyone else?
17  A.    Robin Grewet, David Summers.
18  Q.    Keep going.
19  A.    That's all I can think of right now.
20  Q.    ▓▓▓▓▓ how do you pronounce his last
21  name?
22  A.    ▓▓▓▓
23  Q.    ▓▓▓▓▓▓
24  A.    Yes.

Page 43

1  Q.    Are you, in this litigation, accusing
2  Mr. ▓▓▓ of discrimination or harassment?
3  A.    Not in this litigation.
4  Q.    What about Robin Grewet, in this
5  litigation are you accusing Robin Grewet -- is
6  that a male or female?
7  A.    Female.
8  Q.    Are you accusing Ms. Grewet of
9  discrimination or harassment in this litigation?
10  A.    No.
11  Q.    We've already covered Mr. Summers, you
12  are not accusing Mr. Summers of discrimination or
13  harassment in this litigation, correct?
14  A.    Correct.
15  Q.    Do you still have Mr. Deming's telephone
16  number?  Do you know his telephone number?
17  A.    Yeah.  He's blocked though.
18  Q.    What is his telephone number?
19  A.    I don't know the number without looking
20  at my phone.
21  Q.    But you have the ability to find his
22  number by looking at your phone?
23  A.    Correct.
24  Q.    When we take a break, could you look at

Page 44

1  your phone and provide us with Mr. Deming's
2  telephone number.  Okay?
3  A.    Okay.
4  Q.    Did you ever talk to Mr. Deming about
5  the issues that you were having, that is the
6  harassment, discrimination you allege in this
7  case, did you ever talk to Mr. Deming about those
8  issues?
9  A.    Yes.
10  Q.    Were you being truthful with him when
11  you talked to him about the issues that you were
12  having at Shell, the harassment and
13  discrimination?
14  A.    Yes.
15  Q.    Let's go back to Ms. Laumiller.  You
16  indicated that you started seeing Ms. Laumiller
17  sometime in 2017, correct?
18  A.    Correct.
19  Q.    When did you stop seeing Ms. Laumiller?
20  A.    Shortly after that in -- or it was
21  I think 2018.
22  Q.    Did you start seeing Ms. Laumiller late
23  2017 or mid or early 2017; if you recall?
24  A.    I don't recall.

Page 45

1 Q. How many visits did you have with
2 Laumiller?
3 A. I believe three, maybe more.
4 Q. Why is it that you stopped seeing
5 Ms. Laumiller?
6 A. I didn't think I was really getting the
7 support I was looking for.
8 Q. What type of support were you looking
9 for from a counselor or a therapist?
10 A. I was looking for more ways to cope with
11 my anxiety and having to work in the work
12 environment that I was in.
13 Q. After you ceased seeing Ms. Laumiller,
14 did you seek assistance or help from another
15 counselor or therapist?
16 A. No.
17 Q. Other than Ms. Laumiller, and we'll get
18 to Dr. -- we'll go back to Dr. Babcock -- have you
19 seen anyone else for what you say is your anxiety
20 caused by what you went through at Shell?
21 A. No.
22 Q. Have you spoken to a religious person, a
23 priest, a rabbi or anything like that about the
24 issues that you suffered while you were at Shell?

Page 46

1 A. No.
2 Q. Are you presently seeing Dr. -- is
3 Dr. Babcock presently your family doctor?
4 A. Yeah. She's my primary doctor.
5 Q. It's always tough when men take these
6 kind of depositions. Do you have an OB/GYN?
7 A. Yeah.
8 Q. Have you ever talked to your OB/GYN
9 about any of the issues related to the
10 discrimination or harassment that has happened,
11 that you alleged happened at Shell?
12 A. No.
13 Q. Are there any other medical doctors,
14 other than Dr. Babcock, with whom you discussed
15 the discrimination, harassment and the anxiety
16 that it's caused you?
17 A. No.
18 Q. Do you have any plans to see a
19 therapist?
20 A. Yes.
21 Q. Do you have someone in mind?
22 A. No.
23 Q. Do you plan to see the therapist about
24 what happened with Mr. Deming or do you plan to

Page 47

1 see the therapist about what happened at Shell?
2 A. What happened at Shell.
3 Q. When did you leave Shell?
4 A. April of 2019.
5 Q. What was your salary when you left?
6 A. I think, roughly around 65,000.
7 Q. Why did you leave Shell?
8 A. To get away from the environment that I
9 was in.
10 Q. If I understand correctly, you are
11 making more money at your present job than you
12 made at Shell; is that correct?
13 A. That's correct.
14 MR. TUCKER: Counsel, are you
15 guys alleging destructive discharge?
16 MS. GURMANKIN: We can discuss
17 that off-line, if you'd like. You have
18 her testimony today.
19 BY MR. TUCKER:
20 Q. Was there any triggering event in March
21 or April of 2019 that caused you to leave Shell?
22 A. Just the constant or repeatedly trying
23 to get a resolution from what had happened and I
24 wasn't getting anywhere with that.

Page 48

1 Q. What resolution were you seeking? What
2 were you looking for?
3 A. I was just trying to get transferred to
4 another area.
5 Q. When you say another area, you mean
6 another physical location?
7 A. Within Shell, yes.
8 Q. Another geographical location?
9 A. Yes, Pittsburgh, Pennsylvania.
10 Q. You wanted to be transferred to where?
11 A. Pittsburgh, Pennsylvania.
12 Q. As in Pittsburgh Pirates, Pittsburgh
13 Penguins?
14 A. Yes.
15 Q. Because there's also Pittsboro?
16 A. Oh, okay.
17 Q. Was there a position in Pittsburgh that
18 you sought?
19 A. Yes.
20 Q. What position was that?
21 A. PM planner.
22 Q. What does PM stand for?
23 A. Preventative maintenance.
24 Q. Did you post for that position?

Page 49

1 A.     Yes.
2 Q.     Did you interview for that position?
3 A.     No.
4 Q.     Did you believe you were qualified for
5 that position?
6 A.     Yes.
7 Q.     What were the qualifications necessary
8 for the position?
9 A.     I don't have, like, a description in
10 front of me, but I believe it was along the lines
11 of creating preventative maintenance plans for the
12 asset.
13 Q.     Prior to March of 2018, had you ever
14 created any preventative maintenance plans?
15 A.     Yes.
16 Q.     When had you done that?
17 A.     In my role as a maintenance analyst.
18 Q.     That would have been from October 2014
19 until when?  Is it your position in this
20 litigation that as of October 2014 you became a
21 maintenance analyst?
22 A.     Correct.
23 Q.     And you were a maintenance analyst from
24 October 2014 until when?

Page 50

1 A.     January 2017.
2        MR. TUCKER: Let's take our
3 first break.
4        THE VIDEOTAPE TECHNICIAN: The
5 time is now 11:10.  Going off the video
6 record.
7        - - -
8        (Whereupon, a brief recess was
9 held.)
10        - - -
11        THE VIDEOTAPE TECHNICIAN: 22.
12 Back on the video record.
13 BY MR. TUCKER:
14 Q.     This position of preventative
15 maintenance planner, is it because you did not get
16 that position that you left Shell?
17 A.     No.
18 Q.     Why did you leave Shell?
19 A.     It was a part of why I left Shell.
20 Because I left Shell because of the hostile work
21 environment that I was subjected to, them not
22 allowing me to -- rejecting me for promotions.
23 Q.     So if I understand, you've identified
24 three reasons why you left Shell.  Rejecting you

Page 51

1 for promotions, the hostile work environment and
2 because you didn't get the preventative
3 maintenance planner position; is that correct?
4        MS. GURMANKIN: Objection to
5 form.
6 BY MR. TUCKER:
7 Q.     Is that correct?
8 A.     Well, the preventative maintenance
9 planner was a part of the promotions.
10 Q.     So there are two reasons.  Rejecting you
11 for promotions and the hostile work environment
12 and why you left?
13        MS. GURMANKIN: Same objection.
14 You can answer.
15        THE WITNESS: Yes.  There were
16 many reasons why -- not many, but there
17 were reasons why I left Shell.  I
18 wouldn't say those were the only two
19 reasons.
20 BY MR. TUCKER:
21 Q.     That's the question.  Remember I told
22 you early on this is my only time to ask you
23 questions.  I'm asking to you give me all of
24 the -- your term, many reasons why you left.  The

Page 52

1 indicated two, because of the hostile work
2 environment and they rejected you for promotions.
3 Anything else?
4 A.     The sexual harassment that I was
5 subjected to while I was there, the comments that
6 were made based on my sex.
7 Q.     Let me stop you for a second.  Were
8 these comments still being made to you in 2019?
9 A.     Not to me, no.
10 Q.     Was the sexual harassment still going on
11 in 2019?
12 A.     No.
13 Q.     Was the hostile work environment still
14 going on in 2019?
15 A.     Yes.
16 Q.     Who was subjecting you to the hostile
17 work environment?  Identify the person or persons
18 who was subjecting you to the hostile work
19 environment in 2019?
20 A.     Will Turney, Hondo Blakely.
21 Q.     Anyone else?
22 A.     Ken Forman.
23 Q.     Anyone else?
24 A.     That's all the I can think of right now.

Page 53

1 Q. Any other reasons why -- I want to go
2 back now to any other reason why you left Shell?
3 Or a better question, have you given me all the
4 reasons why you left Shell?
5 A. Another reason I left Shell was because
6 the job opportunity that was presented to me with
7 my current company.
8 Q. Any other reason?
9 A. Not that I can think of right now.
10 Q. When you applied for your present job,
11 did you tell them that one of the reasons you were
12 looking it leave Shell was because of a hostile
13 work environment?
14 A. No.
15 Q. You've identified what you believe is
16 one position that you were failed to give a
17 promotion. Are there any other positions where
18 you believe that you were failed to get
19 promotions?
20 A. I applied to a few other promotions.
21 Q. What are they?
22 A. Sorry. Environmental technician, and
23 there was an analyst role, I believe it was an
24 analyst role in California.

Page 54

1 Q. Any other?
2 A. Not that I can think of right now.
3 Q. Why didn't you got the environmental
4 technician position?
5 A. I was told that the person hired had
6 more experience.
7 Q. Do you have any facts to support -- to
8 disagree with that, that the person who was hired
9 had more experience?
10 A. I wouldn't know because I didn't see his
11 resume.
12 Q. Do you know if it was a man or a woman?
13 A. I believe it was a man.
14 Q. Do you know who it was?
15 A. I do not.
16 Q. Who told you this?
17 A. Told me it was a man?
18 Q. Yeah.
19 A. I spoke to the hiring manager.
20 Q. Who was the hiring manager you spoke to?
21 A. Jim Sewell I think his name was for the
22 environmental tech job. There was a different one
23 for the PM planner.
24 Q. Anything else? You've identified two

Page 55

1 positions, the environmental technology analyst
2 role in California. Any other positions?
3 A. The schedule position.
4 Q. Where was the scheduler position?
5 A. Wellsboro.
6 Q. Any other positions?
7 A. I don't think so.
8 Q. The analyst role in California, do you
9 believe you were qualified for that?
10 A. Yes.
11 Q. Do you know who got the job?
12 A. I do not.
13 Q. Were you told why you didn't get the
14 job?
15 A. No, I believe I left Shell before the
16 job was closed.
17 Q. The scheduler position, did you get that
18 job?
19 A. No, I did not.
20 Q. Do you know who did get the job?
21 A. Yes.
22 Q. Who got the job?
23 A. Jeremy Green.
24 Q. Do you believe you were more qualified

Page 56

1 than Ms. Green to get the position?
2 A. Yes.
3 Q. What do you base that upon?
4 A. I had more experience with a team than
5 he did.
6 Q. Do you know what the pay was for that?
7 A. The pay grade was six. I'm not sure of
8 the dollar amount.
9 Q. Did you interview for the scheduler
10 position?
11 A. Yes, I did.
12 Q. Who did you interview with?
13 A. Hondo Blakely and Will Turney.
14 Q. When did you interview with them?
15 A. I believe it was in -- it was in 2016.
16 Q. It was 2016? Do you recall when in
17 2016?
18 A. I don't recall.
19 Q. I'm sorry. Do you know why you did not
20 get the scheduler position?
21 A. I do not know.
22 Q. Was it -- when you interviewed for the
23 scheduler position, was it before or after you
24 called Shell's help line?

Page 57

1  A.      It was after.
2  Q.      You called Shell's help line in November
3  of 2016, does that fit with your recollection?
4  A.      I did not call -- it was an online email
5  or --
6  Q.      An online process with their help line,
7  correct?
8  A.      Yes.
9  Q.      In November 2016, correct?
10  A.      Yes.
11  Q.      Is it your testimony that you applied
12  for the scheduler position after you went on the
13  help line?
14  A.      Yes.
15  Q.      Was it -- when did, to your
16  understanding, either Hondo or Mr. Turney learn
17  about your allegations?
18  A.      Well, I had been complaining prior to
19  that about --
20  Q.      To my understanding, you correct me if
21  I'm wrong, according to the documents that you
22  filed, you made -- prior to November 2016, you
23  only made one complaint with Hondo Blakely in May
24  of 2016; is that correct?

Page 58

1  A.      No.  I complained to Will Turney also.
2  Q.      When did you first complain to
3  Mr. Turney?
4  A.      In 2016.
5  Q.      When in 2016?
6  A.      I don't -- I can't recall the exact
7  date.
8  Q.      How close in time was it to when you
9  went on Shell's help line?
10  A.      It was more towards the beginning of the
11  year.  There wasn't just one instance where I
12  complained to him, I complained to him a few
13  times -- I complained to him a few about the
14  things that were happening.
15  Q.      Were all of your complaints to
16  Mr. Turney verbal?
17  A.      No.
18  Q.      You gave him written complaints, too?
19  A.      I texted him about certain co-workers
20  that I was having issues with.
21  Q.      Were those complaints of sexual
22  harassment?
23  A.      Yes.
24  Q.      Your counsel produced during discovery

Page 59

1  what they said were relevant emails from you.  I'm
2  going to hand you all of the -- not emails, I'm
3  sorry, texts that you provided to them.  We're
4  going to go off the record and I want you to find
5  in these texts where you complained to Mr. Turney
6  about employees, they were sexually harassing you?
7  Is that --
8  A.      Yes.
9  Q.      I want you to find in these texts that
10  you provided to your counsel and provided to us
11  where you complained to Mr. Turney about an
12  employee or employees sexually harassing you.
13  Okay?
14  A.      Okay.
15  Q.      These are Bates stamped Barnes 587 to
16  Barnes 737.  Okay?
17  A.      Okay.
18  Q.      We're going to take a break.  Okay?
19  Hold off.  Before we take a break, this -- these
20  complaints that you said you gave to Mr. Turney
21  happened in 2016?
22  A.      I believe so.
23  Q.      Then I can cut down some of this.  Let's
24  go off the record.

Page 60

1          THE VIDEOTAPE TECHNICIAN: The
2      time is now 11:34.  Going off the video
3      record.
4              - - -
5          (Whereupon, a brief recess was
6      held.)
7              - - -
8          THE VIDEOTAPE TECHNICIAN: Time
9      is now 11:39.  Back on the video record.
10  BY MR. TUCKER:
11  Q.      Ms. Barnes, while we were off the video
12  record, I asked you to fold the pages from these
13  text messages that you sent to Mr. Turney where
14  you complained about other employees sexually
15  harassing you; is that correct?
16  A.      Yes.
17  Q.      You went through all the texts and you
18  folded back several pages, correct?
19  A.      Yes.
20  Q.      At the bottom of these pages you'll see
21  a number your counsel put on it, whether it's
22  Barnes 682 or Barnes 683.  Do you so that?
23  A.      Yes.
24  Q.      You folded back this page.  Where on

Page 61

1　here are you talking about?  Tell me the specific
2　page number you're referring to.  Okay?
3　A.　　Actually not this side.
4　Q.　　And that's Barnes 683, correct?
5　A.　　Yes.
6　Q.　　Could you identify for me where by
7　pointing?
8　A.　　(Indicating.)  Here, down.
9　Q.　　So this is a text communication between
10　yourself and Mr. Turney from Friday, May 20th,
11　correct?
12　A.　　Correct.
13　Q.　　And you're starting at the 11:41 a.m.
14　text message?
15　A.　　Yes.
16　Q.　　And it says, What are you upset about
17　that isn't done.
18　　　　That's what you sent him,
19　correct?
20　A.　　Correct.
21　Q.　　Meaning Mr. Turney.
22　　　　He says, With what dear.
23　　　　Then you write back, I don't
24　know.  Ken said that you were upset I didn't have

Page 62

1　some things via Z6s.
2　　　　Then Mr. Turney writes you back,
3　What, no, I wasn't.  I would come straight to you
4　and put you in a headlock if I was upset.  You
5　know I don't beat around the bush girl.
6　　　　Then he writes, you want me to
7　put Ken in a head lock.
8　　　　Then you write back, I want him
9　to stop being a manipulative ass hole is what I
10　want.  Just because he doesn't want to schedule
11　and yes, I want you to beat him up LOL.
12　　　　He writes back LOL, consider it
13　done. I'm here for you.  I'll talk with them.
14　　　　You write back, I just want to
15　do my job.  I wish I could make all these happen
16　overnight for you, but I can't.  Thank you.
17　　　　That is the first instance of
18　have you complaining to Mr. Turney about sexual
19　harassment?
20　　　　MS. GURMANKIN: Objection to
21　form.
22　BY MR. TUCKER:
23　Q.　　Or discrimination?
24　A.　　Correct.

Page 63

1　Q.　　And is this sexually harassing -- are
2　you making complaints of sexual harassment or just
3　discrimination?  What are you making a complaint
4　about here?
5　A.　　Both.
6　Q.　　Who is harassing you or discriminating
7　against you?
8　A.　　Ken Forman.
9　Q.　　Could you give me some context as to
10　what is going on here that you find this harassing
11　or discriminatory by Mr. Forman?  This is because
12　of your gender that Mr. Forman is doing this?
13　A.　　Right.
14　Q.　　Tell me why you believe so based on this
15　text exchange?
16　A.　　I was complaining to Will Turney
17　about -- a Z6, it was a part of my job and Ken was
18　taking that work and doing it on his own and
19　telling me that Will was upset about me not doing
20　it.  That's is why I asked why are -- are you
21　upset that isn't done?
22　Q.　　And Mr. Turney told you he was not
23　upset, correct?
24　A.　　Correct.

Page 64

1　Q.　　And Mr. Turney further told you that he
2　would speak to Ken about this, correct?
3　A.　　Correct.
4　Q.　　And you believe Ken was doing this
5　because of your gender?
6　A.　　Correct.
7　Q.　　Why do you believe that?
8　A.　　He belittled me a lot and saying that
9　Will was upset with me because it wasn't done.
10　Led me to believe that he -- he was saying because
11　I was a woman, I wasn't getting -- I wasn't
12　working enough, hard enough or getting these
13　things done quick enough.
14　Q.　　And you made that assumption, correct?
15　A.　　Yes.
16　Q.　　In this first text exchange, it's fair
17　to say that Mr. Turney took your side over Ken's,
18　correct?
19　A.　　No.
20　Q.　　Based upon this exchange where he says
21　he wasn't upset, it's your impression that he took
22　Ken's side?
23　A.　　Yes, because it didn't stop.
24　Q.　　At least in this text exchange, he

Page 65

1  indicated that he was not upset with you and he
2  was siding with you, correct? Mr. Turney?
3  A.      He led me to believe that he was.
4  Q.      Okay. Where -- you have another fold
5  here. And is this Barnes 687 you have folded?
6  A.      Yes.
7  Q.      Where in here were you referring to?
8  A.      Well, it actually starts on this side.
9  Q.      And this is from Thursday, May 25th,
10  2016, correct?
11  A.      Yes.
12  Q.      I'm not intimidating you by reaching at
13  you?
14  A.      Oh, no, no.
15  Q.      Are you comfortable with me reaching?
16  A.      I'm comfortable.
17  Q.      This starts Thursday, May 26th, 2016 at
18  10:50 a.m.?
19  A.      Correct.
20  Q.      You sent Mr. Turney a text saying where
21  are you, correct?
22  A.      Yes.
23  Q.      He responds back almost an hour later
24  saying, What's up.

Page 66

1           You write back, Never mind.
2           He writes back, humm, checking
3  on me. You miss me I assume.
4           You write back, I'm pissed and
5  want to go home. Can I finish my day out at home?
6           He writes back, why, what's
7  wrong? Call me in private.
8           You write back, I can't talk
9  right now. Do you care if I go home. I'm fine, I
10  just can't work here today.
11           He writes back, I guess, but I
12  want an explain when you get home please. Thank
13  you.
14           You write back. Okay.
15           He writes back, you home.
16           You write back, yeah, working in
17  the schedule break down.
18           He writes you back call,
19  question mark.
20           Did you speak to Mr. Turney that
21  day?
22  A.      Yes.
23  Q.      What did you tell Mr. Turney that day?
24  A.      That day Ken Forman had put his hands

Page 67

1  through my hair and I was upset about it that I
2  didn't want to work because our cubicles were
3  right next to each other.
4  Q.      Could you, using your hands on your
5  hair, show me how Ken put his hands through your
6  hair?
7  A.      Well, he came up from behind me and
8  would go like this. (Indicating.)
9  Q.      Pulled your hair almost like in a --
10  like he was going to make a ponytail out of it,
11  put it to the side?
12           MS. GURMANKIN: Objection to the
13           form.
14           THE WITNESS: No.
15  BY MR. TUCKER:
16  Q.      Just what you did, that's what he did?
17  A.      Yeah.
18  Q.      What, if anything, did he say to you?
19  I'm time talking about Ken. When he touched your
20  hair what, if anything, did he say to you?
21  A.      I don't know if he said anything because
22  I immediately told him not to touch me.
23  Q.      And what did he say in response to that?
24  A.      He backed up and put his hands up?

Page 68

1  Q.      Anything else happen after that?
2  A.      Not at that time.
3  Q.      Was it around that time that you sent
4  this text that we're referring to, to Mr. Turney?
5  When you said you were upset? I'm pissed, I want
6  to go home?
7  A.      Right.
8  Q.      And when you got home, and the last text
9  I see is around 1:01 p.m. And he says call,
10  question mark. You called him then?
11  A.      Right.
12  Q.      What did you say to him, if anything?
13  A.      I explained to him what happened.
14  Q.      What did he say?
15  A.      That he would have a talk with him.
16  Q.      What did you say?
17  A.      Okay.
18  Q.      What happened next?
19  A.      I'm unaware if he talked to him. He
20  didn't follow up.
21  Q.      After that time, did he ever touch your
22  hair again?
23  A.      Yes.
24  Q.      When was that?

Page 69

1 A.    I'm sorry, no, not after this time.
2 Q.    So after this time where you told
3 Mr. Turney -- and we can agree this happened May
4 26th, 2016, that you went home that day upset, you
5 and he spoke, he said he would speak to Ken?
6 A.    It's possible he did it again, but I
7 just can't recall right now the exact timeline of
8 -- because there was many -- or not many, multiple
9 times that he put his hands on me.
10 Q.    There were multiple times that Ken put
11 his hands on you?
12 A.    Yes, through my hair.
13 Q.    Did you -- when you had this
14 conversation with Mr. Turney, and we're referring
15 to this conversation of May 26th, 2016, had you
16 told him that there were multiple times that he
17 had put his hands through your hair?
18 A.    I told Turney that he did, that Ken put?
19 Q.    Let me back up. That's my fault. We
20 can agree that this text that we've been going
21 over which is on Barnes 686 and Barnes 687 refers
22 to an instance where you allege that Ken put his
23 hands through your hair and you became so upset
24 went home, correct?

Page 70

1 A.    Correct.
2 Q.    You spoke to Mr. Turney later that day,
3 correct?
4 A.    Correct.
5 Q.    Did you tell Mr. Turney that Ken had put
6 his hands in or through your hair on prior
7 occasions at that time?
8 A.    Yes.
9 Q.    You can't think, as we sit here today,
10 of another occasion after that where Ken put his
11 hands through your hair; is that correct?
12 A.    Not after that, but before.
13 Q.    I apologize.
14         THE VIDEOTAPE TECHNICIAN: Time
15     is now 11:49. This concludes disc one.
16         - - -
17         (Whereupon, a brief recess was
18     held.)
19         - - -
20         THE VIDEOTAPE TECHNICIAN: Time
21     is now 11:55. This begins disc two.
22 BY MR. TUCKER:
23 Q.    Ms. Barnes, we started looking at your
24 text with Mr. Turney because you said you texted

Page 71

1 him about certain co-workers. It was only one
2 co-worker you texted him about, correct? At least
3 according to the text that we went through,
4 correct?
5 A.    Yeah, those two texts.
6 Q.    Those were the two instances where you
7 texted him about what you perceived to be sexual
8 harassment or discrimination, correct?
9 A.    That was the only time? I'm sorry, I
10 didn't understand the question.
11 Q.    That was the only two times where you
12 texted Mr. Turney about what you perceived to be
13 co-employees sexually harassing you or
14 discriminating against you, correct?
15 A.    Texted, him yes.
16 Q.    Did you ever write him in any other
17 format?
18 A.    I don't recall right now.
19 Q.    Did you keep a personal journal at home?
20 A.    No.
21 Q.    Did you ever keep -- do you have a
22 journal? Have you ever journaled your thoughts,
23 things that are happening to you at work or
24 anything?

Page 72

1 A.    Yes, I have.
2 Q.    Do you still have that journal?
3 A.    Yes.
4 Q.    Have you provided it to your counsel?
5 A.    Yes.
6         MR. TUCKER: Have you provided
7     it to us?
8         MS. GURMANKIN: I believe we
9     have.
10 BY MR. TUCKER:
11 Q.    When did you start keeping that journal?
12 A.    After I spoke to Hondo Blakely.
13 Q.    In May of 2016?
14 A.    Yes.
15 Q.    Why did you start keeping a journal? Did
16 your sister suggest -- did your sister suggest
17 that you keep a journal?
18 A.    No, Hondo Blakely suggested I keep or
19 start documenting the things that I complained to
20 him about.
21 Q.    Did you start doing that?
22 A.    Yes.
23 Q.    Were you thorough, complete and
24 accurate?

1 A.      I tried to be.
2 Q.      The position that you applied for, the
3 preventative maintenance planner position -- I'm
4 going to hand you a document that's marked as
5 Barnes-3.  I'd ask you to take an opportunity to
6 take a look at that, please, and notify me when
7 you finish.
8                    - - -
9              (Whereupon, Barnes-3 was marked
10        for identification and is attached
11        hereto.)
12                    - - -
13             THE VIDEOTAPE TECHNICIAN: Do you
14        want to go off the video?
15             MR. TUCKER: Let's go off the
16        video.
17             THE VIDEOTAPE TECHNICIAN: The
18        time is now 11:58.  Going off the video
19        record.
20                    - - -
21             (Whereupon, a brief recess was
22        held.)
23                    - - -
24             THE VIDEOTAPE TECHNICIAN: The

1         time is now 11:59.  Back on the video
2         record.
3 BY MR. TUCKER:
4 Q.      Have you had an opportunity to look at
5 the document we've marked as Barnes-3?
6 A.      Yes.
7 Q.      Do you recognize this document?
8 A.      Yes.
9 Q.      What is it?
10 A.      My resume.
11 Q.      Isn't it more your online application
12 for the position?
13 A.      Right.
14 Q.      Was I accurate?
15 A.      Yeah, it's the -- or the -- I upload my
16 resume into a database.
17 Q.      And that was your attempt to become --
18 when you applied for the position, correct?
19 A.      Correct.
20 Q.      Who are the decisions-makers for that
21 position?  Who decided whether or not you would or
22 would not get that position?
23 A.      Michelle Priest and Brett Kirk, I
24 believe his name was.

1 Q.      Are you in this litigation alleging that
2 either or both of them discriminated or retaliated
3 against you in not giving you that position?
4 A.      Yes.
5 Q.      On what basis do you make that?
6 A.      Michelle Priest was directly involved
7 with my complaints.
8 Q.      Did you complain to her about -- did you
9 complain that she had discriminated or harassed
10 you?
11 A.      No.
12 Q.      So it's only Michelle Priest that you
13 are complaining retaliated against you for making
14 complaints of harassment and discrimination by
15 making sure you didn't get that job?
16 A.      A part of it, yes.
17 Q.      Who else retaliated against you by
18 making sure you didn't get that job?
19 A.      I'm not sure of everybody that was
20 involved with the hiring process.  Those were the
21 two I'm aware of.
22 Q.      But of the two, you believe only
23 Michelle Priest retaliated against you by making
24 sure you didn't get the job?

1 A.      Yes.  The company, she's part of the
2 company.
3 Q.      I know, but the company acts through
4 individuals.  What individuals other --
5 A.      Michelle Priest.
6 Q.      How do you know that Michelle Priest
7 retaliated against you?  What do you make that --
8 what's the basis for you making that statement
9 that Ms. Priest retaliated against you by you not
10 getting that job?
11 A.      Because I complained about sexual
12 harassment and discrimination.
13 Q.      So is it your testimony that merely
14 because you informed Ms. Priest about sexual
15 discrimination and harassment, she made sure you
16 didn't get that job?
17 A.      Yes.
18 Q.      Tell me everything that Ms. Priest did
19 to prevent you from getting that job?
20 A.      I didn't even get a call.  I wasn't
21 informed of why I didn't get it.
22 Q.      Have you told me everything that
23 Ms. Priest has done to prevent you from getting
24 that job?

Page 77

1 A.    I believe so.
2 Q.    Can I have that back?
3 A.    Sure.
4 Q.    Do you know the name of the person who
5 did get the job?
6 A.    Yes.
7 Q.    What was his name again?
8 A.    Leon.
9 Q.    Leon?
10 A.    I don't know his last name, just Leon.
11 Q.    Do you know anything about his
12 qualifications?
13 A.    I do not.
14 Q.    You don't know whether he was more
15 qualified than you?
16 A.    I do not.
17 Q.    Do you know what role Ms. Priest
18 actually played in the selection of the person?
19 A.    She was posted as the HR representative
20 for that role.
21 Q.    As the HR representative, it's your
22 belief that she made the decision for you not to
23 get the job in retaliation for you making
24 complaints?

Page 78

1 A.    She was a part of that decision.
2 Q.    What role, what part did she play in the
3 decision process?
4    MS. GURMANKIN: Objection to
5 form. Go ahead.
6    THE WITNESS: She was -- I'm
7 sorry. Can you repeat that question?
8    MR. TUCKER: I'll have it read
9 back.
10    - - -
11    (Whereupon, the court reporter
12 read back the appropriate portion of the
13 transcript.)
14    - - -
15    THE WITNESS: She's the HR. She
16 would be the person to do all the HR
17 paperwork, all the -- her input,
18 approval of the hiring.
19 BY MR. TUCKER:
20 Q.    How do you know that? Did someone tell
21 you or is this just a belief you have?
22 A.    This is a belief I have.
23 Q.    You have no facts to support that other
24 than your belief, correct?

Page 79

1    MS. GURMANKIN: Objection to
2 form.
3    THE WITNESS: Right. Because
4 she's part of the human resources. I
5 believe that's what they do.
6 BY MR. TUCKER:
7 Q.    In indicating why you left Shell, you
8 talked about a harassment, that you were
9 continuing to have harassment in 2019, correct?
10 A.    I was working in a hostile work
11 environment.
12 Q.    It's your position that one of the
13 persons who was creating -- well, there were three
14 people who were creating that hostile work
15 environment in 2019, Will Turney, Hondo Blakely
16 and Ken Forman, correct?
17 A.    That I can think of right now.
18 Q.    Where was Mr. Turney physically located
19 at the time that you left -- where was he
20 physically stationed at the time you left Shell?
21 A.    I believe he went to Texas.
22 Q.    When did he go to Texas?
23 A.    I'm not sure of his hire date or --
24 Q.    Was it in 2019?

Page 80

1 A.    I believe so.
2 Q.    When in 2019? Was it before you left?
3 A.    I'm not sure when he was in -- when he
4 transferred to Texas.
5 Q.    At the time that you -- on the day that
6 you left Shell Oil, was Mr. Turney still in the
7 same physical location where you were?
8 A.    No.
9 Q.    How long had he not been in the same
10 physical location?
11 A.    I'm not sure how long. I don't --
12 Q.    Was he -- go ahead. Where were you
13 physically located at the time you left? Where
14 was your location?
15 A.    Wellsboro, Pennsylvania.
16 Q.    In the Wellsboro facility -- it's a
17 facility, correct?
18 A.    Correct.
19 Q.    Where was Mr. Blakely physically located
20 in the facility in relation to you? Where was his
21 work area in relation to yours?
22 A.    On the opposite side of the building.
23 Q.    How frequently would you see
24 Mr. Blakely?

Page 81

1 A. Weekly, if not daily.
2 Q. What interactions did you have to have
3 with him?
4 A. We had to talk about work.
5 Q. Go ahead.
6 A. He's our superintendent.
7 Q. And it's your position that Mr. Blakely
8 and you communicated with each other almost daily?
9 A. Yes.
10 Q. Was he harassing you during these daily
11 meetings?
12 A. There were times.
13 Q. Identify for me 2019 those times where
14 Mr. Blakely harassed you because of your gender?
15 A. He left me a note on my desk asking why
16 we -- I don't know the exact words because I don't
17 have it in front of me, but he said why don't we
18 talk any more. There were other times that he
19 would ask me, oh, do you even work here because I
20 spent a lot of times in the field. Tried to.
21 Q. You've indicated two instances where he
22 left you a note, says why don't we talk anymore
23 and he said, oh, do you even work ear hear any
24 more?

Page 82

1 A. Right.
2 Q. Was that a note or was that a statement
3 he made to you?
4 A. A statement.
5 Q. Anything else that you recall in 2019
6 Mr. Blakely said to you that you found
7 discriminatory?
8 A. He said that he was aware that I was
9 getting paid less.
10 Q. Less than?
11 A. Than I should be, or somebody in that
12 role would be paid.
13 Q. Anything else?
14 A. Not that I can think of right now.
15 Q. Have you identified for me all of the
16 statements made by Mr. Blakely in 2019 that you
17 feel that were harassing or discriminatory?
18 A. I'm sorry. Can you repeat the question?
19 Q. Have you identified for me all of the
20 statements made by Mr. Blakely, and by statements
21 I mean writings also, made by him to you in 2019
22 that you believe were discriminary or harassing?
23 A. He also texted me about being in my
24 area. When I say area it's, like, where I live,

Page 83

1 Tioga, Pennsylvania, where I did live. And about
2 him wanting me on the -- we had a softball league
3 through Shell.
4 Q. Were those two different texts, that he
5 text you he was in your area?
6 MS. GURMANKIN: Is that yes?
7 THE WITNESS: Yes, sorry.
8 BY MR. TUCKER:
9 Q. And then the other text was he wanted
10 you to be on the softball team?
11 A. Correct.
12 Q. And him texting that he was in your
13 area, you believe was harassing you because of
14 your gender or it was retaliating because you made
15 complaints?
16 A. He was harassing me.
17 Q. Him asking you to play on the softball
18 team, was that him harassing you because of your
19 gender or retaliating against you?
20 A. He was --I'm sorry. I didn't mean to
21 cut you off.
22 Q. Was that him harassing you and/or
23 retaliating against you for making complaints of
24 discrimination?

Page 84

1 A. He was harassing me because of my sex.
2 Q. When he asked you to play on the
3 softball team?
4 A. Correct.
5 Q. Go ahead.
6 A. He also texted me about checking myself
7 for ticks because I worked in Bradford,
8 Pennsylvania also, and it was in the middle of the
9 woods.
10 Q. And you believe that was harassment,
11 too?
12 A. Yes.
13 Q. Because of your sex?
14 A. Correct.
15 Q. Do you believe it was in retaliation for
16 you making complaints of harassment or
17 discrimination?
18 A. I believe it was sexual harassment.
19 Q. You indicated these statements, why
20 don't we talk any more, do you even work here any
21 more, were those also in retaliation, those
22 statements by him, retaliation for you making
23 complaints of discrimination?
24 A. I believe so.

1 Q. Have you told me everything that
2 Mr. Blakely did to you in 2019 that you found to
3 be harassing because of your gender as well as
4 retaliatory because you made complaints of
5 discrimination?
6 A. That I can think of right now.
7 Q. Well, like I indicated earlier, today is
8 my only chance to get an opportunity to ask you
9 these questions. You realize that, correct?
10 A. Yes.
11 Q. You knew you were coming here to tell me
12 everything about this event, which has been
13 traumatic to you, correct?
14 A. Correct.
15 Q. It's been so traumatic that you reported
16 to have gone and seen a therapist on three
17 occasions, correct?
18 A. Correct.
19 Q. You want to be able to fully tell what
20 happened to you both to myself and later onto an
21 jury, correct?
22 A. Correct.
23 Q. So when we get to trial, are you going
24 to be able to remember additional things?

1 MS. GURMANKIN: Objection to
2 form.
3 BY MR. TUCKER:
4 Q. Do you think you'll be able to remember
5 later on additional things?
6 MS. GURMANKIN: Same objection.
7 THE WITNESS: I can't really
8 answer that question.
9 BY MR. TUCKER:
10 Q. Is your memory pretty clear now of the
11 events that happened to you?
12 A. Yes.
13 Q. In 2019, we have gone over everything
14 that Hondo Blakely did to you. Let's talk about
15 Ken Forman. Identify for me all of the acts done
16 by r. Forman that you believe were in retaliation
17 for you making complaints of harassment and
18 discrimination?
19 A. In 2019 only?
20 Q. Yes. The reason I'm doing 2019, I'm
21 trying to give you pockets so we can keep this
22 organized. I am going to go ask you other time
23 periods, too. But right now you indicated to me
24 certain things happened in 2019 that caused you to

1 leave Shell, correct?
2 A. Yes.
3 Q. We talked about the promotion issue,
4 correct?
5 A. Correct.
6 Q. Now, we're talking about the individual
7 conduct of these three people. Okay?
8 A. Yes.
9 Q. We have talked about all the things that
10 Mr. Blakely did to you in 2019, correct?
11 A. Correct.
12 Q. Now we're talking about all the things
13 that Mr. Forman did to you in 2019. So why don't
14 you begin by telling me all the acts that you
15 believe that Mr. Forman did in retaliation for you
16 making complaints of discrimination and
17 harassment?
18 A. Just being around, having to work with
19 him. He was in some sort of direct control of my
20 schedule on a daily basis.
21 Q. So just the mere fact of him being
22 around you felt was retaliatory?
23 A. Yes.
24 Q. What did he say or do to you?

1 A. He would ask me questions about work. I
2 had to work with him on my schedule being around
3 him.
4 Q. What about this did you find retaliatory
5 or discriminatory? Were you and he required to
6 work with each other?
7 A. I had to work with him, yes.
8 Q. Is it your position that you should not
9 have been made to work with him?
10 A. Correct.
11 Q. So the whole fact that you had -- the
12 mere fact you had to work with Mr. Forman, you
13 believe was discriminatory and retaliatory,
14 correct?
15 A. Retaliatory, yes.
16 Q. Did he say anything to you during that
17 time period in 2019 of a gender-based nature? Did
18 he say things like you're hot blond? Did he touch
19 your hair? Did he kiss you or anything like that?
20 A. No.
21 Q. Did he comment on your physical
22 appearance?
23 A. Yes, because I was dressing differently
24 because I had to be in the field.

Page 89

1 Q. What did he say, if anything, to you?
2 A. He would always make comments -- not
3 always, but often make comments about, in the
4 winter when we had to -- we didn't have to wear,
5 went I wore beanies to keep warm on my head.
6 Q. What would he say?
7 A. I don't remember the exact statement,
8 but he would say something about I looked like
9 something with a fisherman, the way I looked.
10 Q. The Gordon's fisherman?
11 A. Maybe. I don't know. It was something
12 looked like I just got back from the docks because
13 I look like a fisherman.
14 Q. You found that to be sexually
15 harassing?
16 A. Yes.
17 Q. Anything else?
18 A. No.
19 Q. We have gone through Mr. Forman, we have
20 gone through Mr. Blakely in 2019. Now, let's turn
21 to Mr. Turney. A little pun there. Let's turn to
22 Turney. In 2019, identify all the acts and
23 actions by Mr. Turney that you found retaliatory,
24 discriminatory and/or harassing?

Page 90

1 A. The fact that I had to work with him and
2 be around him. The fact that I couldn't go to
3 meetings because of him and also Hondo and Ken's
4 presence in those meetings.
5 Q. Let me stop you. I apologize. I'm
6 breaking my rule. I sincerely apologize. We're
7 going to get back to Mr. Turney. You're saying
8 the fact that you couldn't go to meetings where
9 Mr. Turney, Blakely and Forman were there?
10 A. Right.
11 Q. Who instructed you not to go to
12 meetings?
13 A. I was told I didn't have to going to the
14 meetings if I didn't feel comfortable going to the
15 meetings. Because I complained about having --
16 wanting to be in these meetings, most of the
17 meetings were mandatory for everybody else.
18 Q. What were the nature of the meetings?
19 Did you ever go to any of the meetings?
20 A. I may have gone to one because it was
21 mandatory that I sign a training form.
22 Q. Did anything happen to you during that
23 meeting?
24 A. I stood outside the door. The way our

Page 91

1 conference room is set up, similar to this one,
2 they usually left the doors open so that people --
3 I could just stand by the doorway.
4 Q. It was so crowded that people were
5 standing in the doorway?
6 A. No, I could have fit, but I didn't want
7 to go in.
8 Q. Were there other people outside the
9 doorway with you?
10 A. I believe so.
11 Q. This was in 2019?
12 A. Yes.
13 Q. What was the nature of the, meeting?
14 A. It was a safety meeting.
15 Q. Do you recall headed the meeting?
16 A. I don't.
17 Q. So is it your position in this
18 litigation that because you had to meetings with
19 Mr. Turney, Mr. Forman and Mr. Blakely, that that
20 was in retaliation and harassment -- that was
21 harassment by Shell?
22 A. Yes.
23 Q. Is it your position in this litigation
24 that they should have removed you or removed them

Page 92

1 from working together?
2 A. I don't think they should have removed
3 me. I think they should have removed them.
4 Q. Do you know if anyone was disciplined
5 because of your allegations of discrimination and
6 gender harassment?
7 A. I did not know.
8 Q. After -- did Mr. Turney ever say
9 anything to you in 2019 of a harassing nature, of
10 a sexually harassing nature?
11 A. Not in 2019.
12 Q. Did Mr. Turney ever touch you in 2019?
13 A. No.
14 Q. Did he text you in 2019?
15 A. No.
16 Q. Tell me everything that -- you talked
17 about the fact that you would have had to go to
18 meetings with Mr. Turney, but you were instructed
19 if you did not feel comfortable going to a meeting
20 you should not go, correct?
21 A. Correct.
22 Q. You took that advice, correct?
23 A. Correct. But I wanted to go to the
24 meetings.

1 Q.     You attended one meeting, correct?

2 A.     That I can recall, yes.

3 Q.     No one said anything or did anything to

4 you during those meetings in 2019, correct?

5 A.     No, they didn't do anything to me.

6 Q.     When did you first stop attending these

7 safety meetings?  I mean, you made the complaint

8 in 2016, correct?

9 A.     Yes.

10 Q.     We're all the way at 2019.  I've been

11 limiting your testimony to 2019.  Let's talk about

12 the entire time period from when you first made

13 the allegations of harassment and discrimination

14 to the time that you left, did you ever attend any

15 of these meetings?

16 A.     Not after I complained.

17 Q.     So after November of 2016, you never

18 attended any of these meetings except for at least

19 one safety meeting you can recall in 2019,

20 correct?

21 A.     Correct.

22 Q.     You attended these meetings though prior

23 to making the allegations of discrimination and

24 harassment, correct?

1 A.     I attended some of them, not all of

2 them.

3 Q.     Did you ever have to make a presentation

4 at any of these meetings?

5 A.     I didn't present, but I helped make

6 presentations at times.

7 Q.     How many -- when you say help make, what

8 do you mean helped make?

9 A.     I worked with Wayne, our safety

10 coordinator I think his title is, he would ask me

11 for his help on the presentations and I would help

12 him create the presentations for the safety

13 meetings.

14 Q.     This was all before November 2016?

15 A.     Yes.

16 Q.     Have you told me everything that Will

17 Turney did to you in 2019 of a harassing or

18 retaliatory nature?

19          Because the only thing you've

20 told me is that he -- you had to attend meetings

21 with him that you wanted to go that you didn't go

22 to.  Is there anything else?

23 A.     Just him working there and being at the

24 office.  We had a separate office in our warehouse

1 that he would often be at, and I had to be there

2 for my job and he would -- he asked me about the

3 chemical room that I worked in, and if I wanted it

4 to be cleaned, I needed to leave the door open.

5 Q.     You found that statement to be sexually

6 harassing?

7 A.     No.  That was just an interaction that I

8 had to have with him.

9 Q.     And you feel that you should not have

10 had -- you should not have had to have any

11 professional interactions with him; is that your

12 position in this litigation?

13 A.     Yes.

14 Q.     The mere fact that you have professional

15 interactions with him, that to you constituted the

16 harassment and retaliation?

17 A.     Yes.

18          MR. TUCKER: Do you want to take

19 a lunch break until 1:00?  It's 12:21.

20          MS. GURMANKIN: Sure.

21          THE VIDEOTAPE TECHNICIAN: The

22 time is now 12:24.  We're going off the

23 video record.

24          - - -

1          (Whereupon, a luncheon recess

2 was held.)

3          - - -

4          THE VIDEOTAPE TECHNICIAN: The

5 time is now 1:07.  Back on the video

6 record.

7 BY MR. TUCKER:

8 Q.     Ms. Barnes, before you left Shell in

9 2019, did anyone threaten you with discharge?

10 A.     I was told my job was in jeopardy by

11 Steve Ellis.

12 Q.     When you say you were told your job was

13 in jeopardy, what do you mean?

14 A.     He said I would be the first one to go

15 out of his team.

16 Q.     For what reason?  They were having

17 layoffs?

18 A.     Yes.

19 Q.     Do believe he was telling you that in

20 retaliation for you making claims of harassment

21 discrimination?

22 A.     Yes.

23 Q.     What do you base that upon?

24 A.     Because it was after I complained.

Page 97

1 Q. Anything else other than that?
2 A. Not that I can think of right now.
3 Q. When you -- in the months leading to
4 2019, did you -- were you transferred to a less
5 desirable position? In the whole 2019, did anyone
6 transfer you to a less desirable position?
7 A. Yes. They removed me from my role as an
8 analyst and put me into a demotion.
9 Q. What was the demotion? When did they
10 remove you as an analyst?
11 A. January 2017.
12 Q. So my question was, in 2019, did anyone
13 transfer you in 2019? In January 2019 until --
14 what was date you left? May 2019?
15 A. I believe it was April.
16 Q. From January to April 2019, did anyone
17 transfer you to a less desirable position?
18 A. Yes. When I came back from my FMLA, I
19 was not returned to the same position.
20 Q. What position were you returned to?
21 A. Still don't know.
22 Q. Was your pay reduced?
23 A. No.
24 Q. Did you have an incident where you got

Page 98

1 drunk at a Christmas party in 2018?
2 A. I had drinks at a Christmas party for
3 Shell.
4 Q. And you got so drunk that you began
5 throwing up on your way home?
6 A. I threw up that night.
7 Q. When you went out to the car to throw
8 up, did you hit your face on the concrete?
9 A. I fell.
10 Q. How did you fall?
11 A. Opening up the door.
12 Q. Were you that intoxicated that you fell?
13 A. I'm assuming alcohol had something to do
14 with me falling.
15 Q. Did you go to the hospital that night?
16 A. Not that night.
17 Q. Did you go at all?
18 A. Yes.
19 Q. What hospital did you go to?
20 A. Corning Hospital.
21 Q. In Corning, New York?
22 A. Yes.
23 Q. What injuries did you suffer?
24 A. bruising.

Page 99

1 Q. Where?
2 A. On my face.
3 Q. Did you seek any medical treatment?
4 A. They did an examination there.
5 Q. How long after this incident did you go
6 out -- did you say on family leave?
7 A. FMLA?
8 Q. Yeah. How long after this incident,
9 this drinking and falling incident, did you go out
10 on FMLA?
11 A. Shortly after.
12 Q. Did you ever return to work after this
13 drinking and falling incident?
14 A. Yes.
15 Q. When did you return to work?
16 A. That was on Monday.
17 Q. Then how long after that you did go out
18 on family leave?
19 A. I believe I went out on FMLA in February
20 or March -- oh, no, I'm sorry. I'm not sure of
21 the date I went out on FMLA.
22 Q. What was the reason you went out on
23 FMLA?
24 A. Because the anxiety that I was

Page 100

1 experiencing was so severe.
2 Q. Did you seek any treatment from any
3 doctor because of this anxiety?
4 A. Yes.
5 Q. What doctor did you seek treatment with?
6 A. Courtney Babcock.
7 Q. It's things that we talked about that
8 happened to you in 2019, are those the events that
9 caused you anxiety?
10 When I say that we talked about,
11 with Will Turney, Hondo Blakely and Ken Forman did
12 to you in 2019, as far as harassment and hostile
13 work environment?
14 A. It was a part of why I left.
15 Q. What else caused you to go out?
16 A. All the complaints, the retaliation, the
17 sexual harassment as a whole.
18 Q. From prior, from before 2019?
19 A. Right.
20 Q. All that accumulated and caused you to
21 go out?
22 A. Right.
23 Q. If I understand correctly, you told me
24 earlier that when you saw Mr. Blakely in May 2016

Page 101

1 and made complaints to him about harassment, he
2 told you to keep a journal?
3 A.    Yes.
4        MR. TUCKER: Can we take a
5 break?
6        THE VIDEOTAPE TECHNICIAN: The
7 time is now 1:13.  Going off the video
8 record.
9              - - -
10       (Whereupon, a brief recess was
11 held.)
12             - - -
13       THE VIDEOTAPE TECHNICIAN: The
14 time is now 1:18.  Back on the video
15 record.
16 BY MR. TUCKER:
17 Q.    I'm going to hand you a document which
18 we will mark as Barnes-4.
19              - - -
20       (Whereupon, Barnes-4 was marked
21 for identification and is attached
22 hereto.)
23             - - -
24 BY MR. TUCKER:

Page 102

1 Q.    Take a look.  It's produced by your
2 counsel and it has Bates stamp number of 207 to
3 212.  Do you see that?
4 A.    Yes.
5 Q.    What is this document?  What is it?
6 A.    This is a notebook that I would put all
7 of things that were happening to me.
8 Q.    This is the notebook that you started
9 keeping after you spoke to Mr. Blakely?
10 A.    Yes.
11 Q.    Looking at page 212 -- I mean 207, do
12 you see that?  Do you see 207, the very first?
13 A.    Yeah.
14 Q.    There was a post-it on there.  Do you
15 see that?
16 A.    Yes.
17 Q.    Whose post-it is it?
18 A.    Hondo Blakely's.
19 Q.    Is that the post-it that you talked
20 about he put there in 2019?
21 A.    He put it on my computer screen.
22 Q.    Previously you said, he said why don't
23 we talk any more.  Is this actually what he said?
24 A.    Correct.

Page 103

1 Q.    If you begin looking at this on page
2 2008 -- you're on page 208?
3 A.    Yes.
4 Q.    This actually refers to a 2014 event,
5 correct?
6 A.    Yes.
7 Q.    You didn't write this in 2014, did you?
8 A.    No.
9 Q.    Were these events written -- the 2016
10 event, was that written close in time to when it
11 actually happened?
12 A.    Yes, yeah.
13 Q.    Which things did you start -- are all of
14 these things which you wrote down after you spoke
15 to Mr. Blakely?
16 A.    Yes.
17 Q.    Were they written down at one time or
18 would you go from time to time and write them?
19 A.    Time to time.
20 Q.    Because it looks like they it were all
21 written with the same pen.  Is that true?
22 A.    I don't know if that's true.
23 Q.    It starts with 2000 -- let's start with
24 2016 and 2014.  Did you write the 2014 event down

Page 104

1 at the same time you started the 2016 events?
2 A.    Yes.
3 Q.    And then it continues on without any
4 months or anything like that, you'd agree with me?
5 A.    Can you ask me that again?
6 Q.    There are no time frames written
7 indicating when in 2016 these events happened, you
8 agree with me, correct?
9 A.    Right.
10 Q.    How am I to know looking at this or how
11 would one know looking at this when this happened
12 in 2016?
13 A.    This, you wouldn't know that.
14 Q.    This is the most contemporaneous
15 document you have with what happened in 2016?
16 What I mean by that is, later on you filed an EEOC
17 complaint and later on in 2016 you spoke to
18 Ms. Kloosterman at Shell, correct?
19 A.    Correct.
20 Q.    Was all of this written down before you
21 made your first complaint to Shell's help line?
22 A.    I had a Word document that I was logging
23 incidents in which I provided to the hotline.  I
24 started writing in my day-to-day notebook that I

1 took meetings and ripped out because I didn't want
2 that in my day-to-day notebook. And I was trying
3 to consolidate it, then I thought it wasn't the
4 best way to.
5 Q. When you say your day-to-day notebook,
6 what are you referring to? This document that I'm
7 flipping through here?
8 A. No. It was just a notebook that I took
9 to meetings to write any notes down.
10 Q. I'm going to hand you a document that is
11 Bates stamped Barnes 6 through Barnes -- it goes
12 to like a hundred something. Is this what you
13 mean by your day-to-day notebook?
14 A. Yes.
15 Q. In your day-to-day notebook, you also
16 kept times where you felt you were being harassed
17 or discriminated against?
18 A. Yes.
19 Q. But you threw them away?
20 A. No, I ripped them out.
21 Q. What did you do with them?
22 A. I still have some of them.
23 Q. Have you given them to counsel?
24 A. Yes, but late.

1 Q. Let me have that back. So there are
2 some notes from your day-to-day notebook which
3 show contemporaneous, that is close in time, when
4 an event happened and you took a note about it?
5 A. Right.
6 Q. How recently did you provide that to
7 counsel?
8 A. This month or, I'm sorry, last month,
9 July.
10 MR. TUCKER: Do we have those?
11 MS. GURMANKIN: We produced
12 everything two weeks ago that I got.
13 That's all we have.
14 MS. KIRKPATRICK: What you
15 produced two weeks ago are missing Bate
16 numbers from months ago, correct?
17 MS. GURMANKIN: No. That was
18 the attorney -- I produced documents
19 about two weeks ago. That's everything
20 we have.
21 MR. TUCKER: Off the record for
22 a moment.
23 THE VIDEOTAPE TECHNICIAN: The
24 time is now 1:26. Going off the video

1 record.
2 - - -
3 (Whereupon, a discussion was
4 held off the record.)
5 - - -
6 THE VIDEOTAPE TECHNICIAN: The
7 time is now 1:26. Back on the video
8 record.
9 BY MR. TUCKER:
10 Q. While we were off the record for a
11 second, we sort of had an informal conversation
12 where you said you think it was one sheet of paper
13 from your day-to-day journal you gave counsel?
14 A. Right.
15 Q. Do you recall what it was?
16 A. It was times where I experienced sexual
17 harassment and discrimination at the company.
18 Q. Was it an accumulation of a lot of
19 events or was it one discrete separate event that
20 happened on a particular day that you were keeping
21 in your day-to-day journal?
22 A. It was similarly formatted to this one.
23 Q. When you say this one, you're
24 referring to Barnes-4 and the pages contained in

1 Barnes-4?
2 A. Correct.
3 Q. Did you ever provide that document to
4 anyone at Shell, Barnes-4?
5 A. No.
6 Q. When you were meeting with
7 Ms. Kloosterman, did you provide her that
8 document?
9 A. No, I told her about it.
10 Q. Did you have it with you when you were
11 talking to her?
12 A. No, I provided her a Word document.
13 Q. I'm going to hand you a document. I'm
14 going to step back for a second -- that we'll mark
15 as Exhibit-5.
16 - - -
17 (Whereupon, Barnes-5 was marked
18 for identification and is attached
19 hereto.)
20 - - -
21 BY MR. TUCKER:
22 Q. What is Exhibit-5? It's your resume,
23 correct? It's not a trick question.
24 MS. GURMANKIN: Let her look at

Page 109

1    the pages.
2         THE WITNESS: Yes, it's my
3    resume.
4    BY MR. TUCKER:
5    Q.    This was up-to-date as of the time you
6    left Shell, correct?
7    A.    I believe so.
8    Q.    If goes through education.  It says,
9    Corning Community College, Corning, New York.
10   When were you enrolled in Corning Community
11   College?
12   A.    2017.
13   Q.    While you were working at Shell?
14   A.    Correct.
15   Q.    What classes did you take?
16   A.    I had a business administration major
17   so.
18   Q.    Were you getting tuition reimbursement
19   from Shell?
20   A.    Yes.
21   Q.    How many classes did you take in total?
22   A.    I'd say I took two semesters.
23   Q.    Were your grades -- you took two
24   semesters of classes or you took two classes?

Page 110

1    A.    Two semesters of classes.  I can't
2    remember the exact number of classes I took.
3    Q.    You were taking these classes while you
4    were being subjected to sexual harassment and
5    discrimination at Shell?
6    A.    I took these classes while I was being
7    subjected to retaliation.
8    Q.    Was the retaliation impacting your
9    ability to complete your classes?
10   A.    No.  If anything, it kept my mind off
11   it.
12   Q.    You indicate here, Pennsylvania College
13   of Technology in Williamsport, PA.  When were you
14   taking classes there?
15   A.    2009.
16   Q.    Have you received any degrees outside of
17   your high school diploma?
18   A.    No.
19   Q.    Under training it indicates five
20   different training areas, correct?
21   A.    Correct.
22   Q.    Was all that training given to you while
23   you were at Shell?
24   A.    Yes.

Page 111

1    Q.    Can you go through and identify each
2    year that you received training that you recall of
3    the five things you listed here?
4    A.    Usually we had an annual Maintenance
5    Integrity Execution Sustainability workshop.
6    Q.    In Houston, Texas?
7    A.    They would usually pick a different
8    location every time.
9    Q.    Did you actually travel to Houston,
10   Texas?
11   A.    Yes.
12   Q.    You went there in 2017?
13   A.    No, I went there in 2012.
14   Q.    Did you ever go again after 2012?
15   A.    To Houston, Texas?
16   Q.    Did you ever attend a Maintenance
17   Integrity Execution Sustainablity workshop after
18   2012?
19   A.    Not that exact title of the meeting.
20   Q.    You attended something similar to that,
21   the maintenance, integrity, execution stability
22   workshop after 2012?
23   A.    Right.
24   Q.    But it was just not same title, true?

Page 112

1    Correct?
2    A.    It was just not that same title?
3    Q.    That's what you said?
4    A.    Right, yeah.
5    Q.    Was it actually the Maintenance
6    Reliability Turnaround Workshop?  Here's what I'm
7    trying -- let me see if I can clear this up.  I
8    want to know if every year you had this type of
9    training.  When I say this type, I mean the
10   Maintenance Integrity Execution Sustainability,
11   did you have that each of the years you were a
12   Shell employee?
13   A.    Not the same meeting.
14   Q.    The Maintenance Reliability Turnaround
15   Workshop, when did you have that training?
16   A.    It would have to be at the end of 2014,
17   maybe early 2015.
18   Q.    The maintenance Analyst Shadowing, when
19   did you have that training?
20   A.    October 2014, I believe.
21   Q.    The Eight Step Problem Solving Process,
22   when did you have that training?
23   A.    2015.
24   Q.    The Maintenance Analyst Workshop, when

Page 113

1   did you have that training?
2   A.      I think -- I'm not sure on that one.
3   Q.      Were you given any training at all in
4   2016?
5   A.      I believe I did.
6   Q.      Were you given any training in 2017?
7   A.      In the maintenance analyst position?
8   Q.      So you were given -- I'm asking any
9   training.  Were you given any training in 2017?
10  A.      Yes.
11  Q.      What training were you given in 2017?
12  A.      It's not listed.
13  Q.      I understand it's not listed.  I'm just
14  asking, what type of training were you given in
15  2017?
16  A.      I wasn't -- I was given the trainings
17  below that and my certifications.
18  Q.      I'm not referencing the paper, I'm just
19  asking you to tell me what training were you given
20  in 2017?
21  A.      I was given RCRA training, the DOT
22  training and the hazwoper training.
23  Q.      Were you given any training in 2018?
24  A.      Not that I recall.

Page 114

1   Q.      This certification -- so in 2017, after
2   you made the complaints of harassment
3   discrimination, not withstanding that, Shell still
4   provided you with training?
5   A.      Yes.
6   Q.      The CPR slash AED certified, when did
7   you become certified in that?
8   A.      We have to do it every year.
9   Q.      Who paid for that?
10  A.      Shell.
11  Q.      And they paid for it in 2017?
12  A.      Yes.
13  Q.      2018?
14  A.      Yes.
15  Q.      Did they pay for it in 2019?
16  A.      I don't think I was there then.
17  Q.      RCRA certification, when did you first
18  become RCRA certified?
19  A.      I believe it was 2017.
20  Q.      That was after you made the complaints
21  of discrimination?
22  A.      Right.
23  Q.      Did you have to maintain certification
24  in 2018?

Page 115

1   A.      I didn't go back in 2018 I don't
2   believe.
3   Q.      You didn't work at all in 2018?
4   A.      I don't know how that certification
5   works, you're either certified or you have to
6   renew it.
7   Q.      Do you know if you renewed it in 2018?
8   A.      I don't know.
9   Q.      DOT Hazardous Material Transportation
10  Certification, when did you become certified in
11  that?
12  A.      I don't know the dates on these
13  certifications.
14  Q.      Was it after you made your complaints of
15  discrimination?
16  A.      Yes.
17  Q.      Did you main that certification in
18  hazmat through the time that you left Shell?
19  A.      I know I initially got the certificate
20  after I complained, but I don't know if I had to
21  go back to renew it.
22  Q.      The 40 HR hazwoper, what's that?
23  A.      That's the hazmat.
24  Q.      It's the same thing as the one above it?

Page 116

1   A.      The one above it is how to transport
2   hazardous material.
3   Q.      What's the one before 40 HR hazwoper
4   hazmat?
5   A.      Yes, how to protect yourself.
6   Q.      And you became certified in that?
7   A.      Yes.
8   Q.      When did you become certified in that?
9   A.      I believe in 2018.
10  Q.      These certifications that you got, did
11  someone have to approve you to go to training for
12  those certifications?
13  A.      Yes.
14  Q.      Who was the person that approved it?
15  A.      Steve Ellis.
16  Q.      Each one?
17  A.      Well, the CPR/AED is required.  So
18  everybody gets that.
19  Q.      As the plant manager was it the ultimate
20  responsibility for Mr. Blakely to make the
21  approval?
22  A.      For CPR AED?
23  Q.      For the RCRA certification?
24  A.      No, that was Steve Ellis.

1 Q.     What about for the DOT hazmat
2 transportation?
3 A.     If was recommended by a contractor --
4 contracting company that I was working with that I
5 needed to get these certifications.
6 Q.     Who did you speak to at Shell to get
7 to -- to notify them of this?
8 A.     Steve Ellis.
9 Q.     Did Mr. Ellis speak to anyone to get the
10 approval?
11         MS. GURMANKIN: Objection to
12         form.
13         THE WITNESS: Not that I know
14         of.
15 BY MR. TUCKER:
16 Q.     Do you know whose budget it is?
17 A.     I do not.
18 Q.     At some point you notified Shell that
19 you felt you were being discriminated against.  Do
20 you recall that in 2016?
21 A.     Yes.
22 Q.     Take me through the actual process of
23 what you did to notify Shell.  I'm not talking
24 about Mr. Blakely, but to notify Shell that you

1 felt you were being discriminated or harassed,
2 what did you do?
3 A.     I submitted an online -- online
4 notification.
5 Q.     How long after submitting that online
6 notification were you contacted by someone at
7 Shell?
8 A.     Well, it sends out an automatic email
9 saying that it was accepted or entered and they
10 got it.  I believe it was within two weeks that I
11 received contact from them.
12 Q.     Do you recall who the person was?
13 A.     Megan Kloosterman.
14 Q.     According to the records, it appears as
15 though you notified Shell around November 15th,
16 2016, correct?
17 A.     I believe that's correct.
18 Q.     Did you speak with anyone prior to
19 making this online notification about you making
20 the notification?
21 A.     Yeah.  I told people that I wasn't going
22 to deal with it any more and that I was going to
23 go to HR.
24 Q.     Who are the people?  Your sister?

1 A.     My sisters.  I told Jeremy Green.
2 Q.     Who else?
3 A.     Penny Robbins.
4 Q.     Who else?
5 A.     Tina King.
6 Q.     Who else?
7 A.     That's all I can remember.
8 Q.     So you identified five people.  Your two
9 sisters, Jeremy Green, Penny Robbins and Tina
10 King?
11 A.     Right.
12 Q.     You informed them prior to sending the
13 email to the help line that you were going to
14 report it to HR, correct?
15 A.     Right.
16 Q.     How did you know to report it on the
17 help line?
18 A.     It was just kind of known that that's
19 where you go if there's a problem that you want to
20 escalate.
21 Q.     It was well-known and well-publicized
22 that if you had a complaint of harassment or
23 discrimination you could do it through the
24 help line?

1         MS. GURMANKIN: Objection to
2         form.
3         THE WITNESS: It was known.  I
4         don't know if everybody knows that.  I
5         knew that.
6 BY MR. TUCKER:
7 Q.     You knew that if you had a complaint,
8 the official way to make a complaint was to get on
9 the help line, correct?
10 A.     No, I don't know that.
11 Q.     I thought you just said a second ago you
12 knew?
13 A.     Yeah.  But officially I feel like that
14 should have been official when I told Blakely that
15 I was having issues.
16 Q.     We have -- we'll go over more in detail
17 what you told Mr. Blakely, but you understood the
18 help line existed for you to a make complaint
19 also, correct?
20 A.     Right.
21 Q.     Did you know at the time that you
22 notified Mr. Blakely?
23 A.     I don't know if I knew at that time.
24 Q.     Did you talk to your sister about

Page 121

1 Shell's HR policy, their antidiscrimination or
2 antiharassment policies, the one that is the HR
3 specialist?
4 A. Did I provide her the policy?
5 Q. No. Did you talk to her? Well, did you
6 provide her with the policy?
7 A. No.
8 Q. Did you ever access Shell's
9 antidiscrimination, antiharassment policies?
10 A. Well, it's posted I think in our break
11 room.
12 Q. Did anyone prohibit you from reading the
13 posted antidiscrimination and antiharassment
14 policies?
15 A. No, but they don't abide by them.
16 Q. I understand that's your position. Did
17 anyone prohibit you from reading the policies?
18 A. No.
19 Q. On the policies it indicates how you can
20 report complaints of discrimination and
21 harassment, correct?
22 A. I believe so.
23 Q. Ms. Kloosterman, you said, contacted you
24 about how long after you sent the email? About a

Page 122

1 week did you indicate?
2 A. I would say within two weeks.
3 Q. Did she contact you via email or
4 telephone?
5 A. Both, I believe.
6 Q. When she contacted you -- you two
7 eventually spoke, correct?
8 A. Right.
9 Q. Can you flip over to one and two,
10 Exhibits 1 and 2? Do you have those in front of
11 you? Is that correct have you those in front of
12 you?
13 A. Yes.
14 Q. What we've marked as Exhibit-1 is
15 dated December 6, 2016, correct?
16 A. Yes.
17 Q. It's your email to Ms. Kloosterman,
18 correct?
19 A. Correct.
20 Q. Was this email sent to her in response
21 to a conversation the two of you had? Or after a
22 conversation the two of you had?
23 Do you want me to phrase it
24 differently?

Page 123

1 A. Sure.
2 Q. Did you speak to Ms. Kloosterman and
3 then sent this email?
4 A. I believe so.
5 Q. What was the purpose of you sending this
6 email which we have marked as Exhibit-1 dated
7 December 6th, 2016?
8 A. Because she asked for any proof or
9 documentation that I had.
10 Q. So then I'll go back now. Does this
11 refresh your recollection that you spoke to
12 Ms. Kloosterman before you sent this email?
13 A. I don't know.
14 Q. Either way, this document which we
15 marked as Exhibit-1, you agree it to be true and
16 accurate, correct?
17 MR. TUCKER: Let's go off the
18 record.
19 THE VIDEOTAPE TECHNICIAN: The
20 time is now 1:46. Going off the video
21 record.
22 - - -
23 (Whereupon, a brief recess was
24 held.)

Page 124

1 - - -
2 THE VIDEOTAPE TECHNICIAN: The
3 time is now 1:47. Back on the video
4 record.
5 BY MR. TUCKER:
6 Q. Ms. Barnes, you've had an opportunity to
7 again look at Exhibits-1 and 2?
8 A. Yes.
9 Q. Exhibit-1 was the first email you sent
10 to Ms. Kloosterman, correct?
11 A. As far as I can remember.
12 Q. As far as you also can remember you had
13 a spoken with her prior to sending her Exhibit-1,
14 correct?
15 A. I don't know if I did.
16 Q. How did you know who to send this email
17 to if you hadn't spoken with her or communicated
18 with her?
19 A. If I didn't speak to her, I don't
20 remember the full conversation.
21 Q. This document that we've marked as
22 Exhibit-1, you typed this, correct?
23 A. Yes. I provided a Word document to
24 Megan of my journal entries if that's what you

Page 125

1  want to call them.
2  Q.      That is the attached -- if you look at
3  339, the very first page, you see that it says
4  attachments, HR report doc.  Those are the images
5  that you attached to the email.
6          Is this the Word document you
7  provided beginning on Shell page 340?
8  A.      I believe it is, but I'm not sure if
9  anything is missing on here that was on the
10  original document.
11  Q.      Are you saying this is not the original
12  document you sent to Ms. Kloosterman?
13  A.      I believe it is.
14  Q.      Do you have a different document other
15  than what we have shown -- other than what is
16  shown here that you sent to Mr. Kloosterman?
17  A.      I don't think so.
18  Q.      You've had an opportunity to read Shell
19  pages 340 and 341, correct?
20  A.      Correct.
21  Q.      Is everything that's stated in 340 and
22  341 true?
23  A.      Yes.
24  Q.      Is it accurate also?

Page 126

1  A.      Yes.
2  Q.      You sent Exhibit-2, Kloosterman -- I'm
3  sorry.  Barnes-2, you have that document Barnes-2?
4  Just the typed portion, we're not trying to get
5  into the minute text messages because they're too
6  small to read.  Is everything that -- did you type
7  this and sent this to Ms. Kloosterman?
8  A.      Yes.
9  Q.      Is everything in here true?
10  A.      Most of it, yes.
11  Q.      What in here is not true?
12  A.      Well, before you said have I been
13  diagnosed with PTSD.  I don't know if I have been.
14  It's been mentioned, but I don't know if it was an
15  actual diagnosis.
16  Q.      Well, we go here and we look at this
17  document, Exhibit-2.
18  A.      Right.
19  Q.      You say I do have a problem with people
20  touching me, probably more than the average person
21  because I suffer from PTSD from my childhood,
22  which I do not talk about with my co-workers.  But
23  I do not feel like I need to explain why I do not
24  like being touched.  It shouldn't even be an

Page 127

1  issue.  Is that statement accurate?
2  A.      Yes.
3  Q.      What happened in your childhood that
4  causes you to suffer from PTSD?
5  A.      My dad wasn't the best guy.
6          MR. TUCKER: Can I see you
7  outside?
8          THE VIDEOTAPE TECHNICIAN: The
9  time is now 1:52.  Going off the video
10  record.
11          - - -
12          (Whereupon, a brief recess was
13  held.)
14          - - -
15          THE VIDEOTAPE TECHNICIAN: The
16  time is now 1:54.  Back on the video
17  record.
18  BY MR. TUCKER:
19  Q.      Before we took a break I was asking you
20  about the statement you have in here that, I
21  suffer from PTSD from my childhood.  And you
22  indicated something as it relates to your father;
23  is that correct?
24  A.      Correct.

Page 128

1  Q.      What is it that relates to your father
2  that you believe causes you to suffer PTSD?
3  A.      My father was physically violent at
4  times.
5  Q.      To you?
6  A.      Yes.
7  Q.      Was your father ever sexually violent
8  towards you?
9  A.      No.
10  Q.      To any of your siblings?
11  A.      No.
12  Q.      Either physically or sexually?
13  A.      Physically, yes.
14  Q.      Did you receive any type of counselling
15  or therapy because of your father's actions?
16  A.      Yes.
17  Q.      When did you first receive counselling
18  or therapy about this?
19  A.      When I was 16.
20  Q.      Where did you receive counselling or
21  therapy?
22  A.      It was out Big Flats, New York.  I don't
23  know.  I don't remember.
24  Q.      Big, B-I-G, F-L-A-T-S, Big Flats, New

Page 129

1  York?
2  A.    Yes.
3  Q.    Did -- do you recall who you
4  pediatrician was?
5  A.    No.
6  Q.    Do you recall whether or not he or she
7  was with a specific pediatric group or were they
8  by themselves?
9  A.    I remember it was at her house.
10  Q.    Where was your pediatrician located?
11  A.    Mansfield, PA.
12  Q.    You were living in Mansfield, but you
13  were getting counselling in Big Flats, New York?
14  A.    Yeah, we aren't that far -- I wasn't
15  that far away from Upstate New York border.
16  Q.    Were you prescribed any medications?
17  A.    No.
18  Q.    Did it impact your schooling, your
19  father's actions?
20  A.    No. If anything school was an escape
21  from it.
22  Q.    How long were you -- was this a
23  psychiatrist, a psychologist, therapist or
24  counselor? Who was she?

Page 130

1  A.    I'm not sure.
2  Q.    How long did you remain in-- do you mind
3  if I call it counselling, is that an acceptable
4  term to you?
5  A.    That's fine.
6  Q.    How long did you remain in counselling
7  over these issues surrounding your father?
8  A.    I went once or twice only because my mom
9  asked me to.
10  Q.    Did the family ever go to group
11  counselling?
12  A.    Not that I know of.
13  Q.    Did your father have a drinking problem?
14  A.    Not that I'm aware of.
15  Q.    Does anyone in your family have a
16  drinking problem?
17  A.    Not that I'm aware of.
18  Q.    Was there precipitating events that may
19  have caused your father to act violently or
20  physical towards you or your siblings.
21  A.    I don't think anything I could have done
22  should trigger a violent response.
23  Q.    Was he violent in front of you to your
24  other siblings, too?

Page 131

1  A.    No. In front of my mother?
2  Q.    No. Was your father physically violent
3  toward your other siblings?
4  A.    I believe so.
5  Q.    Did you ever observe his physical
6  violence towards them?
7  A.    Yes.
8  Q.    Was your father physically violent to
9  your mother?
10  A.    Not physically that I saw.
11  Q.    Was he emotionally violent towards her?
12  A.    Yes.
13  Q.    Did you observe his emotional violence
14  towards her?
15  A.    Yes.
16  Q.    How frequently was he emotionally
17  violent towards her?
18  A.    I don't know the answer to that
19  question.
20  Q.    We had talked very early this morning
21  about the issue of whether or not you had seen any
22  type of therapists or counselor, and you had said
23  other than the doctor you saw a couple of times
24  after you had made complaints, you had not seen

Page 132

1  any type of therapist or counselor. Do you recall
2  that?
3  A.    Yes.
4  Q.    Do you now mean to correct that?
5  A.    Yes.
6  Q.    Further in that same vein, we talked
7  about when you were 16 you saw this person a
8  couple of times. You saw this person around the
9  issues dealing with Shell in 2017. In between age
10  16 and 2017 when you saw this new counselor or
11  therapist, whatever you want to call her, had you
12  treated at all with any type of therapist,
13  counselor, psychologist or psychiatrist?
14  A.    No.
15  Q.    Did you suffer -- do you believe you
16  suffered long-term emotional damages because of
17  your father's behavior towards your siblings and
18  your mother?
19        MS. GURMANKIN: Objection to
20  form. Go ahead.
21        THE WITNESS: I feel like
22  anybody would have some sort of impact
23  on them. I was lucky enough to get away
24  when I was 16. So it's been -- I

Page 133

1    haven't spoken, been around that since I
2    was 16 years old.
3  BY MR. TUCKER:
4  Q.    I understand that.  My question is as it
5  relates to you and not anybody.  So do you want to
6  answer my question.  I'm not talking about
7  anybody, I'm talking about you?
8          MS. GURMANKIN: Same objection.
9          THE WITNESS: Can you repeat the
10         question?
11         MR. TUCKER: I'll have it read
12  back.
13             - - -
14         (Whereupon, the court reporter
15  read back the appropriate portion of the
16  transcript.)
17             - - -
18         THE WITNESS: Long-term, I don't
19  know if I would agree with that.  Of
20  course I suffered emotionally.
21  BY MR. TUCKER:
22  Q.    You said you got away from that when you
23  were age 16.  Is that because your mother
24  separated from your father or did you leave home

Page 134

1  or something else?
2  A.    I left home.
3  Q.    Where did you go when you left home?
4  A.    I went to my current boyfriends.
5  Q.    Did you -- I guess this is a poor term,
6  did you run away from home?
7  A.    Yeah, I left home.
8  Q.    This is the person who you're presently
9  living with you now who you ran away to?
10  A.    No.
11  Q.    Who did you run away to?
12  A.    His name was Kelly Harding.
13  Q.    How long did you and Mr. Harding stay
14  with each other?
15  A.    Until I was 19, I believe.
16  Q.    You continued to stay with Mr. Harding
17  and you graduated from high school?
18  A.    Yes, I believe so.
19  Q.    Then you were able to land your
20  waitressing job after that, or did you start
21  waitressing while you were in high school?
22  A.    No.  I was 19, I believe, when I got my
23  waitressing job, I believe.  It wasn't during high
24  school.

Page 135

1  Q.    It was after high school?
2  A.    Yes.
3  Q.    What year did you graduate from high
4  school?
5  A.    2008.
6  Q.    That's when you started at Mark's
7  Brothers?
8  A.    I don't think I started until 2009.
9  Q.    Your resume indicates 2009 to 2011.
10  Does that fit with your recollection?
11  A.    Yes.
12  Q.    And then after that you were at Changos
13  Cantina?
14  A.    I worked at both places while working at
15  Shell.
16       It seems as though you stopped working
17  at Changos Cantina in 2012.  Does that fit with
18  your recollection?
19  A.    Yes.
20  Q.    Why did you stop working at Changos
21  Cantina in 2012?
22  A.    That exact incident was somebody threw a
23  beer bottle behind the bar, so I didn't want to
24  bartend any more.

Page 136

1  Q.    They threw it at you?
2  A.    No, just behind, like, at the  cooler
3  because our manager cut him off.
4  Q.    You indicated earlier in the deposition
5  it's your position that you were an administrative
6  assistant up until 2014; is that correct?
7  A.    Correct.
8  Q.    How is it that you stopped being an
9  administrative assistant?  Who filled your role --
10  who took over your role, if anyone, after you
11  stopped being an administrative assistant in 2014?
12  A.    It was -- penny Robbins took on the work
13  for my role as administrative assistant.
14  Q.    What was Ms. Robbins position prior to
15  you not being an administrative assistant?
16  A.    She was also an administrative
17  assistant.
18  Q.    So it's your position that when you --
19  did you get a promotion in 2014?
20  A.    Yeah.  When I took -- assumed the
21  responsibilities of a maintenance analyst.
22  Q.    It's your position in 2014 you took the
23  role as a maintenance analyst?
24  A.    Correct.

Page 137

1  Q.    When in 2014 did this happen?
2  A.    I believe October.
3  Q.    Did you get a pay raise?
4  A.    Yes, eventually. I don't think it was
5  right away though.
6  Q.    Eventually being how long?
7  A.    I think it was within that year that I
8  did.
9  Q.    2014 you got a pay raise because you
10  became -- because you believe you became a
11  maintenance analyst or because -- let me try this
12  again.  Is it your contention that you received a
13  pay raise in 2014 because you became a maintenance
14  analyst?
15  A.    Because I received a promotion.
16  Q.    Is it your position in this litigation
17  that because you believe you were promoted to a
18  maintenance analyst in 2014, you got a pay raise?
19  A.    Yes, I got a pay raise for filling that
20  role.
21  Q.    And that happened in 2014?
22  A.    That I can remember.
23  Q.    When was your next pay raise?
24  A.    When I was hired on with Shell.

Page 138

1  Q.    So in 2014, who were you working for?
2  A.    Synergy International.
3  Q.    You were working as a contractor,
4  correct?
5  A.    Correct.
6  Q.    You did not start working with Shell
7  until what time?
8  A.    2015.
9  Q.    When you started working in 2015, did
10  you interview for a position?
11  A.    Yes.
12  Q.    What position did you interview for in
13  2015?
14  A.    Maintenance analyst.
15  Q.    When you stopped working with Synergy
16  and you became a maintenance analyst at Shell,
17  what was the pay difference going from Synergy to
18  Shell?  I can ask that differently.  When you
19  stopped working at Synergy as a contractor at
20  shell, how much were you making an hour?
21  A.    19.
22  Q.    When you started as a maintenance
23  analyst when you were no longer a contractor -- to
24  be clear, you were not an employee of Shell when

Page 139

1  you were at Synergy, correct?
2  A.    Correct.
3  Q.    You were contractor, correct?
4  A.    Correct.
5  Q.    You became an employee of Shell in 2015,
6  correct?
7  A.    Yes.
8  Q.    You interviewed for the maintenance
9  analyst position, correct?
10  A.    Correct.
11  Q.    How much -- when you got the position,
12  how much did you start making?
13  A.    I don't know the exact amount, but I
14  believe it's around 58,000.
15  Q.    Was that a substantial increase from
16  your Synergy job?
17  A.    It's more.
18  Q.    Well, how many hours were you working a
19  week at Synergy?
20  A.    40 hours a week.
21  Q.    And you were making $19 an hour; is that
22  correct?
23  A.    That's correct.
24  Q.    That equals about $760 a week?

Page 140

1  A.    I think so.
2  Q.    And over 52 weeks that's, like, 39,520?
3  A.    I believe so.
4  Q.    You'd agree with me $58,000 -- going
5  from 39,520 to 58,000 is a substantial pay
6  increase?
7  A.    I think it was with more around 55,000.
8  Q.    You'd agree with me going from 39,520 to
9  55,000 is a substantial pay increase?
10  A.    It's a pay increase, yes.
11  Q.    Were you given benefits when you were at
12  Synergy?
13  A.    Yes.
14  Q.    Did the benefits get better when you
15  went to Shell?
16  A.    No.
17  Q.    They were not as good, same, better,
18  worse?
19  A.    There was a pension with Shell.
20  Q.    Vacation?
21  A.    Vacation.
22  Q.    Did you get vacation when you were at
23  Synergy?
24  A.    Yes.

Page 141

1 Q.        How much vacation did you got at
2 Synergy, paid vacation?
3 A.        It was three weeks if you have five
4 years.  So I left before my five-year mark with
5 them, so two weeks.
6 Q.        How much vacation did you get when you
7 started with Shell?
8 A.        Three weeks.
9 Q.        So you got more vacation, you got a pay
10 increase and you got a pension.  Did you have
11 health insurance at Synergy?
12 A.        Yes.
13 Q.        Did have you health insurance at Shell?
14 A.        Yes.
15 Q.        Whose health insurance plan was better?
16 A.        I believe Synergy's was.
17 Q.        Why didn't you stay on at Synergy
18 instead of going to work at Shell?
19 A.        Well, that was my goal was to get hired
20 on with Shell.
21 Q.        Who interviewed you for your position?
22 A.        Will Turney, I believe Hondo Blakely was
23 there.
24 Q.        Why do you think you got the job?

Page 142

1 A.        Because I was qualified.
2 Q.        Any other reason?
3 A.        I was agreeable, I didn't cause any
4 problems.
5 Q.        Do you know if anyone -- do you know if
6 either Mr. Turney or Mr. Blakely desired to have
7 someone else other than you in the position?
8 A.        I know they interviewed other people.
9 Q.        Who did they interview?
10 A.        Another lady in the building.
11 Q.        Do you know if they interviewed anyone
12 else?
13 A.        Not that I'm aware of.
14 Q.        Who was the other lady in the building
15 they interviewed?
16 A.        Heather White.
17 Q.        Do you know if she was offered the
18 position?
19 A.        I do not.
20 Q.        Do you know if they interviewed anyone
21 that was in Houston?
22 A.        I do not.
23 Q.        Do you know if they attempted to solicit
24 someone else other than you or as you call it the

Page 143

1 other lady in the building?
2 A.        Not that I'm aware of.
3 Q.        Do you know if you were their first
4 choice to hire?
5 A.        I don't know that.
6 Q.        When were you told when you were at
7 Synergy that you were a maintenance analyst?
8 A.        Will Turney and Chris Anderson came to
9 me and asked me if this would be something I was
10 interested in because they thought I would be a
11 good fit for it.  Will was the one that drove that
12 your title now is maintenance analyst.
13 Q.        He said that to you in October of 2014?
14 A.        Right.
15 Q.        Do you think he did that to you, for you
16 because you were a woman?
17 A.        I want to say I hope it was because I
18 did a good job, but now seeing things more how it
19 progressed, it could have been.
20 Q.        Prior to becoming a Shell employee, not
21 when you worked at Synergy, prior to you becoming
22 Shell while at Synergy, but before you became
23 employed with Shell, did you work with Mr. Turney?
24 A.        Yes.

Page 144

1 Q.        Did you work with Mr. Blakely?
2 A.        Yes.
3 Q.        Who else did you work with?
4 A.        I worked with Ken Forman, Dan Price.  Do
5 you mean directly in my group?
6 Q.        Yes.
7 A.        Dan Price, Ken Foreman, Matt Scolney.
8 Q.        I apologize.  I can make this easier.
9 Identify all the people you allege sexually or
10 harassed you because of your gender.  Identify all
11 the persons who harassed you because of your
12 gender?
13 A.        Hondo Blakely, Will Turney, Mark Hoover.
14 Q.        Could you hold on.  Who else?
15 Mr. Forman?
16 A.        Foreman.
17 Q.        Is that a yes?
18 A.        Yes.  That's all I can think of right
19 now.
20 Q.        You've identified four individuals you
21 contend in this litigation who harassed because of
22 your gender, correct?
23 A.        Yes.
24 Q.        Did you work with any of these four

Page 145

1  individuals before you became employed by Shell?
2  A.    Yes.
3  Q.    Who did you work with?
4  A.    I worked with all of them.
5  Q.    Did any of them harass you because of
6  your gender before you became employed with Shell?
7  A.    Yes.
8  Q.    Who?
9  A.    Will.
10  Q.    Mr. Blakely?  I'm sorry?
11  A.    Turney.
12  Q.    I'm sorry.  Mr. Turney.  Who else?
13  A.    All I can think of right now.
14  Q.    So it is your contention, you contend in
15  this litigation that before you became an employee
16  at Shell and while you were at employed at
17  Synergy, Mr. Turney harassed you because of your
18  gender?
19  A.    It was just the culture there.
20  Q.    Is it your position in this litigation
21  that before you became employed at Shell and while
22  you were a contractor at Synergy, Mr. Turney
23  harassed you because of your gender?
24  A.    There was comments made about women in

Page 146

1  the office all the time.
2  Q.    Is it your position in this litigation
3  that prior to you becoming an employee at Shell
4  and while you were a contractor at Synergy,
5  Mr. Turney harassed you because of your gender?
6  A.    He did, yes.
7  Q.    Tell me everything that Mr. Turney did
8  to you prior to you becoming an employee of Shell
9  that you contend was sexually harassing.  Tell me
10  everything.
11  A.    He showed me a selfie of himself in his
12  underwear.
13  Q.    Anything else?  Are you referring to
14  documents to refresh your recollection?
15  A.    Yes.
16  Q.    Without referring to documents, tell me
17  from your memory.  Then if you want you can refer
18  to documents.  First tell me everything you recall
19  that Mr. Turney did to you prior to you becoming
20  Shell employee that you believe was sexually
21  harassing.
22  A.    He would put me in situations with other
23  female co-workers that he thought that I didn't
24  get along with.

Page 147

1  Q.    Anything else?
2  A.    Not that I can think of at this time.
3         THE VIDEOTAPE TECHNICIAN:
4         Counsel, I'm going to have to switch
5         tapes real quick.
6  BY MR. TUCKER:
7  Q.    While he is switching tapes, would you
8  like to try to refresh your recollection by
9  looking at documents?
10  A.    If that's -- yeah, if that's okay.
11         MR. TUCKER: Let's go off the
12         record.
13         THE VIDEOTAPE TECHNICIAN: Time
14         is now 2:18.  This concludes disk two.
15         - - -
16         (Whereupon, a brief recess was
17         held.)
18         - - -
19         THE VIDEOTAPE TECHNICIAN: The
20         time is now 2:23.  This begins disk
21         three.
22  BY MR. TUCKER:
23  Q.    Ms. Barnes, we just took a break,
24  correct?

Page 148

1  A.    Yes.
2  Q.    Did you have an opportunity to speak
3  with your counsel?
4  A.    Yes.
5  Q.    What did you and she talk about?
6  A.    Just encouraged me to -- I was doing a
7  good job.
8  Q.    What specifically did she say to you?
9  A.    Asked me if I was okay and I was doing
10  good.
11  Q.    Did she point you to any documents to
12  look at to refresh your recollection?
13  A.    No.
14  Q.    Have you had an opportunity to look at
15  documents when we took the break to refresh your
16  recollection?
17  A.    I didn't really review them until we
18  came back into the room.
19  Q.    Based upon your review of the documents,
20  are you able to identify any other sexually
21  harassing conduct by Mr. Turney other than you did
22  before the break?
23  A.    Before I was hired with Shell?
24  Q.    Yes.

Page 149

1 A.     No, I was not able to identify.
2 Q.     So if I understand, prior to being hired
3 by Shell, you said that Mr. Turney showed you a
4 selfie of him in his underwear, correct?
5 A.     Yes.
6 Q.     Were they underwear or were they workout
7 shorts?
8 A.     They were underwear.
9 Q.     How do you know they were underwear?
10 A.     Because they were boxer briefs.
11 Q.     Were they Under Armor boxer briefs?
12 A.     I don't believe so.
13 Q.     In what context did he show you the
14 selfie?  Tell me how it happened.
15 A.     We were at work at an event in Canada and he
16 asked me -- he showed me, and I believe he was
17 expecting a different response than what he got.
18 Q.     Tell me what he said before he showed
19 you the --
20 A.     That he wanted to show me something.
21 Q.     That's all he said?  I want to show you
22 something?  Is that the extent of the conversation
23 you had with him?
24 A.     Yes.

Page 150

1 Q.     Out of the clear blue sky he just said
2 to you, I want to show you something?
3 A.     Yes.
4 Q.     Were you and he talking with each other
5 before he said I want to show you something?
6 A.     Oh, yeah.
7 Q.     What were you guys talking about?
8 A.     I don't recall exactly what we were
9 talking about.  We were all talking that night.
10 Q.     Did he talk to you about him having been
11 overweight?
12 A.     He had -- not at this time.  He had
13 mentioned it before.
14 Q.     Not during that evening he had not
15 talked to you about him having been overweight?
16 A.     Not that I recall.
17 Q.     Did you know Mr. Turney when he was much
18 bigger?
19 A.     Yes.
20 Q.     And he had lost a lot of weight by the
21 time of 2014; is that correct?
22 A.     Correct.
23 Q.     And he showed you selfie of himself?
24 A.     Yes, he did.

Page 151

1 Q.     What did he say when he showed you his
2 selfie?
3 A.     I don't know if I gave him much time to
4 say anything because I told him not show me that.
5 Q.     Were those his exact words?
6 A.     No.
7 Q.     What were you your exact words?
8 A.     I told him not to show me that shit.
9 Q.     What did he say in response?
10 A.     I laughed about it.
11 Q.     What did you do?
12 A.     I left shortly after.
13 Q.     Who did you first tell about this?
14 A.     I don't recall who I told about it.
15 Q.     Did you tell anyone at Synergy?
16 A.     No.
17 Q.     When is the first time you recall
18 telling anyone about this?
19 A.     I don't recall if I -- specifically if I
20 told someone.
21 Q.     How long had you and Mr. Turney been
22 working with each other at this point?
23 A.     Well, we worked -- how long I had been
24 working directly for him or how long we been

Page 152

1 working near each other?  Because we've been in
2 the same building, but we weren't directly working
3 together.
4 Q.     At this point in 2014 he was your direct
5 supervisor through the contracting service?
6 A.     Yes.
7 Q.     How long had he been your supervisor
8 through the contracting service?
9 A.     Less than a year.
10 Q.     More than 10 months?
11 A.     I can't give you an exact answer.
12 Q.     In the time period between 2014 and when
13 you -- by the time you were hired in 2015, had you
14 been working for Mr. Turney for a year?  Was it
15 little more?
16 A.     I believe so.
17 Q.     During that year period, you indicated
18 two things, him showing you the selfie and him
19 putting you in situations with other females who
20 he -- who he suspected you get didn't get along
21 with, correct?  Those were the two sexually
22 harassing and discriminatory acts by Mr. Turney,
23 correct?
24 A.     Those are the two that I can remember

Page 153

1  right now.
2  Q.      When you were at Synergy, did Synergy
3  have an antidiscrimination and harassment policy?
4  A.      I would assume they did, but I didn't
5  deal a lot with Synergy other than they gave me my
6  pay.
7  Q.      When you were you were working with
8  Synergy, did Synergy have an antidiscrimination or
9  harassment policy?
10  A.     I don't know.  I can't recall if I ever
11  saw one.
12  Q.     Did you ever report these incidents to
13  anyone at Synergy?
14  A.     No.
15  Q.     Who made the decision, if you know, at
16  Shell to hire you?
17  A.     I believe Will and Hondo were involved.
18  Q.     They knew you were a female when they
19  hired you, correct?
20  A.     Correct.
21  Q.     You had worked with Mr. Turney directly
22  for close to a year, correct?
23  A.     Correct.
24  Q.     Had you worked with Mr. Blakely for

Page 154

1  close to a year?
2  A.      With him, yes.
3  Q.      When you first became employed, a Shell
4  employee, did you go through any type of
5  antidiscrimination or harassment training, be it
6  on the computer or given information?
7  A.      Yes.
8  Q.      You were informed of Shell's
9  antidiscrimination and harassment policy when you
10  first became employed at Shell?
11  A.     The first day or -- we did annual
12  trainings.  I don't know a specific day of when I
13  did it.
14  Q.     Early on during your orientation when
15  you were first employed at Shell, you were given
16  training about Shell's antidiscrimination and
17  antiharassment policy, correct?
18  A.     I don't think -- I don't know if that's
19  correct.  I don't know if they did that.
20  Q.     You were given at least yearly though,
21  correct?
22  A.     Annually, yes.
23  Q.     You were given training in 2015,
24  correct?

Page 155

1  A.      They typically did it in January of each
2  month, so I don't know if I was in the room in
3  2015.
4  Q.      Do you remember receiving training in
5  August of 2015 on shell's antidiscrimination and
6  harassment policy?
7  A.      August 2015?
8  Q.      Yes.
9  A.      I don't recall.
10         MR. TUCKER: Let's go off the
11  record very quickly so I can get you a
12  document.
13         THE VIDEOTAPE TECHNICIAN: Time
14  is now 2:31.  Going off the video
15  record.
16         - - -
17         (Whereupon, a brief recess was
18  held.)
19         - - -
20         THE VIDEOTAPE TECHNICIAN: The
21  time is now 2:44.  Back on the video
22  record.
23  BY MR. TUCKER:
24  Q.      Ms. Barnes, I want to show you couple of

Page 156

1  documents which we will mark as Barnes-6 and
2  Barnes-7.
3         - - -
4         (Whereupon, Barnes-6 and
5  Barnes-7 were marked for identification
6  and are attached hereto.)
7         - - -
8  BY MR. TUCKER:
9  Q.      Do you have the documents in front of
10  you which we have marked as Barnes-6 and 7?
11  A.     Yes, I do.
12  Q.      You see they're dated August 27th, 2015?
13  A.     Yes, I do.
14  Q.      And you -- does this refresh your
15  recollection of having received and acknowledged
16  Shell's code of conduct?
17  A.     Yes.  I think that -- I don't really
18  remember it, but.
19  Q.      But you don't disagree that this is your
20  acknowledgment of having had the opportunity to
21  review the Shell ethics policy and Shell's
22  antiharassment policy and Shell's equal
23  employment opportunity policy?
24  A.     Yes, I think so.

Page 157

1  Q.      I'm going to hand you a document.  I
2  only have one copy, so I'm going to give it to
3  your counsel first.  This is Shell's
4  antiharassment policy.  I'm going to give this to
5  your counsel.
6          Do you recognize that document?
7  A.      Yes.
8  Q.      This was the antiharassment policy that
9  was in effect at the time you worked at Shell?
10  A.     Yes, I believe so.
11  Q.     I'm going to hand you Shell's equal
12  opportunity policy.  First, I'm going to give it
13  to your counsel.
14                    - - -
15          (Whereupon, Barnes-8 and
16          Barnes-9 were marked for identification
17          and are attached hereto.)
18                    - - -
19  BY MR. TUCKER:
20  Q.     The number that's on that Exhibit-9, is
21  that the number that you called when you reported
22  your claims of harassment and discrimination?
23          MS. GURMANKIN: Objection to
24          form.

Page 158

1          THE WITNESS: I didn't call a
2          number.
3  BY MR. TUCKER:
4  Q.      You did the email?
5  A.      Yeah.  However that works online.
6  Q.      How were you able to know that email?
7  A.      We have an HR online area we go that has
8  policies on it.
9  Q.      And in addition to having that online,
10  Shell-8, could you go back to that, please?  That
11  actually policy was posted?
12  A.      Correct.
13  Q.      From the time that you first started
14  working at Shell, correct?
15  A.      I don't know that.  I've seen this
16  document posted, I believe.
17  Q.      When do you recall first seeing it?
18  When you were working for Synergy?
19  A.      No, when I started looking into more of
20  what I needed to do.
21  Q.      Is that when you first it noticed it?
22  A.      Yes.
23  Q.      It's posted in a break out room?
24  A.      I believe so.

Page 159

1  Q.      Do you believe it was there all along,
2  but you just had never noticed it before?
3  A.      I can't answer that.
4  Q.      You indicated Mr. Turney's preemployment
5  conduct which you found discriminatory and
6  harassing, one was the selfie of himself.  The
7  other one, the other conduct you indicate was him
8  putting you in situations with other female
9  employees who he believed you had conflict with.
10  Is that correct?
11  A.      Yes.
12  Q.      What about that did you believe was
13  harassment because of your gender?
14  A.      Because he wasn't putting males together
15  that he didn't think that got along, he put
16  females together.
17  Q.      How do you know that he didn't think you
18  guys got along?
19  A.      There are messages of him saying he
20  brought me in there on purpose.
21  Q.      Was it just you he was doing this to or
22  was it the other females he was doing this to?
23  A.      I can't speak for the other females.
24  Q.      There are 2014 messages which says he's

Page 160

1  doing this?
2  A.      I don't know if that's the specific -- I
3  don't know the specific date, but there are
4  messages that he brought me into the conference
5  room.
6  Q.      But none of those messages that we
7  looked at were pre-employment Shell.  You'd agree
8  with me?
9  A.      I don't know what messages.
10          MR. TUCKER: Let's go off the
11          record.
12          THE VIDEOTAPE TECHNICIAN: The
13          time is now 2:50.  Going off the record.
14                    - - -
15          (Whereupon, a brief recess was
16          held.)
17                    - - -
18          THE VIDEOTAPE TECHNICIAN: Time
19          is now 2:52.  Back on the video record.
20  BY MR. TUCKER:
21  Q.      So is it your position in this
22  litigation that almost immediately after starting
23  your employment with Shell that you began to be
24  subjected to gender harassment and discrimination?

Page 161

1  A.      Can you repeat that, please?
2  Q.      When do you recall first becoming a
3  full-time employee at Shell?
4  A.      2015.
5  Q.      When in 2015?
6  A.      I believe september.
7  Q.      From September '15 -- when after
8  September '15 did you begin to be subjected to
9  harassment and gender discrimination?
10  A.      It began earlier than that.
11  Q.      Well, we have gone over there because
12  you identified the one person, that was
13  Mr. Turney, who harassed you or discriminated
14  against you prior to you becoming an employee,
15  correct?  And those were
16  A.      Yes, I remember the conversation.
17  Q.      Do you remember the question and answer?
18  You identified two incidents, one where he showed
19  you a selfie of him and the other where you said
20  that he put you and other women in situations
21  where he thought there would be conflict.  Do you
22  remember that?
23  A.      Yes.
24  Q.      He was the only person and those were

Page 162

1  the only two incidents prior to you becoming
2  employed at Shell that you identified as being
3  discriminatory and harassing, correct?
4  A.      That's what I can remember right now.
5  Q.      Now my question is, what was the date
6  you started being a full-time employee at Shell?
7  A.      September 2015.
8  Q.      When after September 2015 was the
9  first -- was the first incident of harassment and
10  discrimination because of your gender?
11  A.      When was the first thing?  It more
12  frequently started in 2016.
13  Q.      Is there anything that you recall in
14  2015 happening to you that was discriminatory or
15  harassing because of your gender?
16  A.      I believe I was referring to when he put
17  -- when I was talking about he put me in
18  situations with other women that I didn't like, I
19  was referring to 2015, not 2014.
20  Q.      That's the only gender harassment or
21  discriminatory act in 2015, when he would put you
22  in situations that he believed that you didn't get
23  along with other women?
24  A.      That I can remember right now.

Page 163

1  Q.      Let's talk about 2016.  When is the
2  first harassing or discriminatory event that you
3  can recall that happened in 2016?
4  A.      That I can remember right now, is that
5  he would make belittling comments and he would
6  criticize my work over the -- a lot more than the
7  males.
8  Q.      This began in 2016?
9  A.      Yes.
10  Q.      Finally, at about November 15th of that
11  year, that's when we established that you reported
12  it on the help line, correct?
13  A.      Yes.
14  Q.      So during that 11 month period, that's
15  when the discriminatory and harassing conduct
16  occurred by various individuals who you
17  identified, correct?
18  A.      That's correct.
19  Q.      You speak to Ms. Kloosterman some time
20  in either very late 2016 -- late November 2016 or
21  early December 2016, is that about right?  If you
22  want, you can look at documents one and two to
23  refresh your recollection.
24  A.      I spoke to her at some point in between

Page 164

1  that time frame.
2  Q.      I just want to --
3  A.      I don't know if --
4  Q.      I'm just trying to get us a time frame.
5  We can agree it was some time in late November
6  2016 or very early December 2016 that you spoke
7  with her, correct?
8  A.      Yes.
9  Q.      From your understanding, Ms. Kloosterman
10  undertook an investigation, correct?
11  A.      Her terms of an investigation.
12  Q.      Do you have any special knowledge of how
13  an investigation should be conducted where there
14  are claims of harassment and discrimination?
15  A.      Do I have knowledge?
16  Q.      Yeah.  Do you have any specialized
17  knowledge?
18  A.      I wouldn't say I have specialized
19  knowledge around it.
20  Q.      Do you believe that Shell's
21  investigation of your claims of discrimination and
22  harassment was inadequate?
23  A.      Can you say that again?
24          MR. TUCKER: I'll have it read

1      back.

2          - - -

3         (Whereupon, the court reporter

4     read back the appropriate portion of the

5     transcript.)

6          - - -

7         THE WITNESS: Inadequate, yes,

8     they did not perform.

9 BY MR. TUCKER:

10 Q.      Do you know if people, if certain

11 employees were disciplined as a result of your

12 complaints of discrimination and harassment?

13 A.      I don't know that.

14 Q.      Ms. Kloosterman met with you around

15 December 15th, 2016, does that fit with your

16 recollection?

17 A.      I believe so.

18 Q.      Did she meet with you more than once on

19 that date? Do you recall if she met with you

20 initially with a gentleman by the name of Gregg

21 Larson?

22 A.      We did meet between the three of us.

23 Q.      Then did she meet with you separately?

24 A.      Yes.

1 Q.      Tell me everything you recall about her

2 meeting when it was you, her and Gregg Larson in

3 the meeting?

4 A.      It was actually the meeting with her

5 first, and then at the end Gregg Larson and I and

6 Megan went over the next time.

7 Q.      Let's talk about the meeting that you

8 had with her first. Tell me everything you recall

9 about the meeting.

10 A.      I supplied her with documents that --

11 the Word document where I had wrote the --

12 Q.      I think -- let me refresh your

13 recollection. And you tell me if I am correct.

14 On December 15th, according to the records,

15 Ms. Kloosterman met with you to give the results

16 of the investigation, and then she met with you

17 and Mr. Larson together. Do you recall that?

18 A.      She didn't give me results of the

19 investigation. She just concluded that they were

20 in violation of the code of conduct.

21 Q.      She concluded that who?

22 A.      Mark Hoover and Will Turney.

23 Q.      So she did give you the results of the

24 investigation that they violated the code of

1 conduct, correct?

2 A.      No.

3 Q.      She didn't tell you that?

4 A.      She told me that they violated the code

5 of conduct.

6 Q.      And that was the basis of her doing the

7 investigation she concluded that, correct?

8         Well, let me -- we're talking

9 past each other. After you gave Ms. Kloosterman

10 this email document, which are one and two,

11 Exhibits-1 and 2, did she then meet with you? Did

12 she physically meet with you to talk to you about

13 your complaints?

14 A.      Yes.

15 Q.      And did she take notes?

16 A.      Yes.

17 Q.      And she asked you questions, specific

18 questions as it related to the allegations you

19 made in that -- in those memos, correct?

20 A.      Correct.

21 Q.      She met with you very shortly after you

22 supplied her with that, correct?

23 A.      Correct.

24 Q.      Is it your position in this litigation

1 that Ms. Kloosterman was biased against you during

2 the investigation?

3 A.      I think so.

4 Q.      What do you base that upon?

5 A.      She was trying to protect the company

6 and not me.

7 Q.      What do you base that upon?

8 A.      What I was subjected to with

9 retaliation.

10 Q.      I'm talking about during her

11 investigation. I'm not talking about the

12 retaliation. During her investigation, you said

13 you thought she was trying to protect the company

14 during her investigation. What do you base that

15 upon? Is that just a belief you have because she

16 worked for the company? Did she say something, do

17 something during the investigation that led you to

18 believe that she was not being fair?

19 A.      She didn't necessarily say something,

20 but it wasn't in -- it wasn't the policy.

21 Q.      What wasn't the policy?

22 A.      There is a zero tolerance policy within

23 Shell.

24 Q.      Did she -- did she say something or do

Page 169

1 something during the investigation that indicated
2 to you that she was not being fair?
3 A.     She said I needed to think about how I
4 came across in the office, that I felt she was
5 blaming me for these things that happened.
6 Q.     Anything else?
7 A.     I had asked -- after she said that Mark
8 -- about Mark and Will, I asked about Ken Forman.
9 Q.     I'm just talk during the investigation.
10 When she came back to you later on in December,
11 she had can completed the investigation, correct?
12 As far as you knew?
13 A.     As far as I knew.
14 Q.     So I'm talking about during the
15 investigation.  After she sat down with you, she
16 had read -- you had gotten the understanding
17 before she met with you she had actually read your
18 documents, correct?  Did you get that impression?
19 A.     Yes.
20 Q.     She went through -- did she go through
21 very specifically your allegations in your
22 documents?
23 A.     She went through them.
24 Q.     She asked you to give her any

Page 170

1 information you had to support, and you already
2 attached information also, correct?
3 A.     Correct.
4 Q.     She asked you about eyewitnesses also?
5 A.     Yes.
6 Q.     She told you she was going to continue
7 her investigation, correct?
8 A.     Yes.
9 Q.     And then she came back and met with you
10 at the end of her investigation and she told you
11 that you certain people had violated Shell's code
12 of conduct, correct?
13 A.     She told me that.
14 Q.     Who did she tell you violated Shell's
15 code of conduct?
16 A.     Will Turney and Mark Hoover.
17 Q.     I thought that was inadequate?
18 A.     Yes.
19 Q.     Why did you believe her conclusion that
20 Mr. Turney and Mr. Hoover violating Shell's code
21 of can conducts was inadequate?
22 A.     Because I was being subjected to sexual
23 harassment and discrimination and that's against
24 the law.

Page 171

1 Q.     Did she tell you that Mr. Turney and
2 Mr. Hoover had violated Shell's policy?
3 A.     Code of conduct I thought was a policy.
4 Q.     Yes.  Did she tell you that Mr. Turney
5 and Mr. Hoover violated the policies?
6 A.     The code of conduct, yes.
7 Q.     Did she tell you that anyone else
8 violated the code of conduct?
9 A.     No.
10 Q.     Did you believe other persons had
11 violated the code of conduct?
12 A.     Yes, I did believe that.
13 Q.     Who else had you believed violated the
14 code of conduct?
15 A.     Ken Forman, Greg Larsen, Michelle
16 Priest.
17 Q.     This is at the time -- let me stop you
18 for a second.  I'm talking when she came to you in
19 December 2016.  Because, correct me if I'm wrong,
20 you believe Ms. Priest violated the code of
21 conduct when you didn't get the position that you
22 wanted, correct?
23 A.     And also when I was ranked at a lower
24 job grade for the maintenance analyst position.

Page 172

1 Q.     So when you originally got the
2 maintenance analyst position and you got a lower
3 grade, you believe that Ms. Priest played a role
4 in that?
5 A.     Yes, and Larson.
6 Q.     Let me see if I can understand what
7 you're saying here.  You correct me if I'm wrong,
8 I want to make sure I'm clear.  Are you saying
9 that when you initially got the maintenance
10 analyst position you were discriminated against
11 because you were a woman?
12 A.     Yes.
13 Q.     Because of the grade that you were
14 given?
15 A.     Right.
16 Q.     And you believe who made the decision to
17 give you that grade?
18 A.     I believe anyone that was involved in my
19 hiring process.
20 Q.     So anyone that was involved in your
21 hiring process that graded you as an eight --
22 A.     Right.
23 Q.     -- instead of a seven, did that because
24 of your gender, correct?

Page 173

1 A.     Yes.
2 Q.     Is that your position in this litigation
3 that because you were graded an eight instead of a
4 seven as a maintenance analyst, that was done
5 because of your gender?
6 A.     I was graded an eight instead of a six.
7 Q.     Because you were graded an eight instead
8 of a six, it's your position in this litigation
9 that that was done because of your gender?
10 A.     Yes.
11 Q.     What do you base that upon?
12 A.     That I was the lowest paid maintenance
13 analyst.
14 Q.     How many other maintenance analysts were
15 at your facility?
16 A.     I was the only one at my facility, but
17 there's maintenance analysts across the U.S. and
18 Canada in Shell.
19 Q.     How many other maintenance analysts were
20 at your facility?
21 A.     Just myself.
22 Q.     What are the various bands that a
23 maintenance analyst can be?  Can they be a six, a
24 seven or an eight?

Page 174

1 A.     I have never seen a maintenance analyst
2 under a six.
3 Q.     You've never seen a maintenance analyst
4 under than a six?
5 A.     Ranked lower than a six.
6 Q.     Such as a seven?
7 A.     I have not seen one.
8 Q.     Do you know what all the maintenance
9 analyst --
10 A.     I apologize.  Can I take that back?
11 After I was removed from my position, the next
12 maintenance analyst was ranked at a seven.
13 Q.     And you were ranked as an eight?
14 A.     Correct.
15 Q.     Do you know the experience of the
16 maintenance analyst that came after you?
17 A.     I don't really, no.
18 Q.     Do you know what the pay of the
19 maintenance analyst was who came after you?
20 A.     I don't know the exact number.
21 Q.     Do you know if there were other female
22 maintenance analysts throughout Shell Corporation?
23 A.     Yes, there were.
24 Q.     Were they ranked lower than you, sixes

Page 175

1 and sevens?
2 A.     An eight is the lowest.
3 Q.     Because it's reversed?
4 A.     It's hard.  Right.  Right.
5 Q.     So let's use six is high, seven is
6 lower, eight is lower.  That's the way -- you and
7 I both have the same understanding.  It's hard
8 talking about that.  Six means more money,
9 correct?
10 A.     Correct.
11 Q.     And seven and eight and nine are lower
12 moneys than sixes.  We both have that same
13 understanding, correct?
14 A.     Correct.
15 Q.     Were there other female maintenance
16 analysts, when you became a maintenance analyst?
17 A.     Yes.
18 Q.     Were any of them ranked six, as sixes?
19 A.     I believe so.
20 Q.     When you met with Ms. Kloosterman, and
21 our records suggest that it was around December
22 15th, 2016, and that comports with your
23 recollection?
24 A.     I believe so.

Page 176

1 Q.     And that's when she told you that Will
2 and Mr. Hoover had violated the codes of conduct,
3 correct?
4 A.     Yes.
5 Q.     Did you tell her, did you say anything
6 to her along the lines of, what about Mr. Forman,
7 Mr. Larson and Ms. Priest?
8 A.     I asked her about Mr. Forman.
9 Q.     What did she say about Mr. Forman?
10 A.     That that was confidential.
11 Q.     What did she say about Mr. Larson?
12 A.     I don't think I specifically asked about
13 him, but I did ask her about why my job grade
14 was so low.
15 Q.     When you initially met with
16 Ms. Kloosterman to tell her about the
17 discrimination and the harassment, did you raise
18 to her at that time your job grading?
19 A.     I'm sorry. Can You repeat that?
20 Q.     Let's go back with the time frame again.
21 Take it from the top.  You spoke to
22 Ms. Kloosterman, you believe, some time before
23 December 6th when you wrote her the emails of
24 Exhibits-1 and 2, correct?

Page 177

1 A.      I think I spoke to her before December
2 6th.
3 Q.      You sent her the emails on December 6th
4 and December 7th, correct?
5 A.      Yes.
6 Q.      Then you met with her in person where
7 she took notes and she went over your allegations
8 that are in Exhibit-1 and 2.  Do you recall that?
9 A.      Yes.
10 Q.      During the time when you met with her,
11 when she went over your allegations that are in
12 Exhibit-1 and Exhibit-2, did you complain to her
13 that you felt that your grading was discriminatory
14 and because of your gender?
15 A.      Yes.
16 Q.      Did you put it in writing?
17 A.      I don't think I put it in writing when I
18 said it to her, but I did for when I asked Will.
19 I'm sorry.  I mean, in the document that I
20 provided her about Will.
21 Q.      So I may have missed it.  Please help
22 me.  In Exhibit-1 and Exhibit-2, do you make
23 complaints about your job grade?  I may have
24 missed it.

Page 178

1 A.      It says, my supervisor told me I was
2 intended to be a pay grade seven, but was told by
3 my ON that I was pay eight with no explanation.
4 Q.      That is you complaining to you that that
5 was done because of your gender?
6 A.      I expressed that in my interview with
7 her or when I had a meeting with her.
8 Q.      What did she say in response when you
9 told her that?
10 A.      That she was going to look into it.
11 Q.      I'm going to hand you Exhibit-9.
12                        - - -
13            (Whereupon, 2Barnes-10 was
14        marked for identification and is
15        attached hereto.)
16                        - - -
17 BY MR. TUCKER:
18 Q.      Do you remember filing a complaint with
19 the EEOC in April of 2017?
20 A.      Yes.  Yes, I remember.
21 Q.      At the time that you filed the complaint
22 had you contacted a lawyer?
23 A.      Yes.
24 Q.      Again, I may be misreading this, but can

Page 179

1 you show me, in this document with the EEOC -- and
2 you swore this out to be the truth, correct?
3 There is a charging party, do you see that there
4 at the bottom?
5            MS. GURMANKIN: That should be
6      10. This is 9.
7 BY MR. TUCKER:
8 Q.      I've been referring to your EEOC
9 document as Exhibit-9, it actually should be
10 Exhibit-10.
11            Turn to the front cover page of
12 that document.  Do you see where it says, I
13 declare under penalty of perjury that the
14 foregoing is true and accurate and you signed your
15 name?
16 A.      Yes.
17 Q.      Did anyone help you prepare this
18 document?
19 A.      My legal counsel.
20 Q.      Did you meet with your legal counsel
21 before you went to the EEOC?
22 A.      I did not meet with them.  I mean, we
23 spoke over the phone.
24 Q.      Were they physically there when you

Page 180

1 completed this document?
2 A.      No.
3 Q.      But you had discussed it with your
4 attorneys before you filed it with the EEOC?
5 A.      Yes.
6 Q.      Help me in here see where you raised the
7 issue of your grade.
8            MR. TUCKER: Go off the record
9      and you can look at it.
10            THE VIDEOTAPE TECHNICIAN: Time
11      is now 3:17.  Going off the video
12      record.
13                        - - -
14            (Whereupon, a brief recess was
15      held.)
16                        - - -
17            THE VIDEOTAPE TECHNICIAN: The
18      time is now 3:19.  Back on video the
19      record.
20 BY MR. TUCKER:
21 Q.      Have you had a chance to look at your
22 EEOC filing?
23 A.      Yes.
24 Q.      I had asked you to the question, that

Page 181

1 maybe I missed it, could you show me in here where
2 you raised a pay issue?
3 A.       In Section V on 853 document.
4 Q.       On or about July 18th, 2016 during my
5 mid-year performance review?
6 A.       Uh-huh.
7 Q.       Turney told me that I, quote, make good
8 money for a woman, should not be upset with my pay
9 grade. I was the lowest paid maintenance analyst
10 and the only female maintenance analyst at
11 respondent's Wellsboro location. Despite my
12 repeated requests for an explanation for why I was
13 the lowest paid maintenance analyst, I did not
14 receive an explanation. Is that your -- is that
15 you raising the issue when you were hired you were
16 given a low grade?
17 A.       That was in my mid-year review.
18 Q.       When did you raise it with anyone at
19 Shell? When you first started?
20 A.       Well, isn't Will Turney a part of Shell?
21 Q.       Did you raise it with him -- this is
22 July 18th, 2016, you had already been working at
23 Shell, correct?
24 A.       Right, right.

Page 182

1 Q.       Is this the first time you raised it
2 with Mr. Turney?
3 A.       I wouldn't say it's the first time that
4 I've said it. I was always questioning why I was
5 the lowest paid. I mean, not always, that's not
6 the term I wanted to use. But I had done it a
7 couple of times.
8 Q.       You were just -- from your understanding
9 what you know you were the lowest paid across the
10 board, correct?
11 A.       The lowest paid maintenance analyst out
12 of the maintenance analysts that I knew.
13 Q.       How many did you know?
14 A.       I knew three to four.
15 Q.       Any of them women?
16 A.       Yes.
17 Q.       And they were paid more than you?
18 A.       To my knowledge.
19 Q.       Some of them were paid more than men,
20 too, correct?
21 A.       I don't know that.
22 Q.       Did you know the exact pay amount -- of
23 the three or four people that you knew, were they
24 men or were they women?

Page 183

1 A.       Women and men.
2 Q.       Identify for me all of the people who
3 you knew and what locations they were at?
4 A.       Stephen Ross, he was out of Texas, I
5 don't know which asset specifically. Callie
6 Larson.
7 Q.       Female?
8 A.       Correct. Was out of Canada. The lady
9 that trained me was in Pinedale, Wyoming and she
10 was a six, I believe.
11 Q.       She was paid more than you?
12 A.       Uh-huh, yes.
13 Q.       Is it your position that the woman who
14 trained you, you and she should be getting paid
15 the same?
16 A.       I'm sorry. Can you repeat that?
17 Q.       Is it your position in this litigation
18 that the woman who trained you should be paid the
19 same time amount as you were paid?
20 A.       I think she should get paid the amount
21 the job is set at.
22 Q.       Should you have been paid the same
23 amount as the woman who trained you?
24 A.       I believe so.

Page 184

1 Q.       Anyone else that you can think of who is
2 a maintenance analyst? You identified two females
3 and one male who were paid more than you?
4 A.       I know there's more, I just can't think
5 of their names right now.
6 Q.       Both men and women who were paid more
7 than you?
8 A.       I believe so.
9 Q.       To your understanding, every maintenance
10 analyst was a six?
11 A.       A six or higher.
12 Q.       Or an a seven?
13 A.       A five.
14 Q.       Were any women fives?
15 A.       I don't know that. I do believe that
16 Steven Ross was a five.
17 Q.       Were any maintenance analysts a seven?
18 A.       Just the one after me.
19 Q.       She was female or a male?
20 A.       Female.
21 Q.       The meeting with Ms. Kloosterman
22 happened around December 15, 2016, correct? This
23 is just we've established that, correct?
24 A.       I believe so.

Page 185

1  Q.      What harassing conduct happened to you
2  after December 15th, 2016?
3  A.      I was -- harassing?
4  Q.      Who harassed you after December 15th,
5  2016?  Let's identify the persons first.
6  A.      I was waiting.  I didn't know if I
7  needed to stop.
8              Harassing, I was taken out of my
9  role put and into a different question.
10  Q.      That's a different question. I said
11  identify the people.
12  A.      People?
13  Q.      Who harassed after December 15th, 2016?
14  A.      I was subjected to still working with
15  the people that harassed me.
16  Q.      Did any of them say -- we have gone over
17  the 2019 stuff that the people did to you.  You
18  recall that earlier, we went over that?
19  A.      Yes.
20  Q.      So now we're dealing with principally
21  2018 because from December 16th, 2017 there may be
22  like two weeks.  Did any harassing conduct happen
23  to you from the day you met with Ms. Kloosterman
24  to the end of 2017?  Those approximately 14 days.

Page 186

1              MS. GURMANKIN: You're saying
2              2016 to 2017.
3  BY MR. TUCKER:
4  Q.      Let's try this one more time.  You met
5  with Ms. Kloosterman December 15th, 2016, correct?
6  A.      Yes, as far as I remember.
7  Q.      Did any harassing conduct occur from
8  2016 -- from December 15th, 2016, until the end of
9  the year?
10  A.      Well, I worked from home a lot.  And I
11  was still under supervision of Will Turney until
12  the first.
13  Q.      Anything else?  That's until January 1,
14  2017 you were still under the supervision of Will
15  Turney?
16  A.      That's true.
17  Q.      You worked from home a lot those last
18  couple of weeks.  Why were you working from home?
19  A.      Because Megan told me that if I didn't
20  feel comfortable, I didn't have to come to work or
21  I could work from home.
22  Q.      Was this -- how long did you continue to
23  work from home?
24  A.      I think I worked from home a week or so,

Page 187

1  but then I was on vacation during the holidays.
2  Q.      Then in 2017 -- let's deal with the year
3  2017, okay?  What harassing conduct occurred
4  during the year of 2017?
5  A.      Harassing conduct, I was told by
6  co-workers that they had heard about me and they
7  didn't want -- I'm not sure if that was 2017 or
8  '18.
9  Q.      What co-workers?
10  A.      An operator.
11  Q.      What's his name?
12  A.      Ray Random.
13  Q.      Say that again?
14  A.      Ray Ransom.
15  Q.      What did Mr. Ransom say to you?
16  A.      He said he heard about me.
17  Q.      What did he say he heard?
18  A.      He was alluding to my HR complaint.
19  Q.      What did he say he heard?  What did he
20  tell you as opposed to what you surmised?
21  A.      I was out on-site and he was on-site.
22  And I said oh, they sent me here to help you,
23  jokingly, because I don't know what -- I wouldn't
24  be able to do an operator's job.  And he said --

Page 188

1  Q.      Did he say to you -- did he say, you
2  didn't know how to do an operator's job?
3  A.      No, no, I'm saying, I was in a joking
4  manner to him saying, they sent me here to help
5  you with what he was working on.
6  Q.      What did he say in response?  You made a
7  joke to him, and what did he say in response?
8  A.      He said that he hadn't seen me out here
9  before to that site and --
10  Q.      What else did he say?
11  A.      I can't remember the context of it,
12  right this -- what he said this second.  But I
13  reported it to HR.
14  Q.      What did he say to you?  I'm still
15  trying to get what he said to you.
16  A.      He said he heard about me.  There's an
17  email that I sent of the exacts word that he said
18  to me, I sent that to HR.
19  Q.      What did you say in return to him saying
20  that?
21  A.      I didn't reply to that.  I just
22  continued to work.
23  Q.      You said you were told by co-workers.
24  What other co-worker other than Ray?

Page 189

1 A.      I had co-workers warn me if Will was in
2 a certain area.
3 Q.      What co-workers warned you if Will was
4 in a certain area?
5 A.      Eric Pagano and Brad Pagano.
6 Q.      How did they know there was any issue
7 with you and Mr. Turney?  Did you tell them?
8 A.      Everyone knew that there was an issue.
9 Q.      I didn't ask you if everyone knew.  Did
10 you tell them?
11 A.      People would come to me and ask me --
12          MS. GURMANKIN: Did you tell
13          those guys is the question.
14          THE WITNESS: Not everything,
15          but they knew -- I told them there was
16          an issue with Will.
17 BY MR. TUCKER:
18 Q.      You told them there was an issue with
19 you and Will, correct?
20 A.      Correct.
21 Q.      Who else did you tell that there was an
22 issue with you and Will?
23 A.      Anybody that I complained to about the
24 things that he was doing to me.

Page 190

1 Q.      I'm talking after Ms. Kloosterman
2 meeting in December 15th, 2016, who else did you
3 tell about your issues with Will?  Was it after
4 that you told Eric and his brother?
5 A.      No.
6 Q.      You told them before?
7 A.      Yeah.
8 Q.      Who else did you tell?
9 A.      I would vent to Wayne Fletcher, Tina.
10 Q.      Was this before or after?
11 A.      Before.
12 Q.      Who else?
13 A.      Tina King.
14 Q.      Before or after your meeting with
15 Ms. Kloosterman?
16 A.      Both.
17 Q.      Who else?
18 A.      Penny Robbins.
19 Q.      Before and after your meeting with
20 Ms. Kloosterman?
21 A.      Right.
22 Q.      Who else?
23 A.      Tony Apugliano.
24 Q.      Before and after?

Page 191

1 A.      Yes.
2 Q.      Who else?  Was it pretty much everyone
3 who you came in contact with?
4 A.      No.
5 Q.      Okay.  Well, who else?
6 A.      I can't think of anybody else right now.
7 Q.      Did you tell each of these individuals
8 that Mr. Turney was sexually harassing you?
9 A.      Yes.
10 Q.      Let's deal with 2017.  What conduct did
11 Mr. Turney direct towards you that you felt was
12 sexually harassing?
13 A.      In 2017?
14 Q.      Yes.
15 A.      I don't have an example right now.
16 Q.      What about Mr. Hoover, any action by him
17 in 2017 that you felt was sexually harassing?
18 A.      I don't have any examples right now.
19 Q.      What about Mr. Forman in 2017?
20 A.      Other than the comments that we already
21 went over about looking like a fisherman.
22 Q.      That was actually in 2019, correct?
23 A.      It was any time I had my -- or not every
24 time, but times that I was in my winter clothes

Page 192

1 for work.
2 Q.      What about Ms. Larson, any comments
3 about him or actions by him in 2017?
4          MS. GURMANKIN: That were
5          sexually harassing?
6 BY MR. TUCKER:
7 Q.      Yes.  Thank you.
8 A.      Not that I can remember right now.
9 Q.      What about Ms. Priest?
10 A.      Not sexually harassing comments.
11 Q.      Did anyone sexually harass you in 2018?
12 A.      Not that I recall.
13 Q.      We've gone over the sexually harassing
14 conduct that happened in 2019 already, correct?
15 A.      We went over.
16 Q.      Now, let's deal with retaliation.  Is it
17 your position in this litigation that Shell
18 retaliated against you when you were given the new
19 position?
20 A.      They retaliated against me by demoting
21 me, yes.
22          MR. TUCKER: I have an emergency
23          that just arose.
24          THE VIDEOTAPE TECHNICIAN: The

Page 193

1      time is now 3:35. Going off the video
2      record.
3             - - -
4             (Whereupon, a brief recess was
5      held.)
6             - - -
7             THE VIDEOTAPE TECHNICIAN: The
8      time is now 3:43. Back on the video
9      record.
10 BY MR. TUCKER:
11 Q.     Ms. Barnes, we've gone through 2017 and
12 2018 as well as 2019 with the harassing conduct
13 that you identified happened to you after the
14 conclusion of the investigation, correct?
15 A.     Yes.
16 Q.     Is there any other harassing conduct
17 that happened to you after the investigation that
18 you have not told me about?
19 A.     Not that I can think of at this time. I
20 included all the information in the charges
21 though.
22 Q.     But this is not -- I want your testimony
23 now, your sworn testimony. I want you to tell me
24 because this is now one thing, this is now sworn

Page 194

1 under oath before a jury. Do you want to review
2 your document? Because as I told you, this is my
3 only time before trial for you to tell me the
4 harassing conduct that happened to you after the
5 conclusion of Ms. Kloosterman's investigation.
6             I'd like to hear from your
7 words, I'd like you to tell the jury right now,
8 look in the camera and tell me anything else you
9 recall that happened that you felt to be harassed
10 because of your gender? Could you look at the
11 jury and tell them everything else that happened
12 to you that you haven't told me?
13 A.     I can't think of anything at this time
14 for 2017 and '18.
15 Q.     2019. And you told me about 2019
16 already, correct?
17 A.     Yes.
18 Q.     And you told me about 2016 from the time
19 when you worked home for a week and then you were
20 on vacation during that last part of 2016,
21 correct?
22 A.     I did tell you about that, yes.
23 Q.     You believe -- you contend in this
24 litigation that you were retaliated against by

Page 195

1 being moved to another position; is that correct?
2 A.     Yes, demoted.
3 Q.     Did your pay change?
4 A.     No.
5 Q.     Did any of the benefits change?
6 A.     Not like my insurance-wise or
7 pension-wise, no.
8 Q.     What position do you believe you were
9 demoted to?
10 A.     The name of the position was --
11 Q.     What position were you at before and
12 what position were you demoted to?
13 A.     They put me on HSSE team.
14 Q.     You were a maintenance analyst before
15 that?
16 A.     Correct.
17 Q.     They put you on the -- what does HSSE
18 stand for?
19 A.     Health Safety Security Environmental.
20 Q.     Did your grade change?
21 A.     No.
22 Q.     Is it fair to say that as a maintenance
23 analyst you believe that all the people you have
24 to work with were harassing you?

Page 196

1             In your position as a
2 maintenance analyst, if you were to maintain that
3 position, is it your belief that you would have
4 had to continue to work with people who were
5 harassing you?
6 A.     I had to continue to work with people
7 who were harassing me regardless if I was in that
8 role or not.
9 Q.     As health safety, in the position that
10 you went to, did you have to work with Mr. Turney
11 on a daily basis?
12 A.     No, because I did not attend the
13 meetings that he was in, otherwise I would have.
14 Q.     Did you have to work with Mr. Turney on
15 a daily basis as a health safety person?
16 A.     We had to interact or go through
17 supervisors to talk, to communicate with each
18 other.
19 Q.     Is it your -- I think you said at this
20 point, just let me make sure I'm absolutely clear
21 with this. The mere fact that you had to continue
22 to work with people who you believed had harassed
23 you, you felt was retaliation?
24 A.     Yes.

Page 197

1 Q.     Do you feel that each of these
2 individuals who you contend harassed you should
3 have been fired?
4 A.     Yes.
5 Q.     Because Shell did not fire these people
6 who you contend harassed you, that was an act of
7 retaliation?
8 A.     I believe so.
9 Q.     They should have fired Mr. Turney, Will
10 Turney?
11 A.     Yes.
12 Q.     They should have fired Mr. Hoover?
13 A.     Yes.
14 Q.     They should have fired Mr. Forman?
15 A.     Yes.
16 Q.     They should have fired Mr. Larson?
17 A.     I think so.
18 Q.     They should have fired Ms. Priest?
19 A.     Yes.
20 Q.     Their failure to fire these five people
21 because of your allegations constituted
22 retaliatory conduct by Shell?
23 A.     Yes, because they're policy states there
24 is zero tolerance.

Page 198

1 Q.     Their failure to fire these five people,
2 did that constitute retaliation by Shell?
3 A.     I feel like that constitutes that they
4 were tolerant towards it.
5 Q.     The failure of Shell to fire these five
6 people, did you consider that act retaliatory by
7 Shell?
8        MS. GURMANKIN: It was already
9        asked and answered.  You can answer
10       again.
11       THE WITNESS: Yes.
12 BY MR. TUCKER:
13 Q.     Is there anything else that you believe
14 that Shell should have done to any of these
15 individuals short of firing them?  Or you believe
16 firing was the only acceptable result?
17 A.     I don't know if there's any other
18 possibility outcomes that I can think of that
19 would be acceptable.
20 Q.     To you?
21 A.     Right.
22 Q.     When you got this position, this health
23 safety position, tell me how that came about.
24 Tell me the discussions, if any, that lead up to

Page 199

1 that?
2 A.     I was presented with three roles that --
3 Q.     Three roles?
4 A.     Yeah.
5 Q.     By whom?
6 A.     Megan and Gregg Larson.
7 Q.     When was this presentation made?  During
8 that December 15th meeting or after it?
9 A.     I believe it was after.  I'm sorry.
10 Greg and I met alone without Megan at one point
11 and he gave me the -- or told me these were the
12 roles that were available, and that he needed me
13 to choose one quick.  And he suggested me to take
14 the backup control operator position.
15 Q.     Did you take that position?
16 A.     No.
17 Q.     Why not?
18 A.     I expressed that I did not like the
19 backup of the role.  That I was not an equal
20 control room operator, that I would just be the
21 backup, so I thought it would be easier for them
22 to get rid of me.
23 Q.     Did you tell Ms. Kloosterman or Greg
24 that you never wanted to work with these people

Page 200

1 again?  Will, Hoover, Forman and Larson?
2 A.     I told them I did not want to work with
3 Will ever again.
4 Q.     What about as it relates to Mr. Hoover?
5 A.     I don't know if I said that or not.
6 Q.     Do you recall Ms. Kloosterman calling
7 about options?
8 A.     Yes.
9 Q.     Tell me about that.
10 A.     I chose to stay in the maintenance
11 analyst role.
12 Q.     What options did Ms. Kloosterman present
13 to you?
14 A.     They gave me the options of backup
15 control operator, environmental technician, and I
16 don't know if there is title with the other one
17 but it was using the flare camera.
18 Q.     You indicated earlier that you actually
19 applied for a position in California?
20 A.     Yes.
21 Q.     Were you willing to go to California?
22 A.     Yes.
23 Q.     Why?
24 A.     To get away from the situation.

1 Q.      Did Ms. Kloosterman offer you a position
2 at a different site?
3 A.      No.
4 Q.      There is a text exchange between you and
5 your sister which is at Barnes 778.  This is a
6 two-sided document.
7        MR. TUCKER: I guess, Counsel,
8        we're fighting over the redacted portion
9        here?
10       MS. GURMANKIN: I don't know,
11       are you?
12       MS. KIRKPATRICK: I asked for a
13       privilege log.
14       MS. GURMANKIN: Right.  You
15       emailed on Wednesday with certain issues
16       with the documents that you've had since
17       June 17th.  I said on Wednesday, we'll
18       get you a privilege log.
19       MS. KIRKPATRICK: I thought you
20       said that --
21       MS. GURMANKIN: I'll get you a
22       log regarding the redactions that we
23       made because it's irrelevant or
24       non-responsive.

1        MS. KIRKPATRICK: So you are
2 getting me log for this?
3        MS. GURMANKIN: I said that in
4 my email on Wednesday.
5        MS. KIRKPATRICK: I thought you
6 said it was irrelevant or technical
7 information from your tech company.
8        MS. GURMANKIN: No, I said the
9 beginning of each text exchange --
10       MR. TUCKER: I'm sorry.  I
11 didn't mean for the deposition to
12 digress into this.  Can I interrupt so
13 we can do the deposition?  I'm sorry.
14       MS. GURMANKIN: Sure.
15 BY MR. TUCKER:
16 Q.      Do you see where it starts at, she
17 called me and was asking about options on 778?
18 A.      Yes.
19 Q.      Top of 778?
20 A.      Yes.
21 Q.      Who are you referring to?
22 A.      Megan Kloosterman.
23 Q.      And what options did she present to you?
24 A.      The three roles I described.  And she

1 didn't ask me if I was interested in transferring
2 I told her yes.  And she said she would look into
3 it.  But I was never presented an option to choose
4 from being --
5 Q.      Because your position was they should
6 transfer Mr. Turney, correct?
7 A.      They should have, yes.
8 Q.      Did you tell them that you wanted to be
9 transferred out from Mr. Turney if they would not
10 fire him?
11 A.      I said I did not want to work with Will
12 at all.
13 Q.      You said you would not work with him,
14 too, correct?
15 A.      I believe so.
16       MR. TUCKER: I may be close to
17       finishing.  Can with we take a break?
18       THE VIDEOTAPE TECHNICIAN: The
19       time is now 3:56.  Going off the video
20       record.
21            - - -
22       (Whereupon, a brief recess was
23       held.)
24            - - -

1        THE VIDEOTAPE TECHNICIAN: The
2        time is now 4:07.  Back on the video
3        record.
4 BY MR. TUCKER:
5 Q.      Ms. Barnes, at some point you did find
6 out that there was some type of disciplinary
7 action taken against Will, correct?  Mr. Turney,
8 correct?
9 A.      I heard rumors that there was.
10 Q.      As a matter of fact, you say in a text
11 to your sister, and I'm quoting, Oh, I found out
12 today Will's bonus was taken away, which was about
13 $15,000.  And he had to sign a form that he
14 pleaded guilty that goes in his personnel file for
15 18 months.  And has to take classes on ethics and
16 code of conduct.  Do you recall writing that to
17 your sister?
18 A.      Yes.
19 Q.      Who did you find that information out
20 from?
21 A.      Wayne Fletcher.
22 Q.      When did Mr. Fletcher tell you that?
23 A.      After Megan's departure, he heard it
24 from Will.

Page 205

1 Q. And you were evil laughing about that?
2 A. Is that what the document says?
3 Q. No. I'm asking you. I'm not asking
4 what the document says. Were you evil laughing
5 after that?
6 A. Evil laughing. I wouldn't use the term
7 evil.
8 Q. Well, let me show you what you put on
9 Barnes 787 and ask if you used the term evil?
10 A. Yes, I did.
11 Q. Did you feel good about this having
12 happened to him?
13 A. I felt it wasn't enough.
14 Q. Because enough would have for him to be
15 fired, correct?
16 A. Yes.
17 Q. Along with Mr. Hoover being fired,
18 correct?
19 A. Yes.
20 Q. And Mr. Forman being fired, correct?
21 A. Yes.
22 Q. And Mr. Larson being fired also,
23 correct?
24 A. Yes.

Page 206

1 Q. And Ms. Priest being fired, correct?
2 A. Yes.
3 Q. And that would have been enough to
4 satisfy you, right?
5 A. And to give me the proper pay grade.
6 Q. So fire all five of them. Who would
7 have then constituted the department if all five
8 of them would have been fired?
9 MS. GURMANKIN: Objection to
10 form.
11 THE WITNESS: Who would have ran
12 the department?
13 MR. TUCKER: Yes.
14 MS. GURMANKIN: Same objection.
15 BY MR. TUCKER:
16 Q. Who would have run the department if
17 your wishes would have been granted?
18 MS. GURMANKIN: Objection to
19 form.
20 THE WITNESS: I would think the
21 people that -- there's more competent
22 people within the company that they
23 could hire.
24 BY MR. TUCKER:

Page 207

1 Q. Where did you get that impression from?
2 A. I worked with more competent people.
3 Q. Before you were employed at Shell -- you
4 were never an employee of Shell until you started
5 working with Mr. Turney, correct?
6 A. A Shell staff employee, that's correct.
7 Q. And before that you were a waitress
8 bartender correct? Other than being a contractor
9 you were a waitress bartender, correct?
10 A. Right.
11 Q. So you had never been an employee of
12 Shell prior to Mr. Turney hiring you, correct?
13 A. Not a direct higher, no, I was a
14 contractor.
15 Q. You were not an employee of Shell until
16 Mr. Turney hired you, correct?
17 A. Correct.
18 Q. So you had never been supervised by a
19 Shell employee as employee to Mr. Turney hired
20 you, correct?
21 MS. GURMANKIN: Objection to
22 form.
23 THE WITNESS: I was supervised
24 by Shell employee as a contractor, but

Page 208

1 not as a Shell --
2 BY MR. TUCKER:
3 Q. The first time as a Shell employee you
4 were supervised was by a Shell employee, correct?
5 A. Correct.
6 Q. But yet you sit here suggesting to us
7 that you know what proper supervision is, even
8 though the first time you were supervised by a
9 Shell employee was by Mr. Turney?
10 MS. GURMANKIN: Objection to
11 form.
12 THE WITNESS: I had Shell
13 supervisors in the past.
14 BY MR. TUCKER:
15 Q. How long had Mr. Hoover been working at
16 Shell?
17 A. A long time.
18 Q. And you knew more than him?
19 A. I'm not saying I knew more than him.
20 Q. About 20 years he had been working
21 there, correct?
22 A. I believe so.
23 Q. What did Mr. Hoover do to you again?
24 A. He called me a bitch.

Page 209

1 Q.    Anything else?

2 A.    He said I wasn't smart enough to do a

3 tasks, commented on my blond hair.

4 Q.    Anything else?

5 A.    There's details in my --

6 Q.    No, I need you to testify to it. I need

7 you to tell this jury what he did to you.

8 A.    That's all I can think of right now. He

9 called me a bitch at work, he belittled me in

10 front of my co-workers by saying I wasn't smart

11 enough to do something because I had blond hair.

12 Q.    Anything else?

13 A.    Not that I can think of at the moment.

14 Q.    Not a single thing did he do, again,

15 afterwards other than what you've told us right?

16 A.    Right, he went into -- I think he

17 retired at some point during that.

18 Q.    Do you know if Ms. Priest has a family?

19 A.    I believe she does.

20 Q.    Do you know if she has kids?

21 A.    I believe she does.

22 Q.    You think she should have been fired

23 because she, in your mind, helped assist in your

24 grading?

Page 210

1 A.    She broke the law, I believe, so if that

2 constitutes firing, then yes.

3 Q.    Who says she's broke the law, you did?

4 A.    Yes.

5 Q.    And you get to decide the law?

6 A.    I didn't write the law.

7         MS. GURMANKIN: Objection to

8 form.

9 BY MR. TUCKER:

10 Q.    Well, you said she broke the law. Who

11 else said she broke the law other than you?

12 A.    I don't know.

13 Q.    How long has Ms. Priest been working at

14 Shell?

15 A.    I think for a while. I'm not sure of

16 the exact amount.

17 Q.    Mr. Larson has been working a Shell for

18 a while, too, correct?

19 A.    Correct.

20 Q.    And Mr. Forman?

21 A.    I believe so.

22 Q.    Any other allegations of sexual

23 harassment or discrimination against them that you

24 know of?

Page 211

1 A.    Not that I'm aware of at this time.

2 Q.    What about Will, any allegations of

3 sexual harassment and discrimination against him?

4 A.    I'm not sure.

5 Q.    Mr. Hoover same thing?

6 A.    I'm not sure.

7 Q.    From having been an employee from --

8 when did you start? 2015?

9 A.    Yes.

10 Q.    From what you've indicated, the

11 harassment started sometime in 2016, and stopped

12 at the time of Ms. Kloosterman's investigation?

13         MS. GURMANKIN: Objection to

14 form.

15         THE WITNESS: It started in

16 2014.

17 BY MR. TUCKER:

18 Q.    Yes, with the two, with the two

19 incidents that you talked about with Mr. Turney,

20 correct?

21 A.    Yes.

22         MR. TUCKER: Let's go off the

23 record.

24         THE VIDEOTAPE TECHNICIAN: The

Page 212

1 time is now 4:14. Off the video record.

2             - - -

3         (Whereupon, a brief recess was

4 held.)

5             - - -

6         THE VIDEOTAPE TECHNICIAN: The

7 time is now 4:17. Back on the video

8 record.

9 BY MR. TUCKER:

10 Q.    According to the document you have

11 there, when did you file the complaint with the

12 EEOC? Could you look there in front of you?

13 A.    Oh.

14 Q.    When did you file it?

15 A.    Oh, when. April 25th, 2017.

16 Q.    Do you recall emailing with your sister

17 around that same period of time where you were

18 talking to her about, you've been picking out

19 $300,000 houses that you're going to buy when you

20 get your moneys?

21 A.    I recall it.

22 Q.    Was that in relation to this lawsuit?

23 A.    Yes. It was a joke.

24 Q.    So every time you put LOL behind

Page 213

1 something that means it's a joke?
2     MS. GURMANKIN: Objection to
3     form.
4     THE WITNESS: No, not
5     necessarily.
6 BY MR. TUCKER:
7 Q.     But you were thinking about money when
8 you filed the EEOC complaints because you already
9 consulted with a lawyer?
10 A.     I was not thinking about -- obviously,
11 that's something that comes up. However, that's
12 not -- I wanted justice for what had been done to
13 me and what continued to be done to me.
14 Q.     Did you want them to show you the money
15 so you could buy a big house and fill it with
16 puppies as part of the lawsuit?
17 A.     It was a joke between my sister and I.
18 Q.     Your sister bought into the joke because
19 she said, when they win you the big bucks, you'll
20 get the F out of here for a while.  Do you recall
21 her saying that?
22 A.     We joked back and forth about things of
23 those nature.
24 Q.     You had an email showing your attorneys

Page 214

1 who are representing you, and you were talking
2 about money they had won in a case and you wanted
3 to win money like that, too, right?
4 A.     Did I say that?  Is that what you're
5 asking?
6 Q.     Do you recall saying it?  Writing it in
7 the text to your sister.
8 A.     I don't have it in front of me so I --
9 Q.     I'm not asking you were whether you have
10 it in front of you.  I'm saying, do you recall
11 that email exchange with your daughter --
12     Do you recall that email
13 exchange with your sister where you were talking
14 about the big bucks that you wanted to win?
15 A.     We talked about money within the
16 lawsuit, yes.
17 Q.     You talked about the big bucks you
18 wanted to win?
19 A.     I suppose I may have termed it that way.
20 Q.     You looked at the firm's website and you
21 saw the money they had gotten in an age
22 discrimination, you wanted that kind of money,
23 right?
24 A.     I was on an email list for notifications

Page 215

1 of those sort.  So I just got an email about it
2 and was more confident in my attorneys.
3 Q.     How is it that you were on their email
4 list?  Had you contacted them prior to this
5 lawsuit?
6 A.     No, I don't know how.  It's not like I
7 -- I don't know how they set it up.
8 Q.     In your email exchange with your sister,
9 you talked about you two going to Barcelona, Spain
10 if you got money from this lawsuit, didn't you?
11 A.     I think I'd go there regardless of that.
12 Q.     In your email exchange with your sister,
13 do you talk about justice or do you just talk
14 about money?
15 A.     I think it's both.
16 Q.     In this email you talk about justice?
17 A.     Is it email or text messages?
18 Q.     I'm sorry.  In this text exchange do you
19 talk about justice or do you talk about money?
20     MS. GURMANKIN: Objection.
21     Asked and answered.  You can answer
22     again.
23     THE WITNESS: I believe we talk
24     about both.

Page 216

1     MR. TUCKER: My final break.  I
2 think I may be done.
3     THE VIDEOTAPE TECHNICIAN: Time
4 is now 4:21.  Going off the video
5 record.
6     - - -
7     (Whereupon, a brief recess was
8 held.)
9     - - -
10     THE VIDEOTAPE TECHNICIAN: Time
11 is now 4:23.  Back on the video record.
12 BY MR. TUCKER:
13 Q.     I thought I asked you at the beginning
14 of the litigation, beginning of this deposition,
15 had you ever made any claims of sexual harassment
16 prior to this lawsuit against anyone else.  Did I
17 ask you that?
18 A.     Not that I remember.
19 Q.     It was in my mind.  Prior to accusing
20 Mr. Turney, Hoover, Forman, Larson and Priest of
21 discrimination, had you ever accused anyone else
22 have of discrimination or harassment?
23 A.     Yes.
24 Q.     Who had you accused?

1  A.     ██████████ and ████████
2  Q.     Tell me about the allegations against
3  Mr. ████████?
4  A.     He was sending me IM's through our work
5  communicator on the computer saying that he wanted
6  to be up front with me that he's married, but he
7  wanted to flirt with me. So I called Hondo into
8  the room to review the messages and he instructed
9  me what to do from there.
10 Q.     What did Mr. Blakely tell you to do?
11 A.     To documents, do a write-up of
12 everything that happened. And he, I believe, went
13 to his supervisor and his supervisor went to his
14 supervisor and they wanted to keep it internal and
15 not involve HR.
16 Q.     What happened as a result of it?
17 A.     He was promoted.
18 Q.     Mr. ████████?
19 A.     Yes.
20 Q.     Did he ever harass you again?
21 A.     Not that I recall, no.
22 Q.     So after you reported to Mr. Blakely,
23 nothing else happened again after that?
24 A.     No.

1  Q.     And you weren't even -- was
2  Mr. Brownsville a Shell employee?
3  A.     Yes.
4  Q.     You were a contract employee at that
5  time?
6  A.     Correct.
7  Q.     Notwithstanding that, Mr. Blakely still
8  hired you later on to work for Shell?
9  A.     Yes.
10 Q.     Did Mr. ████████ ever harass you when
11 you became an employee of Shell?
12 A.     No. He was out of a different asset.
13 Q.     Mr. ████████ wasn't even at your
14 location when you became an employee of Shell,
15 correct?
16 A.     No, he was not at that location when I
17 became a Shell employee.
18 Q.     But he was still working for Shell after
19 you made -- at your location when you told
20 Mr. Blakely, correct?
21 A.     Well, he would travel back and forth
22 between ours and one in Bradford, Pennsylvania.
23 Q.     But to be clear, as soon as you told
24 Mr. Blakely what Mr. ████████ did, there was

1  never another incidents from Mr. ████████,
2  correct?
3  A.     No.
4  Q.     I'm not correct?
5  A.     Oh, I'm sorry. You are correct. There
6  wasn't an incident.
7  Q.     What happened with ████████?
8  A.     ████████ was sending me inappropriate
9  messages, he was hugging me at work, he said I
10 should dance on a stripper pole for the landowners
11 to calm them down when they came in angry at
12 Shell.
13 Q.     Who did you report this to?
14 A.     My supervisor.
15 Q.     Who was that?
16 A.     David Summers.
17 Q.     What did Mr. Summers do?
18 A.     Went to Michelle Priest.
19 Q.     What happened?
20 A.     I was told that I was -- I took it too
21 seriously, it was a joke.
22 Q.     Who told you that?
23 A.     Michelle Priest.
24 Q.     Did Mr. ████ever do anything else to you

1  again after that?
2  A.     Not that I recall.
3  Q.     Did he retaliate against you?
4  A.     Not that I recall.
5  Q.     Both this incident with Mr. Brownsville
6  and Mr. ████, was that known, as far as you know,
7  to Mr. Blakely prior to you being hired?
8  A.     Yes, Mr. Blakely was aware.
9  Q.     Notwithstanding, Mr. Blakely knowing you
10 had made two allegations of sexual harassment, he
11 still hired you for Shell?
12 A.     Yes.
13        MR. TUCKER: I have three more
14 minutes. Let's go off.
15        THE VIDEOTAPE TECHNICIAN: Time
16 is now 4:28. Going off the video
17 record.
18        - - -
19        (Whereupon, a brief recess was
20 held.)
21        - - -
22        THE VIDEOTAPE TECHNICIAN: Time
23 is now 4:28. Back on the video record.
24 BY MR. TUCKER:

Page 221

1 Q. When you were out on short-term
2 disability, were you under the care of a doctor?
3 A. Yes.
4 Q. What doctor were you under the care of?
5 A. Courtney Babcock and Shell had assigned
6 me a nurse you through their program.
7 Q. For what reason were you out on
8 disability? Because of stress?
9 A. Anxiety.
10 Q. When you returned to work, did you
11 return to a different position?
12 A. I returned to -- I don't even think
13 there was a position. I returned to work and then
14 they didn't give me --
15 Q. You returned on, like, April 1st of
16 2019?
17 A. April, yeah, sound about right.
18 Q. You returned as a safety tech?
19 A. That was my title.
20 Q. Previously you were an environmental
21 tech?
22 A. My title was safety tech the entire
23 time, but they worded it as environmental tech.
24 Q. How did your duties change when you

Page 222

1 returned on April 1st of '19 to the new position?
2 A. How did I? I'm sorry. I didn't
3 understand the first part of your question.
4 Q. How did your job duties change?
5 A. Oh, job duties. I didn't return to any
6 of my old job. I didn't take on anything that I
7 was doing when I returned. They told me that my
8 -- I wasn't going to be doing my old job.
9 Q. What were you doing when you returned?
10 A. I did -- I went through power point
11 presentations for Wayne, I did administrative
12 tasks, I drove around in a truck all day one time
13 I had nothing to do so he asked me to drive him
14 around.
15 Q. Who is T.J. hall?
16 A. I don't know if he's a Shell employee
17 still or not.
18 Q. Did you and Mr. hall have a romantic
19 relationship?
20 A. Yes.
21 Q. He was a Shell employee?
22 A. Correct.
23 Q. And you were a Shell employee?
24 A. No.

Page 223

1 Q. Who were you employed by at that time?
2 A. Synergy.
3 Q. How long did that romantic relationship
4 last?
5 A. Less than a year.
6 Q. Who is Matt Bedrich?
7 A. He was -- we were in a relationship.
8 Q. When was that?
9 MS. GURMANKIN: This has been
10 asked and answered.
11 BY MR. TUCKER:
12 Q. I asked that exact person?
13 A. Yeah.
14 Q. I'm sorry. Just going over my notes.
15 During 2016, did Mr. Turney know
16 who your boyfriend was?
17 A. 2016, yes.
18 Q. How did he know who your boyfriend was?
19 A. They met at a Shell Christmas party or
20 holiday party.
21 Q. Would that have been in 2015?
22 A. I don't remember the exact date. It
23 could have been 2015. I don't know if I attended
24 the 2016 holiday or not.

Page 224

1 Q. But in 2016 he knew who your boyfriend
2 was. So if there was a holiday day party, it
3 would have had to have been 2015, correct?
4 A. I believe so.
5 Q. Did you talk to Mr. Turney about any
6 problems or issues you were having with your then
7 boyfriend in 2016?
8 A. No.
9 Q. You never complained to him about any
10 issues at all with you and your boyfriend?
11 A. I didn't talk about him that much,
12 unless Will would ask me about questions. It's
13 not something I wanted to talk about.
14 Q. I'm going to ask you the same question.
15 Did you make any complaints to Mr. Turney about
16 your boyfriend in 2016?
17 A. Not that I recall.
18 Q. Did you share any personal information
19 about you and your boyfriend with Mr. Turney in
20 2016?
21 A. I asked to leave work early one day
22 because my boyfriend at the time was in the
23 hospital.
24 Q. What was he in the hospital for?

Page 225

1  A.      A slipped disc.
2  Q.      Is that the only time that you recall in
3  2016 you talked to Mr. Turney about you and your
4  boyfriend's personal life?
5  A.      I believe so.  If I did, it was either
6  maybe we went somewhere together or something.  He
7  would ask me because he said he saw me on the
8  highway driving back with him before, and he was
9  asking where I was going.
10 Q.      Did any of these people who allege
11 harassed you, did any -- you talked about in your
12 write-ups how Mr. Turney would touch you, correct?
13 A.      Correct.
14 Q.      After the investigation by
15 Ms. Kloosterman, he never touched you again,
16 correct?
17 A.      Correct.
18 Q.      You talked about how Mr. Hoover touched
19 your hair, correct?
20 A.      Ken Forman touched my hair.
21 Q.      I'm sorry. Ken Forman touched your hair,
22 correct?
23 A.      Correct.
24 Q.      After Ms. Kloosterman's investigation,

Page 226

1  he never touched you again, correct?
2  A.      Correct.
3  Q.      Mr. Hoover never touched you, correct?
4  A.      Correct.
5  Q.      Mr. Larson never touched you either,
6  correct?
7  A.      Correct.
8  Q.      Ms. Priest, her limited discrimination
9  was the grading, correct?
10         MS. GURMANKIN: Objection to
11 form.
12         THE WITNESS: Discrimination?
13 BY MR. TUCKER:
14 Q.      Her limited discrimination --
15 Ms. Priest's discrimination against you was the
16 grading of your job when you first started,
17 correct?
18         MS. GURMANKIN: Objection to
19 form.
20         THE WITNESS: Yes.
21 BY MR. TUCKER:
22 Q.      Did any of the these individuals who you
23 allege discriminated against you, did any of them
24 ever ask you out for a date?

Page 227

1  A.      Not that specific wording.
2  Q.      Generally?
3  A.      I was asked to lunch a lot.
4  Q.      And you felt that that was
5  inappropriate?
6  A.      In some cases, yes.
7  Q.      In what instances did you believe being
8  asked to lunch and by whom was inappropriate?
9  A.      By --
10 Q.      Let me he ask.  Did you believe being
11 asked to lunch by one of these individuals was
12 sexual harassment?
13 A.      When I would -- went to lunch they would
14 say I'm not going to tell my wife that Jesse is
15 going with us.
16 Q.      Did you believe that these individuals
17 asking you to go to lunch was sexual harassment?
18 A.      If they are not telling their wife's
19 that I'm going, then, yes.  It's implying that --
20 Q.      Did you believe --
21         MS. GURMANKIN: Wait.  Wait.
22 You can finish.
23         THE WITNESS: It was implying
24 that something was going to happen in a

Page 228

1  sexual nature so they didn't want their
2  wives knowing.
3  BY MR. TUCKER:
4  Q.      Did you believe that these individuals
5  asking you to go to lunch was sexual harassment?
6         MS. GURMANKIN: Objection.
7         THE WITNESS: So in some case.
8  BY MR. TUCKER:
9  Q.      In what instances were they?
10 A.      The ones that I just explained.
11 Q.      Did Mr. Turney ever tell you -- what
12 individual said what you just said?
13 A.      Ken Forman.
14 Q.      Who else?
15 A.      Mr. Turney was there.  He didn't say
16 those specific words, Ken did.
17 Q.      Anyone else other than Mr. Forman?
18 A.      Not those words, no.
19         THE VIDEOTAPE TECHNICIAN:
20 Counsel, I'm going have to switch cards.
21 The time is now 4:36.  This concludes
22 disk three.
23         - - -
24         (Whereupon, a brief recess was

1    held.)

2        - - -

3        THE VIDEOTAPE TECHNICIAN: Time

4    is now 4:37.  This begins disk four.

5    BY MR. TUCKER:

6    Q.      Mr. Forman said to you something to the

7    effect of, I'm not going to tell my wife I went to

8    lunch with you today?

9    A.      Yeah, he said that.

10   Q.      He said that in the presence of

11   Mr. Turnery?

12   A.      Correct.

13   Q.      Did he laugh when he said that?

14   A.      No, he was serious.

15   Q.      How many times did he say that to you?

16   A.      One time.

17   Q.      Did anyone else say something like that

18   to you?

19   A.      No.

20   Q.      Did anyone ask you out for after work

21   drinks?

22   A.      To imply a date?

23   Q.      Well, did you ever go out for drinks

24   after work with either Mr. Turney, Hoover,  Forman

1    or Larson?

2    A.      No.

3    Q.      Did you ever -- did you ever socialize

4    with Mr. Turney, Hoover, Forman or Larson after

5    work or outside of work?

6    A.      Not unless it was a work event, like, a

7    dinner.

8    Q.      When you were at the dinner, did any of

9    them act in appropriate towards you at the dinner?

10   A.      When he showed me a selfie in his

11   underwear, yes.

12   Q.      That was the single event we were

13   talking about when you were in Canada, correct,

14   that happened in 2014?

15   A.      Right.

16   Q.      Did you ever go out with him in any work

17   related dinner other than that?

18   A.      Not that there wasn't wife's present and

19   boyfriends and significant others, in general.

20       MR. TUCKER: Thank you for your

21   time.  I appreciate your time.  I have

22   no further questions at this point.

23   Your counsel may ask some questions

24   though.

1        MS. GURMANKIN: No questions.

2    Thank you.

3        THE VIDEOTAPE TECHNICIAN: Time

4    is now 4:39.  This concludes this video

5    deposition.

6        - - -

7        (Whereupon, the deposition

8    concluded at 4:39 p.m.)

9        - - -

1
2        C E R T I F I C A T I O N

3

4        I HEREBY CERTIFY that the

5    proceedings and evidence are contained fully and

6    accurately in the stenographic notes taken by me

7    upon the foregoing matter and that this is a

8    correct transcript of the same.

9

10

11

12        AMY L. TAYLOR
          Court Reporter
          Notary Public

13

14   (The foregoing certification of this transcript

15   does not apply to any reproduction of the same by

16   any means unless under the direct control and or

17   supervision of the certifying reporter.)

18

19

20

21

22

23

24

Exhibit 2



Compressed Transcript of the Testimony of
# WILLIAM TURNEY-CONTAINS CONFIDENTIAL PORTIONS, 2/19/20

**Case:** Barnes v. Shell Exploration & Production Company Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

JESSE BARNES,                : CIVIL ACTION
                             :
           Plaintiff,  :
                             :
v.                           :
                             :
SHELL EXPLORATION       :
AND PRODUCTION COMPANY    :
APPALACHIA; SHELL       :
EXPLORATION AND PRODUCTION :
COMPANY; SHELL OIL COMPANY, :
                             :
           Defendants.  : NO. 18-1497

- - -

CONTAINS CONFIDENTIAL PORTIONS

ORAL AND VIDEOTAPED DEPOSITION of WILLIAM
TURNEY, taken at Shell Woodcreek, 150 N. Dairy
Ashford Road, Houston, Texas 77079 on February 19,
2020, beginning at 8:55 a.m., before Constance
Koenig, RMR and CSR in and for the State of Texas.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

## Page 2

1   APPEARANCES:
2
3   CONSOLE MATTIACCI LAW, LLC
    BY:  CAREN N. GURMANKIN, ESQUIRE
4   1525 Locust Street
    9th Floor
5   Philadelphia, Pennsylvania 19102
    (215) 545-7676
6   Gurmankin@consolelaw.com
    Counsel for Plaintiff
7
8   TUCKER LAW GROUP
9   BY:  JOE H. TUCKER, JR., ESQUIRE
    1801 Market Street
10  Suite 2500
    Philadelphia, Pennsylvania 19103
11  (215) 875-0609
    Jtucker@tlgattorneys.com
12  Counsel for Defendants
13
14  ALSO PRESENT:
15     Cynthia Bivins
       Stephanie Jackson
16     Jesse Barnes (By Telephone)
       Sam Among, Videographer
17
18
19
20
21
22
23
24

## Page 3

1                       INDEX
2   WITNESS:
3   WILLIAM TURNEY
4   EXAMINATION
5     By Ms. Gurmankin          6
6
7     (CONFIDENTIAL PORTION - Page 126, Line 13
       through Page 127 Line 17)
8                  EXHIBITS
9   EXHIBIT NO.         DESCRIPTION          PAGE
10
11  Exhibit 49   Letter (from Gurmankin to      9
                 Turney) dated February 3,
12               2020 with Attachments
                 (NO BATES NUMBERS)
13  Exhibit 50   Letter (from Hallbach to      27
                 Turney) dated December 15,
14               2011 with Attachment
                 (SHELL_0001369-373)
15
16  Exhibit 51   Acknowledgement of Receipt    39
                 of the Code of Conduct
17               (SHELL_0001367-368)
18  Exhibit 52   Goals and Performance         76
                 Appraisals for William
19               Turney 2012-2019
                 (SHELL_0001377-389)
20  Exhibit 53   Goals and Performance        169
                 Appraisal Report 2015 for
21               Jesse Barnes
                 (Shell_0001181-182)
22  Exhibit 54   2015 End-of-Year Performance  171
                 Summary for Jesse Barnes
23               (Shell_0000882)
24

## Page 4

1   Exhibit 55   Email (from Turney to        188
                 Priest) dated November 23,
2                2016 (Shell_0000346)
3   Exhibit 56   Candidate Response to        334
                 Internal Application
4                Questions, Jesse Barnes
                 (Shell_0000287-295)
5
6         PREVIOUSLY MARKED EXHIBITS
7
8   Exhibit 1    Email (from Underholt to     380
                 Priest) dated February 9,
9                2017 with Attachments
                 (Shell_0000883-892)
10  Exhibit 7    Civil Cover Sheet,           360
                 Complaint
11               (NO BATES NUMBERS)
12  Exhibit 11   Scheduler Job Posting        336
                 (Shell_0000878-881)
13
14  Exhibit 12   Email (from Turney to        328
                 Priest) dated August 1,
15               2017 with Attachments
                 (Shell_0000642-668)
16  Exhibit 19   Interview Questions: Will    215
                 Turney (Shell_0001122-129)
17
18  Exhibit 33   Memorandum (from Larsen to   307
                 Turney) dated December 15,
19               2016 (Shell_0000851)
20
21
22
23
24

1 (Pages 1 to 4)

Page 5

1    THE VIDEOGRAPHER:  We are on record at
2  8:55 a.m., February 19, 2020.  This is the start of
3  Media Unit No. 1 of the videotaped deposition of
4  William Turney in the matter of Jesse Barnes versus
5  Shell Exploration and Production Company, et al.,
6  filed in the Middle District of Pennsylvania.
7         This deposition is being held at Shell
8  Woodcreek, 150 North Dairy Ashford Road, Houston,
9  Texas.  My name is Sam Among from the firm of Summit
10  Reporting Inc., and I am the videotape operator.
11  The Court Reporter is Connie Koenig, also from the
12  firm of Summit Court Reporting, Inc.
13         Counsel will now state their
14  appearances and firm affiliation on the record.
15     MS. GURMANKIN:  Caren Gurmankin of
16  Console Mattiacci Law for the Plaintiff.
17     MR. TUCKER:  Joe Tucker of the Tucker
18  Law Group on behalf of Defendant.
19     THE VIDEOGRAPHER:  Will the Court
20  Reporter please swear in the witness.
21
22                    - - -
23
24

Page 6

1          WILLIAM TURNEY,
2  having been first duly sworn, testified as follows:
3       E X A M I N A T I O N
4  BY MS. GURMANKIN:
5     Q.  All right.  Mr. Turney, good morning.
6     A.  Good morning.
7     Q.  We just met.  But for the record, my name
8  is Caren Gurmankin, and I have the privilege of
9  representing Jesse Barnes in a lawsuit that she's
10  filed against Shell for sex discrimination and
11  retaliation.
12     A.  Okay.
13     Q.  Have you ever had your deposition taken
14  before today?
15     A.  No.
16     Q.  Okay.
17     MR. TUCKER:  My client would like the
18  opportunity to read and sign the deposition
19  transcript.
20     MS. GURMANKIN:  Sure.
21     Q.  (BY MS. GURMANKIN)  I'm going to ask you a
22  series of questions today.  If I ask you a question
23  and you don't understand it, I need you to tell me
24  so I can rephrase it.

Page 7

1       Do you understand that?
2     A.  I do.
3     Q.  If I ask you a question and you answer the
4  question, I'm going to assume that you have
5  understood it and you've answered it accordingly.
6       Do you understand that?
7     A.  I do.
8     Q.  As you have been doing, we just need you to
9  keep giving verbal responses to all of my questions
10  so we can make sure that what you say is captured
11  accurately on the written transcript that will
12  result from this deposition.  Okay?
13     A.  Okay.
14     Q.  Even though this deposition is taking place
15  in a conference room at Shell, it has the same force
16  and effect as if you were testifying in federal
17  court in front of a federal judge and jury.
18       You have just taken an oath to tell the
19  truth.  If you do not tell the truth, and that
20  includes saying you don't know when you do know or
21  you don't remember when you do remember, that's
22  considered perjury.
23       Do you understand that?
24     MR. TUCKER:  Objection to the client's

Page 8

1  interpretation of the law what perjury is.
2       But you may answer the question to the
3  extent you understand it.
4     A.  I understand.
5     Q.  (BY MS. GURMANKIN)  Okay.  Is there any
6  reason why you wouldn't be able to testify
7  truthfully today?
8     A.  No.
9     Q.  If you need a break at any time, we can
10  take a break whenever you'd like.  If there's a
11  question pending, I just need you to answer the
12  question and then we can take the break.  Okay?
13     A.  Okay.
14     Q.  What is your date of birth?
15     A.           .
16     Q.  You're currently employed?
17     A.  I am.
18     Q.  By who?
19     A.  Shell Oil Company.
20     Q.  And what is your home address?
21     MR. TUCKER:  We'll accept service of
22  any subpoenas on his behalf.  You can use his
23  corporate address, Counsel.
24     MS. GURMANKIN:  In the event that he is

2 (Pages 5 to 8)

Page 9

1   no longer employed at the time of trial, we just
2   need to know that.
3          MR. TUCKER:  We will still accept
4   service on his behalf at the time of trial.
5          MS. GURMANKIN:  And you'll represent
6   him?
7          MR. TUCKER:  Yes.
8       Q.  (BY MS. GURMANKIN)  You are being
9   represented by Shell's attorneys today, correct?
10      A.  Yes.
11      Q.  And you are not paying them to represent
12  you, correct?
13      A.  That's correct.
14         (Exhibit 49 was marked.)
15      Q.  (BY MS. GURMANKIN)  You should be shown
16  what is being marked as Exhibit 49.
17      A.  Uh-huh.
18      Q.  The first page is a covered letter from my
19  office dated February 3, 2020, enclosing a subpoena
20  to you.
21         Do you see that?
22      A.  I do.
23      Q.  Have you seen this letter or the enclosed
24  subpoena before?

Page 10

1       A.  I have.
2       Q.  Okay.  You were served it directly,
3   correct?
4       A.  Correct.
5       Q.  Did you produce any documents responsive to
6   the subpoena?
7       A.  I have not.
8       Q.  Why not?
9       A.  Counsel advised me --
10         MR. TUCKER:  Objection.  Don't -- don't
11  answer the question.  It's attorney-client
12  privilege.
13      Q.  (BY MS. GURMANKIN)  Okay.  So is it
14  accurate that you are not able to answer the
15  question of why you have not -- why you have not
16  produced any documents responsive to the subpoena
17  because your attorney's instructed you not to?
18         MR. TUCKER:  No.  All documents, as you
19  know, Counsel -- and I hope we don't start off like
20  this, Caren -- we have produced all documents
21  relevant to this case by Mr. Turney in response to
22  deposition requests, document productions and
23  self-executing.
24         And I hope you spend your time on

Page 11

1   something other than this, Counsel.  I'm -- I'm not
2   here -- I don't want us to fight today, Caren.  I
3   just -- Caren -- let's go off the record.
4          THE VIDEOGRAPHER:  We are off record.
5   Time is 9 a.m.
6          (Off the record.)
7          THE VIDEOGRAPHER:  We are back on
8   record.  Time is 9 a.m.
9       Q.  (BY MS. GURMANKIN)  When you got the
10  subpoena that's marked as Exhibit 49, did you do
11  anything to see if you had any documents responsive
12  to the subpoena?
13      A.  No.
14      Q.  At any point have you -- well, strike that.
15         Your current -- you have a current
16  phone, correct?  You have a phone in your
17  possession?
18      A.  Correct.
19      Q.  Okay.  Is that the same phone that you had
20  as of 2016?
21      A.  Yes.
22      Q.  Okay.  When did you get your current phone?
23      A.  I don't recall that, what -- what year, but
24  it was before then.  It was probably 2013, 2012

Page 12

1   maybe.
2       Q.  What kind of phone is it?
3       A.  iPhone.
4       Q.  Did you ever search your text messages on
5   your iPhone to see if you had anything having to do
6   with Jesse Barnes or her case?
7       A.  The only thing I did when this all came
8   about, counsel asked me to send my phone.  So I sent
9   my phone somewhere to Houston so they could look
10  through it.
11      Q.  Okay.  To Shell?
12      A.  Yes, ma'am.
13      Q.  Do you know if they looked -- without
14  getting into attorney-client communication, do you
15  know if they searched your text messages?
16      A.  Yes.  That was the main purpose, I believe.
17      Q.  But you have never searched your text
18  messages?
19      A.  I found the text messages for them, and I
20  categorized them.  But I knew I had text messages on
21  there, so I would say, yes, I did search for them.
22      Q.  Okay.  And some of those text messages you
23  sent to Megan Kloosterman?
24      A.  No.  I don't recall doing that.

3 (Pages 9 to 12)

Page 13

1 Q. Okay. Did you ever send text messages that
2 you found to anyone at Shell?
3  A. Say that again.
4 Q. Sure. Did you ever send text messages that
5 you found and categorized to anyone at Shell?
6  A. No.
7 Q. What did you do when you found text
8 messages and categorized them?
9  A. I was just preparing it to go to the Shell
10 here to send off.
11 Q. How did you prepare it?
12  A. Just got rid of anything that didn't have
13 to do with the relevant case and got rid of them so
14 they can just see the text messages that was
15 relevant.
16 Q. Okay. When you say "got rid of," you
17 deleted?
18  A. Yes, ma'am.
19 Q. Okay. And that's before you sent your
20 phone to Shell per the request so they could look
21 through it?
22  A. Yes, ma'am.
23 Q. Did you delete any text messages between
24 you and Jesse Barnes?

Page 14

1  A. No.
2 Q. Did you delete any text messages between
3 you and anyone on your team?
4  A. I'm sure, yes.
5 Q. Do you recall which members of your team
6 that you had sent text messages to did you delete?
7  A. I don't recall that.
8 Q. Anyone else other than multiple members of
9 your team whose text exchanges you deleted in
10 preparation for you sending your phone to Shell so
11 they could look through it?
12  MR. TUCKER: Objection to the use of
13 the term "multiple members."
14  With that objection, you may answer.
15  A. Ask the question again, please.
16 Q. (BY MS. GURMANKIN) Sure. Other than
17 members of your team, was there anyone else with
18 whom you had text exchanges that you deleted in
19 preparation for you sending your phone to Shell so
20 they could look through it?
21  A. I don't believe so, no.
22 Q. Before you deleted the text messages
23 between you and members of your team, did you look
24 through them to see if they had any relation to

Page 15

1 Jesse Barnes or her claims?
2  A. No, ma'am.
3 Q. Okay. Do you recall when you deleted the
4 text messages in preparation for you sending your
5 phone to Shell?
6  A. I do not recall that.
7 Q. At some point you had an interview with
8 Megan Kloosterman, correct?
9  A. Yes, ma'am.
10 Q. Do you recall when it was in relation to
11 that interview?
12  A. The interview between me and Megan happened
13 sometime in 2016, the latter part --
14 Q. It was December of 2016?
15  A. Yeah. Yeah.
16 Q. So --
17  MR. TUCKER: Mr. Turney, slow down.
18 Okay?
19  THE WITNESS: Okay.
20  MR. TUCKER: No matter how fast she
21 talks, you slow down.
22  THE WITNESS: Okay.
23  MR. TUCKER: All right? Hear the
24 question and understand the question.

Page 16

1  THE WITNESS: Okay.
2 Q. (BY MS. GURMANKIN) Do you recall how soon
3 before or after your interview with Kloosterman did
4 you delete the text messages from your phone?
5  A. I don't recall.
6 Q. Do you recall if it was before or after?
7  A. I don't recall that, as well.
8 Q. Have you ever been arrested?
9  A. Yes.
10 Q. Okay. How many times?
11  A. Once.
12 Q. When was that?
13  A. 20-something years ago.
14 Q. And what was the context?
15  A. Domestic violence.
16 Q. Was that in connection with your current
17 wife?
18  A. Yes.
19 Q. Were you convicted of a crime?
20  A. No.
21 Q. What happened after the arrest?
22  MR. TUCKER: Objection.
23 Q. (BY MS. GURMANKIN) What happened in
24 connection with your arrest?

4 (Pages 13 to 16)

Page 17

1    MR. TUCKER: What do you mean, "in
2 connection with"?
3    Q. (BY MS. GURMANKIN) Did it lead to trial?
4 Did you plead? Were the charges dropped? What
5 happened?
6    MR. TUCKER: Objection; relevancy.
7    But you may answer.
8    A. The charges were dropped because --
9    MR. TUCKER: She didn't -- did she ask
10 you why?
11    THE WITNESS: Oh, sorry.
12    MR. TUCKER: Let's stick to answering
13 her question, okay?
14    THE WITNESS: Okay.
15    Q. (BY MS. GURMANKIN) Why were the charges
16 dropped?
17    A. The charges were dropped because I wasn't
18 actually at fault.
19    Q. Did your wife make up the charges that were
20 the basis of your arrest?
21    MR. TUCKER: Objection; misleading
22 question.
23    But you may answer.
24    A. I really don't know how to answer that.

Page 18

1    Q. (BY MS. GURMANKIN) Do you know why the
2 charges were dropped?
3    A. Because the facts came out.
4    Q. Okay. And the facts were not as you were
5 charged?
6    A. That's correct.
7    Q. You did not engage in domestic violence?
8    A. That's correct.
9    Q. So did your wife lie when she made the
10 allegations that led to your arrest?
11    MR. TUCKER: Objection to the use of
12 the term "lie" and objection to the use -- that she
13 made the allegations in the first instance.
14    But you may answer.
15    A. Repeat the question.
16    Q. (BY MS. GURMANKIN) Sure. Do you believe
17 that your wife lied or made up the allegations that
18 led to your arrest?
19    MR. TUCKER: Objection.
20    THE WITNESS: Can I still answer?
21    MR. TUCKER: Yeah. She's just trying
22 to create conflict. This has nothing to do with the
23 case, but go ahead and answer.
24    MS. GURMANKIN: Well, it does. It has

Page 19

1 to do with his credibility.
2    But go ahead.
3    MR. TUCKER: That's absolutely untrue.
4    MS. GURMANKIN: No, it's not.
5    MR. TUCKER: It's absolutely untrue.
6    Q. (BY MS. GURMANKIN) Go ahead.
7    A. You're going to have to repeat the question
8 again. I apologize.
9    Q. Do you believe that your wife made up the
10 allegations that led to your arrest for domestic
11 violence?
12    MR. TUCKER: Objection; relevancy.
13    A. No.
14    Q. (BY MS. GURMANKIN) Did you engage in
15 domestic violence that led to your arrest?
16    MR. TUCKER: Objection; relevancy.
17 Simply to harass the client, having nothing to do
18 with this litigation.
19    MS. GURMANKIN: You can answer.
20    MR. TUCKER: Let me finish.
21    And it is not admissible and does
22 not -- will not lead to the discovery of any
23 admissible or any relevant evidence.
24    You may answer.

Page 20

1    A. You're going to have to repeat the
2 question. I apologize.
3    Q. (BY MS. GURMANKIN) Sure. Did you engage
4 in domestic violence against your wife?
5    A. No.
6    Q. Is that the only time you have been
7 arrested?
8    A. Yes.
9    Q. Did you ever hear rumors going around Shell
10 that you were arrested for domestic violence?
11    A. No.
12    Q. Did you disclose to Shell before today that
13 you were arrested?
14    A. It was irrelevant.
15    Q. What's the answer to my question?
16    A. No.
17    Q. Were you ever asked if you were arrested?
18    A. No.
19    Q. Did you ever disclose to Synergy that you
20 were arrested?
21    A. No.
22    Q. Were you ever asked?
23    A. No.
24    Q. And you worked through Synergy as a

5 (Pages 17 to 20)

Page 21

1    contractor at Shell before you started full-time at
2    Shell, correct?
3        A.  That's correct.
4        Q.  When did you start working as a full-time
5    employee at Shell?
6        A.  February 2012.
7        Q.  And prior to that, you worked at Shell as a
8    contractor?
9        A.  Yes, ma'am.
10       Q.  You were employed by Synergy?
11       A.  Correct.
12       Q.  About how long?
13       A.  From August 2011.
14       Q.  What capacity were you working as a
15   contractor at Shell?  What was your job?
16       A.  Kind of a job coordinator, OSR role for
17   construction.  On-site representative.
18       Q.  So from August 2011 through February 2012,
19   you worked as a contractor at Shell?
20       A.  Yes.
21       Q.  In the same capacity?
22       A.  Yes.
23       Q.  Immediately prior to Synergy, where did you
24   work?

Page 22

1        A.  A company called HD Supply in Lakeland,
2    Florida.
3            MR. TUCKER:  Did she ask you where it
4    was?
5            THE WITNESS:  I apologize.
6            MR. TUCKER:  Can you do me a favor?
7    We'll get out of here if you answer her questions.
8    Okay?
9            THE WITNESS:  Okay.
10       Q.  (BY MS. GURMANKIN)  How long were you at HD
11   Supply?
12       A.  15 years.
13       Q.  From when to when?
14       A.  August 1997 until 2011.
15       Q.  And when you were at HD Supply, what jobs
16   did you hold?
17       A.  Started out -- I held several jobs.  I
18   started out as a pipe hand or a millwright and then
19   worked my way up from there to shop field manager.
20       Q.  During your time at HD Supply, were you
21   ever disciplined?
22       A.  Not that I believe.
23       Q.  Were you ever accused of sexual harassment
24   or discrimination of any kind?

Page 23

1        A.  Absolutely not.
2        Q.  Ever accused of misconduct?
3        A.  No.
4        Q.  Ever the subject of an investigation?
5        A.  No.
6            MR. TUCKER:  What do you mean by
7    "investigation"?
8            MS. GURMANKIN:  Investigation into his
9    conduct.
10           MR. TUCKER:  That --
11           MS. GURMANKIN:  He answered.
12           MR. TUCKER:  No, he answered the
13   question investigation.  Now you are saying
14   investigation into his conduct.
15           I need you to slow down.  No matter how
16   quickly she talks, you slow down; you hear the
17   question; you understand what you are answering.
18           THE WITNESS:  Okay.
19           MR. TUCKER:  Objection to the format of
20   the question, what has been answered.
21       Q.  (BY MS. GURMANKIN)  Did you ever have a
22   relationship with a female subordinate during your
23   time at HD Supply?
24           MR. TUCKER:  Objection; relevancy.

Page 24

1            THE WITNESS:  May I answer?
2            MR. TUCKER:  Yes.
3        A.  No.
4        Q.  (BY MS. GURMANKIN)  Where were you
5    immediately prior to HD Supply?
6        A.  A little company called -- it was a
7    wholesale company.  I can't think of the name of it.
8    It was a freezer company --
9            MR. TUCKER:  If you can't think of the
10   name of it, you can't think of the name of it.
11   Let's try answering her question.  Okay?
12           THE WITNESS:  Okay.
13       Q.  (BY MS. GURMANKIN)  You were starting to
14   say it was a little?
15       A.  It was a freezer company.  I was an order
16   picker.
17           MR. TUCKER:  Did she ask you what did
18   you do there?
19       Q.  (BY MS. GURMANKIN)  Where was it?
20       A.  It was in Plant City, Florida.
21       Q.  What position did you hold there, order
22   picker?
23       A.  Yeah.
24       Q.  The whole time?

**6 (Pages 21 to 24)**

Page 25

1    A. Yes.

2    Q. Why did you leave there?

3    A. Found a better job at HD Supply.

4    Q. You left voluntarily?

5    A. Uh-huh.

6    Q. Yes?

7    A. Yes. Sorry, sorry.

8    Q. During your employment there, were you ever

9 disciplined?

10    A. No.

11    Q. Ever accused of sexual harassment or

12 discrimination?

13    A. No.

14    Q. Why did you leave HD Supply?

15    A. Got a job at Shell.

16    Q. You left voluntarily?

17    A. Yes.

18    Q. What is your educational background?

19    A. High school, little college.

20    Q. Do you have your high school diploma?

21    A. Yes.

22    Q. From where?

23    A. Zephyrhills High School.

24    Q. When did you get it?

Page 26

1    A. 1990.

2    Q. You said a little college?

3    A. Uh-huh.

4    Q. Yes?

5    A. Yes.

6    Q. Do you have a degree?

7    A. No.

8    Q. Where did you attend the little college?

9    A. Pasco-Hernando.

10    Q. How many credits?

11    A. I don't recall.

12    Q. Do you recall how many classes you took?

13    A. I do not recall that, as well.

14    Q. Were you working towards a particular

15 degree?

16    A. Mortuary science.

17    Q. Why did you stop attending?

18    A. Didn't want to go to school no more.

19    Q. When you started working at Shell through

20 Synergy, were you ever asked by Shell whether you

21 had been previously accused of sexual harassment?

22    A. No.

23    Q. Were you ever asked that by Synergy?

24    A. No.

Page 27

1    Q. Prior to starting working at Shell

2 full-time, were you ever asked by the company

3 whether you had been previously accused of sexual

4 harassment?

5    MR. TUCKER: Objection; relevancy.

6    You may answer.

7    A. No.

8    (Exhibit 50 was marked.)

9    Q. (BY MS. GURMANKIN) Showing you what's been

10 marked as Exhibit 50. This was produced by Shell,

11 and it appears to be an offer letter for you.

12    Is that correct?

13    MR. TUCKER: Can he read the document,

14 please?

15    MS. GURMANKIN: Sure.

16    A. Okay. What was the question?

17    Q. (BY MS. GURMANKIN) This appears to be an

18 offer letter to you for a job at Shell. Is that

19 correct?

20    A. It looks that way, yes.

21    Q. And if you look at the last page, that's

22 your signature?

23    A. Yes.

24    Q. Accepting the offer?

Page 28

1    A. Correct.

2    Q. And that's your handwriting on top of the

3 date line?

4    A. Yes.

5    Q. This letter is dated December 15, 2011,

6 correct?

7    A. December what?

8    Q. 15.

9    A. No, ma'am.

10    Q. If you look at the first page.

11    A. Okay.

12    Q. It says at the top December 15, 2011; is

13 that right?

14    A. That's correct.

15    Q. Okay. And you are being offered --

16    MR. TUCKER: But I think for

17 clarification purposes, the letter is dated by him

18 December 18.

19    Q. (BY MS. GURMANKIN) Well, that's when you

20 signed it, right?

21    A. Correct.

22    Q. Okay. But the letter is actually dated

23 December 15.

24    MR. TUCKER: No. The letter is dated

7 (Pages 25 to 28)

Page 29

1   December 18, 2011, by him.
2          MS. GURMANKIN:  No.  The letter itself
3   is dated December 15.  It says that on the first
4   page, right?
5          MR. TUCKER:  Well, depends what you
6   mean by when is it dated.  Is it dated when it was
7   signed or when it was sent?
8          MS. GURMANKIN:  Right.
9   Q.  (BY MS. GURMANKIN)  But it's dated December
10  15, 2011, on the first page, right?
11  A.  Yes.
12  Q.  And you signed it three days later?
13  A.  Correct.
14  Q.  Okay.  This is an offer for -- a
15  conditional offer of employment.
16        You see that?
17  A.  On which page?
18  Q.  On the first page, second paragraph.
19  A.  Yes.
20  Q.  And what did that mean to you when you
21  signed it?
22  A.  That means they accepted my résumé, they
23  liked my work, and they wanted me to come to work
24  for them full-time.

Page 30

1   Q.  If you look on the fourth page, it says
2  under the header "Conditional Offer."
3        You see where I am?
4  A.  On the very top?
5  Q.  Yep.
6  A.  Uh-huh.
7  Q.  Yes?
8  A.  Correct, yes.
9  Q.  It says, "This employment offer is
10  condition -- conditional upon your satisfying the
11  preemployment requirements of Shell.  Those
12  requirements include but are not limited to the
13  following."  And there's a list of bullet points.
14        Do you see that?
15  A.  I do.
16  Q.  Okay.  And one of them is, if you look at
17  the third one down, it says, "Success- -- successful
18  completion of a background and reference screening."
19        Do you see that?
20  A.  No, I do not.
21  Q.  Third bullet point under "Conditional
22  Offer."
23  A.  Submission of -- yes, I do see it now.
24  Q.  Okay.  In connection with this pre- -- this

Page 31

1   conditional offer, did you ever advise anyone at
2  Shell that you had been arrested?
3          MR. TUCKER:  Objection; asked and
4  answered.
5        You may answer again.
6        Also, objection because of relevancy.
7  A.  No.
8  Q.  (BY MS. GURMANKIN)  Were you ever asked?
9  A.  No, I was not.
10       MR. TUCKER:  Objection; asked and
11  answered.
12  Q.  (BY MS. GURMANKIN)  Did you sign an
13  employment application in connection with your work
14  at Shell?
15  A.  I am sure I did.
16  Q.  Do you recall --
17       MR. TUCKER:  The question is did you.
18  Do you recall?
19       THE WITNESS:  I do not recall.
20       MR. TUCKER:  Then let's talk -- let's
21  testify about what you recall.  Okay?
22       THE WITNESS:  Okay.
23  Q.  (BY MS. GURMANKIN)  Why were you sure you
24  did?

Page 32

1   A.  I would think it's protocol that you sign
2  something that way, but again, I do not recall.
3  That's why I said I was sure, but I'm not really
4  sure.  I was just going by what typically happens to
5  the best of my knowledge.
6  Q.  (BY MS. GURMANKIN)  At the time that you
7  signed this letter on December 18, 2011, and
8  accepted the conditional offer of employment, were
9  you still a contractor, or were you a full-time
10  employee?
11  A.  I had to be still a contractor at that
12  time.
13  Q.  Why is that?
14  A.  Because it was in December.  I didn't get
15  hired on as a full-time until 2012.
16  Q.  Did anything change about your contractor
17  status as of the time that you signed this
18  conditional offer of employment on December 18,
19  2011?
20       MR. TUCKER:  Objection; confusing
21  question.
22  A.  I -- I don't understand what you are
23  asking.
24  Q.  (BY MS. GURMANKIN)  You don't understand my

8  (Pages 29 to 32)

Page 33

1  question?
2      A.  That's correct.
3      Q.  Did anything about your employment status
4  with Shell change as of the time that you signed
5  this conditional offer of employment on December 18,
6  2011?
7          MR. TUCKER:  Objection; same basis.
8      You may answer, if you can.
9      A.  I still -- I'm not seeing what you are
10  asking of me.  I don't know what you are asking me.
11     Q.  (BY MS. GURMANKIN)  Were you still paid by
12  Synergy?
13     A.  Until I was full-time with Shell, yes.
14     Q.  Until February 2012?
15     A.  Yes.
16     Q.  Did you receive any benefits from Shell as
17  of the time that you signed this conditional offer
18  of employment?
19     A.  Again, I'm not sure what you are asking.
20     Q.  Did you get benefits from Synergy during
21  the time that you were working as a contractor at
22  Shell?
23     A.  No.  I was a day-rate contractor.  Had to
24  pay my own benefits.

Page 34

1      Q.  Okay.  Did you get benefits from Shell as
2  of the time that you signed this conditional offer
3  of employment letter?
4      A.  To the best of my recollection, yes.  As
5  soon as I signed it, I should have been under their
6  package.
7      Q.  Okay.
8          MR. TUCKER:  Let's take a quick break.
9  Take your microphone off.
10         THE VIDEOGRAPHER:  We are off record.
11  Time is 9:18 a.m.
12         (A recess was taken.)
13         THE VIDEOGRAPHER:  We are back on
14  record.  Time is 9:19 a.m.
15     Q.  (BY MS. GURMANKIN)  All right.  So if you
16  look at page 3 --
17         MR. TUCKER:  See, I feel some kind of
18  way.  When I take breaks, you never ask him what we
19  talk about.
20         MS. GURMANKIN:  Do I need to?
21         MR. TUCKER:  You can but I just feel
22  with Kathy you always say, "What did you talk
23  about?"  With me you never ask.
24     Q.  (BY MS. GURMANKIN)  All right.  Page 3 of

Page 35

1  Exhibit 50.
2      A.  Yes.
3      Q.  You see the "Offer Details"?
4          MR. TUCKER:  Hold on.  Let me go on the
5  record because I'll tell you what I talked to him
6  about.
7      I don't think that you told him at the
8  beginning that he should not guess or speculate.
9          So you are not to guess or speculate on
10  your answers.  Okay?
11         THE WITNESS:  Yes.
12     Q.  (BY MS. GURMANKIN)  I'll add to that, if
13  you can approximate, then that's fine.  Just let me
14  know you are approximating.  Okay?
15     A.  Okay.
16     Q.  If you have no idea, then we don't want you
17  to guess.
18     A.  Okay.
19     Q.  Understand that?
20     A.  Yes, I do.
21         MR. TUCKER:  Or speculate.
22         THE WITNESS:  Or speculate.
23     Q.  (BY MS. GURMANKIN)  Page 3 of Exhibit 50.
24     A.  Okay.

Page 36

1      Q.  "Offer details."  You see that?
2      A.  I do.
3      Q.  All right.  It says your starting base
4  salary will be $██████ per month, which is
5  equivalent to ██████ yearly for the position.
6      You see that?
7      A.  I do.
8      Q.  Did that start as of the time that you
9  signed the conditional offer of employment on
10  December 18, 2011?
11     A.  No.
12     Q.  Did it start February 2012?
13     A.  Correct.
14     Q.  So you continued to be paid your contractor
15  rate until February 2012?
16     A.  Correct.
17     Q.  The Performance Bonus Program, is that
18  something that you were eligible for before February
19  of 2012?
20     A.  No.
21     Q.  It says, "You will be eligible for a
22  prorated bonus amount for 2011 scheduled to be paid
23  out February 2012 or as determined by company
24  policy."

9 (Pages 33 to 36)

Page 37

1　　　　You see that?  Third sentence?
2　　A.  Correct.
3　　　　MR. TUCKER:  Counsel, can we agree that
4　I have a standing objection to relevance to this
5　line of questions so I don't have to interrupt you?
6　You can keep moving.
7　　　　MS. GURMANKIN:  Sure.
8　　Q.  (BY MS. GURMANKIN)  Did you actually get
9　paid a prorated bonus in February 2012 for 2011?
10　　A.  I got a bonus, correct.
11　　Q.  Okay.  Paid out around February 2012?
12　　A.  I -- I don't recall.
13　　Q.  Okay.  But it was prorated for 2011?
14　　A.  I don't think it was -- I don't know.
15　　Q.  All right.  Well, what bonus are you
16　referring to?
17　　A.  It was a sign-on bonus.
18　　Q.  Okay.  That's referenced in the next
19　paragraph?
20　　A.  Correct.
21　　Q.  And that was $▇▇▇▇?
22　　A.  I don't recall.  It may have been but I
23　don't recall.
24　　Q.  Okay.  But you do recall getting a sign-on

Page 38

1　bonus?
2　　A.  Yes.
3　　Q.  When did you get that?
4　　A.  I don't recall.
5　　Q.  Other than your sign-on bonus, do you
6　recall getting other -- any other bonus before
7　February 2012?
8　　A.  I don't recall.
9　　Q.  Do you actually recall getting a
10　performance bonus prorated for 2011 at any point?
11　　A.  No, I do not.
12　　Q.  Further down on the page it talks about
13　eligibility for vacation hours.
14　　　　Do you see that?
15　　A.  Yes.
16　　Q.  Did you get any of that for -- before you
17　started full-time in February 2012?
18　　A.  No.
19　　Q.  And it says "Standard benefits" in the last
20　paragraph.  You were eligible for those as of the
21　time that you signed this letter?
22　　A.  No.
23　　Q.  Earlier you testified that you would have
24　been.  Is that not correct?

Page 39

1　　A.  That's nothing what I said.
2　　Q.  What did you say?
3　　A.  I said the benefits didn't start until I
4　hired on full-time with Shell in 2012.
5　　Q.  Okay.  You didn't get benefits prior to
6　February 2012 from --
7　　A.  That's correct.
8　　　　MR. TUCKER:  Let her finish her
9　question.  Even if you can anticipate what her
10　question is, let her finish it so you can absorb it
11　and answer it.
12　　　　THE WITNESS:  Okay.
13　　　　(Exhibit 51 was marked.)
14　　Q.  (BY MS. GURMANKIN)  Showing you what's been
15　marked as Exhibit 51.  This is an acknowledgment of
16　receipt of the Code of Conduct that was produced by
17　Shell as part of your personnel file.
18　　　　Do you recall receiving this?
19　　A.  No, I do not recall that.
20　　Q.  Are those your initials at the bottom of
21　the page?
22　　A.  Yes.
23　　Q.  And the date on there, 1/23/2012, that was
24　shortly before you started full-time?

Page 40

1　　A.  No.
2　　Q.  You started full-time in February 2012?
3　　A.  Yes.
4　　Q.  So January 23, 2012, was not shortly before
5　you started full-time?
6　　A.  No.
7　　Q.  How long was it before you started
8　full-time?
9　　A.  I started full-time Jan- -- February 1 of
10　2012.
11　　Q.  Okay.  So --
12　　A.  Oh.  I apologize.  I was thinking, too.
13　I'm sorry.  You are correct, yes.
14　　Q.  Okay.  Do you recall ever signing an
15　acknowledgement of Shell's Code of Conduct?
16　　A.  I don't remember that.
17　　Q.  Do you recall ever receiving the Code of
18　Conduct?
19　　A.  I don't recall.
20　　Q.  Did you ever violate Shell's Code of
21　Conduct during your employment?
22　　　　MR. TUCKER:  Other than in this
23　instance?
24　　　　MS. GURMANKIN:  No.  Period.

10  (Pages 37 to 40)

Page 41

1　　Q. (BY MS. GURMANKIN) Did you ever violate
2　Shell's Code of Conduct?
3　　A. No, not to my knowledge.
4　　Q. Did you ever violate any of Shell's
5　policies during your employment?
6　　A. No, not to my knowledge.
7　　Q. Anyone ever tell you that you violated
8　Shell's policies or Code of Conduct?
9　　　MR. TUCKER: Are you talking other
10　than --
11　　　MS. GURMANKIN: No. Period. That's
12　the question.
13　　　MR. TUCKER: I need you to stop --
14　　　MS. GURMANKIN: No, no. He answered.
15　　　MR. TUCKER: Counsel, I know you are
16　trying to play a trap game, but I need you -- you --
17　you can have a misleading record and we can then --
18　　　MS. GURMANKIN: Huh-uh.
19　　　MR. TUCKER: Counsel, let me finish,
20　please.
21　　　MS. GURMANKIN: Joe, he answered. He
22　answered.
23　　　MR. TUCKER: She is talking about
24　including as it relates to Ms. Barnes. Did you

Page 42

1　understand that to be the question?
2　　　MS. GURMANKIN: Joe, that's not proper.
3　That's not proper. He answered. We are moving on.
4　　Q. (BY MS. GURMANKIN) Did anyone --
5　　　MS. GURMANKIN: We are.
6　　　MR. TUCKER: No, I'm not going to have
7　you counsel him --
8　　　MS. GURMANKIN: Joe --
9　　　THE REPORTER: One at a time, please.
10　　　MR. TUCKER: Counsel, I am not going to
11　have you a record that is purposely misleading.
12　　　Now, you need to stop, Mr. Turney, and
13　understand her questions. She said ever during your
14　employment. So she includes this case, also.
15　　　Did you understand that?
16　　　THE WITNESS: I did -- I did not
17　understanding that.
18　　　MR. TUCKER: Well, that's what I mean.
19　You need to stop, slow up, no matter how fast she
20　talks.
21　　　THE WITNESS: Okay.
22　　　MR. TUCKER: Okay? Don't let a
23　fast-talking Philadelphia lawyer get you confused.
24　Okay?

Page 43

1　　　THE WITNESS: Okay.
2　　Q. (BY MS. GURMANKIN) Do you want to change
3　your answer now?
4　　A. Repeat the question, please.
5　　Q. Sure. A couple minutes ago I asked you
6　whether you had ever violated Shell's Code of
7　Conduct or policies during your employment. You
8　said no.
9　　　Was that truthful?
10　　A. No, it was not truthful.
11　　Q. Okay. What's the truthful answer?
12　　A. I did violate the Code of Conduct.
13　　Q. Why did you say no?
14　　A. I was thinking that you were talking about
15　prior before this incident here.
16　　Q. Did I say that in my question?
17　　A. No, ma'am, you did not.
18　　Q. Did you say you didn't understand the
19　question?
20　　A. I did not.
21　　Q. Any reason other than what your lawyer --
22　　　MR. TUCKER: Therefore --
23　　　MS. GURMANKIN: Joe, I'm talking.
24　　　MR. TUCKER: Therefore, then, it's

Page 44

1　important --
2　　　THE REPORTER: One at a time.
3　　　MR. TUCKER: -- you understand her
4　question, okay? That's the point I'm making. Okay?
5　　　MS. GURMANKIN: Joe, please don't
6　interrupt me.
7　　Q. (BY MS. GURMANKIN) Other than what your
8　lawyer said, any reason why you are changing your
9　answer?
10　　A. Just because that's the truth.
11　　Q. And other than what your lawyer said, any
12　reason why you are changing your answer?
13　　　MR. TUCKER: He answered. He said it's
14　the truth.
15　　A. That's the truth.
16　　Q. (BY MS. GURMANKIN) Any reason why you
17　changed your answer from a couple minutes ago when
18　you said no, you had never been disciplined -- I'm
19　sorry; that you never violated company policy or the
20　Code of Conduct to yes, you had, than what your
21　lawyer said?
22　　　MR. TUCKER: Objection; asked and
23　answered. He answered that question by saying he
24　did not understand it to mean this case that we are

Page 45

1  talking about right here.
2      Q. (BY MS. GURMANKIN) Any other explanation
3  for why you changed your answer than what your
4  lawyer said to you?
5      MR. TUCKER: No, that is not what I
6  said. His answer was his answer. And his answer
7  was he did not understand your question to mean this
8  specific case, and that was his answer.
9      Q. (BY MS. GURMANKIN) Any other reason why
10  you changed your answer?
11      MR. TUCKER: Other than what -- other
12  than what you've already given, any other reason?
13      Q. (BY MS. GURMANKIN) No. Any reason why you
14  changed your answer other than what your lawyer said
15  to you?
16      MR. TUCKER: Objection; asked and
17  answered.
18      You may answer the question again.
19      A. Just because that is the truth. That's the
20  way I understood it.
21      Q. (BY MS. GURMANKIN) Was it the truth
22  earlier when I asked you if you'd ever violated
23  Shell's policies or the Code of Conduct?
24      MR. TUCKER: Objection; asked and

Page 46

1  answered.
2      THE WITNESS: Can I answer?
3      MS. GURMANKIN: Yes.
4      MR. TUCKER: Do you want the question
5  read back or do you want to answer what --
6      THE WITNESS: Yeah, read it back one
7  more time, please.
8      Q. (BY MS. GURMANKIN) Sure. When you
9  answered earlier to my question as to whether you'd
10  ever violated Shell's policies or the Code of
11  Conduct that you had not, that wasn't the truth, was
12  it?
13      A. It was misleading. I was -- I took it as a
14  wrong question. That's why I changed my answer.
15      Q. What was misleading about the question?
16      A. Well, I was thinking prior to this case
17  right now is what I was thinking.
18      Q. And any reason why you had that thought
19  other than what your lawyer explained?
20      A. Just because we're here for a reason and
21  that's -- that's it.
22      Q. Anything else that you haven't told the
23  truth about so far in your deposition?
24      A. No, ma'am.

Page 47

1      Q. All right. So you did violate Shell's
2  policies and Shell's Code of Conduct --
3      MR. TUCKER: Objection. He did not say
4  he violated Shell's policies. He said he violated
5  Shell's Code of Conduct. So your question's
6  misleading.
7      Q. (BY MS. GURMANKIN) Did you violate Shell's
8  Code of Conduct?
9      A. Yes.
10      MR. TUCKER: Objection; asked and
11  answered.
12      Q. (BY MS. GURMANKIN) Did you violate Shell's
13  policies?
14      A. No.
15      Q. What's the difference?
16      A. Code of Conduct is -- is a particular set
17  of rules that we have to live by at Shell, and then
18  the policies are the policies. I -- I don't -- I
19  haven't read the policies to familiarize myself.
20      Q. You haven't read Shell's policies during
21  your employment?
22      A. Well, I have, but I don't recall them.
23      Q. And when did you read them?
24      A. I don't recall that.

Page 48

1      Q. When you started working as a full-time
2  employee?
3      A. I'm certain I did but I don't recall.
4      Q. Do you have a specific recollection of
5  reading Shell's policies at any point during your
6  employment?
7      A. Nothing specific or I don't recall.
8      Q. Did you ever read the Code of Conduct?
9      A. Yes.
10      Q. When?
11      MR. TUCKER: When's the first time
12  or --
13      MS. GURMANKIN: No. When.
14      MR. TUCKER: When -- objection to no
15  time reference.
16      MS. GURMANKIN: That's fine.
17      A. So you are asking the most recent time or
18  what -- what are you -- what are you asking for?
19      Q. (BY MS. GURMANKIN) When did you read the
20  Code of Conduct?
21      A. I don't recall any time other than I reread
22  it in 2016.
23      Q. Was that in connection with Jesse Barnes'
24  complaints?

12 (Pages 45 to 48)

Page 49

1    A. It's in connection to the findings.
2    Q. Prior to that time, do you have a
3  recollection of reading Shell's Code of Conduct?
4    A. I don't recall.
5    Q. Other than in connection with Jesse Barnes'
6  complaints, did you ever violate company policy or
7  the Code of Conduct in any other occasion during
8  your employment?
9        MR. TUCKER: Objection; misleading. He
10  has not indicated he's violated Shell policy. There
11  has been no indication he has ever violated Shell's
12  policy.
13        But please answer the question.
14    A. Answer the -- ask the question again,
15  please.
16    Q. (BY MS. GURMANKIN) Sure. Other than in
17  connection with Jesse Barnes' complaint, did you
18  ever violate the Code of Conduct or Shell's policies
19  on any other occasion?
20        MR. TUCKER: Objection; compound
21  question and misleading.
22    A. The answer is no.
23    Q. (BY MS. GURMANKIN) Have you ever been
24  disciplined during your employment with Shell?

Page 50

1        MR. TUCKER: Other than this incident?
2        MS. GURMANKIN: No.
3    A. Other than this incident, no.
4    Q. (BY MS. GURMANKIN) You were disciplined in
5  connection with this -- Jesse Barnes' complaints?
6    A. Yes.
7    Q. What was your discipline?
8    A. IPF -- a lower IPF score. I had to do some
9  LEAD training courses, which led to lower bonus and
10  lower pay increase.
11    Q. Lower IPF score, what is IPF?
12    A. Individual performance factor.
13    Q. And the LEAD training, what is that?
14    A. It's a course for leadership to go through
15  to kind of get some of your -- your four core
16  values. It's just -- it's a course for leadership.
17    Q. Had you taken that before?
18    A. I took a course similar to that, yes.
19    Q. When you became a supervisor?
20    A. That's correct.
21    Q. What did your IPF go from to?
22        MR. TUCKER: In relation to?
23        MS. GURMANKIN: The discipline.
24    A. So I don't know what it was going to be. I

Page 51

1  don't recall that. But it went to a ███ after the
2  discipline.
3    Q. (BY MS. GURMANKIN) What does that mean?
4  What does a ███ rating mean?
5    A. I'm not sure I understand what your
6  question is.
7    Q. Like there are ratings, exceeds
8  expectations, meets expectations. What did a ███
9  mean?
10        MR. TUCKER: Objection.
11        You may answer.
12    A. A ███ is just doing your -- the -- the --
13  the minimum to get by, right? So you are just doing
14  your job.
15    Q. (BY MS. GURMANKIN) And you said you got a
16  lower bonus?
17    A. Yes.
18    Q. Do you know what you would have gotten?
19    A. I don't recall.
20    Q. What did you end up getting?
21    A. For a bonus?
22    Q. Uh-huh.
23    A. I don't recall that.
24    Q. But you did get one?

Page 52

1    A. I did get one.
2    Q. And you got a lower pay increase?
3    A. That's correct.
4    Q. What was your pay increase going to be?
5    A. I don't recall.
6    Q. What did you end up getting?
7    A. I don't recall that either.
8    Q. But you did get one?
9    A. I don't even recall that, to be honest with
10  you.
11    Q. You don't recall one way or the other?
12    A. No.
13    Q. Other than Jesse Barnes, to your knowledge,
14  has anyone else during your employment at Shell
15  complained about your conduct?
16    A. Not to my knowledge, no.
17    Q. Have you ever had a sexual or romantic
18  relationship with another Shell employee or
19  contractor?
20    A. No.
21    Q. During your employment -- well, strike
22  that.
23        You did take the LEAD training as part
24  of this discipline; is that correct?

13 (Pages 49 to 52)

Page 53

1      A. Yes, ma'am.
2      Q. When was that?
3      A. It was shortly after the findings, but I
4  don't know specific dates.
5      Q. Was that something that you went through
6  individually, or was it part of a group training?
7      A. Well, so, I was assigned to it
8  individually, but there was other folks in the
9  room -- you know, in the course, as well.
10     Q. Who led the course?
11     A. Oh, I don't know.
12     Q. And what was the training that comprised
13  the course?
14     A. Just leadership attributes.
15     Q. Meaning what?
16     A. Authenticity, collaboration, growth, things
17  like that.
18     Q. How long was the training?
19     A. I believe it was a week long.
20     Q. All week?
21     A. As far as I can recollect, yes.
22     Q. Where?
23     A. Houston, Shell One Square.
24     Q. You attended in person?

Page 54

1      A. Correct, yes.
2      Q. What else did the course cover other than
3  leadership attributes?  Anything else?
4      A. I don't recall.
5      Q. Did it cover any information about
6  antiharassment or antidiscrimination policies?
7      A. I don't recall it doing that.
8      Q. Other than the LEAD training that you had
9  as a result of the discipline and similar training
10  that you had at Shell when you became a supervisor,
11  did you attend any other training at Shell during
12  your employment?
13     MR. TUCKER:  In relation to his
14  discipline or in general?
15     MS. GURMANKIN:  General.
16     A. I don't --
17     MR. TUCKER:  Can you read the question
18  back?
19     And I need you to answer the question.
20     Can the Court Reporter please read the
21  question?
22     (The requested portion was read.)
23     MR. TUCKER:  The entire time of your
24  employment is the question.

Page 55

1      A. So I would think, yes, I know I went to LOT
2  training, Leaders of Teams.  And I had
3  other -- other trainings.  I don't recall what.  But
4  I know I have had other trainings for certain
5  things.
6      Q. (BY MS. GURMANKIN)  All right.  You started
7  that answer by saying, "I would think."
8      Do you actually recall any other
9  training that you attended?
10     A. The LOT sticks out in my mind.  So,
11  again, I'm going to say -- I'm going to ask you this
12  question.  "Trainings," you mean going somewhere and
13  physically training or just taking a training course
14  online?  What is -- what are you --
15     Q. Anything provided by Shell, any type of
16  training.
17     A. Oh, absolutely.  We do a lot of
18  computer-based trainings.  Yeah.  There is just too
19  much to -- to mention, but we do a lot of trainings.
20     Q. Okay.  Anything other than computer-based
21  training that you recall participating in, other
22  than the two leadership trainings that we talked
23  about?
24     A. No.  I don't recall anything else.

Page 56

1      Q. What's LOT training?
2      A. Leaders of Teams.
3      Q. And do you actually have a recollection of
4  participating in that or no?
5      A. Yeah, somewhat.
6      Q. What is that, what is Leaders of Training?
7      A. Again --
8      MR. TUCKER:  Leaders of Teams.
9      Q. (BY MS. GURMANKIN)  Leaders of Teams.
10     A. Yeah, Leaders of Teams.  It's just, again,
11  another collaboration session against other leaders
12  in the basis to kind of come together to collaborate
13  to, you know, to have different trainings on, you
14  know, whether it be leadership, whether it be
15  authenticity, collaboration or growth.  And then you
16  basically say, you know, what are our issues
17  compared to their issues.  It's just a
18  leadership-building course to try to prepare you for
19  leadership.
20     Q. And when do you think you might have taken
21  that?
22     A. 2015, maybe.
23     Q. In connection with what?  Why do you think
24  it happened around that time?

14 (Pages 53 to 56)

Page 57

1     A.  I'm guessing.  So that's why I said
2  "maybe."
3     Q.  Okay.  CVT training, how often did you
4  participate in that?
5     A.  Computer-based trainings are -- are always
6  ongoing.  So you have a list of -- your profile,
7  whatever you're doing within Shell, and then that
8  gives you something based on criteria.  So it could
9  be weekly that you do it, could be annually.  A lot
10 of things are annually.  Some things are biannual.
11 It just depends so...
12    Q.  Depends in part what your specific job is?
13    A.  Correct.  And how many you get.
14    Q.  As part of the computer-based training, did
15 you do any training on the antiharassment or
16 antidiscrimination policies or law?
17    A.  I'm certain I have.  I don't recall any
18 dates if I have done them.
19    Q.  Okay.  But you have done them during your
20 employment at Shell?
21    A.  I don't recall specifically that but...
22    Q.  Okay.  So you don't have a recollection of
23 that being part of your training at Shell?
24    A.  Correct.

Page 58

1     Q.  All right.  So when you start full-time at
2  Shell in February 2012 --
3     MR. TUCKER:  This is a first good
4  bathroom break for me.
5     MS. GURMANKIN:  Sure.
6     THE VIDEOGRAPHER:  We are off record.
7  Time is 9:38 a.m.
8     (A recess was taken.)
9     THE VIDEOGRAPHER:  We are back on
10 record.  Time is 9:44 a.m.
11    Q.  (BY MS. GURMANKIN)  When you start as a
12 full-time employee at Shell in February 2012, what
13 position are you starting in?
14    A.  Construction supervisor.
15    Q.  Where?
16    A.  In Appalachia.
17    Q.  Who do you report to?
18    A.  A gentleman by the name of Joe Bennett.
19    Q.  His position at the time?
20    A.  Construction superintendent.
21    Q.  Do you have any direct reports in that
22 position?
23    A.  So not really.  So --
24    MR. TUCKER:  If that -- if that answers

Page 59

1  the question, that answers the question.
2     A.  Okay.  Not really.
3     Q.  (BY MS. GURMANKIN)  Well, what does that
4  mean?
5     A.  So "not really" means I -- there were some
6  folks that worked for me as OSRs but not really
7  direct reports.  They were contractors.  Went
8  through Joe Bennett.  I just kind of guided them.
9     Q.  Okay.  And OSR means?
10    A.  On-site representative.
11    Q.  Okay.  So you kind of managed their work?
12    A.  No.  Just kind of guided their day-to-day
13 activities, what they were doing.
14    Q.  But you were not their direct supervisor?
15    A.  Correct.
16    Q.  How long did you hold the position
17 construction supervisor?
18    A.  Year and a half, I'm guessing.  So a year
19 and a half.
20    Q.  Through sometime -- I know it's
21 approximate -- around mid-2013?
22    A.  Correct.
23    Q.  And then what happens?
24    A.  Then I became the interim construction

Page 60

1  superintendent.
2     Q.  Why interim?
3     A.  The current superintendent left and they
4  wanted me to take that position over, but they were
5  just getting things lined up.
6     Q.  That was Bennett?
7     A.  Bennett, yes.
8     Q.  As interim construction supervisor, you had
9  direct reports?
10    A.  Yes.
11    Q.  Any women?
12    A.  No.
13    Q.  How long do you hold the interim
14 construction supervisor position?
15    A.  Until the first part of 2014.
16    Q.  Okay.  And then what happened?
17    A.  Then I moved over to the maintenance group
18 for operations.
19    Q.  So you never became the construction
20 superintendent, right?
21    A.  No, ma'am.
22    Q.  Okay.  You were always interim?
23    A.  Yeah.
24    Q.  Do you know why you never became the

15 (Pages 57 to 60)

Page 61

1  full-time construction superintendent?
2      A.  I don't recall specifically, no.
3      Q.  Did it have to do with -- something with
4  your conduct or your performance?
5      A.  Not to my knowledge, no.
6      Q.  You were never told that?
7      A.  I was never told, no.
8      Q.  Did you ever follow up and ask whether you
9  were going to be made the full-time, permanent
10  construction superintendent?
11      A.  I probably did.  I don't recall.  But I
12  do -- yeah, no.
13      Q.  Sometime around 2014 -- is it early '14?
14      A.  It should be around January.
15      Q.  -- you moved over to the maintenance group?
16      A.  Yes, ma'am.
17      Q.  In what position?
18      A.  Maintenance supervisor.
19      Q.  Was that a promotion for you?
20      A.  Yes, it was.
21      Q.  Was that a position that you had applied
22  for?
23      A.  Yes, I have.
24      Q.  It had been posted?

Page 62

1      A.  Yes.
2      Q.  Did you interview for it?
3      A.  I did.
4      Q.  With whom?
5      A.  David Summers and ████████, I believe.
6      Q.  As maintenance supervisor, where did you
7  work?
8      A.  Say that again.
9      Q.  When you -- when you got the job of
10  maintenance supervisor in around January 2014, where
11  were you working?
12          MR. TUCKER:  You mean physical
13  location?
14          MS. GURMANKIN:  Uh-huh.
15      A.  In the Appalachia asset.
16      Q.  (BY MS. GURMANKIN)  When you became
17  maintenance supervisor, who did you report to?
18      A.  David Summers.
19      Q.  How long did you hold the position of
20  maintenance supervisor?
21      A.  Five years.
22      Q.  You were promoted at the end of 2018; is
23  that right?
24      A.  Yes, ma'am.

Page 63

1      Q.  Okay.  To another position?
2      A.  Yes, ma'am.
3      Q.  From 2014 through the end of 2018, you held
4  the position of maintenance supervisor?
5      A.  Yes.
6      Q.  How long did you report to Summers?
7      A.  I don't recall how long.
8      Q.  Approximately?
9      A.  Couple months.
10      Q.  Then what happens to him?
11      A.  He transferred out of the -- of Appalachia.
12      Q.  And then who do you start reporting to?
13      A.  You know, I don't recall.  I don't recall.
14      Q.  Do you recall who one of your next
15  supervisors is, even if you don't recall who came
16  exactly next?
17          MR. TUCKER:  After?
18          MS. GURMANKIN:  After Summers.
19      A.  Yeah.  So ████████ was supposed to take
20  his spot at the time, but I don't know when that
21  actually was.  So I don't know if I was actually
22  working for him or who is the reason why I said I
23  didn't know.
24          So I would think the next supervisor

Page 64

1  that did take that role was ████████.
2      Q.  (BY MS. GURMANKIN)  Okay.  Do you recall
3  reporting to ████████ for a period?
4      A.  I don't recall how long, but I believe I
5  did report to ████████.
6      Q.  What was the position that Summers and then
7  ████ held?
8      A.  Op- -- yeah, operations superintendent.
9      Q.  All right.  Do you recall about how long it
10  was that you reported to ███?
11      A.  It wasn't very long, but I don't recall
12  exact -- exact timing.
13      Q.  Okay.  What happened to him?
14      A.  He left the company.  He left the company.
15      Q.  Do you know why?
16      A.  I do not know why.
17      Q.  Did you ever hear why?
18      A.  I heard rumors.
19      Q.  What rumors did you hear?
20      A.  I don't recall specifics.
21      Q.  Do you recall generally?
22      A.  Just that -- no, I don't.  I'd be guessing.
23  I'm not going to guess.
24      Q.  You don't recall anything about the rumors

16  (Pages 61 to 64)

Page 65

1  you heard?
2      A.  No.
3      Q.  That he engaged in some sort of misconduct?
4      A.  I knew about that.
5      Q.  What did you know about that?
6      A.  Well, nothing specific but I was asked to
7  mediate between him and Jesse Barnes one day in a
8  conference room.
9      Q.  What was that about?
10     A.  I -- I don't know.  I was just asked to sit
11  in there as a witness.
12     Q.  Who asked you?
13     A.  Robin Grouette, I believe.
14     Q.  Did she tell you why she was asking you to
15  sit in as a witness?
16     A.  Just as little as possible what I can
17  recall, just them two had some kind of dealings, and
18  she wanted me in there to make sure that everybody
19  agreed everything was going to be fine.
20     Q.  Did you understand you were there in any
21  other capacity but as a witness to observe?
22     A.  Say that again.
23     Q.  What did she tell you -- what did Robin
24  Grouette tell you that she wanted you to do in

Page 66

1  there?
2      A.  She just wanted me to sit in there as a --
3  as a witness to make sure that, you know, David
4  apologized and Jesse accepted and that was it.
5      Q.  Okay.
6      A.  That was really all I knew.
7      Q.  And did you actually sit in on a meeting
8  between Jesse and ▇▇▇▇▇
9      A.  Just that particular event that I'm talking
10  about.  That's it.
11     Q.  Okay.  Tell me about that event.  What
12  happened?
13     A.  She asked me to sit in there and they came
14  in and he apologized, she accepted, and that was
15  really it.  That's all I can remember.
16     Q.  Did he apologize for anything specific, or
17  he just apologized?
18     A.  I don't recall specifics.
19     Q.  Did you ever find out what that was about?
20     A.  I did not.
21     Q.  Did ▇▇▇ end up leaving at some point after
22  that event?
23     A.  Yes, it would have to have been after that
24  event, I guess.

Page 67

1      Q.  And did you hear it was in connection with
2  that event, his leaving?
3      A.  I did not hear.
4      Q.  All right.  After ▇▇▇ who did you report
5  to?
6      A.  I believe they brought in a superintendent
7  Chris Andersen, I'm thinking.  Chris Andersen.
8      Q.  About how long did you report to Andersen?
9      A.  Nine months maybe, a year.  I'm guessing
10  but...
11     Q.  And then what happened to him?
12     A.  He was set for retirement, so he left.
13     Q.  And who replaced him?
14     A.  Steve Craig.
15     Q.  And how long did you report to Craig?
16     A.  From that point until I left Appalachia and
17  went to Permian.
18     Q.  Okay.  At the end of 2018?
19     A.  Yeah, the beginning of 2019, but yes.
20     Q.  From the -- during the time that you were
21  maintenance supervisor, so from January 2014 through
22  the end of 2018, who were your direct reports?
23     A.  Like all my direct reports?
24     Q.  Uh-huh.

Page 68

1      A.  I'd have to look at the list to give you
2  the names of all of them.
3      Q.  Okay.  Any female direct reports?
4      A.  I had a few.
5      Q.  Who?
6      A.  Jill -- Jill -- Jill Brueilly was one of
7  them.  Jennifer Compton was another.  I believe
8  April Heater worked for me in that time.  Jesse
9  Barnes.  Tina King.  I feel like I'm missing
10  someone.  I'd have to look at a list though.  That's
11  all I can remember.
12     Q.  Okay.  Did Wendy Barnes ever report to you?
13     A.  Wendy Barnes -- no, Wendy Barnes never
14  reported to me.
15     Q.  Okay.  Do you think there are other females
16  who reported directly to you and you just can't
17  remember, or you are not sure if there are others?
18     A.  I just -- I can't remember.
19     Q.  Did you hire any of these women, or did you
20  inherit them when you came on as maintenance
21  supervisor?
22         MR. TUCKER:  I'm sorry; I wasn't taking
23  notes.  Can we go back and you give me the list of
24  the women?

17 (Pages 65 to 68)

## Page 69

1      MS. GURMANKIN:  Here, I'll tell you.
2   Jill Brueilly, Jennifer Compton --
3      MR. TUCKER:  You definitely have to
4   slow down.
5      MS. GURMANKIN:  Yeah.
6      MR. TUCKER:  Okay.  Go ahead.
7      MS. GURMANKIN:  Jill Brueilly.
8      MR. TUCKER:  Jill.
9      MS. GURMANKIN:  Brueilly.
10      THE WITNESS:  Brueilly.
11      MS. GURMANKIN:  Jennifer Compton, April
12   Heater, Jesse Barnes, Tina King.
13      MR. TUCKER:  One, two, three, four,
14   five -- okay.
15      Q. (BY MS. GURMANKIN)  In -- at the end of --
16      MR. TUCKER:  I interrupted your
17   question.  You didn't finish your question.
18      (Discussion off record.)
19      Q. (BY MS. GURMANKIN)  Did you hire any of
20   them, or did you inherit them?
21      A.  I inherited a few and I hired a few.
22      Q.  Who did you hire?
23      A.  I hired Jesse Barnes.  I hired Tina King
24   and -- can I see the notes?

## Page 70

1      MR. TUCKER:  Do you mind if I show him
2   the list, Counsel?
3      Q. (BY MS. GURMANKIN)  Jill Brueilly, Jennifer
4   Compton and April Heater are the others.
5      A.  Yeah, the rest were inherited.
6      Q.  Okay.  The position into which you were
7   promoted in late 2018, what was that?
8      A.  It holds the same title, but it was -- it's
9   a maintenance -- it's a field support supervisor,
10   but it's over the maintenance supervisors.
11      Q.  So increased responsibility?
12      A.  Correct.
13      Q.  Okay.  And you're supervising individuals
14   who held the title that you held?
15      A.  Correct.
16      Q.  Increase in compensation?
17      A.  Correct.
18      Q.  Was that a position that you applied for?
19      A.  I did, yes.
20      Q.  It was posted?
21      A.  Yes.
22      Q.  Were you interviewed?
23      A.  No.
24      Q.  At some point someone just calls you and

## Page 71

1   tells you that you have got it?
2      A.  Correct.
3      Q.  Who was that?
4      A.  HR -- well, HR actually sent me a letter
5   saying that I got the position.
6      Q.  That's how you found out?
7      A.  Yes, ma'am.
8      Q.  Do you remember who sent you the letter?
9      A.  I do not recall.
10      Q.  And that required relocating?
11      A.  Yes.
12      Q.  To the Houston area?
13      A.  To Midland, Texas, West Texas.
14      Q.  Is that where you are living now?
15      A.  Yes.
16      Q.  Where do you work out of, Midland?
17      A.  Midland.
18      Q.  Do you have an office?
19      A.  I do.
20      Q.  And you have direct reports?
21      A.  I do.
22      Q.  Including females?
23      A.  I have one female.
24      Q.  Who's that?

## Page 72

1      A.  Lena Soliz.
2      MR. TUCKER:  Spell her last name.
3      THE WITNESS:  S-O-L-I-Z.
4      Q. (BY MS. GURMANKIN)  Did you hire her or was
5   she inherited?
6      A.  She's inherited.
7      Q.  She's still there?
8      A.  Yes.
9      Q.  Any other females you have had reporting to
10   you since you were promoted into the field support
11   supervisor position?
12      A.  No.  Can I go back one?
13      Q.  Sure.
14      A.  So there is one female that -- it's a
15   contractor that is under me but actually doesn't
16   take my direction.  So it's a dotted line.  But she
17   doesn't take direction.  I just wanted to make sure
18   I was clear with that.
19      Q.  Okay.
20      A.  Okay?
21      Q.  Are we talking when you were maintenance
22   supervisor?
23      A.  I'm talking right now.
24      Q.  Okay.  Who is that?

18  (Pages 69 to 72)

Page 73

1　A.　Elizabeth and I don't even -- I can't
2　remember her last name, but it's Elizabeth.　But
3　she's a contractor but she works for Bartie Bray,
4　not myself.　But it's under me when it's -- when you
5　see it in the system.
6　Q.　Okay.　And she's still working as a
7　contractor?
8　A.　Yes.
9　Q.　Any other female employees or contractors
10　that have been under your supervision since you
11　became a field support supervisor?
12　A.　Not that I recall.
13　Q.　You receive performance reviews during your
14　employment?
15　A.　Yes.
16　Q.　Have you received a performance review
17　since you have been field support supervisor?
18　A.　So I want to make sure we are -- we are
19　clear.　So field support supervisor I was in
20　Appalachia, and that's still my title now.　So are
21　you talking -- which -- which one are you talking?
22　Q.　Well, let me make sure we're clear.　I
23　thought you had said from 2014 through the end of
24　2018 you were maintenance supervisor.

Page 74

1　A.　I was the maintenance supervisor, but the
2　title, to be clear, it was field support supervisor.
3　Q.　Okay.
4　A.　But, yeah.　And I apologize if I misled
5　you.　But that's what the title is actually called.
6　Q.　Okay.　So you were actually referred to
7　as -- or called field support supervisor from 2014?
8　A.　Correct.
9　Q.　All right.　You just had the job
10　responsibilities of maintenance supervisor?
11　A.　So it was the maintenance supervisor, but
12　they call just it something different.　Why, I don't
13　know but --
14　Q.　Okay.
15　A.　Yeah.　Is that -- is that clear?
16　Q.　Do you know how it's split?　Like
17　what -- where you are called field support
18　supervisor and where you're called maintenance
19　supervisor?
20　A.　I really don't know.　And that's my --
21　again, that's my same title that I hold right now.
22　So why, I don't know.　That's just the way the
23　system is.
24　Q.　Okay.

Page 75

1　A.　I know it's confusing.
2　Q.　That's okay.
3　So since you took your current job as
4　field support supervisor at the end of 2018 where
5　you started working out of Midland -- just so we are
6　on the same page.
7　A.　Yes.
8　Q.　-- have you gotten a performance review in
9　that position?
10　A.　Yes.
11　Q.　Okay.　How many?　Do you know?
12　A.　I'm guessing but I know I had one.
13　Q.　Okay.　That would have been --
14　A.　That was just this past year.　Actually,
15　probably had two, one mid-year and one end of
16　year --
17　Q.　Okay.
18　A.　-- for 2019.
19　Q.　All right.　So one in the middle of 2019?
20　A.　Correct.
21　Q.　And one at the end --
22　A.　At the end, yes.
23　Q.　Were there actual documents that you got?
24　A.　I think there is a write-up, but I think it

Page 76

1　was more of a face-to-face, this is what we did.
2　And then it's also in our system, you know.　Once
3　you go in, you can see what they wrote.
4　Q.　Okay.　But you also received write-ups?
5　A.　I don't receive them, no.
6　Q.　Okay.　Did you see them?
7　A.　In the system you can see them.　I don't
8　recall visibly looking at them, but I know they are
9　there.
10　Q.　Okay.　Just based on your experience at
11　Shell?
12　A.　Yeah.
13　(Exhibit 52 was marked.)
14　Q.　(BY MS. GURMANKIN)　All right.　Let's look
15　at what's been marked as Exhibit 52.　These are
16　reviews that we got from Shell for you from what
17　appears to be 2012 through 2017.　If you could just
18　look through these and let me know if you have seen
19　them before.
20　A.　So just to clarify, it says 2012 to 2019 at
21　the top?
22　Q.　Yeah, it does.　But then if you look at the
23　last page -- are you there?
24　A.　Yes, ma'am.

Page 77

1      Q. All right. So you see for "Goals and
2   Performance Appraisal 2018," it says "No performance
3   appraisal, 2018"?
4      A. Okay.
5      Q. You see that?
6      A. Yes.
7      Q. Is that true?
8      A. It says it but I don't know if it's true or
9   not.
10     Q. Okay.
11     A. Yeah, I don't know.
12     Q. Do you remember getting one?
13     A. So that was that transition period. So I
14  may not have. I don't remember.
15     Q. Well, you were promoted into the current
16  field support supervisor position at the end of
17  2018, right?
18     A. Uh-huh.
19     Q. Yes?
20     MR. TUCKER: Is that a yes?
21     THE WITNESS: Yes. Sorry. I
22  apologize. Yes.
23     MR. TUCKER: The other -- the other
24  instruction. You are not having a conversation with

Page 78

1   her. The Court Reporter sitting to your left can
2   only take down verbal and not monosyllabic and head
3   shrugs --
4      THE WITNESS: Okay.
5      MR. TUCKER: -- shoulder gestures. So
6   you have to keep your answers verbal.
7      THE WITNESS: You got it. Yes, sir.
8      Q. (BY MS. GURMANKIN) So you were in the
9   maintenance supervisor position for Appalachia
10  during almost all of 2018, right?
11     A. Correct.
12     Q. Okay. Do you recall getting a performance
13  review for that period?
14     A. No. I -- I don't recall if I did or not.
15     Q. You don't recall one way or the other?
16     A. Yeah, I don't.
17     Q. Okay. And then under that it says "Goals
18  and Performance Appraisal 2019"?
19     A. Yes.
20     Q. You see that?
21     A. Yes.
22     Q. Mid-year?
23     A. Uh-huh.
24     Q. It says -- did you ever see what it says

Page 79

1   there before, or is this the first time seeing it?
2      A. This is actually the first time I'm seeing
3   it.
4      Q. Okay. Was that the verbal feedback that
5   you got?
6      A. The mid-year, yes, I remember the
7   conversation and the end of the year. Yeah, that's
8   the mid-year.
9      Q. That's the verbal feedback that you got?
10     A. Yeah, it looks to be that way.
11     MR. TUCKER: Hold on. It looks to be
12  that way or -- now, let's get --
13     MS. GURMANKIN: That's -- he answered,
14  Joe.
15     THE WITNESS: So it looks like it's the
16  mid-year because -- the only reason why I said
17  that --
18     MR. TUCKER: Let's talk about what you
19  know. That's the instruction I'm giving you.
20     THE WITNESS: Okay.
21     MR. TUCKER: Again, I'm telling you.
22     THE WITNESS: Okay. Sorry, Joe.
23     Q. (BY MS. GURMANKIN) Is that consistent with
24  the verbal feedback that you received?

Page 80

1      A. Yes.
2      Q. Okay. For 2018 did you receive a pay
3   increase?
4      A. I don't recall.
5      Q. Did you receive a bonus?
6      A. In 2018?
7      Q. Uh-huh. For 2018.
8      A. Yes, I know I did.
9      Q. Okay. And would it be consistent, just
10  based on your experience at Shell, to receive a
11  performance evaluation?
12     A. Yes.
13     Q. As you sit here today, can you recall
14  having a year where you didn't get a performance
15  evaluation since you became a full-time employee?
16     A. I don't recall either -- I don't recall
17  that.
18     Q. All right. So going back, do you recall
19  having seen any of these performance reviews before?
20     A. I'm sure I have seen them, but I don't
21  recall specifics.
22     Q. All right. So if we go to page 1.
23     A. Okay.
24     Q. This is "Goals and Performance Appraisal

20  (Pages 77 to 80)

Page 81

1    2012," for you.
2         A.  Uh-huh.
3         Q.  And you see on the first bullet point under
4    the HSSE heading, it says, "There have been OSHA
5    recordable incidents on facility projects over the
6    last couple of months."
7              Do you see that?
8         A.  I do.
9         Q.  Do you recall being told that for your 2012
10   review?
11        A.  I don't recall.
12        Q.  Okay.  Do you recall that there were OSHA
13   recordable incidents on facility projects?
14        A.  I don't recall.
15        Q.  Second bullet point, "All incidents were
16   related to activities the contractor was not
17   supposed to be doing."
18             Ever recall being told that you weren't
19   supposed to be doing certain things that were
20   leading to OSHA-recordable incidents?
21        A.  I don't recall.
22        Q.  And the fifth bullet point, "Too much Shell
23   oversight is making the contractor nervous."
24             Ever recall having that discussion?

Page 82

1         A.  No, I do not know.
2         Q.  So the stuff we went over, you don't recall
3    that being told to you as part of your performance
4    review?
5         A.  That's correct.
6         Q.  Or any -- or at any point in 2012?
7         A.  Yeah, I don't recall that.
8         Q.  Do you recall ever having discussions with
9    Bennett along those lines?
10        A.  I don't recall.
11        Q.  All right.  Go to page 6, please.  If you
12   look at the top, it looks like there is a note
13   that's concluding from Craig --
14             MR. TUCKER:  What Bates-stamp numbered
15   page is page 6?  6 of 13.  I'm sorry.
16        Q.  (BY MS. GURMANKIN)  So first go to page 5,
17   which is Shell 1382.  And you see there is a note at
18   the top that's continued from the prior page from
19   Craig Ritschel?
20        A.  On top of page 5?
21        Q.  Uh-huh.
22        A.  Okay.
23        Q.  Who is Craig Ritschel?
24        A.  Craig Ritschel was the civil

Page 83

1    superintendent.
2         Q.  Did you have a reporting relationship to
3    him at some point?
4         A.  Probably.  So in the -- yes.
5         Q.  When?
6         A.  In the meantime from where I was going from
7    interim superintendent, he was kind of help leading
8    that.  So he was kind of my mentor to get me up to
9    speed.  But I don't remember a specific date, but it
10   was in that time frame that I told you earlier.
11        Q.  Did you report to him at the same time that
12   you had a reporting relationship to Bennett?
13        A.  So I -- I don't know, he -- not really.  So
14   I stepped in, but he was kind of the mentor guy.  So
15   he was --
16        Q.  Ritschel?
17        A.  -- probably handing off -- yes.  He was
18   handing off what Joe Bennett was starting, and then
19   I kind of took over.
20        Q.  Okay.  So if you look at page 6 of 13,
21   "Goals and Performance Appraisal 2013."
22             You see that?
23        A.  Yes.
24        Q.  And if you look at the third bullet point,

Page 84

1    it says, "Attitude is a key to success in this
2    environment and your leadership in this regard is
3    very transparent to your troops.  Consider your role
4    and how effective you currently are.  Challenge
5    yourself.  Don't get distracted by stuff out of your
6    control."
7              Do you recall having that discussion as
8    part of your 2013 performance --
9         A.  I do not.
10        Q.  -- appraisal?
11             MR. TUCKER:  Let her finish her
12   question.
13             THE WITNESS:  I apologize.
14        Q.  (BY MS. GURMANKIN)  Do you recall ever
15   being told that?
16        A.  I do not recall that.
17        Q.  Next page, if you look at the
18   second-to-last paragraph above Ritschel's name that
19   starts with "William, your challenges for 2014."
20             You see where I am?
21        A.  I do.
22        Q.  It says, "Your challenges for 2014 are
23   related to your new position in the production
24   team."  I'll stop there for a sec.

Page 85

1    Do you know if he was referring to your
2 maintenance supervisor position that you started in
3 January of 2014?
4    A. Yeah. He -- I'm -- I'm speculating that he
5 was --
6    MR. TUCKER: Guess what? Do
7 not -- just stop for a second. If you don't know,
8 say you don't know. You don't have to speculate.
9 We do not want you to speculate or guess.
10    THE WITNESS: Okay.
11    MR. TUCKER: This is the last time I'm
12 telling you.
13    THE WITNESS: All right.
14    Q. (BY MS. GURMANKIN) Is there -- is there
15 anything else that he would be referring to that you
16 can think of?
17    A. No.
18    Q. Okay. Just your move to maintenance
19 supervisor?
20    A. Correct.
21    Q. Okay. He goes on to say, "Key focus points
22 are to lead by example and don't let your technical
23 drawbacks overshadow your ability to lead people.
24 Work with someone on your team to coach and mentor

Page 86

1 you with policies and procedures and care for your
2 work/life balance as well as able. Delegate and
3 keep your R&Rs at the forefront of what you were
4 hired to do. Let me know if there is anything I can
5 do to assist you at any time."
6    Do you recall being told that as part
7 of your 2013 performance appraisal?
8    A. No, I do not.
9    Q. Ever been told that you had technical
10 drawbacks?
11    A. Not that I recall.
12    Q. Do you know what he's referring to there?
13    A. I do not.
14    Q. Next page. In the second-to-last paragraph
15 above the July 7, 2014, you see where I am?
16    A. Chris Andersen?
17    Q. Yeah. Two paragraphs above that.
18    A. Okay.
19    MR. TUCKER: "Will has a high trust
20 status"?
21    MS. GURMANKIN: Yep.
22    Q. (BY MS. GURMANKIN) "Will has a high trust
23 status within the organization, as he has been asked
24 to provide 'oversight' to some very sensitive

Page 87

1 discussions in support of HR, as well as a good
2 trust relationship with the majority of his team."
3    Do you know what that refers to?
4    A. I do not.
5    Q. Had you been asked to provide oversight to
6 sensitive discussions in support of HR around this
7 time?
8    A. I don't recall that.
9    Q. At any time?
10    A. Yeah -- yeah, no, I don't.
11    Q. Next paragraph, "His struggle will be to
12 keep accountability high in his team (example
13 Barry), partially from the organization structure
14 (many reports) as well as time to manage marginal
15 performers. However, I have seen some coachable
16 moment events which I believe has been productive."
17    Who's the Barry that's referred to
18 there? Do you know?
19    A. Barry Strayer was the rotating focal point.
20    Q. Were there performance issues with him?
21    A. There was.
22    Q. Did you terminate him at some point?
23    A. I did not terminate him, no.
24    Q. At some point did he leave your group?

Page 88

1    A. He did, yes.
2    Q. Why?
3    A. Organization restructure.
4    Q. Did he go into another group at Shell?
5    A. I don't know.
6    Q. You don't know what happened to him?
7    A. No, ma'am.
8    Q. So at some point you are told he's leaving
9 your group, but you don't know what happens after
10 that?
11    A. No.
12    Q. There is a reference to plural marginal
13 performers. Was there anyone else other than Barry
14 that was having performance issues?
15    A. I don't recall.
16    Q. Next page, first full paragraph from the
17 top, there is a sentence around the middle that
18 starts with "He also needs to look at big picture."
19    You see that?
20    MR. TUCKER: Can you hold on? The
21 paragraph that starts with "Will is very positive"?
22    MS. GURMANKIN: Uh-huh.
23    MR. TUCKER: What line?
24    MS. GURMANKIN: "He also needs to look

22 (Pages 85 to 88)

Page 89

1    at big picture."
2            MR. TUCKER:  Sixth line down.
3        A.  Okay.
4        Q.  (BY MS. GURMANKIN)  "He also needs to look
5    at big picture when emergency work comes up.  Sit
6    back, understand and think through the identified
7    issue before executing urgent work, which is
8    costly."  I'll stop there for a sec.
9            Do you know what that refers to?
10       A.  Not specifically, no.
11       Q.  Generally?
12       A.  No.
13       Q.  Do you recall being told that?
14       A.  I don't know it and it.
15       Q.  Last sentence says, "The strength of the
16   relationship he has with Mark is key to the success
17   of these efforts."
18           Is that Mark Hoover?  Do you know?
19       A.  I'm assuming so.
20       Q.  He's the only Mark that that could refer
21   to?
22       A.  Yes.
23       Q.  Who is Mark Hoover?
24       A.  Mark Hoover was operations supervisor.

Page 90

1        Q.  Okay.  Was that during --
2        A.  Well, let me recant.
3        Q.  Sure.
4        A.  So he was the flowback supervisor and then
5    moved over to the operations supervisor.  So I just
6    wanted to make sure that was known.
7        Q.  Okay.  Was that during the whole time that
8    you were maintenances supervisor?
9        A.  I -- I honestly don't recall.
10       Q.  But you worked with him during the whole
11   time you were maintenance supervisor?
12       A.  Yes.
13       Q.  The two paragraphs down from that, it says,
14   "His struggle will be."
15           You see where I am?
16       A.  Yes.
17       Q.  "His struggle will be to keep
18   accountability high in his team, partially from the
19   organization structure (many reports), however, I
20   have seen some positive evidence of managing people
21   performance.  Some feedback provided is that Will
22   has been hard on some folks, but I have seen that he
23   is holding these folks accountable to their work, at
24   a reasonable standard.  Single biggest impact on

Page 91

1    business performance this year has been getting rid
2    of Barry and replacing him with Brian."
3        A.  Okay.
4        Q.  Did you ever get feedback that you had been
5    hard on some folks?
6        A.  Not that I recall.
7        Q.  The last sentence about getting rid of
8    Barry, does that refresh your recollection at all
9    about what happened to him?
10       A.  So they did a reorg, and Brian came and
11   replaced him, Brian Gillespie.
12       Q.  But that doesn't refresh your recollection
13   about what happened to Barry?
14       A.  Yeah, I don't know what he did.
15           MR. TUCKER:  That was her original
16   question.
17       Q.  (BY MS. GURMANKIN)  Next page.
18       A.  Yes, correct.
19           Page 10?
20       Q.  Uh-huh.
21       A.  Okay.
22       Q.  All right.  Looking at the "Goals and
23   Performance Appraisal 2015," under "Opportunities."
24           Do you see where I am?

Page 92

1        A.  Okay.
2        Q.  Says, "Several of Will's staff provided him
3    opportunities to practice his people management
4    skills.  Active listening and seeking to understand
5    first, then providing constructive feedback will
6    help such employees improve."  I'll stop there for a
7    sec.
8            Do you know -- do you remember being
9    told that?
10       A.  No.
11       Q.  Okay.  Any idea what that refers to?
12       A.  No.
13       Q.  "On occasion Will can allow his frustration
14   of certain management skills be communicated outward
15   to his reports.  In a position of leadership it is
16   important to remember the influence you have with
17   few words that can help or hurt a situation.  Focus
18   observations and insights upward."
19           Do you remember being told that?
20       A.  I do not.
21       Q.  Do you recall that sometimes you let your
22   frustration with certain management styles be
23   communicated to your reports?
24           MR. TUCKER:  Objection.

23  (Pages 89 to 92)

Page 93

1        You may answer.
2        A. I do not.
3        Q. (BY MS. GURMANKIN) Was that a performance
4    issue for you?
5        A. It's written down here, but I don't
6    remember any -- any details to it.
7        Q. Do you agree that that was a performance
8    issue for you when you were maintenance supervisor?
9        A. The only thing I can agree to is I see it
10   written down. But I don't recall any details.
11       Q. Right. I'm asking if you thought that was
12   an opportunity area for you when you were
13   maintenance supervisor?
14       A. Again, I apologize but I -- I don't
15   remember back that far and I --
16       Q. Okay.
17       A. -- so I can't tell you yes or no. So I'm
18   going to say I disagree with what's written down.
19       Q. Page 11, "Goals and Performance Appraisal
20   2016." The paragraph right above where it says
21   "Steve Craig."
22           You see where I am?
23       A. Yes.
24       Q. Says, "Areas of growth opportunity in 2017

Page 94

1    include being mindful of how our decisions and
2    behaviors as leaders may affect others. Please
3    continue to help raise up the level of
4    professionalism across our organization and promote
5    a workplace free from harassment and discrimination.
6    Also, please work with the maintenance team to focus
7    on reducing LOPCs."
8           Do you recall being told that as part
9    of your 2016 review?
10       A. No.
11       Q. Do you know what that refers to?
12       A. If I'm -- no.
13       Q. The LOPC, what is that about?
14       A. Loss of primary containment. So if we have
15   spills --
16           MR. TUCKER: She asked you what LOPC
17   stands for. You told her.
18           THE WITNESS: Okay.
19       Q. (BY MS. GURMANKIN) What is that?
20       A. What is LOPCs?
21       Q. Yes. You were just going to explain.
22       A. It's -- it's just where we lose fluid from
23   a process pipe or containment that wasn't
24   controlled.

Page 95

1        Q. Do you recall being told that as part of
2    your 2016 review?
3        A. I don't recall that.
4        Q. On page 12, "Goals and performance
5    Appraisal 2017," second paragraph, "Opportunities
6    for improvement for Will include continuing to
7    deepen his understanding of CI concept and tools and
8    determine how they can best help the maintenance
9    organization to solve problems and improve the
10   business." I'll stop there for a sec.
11           Do you recall being told that as part
12   of your 2017 --
13       A. I do recall that.
14       Q. What was that about?
15       A. So we're right in the middle of LEAN, which
16   is trying to work out the waste and so we are all
17   trying to be practitioners at it, so the more
18   knowledge I had with it, the better I could be at
19   it.
20       Q. And then it goes on to say, "At times Will
21   can still let his emotions influence his behavior.
22   It is important to address concerns promptly through
23   open communication when they arise."
24           Do you recall being told that?

Page 96

1        A. I do.
2        Q. Okay. What was that about?
3        A. So in -- in the concept of LEAN, you know,
4    everyone has different ideas of how it should be.
5    And so one person would want it one way, another
6    person would want it the other, and then I would
7    want it another. So it just gets frustrating trying
8    to accommodate everyone. And that's what that was
9    from.
10       Q. Was there a specific example that you were
11   given?
12       A. I don't have any specific examples, no.
13       Q. Were you given any?
14       A. I think it was a general statement.
15       Q. You don't recall Craig giving you any
16   specific examples?
17       A. I don't recall that, no.
18       Q. Do you recall what you were told as part of
19   your 2019 mid-year other than what is written on the
20   last page of ==Exhibit 52==?
21       A. What page?
22       Q. The last page.
23           MR. TUCKER: 13?
24           THE WITNESS: Okay.

24  (Pages 93 to 96)

Page 97

1          MR. TUCKER:  Is that what page we are
2     on?
3          MS. GURMANKIN:  Yes.
4     Q.  (BY MS. GURMANKIN)  It's what we had looked
5     at earlier, when it says that was consistent with
6     the verbal feedback you got, right?
7     A.  Yeah.
8     Q.  Do you recall anything else you were told
9     as part of your 2019 mid-year?
10    A.  Can I read this real quick?
11    Q.  Sure.
12    A.  I don't recall anything other than -- than
13    what's written down.
14    Q.  How about your 2019 end-of-year review?
15    What is the feedback you were given there?
16    A.  Kind of the same thing, just -- I don't
17    remember specifics, so I just know it was kind of
18    saying -- yeah, I don't know exactly.  I'm going to
19    say I don't know.
20    Q.  You don't remember?
21    A.  No.
22    Q.  When did you get that?
23    A.  I think December 2019.
24    Q.  Okay.  So a couple months ago?

Page 98

1     A.  Yeah.
2     Q.  And you don't remember anything you were
3     told as part of that?
4     A.  Not to be verbatim, no, ma'am.
5     Q.  That's okay.  Even if it's not verbatim, do
6     you remember anything you were told?
7     A.  Just that I was performing well, things
8     were going good, high level.  That's about it.
9     Q.  All right.  So you were involved in Jesse
10    Barnes' hiring as a full-time employee; is that
11    correct?
12    A.  That's correct.
13    Q.  Okay.  And before she was hired as a
14    full-time employee, you had worked with her in her
15    capacity as a contractor?
16    A.  Correct.
17    Q.  What was your involvement in getting her
18    hired full-time?
19    A.  So I'm going to ask you to repeat the
20    question because I'm looking for what you're looking
21    for.  So I don't know -- are you asking me how she
22    came about to be hired, or what are you asking me
23    specifically?
24    Q.  Sure.  Let's start with that.

Page 99

1     A.  So I needed a maintenance analyst.  I think
2     she was an admin at the time -- or I know she was an
3     admin at the time.  We needed a maintenance analyst
4     in my group, and I asked Jesse if she wanted to come
5     over and start working as a maintenance analyst.
6     Q.  And I assume she said yes.
7     A.  Yes.
8     Q.  Okay.  And then what happens in connection
9     with her full-time hire?
10    A.  What do you mean?
11    Q.  What was your involvement after that?
12    A.  So to get her hired on with Shell, is that
13    what you're asking?
14    Q.  Uh-huh.
15    A.  So we -- we wanted to make a full-time
16    position there.  Jesse was a candidate for that
17    full-time position.  And so I wanted to make sure
18    that, you know, she put in -- her name in the hat,
19    she filled out an application, had interviews and
20    then she was a successful candidate.
21    Q.  Why did you want her for that position?
22         MR. TUCKER:  Objection.
23         You may answer.
24    A.  She was already doing the capacity in an --

Page 100

1     in an administrative role.  So when I say that,
2     it's -- she was already doing a lot of the tasks for
3     it, though new to the role.  But I knew she -- I
4     believed in, you know, her abilities to get that
5     done.  So I wanted her in that role.
6     Q.  (BY MS. GURMANKIN)  And what was the basis
7     for you believing in her abilities to get the
8     maintenance analyst job done in that role?
9     A.  She -- she knows -- she knew the folks
10    there.  She had already had a little bit of SAP
11    experience, and I just -- I -- I knew she could do a
12    good job.
13    Q.  She performed well in her contractor role?
14    A.  Yes.
15    Q.  Did you have to get approval from anyone at
16    the company to create the role and hire her into it?
17    A.  Yes.
18    Q.  Who did you talk to about that?
19    A.  So I believe Chris Andersen is the one that
20    started this up.  So he had to get permission.  It's
21    a chain thing.  So I had to ask Chris; Chris had to
22    ask the OM at the time I believe was Greg Larsen;
23    and then Greg had to go to HR, and then they all
24    kind of compiled.  That's how we -- we got the

Page 101

1    full-time position posted.
2        Q.  Was anyone else considered?
3        A.  There was, I believe, one other individual
4    that was considered.
5        Q.  Do you remember who that was?
6        A.  I can't recall her name, but she was from
7    out west.
8        Q.  Was she a contractor at the time?
9        A.  She was a full-time Shell employee.
10       Q.  Okay.  And why did you guys want Jesse?
11           MR. TUCKER:  Objection.
12       Q.  (BY MS. GURMANKIN)  Go ahead.
13       A.  So the other individual was more qualified,
14   but I don't believe that this individual wanted to
15   move to Willsboro.  And Jesse was the more qualified
16   candidate of the other applicants.  There was a few
17   others.  I can't remember their names.  But Jesse
18   was more -- more qualified than the others.
19       Q.  Where did this other woman live?
20       A.  I don't know.  Somewhere out west.
21   Wyoming, Montana, I'm guessing.
22       Q.  How did you know about her?
23       A.  Through Greg Larsen.
24       Q.  And then when Jesse started full-time, she

Page 102

1    reported to you directly?
2        A.  Correct.
3        Q.  Same as when she was a contractor?
4        A.  If she was a contractor working for me in
5    the maintenance analyst role?  Is that what you're
6    asking?
7        Q.  No.  Before she became a full-time employee,
8    did she report directly to you in her role as
9    contractor?
10       A.  Yes, as the maintenance analyst.
11       Q.  Okay.  In her maintenance analyst role?
12       A.  Yeah.  So she was kind of doing the role
13   prior to becoming full-time.  But until that point,
14   she was an administrative assistant working for
15   someone else.
16       Q.  Okay.  So she did not report to you in her
17   admin role.  She reported to you in her maintenance
18   analyst role that she was doing?
19       A.  Correct.  As a contractor.
20       Q.  Uh-huh.
21       A.  Yes.
22       Q.  Before she was hired full-time, at any
23   point did Chris Andersen give you any warnings or
24   concerns that he had about bringing her on

Page 103

1    full-time?
2        A.  I remember some -- some -- some concerns
3    that Chris Andersen had, yes.
4        Q.  What were his concerns that he expressed to
5    you?
6        A.  He didn't -- he didn't give me the details.
7    He just expressed concern.
8        Q.  What did he say?
9        A.  "I express concern with hiring her, if
10   that's what you want to do."
11       Q.  What did you say?
12       A.  I said, "I believe so."
13       Q.  Did you ask what his concerns were?
14       A.  If he didn't give the details.  I wasn't
15   asking.
16       Q.  Wasn't that something that you wanted to
17   know when you're considering hiring a full-time
18   employee?
19           MR. TUCKER:  In general or as it
20   relates to Ms. Barnes?
21           THE WITNESS:  Yeah, I was kind of --
22           MS. GURMANKIN:  In general.
23       A.  In general maybe.  But I -- yeah -- no.  I
24   mean, yes, but I didn't ask.

Page 104

1        Q.  (BY MS. GURMANKIN)  Any explanation --
2            MR. TUCKER:  The question was in
3    general.  If you can answer that question.
4            THE WITNESS:  I said yes, yes, maybe.
5        Q.  (BY MS. GURMANKIN)  Any explanation for why
6    you didn't ask?
7        A.  What's that?
8        Q.  Any explanation for why you didn't ask
9    Andersen what he meant?
10           MR. TUCKER:  Objection; asked and
11   answered.
12           You may answer it again.
13       A.  No indication.  I don't recall why I didn't
14   ask him.  I just know I didn't.
15       Q.  (BY MS. GURMANKIN)  Had he given you a
16   warning about -- or did he ever give you a warning
17   about hiring any other employee other than Jesse?
18       A.  Not that I recall.
19       Q.  Did he mention anything about his concerns
20   being in connection with the ███████ issue?
21       A.  He did not tell me.
22       Q.  Did you ever speak with him about the ███████
23   ███ issue?
24       A.  No, ma'am.

26  (Pages 101 to 104)

## Page 105

1　　Q.  Did you ever talk to anyone other than
2　Robin Grouette about that meeting that you mediated?
3　　A.  No.
4　　Q.  Did you tell anyone at Shell that you
5　wanted to have a sexual or romantic relationship
6　with Jesse?
7　　A.  No.
8　　Q.  Did you?
9　　A.  Did I what?
10　　Q.  Want to have a sexual or romantic
11　relationship with her?
12　　A.  No.
13　　Q.  Did you ever do anything to indicate to her
14　that you did want to have a sexual or romantic
15　relationship with her?
16　　A.  Absolutely not.
17　　Q.  Did you think that she was attractive?
18　　A.  No.
19　　Q.  Did you tell anyone at Shell that you
20　thought she was attractive or pretty or words to
21　that effect?
22　　A.  No.
23　　Q.  You sure about that?
24　　A.  The only -- I said -- I said she was a hot

## Page 106

1　blond one time.
2　　Q.  So yes?
3　　A.  But it was as a banter manner.  I was just
4　joking.  That wasn't a physical attraction.
5　　Q.  Well, that was -- you did tell someone at
6　Shell that you thought she was attractive or pretty
7　by calling her a hot blond?
8　　A.  No.
9　　MR. TUCKER:  No, that's not what he
10　said.  You're mischaracterizing --
11　　Q.  (BY MS. GURMANKIN)  I'm asking.
12　　MR. TUCKER:  -- those questions.
13　　A.  I called her that one day, and I said it to
14　her, not to anyone else.
15　　Q.  (BY MS. GURMANKIN)  And when did you say
16　that to her?
17　　A.  I don't recall the date.
18　　Q.  How about the year?
19　　A.  I don't even recall the year.
20　　Q.  After she started reporting to you
21　full-time?
22　　A.  Yes.
23　　Q.  What was the context?
24　　A.  As in what?

## Page 107

1　　Q.  Did you just walk up to her and call her a
2　hot blond, or was there a discussion?
3　　A.  She asked me a question -- or actually, I
4　asked her a question, and then it came up as a joke.
5　　Q.  How did it come up as a joke?
6　　A.  So we were driving by a grocery store, and
7　I seen her walking through the parking lot and I
8　blew the horn.  She didn't hear the horn.
9　　And then we -- she seen us I think it
10　was -- she seen us at the entrance and she said
11　something, and I said, "Did you see any -- did you
12　hear somebody beeping the horn at you?"
13　　She said, "No."
14　　And I said, "Well, there was a hot
15　blond walking across the parking lot."
16　　And she's like, "Well, who?"
17　　And I said, "Well, that would be you."
18　　And then we just starting laughing.
19　　MR. TUCKER:  Stop right there.  Please.
20　Off the record.
21　　THE VIDEOGRAPHER:  We are off record.
22　Time is 10:28 a.m.
23　　(Off the record.)
24　　THE VIDEOGRAPHER:  We are back on

## Page 108

1　record.  Time is 10:29 a.m.
2　　Q.  (BY MS. GURMANKIN)  Were you with anyone in
3　the car when you honked at her?
4　　A.  Yes.
5　　Q.  Who?
6　　A.  Mark Hoover.
7　　Q.  Do you recall where you guys were going at
8　the time?
9　　A.  I believe we were coming back from lunch.
10　　Q.  And was she in the parking lot of the
11　grocery store?
12　　A.  Yes.
13　　Q.  Could you tell whether she was coming or
14　going?
15　　A.  I -- I couldn't tell.  I don't recall.  I
16　just remember her being in the parking lot.
17　　Q.  How close were you to her when you honked
18　at her?
19　　A.  I don't recall.  50 yards maybe.
20　　Q.  So then when you saw her, you said at the
21　entrance, were you guys coming back in the building
22　together?
23　　A.  Correct.
24　　Q.  Okay.  All three of you?

27 (Pages 105 to 108)

Page 109

1　　A. Yes.
2　　Q. So you thought it was funny when you called
3　her a hot blond?
4　　　　　MR. TUCKER: Objection. He said
5　"We laughed."
6　　　　　MS. GURMANKIN: That wasn't my
7　question.
8　　Q. (BY MS. GURMANKIN) You thought it was
9　funny?
10　　A. We all thought it was funny.
11　　Q. How do you know she thought it was funny?
12　　A. Because she laughed.
13　　Q. Okay. She was reporting directly to you at
14　the time?
15　　A. Yes.
16　　Q. Did you ever consider that maybe she
17　laughed because you were her boss and you thought it
18　was funny?
19　　A. I didn't consider that, no.
20　　Q. And Hoover heard this, correct?
21　　A. Yes.
22　　Q. Did you think you calling her a hot blond
23　was a violation of Shell's Code of Conduct?
24　　A. No, I do not.

Page 110

1　　Q. At the time you did not, correct?
2　　A. And I still don't.
3　　Q. Okay. Do you think you calling her a hot
4　blond was a violation of Shell's policies at the
5　time that you said it?
6　　A. No, I do not.
7　　Q. How about now?
8　　A. No.
9　　Q. Did you ever show Jesse a picture of
10　yourself?
11　　A. I did.
12　　Q. Okay. How many times?
13　　A. Just once.
14　　Q. Were you in your underwear?
15　　A. No.
16　　Q. What were you in?
17　　A. Compression shorts, workout shorts.
18　　Q. Okay. Were you wearing a shirt?
19　　A. No.
20　　Q. Were the shorts tight?
21　　A. Yes.
22　　Q. How far down did they go?
23　　A. Knee level.
24　　Q. Is that like bike shorts?

Page 111

1　　A. Kind of.
2　　Q. When was this?
3　　A. I don't recall exact year or day. I
4　believe it was in 2015 maybe. I'm -- I'm -- yeah.
5　　Q. Where were you?
6　　A. We were in Canada.
7　　Q. Where?
8　　A. In a sports bar. I don't know the name of
9　the bar.
10　　Q. Where in Canada?
11　　A. Calgary.
12　　Q. Was that for a conference or meeting?
13　　A. It was for a face-to-face maintenance
14　meeting, yeah.
15　　Q. Other than you and Jesse, was anyone else
16　there from your group?
17　　A. Ken Foreman.
18　　Q. Anyone else?
19　　A. Not from our group, no.
20　　Q. This was after she's a full-time employee?
21　　A. I don't recall that, if she was a full-time
22　employee or not.
23　　Q. All right. And what's the context in which
24　you show her a picture of yourself in your

Page 112

1　compression shorts?
2　　A. So we were all hanging out and eating and
3　talking and having a good time and folks started
4　talking about back in the day when they were
5　skinnier and doing this and that. And someone
6　showed a picture of them boxing, and someone else
7　showed another picture of them working out. And so
8　then I showed a picture of myself when I lost
9　weight.
10　　Q. Who were you with?
11　　A. There was a group of folks there, but I
12　don't know specifically who was there.
13　　Q. All Shell employees?
14　　A. I can't even answer that truthfully. I
15　don't know.
16　　Q. Jesse was there?
17　　A. Jesse was there.
18　　Q. Ken Foreman?
19　　A. Ken Foreman was there.
20　　Q. Anyone else that you specifically recall
21　from Shell?
22　　A. No. And just to be clear, I don't know if
23　they were -- so I know Jesse seen it, but I don't
24　know who was around me when I shown the picture.

28 (Pages 109 to 112)

Page 113

1  Q. Who showed a picture of themselves boxing?
2  A. Chad Mouton.
3  Q. Shell employee?
4  A. Yes.
5  Q. What was he wearing in the picture?
6  A. I don't recall. Shorts, workout gear. But
7  I don't know if he had a shirt on or not. I don't
8  recall, to be honest with you.
9  Q. Who showed a picture of themselves working
10  out?
11  A. An individual, I can't even think of their
12  name.
13  Q. Shell employee?
14  A. I don't even know that.
15  Q. All right. And then after those two showed
16  their pictures, you show a picture of yourself in
17  compression shorts?
18  A. Correct.
19  Q. And why do you show that picture?
20  A. Just to kind of show them --
21  MR. TUCKER: Objection; asked and
22  answered.
23  You may answer again.
24  THE WITNESS: Sorry.

Page 114

1  A. I just showed it just to show how much
2  weight I lost.
3  Q. (BY MS. GURMANKIN) When was the picture
4  from? When was the picture from?
5  A. Oh, I don't recall that. I don't know.
6  Q. So you were -- you were skinnier in the
7  picture?
8  A. Yes, ma'am.
9  Q. Okay. Than you were at the time you were
10  showing it?
11  A. It was probably about the same time frame.
12  I don't know. But, yeah, I was -- I was skinnier
13  but not skinnier than the picture, I don't believe.
14  I don't remember.
15  Q. Were you approximately the same weight as
16  you were in the picture at the time?
17  A. I think so, yes.
18  Q. Okay. So why were you showing the picture?
19  A. Just to -- no, no, I don't remember why. I
20  just did.
21  Q. Well, you said it was to show how much
22  weight you lost, but you were about the same weight
23  as you were at the time.
24  So if they could see you in person, why

Page 115

1  were you showing the picture?
2  A. Just because everyone else was showing
3  pictures. I really have no -- give you a definition
4  for it. I don't know.
5  Q. Any explanation?
6  A. Other than --
7  MR. TUCKER: Go ahead. Other than what
8  he said thus?
9  Q. (BY MS. GURMANKIN) I'm trying to
10  understand. If you were about the same weight as
11  you were in person at the time that you were in the
12  picture, then why would you need to show the picture
13  to show how much weight you lost when they could see
14  you right there?
15  MR. TUCKER: Objection; asked and
16  answered.
17  You may answer.
18  A. Again, I -- I have no explanation for it.
19  Q. (BY MS. GURMANKIN) Was it to show Jesse a
20  picture of yourself with your shirt off?
21  A. No.
22  Q. Why did you choose that picture?
23  A. I -- I don't recollect why I chose that
24  picture.

Page 116

1  Q. Did you have any other pictures of yourself
2  on your phone in workout gear but wearing a shirt
3  and shorts that weren't skintight?
4  A. I don't recall that.
5  MR. TUCKER: Objection to the term
6  "skintight."
7  But you may answer. And why don't you
8  slow down after she asks a question so you can give
9  me an opportunity to object.
10  THE WITNESS: Okay.
11  Q. (BY MS. GURMANKIN) You said you don't
12  recollect?
13  A. I don't recollect why I did that.
14  Q. Did you look to see if there was any other
15  pictures if you wanted to show a picture that had
16  you with a shirt on and not in skintight shorts?
17  A. I don't remember doing that.
18  Q. Was that the first picture that came up on
19  your phone?
20  A. I don't recall.
21  Q. And who did you show the picture to?
22  A. Just the group that was there. I don't
23  remember who all was around.
24  Q. Where was Jesse sitting in relation to you?

29 (Pages 113 to 116)

Page 117

1　A. I don't remember.
2　Q. But you made sure that she saw the picture?
3　　　MR. TUCKER: Objection.
4　A. She saw the picture but I didn't -- yeah.
5　Q. (BY MS. GURMANKIN) Anyone say anything
6　when you showed the picture?
7　A. No.
8　Q. And that was on your phone, right?
9　A. Yes.
10　Q. How long did you hold it up?
11　A. Oh, I don't remember.
12　Q. More than 10 seconds?
13　A. Just a few seconds.
14　Q. Did you say anything when you held it up?
15　A. I don't believe I did.
16　Q. Did you think that was a violation of
17　Shell's Code of Conduct at the time that you did it?
18　A. No, not at the time I did it.
19　Q. Do you now?
20　A. No, I do not.
21　Q. Did you think at the time you did it that
22　it was a violation of Shell's policies?
23　A. No.
24　Q. How about now?

Page 118

1　A. No.
2　Q. Did you show Jesse a picture of yourself on
3　any other occasion?
4　A. I don't believe so.
5　Q. Show anyone else that picture?
6　　　MR. TUCKER: "That picture" referring
7　to the picture --
8　　　MS. GURMANKIN: That he showed at the
9　time.
10　A. Of my shirt off?
11　Q. (BY MS. GURMANKIN) Yeah.
12　A. No, I don't believe so.
13　Q. Do you still have that picture on your
14　phone?
15　A. I do not.
16　Q. Why not?
17　A. I probably swapped phones then, and it
18　just -- the picture didn't save I'm going to guess.
19　Q. Do you have -- do you know why the picture
20　is no longer on your phone?
21　A. If I got a new phone, the pictures didn't
22　translate to the new phone.
23　Q. Is that why or are you guessing?
24　A. I'm guessing.

Page 119

1　Q. Okay. Do you know why the picture is no
2　longer on your phone?
3　A. I do not know why -- exactly why the
4　picture is not on my new phone.
5　Q. Did you ever delete it?
6　A. I don't recall doing that.
7　Q. Were you ever asked to send anyone at Shell
8　the picture?
9　A. No.
10　Q. And you testified earlier that you thought
11　you had your current phone since around 2013.
12　A. That's correct.
13　Q. Okay. So it wouldn't have happened -- so
14　it wouldn't have been lost with you swapping out a
15　new phone, right?
16　A. This was my personal phone.
17　Q. So the one from 2013 was your work phone?
18　A. Yes, ma'am.
19　Q. Okay. That Shell pays for?
20　A. Correct.
21　Q. And you pulled out -- you showed the
22　picture on your personal phone?
23　A. Correct.
24　Q. Do you still have the one now that you had

Page 120

1　as of 2015?
2　A. I do not know that.
3　Q. You don't know how long you have had your
4　current one?
5　A. No, I don't.
6　Q. Have you ever checked to see if that
7　picture is on your phone?
8　A. I've reviewed my pictures, and I know it's
9　not on there.
10　Q. When did you first -- did you review your
11　pictures specifically to see if that picture was on
12　there?
13　A. I did, yes.
14　Q. Okay. When was that?
15　A. During the investigation.
16　Q. Was that on your own initiative that you
17　did that?
18　A. I wanted to show them what the picture
19　showed, yes.
20　Q. Did you tell anyone at Shell that you had
21　done this, that you had checked on your phone but
22　the picture was no longer there?
23　A. I did.
24　Q. Who did you tell?

30 (Pages 117 to 120)

Page 121

1        MR. TUCKER:  Other than counsel, who
2    did you tell?
3        A.  I believe I told Megan -- I can't pronounce
4    her last name.
5        Q.  (BY MS. GURMANKIN)  Kloosterman?
6        A.  Yeah.
7        Q.  Anyone else?
8        A.  No.
9        Q.  And you told her in the context of the
10   investigation?
11       A.  Correct.
12       Q.  Did you do anything to see if you could
13   retrieve the picture?
14       A.  No, I don't believe I did.
15       Q.  Was that a picture you had taken?
16       A.  Yes, selfie.
17       Q.  Did you ever tell Jesse that she makes good
18   money for a woman or words to that effect?
19       A.  I did.
20       Q.  When was that?
21       A.  I believe it was during her mid-year.
22       Q.  Which year?
23       A.  2016.
24       Q.  Tell me the context in which you said that.

Page 122

1        A.  So she was, you know, talking about money,
2    you know, wished she had, you know, made more money.
3    And I just referenced, I said, "Look, you're young
4    in your career.  My wife is an RN and doesn't make
5    as much money as you do right now."
6        It was just -- it was more to console
7    her with a relationship that we had back and forth.
8    I mean, this is why I said what I did, right?  So
9    just trying to make sure that she understood like,
10   you know, this is a good thing.  You are going to
11   keep growing in the company.  So that was the
12   contents.
13       Q.  So tell me what you said.
14       MR. TUCKER:  Other than what he's just
15   said?
16       A.  I just -- yeah.
17       Q.  (BY MS. GURMANKIN)  What did you say about
18   her making good money for a woman?
19       A.  That was it.  I said, "For a woman you are
20   making good money."  And then I referenced my wife
21   as a reference point.  She's an RN and doesn't make
22   the money that she was making at the time.
23       Q.  Why would you compare it -- did your wife
24   work at Shell at the time?

Page 123

1        A.  No.
2        Q.  So why would you say, "For a woman you are
3    making good money"?  Why did you put it in that
4    context?
5        MR. TUCKER:  Objection.  He gave a
6    prior answer to -- as the whole context of the
7    conversation.
8        Q.  (BY MS. GURMANKIN)  Why did you qualify it
9    with "for a woman"?
10       A.  There is no specific reason why I did that.
11       Q.  Did you think women should be grateful for
12   making any money that they were able to make?
13       MR. TUCKER:  Objection.
14       A.  Yeah, I -- say the question again.
15       Q.  (BY MS. GURMANKIN)  Yeah.  Did you think
16   women should just be -- did you think Jesse as a
17   woman should just be grateful for having a job at
18   Shell?
19       A.  No, absolutely not.
20       Q.  So why would you qualify telling her "You
21   are making good money for a woman"?  Why wouldn't
22   you just say, You are making good money as a
23   maintenance analyst?
24       MR. TUCKER:  Objection.

Page 124

1        You may answer.
2        A.  Poor choice of words.
3        Q.  (BY MS. GURMANKIN)  Why wouldn't you just
4    say, You are making good money for a Shell employee?
5        A.  Again, poor choice of words.
6        Q.  Did you ever tell a man at Shell, You are
7    making good money for a man?
8        A.  I don't recall.
9        Q.  Do you agree that that comment is sexist?
10       A.  No.
11       Q.  Why didn't you compare Jesse to a male
12   employee at Shell when you were talking about her
13   compensation?
14       A.  As in what?
15       Q.  When you are talking about her
16   compensation, why wouldn't you compare her to a male
17   employee at Shell instead of a female employee who
18   doesn't work at Shell?
19       A.  Well, again, other than the poor decision,
20   I thought it was just relevant.  I wanted her to
21   understand what my wife was making and what she was
22   making, just kind of comparing the two.  Just trying
23   to help for that -- you know, because we had that
24   relationship back and forth, I just wanted her to

31 (Pages 121 to 124)

Page 125

1 know, like, this is okay.  Let's just work through
2 it.
3 　　　Q.  Well, how would it help her to feel better
4 about her compensation to know what your wife, who
5 doesn't work at Shell, was making?
6 　　　A.  I was just thinking it was in comparison.
7 That's all.
8 　　　Q.  Did you -- was there a male employee that
9 you knew of who was making less than Jesse and doing
10 her responsibilities?
11 　　　A.  I believe there is, yes.
12 　　　Q.  Then why didn't you use that person as an
13 example instead of a woman who worked outside of the
14 company?
15 　　　A.  Well, it's not company policy to share, you
16 know, who makes what with the company.  So my wife,
17 being noncompany related, it just made sense to me
18 to bring that up.
19 　　　Q.  You could have just said there are other
20 maintenance analysts who are earning less than you.
21 That wouldn't give up any secret information, would
22 it?
23 　　　MR. TUCKER:  Objection.
24 　　　Q.  (BY MS. GURMANKIN)  Right?

Page 126

1 　　　MR. TUCKER:  Objection; he said why he
2 can't -- couldn't say that, Counsel.
3 　　　MS. GURMANKIN:  That's not my question.
4 　　　Q.  (BY MS. GURMANKIN)  You could have said,
5 There are other maintenance analysts making less
6 than you, right?
7 　　　MR. TUCKER:  No.  Objection.
8 　　　You may answer.
9 　　　A.  There was no other maintenance analysts
10 that I knew of making less than her.  I was
11 referencing another individual doing a similar role
12 that made less than she did.
13 　　　(BEGINNING OF CONFIDENTIAL TESTIMONY.)
14
15
16
17
18
19
20
21
22
23
24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17 　　　(END OF CONFIDENTIAL TESTIMONY.)
18 　　　Q.  When you had told Jesse that she makes good
19 money for a woman, did you think that was a
20 violation of Shell's Code of Conduct?
21 　　　MR. TUCKER:  We can agree that starting
22 this question, the confidentiality portion is no
23 longer marked.
24 　　　MS. GURMANKIN:  Correct.  Thank you.

Page 128

1 　　　MR. TUCKER:  Can you read back the
2 question so he can answer, please?
3 　　　MS. GURMANKIN:  I got it.
4 　　　Q.  (BY MS. GURMANKIN)  At the time that you
5 told Jesse, "For a woman you are making good money,"
6 did you think that was a violation of Shell's Code
7 of Conduct?
8 　　　A.  No.
9 　　　Q.  Do you now?
10 　　　A.  No.
11 　　　Q.  At the time you said it, did you think it
12 was a violation of Shell's policies?
13 　　　A.  No.
14 　　　Q.  Do you now?
15 　　　A.  No.
16 　　　Q.  Did you ever tell Jesse that she works well
17 with male employees because she's a girl?
18 　　　A.  I have.
19 　　　Q.  When was that?
20 　　　A.  I don't -- I can't remember the date.
21 　　　Q.  Do you remember the year?
22 　　　A.  No, not -- no.
23 　　　Q.  Was that after she was full-time?
24 　　　A.  I don't even recall that.

32 (Pages 125 to 128)

Page 129

1    Q.  Okay.  What's the context?
2    A.  So she -- to get more work out of some of
3  the field crews out there in the field -- so most of
4  those guys who come in, you know, they are just
5  grumpy in nature.  And, you know, she would always
6  come to me like, you know, "Hey, Tim Brueilly would
7  do this for me, but he wouldn't do it for you."
8        And so I said, "Well, that's because
9  you are a woman.  They are going to be nicer to you
10  than they are me."
11    Q.  Did you call her a girl or a woman?
12    A.  I probably said "woman," but I don't
13  recall.
14    Q.  Could have been girl?
15    A.  Could have been but I'm thinking it was a
16  woman, but...
17    Q.  And why did you think she could get more
18  out of the guys than you because of her sex?
19    A.  Because she just kind of flirted with them,
20  was super nice to them, and they just bought into
21  that.
22    Q.  Was her being super nice flirting, or are
23  they two different things, her flirting and being
24  super nice?

Page 130

1    A.  So it's -- I would say flirting.
2    Q.  Okay.  So super nice was incorporated into
3  the flirting?
4    A.  Yes.
5    Q.  Other than being super nice, any other ways
6  in which she flirted?
7    A.  As in what?
8        MR. TUCKER:  Hold on.  Objection to
9  your characterization of what he said.
10    Q.  (BY MS. GURMANKIN)  Other than being super
11  nice, any other ways that she flirted?
12        MR. TUCKER:  That's not what
13  he -- that's a mischaracterization of what he said.
14        MS. GURMANKIN:  I don't think so but --
15        MR. TUCKER:  It is so.
16        MS. GURMANKIN:  Okay.
17    Q.  (BY MS. GURMANKIN)  You said she flirted,
18  right?
19    A.  Correct.
20    Q.  And you also said she was super nice?
21    A.  Correct.
22    Q.  And you said her being super nice was how
23  she flirted?
24    A.  Correct.

Page 131

1    Q.  Okay.  Other than being super nice, were
2  there any other ways in which she flirted?
3    A.  I still don't understand what you are
4  asking me.
5    Q.  How was she super nice?  How did she flirt
6  in a way that made her super nice?
7    A.  So she would -- if the guys would come up,
8  she would, you know, smile real big, you know, bat
9  her eyes at them and just ask them, you know, what
10  she wanted from them.  You know, ask something from
11  them.
12    Q.  So she'd smile real big?
13    A.  Yes.
14    Q.  Bat her eyes?
15    A.  Yes.
16    Q.  And ask them what they wanted?
17    A.  Yeah, ask, you know, whatever she was
18  wanting them to do.
19    Q.  Was that last part her flirting?
20    A.  I take it as flirting, yes.
21    Q.  Why?
22    A.  No particular reason.
23    Q.  Because she's a woman?
24    A.  Just because being extremely nice, getting

Page 132

1  them guys to do what they want.  But not because
2  she's a woman, just because that's what it is.
3    Q.  During your time as a supervisor at Shell,
4  have you gotten your direct reports to do what you
5  wanted them to do?
6    A.  Yes, ma'am.
7    Q.  I mean, that's part of being a manager?
8    A.  Yes.
9    Q.  Okay.  Do you do that by flirting?
10    A.  No.
11    Q.  Do you only call it flirting when women do
12  that?
13    A.  No.
14    Q.  Anyone else that she flirted with?
15    A.  Excuse me?
16    Q.  Anyone else that she flirted with at Shell?
17    A.  That she flirted with?
18    Q.  Let me ask you this way:  Was it all male
19  employees that she flirted with?
20    A.  Pretty much.
21    Q.  You?
22    A.  Yes.
23    Q.  How did she flirt with you?
24    A.  Did she flirt with me?

33 (Pages 129 to 132)

Page 133

1      Q.  You said yes.  How did she flirt with you?
2      A.  She would just try to get -- she would do
3  the same thing.  Bat her eyes, "Please, Will."  Just
4  kind of, you know, just bat her eyes, smile real
5  big.
6      Q.  Any other ways in which she flirted with
7  you?
8      A.  No.
9      Q.  Did you think that she wanted to have a
10  romantic or sexual relationship with you?
11      A.  I don't believe so.
12      Q.  Did you think she was acting
13  inappropriately?
14      A.  No.
15      Q.  You ever see guys flirt at Shell or just
16  Jesse?
17      A.  Oh, I'm sure guys do, but I don't recall
18  the guys doing it.
19      Q.  Okay.  You just recall Jesse?
20      A.  Yes.
21      Q.  Any other female employees who you saw
22  flirting at Shell?
23      A.  No.
24      Q.  How about contractors?

Page 134

1      A.  No.
2      Q.  And other than smiling real big and batting
3  her eyes, any other ways that she flirted with you?
4      MR. TUCKER:  Objection.  He also said,
5  and it's reflected on the video record but not on
6  the Court Reporter's record, she -- he mimicked a
7  sing-songy voice in which she spoke to him.  It's
8  shown on the video but not on the Court -- not on
9  the Court Reporter's record.  So I think that's a
10  mischaracterization.
11      Q.  (BY MS. GURMANKIN)  Any other ways that she
12  flirted with you?
13      A.  Not that I can think of.
14      Q.  Did she ever touch you?
15      A.  Not that I recall.
16      Q.  Did she ever touch a male employee that you
17  saw?
18      A.  Did I ever touch a male employee?
19      Q.  No.  Did she ever touch a male employee
20  that you saw?
21      A.  I don't recall that.
22      Q.  Did she ever dress inappropriately, in your
23  opinion?
24      A.  In my opinion, no.

Page 135

1      Q.  Did you ever see her wear tight pants?
2      A.  Yes.
3      Q.  Did you think that was inappropriate?
4      A.  No.
5      Q.  Did you ever see her shirts that showed off
6  her cleavage?
7      MR. TUCKER:  Go ahead.
8      A.  I don't recall.
9      Q.  (BY MS. GURMANKIN)  All right.  And what
10  did she say when you said this to her, that she
11  works well with the male employees because she's a
12  girl or woman?
13      A.  I don't recall specifically, but I know she
14  laughed and said, "That's right."  Something to that
15  effect, that she does do that.
16      Q.  At the time she reported directly to you?
17      A.  Correct.
18      Q.  Anyone else around when you said that?
19      A.  I don't recall.
20      Q.  Did you think it was a violation of Shell's
21  Code of Conduct at the time that you said it?
22      A.  No.
23      Q.  How about now?
24      A.  No.

Page 136

1      Q.  Did you think it was a violation of Shell's
2  policies at the time you said it?
3      A.  No.
4      Q.  How about now?
5      A.  No.
6      Q.  Did you ever touch Jesse?
7      A.  Inadvertently, yes.
8      Q.  How many times?
9      A.  I don't know that.
10      Q.  More than ten?
11      A.  I don't know that.
12      Q.  Okay.  When?
13      A.  When what?
14      Q.  Did you touch her inadvertently.
15      A.  I don't even recall specifics.
16      Q.  Where did you touch her inadvertently?
17  Where on her body?
18      A.  Again, I don't recall.  I don't know.
19      Q.  But you recall it was inadvertent?
20      A.  So I know that I talk with my hands a lot.
21  And so if I was talking, I could have inadvertently
22  touched her on the arm or hand.
23      Q.  All right.  So you testified that you
24  touched her inadvertently.  Do you have a

Page 137

1    recollection of actually touching her inadvertently
2    or not inadvertently?
3        A.  No.
4        Q.  Okay.  So as you sit here today, you have
5    no recollection of ever touching her, correct?
6        A.  Correct.
7        Q.  Did you ever ask her something to the
8    effect of why she was not wearing shorts?
9        A.  I did.
10       Q.  Okay.  When was that?
11       A.  I think it was a 2016 golf event, golf
12   charity event.
13       Q.  Where was that?
14       A.  In Tioga at the golf course.
15       Q.  And what was the context in which you said
16   something to the effect of why she's not wearing
17   shorts?
18       A.  She had talked about it being hot that day
19   and she had on pants.  Said she was going to get
20   swamp ass.  And so I could have mentioned, you know,
21   "Why don't you put on shorts?"
22       Q.  Did you say that?
23       A.  What I told Megan is, it sounds like
24   something I would say, but I'm not saying I did say

Page 138

1    it.  I'm just saying I could have said that.
2        Q.  Why did that sound like something you would
3    say?
4        A.  Because it doesn't -- it just doesn't sound
5    off, so -- I don't recall saying it.  But, again,
6    when she was asking me that, I could have said.
7        Q.  But you recall Jesse saying to you that she
8    was going to get swamp ass --
9        A.  That's correct.
10       Q.  -- because she was hot?
11           MR. TUCKER:  Please let her finish.
12           THE WITNESS:  I'm so sorry.  My
13   apologies.
14       Q.  (BY MS. GURMANKIN)  You just don't have a
15   specific recollection of whether she -- whether you
16   said anything to her?
17       A.  That's correct.
18       Q.  At that event do you know if
19   anyone -- well, was anyone around when she said to
20   you that it was hot and she was going to get swamp
21   ass?
22       A.  I don't remember if anyone else was around.
23   There could have been, but I don't recall.
24       Q.  Okay.  Do you know if anyone took a picture

Page 139

1    of Jesse -- Jesse's backside at that event?
2        A.  I do not know that.
3        Q.  Hondo never told you he did that?
4        A.  No.
5        Q.  And you never saw anyone do it?
6        A.  No.
7        Q.  Did you ever tell Jesse that you thought
8    about her while you were showering?
9        A.  No.
10       Q.  Did you ever tell anyone that at Shell?
11       A.  No.
12           MR. TUCKER:  Hold it.  Told anyone that
13   he thought about Jesse?  Is the question did he ever
14   tell anyone at Shell that he thought about Jesse --
15           MS. GURMANKIN:  No.
16           MR. TUCKER:  -- while he was
17   showering?
18       Q.  (BY MS. GURMANKIN)  Did you ever tell Jesse
19   that you thought about her while you were showering?
20       A.  No.
21           MR. TUCKER:  Objection; asked and
22   answered.
23       Q.  (BY MS. GURMANKIN)  Did you ever tell
24   anyone at work that you thought about them while you

Page 140

1    were showering?
2        A.  No.
3        Q.  Did you ever tell anyone at work that you
4    thought about work issues while you were in the
5    shower?
6        A.  Yes.
7        Q.  Who did you say that to?
8        A.  My group.
9        Q.  Including Jesse?
10       A.  Including Jesse.
11       Q.  What was the context of that?
12       A.  We were having a little team meeting that
13   morning.  I came in.  Everyone was kind of already
14   huddled around.  And I said, "Guys, this morning I
15   was thinking about" whatever it was "in the shower
16   this morning, and this is what I want to try to do."
17           So it was all in the contents of work
18   related but that was it.
19       Q.  When was this?
20       A.  I don't remember the date.
21       Q.  What was the year?
22       A.  I don't even remember the year.
23       Q.  Was it just your group in the meeting?
24       A.  Yes.

35 (Pages 137 to 140)

Page 141

1     Q. What was the meeting about?
2     A. Work related. I don't remember a topic.
3     Q. What was the work issue that you were
4  thinking about in the shower?
5     A. I don't remember that, either.
6     Q. Okay. So you recall you going into the
7  meeting, your whole team is sitting there. You say
8  this comment, you don't recall what the work
9  issue was that was the topic of the meeting or what
10  work issue you were thinking about in the shower; is
11  that correct?
12     A. That's correct.
13     Q. Did you ever make cat-claw gestures and
14  hissing noises?
15     A. I have.
16     Q. At work?
17     A. Yes.
18     Q. In front of Jesse?
19     A. Yes.
20     Q. How many times?
21     A. I don't recall that.
22     Q. And what did it mean when you did that?
23     A. It meant that, you know, somebody was
24  either arguing, and I was trying to make light of

Page 142

1  it. That's it.
2     Q. Was that when females were disagreeing or
3  arguing?
4     A. Oh, no. It was males, females, whoever.
5     Q. And what did you mean when you made
6  cat-claw gestures and hissing noises?
7     A. Just that, you know, here we are arguing
8  again. So kind of like a tiger trying to get out of
9  a cage is my kind of analogy.
10     Q. You are suggesting that it was a cat fight?
11     A. No. I'm just saying that this was, you
12  know, everyone's on defense. So that was my gesture
13  for it.
14     Q. How did that become your gesture for people
15  are arguing?
16     A. Just what I did. I don't know.
17     Q. You ever hear the term "cat fight"?
18     A. Yes.
19     Q. Okay. And what have you heard that to
20  refer to?
21     A. People are just cat fighting.
22     Q. You have heard that to refer to women
23  arguing or fighting?
24     A. It could be both, men or women.

Page 143

1     Q. Have you heard that to refer to both men
2  and women arguing --
3     A. Yeah.
4     Q. -- or fighting?
5     A. Yes.
6     Q. When have you heard it used to refer to men
7  who were arguing or fighting?
8     A. Just because they would be yelling and
9  screaming at one another in particular is what I'm
10  thinking. I remember someone actually saying it was
11  like a cat fight in there.
12     Q. My question was, when have you heard the
13  term "cat fight" to refer to men who were fighting
14  or arguing?
15     A. I don't --
16     MR. TUCKER: Objection; asked and
17  answered.
18     You may answer it again.
19     A. (Continuing.) Yeah. I -- I don't recall a
20  specific day.
21     Q. (BY MS. GURMANKIN) Was it in your
22  employment at Shell?
23     A. I don't recall.
24     Q. Do you recall the context of you hearing

Page 144

1  "cat fight" referring to men fighting or arguing?
2     MR. TUCKER: Objection; asked and
3  answered.
4     A. No, I don't.
5     Q. (BY MS. GURMANKIN) When you did that --
6  well, strike that.
7     Have you ever heard two women fighting,
8  that some men get turned on by that? Have you ever
9  heard that?
10     MR. TUCKER: Objection; relevancy.
11     A. No.
12     Q. (BY MS. GURMANKIN) Never heard that?
13     A. No.
14     Q. Did you think it was a violation of Shell's
15  Code of Conduct for you to do that at the time that
16  you did it?
17     A. No.
18     Q. And you did that multiple times, right?
19     A. Probably. I don't have a count, but I
20  would assume I did.
21     Q. Did you think -- as you sit here today, do
22  you think it's a violation of Shell's Code of
23  Conduct?
24     A. No.

Page 145

1    Q.  Did you think it was a violation of Shell's
2  policies at the time that you did it?
3    A.  No.
4    Q.  How about now?
5    A.  No.
6    Q.  Did you ever say to anyone at Shell other
7  than Jesse -- comment on her clothes or say, "Did
8  you see what she's wearing today?"
9    A.  Not that I recall.
10   Q.  Did you ever tell -- well, strike that.
11       Who was Wayne Fletcher?
12   A.  He's an HSE tech.
13   Q.  Did you work with him?
14   A.  I have worked with him, yes.
15   Q.  Did he report to you?
16   A.  No.
17   Q.  Did you ever tell Wayne Fletcher to tell
18  Jesse that she was pretty in order to get her to do
19  some work for him that he wanted her to do?
20   A.  No.
21   Q.  Is Wayne Fletcher an honest person, in your
22  opinion?
23   A.  From what I know, yes.
24   Q.  Did you ever ask Jesse about her personal

Page 146

1  life?
2    A.  Yes.
3    Q.  In what way?
4    A.  Well, she would voluntarily give her
5  personal life details up, and in our group we would
6  just talk back and forth about different things, and
7  that's just how things came up.
8    Q.  What personal details --
9        MR. TUCKER:  Can we stop?  I have to
10  make a call.
11       THE VIDEOGRAPHER:  We are off record.
12  Time is 11 a.m.
13       (A recess was taken.)
14       THE VIDEOGRAPHER:  We are back on
15  record.  Time is 11:03 a.m.
16   Q.  (BY MS. GURMANKIN)  What personal things
17  did Jesse voluntarily give up?
18   A.  So boyfriend-related stuff, house fires,
19  car issues, several things.
20   Q.  Anything else?
21   A.  Parties, you know, getting drunk, yeah,
22  things like that.
23   Q.  What did she say that was boyfriend
24  related?

Page 147

1    A.  Just she talked about her boyfriend and
2  some of the things that he does, you know, just
3  different things.  "He better make sure that the
4  lawn's mowed when I get there."
5        She talked about him having a back
6  surgery one time.  Things like that.  I mean, there
7  is a lot of topics I may not remember, but those are
8  a couple.
9    Q.  Okay.  Anything else you remember that was
10  boyfriend related?
11   A.  Not necessarily.
12   Q.  I don't know what that means.
13   A.  No.
14   Q.  House fires, what did she say about that?
15   A.  She had a breaker one time in her -- in her
16  house -- I can't remember if it was inside or
17  outside -- catch on fire.
18   Q.  Anything else about that?
19   A.  No particulars.
20   Q.  Car issues?
21   A.  She always had car issues.  She drove
22  around in a little car, always breaking down,
23  needing either a ride to or from the place where she
24  got it worked on.  Had to, you know, take a longer,

Page 148

1  extended lunch or come in late dealing with it.
2    Q.  Parties and getting drunk?
3    A.  Yes.
4    Q.  What did she say about that?
5    A.  She told me a couple of times where -- one
6  story in particular, she was in California and was
7  hitting on some girl's boyfriend and she didn't
8  realize that and she was drunk and they beat her up
9  for it, or that girl particularly beat her up for
10  it.
11       Or she was driving one time drunk and
12  then she passed out and didn't remember where she
13  was at.  Just topics like that.
14   Q.  Anything else about partying and getting
15  drunk?
16   A.  Nothing I can think of right this second.
17   Q.  The part about the getting beat up in
18  California, when did she share that story?
19   A.  I can't remember exactly when -- when she
20  shared the story with us.
21   Q.  Was it just you or other people?
22   A.  It was me and a few other people.
23   Q.  Do you remember who?
24   A.  I believe it was Hondo and Mark Hoover.

37 (Pages 145 to 148)

Page 149

1    Q.  And the just getting drunk and passing out,
2  who did she share that with, just you?
3    A.  I can't recall who was there.
4    Q.  Was that about a particular party or just
5  generally?
6    A.  I think just in general.
7    Q.  And what was the context of that
8  discussion, or did she just come out and say that?
9        MR. TUCKER:  Which discussion?
10   Q.  (BY MS. GURMANKIN)  The passing out at
11  parties and getting drunk.
12   A.  It could just be in general, people
13  talking, or she just come over wanting to BS with me
14  and Hoover or Hondo.  It could just be out of the
15  blue.
16   Q.  You said "could be."  Was it?
17   A.  Typically, yes.
18   Q.  And how about the part about her getting
19  beat up in California?  What was that -- what was
20  the context of that?
21   A.  I think she was talking about when she was
22  going again.  She was telling us that we may have to
23  check up on her and -- because last time or a time
24  that she got beat up over there.  So...

Page 150

1    Q.  And I'm sorry if I asked you this, but you
2  don't recall when that was?
3    A.  No, I don't recall.
4    Q.  Other than her giving out --
5        MR. TUCKER:  When you say "don't
6  recall," are we talking about the first time she got
7  beat up or the time she went back to California and
8  said checking up on me?
9        MS. GURMANKIN:  Well, it's the same
10  conversation.
11   Q.  (BY MS. GURMANKIN)  She was telling you
12  about getting beat up in the context of her having
13  to go out to California and that you guys may need
14  to check up on her, right?
15   A.  Correct.
16   Q.  All right.  And you don't remember when
17  that discussion was?
18   A.  No, ma'am.
19   Q.  Other than these personal things that she
20  voluntarily gave up, did you ever ask her about her
21  personal life?
22   A.  Not that I recall.
23   Q.  Did you ever talk about anything personal
24  in the office?

Page 151

1    A.  Myself?
2    Q.  Uh-huh.
3    A.  Oh, I'm sure, yes.
4    Q.  Okay.  What?
5    A.  Oh, I don't recall any specifics.
6    Q.  Did you ever talk about your wife?
7    A.  Maybe.
8    Q.  Do you remember?
9    A.  No.
10   Q.  Ever talk about your marriage?
11   A.  Don't recall.
12   Q.  Ever talk about your sex life?
13   A.  I -- no.
14   Q.  Did you ever tell anyone at Shell that you
15  almost didn't get married because you kissed another
16  woman on the day of your wedding?
17   A.  I don't recall that.  That did happen but I
18  don't recall that.
19   Q.  You don't recall telling anyone at Shell
20  that?
21   A.  No.
22   Q.  Did you ever ask Jesse if she missed you
23  over the weekends?
24   A.  I have.

Page 152

1    Q.  How many times?
2    A.  I can't recall.
3    Q.  Why would you ask her that?
4    A.  Just a general statement that I made to
5  everybody.
6    Q.  So you asked everyone on your team if they
7  missed you over the weekend?
8    A.  Over the weekend or if I was off or on
9  vacation, yes.
10   Q.  Did you ask everyone at once, or would you
11  go around to each person separately and ask them?
12   A.  Both.
13   Q.  Did you do this every weekend or every time
14  you were off?
15   A.  Not every time, no.
16   Q.  And who else on your team other than Jesse
17  would you ask that question?
18   A.  Probably everyone on my team.
19   Q.  Are you guessing or do you remember asking
20  everyone on your team?
21   A.  I'm guessing.
22   Q.  Other than Jesse, as you sit here today,
23  can you think of any other person on your team who
24  you asked that?

38 (Pages 149 to 152)

Page 153

1    A. Yes.
2    Q. Who?
3    A. Ken Foreman, Dan Krise, Mark Hoover, Steve
4 Craig, Greg Larsen. Did I say Hondo?
5    Q. No.
6    A. Hondo, Tim Brueilly, Jill Brueilly, Calvin
7 Flynne. I'll stop at that.
8    MR. TUCKER: When you said "Hondo," you
9 meant Hondo Blakley?
10    THE WITNESS: Hondo Blakley, yes. I
11 apologize for not having said his last name.
12    Q. (BY MS. GURMANKIN) When you said you'll
13 stop at that, any others that you can think of or
14 that's it?
15    A. None that I can think of.
16    Q. And did you ask all of these people that
17 question every time you returned from the weekend or
18 returned from an absence?
19    A. I don't recall if it's every weekend or
20 not. So, no, I don't know that.
21    Q. Did you ask all these people, including
22 Jesse, that question equally or one more than the
23 others?
24    A. I would say equally.

Page 154

1    Q. Did you ever tell Jesse you thought it was
2 funny when she got into disagreements with other
3 employees who were female?
4    A. No.
5    Q. Did you think that was funny?
6    A. No.
7    Q. So when Jesse was a contractor, you had a
8 good relationship with her, correct?
9    A. I believe so.
10    Q. Okay. And initially when she starts
11 full-time you have a good on relationship with her?
12    A. I thought so, yes.
13    Q. And at some point she pulls back and stops
14 engaging with you in the same way that she had?
15    A. I don't recall that.
16    Q. Did that happen at any point before your
17 meeting with Kloosterman?
18    A. No, not that I recall.
19    Q. Okay. At some point Hondo Blakley tells
20 you that Jesse has complained about you to him,
21 correct?
22    A. No, I don't recall that neither.
23    Q. Do you ever learn that from him prior to
24 your meeting with Kloosterman?

Page 155

1    A. No.
2    Q. And up until your meeting with Kloosterman,
3 your relationship with Jesse was the same as when
4 she was a contractor and then a full-time employee,
5 nothing changed?
6    A. No.
7    Q. Okay. Is that correct, nothing changed?
8    A. No, it's not correct.
9    Q. Okay. What's not correct about that?
10    A. So the day of the meeting that I pulled
11 Jesse in to have the one on, that's when our
12 relationship changed.
13    Q. Okay. Tell me about that.
14    When is that meeting?
15    A. Mid-November I believe it was, 15th, 16th.
16    Q. 2016?
17    A. Yes. I was up at the group. We were all
18 in a group. They were having some kind of
19 conversation, something was said and Jesse just, you
20 know, went off on I believe it was Jeremy Greene.
21 And everybody just kind of looked at me. Because
22 they'd been -- they'd been complaining that she's --
23 she's had an attitude. So they just kind of looked
24 at me like, are you going to take care of this or

Page 156

1 not?
2    So I don't know the contents of what I
3 did right then, but I think I pinged her or I
4 emailed her, something, said, "Hey, can you meet me
5 in Conference Room 120A. We need to have a little
6 discussion."
7    Q. All right. You said prior to that time
8 when she went off on Jeremy Greene in around
9 mid-November 2016, everyone had been complaining
10 that she's got an attitude?
11    A. That she has an attitude.
12    Q. Okay. Who had been complaining about that?
13    A. Specifically Dan, Ken and Jeremy.
14    MR. TUCKER: Can you give full names,
15 please?
16    A. Dan Krise, Jeremy Greene and Ken Foreman.
17    Q. (BY MS. GURMANKIN) All right. What had
18 Dan Krise said to you about Jesse's attitude?
19    A. Just that she has -- she's just
20 quick-tempered, just moody attitude. And also added
21 Matt Skolny to that list, as well.
22    Q. So Krise says she's got a quick temper, you
23 said?
24    A. Correct.

39 (Pages 153 to 156)

Page 157

1 Q. Okay. And how many times did he talk to
2 you about this before that mid-November 2016
3 incident?
4 A. I don't remember exact time, but it was --
5 it was several times.
6 Q. Okay. All after she's a full-time employee
7 or some before she's a full-time employee?
8 A. I don't recall that.
9 Q. You don't recall one way or the other?
10 A. That is correct.
11 Q. Okay. Anything other than she's got a
12 quick temper?
13 A. And that she's moody.
14 Q. He give you any examples?
15 A. I didn't need examples. I knew what he was
16 talking about.
17 Q. Did he give you any?
18 A. No.
19 Q. Okay. Did you ask him for any?
20 A. I don't recall.
21 Q. What was he talking about?
22 A. Her quick temper and moodiness.
23 Q. You said you didn't need examples; you knew
24 what he was talking about.

Page 158

1 What specifically was he talking about?
2 A. That if you are in a group session and you
3 say the wrong thing, she just flies off the handle
4 and yells at you or she doesn't talk to anyone
5 because she doesn't feel like it for the day, or you
6 try to help her out and she gets upset because you
7 are trying to help her. Those are examples of what
8 I'm talking about.
9 Q. How many times did this happen before that
10 mid-November 2016 incident?
11 MR. TUCKER: With -- with whom? With
12 her or with other employees or other employees
13 because the "it" -- I need the "it" defined, the
14 pronoun "it."
15 MS. GURMANKIN: Where she flies off the
16 handle, yells, does the things that you just
17 testified to.
18 MR. TUCKER: To him or to other
19 employees?
20 MS. GURMANKIN: Period.
21 A. Well, when I'm around, it happened quite a
22 bit. Now, what happened when I wasn't around, I
23 don't know. They would just come to me and tell me,
24 you know.

Page 159

1 Q. (BY MS. GURMANKIN) Okay. So how many
2 times did you see it prior to mid-November 2016?
3 A. I can't give an exact time -- exact amount.
4 It was a lot.
5 Q. More than 20?
6 A. It would -- oh, yes.
7 Q. Okay. More than 50?
8 A. Let's say 50.
9 Q. Okay. And was this just to you one-on-one
10 or not necessarily? You just saw it?
11 A. No. This was in the group settings.
12 Q. Okay. Any one-on-ones of those 50 times?
13 A. Oh, sure.
14 Q. How many?
15 A. I'd say 20.
16 MR. TUCKER: Are you guessing?
17 THE WITNESS: I am guessing, Joe. I'm
18 sorry. I'm sorry, Joe.
19 Q. (BY MS. GURMANKIN) That's fine.
20 A. It is approximate.
21 Q. Okay. That's fine.
22 A. You are asking me a question that I just
23 can't answer.
24 Q. That's fine. Did you document any of these

Page 160

1 50 times?
2 A. In her year-end evaluations and mid-years,
3 yes.
4 Q. Did you ever talk to anyone in HR?
5 A. About?
6 Q. Her doing this.
7 A. No.
8 Q. Did you ever talk to Steve Craig about it,
9 again, prior to this mid-November 2016 conversation?
10 A. I don't believe so.
11 Q. How come?
12 A. That's a supervisor-employee coaching
13 event. That doesn't need to be escalated.
14 Q. So you didn't think she was acting
15 inappropriately in any way?
16 A. I didn't say that.
17 Q. Did you?
18 A. I thought that her -- her attitude needed
19 to be calmed down a bit. So inappropriately
20 probably not, but people just didn't like coming to
21 her because of the -- her attitude that she was
22 giving them.
23 Q. You didn't think it was enough to warrant
24 escalating it to HR or your supervisor, correct?

Page 161

1      A. That's correct.
2      Q. All right. What does Jeremy Greene tell
3  you about this, the complaints about her attitude?
4      A. Just that -- the same thing as Dan, almost
5  identical. That's what he complained about.
6      Q. Moody and quick-tempered?
7      A. Correct.
8      Q. Did they both use those words?
9      A. I'm guessing but --
10      MR. TUCKER: Don't. Don't guess.
11      Q. (BY MS. GURMANKIN) Do you remember?
12      A. I don't recall.
13      THE WITNESS: That's why I said it
14  first, Joe.
15      Q. (BY MS. GURMANKIN) But you call the gist
16  that that's what Greene was complaining about, as
17  well?
18      A. Correct.
19      Q. How many times does Greene come to you
20  about Jesse prior to mid-November 2016?
21      A. I don't recall.
22      Q. More than ten?
23      A. I -- I don't recall.
24      Q. Multiple?

Page 162

1      A. Multiple times.
2      Q. All right. Foreman, what did he complain
3  about Jesse's attitude?
4      A. Same thing as -- as Dan -- as Dan Krise and
5  Jeremy Greene.
6      Q. Quick-tempered and moody?
7      A. Yes.
8      Q. And am I correct that you don't recall
9  whether he used those words, but that was the gist?
10      A. That's correct.
11      Q. Matt Skolny?
12      A. Same thing.
13      Q. Did any of them give you examples?
14      A. They probably did.
15      Q. Do you recall if they did?
16      A. Well, I can -- I can recall one example.
17      Q. Okay. Tell me.
18      A. So Ken Foreman -- actually, Jesse had
19  brought it up. Ken Foreman was -- was trying to
20  help Jesse, and Jesse lost her cool and told Ken she
21  didn't want him in her business and that she -- he
22  needed to manage his own business.
23      And then supposedly Ken said, Well,
24  Will told me to do this, come help you, which I did

Page 163

1  not say.
2      And so Jesse had called me on the -- on
3  the phone or texted me and said, "I just got to
4  leave."
5      And I said, "For what?"
6      "Because I'm just pissed off."
7      I said, "Why?"
8      "I can't talk right now."
9      And I said, "Well, I want -- I want an
10  answer. Like, I want to know why you are leaving."
11      That's one example of what Ken would
12  come to me about.
13      Q. Okay. Any other examples that Ken came to
14  you about?
15      A. Not that I recall.
16      Q. And did you --
17      MR. TUCKER: Hold on a second. Bear
18  with me one second, Counsel.
19      MS. GURMANKIN: Okay.
20      Q. (BY MS. GURMANKIN) Did you ask Jesse
21  whether Ken had done anything to warrant that
22  reaction from her?
23      A. Say that question one more time.
24      Q. Sure. Did you ever ask Jesse whether Ken

Page 164

1  had done something to provoke that reaction?
2      MR. TUCKER: Other than what he
3  testified to a moment ago?
4      Q. (BY MS. GURMANKIN) Well, you didn't say
5  specifically whether he did anything.
6      Did you ever ask Jesse if Foreman did
7  anything?
8      A. Well, that was the contents. He was trying
9  to help her do something work related.
10      Q. Okay. So is that what you understood Jesse
11  was so upset about, that Foreman was trying to help
12  her?
13      A. Correct.
14      Q. Okay.
15      A. And that Will said to help her. Will said
16  I was up-- Ken told me -- this is coming from
17  Jesse. Ken told me that you said me, as Will, he
18  needed to come help me do this, whatever this work
19  was.
20      Q. Okay.
21      A. That's what got her so upset.
22      Q. Okay. Did you get this first from Jesse
23  before Foreman?
24      A. I got that from Jesse.

Page 165

1  Q. Okay. Had you told Foreman that?
2  A. I went to Foreman about that, yes.
3  Q. Had you told Foreman --
4  A. No.
5  Q. Okay.
6  A. I apologize for interrupting, but no.
7  Q. All right. So just to be clear, you had
8  not told Foreman what Jesse said that Foreman told
9  her?
10 A. Say it again.
11 Q. About you telling -- you com- -- you said
12 that Jesse told you that Foreman went to help her
13 because he said he was instructed by you to go help
14 Jesse with this work task?
15 A. Correct.
16 Q. And you had not told Foreman that, correct?
17 A. That's correct.
18 Q. Did you ask Foreman whether he said that to
19 Jesse?
20 A. Yes.
21 Q. And he said what?
22 A. He said, "I didn't say that."
23 Q. Did he say he said something like that?
24 A. He didn't allude it. He said, "I didn't

Page 166

1  say that. I was just trying to help her."
2  Q. Okay. So did you conclude that Jesse was
3  lying?
4  MR. TUCKER: Objection.
5  A. No. I just concluded that between what he
6  said and what she assumed, somewhere was the truth.
7  And then I asked him, you know, "Make sure there is
8  no circumstance where you said I said something that
9  I didn't say."
10 Because my words to Jesse were, "If I
11 wanted Ken to help you, I would tell you that I
12 wanted Ken to help you. Or if I was upset with you,
13 I would tell you I'm upset with you because this
14 wasn't done. It wouldn't come through Ken through
15 me." That's my role to make that clear.
16 Q. (BY MS. GURMANKIN) All right. So you
17 never concluded that either Jesse or Foreman were
18 lying in connection with that issue, correct?
19 A. I just -- I think the truth was somewhere
20 in the middle, and I just don't know where.
21 Q. All right. Did you conclude that Jesse
22 acted inappropriately in any way?
23 A. During that particular incident? Not
24 inappropriately, but leaving because you are upset

Page 167

1  someone's trying to help you is not warranted. But
2  not inappropriately.
3  Q. You approved her leaving, though?
4  A. I did -- well, yes.
5  Q. All right. And any other examples that
6  your -- that you can discuss as you sit here today
7  other than that one?
8  MR. TUCKER: Examples of what?
9  MS. GURMANKIN: Of Jesse flying off the
10 handle, being moody, having a quick temper.
11 A. Even though it was in a banter way, they
12 came to me one time I remember specifically --
13 MR. TUCKER: Who's "they"?
14 THE WITNESS: Sorry.
15 A. The group. So I'm going to say Jeremy
16 Greene, Ken Foreman, Dan Krise came to me and said
17 in a joking way, though, but this is what -- how it
18 starts, you know, Jesse is mad at Jeremy for
19 something. I don't know why. And that she was
20 going to kill him, wrap him up in a carpet and throw
21 him off a bridge.
22 And so again, people are joking back
23 and forth, but I think this is how some of that
24 starts, when people get upset. But I remember that.

Page 168

1  And then Jesse getting upset. And I
2  don't know what she was upset for that particular
3  reason, but, you know, she was upset saying it, but
4  it ended up as a joke.
5  Q. (BY MS. GURMANKIN) All right. And what
6  was that in -- what was the context of that?
7  A. It was work related and I really don't
8  know. I just -- that was one of those times where I
9  just come up there and like, What's going on.
10 Q. They didn't think seriously that she was
11 going to kill Jeremy?
12 A. No, ma'am. No.
13 Q. And you -- and you are laughing because you
14 didn't think that, either, right?
15 A. Yeah. So I apologize for laughing. But
16 no, I knew she was not going to kill Jeremy Greene.
17 Q. Okay. Did you talk to her about that
18 issue?
19 A. No, because it was -- it was -- it was the
20 back-and-forth. I mean, this is how that
21 group -- this is how they did things. I mean,
22 they'd -- they'd argue and then they'd make up;
23 they'd argue and then make up. They were back and
24 forth. So it was a give-and-take between them, her,

42 (Pages 165 to 168)

Page 169

1  me. So...
2     Q. Same with the guys, right?
3     A. Same with the guys, yes.
4     Q. They would do that with each other?
5     A. Yes, ma'am.
6     Q. Did you ever get any complaints that any of
7  the guys had quick tempers?
8     A. Not quick tempers, no.
9     Q. And you get complaints that the guys were
10  moody?
11     A. No.
12     Q. Or would fly off the handle?
13     A. No.
14        (Exhibit 53 was marked.)
15     Q. (BY MS. GURMANKIN) Let's take a look at
16  what's been marked as Exhibit 53. This is Jesse's
17  performance appraisal from September 2015 through
18  December 2015.
19        Is this something that you completed?
20     A. Yes, looks like it. My name's there at the
21  bottom.
22        MR. TUCKER: Could you read the entire
23  document, please?
24        THE WITNESS: Yes.

Page 170

1     A. Okay.
2     Q. (BY MS. GURMANKIN) This is something that
3  you did?
4     A. Yes.
5     Q. You wrote what's included?
6     A. Yes.
7     Q. Is there anywhere where you talk in there
8  about her having a quick temper, being moody or
9  flying off the handle or yelling?
10     A. In the "Opportunities" stage it suggests
11  that her frustrations gets the best of her.
12     Q. So what you said there, and tell me if this
13  is what you are referring to, "Jesse can allow her
14  frustration with certain management decisions to
15  affect her ability to manage aspects of her role."
16        Is that what you were referring to?
17     A. Yes.
18     Q. All right. Anywhere else where you talk
19  about her having a quick temper, being moody or
20  flying off the handle or yelling?
21     A. No.
22     Q. You actually don't say any of that in here,
23  right?
24     A. That's correct.

Page 171

1        MR. TUCKER: When you say "say that,"
2  use those specific words, Counsel.
3     Q. (BY MS. GURMANKIN) Have you been shown --
4        MR. TUCKER: Did you assume that's what
5  she meant by that?
6        THE WITNESS: I did assume that, yes,
7  sir.
8        (Exhibit 54 was marked.)
9     Q. (BY MS. GURMANKIN) You have been shown
10  what's been marked as Exhibit 54.
11        What is this document?
12     A. 2015 end-of-year performance summary.
13     Q. Did you do that as part of the performance
14  reviews?
15     A. Uh-huh.
16     Q. Yes?
17     A. Yeah.
18     Q. For everyone?
19     A. Yes.
20     Q. Is there anywhere in here where you talk
21  about her having a quick temper, being moody or
22  flying off the handle or yelling?
23     A. No.
24     Q. All right. So going back to -- and prior

Page 172

1  to mid-November 2016 when you talked to Jesse in
2  Conference Room 120A about this incident where she
3  went off on Jeremy Greene, had you specifically
4  talked to her about her quick temper, being moody or
5  flying off the handle or yelling?
6     A. In her mid-years and reviews, yes.
7     Q. Okay. So as part of that 2015 review
8  discussion?
9        MR. TUCKER: Objection.
10     Q. (BY MS. GURMANKIN) That we -- as part of
11  the discussion about the 2015 review that we looked
12  at your appraisal, you had that conversation with
13  her?
14     A. I don't remember the specific topics, so I
15  can't say then. But I know it was brought up in
16  conversations.
17     Q. Any documentation of that?
18     A. No.
19     Q. How many times did you talk to her about
20  that?
21     A. That's unclear. I don't know.
22     Q. You don't remember?
23     A. I don't remember.
24     Q. All right. So in mid-November 2016 what

43 (Pages 169 to 172)

Page 173

1   does she go off on Jeremy Greene about?
2       A. I don't remember the topic. I just know
3   she lost her cool and that's all -- that's all I
4   remember about that.
5       Q. You saw it?
6       A. Yes.
7       Q. What happened? I mean, how did she go off
8   on Greene?
9       A. They were back and forth with something,
10  and I don't know if it was the carpet thing or what.
11  But then she just -- he said something that just
12  sparked something in her, and she lit into him.
13      Q. How did she light into him?
14      A. Just -- I can't remember verbatim, so I
15  don't even want to guess.
16      Q. Even if you can't tell me verbatim, what
17  did she do?
18      A. Yelled at him, told him something. But I
19  remember her yelling at him.
20      Q. Okay. Do you remember what she said?
21      A. No.
22      Q. Did she curse?
23      A. Did she curse?
24      Q. Uh-huh.

Page 174

1       A. I don't recall.
2       Q. Was he yelling?
3       A. No.
4       Q. How -- how long was she yelling?
5       A. It was just an outburst, quick.
6       Q. Did you end the meeting at that time?
7       A. It wasn't a meeting. I just went up there.
8   So --
9       Q. Okay.
10      A. But it abruptly stopped.
11      Q. Did you do anything at that point?
12      A. Not at that point.
13      Q. Okay. How come?
14      A. Because I didn't want to do it in front of
15  everyone. I wanted to do it in private.
16      Q. You could have asked her to come talk to
17  you, right?
18          MR. TUCKER: Objection.
19          You may answer.
20      A. I could have then, yes, but I didn't.
21      Q. (BY MS. GURMANKIN) Any explanation why
22  not?
23      A. I just didn't want to make a scene right
24  then.

Page 175

1       Q. All right. So when do you meet with her?
2   How long after this incident?
3       A. I don't remember exact timing. I think it
4   was pretty quick.
5       Q. That day?
6       A. That day, yeah.
7       Q. And how do you arrange the meeting? Do you
8   just grab her and pull her in?
9       A. I don't remember. No -- I don't remember.
10      Q. Okay. Is it just the two of you in the
11  meeting?
12      A. Yes.
13      Q. Did you talk to anyone before the meeting
14  about what you were going to say?
15      A. No.
16      Q. All right. So tell me about the meeting.
17      A. So I called her in the meeting, and I
18  wanted to find out, you know, what's been going on,
19  why has -- has her -- has her tempers been flaring
20  up so much lately. And then that's when she said,
21  "It's all your fault." You know, "You" -- I can't
22  remember exact words, but it's basically all my
23  fault.
24          And then from there, I said, "If you

Page 176

1   don't mind, excuse me. I'm going to go get Steve
2   Craig because I want a witness to this."
3           So I went and pulled Steve Craig off of
4   what he was doing, and then we went immediately in a
5   room.
6       Q. All right. So before you go get Craig,
7   anything else that Jesse said other than "It's all
8   your fault"?
9       A. I can't recall specifics. But I'm -- no, I
10  can't recall specifics.
11      Q. Did she say anything else other than "It's
12  all your fault"?
13      A. I'm sure she did, but I just can't recall
14  exactly word for word what happened.
15      Q. Why do you go get Steve Craig?
16      A. Because I wanted a witness.
17      Q. Why?
18      A. Because I knew what she was telling me that
19  time needed a witness to what was going on.
20      Q. Why?
21      A. Because in the -- in Shell culture, any
22  culture that you are doing, you want to make sure
23  that if someone's upset about something, it's not a
24  standard coaching, that you have a backup to what's

44 (Pages 173 to 176)

Page 177

1  being said or not said.
2      Q.  Why did you think this was something other
3  than the standard coaching?
4      A.  Just because she said -- her choice of
5  words, whatever they were at the time, were telling
6  me that this could get ugly quick.
7      Q.  What did she say that gave you that
8  impression?
9      A.  I just said I couldn't remember that.
10     Q.  Was it something other than "It's all your
11 fault"?
12     A.  It could have been.
13         MR. TUCKER:  Objection; asked and
14 answered.
15     Q.  (BY MS. GURMANKIN)  Did she reference the
16 fact that you had been sexually harassing her?
17     A.  No.
18     Q.  She had let you know prior to this that she
19 didn't appreciate certain of the comments that you
20 had made to her, right?
21     A.  No.
22     Q.  Did she ever let you know prior to this
23 meeting that your conduct or your comments were
24 unwelcome?

Page 178

1      A.  No.
2      Q.  Did she ever --
3          MR. TUCKER:  Objection.  There was a
4  suggestion during this meeting that she said any of
5  those things.
6          MS. GURMANKIN:  I don't know what the
7  objection is, but you can object to form.
8          MR. TUCKER:  The objection is the
9  question's misleading because there is a suggestion
10 that she said that during this meeting.
11         MS. GURMANKIN:  Okay.  You can object
12 to form.
13         MR. TUCKER:  No.  I object to what I
14 want to object.
15         MS. GURMANKIN:  Well, you -- it's got
16 to be a form.
17         MR. TUCKER:  No.  I'll object to the
18 way I want to object.
19         MS. GURMANKIN:  It's got to be to form,
20 if you want to follow the Rules, Joe.
21         MR. TUCKER:  No.  I follow the Rules,
22 Counsel.
23         MS. GURMANKIN:  Well, then it would be
24 to form.

Page 179

1          MR. TUCKER:  No, it will not be to
2  form, because we have not indicated any type of
3  objection preservation here.
4      Q.  (BY MS. GURMANKIN)  Prior to this meeting,
5  did she ever --
6          MR. TUCKER:  So those are what the
7  Rules actually say, Counsel, if you want to quote
8  the Rules.
9      Q.  (BY MS. GURMANKIN)  Prior to this meeting,
10 did she ever indicate to you that she had a problem
11 with your conduct?
12     A.  No.
13     Q.  Did anyone indicate to you that she had a
14 problem with your conduct prior to this meeting?
15     A.  No.
16     Q.  Did you ever consider prior to this meeting
17 that making the comments that you testified that you
18 did to a female subordinate wasn't appropriate?
19     A.  No.
20     Q.  What do you tell Craig?  When you go get
21 Steve Craig, what do you tell him?
22     A.  "I need to see you in this conference room.
23 I'm meeting with Jesse and I want you to be there as
24 a witness."

Page 180

1      Q.  Did you tell him why?
2      A.  No, I did not.
3      Q.  Did you tell him that she said something to
4  lead you to believe that this could get ugly quick?
5      A.  I did not.
6      Q.  Have you ever had a meeting with a male
7  subordinate where you thought, based on something
8  they said, that this could get ugly quick?
9      A.  Repeat the question one more time.
10     Q.  Sure.  Have you ever had a meeting with a
11 male subordinate where they said something that led
12 you to believe this could get ugly quick?
13     A.  No.
14     Q.  Did you ever have a meeting with a male
15 subordinate where you pulled your supervisor in to
16 be a witness?
17     A.  I have but I cannot recall specifics.
18     Q.  Do you recall who that meeting was with?
19     A.  So I do.  I remember one for sure.  Barry
20 Strayer.  I remember calling him in because his
21 performance wasn't meeting standards.  So I did have
22 a witness in there.  I don't think it was my
23 supervisor, but it was a witness so...
24     Q.  HR?

45 (Pages 177 to 180)

Page 181

1    A.  No, it wouldn't have been HR, not at that
2   point.
3        Q.  Why did you have a witness in that meeting?
4        A.  Just so that way there's no
5   he-said-she-said-type conflict.  This is here's the
6   witness, this is what we talked about, and it's kind
7   of documented.
8        Q.  And that was about Strayer's performance
9   issues?
10       A.  Correct.
11       Q.  And you had the witness in from the
12  beginning?
13       A.  Correct.
14       Q.  Because you wanted someone in there just to
15  see that conversation?
16       A.  That's correct.
17       Q.  Have you ever had a meeting with a male
18  subordinate where you stopped the meeting and went
19  and got your supervisor or anyone to act as a
20  witness because you had concerns?
21       A.  Not that I recall.
22       Q.  All right.  So how long did you meet with
23  Jesse before you get Craig?
24       A.  I'm going to say -- I don't want to

Page 183

1        Q.  All right.  And does Craig come back in the
2   room immediately?
3        A.  Yes.
4        Q.  Into Conference Room 120A?
5        A.  Yes.
6        Q.  And how long are the three of you in there?
7        A.  I don't remember how long.
8        Q.  More than ten minutes?
9        A.  I can't remember.
10       Q.  What do you recall?
11       A.  I just recall Steve coming in.  Jesse was
12  okay with that, and then I just gave Steve a recap
13  of kind of what happened and where we were at to
14  that point.
15       Q.  What did you tell Craig?
16       A.  Just what I knew at that point, at the time
17  that I knew that.
18       Q.  Which is what?
19       A.  I can't remember.
20       Q.  Are you talking about just a recap of what
21  happened in the meeting up until that point?
22       A.  Yes.
23       Q.  Did you tell him what happened prior to the
24  meeting that led you to have the meeting?

Page 182

1   guess -- ten minutes.
2        Q.  And you don't recall anything she said or
3   you said -- well, strike that.
4            You don't recall anything she said
5   other than "It's all your fault"?
6        A.  That is what led up to believe something
7   was going to get bad, yes.
8        Q.  Okay.  My question is, do you remember
9   anything else she said --
10       A.  No.
11       Q.  -- in those ten minutes?
12           MR. TUCKER:  Let her finish, please.
13           THE WITNESS:  I apologize.  So sorry.
14       A.  No, I do not.
15       Q.  (BY MS. GURMANKIN)  And do you recall
16  anything you said in those ten minutes other than
17  "What's been going on with you?"
18       A.  No, that was all I said.
19       Q.  So did she talk for the remainder of the
20  ten minutes?
21       A.  Yeah, she did.
22       Q.  But you can't remember anything else she
23  said?
24       A.  No, I do not.

Page 184

1        A.  I don't recall saying that, no.
2        Q.  Did you say that when you went out to get
3   him?
4        A.  No.
5        Q.  All right.  So you give him a recap and
6   then what?
7        A.  And then I can't remember what exactly
8   happens next, but I just know that it was -- we were
9   talking back and forth.  Jesse started bringing up
10  issues that she thought I had done to her.  And,
11  again, I don't know specifics but...
12       Q.  Were some of those issues the allegations
13  that she made against you regarding sexual
14  harassment and discrimination?
15       A.  I don't believe so, not at that time.
16       Q.  But you don't recall what they were?
17       A.  That's correct.
18       Q.  Is it possible they were about the sexual
19  harassment?
20       A.  I wouldn't even care to guess, no.  I don't
21  know.
22       Q.  You don't know?
23       A.  I don't know.
24       Q.  Okay.  Because you don't recall what she

46 (Pages 181 to 184)

Page 185

1    said?
2        A.  That's correct.
3        Q.  And what do you say?
4        A.  Nothing.  I'm stunned.  And then shortly
5    after that -- and I can't remember timing.  Could be
6    a couple minutes.  I don't know -- Steve asked me if
7    he could talk to her alone.  I said absolutely.  And
8    so I left the room.
9        Q.  And you don't recall how long the three of
10   you were in there before you leave the room?
11       A.  No, ma'am.
12       Q.  What are you stunned about?
13       A.  Just her allegations.
14       Q.  What are her allegations?
15       A.  That I was doing things to, you know,
16   either -- whatever she was accusing me of, I was
17   stunned over those allegations.
18       Q.  What was she accusing you of?
19       A.  I can't remember that.
20       Q.  Is it fair to say that the only thing that
21   would have stunned you is her allegations about you
22   sexually harassing her?
23           MR. TUCKER:  Objection.
24       A.  No.  About whatever she -- her allegations

Page 186

1    were towards me.
2        Q.  (BY MS. GURMANKIN)  But you don't recall?
3        A.  I do not recall.
4            MR. TUCKER:  I'm sorry; Caren.  I'm
5    drinking too much.  I have to go to the bathroom
6    again.
7            THE VIDEOGRAPHER:  We are off record.
8    Time is 11:39 a.m.
9            (A recess was taken.)
10           THE VIDEOGRAPHER:  We are back on
11   record.  Time is 11:45 a.m.
12       Q.  (BY MS. GURMANKIN)  What did you discuss
13   during the break?
14       A.  He told me to breathe and relax.
15       Q.  Anything else?
16       A.  That's about it.
17       Q.  Okay.  You were out there for longer than
18   it takes to say breathe and relax.
19       A.  Because I was trying to explain to him, you
20   know, because I'm sitting here just like this, I'm,
21   like, anticipating everything you're saying.  So I
22   was asking him can I sit back in my chair, can I
23   relax.  But he said, "Just breathe.  Just take your
24   time and breathe."  That's what it was about.

Page 187

1        Q.  Anything else?
2        A.  That's it.
3            MR. TUCKER:  You didn't tell her about
4    the bathroom breaks?
5            THE WITNESS:  The what?
6            MR. TUCKER:  You forgot to tell her
7    about the bathroom breaks.
8            THE WITNESS:  About what?
9            MR. TUCKER:  She said did we discuss
10   anything else.
11           THE WITNESS:  Oh, the bathroom break?
12       Q.  (BY MS. GURMANKIN)  Anything else?
13       A.  No, ma'am.
14       Q.  Okay.  All right.  After you leave the
15   meeting with Jesse and Craig, do you have a
16   conversation with Craig after he's done meeting with
17   Jesse?
18       A.  I did.
19       Q.  Okay.  Tell me about that.
20       A.  He just said, "Look, Jesse's really upset.
21   She's got some things she's accused you of" and, you
22   know, that was kind of it in the -- in the contents.
23   Didn't get into specifics of what he -- you know,
24   what she said, but that's kind of what it led to.

Page 188

1        Q.  But you understood the nature was sexual
2    harassment and discrimination?
3        A.  No.  No.  It wasn't sexual harassment.
4    That's what -- she didn't bring that up in that
5    meeting, but he didn't tell me it was sexual
6    harassment, either.  I didn't know that until
7    -- regardless.
8            But no, he just said she had some
9    allegations against me that, you know, we need to
10   get with HR on.
11       Q.  You didn't know about the sexual harassment
12   allegations until when?
13       A.  Until Megan -- Megan came to see me.
14       Q.  Until the meeting with Megan?
15       A.  Yes.
16       Q.  That's the first time you learned that
17   Jesse's allegations against you included sexual
18   harassment allegations?
19       A.  Correct, yes.
20           I actually thought she -- well...
21       Q.  You thought what?
22       A.  I thought she was there because of my note
23   to HR.
24           (Exhibit 55 was marked.)

47 (Pages 185 to 188)

Page 189

1    Q. (BY MS. GURMANKIN)  You're being shown
2  what's been marked as Exhibit 55.
3       Is this the note to HR that you were
4  just referring to?
5       MR. TUCKER:  Could you take your time
6  and read the document?
7       THE WITNESS:  Yes.
8    A. Yes, I wrote that.
9    Q. (BY MS. GURMANKIN)  Is this the document
10 you just referred to?
11   A. Yes.
12   Q. You thought Megan was coming up to talk to
13 you about this document?
14   A. That's -- that -- that was what I thought,
15 yes.
16   Q. Okay.  Why do you draft this email?
17   A. It says it sent it on 11/23.
18   Q. Why?
19   A. Why did I draft this particular email?
20   Q. Why did you draft and send this particular
21 email marked as Exhibit 55?
22   A. Because I wanted Michelle and HR to -- to
23 look into her allegations.
24   Q. You didn't know what they were.

Page 190

1    A. Well, I'm saying right here that she said I
2  was the problem and I asked why.
3    Q. Well, before you send this email, you've
4  had the follow-up conversation with Steve Craig
5  after he's done meeting with her, right?
6    A. Uh-huh.
7    Q. Yes?
8    A. Yes.
9    Q. And he tells you that she's making
10 allegations against you?
11   A. Correct.
12   Q. Do you ask him, What allegations are you
13 talking about?
14   A. I probably did.  I don't recall
15 specifically asking that, but I probably did.
16   Q. Are you saying you probably did because you
17 would want to know what --
18   A. I would want to know what allegations, yes.
19   Q. Okay.  But you don't recall asking, right?
20   A. No, I don't.
21   Q. Okay.  Do you recall him telling you?
22   A. I don't.
23   Q. So at any point before you're sending this
24 email, do you ask him, Can you tell me what are the

Page 191

1  allegations that she's making?
2    A. Well, I guess I was assuming -- because of
3  what she already said in the meeting when I was in
4  there, I'm assuming that's what they were.
5    Q. But you don't remember what they were.
6    A. No.  But I remember her telling me
7  something in the meeting which led me to believe
8  that that's why this might get bad.  That's why I
9  went and got Steve Craig.  Though I don't remember
10 specifics, I do remember her telling me something
11 that says, Hey, this is your fault, whatever that
12 is, and that's why I went and got Steve Craig.
13   Q. Well, other than sexual harassment or some
14 kind of discrimination, what else could she have
15 said that made you think this could get ugly real
16 quick?
17   A. Well, being how everything is my fault
18 would be a huge indicator to me that, you know,
19 she's thinking I'm to blame for her moodiness or
20 lack of performance.
21   Q. Is it your testimony that when you
22 concluded that what she said led you to think this
23 could get ugly real quick, did the thought that
24 she's accusing you of sexual harassment or

Page 192

1  discrimination cross your mind at that point?
2    A. Not at all.
3    Q. Even though that's something that could get
4  ugly real quick, if she's accusing you of that,
5  right?
6    A. If she was accusing me of that, yeah, that
7  could get ugly quick.
8    Q. All right.  And why are you sending this to
9  Michelle Priest?
10   A. I want her to come in and -- and
11 investigate what she's saying.
12   Q. All right.  This email, it looks like it's
13 sent two days after that meeting with Jesse that we
14 just talked about.  Is that right?
15   A. Yes, it looks like that.
16   Q. So you say, "Michelle, Monday afternoon
17 (11/21/2016) I called Jesse Barnes into Room 120A to
18 have a one-on-one discussion about recent
19 performance concerns.  After talking with her for a
20 few minutes, she started saying that I was the
21 problem.  I asked why I was problem, and she stated
22 that I always put her down, telling her nothing was
23 ever done correctly, etc.
24      "After only a few minutes into this, I

48 (Pages 189 to 192)

Page 193

1　asked her to hold tight until I went and got Steve.
2　She agreed to this and Steve joined the
3　conversation.
4　　　　"Talking with Steve today, I don't want
5　to let this go.  I haven't (in my opinion) ever done
6　anything wrong.  Now, I know I have said some things
7　that I shouldn't have but apologized for saying it.
8　I guess what I'm wondering if we can discuss this.
9　Everything has been fine this week (between her and
10　me) and as far as business goes.  I don't want this
11　to get out of hand or I fear that I cannot coach her
12　because of this.
13　　　　"Anyway, let's discuss, Michelle, when
14　you return to work.  Thank you very much?"
15　　　　Did I read that correctly?
16　　A.  Correct.
17　　Q.  You wrote this by yourself?
18　　A.  Yes.
19　　Q.  And was Michelle Priest the HR support for
20　your group at the time?
21　　A.  Yes.
22　　Q.  That's why you are sending this to her?
23　　A.  That's correct.
24　　Q.  Why are you copying Craig?

Page 194

1　　A.  Because he was involved in it, and he is my
2　supervisor.
3　　Q.  Before -- or between the time that you
4　talked to Craig immediately after the meeting with
5　Jesse and you sending this email, did you have
6　conversations with anyone at Shell about the meeting
7　with Jesse?
8　　A.  So say that one more time.
9　　Q.  Sure.  Between the meeting with Jesse on
10　Monday afternoon November 21 and the follow-up
11　discussion you had with Steve Craig as soon as he
12　finished his meeting with her and you sending this
13　email on November 23 at 1:08 p.m., did you talk to
14　anyone at Shell about the meeting with Jesse?
15　　A.  I don't believe so, no.
16　　Q.  So why do you wait two days before sending
17　this?
18　　A.  I'm not sure.  I don't know if it was a
19　weekend or not.  I'm not sure.
20　　Q.  You don't actually say anywhere in this
21　email asking Michelle to investigate Jesse's
22　allegations, right?
23　　A.  That's correct.
24　　Q.  But that's what you wanted her to do?

Page 195

1　　A.  I wanted her to discuss so that way we can
2　figure out what's going to happen.
3　　Q.  Well, you said you wanted her to
4　investigate Jesse's allegations.  Why don't you say
5　that in here if that's what you are looking for?
6　　A.  Because I'm just asking Michelle, so let's
7　discuss it.
8　　Q.  Well, if what you want is for her to
9　investigate Jesse's allegations, why don't you just
10　say that?
11　　A.  I guess because I wanted just to discuss it
12　first.
13　　Q.  And you wanted Michelle to know that Jesse
14　has performance concerns, according to you, right?
15　I mean, that's the first thing you say to her.
16　　A.  So I wanted her to get the contents of what
17　the meeting was about so she understood it.
18　　Q.  You didn't even tell her that.  You just
19　said, "I was calling Jesse in to talk about recent
20　performance concerns."
21　　A.  That's correct.
22　　Q.  You don't give her any context, do you?
23　　A.  Well, performance concerns I think is
24　relevant to contents.

Page 196

1　　Q.  But you don't tell her what performance
2　concerns?
3　　A.  No.
4　　Q.  You don't tell her what it was about?
5　　A.  Not in this email, no.
6　　Q.  When you say, "I know I have said some
7　things that I shouldn't have but apologized for
8　saying it," what you are talking about?
9　　A.  I don't remember.  I read that.  But I
10　think Jesse might have brought something up in the
11　meeting that I might have said and I apologized for
12　it, but I can't remember the detail of what it was.
13　　Q.  Did she?
14　　A.  I'm -- I'm thinking she did, but I can't
15　remember.
16　　Q.  Do you remember why you wrote this?
17　　A.  Yeah, because it was only a couple of days
18　later?
19　　Q.  Do you remember why you wrote that
20　statement, "I have said some things that I shouldn't
21　have but apologize for saying it"?
22　　A.  Only reason why I'm thinking I did that
23　is because she said something that I said, and that's
24　when I probably apologized to her in the meeting.

49 (Pages 193 to 196)

Page 197

```
 1   That's -- I'm just --
 2       Q.  Are you guessing?
 3       A.  I am guessing.
 4       Q.  Okay.  As you sit here today, do you
 5   remember what you were referring to when you said to
 6   Priest, "I know I have said some things that I
 7   shouldn't have"?
 8       A.  I do not know.
 9       Q.  Did Priest ever ask you?
10       A.  I don't recall.
11       Q.  You don't recall one way or the other?
12       A.  No, I don't.
13       Q.  Did Steve Craig ever ask you what you meant
14   by that?
15       A.  I don't recall.
16       Q.  Did you talk to Priest about this email?
17       A.  I don't recall that.
18       Q.  Was she on vacation at the time?
19       A.  I don't remember.
20       Q.  Did you document that meeting with Jesse in
21   any other form other than this email marked as
22   Exhibit 55?
23       A.  I don't recall.
24       Q.  Had you told Steve Craig you were going to
```

Page 198

```
 1   send it before you sent it?
 2       A.  I don't recall that, neither.
 3       Q.  Okay.  So what's your next communication
 4   with anyone after this -- after you send this email
 5   about the meeting with Jesse or about this email?
 6       A.  I don't think I had any.  I know I didn't
 7   have any with anyone.
 8           MR. TUCKER:  You don't think you had
 9   any or you know you don't?
10           THE WITNESS:  I didn't have any.
11       Q.  (BY MS. GURMANKIN)  All right.  And at some
12   point Megan Kloosterman comes up to Willsboro?
13       A.  That's correct.
14       Q.  Between you sending this email and the time
15   that Kloosterman comes up, did you have
16   communications with anyone at Shell about Jesse?
17       A.  Not that I recall.
18       Q.  Any communications about this email?
19       A.  Not that I recall.
20       Q.  And at some point Kloosterman schedules a
21   time to meet with you?
22       A.  That's correct.
23       Q.  Before you actually meet with her, does
24   anyone tell you why she's up there?
```

Page 199

```
 1       A.  I think -- let me -- let me take that back.
 2           Steve Craig came to me and said before
 3   that meeting that she is here to investigate
 4   allegations that Jesse had and then I was going to
 5   have to meet with her.  And that was maybe an hour
 6   or so before I met with her.
 7       Q.  Okay.  Because earlier you testified that
 8   you thought she was there to discuss your email to
 9   Michelle Priest marked as Exhibit 55.
10       A.  That's correct.
11       Q.  So -- and you thought that up until the
12   time that you actually met with her?
13       A.  Correct.
14       Q.  Okay.  But Craig is telling you something
15   different an hour before you meet with her, right?
16           MR. TUCKER:  Objection.
17       A.  No.  He's telling me that he -- she is
18   coming to meet for allegations, but I thought it was
19   still the same thing that I had put in, that I had
20   raised up.  I didn't know -- and I still didn't know
21   that Jesse had made allegations until Megan told me.
22   I just thought they were tied together.
23       Q.  (BY MS. GURMANKIN)  You actually don't say
24   in Exhibit 5 that Jesse's made allegations against
```

Page 200

```
 1   you, do you?
 2           MR. TUCKER:  Exhibit 55.
 3       A.  Exhibit 55?
 4       Q.  (BY MS. GURMANKIN)  Yes, the email that we
 5   were just looking at.
 6           MR. TUCKER:  Because you said
 7   "Exhibit 5."
 8           MS. GURMANKIN:  I'm sorry; I meant "55"
 9   if I said "5."
10           MR. TUCKER:  You did say "5."
11       A.  Ask that question again, please.
12       Q.  (BY MS. GURMANKIN)  Sure.  You don't
13   actually say in your email to Priest marked as
14   Exhibit 55 that Jesse has made allegations against
15   you?
16       A.  No.  Because I didn't know that.
17       Q.  Well, you said that Jesse made allegations
18   against you in the meeting, right?
19       A.  Uh-huh.
20       Q.  You just couldn't remember the nature?
21       A.  Correct.
22       Q.  Okay.
23           MR. TUCKER:  That's not -- that's not
24   true.
```

50 (Pages 197 to 200)

Page 201

1     Q. (BY MS. GURMANKIN) And you also -- and you
2 also said --
3     MS. GURMANKIN: Joe, Joe --
4     MR. TUCKER: You don't have to agree
5 with her for the sake of agreeing with her.
6     MS. GURMANKIN: Joe, Joe, stop --
7     THE REPORTER: One at a time.
8     MR. TUCKER: I need you to stop and
9 listen to her question. Okay?
10     THE WITNESS: Okay.
11     MR. TUCKER: You don't need to agree
12 with her. As I told you before, stop and breathe.
13     THE WITNESS: Okay.
14     MS. GURMANKIN: The question's been
15 answered.
16     Q. (BY MS. GURMANKIN) And Steve Craig told
17 you after the meeting that Jesse made allegations
18 against you, right?
19     A. Correct.
20     Q. And both of those were before you sent this
21 email to Michelle Priest, right?
22     A. Ask the question again.
23     Q. Sure. The meeting with Jesse and the
24 conversation with Steve Craig both happened before

Page 202

1 you send this November 23 email to Michelle Priest?
2     A. That's correct.
3     Q. So you did know as of the time that you
4 sent this email that Jesse had made allegations
5 against you?
6     A. No. She was alluding to allegations during
7 that meeting is what I'm referring to. Allegations
8 not because they went to the HR hotline. It was
9 allegations what she's telling me that I was the
10 problem. That's the allegations I'm referring to.
11     Q. I didn't talk about the HR hotline.
12     A. I know that. But that's what I'm saying.
13 So when I say "allegations," that's what I meant,
14 what she said I did.
15     Q. Right. Jesse made allegations against you
16 in the November 21 meeting?
17     A. Correct.
18     Q. And Craig told you immediately after that
19 meeting that Jesse made allegations against you?
20     A. It was basically following up from what I
21 already knew, correct.
22     Q. All right. So at the time that you are
23 sending this email to Michelle Priest, you did know
24 that Jesse had made allegations against you. You

Page 203

1 just didn't know what they were about, right?
2     A. No. Jesse -- no. Jesse made remarks in
3 here that what I'm calling allegations. So she said
4 I was the problem. That's why I sent that note to
5 Michelle.
6     Q. You testified under oath that in that
7 meeting with Jesse two days before you sent this
8 email Jesse made allegations against you. You
9 testified to that numerous times.
10     Is that true?
11     A. During that meeting, yes.
12     Q. Okay. And you have also testified numerous
13 times that Craig told you immediately after the
14 meeting when he met with Jesse alone that she made
15 allegations against you?
16     MR. TUCKER: Objection. He's not
17 testified to --
18     Q. (BY MS. GURMANKIN) Correct?
19     MR. TUCKER: Objection to the use of
20 your term "numerous times."
21     Q. (BY MS. GURMANKIN) Is that correct?
22     MR. TUCKER: Let me -- Counsel, please
23 let me finish.
24     Objection to the use of the term

Page 204

1 "numerous times."
2     MS. GURMANKIN: I didn't say "numerous
3 times." But you can object to form.
4     MR. TUCKER: Can we go back and have
5 the question read -- read back, please, so that we
6 can correct counsel?
7     THE REPORTER: "And you have also
8 testified numerous times" --
9     MR. TUCKER: Did you say the word
10 "numerous," Counsel? Counsel, did you say the word
11 "numerous," or did the Court Reporter --
12     MS. GURMANKIN: I did. I did. My
13 apologies.
14     MR. TUCKER: Okay. Apology is
15 accepted.
16     MS. GURMANKIN: Are you done?
17     MR. TUCKER: Objection.
18     Q. (BY MS. GURMANKIN) You also testified that
19 Steve Craig told you immediately after the meeting
20 when he meets with Jesse one-on-one that Jesse made
21 allegations against you, right?
22     A. Correct.
23     Q. Okay. So you knew prior to you sending
24 this email to Michelle Priest that Jesse had made

51 (Pages 201 to 204)

1  allegations against you. You just didn't know what
2  they were in reference to, correct?
3      A. So I want to make sure we are on the same
4  page here. I'm only saying I only knew what she
5  told me in that meeting prior to me getting Steve
6  Craig in there.
7      Q. Right. You knew that she had made
8  allegations against you?
9      A. In that meeting, correct.
10     Q. And you also knew immediately after the
11 meeting per Craig that she's made allegations
12 against you?
13     A. Correct.
14     Q. So you know prior to you sending your email
15 to Michelle Priest that Jesse has made allegations
16 against you?
17     A. Correct.
18     Q. Okay. So you said earlier that you did not
19 say in your email to Michelle Priest that Jesse's
20 made allegations against you because you didn't
21 know. But that's not true, is it?
22     MR. TUCKER: Objection; that is
23 absolutely misleading. He has testified about what
24 the, quote, allegations were as the term is being

1  used here.
2      MS. GURMANKIN: Please don't make
3  speaking objections.
4      MR. TUCKER: I will not let you pollute
5  the record with misleading questions where he is
6  talking about the allegations and he said what they
7  were, and now you are trying to conflate the
8  allegations.
9      MS. GURMANKIN: Joe, please, your
10 speaking objections are for the purpose of coaching.
11     MR. TUCKER: We'll take it up with the
12 Judge, but you may ask your question. Because you
13 are trying to mislead the witness. It's improper.
14     MS. GURMANKIN: You need my question
15 repeated?
16     THE WITNESS: Please.
17     Q. (BY MS. GURMANKIN) Okay. When you
18 testified a few minutes ago that you did not include
19 in your email to Michelle Priest that Jesse had made
20 allegations against you because you didn't know that
21 she had made allegations against you, that wasn't
22 true, was it?
23     A. Repeat the question one more time, and I
24 apologize because I want to make sure this is clear.

1      Q. Sure. When you testified a few minutes ago
2  that you did not include in your email to Michelle
3  Priest that Jesse had made allegations against you
4  because you didn't know at that time that she had
5  made allegations against you, that's not true, is
6  it?
7      A. That is true because I told Michelle in my
8  email what allegations she said -- she had said
9  against me.
10     Q. Why didn't you say to Michelle Priest,
11 "Jesse's made allegations against me"?
12     MR. TUCKER: Objection. He has said he
13 said in this email what the allegations were.
14     Q. (BY MS. GURMANKIN) Why didn't you say the
15 words "Jesse's made allegations against me" in this
16 email?
17     A. Poor choice of words, I guess. I don't
18 know.
19     MR. TUCKER: You don't have to say it's
20 "poor choice of words." Just say why.
21     MS. GURMANKIN: Stop correcting his
22 answers if you don't like them, Joe. He's answering
23 the question.
24     MR. TUCKER: No. Because you are

1  misleading. Because you have taken -- he has
2  said -- I really don't want to give this speaking
3  objection. Just go ahead.
4      Objection to you trying -- you asking
5  misleading questions.
6      MS. GURMANKIN: It's a
7  cross-examination. That's what I'm doing.
8      MR. TUCKER: This isn't
9  cross-examination.
10     MS. GURMANKIN: Yes, it is.
11     MR. TUCKER: This is a discovery
12 deposition, Counsel, and I think you know the rules
13 about a discovery deposition.
14     MS. GURMANKIN: And I think you know
15 that I can -- this is a cross-examination.
16     MR. TUCKER: Let me finish, Counsel.
17     You also know we should speak one at a
18 time. I think you know the rules for discovery is
19 not cross-examination.
20     MS. GURMANKIN: You know that he's
21 being cross-examined. You know that's proper. He's
22 an adverse witness.
23     MR. TUCKER: No, no, I do not -- let
24 me --

Page 209

1      MS. GURMANKIN:  You should.
2      MR. TUCKER:  We have different rules.
3  I -- I just started at this, and you have been doing
4  this a little longer than me.
5      But either way, this is the discovery
6  deposition.  You may conduct it like you think
7  you're cross-examining someone, but this is not a
8  cross-examination.  But I now understand that you
9  are cross-examining the witness is what you have
10 been doing.  Then go ahead.  Continue to
11 cross-examine the witness in this discovery
12 deposition.
13     MS. GURMANKIN:  Okay.
14     MR. TUCKER:  You need to make sure that
15 you and she are using the same term.
16     THE WITNESS:  Okay.
17     MR. TUCKER:  Okay?
18     THE WITNESS:  Yes, sir.
19     MR. TUCKER:  Since this is your
20 cross-examination, I'm going to -- since you have
21 categorized this as cross-examination, I'm going to
22 make appropriate objections.
23     MS. GURMANKIN:  I can ask leading
24 questions, Joe.  It's not --

Page 210

1      MR. TUCKER:  But which one is this?
2      MS. GURMANKIN:  Joe, stop.
3      MR. TUCKER:  But which is this?  Is
4  this you asking leading questions or is this
5  cross-examination?
6      MS. GURMANKIN:  Stop.  Stop.
7      MR. TUCKER:  Counsel, on the record,
8  please do not refer to me as "Joe."
9      MS. GURMANKIN:  Mr. Tucker, please
10 stop.
11     MR. TUCKER:  Counsel -- I'm going to
12 say Counsel --
13     MS. GURMANKIN:  You keep interrupting
14 me.  Mr. Tucker, you keep interrupting.  You ask
15 me not to do the same.  You have repeatedly
16 interrupted me.  Okay?  Please let me talk.
17     You are making speaking objections.
18 You are coach -- you are doing so to coach the
19 witness, and it's got to stop.  Okay?  You are
20 making speeches on the record.  Please stop.
21     I'm going to ask my questions.  You do
22 this after he answers.  It's got to stop.  Thank
23 you.
24     MR. TUCKER:  Counsel, I will not let

Page 211

1  you have misleading questions to -- to my client.  I
2  will not let you pollute the record.  I will not let
3  you do it, and I will protect the record from you
4  making misleading questions that you know are
5  misleading and you know it's not right.  And I'm
6  going to continue to make objections to your
7  misleading questions.  I'm going to tell you how the
8  questions are misleading.
9      MS. GURMANKIN:  I understand that you
10 don't like some of his answers, but that doesn't
11 give you the right --
12     MR. TUCKER:  I was not finished,
13 Counsel.
14     MS. GURMANKIN:  Go ahead.
15     MR. TUCKER:  If you would like to use
16 part of your time arguing with me back and forth,
17 because we are going to stop at seven hours, then
18 you can continue to do that.  But I will continue to
19 object to your misleading questions.
20     MS. GURMANKIN:  What's taking up the
21 time is your speaking objections.
22     Q.  (BY MS. GURMANKIN)  Why didn't you tell
23 Michelle Priest in your email that Steve Craig told
24 you that Jesse had made allegations against you?

Page 212

1      A.  I just didn't use the word "allegations"
2  but that's -- he told me exactly what I put in my
3  email, and that's just the way I worded it.
4      Q.  Well, why didn't you tell Michelle Priest
5  that this also came, not only from Jesse, but also
6  from Steve Craig?
7      A.  Well, again, I -- because I CC'd Steve
8  Craig, I wanted to talk to Michelle about all
9  what -- what transpired.  And then I also state in
10 here that I got Steve Craig so he knew the same that
11 I knew, unless she told him something different when
12 I wasn't in the room.  But he didn't tell me
13 anything different that I already knew.  So she
14 already says I was the problem, and that -- that was
15 the conversation.  That's why I wanted to talk to
16 Michelle.
17     Q.  Well, according to your earlier testimony,
18 Craig didn't give you any details.  He just said
19 Jesse's made allegations against you.  Is that true?
20     A.  That's true.
21     Q.  All right.  So you don't know what Jesse
22 said to Craig after you left the room?
23     A.  That is true.
24     Q.  Because he didn't tell you and you didn't

Page 213

1    ask --
2       A. But he was there when --
3       Q. -- right?
4       A. -- I was in there, correct.
5       Q. All right. And you said, "Talking with
6    Steve today, I don't want to let this go." What's
7    that conversation you had with Steve on November 23?
8       A. He was probably recapping what was -- what
9    was going on, hence the reason why I sent the email.
10      Q. Are you guessing?
11      A. No. I know for a fact.
12      Q. All right. Tell me about your conversation
13   with Steve Craig on November 23.
14      A. He just said, Listen, we need to make sure
15   that Michelle gets involved in this and that -- that
16   way we can cut off anything if there is going to be
17   any issues. Now, that is not verbatim. That is
18   just ad lib of kind of what he said.
19      Q. How did that conversation start? Who
20   initiated it?
21      A. I don't recall that. I just know we spoke
22   about it.
23      Q. All right. So you did talk to someone else
24   at Shell about these issues -- excuse me -- between

Page 214

1    your follow-up meeting with Craig after the meeting
2    on Monday and you sending this email, right?
3       A. No.
4       Q. You had a conversation with Steve Craig on
5    the day that you are sending this email before you
6    sent the email, right?
7       A. Correct.
8       Q. Okay.
9       A. But that's -- oh. Again, I assumed that
10   you meant someone else other than Steve Craig that
11   was already involved in that.
12      Q. He's a Shell employee, right?
13      A. That's correct.
14      Q. Okay. So my question was anyone at Shell.
15      A. Okay. I apologize.
16      Q. Was there something about that that was
17   confusing?
18      A. No, ma'am.
19      Q. Anything else that you recall about your
20   conversation with Steve Craig on Wednesday the 23rd?
21      A. No.
22      Q. How long was your meeting with Kloosterman?
23      A. I don't recall.
24      Q. When -- when Craig tells you about an hour

Page 215

1    before you meet with Kloosterman that she's doing
2    investigations into allegations that Jesse's made,
3    does he tell you what the allegations are?
4       A. No.
5       Q. Okay. Even generally?
6       A. No.
7       Q. Do you ask?
8       A. No.
9       Q. Why?
10      A. Because I assumed it was because of this.
11      Q. Your email?
12      A. Yes, ma'am.
13      Q. All right. Showing you what's been marked
14   as Exhibit 19. These are Megan Kloosterman's notes
15   of her conversation with you.
16         MR. TUCKER: Do you want to take a
17   lunch break now?
18         MS. GURMANKIN: Let me get through a
19   couple of them.
20         MR. TUCKER: Okay.
21      Q. (BY MS. GURMANKIN) Have you seen this
22   document before?
23      A. Yes, ma'am.
24      Q. Okay. Was that in preparation for your

Page 216

1    deposition?
2       A. Yes.
3       Q. Did you see it prior to that?
4       A. No.
5       Q. Did you document the meeting with
6    Kloosterman?
7       A. Excuse me?
8       Q. Did you take notes during the meeting with
9    Kloosterman?
10      A. No.
11      Q. Did you document it in any way after the
12   meeting?
13      A. I believe I sent her some follow-up
14   questions that she was asking because I -- I wasn't
15   prepared. So I think she asked for some rebuttals.
16   So yeah, I believe I -- I think I sent her -- I know
17   I sent her an email, in fact.
18      Q. Okay. But I mean, did you write down a
19   memo, you know, this is what was said during the
20   meeting with Kloosterman? Something to that effect?
21      A. I don't recall writing that down.
22      Q. When you reviewed it in preparation for
23   your deposition today, did it appear to be an
24   accurate reflection of what you could recall about

54 (Pages 213 to 216)

Page 217

1  the meeting with Kloosterman?
2         MR. TUCKER:  You cannot tell her
3  anything that you discussed with counsel.
4         THE WITNESS:  Okay.
5         MR. TUCKER:  So with that caveat, other
6  than any discussions you've had with counsel, you
7  can answer that question.
8         THE WITNESS:  Okay.
9      A.  It -- it seems -- it seems accurate.  There
10 could be some discrepancies somewhere, but most
11 everything's intact.
12     Q.  (BY MS. GURMANKIN)  Did you see any
13 discrepancies when you reviewed it?
14        MR. TUCKER:  Other than any
15 conversations you had with me that may have
16 indicated such.
17     A.  So then no.
18     Q.  (BY MS. GURMANKIN)  Did you see any
19 discrepancies?
20     A.  I did but I -- I did discuss them with --
21 with -- with counsel.
22     Q.  What discrepancies did you see?
23        MR. TUCKER:  Do not answer.
24        THE WITNESS:  Okay.

Page 218

1         MR. TUCKER:  Do not answer that
2  question.
3         MS. GURMANKIN:  What discrepancies did
4  he see?  How does that go to a communication?  I'm
5  not asking him about what he talked to you about.
6         MR. TUCKER:  You can go through the
7  memo with him, if you want.
8         MS. GURMANKIN:  You are not -- you are
9  answering my question?
10        MR. TUCKER:  I'm not being deposed.
11        Do not answer that question because it
12 is attorney-client privilege.
13        MS. GURMANKIN:  How does that go to
14 attorney-client privileged communication?
15     Q.  (BY MS. GURMANKIN)  Okay.  You are
16 listening to your attorney's instruction not to
17 answer?
18        MR. TUCKER:  Yes, he is going to listen
19 to my instruction.
20        MS. GURMANKIN:  I need him to answer
21 that question.  You are not being deposed, as you
22 just said.
23     Q.  (BY MS. GURMANKIN)  Are you listening to
24 your attorney's instruction not to answer?

Page 219

1         MR. TUCKER:  Of course he is going to
2  listen to my instructions.
3      A.  Yes.
4      Q.  (BY MS. GURMANKIN)  Did you notice anything
5  that was not true in this memo marked as
6  Exhibit 15 -- I'm sorry; 19?
7      A.  There was some things that -- that weren't
8  the full truth, correct.
9      Q.  Okay.  What wasn't the full truth?
10     A.  The showing him in my underwear.  That
11 wasn't the full truth.
12     Q.  Okay.  Where are you?
13     A.  I apologize.  I'm on page 3.
14     Q.  That's the first bullet point under the
15 "supervisor" heading?
16     A.  That's correct.
17     Q.  It says, "I have been shown a 'selfie' of
18 my supervisor in his underwear by him."  And then
19 under that "Me, Ken and Jesse were there."
20        Second bullet point, "We were showing
21 pictures.  Chad was showing picture of him boxing,
22 posing in his shorts.  So I showed a picture of me
23 in my underwear to the group."
24        I read that correctly?

Page 220

1      A.  Correct.
2      Q.  What's not true about that?
3      A.  I was not in my underwear.
4      Q.  Okay.  You were in your compression shorts?
5      A.  Yes, ma'am.
6      Q.  Did you tell Kloosterman you were wearing
7  compression shorts in the picture?
8      A.  I don't recall saying I wore -- telling her
9  that.  I just recall the selfie itself.  So that's
10 why it wasn't my underwear.
11     Q.  Did you tell her you were in your
12 underwear?
13     A.  I did not.
14     Q.  Did you tell her that other than Chad,
15 someone else showed a picture of themselves working
16 out?
17     A.  I don't recall but I don't see it in here,
18 either.
19     Q.  Did she ask if you had the picture on your
20 phone?
21     A.  I don't recall if she did, but I know I
22 looked for it, but I don't -- I don't remember if
23 she asked me that question or not.
24     Q.  Anything else that's not the full truth?

55 (Pages 217 to 220)

Page 221

1      A.  That's it.
2      Q.  Okay.  All right.
3          MS. GURMANKIN:  Let's take a lunch
4  break.
5          THE VIDEOGRAPHER:  We are off record.
6  Time is 12:13 p.m.
7          (A recess was taken.)
8          THE VIDEOGRAPHER:  We are back on
9  record.  Time is 1:02 p.m.
10     Q.  (BY MS. GURMANKIN)  We talked earlier about
11 the texts that you had deleted before you sent the
12 phone back to Shell.
13     A.  Uh-huh.
14     Q.  Were they actually deleted off of your work
15 phone?
16     A.  Yes.
17     Q.  Okay.  On your personal phone, did you ever
18 text with Shell people during your employment?
19     A.  Some people maybe, yes, but not the
20 general -- general folks, yeah.
21     Q.  Okay.  At any time have you looked on your
22 personal phone to see if you have any texts that are
23 relevant to Jesse Barnes or her complaints?
24     A.  I do not.

Page 222

1      Q.  You have not?
2      A.  I haven't -- I haven't -- I haven't checked
3  it, but I -- I just know I don't have any on there.
4      Q.  So you have not checked to see, correct?
5      A.  That's correct.
6      Q.  Okay.  All right.  Looking back at
7  Exhibit 55 for a second, which is your email to
8  Michelle Priest in November 2016, in the second
9  sentence you say that Jesse started saying that you
10 were the problem, that you asked why you were the
11 problem and she stated that you always put her down,
12 telling her nothing was ever done correctly.
13          You see that?
14     A.  Yes, ma'am.
15     Q.  You testified earlier that what Jesse said
16 to you was "It's all your fault."  Does this refresh
17 your recollection about other specifics that Jesse
18 said to you?
19     A.  Yes.
20     Q.  Okay.  Do you recall anything else?
21     A.  No.
22     Q.  Did Jesse give you examples about what she
23 meant when you -- when she said that you always put
24 her down, nothing was ever done correctly?

Page 223

1      A.  I -- I don't recall that.
2      Q.  Is that the first time that she ever had
3  complained to you about that?
4      A.  Yes.
5          MR. TUCKER:  "That" being having put
6  her down?
7          MS. GURMANKIN:  Uh-huh.
8          MR. TUCKER:  Okay.  Repeat the question
9  to yourself.
10         THE WITNESS:  Okay.
11     Q.  (BY MS. GURMANKIN)  Did anyone tell you
12 that Jesse had complained about you putting her down
13 before?
14     A.  No.
15     Q.  All right.  Going back to Exhibit 19, which
16 is Megan Kloosterman's notes of your interview with
17 her, so at what point during the meeting do you
18 realize that Jesse has made allegations of sexual
19 harassment and discrimination against you?
20     A.  I'm almost -- I would think -- very
21 beginning of the meeting.
22     Q.  What did Kloosterman say to you that led
23 you to that?
24     A.  She basically told me, you know, that Jesse

Page 224

1  filled out a complaint with HR online, and we are
2  going to go over a series of questions of those
3  complaints.  Some of them are going to be -- how did
4  she put it? -- sensitive in nature.  So if I need
5  time, take my time, answer the questions.  That's
6  how it kind of started out.
7      Q.  Did she tell you that Jesse's allegations
8  involved sexual harassment?
9      A.  I can't recall that specifically.  To the
10 best of my knowledge, I don't remember.
11     Q.  All right.  But you do recall coming to
12 that realization during the course of the meeting?
13     A.  Yes.
14     Q.  Okay.  How did Kloosterman introduce
15 herself and her role?
16     A.  As in "I'm Megan Kloosterman.  I'm from HR.
17 I'm investigating."
18     Q.  Okay.  So that's what she said?
19     A.  Yes.
20     Q.  Had you had any contact with her before
21 this?
22     A.  No.
23     Q.  Did you bring anything to the meeting?
24     A.  No.

56 (Pages 221 to 224)

Page 225

1　　　Q.　Other than Steve Craig, did you ever have
2　any conversations with anybody about Kloosterman or
3　the meeting with her before you meet with her?
4　　　A.　No.
5　　　Q.　All right.  So let's go to the interview
6　questions.
7　　　A.　Okay.
8　　　Q.　No. 1, "Describe your current roles and
9　responsibilities."  And according to her, you said,
10　"Been in role since January 2015."
11　　　　　You see that?
12　　　A.　Yes.
13　　　Q.　That should be January 2014, right?
14　　　A.　Yes.
15　　　Q.　Okay.  Do you recall telling her '15?
16　　　A.　No.  But again, some of the stuff in here,
17　just she was -- I know we were talking, she was
18　trying to make notes, and so that just could be an
19　oversight for her.
20　　　Q.　It's not possible you told her 2015?
21　　　A.　I don't believe, no.
22　　　Q.　Okay.  No. 2, "Describe what event led you
23　to send the email to Michelle with your concerns,"
24　which is Attachment 1.

Page 226

1　　　　　If you look at the bottom of page 7
2　onto page 8.  Take a look at that.
3　　　A.　What's that?
4　　　Q.　Take a look at page 7 at the bottom.
5　　　A.　Okay.
6　　　Q.　Onto page 8.  That's the email we just
7　looked at, your email to Michelle Priest in
8　November.
9　　　　　You see that?
10　　　A.　Yes.
11　　　Q.　Okay.  So back to page 1.  I just wanted
12　you to see what she was referring to.
13　　　A.　Okay.
14　　　Q.　And you told her, according to her notes,
15　"It's been building based on things Jesse has been
16　doing.  It's around -- it's been around the A3,
17　which is on a visual board.  I told her I wanted her
18　to manage this board.  Assigned this to her in
19　October.  She will send an email/ping/text that
20　she's not ready.  Then we will review what she does
21　have.  She created the board, and I critiqued it.
22　Rory helped her and I said just remember LEAN is on
23　this board.  Rory won't know everything to put on
24　our board.

Page 227

1　　　　　"A week later she didn't have any
2　changes to the board.  When I questioned her on why,
3　she said, 'You know I have another job besides this
4　board.'  She had Jeremy do this.  He said Jeremy
5　said, 'I have another job to do.'  She got really
6　upset and said 'That's not funny.'  She looked
7　really mad.
8　　　　　"I said that isn't funny.  This is
9　important.  I called her in to talk about it and she
10　started flooding out all of these issues and how I
11　treat her.  She brought up a few examples, Pulse
12　survey meeting.  I apologized for saying what is the
13　value of doing these things.  I said, Jesse, it
14　isn't about you; it's about business.  And I
15　apologized.  I was hurt when she brought up that she
16　has felt this way about me since she's been working
17　with me.  She says I put her down."
18　　　　　I read that correctly?
19　　　A.　Yes.
20　　　Q.　Do you recall saying that to Kloosterman?
21　　　A.　I don't recall, but it's ad-libbed for what
22　we talked about.
23　　　Q.　What do you mean by "ad-libbed"?
24　　　A.　So it may not be word for word.  I think

Page 228

1　she's just typing stuff because some of that stuff
2　don't make sense to me.
3　　　Q.　Okay.  What doesn't make sense to you?
4　　　A.　Let's see, email sent, ping/texted she's
5　not ready.  Then when we review, she has create the
6　board --
7　　　Q.　Just slow down if you're talking out loud
8　so she can take it down.
9　　　A.　I apologize.
10　　　　　Anyway, the part about Rory, just -- it
11　doesn't make sense.  Again, she's taking notes.  So
12　conversation I believe took place.  I just don't
13　think it's word for word.
14　　　Q.　Who is Rory?
15　　　A.　Rory Hunter -- what was his role?  He was
16　a -- at the time I don't -- I think he was still an
17　environmental tech, and he was into the LEAN, as
18　well.  So she probably went to him for advice.
19　　　Q.　The visual board, is that the work issue
20　that led to her kind of losing it's in mid-November
21　2016?
22　　　A.　I can't be certain of it, but reading it, I
23　mean, it kind of ties in.  But I can't be certain of
24　that.

57 (Pages 225 to 228)

Page 229

1    Q.  The part about Jeremy, "She had Jeremy do
2  this.  He said Jeremy said, 'I have another job to
3  do.'  She got really upset and said that's not
4  funny.  She looked really mad," is that her lighting
5  into Jeremy that you testified to earlier that led
6  to you talking to her in mid-November?
7    A.  Again, if that was -- if that -- if this is
8  instance that I was referring to, then yes.  But
9  I just can't be sure if that's the correct instance.
10    Q.  But is that the way that she lit into
11  Jeremy?
12    A.  That would be one way, yes.
13    Q.  Well, is that the way that led to you
14  pulling her into Conference Room 120A and talking to
15  her in mid-November?
16    A.  Again, if this was what I heard, then yes.
17  But I don't know if this is exactly what I heard on
18  that day.
19    Q.  But you heard that at some point?
20    A.  I heard this at some point?
21    Q.  Did you?
22    A.  Correct, yes.
23    Q.  Okay.  Is that an example of her losing her
24  temper and flying off the handle?

Page 230

1    A.  Correct.
2    Q.  Saying "That's not funny"?
3    A.  Yeah.  But in a very loud voice.
4    Q.  She said it in a really loud voice?
5    A.  Yes.
6    Q.  Did you tell Kloosterman that?
7    A.  I'm sure of that.
8    Q.  But that's not included here, right?
9    A.  Again, it could just be what she's writing
10  down.
11    Q.  Yeah.  I'm just asking you, that's not
12  included in here, right?
13    A.  That's correct.
14    Q.  Okay.  You said -- I'm sorry; according to
15  Kloosterman, I said -- you said, "That isn't funny.
16  This is important.  I called her in to talk about it
17  and she started flooding out all these issues and
18  how I treat her," does that sounds like the incident
19  that led to you talking to her in mid-November?
20    A.  It does sound like that, yes.
21    Q.  "She brought up a few examples, Pulse
22  survey meeting."
23    What happened with that?
24    A.  So the Pulse survey meeting we had -- so

Page 231

1  that was a Shell People meeting is what it was.  We
2  were in there.  So every year we do the Shell People
3  survey, and then I go over the results with my
4  group.  And then so we go over line-by-line item,
5  and we just kind of discuss what the -- what the
6  outcome was and how we can improve.
7    So she had said something about, you
8  know, This doesn't make sense.  I don't know why we
9  are doing this.  This isn't -- there is no value in
10  this.
11    And then I abruptly said, "Jesse, this
12  isn't about Jesse Barnes.  It's about Shell Oil
13  Company."  That's what that was.
14    Q.  Did you apologize for that?
15    A.  I did.  It says, yes, I did.
16    Q.  Do you recall apologizing?
17    A.  I don't recall it.  I'm just looking at
18  what the note says.
19    Q.  The comment that you made to Jesse was in
20  front of the team?
21    A.  It was.
22    Q.  Going on to page 2, next paragraph, "She
23  gets upset with the feedback of the board and she
24  gets upset about things."

Page 232

1    What were you talking about the
2  feedback of the board?  Was that the visual board?
3    MR. TUCKER:  You mean what does her
4  note refer to?
5    MS. GURMANKIN:  Sure.
6    MR. TUCKER:  I only say that because
7  you suggested he said that, as opposed to what her
8  note says.
9    MS. GURMANKIN:  Okay.  That's fair.
10    Q.  (BY MS. GURMANKIN)  Do you recall saying
11  that to Kloosterman?
12    A.  Can you repeat the question?
13    Q.  Sure.  Do you recall saying to Kloosterman
14  "She gets upset with the feedback of the board"?
15    A.  I don't recall saying that to her, no.
16    Q.  Did Jesse get upset with the feedback of
17  the board?
18    A.  She got upset quite a bit because I had her
19  change it quite often.
20    Q.  The visual board?
21    A.  Yes.
22    Q.  That's what was referred to on page 1, the
23  visual board that we talked about?
24    A.  It could be one and the same, yes.

58 (Pages 229 to 232)

Page 233

1    Q. "She gets mad about everyone." Did you say
2  that to Kloosterman?
3    A. I don't know about them exact words, but
4  this is what's written. I don't recall saying it,
5  but...
6    Q. Did Jesse get mad about everyone?
7    A. She got mad about a lot of people, yes.
8    Q. Everyone?
9    A. I wouldn't say "everyone," but she got mad.
10    Q. "Matt Skolny used to be my backfill and I
11  would ask him. It's never been brought up to me
12  before. I was stunned and I couldn't believe it."
13    Did you say that to Kloosterman?
14    A. No. I mean, not in these words. I don't
15  know what she's writing down here, but...
16    Q. Were you stunned in the meeting when you
17  found out Jesse had been making allegations of
18  sexual harassment against you?
19    A. Yes.
20    Q. Because you never engaged in conduct that
21  you thought was sexually harassing?
22    A. Correct.
23    Q. "Mark is my peer and Hondo is one role
24  above me. I've been sharing these things with me."

Page 234

1  Do you recall saying something like that to
2  Kloosterman?
3    A. No. But the question "I have been sharing
4  these things with me," I don't even know -- is that
5  a typo?
6    Q. I don't know.
7    A. Yeah. We'd have to ask Megan. I really
8  don't know.
9    Q. Next paragraph, "I stopped sending her to
10  meetings because she seems disinterested and wants
11  to leave. She acts like she has no interest.
12  Blames others for why things aren't right."
13    Did you say that to Kloosterman?
14    A. Yes.
15    Q. Is that true, that you stopped sending
16  Jesse to meetings?
17    A. I did.
18    Q. Why was that?
19    A. Because she seemed disinterested and acted
20  like she wanted to leave. She just wasn't engaged.
21    Q. How did she seem disinterested?
22    A. Just looking somewhere else, not paying
23  attention to what's maybe on the board, could be on
24  her phone or just -- yeah.

Page 235

1    Q. Before you stopped sending her to meetings,
2  did you ask her if anything was going on?
3    A. No, but I have -- I have sent a text to her
4  before and asked her like, you know, is everything
5  okay? I even sent a text one time about "Smile.
6  You know, it's just a meeting. We'll get through
7  it."
8    And then I asked her -- you know, I did
9  have to ask her on one particular meeting -- I think
10  it was a safety meeting -- that she needed to start
11  attending when she was working for me, because she
12  wasn't going. She didn't think they added value.
13  And I said, "Everything adds value. So just -- you
14  know, I want you to attend."
15    Q. Did you ever tell a male subordinate to
16  smile?
17    A. Not that I recall.
18    Q. Before you stopped sending her to meetings,
19  did you tell Jesse something to the effect of, Look,
20  I'm going to stop sending you to meetings because
21  you seem disinterested?
22    A. I believe -- I don't recall that
23  particular -- no.
24    Q. What meetings did you stop sending her to?

Page 236

1    A. Notification meetings, safety
2  meetings -- well, safety meetings she had to attend.
3  Notification meetings, planner scheduling meetings,
4  and sometimes every week we had a maintenance
5  meeting, if you will, for the hourly folks. That
6  meeting, as well.
7    Q. Next paragraph, "I get complaints from a
8  lot of people about her attitude." I'll stop there
9  for a sec.
10    Is that what we talked about earlier?
11    A. About her attitude?
12    Q. Yes.
13    A. Yes.
14    Q. Did you tell Kloosterman that you get a lot
15  of complaints about her attitude?
16    A. It looks like I did, yes.
17    Q. Do you recall that or it's just from
18  looking?
19    A. Just from looking.
20    Q. "She was really upset at Ken Foreman. I
21  told her she doesn't play nice in the sandbox."
22    Did you say that to Jesse?
23    A. I believe I did say that, yes.
24    Q. Did you say that to Foreman?

59 (Pages 233 to 236)

Page 237

1    A.  That he doesn't play nice, yes.
2    Q.  Was that in connection with that incident
3    where Jesse says he told her that you told him to
4    help her with something?
5    A.  I can't -- I don't know for sure, but it
6    sounds like that is one incident -- once instance
7    that was that way.
8    Q.  How was that relevant to the allegations
9    that Jesse was making against you for sexual
10   harassment?
11   A.  I don't understand the question.
12   Q.  Well, you understood from what Kloosterman
13   said at the beginning that Jesse had made
14   allegations of sexual harassment, right?
15   A.  Uh-huh.
16   Q.  Yes?
17   A.  Yes.
18   Q.  And that Kloosterman was investigating
19   those --
20   A.  Correct.
21   Q.  -- right?
22       So how do complaints that you got from
23   people about Jesse's attitude have any relevance to
24   her allegations of sexual harassment against you?

Page 238

1        MR. TUCKER:  Objection; misleading.
2        THE WITNESS:  Answer?
3        MS. GURMANKIN:  Yes.
4        MR. TUCKER:  Uh-huh.
5    A.  So I don't know what the -- these are --
6    these are just my responses to something she asked
7    me.  So I don't know what they -- what that was.
8    Q.  (BY MS. GURMANKIN)  So if you go --
9        MR. TUCKER:  Counsel, I'll at least say
10   that now that you have finished a question, this is
11   all under No. 2.
12       MS. GURMANKIN:  I know.
13       MR. TUCKER:  Okay.
14   Q.  (BY MS. GURMANKIN)  If you look at page
15   1 --
16   A.  Yes, ma'am.
17   Q.  -- No. 2.
18   A.  Uh-huh.
19   Q.  "Describe what event led you to send that
20   email to Michelle with your concerns."
21   A.  Okay.
22   Q.  See that?
23   A.  Yes.
24   Q.  Then continuing on to page 2, we are still

Page 239

1    under that question.
2    A.  Okay.
3    Q.  All right?  And the email was what we
4    looked at earlier marked as Exhibit 5 [sic] that you
5    sent to Michelle Priest.
6    A.  Okay.  I understand.
7    Q.  Okay.  So first, the complaints that you
8    got about Jesse, does that have any relevancy to the
9    allegations she is making of sexual harassment
10   against you?
11   A.  No.
12   Q.  Does it benefit -- well, strike that.
13       Why didn't you tell Michelle Priest in
14   your email to her that you could -- you get
15   complaints from a lot of people about Jesse's
16   attitude?
17       MR. TUCKER:  Objection.
18   A.  Again, I sent Michelle a note saying I
19   wanted to talk to her about that particular
20   incident.  It wasn't a formal, written documentation
21   of any kind.  And so that's why I didn't put that in
22   the note.
23   Q.  (BY MS. GURMANKIN)  But it wasn't a
24   one-sentence email.  I mean, you put in stuff about

Page 240

1    what Jesse said in the meeting and that you had
2    performance concerns about Jesse, right?
3    A.  Correct.
4    Q.  So why didn't you just include that you get
5    complaints from a lot of people about her attitude?
6        MR. TUCKER:  Objection; asked and
7    answered.
8        THE WITNESS:  Go ahead and answer?
9        MS. GURMANKIN:  Yes.
10   A.  Again, there is no reason why I didn't do
11   it.  I just didn't do it.
12   Q.  (BY MS. GURMANKIN)  Were you trying to
13   portray Jesse in a negative light so her allegations
14   wouldn't be believed?
15       MR. TUCKER:  Objection.
16   A.  Absolutely not.
17   Q.  (BY MS. GURMANKIN)  So why would you tell
18   Kloosterman something that has no relevance to her
19   allegations of sexual harassment?
20       MR. TUCKER:  Objection; asked and
21   answered.
22   A.  Again, just giving her some details of --
23   of what's going on, trying to give her the
24   background because I want her to have both sides of

60  (Pages 237 to 240)

Page 241

1   the story.
2      Q. (BY MS. GURMANKIN) And no documentation
3   from -- there is no documentation that exists prior
4   to your meeting with Kloosterman about any
5   complaints that you have gotten about Jesse's
6   attitude, correct?
7      A. Other than her evaluations.
8      Q. Well, you talked about her frustration with
9   management positions, right?
10     A. That's correct.
11     Q. But not that you are getting complaints
12   about her attitude, correct?
13     A. So I just want to make a clarification. So
14   when we write up evaluations on someone, you want to
15   make it to where it fits what the IPF is. And so
16   what I'm trying to say is, just because she had a
17   list of things that, you know, opportunities to
18   improve on doesn't mean I'm going to put them in
19   that list, because that's going to be what someone
20   sees.
21        So what you do is you just kind of
22   ad-lib and you put, Hey, these are some of the
23   things I want you to work on, and then we can talk
24   about the others. So you don't want to belittle

Page 242

1   them or degrade them inside this document that's
2   going to be in their file forever. So...
3      Q. No, but you want to be honest about the
4   feedback that you are including in the performance
5   review, right?
6      A. That's correct.
7      Q. Okay. Because it's supposed to be an
8   accurate reflection of their positive attributes and
9   their opportunities to improve?
10     A. Agreed.
11     Q. Okay. And you don't actually say anywhere
12   in the performance review for 2015 that we looked at
13   that you have gotten any complaints from people
14   about Jesse's attitude, correct?
15     A. Correct.
16     MR. TUCKER: Can we turn to that?
17     MS. GURMANKIN: He answered.
18     Q. All right. Go back to Exhibit 19.
19     MR. TUCKER: If you need to look at --
20     MS. GURMANKIN: He answered. He
21   answered.
22     MR. TUCKER: Counsel -- if you need to
23   look at a document -- if she's referring to a
24   document, take your time to look at the document.

Page 243

1   Okay?
2      THE WITNESS: Okay.
3      MR. TUCKER: You don't need to answer
4   just to give her an answer. Okay?
5      THE WITNESS: Okay.
6      Q. (BY MS. GURMANKIN) No, but if you are able
7   to answer without looking at the document, then you
8   need to answer.
9      MR. TUCKER: I'm giving you my
10   instructions. If she's asking about a document,
11   you'll follow my instructions. You take your time.
12   You look at the document. Okay?
13     THE WITNESS: Okay.
14     Q. (BY MS. GURMANKIN) All right. Page 2 of
15   Exhibit 19.
16     A. Okay.
17     Q. "When I told her I wanted her to train the
18   CATS people how to do it themselves, she thinks
19   everyone is incompetent and they can't do it. She
20   did not want them to do it themselves. We came up
21   with a whole list of things that weren't being done
22   right."
23      Did you tell Kloosterman that?
24     A. I don't recall but just seeing this, it

Page 244

1   looks like I -- I said something to that effect.
2      Q. Okay. And does that have any relevancy to
3   Jesse alleging that you sexually harassed her?
4      A. I really can't answer that. I wasn't --
5   I'm not there -- I wasn't there -- I don't remember
6   what Megan said or the contents. I know what the
7   question was, but this is what I sent her.
8      Q. Okay. But just seeing that paragraph, does
9   that have any relevancy to Jesse alleging that you
10   sexually harassed her?
11     A. No.
12     Q. It's portraying Jesse in a negative light
13   is what it's doing, right?
14     MR. TUCKER: Objection to your
15   characterization.
16      You may answer.
17     A. I'm just giving her the background of --
18   of -- how -- of what Jesse has been doing.
19     Q. (BY MS. GURMANKIN) It's not a compliment
20   about Jesse, right?
21     A. That's correct.
22     Q. Okay. It's not positive feedback?
23     A. That's correct.
24     Q. Negative feedback?

61 (Pages 241 to 244)

Page 245

1    A. It's -- it's feedback.
2    Q. It's negative, right?
3    A. It's opportunities, that's correct.
4    Q. Okay. And you were doing that because you
5    wanted to try to portray Jesse in as negative a
6    light as possible so her allegations wouldn't be
7    believed?
8    A. No. I'm trying to say that when she says I
9    always put her down and whatever else that her
10   allegations were, I'm just rebutting to that. So if
11   there's -- if I'm -- if she's saying I'm
12   putting her down because I have got some questions
13   about a visual board, I don't want her -- I'm not
14   putting her down. I'm just giving her coaching on
15   that visual board. So I'm putting that in contents,
16   right? Because I don't want her to know that, you
17   know, I haven't done this. So I have a reason to
18   talk to Jesse, but Jesse may see it in a different
19   light than what I'm actually bringing up.
20   Q. Next paragraph, "She gets so mad. She said
21   she was going to go to the field. She texted me
22   that she would be gone all day. I asked her if we
23   could make it four hours, and she got very upset and
24   wouldn't talk to me for three, four days. The week

Page 246

1    before that to ask if she could take April/Tonia out
2    to dinner on the Shell card. I said sure, keep it
3    reasonable if you want to get together. She gets
4    very mad at me when I say no as my supervisor."
5         You mean she got mad at you when you
6    said no as her supervisor, right?
7    A. I'm going to assume that's what Megan's
8    writing.
9    Q. Did you say that to Kloosterman?
10   A. Again, I don't know word for word, but
11   reading this, it looks like there was some content
12   to that.
13   Q. And again, that portrays Jesse in a
14   negative light?
15   A. It's just giving the facts.
16   Q. It's not a compliment, right?
17        MR. TUCKER: Objection; asked and
18   answered.
19   A. No.
20   Q. (BY MS. GURMANKIN) Right? No, I haven't
21   asked about this. It's not a compliment, is it,
22   what you are saying here, according to Kloosterman?
23        MR. TUCKER: Objection; asked and
24   answered.

Page 247

1         You may answer.
2    A. No, it's not a compliment.
3    Q. (BY MS. GURMANKIN) Okay. It's not
4    positive feedback?
5    A. That's correct.
6    Q. It's negative feedback?
7    A. It's not positive for sure.
8    Q. It's negative feedback, right?
9         MR. TUCKER: Objection; asked and
10   answered.
11   A. Yes, it's not -- it's not positive.
12   Q. (BY MS. GURMANKIN) Which means it's
13   negative, right?
14        MR. TUCKER: Objection; asked and
15   answered three times.
16        Don't answer it.
17   Q. (BY MS. GURMANKIN) It's the opposite of
18   positive, right?
19        THE WITNESS: You want me to answer?
20        MR. TUCKER: You can stick to your
21   answer. Answer the question.
22   A. No, it is what it is. It's not -- it's not
23   positive.
24   Q. (BY MS. GURMANKIN) Right. Are you trying

Page 248

1    to portray Jesse in a negative light when you say
2    that --
3    A. No.
4         MR. TUCKER: Objection; asked and
5    answered.
6    A. (Continuing.) I'm -- I'm just giving the
7    facts.
8    Q. (BY MS. GURMANKIN) Does that paragraph
9    have any relevancy to her alleging that you sexually
10   harassed her?
11   A. Again, I'm just stating the facts of some
12   of the accusations that she gave me.
13   Q. Again, I'm just asking, as that paragraph
14   reads, does that have any relevancy to her
15   allegations that you sexually harassed her?
16   A. No.
17   Q. Next paragraph, "I found out that she and
18   someone else went out on a drilling rig. I didn't
19   know that she did it, but why would you do that if
20   you had other work for me to do."
21        When did you find this out? Well,
22   first of all, do you recall saying this to
23   Kloosterman?
24   A. I remember something about the drilling

62 (Pages 245 to 248)

Page 249

1  rig, but again, I don't recall the conversation with
2  me and Megan.
3      Q.  Okay.  When did this happen?
4      A.  I don't even -- I don't remember that.
5      Q.  Okay.  As you sit here today, you have no
6  recollection of that happening?
7      A.  I have a recollection but I can't remember
8  the day or when -- when it happened.
9      Q.  How about the year?
10     A.  I -- I -- I couldn't tell you.
11     Q.  Was it before Jesse was full-time?
12     A.  It was after when she was full-time.
13     Q.  Do you recall if it was 2016?
14     A.  I don't remember.  I would almost -- yeah,
15  it would almost have to be because this was in '16.
16     Q.  Okay.  Who was the someone else she went
17  out with?
18     A.  Again, I don't know.
19     Q.  Did you address it at the time?
20     A.  No, because it was already past -- past
21  gone when I found out.
22     Q.  Okay.  So were you concerned about it when
23  you found out?
24     A.  Not too concerned.

Page 250

1      Q.  Okay.  I mean, not concerned enough to
2  address it with her, right?
3      A.  Correct.
4      Q.  Or raise it to anyone at Shell?
5      A.  Correct.
6      Q.  Why did you mention it to Kloosterman?
7      A.  Again, relevance to what Jesse was -- was
8  saying, and I'm just giving some contents to her.
9          MR. TUCKER:  When you say "contents,"
10  do you mean context?
11         THE WITNESS:  That's -- am I saying --
12  my braces kind of -- context.  I apologize if I'm
13  saying contents.  Context.
14         MR. TUCKER:  Stop for a second.  I want
15  to talk to the Court Reporter.
16         Have you been hearing him say
17  "contents" or "context"?
18         THE REPORTER:  Contents.
19         MR. TUCKER:  Yeah, that's what I've
20  been hearing, contents, too.
21         THE WITNESS:  Context.  I apologize.
22  It's hard sometimes to say certain words with these
23  braces.
24         MR. TUCKER:  The three of us heard

Page 251

1  "contents."
2          MS. GURMANKIN:  I heard "context."
3          THE WITNESS:  Thank you.  That's what I
4  have been meaning.
5          MR. TUCKER:  Two of the four of us.
6          THE WITNESS:  Okay.
7      Q.  (BY MS. GURMANKIN)  All right.  The
8  paragraph about the drilling rig, as you read that,
9  does that have any relevancy to Jesse alleging that
10  you sexually harassed her?
11     A.  Not that I can see, no.
12     Q.  All right.  "No other performance-related
13  concerns before the board, just her attitude.  So I
14  was trying to be accommodating and work with her,
15  i.e., not attending meetings."
16         Do you recall saying that to
17  Kloosterman?
18     A.  Again, not word for word but --
19     Q.  The gist?
20     A.  -- reading it, yeah.
21     Q.  The "no other performance-related concerns
22  before the board," what does that mean?
23     A.  So if I asked her to do some kind of like
24  an administrative task -- and I say administrative,

Page 252

1  not in the context that she wasn't an analyst --
2  excuse me -- pull in KPI certain -- certain reports,
3  she could do that really well.  But when it comes to
4  the board, that's where you had to think outside the
5  box and come up with some different ideas.
6          Even though I didn't know every time
7  what I wanted, I knew we had to come up to
8  something.  And I know that makes -- that's hard to
9  say.  So I'm wanting to see something; I just don't
10  know what.  That was hard for her to try to envision
11  and -- and make possible.  That's why she went to
12  Rory on a few things or she went to someone else,
13  trying to get that captured on the board.
14     Q.  Okay.  So are you saying there were no
15  performance-related concerns about Jesse before the
16  visual board issue came up?
17     A.  Right.  So performance and attitude is two
18  different things when it comes, but yes.
19     Q.  Okay.  And when did the visual board come
20  up?  When did that issue start?
21     A.  I can't remember the date.
22     Q.  The year?
23     A.  It had to be in 2016.
24     Q.  Okay.  Do you recall which part, early,

**63 (Pages 249 to 252)**

Page 253

1    mid?
2        A.  No, I don't.  And I don't want to guess.
3        Q.  A few paragraphs down you say, according
4    Kloosterman, "I fought to get her hired," meaning
5    Jesse.
6            Do you recall saying that to
7    Kloosterman?
8        A.  Again, I do not recall saying that.
9        Q.  Is that true?
10       A.  It is true.
11       Q.  Is that because of how she performed when
12   she was a contractor?
13       A.  Correct.
14       Q.  Next paragraph, JG7 issue.  What is that?
15   Do you know?
16       A.  What is what?
17       Q.  The JG7 reference.
18       A.  Let me read the -- what it says here.
19           So this was in reference to the money
20   issue that was brought up earlier during the
21   deposition where I made the reference where she was
22   at, you know, wanting more -- you know, more money.
23   So the JG7 is a pay grade up for her.
24       Q.  And you are telling -- according to

Page 254

1    Kloosterman, you said, "I was trying to build her
2    up.  I told her, I'm sorry -- I told her, I'm sorry
3    I said this, but you're making good money as a
4    woman.  My intent was good but I was trying to make
5    her feel good about it.  I won't lie to you."
6            Do you recall saying that to
7    Kloosterman?
8        A.  Not word for word.  And again, it
9    was -- the sorry was to Megan, not to Jesse.  So,
10   yeah, not word for word but she's written something
11   down here that we discussed it.
12       Q.  Why would you say "I'm sorry" to Megan?
13       A.  I'm just being apologetic for saying that.
14       Q.  Why?
15       A.  A choice of words, using my wife versus
16   someone else.
17       Q.  Why are you apologizing to Megan about
18   that?
19       A.  Again, just apologetic for saying it.
20       Q.  No, I know.  But why Megan?
21       MR. TUCKER:  Objection; asked and
22   answered.
23       Q.  (BY MS. GURMANKIN)  You didn't say it to
24   Megan.

Page 255

1        A.  I don't know.  I just said that.
2        Q.  Because you were afraid that she concluded
3    that you did something wrong by saying that to
4    Jesse?
5        A.  Well, I admitted it.  So -- and I just
6    said, if it was wrong, I apologize for it.
7        Q.  Did you ever apologize to Jesse?
8        A.  I don't believe so, no.
9        Q.  Why?
10       A.  Because at that point right there, it
11   wasn't -- we just weren't on talking terms anymore.
12       Q.  And you don't think you actually did
13   anything wrong by saying that to Jesse, do you?
14       A.  I do not.
15       Q.  So why did you say "I'm sorry" to Megan?
16       A.  I don't know.
17       Q.  Did Jesse ever talk to you about wanting
18   more field experience?
19       A.  I don't recall specifically that she's
20   saying that, but I have read that somewhere in the
21   deposition so -- but I don't recall that.
22       Q.  Did you ever talk to her about getting more
23   field experience?
24       A.  I don't recall.

Page 256

1        Q.  Did you ever try to get her more field
2    experience?
3        A.  Well, allowing her go to the field would be
4    me letting her get that field experience.
5        Q.  Was that when she asked you?
6        A.  Uh-huh.
7        Q.  Yes?
8        A.  Yes.
9        Q.  Did you ever encourage her to do that
10   outside of when she asked you?
11       A.  I -- I really don't recall if I have or
12   not.
13       Q.  Did you encourage any of your male direct
14   reports to get more field experience?
15       A.  I don't believe so.
16       Q.  All right.  Question No. 3 at the bottom of
17   page 2, "Overall, describe your working relationship
18   with Jesse.  How has the relationship been this
19   year?"  First bullet point says, "Recently not very
20   good."
21           Did you tell Kloosterman that?
22       A.  Can you --
23       Q.  Bottom of page 2.
24       A.  Okay.  I got back the document.  Sorry; I

**64 (Pages 253 to 256)**

Page 257

1  hit the wrong button.  I apologize.
2          Can you read that question again?
3    Q.  Yes.  No. 3 at the bottom.  You see where I
4  am?
5    A.  Yes, ma'am.
6    Q.  "Overall, describe your working
7  relationship with Jesse.  How has the relationship
8  been this year?"
9          You see that?
10    A.  Yes.
11    Q.  First bullet, "Recently not very good."
12          Did you tell Kloosterman that?
13    A.  According to this, looks like I said
14  something to that effect.
15    Q.  Okay.  And you are not disputing anything
16  that Kloosterman writes in here?
17    A.  I'm not what?
18    Q.  Disputing anything that she writes here?
19    A.  So I don't know -- again, I don't know if
20  this was taken word for word.  I think she was just
21  ad-libbing some of the stuff that I said.  But we'd
22  have to ask Megan because I really don't know.  To
23  me this is a summary of kind of what happened.
24  So...

Page 258

1    Q.  By "ad-libbing," you mean paraphrasing?
2    A.  Yes, ma'am.
3    Q.  In any case, was your working relationship
4  with Jesse recently not very good?
5    A.  According to this, correct.
6    Q.  Well, no, I'm asking.
7    A.  Yes.
8    Q.  Okay.  And that started at the time that
9  you have that one-on-one meeting with her on
10  November 21, 2016?
11    A.  I can't be for sure of the date, but I know
12  it had to do with the A3 board, whenever that was
13  started up.
14    Q.  Well, that meeting that you had with her
15  after she blows up at Jeremy Greene was November 21,
16  2016.
17          Was that the first time that you
18  had -- you and Jesse had issues?
19          MR. TUCKER:  Issues as related to the
20  board that you were talking about or issues at all?
21          MS. GURMANKIN:  Yeah.
22    A.  Yeah, so not issues at all.  I mean, she's
23  been mad at me several times before, but this is the
24  first time I called her in for a one-on-one coaching

Page 259

1  in that effect.
2    Q.  (BY MS. GURMANKIN)  Okay.  And that was the
3  first time that your relationship started to change?
4          MR. TUCKER:  Objection.
5    Q.  (BY MS. GURMANKIN)  Or did it start to
6  change before?
7    A.  It -- it changed after that.
8    Q.  Okay.  Immediately after that?
9    A.  Yes.
10    Q.  As a result of that meeting?
11    A.  Yes.
12    Q.  Your relationship was the same from the
13  time she was a contractor up through that meeting?
14    A.  I believe so, yes.
15    Q.  Third bullet point, "Told an individual
16  that hugged her that she doesn't like to be hugged.
17  I was looking out for her, and she was upset that I
18  did that."
19          Did you tell Kloosterman that?
20    A.  It looks like I mentioned that, yes.
21    Q.  Do you know what that's about?
22    A.  I do.
23    Q.  What?
24    A.  So she -- someone came in from Canada, a

Page 260

1  maintenance expert, if you will, SME, subject matter
2  expert, Dalton Marshal.  And I was in another
3  meeting.  He came in and I don't know if he was
4  there for us or not.  And then apparently he gave
5  Jesse a hug.
6          And then when I got out of my
7  meeting -- I don't recall who came up to me, if it
8  was one or two people, could have been Dan Krise or
9  Ken Foreman or Jeremy Greene.  I don't know who
10  did -- but someone came up and said, "Hey, I just
11  want to let you know, Dalton hugged Jesse."
12          And I said, "Oh, boy.  Okay."
13          And they said, "She's pissed."
14          And I said, "Okay."  So I went, found
15  Dalton.  And I said, "Listen, between you and I,
16  Jesse don't like to be touched or hugged or anything
17  like that."
18          And he's like, "Oh, my God.  I didn't
19  know."
20          And I said, "It's fine.  She didn't say
21  nothing to me.  I'm just letting you know.  But
22  don't go to her that I told you.  Just let it go.
23  But for future reference, she doesn't want to be
24  touched."

**65 (Pages 257 to 260)**

Page 261

1      And so that's what I did.  And then he
2  went and told Jesse that I said that, and then she
3  got mad at me for saying that.
4      Q.  When either Krise or Jeremy or Ken, whoever
5  told you that he hugged Jesse, your reaction was
6  "Oh, boy," why was that your reaction?
7      A.  Because I know Jesse didn't like to be
8  touched.
9      Q.  And how did you know that?
10     A.  She's mentioned that before.
11     Q.  To you or to other people who told you?
12     A.  To me and other people.
13     Q.  Okay.  When has she said that to you?
14     A.  I don't recall when.
15     Q.  What was the context?
16     A.  I can't remember what the context was, to
17 be honest with you.  I just -- we just know she
18 doesn't like to be touched or hugged.
19     Q.  Is it because she was touched or hugged at
20 work?
21     A.  She didn't say that.
22     Q.  Did she say why she was saying this?
23     A.  No, she didn't.  If she did, I don't recall
24 that.

Page 262

1      Q.  So as far as you can recall, she just came
2  up to you and others one day and said she doesn't
3  like to be touched or hugged?
4      MR. TUCKER:  Objection.  It
5  mischaracterizes his testimony.
6      Please answer.
7      A.  Yeah, I don't know how the contents --
8  context was, but it was not that.  I don't know.
9      Q.  (BY MS. GURMANKIN)  And can you think of
10 any other way that that makes sense other than she
11 was reacting to being touched or hugged by people at
12 work?
13     MR. TUCKER:  Objection; calls for
14 speculation.
15     You may answer.
16     A.  I can't think of anything.
17     Q.  (BY MS. GURMANKIN)  Was Dalton an employee
18 of Shell at the time?
19     A.  He was.
20     Q.  Did you tell him that he shouldn't in
21 general go around hugging female employees of the
22 company?
23     A.  I did not.
24     Q.  How come?

Page 263

1      A.  I just -- I didn't think about it, I guess,
2  at the time.
3      Q.  You thought it was okay?
4      MR. TUCKER:  Thought what was okay?
5      THE WITNESS:  Yeah.
6      Q.  (BY MS. GURMANKIN)  Hugging female
7  employees.
8      A.  If -- I would assume yes.
9      Q.  Next bullet -- I'm sorry; two bullet points
10 down, "They mess around a lot and joke around and
11 then she gets mad at me for not intervening."
12     Did you say that to Kloosterman?
13     A.  I don't recall if I said that or not.  I
14 don't -- I don't even know what that means.
15     Q.  You don't -- you have no idea what that
16 refers to?
17     A.  I mean, it's about joking, but I don't know
18 what -- you know, what there was something else to
19 be said.  She might have asked me a question, but it
20 just means she gets mad -- or gets mad at me for not
21 intervening.  Unless it's with somebody -- I don't
22 know.
23     Q.  Under No. 3, "Overall, describe your
24 working" --

Page 264

1      MR. TUCKER:  Hold on.  Were you
2  finished --
3      Can you read back his answer?
4      Because you gave an answer, and then
5  you said "I don't know."
6      Read back the question and answer,
7  please.
8      (The requested portion was read.)
9      MR. TUCKER:  Stop for a second.
10     Did you hear your response to that
11 question?
12     THE WITNESS:  Yeah, that sounded
13 horrible.
14     MR. TUCKER:  You start off by saying
15 you don't know, then you give some stuff.  I need
16 you to -- I need you to listen to her question,
17 repeat it if necessary and answer her question,
18 please.
19     And, Counsel, if you want to reask that
20 question, please do because it made no -- his answer
21 made no sense.
22     Q.  (BY MS. GURMANKIN)  Did the guys on your
23 team mess around a lot?
24     A.  They joke a lot, yes.

66 (Pages 261 to 264)

Page 265

1　　Q. Do they make jokes that are inappropriate?
2　　A. Not that I heard.
3　　Q. Okay. What do they joke about?
4　　　　MR. TUCKER: You are talking about in
5　the context of 2016, Counsel, or are you talking
6　about right now in 2020?
7　　Q. (BY MS. GURMANKIN) Your group when you
8　were maintenance supervisor in Appalachia.
9　　A. All kinds of stuff.
10　　Q. What?
11　　A. Golf, football, just all kinds of stuff. I
12　don't know any particulars.
13　　Q. Women?
14　　A. I have never heard them joke about women.
15　　Q. Have you heard them joke about anything
16　other than golf or football?
17　　A. I'm sure I have, but I can't recall that.
18　　Q. All you can recall today is golf and
19　football?
20　　A. Sure. Yes.
21　　Q. And would Jesse get mad at you for not
22　intervening?
23　　A. It says that she gets mad at me for not
24　intervening.

Page 266

1　　Q. Would she?
2　　A. I don't know. I -- I can't -- I can't
3　recall.
4　　Q. Page 3. No. 4 at the top, "Are you aware
5　of any concerns she has with your working
6　relationship? Has he made you -- has she made you
7　aware of any concerns that she has?"
8　　　　The only -- and I just want to make
9　sure of this. The first time that you learned of
10　any concerns that Jesse had from anyone at Shell was
11　in that November 21, 2016, meeting with Jesse?
12　　A. Yes.
13　　　　MR. TUCKER: Objection.
14　　Q. (BY MS. GURMANKIN) Correct?
15　　A. Yes.
16　　Q. Okay. All right. So under the
17　"Supervisor" header on page 3.
18　　A. Okay.
19　　Q. We talked about the first one. Second one,
20　"I have been brought into situations with an
21　employee that were not necessary because my
22　supervisor thought it was funny that the other
23　employee and myself did not like each other (Robin
24　G.)"

Page 267

1　　　　Did you do that?
2　　A. No.
3　　Q. What was your relationship with Robin
4　Grouette?
5　　A. She was my operations manager.
6　　Q. Did you have any relationship with her
7　other than a working relationship?
8　　A. No.
9　　Q. Did you flirt with her?
10　　A. No.
11　　Q. If somebody said that they thought that you
12　may have had an inappropriate relationship with
13　Robin Grouette, then would they be lying?
14　　A. Yes.
15　　Q. Okay. And according to Kloosterman's notes
16　under that second bullet point, you said, "Jesse
17　said she hoped she ran into Robin's husband in
18　Canada because she'd hit on him."
19　　　　Do you remember saying that to
20　Kloosterman?
21　　A. I don't recall saying it, but I -- I do
22　remember Jesse saying that.
23　　Q. Okay. When did Jesse say that?
24　　A. I don't recall when.

Page 268

1　　Q. Do you recall the year?
2　　A. I do not recall the year.
3　　Q. But she was full-time?
4　　A. I don't recall that, as well.
5　　Q. Did you say anything when she said that?
6　　A. No, I just basically said, "Jesse, that's
7　wrong." And she just laughed. And then -- because
8　again, that's the kind of -- that was the
9　relationship I perceived us having is that
10　back-and-forth banter.
11　　Q. Had you told anyone at Shell about that
12　comment before your talk with Kloosterman?
13　　A. I don't think so.
14　　Q. Next one, "Jesse hates Robin Grouette."
15　　　　Why are you telling -- well, strike
16　that.
17　　　　Do you remember telling Kloosterman
18　that?
19　　A. I don't remember telling her that, no.
20　　Q. Okay. Would there been any reason for you
21　to tell her that?
22　　A. There had to be some kind of reason, but I
23　don't know why.
24　　Q. Why would you tell her about Jesse's

67 (Pages 265 to 268)

Page 269

1    comment about Robin's husband?
2       A.  Because I just wanted to make sure she
3    understood the relationship between Jesse and I.
4       Q.  How does that, according to what she wrote
5    here, suggest anything about your relationship?
6       A.  That to me it suggests that she has an
7    open -- an open relationship with me.  She tells me
8    things like this.
9       Q.  Did Robin Grouette ever ask you to bring
10   Jesse to a meeting?
11      A.  I -- I don't remember if she did or has or
12   has not.
13      Q.  Would you joke and say to Jesse, "Hey, your
14   favorite person is here" when Robin was around?
15      A.  I don't recall that at all.
16      Q.  All right.  Next bullet point, "I was told
17   in my mid-year review that I make good money for a
18   woman and should not be upset with my pay grade by
19   my supervisor."  And according to Kloosterman's
20   notes, you said, "It was when we first hired her and
21   when she got her salary.  But I did say that, yes."
22          You did admit that to Kloosterman,
23   right?
24      A.  Yes.

Page 270

1       Q.  Did you tell Kloosterman that you said it
2    in the context of your wife is a nurse and Jesse
3    makes more than her?
4       A.  I'm thinking I did, yes.
5       Q.  Two bullet points down, "I was told I work
6    well with male employees because I am a woman by my
7    supervisor (project with lead mechanics - PMPs)."
8    According to Kloosterman, your response was, "I said
9    that.  I said we saved this money.  Let's put it on
10   the board.  Let's keep going.  I said that's good
11   it's because you are a girl.  Tim Brueilly and Luke
12   are who she said she works with -- well with, and
13   you gotta know them to understand.  You need to know
14   Tim."
15          Do you remember saying that to
16   Kloosterman?
17      A.  I remember us talking about it but not
18   verbatim.
19      Q.  Is that Luke Strikeweather [phonetic]?
20      A.  It is.
21      Q.  The reference to "You gotta know them to
22   understand.  You need to know Tim," do you know what
23   that's about?
24      A.  So I believe we talked about this earlier

Page 271

1    today, but that's the guys who are kind of gruff.
2    They are -- you know, you ask them to go do
3    something, it's 50/50 if they do it or they, you
4    know, do something.  And that's what it's about.
5    They are just -- they are just rough around the
6    edges.
7       Q.  Okay.  Next bullet point,
8    "Superintendent" --  and who was that at this time?
9       A.  Would be Steve Craig.  Well, let's -- let
10   me -- let's read the bullet before I say that.
11      Q.  Sure.  Go ahead and read it.
12      A.  Yeah.  So I retract when I said Steve
13   Craig, because I don't know who this is.  This is a
14   statement from Jesse.  So I don't know in
15   what -- when this would have happened.  So I don't
16   know who this was.
17      Q.  Okay.  And do you remember discussing that
18   with Kloosterman?
19      A.  I do not.
20      Q.  At least, according to her notes, you are
21   not disputing that, right?
22      A.  That's correct.  Well -- okay.  No, I --
23   well, you see here "I was taken aside by my
24   supervisor," but then my response was "I don't do

Page 272

1    that."  But if she wrote that down there, that's
2    what was talked about.
3       Q.  And you are saying "I don't remember what
4    we were speaking about," according to her notes?
5       A.  Verbatim, that's correct.
6       Q.  Next one, "I was told I am a hot blond by
7    my supervisor (Supermarket story - 'saw a hot blonde
8    at supermarket')."
9          According to her notes, you confirmed
10   the supermarket story and also said, "At last year's
11   Christmas party, she was showing me the picture of
12   me and her boyfriend at the Christmas party and
13   referenced two handsome gentlemen."
14          Do you remember telling Kloosterman
15   that?
16      A.  I don't recall specifically, but...
17          MR. TUCKER:  But what?
18      A.  But no.  I -- I must have said something to
19   that general effect.
20      Q.  (BY MS. GURMANKIN)  Next one, "I am
21   continuously asked about my personal life by my
22   supervisor, (example, do you drink wine when you get
23   home?)"
24          Did you ever ask Jesse that?

Page 273

1    A.  Yes.
2    Q.  Why?
3    A.  Because she brought up how she likes to
4    drink when she gets home at different times.  So I
5    would bring that up to her.
6    Q.  Did you bring it up to her in any other way
7    than asking does she drink wine when she gets home?
8    A.  Not that I recall.
9    Q.  Under that, according to Kloosterman, you
10   say, "I do talk with her.  We will all sit in a
11   group.  She talked about buying a house.  Asked her
12   about buying a house.  She confided in my one time
13   that she had to go to the doctor.  I asked if she
14   was okay, and she shared with me."
15           Do you remember saying that to
16   Kloosterman?
17   A.  No.
18   Q.  Do you remember telling Kloosterman that
19   Jesse had talked about car issues, house fires, her
20   boyfriend and partying and getting drunk?
21   A.  That was my words, yes.
22   Q.  Did you tell Kloosterman that?
23   A.  I don't recall.
24   Q.  Because that's everything that Jesse talked

Page 274

1    about to you about regarding personal issues.
2    That's what you testified to earlier, right?
3    A.  I wouldn't say everything, but that's some
4    of the things we talked about, yes.
5    Q.  That's all you can think of --
6    A.  Yes.
7    Q.  -- as you sit here today?
8        All right.  Page 4.  First bullet
9    point, "My supervisor has referred to my significant
10   other as a nerd."  According to Kloosterman, you
11   say, "Probably so.  One day I saw her passing and I
12   asked who that goofball was that was driving her
13   car.  I am always asking about how he's doing.  My
14   wife is an RN."
15           Do you remember telling Kloosterman
16   your wife was a nurse?
17   A.  No, I don't -- I don't recall that.
18   Q.  Next one, "At a work charity golf
19   tournament I was asked more than once why I was not
20   wearing shorts at this event and if my supervisor
21   could cut my pants into shorts, as well as other
22   supervisors joined in and took a picture of my
23   backside (buttock) and saved on phone."
24           According to Kloosterman, you said,

Page 275

1    "She told us she would get swamp ass walking around
2    in those pants."
3        Do you recall telling that to
4    Kloosterman?
5    A.  I don't.
6    Q.  Okay.  But you said Jesse said that to you?
7    A.  Correct.
8    Q.  Next bullet point, "It doesn't sound like
9    something out of the ordinary to cut her pants."
10           Do you recall saying that?
11   A.  That's what I was talking about before I --
12   when I said I didn't think that -- it sounded like
13   something I'd say so -- but I don't recall telling
14   Megan that.
15   Q.  Do you recall what you told her about the
16   picture?
17   A.  No, I do not.
18   Q.  In the last bullet point -- I'm sorry; the
19   second-to-last bullet point under this one,
20   according to her, you said, "I don't know who took
21   the picture."
22       You see that?
23       MR. TUCKER:  Where?  Hold on.  I don't
24   see it, either.  Counsel, give me one second.  I'm

Page 276

1    trying to find it.
2        MS. GURMANKIN:  Third bullet point.
3        MR. TUCKER:  Third bullet point.
4        MS. GURMANKIN:  Under the second, "At a
5    work charity golf tournament."
6        THE WITNESS:  Okay.
7        MR. TUCKER:  Go ahead.  I'll catch up.
8    Q.  (BY MS. GURMANKIN)  Okay.  You see that,
9    Mr. Turney?
10   A.  Yes.
11   Q.  That would indicate that you knew that
12   there was a picture taken.  You agree with that, the
13   way it's written?
14       MR. TUCKER:  Objection.
15   A.  No, I don't agree with that.
16   Q.  (BY MS. GURMANKIN)  Okay.  Well, according
17   to Kloosterman's notes, you are referencing a
18   picture, right?
19       MR. TUCKER:  Objection.
20   A.  It says, "I don't know who took the
21   picture."  But I -- again, she's telling me that
22   Jesse said that there was a picture taken,
23   obviously, but I don't know about any picture.
24   Q.  (BY MS. GURMANKIN)  You didn't say,

69 (Pages 273 to 276)

Page 277

1    according to Kloosterman's notes, that never
2    happened, right?
3              MR. TUCKER:  Objection.
4         A.  Again, going by the notes, it just says, "I
5    don't know who took a picture."  If someone took a
6    picture, I don't know who -- who it was.
7         Q.  (BY MS. GURMANKIN)  Well, it doesn't say,
8    "If someone took a picture, I don't know who it
9    was," right?
10             MR. TUCKER:  Objection.
11        A.  Again, this is a summary of what Megan
12   wrote.  We'd have to ask Megan.
13        Q.  (BY MS. GURMANKIN)  I'm asking you.
14             MR. TUCKER:  What are you asking him?
15             MS. GURMANKIN:  The question I just
16   asked, which is, it doesn't say, "If someone took
17   the picture, I don't know who took it."  Right?  It
18   doesn't say that?
19             MR. TUCKER:  Objection.
20        A.  It says, "I don't know who took the
21   picture."
22        Q.  (BY MS. GURMANKIN)  Uh-huh.
23        A.  So that's what I'm telling her.
24        Q.  It doesn't say, "If someone took a picture,

Page 278

1    I don't know who took it," right?
2         A.  That's correct, it does not say that.
3         Q.  All right.  And then do you recall telling
4    Kloosterman about a friend that Jesse brought with
5    her?
6         A.  No, I don't remember that conversation.
7         Q.  Okay.  Do you remember that Jesse brought a
8    friend with her?
9         A.  I do.
10        Q.  What do you remember about the friend?
11        A.  I remember the friend getting extremely
12   drunk, hanging all over everybody.  And if memory
13   serves me, to the best of my knowledge, I believe
14   they took her home earlier because she was so
15   intoxicated.
16        Q.  Did you ever get drunk at a work event?
17        A.  No.
18        Q.  Did you ever drink at a work event?
19        A.  Yes.
20        Q.  At this charity golf event, were you
21   drinking?
22        A.  I believe I was, yes.
23        Q.  Do you know -- do you remember what you
24   were drinking?

Page 279

1         A.  Probably blue juice.  I probably had a
2    glass of that blue juice -- they call it "blue
3    juice" something that I think Jesse had made up.
4         Q.  What's that have in it?
5         A.  You know, honestly, I don't know.  I just
6    know it's blue.
7         Q.  And it's alcoholic?
8         A.  There is alcohol, yes, sorry.
9         Q.  How many glasses of that did you have?
10        A.  Probably just a half a glass.
11        Q.  Anything else?
12        A.  No.
13        Q.  You drink at any other work events?
14        A.  On occasion if we go out to dinner, I might
15   have a beer.  But I'm not a big drinker.
16        Q.  Next bullet point, "I was informed to
17   'bullshit' my superintendent on what my position
18   competency by my supervisor."
19             Did you ever tell Jesse something to
20   that effect?
21        A.  I have no idea even what that means, and
22   no, I have not.
23        Q.  Last bullet point under that, it says,
24   "Steve was questioning her performance because he

Page 280

1    would ask her to do something and she wouldn't
2    understand."
3              Did Steve ever talk to you about that
4    issue regarding Jesse?
5         A.  I don't remember specifically.  I know
6    Steve brought up concerns with her, but this
7    particular thing, I can't say I remember or recall.
8         Q.  Steve brought up performance concerns with
9    her?
10        A.  Yes, to me.
11        Q.  To you?
12        A.  Yes.
13        Q.  Okay.  Prior to that November 21, 2016,
14   meeting?
15        A.  I'm going to probably say -- I don't know.
16   I don't remember dates.
17        Q.  You don't recall if it was before or after?
18        A.  That's correct.
19        Q.  Next bullet point, "My supervisor touches
20   my arm and/or leg the majority of the time I have a
21   meeting or talk to him one on one."
22             Do you recall talking about this to
23   Kloosterman?
24        A.  I do, actually.

70 (Pages 277 to 280)

Page 281

1    Q.  Okay.  Do you recall saying, "I never touch
2   her leg, but I do this to everybody.  I tap people's
3   arms"?
4    A.  So I don't remember that specific comment,
5   but I do know I talk with my hands.  So, you know,
6   yeah.
7    Q.  Did you tell Kloosterman that you talk with
8   your hands?
9    A.  I may have.
10   Q.  Do you recall?
11   A.  I don't recall.
12   Q.  Next bullet, "I have never touched her leg,
13  unless I am scooting in to talk to her."
14       Did you touch her leg when you were
15  scooting in to talk to her?
16   A.  Again, I think I was referencing if she
17  said I touched her leg, I may have if I was scooting
18  in, but I don't know for a fact.
19   Q.  But as far as you know, you never touched
20  her?
21   A.  As far as I know, I have never touched her
22  leg.
23   Q.  Or her arm?
24   A.  Or her arm.

Page 282

1    Q.  Or any body part, right?
2    A.  Correct.
3    Q.  Last bullet point, "She has never asked me
4   to stop."
5        Do you see that?
6    A.  Yes.
7    Q.  Did you say that to Kloosterman?
8    A.  I don't know if I said that or not.
9    Q.  In light of you saying that you never
10  touched Jesse, would that make sense for you to tell
11  Kloosterman that "She's never asked me to stop"?
12   A.  Again, I don't know if I -- yeah, I'm not
13  going to say what Megan was thinking when she wrote
14  that because I don't know.
15   Q.  No, I'm asking you.  Does it make sense
16  that you would have told Kloosterman that Jesse
17  never asked you to stop if you are saying, I never
18  touched Jesse at all?
19       MR. TUCKER:  Objection; as makes sense
20  to?
21       MS. GURMANKIN:  Him.
22       MR. TUCKER:  Objection.
23   A.  If that's what I'm saying, I don't know
24  what the question was, why she would wrote that.

Page 283

1   Because if I'm saying I don't think I have ever
2   touched her, then I don't know why I would say she
3   never asked me to stop.
4    Q.  (BY MS. GURMANKIN)  Right.  That doesn't
5   make sense, does it?
6    A.  It doesn't make sense.
7    Q.  Next one, "I was told I am only right if my
8   supervisor allows me to be my supervisor."
9        Did you ever tell Jesse that?
10   A.  No.  And I have no idea what that even
11  means.  I mean, I get the gist of it, but I have
12  never said that.
13   Q.  The next one, "I have addressed my
14  supervisor about an issue I was having with a
15  coworker and was told that is the way it was going
16  to be.  (Ken Foreman completing some of her work.)"
17       Is that -- do you remember talking
18  about that with Kloosterman?
19   A.  I do not remember talking about that to
20  her.
21   Q.  Is the only issue that Jesse had -- that
22  she talked to you about in connection with Foreman
23  that incident where she had to leave early because
24  she was upset about his comment?

Page 284

1    A.  So, no.  She had -- she had several issues
2   with Ken Foreman but never -- always about
3   work-related issues.
4    Q.  What else were her issues about Foreman?
5    A.  Just, again, like it says in parentheses
6   there, Ken Foreman completing some work.  She didn't
7   want -- because Ken used to be in the role that she
8   was in.  And so he knew a lot of what she knew as
9   far as maintenance analyst.  And so he would try to
10  come in and help her do certain tasks, certain
11  things if she needed -- if he thought she needed to
12  get caught up.
13   Q.  Did you think that she hated Ken?
14       MR. TUCKER:  What word did you say?
15       MS. GURMANKIN:  Hated.
16   A.  Yeah.
17       THE REPORTER:  Could you ask the
18  question again?
19       MS. GURMANKIN:  Sure.
20   Q.  (BY MS. GURMANKIN)  Did you think that she
21  hated Ken?
22   A.  I don't know.
23   Q.  Did you think that she hated Dan Krise?
24   A.  Again, I don't know what she -- if she

Page 285

1    hated someone or not.
2        Q.  Do you remember telling Kloosterman that
3    she hated Foreman or Krise?
4        A.  No, I don't recall saying that.
5        Q.  Page 5, first bullet point from the top.
6        A.  Did you say "third"?
7        Q.  I'm sorry; the second one.  "My supervisor
8    said he thinks it's funny when I get into a
9    disagreement with other women coworkers.  (Example,
10   Tonia P in Pittsburgh -- pointing out an issue)."
11       We talked about that earlier.  You did
12   not ever say that you thought it was funny when she
13   got into a disagreement with female coworkers,
14   correct?
15       A.  That's correct.
16       Q.  And you did not think it was funny when she
17   did that, right?
18       A.  No, I do not think it's funny.
19       Q.  In the last bullet point under that you
20   said, according to Kloosterman, "Example: Tonia is
21   very aggressive.  She will send a note that Jesse
22   can't do her job.  Tonia said she sent you the
23   procedure and she is asking you if you know how to
24   do.  I told her to get with Tonia to figure it out."

Page 286

1        Did Tanya send you a note saying that
2    Jesse can't do her job?
3        A.  I don't recall that.  I'm reading a note
4    here, but I don't recall that.
5        MR. TUCKER:  Recall?
6        THE WITNESS:  The note.
7        MR. TUCKER:  That's
8    referenced -- I'm -- I'm confused, Counsel.  Are you
9    asking does he recall saying this --
10       MS. GURMANKIN:  No.
11       MR. TUCKER:  -- during the
12   investigation?
13       MS. GURMANKIN:  I said did Tonia send
14   the note saying Jesse can't do her job, and he said
15   no.
16       THE WITNESS:  I said, "I don't recall."
17       MR. TUCKER:  "Recall" is what he said.
18       Q.  (BY MS. GURMANKIN)  You don't recall?
19       A.  I don't recall her sending that note.
20       Q.  You don't recall receiving a note saying
21   that Jesse can't do her job?
22       A.  That's correct.
23       Q.  Do you recall Tonia ever complaining about
24   Jesse?

Page 287

1        A.  No.
2        Q.  Did Jesse say to you, Don't send Jill over
3    here, or something to that effect?
4        A.  She did.
5        Q.  Is that Jill Brueilly?
6        A.  It is.
7        Q.  Did she say why?
8        A.  Because she just doesn't want anyone to try
9    to do her work.  I think she was fearful for someone
10   trying to take her role.  I really don't know.  But
11   she just does not like someone else trying to manage
12   her work.
13       Q.  Next bullet point, "Supervisor gestures cat
14   claws and makes a hissing noise."  And you said,
15   according to Kloosterman, "I have done that.  I'm
16   sorry, Megan.  I do that to everyone.  You don't
17   single anyone out."
18       Did you say that to Kloosterman?
19       A.  It says I did here.  Within the same
20   context, yes.
21       Q.  Why did you apologize to Kloosterman?
22       A.  Again, I don't know.
23       Q.  You understand that this is part of Jesse's
24   allegations against you, right?

Page 288

1        A.  Correct.
2        Q.  Did you apologize to Jesse?
3        A.  Again, I already answered that, but I did
4    not.
5        Q.  Did you apologize to Jesse regarding any of
6    your conduct at any time?
7        A.  No.
8        Q.  Next bullet point, "I expressed a concern
9    to my supervisor, a CPR trainer that instructed at
10   our office, that when I was performing CPR, the
11   instructor told me to 'pick my ass up' in front of
12   male colleagues.  My supervisor said, 'Well, did you
13   pick it up?' in a laughing manner."
14       Did that happen?
15       A.  I don't know.
16       Q.  You don't recall?
17       A.  I don't recall.  I was -- I know I was in a
18   class with her, but I don't recall any of the -- any
19   of that.
20       Q.  Next bullet point, "In my goals on HR
21   online I entered I would attempt to visit the field
22   every quarter, for I am office based and want to
23   gain knowledge of the field.  When I asked
24   permission to spend the day in the field with a

72 (Pages 285 to 288)

Page 289

1　female colleague, I was told by my supervisor I was
2　only allowed to go for four hours.  When I asked why
3　and/or if he needed me for something that prevented
4　me from spending an eight-hour day in the field, he
5　responded with, 'No.  I just don't think you need to
6　spend the whole day in the field (April Heater
7　visit).'"
8　　　　　Did that happen?
9　　　A.  Yes.
10　　　Q.  Why did you tell her that she couldn't
11　spend the whole day in the field?
12　　　A.  Because I didn't want her to spend all day
13　in the field.
14　　　Q.  Why not?
15　　　A.  Because her job was a maintenance analysts,
16　not a field hand.
17　　　Q.  And one day would make a difference?
18　　　A.  Could be.  It depended on the workload.
19　Not there now, but there obviously was a reason for
20　that.
21　　　Q.  Are you sure about that?
22　　　A.  Pretty sure, yes.
23　　　Q.  Do you recall what that reason was?
24　　　A.  I do not recall.

Page 290

1　　　Q.  Next one, "I have been asked by my
2　supervisor multiple times if I thought about him
3　over the weekend."
4　　　　　You say, according Kloosterman, "I do
5　say this to a lot of people.  'I asked people Did
6　you miss me?'  I could have said, 'Did you miss me
7　this weekend' because I don't do that."
8　　　　　Do you recall discussing that with
9　Kloosterman?
10　　　A.  No.
11　　　Q.  Next one, "My supervisor has told me that
12　he has thought about me while showering."
13　　　　　You recall discussing this with
14　Kloosterman?
15　　　A.  I do.
16　　　Q.  You said, according to her, "I have said
17　this in front of everyone.  I think about work all
18　the time.  It was business related.  When I was in
19　the shower I thought about, 'Oh.'  I think about
20　stuff all the time in the shower.  It wasn't in that
21　context."
22　　　　　Do you recall saying that?
23　　　A.  I don't remember verbatim what -- what I
24　said, but I was talking about that, yes.

Page 291

1　　　Q.  How come you didn't -- well, strike that.
2　　　　　Did you tell Kloosterman what you
3　testified to earlier, that you said it in the
4　context of talking to your group one time, that you
5　were thinking about that particular work issue in
6　the shower?
7　　　A.  I did tell her that.
8　　　Q.  That's not reflected in her notes, right?
9　　　A.  Let me read it.
10　　　Q.  Sure.
11　　　A.  It doesn't look like it.
12　　　Q.  Last bullet point on that page, "My
13　supervisor mocks me when I have informed people I do
14　not like to be touched."
15　　　　　Is that true?
16　　　A.  That's not true.
17　　　Q.  What did you say when she said she didn't
18　like to be touched?
19　　　A.  I don't recall what I said.
20　　　Q.  Is it possible you mocked her?
21　　　A.  No.  Absolutely not.
22　　　Q.  But you have no idea what you said?
23　　　A.  I don't know what I said, but I wouldn't
24　have mocked her.

Page 292

1　　　Q.  Next page, page 6, "My supervisor has
2　mocked me when I told him I do not come to work to
3　hear that I am  pretty when a coworker referred
4　to" -- looks like should be "me as pretty.  My
5　supervisor kept saying it when I addressed him.  'I
6　don't come to work to hear I am pretty,' he would
7　say to me.
8　　　　　And you testified earlier you did not
9　say something like that to Wayne Fletcher, right?
10　　　A.  That's correct.
11　　　Q.  There was -- according to Kloosterman's
12　notes, you told her about a time when Wayne Fletcher
13　came in and asked Jesse to do something?
14　　　A.  I don't recall that.
15　　　Q.  You see it says that in the first bullet
16　point?
17　　　A.  Yeah, "Fletch came in and asked her to do
18　something."  I don't even know what that means.
19　Again, she's -- she's just writing stuff down, but
20　I -- I don't know what it's meaning.
21　　　Q.  Two bullet points down from that, "I have
22　been referred to as a 'window licker,' which I
23　believe was to insult my intelligence."
24　　　　　You ever hear anyone call Jesse that?

73 (Pages 289 to 292)

Page 293

1     A.  No.
2     Q.  Do you recall telling Kloosterman no, that
3  didn't happen?
4     A.  Yeah.  No, I don't remember telling her
5  that, but I don't remember if it happened or not.
6     Q.  Right under that in the next bullet point
7  it says, "People mess with her because she dishes it
8  back."
9         Was that true?
10    A.  I don't know why they -- why they mess with
11  her.
12    Q.  Who messed with her?
13    A.  I don't know.
14    Q.  Did anyone mess with her in your group?
15    A.  I think there was banter back and forth
16  within the group.
17    Q.  Okay.  Who gave her banter?
18         MR. TUCKER:  You mean engaged in
19  banter.
20         MS. GURMANKIN:  Better question.
21    A.  So could be the whole group, I would
22  imagine.  But I don't know.  I mean, I know Ken was
23  up there, Ken Foreman, Dan Krise, Jeremy Greene,
24  Matt Skolny.  Those are the folks that were her core

Page 294

1  group.
2     Q.  (BY MS. GURMANKIN) Did they engage in
3  banter with her?
4     A.  Yes, I have heard banter between all of
5  them before.
6     Q.  Okay.  What banter have you heard?
7     A.  I can't remember specifics.
8     Q.  Can't remember anything?
9     A.  As we talked earlier about the carpet and
10  killing Jeremy, that kind of stuff is what I'm
11  referring to.
12    Q.  That stuff that they said she said, right?
13    A.  That stuff that they both said because
14  Jeremy was saying something, too.  So it's just back
15  and forth.
16    Q.  Okay.  How about Foreman?
17    A.  What about Foreman?
18    Q.  What banter did he engage in with Jesse?
19    A.  Again, I don't recall specifics.  I just
20  know there was banter back and forth between them.
21    Q.  How about Krise?
22    A.  Same thing.
23    Q.  Any other examples of banter that Greene
24  engaged in with Jesse?

Page 295

1     A.  No.
2     Q.  How about Matt Skolny?
3     A.  Again, I can't recall any specifics.
4     Q.  Next one, "I was told when I voiced some of
5  my concerns that 'I need to stop playing the
6  victim.' (When she told Penny that Ken asked what
7  she accomplished this year outside of not dyeing her
8  hair)."
9         Under that it looks like, according to
10  Kloosterman's notes, that you admitted that you did
11  say that to her.
12         Is that true?
13    A.  Let me read it --
14    Q.  Sure.
15    A.  -- please.
16         Okay.
17    Q.  Did you say that to Jesse?
18    A.  Say what?
19    Q.  You need to stop playing the victim?
20    A.  According to this, it looks like I did say
21  that.
22    Q.  No.  Did -- do you have a recollection of
23  saying that to Jesse?
24    A.  I don't recall, but if I said I said it

Page 296

1  there...
2     Q.  You are not disputing that?
3     A.  Right.
4     Q.  Okay.  Do you remember the -- I mean, does
5  this refresh your recollection about the context?
6     A.  So, just looking what it says for the
7  context, I -- when Ken's taking my work, she is
8  playing like it's something bad.  So I'm assuming if
9  Ken is trying to do some of her work, then she's
10  getting upset because he's doing work.  And then
11  it's like, you know, again, stop playing the victim.
12  All we're trying to do is get -- get you some help.
13  So...
14    Q.  Did you ever consider that, when Jesse was
15  complaining about Ken doing her work, that he was
16  doing it because he was sexist?
17    A.  No.
18    Q.  That never crossed your mind?
19    A.  No.
20    Q.  Did you ever ask him if he was doing her
21  work because he was sexist or he didn't think she
22  could do as good a job as a woman?
23         MR. TUCKER:  As a man, you mean.
24         MS. GURMANKIN:  No.  That she didn't --

Page 297

1　he didn't think she could do as good a job as a
2　woman?
3　　　　MR. TUCKER:　Counsel, that question --
4　can you read the question back?
5　　　　(The requested portion was read.)
6　　　　MR. TUCKER:　Instead of "because she's
7　a woman" you said "as a woman."
8　　　　MS. GURMANKIN:　Okay.
9　　　Q.　(BY MS. GURMANKIN)　Did you ever consider
10　whether Foreman did her work because he was sexist?
11　　　A.　No.
12　　　Q.　Did you ever consider whether Foreman did
13　her work because she thought that she could not do
14　as good a job as he did because she's a woman and
15　he's a man?
16　　　A.　Okay.　Say that one more time.
17　　　Q.　Sure.　Did you ever consider whether
18　Foreman did Jesse's work because he thought she
19　could not do as good a job because she's a woman?
20　　　A.　No, I never thought that.
21　　　Q.　Okay.　Did you ever talk to him about that
22　to try to ascertain whether that's why he was doing
23　her work?
24　　　A.　No.

Page 298

1　　　Q.　All right.　Next bullet point on page 6, "A
2　coworker had put his hands through my hair without
3　permission."
4　　　　Did you ever see anyone do that to
5　Jesse?
6　　　A.　No, I have not.
7　　　Q.　Ever seen anyone touch her hair?
8　　　　MR. TUCKER:　Let her finish her
9　question, please.　You're doing a good job.
10　　　　THE WITNESS:　I thought she did finish
11　it, Joe.　I apologize if I did not.
12　　　　Can you repeat the question, please?
13　　　Q.　(BY MS. GURMANKIN)　Sure.　Ever see anyone
14　touch her hair?
15　　　A.　No.
16　　　Q.　Okay.　And ever see anyone run their hands
17　through her hair?
18　　　A.　No.
19　　　Q.　Okay.　According to Kloosterman, you said,
20　"No recollection" and then you said, "If you talk to
21　Kenny, you will see he means nothing by it."
22　　　　Do you see that?
23　　　A.　I do see that.
24　　　Q.　Do you know what that means?

Page 299

1　　　A.　I don't know.
2　　　Q.　Do you remember saying that to Kloosterman?
3　　　A.　No.
4　　　Q.　Do you remember if Kloosterman told you
5　that this allegation referred to Foreman?
6　　　A.　I'm speculating only, but if it says this
7　right here, maybe she told me that that was one of
8　the allegations that Jesse made.　So...
9　　　Q.　Because, otherwise, how would you know?
10　　　A.　Exactly.
11　　　　MR. TUCKER:　You want to know what you
12　are not going to do?　What words did you start off
13　with?　"I'm speculating."
14　　　　THE WITNESS:　Yes.　I'm not guessing
15　anymore.
16　　　　MR. TUCKER:　You are not -- you are not
17　to guess or speculate.
18　　　　THE WITNESS:　Okay.
19　　　　MR. TUCKER:　All right?　You with me?
20　You are not to guess or speculate.
21　　　　THE WITNESS:　Okay.
22　　　　MR. TUCKER:　If you know, you know.
23　　　　THE WITNESS:　If I don't, I don't.
24　　　Q.　(BY MS. GURMANKIN)　No. 5, "At any point

Page 300

1　did Jesse notify you that any of these instances
2　were unwelcomed or she was concerned with any of
3　these situations?"　According to her, you say, "No,
4　she did not.　That is why I am so stunned."
5　　　　Do you remember saying that to
6　Kloosterman?
7　　　A.　I do.
8　　　Q.　Okay.　Because you remember being stunned
9　when you learned that she was making those
10　allegations against you?
11　　　A.　I was completely stunned.
12　　　Q.　According to my notes, you said, "When I
13　said the comment in the SPS meeting, I knew that I
14　did the wrong thing.　But other than that, this is
15　all total shock."
16　　　　Is that the Pulse survey meeting that
17　we talked about earlier?
18　　　A.　Yes, it is.
19　　　Q.　Okay.　Now, some of this stuff you admit to
20　saying, right?　Some about Jesse's allegations you
21　are not disputing?
22　　　A.　That's correct.
23　　　Q.　You are admitting that you engaged in the
24　conduct that she's accusing you of?

75　(Pages 297 to 300)

1    A.  That's correct.
2    Q.  So what are you stunned about?
3    A.  I'm stunned at the fact that -- so there is
4  some truth to this, and there is not some truth.
5  And I'm stunned in the fact that she would bring all
6  these allegations up without me knowing about it.
7        And when I say that is, we had banter
8  back and forth for years.  She would go at me; I
9  would go at her, whatever that looked like.  So when
10  she brought all these things up, I had no clue that
11  this was even bothering her because I was never
12  told.
13        And the fact that I would intervene
14  with something that tried to hug her because she
15  didn't like to be touched proves that I'm trying to
16  look out for her best interest.
17        So I did not have any clue that this
18  was bothering her.  I would have never done this.
19  And so to me, this was just back-and-forth banter,
20  some of the things that I did that I admitted to.
21        But then now that it's been brought up
22  and it's -- and it's in HR's hands, this is what I'm
23  apologetic about.  Because if I had known that, I
24  would have never done these things.  So that's why I

1  was stunned.
2        MR. TUCKER:  That's a good breaking
3  point for me.
4        THE WITNESS:  Okay.  Me, too.
5        THE VIDEOGRAPHER:  We are off record.
6  Time is 2:14 p.m.
7        (A recess was taken.)
8        THE VIDEOGRAPHER:  We are back on
9  record.  Time is 2:21 p.m.
10    Q.  (BY MS. GURMANKIN)  Were you also stunned
11  about the allegations that Jesse was making that you
12  learned about in this meeting with Kloosterman
13  because you didn't think that you had done anything
14  wrong?
15    A.  Yes, correct.
16    Q.  And you still don't, right?
17    A.  Correct.
18    Q.  Go to page 7, please, of Exhibit 19.
19        MR. TUCKER:  Page 7.
20    Q.  (BY MS. GURMANKIN)  At the top it says,
21  "There are times when things people do are not
22  appropriate."
23        Do you remember saying that to
24  Kloosterman?

1        MR. TUCKER:  Hold on.  Where?  At the
2  top of page 7?
3        MS. GURMANKIN:  Uh-huh.
4    A.  Where it says, "I don't take notes"?
5    Q.  (BY MS. GURMANKIN)  Yes.  Right after that.
6    A.  Okay.  Can I read that?
7    Q.  Sure.
8    A.  I have read it.
9    Q.  Do you know what that refers to?
10    A.  I do not know what that refers to.
11    Q.  Did you believe that there are times when
12  things people do are not appropriate?
13    A.  I would say there are some times people --
14  people do something that's not appropriate, yes.  I
15  think that's a fair statement.
16    Q.  Did you ever experience that at Shell?
17    A.  Not that I recall.
18    Q.  Under No. 8, "Is there anyone specifically
19  you think I should talk to regarding the concerns
20  raised?"
21        Do you recall giving her these names?
22    A.  No.  That doesn't ring a bell at all.  I
23  don't know what that is.
24    Q.  Do you think that Hondo Blakley would have

1  information regarding the allegations that Jesse's
2  making?
3    A.  I don't understand the question.
4    Q.  Do you think that Hondo Blakley had
5  information relevant to Jesse's claims of sexual
6  harassment against you?
7        MR. TUCKER:  Can you read that back?
8        MS. GURMANKIN:  I'll ask it again.
9    Q.  (BY MS. GURMANKIN)  Do you think that Hondo
10  Blakley had information that was relevant to the
11  allegations Jesse's making against you?
12    A.  I don't know.
13    Q.  How about April Heater?
14    A.  I don't know.
15    Q.  Penny Robbins?
16    A.  Again, don't know.
17    Q.  Ken Foreman?
18    A.  I don't know.
19    Q.  Dan Krise?
20    A.  Don't know.
21    Q.  And Matt Scorney?
22    A.  It's actually Skolny.  And I don't know.
23    Q.  How long is the meeting with Kloosterman?
24    A.  I can't say for sure.

76 (Pages 301 to 304)

Page 305

1    Q.  Approximately?

2    A.  Two to three hours.

3    Q.  And how does it end?

4    A.  I don't recall that, as well.

5    Q.  When is the next time you have a

6  conversation with anyone at Shell about Jesse's

7  allegations of sexual harassment or the

8  investigation?

9    A.  I don't remember.  I don't recall.

10    Q.  At some point do you learn that the

11  investigation's been concluded?

12    A.  Yes.  At some point, yes.

13    Q.  Who do you learn that from?

14    A.  I don't know.

15    Q.  You don't recall?

16    A.  I don't recall.

17    Q.  Okay.  At some point you learn about the

18  discipline that you are getting?

19    A.  Yes.

20    Q.  Do you recall if that was the same

21  conversation in which you learned that the

22  investigation's been concluded?

23    A.  I'm going to say I don't recall because I

24  don't, but I know -- I knew -- I knew what was

Page 306

1  concluded during that meeting.

2    Q.  Okay.  But you are not sure if you found

3  out at the meeting or before the meeting?

4    A.  Correct.

5    Q.  What do you learn about the investigation?

6    Q.  What specifically are you looking for?

7    Q.  The conclusion.

8    A.  Code of Conduct, I failed to follow Shell's

9  Code of Conduct policy.

10    Q.  The meeting in which you are given the

11  discipline, who is that with?

12    A.  Did you ask who I sat with?  Greg Larsen

13  and Steve Craig, and then on the phone was Megan.

14    MR. TUCKER:  Megan who?

15    THE WITNESS:  Megan Kloosterman.

16    Q.  (BY MS. GURMANKIN)  Are you told how

17  that -- you failed to follow Shell's Code of

18  Conduct?

19    THE REPORTER:  Can you repeat that?

20    Q.  (BY MS. GURMANKIN)  Are you told how you

21  failed to follow Shell's Code of Conduct?

22    MR. TUCKER:  During that meeting.

23    A.  During the meeting?  Yes.

24    Q.  (BY MS. GURMANKIN)  That's the only -- is

Page 307

1  that the only time you had that discussion?

2    A.  As far as I recollect, yes.

3    Q.  Okay.  So yeah.

4    A.  They just went over -- I don't know

5  verbatim so I'm not going to guess at it, but they

6  had it written down for me.

7    Q.  How you violated the Code of Conduct?

8    A.  Yes.

9    Q.  Okay.  Did they give you a copy or they

10  just showed it to you?

11    A.  They gave me a copy.

12    Q.  I'm showing you what's marked as

13  ==Exhibit 33.==

14    Is this the copy of what they gave you?

15    A.  Do you mind if I read it?

16    Q.  No.

17    A.  Okay.

18    Q.  Is that the document you were referring to?

19    A.  Yes.

20    Q.  So tell me what you recall about that

21  meeting with Larsen, Craig and Kloosterman on the

22  phone.

23    A.  And specifically to what?  Just the general

24  meeting?

Page 308

1    Q.  Anything you recall about that meeting.

2    A.  So they called me in.  They wanted to give

3  me the investigation details.  I sat down with them.

4  Greg Larsen did most of the talking -- actually, I

5  think all of the talking.  And then he just

6  basically read the letter verbatim and then asked me

7  if I had any questions.

8    Q.  Okay.  And then what?

9    A.  Then I didn't have any questions.  They

10  said, "We need you to sign this.  Do you agree with

11  it?  You need to sign this.  This is going to go in

12  your file for 18 months.  And again, do you have

13  any -- any questions for us?  Megan on the phone,

14  Megan Kloosterman or any of us in the room?"

15    And I replied, "No.  I understand."

16  And that was it.

17    Q.  Where in this document does it say how you

18  failed to follow the Code of Conduct?

19    A.  It's -- it's with respect -- I think it's

20  Harassment 3.3.  It's about making jokes, intimidate

21  or humiliate others is the specific portion in that

22  Code of Conduct that I failed to follow.

23    Q.  Now, just point me to where in this

24  document.  You said that they gave you a document,

77 (Pages 305 to 308)

Page 309

1    which you identified as Exhibit 33 in that meeting
2    which said how you failed to follow Shell's Code of
3    Conduct.
4              Where does it say that in here?
5        A.  The first -- the first line.  Right?
6    "Failure to comply with Shell's Code of Conduct,"
7    very first line.
8        Q.  Okay.  Does it say how?
9        A.  "Inappropriate jokes or comments."
10       Q.  Does it say what specific one?
11       A.  I'm not sure I understand your question.
12       Q.  Does it say in there which specific
13   inappropriate jokes or comments you made that failed
14   to follow the Code of Conduct?
15       A.  It does not say that in here.
16       Q.  Did you ask?
17       A.  I did not ask.
18       Q.  Do you know how you violated the Code of
19   Conduct as you sit here today?
20       A.  I do.
21       Q.  How?
22       A.  Just some of the comments and things that I
23   made, the cat calls, that -- that kind of stuff was
24   inappropriate for a supervisor.  The banter back and

Page 310

1    forth was another one.
2        Q.  I want to understand specifically.  What
3    was your understanding as to how you failed to
4    follow Shell's Code of Conduct?  What specifically
5    did you do or say?
6        A.  I don't understand what you are asking me.
7        Q.  What specifically did you do or say that
8    led to the company's conclusion which they told you
9    that you failed to follow the Code of Conduct?
10            MR. TUCKER:  Objection, asked and
11   answered.  He's already answered it, but you may
12   continue.
13       A.  Yeah, I -- I just gave you some of the
14   suggestions.  There is -- there is several things
15   that I did, the banter back and forth.
16       Q.  (BY MS. GURMANKIN)  What?  What?  Not just
17   banter.  Tell me what specifically did you say.  You
18   said the cat calls were one way in which you failed
19   to follow; is that right?
20       A.  That's one of them, yes.
21       Q.  And when you say "cat calls," do you mean
22   making the hissing noise --
23       A.  Just (Making sound and indicating.)
24       Q.  -- and cat gestures?

Page 311

1        A.  Yeah.
2        Q.  Okay.  Any other ways in which you violated
3    the Code of Conduct?
4        A.  That's the only ones I can think of right
5    now.
6        Q.  Okay.  You said ones, plural.  So I just
7    want to make sure we're on the same page.
8            The only one that you understood to
9    have violated the Code of Conduct that you did was
10   make cat-claw gestures and make hissing noises?
11       A.  That's not what I said.  I said there is
12   other stuff.  I just can't recall everything.
13       Q.  Right.  Just so we are clear, the only
14   thing that you can think of as you sit here now is
15   making the cat gestures and the hissing noises?
16       A.  And the banter.
17       Q.  Right.  But you can't recall specifically
18   what it was about the banter that violated the Code
19   of Conduct?
20       A.  Just in general, the banter back and forth.
21       Q.  Were you ever told specifically what it was
22   you said that violated the Code of Conduct?
23       A.  I don't recall if I was told specifically
24   or not.  I just know that banter is what was one of

Page 312

1    them.
2        Q.  Do you have any knowledge of what it was
3    you said that violated the Code of Conduct?
4        A.  Not that I can think of.  Nothing I recall.
5        Q.  No one ever told you specifically, correct?
6        A.  Not to my knowledge.
7        Q.  Okay.  Did you say in that meeting that you
8    did not believe that you violated the Code of
9    Conduct?
10       A.  That's correct.
11       Q.  Did you say that in the meeting?
12       A.  Yes.
13       Q.  Okay.  You didn't mention that so I wanted
14   to make sure.
15            You recall saying that now?
16       A.  In this particular meeting --
17       Q.  Yes.
18       A.  -- that we're talking about?  Correct.
19   Yes.
20       Q.  Okay.  And did anyone respond to that?
21       A.  I don't recall specifically what they said.
22   But, again, this is -- yeah.
23       Q.  This is what?
24       A.  Oh, no, I -- I lost my train of thought.

78 (Pages 309 to 312)

Page 313

1    So I apologize.
2       Q.  Why did you sign this if you did not think
3    that you violated the Code of Conduct?
4       A.  Because this is the investigation that
5    they -- that they had.  I accept the investigation,
6    and so I signed it.
7       Q.  How come you didn't write on there that you
8    disagree that you violated the Code of Conduct?
9          MR. TUCKER:  Objection; asked and
10   answered.
11         MS. GURMANKIN:  I haven't asked that.
12         MR. TUCKER:  Go ahead.  You can answer
13   the question.
14      A.  I said I accepted this investigation.
15   That's why I signed it.
16      Q.  (BY MS. GURMANKIN)  Did they tell you in
17   that meeting that their conclusion would impact your
18   IPF score?
19      A.  They did.
20      Q.  And your bonus?
21      A.  Correct.
22      Q.  And salary increase?
23      A.  That's correct.
24      Q.  Did they tell you how it would impact them?

Page 314

1       A.  Through my IPF.
2       Q.  But I mean, did they tell you specific
3    numbers?
4       A.  I don't know if they even knew that at the
5    time.  I mean, I got my IPF ranking, if that's what
6    you're asking.  They were going to drop it down.
7    But I don't know if they told me then what it was
8    going to be.
9       Q.  Did they tell you in that meeting it was
10   going to be ██?
11      A.  I can't recall.  I do know I knew that, but
12   I don't know if that was this meeting.
13      Q.  Okay.  Is this the only meeting that you
14   can recall where the investigation or your
15   discipline is discussed?
16      A.  With me, yes.
17      Q.  Okay.  Were there meetings with other
18   people that you are aware of?
19      A.  I don't know.  I'm just referring to
20   myself, just in case you were alluding to something.
21   Just with me, yes.
22      Q.  Anything else about that meeting that you
23   recall?
24      A.  No.

Page 315

1       Q.  Did Kloosterman say anything?
2       A.  She said very little, but I don't remember
3    if she said anything at all.  But she might have
4    just made sure that I understood this.  But, again,
5    I shouldn't speculate.  So...
6       Q.  How about Craig?
7       A.  I think he was pretty quiet throughout the
8    meeting.
9       Q.  Did you talk to anyone on your team about
10   Jesse's allegations or the investigation?
11      A.  Yes.
12      Q.  Who did you talk to?
13      A.  Mark Hoover and Hondo Blakley.
14      Q.  Anyone else?
15      A.  No.
16      Q.  You were aware that other members of your
17   team were interviewed by Kloosterman?
18      A.  Correct.
19      Q.  How did you know that?
20      A.  Hallway talk, I guess.
21      Q.  That you were involved in?
22      A.  Involved in what?
23      Q.  I mean, did you hear it, or were you
24   involved in the discussion?

Page 316

1       A.  Oh, no, I just heard it.
2       Q.  Okay.  What did you discuss with Mark
3    Hoover?
4       A.  Just high level.  Nothing detailed.  Really
5    it was more about the findings, the -- you know,
6    what's happening, because Mark Hoover was also part
7    of the decision to take an LEAD class.  So we --
8    that's really what we were discussing.
9       Q.  Were you aware whether there was a finding
10   that Hoover had violated the Code of Conduct?
11      A.  I knew that because he had also had to go
12   to class.  We were trying to set it up together.
13      Q.  How did you know to talk about setting it
14   up together?
15      A.  He told me that he had to take this course.
16      Q.  As a result of the investigation --
17      A.  Yes.
18      Q.  -- and Jesse's allegations?
19         MR. TUCKER:  Let -- let -- see, that's
20   what I mean.
21         THE WITNESS:  Oh, I jumped in there.
22   Okay.
23         MR. TUCKER:  Let her finish.
24         THE WITNESS:  Sorry, Joe.

79 (Pages 313 to 316)

1          MR. TUCKER:  Don't apologize to me.
2    Apologize to her.
3          THE WITNESS:  I apologize for cutting
4    you off.
5          MS. GURMANKIN:  It's okay.  It was -- I
6    paused for a second.
7     Q.  (BY MS. GURMANKIN)  You knew -- I'm sorry.
8    I lost my train of thought.
9          How did you know that Hoover would have
10    to take the class?
11     A.  I don't recall specifically how it came
12    about.  I just knew we had to take the LEAD class,
13    or the LEAD class together.
14     Q.  So what did you and Hoover talk about the
15    high-level elements of the findings?
16     A.  Not about the findings.  We just talked
17    about this is what we got to do.
18     Q.  Anything other than scheduling the LEAD
19    training?
20     A.  I don't believe so.
21     Q.  What did you talk to Blakley about?
22     A.  The same thing, that I had to take this
23    class.
24     Q.  Anything else?

1     A.  Not to my knowledge.
2     Q.  Other than the warning that you got, did
3    you see any other documentation in connection with
4    the investigation or Jesse's allegations?
5     A.  I'm not sure I understand the question.
6     Q.  Other than the written warning that was
7    marked as Exhibit 33 that was the document that they
8    gave you a copy of when Larsen and Craig and
9    Kloosterman on the phone met with you --
10     A.  Yes.
11     Q.  -- did you receive any other documentation
12    in connection with Jesse's allegations or the
13    investigation?
14     A.  No, I don't believe I had.
15     Q.  In that meeting where you got a copy of the
16    warning -- and by the way, did you consider the
17    warning to be part of the discipline that was given
18    to you?
19     A.  Absolutely.
20     Q.  Okay.  You hadn't mentioned that earlier,
21    so I just wanted to be sure.
22     A.  Oh, yes.
23     Q.  That was part of it though, right?
24     A.  Yes.  Yes.

1     Q.  Was that the first time you had gotten any
2    kind of warning at Shell?
3     A.  Yes.
4     Q.  And as far as you understand, from what you
5    were told, that's no longer in your file?
6     A.  That's correct.  After 18 months it was
7    supposed to go away.
8     Q.  Did you understand "go away" to mean
9    removed from your file?
10     A.  That was my understanding.
11     Q.  As if it never existed?
12     A.  That's my understanding.
13     Q.  All right.  At any point in that meeting
14    with Craig and Larsen and Kloosterman on the phone,
15    did anyone discuss with you what would happen with
16    Jesse?
17     A.  No.
18     Q.  At some point she's moved out of your
19    group, right?
20     A.  Yes.
21     Q.  Okay.  When did you learn that that was
22    happening?
23     A.  I -- I don't remember.  I don't recall a
24    specific date.  So I -- I don't -- I can't recall.

1    I don't know if it was the end of the year.  I don't
2    remember.
3     Q.  Was it before or after you get your
4    warning?
5     A.  I don't recall.
6     Q.  How do you find out that she's being moved
7    out of the group?
8     A.  I believe someone told me, and I'm not
9    guessing who, but someone did tell me.  I just don't
10    know who told me.
11     Q.  Do you recall if it was from HR or
12    somewhere else?
13     A.  It was not from HR.  It was either from
14    Greg or Steve Craig.
15     Q.  And do either Larsen or Craig tell you
16    where she's going?
17     A.  When they told me she was moving out, I
18    don't recall if they told me where she was going or
19    not.  I don't remember that.
20     Q.  At any point did anyone tell you that there
21    was a possibility that you would be moved out of
22    your supervisor role?
23     A.  There was talk about it, and I don't
24    remember where that talk came from.  But there -- I

Page 321

1 do remember them talking about that.
2  Q. To you?
3  A. Not talking to me; telling me that was an
4 option.
5  Q. Okay. You didn't mention that as part of
6 the meeting that you had with Larsen and Craig and
7 Kloosterman on the phone.
8    Was it then or another time?
9  A. I -- I really don't remember when it was.
10  Q. Before -- I'm sorry. Go ahead.
11  A. I apologize. I didn't mean to cut you off.
12  Q. That's all right.
13  A. Yeah, I don't remember.
14  Q. Was it before or after you learned from
15 either Craig or Larsen that Jesse's being moved out?
16  A. Again, I can't remember when it was.
17  Q. Did you learn about this from Larsen or
18 Craig?
19  A. It would have to be one of those two, I
20 would think.
21  Q. What did you hear? What was the talk?
22  A. Again, I don't know. I just heard that one
23 of the options was to move me out of the position.
24  Q. So at some point are you having a

Page 322

1 discussion about options for Jesse?
2  A. No, absolutely not. I never had any
3 dealings with that.
4  Q. All right. Well, you said you heard that
5 one of the options was moving you out.
6    So what options are you talking about?
7  A. Well, I don't know. They said one of the
8 things they talked about, somebody said that there
9 was an option for me to move out of that role, as
10 well.
11  Q. And you don't recall when this was?
12  A. No, ma'am. No, I do not.
13  Q. You don't recall the context?
14  A. No, I do not.
15  Q. But that never came to fruition, obviously?
16  A. That's correct.
17  Q. And other than that discussion that that
18 was an option being discussed, that was all that you
19 heard about it, correct?
20  A. That's correct.
21  Q. Did you say anything when you heard that
22 that was one of the options being discussed?
23  A. I don't recall saying anything.
24  Q. Fair to say that you were upset about

Page 323

1 Jesse's allegations when you found out about them
2 from Kloosterman?
3  A. Yeah. We -- we discussed that already,
4 that I was upset.
5  Q. And when you talked to Hoover about the
6 training, did you get from him that he was upset
7 about Jesse's allegations?
8  A. You know, I don't -- I don't recall what
9 his -- what his -- what -- what -- if he was upset
10 or not. I really don't.
11  Q. Did you ever find out what the allegations
12 were that Jesse made against him?
13  A. No.
14  Q. Had you known prior to talking to him about
15 the training that she had made allegations against
16 him?
17  A. Say that again.
18  Q. Prior to you talking to him about the
19 training, had you known that Jesse made allegations
20 against Hoover?
21  A. No.
22  Q. All right. Any other discussions with
23 anyone at Shell around this time about the
24 investigation or Jesse's allegations?

Page 324

1  A. No, not that I can recall.
2  Q. After you have your meeting with
3 Kloosterman, Jesse is still in your group for some
4 period of time, correct?
5    MR. TUCKER: Objection.
6  A. I don't recall.
7    MR. TUCKER: Objection to the use of
8 the term (inaudible).
9    MS. GURMANKIN: I'm sorry?
10    MR. TUCKER: Objection to your
11 characterization on the length of time.
12  Q. (BY MS. GURMANKIN) I mean, from what you
13 recall, she wasn't moved out as of the time that you
14 are having this meeting with Kloosterman, right?
15  A. I don't recall.
16  Q. Because you didn't hear that from
17 Kloosterman, that she's being moved out, right?
18  A. That's correct.
19  Q. All right. And the only discussions that
20 you have before your meeting with Kloosterman about
21 the investigation are Steve Craig telling you an
22 hour before that you are going to meet with
23 Kloosterman about an investigation?
24  A. That's correct.

81 (Pages 321 to 324)

Page 325

1    Q.  Okay.  And you don't even know at that
2  point what the allegations are?
3    A.  That's right.
4    Q.  So you don't think that you -- I'm sorry;
5  you don't think that Jesse would have been moved out
6  before your meeting with Kloosterman?
7    A.  I would think not.
8    Q.  Do you recall if she was moved out before
9  you get your warning?
10    A.  I don't -- I do not know.  I don't recall.
11    Q.  After the November 21, 2016, meeting with
12  Jesse, did you have any interaction with her?
13    A.  I don't recall.
14    Q.  Would you see her in the building?
15    A.  If she was there on occasions, I would
16  probably see her, yes.
17    Q.  And would you speak to her?
18    A.  If we were walking by the same hallway, I
19  would attempt to say hello just to be nice -- you
20  know, to be polite, as it being business is
21  business.
22    Q.  What does that mean, you would attempt to
23  say hello?
24    A.  I might say hello but she wouldn't -- she

Page 326

1  wouldn't say it back.
2    Q.  So there were times when you say hello but
3  she wouldn't respond?
4    A.  Correct.
5    Q.  How many times did that happen?
6    A.  I can't recall.
7    Q.  More than five?
8    A.  What's that?
9    Q.  More than five?
10    A.  I don't recall.
11    Q.  At some point right around this time in
12  late 2016, Jeremy Greene is promoted into the
13  scheduler position in your group, correct?
14    A.  Correct.
15    Q.  Was that a new position that was created,
16  or was that a position that had been vacated?
17    A.  It was a position vacated.  We were filling
18  it.
19    Q.  By whom?
20    A.  What's the question?
21    Q.  Who was it vacated by?
22    A.  I can't remember right now.
23    Q.  Was that as a result of Matt Skolny moving
24  into a different position?

Page 327

1    A.  Thank you.  I believe it was.  I
2  can't -- yeah.
3    Q.  And that position was posted?
4    A.  Yes.
5    Q.  And just Jesse and Jeremy applied?
6    A.  That's correct.
7    Q.  And you interviewed both?
8    A.  Yes.
9    Q.  Anyone else or just you?
10    A.  Me and Hondo Blakley.
11    Q.  You interviewed them together?
12    A.  Interviewed who together?
13    Q.  You and Hondo together interviewed Jesse
14  and Jeremy?
15    A.  Separately.
16    Q.  You and Hondo separately interviewed Jesse
17  and then separately interviewed Jeremy?
18    A.  Me and Hondo interviewed Jeremy or Jesse,
19  and then me and Hondo interviewed Jesse and/or
20  Jeremy.
21    Q.  You and Hondo were together?
22    A.  Correct.
23    Q.  Okay.  And you decided on Jeremy?
24    A.  That's correct.

Page 328

1    Q.  Why?
2    A.  I'd have to review the notes to go back and
3  find out why we selected Jeremy over Jesse.
4    Q.  Do you recall as you sit here today or no?
5    A.  I recall one specific competency I know
6  Jeremy had over Jesse.
7    Q.  What was that?
8    A.  Just maintenance competency.
9    Q.  Was that a requirement?
10    A.  Yes, it was.
11    Q.  Okay.  What does that mean, maintenance
12  competency?
13    A.  Experience in maintenance.
14    Q.  Is that different from a maintenance
15  analyst's work?
16    A.  Yes.
17    Q.  Anything else you recall that led to you --
18  you picking Jeremy over Jesse?
19    A.  Not that I recall.
20    Q.  I am showing you -- do you have Exhibit 12
21  on your screen?
22    A.  It's pulling up now.
23    Q.  So these are the interview notes for Jesse
24  and Jeremy.  The cover page is an email from you to

82 (Pages 325 to 328)

Page 329

1  Michelle Priest on August 1, 2017, sending her the
2  notes.
3          Do you know why you are sending those
4  to her at this time?
5      A.  Can I read it real quick?
6      Q.  Sure.
7      A.  Looks like I'm sending her the interview
8  notes.  It's standard protocol for Shell.  Once we
9  get done with them, we have a certain timeline to
10  send those back to HR.
11      Q.  This is just short of a year after, right?
12      A.  Year after what?
13      Q.  The decision was made around November or
14  late 2016, right?
15      A.  For?
16      Q.  The scheduler position.
17      A.  I'm not sure I understand your question.  I
18  apologize.
19      Q.  The scheduler position opened up, and
20  Jeremy was selected for it in late 2016, right?
21      A.  Okay.
22      Q.  You are sending Michelle Priest these notes
23  on August 1, 2017.  You see that?
24      A.  I do.

Page 330

1      Q.  My question is, why are you sending them to
2  her as of this time?
3      A.  Okay.  I believe I was requested for this
4  particular -- you know, for this legal.  I believe
5  that's why I did that then.
6      Q.  You say in your email to her Jeremy did
7  want to be considered for both the planning role and
8  the scheduler, and he wanted the planning role over
9  the scheduling position.
10          Do you see that?
11      A.  Yes, I do.
12      Q.  Was there an open planning role in your
13  group as of late 2016, as well?
14      A.  I don't recall.  I'm reading that but I
15  don't recall if there was.  But obviously there was
16  something going on there.
17      Q.  Was Jesse qualified for the scheduler
18  position?
19      A.  I'd have to review all the notes.
20      Q.  Okay.  You can't answer that without
21  looking at the notes?
22      A.  That's correct.
23      Q.  All right.  Go through.
24      A.  What's that?

Page 331

1      Q.  Go through.
2      A.  Okay.
3      Q.  They are attached to this email.
4      A.  I'm looking for the --
5          MR. TUCKER:  Why don't you use the hard
6  copies.
7          THE WITNESS:  Okay.
8      A.  (Continuing.)  Do you have the -- I'm
9  looking for the posting, as well, for the
10  competencies.
11      Q.  (BY MS. GURMANKIN)  I can show you that.
12  That should be up on your screen.
13      A.  Perfect.
14          MS. GURMANKIN:  Is that Exhibit 12?
15          MR. TUCKER:  Yes.
16          MS. GURMANKIN:  Other than the email?
17          MR. TUCKER:  Other than the email,
18  yeah.  I just think it's easiest for him than going
19  back and forth.
20      A.  I got what information I need.
21          Can you ask the question again?
22      Q.  (BY MS. GURMANKIN)  Sure.  Was Jesse
23  qualified for the position?
24      A.  No.

Page 332

1      Q.  Okay.  Then why was she interviewed?
2      A.  So at Shell we like to interview folks that
3  either have the competencies or are ready to move
4  just to get them experience and to gain that
5  knowledge of how it feels to be in interviews, so
6  that way they are more comfortable when they do post
7  for a role that they could be more eligible in.  And
8  I believe that was the case for Jesse.
9          And it -- sorry.  And it also shows
10  where people put in.  So it shows they are motivated
11  to do something else.  Right?  Does that make sense?
12      Q.  No.  How would interviewing them help with
13  that?
14      A.  So what it does is, when they apply for a
15  role, that shows that they have interest in doing
16  some more with Shell.  So they -- they want to keep
17  moving.  They don't want to stay in the same role
18  for a long time.
19      Q.  Okay.  But how would interviewing them help
20  with that?
21      A.  Again, that's part of they put in for the
22  role, and then we want to give them that -- that
23  competency piece to say, Okay, this is the role I'm
24  putting in for.  If you're -- if you have the

Page 333

1  competencies or not, if you are qualified, we just
2  want to give you the questions.  So it's not every
3  day that you get these kind of questions, so we want
4  to prep them for this.  This is going through the
5  motions with them.
6      Q.  Okay.
7      A.  It's part of their -- their competency
8  and -- and, you know, leadership.
9      Q.  So it's to help them with their future
10  career development at Shell, basically?
11     A.  That's correct.
12     Q.  Okay.  So am I correct that Jesse was not
13  actually considered for this role?
14     A.  I wouldn't say she wasn't considered.  We
15  just concluded that she doesn't have the experience
16  once we went through the interviews.
17     Q.  Before the interviews or after?
18     A.  During the -- after the interviews, once
19  we -- we interviewed her, here's the requirements --
20  I'm looking at the requirements now on the screen.
21  Once we did the interviews, then we took a look at
22  both what Jesse and Jeremy's competencies were and
23  their résumés, and then we made that determination.
24     Q.  All right.  So did you conclude based on --

Page 334

1  you saw Jesse's application that she submitted for
2  the position, right?
3      A.  I don't recall seeing it, but she had to
4  submit one.
5      Q.  And would it be typical, based on your
6  Shell experience, for the hiring managers to see the
7  applications as part of the decision-making process?
8      A.  Yes.
9      Q.  Before the interviews or not necessarily?
10     A.  You should be prepped before the
11  interviews, right.
12         (Exhibit 56 was marked.)
13     Q.  (BY MS. GURMANKIN)  All right.  So take a
14  look at what's been marked as Exhibit 56.  This
15  is -- this has been produced by Shell as Jesse's
16  application.
17     A.  Okay.
18         MR. TUCKER:  Counsel, are you going to
19  ask him specific questions about it?  Because I want
20  to give him a hard copy.
21         MS. GURMANKIN:  Uh-huh.
22         MR. TUCKER:  It's nine pages.
23         THE WITNESS:  Nine pages.
24         MR. TUCKER:  Go ahead.

Page 335

1      A.  I'm looking at it, but I don't -- you
2  haven't asked a question, have you?
3      Q.  (BY MS. GURMANKIN)  Have you seen this
4  before?
5      A.  I don't recall if I have or not.
6      Q.  Is there anything in this application that
7  would indicate that she does not meet the
8  qualifications?
9      A.  I'd have to review it.
10     Q.  Okay.
11         MR. TUCKER:  Do you mind if I give him
12  the hard copy?
13         MS. GURMANKIN:  Just to be sure, it's
14  Bates stamped 287 through 295.
15         MR. TUCKER:  All right.  Look at 287
16  and 288.
17         THE WITNESS:  287 and 288?
18         MR. TUCKER:  And then here is the rest.
19         THE WITNESS:  Okay.  287, that's 288.
20         MR. TUCKER:  That's the rest of them.
21     A.  Can you repeat the question, please?
22     Q.  (BY MS. GURMANKIN)  Yes.  Is there anything
23  in what's been marked as Exhibit 56, Jesse's
24  application, that indicates that she does not meet

Page 336

1  the qualifications in the job posting that's
2  Exhibit 11?
3      A.  From what I can see, yes, there is.
4      Q.  Okay.  Where?
5      A.  It's the lack of.  So under the "Skills and
6  Requirements."
7      Q.  Tell me what page you are on of Exhibit 56.
8  You can give me the number at the bottom right --
9         MR. TUCKER:  The number at the bottom
10  down here.  The number at the bottom.
11         THE WITNESS:  But I'm not looking at
12  this.  I'm looking at Exhibit 11 on page 2.
13     Q.  (BY MS. GURMANKIN)  Okay.
14     A.  Under "Skills and Requirements."
15     Q.  Okay.
16     A.  And then where the bullet points start,
17  minimum of five years experience in maintenance work
18  and projects; knowledge of preventative and
19  predictive maintenance works and projects; skill in
20  the use of scheduling tools such as Gantt charts --
21  I'm reading that.  She has some of that.  Skills
22  based in assessing and prioritizing work based on
23  critical systems and equipment requirements, project
24  commitments, age of the work orders, resource

84 (Pages 333 to 336)

Page 337

1    availability and customer satisfaction.  And then
2    skill in working with supervisors to communicate
3    priorities and assign resources.
4          So based on these requirements, Jesse
5    doesn't have that in her résumé.  Some of this is
6    valid in between.  So the Gantt charts and stuff
7    would probably interface, but the rest of this will
8    not interface with what her requirements are -- what
9    her competencies are.
10   Q.  Just so we are clear, are you saying that
11   her application does not include mention of any of
12   the bullet points under the "Skills and
13   Requirements" section of Exhibit 11?
14         MR. TUCKER:  Objection.
15   Mischaracterizes his testimony.
16         Please answer.
17   A.  Yes.  I'm not saying nothing.  I'm just
18   saying it doesn't pertain to most of this as on the
19   skills and requirements.
20   Q.  (BY MS. GURMANKIN)  All right.  Let's go
21   through it.
22         Does she have the first one, a minimum
23   of five years experience in maintenance work and
24   projects?

Page 338

1    A.  No.
2    Q.  All right.  Knowledge of preventative and
3    predictive maintenance work and projects?
4    A.  No.
5    Q.  No knowledge of that?
6    A.  Knowledge of preventative maintenance work
7    and projects?  So as an analyst, probably not.  So
8    that's -- you got to know what PMs are there and
9    what the PMs and correctives are to have knowledge
10   of it.  So when she has -- you got to know what --
11   what that equipment is, and she doesn't have that
12   knowledge.
13   Q.  You said "probably not."  Did you know
14   whether or not she had knowledge of that before the
15   interview?
16   A.  No, I did not know that before the
17   interview.
18   Q.  Okay.  Did you know before the interview
19   whether she had a minimum of five years experience
20   in maintenance work and projects?
21   A.  Yes.
22   Q.  You knew that she did not?
23   A.  I knew that she did not.
24   Q.  Skill in the use of scheduling tools such

Page 339

1    as Gantt charts, PERT networks, CMMS scheduling
2    module and resource histograms.
3          Did she -- she did not mention that on
4    her application, correct?
5    A.  She does have some skills that tie her to
6    that right there as far as the maintenance analyst
7    stuff, setting up SAP profiles, things like that.
8    That does tie into that particular requirement.
9    Q.  Okay.  And did you know before the
10   interview whether or not she had skills in that
11   area?
12   A.  I -- yeah, I would -- I would say yes, yes,
13   I did know that.
14   Q.  All right.  Skill in assessing and
15   prioritizing work based on critical systems and
16   equipment requirements, project commitments, age of
17   work orders, resource availability and customer
18   satisfaction.
19   A.  Yeah, so she does not have all of those
20   skills.  There's some clerical stuff that you could
21   do.  But knowing what equipment's out in the field,
22   she doesn't have that knowledge just because she
23   hasn't been out there.
24   Q.  So which one of those did she not have

Page 340

1    skill in?
2    A.  Skill in assessing and prioritizing work
3    based on critical systems and equipment
4    requirements.
5    Q.  Okay.
6    A.  The project commitments, age of work
7    orders, that's something that's found online.  She
8    should have enough general knowledge to make that
9    work.
10   Q.  All right.  Same with resource availability
11   and customer satisfaction?
12   A.  Correct.
13   Q.  Okay.  Did you know before the interview
14   whether or not she had skill in this area?
15   A.  I'm going to assume that I knew she did in
16   those particular parts that I just mentioned she
17   did.
18   Q.  Did you know whether or not she had skill
19   in assessing and prioritizing work based on critical
20   systems and equipment -- I'm sorry; critical systems
21   and equipment requirements before the interview?
22   A.  I knew she did not.
23   Q.  Skill in working with supervisors to
24   communicate priorities and assign resources

85  (Pages 337 to 340)

Page 341

1  required?
2       A. Yes.
3       Q. She had that?
4       A. Yes, ma'am.
5       Q. And you knew that before the interview?
6       A. Yes.
7       Q. So it's not anything in her application
8  that's included that caused you to think she wasn't
9  qualified. It's what was not included?
10      A. That's correct.
11      Q. Okay. So as of the time that you meet with
12 her for the interview, is she being considered, or
13 is she just being interviewed as part of Shell's
14 prep for people and part of the career development
15 process?
16      A. So I don't want that to be a trick
17 question. So she actually -- she would be
18 considered, but we are going through the steps. If
19 there was some things that I thought I didn't know
20 that she told us in the interview process, that
21 would certainly be a weighing-in factor on her
22 decision. Based on what I knew of Jesse and her
23 background at the time, I didn't think she would
24 have those certain competencies. But if she said,

Page 342

1       Yes, I did. I was -- you know, I worked maintenance
2  prior to coming to Shell, then, obviously, that's
3  going to be a factor.
4       But -- so yes, she was considered, you
5  know, a serious interviewee, but she just wasn't
6  awarded a position.
7       Q. Okay. Going back to your notes that are
8  Exhibit 12. And your attorney placed a hard copy in
9  front of you.
10      A. Exhibit 12 or Document 12? Okay. My
11 notes. Okay.
12      MR. TUCKER: At the bottom you see
13 there are numbers there.
14      THE WITNESS: Okay.
15      MR. TUCKER: No. 657.
16      THE WITNESS: Did you want me to go to
17 a particular one?
18      MR. TUCKER: That's the first page --
19      MS. GURMANKIN: Actually, Joe, 643.
20      MR. TUCKER: 643.
21      THE WITNESS: Okay.
22      Q. (BY MS. GURMANKIN) You have had an
23 opportunity to review your notes?
24      MR. TUCKER: I'm on the wrong page.

Page 343

1  I'm sorry.
2       A. No, I have not.
3       Q. (BY MS. GURMANKIN) Okay. Why don't you go
4  through those. Let me know when you are done.
5       A. Okay.
6          I think I reviewed them.
7       Q. All right. Is there anything in
8  either of -- well, first, those are your handwritten
9  notes regarding the interviews with Jesse and
10 Jeremy, correct?
11      A. Yes.
12      Q. In connection with both of their
13 applications to the scheduler position?
14      A. Okay. Repeat the question.
15      Q. Sure. In connection -- those are your
16 notes in connection with their interviews for the
17 scheduler position?
18      A. For Jesse's is what I looked at right here.
19      Q. Okay. I need you to also look at Jeremy's.
20      A. Oh, I apologize.
21      Q. That's okay.
22      A. I don't think I have got Jeremy's. I just
23 have Jesse's right here. Hard copy.
24      MR. TUCKER: What numbers are his,

Page 344

1  Counsel? Does it end in 656? Counsel?
2       MS. GURMANKIN: Yeah, I am looking. I
3  think so.
4       MR. TUCKER: Keep those right here.
5  Keep Jeremy's right here.
6       (Discussion off the record.)
7       MR. TUCKER: Can we go off the record
8  while he's reviewing this, Counsel?
9       MS. GURMANKIN: Yes.
10      THE VIDEOGRAPHER: We are off record.
11 The time is 3:06 p.m.
12      (A recess was taken.)
13      THE VIDEOGRAPHER: We are back on
14 record. Time is 3:11 p.m.
15      Q. (BY MS. GURMANKIN) You have had an
16 opportunity to review Exhibit 12, which is your
17 notes from the interview of Jeremy Greene and Jesse
18 Barnes, correct?
19      A. Yes.
20      Q. And that is your handwriting throughout,
21 correct?
22      A. Yes.
23      Q. When did you make these notes?
24      A. During the interview.

86 (Pages 341 to 344)

Page 345

1      Q.  Okay.  Did you make any after the
2   interview, or it was all done during?
3      A.  I think the only thing that we do --
4   scratch that.  We do the scoring after the
5   interview's over with.  We just take the general
6   notes and then we start collecting everything that
7   we put in there, and we put that down.
8      Q.  All right.  When was the scoring done?
9      A.  I don't recall exactly when.
10      Q.  Do you recall if it was the same day,
11   within a week, two weeks?
12      A.  I don't recall.
13      Q.  So it could have been done a week later?
14      A.  Typically the answer is no, because you
15   want to make sure that you write down what you
16   retain, and we have a timeline that we have to turn
17   this in to HR.  So I'm going to say within two days
18   it was done.
19      Q.  What's the timeline to turn it in to HR?
20      A.  I don't recall that.  I think -- I'm not
21   going to guess.  I don't know.
22      Q.  You don't have a specific recollection of
23   completing the scoring within two days, correct?
24      A.  That's correct.

Page 346

1      Q.  You don't have a recollection of when that
2   was done?
3      A.  That's correct.
4      Q.  If you look at Jesse's notes or your notes
5   about the interview with Jesse, is there anywhere in
6   there where you state that she hasn't met certain of
7   the skill requirement elements in the job posting?
8      A.  No, and it won't state that in here.  So
9   one of the -- one of the things about the interview
10   questions is, you see we ask the exact same
11   questions.  This is a standard template regardless
12   of what they are applying for.  It could change from
13   hourly to -- and so these questions are -- are a
14   mirror to get the answers that we are looking for.
15   Like, for example --
16      Q.  Tell me what page you are on.
17      A.  On page 645.
18      Q.  Hang on one second.  Yep.
19      A.  So at the top, we circled that Q4.  So what
20   that means is, we should ask the same questions of
21   each candidate that applied.  So these are general
22   questions.  They are not -- they are not competency
23   questions to that task.  These are just general
24   questions.  We get a better feel because someone

Page 347

1   could have way more experience.  So these -- these
2   questions are just in general and how did you work.
3   Then we go back to their experience that they
4   submitted based on the requirements.
5      Q.  Okay.  So just to confirm, there is nowhere
6   in your notes of the interview with Jesse where it
7   states that she doesn't meet certain skills or
8   requirements in the job description?
9      A.  Not that I have seen.  That's correct.
10      Q.  Okay.  The date on these notes indicate
11   that the interviews occurred on 11/16, 2016.
12      A.  Looking at the date, that looks like that.
13      Q.  No reason to dispute that, right?
14      A.  That's correct.
15      Q.  Okay.  Because you would have written the
16   date on which the interviews were being done?
17      A.  That's correct.
18      Q.  Is there anywhere in these notes where it
19   states that the decision's been made to give Jeremy
20   the position over Jesse?
21      A.  Mind if I just quick -- take a quick
22   glance?
23      Q.  No.
24      A.  No, I do not see that.

Page 348

1      Q.  Is there anywhere -- is there any
2   documentation that says that you and Hondo Blakley
3   made the decision to select Jeremy over Jesse for
4   these reasons?
5      A.  Repeat the question.
6      Q.  Sure.  Is there any documentation that lays
7   out the reasons why you and Hondo Blakley decided to
8   promote Jeremy over Jesse into the scheduler
9   position?
10      A.  The only documentation that we would
11   have -- and this is from Hondo's notes here -- is a
12   general score, but I don't see the other one.  So we
13   have a scoring --
14      Q.  Tell me what page you are on.
15      A.  This is No. 655.  And I'm going to look in
16   here.  I want to see --
17      Q.  Tell me what you are looking at so I can
18   follow you.
19      A.  Okay.  Well -- so I guess ==Exhibit 56==, would
20   that have Hondo's notes in that, as well, or that is
21   just an application?
22      Q.  56 is just Jesse's application.
23      A.  Where is -- what documents is the notes,
24   and would it have Hondo's notes and mine or just

87 (Pages 345 to 348)

Page 349

1    mine?
2        Q.  So Exhibit 12.
3        A.  Exhibit 12?
4        Q.  Yeah.
5        A.  Okay.  There's 27.  And I'm scrolling
6    through right now.  I'm not on -- so on -- on
7    page -- I can't see that -- 668, this is the -- this
8    is the sum -- summary total that we will have added
9    up for him and I on -- on how we thought the
10   interview questions were.
11       MR. TUCKER:  For the record purposes,
12   this is Exhibit 12, page 27, with a Bates-stamp
13   number Shell 668.
14       Q.  (BY MS. GURMANKIN)  All right.  And this
15   looks like it's for Jeremy.
16       A.  This is for Jeremy, correct.  I did not see
17   Jesse's.
18       Q.  Okay.
19       MR. TUCKER:  It was up earlier.
20       THE WITNESS:  I'm looking.
21       Q.  (BY MS. GURMANKIN)  And is this your
22   handwriting on this page?
23       A.  Let me go back.  So the "Jeremy"
24   handwriting on the top is my handwriting.

Page 350

1    Everything else is not.
2        Q.  That's Hondo's?
3        A.  It -- it's not mine.  So...
4        Q.  I mean, would it be anyone other than
5    Hondo?
6        A.  I wouldn't think so.
7        Q.  So Jesse's overall interview matrix is on
8    page 14 of 27, Bates No. 655.
9        A.  Thank you.
10       MR. TUCKER:  And if you want, you can
11   pull those two pages out of --
12       THE WITNESS:  Out of here?  I thought I
13   had seen them.  Oh, I see it now.
14       A.  Okay.  Was there a question?
15       Q.  (BY MS. GURMANKIN)  No.  Do you have those
16   in front of you?
17       A.  I have got one on the screen and one
18   here --
19       MR. TUCKER:  Yes, yes, he has both of
20   them in front of him.
21       Q.  (BY MS. GURMANKIN)  Okay.  All right.  Is
22   there any documentation to explain how you and Hondo
23   came up with these scores for the different
24   competencies?

Page 351

1        A.  The documentation would be imbedded inside
2    of the handwritten notes.  So we are trying to
3    handwrite some of what they are saying.
4            But what it doesn't document is, you
5    know, maybe the difficulty, how they came up with
6    this stuff or the probing that we -- we might have
7    had to give or, you know, their demeanor or things
8    like that.  This is basically -- this is strictly
9    only what they are trying to tell us, and then
10   that's where we are trying to write it down.
11       Q.  Okay.  And your interpretation of what they
12   are trying to tell you?
13       A.  Yes.
14       Q.  Okay.  Am I correct that these scores are
15   subjective?
16       A.  I would say yes.
17       Q.  So if I want to know, for example, how you
18   came up with a score of 2 for Jesse on authenticity,
19   is there anything you can point me to?
20       A.  I'd have to review the notes again to look.
21   But I don't know if the notes would tell me that.
22   You want me to look at the notes real quick?
23       Q.  Sure.
24       A.  Okay.

Page 352

1            So I have reviewed it, and I'm on
2    page 647.
3        Q.  Hold on.
4        A.  Of Exhibit 12.
5        Q.  Okay.
6        A.  So, again, we got the Question 4 is what we
7    highlighted.  Tell us the time when you felt most
8    energized at work, and the notes here from Q4, it
9    looks like what I'm seeing, working on KPI board.
10           Why were you energized?  "Making sense
11   of information" is what I put down for notes.
12           How do you stay energized at work?
13   Team work motivates, the recognition from others,
14   team motivates them, recognition from others.
15           So we took, just out of our experience,
16   that this is the score that we gave her for
17   authenticity.  Rather was there -- you know, what
18   kind of information was here, how she talked about
19   it, and that's what we come up with the scores.
20       Q.  But there is nothing I can use to -- there
21   is nothing on page 647 or anywhere else that
22   explains why you gave her a 2 as opposed to a 3 or a
23   4 or a 1?
24       A.  That is correct.

Page 353

1    Q.  Okay.  And for Jeremy, same thing.  No
2  explanation or nothing you can point to to say why
3  you gave him a 4 for authenticity as opposed to a 3
4  or a 2 or a 1?
5    A.  That's correct.
6    Q.  Is there any document that explains why you
7  and Blakley -- and you made the decision together;
8  is that right?
9    A.  Yes.
10   Q.  Is there any document that explains why you
11 and Blakley decided to promote Jeremy over Jesse for
12 the scheduler position?
13        MR. TUCKER:  Other than what we've
14 already talked about?
15        MS. GURMANKIN:  Well, no.  There is
16 nothing that says, This is why we made the decision
17 to promote Jeremy over Jesse, or words to that
18 effect.
19   Q.  (BY MS. GURMANKIN)  Is there a document
20 that says that?
21        MR. TUCKER:  Is there a document that
22 says that?
23        MS. GURMANKIN:  Yes.  Or the gist of
24 it?

Page 354

1        MR. TUCKER:  Well, those are two
2  different questions, if the document says that or
3  the gist of that.  Which one?
4    Q.  (BY MS. GURMANKIN)  Is there a document
5  that says that?
6    A.  That says what?  Sorry.  You got --
7    Q.  All right.  Is there anywhere in these
8  interview notes that explains why the decision was
9  made to promote Jeremy over Jesse?
10   A.  No.
11   Q.  Okay.  Is there any document that explains
12 that?
13   A.  Yes.  The requirements for the -- for the
14 role.
15   Q.  Okay.  Is that Exhibit 11 that we looked
16 at?
17   A.  I can't recall.  Let me look.
18        Yes, Exhibit 11, page 879 under "Skills
19 and Requirements."
20   Q.  Okay.  But is there anywhere in Exhibit 11
21 where it says this is why the decision was made to
22 promote Jeremy over Jesse?
23   A.  No.
24   Q.  Okay.  Is there any documentation that says

Page 355

1  that?
2    A.  Other than the requirements, no.
3    Q.  And the requirements, again, don't say this
4  is why Jeremy was promoted over Jesse, correct?
5    A.  This is correct.
6    Q.  Okay.  At the time -- and how soon after
7  the scoring was done did you guys make the decision
8  to promote Jeremy?
9    A.  I don't recall that.
10   Q.  Do you recall if we are talking days,
11 weeks, months?
12   A.  I -- I -- I couldn't -- I couldn't tell
13 you.  So sometimes if we are waiting on HR
14 decisions, it could take longer.  If everything is
15 ready, it could take shorter.  So I -- I don't know.
16 I can't remember.
17   Q.  So after you guys make the decision -- let
18 me ask you this:  Did you do the scoring together?
19 You sat down and went through the scoring together?
20   A.  To my -- to the best of my recollection --
21 thank you -- yes, we did.  You know what I'm trying
22 to say.
23   Q.  All right.  And did you make the decision
24 in that same discussion in which you did the

Page 356

1  scoring, or was that a separate discussion?
2    A.  I don't recall specifically if we made it
3  in that one or a separate one.
4    Q.  And did you have to get approval from HR?
5    A.  Yes.
6    Q.  Who did you guys talk to?
7    A.  I don't recall.  I'd have to look up.  If
8  Michelle was our HR, I would -- I would think it was
9  her, but I'm not positive.  I would have to see.
10   Q.  But whoever your HR support was at that
11 time?
12   A.  Whoever was on that rec, yes.
13   Q.  And did that person ask -- when you say the
14 "rec," would that be the job description?
15   A.  Yeah.  So they -- they create the
16 requisition, and then what happens is there is an HR
17 representative attached to it.  It may or may not be
18 Michelle.  It could have been -- I don't want to say
19 an HR trainee, but it could have been a -- you know,
20 someone else.  But I just don't know.  It depends.
21   Q.  All right.  So if you go back to
22 Exhibit 11.
23   A.  Okay.  Page?
24   Q.  Page 4.

Page 357

1      A.  Okay.  Here we go.  Here?

2      Q.  Yeah.  So Ria Magtoto?

3      A.  Ria.

4      Q.  Okay.  She was the HR business partner at

5  the time?

6      A.  Yes.

7      Q.  She would have been the person that you

8  guys talked to about the decision?

9      A.  Between Ria and Michelle.  But, again, I'm

10  not sure which one.  They are both on here.  Why

11  there is two, I don't -- I don't know.

12      Q.  Well, only one is listed as the HR business

13  partner, right?  Only Ria is.

14      A.  Yes, but "Selection Panel" I see it says

15  Michelle.  And again, I'm not sure why that is.  We

16  could have discussed it.  It could have just been a

17  brief discussion.  I don't know.  I don't recall it.

18      Q.  Do you know what the selection panel is?

19      A.  It's just the panel for everyone to say,

20  Okay, this is who we want.  Did we do the notes?

21  Does everything look good?  This is who -- and then

22  that's basically it.  They are not in the interview

23  at all.

24      Q.  Right.  But you and Blakley were the sole

Page 358

1  decision makers?

2      A.  We recommended who we wanted, and then

3  everyone collectively decided yes.

4      Q.  When you say "everyone," who are you

5  talking about?

6      A.  I would probably be -- we're talking to

7  Steve Craig, to HR and then Hondo and myself.  We

8  made the recommendations.  Unless something was

9  completely off, they wouldn't typically go against

10  our recommendations.

11      Q.  Okay.  So did you have a conversation with

12  Steve Craig about your recommendation?

13      A.  I don't recall one, but I'm certain I had

14  one.

15      Q.  Because that would have been your practice?

16      A.  That is the practice.

17      Q.  Okay.  But you don't recall having one?

18      A.  I don't recall specifically having one

19  but...

20      Q.  Do you recall having one with either Ria or

21  Michelle?

22      A.  I do not.  I did not.  Yeah, I don't

23  remember that.

24      Q.  But at some point, I guess, you got the

Page 359

1  approval for your decision.  Right?

2      A.  That's correct.

3      Q.  And we know that because Jeremy was the one

4  who was selected?

5      A.  Yes, ma'am, correct.

6      Q.  But you don't recall anyone asking you the

7  basis for your decision; is that correct?

8      A.  No.  They just ask for the notes, and they

9  leave the rest up to us.

10      Q.  Okay.  Prior to the interview, were you

11  aware that Jesse had made complaints of sexual

12  harassment and discrimination against you?

13      A.  No, I was not.

14      Q.  Prior to the scoring, had you been aware of

15  that?

16      A.  No, I have not.  No, I was not.

17      Q.  Prior to the decision being made, were you

18  aware of that?

19      A.  No.

20      Q.  You sure about that?

21      A.  I'm positive.

22      Q.  Is there any documentation that you can

23  point to to support your testimony that you were not

24  aware of Jesse's allegations of sexual harassment

Page 360

1  before you made the decision?

2      A.  I don't think there was any documentation

3  for me to know that there was.

4      Q.  I'm sorry; I didn't understand that answer.

5      A.  There is no documentation for me to know

6  that there was allegations of sexual harassment

7  against me.

8      Q.  All right.  My questions was different.

9          Was there any documentation that you

10  can point to that supports your testimony that as of

11  the time you make the decision about the scheduler

12  position, you did not know that Jesse had made

13  sexual harassment allegations against you?

14      A.  I don't believe there is, no.

15      Q.  At any point after the decision's made,

16  does anyone from Shell ask you or tell you that

17  they're reviewing the decision to make sure that it

18  was legitimate?

19      A.  I do not recall that, no.

20      Q.  I'm showing you what's been marked as

21  Exhibit 7.

22          MR. TUCKER:  Excuse me for a second.

23  I'm going to get these out of his way.  You think

24  you are going back to these?

90 (Pages 357 to 360)

Page 361

1    Q. (BY MS. GURMANKIN) If you go to page 2,
2  this is the complaint that Jesse file in the Middle
3  District of Pennsylvania.
4        Have you seen this before? And if you
5  need to review it to answer the question, that's
6  fine.
7    A. I honestly don't remember if I have seen
8  this before or not.
9    Q. All right. If you go to paragraph 32.
10   A. On page?
11   Q. On page 10 of the complaint, page 11 of 32
12 of the document.
13   A. Page 11?
14   Q. Uh-huh.
15        MR. TUCKER: 11 of Exhibit 7?
16        MS. GURMANKIN: 11 of 32, yeah.
17   Q. (BY MS. GURMANKIN) You there, Mr. Turney?
18   A. Yes, I am.
19   Q. All right. So it says, "In or about May
20 2016, Plaintiff complained of sexual harassment to
21 Blakley." I'll stop there for a sec.
22        You were never told about that,
23 correct?
24   A. That's correct.

Page 362

1    Q. Okay. And you don't know whether or not
2  that's true, right?
3    A. I do not know.
4    Q. All right. "Blakley has supervisory
5  authority over Plaintiff and Turney."
6        Is that true?
7    A. No, it couldn't have been true.
8    Q. How come?
9        MR. TUCKER: You said 11 of 32. I'm
10 looking at 11 of 32. I'm sorry, Counsel, I don't
11 see where you are.
12        MS. GURMANKIN: Paragraph 32, page 10
13 of the complaint.
14        MR. TUCKER: In or about -- I'm sorry.
15        MS. GURMANKIN: That's okay.
16   Q. (BY MS. GURMANKIN) Why can't that not be
17 true?
18   A. So Hondo was a PIL, if I'm not mistaken, at
19 the time, which was not my direct supervisor.
20   Q. What's that?
21   A. PIL?
22   Q. Uh-huh.
23   A. A process improvement lead.
24   Q. Did he have supervisory authority over you?

Page 363

1    A. So I'm going to say I don't know what that
2  question means. So he's not my boss; so then he's
3  not my supervisor.
4    Q. Did you fall under his umbrella of
5  supervision?
6    A. No.
7    Q. Could he direct you in terms of work?
8    A. He could ask me to do work and I would
9  respect his position and do the work, but he could
10 not make me do something if I didn't want to do it.
11   Q. Was he above you organizationally?
12   A. Yes.
13   Q. Okay. Goes on to say, "Plaintiff asked
14 Blakley for help and expressed that she was upset at
15 the way she was being treated by Turney and other
16 male managers and employees because she is female."
17        Am I correct that you do not know
18 whether or not that is true?
19   A. Yes, that's true, I do not know.
20   Q. Paragraph 33, "In response to Plaintiff's
21 complaint, Blakley told Plaintiff that the same was
22 out of character for her and that she needed to make
23 sure to control her emotions.
24        "Blakley also told Plaintiff that

Page 364

1  Turney was inappropriate and not qualified to be a
2  supervisor and that she should start documenting
3  Turney's conduct."
4        Am I correct that you don't know
5  whether or not that's true?
6    A. I do not know.
7    Q. Last line of that paragraph, "Blakley
8  acknowledged that Plaintiff was the lowest paid
9  maintenance analyst."
10        Do you know if that was true?
11   A. I do not know if that was true or not.
12   Q. Paragraph 34, "After Plaintiff complained
13 regarding the sex discriminatory conduct to which
14 she was subjected: (a) Plaintiff was excluded from
15 work-related meetings; Turney became short-tempered
16 with Plaintiff; Turney started micromanaging
17 Plaintiff and her work; Turney said that he needed
18 to watch what he said around Plaintiff, which
19 Plaintiff understood to be a reference to her
20 complaints of sex discriminatory conduct."
21        At any time before November 21, 2016,
22 did any of that happen?
23   A. No.
24   Q. Okay. Well, you did take Jesse out of

91 (Pages 361 to 364)

Page 365

1    certain meetings, correct?
2         A.  Correct.
3         Q.  Anything else that's true about that?
4         A.  No.
5         Q.  Paragraph 36 --
6              MR. TUCKER:  Objection to the
7    question -- two questions ago where he said he did
8    take her out of meetings.  This allegation
9    (inaudible).
10             THE REPORTER:  Could you speak up?  I
11   couldn't hear you.
12             MR. TUCKER:  The statement in 34 is
13   that she was -- Plaintiff was excluded from
14   work-related meetings.
15        Q.  (BY MS. GURMANKIN)  Paragraph 36, "In or
16   about October 2016, Plaintiff again complained of
17   sex discrimination to Blakley and Turner."
18             Am I correct that your testimony is she
19   did not complain to you about sex discrimination in
20   October 2016?
21        A.  That's correct.
22        Q.  And, in fact, she never complained to you
23   about sexual harassment or sex discrimination,
24   correct?

Page 366

1         A.  That's correct.
2         Q.  You understand from her complaints she's
3    saying she did?
4         A.  I understand that.
5         Q.  And you are disputing that?
6         A.  That's correct.
7         Q.  Do you know whether or not she complained
8    to Blakley about sex discrimination in October 2016?
9         A.  I do not know that.
10        Q.  "Their only response to Plaintiff's
11   complaint was that she needed to stop playing the
12   victim."
13             It is true that you told her that at
14   some point, correct?
15        A.  That's correct.
16        Q.  Okay.  Your testimony is you did not tell
17   her that in response to her complaining of sex
18   discrimination?
19        A.  That's correct.
20        Q.  In or about -- paragraph 37, "In or about
21   November 2016, Defendants posted an open position of
22   scheduler, for which Turney and Blakley were the
23   hiring managers."  I'll stop there for a sec.
24             That's correct, right?

Page 367

1         A.  Yes.
2         Q.  "As Plaintiff was qualified for the
3    position, which would have been a promotion for her,
4    she applied and was interviewed for the same."
5              Is that true?
6         A.  The part that she was qualified for the
7    position is not true.
8         Q.  Okay.  How about the rest?
9         A.  It would have been a promotion for her,
10   yes, that is true.
11        Q.  And it is true that she applied and was
12   interviewed?
13        A.  That is also true.
14        Q.  Paragraph 38, "Turney and Blakley conducted
15   Plaintiff's interview for the scheduler position."
16   I'll stop there.
17             That's true?
18        A.  That is true.
19        Q.  "During the interview, Turney and Blakley
20   laughed when Plaintiff told them that she wanted the
21   position because she wanted to advance her career at
22   Defendants."  I'll stop there.
23             Is that true?
24        A.  That is not true.

Page 368

1         Q.  Did she say something to the effect of she
2    wanted the position because she wanted to advance
3    her career at the company?
4         A.  I believe -- I'm not sure.
5         Q.  Okay.  You don't recall?
6         A.  I don't recall.
7         Q.  Did either of you laugh at all during the
8    interview?
9         A.  Oh, I'm -- I'm certain that we did because
10   I -- yes.
11        Q.  Why are you certain that you did?
12        A.  Just some of the things that -- that she
13   would say.  And she would ask us -- so during the
14   interview -- I remember this distinctly -- I cannot
15   talk tonight.
16             She didn't know how to answer these
17   questions.  So we asked her a question, and she just
18   looked at us and was waiting for us to prompt an
19   answer like -- and we said, you know, "Jesse, you've
20   got to answer these questions."
21             And she would say something funny as,
22   "Well, I don't know what you want me to say."
23             And so we probably giggled -- or we did
24   giggle about that and said, "You've just got to

Page 369

1 answer. We can't answer these questions for you."
2      So that's where -- if we laughed, if
3 that was it, that's what she's talking about.
4      Q. Is that the only time that you guys laughed
5 during the interview?
6      A. As far as I can recall, yes.
7      Q. "Turney and Blakley also told Plaintiff
8 that they did not think she would do well in the
9 position."
10      Is that true?
11      A. I don't recall saying that at all.
12      Q. Did you talk to Jesse about or let her know
13 that she wasn't selected for the position?
14      A. I did.
15      Q. Okay. Just you?
16      A. Yes. Yes, just me.
17      Q. And do you recall how soon that was after
18 the interviews on November 16?
19      A. No, I do not recall.
20      Q. Do you recall if it was before or after
21 that November 21, 2016, meeting that you had with
22 Jesse?
23      A. I do not recall that, as well.
24      Q. What do you recall about that meeting?

Page 370

1      A. Just where it was.
2      Q. Where was it?
3      A. In the hallway by the conference rooms is
4 where I told her.
5      Q. Okay. Do you recall what you said?
6      A. I just -- I -- I grabbed her -- I didn't
7 grab her. I pulled her to the side or asked her to
8 come over. I just said, "Listen, you weren't
9 selected for the -- for the scheduler role."
10      Q. Did you tell her why?
11      A. I don't recall if I told her why or not. I
12 would assume that I did. But, again, I don't want
13 to assume anything. So I don't remember if I did or
14 not.
15      Q. Okay. So going back to the complaint,
16 Exhibit 7, page 13 of 32, paragraph 40.
17      A. Okay, hold on.
18      Q. Sure.
19      A. Page 7 -- or Exhibit 7.
20      Q. Page 13 of 32.
21      A. Okay.
22      Q. Paragraph 40, "Defendants did not give
23 Plaintiff a reason for failing to select her for the
24 scheduler position."

Page 371

1      A. Okay.
2      Q. As you sit here today, you can't dispute
3 that, right?
4      A. I don't remember if I did that or not.
5      Q. Paragraph 41, "After Defendants selected
6 the male employee for the scheduler position over
7 Plaintiff, Turney told Plaintiff that he was worried
8 that Plaintiff might have received the promotion
9 because she had more time in the group than the male
10 employee."
11      Is that true?
12      A. That's completely false.
13      Q. Okay. You never told her that?
14      A. No.
15      Q. Is that statement true, that she had more
16 time in the group than Greene?
17      A. I don't know.
18      Q. Did you ever look into that before you made
19 the decision?
20      A. If she had more time?
21      Q. Uh-huh.
22      A. Time -- no. Time's irrelevant.
23      Q. So if someone's in a group for 15 years and
24 there is an outside applicant, that's irrelevant?

Page 372

1      A. That's correct.
2      MS. GURMANKIN: Let's take a break, and
3 I'll see how much more I have.
4      THE VIDEOGRAPHER: We are off record.
5 Time is 3:39 p.m.
6      (A recess was taken.)
7      THE VIDEOGRAPHER: We are back on
8 record. Time is 3:54 p.m.
9      Q. (BY MS. GURMANKIN) Looking at Exhibit 11,
10 which is the job posting for the scheduler position
11 that Jeremy Greene was promoted into, did you see
12 this job description before you made the decision?
13      A. Yes.
14      Q. Did you help draft it?
15      A. I don't recall if I helped or not.
16 Sometimes this is already in the system. We could
17 have put some stuff together. But I don't recall if
18 I helped draft this or not.
19      Q. Did you see, prior to the decision being
20 made, Jereme Greene's résumé?
21      A. I'm certain I have, but I don't recall
22 that.
23      Q. Are you certain you have because it's a
24 matter of practice you would have seen the résumé of

93 (Pages 369 to 372)

Page 373

1  the applicants?
2      A.  That's exactly what time saying.
3      Q.  Okay.  But you don't recall if you saw his
4  résumé in connection with this position?
5      A.  That's correct.
6      Q.  Did you know prior to the decision being
7  made how much maintenance experience Jereme Greene
8  had?
9      A.  I knew the positions that he held at Shell
10 and what he did at Shell.
11     Q.  Did you know prior to the decision how much
12 maintenance experience he had?
13     A.  No.
14     Q.  Did you know prior to the decision being
15 made how much knowledge of preventative and
16 predictive maintenance work in projects he had?
17     A.  Yes.
18     Q.  What was that?
19     A.  The time that he worked for us and his time
20 in the warehouse.  And when I -- when I say that, so
21 the time in the warehouse that he did, he was
22 pulling jobs and preparing for preventative
23 maintenance roles.  So he had to be the ones
24 creating BOMs and getting his parts together in

Page 374

1  order to know what those -- what they are going to
2  be fixing in the field.
3      Q.  So you were -- you were aware that he did
4  have knowledge of preventative and predictive
5  maintenance work in projects prior to the position?
6      A.  Yes.
7      Q.  Were you aware of what skills he had in the
8  use of scheduling tools such as Gantt charts, PE- --
9  PERT network, CMMS scheduling module and resource
10 histograms prior to the decision being made?
11     A.  I knew he had extensive knowledge in SAP
12 and the working systems that we were dealing with.
13     Q.  Anything else?
14     A.  Nothing particular.  I just knew he knew
15 SAP inside and out.
16     Q.  Did you know prior -- and you knew that
17 prior to the decision being made?
18     A.  Yes.
19     Q.  Prior to the decision being made, did you
20 know what his skill was in assessing and
21 prioritizing work based on critical systems and
22 equipment requirements?
23     A.  I knew that he had the knowledge to assess
24 that, being -- because he was in the field as a

Page 375

1  mechanic and he worked in the warehouse gathering
2  those parts and creating BOMs for us.
3      Q.  Did you know what his skill was in project
4  commitments, age of work orders, resource
5  availability and customer satisfaction?
6      A.  Yes.
7      Q.  Prior to the decision?
8      A.  Yes.
9      Q.  How long was he in the warehouse?
10     A.  Roughly this time I'm going to say six to
11 seven years.
12     Q.  As a full-time employee?
13     A.  He was a contractor while he was in the
14 warehouse.
15     Q.  And then after six or seven years as
16 a -- in the warehouse, then what did he do?
17     A.  Then he applied for a position as a
18 maintenance mechanic in my group.
19     Q.  He got that, I assume.
20     A.  Yes.
21     Q.  As a full-time employee or contractor?
22     A.  I can't recall if he was a contractor or
23 a -- or a Shell employee at that time.  I cannot
24 remember.

Page 376

1      Q.  Do you know when he became maintenance
2  mechanic, approximately?
3      A.  I do not recall.
4      Q.  Before you became maintenance supervisor
5  for Appalachia?
6      A.  It was during my -- during my time as
7  maintenance supervisor when he came over.
8      Q.  So it would have been at some point after
9  January 2014?
10     A.  Yes.
11     Q.  And then did he go from maintenance
12 mechanic to scheduler?
13     A.  Correct.
14     Q.  Okay.  Do you know who Brett Kirk is?
15     A.  I have heard the name.  I have heard the
16 name.  I can't picture where I heard the name from.
17     Q.  Okay.  He's an employee at Shell.  Does
18 that ring a bell?
19     A.  No.
20     Q.  Okay.
21     A.  I figured that's where I've heard the name.
22     Q.  Did Hondo Blakley ever talk to you about
23 Jesse applying for another position after she was
24 moved out of the group?

94 (Pages 373 to 376)

Page 377

1    A.  Ask me that question again.
2    Q.  Sure.  After Jesse was moved out of your
3  group, did Hondo Blakley talk to you about her
4  applying for another position?
5    A.  No.
6    Q.  At any point does anyone talk to you about
7  applying for -- about Jesse applying for another
8  position after she's moved out of your group?
9    A.  No, not that I recall.
10   Q.  Did you ever hear anyone call Jesse a bitch
11  or bitchy?
12   A.  No.
13   Q.  Did you ever refer to her as a bitch or
14  bitchy?
15   A.  No.
16   Q.  Did you ever use that term to refer to any
17  female employee at Shell?
18   A.  No.
19   Q.  Did Jen Card ever kiss you on the cheek?
20   A.  She did.
21   Q.  When was that?
22   A.  The golfing tournament.
23   Q.  Did she just come up to you and kiss you?
24   A.  Gave me a hug and kissed me on the cheek.

Page 378

1    Q.  Did you tell Jesse that Jen Card kissed you
2  on the cheek?
3    A.  I did.
4    Q.  Why?
5    A.  Because I guess to get under her skin
6  because the banter we had back and forth, because
7  she didn't like Jen Card.
8    Q.  Why would you want to get under her skin?
9    A.  Just because --
10       MR. TUCKER:  Objection; asked and
11  answered.
12       You may answer it again.
13       THE WITNESS:  I apologize.
14   A.  Just that was the relationship that we had
15  at the time.  We just were back and forth with
16  banter.
17   Q.  (BY MS. GURMANKIN)  Weren't you telling
18  Jesse that Jen Card kissed you on the cheek -- cheek
19  to suggest that Jesse should do the same?
20   A.  Absolutely not.
21   Q.  You were just doing it to get under her
22  skin?
23   A.  That's correct.
24   Q.  After Jesse was moved out of your group,

Page 379

1  who took over her position?
2    A.  Tina King.
3    Q.  Had Tina King been an employee of Shell?
4    A.  As a contractor, yes.  I don't -- I can't
5  recall if she was a Shell employee or not.
6    Q.  How did she come to fill the position that
7  Jesse vacated?
8    A.  She was getting -- I think she was
9  getting -- let me rephrase that.
10       As my recollection goes, she was
11  getting divested.  So that means her job role in
12  projects was going away, and they wanted her to
13  apply for Jesse's role.
14   Q.  Who is "they"?
15   A.  "They" as in Greg Larsen.  And I'm going to
16  say just him, Greg Larsen.
17   Q.  So the position was posted after Jesse was
18  moved out?
19   A.  As far as I can recollect, yes.
20   Q.  Okay.  And do you know if Tina King was
21  asked to apply?
22   A.  Excuse me?
23   Q.  Was she asked to apply?
24   A.  I'm not 100 percent certain on that.

Page 380

1    Q.  But she did apply?
2    A.  She did apply.
3    Q.  Was she interviewed?
4    A.  You know, I don't know.  I don't even know
5  if I did the interview, neither.  I can't recall and
6  I can't remember.
7    Q.  Do you know if anyone else applied?
8    A.  I do not recall that.
9    Q.  Were you involved in her being selected?
10   A.  I do not recall that, as well.
11   Q.  Was she still in the group at the time that
12  you were promoted in 2018?
13   A.  Yes.
14   Q.  In connection with your 2018 promotion, did
15  you tell anyone that you had been accused of sexual
16  harassment?
17   A.  No.
18   Q.  Had you told anyone that you were found to
19  have violated the Code of Conduct?
20   A.  No.
21   Q.  I'm showing you what's been marked as
22  Exhibit 1.  This is a cover email to Michelle Priest
23  attaching training rosters.
24   A.  Okay.

95 (Pages 377 to 380)

Page 381

1     Q. And I want to show you page -- well, if you
2  go to page 2, the first page of the sign-in sheet,
3  it says on the right side at the top "Ethics
4  Training Code of Conduct refresher supervisor
5  session."
6          Do you see that?
7     A. I do.
8     Q. Do you recall this training?
9     A. I don't recall it.
10    Q. All right. If you go to page 3.
11    A. Okay.
12    Q. That's your name printed in the left
13 column, second from the top, right?
14    A. Yep.
15    Q. And is that your signature two columns to
16 the right?
17    A. It is.
18    Q. And your handwriting is the date?
19    A. That's correct.
20    Q. Okay. This is not the LEAD training that
21 you were required to do as part of your discipline,
22 correct?
23    A. That's correct. This is just a refresher.
24    Q. Okay. For everybody?

Page 382

1     A. Yes.
2     Q. Okay. All right. That's all I have for
3  you.
4     A. Okay.
5          MR. TUCKER: Let me see counsel outside
6  for a moment.
7          THE WITNESS: Okay.
8          THE VIDEOGRAPHER: We are off record.
9  Time is 4:04 p.m.
10         (A recess was taken.)
11         THE VIDEOGRAPHER: We are back on
12 record. Time is 4:06 p.m.
13         MR. TUCKER: Hold on. Let me see my
14 client outside for a second.
15         THE VIDEOGRAPHER: Back off record.
16 Time is 4:06 p.m.
17         (A recess was taken.)
18         THE VIDEOGRAPHER: We are back on
19 record. Time is 4:09 p.m.
20    F U R T H E R   E X A M I N A T I O N
21 BY MS. GURMANKIN:
22    Q. Just a couple of questions. I'm going to
23 try to keep this short --
24    A. Okay.

Page 383

1     Q. -- and focused. All right?
2          Earlier I had asked you -- or earlier
3  you testified that you reviewed Megan Kloosterman's
4  notes of your meeting with her in preparation for
5  your deposition today.
6          You recall that?
7     A. Yes, I do.
8     Q. And you said you had seen some
9  discrepancies based on your review, correct?
10    A. Correct.
11    Q. All right. And then you got an instruction
12 not to answer that question. And then you had
13 testified that what was not fully true about her
14 notes was when she said that -- when her notes
15 reflected that you said that you showed a picture of
16 yourself in your underwear to the group.
17         You recall that?
18    A. Correct.
19    Q. Okay. And you said that wasn't true
20 because you were not in your underwear; you were in
21 your compression shorts?
22    A. That's right.
23    Q. Okay. Are there any other discrepancies
24 that you noticed when you reviewed this document?

Page 384

1  And for the record, it's Exhibit 19, and it should
2  be before you.
3          Any other discrepancies that you
4  noticed when you reviewed this document in
5  preparation for your deposition today?
6     A. To the best of my knowledge, everything
7  that I testified to is accurate. This is a summary
8  of what Megan said. So I'm going to say that
9  everything that I reviewed is -- is accurate, either
10 true or false, but I believe we are okay. It's
11 okay.
12    Q. Okay. All right. Thanks. That's all.
13         MS. GURMANKIN: Anything, Joe?
14         MR. TUCKER: Uh-uh.
15         THE VIDEOGRAPHER: This concludes
16 today's deposition. We are off record. Time is
17 4:11 p.m.
18         (4:11 p.m., deposition concluded.)
19
20
21
22
23
24

96 (Pages 381 to 384)

Page 385

```
1            REPORTER'S CERTIFICATE
2        I, CONSTANCE KOENIG, Certified Shorthand
3    Reporter in and for the State of Texas, do hereby
4    certify:
5        That the witness named in the foregoing
6    deposition was by me duly sworn; that the deposition
7    was then taken before me at the time and place
8    herein set forth; that the testimony and proceedings
9    were reported stenographically by me and were
10   transcribed through computerized transcription by
11   me; that the foregoing is a true record of the
12   testimony and proceedings taken at that time; and
13   that I am not interested in the event of the action.
14       Witness my hand dated March 3, 2020.
15
16
17
     _____
18   CONSTANCE KOENIG, Texas CSR 6577
     Expiration Date:  01-31-2021
19   SUMMIT COURT REPORTING, INC.
     Certified Court Reporters and Videographers
20   1500 Walnut Street, Suite 1610
     Philadelphia, Pennsylvania 19102
21   424 Fleming Pike
     Hammonton, New Jersey 08037
22   (215) 985-2400 * (800) 447-8648 * (609) 567-3315
     www.summitreporting.com
23
24
```

Page 387

```
1            ERRATA SHEET
2    Attach to Deposition of:  William Turney
     Taken on:  February 19, 2020
3    In the matter of:  Barnes v. Shell Exploration, et al.
4    PAGE      LINE NO.      CHANGE        REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
```

Page 386

```
1         INSTRUCTIONS TO THE WITNESS
2        Read your deposition over carefully
3    It is your right to read your deposition and make
4    changes in form or substance.  You should assign a
5    reason in the appropriate column on the errata
6    sheet for any change made.
7        After making any changes in form or
8    substance which have been noted on the following
9    errata sheet along with the reason for any change,
10   sign your name on the errata sheet and date it.
11       Then sign your deposition at the
12   end of your testimony in the space provided.  You
13   are signing it subject to the changes you have
14   made in the errata sheet, which will be attached
15   to the deposition before filing.  You must sign it
16   in front of a witness.  Have the witness sign in
17   the space provided.  The witness need not be a
18   notary public.  Any competent adult may witness
19   your signature.
20       Return the original errata sheet to
21   your counsel promptly.  Court rules require filing
22   within thirty days after you receive the
23   deposition.
24
```

Page 388

```
1            SIGNATURE PAGE
2
3            - - -
4
5        I hereby acknowledge that I have
6    read the aforegoing transcript, dated February 19,
7    2020, and the same is a true and correct
8    transcription of the answers given by me to the
9    questions propounded, except for the changes, if
10   any, noted on the Errata Sheet.
11
12            - - -
13
14
15
16
17   SIGNATURE:  _____
             William Turney
18
19   DATE:  _____
20
21   WITNESSED BY:  _____
22
23
24
```

97 (Pages 385 to 388)

Exhibit 3

Maintenance Analyst - Wellsboro, PA

*Company description

Shell has been operating in the United States since 1912. We believe that our people are our greatest asset and that is why we invest heavily in our employees. Our industry-leading development programme helps unlock your potential and will see you work with an unrivalled pool of local and global experts. We will make sure that your ideas will travel through our global network of experts. In the United States, Shell is a major oil and gas producer in the deepwater Gulf of Mexico, a recognized innovator in oil and gas exploration and production technology and one of America's leading oil and gas producers, fuel and natural gas marketers and petrochemical manufacturers. We operate in 50 states and employ more than 22,000 people delivering energy in technically innovative ways.

*Job Description

Performs the administrative tasks necessary for effective productivity and reporting of the Maintenance team. Administer work order completion updates, technical history updates including failure codes for work orders. Assist in ongoing SAP user support and training

*Requirements

- Must be eligible to work in the USA without sponsorship
- Must have advanced SAP skills
- Must be capable of balancing multiple tasks to achieve results with weekly and monthly deadlines
- Experience or capable of developing a working knowledge of oil and gas production equipment, labor roles and business functions
- Administer the SAP Maintenance integrity execution data management requirements including updates to the asset hierarchy, new equipment tag creation, and preventive maintenance plan edits
- Assist scheduler in communication and publishing the weekly schedule
- Assist maintenance coordinator to analyze key metrics and cost control measures for maintenance and project work

*Disclaimer

Please note: We occasionally amend or withdraw Shell jobs and reserve the right to do so at any time, including prior to the advertised closing date.

Before applying, you are advised to read our data protection policy. This policy describes the processing that may be associated with your personal data and informs you that your personal data may be transferred to Royal Dutch/Shell Group companies around the world.

The Shell Group and its approved recruitment consultants will never ask you for a fee to process or consider your application for a career with Shell. Anyone who demands such a fee is not an authorised Shell representative and you are strongly advised to refuse any such demand.

Shell/Motiva participates in E-Verify.

All qualified applicants will receive consideration for employment without regard to race, color, sex, national origin, age, religion,

Exhibit 4

# JESSE A. BARNES

50 Apache Lane, Tioga, Pennsylvania 16946 | 570.404.0861 | jesseandrea632@yahoo.com

## EDUCATION AND TRAINING

**Training**

- 8 Step Problem Solving Process
- Maintenance Analyst Shadowing
- Maintenance Reliability Turnaround Workshop
- MIE Sustainability Workshop

**Wellsboro, PA**
**Wellsboro, PA**
**Calgary, AB**
**Houston, TX**

2009-2010 **Pennsylvania College of Technology**

**Williamsport, PA**

2002-2008 **Mansfield Junior/Senior High School**
*High School Diploma*

**Mansfield, PA**

## WORK EXPERIENCE

**Shell Exploration and Production Company**
October 2014-Present
*Maintenance Analyst (Cenergy Contract)*

**Wellsboro, PA**

- Work closely with Planners, Scheduler, and Maintenance Technicians to accomplish daily goals
- Communicate work schedule and close out work orders daily
- Review feedback daily for continuous improvement opportunities
- Attend daily meetings
- Communicate work schedule and distribute shop papers to appropriate personnel weekly
- Analyze data and reports daily
- Create and track notifications
- Skilled SAP abilities
- Maintain Maintenance Integrity Execution standards
- Create reports and presentations for accountability assessments
- Set up SAP profiles and request proper access for employees
- Update visuals for schedule compliance initiatives
- Plan office building maintenance jobs

**Shell Exploration and Production Company**
November 2010-October 2014
*Administrative Assistant (Cenergy Contract)*

**Wellsboro, PA**

- Assist the Operations team with reaching business and personal goals in a fast-paced work environment
- Assist with scheduling Superintendent's travel plans
- Work closely with vendors on invoice processes
- Manage telephone call, emails, and in-person visits from a community hot line
- Delegate community cases to proper personnel for resolution
- Research landowner claims, enter detailed data, and close claims
- Organize community open houses, in addition to answering and directing questions at open houses
- Provide support with spreadsheets and presentations using Microsoft Excel, Word, and PowerPoint
- Proficient with Microsoft Outlook
- Provide support with copiers, printers, and postage meters
- Purchase office supplies and keep items in stock
- Schedule meetings
- Keep updated employee records
- Data entry
- Provide IT assistance

**Changos Cantina**
2012-2012
*Bartender*

**Mansfield, PA**

- Beverage and food sales
- Interact and build customer relationships

**Mark's Brother's Restaurant and Lounge**                      **Mansfield, PA**
2009–2011
*Bartender*
- Beverage and food sales
- Interact and build customer relationships

## ACHEIVEMENTS
Charity Golf Tournament Committee Member
Building Fire Warden
Volunteer for Community Events

## REFERENCES

Exhibit 5

**Attendees:** Jesse Barnes, Megan Kloosterman (HR)
**Date:** 12/6/16

**Introduction**
- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised in the E&C hotline call you made regarding allegations of harassment – we will be taking the lead on the investigation
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- I ask that you be honest and transparent in your responses so I can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

**Interview Questions**

1. Describe your current role and responsibilities.
   Hired in Sept 2015 as a full-time employee into the team; Will was just hired as well; I was an Admin Asst, was asked to train as a maintenance analyst role and started training in October of 2014 – moved to the maintenance team's cubicle area. Will was the supervisor at that point and I was transferred under Will.

   Role is to be a communications amongst the team – KPIs, areas of improvement, reports on how we are doing, etc. Mostly communicate and share with Will and he is supposed to support when you give to the rest of the team. Work with schedulers/planners to ensure coordination. Have to work with engineers too – gathering information from people. Work with Will on a daily basis for your work.

   a. How is your job going (i.e. job duties, work specific)? Enjoy the work that I am doing.

2. Describe the org structure for the team you are a part of and how your role interacts with theirs.

Jeremy, Calvin – work really well with them; realize there will be butting heads sometimes, but Ken is almost an instigator, or tries to put down people; not just me, but I've seen him do this to another planner (Dan). He thinks its funny, it's not though. He will make comments about me being blonde; I asked how to spell a word and said don't make fun of me and he made a comment like it might be too late for that.

Will – mostly it's not about work when he approaches me; it turns into non work-related conversations; I have a hard time talking to him. My instant reaction is to go away from him when I see him or hear

EXHIBIT
018

him; If I need to go to him about something I try to avoid it; Some work is independent and I don't need a lot of direction; a lot of my support comes from a team in CA so I can call them up; if I am having an SAP issue I call them; We have Monday 1:1s and it is an argument every time we are in the room together; most of the time 9/10, he will either touch me in some way, put his arm on my shoulder or on leg and I will have to back up; I have expressed to him that I don't want to be touched. Arguments are around the whiteboard, visibility, leadership visibility to see problem areas, I see the data all day long, a lot of the conversations is Will telling me what he wants to see and then me putting it up and then Will knit picks everything, all info he wants on the board he will talk down to it or knit-picky and destroys peoples' confidence. He gave me directions on Monday and on Friday I completed it. In my IDP it says I'm supposed to visit the field quarterly to gain field knowledge. That's the only goal I'm not meeting in my IDP, I went to the rig with a co-worker (Jen Carg – Rig Admin). On Monday I did not tell him – someone must have told him I went on a rig visit by it's his Friday off. He said you went to the field instead of finishing the board like i wanted to. I felt like it was finished, it had all the information he asked for on it. I feel like he has a control issue with me, idk if he was upset I didn't tell him I was going to the field. Rory is our lean focal point, he helps with costs, he's asked everyone to build these boards, and we started working on the board this morning. I liked his suggestions so I put them up on the board, certain targets. When will saw that he didn't like it, he said why did you have Rory help you on this. Will said this isn't Rory's board, it is our board.

Ken Foreman would come up behind me and put his hands through my hair – it became a joke between Ken/Will, that Jesse doesn't like to be touched.

Women – At this office, there are about 5-6 females that work here. Engineers will visit monthly that are females. I haven't noticed that as a whole or heard from other women that there are issues.

When Greg/Steve are around things are different, people act different because they are the leaders.

Will – haven't noticed that he will touch others on the team, like putting hand on leg, but he is friendly and gives high-fives, but haven't noticed specifically touching on leg/arm like with me.

I think Will is the ring leader of disrespect towards me – I mentioned Ken, but I feel like as a group they get a vibe on how to treat certain people; you can treat Jesse this way because Will isn't showing how to be respectful. The guys all joke around together, but I feel like I am treated differently. I don't feel like there is a good vibe on our team; communication issues.

*In the hotline call you provided various examples that I would like to gather additional information on. I would like to walk through each one to gather additional information and details.*

- Would like to understand when this happened (date), any documentation/notes/evidence, and any witnesses to the events.
- When you are referring to your supervisor in the hotline call, who are you referring to?

**Supervisor**

Confidential

- I have been shown a "selfie" of my supervisor in his underwear by him.
  - Went to Canada, Will/Jesse/Ken Foreman, for a training. At a social network for the training; Went after work, got dinner and had a social night. This is when he showed me; he said don't tell anyone I showed you this, this is what I sent to my wife. He was in his boxer briefs, they were lime green/black. He showed it on his phone, did not send to me. He wasn't wearing anything else in the picture; no one else heard or saw; Ken was around, but I don't believe he saw. This was in 2014 when I was a contractor.

- I have been brought into situations with an employee that were not necessary because my supervisor thought it was funny that the other employee and myself did not like each other.
  - Will – this specific time was with Robin and him. He asked me some simple/basic question and she was sitting across the table; he said he brought me into the meeting bc he knew me and robin didn't get along and I laughed about it and I thought it was funny. This was in 2015 because Robin hasn't been here for a while- this was when she was working with Greg Andrews' team. She was here to help with LEAN. I don't remember the specific topic; but it was a very simple question. Then later he was joking about why he brought me in there. Cat claws/hissing.
  - I was in a similar situation like this before; Robin Grouette is the other employee I am referring to; my history with Robin is, I don't feel I had any visible conflict with her. But I had been in a situation with a supervisor- sexual harassment before – she was handling the situation. People would joke that we had resentment towards each other bc she didn't necessarily help me in the situation; This was with ▆▆▆▆▆▆; Mike came in and stepped in and did some interviews.

- I was told in my mid-year review that I make good money for a woman and should not be upset with my pay grade by my supervisor.
  - MYR was in the summer – July/August timeframe. I realized I wasn't meeting my field goal.
  - We were talking – he gave me a good MYR – he said you're a JG7 right? I said no I'm a JG8. He said oh, that's right.. I put in for a jG7 but Greg Larsen said I will be an 8 – no reason – but not to be upset bc I make good money for a women. I said I don't know what that's supposed to mean. But he kind of stumbles around the conversation so that's what he did.

- My supervisor told me I was intended to be a pay grade 7 but was told by OM that I would be an 8 with no explanation.
  - Refer to the above; have not asked Will or anyone for a more thorough explanation.

- I was told I work well with male employees because I am a woman by my supervisor.
  - Will – I started a new project for the asset where I work with our lead mechanics; they would come in from the field about an hour per week, but the weekly timeframe didn't work out; but the leads would come in and sit with me and pick a preventative maintenance plan; I would pick one that was a good bc there were a lot of discussion about it; the lead would go through and make corrections to the PMP; it saves us money and we came up with (worked with Rory) to come up with $ amount for time/money it's saved us. Right now we are at 16K. This was on one of our visibility boards.
  - I was explaining it to Will on how I came up with the number and I was excited about the project. I said I work well with Luke and the leads' on this stuff, and he said well that's because you are a woman. I was taken back because I didn't know how to process that.
  - This was this year, right before Michael Crothers came to the asset.

- Superintendent had written me a note to tell me he thought I did a good job regarding certain projects and CC's my supervisor on the email. I was then taken a side by my supervisor and a door was closed so the superintendent could not hear supervisor talk down to the things the superintendent just gave me recognition for.

- o Steve congratulated me on that visit; good job for discussing the visibility board; The day he received the email will asked me to come to the board and the board is right next to the conference room and there was a bunch of people in there; I think Will saw Steve and shut the door and proceeded to put me down on the project; he said it's not showing what we are saving, I felt he talked down about it; he kept saying you didn't do what I told you to do. It felt to me like maybe he was upset that i was getting praise from someone other than him. (Mike Dueitt even said it looked good and good job).

- I was told I am a hot blonde by my supervisor.
  - o Will – numerous people overheard this one for sure; I left that day to grab a salad at the supermarket and apparently they saw me and beeped their horn at me. He said oh I just saw a hot blonde at the grocery market; I said really I was just there (thinking it wasn't me) he said yeah, I'm talking about you. I said well I wouldn't expect my boss to say that to me and he laughed about it. He told that story in front of some supervisors where he sits. He told the story to the team in the cubicle. Hondo (process improvement lead) was in the cube when he said it. Dalton was in the truck with Will at the time. Jeremy Greene was in the cubicle the second time when Will told the story. It was this year, in the Fall.
  - o I think people sense there is a tension around Will and I. With Will being the lead they kind of just laugh with him. I know Jeremy knew I was upset about it.

- I am continuously asked about my personal life by my supervisor.
  - o Will asks me what do I do when I get home? Do you start drinking wine? Do I cook? He asks me bizarre questions when people are around. It is really uncomfortable. He asks me about my boyfriend, what does he do, what does he do, does he make good money? He has met him once, I brought him to the holiday party and ever since he met him there have been a lot of question about him. My boyfriend had to get back surgery, they called me and told me they were going to bring him into surgery. I asked Will if I could take the rest of the day off and when I came back from work, he asked how it went. Then he continually asked about him. It's been 4-5 months and he will still ask about it.
  - o The supervisors he works with in the cubicle hear (Hondo Blakely and Mark Hoover, in front of the direct team).

- My supervisor has referred to my significant other as a nerd.
  - o Will – it came up at work after the holiday party (first and only time he has met him); He said something about pretty girls dating nerds, that's when he asked me all of the questions about him. Hondo was there when he was asking.

- During a pulse survey meeting, when I spoke up about an opinion I had, I was told the meeting was not about me by my supervisor.
  - o Will's whole team was there; I spoke up once and I said sometimes I feel like you don't have me do what's for the business value because he will pull me away from certain projects; I was trying to explain why I answered that question negatively; he said well this meeting is not about you Jesse, and I just kind of shut down. I didn't talk or bring up any points I had after that.
  - o After that meeting he asked why I shut down and I said you shouldn't have said that and it's not right, and he admitted that he shouldn't have said that and he apologized.

- At a work charity golf tournament I was asked more than once why I was not wearing shorts at this event and if my supervisor could cut my pants into shorts as well as other supervisors joined in and took a picture of my backside (buttock) and saved on phone.
  - o Will asked multiple times why I am not wearing shorts; I said I can't wear shorts around you guys. He repeatedly asked me; I organized the tent for the golf tournament; in the morning he asked multiple times; maybe we can cut those shorts

- - Hondo hasn't done anything other than this, but he took a picture of my backside; he asked how much I thought he could get for the picture; and I said I would delete that if I were you.
  - Tina could have heard; she helped me set up the tent; Wayne Fletcher was around at that time
  - The tournament was in June 2016

- I was informed to "bullshit" my superintendent on what my position competency by my supervisor.
  - Confronted Will about an issue I had; a superintendent was questioning my competency about my role; I said I have only been in this role a year and I feel like I'm being compared to a 5-year analyst; I said I'm trying, I hope you see that; he said I think you're doing a good job, he said there is just a lot of pressure to get where we need to be. I expressed I felt overwhelmed. He said Steve questioned it to Will; and I am the type of person to tell you if I have a problem; I told Will how I felt; I was the first person in this role at our asset; I have had 2 weeks of training; Will shared with me that Steve had said that.
  - Will said when Steve approaches you, just bullshit him. I feel like this is an example of how he tries to get a rise out of me to make me think I'm not doing good enough

- My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one.
  - Any time we have a 1:1 meeting; if we have a group meeting he will roll over and tell me something in my ear (About work), but i don't know what he is trying to portray (during team meetings)
  - He will text me to smile in a meeting.

- I was told I am only right if my supervisor allows me to be by my supervisor.
  - Standing by our Admin Penny. Will came back from lunch and I was asking her a question. He walked by and he told me that. I don't remember how the conversation started, Penny was there but it was a conversation with me and Will.
  - This was recent; a month ago or so.

- I have addressed my supervisor about an issue I was having with a co-worker and was told that is the way it was going to be.
  - (SUMMER) Will – had a conversation about Ken Foreman with him. Ken was doing some of my job. I asked Will why he was letting Ken do that, I expressed I wanted to do my work. I said this multiple times. Every time I confront Will, he said you have to play nice, you can't do everything by yourself. One day I told Ken that I don't want him to do my work, he said Will was upset that certain things weren't being done in a timely manner. So I asked Will what needs to be done that you need done right now. Ken is telling me that you're upset and that's why he is doing a part of my job. Will said I don't know what he is talking about; Will said he would come to me if there is a problem. I told Ken that and he said well, uh, and stumbled over his words. I was very upset about how he lied about the situation. I asked if I could work from home because I was so upset. Nobody was really telling me, he was just doing it. Will told me there was nothing I wasn't dong that he needed done. That went on for about a month because Jeremy was scheduling and Ken was supposed to be training him.
  - Will told me I need to play nice in the sandbox and I can't do all of this work by myself. Which, now I am doing this work by myself.
  - We were trying to streamline a process; to make these changes you have to document a lot of stuff; a lot of inquiries weren't being captured, so I kept asking Will if I could manage it; when Ken went off Will finally gave me the management role for that; since then I feel like it's improved. I now capture the requests coming into me and save it on the shared drive. I feel like it's going well; but Will hasn't given any feedback whether he thinks it's going well or not.
  - This was not discussed between the 3 of them at any point.

- My supervisor said he thinks it's funny when I get into a disagreement with other women co-workers.
  - There is a lady in Pittsburgh who I get along with, but she is pretty stern and outspoken. She emailed us (me, Will, Hondo) about a purchase order that was not done correctly – coding or agreement with vendor. I asked Will what do you want me to say back? It was a communication mishap – she called us out on the issue; Will kept saying, you guys get in a fight i don't want to be a part of it , you guys can fight it out. He thought it was funny that we were in a disagreement.
  - The girl is Tonia P.

- Supervisor gestures cat claws and makes a hissing noise.
  - All the time; if I speak up in a meeting, I state – my job is pointing out areas that is not to our standards – I have to point out flaws. Our team is so defensive they will speak up and Will sits in the corner and makes cat claws. He does it in front of the team so they think… idk, idk how else to go about it. Instead of supporting me, he makes those gestures. He doesn't step up and lead it.
  - These are during planner/schedule meetings – Calvin Flynn (EWIMS focal point) (Ken Foreman, Dan Krise, Calvin, Mark Hoover (sometimes), Jeremy, Will) – Monthly MIE.
  - Operators/Morning meetings – they will voice during the meeting if they have concerns about the schedule; Kyle Vessel (example) say that people on my team are throwing me under the bus – that I was the reason for a scheduling issue.

- I expressed a concern to my supervisor a CPR trainer that instructed at our office that when I was performing CPR the instructor told me to "pick my ass up" in front of male colleges. My supervisor said "well did you pick it up?" in a laughing manner.
  - Jeremy and Lynn Doud were partners
  - The trainer said no offense but pick your ass up – about my technique. Later, weeks later, Will said something about the CPR training. I said yeah I don't like that guy and I told him the story. And he said Well, did you pick it up? He said that in front of people too. Jeremy was there, Luke one of our leads was there.

- In my goals on HR online I entered I would attempt to visit the field every quarter for I am office based and want to gain knowledge of the field. When I asked permission to spend the day in the field with a female colleague I was told by my supervisor I was only allowed to go for 4 hours. When I asked why and/or if he needed me for something that prevented me from spending an 8 hour day in the field, he responded with no I just don't think you need to spend the whole day in the field.
  - Go to field with April Heater – asked Will if she could go for a day with April. He said I don tthink you need to spend a whole day with her. I disagreed with him; and he said he didn't want me to spend all day with her for no reason. It was frustrating; even though there wasn't any work for me to do here.

- I have been asked by my supervisor multiple times if I thought about him over the weekends.
  - This wasn't very long ago. This past Fall it would have happened – within the past month.
  - Ken Foreman was in the room when he asked me
  - He asked me to come to the conference room, it was a Monday, I said no, and he said come on, not once? And then he asked a question about work.

- My supervisor has told me that he has thought about me while showering.
  - He said "I thought about you in the shower this morning" and he said he was thinking about you and how you buying your vehicle. And I stopped talking to him – I couldn't get over that he was thinking about me in the shower.
  - Jeremy was there when he said that.
  - This was in the Fall – past couple of months

- My supervisor encourages arguments among my team.
  - Him being the ring leader, setting the presence of its ok to talk to me(or whoever)
  - The cat claws when I'm trying to make points.
  - If someone makes a dig – eh will laugh at it instead of trying to correct it and not talk like that. He laughs at us arguing and making digs at each other.
  - I'm not an angel, I have called people out. If I'm provoked I have probably said things that I should have. I've told a supervisor to f*** off. I guess that's me trying to stick up for myself.

- My supervisor mocks me when I have informed people I do not like to be touched.
  - The hug example when the visitor from Canada hugged me when I saw him (Dalton)
  - He came up to me and said 'Jesse doesn't like to be touched' – I said you shouldn't have said that to Dalton.
  - The beginning of the summer time.

- My supervisor has mocked me when I told him I do not come to work to hear that I am pretty when a co-worker referred to be as pretty.
  - A coworker had asked me to do something for him outside of my normal work; Will was joking saying that you have to tell Jesse she's pretty to try to get them to do what he was asking. I said I don't come to work to be told I am pretty. And Will kept saying that over and over the whole day.
  - I was trying to put a stop to it and then he continued to mock me. I stopped talking to him that whole day.
  - My supervisor kept saying it when I addressed him "I don't come to work to hear I am pretty" he would say to me.

**Other**

- I was told I was not smart enough by a supervisor to be able to do something.
  - Mark Hoover brought a new employee up to my desk (Nathan Smelzer) – needed work order to charge his time. Mark said we will come back, and he said he needs a work order, and I said I can get that for him, and he said I didn't know you were smart enough to do that. I rolled my eyes and I got him a work order. He may have been trying to be funny. I never had a problem with Mark before Will came around. So it seems like because of the way Will acts, its ok to say those things.

- I have received non work related text messages.
  - He (Will) has asked if I missed him, while I was on vacation (May)
  - He (Will) asked if I had been drinking yet (May)
  - Kyle Vessel and Ricky Dake approached me when I returned and they asked if Will texted me on my days off. He said he brought it up in a meeting. They said he's not supposed to do that.
  - Mark Hoover has also texted me things that don't need to be said. Maybe they thought it was funny. I started making sure they knew it wasn't ok.
  - Jesse has personal cell phone and believes the texts came from Will's work cell phone.

- I have been referred to as a "window licker", which I believe was to insult my intelligence.
  - Mark Hoover; this is the day I told him to F off. There is no reason for him to come talk to me specifically. He called me a window licker and I told him to F*** off. He laughed and walked away.
  - This year; was not that long ago; No one was around but he told Will that I told him to F off and Will though it was funny.

- I have been called a bitch by numerous people in the office.

- o Mark has called me that to my face – 'boy you are being a real bitch today'; I try to avoid conversation with him, a lot of times I walk into the door and people say you are in such a bad mood today, and I won't have said anything to them yet.
- o Coworkers say you are being a real --- and stop before saying it.
- o As a woman there is a perception that you have to be all happy and positive; and if I am not smiling and all happy that I am there then they think I'm being a B.
- o I am not happy when I'm around Will and I can't be happy. I'm always worried about what he is going to say or do, or touch me.
- o You don't want to see him or talk to him, so you are chained to your cubicle. I will stay in the bathroom until I hear him walk by for example.
- o Everything added together as a whole is very overwhelming

- I was told when I voiced some of my concerns that "I need to stop playing the victim".
  - o Will– I told Penny that Ken just asked me what did you accomplish this year besides dying your hair? And Will overheard and he said you're always playing the victim aren't you?
  - o Hondo – We had built a working relationship bc he has been involved in the Robin/▉▉▉▉ situation. Before that, there was a time when a guy from our Bradford asset was messaging me. HE was messaging inappropriate things on messenger that he wants to flirt with me. I grabbed Hondo and asked him what to do. He said you need to tell Robin. I felt Hondo and I developed a relationship where I knew I could go to him if I had an issue. For some of these things with Will I talked to him about it. He advised me to control my temper, because of the time when I wanted to leave when Ken was lying – he also said Will shouldn't be telling me (bullshitting my competency, JG issue). Hondo said to me when I was talking about Will with him and something – Hondo said that I'm always the victim.
- I have been told by co-workers that maybe if they wore tight pants and batted their eyes they could get what they wanted, suggested that this is what I do.
  - o My group in my cubicle area – Ken Foreman, Dan Cryss
  - o I think it's been brought up more than once, I think it's a joke to them that this is what I do.

- This co-worker had lied to me saying that my supervisor was mad at me because I was falling behind on work. When I asked my supervisor what I needed to catch up on he denied that he had said anything.
  - o Refer to example above – Ken and Will

- A co-worker had put his hands through my hair without permission.
  - o Ken has done this multiple times
  - o I have asked him to stop and he did stop but they joked about it and he has his hands up in the air when he approaches me.

3. How did the harassment affect you? Has your job been affected in any way?
   a. For my jobs, I have found ways around it; I've developed a wall where it's kind of like 'if you don't need to talk to me then don't – unless work related'. In the situation, I've done a good job because people have told me that.
   b. Personally, it wears on you. I talked to my doctor about it a little bit and she thought it could be situational anxiety. MY personality at work has changed at work. It is different when you are under a higher level person. I have always been under the Superintendent. It's different level of professionalism. I felt respected when I worked under them. Now I feel like I'm very limited on trying to go above and beyond. I feel like every time I have to communicate with Will. When I try to work with others, like Rory, I get told I shouldn't do that.

c. I'm very anxious when he is around; my body tenses up; everybody in the cubicle can tell we don't get along; that there is definitely tension.

4. Do you feel OK continuing to work in the current org structure? I've felt a little better knowing that you are coming and that Steve/Greg knew. I thought he might stay away from me more, or knew that Steve/Greg would be here. I'm not trying to get out of work. Monday's are the hardest days, when we have our 1:1s.

5. Did you tell anyone about the harassment?

    a. Who did you tell, when, and what did you tell the person?
        i. Hondo – talked with him about most of it (during the time when I asked Will if I could leave when the situation with Ken happened/he was lying) – I was trying to deal with it on my own. He gave me advice to control emotions/temper and that Will shouldn't have said this stuff. I feel like when I confront someone they think I am attacking them.
        ii. Steve – wanted to follow the process; reached out to Michelle
        iii. I think others know there are issues between us – I come to my cubicle and they can tell with how my mood has changed
        iv. Jeremy – my mid-year review, when he brought up I'm a woman, my pay and project (working with men).
    b. What happened as a result of your complaint? Did the harassment/hostile work environment stop? When did it stop? Promptly?

6. Are you aware of these individuals harassing others? Do you know whether anyone complained about harassment by that person?
    a. Not Ken
    b. Will – I have heard people say he talks to you in a manner that he shouldn't and they also had run-in's with him where he comes off very aggressively. Shane Sullinger heard a conversation and was shaking his head.
        i. Matthew Emspen, Carlton (no longer here)
        ii. I think people don't want to say anything, but I know people think it's not right

7. How would you like to see the situation resolved?

    - What I want – I don't know if it's the right thing – saying I want him gone – I don't know if that is the right thing. I know he has the family.
    - I don't want to feel like this is my goal.
    - I don't want to be viewed like I think I'm being viewed by my team.
    - I feel discouraged
    - I don't want to report to him

- My goal is to do my job and move up and work.

8. Is there anything else you'd like to share with us related to your concerns that have not already been discussed?
    a. Pay grade – questioned whether I was brought in as a JG8 was because I am a female (you were supposed to be a 7 and now you are an 8)
    b. When mom worked here the government came in and did a review on paying and found a women and male were paid differently. (she was a scheduler)
    c. Will has told me that he has driven past my house before – I purchased a jeep; I don't drive it to work, I drive a beater car I would rather put my miles on. I live 30 minutes away and it is a dead-end street. He told me he has seen my jeep because he has driven past my house before (I got my jeep in September)

**(in regards to recent meeting with Steve/Will)**
    d. I think he has sensed a lot of tension from me and has backed off the last few weeks.
    e. (THREE WEEKS AGO) There had been a conversation between me, Steve, and Will. I applied for a scheduler job and Jeremy Greene got, which I am perfectly ok with. In the interview (it was Will/Hondo), I felt like some of the questions were fine. But it felt like a few were directed to point out my flaws, which is fine, but i didn't want my attitude towards Will to affect anything. I approached Steve if you got any feedback from the interview; I want a different point of view. Steve set up a meeting g with me 1:1 and said he wasn't involved in the interview. I said I didn't want bad information to be funneled to Steve. He said he wasn't involved much, but was trying to give me advice on how to get the job. I told him I was having a hard time with Will. He sense I was upset bc I started crying. I shared some of these with him and told him I submitted something. He said he wanted us to go through the process it should go through.
    f. (TWO MONDAYS AGO) The same day of my meeting with Steve, we had our 1:1, apparently I said something that upset him so he called him to the conference room and he said he doesn't appreciate my comments when we're having this meeting. My comment he was upset about was that I was on the rig when I was working on the board. I said you know I have a full-time job; I have other jobs other than this board. He said he didn't appreciate that comment, and when I made the comment he said what do you do all day? And I said you should know what I do all ay. He could tell I was upset with him. He said do you want me to go get Steve, and I said yes. Steve is trying to be neutral; he was acting like he had never heard it before. I started saying some of these things with Steve/Will. He was taken back because he didn't know I was documenting everything. He didn't say very much. They listened. He didn't deny anything or confirm anything. I spoke about me being a woman; Steve said that should not have been brought up. Will didn't say much. At the end, Will said I want to repair this relationship, if I need to only talk about work related things, I can do that. Something along those lines. I said to Steve, is this my only option – to repair my relationship with Will? Will asked if I wanted to be switched to another supervisor – so Will told Steve that's why she's asking? Steve said I think you're referring to your HR claim and he said I just want this process to play out like it's supposed to and if I need to work from home bc I don't feel like I can work here. I remember saying I'm not OK.

    I feel like this has been going on for so long for so long; can I work with Will, I don't think so.

9. Is there anyone specifically you think we should talk to regarding the concerns raised?

    a. It's hard because you don't want to get people involved

     i. Matt Empsen

     ii. Kelvin Flynn

    iii. Penny Robins

10. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of the investigation.


FOLLOW-UP QUESTIONS 12/7/16

Q: What was the tipping point that led you to make the hotline call?

A: I was concerned that since I had built up all of these walls and was concerned that leaders would receive feedback that I'm difficult to work with and it would impact my career with Shell. I Ddnt want negative feedback that i am difficult to work with or communications were poor when it was because of these situations. I decided I needed to do something about it when I realized it could impact me. I was holding all of this inside and it was impacting me and my performance.

<u>Conclusion</u>

- Please keep this conversation and the information we discussed confidential and do not share others
- Stress this is an on-going investigation, I will be talking to a number of people and this needs to remain most confidential.
- I will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let me know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, I will not draw any conclusions until the investigation has been completed

Exhibit 6

| | |
|---|---|
| **From**: | Soudelier, Kelly H SEPCO-HRN/AT [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+SOUI] |
| **Sent**: | 11/29/2016 3:32:09 PM |
| **To**: | Kloosterman, Megan SEPCO-HRN/AT [megan.kloosterman@shell.com] |
| **Subject**: | Fwd: ACTION: GLOBAL COMPLIANCE CASE SHELL-16-11-0050 |
| **Attachments**: | SHELL-16-11-0050 _UA.pdf; ATT00001.htm |

Kelly Soudelier
Human Resources Manager
US HR Operations - Unconventionals and Integrated Gas

Mobile 713-628-2131

Begin forwarded message:

**From:** "Priest, Michelle L SEPCO-HRN/AT" <Michelle.Priest@shell.com>
**Date:** November 28, 2016 at 4:08:55 PM CST
**To:** "Soudelier, Kelly H SEPCO-HRN/AT" <Kelly.Soudelier@SHELL.com>
**Subject: FW: ACTION:  GLOBAL COMPLIANCE CASE SHELL-16-11-0050**

Here is the case—I'll forward this and a summary of both queries and background to Megan once I hear from you if she is the right person who can help this week?

Michelle

**Michelle Priest**
HR Account Manager, Unconventionals

Address: 150 N. Dairy Ashford, Houston, TX 77079 – F0396B
Phone: +1 281 544 7474 (Click here to call me on Communicator)
Email: Michelle.Priest@shell.com
Internet: http://www.shell.com/global/future-energy/natural-gas.html

This mail has attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorised persons and deleted after its legitimate use.

**From:** Otto, Cari E SHLOIL-HRN/AB
**Sent:** Monday, November 28, 2016 9:58 AM
**To:** Priest, Michelle L SEPCO-HRN/AT
**Cc:** Otto, Cari E SHLOIL-HRN/AB
**Subject:** ACTION: GLOBAL COMPLIANCE CASE SHELL-16-11-0050

Michelle,

We received the attached Global Compliance Hotline case in which the Caller is alleging harassment, specifically name calling, belittling, inappropriate touching and commentS.  I have attached the case for your review.

EXHIBIT

014

Shell_0000523

Please let me know who will be investigating this incident, and then have that person respond with his/her notes, findings, and any recommendations by **Dec. 23.**   I will correspond with the investigator going forward once identified.


Thank you,
Cari

# CASE DETAILS
## SHELL-16-11-0050

### CONFIDENTIAL MEMORANDUM

| | | | | |
|---|---|---|---|---|
| **Report Initiated** | 2016-11-15 13:38 GMT | **Primary Priority** | C | |
| **Scheduled Follow-up** | | **Case Indicator** | | |
| **Source** | Web Submission | **Current Status** | Open | 2016-11-15 |
| **Awareness Resource** | Declined | **Case Opened** | 2016-11-15 | |
| **Language** | English | **Case Closed** | | |
| **Documented by** | WEBALLEGATIONSUBMIT | **Days Open** | 13 days | |
| | | **Case Due Date** | 2017-01-14 | |

| Allegation | Class | Priority | Primary |
|---|---|---|---|
| Harassment | People and Safety | C | Yes |

| Location | Location Geography | Location Function |
|---|---|---|
| United States | Region:Americas | |
| Shell Appalachia &#xd;&#xa;12880 Route 6, Wellsboro, PA 16901 | | |

| Parties Involved | Party Type | Job Title | Description |
|---|---|---|---|
| Jesse Barnes | Caller | Maintenance Analyst | |
| Other (570) 404 0862 | | | |
| jesse.a.barnes@shell.com | | | |
| William Turney | Subject | Maintenance Supervisor | |

### Issue Summary

I have been dealing with harassment issues, specifically name calling, belittling, inappropriate touching and comments.

### Issue Details

Since I have started working under my direct supervisor there has been issues with harassment and a hostile work environment.

I put in a list form below of the incidents I have been dealing with.

I have been shown a "selfie" of my supervisor in his underwear by him.

I have been brought into situations with a employee that were not necessary because my supervisor thought it was funny that the other employee and myself did not like each other.

I have received non work related text messages.

I was told in my mid-year review that I make good money for a woman and should not be upset with my pay grade by my supervisor.

I was told I work well with male employees because I am a woman by my supervisor.

I was told I am a hot blonde by my supervisor.

I am continuously asked about my personal life by my supervisor.

My supervisor has referred to my significant other as a nerd.

During a pulse survey meeting, when I spoke up about an opinion I had, I was told the meeting was not about me by my supervisor.

At a work charity golf tournament I was asked more than once why I was not wearing shorts at this event and if my supervisor could cut my pants into shorts as well as other supervisors joined in and took a picture of my backside (buttock) and saved on phone.

I was informed to "bullshit" my superintendent on what my position competency by my supervisor.

My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one.

I was told I am only right if my supervisor allows me to be by my supervisor.

I have addresses my supervisor about an issue I was having with a co-worker and was told that is the way it was going to be. This co-worker had lied to me saying that my supervisor was mad at me because I was falling behind on work. When I asked my supervisor what I needed to catch up on he denied that he had said anything.

My supervisor told me I was intended to be a pay grade 7 but was told by OM that I would be an 8 with no explanation.

My supervisor said he thinks it's funny when I get into a disagreement with other women co workers. Supervisor gestures cat claws and makes a hissing noise.

I expressed a concern to my supervisor a CPR trainer that instructed at our office that when I was performing CPR the instructor told me to "pick my ass up" in front of male colleges. My supervisor said "well did you pick it up?" in a laughing manner.

In my goals on HR online I entered I would attempt to visit the field every quarter for I am office based and want to gain knowledge of the field. When I asked permission to spend the day in the field with a female colleague I was told by my supervisor I was only allowed to go for 4 hours. When I asked why and/or if he needed me for something that prevented me from spending an 8 hour day in the field, he responded with no I just don't think you need to spend the whole day in the field.

I have been called a bitch by numerous people in the office.

I was told when I voiced some of my concerns that "I need to stop playing the victim".

I have been told by co workers that maybe if they wore tight pants and batted their eyes they could get what they wanted, suggested that this is what I do.

I have been referred to as a "window licker", which I believe was to insult my intelligence.

Superintendent had written me a note to tell me he thought I did a good job regarding certain projects and CC's my supervisor on the email. I was then taken a side by my supervisor and a door was closed so the superintend could not hear supervisor talk down to the things the superintendent just gave me recognition for.

I have been asked by my supervisor multiple times if I thought about him over the weekends.

I supervisor has told me that he has thought about me while showering.

My supervisor encourages arguments among my team.

I was told I was not smart enough by a supervisor to be able to do something.

A co worker had put his hands through my hair without permission.

My supervisor mocks me when I have informed people I do not like to be touched.

My supervisor has mocked me when I told him I do not come to work to hear that I am pretty when a co worker referred to be as pretty. My supervisor kept saying it when I addressed him "I don't come to work to hear I am pretty" he would say to me.

I feel like I am being bullied at work. On a daily basis I feel upset and frustrated.I have become very unhappy while at work. My motivation level has decreased and my communication is lacking. This is affecting my work and personality at work.

---

| Additional Questions | Answers |
| --- | --- |
| What is your relationship to Shell? | Shell Employee |

| | |
|---|---|
| Did you choose to remain anonymous? | No |
| If you would rather remain anonymous, would you instead be willing to communicate with just one individual in Shell without having your name documented? | N/A |
| If you are not comfortable with this would you be prepared to communicate via an independent Third Party? | N/A |
| If you are willing to do this Shell will respond to your issue with a contact name/number for you to receive on your follow up call. | N/A |
| Are you reporting an issue in the United States or outside the US? | Inside the US |
| For which business unit or area of operations does the subject of this report work [if the caller does not know, ask which business unit he/she works for]. | Shell Oil Products US (SOP US) (also includes Chemical Manufacturing at Deer Park, Geismar or Norco) |
| If you do not work for one of these units, what is the name of your operating unit? | N/A |
| To which Shell company does this issue refer? | N/A |

---

**Communication with Reporter**

| Type | Date Entered | Entered By | Reply Given to Reporter | Language |
|---|---|---|---|---|
| Follow-up | 2016-11-16 13:30 GMT | webAllegationSubmit | No | English |

WPA Follow-Up

The user has not provided any additional details for this report.

| Type | Date Entered | Entered By | Reply Given to Reporter | Language |
|---|---|---|---|---|
| Reply | 2016-11-15 19:05 GMT | Connie  Olivarez | Yes | English |

Investigation Pending

Dear Reporter:

Thank you for your submission.   Your report has been received and is now being assessed accordingly.


Regards,
Business Integrity Department


**Other Background Details**

| | |
|---|---|
| **Shell Business (Level 1)** | Upstream |
| **Shell Business (Level 2)** | UPU - Unconventionals |
| **Report Type** | Allegation |
| **BID Investigation** | No, HR/HSSE |
| **Report Name** | HR |
| **CMS Case Number** | |
| **Origin of Report** | Helpline |
| **Allegation against** | Shell Employee |
| **Location of case material** | |
| **Date set to Pending** | |
| **Referred to Law Enforcement** | |
| **Job Grade of Subject 1** | |

**Job Grade of Subject 2**
**Job Grade of Subject 3**
**# Employees terminated**
**# Contractors terminated**
**# Employees disciplined**
**# Contractors disciplined**

| Assignee | Assignment Type | Complete/Removed | Date Assigned | Assigner |
|---|---|---|---|---|
| Cari Otto | Lead Investigator | | 2016-11-15 19:01 GMT | Connie Olivarez |
| Doug Schlegel | View-Only | | 2016-11-15 19:01 GMT | Connie Olivarez |
| Joseph Montemayor | View-Only | | 2016-11-15 19:01 GMT | Connie Olivarez |
| Matthew D Griffiths | View-Only | | 2016-11-15 19:01 GMT | Connie Olivarez |

| Assignment Notes | | | Date Entered | Entered By |
|---|---|---|---|---|

No Case Assignment Notes found for this call report.

**Investigation Notes**
**Date Entered**                                    **Entered By**

No Case Investigation Notes found for this call report.

**Other Investigation Details**

Date of Incident          N/A

External Investigator Cost:                    Currency

Real loss:                                             Currency

Potential loss:                                       Currency

Case Indicator

Legally Privileged
Potential Report to SEC
Up the Ladder

| Related Case | Same Case | Date Added | Added by |
|---|---|---|---|

No Related case found for this call report.

**Resolution Details**

No Resolution found for this call report.
**Executive Summary**     Reporter alleges harassment in the workplace.

**Other Resolution Details**

## Attachments

| File Name | Date Added | Uploaded By |
|-----------|------------|-------------|

No Case Upload Files found for this call report.

*Client agrees and understands that NAVEX Global neither warrants, vouches for, nor authenticates the reliability of the allegations provided in this report. Client agrees that it shall have the sole responsibility for investigating or otherwise evaluating these allegations and other information provided and to comply with all local, state and federal laws pertaining to the investigation and protection of such information, as well as the protection of all rights of any person or persons accused of any wrongdoing.

Exhibit 7

PIL's — Darren Enrique
      — Allan.

Planner — Kent
Scheduler — Jeremey
Mt Analyst —
Planner — Dan.

<u>Jesse 1:1   Nov 21st / 2016</u>

- Applied for Scheduler.
- Issues ē how Will treats her
- Don't want to be touched.
- Ken — hands through hair — witnessed ē Hando.
- Feels harassment.
- Has touched other women
- Not a joke

<u>Nov 22nd — Mtg ē Will + Jesse</u>
- Short discussion on concerns x Jesse ē Will.

Dec 1 ‖ Megan Kloosterman, Kelly Soudelier, Greg
- Investigation Tues/Wed next week. (Megan)   Tues — Thurs @ 3pm
- Room 130
- Ken C. April ?    Also here next week



EXHIBIT P 39
WIT: Craig
DATE: 9/20/19
Patricia Chapin, CSR, Notary

# Exhibit 8

\



Compressed Transcript of the Testimony of
**KEN FOREMAN, 2/14/20**

**Case:** Barnes v. Shell Exploration & Production Company
Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jesse Barnes,             :
        Plaintiff,         :
                           :
                           :
    vs                     :
                           : 4:18-CV-01497
                           :
Shell Exploration and Production :
Company Appalachia, Shell  :
Exploration and Production :
Company, Shell Oil Company, :
        Defendants.        :

Videotaped deposition of KEN FOREMAN, taken at Holiday Inn, 100 Pine Street, Williamsport, Pennsylvania, on Friday, February 14, 2020 beginning at 12:04 p.m., before Lori A. Fausnaught, Registered Merit Reporter/Certified Realtime Reporter.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

---

1   INDEX TO WITNESSES
2
3   WITNESS                    PAGE
4   KEN FOREMAN
5   EXAMINATION
6   By Ms. Gurmankin              5
7
8
9
10      PREVIOUSLY MARKED EXHIBITS
11
    EXHIBIT     DESCRIPTION     REFERENCED
12
    Exhibit 22  Interview Notes      46
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 2

1
2   APPEARANCES:
3
4   CONSOLE MATTIACCI LAW, LLC
    By: CAREN N. GURMANKIN, ESQUIRE
5   1525 Locust Street, Ninth Floor
    Philadelphia, PA 19102
6   (215) 545-7676
    gurmankin@consolelaw.com
7
        Counsel for Plaintiff
8
9
    TUCKER LAW GROUP
10  By: KATHLEEN KIRKPATRICK, ESQUIRE
    Ten Penn Center
11  1801 Market Street, Suite 2500
    Philadelphia, PA 19103
12  (215) 875-0609
    kkirkpatrick@tlgattorneys.com
13
        Counsel for Defendants
14
15  ALSO PRESENT:
16  Bryce Connor, Videographer
17
18
19
20
21
22
23
24

---

Page 4

1        STIPULATION
2        It is hereby stipulated by and between
3   counsel for the respective parties that sealing
4   and certification and filing are hereby waived;
5   and that all objections, except as to the form of
6   the question, are waived until time of trial.
7
             *    *    *    *
8
9        THE VIDEOGRAPHER:  We are now on the
10  record at 12:04 p.m. on February 14, 2020 for the
11  videotaped deposition of Ken Foreman in the matter
12  of Jesse Barnes v. Shell Exploration and
13  Production Company, Appalachia, et al., filed in
14  the U.S. District Court, Middle District of PA,
15  Number 18-1497.  This deposition is being held at
16  100 Pine Street, Williamsport, PA, 17701.
17        My name is Bryce Connor, from Summit
18  Court Reporting, Incorporated, and I am the
19  videotape operator.  The court reporter is Lori
20  Fausnaught, also from the firm Summit Court
21  Reporting, Incorporated.  Counsel will be noted on
22  the stenographic record.
23        Will the court reporter please swear in
24  the witness?

1 (Pages 1 to 4)

Page 5

1    THE COURT REPORTER:  Sir, if you could
2  raise your right hand for me, please; I need to
3  administer an oath.
4              KEN FOREMAN,
5  called as a witness by the Plaintiff, having been
6  duly sworn or affirmed according to law, testified
7  as follows:
8          DIRECT EXAMINATION
9  BY MS. GURMANKIN
10    Q.  Mr. Foreman, good afternoon.
11    A.  Good afternoon.
12    Q.  We just met a couple minutes ago.  But
13  for the record, my name is Caren Gurmankin, and I
14  have the privilege of representing Jesse Barnes in
15  a lawsuit that she has filed against Shell for sex
16  discrimination and retaliation.
17        Have you ever been deposed before
18  today?
19    A.  I have not.
20    Q.  I'm going to ask you questions today.
21  If I ask you a question that you don't understand,
22  I need you to tell me so I can rephrase it.  Do
23  you understand that?
24    A.  I do.

Page 6

1    Q.  If I ask you a question and you answer
2  the question, I'm going to assume that you've
3  understood my question and you have answered it
4  accordingly.  Do you understand that?
5    A.  I do.
6    Q.  Even though this deposition is taking
7  place in a conference room at a hotel, it has the
8  same force and effect as if you were testifying in
9  a federal courtroom, in front of a federal judge
10  and jury.
11        You have just taken an oath to tell the
12  truth.  If you cannot tell the truth, that's
13  considered perjury and that's a felony.  Do you
14  understand that?
15    A.  I do.
16    Q.  For the sake of the written transcript
17  which will result from this deposition, you need
18  to keep giving verbal responses to all of my
19  questions, as you have been doing.  Do you
20  understand that?
21    A.  I do.
22    Q.  Also for the sake of the written
23  transcript, there may be times where you
24  anticipate what my question is going to be; just

Page 7

1  try to let me finish my entire question before you
2  answer it.  Okay?
3    A.  Okay.
4    Q.  Is there any reason why you wouldn't be
5  able to testify truthfully today?
6    A.  No.
7    Q.  What's your date of birth?
8    A.  ▇▇▇▇▇.
9    Q.  Are you currently employed?
10    A.  I am.
11    Q.  Where?
12    A.  Shell Exploration and Production
13  Company.
14    Q.  What is your current position?
15    A.  Maintenance planner.
16    Q.  When did you start working at Shell?
17    A.  2011.
18    Q.  What position were you hired into?
19    A.  Maintenance scheduler.
20    Q.  You started as a full-time employee.
21  Correct?
22    A.  That is correct.
23    Q.  Had you worked previously as a
24  contractor, prior to 2011 at Shell?

Page 8

1    A.  I did not.
2    Q.  How did you come to work at Shell?
3    A.  The company that I was working at got
4  bought out by Shell.  They bought -- bought the
5  employees.
6    Q.  What company was that?
7    A.  East Resources.
8    Q.  So when that purchase happened, you
9  became an employee of Shell?
10    A.  Yes.
11    Q.  Have you worked at Shell consistently,
12  since 2011 through today?
13    A.  I have.
14    Q.  Prior to working at Shell, have you
15  ever been terminated from any job?
16    A.  I have not.
17    Q.  Prior to working at Shell, have you
18  ever had a complaint brought against you, for any
19  reason, at any other employer?
20    A.  I have not.
21    Q.  Prior to Shell, have you ever been
22  accused of any kind of harassment or
23  discrimination?
24    A.  I have not.

2 (Pages 5 to 8)

Page 9

1      Q.   Prior to Shell --
2      A.   I have not been accused, no.
3      Q.   Prior to Shell, have you ever been
4  accused of engaging in inappropriate conduct?
5      A.   No, I have not.
6      Q.   Prior to Shell, have you ever been the
7  subject of an investigation into your conduct?
8      A.   I have not.
9      Q.   Prior to Shell, have you ever been made
10  aware that there have been any complaints made
11  about your conduct?
12      A.   I have not, no.
13      Q.   During the time that you worked at
14  Shell from -- when you were hired in 2011 as a
15  maintenance scheduler, about how long did you hold
16  that position?
17      A.   I'm not exactly sure.
18      Q.   Approximately?
19      A.   Four years.  That's as close as I can
20  guess.
21      Q.   Understood.  So sometime around 2015?
22      A.   I would think so, yes.
23      Q.   What happened in 2015 to change your
24  position?

Page 10

1      A.   It was longer than that.  I've only
2  been a planner for two years.  So it was 2016,
3  '17.
4      Q.   So you went from maintenance scheduler
5  to planner?
6      A.   I went from maintenance scheduler to
7  planner, yes.
8      Q.   Was that a promotion?
9      A.   No.
10      Q.   A lateral?
11      A.   Basically, a lateral move.
12      Q.   As a maintenance scheduler, who did you
13  report to?
14      A.   Initially?
15      Q.   Let's start with that.
16      A.   Matt Albanese.
17      Q.   His position?
18      A.   He was production supervisor, I
19  believe.
20      Q.   About how long did you report to
21  Albanese?
22      A.   Three years.  Probably about three
23  years.
24      Q.   And then how did your reporting

Page 11

1  relationship change?
2      A.   He left and Tom Underholt became my
3  boss.
4      Q.   What was Tom's position?
5      A.   The same as Matt's.
6      Q.   Production supervisor?
7      A.   Yep.
8      Q.   About how long did you report to
9  Underholt?
10      A.   Two years.
11      Q.   So we're talking around, through 2016?
12      A.   Somewhere in that area.
13      Q.   Then what happened?
14      A.   There was a reorganization of how
15  maintenance was conducted, and production
16  supervisors took the production employees and we
17  got a maintenance supervisor.
18      Q.   Who was that?
19      A.   Will Turney.
20      Q.   How long did you report to Turney?
21      A.   Until he moved on to a different
22  position.
23      Q.   That was around the end of 2018?
24      A.   I -- whenever he left.

Page 12

1      Q.   Was that before or after you became
2  planner?
3      A.   I was planner for Will for a short
4  time.
5      Q.   So you were both scheduler and planner
6  under Turney?
7      A.   Yes.
8      Q.   After Turney left at the end of 2018,
9  who did you report to?
10      A.   Gary Wilson.
11      Q.   For about how long?
12      A.   Until now.  He's my boss.
13      Q.   His position?
14      A.   Maintenance supervisor.
15      Q.   Did he take over for Turney?
16      A.   He did.
17      Q.   How did you come to get the position of
18  planner?
19      A.   The planner that we had moved on to a
20  different position.  That job opened up.  I put in
21  a bid, or a request for that position, and I won
22  that bid.
23      Q.   Who was the planner who left?
24      A.   Matt Skolny.

3 (Pages 9 to 12)

Page 13

1      Q.   Did he leave Shell or just the group?
2      A.   He left the group, initially, and now
3   left Shell.
4      Q.   Do you know why he left the group?
5      A.   I'm not --
6      Q.   Did you hear anything about why?
7      A.   I think that he wanted the job that he
8   moved into.
9      Q.   Do you know what that was?
10     A.   Water coordinator, I believe, was the
11  position that he moved into.
12     Q.   And when did he leave Shell?
13     A.   2019, I believe.
14     Q.   Do you know why?
15     A.   A position at another company.
16     Q.   Do you know where?
17     A.   JKLM.
18     Q.   All right.  So when he left the group,
19  his position became open?
20     A.   Yes.
21     Q.   Was it posted?
22     A.   Yes.
23     Q.   Did you apply for it?
24     A.   I did.

Page 14

1      Q.   Did you interview?
2      A.   I did.
3      Q.   With whom?
4      A.   Will Turney, I believe.
5      Q.   And that was not a promotion for you.
6   Correct?
7      A.   It was not a promotion.
8      Q.   Why did you want that position?
9      A.   More freedom, more out of the office
10  time.
11     Q.   Is that what you meant by more freedom?
12     A.   Mostly.  Yes.
13     Q.   Anything else?
14     A.   No.  I -- my eyes were tired of looking
15  at a computer screen all the time, and this was
16  much less computer screen time.
17     Q.   So you viewed the planner position as
18  more desirable because it involved less computer
19  time?
20          MS. KIRKPATRICK:  Objection.  More
21  freedom, more out of the office, he said.
22          MS. GURMANKIN:  That wasn't my
23  question.
24          MS. KIRKPATRICK:  You mischaracterized

Page 15

1   his testimony.
2          MS. GURMANKIN:  It's a question.  Do
3   you need the question repeated or can you answer
4   it?
5          MS. KIRKPATRICK:  It's a
6   mischaracterization of his question (sic).
7          THE WITNESS:  What was the question?
8   BY MS. GURMANKIN:
9      Q.   You viewed the planner position that
10  you applied for when Skolny vacated it as more
11  desirable because it involved less computer time.
12  Right?
13          MS. KIRKPATRICK:  Objection.
14  Mischaracterization.  He gave you the reasons.
15          MS. GURMANKIN:  You can answer.
16          MS. KIRKPATRICK:  You can tell her
17  again.
18          MS. GURMANKIN:  You can answer my
19  question.
20          THE WITNESS:  I'm not understanding
21  what's going on here.
22          MS. GURMANKIN:  You need to answer the
23  question.
24          THE WITNESS:  I wanted more freedom.

Page 16

1   BY MS. GURMANKIN:
2      Q.   The question was, you viewed the
3   planner position that you applied for when Skolny
4   vacated it as more desirable because it involved
5   less computer time than your scheduler position.
6          Is that accurate?
7          MS. KIRKPATRICK:  Objection.  Asked and
8   answered.  He just said to you twice, it also gave
9   him more freedom.
10          MS. GURMANKIN:  Is that accurate?
11          MS. KIRKPATRICK:  And allowed him out
12  of the office, as well.
13          MS. GURMANKIN:  Is that accurate?
14          MS. KIRKPATRICK:  You can tell her
15  again.
16  BY MS. GURMANKIN:
17     Q.   That you viewed it as more desirable
18  because it involved less computer time?
19          MS. KIRKPATRICK:  Objection.  That's
20  not what he said.
21          THE WITNESS:  I wanted more freedom.
22  BY MS. GURMANKIN:
23     Q.   Did you apply for the planner position
24  that Skolny vacated because you viewed it as more

4 (Pages 13 to 16)

Page 17

1    desirable than your scheduler position?
2         MS. KIRKPATRICK:  Objection.  Asked and
3    answered.  You can tell her.
4         MS. GURMANKIN:  You can answer.
5         MS. KIRKPATRICK:  You can tell her
6    again.
7         THE WITNESS:  It was the job that I
8    wanted.  It was more freedom.
9    BY MS. GURMANKIN
10        Q.  And you viewed that as more desirable
11   because it involved more freedom.  Right?
12        MS. KIRKPATRICK:  Objection.  You can
13   tell her again.
14        THE WITNESS:  Yeah.  And it's the job I
15   wanted.
16   BY MS. GURMANKIN
17        Q.  That's why you applied for it.  Right?
18        A.  Right.
19        MS. KIRKPATRICK:  Objection.
20   BY MS. GURMANKIN
21        Q.  Did you interview with anyone other
22   than Turney?
23        A.  I don't recall.
24        Q.  You only recall interviewing with him?

Page 18

1         A    (Witness nodded in the affirmative.)
2         Q.  Yes?
3         A.  Yes.
4         Q.  And you understood that he was the
5    hiring manager for that position?
6         A.  He was hiring manager for that
7    position, yes.
8         Q.  He made the decision to select you for
9    that position?
10        A.  Yes, he did.
11        Q.  Do you know if anyone else interviewed?
12        A.  I don't know.
13        Q.  Do you know if anyone else applied?
14        A.  I don't know.
15        Q.  Did you receive an increase in
16   compensation?
17        A.  I did not.
18        Q.  Other than less computer time, more
19   freedom, more time out of the office, any other
20   changes from your scheduler position to the
21   planner position that you held?
22        A.  No.
23        Q.  And you're still a planner.  Is that
24   correct?

Page 19

1         A.  That is correct.
2         Q.  Have you applied for any other
3    positions, other than applying for the planner
4    position that you are currently in?
5         A.  No.
6         Q.  During your time at Shell, from 2011
7    through today, are you aware of any complaints
8    that have been made about your conduct?
9         MS. KIRKPATRICK:  Objection.  Asked and
10   answered.
11        MS. GURMANKIN:  No.  I said before
12   Shell.  Before.  This is my question, during
13   Shell.
14   BY MS. GURMANKIN:
15        Q.  Are you aware of any complaints that
16   have been made about your conduct during your
17   employment at Shell?
18        MS. KIRKPATRICK:  Objection.
19        THE WITNESS:  Just what we're involved
20   with right now.
21   BY MS. GURMANKIN
22        Q.  The Jesse Barnes complaint?
23        A.  Yes.
24        Q.  How did you become aware that she made

Page 20

1    complaints about your conduct?
2         A.  I -- I got an e-mail that said that I
3    was not supposed to get rid of any of the records
4    that pertained to Jesse Barnes on my computer and
5    on my phone and stuff like that.  I don't know
6    what it's called.  But that's how I became aware.
7         Q.  When did you get that e-mail?
8         A.  I don't know that.
9         Q.  Do you recall the year?
10        A.  Whenever it started.  I have -- no,
11   I -- I would --
12        MS. KIRKPATRICK:  Don't assume or
13   guess.
14        THE WITNESS:  I don't know.
15   BY MS. GURMANKIN
16        Q.  You have no idea of the year that you
17   got that e-mail?
18        A.  Not without assuming or guessing, no.
19        Q.  What would be your best approximation?
20        A.  2017, 2018.
21        Q.  Did that e-mail say that there have
22   been complaints made about you?
23        A.  It did not.
24        Q.  So what about that e-mail led you to be

5 (Pages 17 to 20)

Page 21

1    aware that there were complaints made about your
2    conduct?
3        A. I don't know. I guess I just figured
4    that if there was a hold on the record that it
5    involved me.
6        Q. That you engaged in some sort of
7    misconduct?
8        MS. KIRKPATRICK: Objection.
9        MS. GURMANKIN: Was that your
10    assumption?
11        MS. KIRKPATRICK: Objection.
12        THE WITNESS: No. That was not my
13    assumption.
14    BY MS. GURMANKIN:
15        Q. Okay. So what about the e-mail that
16    you received that led you to conclude that there
17    were complaints made about your conduct?
18        MS. KIRKPATRICK: Objection. Asked and
19    answered.
20        THE WITNESS: I don't know that I knew
21    that there was any complaints about my conduct.
22    BY MS. GURMANKIN
23        Q. You testified a couple minutes ago that
24    you became aware that there were complaints made

Page 22

1    about your conduct during your employment with
2    Shell because of the e-mail you received in 2017
3    or 2018, telling you you're not supposed to delete
4    any records from your e-mail or your phone.
5        Is that correct?
6        MS. KIRKPATRICK: Objection. You can
7    answer.
8        THE WITNESS: Yeah. That is what I
9    testified to.
10    BY MS. GURMANKIN
11        Q. Is that true?
12        A. I think I just assumed that it was
13    about my conduct, now that I think about it.
14        Q. Why would you assume that?
15        MS. KIRKPATRICK: Objection.
16        THE WITNESS: Because they sent me an
17    e-mail that said I was supposed to keep all my
18    records. So it led me to believe that there was
19    something in my records that had something to do
20    with me.
21    BY MS. GURMANKIN
22        Q. Why would an e-mail like that make you
23    assume that there were complaints made about your
24    conduct?

Page 23

1        MS. KIRKPATRICK: Objection.
2        MS. GURMANKIN: You can answer.
3        THE WITNESS: I have no reason to keep
4    anything. When I got the e-mail, I figured there
5    was something about me.
6    BY MS. GURMANKIN:
7        Q. Had you done something wrong?
8        A. Not that I was aware of.
9        Q. So why would you assume, if you weren't
10    doing anything wrong when you got the e-mail, that
11    it was about a complaint about you?
12        MS. KIRKPATRICK: Objection. Asked and
13    answered, five times. You can tell her again.
14        THE WITNESS: Because I never received
15    an e-mail like that. I didn't know.
16    BY MS. GURMANKIN
17        Q. You didn't know what?
18        A. I didn't know why that I got had gotten
19    that e-mail.
20        Q. But you assumed when you got the e-mail
21    that it had to do with a complaint about you. Is
22    that correct?
23        MS. KIRKPATRICK: Objection. Asked and
24    answered. Five times. Six times, I think, now.

Page 24

1    BY MS. GURMANKIN:
2        Q. Is that correct?
3        MS. KIRKPATRICK: You can answer. You
4    can keep telling her.
5        THE WITNESS: I got an e-mail, and I
6    figured it had something to do with me because
7    they sent me the e-mail.
8    BY MS. GURMANKIN
9        Q. And you assumed they wouldn't have sent
10    you the e-mail unless there was a complaint about
11    you?
12        MS. KIRKPATRICK: Objection. You can
13    tell her again.
14        THE WITNESS: Yes, that was my
15    assumption.
16    BY MS. GURMANKIN:
17        Q. Was it based on anything or just your
18    assumption?
19        MS. KIRKPATRICK: Objection.
20        THE WITNESS: It was just an
21    assumption.
22    BY MS. GURMANKIN:
23        Q. Did you ask anyone why you got the
24    e-mail?

6 (Pages 21 to 24)

Page 25

1      A.  Said I wasn't allowed to talk to anyone
2   about it.  So I did not talk to anyone about it.
3      Q.  Prior to you getting that e-mail, had
4   you ever been aware that there was a complaint
5   made about you, during your employment at Shell?
6      A.  I never heard that there was a
7   complaint about me.
8      Q.  Since you've gotten that e-mail, has
9   anyone actually told you that there have been
10  complaints made about you?
11     A.  Yes.  Shell's counsel.
12     Q.  Other than that?
13     A.  No Shell employees, no.
14     Q.  During your employment with Shell, did
15  you ever violate company policies?
16     A.  Not that I'm aware of.
17     Q.  No one ever told you that?
18     A.  No one has ever told me that I did
19  that.
20     Q.  Did you ever violate the code of
21  conduct?
22        MS. KIRKPATRICK:  Objection.
23        THE WITNESS:  I -- I don't know.  I
24  don't think so.

Page 26

1   BY MS. GURMANKIN
2      Q.  Did anyone ever tell you that you did?
3      A.  No one has ever told me that I violated
4   the code of conduct, no.
5      Q.  Have you ever been disciplined for any
6   reason during your employment with Shell?
7      A.  No, I have not.
8      Q.  During your employment at Shell, have
9   had you ever reported to a woman?
10     A.  Not directly.
11     Q.  How about indirectly?
12     A.  Yes.
13     Q.  Who?
14     A.  Robin Grouette was the manager of our
15  whole asset.  And then Tonya Williams became the
16  manager of our asset after that.
17     Q.  When was Robin Grouette the manager of
18  the asset?
19     A.  After Dave Summers left, I believe.  I
20  think he was the manager.  I wasn't really
21  familiar with the hierarchy at that time.  It was
22  all new to me.  But when Robin got to be the
23  manager, I realized she was the manager of the
24  asset.

Page 27

1      Q.  Do you know when that was?
2      A.  I don't.  Probably -- this is a
3   guess -- around 2013, 2014 timeframe.
4      Q.  Did you ever hear rumors that Will
5   Turney and Robin Grouette had a relationship?
6      A.  I did not.
7      Q.  When did Tonya Williams become manager
8   of the asset?
9      A.  She is leaving right now.
10        MS. KIRKPATRICK:  The question wasn't
11  whether she is leaving right now.  Don't think out
12  loud.
13        THE WITNESS:  Okay.  2017, 2018 is my
14  guess, again.
15  BY MS. GURMANKIN
16     Q.  Did you ever show a TV show on your
17  computer in the office, an episode of South Park?
18     A.  No.
19     Q.  Did you watch that show?
20     A.  Never.
21     Q.  Did you ever show any of your
22  colleagues a TV show on your computer in the
23  office?
24     A.  A TV show?

Page 28

1      Q.  Um-hmm.
2      A.  No.
3      Q.  How about a movie?
4      A.  No.  I don't watch movies.
5      Q.  Ever?
6      A.  Rarely.
7      Q.  When Tonya Williams became the
8   operations manager, did you say something to the
9   effect of, she's a black female, laughing?
10     A.  Could you repeat that?
11     Q.  Sure.  When Tonya Williams was promoted
12  to operations manager of the office, did you say
13  something to the effect of she's a black female,
14  laughing?
15     A.  No.
16     Q.  Did you think that she got that job, in
17  part, based on her race?
18     A.  No.
19     Q.  Did you think that she got that job, in
20  part, based on her sex?
21     A.  No.
22     Q.  Any other females at Shell that you
23  have reported indirectly to?
24     A.  Not that I can think of.

7 (Pages 25 to 28)

Page 29

```
 1        Q.   During your employment at Shell, have
 2   you had any direct reports -- people reporting
 3   directly to you?
 4        A.   No.
 5        Q.   At some point, did you find out that
 6   Jesse Barnes had made complaints about anyone at
 7   Shell?
 8        A.   At some point, I did.
 9        Q.   When?  When is the first time?
10        A.   Um, when I had to give an interview
11   with, um, whoever the HR lady was, her name.
12        Q.   Megan Kloosterman?
13        A.   No.
14        Q.   Someone else?
15        A.   Yeah.  Um, I think it was someone in
16   HR.
17        Q.   Do you know where she was from, which
18   office?
19        A.   I believe Houston.
20        Q.   And how was --
21        A.   Michelle Priest.
22        Q.   Michelle Priest.  When was that?
23        A.   2016 would be my guess.
24        Q.   Was that an in-person meeting?
```

Page 30

```
 1        A.   No.  It was on the telephone.
 2        Q.   She called you?
 3        A.   Yes.
 4        Q.   And what did you discuss?
 5        A.   That there was allegations against me.
 6        Q.   Anyone else?
 7        A.   No.  We didn't discuss anyone else.
 8        Q.   All right.  So Priest calls you and
 9   tells you that there's an allegation against you.
10   Does she say who's making the allegation?
11        A.   I don't remember.
12        Q.   You don't remember, one way or the
13   other?
14        A.   I don't remember what she said.  I
15   don't know if she said that or not.
16        Q.   Did she tell you about the nature of
17   the allegation?
18        A.   I don't remember what was discussed,
19   other than I know that she called me and it was
20   around the time that I got the --
21        Q.   The e-mail?
22        A.   Yes.
23        Q.   Sometime in 2017, 2018?
24        MS. KIRKPATRICK:  Objection.
```

Page 31

```
 1        THE WITNESS:  Whatever it was.  I don't
 2   know when it was.
 3   BY MS. GURMANKIN
 4        Q.   You said earlier you thought 2017,
 5   2018.  Is that around the time that Priest called
 6   you?
 7        MS. KIRKPATRICK:  He said she -- he
 8   thought Priest called him in 2016.
 9        MS. GURMANKIN:  Right.  And now I'm
10   asking a different question.
11        MS. KIRKPATRICK:  Objection.  No.  You
12   are mischaracterizing the testimony.
13        MS. GURMANKIN:  It's a question.  If
14   you have an objection to the form, make it.
15        MS. KIRKPATRICK:  It is a
16   mischaracterization.
17   BY MS. GURMANKIN:
18        Q.   Did Priest call you in 2017 or 2018,
19   around the time that you got the e-mail telling
20   you not to delete records from your phone or
21   e-mail?
22        MS. KIRKPATRICK:  Objection.  You can
23   answer.
24        THE WITNESS:  Yes.
```

Page 32

```
 1   BY MS. GURMANKIN:
 2        Q.   And that phone call from Priest, that's
 3   the first time you became aware that there were
 4   allegations made against you?
 5        MS. KIRKPATRICK:  Objection.
 6        MS. GURMANKIN:  Right?
 7        MS. KIRKPATRICK:  He said the e-mail
 8   made him aware.
 9        MS. GURMANKIN:  All right.
10        MS. KIRKPATRICK:  You can answer.
11   BY MS. GURMANKIN
12        Q.   All right.  Which was it, the e-mail or
13   the call from Priest?
14        A.   I don't know what I thought.
15        Q.   The question wasn't what you thought,
16   was either the e-mail -- I'm sorry, the phone call
17   from Priest or the e-mail telling you you are not
18   supposed to delete, um, stuff from your e-mail or
19   phone, was that one of the first times you became
20   aware that there were complaints made about you?
21        A.   Could you ask that one more time?
22        MS. GURMANKIN:  Sure.  Let me ask it
23   this way.
24
```

8 (Pages 29 to 32)

Page 33

BY MS. GURMANKIN:

Q. The call from Priest, that was the first time that anyone had communicated to you, in any way, that there were allegations made against you. Is that correct?

A. I don't know if that's correct.

Q. Okay. When do you think the first time may have been that you became aware that there were allegations made against you, that anyone communicated that to you?

A. Without knowing what the e-mail said, or what she said, allegations against me, I'm not sure.

Q. You testified that Priest told you in that phone call that there were allegations made against you. Is that right?

A. She definitely did.

Q. And you testified that the e-mail that you got that told you that you weren't supposed to delete stuff from your phone or e-mail did not say that there were complaints or allegations made against you. Is that right?

A. I think that was just the records hold.

Q. Okay. So is the first time that anyone

Page 34

communicates to you that there have been allegations made against you was the phone call from Priest?

A. I believe that to be true.

Q. Okay. And you don't remember anything else that was said in that phone call, other than her telling you that there were allegations made against you. Is that right?

A. Yeah. I don't remember what all we discussed.

Q. You don't remember anything else, other than that. Is that right?

A. I don't remember what we discussed, no.

Q. Other than her telling you that there's been allegations made against you?

A. Right.

Q. Do you have any other conversations with Michelle Priest about the allegations that she said were made against you, other than that initial phone call in which she tells you that there are allegations?

A. There was a time six months, or maybe even a year later, where we had another conversation.

Page 35

Q. You and -- I'm sorry. Go ahead.

A. Michelle and I, yes.

Q. About a year after the initial call?

A. Sometime around that timeframe.

Q. And that second call, about a year after the initial call, is also with Michelle Priest?

A. It was.

Q. And what do you discuss in that second call?

A. She said that her thought was that I had not done anything wrong, and that was about it.

Q. Okay. Anything else you recall her saying in that second phone call, other than her thought was that you had not done anything wrong?

A. No.

Q. Did she tell you how she reached that conclusion?

A. She did not.

Q. And in the approximately one-year period between the initial phone call, when she tells you that there have been allegations made against you, and the second phone call about a

Page 36

year later, when she tells you her thought was you had not done anything wrong, did you communicate with anyone from Shell about the allegations?

A. I did not.

Q. After that second phone call with Michelle Priest, and when she tells you that her thought was that you had not done anything wrong, up through today, and excluding the lawyers, have you communicated with anyone at Shell about the allegations that Priest told you had been made against you?

A. I have not.

Q. Before Priest called you on the first time, to tell you that there had been allegations made against you, had you talked to her before about anything?

MS. KIRKPATRICK: Ever about anything?

MS. GURMANKIN: Yeah.

THE WITNESS: (Nodded in the affirmative.)

BY MS. GURMANKIN:

Q. Okay. You communicated with her about -- is that a yes?

A. That is a yes.

9 (Pages 33 to 36)

Page 37

1    Q.  You communicated with her about HR
2  issues?
3    A.  Yes.
4    Q.  Any complaints or allegations against
5  you?
6    A.  No.
7    Q.  Other than Michelle Priest, did you --
8  and the lawyers, did you ever speak with anyone
9  else at Shell, at any time, about the allegations
10 that have been made against you?
11   A.  No.
12   Q.  Did you ever learn that Jesse Barnes
13 had made complaints about your conduct?
14   A.  Yes.
15   Q.  Okay.  How did you learn that?
16   A.  Michelle Kloosterman.
17   Q.  Megan Kloosterman?
18   A.  Megan, Megan.  Yep.
19   Q.  When was that?
20   A.  When she came to the office and
21 interviewed me.
22   Q.  When was that, in connection with the
23 initial phone call from Michelle Priest, when she
24 tells you there have been allegations made against

Page 38

1  you, and the second phone call from Priest about a
2  year later, when she tells you her thought was
3  that you had not done anything wrong?
4       MS. KIRKPATRICK:  Objection.
5       MS. GURMANKIN:  You can answer.
6       THE WITNESS:  I don't know what
7  chronological order it was in.
8  BY MS. GURMANKIN:
9    Q.  You have no idea where the conversation
10 with Kloosterman happened?
11      MS. KIRKPATRICK:  Objection.  You can
12 tell her again, if you are not sure what the
13 chronological order was.
14      THE WITNESS:  I'm not sure.
15 BY MS. GURMANKIN
16   Q.  All right.  So when you testified that
17 you hadn't talked to anyone at Shell, excluding
18 the lawyers, other than the two phone calls with
19 Michelle Priest about the allegations that had
20 been made about you, that was not true testimony.
21 Correct?
22      MS. KIRKPATRICK:  Objection.
23      THE WITNESS:  Ask that again.
24

Page 39

1  BY MS. GURMANKIN:
2    Q.  Sure.  When you testified a few minutes
3  ago that the only conversations you had with
4  anyone at Shell, other than the lawyers, about the
5  allegations that had been made against you were
6  those two conversations with Michelle Priest, that
7  was not true testimony, was it?
8       MS. KIRKPATRICK:  Objection.
9       THE WITNESS:  I don't understand what
10 you're asking.
11 BY MS. GURMANKIN
12   Q.  You also testified that you spoke --
13 you just testified that you had a conversation
14 with Megan Kloosterman about the allegations that
15 have been made against you.  Correct?
16   A.  I did.
17   Q.  When I asked you earlier if you had had
18 communications with anyone about the allegations
19 that had been made against you, other than the two
20 phone calls with Michelle Priest, why did you say
21 that was it?
22      MS. KIRKPATRICK:  Objection.
23      MS. GURMANKIN:  You can answer.
24      THE WITNESS:  Isn't Megan a lawyer for

Page 40

1  Shell?
2  BY MS. GURMANKIN:
3    Q.  Do you think she's a lawyer?
4    A.  I did.
5    Q.  Is that what your understanding was
6  when you spoke with her?
7    A.  I thought she was some type of counsel,
8  yes.
9    Q.  So why did you just testify a couple
10 minutes ago that you had, in fact, talked to her?
11   A.  I said that I had talked to Shell
12 counsel.
13   Q.  But you didn't actually.  Is that your
14 testimony now?
15      MS. KIRKPATRICK:  Objection.
16      THE WITNESS:  I guess I don't
17 understand your question.
18 BY MS. GURMANKIN
19   Q.  Okay.  You had two conversations with
20 Michelle Priest about a year apart about the
21 allegations that had been made against you.
22 Correct?
23   A.  Yes.
24   Q.  And you also, at some point, are now

10  (Pages 37 to 40)

Page 41

1  saying you had a conversation with Megan
2  Kloosterman about the allegations that have been
3  made against you.  Correct?
4         MS. KIRKPATRICK:  Objection.
5  BY MS. GURMANKIN
6      Q.  Yes?
7      A.  Yes.
8      Q.  Other than the two phone calls with
9  Michelle Priest and the conversation with Megan
10 Kloosterman, anyone else that you spoke with at
11 Shell about the allegations that had been made
12 against you?
13        MS. KIRKPATRICK:  Other than counsel.
14        THE WITNESS:  No.
15 BY MS. GURMANKIN
16     Q.  Where did you get the impression that
17 Megan Kloosterman was a lawyer?
18     A.  I don't know.  She sounded like a
19 lawyer when she was asking me questions, I guess.
20     Q.  Why?
21     A.  Because she was asking me questions and
22 writing stuff down.  Just sounded like a lawyer.
23     Q.  Is it possible that that was after the
24 conversation with Priest, in which she told you

Page 42

1  that her thought was that you had not done
2  anything wrong?
3      A.  It's possible.  I -- I don't know.
4      Q.  The Kloosterman conversation, was that
5  over the phone or in person?
6      A.  In person.
7      Q.  Where was that?
8      A.  In the room 130.
9      Q.  In Wellsboro?
10     A.  Yes.
11     Q.  How did it come about that you met with
12 Kloosterman?
13     A.  I was somehow directed.
14     Q.  By whom?
15     A.  I don't know that.
16     Q.  Prior to the meeting with Kloosterman,
17 did you know that there had been any allegations
18 made against you?
19     A.  Ask that question again, please.
20     Q.  Sure.  Prior to the meeting with
21 Kloosterman, had you been made aware that there
22 were allegations made against you?
23     A.  Yes.  From Michelle Priest.
24     Q.  The initial phone call?

Page 43

1      A.  Yes.
2      Q.  And there was the initial phone call
3  from Priest when she tells you there's been
4  allegations made against you, and then after that,
5  you met with Kloosterman?
6      A.  Yes.
7      Q.  Do you recall how soon those two
8  conversations were?
9      A.  There was, I believe, months in
10 between.
11     Q.  Did anyone tell you why?
12     A.  Why?
13     Q.  There was a delay of months in between.
14        MS. KIRKPATRICK:  Objection.  To delay.
15        THE WITNESS:  No.
16 BY MS. GURMANKIN
17     Q.  Tell me what you recall about your
18 meeting with Kloosterman.
19     A.  She asked me a bunch of questions.
20     Q.  Do you recall any?
21     A.  No.  I don't recall exactly what the
22 question was, no.
23     Q.  Did you think that you were meeting
24 with her based on the phone call from Priest,

Page 44

1  saying that there were allegations made against
2  you?
3         MS. KIRKPATRICK:  Objection.
4         MS. GURMANKIN:  You can answer.
5         MS. KIRKPATRICK:  You can answer.
6         THE WITNESS:  Yes, I did.
7  BY MS. GURMANKIN
8      Q.  Based on your assumption or from what
9  someone told you?
10        MS. KIRKPATRICK:  Objection.
11        THE WITNESS:  That was my assumption.
12 There was -- when I got to meet with her, it was
13 the same subject.
14 BY MS. GURMANKIN
15     Q.  When you met with her, did she tell you
16 that there were allegations made against you?
17     A.  I don't know that.
18     Q.  You don't recall?
19     A.  No.
20     Q.  Did she tell you why she was meeting
21 with you?
22     A.  That there was an investigation.
23     Q.  Okay.  Did she say about what?
24     A.  I don't know that.

11 (Pages 41 to 44)

Page 45

1     Q.  You don't remember?

2     A.  I don't.

3     Q.  At any point during the meeting with

4  Kloosterman, did she tell you what her

5  investigation was about?

6     A.  I don't know that, either.

7     Q.  Did you understand from the meeting

8  that part of what she was investigating were the

9  allegations about you?

10     A.  Ask that again, please.

11     Q.  Sure.  Did you understand from the

12  meeting with her that part of what she was

13  investigating were the allegations made against

14  you?

15     A.  It seemed that way, yes.

16     Q.  Based on the questions she was asking?

17     A.  Yes.

18     Q.  How long was the meeting with her?

19     A.  I don't know.  Half an hour or

20  something.  I'm guessing.

21     MS. KIRKPATRICK:  We don't want you to

22  guess.

23  BY MS. GURMANKIN:

24     Q.  That's your best approximation?

Page 46

1     A.  My best approximation would be

2  somewhere around a half an hour.

3     Q.  Did you take any notes of the meeting?

4     A.  I did not.

5     Q.  Did you document the meeting in any way

6  after it was over?

7     A.  I did not.

8     Q.  And you don't remember any questions

9  she asked you?

10     A.  I do not.

11     Q.  Were they about the allegations that

12  were made against you?

13     A.  I don't know.

14     Q.  You don't remember?

15     A.  No.

16     Q.  All right.  Showing up on your screen

17  should be what has been previously marked as

18  Exhibit 22.  Have you seen this document before?

19     A.  I have.

20     Q.  Did you see it in preparation for your

21  deposition?

22     A.  I have.

23     Q.  Did you see it prior to that?

24     A.  I have not.

Page 47

1     Q.  Did you see any documentation from your

2  meeting with Kloosterman, before you were

3  preparing for your deposition?

4     A.  No.

5     Q.  Did you review this when you saw it in

6  preparation for your deposition?

7     A.  I did.

8     Q.  Did it look completely accurate?

9     A.  Umm, I thought it was accurate, yes.

10     Q.  When you reviewed it, was there

11  anything that you thought was not included in the

12  document that you recall from the meeting?

13     A.  No.

14     Q.  Let's look at the first page.  It says

15  the date was 12/7/2016.  Is that when you recall

16  the meeting happening?

17     A.  I know it was cold.  So that would make

18  sense.

19     Q.  You are not disputing that it happened

20  around that time?

21     A.  No.  It was cold.  That day it was

22  cold.

23     Q.  All right.  In the introduction, do you

24  see the bullet points under that, the five bullet

Page 48

1  points under that?

2     A.  I am reading that, yes.

3     Q.  And you read them when you were looking

4  at this document in preparation for your

5  deposition?

6     A.  I did.

7     Q.  There is nowhere in here that she says

8  she told you that there were allegations against

9  you that they were investigating.  Right?

10     A.  I don't recall reading that.  I don't

11  know, though.

12     Q.  Well, take a look.  I'm just talking

13  about the bullet points under the introduction.

14     A.  I don't see where she says there is any

15  allegations.

16     Q.  You don't recall her saying that in the

17  meeting; you just took that from the questions she

18  was asking you.  Is that correct?

19     A.  I believe, yes.

20     Q.  At the time that this meeting is dated,

21  12/7/2016, you were in the planner position.

22  Correct?

23     A.  I don't know that for sure.

24     Q.  Okay.  Well, take a look under question

Page 49

1   one, it says, "Describe your current role and
2   responsibilities."  And your answer, according to
3   her notes is, "Role just changed.  Was the
4   scheduler and now the maintenance planner."
5        Do you see that?
6        A.  Yes, I do.
7        Q.  Do you agree, as of this time, you were
8   the maintenance planner?
9        A.  Yes.
10       Q.  Do you recall how soon it was, prior to
11  this, that you became the maintenance planner?
12       A.  I said my role just changed, so it was
13  just prior to that.
14       Q.  You said "I put the
15  parts/time/resources on the job, and the scheduler
16  picks a day.  Interface with everybody, very
17  outgoing and talk to everyone."
18       That's your description of yourself.
19  Right?  In your planner job.
20       A.  It is.
21       Q.  By the way, who got the scheduler
22  position that you vacated?
23       A.  Umm, Jeremy Greene.
24       Q.  Did you have any involvement in his

Page 50

1   being chosen to fill your position?
2        A.  I did not.
3        Q.  Did you know that Jesse applied for
4   that position?
5        A.  I don't know if she did or didn't.
6        Q.  Did you know anyone who applied?
7        A.  I knew that Jeremy did.
8        Q.  Did you know of anyone else?
9        A.  I don't -- I don't know.
10       Q.  Were you asked any feedback about
11  Jeremy for that position?
12       A.  No.  I was not involved with the
13  interview at all.
14       Q.  All right.  So question number two,
15  "Describe the work environment and human dynamics
16  in your immediate team; i.e., direct reports to
17  Will."
18       And your answer, according to
19  Kloosterman's notes, "I have worked in way worse
20  teams.  It's not bad.  I really don't think it's
21  bad.  We are like a family.  Spats do erupt now
22  and then.  If someone says the wrong thing and
23  it's not taken how it's meant."
24       I'll stop there for a sec.

Page 51

1        Do you remember saying that to
2   Kloosterman?
3        A.  I don't remember but --
4        Q.  But you're not disputing?
5        A.  True.
6        Q.  What did you mean when you said spats
7   do erupt now and then, if someone says the wrong
8   thing and it's not taken how it's meant?
9        A.  There's a lot of passion around the
10  work that we do, and people sometimes take things
11  the wrong way.
12       Q.  Who were the people that sometimes took
13  things the wrong way?
14       A.  Members of our group.
15       Q.  Who?
16       A.  All of us have mistook different --
17       Q.  Names?
18       A.  Well, myself.  So it would have been
19  Matt Skolny, prior to this, Jesse, and Dan would
20  have been there at the same time.  Dan Krise.
21       Q.  So that's not all of the people who
22  were direct reports of Will at the time.  Right?
23       A.  Ask that again.
24       Q.  Sure.  You said all of us when I asked

Page 52

1   you who were you referring to who said the wrong
2   thing and who took it the wrong way, you said all
3   of us.  And then, you said specifically you, Matt
4   Skolny, Jesse and Dan Krise.
5        That's not all of Will's direct
6   reports.  Right?
7        A.  That's not all of Will's direct
8   reports.
9        Q.  So it wasn't all of you.  Right?
10       MS. KIRKPATRICK:  Objection.
11       THE WITNESS:  It was the group that I
12  worked with.
13  BY MS. GURMANKIN:
14       Q.  Right.  But not all of Turney's direct
15  reports?
16       MS. KIRKPATRICK:  He didn't say it was
17  Turney's direct reports.  He said his group.
18  Explain it to her.
19  BY MS. GURMANKIN:
20       Q.  That's not all of Turney's direct
21  reports.  Right?
22       MS. KIRKPATRICK:  Objection.
23  BY MS. GURMANKIN:
24       Q.  You, Skolny, Jesse and Krise?

13 (Pages 49 to 52)

Page 53

1          MS. KIRKPATRICK: Objection. You can
2     explain it to her.
3          THE WITNESS: It's the group of us that
4     worked together planning, scheduling, maintenance.
5     BY MS. GURMANKIN:
6          Q.  Right. And my question was, Turney had
7     direct reports other than you, Skolny, Jesse and
8     Dan Krise. Right?
9          A.  I didn't hear you ask that. But yes,
10    he does.
11         Q.  What did Jesse take in a way that
12    wasn't meant the way that she took it?
13         MS. KIRKPATRICK: Objection.
14         THE WITNESS: I can't think of any
15    example.
16    BY MS. GURMANKIN:
17         Q.  What did you take in a way that was not
18    meant the way it was said?
19         MS. KIRKPATRICK: Objection.
20         THE WITNESS: I don't recall anything
21    right now.
22    BY MS. GURMANKIN
23         Q.  How about Skolny?
24         MS. KIRKPATRICK: Objection.

Page 54

1     BY MS. GURMANKIN:
2          Q.  You can answer.
3          A.  When I was the scheduler and he was the
4     planner, I was asking for work, asking for his
5     work product. And he got mad at me because he
6     said was plenty of work. And there was not
7     plenty of work planned, in my opinion.
8          Q.  Anything else regarding your statement
9     to Kloosterman that if someone says the wrong
10    thing and it's not taken how it's meant, in
11    connection with Matt Skolny?
12         A.  I'm sorry. Ask that again, please.
13         Q.  Sure. You told Kloosterman that spats
14    do erupt now and then if someone says the wrong
15    thing and it's not taken how it's meant. I asked
16    you who you were referring to. You said yourself,
17    Matt Skolny, Jesse Barnes and Dan Krise.
18         You couldn't remember anything that you
19    meant in connection with Jesse. Right?
20         MS. KIRKPATRICK: Objection.
21         MS. GURMANKIN: Right?
22         MS. KIRKPATRICK: Objection.
23         THE WITNESS: Right.
24

Page 55

1     BY MS. GURMANKIN:
2          Q.  You can't remember anything you
3     mentioned in connection with yourself. Right?
4          MS. KIRKPATRICK: Objection.
5          MS. GURMANKIN: Right?
6          THE WITNESS: That is true.
7     BY MS. GURMANKIN
8          Q.  Matt Skolny, you just testified to an
9     example of what you meant, in terms of Skolny.
10    Right?
11         MS. KIRKPATRICK: Objection.
12    BY MS. GURMANKIN:
13         Q.  Anything else with Skolny?
14         MS. KIRKPATRICK: Objection.
15         THE WITNESS: Not that I recall.
16    BY MS. GURMANKIN
17         Q.  How about Krise?
18         MS. KIRKPATRICK: Objection.
19         THE WITNESS: I don't recall anything
20    with him, either.
21    BY MS. GURMANKIN  PROOF  -check exh
22         Q.  You go on to say, "As far as a negative
23    vibe, I don't know it at all. I would describe it
24    in three words, semi-professional, we could do

Page 56

1     better, but there is worse out there."
2          I'll stop there. What did you mean
3     when you told Kloosterman that we could do better?
4          A.  We were all learning our job. There's
5     a process. Then we were all learning that process
6     and we were getting better at it as we were
7     learning it.
8          Q.  What did you mean when you said
9     semi-professional?
10         A.  That we weren't as good at the process
11    as we could be.
12         Q.  Who are you talking about?
13         A.  All -- the whole group of us.
14         Q.  Is that all of Turney's direct reports?
15         A.  Not all of Will's direct reports
16    include the names that I just mentioned.
17         Q.  You, Krise, Skolny and Jesse?
18         A.  Yes.
19         Q.  And as of this date, 12/7/2016, Skolny
20    is out of the group. Right?
21         A.  If I'm the planner, yes, he is.
22         Q.  So are you just talking about you,
23    Jesse and Dan Krise?
24         A.  Yeah, I would say at that point I was.

14 (Pages 53 to 56)

Page 57

1    Q.  You go on to say, according to her
2  notes, "The people in the office are one team, and
3  the people are another team in the field."
4        Who are the people in the office that
5  you are referring to?
6    A.  The names that we just went over.
7    Q.  You, Krise and Jesse?
8    A.  And then Jeremy Greene.
9    Q.  As the scheduler?
10   A.  Yes.
11   Q.  Who are the people that are on the
12  other team in the field?
13   A.  That would be the skill tradesmen in
14  the field.
15   Q.  And who did they report to, at this
16  time?
17   A.  Will.
18   Q.  About how many?
19   A.  Ten.  That's about -- I just don't
20  know.  I'll say ten.
21   Q.  Sure.  All male?
22   A.  No.
23   Q.  How many women?
24   A.  I don't know at this time.  He had a

Page 58

1  bigger team at one point.  So I don't know how
2  many people there was at this point.  But I would
3  say at this point, he probably still had women
4  working for him in the field.
5    Q.  Who?
6    A.  I would think that it was April.  And I
7  don't know the other girl's name.  It was a woman
8  who -- her name is eluding me right now.
9    Q.  Okay.  If you think of it later, let me
10  know.  And that's April Heater?
11   A.  Yes.
12   Q.  Let's go to question three, on page
13  one.  Exhibit 22.  "Describe your working
14  relationship with Will Turney and Jesse Barnes.
15  Will, fine, easy to get ahold of.  He understands
16  real life."
17        What does that mean, he understands
18  real life?
19   A.  Umm, I had take some time off and he
20  was very understanding of it and allowed me to do
21  that.
22   Q.  Next sentence, "We have
23  freedom/autonomy to do our work, is very
24  positive."  Is that reference to Turney's

Page 59

1  supervision?
2    A.  Yes.
3    Q.  Next sentence, "I can identify issues."
4  What are you talking about?
5    A.  I knew where improvements could be made
6  in the maintenance process that weren't being
7  made.
8    Q.  "Know what to do.  Don't need a lot of
9  guidance."  Are you referring to yourself there?
10   A.  I am.
11   Q.  "It is our goal to teach Will how to do
12  our jobs.  He doesn't know the details."  What did
13  you mean by that?
14   A.  That SAP is a program, and Will was not
15  SAP savvy at all.
16   Q.  Anything else that he wasn't savvy
17  about?
18   A.  I don't know that.
19   Q.  Well, anything else you were referring
20  to?
21   A.  No.  That is reference to SAP.
22   Q.  If you go to the second paragraph,
23  under number three.  "Jesse, she received my
24  product when I was a scheduler."  What does that

Page 60

1  mean?
2    A.  So the process -- the maintenance
3  process work is identified, and it is planned, and
4  then is scheduled.  The field guys do the work.
5  And then Jesse closes the work out.  So there was
6  a group of people in between, but my schedule, she
7  was responsible for closing out.  So the product
8  of my work went to her.
9    Q.  You worked with her in that capacity
10  when you were a scheduler?
11   A.  Yes.
12   Q.  And you worked with her when you were a
13  planner, as well?
14   A.  Yes.
15   Q.  In what capacity?
16   A.  Similar.
17   Q.  So you say, according to Kloosterman's
18  notes, "She is a different girl.  She is super
19  smart."  What did you mean by she is a different
20  girl, she is super smart?
21   A.  She is very driven to get ahead and do
22  well.
23   Q.  Is that different from other women you
24  know?

Page 61

1      A.  There's a lot of people that don't
2  really do well in the maintenance field, and she
3  did well in the maintenance field.  She was
4  learning.  She was really doing well.
5      Q.  Is that what you meant when you said
6  she was a different girl?
7      A.  Yeah.
8      Q.  When you said there are people that
9  don't do well in the maintenance field, are you
10 talking about women?
11     A.  There's lots of people that don't do --
12 we lost a lot of employees because they didn't do
13 well.
14     Q.  Men and women?
15     A.  Men and women, yes.
16     Q.  Which women?
17     A.  I can't think of her name.  It's the
18 same -- it's the same lady, I can't think of her
19 name.  It will come to me.
20     Q.  Any other women?
21     A.  I believe she was the only one that was
22 on our team.
23     Q.  Any men that didn't do well in the
24 maintenance field?

Page 62

1      A.  Yes.
2      Q.  Who?
3      A.  He got fired.  I can't think of his
4  name.
5      Q.  Any others?
6      A.  Yeah, that's all I can think of.
7      Q.  Why did you say that Jesse is a
8  different -- or she is a different girl, she is
9  super smart, as opposed to saying she is different
10 because she did well, or she does well, in the
11 maintenance field?
12         MS. KIRKPATRICK:  Objection.  He said
13 she is driven to get ahead and to do well.
14 BY MS. GURMANKIN
15     Q.  Why didn't you say that to Kloosterman?
16 Why did you say she is a different girl, she is
17 super smart?
18         MS. KIRKPATRICK:  Objection.
19         THE WITNESS:  Because she was not --
20 like I said, a lot of people don't excel in the
21 field and she was different.
22 BY MS. GURMANKIN:
23     Q.  Well, why didn't you say to
24 Kloosterman, she is different because she did well

Page 63

1  in the field; not she's a different girl, she is
2  super smart?
3         MS. KIRKPATRICK:  Objection.
4         THE WITNESS:  Well, I was referring to
5  Jesse.
6  BY MS. GURMANKIN:
7      Q.  Right.  So why didn't you say Jesse
8  does well in the field?  Why did you put it as
9  she's a different girl, she's super smart, if what
10 you were trying to express was she does well in
11 the field?
12         MS. KIRKPATRICK:  Objection.
13 Mischaracterization and asked and answered.  You
14 can tell her again.  You can keep repeating it.
15         THE WITNESS:  Ask it again, please.
16 BY MS. GURMANKIN:
17     Q.  Sure.  Why didn't you say to
18 Kloosterman something to the effect of what you
19 are saying now, which is Jesse does well in the
20 field?  Why did you phrase it to Kloosterman as
21 she's a different girl, she is super smart?
22         MS. KIRKPATRICK:  Objection.
23 Mischaracterization and asked and answered.
24         THE WITNESS:  One more time.

Page 64

1  BY MS. GURMANKIN:
2      Q.  Sure.  Why didn't you phrase to
3  Kloosterman what you are saying today, which is
4  what you meant was that Jesse does well in the
5  field and she is driven?  Why did you, instead,
6  say it as she's a different girl, she is super
7  smart?
8         MS. KIRKPATRICK:  Objection.
9         THE WITNESS:  I don't know why I said
10 it that way.
11 BY MS. GURMANKIN:
12     Q.  Okay.  Do you think that women are not
13 as smart as men?
14     A.  No, I do not.
15     Q.  So when you said to Kloosterman that
16 Jesse is a different girl, she is super smart, did
17 you mean that she is super smart because she's a
18 girl?
19         MS. KIRKPATRICK:  Objection.
20         THE WITNESS:  I did not.
21 BY MS. GURMANKIN:
22     Q.  Why did you call her a girl instead of
23 a woman?
24     A.  Because I was referring to her, to

16  (Pages 61 to 64)

Page 65

1　Jess.
2　　Q.　And you refer to her as a girl?
3　　A.　It looks like I did, yes.
4　　Q.　Why?
5　　A.　Because she's the same age as my son,
6　and that's what I thought.
7　　Q.　Did you refer to any male employees at
8　Shell, who are the same age as your son, as boy?
9　　A.　Yes.
10　　Q.　Who?
11　　A.　Lynn Dowd's son.
12　　Q.　Who?
13　　A.　Justin.
14　　Q.　Dowd?
15　　A.　Yes.
16　　Q.　Anyone else?
17　　A.　That's all I can think of.
18　　Q.　Justin Dowd worked at Shell?
19　　A.　Still does.
20　　Q.　Next sentence.　"If you go with
21　stereotypes, she is surprisingly smart."　What
22　stereotypes were you talking about?
23　　A.　Someone not having any maintenance
24　experience.　People that have maintenance

Page 66

1　experience are -- or people that don't have
2　maintenance experience, a lot of times, don't do
3　well in maintenance.
4　　Q.　That's the stereotype you were
5　referring to?
6　　A.　Yes, ma'am.
7　　Q.　The stereotype that people with
8　maintenance experience don't always do well in
9　maintenance?
10　　MS. KIRKPATRICK:　Objection.
11　　THE WITNESS:　People that do not have
12　maintenance experience, a lot of times when they
13　get into maintenance have trouble with performing
14　maintenance.
15　BY MS. GURMANKIN:
16　　Q.　And that's the stereotype that you
17　referenced here?
18　　A.　Yes, ma'am.
19　　Q.　But why did you say after that that
20　Jesse is surprisingly smart?　If you go with
21　stereotypes, she is surprisingly smart, what does
22　that mean?
23　　A.　I'm not sure that -- that is exactly
24　what I said.　She is surprisingly smart.　I don't

Page 67

1　know why I characterized it with the stereotype.
2　　Q.　Any explanation for that?
3　　A.　I don't have one, no.
4　　Q.　But that doesn't make sense, given your
5　testimony that the stereotype you referred to is
6　that people who do not have maintenance
7　experience, a lot of times, when they get into
8　maintenance, they have trouble performing.　Right?
9　　MS. KIRKPATRICK:　Objection.
10　　THE WITNESS:　So what was the question?
11　BY MS. GURMANKIN:
12　　Q.　Sure.　Your testimony that the
13　stereotype you were referring to is that people
14　that do not have maintenance experience, a lot of
15　times when they get into maintenance, they have
16　trouble performing; the rest of what you told
17　Kloosterman, she is surprisingly smart, doesn't
18　make sense, does it?
19　　MS. KIRKPATRICK:　Objection.　It makes
20　perfect sense.
21　　THE WITNESS:　Yeah.　It does.
22　　MS. GURMANKIN:　Please don't testify.
23　　THE WITNESS:　What?
24　　MS. GURMANKIN:　I'm talking to your

Page 68

1　lawyer.
2　　MS. KIRKPATRICK:　Please don't
3　mischaracterize the testimony.
4　　MS. GURMANKIN:　What's your answer to
5　the question?
6　　MS. KIRKPATRICK:　We don't need to know
7　your opinion.　Go ahead.　You can answer the
8　question.　You can explain it again.
9　　THE WITNESS:　She is very driven.
10　BY MS. GURMANKIN:
11　　Q.　How does this sentence that Kloosterman
12　says you said, "If you go with stereotypes, she is
13　surprisingly smart"; how does the second part, she
14　is surprisingly smart, make sense in light of your
15　testimony that the stereotype you were referring
16　to was that people that do not have maintenance
17　experience, a lot of times when they get into
18　maintenance, they have trouble performing?
19　　Can you explain that to me?
20　　MS. KIRKPATRICK:　Objection.　He
21　already said she was driven and did well.
22　　THE WITNESS:　Yeah, that's just it.
23　BY MS. GURMANKIN
24　　Q.　What's just it?　Your lawyer doesn't

17　(Pages 65 to 68)

Page 69

1  testify. You do.
2          Can you explain to me how what you told
3  Kloosterman, that Jesse is surprisingly smart,
4  makes sense, in light of your testimony about what
5  you meant by stereotype?
6          MS. KIRKPATRICK: Objection.
7          THE WITNESS: She is super smart. She
8  is driven to get ahead.
9  BY MS. GURMANKIN
10         Q. How does that make sense, in light of
11 your testimony about what you meant when you
12 referred to the stereotype then?
13         MS. KIRKPATRICK: Objection. That was
14 the same question. You can tell her again.
15         THE WITNESS: Yes. She is driven to
16 get ahead.
17 BY MS. GURMANKIN
18         Q. Why did you say she is surprisingly
19 smart?
20         MS. KIRKPATRICK: Objection.
21         THE WITNESS: I don't know why I said
22 that.
23 BY MS. GURMANKIN
24         Q. No explanation?

Page 70

1          A. No.
2          Q. Have you heard of the stereotype that
3  men are smarter than women?
4          A. Say that again, please.
5          Q. Sure. Have you ever heard the
6  stereotype that men are smarter than women?
7          A. Have I heard of that stereotype?
8          Q. Sure.
9          A. I don't know if I have or haven't.
10         Q. Do you believe that?
11         MS. KIRKPATRICK: Objection.
12         THE WITNESS: No, I don't believe that.
13         MS. KIRKPATRICK: Asked and answered.
14 BY MS. GURMANKIN:
15         Q. That's what you meant when you referred
16 to stereotypes here, isn't it?
17         MS. KIRKPATRICK: Objection.
18         THE WITNESS: It is not, no.
19 BY MS. GURMANKIN
20         Q. In your experience at Shell, from 2011
21 to the time of this interview in December of 2016,
22 how many women had you seen work in the
23 maintenance field at Shell?
24         A. In the maintenance field?

Page 71

1          Q. Um-hmm.
2          A. Two.
3          Q. April Heater is one?
4          A. She was a direct report to Will.
5          Q. Who were you talking about, the women
6  who worked in the maintenance field at Shell?
7          MS. KIRKPATRICK: Objection. You can
8  answer.
9          THE WITNESS: So Wendy Barnes and Jesse
10 Barnes were the two in the maintenance field.
11 BY MS. GURMANKIN
12         Q. Those are the two that you were
13 referring to?
14         A. Yes.
15         Q. And how many men have you seen work in
16 the maintenance field during your employment at
17 Shell from 2011 through 2016, when you were having
18 this meeting with Kloosterman?
19         A. Approximately ten.
20         Q. Have you heard the stereotype that men
21 will do better in the maintenance field than
22 women?
23         A. I have not heard that, no.
24         Q. Do you believe that?

Page 72

1          A. I've seen women excel in the
2  maintenance field. No, I don't believe that.
3          Q. Is that what you are referring to here,
4  when you said stereotypes?
5          MS. KIRKPATRICK: Objection. You can
6  answer.
7          THE WITNESS: No.
8  BY MS. GURMANKIN
9          Q. As of December of 2016, did you think
10 there was any woman who was smarter than you?
11         A. Is there -- ask that again.
12         Q. Sure. As of December 2016, did you
13 think there was any woman who was smarter than you
14 were?
15         A. Yes, I do.
16         Q. Who?
17         A. Lots of women.
18         Q. Who?
19         MS. KIRKPATRICK: At Shell or in his
20 whole life?
21 BY MS. GURMANKIN:
22         Q. No. As of December 2016, did you think
23 there was any woman smarter than you were?
24         A. Yes, I did.

18 (Pages 69 to 72)

Page 73

1　　Q.　Who?
2　　A.　There's lots.
3　　Q.　Who?
4　　A.　Condoleezza Rice is one that comes to
5　mind.
6　　Q.　Did you know her personally?
7　　A.　I do not.
8　　Q.　Why don't we start with people that you
9　know personally?
10　　A.　My wife.
11　　Q.　Anyone else?
12　　A.　My mom.
13　　Q.　Anyone else?
14　　A.　This is 2016.  Robin Grouette.
15　　Q.　Anyone else at Shell?
16　　A.　I think there was -- there's lots of
17　women who are smarter than me at Shell.
18　　Q.　Anyone else, other than Robin Grouette?
19　　A.　Yes.  But I can't -- she doesn't work
20　for us now, and I can't think of her name.
21　　Q.　Okay.  If you think of it later, let me
22　know.  Anyone else?
23　　A.　I'm going to say no.
24　　Q.　Did you think that women did not belong

Page 74

1　in the field at a company like Shell?
2　　A.　No.  I thought exactly opposite of
3　that.
4　　Q.　Did you think that women didn't belong
5　in maintenance positions at Shell?
6　　A.　I did not.
7　　Q.　Let's go back to the bottom paragraph
8　of page one of Exhibit 22, you go on to say,
9　"She" -- meaning Jesse -- "gets offended by things
10　that are not meant to be offensive."
11　　　　What are you talking about?
12　　A.　When we were talking about the work
13　process, she would get mad about different things
14　or be offended by different things.
15　　Q.　What?
16　　A.　I don't know.  The way our work was
17　handled, as far as the way orders progressed
18　through the system, and she would be upset
19　sometimes when it was just business that was
20　progressing through the system.
21　　Q.　What would she be upset about?
22　　A.　I'm not sure.  But I do remember it
23　happening.
24　　Q.　Well, you said to Kloosterman, She gets

Page 75

1　offended by things that are not meant to be
2　offensive.  What were you referring to?
3　　　　MS. KIRKPATRICK:  Objection.  Asked and
4　answered.  He just told you.  You can tell her
5　again.
6　　　　THE WITNESS:  It was the way the work
7　progressed through the system, that's what she
8　would get mad about sometimes.
9　BY MS. GURMANKIN:
10　　Q.　She was offended by the way that the
11　work progressed through the system?
12　　　　MS. KIRKPATRICK:  Objection.
13　　　　MS. GURMANKIN:  You can answer.
14　　　　THE WITNESS:  Different times I would
15　say, yes.
16　BY MS. GURMANKIN:
17　　Q.　What about the way that the work
18　progressed through the system was she offended by?
19　　　　MS. KIRKPATRICK:  Objection.  He also
20　said the way work was handled.
21　　　　THE WITNESS:  It's who was involved
22　with the process of getting work through the
23　system.
24

Page 76

1　BY MS. GURMANKIN:
2　　Q.　Anything else?
3　　A.　Not that I can think of.
4　　Q.　What was she offended by about who was
5　involved with the process of getting work through
6　the system?
7　　A.　I know that there was times where she
8　was mad at me for helping progress work through
9　the system.
10　　Q.　Anything else?
11　　A.　Not that I recall.
12　　Q.　How many times did that happen?
13　　A.　I recall one time, for sure.
14　　Q.　Any others?
15　　A.　Not that I recall.
16　　Q.　When was the one time?
17　　A.　When we were dealing with some people
18　in Calgary and I was talking with them, and she
19　thought that she should have been the person that
20　was talking to them.
21　　Q.　When did this happen?
22　　A.　Prior to this meeting.
23　　Q.　How soon?
24　　A.　In the previous year.

19　(Pages 73 to 76)

Page 77

1    Q.  What were you talking to the people in
2  Calgary about?
3    A.  About functional location.
4    Q.  Functional what?
5    A.  Location.
6    Q.  Was Jesse right?  Should she have been
7  talking to them instead of you?
8    A.  It was shared workload, so no.
9    Q.  And how did she express her upset?
10   A.  She said that it was her job and I
11  wasn't supposed to do it.
12   Q.  Was she offended?
13   A.  She was.
14   Q.  Okay.  How did she express that?
15   A.  That she was -- I could tell by her
16  demeanor.
17   Q.  What about it?
18   A.  That she was mad.  And she asked me
19  never to do it anymore.
20   Q.  What did you say?
21   A.  I said okay, and I didn't do it
22  anymore.
23   Q.  Why didn't you explain that it was
24  shared workload?

Page 78

1    A.  To that point it had been.
2    Q.  Did it stop at that point?
3    A.  It did.
4    Q.  As of the moment after you talked to
5  the people in Calgary, it stopped being shared
6  workload?
7    MS. KIRKPATRICK:  Objection.  The
8  moment she told him to not do it anymore is what
9  he said.
10   THE WITNESS:  Yeah.  That is the way it
11  is.
12  BY MS. GURMANKIN:
13   Q.  You need to actually answer the
14  question.
15   MS. KIRKPATRICK:  He is answering the
16  question.
17   MS. GURMANKIN:  No, he is not.  Do you
18  need it repeated?
19   THE WITNESS:  Yes.
20  BY MS. GURMANKIN:
21   Q.  It was shared workload as of the time
22  you were talking to the people in Calgary?
23   MS. KIRKPATRICK:  Objection.  He said
24  it was shared workload until the time she told him

Page 79

1  not to do it anymore.
2  BY MS. GURMANKIN:
3    Q.  Was it shared workload until the time
4  that you talked to the people in Calgary?
5    MS. KIRKPATRICK:  Objection.  He said
6  it was shared workload until the time she told him
7  not to do it anymore.  I'm not going to let you
8  mischaracterize his testimony.
9    MS. GURMANKIN:  Answer the question.
10   THE WITNESS:  It was shared workload
11  until Jesse told me not to do it anymore.
12  BY MS. GURMANKIN:
13   Q.  Does she determine what the workload
14  was and who did what?  Was that her job?
15   A.  This job right here was part of her job
16  that she was learning, and I had done it for many
17  years.  And she thought, at this point, that she
18  was able to do it without my help.
19   Q.  Okay.  So it was her job as of the time
20  that you are having this communication with the
21  people in Calgary; it was part of Jesse's job.
22  Right?
23   MS. KIRKPATRICK:  Objection.  He said
24  it was job sharing.

Page 80

1    MS. GURMANKIN:  Right?
2    THE WITNESS:  It was also part of my
3  job at the same time.
4  BY MS. GURMANKIN:
5    Q.  Were you a scheduler or a planner at
6  the time?
7    A.  When she said this, I think I was a
8  scheduler.
9    Q.  Okay.  So the issue that you are
10  talking with people in Calgary about, was that
11  part of your scheduler job at the time?
12   MS. KIRKPATRICK:  Objection.  He said
13  it was shared job duties.  You can tell her again.
14   THE WITNESS:  It was shared job duties.
15  BY MS. GURMANKIN:
16   Q.  So that means it was part of your job
17  and it was also part of Jesse's job.  Is that what
18  that means?
19   MS. KIRKPATRICK:  Objection.
20   THE WITNESS:  That is what it means.
21  BY MS. GURMANKIN:
22   Q.  Okay.  So when Jesse tells you that she
23  can handle it, she doesn't need your help anymore,
24  then you say that basically it will no longer be

20  (Pages 77 to 80)

Page 81

1　part of your job?
2　　　　MS. KIRKPATRICK: Objection. She said
3　he wasn't supposed to do it. You mischaracterized
4　his testimony again. But you can answer.
5　　　　THE WITNESS: What was the question
6　again?
7　BY MS. GURMANKIN
8　　　Q. She finds out that you talked to the
9　people in Calgary. Right?
10　　　A. She is listening to me talk to them,
11　yes.
12　　　Q. That was in person?
13　　　A. Yes.
14　　　Q. And at some point after that, she tells
15　you something to the effect of she no longer needs
16　your help, she can handle that responsibility.
17　Correct?
18　　　　MS. KIRKPATRICK: Objection. That's
19　not what he said. He said that she said this was
20　her job and he wasn't supposed to do it.
21　Mischaracterizing the testimony.
22　　　　THE WITNESS: That is what she said.
23　BY MS. GURMANKIN:
24　　　Q. What is what she said?

Page 82

1　　　A. She said it's my job and don't do it
2　anymore, or don't help me anymore or something
3　like that.
4　　　Q. And you said okay?
5　　　A. I did say okay.
6　　　Q. Well, why didn't you tell her it was a
7　shared job responsibility, part of both of your
8　jobs?
9　　　　MS. KIRKPATRICK: Objection. Asked and
10　answered.
11　　　　THE WITNESS: I wasn't going to argue
12　with her.
13　BY MS. GURMANKIN
14　　　Q. Why?
15　　　A. That's not my nature to.
16　　　Q. Did you go to Turney and say look, this
17　is part of both of our jobs, Jesse is telling me
18　not to do it anymore, what should we do or
19　something to that effect?
20　　　A. No.
21　　　Q. Why?
22　　　A. If she wanted to do it, I let her do
23　it.
24　　　Q. Did that continue as part of your job

Page 83

1　when you became the planner?
2　　　A. No.
3　　　Q. Anything else that you meant when you
4　told Kloosterman that Jesse gets offended by
5　things that are not meant to be offensive?
6　　　A. Not that I can think of.
7　　　Q. Did you actually tell Kloosterman that
8　it was plural things, in other words, that Jesse
9　gets offended by things, plural, that are not
10　meant to be offensive, or did you say singular?
11　　　A. I don't know.
12　　　Q. But the only thing you were referring
13　to was this issue with you talking to the people
14　in Calgary?
15　　　　MS. KIRKPATRICK: Objection.
16　　　　MS. GURMANKIN: Right?
17　　　　MS. KIRKPATRICK: He said the way work
18　is handled --
19　　　　MS. GURMANKIN: Right?
20　　　　MS. KIRKPATRICK: -- and work orders
21　are processed.
22　　　　MS. GURMANKIN: Is that right?
23　　　　MS. KIRKPATRICK: That's not what he
24　said.

Page 84

1　　　　MS. GURMANKIN: Is that right?
2　　　　MS. KIRKPATRICK: You can explain it to
3　her again.
4　　　　MS. GURMANKIN: Is that right?
5　　　　THE WITNESS: No, that's not right.
6　BY MS. GURMANKIN
7　　　Q. So tell me what else you were referring
8　to, other than the issue of Jesse getting upset
9　that you were talking to these people in Calgary,
10　when you said to Kloosterman, she gets offended by
11　things that are not meant to be offensive?
12　　　　MS. KIRKPATRICK: He said it involved
13　the process of getting the work through.
14　　　　MS. GURMANKIN: That's right. And the
15　only example he gave was him talking to the people
16　in Calgary.
17　　　　MS. KIRKPATRICK: Let me finish.
18　　　　MS. GURMANKIN: No. You are making a
19　speaking objection.
20　　　　MS. KIRKPATRICK: And the way he --
21　　　　MS. GURMANKIN: No. You're making a
22　speaking objection.
23　　　　MS. KIRKPATRICK: That's not your
24　question.

21 (Pages 81 to 84)

Page 85

1      MS. GURMANKIN: You're making a
2  speaking objection.
3      MS. KIRKPATRICK: You're
4  mischaracterizing his testimony.
5      MS. GURMANKIN: Stop making objections
6  that are violations of the rules.
7      MS. KIRKPATRICK: You are asking the
8  same questions over and over again.
9  BY MS. GURMANKIN:
10      Q.  Can you answer the question?  Do you
11  need it repeated?
12      A.  Repeat the question, please.
13      Q.  Sure.  When you told Kloosterman that
14  she gets offended by things that are not meant to
15  be offensive, is there anything else that you are
16  referring to, other than the example of you
17  talking to the people in Calgary?
18      MS. KIRKPATRICK: Objection.
19      THE WITNESS: Yeah.  Yeah.
20      MS. KIRKPATRICK: And the other
21  explanation.
22      THE WITNESS: And how the work
23  progressed through the system.
24

Page 86

1  BY MS. GURMANKIN:
2      Q.  Well, earlier when I asked you what you
3  were talking about, the only example you gave was
4  you talking to the people in Calgary.  Is there
5  anything else that you were referring to?
6      A.  I don't think that's what I said.
7      Q.  Well, it was.  But the record will
8  reflect that.
9      In any case, is there anything else you
10  are talking about about how work progressed
11  through the system that Jesse was offended by,
12  other than you talking to the people in Calgary?
13      MS. KIRKPATRICK: Objection.  Do you
14  have any other examples, is the question.
15      THE WITNESS: I wish she would ask that
16  question.  I do not have any other examples.
17  BY MS. GURMANKIN:
18      Q.  Okay.  Was the only thing that you were
19  referring to when you told Kloosterman that Jesse
20  gets offended that are not meant to be offensive,
21  was Jesse's reaction when you talked to the people
22  in Calgary?
23      MS. KIRKPATRICK: Objection.  That
24  wasn't the only thing he was referring to.  That

Page 87

1  was the only example.  You can tell her again.
2  BY MS. GURMANKIN:
3      Q.  Is there anything else you were
4  referring to when you said that to her?
5      A.  Not that I'm aware of, no.
6      MS. GURMANKIN: Okay.  Let's take a
7  break to change the tape.
8      THE VIDEOGRAPHER: This will conclude
9  file one in the videotaped deposition of Ken
10  Foreman in the matter of Barnes v Shell, et al.
11  We are going off the record at 1:30 p.m.
12      (A recess was taken from 1:30 to 1:39
13  p.m.)
14      THE VIDEOGRAPHER: This will begin file
15  number two in the videotaped deposition of Ken
16  Foreman in the matter of Barnes v Shell, et al.
17  We are going back on the record at 1:39 p.m.
18  BY MS. GURMANKIN:
19      Q.  Going back to the bottom of page one,
20  of Exhibit 22.  According to Kloosterman's notes,
21  you told her that Jesse thinks things are personal
22  when they are not.  What did you mean by that?
23      A.  She took the business process or
24  anyone's objection to how the business process was

Page 88

1  handled as it was personal.
2      Q.  What are you referring to?
3      A.  If someone didn't think something in
4  the process was handled right, she took it, you
5  know, that it was personal attack against her.
6      Q.  What are you talking about?
7      A.  What I just told you.
8      Q.  Do you have an example?
9      A.  I don't know that I have an example,
10  but I know that that's why I said that.
11      Q.  Did Kloosterman ask you for an example?
12      A.  I don't recall.
13      Q.  Did Kloosterman ask you for an example
14  of what you meant when you told her that Jesse
15  gets offended by things that are not meant to be
16  offensive?
17      A.  Not that I know of.  I don't -- I
18  don't --
19      Q.  You go on to say, "I have had to deal
20  with that."  What did you mean by that?
21      A.  She would be personally mad about
22  something that was just part of the process.
23      Q.  At you?
24      A.  I don't know.

Page 89

1    Q.  What did you mean when you said I had
2 to deal with that.  What did you have to deal
3 with?
4        MS. KIRKPATRICK:  Objection.  He just
5 told you.
6        THE WITNESS:  Yeah, her being mad at
7 the way the process was.
8 BY MS. GURMANKIN:
9    Q.  Mad in general or mad at any particular
10 person?
11    A.  Could you ask that again?
12    Q.  Sure.  Was she mad in general or mad at
13 a particular person?
14    A.  I would say mad at the process, which
15 would be mad in general.
16    Q.  Well, if she was mad at the process
17 then what did you have to deal with?
18    A.  Her being mad.
19    Q.  Did she express that to you?
20    A.  Yes.
21    Q.  How did she express that to you?
22    A.  Well, there was timelines that she had
23 to meet.  And there was times where I was still
24 working on my work that was making her deadline

Page 90

1 come up.
2    Q.  Okay.  And what did she get mad about
3 that that she expressed to you?
4    A.  Like, get your work done so I can
5 print.  That was what she said.
6    Q.  And what about that led you to conclude
7 that she was mad about the process?
8    A.  The process is what had slowed me from
9 getting my work done.
10    Q.  Did she have to wait for you to get
11 your work done before she could complete what she
12 had to do?
13    A.  Yes.
14    Q.  Did she yell?
15    A.  No, I don't think she was yelling.
16    Q.  Did she curse?
17    A.  I don't recall.
18    Q.  Did she throw stuff?
19    A.  No, she didn't throw stuff.
20    Q.  So what about her saying, basically,
21 get your stuff done so I can print led you to
22 conclude that she was mad about the process?
23    A.  I could tell that she was visibly
24 upset.

Page 91

1    Q.  How?
2    A.  She just looked upset.
3    Q.  From the look on her face?
4    A.  Her demeanor.
5    Q.  What about it?
6    A.  She looked like someone that was upset.
7    Q.  What about her demeanor led you to that
8 conclusion?
9    A.  She just looked like someone that was
10 upset.
11    Q.  Was it the look on her face or
12 something else?
13    A.  She would act -- I don't know.  She
14 just looked like someone that was upset.
15    Q.  When she said to you, basically, get
16 your stuff done so I can print, what about that
17 was she taking personally?
18        MS. KIRKPATRICK:  Objection.
19        THE WITNESS:  She thought that I was
20 trying to slow her process down or trying to make
21 it so she couldn't do her work.
22 BY MS. GURMANKIN:
23    Q.  Where did you get that from her saying,
24 basically, finish your stuff so I can print?

Page 92

1    A.  Ask the question again, please.
2    Q.  Sure.  Where did you get from her
3 saying to you something to the effect of finish
4 your stuff so I can print, did you get that she
5 was taking things personally?
6    A.  It just felt to me like she was taking
7 them personally.
8    Q.  Do you have any basis for that?
9        MS. KIRKPATRICK:  Objection.  He talked
10 about the look on her face and her demeanor.
11        MS. GURMANKIN:  That was about her
12 being upset.  I'm asking about her taking things
13 personally.
14        MS. KIRKPATRICK:  Objection.
15        THE WITNESS:  To me, it's the same
16 thing.
17 BY MS. GURMANKIN:
18    Q.  From her demeanor?
19    A.  Yes.
20    Q.  From her demeanor, it appeared to you
21 that she was taking personally her statement to
22 you that you had to finish your work before she
23 could print?
24        MS. KIRKPATRICK:  And the look on her

1    face. You can answer.
2        THE WITNESS: Yeah. It seemed to me
3    like she was taking it personal.
4    BY MS. GURMANKIN
5      Q.  Did she say anything that led you to
6    conclude that she was taking it personal?
7        MS. KIRKPATRICK: Objection. Asked and
8    answered.
9        THE WITNESS: Yes. Her whole demeanor
10   said that she was taking it personal.
11   BY MS. GURMANKIN
12     Q.  Right. I understand it's her demeanor.
13   But was it anything she actually said or how she
14   appeared in her demeanor?
15       MS. KIRKPATRICK: Objection.
16       THE WITNESS: How she appeared.
17   BY MS. GURMANKIN
18     Q.  Anything she said or just how she
19   appeared?
20     A.  Probably just how she appeared.
21     Q.  Okay. Anything else that you meant
22   when you told Kloosterman that she thinks things
23   are personal when they are not, other than her
24   saying to you something to the effect of finish up

1    your stuff so I can print?
2       MS. KIRKPATRICK: Objection.
3       THE WITNESS: Not that I can think of.
4    BY MS. GURMANKIN
5     Q.  Did Kloosterman ask you what you were
6    talking about?
7     A.  I don't know.
8     Q.  You don't remember?
9     A.  I do not.
10    Q.  You go on to say, according to
11   Kloosterman's notes, "She is not a morning person
12   at all. From noon on she is happy Jesse." What
13   did you mean by that?
14     A.  Jesse's not a morning person.
15     Q.  And how did you come to that
16   conclusion?
17     A.  She told us.
18     Q.  Who is us?
19     A.  People in our group.
20     Q.  Who?
21     A.  Matt Skolny and I, for sure.
22     Q.  Together?
23     A.  I would say, yes.
24     Q.  What was the context?

1     A.  That she's just not a morning person.
2     Q.  Did she just announce that? Was there
3    a discussion? Was there anything leading up to
4    her saying that?
5     A.  There was something that led up to it,
6    but I don't know what that -- what that was.
7     Q.  You go on to say "There was a time --
8    I'm sorry. "There was a while when she did not
9    know her role, a year ago or so. I knew her role
10   better than she did. I did not know her role as
11   well as she knows it now. She has improved a
12   lot."
13       When you say you knew her role better
14   than she did, that was her maintenance analyst
15   role?
16     A.  True.
17     Q.  And when you say I did not know her
18   role as well as she knows it now, she has improved
19   a lot, you are talking about her work in that
20   maintenance analyst role?
21     A.  I am, yes.
22     Q.  Did she handle scheduling at all as
23   part of her maintenance analyst responsibilities?
24     A.  No.

1     Q.  Not to your knowledge?
2     A.  No.
3     Q.  How about planning?
4     A.  No.
5     Q.  Why did you know her role better than
6    she did?
7     A.  Because I had done that role.
8     Q.  The maintenance analyst role?
9     A.  Yes.
10    Q.  When?
11    A.  From 2011 until Jesse told me to stop
12   doing it.
13    Q.  You were a scheduler. Right?
14    A.  Yes.
15    Q.  Was being a maintenance analyst part of
16   your job as a scheduler?
17    A.  We did not have a maintenance analyst
18   until Jesse became the maintenance analyst, yes.
19    Q.  So you had a dual role?
20    A.  It wasn't announced that way, but I did
21   the work of both of those roles.
22    Q.  The scheduler and the maintenance
23   analyst?
24    A.  Yes.

Page 97

1      Q.   Then when Jesse was hired full time,
2   did you drop the maintenance analyst
3   responsibilities?
4      A.   When she was capable of doing it, yes.
5      Q.   And who determined that?
6      A.   I guess she did.
7      Q.   Well, did you?
8      A.   I did not.
9      Q.   Did you ever tell Turney what your
10  opinion was about whether or not she was ready to
11  handle the maintenance analyst responsibilities
12  without your help?
13     A.   I did not.
14     Q.   Did he ever ask you your opinion on
15  that?
16     A.   He did not.
17     Q.   You go on to say, "She was offended
18  that I would do things that were supposedly in her
19  wheelhouse when I knew that she didn't know what
20  to do."
21          Is that the same as what we talked
22  about earlier, in connection with your statement
23  to Kloosterman, that she gets offended by things
24  that are not meant to be offensive?

Page 98

1      A.   No.
2      Q.   What is different about you telling
3   Kloosterman she was offended that I would do
4   things that were supposedly in her wheelhouse,
5   when I knew that she didn't know what to do?
6      A.   That is talking about maintenance
7   analyst kind of work.
8      Q.   What?
9      A.   When I was helping do that and she was,
10  you know, mad that I was helping do that.
11     Q.   Was one of her maintenance analyst
12  responsibilities the issue that you talked to the
13  Calgary people about?
14     A.   I don't know.
15     Q.   You don't know if it was one of the
16  responsibilities?
17     A.   I don't know.
18     Q.   Well, you handled that maintenance
19  analyst job.  Was talking to Calgary part of the
20  maintenance analyst responsibility?
21          MS. KIRKPATRICK:  Objection.  Asked and
22  answered.  He said it was a shared duty.
23          THE WITNESS:  Yeah, I don't know what I
24  was talking to them about at that time.

Page 99

1   BY MS. GURMANKIN:
2      Q.   And you don't know if it was the
3   maintenance analyst responsibility or scheduler
4   responsibility.  Is that your testimony?
5          MS. KIRKPATRICK:  Objection.  Asked and
6   answered.
7   BY MS. GURMANKIN:
8      Q.   Right?
9      A.   Right.
10     Q.   Well, if it was a scheduler
11  responsibility, then that would be your job, not
12  Jesse's job.  Right?
13     A.   Not necessarily.
14     Q.   Okay.  There may have been scheduler
15  responsibilities that if Jesse said -- that when
16  Jesse said to you she wanted to handle that, you
17  said, okay.  Let me ask it a better way.
18          It's possible that that was a scheduler
19  responsibility, the issue that you were talking to
20  Calgary about; you don't recall whether it was
21  scheduler or maintenance analyst.  Is that
22  correct?
23          MS. KIRKPATRICK:  Objection.  He said
24  it was job sharing.

Page 100

1   BY MS. GURMANKIN:
2      Q.   Is that right?
3      A.   What's your question again?
4      Q.   Sure.  The issue that you were talking
5   to Calgary about, do you recall if that was a
6   scheduler responsibility, or part of the
7   maintenance analyst responsibilities that you
8   held?
9          MS. KIRKPATRICK:  Objection.  He said
10  it was job sharing.
11          THE WITNESS:  Yeah.  You're going to
12  have to ask it again.  I'm sorry.
13  BY MS. GURMANKIN:
14     Q.   Sure.  The issue that you were talking
15  to Calgary about, was that part of your scheduler
16  job?
17     A.   I don't know.
18     Q.   Was it part of the maintenance analyst
19  responsibilities that you had?
20     A.   I don't know.
21     Q.   But you testified that Jesse was mad
22  that you had that communication, and she told you
23  she wanted to handle that and you agreed.  Right?
24          MS. KIRKPATRICK:  Objection.  She told

25  (Pages 97 to 100)

Page 101

1    him he should stop.  He wasn't supposed to be
2    doing it any further.
3          MS. GURMANKIN:  That's correct?
4          MS. KIRKPATRICK:  She said it wasn't
5    his job.
6          MS. GURMANKIN:  Okay.  That's correct?
7          MS. KIRKPATRICK:  Mischaracterization.
8          THE WITNESS:  That's correct.
9    BY MS. GURMANKIN
10      Q.  If that were -- and you agreed to not
11   do it anymore and to let her do it.  Right?  After
12   she said that to you.
13        MS. KIRKPATRICK:  Objection.  Asked and
14   answered, five times now, I think.
15        MS. GURMANKIN:  Right?
16        MS. KIRKPATRICK:  You can tell her
17   again.
18        THE WITNESS:  Yes, I stopped.
19   BY MS. GURMANKIN:
20      Q.  Would you have stopped if that was part
21   of your scheduler responsibilities?
22      A.  It's a little -- there was times when I
23   got advice from the people in Calgary, as far as
24   scheduling.  So I would not have stopped talking

Page 102

1    to them, no.
2      Q.  Right.  So when you told her that you
3   would stop, did you actually stop?
4      A.  I stopped being involved with the
5   maintenance analyst stuff, yes.
6      Q.  But you don't remember if that
7   communication that you had with the people in
8   Calgary was in connection with scheduling or
9   maintenance analyst responsibilities.  Right?
10        MS. KIRKPATRICK:  Objection.
11   BY MS. GURMANKIN:
12      Q.  Is that accurate testimony?
13        MS. KIRKPATRICK:  Objection.
14        THE WITNESS:  I don't know what we were
15   talking about.
16   BY MS. GURMANKIN
17      Q.  Okay.  So would you have agreed to
18   Jesse's request that you stop if that had been a
19   scheduler responsibility?
20      A.  I probably would have still agreed,
21   yes.
22      Q.  Okay.  So there may have been scheduler
23   responsibilities that she handled in her role as
24   maintenance analyst?

Page 103

1      A.  No.  She did not.
2      Q.  Is that possible?
3        MS. KIRKPATRICK:  He just said no.
4    BY MS. GURMANKIN
5      Q.  Is that possible?
6        MS. KIRKPATRICK:  Objection.
7        THE WITNESS:  Is it possible -- ask it
8   again.
9    BY MS. GURMANKIN:
10      Q.  Sure.  Is it possible that she handled
11   scheduling responsibilities in her role as
12   maintenance analyst?
13        MS. KIRKPATRICK:  Objection.
14        THE WITNESS:  She did not handle
15   scheduling responsibilities.
16   BY MS. GURMANKIN:
17      Q.  Well, you may have backed off of the
18   issue that you talked to the Calgary people about,
19   which may have been part of your scheduling role.
20   Right?
21        MS. KIRKPATRICK:  Objection.
22        THE WITNESS:  Ask that again.
23        MS. GURMANKIN:  Sure.
24

Page 104

1    BY MS. GURMANKIN:
2      Q.  You testified that even if the issue
3   that you were communicating with Calgary about
4   would have been part of your scheduling
5   responsibilities, that you probably still would
6   have agreed to back off when Jesse asked to you
7   stop.  Right?
8        MS. KIRKPATRICK:  Objection.  It was a
9   hypothetical.  You can answer.
10        THE WITNESS:  Yeah, I would have likely
11   stopped.
12   BY MS. GURMANKIN
13      Q.  Why, if it was part of your scheduling
14   responsibilities?
15        MS. KIRKPATRICK:  Objection.
16        THE WITNESS:  Because I knew what I
17   needed to know.
18   BY MS. GURMANKIN
19      Q.  What does that mean?
20      A.  If I was talking to them for advice,
21   then I would have got the advice that I needed to
22   know.
23      Q.  Why would you have agreed to stop
24   handling issues that were part of your scheduling

26 (Pages 101 to 104)

Page 105

1  role and let Jesse handle them?
2      A.  I did not do that.
3      Q.  Okay.  So then can we assume that the
4  issue that you talked to Calgary about was, in
5  fact, part of your scheduling role and not part of
6  your maintenance analyst responsibilities, that
7  you handled until Jesse was hired?
8      MS. KIRKPATRICK:  Objection.
9      THE WITNESS:  We were all -- we were
10  working across teams until Jesse got up to speed.
11  BY MS. GURMANKIN
12      Q.  Which was when?
13      A.  Whenever she said let me do it.
14      Q.  When?
15      A.  I don't know when that was.
16      Q.  Okay.  Anything else that you were
17  referring to when you told Kloosterman that she
18  was offended that I was doing things that were
19  supposedly in her wheelhouse, when I knew what
20  (sic) she didn't know what to do?
21      A.  That's what I was talking about.
22      Q.  Okay.  Nothing else?
23      A.  Nothing else.
24      Q.  Then you go on to say, "But that has

Page 106

1  changed and I saw it coming.  It got to the
2  point" -- if you can go to the next page, you can
3  just scroll over -- "where Will said, it's time to
4  let her fly or fail."  When was that?
5      A.  When -- could you ask that again,
6  please?
7      Q.  Sure.  When did Will say it's time to
8  let her fly or fail?
9      A.  After she said that she wanted to do it
10  on her own.
11      Q.  Did she say that to both you and
12  Turney?
13      A.  She may have.  I don't know.
14      Q.  At some point, Turney says to you it's
15  time to let her fly or fail.  Right?
16      A.  Yes.
17      Q.  What was the context of that
18  discussion?
19      A.  It was discussing the maintenance
20  analyst responsibilities.
21      Q.  And prior to this discussion, had Jesse
22  said to you that she wanted you to stop, and she
23  wanted to handle the responsibility in connection
24  with the Calgary issue?

Page 107

1      A.  I would say, yes.
2      Q.  And had she expressed to you, by this
3  time, that she felt ready to take on all the
4  maintenance analyst responsibilities?
5      MS. KIRKPATRICK:  Objection.
6      THE WITNESS:  She did not say that.
7  BY MS. GURMANKIN
8      Q.  Did Turney ask for your feedback about
9  whether she was ready fly or fail?
10      A.  He did not.
11      Q.  Did you offer any?
12      A.  No.
13      Q.  You go on to say, "She has a peer group
14  for the different assets.  She has met the other
15  MAs."  Is that maintenance analysts?
16      A.  It is.
17      Q.  "Only deals well with the female MAs,
18  doesn't reach out to the males."  What was your
19  basis for that?
20      A.  I knew who she was talking to.
21      Q.  How?
22      A.  Because she would tell me who she was
23  talking to.
24      Q.  Why?

Page 108

1      MS. KIRKPATRICK:  Why would she tell
2  him something?  He can't speculate to that.  Did
3  she say why she was speaking to those individuals?
4      THE WITNESS:  I gave her advice on who
5  to talk to.
6  BY MS. GURMANKIN:
7      Q.  Okay.  So who did you tell her to talk
8  to?
9      A.  To the maintenance analysts in Canada.
10      Q.  Did you give her names or did you say
11  maintenance analysts in Canada?
12      A.  Names.
13      Q.  Who?
14      A.  I don't know who they are.
15      Q.  Well, how did you give her names if you
16  don't know who they are?
17      A.  I did at that point.
18      Q.  You knew at that point?
19      A.  I could look on my computer and see.
20      Q.  Is your computer with you?
21      A.  It is not.
22      Q.  How many MAs in Canada did you tell her
23  to talk to?
24      A.  I don't know.  Two or three.

27 (Pages 105 to 108)

Page 109

1      Q.   Male or female?
2      A.   They are all female.
3      Q.   As you sit here today, you can't think
4   of a single name?
5      A.   No.
6      Q.   Okay.  Anyone else you told her to talk
7   to, other than the two or three female MAs in
8   Canada?
9      A.   Beyond who she was already talking with
10  in Canada, no.
11     Q.   And she told you that she reached out
12  to these MAs in Canada?
13     A.   Yes, she did.
14     Q.   Did you tell her to reach out to any
15  male MAs and she did not?
16     A.   I did not do that, no.
17     Q.   So did you tell Kloosterman -- when you
18  are saying that Jesse only deals well with the
19  female MAs, doesn't reach out to the males, did
20  you tell Kloosterman that you told Jesse to talk
21  to only female MAs?
22     A.   I did not tell her that, no.
23     Q.   Why?
24     A.   I don't know that it was asked.

Page 110

1      Q.   Well, what was your point in telling
2   Kloosterman that Jesse only deals well with the
3   female MAs and doesn't reach out to the males?
4      A.   That's what I had seen.  That she had
5   not reached out to all the assets in the United
6   States, that she only reached out to the assets in
7   Canada.
8      Q.   The only people that you told her to
9   reach out to, according to your testimony, was the
10  two or three female MAs in Canada.  Is that right?
11     MS. KIRKPATRICK:  Objection.  You
12  already told her yes.  You can answer.
13     THE WITNESS:  Yes.
14  BY MS. GURMANKIN
15     Q.   So why are you suggesting to
16  Kloosterman -- why are you saying to Kloosterman
17  that Jesse only deals well with the female MAs,
18  doesn't reach out to the males, when you only told
19  her to reach out to MAs who are female?
20     A.   I don't know.  I may have told her to
21  reach out to the others ones, too.  I don't
22  remember.
23     Q.   And your testimony under oath is that
24  you only told her to reach out MAs that were

Page 111

1   female.  Is that right?
2      MS. KIRKPATRICK:  Objection.  He said
3   he may have told her to reach out to others.
4   BY MS. GURMANKIN:
5      Q.   Is there any reason as to why you told
6   Kloosterman that Jesse doesn't reach out to males
7   when you didn't tell her to reach out to any
8   males?
9      A.   She had the option without me telling
10  her.
11     Q.   Any reason why you didn't tell
12  Kloosterman that you only told Jesse to reach out
13  to MAs who were female?
14     A.   I didn't tell her that.
15     Q.   Any explanation as to why?
16     A.   No.
17     Q.   What was your point in telling
18  Kloosterman that Jesse only deals with the female
19  MAs and didn't reach out to the males?
20     MS. KIRKPATRICK:  Objection.  This was
21  already asked and answered three times.  You can
22  answer.
23     MS. GURMANKIN:  You can answer.
24     THE WITNESS:  What was the question

Page 112

1   again?
2   BY MS. GURMANKIN:
3      Q.   What was your point in telling
4   Kloosterman that Jesse only deals well with the
5   females and she doesn't reach out to the males?
6      MS. KIRKPATRICK:  Objection.
7      THE WITNESS:  That's the only one I --
8      MS. KIRKPATRICK:  I'm sorry.  Go ahead.
9      THE WITNESS:  That's the only one that
10  I heard her talking about.
11  BY MS. GURMANKIN
12     Q.   Why are you telling Kloosterman that?
13     MS. KIRKPATRICK:  Objection.
14     THE WITNESS:  I don't know.  I don't
15  know what the question was that was asked of me.
16  BY MS. GURMANKIN
17     Q.   Let's go back to page one.  Look under
18  the question, Describe your working relationship
19  with Will Turney and Jesse Barnes.  So why are you
20  telling Kloosterman that?
21     MS. KIRKPATRICK:  Objection.
22     THE WITNESS:  I don't know.
23  BY MS. GURMANKIN
24     Q.   Did Jesse tell you that she reached out

28 (Pages 109 to 112)

Page 113

```
1    to the female MAs in Canada?
2         A.  Yes.  We talked about that.
3         Q.  Did you hear her actually speaking with
4    the female MAs?
5         A.  Yes.
6         Q.  Were you on the phone?
7         A.  No.
8         Q.  You heard her end of the conversation?
9         A.  Yes.
10        Q.  Was that the basis for your conclusion
11   that she dealt well with the female MAs?
12        A.  That's the ones that I heard her
13   speaking with, yes.
14        Q.  Were you being critical of Jesse when
15   you told Kloosterman that Jesse only deals well
16   with the female MAs, doesn't talk to the males?
17        A.  No.
18        Q.  Were you trying to suggest that she did
19   something wrong?
20        A.  No.
21        Q.  No explanation as to why you told her
22   that.  Right?
23        MS. KIRKPATRICK:  Objection.
24        THE WITNESS:  (Indicated in the
```

Page 114

```
1    negative.)
2         MS. KIRKPATRICK:  In response to the
3    question.
4         MS. GURMANKIN:  Right?
5         THE WITNESS:  What was the --
6         MS. GURMANKIN:  No explanation as to
7    why you told Kloosterman that?
8         MS. KIRKPATRICK:  Objection.  In
9    response to the question.
10        THE WITNESS:  Yeah, it's -- I was just
11   talking then.  I don't know why I may have said
12   that.
13   BY MS. GURMANKIN:
14        Q.  No explanation for why you didn't tell
15   Kloosterman that you only told Jesse to reach out
16   to MAs that were females.  Right?
17        MS. KIRKPATRICK:  Objection.
18        THE WITNESS:  Ask it again, please.
19   BY MS. GURMANKIN:
20        Q.  Sure.  No explanation as to why you
21   didn't tell Kloosterman that you only told Jesse
22   to reach out to MAs who were female?
23        MS. KIRKPATRICK:  Objection.  He said
24   that she may not have asked.
```

Page 115

```
1         MS. GURMANKIN:  Right?
2         THE WITNESS:  Yeah, I don't know that I
3    told her anything about that.
4    BY MS. GURMANKIN
5         Q.  Right.  You didn't tell Kloosterman
6    that you only told Jesse to reach out to MAs who
7    were female.  Correct?
8         MS. KIRKPATRICK:  Objection.
9         THE WITNESS:  I did not tell her that.
10   BY MS. GURMANKIN:
11        Q.  Right.  Why not?
12        MS. KIRKPATRICK:  Objection.  He said
13   she may not have asked.
14        THE WITNESS:  It wasn't part of the
15   conversation.
16   BY MS. GURMANKIN:
17        Q.  Well, it had to do with you telling her
18   that Jesse only deals well with the female MAs,
19   doesn't reach out to the males.  Right?  Relevant
20   to that.  But you don't tell Jesse to reach out to
21   any male MAs.
22        MS. KIRKPATRICK:  The question is was
23   it relevant?
24        MS. GURMANKIN:  No, that wasn't the
```

Page 116

```
1    question.
2         MS. KIRKPATRICK:  That was the
3    question.
4         MS. GURMANKIN:  Nope.  Do you need it
5    repeated?
6         THE WITNESS:  What was the question?
7    BY MS. GURMANKIN
8         Q.  You said it wasn't part of the
9    conversation for you to tell Kloosterman that you
10   only told Jesse to reach out to MAs who are
11   female, not male.  So wasn't you explaining that
12   to Kloosterman part of the conversation, where you
13   are telling her that Jesse only deals well with
14   female MAs, she hasn't reached out to any male?
15        MS. KIRKPATRICK:  Objection.
16   Mischaracterization.  Compound.
17        THE WITNESS:  I didn't tell Kloosterman
18   that I told Jesse to reach out to the female
19   maintenance analysts.
20   BY MS. GURMANKIN:
21        Q.  The question is, why didn't you tell
22   Kloosterman that you only told Jesse to reach out
23   to MAs who were female and not male?
24        MS. KIRKPATRICK:  Objection.  Asked and
```

29 (Pages 113 to 116)

Page 117

1  answered.  Five times.  He told you she may not
2  have asked.  You can tell her again.
3       MS. GURMANKIN:  My question is why
4  didn't you tell her?
5       MS. KIRKPATRICK:  She may not have
6  asked.
7       THE WITNESS:  I don't believe she asked
8  me.
9  BY MS. GURMANKIN
10      Q.  Were you only told that you could
11  answer specific questions?
12      A.  I don't get what that question is.  I'm
13  sorry.
14      Q.  Did Kloosterman specifically ask you if
15  Jesse only dealt well with female MAs?
16      A.  I don't know.
17      Q.  Did she specifically ask you whether
18  Jesse reached out to males?
19      A.  And I don't know that, either.
20      Q.  Is it possible she didn't ask you those
21  specific questions?
22      A.  It is possible, yes.
23      Q.  Okay.  But you still told her that
24  information.  Right?

Page 118

1       A.  Yes.
2       Q.  Okay.  So even if she didn't ask, is
3  there any explanation for why you didn't tell
4  Kloosterman that you only directed Jesse to reach
5  out to MAs who were female and none who were male?
6       MS. KIRKPATRICK:  Objection.
7       THE WITNESS:  I knew that the female
8  maintenance analysts were competent.  That's why I
9  said to reach out to them.  But she also knew the
10  other maintenance analysts in their peer group.
11  BY MS. GURMANKIN:
12      Q.  Even if Kloosterman didn't ask, is
13  there any reason why you did not tell Kloosterman
14  that you had directed Jesse to only reach out to
15  MAs who were female and none who were male?
16      A.  No.
17      Q.  Underneath the first bullet point on
18  page two.  The question is, "Gets offended", and
19  then, according to her notes, your answer is
20  "There have been lots of times when she has been
21  mad at me or Dan.  She gets set off pretty easily.
22  She has something against Dan."
23       How many times were you referring to
24  that she got mad at you and Dan?  Is that Dan

Page 119

1  Krise, by the way?  Or Krise.
2       A.  Yes.
3       Q.  How many times did she get mad at you
4  and Dan?
5       A.  I'm not seeing where you are talking
6  about.
7       Q.  The second page, first bullet point on
8  the page.  Above the chart.
9       A.  I see it.  What was the question?
10      Q.  How many times did she get mad at you
11  and Dan Krise?
12      A.  I don't know.  Off and on.
13      Q.  What's lots?  You said lots of times.
14      A.  Yeah.
15      Q.  How many is lots?
16      A.  Ten or more.
17      Q.  More than 20?
18      A.  I'll stay with ten or more.
19      Q.  Between ten and 20?
20      A.  Ten or more.
21      Q.  What did she get mad at you and Dan
22  about?
23      A.  I don't know.  Being loud.
24      Q.  Are you guessing, or did she get mad at

Page 120

1  you for being loud?
2       A.  No.  She has gotten mad at us for being
3  loud.
4       Q.  Because she was trying to work?
5       MS. KIRKPATRICK:  Objection.
6       THE WITNESS:  I don't know if she was
7  trying to work or not.
8  BY MS. GURMANKIN
9       Q.  Was it during the workday?
10      A.  Yes, it was during the workday.
11      Q.  Was she at her desk?
12      A.  Yes.  She was in the work area.
13      Q.  Were you guys being loud?
14      A.  I would say yes.
15      Q.  And what did she say?
16      A.  Asked us to be quiet.
17      Q.  What about that led you to conclude
18  that she was mad?
19      A.  You could tell from her demeanor that
20  she was mad.
21      Q.  Did you quiet down when she asked you
22  to?
23      A.  Yes.
24      Q.  Do you think there was anything wrong

30 (Pages 117 to 120)

Page 121

1  with what she was doing?
2      A.  No.  I would say no.
3      Q.  Anything else that she got mad at you
4  and Dan about, when you told Kloosterman that
5  there have been lots of times when she has been
6  mad at you and Dan?
7      A.  The leek dip.
8      Q.  I'm sorry?
9      A.  The leek dip.  She didn't like when we
10 had leek dip.
11     Q.  Leek dip?
12     A.  Yes.
13     Q.  A food?
14     A.  A food.
15     Q.  Okay.  And she didn't like that because
16 of the smell?
17     A.  Yes.
18     Q.  And what did she say when you had leek
19 dip?
20     A.  That we had to get it out of there.
21     Q.  Did you agree it had a pungent odor?
22     A.  Yes.
23     Q.  And when she asked you to get it out of
24 there, did you eat it somewhere else?

Page 122

1      A.  We did.
2      Q.  Anything wrong with her asking you to
3  eat it somewhere else?
4      A.  No.
5      Q.  Anything else that you were referencing
6  when you told Kloosterman there have been lots of
7  times when she has been mad at you and Dan?
8      A.  Not that I can think of right now.
9      Q.  Okay.  Did Kloosterman ask you for any
10 examples?
11     A.  I don't believe so.
12     Q.  Did you ever run your hands through
13 Jesse's hair?
14     A.  No.
15     Q.  You sure about that?
16     A.  I'm positive about --
17         MS. KIRKPATRICK:  Objection.
18         THE WITNESS:  -- that.
19 BY MS. GURMANKIN:
20     Q.  Did you touch her hair?
21     A.  Yes, I did.
22     Q.  Did she get mad at you about that?
23     A.  She told me not to do it again.
24     Q.  Was she upset when she said it?

Page 123

1      A.  Yes.
2      Q.  Did you tell Kloosterman that one of
3  the things that she was upset about was when you
4  touched her hair?
5      A.  I did not.
6      Q.  Why not?
7      A.  I don't believe it was asked.
8      Q.  She didn't specifically ask the
9  question did Jesse get mad when you touched her
10 hair; is that your testimony as to why you didn't
11 tell her?
12     A.  Did she ask me about that?
13         MS. KIRKPATRICK:  She did, if you look
14 on the fourth page.  The question is not based
15 upon document -- the document in evidence.  It's
16 contrary to it.
17         MS. GURMANKIN:  Is that an actual
18 objection?
19         MS. KIRKPATRICK:  Well, I'm not going
20 to let you --
21         MS. GURMANKIN:  Do you need the
22 question repeated?
23         MS. KIRKPATRICK:  -- ask leading
24 questions that are contrary to the evidence.

Page 124

1          MS. GURMANKIN:  Do you understand
2  leading questions are permitted in
3  cross-examination?
4          MS. KIRKPATRICK:  I'm not saying it's
5  leading.  I'm saying --
6          MS. GURMANKIN:  Please stop making
7  speaking objections.
8          MS. KIRKPATRICK:  It's
9  mischaracterized.  I have a right to object to
10 leading questions.
11 BY MS. GURMANKIN:
12     Q.  Is your testimony that you didn't tell
13 Kloosterman that Jesse got mad and upset when you
14 touched her hair because Kloosterman didn't
15 specifically ask you that?  Is that your
16 testimony?
17         MS. KIRKPATRICK:  Read page four.
18         MS. GURMANKIN:  No.  Answer the
19 question first.
20         MS. KIRKPATRICK:  No.  The question is
21 misleading because you state here --
22         MS. GURMANKIN:  Kathy, you are being
23 extremely inappropriate right now and you know
24 that.

31 (Pages 121 to 124)

Page 125

1　　　　MS. KIRKPATRICK:  No.  It's misleading.
2　　　　MS. GURMANKIN:  Is that your testimony?
3　　　　MS. KIRKPATRICK:  You are trying to
4　twist it around.
5　　　　MS. GURMANKIN:  Is that your testimony?
6　　　　THE WITNESS:  What's your question?
7　BY MS. GURMANKIN
8　　　　Q.  Is your testimony that you did not tell
9　Kloosterman that Jesse got upset when you touched
10　her hair because she didn't specifically ask you
11　that?
12　　　　MS. KIRKPATRICK:  Here it is.
13　　　　MS. GURMANKIN:  No.  No.  Answer the
14　question first, and then you can look at the
15　document.
16　　　　MS. KIRKPATRICK:  No.  He can look at
17　the document.
18　　　　MS. GURMANKIN:  No.  You are being
19　inappropriate.
20　　　　MS. KIRKPATRICK:  You are asking him
21　about something that is in the document.
22　　　　MS. GURMANKIN:  Answer the question.
23　　　　MS. KIRKPATRICK:  Right here.
24　　　　MS. GURMANKIN:  Nope.  We're clearing

Page 126

1　that for now.  Answer the question.
2　　　　MS. KIRKPATRICK:  No, you're not.
3　　　　MS. GURMANKIN:  Answer the question.
4　　　　MS. KIRKPATRICK:  No.  You are not --
5　　　　MS. GURMANKIN:  What's the basis --
6　　　　MS. KIRKPATRICK:  No.
7　　　　MS. GURMANKIN:  Are you instructing him
8　not to answer?
9　　　　MS. KIRKPATRICK:  No.  Yes, I'm
10　instructing him not to answer.
11　　　　MS. GURMANKIN:  What's the basis?
12　　　　MS. KIRKPATRICK:  Because you are
13　asking him a misleading question.  And you are
14　basing it on a document, an exhibit that you have
15　given him.  He has a right to look at the exhibit
16　before he answers the question.
17　　　　MS. GURMANKIN:  You're instructing him
18　not to answer?  I want to get that on the record.
19　　　　MS. KIRKPATRICK:  I'm instructing him
20　not to answer and to take the opportunity to read
21　the document that you have given him, that you
22　have put before him, that you are asking him
23　questions about, and that your question is
24　completely contrary to.

Page 127

1　BY MS. GURMANKIN:
2　　　　Q.  Answer the question, Mr. Foreman.  Is
3　it your testimony that you did not tell
4　Kloosterman that Jesse got upset when you touched
5　her hair because Kloosterman did not specifically
6　ask you that?
7　　　　MS. KIRKPATRICK:  Wait.  Objection.
8　　　　MS. GURMANKIN:  Is that your testimony?
9　　　　MS. KIRKPATRICK:  Wait.  Stop.
10　　　　MS. GURMANKIN:  Nope.  Is that your
11　testimony?
12　　　　MS. KIRKPATRICK:  You need to show me
13　the exhibit.  You have removed the exhibit from my
14　screen.
15　　　　MS. GURMANKIN:  Is that your testimony?
16　　　　MS. KIRKPATRICK:  You have taken the
17　exhibit.  Do not answer.  Do not answer.
18　　　　THE WITNESS:  I don't know what the
19　question is.
20　　　　MS. GURMANKIN:  I'm asking you.
21　　　　MS. KIRKPATRICK:  You have removed the
22　exhibit.  You have taken the exhibit from my
23　screen.  If you are showing the witness the
24　exhibit and it is part of this question --

Page 128

1　　　　MS. GURMANKIN:  It's not.
2　　　　MS. KIRKPATRICK:  -- then you need to
3　put it back on my screen.
4　　　　MS. GURMANKIN:  It's not part of the
5　question.
6　BY MS. GURMANKIN:
7　　　　Q.  Is it your testimony that you did not
8　tell Kloosterman that Jesse got upset when you
9　touched her hair because she did not specifically
10　ask you that?  That's the question.
11　　　　MS. KIRKPATRICK:  Objection.
12　　　　THE WITNESS:  I don't know what she
13　specifically asked me.
14　BY MS. GURMANKIN:
15　　　　Q.  You testified that you didn't tell her
16　that Jesse got upset when you touched her hair
17　because she didn't specifically ask you.
18　　　　MS. KIRKPATRICK:  Objection.
19　BY MS. GURMANKIN:
20　　　　Q.  Is that right?  Is that true or not?
21　　　　A.  I don't know if that's true.
22　　　　Q.  You testified to it.  Is that true?
23　　　　MS. KIRKPATRICK:  Objection.
24　　　　THE WITNESS:  I was mixed up with what

32 (Pages 125 to 128)

Page 129

1　your question was.  I --
2　BY MS. GURMANKIN:
3　　　Q.  Did you tell Kloosterman that Jesse got
4　upset when you touched her hair?
5　　　A.  I don't know --
6　　　MS. KIRKPATRICK:  If you need to look
7　at the exhibit --
8　　　MS. GURMANKIN:  No.  I'm asking --
9　　　MS. KIRKPATRICK:  -- to refresh your
10　memory, you can do that.
11　　　MS. GURMANKIN:  Nope.  I'm asking
12　without the exhibit.
13　　　MS. KIRKPATRICK:  Mr. Foreman, if you
14　need to read this to refresh your memory --
15　　　MS. GURMANKIN:  You're being
16　inappropriate.  I'll ask him after this.
17　BY MS. GURMANKIN:
18　　　Q.  Is it your testimony that you did not
19　tell Kloosterman that Jesse got upset when you
20　touched her hair because Kloosterman didn't
21　specifically ask you that?
22　　　MS. KIRKPATRICK:  Objection.
23　BY MS. GURMANKIN:
24　　　Q.  Yes or no?

Page 130

1　　　A.  I don't know.
2　　　MS. KIRKPATRICK:  You've asked him five
3　times already.
4　BY MS. GURMANKIN:
5　　　Q.  You don't remember?
6　　　A.  I don't remember.
7　　　Q.  Well, why didn't you tell Kloosterman
8　that Jesse got upset when you touched her hair?
9　　　MS. KIRKPATRICK:  He did tell her that.
10　It's right in the document.  It's an inappropriate
11　question.
12　　　THE WITNESS:  Yeah.  I didn't know what
13　she had written down, though, what we had talked
14　about.
15　　　MS. GURMANKIN:  That wasn't my
16　question.  Do you need it repeated?
17　　　THE WITNESS:  I do.
18　BY MS. GURMANKIN
19　　　Q.  Did you not tell Kloosterman that Jesse
20　got upset when you touched her hair because
21　Kloosterman didn't specifically ask you that?
22　　　MS. KIRKPATRICK:  Objection.  He did
23　tell her that in the document.
24　　　MS. GURMANKIN:  It's a speaking

Page 131

1　objection.
2　BY MS. GURMANKIN:
3　　　Q.  Is that your testimony, Mr. Foreman?
4　　　A.  I don't know what my testimony is.  I
5　don't.  I don't know what I told her.  So...
6　　　Q.  You don't remember?
7　　　A.  No.
8　　　Q.  So when you testified a couple minutes
9　ago that you did not tell Kloosterman that Jesse
10　got upset when you touched her hair, is that true?
11　　　A.  What was that question again?
12　　　Q.  When you testified a couple minutes ago
13　that you did not tell Kloosterman that Jesse
14　upset when you touched her hair, is that true
15　testimony?
16　　　MS. KIRKPATRICK:  Objection.  In the
17　document.
18　BY MS. GURMANKIN
19　　　Q.  Is that true?
20　　　A.  Let's try this one more time.
21　　　Q.  Sure.  You testified a moment ago that
22　you didn't remember what you told Kloosterman.  So
23　I'm asking if the testimony you gave a couple
24　minutes before that is true, which was that you

Page 132

1　did not tell Kloosterman that Jesse got upset when
2　you touched her hair.
3　　　MS. KIRKPATRICK:  Objection.
4　BY MS. GURMANKIN
5　　　Q.  Is that true testimony?
6　　　A.  I really don't get the question.
7　　　Q.  You testified a few minutes ago that
8　you did not tell Kloosterman that Jesse got upset
9　when you touched her hair.  Is that true?
10　　　MS. KIRKPATRICK:  Objection.
11　　　THE WITNESS:  I don't think you're
12　saying what Ms. Kloosterman said.  I think you're
13　saying something else.
14　　　MS. GURMANKIN:  That's not my question.
15　BY MS. GURMANKIN:
16　　　Q.  When you testified a few minutes ago
17　that you did not tell Kloosterman that Jesse got
18　upset when you touched her hair, is that true
19　testimony?
20　　　MS. KIRKPATRICK:  Objection.  He just
21　told you.  He just answered your question.  You
22　may not like the answer, but he answered it.  It's
23　not how --
24　　　MS. GURMANKIN:  I'm sorry.  I didn't

Page 133

1 understand your answer then. I need you to answer
2 again.
3 　　MS. KIRKPATRICK: He'll answer how he
4 thinks it's fit, whether you understand it or not.
5 BY MS. GURMANKIN
6 　　Q. When you testified a few minutes ago
7 that did you not tell Kloosterman that Jesse got
8 upset when you touched her hair, is that true
9 testimony?
10 　　MS. KIRKPATRICK: Objection.
11 　　THE WITNESS: I don't know what she
12 asked.
13 BY MS. GURMANKIN:
14 　　Q. My question was not what she asked you.
15 My question was when you testified a few minutes
16 ago that did you not tell Kloosterman that Jesse
17 got upset when you touched her hair, is that true
18 testimony?
19 　　MS. KIRKPATRICK: Objection. If you
20 need to look at the document to refresh your
21 memory, you can.
22 BY MS. GURMANKIN:
23 　　Q. Well, first, are you able to answer
24 that question without looking at the document? Is

Page 134

1 your testimony from a few minutes ago true when
2 you testified that did you not tell Kloosterman
3 that Jesse got upset when you touched her hair?
4 　　MS. KIRKPATRICK: Objection.
5 　　THE WITNESS: I don't know what I told
6 her.
7 BY MS. GURMANKIN:
8 　　Q. You don't remember?
9 　　A. I don't remember.
10 　　Q. Why did you testify a few minutes ago
11 that you did not tell Kloosterman that Jesse got
12 upset when you touched her hair?
13 　　MS. KIRKPATRICK: Objection.
14 　　THE WITNESS: That's what I'm saying.
15 I didn't understand what you were asking me.
16 　　MS. GURMANKIN: You heard my
17 instruction at the beginning when I told you if
18 you didn't understand the question to let me know
19 and I would rephrase it?
20 　　THE WITNESS: I did.
21 BY MS. GURMANKIN:
22 　　Q. Any reason why you didn't say that if
23 you didn't understand the question?
24 　　MS. KIRKPATRICK: He realized it

Page 135

1 afterwards, which is clear.
2 　　THE WITNESS: Yeah. It was very
3 confusing.
4 BY MS. GURMANKIN
5 　　Q. Any reason why you didn't tell me you
6 didn't understand the question if you didn't
7 understand the question?
8 　　MS. KIRKPATRICK: Objection. He
9 thought he understood it at the time.
10 　　MS. GURMANKIN: Would you stop
11 testifying?
12 　　MS. KIRKPATRICK: I'm not testifying.
13 BY MS. GURMANKIN:
14 　　Q. Is there any reason why you didn't say
15 that?
16 　　A. I don't -- I don't know why I didn't
17 say that.
18 　　Q. Okay. When did you touch Jesse's hair?
19 　　A. When I was at her work station.
20 　　Q. How many times?
21 　　A. One time.
22 　　Q. When?
23 　　A. I get the question. But give me more
24 of a question.

Page 136

1 　　Q. Sure. Do you remember the year?
2 　　A. I do not.
3 　　Q. It was before you met with Kloosterman?
4 　　A. That would be so, yes.
5 　　Q. Is it before the initial phone call
6 from Michelle Priest in which she tells you that
7 there have been allegations made against you?
8 　　A. I would think so, yes.
9 　　Q. But you're not sure?
10 　　A. I'm not sure. But I would -- yeah,
11 pretty sure. Not 100 percent sure.
12 　　Q. So tell me what happened when you
13 touched Jesse's hair.
14 　　A. I went to her work station to help her,
15 and the way that she would sit at her work station
16 made it so it was hard for me to see the screen.
17 And I had tried to put my head basically where her
18 head was so I could see the screen. And her hair
19 was hanging there, so I pulled her hair back and
20 laid it on her shoulder.
21 　　Q. Did you actually touch your head to
22 hers?
23 　　A. No.
24 　　Q. How close did you get?

Page 137

1    A.  Close.  I really needed to be where she
2  was to be able to see the screen.
3    Q.  Did you ask her to get up?
4    A.  No.
5    Q.  Did you ask her to move the screen?
6    A.  No.
7    Q.  Did you try to move around her so you
8  could get a different angle?
9    A.  No.
10    Q.  So you put your head -- did you put it
11  as close as it could get to her head without
12  touching?
13    A.  I would say no.
14    Q.  So how many inches away was your head
15  from her head?
16    A.  I don't know.
17    Q.  Are we talking feet, inches, what?
18    A.  Close.
19    Q.  Within a couple of inches?
20    A.  Likely, yes.
21    Q.  Were you standing?
22    A.  Yes.
23    Q.  And she was sitting?
24    A.  Yes.

Page 138

1    Q.  So you leaned down?
2    A.  Yes.
3    Q.  And where did you put your head within
4  a couple of inches of hers; was it to the side?
5    A.  Right behind her shoulder, yes.
6    Q.  All right.  Then when you did that --
7    A.  Sometimes I had to lean ahead of her
8  even -- depending on where she was sitting.
9    Q.  So this happened on other occasions?
10    MS. KIRKPATRICK:  What happened on
11  other occasions?  Let's be clear.
12    THE WITNESS:  That I had to be in her
13  work cubicle and look at her screen.
14  BY MS. GURMANKIN:
15    Q.  Did that happen on other occasions?
16    A.  All the time.
17    Q.  Other occasions in which you put your
18  head within a couple of inches of hers?
19    A.  All the time.
20    Q.  Any other occasion in which you touched
21  her hair?
22    A.  No.
23    Q.  So on this particular occasion that
24  we're talking about, you put your head within a

Page 139

1  couple of inches of hers.  And then what happened,
2  her hair got in your way?
3    A.  It was in my way when I went to look at
4  the screen.  So I just pushed it out of -- so I
5  could be right there looking.
6    Q.  Was it in your way when you leaned down
7  and put your head within a couple of inches of
8  hers?
9    A.  It was in my line of sight.
10    Q.  Even after you leaned down and put your
11  head within a couple of inches of hers?
12    A.  When I got so I could see the screen,
13  her hair was in my line of sight.
14    Q.  Was it in your line of sight before you
15  leaned down?
16    A.  I couldn't see the screen then.
17    Q.  Was her hair in your line of sight
18  before you leaned down?
19    MS. KIRKPATRICK:  Line of sight to the
20  screen?  That's unclear.
21  BY MS. GURMANKIN
22    Q.  What's your answer?
23    THE WITNESS:  I don't -- yeah.
24

Page 140

1  BY MS. GURMANKIN:
2    Q.  Her hair was in your line of sight
3  before you leaned down and after you leaned down?
4    MS. KIRKPATRICK:  That's not what he
5  said.
6    MS. GURMANKIN:  That's the question.
7    THE WITNESS:  It was not.
8  BY MS. GURMANKIN
9    Q.  Okay.  Was it in your line of sight
10  before you leaned down?
11    MS. KIRKPATRICK:  Was the screen in the
12  line of sight?
13    MS. GURMANKIN:  Stop asking the
14  question.
15    MS. KIRKPATRICK:  The question is
16  unclear.
17    MS. GURMANKIN:  Well, then you can make
18  an objection to form.
19    MS. KIRKPATRICK:  Well, I need to
20  understand the question.
21  BY MS. GURMANKIN
22    Q.  Was her hair in your line of sight
23  before you leaned down and put your head within a
24  couple of inches of hers?

35 (Pages 137 to 140)

Page 141

1      A.  In line of sight of what?
2      Q.  Of the screen.
3      A.  Her hair was not in the line of sight
4 when I was looking above her head, but I can't see
5 the screen.
6      Q.  Okay. So before you leaned down, her
7 hair was not in your line of sight, but you
8 couldn't see the screen because of the angle of
9 the screen?
10     A.  And I can't see at that distance.
11 That's more it than anything.
12     Q.  Which was it, because of the angle or
13 you couldn't see at that distance?
14     A.  More the distance.
15     Q.  Are you nearsighted?
16     A.  Yes.
17     Q.  Were you wearing your glasses at the
18 time?
19     A.  I have computer-specific glasses that
20 are set at 24 inches from the screen.
21     Q.  Were you wearing those when you went
22 over to her work station?
23     A.  That's what I wear when I work.
24     Q.  Does that help with your

Page 142

1 nearsightedness?
2     A.  Makes it so I can read the screen
3 without being up against it, yes.
4     Q.  So did you move over away from her but
5 closer to the screen?
6     A.  I just did what I always did, leaned
7 down alongside of her to see the screen.
8     Q.  Why didn't you move elsewhere but
9 closer to the screen so that your head wasn't
10 within a couple of inches of hers?
11    A.  Because she was sitting right there.
12    Q.  Why didn't you ask her to move?
13    A.  I didn't want to inconvenience her to
14 move. I just wanted to see the screen.
15    Q.  Did you ask her whether it would be an
16 inconvenience for her to move?
17    A.  I did not.
18    Q.  She could have moved her chair a couple
19 inches. Right?
20    A.  Yes.
21    Q.  You didn't ask her to do that, did you?
22    A.  I did not.
23    Q.  Any explanation for why you didn't?
24    A.  No.

Page 143

1     Q.  Why didn't you ask her to move the
2 screen?
3     A.  Same reason.
4     Q.  Any explanation for why you didn't?
5     A.  No.
6     Q.  So then when you lean down so your head
7 is within a couple of inches of hers, her hair is
8 in the line of sight to the screen. Right?
9     A.  That's true.
10    Q.  Is her hair actually touching your head
11 after you lean down?
12    A.  Touching my head?
13    Q.  Yes.
14    A.  No.
15    Q.  What hairstyle was she wearing at that
16 time?
17    A.  Her hair is just straight and hangs
18 down.
19    Q.  Was it straight and hanging down at the
20 time of this happening?
21    A.  Yes.
22    Q.  All right. So you gather all of her
23 hair in your hands?
24    A.  No.

Page 144

1     Q.  What do you do?
2     A.  I just took my thumb and pushed her
3 hair back.
4     Q.  Which thumb?
5     A.  I take it it would have been this one
6 (indicating) to do it at the right angle.
7     Q.  Your left thumb?
8     A.  Yes.
9     Q.  And you pushed her hair over?
10    A.  Just pushed it back on to her shoulder,
11 yes.
12    Q.  Did you touch her -- any part of her
13 body while you were doing this?
14    A.  I don't think so, no.
15    Q.  Are you sure when you gathered her hair
16 with your thumb you didn't touch any part of her
17 body?
18    A.  No. No, I didn't.
19    Q.  And did you push it over her shoulder?
20    A.  Onto her shoulder, yes.
21    Q.  Did you ask her before you did this if
22 that was okay with her?
23    A.  I did not.
24    Q.  Why not?

36 (Pages 141 to 144)

Page 145

1      A.  I didn't think to -- I didn't -- I
2  didn't see it as offensive.
3      Q.  Did you ask her if she found it
4  offensive or uncomfortable before you did it?
5      A.  No, I did not.
6      Q.  Why not?
7      A.  I didn't think to ask that question.
8      Q.  How long was your thumb gathered around
9  her hair?
10     A.  A second or two.
11     Q.  Anyone else around who you think would
12 have seen this?
13     A.  I think there was someone there that
14 caused us to be in closer proximity than normal.
15     Q.  Someone else in her work station?
16     A.  I believe so.
17     Q.  Was someone else in the work station
18 when you entered the work station to help her?
19     A.  I think so, yeah.
20     Q.  Who was it?
21     A.  I believe it was Hondo.  Hondo Blakely.
22     Q.  Do you know why he would have been
23 there?
24     A.  I believe he was getting financial

Page 146

1  information.  The cost of something.
2      Q.  So was he sitting or standing in the
3  work station?
4      A.  He would have been standing, too.
5      Q.  Was he standing?
6      A.  I would guess.
7      Q.  Do you recall?
8      A.  I don't ever recall him sitting there.
9  So I would say standing.
10     Q.  Did he see you do this, to your
11 knowledge?
12     A.  I think so.
13     Q.  Was there any way he could have missed
14 it, if he was standing right there?
15     A.  I don't know that.
16     Q.  Did he say anything to you when you did
17 it?
18     A.  He did not, no.
19     Q.  Did Jesse?
20     A.  No.  She did not then, no.
21     Q.  At some point?
22     A.  Afterwards she told me not to touch
23 her.
24     Q.  How soon after that?

Page 147

1      A.  I don't know that.
2      Q.  What did she say to you?
3      A.  Not to touch her.
4      Q.  What did you say?
5      A.  I said okay.
6      Q.  Did you apologize?
7      A.  I did not apologize.
8      Q.  Why?
9      A.  I just thought it would maybe make the
10 situation worse.
11     Q.  Why?  Because you would have been
12 acknowledging wrongdoing?
13     MS. KIRKPATRICK:  Objection.  That's
14 not what he said.
15     MS. GURMANKIN:  Yeah.  I'm asking.  Is
16 that why you didn't apologize?
17     MS. KIRKPATRICK:  Objection.
18     THE WITNESS:  No.
19 BY MS. GURMANKIN:
20     Q.  Any explanation for why you didn't
21 apologize?
22     MS. KIRKPATRICK:  He just said because
23 it might make the situation worse.
24     THE WITNESS:  That's -- that's why.

Page 148

1  BY MS. GURMANKIN:
2      Q.  Why?  Why would you think that?
3      A.  I don't know why I would think that.
4      Q.  No explanation for that?
5      A.  That was my thought.
6      MS. KIRKPATRICK:  Objection.
7  BY MS. GURMANKIN:
8      Q.  No explanation for why you thought
9  that.  Right?
10     MS. KIRKPATRICK:  Objection.
11     THE WITNESS:  Yeah.  I just thought it
12 would make the situation worse.
13 BY MS. GURMANKIN:
14     Q.  Did you ask her if it would make it
15 worse if you apologized?
16     A.  No.
17     Q.  Had you ever done that to any female
18 employee before doing it to Jesse?
19     A.  No.
20     Q.  Did you ever touch a female employee's
21 hair other than that during your time at Shell?
22     A.  Not that I recall.
23     Q.  Did you tell anyone about that at the
24 time?

Page 149

1    A.  I did not.
2    Q.  Did you think you were doing anything
3  wrong when you did it?
4    A.  No, I did not.
5    Q.  Prior to you doing that, you had
6  training at Shell on the anti-harassment,
7  anti-discrimination policy.  Correct?
8    A.  I believe so.
9    Q.  Is that the only time that you touched
10  Jesse's hair like that?
11    A.  Yes.
12    Q.  Is that the only time that you touched
13  her hair, period?
14    A.  Yes.
15    Q.  All right.  Going back to page two of
16  Exhibit 22.  If you look under that first bullet
17  point on the top of the second page, after the
18  question gets offended.  You said to Kloosterman,
19  "She gets set off pretty easily."
20        What did you mean by that?
21    A.  She just gets mad easy.
22    Q.  When?
23    A.  When she gets upset.
24    Q.  One example being when you touched her

Page 150

1  hair?
2    A.  I would say yes.
3    Q.  Did you tell Kloosterman that was an
4  example of what you meant when you said she gets
5  set off pretty easily?
6    A.  I did not tell her that.
7    Q.  How come?
8    A.  I don't know that I was asked.
9    Q.  Were you told that you could only
10  answer to specific questions that you were asked?
11    A.  No.
12    Q.  Were you asked specifically if Jesse
13  gets set off pretty easily?
14    A.  I don't believe so, no.
15    Q.  So why did you say that she gets set
16  off pretty easily, even though you weren't
17  specifically asked?
18    A.  Because she does.
19    Q.  But she also -- one example of that was
20  when you touched her hair.  Right?
21    A.  Yes.
22    Q.  So why didn't you tell Kloosterman
23  that, even though she didn't specifically ask?
24    A.  I have no reason.

Page 151

1    Q.  You said she has something against Dan.
2  What is your basis for that?
3    A.  She said so.
4    Q.  She told you she has something against
5  Dan?
6    A.  Oh, she told everyone she didn't like
7  Dan.
8    Q.  Did she tell you that she has something
9  against Dan?
10    A.  Not in those words.
11    Q.  What words did she use?
12    A.  I don't like him.
13    Q.  Did she say why?
14    A.  Because he stinks.
15    Q.  Is that what she said?
16    A.  Yes.
17    Q.  Did you know what she meant by that?
18    A.  Yes.
19    Q.  What?
20    A.  That she didn't like him because he
21  stank.
22    Q.  His smell or his performance or his
23  work?
24    A.  Smell.

Page 152

1    Q.  She said she didn't like him because he
2  smelled; well she used the word stink?
3    A.  I believe so.
4    Q.  Is this just to you?
5    A.  No.  To him, as well.
6    Q.  Okay.  But I mean she told you one on
7  one that she didn't like Dan because he stank?
8    A.  No.  I think she said it to both of us.
9    Q.  At the same time?
10    A.  Yes.
11    Q.  When was this?
12    A.  After he started working there.
13    Q.  When?
14    A.  I don't know when.
15    Q.  Did you say anything when she said
16  this?
17    A.  No.
18    Q.  Did he?
19    A.  I don't recall.
20    Q.  What was the context?  Did she just
21  come up to the two of you and say she doesn't like
22  Dan because he stinks?
23    A.  I don't know.  We were all working
24  together, and I do recall that she said that.

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Page 153

1 Q.  But you don't recall what the rest of
2 the discussion was?
3  A.  I do not.
4  Q.  Did you tell Kloosterman that she had
5 said she didn't like Dan because he stinks?
6  A.  I don't know if I did or didn't.
7  Q.  You don't remember?
8  A.  I do not remember.
9  Q.  Did Kloosterman ask you what she had
10 against Dan?
11  A.  I don't know that, either.
12  Q.  You don't remember?
13  A.  No, I don't.
14  Q.  Do you remember if Kloosterman asked
15 you whether what she had against Dan was that Dan
16 harassed her or acted inappropriately towards her?
17  MS. KIRKPATRICK:  Objection.
18  THE WITNESS:  Ask that again.
19  MS. GURMANKIN:  Um-hmm.
20 BY MS. GURMANKIN
21  Q.  Did Kloosterman ask you whether what
22 Jesse had against Dan had to do with anything
23 inappropriate that Dan did?
24  MS. KIRKPATRICK:  Objection.

Page 154

1  THE WITNESS:  I don't know that.
2 BY MS. GURMANKIN
3  Q.  All right.  Going to the chart on page
4 two.  We'll start with the first claim.  "I am
5 continuously asked about my personal life by my
6 supervisor."
7  And then your response, according to
8 Kloosterman is, "She is a very private person.
9 She doesn't talk about enough to let people into
10 her life enough to be able to help her."
11  What are you talking about?
12  A.  So I'm reading here.  What was your
13 question?
14  Q.  What are you talking about?
15  A.  You're going to have to ask more of a
16 question than that.
17  Q.  When you said she doesn't talk about
18 enough to let people into her life enough to be
19 able to help her, what are you talking about?
20  A.  I don't know what I was talking about
21 at that time.
22  Q.  Did you think there was anything
23 inappropriate about Jesse being private?
24  A.  No.

Page 155

1  Q.  Are you trying to suggest to
2 Kloosterman that there is?
3  A.  No.
4  Q.  You go on to say, "She doesn't like to
5 take advice from older people.  Occasionally she
6 has taken time off and things become known.  She
7 keeps them separate way better than the guys do."
8  What things became known?
9  A.  I don't know what it was I was talking
10 about that time.
11  Q.  You go on to say, "As far as Will
12 prying in on that, a lot of times conversations
13 between those two don't happen at our cubicle.
14 Will is always talking.  I've never seen him talk
15 with an agenda.  He likes to hear himself talk.
16 I've worked for narcissistic people who are way
17 worse."
18  Did you think Turney was narcissistic?
19  A.  He was very proud of his
20 accomplishments.
21  Q.  Does that mean narcissistic?
22  A.  He was proud of his accomplishments.
23 I'll go that far.
24  Q.  Is that what you meant by narcissistic?

Page 156

1  A.  Yes.
2  Q.  What -- did he brag about his
3 accomplishments?
4  A.  He was proud that he had worked his way
5 up from being a laborer to a supervisor.
6  Q.  So what about that did you think was
7 narcissistic?
8  A.  He just talked about himself a lot.
9  Q.  Do you think it was inappropriate?
10  A.  No.
11  Q.  Did you ever hear Turney ask Jesse
12 about her personal life?
13  A.  No.
14  Q.  Did you ever hear Turney ask Jesse on
15 Monday mornings or Mondays if he missed her -- if
16 she missed him over the weekend?
17  A.  No.
18  Q.  Did you ever hear him say that to
19 anyone?
20  A.  No.
21  Q.  Next claim in the chart.  "My
22 supervisor touches my arm and/or leg the majority
23 of the time I have a meeting or talk to him one on
24 one."

39 (Pages 153 to 156)

Page 157

```
 1          You say, according to Kloosterman, "Any
 2   touch is too much.  She does not like to be
 3   touched.  I don't know if she (sic) has touched
 4   her."
 5          What did you mean when you said any
 6   touch is too much, she does not like to be
 7   touched?
 8       A.  I knew that Jesse didn't like to be
 9   touched, because I had seen her reaction when I
10   touched her or when other people touched her that
11   she didn't like to be touched.
12       Q.  Who else touched her?
13       A.  His name I will come up with.  Dalton
14   Marshal.
15       Q.  Who is that?
16       A.  Our trainer from Calgary.
17       Q.  Man?
18       A.  Yes.
19       Q.  When did he touch her?
20       A.  When he arrived from Calgary one day.
21       Q.  Tell me what happened.
22       A.  He tried to greet Jesse with a hug and
23   she wasn't receptive to that.
24       Q.  Did he actually hug her?
```

Page 159

```
 1   say anything to anyone at Shell about what you saw
 2   with Dalton from Calgary trying to give her a hug?
 3          MS. KIRKPATRICK:  Other than what you
 4   may have said to counsel.
 5          THE WITNESS:  No, I don't think so.
 6   No.
 7   BY MS. GURMANKIN:
 8       Q.  Did he stop trying to give her a hug
 9   when he saw her reaction?
10       A.  Yeah.  Yeah.
11       Q.  Did he say anything?
12       A.  I don't recall.  I don't think so, but
13   I don't recall.
14       Q.  Did you ever see Turney touch Jesse?
15       A.  No.
16       Q.  Did you ever see Turney touch a female
17   employee or contractor with Shell?
18       A.  No.  I don't think so.  No.
19       Q.  So going back to the second claim in
20   the chart on page two.  You said, "If it happened
21   and I was a witness to it, it wasn't in a sexual
22   way."
23          What are you talking about?
24       A.  I -- yeah, I don't know that I ever
```

Page 158

```
 1       A.  I don't know that he hugged her.  He
 2   started to or tried to, and her reaction said
 3   don't do that.
 4       Q.  So he got as far as touching her?
 5       A.  Yes.
 6       Q.  And what was her reaction?
 7       A.  She pulled away or she did something.
 8   I don't know exactly what.
 9       Q.  But enough to indicate she didn't
10   want --
11       A.  To be touched.
12       Q.  -- to be touched.  You saw this?
13       A.  I did.
14       Q.  Anyone else around?
15       A.  I don't know.
16       Q.  Did you say anything?
17       A.  Not then.
18       Q.  At some point?
19       A.  You're going to have to ask a clearer
20   question than that.
21       Q.  You said you didn't say anything then.
22   Did you say something at some point after that?
23       A.  Now?
24       Q.  No.  Between then and today, did you
```

Page 160

```
 1   seen him touch anyone.  So...
 2       Q.  Okay.  Well, you're not sure if you saw
 3   him touch Jesse, or you never saw him touch Jesse?
 4          MS. KIRKPATRICK:  Objection.  He said
 5   he never saw it.
 6          THE WITNESS:  I never saw him touch
 7   Jesse.
 8   BY MS. GURMANKIN:
 9       Q.  All right.  Then why did you say it
10   wasn't in a sexual way, if it happened and I was a
11   witness to it?  Explain that to me.
12       A.  Well, it might have been like
13   inadvertent touching or something like that.  You
14   know, they touch -- their hands touched or
15   something.
16       Q.  You never saw Turney touch her at all.
17   Right?
18       A.  That's what I'm saying there.  If I was
19   there and they touched, it wasn't anything meant
20   by it.  It was just a touch.
21       Q.  Well, how can you say that if you never
22   saw them touching?
23       A.  I can't say that I ever did see them
24   touching.
```

40 (Pages 157 to 160)

1     Q.  Did you tell Kloosterman I never saw
2  them -- wait.  I'm sorry.  Did you -- you can't
3  say that you never saw them touching?  Is that
4  what you just said?
5     MS. KIRKPATRICK:  Objection.  That's
6  not what he said.
7     THE WITNESS:  I never -- I don't recall
8  ever seeing them touch.
9  BY MS. GURMANKIN
10     Q.  Okay.  Can you testify under oath that
11  you never saw them touching?
12     MS. KIRKPATRICK:  He just did.  Answer
13  the question.
14  BY MS. GURMANKIN
15     Q.  Is your testimony under oath that you
16  never saw Turney touch Jesse?
17     A.  Yes.
18     Q.  Okay.  Why didn't you tell Kloosterman
19  that?
20     A.  I don't know.
21     Q.  Did you?
22     MS. KIRKPATRICK:  Well, I don't know if
23  she has.
24

1  BY MS. GURMANKIN:
2     Q.  Did you tell Kloosterman that?
3     A.  I think she wrote down what I said.
4     Q.  Well, it doesn't look like from what
5  she wrote down that you told her that.  Right?
6     MS. KIRKPATRICK:  Objection.
7     THE WITNESS:  I don't know how the
8  question was asked to me.
9  BY MS. GURMANKIN:
10     Q.  That wasn't my question.  Did you tell
11  her that you never saw Turney touch Jesse?
12     MS. KIRKPATRICK:  Objection.
13     THE WITNESS:  I don't think so.
14  BY MS. GURMANKIN
15     Q.  Why?
16     A.  I don't know if that was an answer to
17  her question.
18     Q.  Do you remember what she asked you that
19  led you to say if it happened and I was a witness
20  to it, it wasn't in a sexual way?
21     A.  I do not.
22     Q.  How can you say that if it happened and
23  I was a witness to it, it wasn't in a sexual way
24  if you never saw Turney touch Jesse?

1     MS. KIRKPATRICK:  Objection.  We
2  already went through this.  You can tell her
3  again.
4     THE WITNESS:  I never seen her touch --
5  yeah -- seen him touch her.  I don't know what was
6  asked of me.  I don't know why that answer is
7  that.
8  BY MS. GURMANKIN:
9     Q.  Did you have any explanation as to why
10  you never told Kloosterman that you never saw
11  Turney touch Jesse?
12     MS. KIRKPATRICK:  Objection.  He said
13  he doesn't know whether the question was asked.
14     MS. GURMANKIN:  That wasn't my
15  question.
16  BY MS. GURMANKIN
17     Q.  Did you have any explanation for why
18  you never told Kloosterman that you never saw
19  Turney touch Jesse?
20     MS. KIRKPATRICK:  Objection.  He said
21  he doesn't know what question was asked.  You can
22  tell her again.
23     MS. GURMANKIN:  That wasn't my
24  question.

1     MS. KIRKPATRICK:  And you can give her
2  the same answer.
3  BY MS. GURMANKIN
4     Q.  My question is do you have any
5  explanation for why you didn't tell Kloosterman
6  that you never saw Turney touch Jesse?
7     MS. KIRKPATRICK:  Objection.  He
8  already answered it.
9     THE WITNESS:  Yes.  I don't know what
10  question was asked.
11  BY MS. GURMANKIN
12     Q.  My question is different.  Do you have
13  any explanation for why you did not tell
14  Kloosterman that you never saw Turney touch Jesse?
15     MS. KIRKPATRICK:  Objection.  He said
16  two times now he's not sure what question was
17  asked.
18     MS. GURMANKIN:  That's not my question.
19     MS. KIRKPATRICK:  You can tell her
20  again.
21  BY MS. GURMANKIN:
22     Q.  Why didn't you tell her at any point
23  during this approximately 20 minute meeting that
24  you never saw Turney touch Jesse?

1    MS. KIRKPATRICK: Objection.
2    THE WITNESS: I don't know if I was
3  asked that.
4  BY MS. GURMANKIN
5    Q.  You gave information that you weren't
6  specifically asked about. We have talked about
7  that throughout this deposition. Right?
8    MS. KIRKPATRICK: Objection. It's not
9  what he said.
10    MS. GURMANKIN: Right?
11    MS. KIRKPATRICK: He answered the
12  question.
13    THE WITNESS: What was --
14  BY MS. GURMANKIN:
15    Q.  You gave Kloosterman information that
16  she did not specifically ask you during the
17  meeting. Right?
18    MS. KIRKPATRICK: Objection. That's
19  not what he said.
20  BY MS. GURMANKIN
21    Q.  Is that right?
22    A.  I don't know what I was asked.
23    Q.  Well, let's go through this again.
24    We talked about the fact that you told

1  Kloosterman that you thought Jesse had something
2  against Dan, even though she didn't specifically
3  ask you whether Jesse had something against Dan.
4  Right?
5    A.  I did.
6    Q.  Okay. And we talked about the fact
7  that you told Kloosterman that Jesse gets set off
8  pretty easily, even though she didn't
9  specifically -- even though Kloosterman didn't
10  specifically ask you that. Right?
11    MS. KIRKPATRICK: Objection.
12    THE WITNESS: I don't know if she asked
13  me that or not.
14  BY MS. GURMANKIN:
15    Q.  And we talked about the fact that you
16  told Kloosterman that there have been lots of
17  times when Jesse has been mad at you and Dan, even
18  though Kloosterman didn't specifically ask you
19  that. Right?
20    MS. KIRKPATRICK: Objection.
21    THE WITNESS: I don't know how many
22  times she asked, if she asked any times.
23  BY MS. GURMANKIN:
24    Q.  Did she ask you specifically whether

1  Jesse had been mad at you and Dan?
2    A.  I don't know.
3    Q.  You don't remember?
4    A.  Yeah. I just don't know.
5    Q.  All right. Well, in any case, you did
6  tell her that you thought Jesse had something
7  against Dan, even though she didn't specifically
8  ask you.
9    MS. KIRKPATRICK: Objection.
10  BY MS. GURMANKIN
11    Q.  So why wouldn't you tell her that you
12  never saw Turney touch Jesse even if she didn't
13  specifically ask you?
14    MS. KIRKPATRICK: Objection.
15    THE WITNESS: I was just volunteering
16  information, I guess. I don't know.
17  BY MS. GURMANKIN
18    Q.  Why didn't you volunteer that
19  information?
20    A.  Ask that question again.
21    Q.  Sure. Why didn't you volunteer that
22  information, that you never saw Turney touch
23  Jesse?
24    MS. KIRKPATRICK: He says if it

1  happened.
2    THE WITNESS: Yeah.
3  BY MS. GURMANKIN
4    Q.  Why didn't you ever volunteer to
5  Kloosterman the information that you never saw
6  Turney touch Jesse?
7    MS. KIRKPATRICK: Objection.
8    THE WITNESS: That question wasn't
9  clear. Would you say that again?
10  BY MS. GURMANKIN:
11    Q.  Sure. Why didn't you ever volunteer to
12  Kloosterman that you never saw Turney touch Jesse?
13    MS. KIRKPATRICK: Objection.
14    THE WITNESS: I think I did say that.
15  BY MS. GURMANKIN:
16    Q.  You told Kloosterman that you never saw
17  Turney touch Jesse?
18    A.  I think I do right there, I do not know
19  if -- yeah, it's he has touched her.
20    Q.  Did you --
21    A.  I don't -- yeah, I don't know. If I
22  would have seen it, then I would know. So I don't
23  know. I didn't see it.
24    Q.  But you're saying now that you never

42 (Pages 165 to 168)

Page 169

```
 1    saw Turney touch Jesse.  Right?
 2        A.   That's what I testified.
 3        MS. KIRKPATRICK:  Objection.  That's
 4    what he said then, too.
 5    BY MS. GURMANKIN:
 6        Q.   So why didn't you tell Kloosterman that
 7    you never saw Turney touch Jesse; not I don't know
 8    if he's touched her but that you never saw it?
 9        A.   I don't know if that was --
10        MS. KIRKPATRICK:  Objection.
11        THE WITNESS:  -- the question that was
12    asked.
13    BY MS. GURMANKIN:
14        Q.   Regardless of whether it was the
15    question, did you ever tell Kloosterman that you
16    never saw Turney touch Jesse?
17        MS. KIRKPATRICK:  Objection.  Asked and
18    answered a hundred times.
19        THE WITNESS:  Yeah.
20        MS. GURMANKIN:  What's your answer?
21        MS. KIRKPATRICK:  You can keep telling
22    her.
23    BY MS. GURMANKIN:
24        Q.   Did you tell Kloosterman that you never
```

Page 170

```
 1    saw Turney touch Jesse?
 2        MS. KIRKPATRICK:  Objection.
 3        THE WITNESS:  I don't think I did.
 4    BY MS. GURMANKIN:
 5        Q.   Why?
 6        A.   I don't know.
 7        Q.   You don't know why.  Right?
 8        MS. KIRKPATRICK:  Objection.
 9        THE WITNESS:  Don't -- what was your
10    question now?
11    BY MS. GURMANKIN:
12        Q.   Did you tell Kloosterman that you never
13    saw Turney touch Jesse?
14        MS. KIRKPATRICK:  Objection.
15        THE WITNESS:  I don't know if I did.
16    BY MS. GURMANKIN:
17        Q.   You don't remember?
18        A.   Right.
19        MS. KIRKPATRICK:  Objection.
20        MS. GURMANKIN:  Okay.  Take a break to
21    change the tape.
22        THE VIDEOGRAPHER:  This will conclude
23    file number two in the videotaped deposition of
24    Ken Foreman in the matter of Barnes v. Shell, et
```

Page 171

```
 1    al.  We are going off the record at 3:00 p.m.
 2        (A recess was taken from 3:00 to 3:11
 3    p.m.)
 4        THE VIDEOGRAPHER:  We are going back on
 5    the record at 3:11 p.m.
 6    BY MS. GURMANKIN:
 7        Q.   Have you spoken to anyone during the
 8    breaks in your deposition today?
 9        A.   No.
10        Q.   Going back to page two of Exhibit 22.
11    Second row on the chart, the last sentence you
12    say, according to Kloosterman, "He is outgoing, so
13    friendly touches would not be surprising."
14        What did you mean by friendly touches?
15        A.   Just like Will touching people or
16    something like that (indicating) would not be -- I
17    know that he's touched me in a meeting or
18    something like that; hey, hey, hey (indicating),
19    you know, something like that.
20        Q.   Has he touched you in a meeting?
21        A.   Just like on my arm or my leg or
22    something.
23        Q.   Where on your leg?
24        A.   Just on the big part of my leg, the
```

Page 172

```
 1    top, I guess.
 2        Q.   Your thigh?
 3        A.   Yeah.  Or (indicating) whatever -- on
 4    my leg.
 5        Q.   On your thigh or your lower leg?
 6        MS. KIRKPATRICK:  Do you know what the
 7    thigh is?  He's indicating his upper leg.
 8        THE WITNESS:  Upper leg.
 9    BY MS. GURMANKIN:
10        Q.   Do you know that's your thigh?
11        A.   I do now.
12        Q.   You never heard that before?
13        A.   I'm not sure.
14        Q.   How did Turney touch you on your thigh?
15        A.   Like with his hand (indicating), to get
16    my attention to write something down or do
17    something like that.
18        Q.   Did he rest his hand on your thigh?
19        A.   No.
20        Q.   How long did he have his hand on your
21    thigh?
22        A.   It was just like touching.
23        Q.   How many times?
24        A.   How many -- I don't get what your
```

43 (Pages 169 to 172)

Page 173

1   question is.
2       Q.  How many times did he touch your thigh?
3       A.  You are going to have to ask a bigger
4   question than that.
5       Q.  Sure.  During your employment, how many
6   times did Turney touch your thigh?
7       A.  So there's one time that I remember.
8       Q.  Um-hmm.
9       A.  And it was like tap, tap, tap kind of
10  thing (indicating).  That's why I'm asking.  So
11  three or something.
12      Q.  All on your thigh?
13      A.  Yeah, like (indicating) hey.  Get my
14  attention kind of thing.
15      Q.  Um-hmm.  Did he ever lean against you?
16      THE COURT REPORTER:  I'm sorry.  Did he
17  ever?
18      MS. GURMANKIN:  Lean.
19      THE COURT REPORTER:  Thank you.
20      THE WITNESS:  Not that I recall.
21  BY MS. GURMANKIN:
22      Q.  Did he ever put his arm around your
23  waist?
24      A.  No.

Page 174

1       Q.  Did you ever see him touch anyone else
2   or just you?
3       A.  I don't know if I have ever seen him
4   touch anyone else.  I can't say for a fact that I
5   have.
6       Q.  Not that you can think of, as you sit
7   here today.  Right?
8       A.  That's more it than the other way,
9   yeah.
10      Q.  That's accurate?
11      A.  Yes.
12      Q.  Okay.  Did you tell Kloosterman that
13  Turney had touched your thigh?
14      A.  No.
15      Q.  Why not?
16      A.  I don't believe it was asked.
17      Q.  Other than her not asking specifically
18  whether Turney touched your thigh, any other
19  reason why you didn't volunteer that information?
20      MS. KIRKPATRICK:  Objection.
21      THE WITNESS:  No.
22  BY MS. GURMANKIN
23      Q.  Does this -- what Turney -- I'm sorry.
24  What Kloosterman wrote about your responses in

Page 175

1   this column about touching, is there anywhere in
2   there where her notes indicate where you told her
3   that you touched Jesse's hair?
4       A.  Where am I looking at?
5       Q.  Second row of the claims chart on page
6   two.
7       MS. KIRKPATRICK:  "My supervisor
8   touches my arm and/or leg."
9       THE WITNESS:  I'm there.
10  BY MS. GURMANKIN:
11      Q.  Yep.  Looking at your response that
12  we've been talking about, anywhere in there that
13  it indicates that you told Kloosterman that you
14  touched Jesse's hair?
15      A.  No.
16      Q.  Do you recall now whether or not you
17  told her that?
18      MS. KIRKPATRICK:  We went through this.
19      MS. GURMANKIN:  He went back and forth.
20  I'm asking what his recollection is right now.
21      THE WITNESS:  It's over on four.
22  Right?
23      MS. KIRKPATRICK:  So to get to the next
24  page, if you want page four, you have to do this.

Page 176

1   You can't just swipe it with your finger.
2       THE WITNESS:  So she asked me and I
3   told her yeah.
4   BY MS. GURMANKIN:
5       Q.  Where are you looking?
6       A.  On page four.
7       Q.  Where is that?
8       A.  Six boxes at the top of the page.  It's
9   in box three and four of those six.
10      Q.  All right.  So three says, "A coworker
11  has put his hands through my hair without
12  permission."
13      Is that the one you are looking at?
14      A.  Yes.
15      Q.  And your response, according to
16  Kloosterman, is "I touched her before and she does
17  not like to be touched.  And I stopped when she
18  told me don't ever touch me."  Is that accurate?
19      A.  Yes.
20      Q.  Does it say anywhere in there that you
21  touched Jesse's hair?
22      A.  It does not.
23      Q.  Did you tell her that?
24      A.  I don't think so.

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Page 177

1      Q.  How come?
2      A.  I wasn't asked.
3      Q.  You told Kloosterman other things that
4   weren't specifically asked.  Why not this?
5          MS. KIRKPATRICK:  Objection.
6          THE WITNESS:  I don't know.
7   BY MS. GURMANKIN
8      Q.  Was your touching Jesse's hair what you
9   would categorize as a friendly touch?
10     A.  I don't get the question.
11     Q.  We went over your telling Kloosterman
12  that Turney's outgoing to friendly touches would
13  not be surprising.  Then you said the way he
14  touched you was a friendly touch.  Is that right?
15     A   (Witness nodded in the affirmative.)
16     Q.  Yes?
17     A.  Yes.
18     Q.  The way that you touched Jesse's hair,
19  was that what you would classify as a friendly
20  touch?
21     A.  Yes.
22     Q.  Did you do that friendly touch to any
23  other female employee at Shell?
24         MS. KIRKPATRICK:  Objection.  Asked and

Page 178

1   answered.  You can tell her again.
2          THE WITNESS:  No.
3   BY MS. GURMANKIN:
4      Q.  Or any female contractor?
5      A.  No.
6      Q.  On page three, please.
7          MS. GURMANKIN:  What are you showing
8   your lawyer?
9          THE WITNESS:  That it will move back
10  and forth.
11  BY MS. GURMANKIN
12     Q.  On page three, the first full paragraph
13  in the chart on the right side.  It says, "Will is
14  very smart and hardworking, too.  But those two,
15  in the beginning it was very happy, friendly,
16  outgoing.  Will came in as a new supervisor.  We
17  were in the storming phase of our team, figuring
18  out how to work together.  It seemed like things
19  were on the up and up and it wasn't as
20  professional as it was today.  Then Jesse started
21  getting offended by whatever.  It really doesn't
22  take much."
23         What did you mean by that, then Jesse
24  started getting offended by whatever, it really

Page 179

1   doesn't take much?
2      A.  That she just seemed to be getting
3   offended easy by anything that happened.
4      Q.  What's anything?
5      A.  Being asked to do her job.
6      Q.  She was offended when she was asked to
7   do her job?
8      A.  Yes.
9      Q.  Who asked her that?
10     A.  Will.
11     Q.  And anyone else?
12     A.  Was that a question?
13     Q.  Yeah.  Anyone else?
14     A.  No.
15     Q.  How did she get offended when Turney
16  asked her to do her job?
17     A.  I don't know how she got offended.
18     Q.  Well, then what was the basis for you
19  testifying to that?
20     A.  She came to me and told me that she did
21  not know what he was asking her to do.
22     Q.  Okay.  Did she tell you she was
23  offended?
24     A.  Oh, she was mad.  She was really mad.

Page 180

1      Q.  When was this?
2      A.  Towards the end of the time that she
3   was maintenance analyst.
4      Q.  Still close to this meeting with
5   Kloosterman in December of 2016?
6      A.  Probably so, yes.
7      Q.  And she comes to you and says that she
8   doesn't know what Turney is asking her to do?
9      A.  Yes.
10     Q.  And she's really mad?
11     A.  She was very mad.
12     Q.  How did that manifest?  How did she
13  express that?
14     A.  She was -- she was mad.
15     Q.  How did she express it?
16     A.  I could tell by her body language, her
17  language, her facial -- her facial expression that
18  she was mad.
19     Q.  What about her language?
20     A.  It wasn't a calm voice.
21     Q.  Okay.  So it was her tone of voice?
22     A.  There we go.  Yeah.
23     Q.  Was she yelling?
24     A.  No, I wouldn't say she was yelling, but

45 (Pages 177 to 180)

Page 181

1    her tone of voice said that I'm upset.
2        Q.   What about her body language?
3        A.   Same thing.
4        Q.   What about her facial expression?
5        A.   Same thing again.
6        Q.   All right.  And did she say anything to
7    you when she comes over other than I don't know
8    what Will is asking me to do, or words to that
9    effect?
10       A.   No.  That's what she said.
11       Q.   Word for word?
12       A.   Yes.
13       Q.   Okay.  And what did you say?
14       A.   You can put that one in quotes, yes.
15   Huh?
16       Q.   What did you say?
17       A.   I didn't know what he wanted her to do,
18   either.  I didn't have anything to say.
19       Q.   Oh.  Did she -- did you understand her
20   expressing that he wasn't being clear when he gave
21   her assignments?
22           MS. KIRKPATRICK:  Objection.
23           THE WITNESS:  I didn't know what --
24

Page 182

1    BY MS. GURMANKIN:
2        Q.   Okay.  So you didn't say anything?
3        A.   I didn't say anything.
4        Q.   So what happens?  Does she walk away?
5    Does she --
6        A.   Yeah, we went our separate ways.
7        Q.   So she comes over to you and says I
8    don't know what Will wants me to do, word for
9    word, you don't say anything, and then she just
10   walks away?
11           MS. KIRKPATRICK:  Objection.
12   BY MS. GURMANKIN:
13       Q.   Is that it?
14       A.   She showed up to her work cubicle,
15   announced, where I heard I don't know what Will
16   wants me to do.  And I think she sat down and
17   started working on her work or whatever.
18       Q.   Okay.  So she didn't come over to talk
19   to you specifically?
20       A.   No.
21       Q.   She was coming back to her cube?
22       A.   Yes.
23       Q.   Which was right in front of yours?
24       A.   Behind me.

Page 183

1        Q.   Okay.  And you concluded from that that
2    she was offended by whatever?
3        A.   Yeah.  Something had -- something Will
4    had said had set her off.
5        Q.   Did you ask her what it was?
6        A.   No.
7        Q.   How come?
8        A.   I didn't want to know.
9        Q.   Why not?
10       A.   It wasn't any of my business.
11       Q.   Anything else that you referred to when
12   you told Kloosterman that Jesse started getting
13   offended by whatever?
14       A.   I don't know what more there may have
15   been.  I don't remember anything that sticks out.
16       Q.   That's all you can think of?
17       A.   Yes.
18       Q.   And you followed that with, it really
19   doesn't take much.  Do you see that?
20       A.   I do.
21       Q.   What was your basis for saying that, if
22   you don't know what Turney said to her, that led
23   to her coming over to her desk and saying I don't
24   know what Will wants me to do?

Page 184

1        A.   One more time with that question.
2        Q.   Sure.  What was your basis for saying
3    it really doesn't take much?
4        A.   She got mad easy, and I know that.
5        Q.   But you don't actually know what Turney
6    said to her that led to her coming back to her
7    desk and saying I don't know what Will wants me to
8    do?
9        A.   That's true.
10       Q.   So how can you say that it really
11   doesn't take much?
12       A.   I knew that she was mad.  In this case
13   I didn't know what it took to set her off.
14       Q.   So you don't know whether or not it
15   took much?
16       A.   I don't.
17       Q.   So did you have any basis for saying
18   that to Kloosterman?
19           MS. KIRKPATRICK:  Objection.  He has
20   testified to that.  You can answer.  The basis for
21   why you said it really doesn't take much.
22   BY MS. GURMANKIN:
23       Q.   No.  Did you have any basis for saying
24   that to Kloosterman?

46 (Pages 181 to 184)

Page 185

1      MS. KIRKPATRICK: He just told you.
2      THE WITNESS: I know that it doesn't
3 take much to set --
4 BY MS. GURMANKIN:
5      Q. The only example that you're telling me
6 that she was offended by whatever was the example
7 of her coming back to her desk and saying I don't
8 know what Will wants me to do. Right?
9      A. That's the only example that I can
10 think of now.
11      Q. That's all you can think of?
12      A. Right now.
13      Q. So you don't know what Turney said to
14 her to have her -- that made her come back to her
15 desk and say that. Right?
16      A. I do not.
17      Q. So what's your basis for saying it
18 really doesn't take much?
19      MS. KIRKPATRICK: Objection. Asked and
20 answered.
21      THE WITNESS: It doesn't take much.
22 BY MS. GURMANKIN:
23      Q. Okay. What are you referring to?
24      A. She gets mad easy.

Page 186

1      Q. What are you referring to?
2      MS. KIRKPATRICK: Objection. He's
3 talked about this.
4 BY MS. GURMANKIN:
5      Q. What are you referring to?
6      MS. KIRKPATRICK: He has talked about
7 when they were being loud, when they --
8      MS. GURMANKIN: Hey, stop testifying.
9      MS. KIRKPATRICK: No. You are
10 mischaracterizing.
11      MS. GURMANKIN: No, I'm not. I haven't
12 asked him at all, this, before.
13 BY MS. GURMANKIN:
14      Q. When you said to Kloosterman it really
15 doesn't take much, what are you referring to?
16      MS. KIRKPATRICK: Tell her again.
17      THE WITNESS: That Jesse gets mad easy.
18 BY MS. GURMANKIN:
19      Q. How?
20      MS. KIRKPATRICK: Objection.
21      THE WITNESS: I don't know how people
22 get mad. She just gets mad easy.
23 BY MS. GURMANKIN:
24      Q. When?

Page 187

1      MS. KIRKPATRICK: Objection.
2      THE WITNESS: Whenever she gets mad.
3 BY MS. GURMANKIN
4      Q. How many times did you see her mad?
5      MS. KIRKPATRICK: Objection.
6      THE WITNESS: I don't know. I don't
7 know.
8 BY MS. GURMANKIN
9      Q. Did Kloosterman ask you what you meant
10 by that?
11      A. I don't think so.
12      Q. Immediately after you say Jesse started
13 getting offended by whatever, it really doesn't
14 take much, you talked about the incident where
15 Dalton had started to give her a hug. Right? Do
16 you see that?
17      A. I do, yes.
18      Q. Were you connecting that to your
19 statement that she started getting offended by
20 whatever, it really doesn't take much, or were
21 those two separate thoughts?
22      A. I don't know.
23      Q. Well, do you have any other explanation
24 as to why you would have said it immediately after

Page 188

1 saying that Jesse started getting offended by
2 whatever, it really doesn't take much, unless you
3 were setting that as an example?
4      A. Looks like the Dalton example is what I
5 was talking about.
6      Q. And what was your basis, as a result of
7 that example, to say that she started getting
8 offended by whatever, it really doesn't take much?
9      Let me ask it this way. Did you think
10 that she was overreacting by kind of reacting to
11 let Dalton know that she didn't want him to hug
12 her?
13      A. Did I think she was overreacting?
14      Q. Um-hmm.
15      A. No.
16      Q. Then why are you citing that as an
17 example to your telling Kloosterman that she
18 started getting offended by whatever and it really
19 doesn't take much?
20      A. I just know that Jesse gets mad easy.
21      Q. Why were you citing that incident as an
22 example to you telling Kloosterman that she
23 started getting offended by whatever, it really
24 doesn't take much?

47 (Pages 185 to 188)

Page 189

1    MS. KIRKPATRICK: Objection. He just
2  told you. Tell her again.
3    THE WITNESS: That she -- I'm just
4  saying she gets mad easy.
5  BY MS. GURMANKIN:
6    Q. My question is specifically why you
7  cited the incident with Dalton trying to give her
8  a hug in connection with you telling Kloosterman
9  that she started getting offended by whatever, it
10  really doesn't take much.
11    What was it about that incident that
12  led you to use that as an example to she started
13  getting offended by whatever, it really doesn't
14  take much?
15    MS. KIRKPATRICK: Objection.
16    THE WITNESS: I didn't think that her
17  reaction was -- she got mad instead of, you know,
18  just stopping him or something like that.
19  BY MS. GURMANKIN:
20    Q. How --
21    A. She got mad at it.
22    Q. How did she get mad?
23    A. Same thing as I've said before. Her
24  body language changes and her, you know, face

Page 190

1  changes. You can tell that she is mad.
2    Q. So your issue was that she reacted
3  differently than you thought she should have when
4  she started getting a hug that she didn't want?
5    MS. KIRKPATRICK: Objection. That's
6  not what he said.
7    THE WITNESS: No.
8    MS. GURMANKIN: Okay.
9    THE WITNESS: It just -- I didn't see
10  it as anything to be mad about.
11  BY MS. GURMANKIN:
12    Q. Did you consider that maybe she did?
13    A. Afterwards, yes.
14    Q. Well, then why would you say to
15  Kloosterman that she started getting offended by
16  whatever, it really doesn't take much in
17  connection with that example where she is getting
18  a hug that she doesn't want?
19    MS. KIRKPATRICK: He just told you.
20  You can tell her again. Objection.
21    THE WITNESS: Yeah, I didn't think the
22  reaction was -- I thought it was an overreaction,
23  or it just didn't seem appropriate, her reaction.
24

Page 191

1  BY MS. GURMANKIN:
2    Q. As opposed to Dalton giving her a hug
3  without asking if she wants one. Right?
4    MS. KIRKPATRICK: Objection.
5    THE WITNESS: I didn't see that as
6  really a problem.
7  BY MS. GURMANKIN:
8    Q. You didn't think about that, did you?
9    A. I did afterwards.
10    Q. When afterwards?
11    A. After it happened.
12    Q. Before you're talking to Kloosterman?
13    A. Yes.
14    Q. Did you talk to Dalton about the fact
15  that he needs to think about whether or not a
16  woman is going to welcome a hug before he starts
17  to give her one?
18    A. I didn't talk to Dalton about it at
19  all.
20    Q. Did you talk to Jesse and see if she
21  was okay about the fact that a male employee had
22  started to give her a hug when she clearly didn't
23  want one?
24    MS. KIRKPATRICK: Objection. That's

Page 192

1  not how he described it happening.
2    THE WITNESS: No.
3  BY MS. GURMANKIN
4    Q. Did you talk to anyone at Shell about
5  that?
6    MS. KIRKPATRICK: Objection.
7    THE WITNESS: I did not.
8  BY MS. GURMANKIN:
9    Q. Did you tell Kloosterman that?
10    MS. KIRKPATRICK: Objection.
11    THE WITNESS: What was the question?
12  BY MS. GURMANKIN:
13    Q. Did you tell Kloosterman that you
14  thought that Jesse -- strike that.
15    Next row. "I've been called a bitch by
16  numerous people in office." Your response is,
17  "Yes, but it is because of her mood."
18    Did you understand, as a result of your
19  training with Shell, that that did not violate
20  policy if it was said because of her mood?
21    THE WITNESS: One more time. I'm
22  sorry.
23  BY MS. GURMANKIN:
24    Q. Sure. Based on the training that you

48 (Pages 189 to 192)

Page 193

1   had at Shell, did you believe it was not a
2   violation of policy to call her a bitch because of
3   her mood?
4       A.  I'm trying to figure if you've got a
5   double negative in here.
6       MS. KIRKPATRICK:  If you don't
7   understand the question, you should say that.
8       THE WITNESS:  I don't understand the
9   question.
10      MS. GURMANKIN:  You have to just tell
11  me.  Do you remember that?
12      THE WITNESS:  I'm trying to listen to
13  your questions but --
14      MS. GURMANKIN:  Do you remember my
15  instructions in the beginning?
16      THE WITNESS:  I do.
17  BY MS. GURMANKIN:
18      Q.  As a result of the training that you
19  had at Shell on the anti-harassment and
20  anti-discrimination policies, did you think that
21  it was a violation of policy for Jesse to be
22  called a bitch if it was said because of her mood?
23      A.  I would say yes.
24      Q.  Okay.  Who did you hear call Jesse a

Page 194

1   bitch?
2       A.  I don't know that I heard anyone.
3       Q.  Then why did you tell Kloosterman yes?
4       A.  I don't know that that's the question
5   that I was asked.
6       Q.  Your response is in connection with the
7   claim, "I have been called a bitch by numerous
8   people in the office."  According to Kloosterman's
9   notes said, "Yes, but it is because of her
10  mood."
11      Is that true?
12      A.  That's true that it says that there.
13      Q.  Okay.  Did you say that to Kloosterman?
14      A.  I may have, yes.
15      Q.  So who is it that you heard call Jesse
16  a bitch?
17      MS. KIRKPATRICK:  Objection.  Asked and
18  answered.
19      THE WITNESS:  Yeah, I don't know that
20  anyone --
21  BY MS. GURMANKIN:
22      Q.  Then why did you say yes to
23  Kloosterman?
24      MS. KIRKPATRICK:  Objection.  He said

Page 195

1   he doesn't know if that was the question that was
2   asked.
3   BY MS. GURMANKIN:
4       Q.  Is that really your testimony, that you
5   don't think that was the question that was asked
6   when you looked at the claim in the chart, which
7   is, "I have been called a bitch by numerous people
8   in the office", and your response is, "Yes, but it
9   is because of her mood."?
10      MS. KIRKPATRICK:  Objection.  Asked and
11  answered.
12      THE WITNESS:  Yeah.
13      MS. KIRKPATRICK:  That's really his
14  testimony.
15      THE WITNESS:  It is, too.
16  BY MS. GURMANKIN:
17      Q.  What do you think that was in response
18  to?
19      MS. KIRKPATRICK:  I don't even
20  understand that question.
21  BY MS. GURMANKIN
22      Q.  What do you think you are answering
23  now?
24      A.  I don't know.

Page 196

1       Q.  Go back to page two, please.  Can you
2   think of anything else that you are answering
3   there other than the question of whether Jesse has
4   been called a bitch by the people in the office?
5       A.  That was on page two.
6       Q.  Right.  I haven't gotten there yet.  Do
7   you need my question repeated?
8       MS. KIRKPATRICK:  It's not on -- I
9   think we are talking about different pages.
10      MS. GURMANKIN:  I'm not talking about
11  pages at the moment.  Do you need my question
12  repeated?
13      MS. KIRKPATRICK:  You just said page
14  two.
15      MS. GURMANKIN:  Right.  And then I
16  asked a question.  Do you need my question
17  repeated?
18      MS. KIRKPATRICK:  I'm confused.
19      MS. GURMANKIN:  Do you need my question
20  repeated?
21      THE WITNESS:  Yes.
22  BY MS. GURMANKIN
23      Q.  Can you think of any other question,
24  looking at page three of the chart, in which the

49 (Pages 193 to 196)

Page 197

1  claim is, "I've been called a bitch by numerous
2  people in the office." and your response is, "Yes,
3  but it is because of her mood."
4      Any other questions that that would be
5  responsive to other than whether you've heard
6  Jesse being called a bitch?
7      MS. KIRKPATRICK:  Objection.
8      THE WITNESS:  Yeah, that could be lots
9  of questions that that would be the answer.
10  BY MS. GURMANKIN
11     Q.  What?  Looking at the chart.
12     MS. KIRKPATRICK:  Objection.
13     THE WITNESS:  It's not for me to
14  speculate.
15     MS. GURMANKIN:  You just said there
16  could be lots.  Give me one.
17     MS. KIRKPATRICK:  Let him finish his
18  answer.  Do you remember the question?
19     THE WITNESS:  Yeah.  I can't think of
20  any right now.  But...
21  BY MS. GURMANKIN
22     Q.  Going back to page two.  Right above
23  the chart, do you see in italics "I would like to
24  review a few specific examples of the work

Page 198

1  environment and team environment with you.  Please
2  share any information or your perspective you have
3  related to these matters."
4      Do you see that?
5      A.  I do.
6      Q.  Do you see the first column that we've
7  been going over is claim.  Do you see that?
8      A.  Yes.
9      Q.  Second column is timing from Jesse.
10  Right?
11     A.  Yes.
12     Q.  And third is test whether you see this
13  amongst Will and others on the team, paren, self,
14  or just between Jesse.  Do you see that?
15     A.  Yes.
16     Q.  And it's still your testimony that
17  you're not sure whether yes, but it is because of
18  her mood is not necessarily responsive to the
19  question as to whether you've heard Jesse being
20  called a bitch?
21     MS. KIRKPATRICK:  Objection.
22     THE WITNESS:  Yes.
23  BY MS. GURMANKIN
24     Q.  Did you ever hear Jesse being called a

Page 199

1  bitch in the office?
2      A.  No.
3      Q.  How about bitchy?
4      A.  No.
5      Q.  Did you ever hear anyone refer to her
6  as a bitch or bitchy?
7      A.  No.
8      Q.  Did you?
9      A.  No.
10     Q.  Do you think that's funny?
11     A.  I do not think that's funny.  I think
12  it's funny that you keep asking me when I tell you
13  no.  I have a nervous laugh.  It didn't make sense
14  that would you keep asking.
15     Q.  Did you tell Kloosterman that you had
16  heard Jesse being called a bitch by people in the
17  office?  Was that a lie?
18     MS. KIRKPATRICK:  Objection.  He just
19  said that it's not what he said.
20  BY MS. GURMANKIN:
21     Q.  Please listen to my question.  Do you
22  understand it, or do you need it repeated?
23     A.  I need it repeated.
24

Page 200

1      Q.  Sure.  If you told Kloosterman that you
2  had heard Jesse being called a bitch in the
3  office, would that be a lie?
4      MS. KIRKPATRICK:  Objection.
5      THE WITNESS:  If I had told her that?
6      MS. GURMANKIN:  Yes.
7      THE WITNESS:  I don't ever remember her
8  being called any names.
9  BY MS. GURMANKIN:
10     Q.  So would that be a lie if you told
11  Kloosterman that?
12     MS. KIRKPATRICK:  Objection.  Give her
13  the same answer.
14     THE WITNESS:  I don't --
15  BY MS. GURMANKIN:
16     Q.  Would that be a lie if you told her
17  that?
18     MS. KIRKPATRICK:  Objection.  Tell her
19  again.
20     THE WITNESS:  I don't remember of
21  anyone telling her that.
22  BY MS. GURMANKIN:
23     Q.  It wasn't my question.  If you told
24  Kloosterman that you had heard people calling her

50 (Pages 197 to 200)

Page 201

1  that, would that be a lie?
2       MS. KIRKPATRICK:  Objection.  Give her
3  the same answer.
4       MS. GURMANKIN:  No.  I need you to
5  answer the question that I'm asking.
6       MS. KIRKPATRICK:  He's answering the
7  question.
8       MS. GURMANKIN:  No, he's not.
9       MS. KIRKPATRICK:  You just don't like
10  the answer.
11       MS. GURMANKIN:  No, he's not.  You know
12  he's not.
13       MS. KIRKPATRICK:  He said that he has
14  never heard anyone call her a bitch.
15       MS. GURMANKIN:  No, he's not.  That's
16  not my question.
17       MS. KIRKPATRICK:  Now you're asking an
18  improper hypothetical.
19       MS. GURMANKIN:  No.  You know
20  hypotheticals are proper, Kathy.
21       MS. KIRKPATRICK:  This is an improper
22  hypothetical.
23       MS. GURMANKIN:  No.  You just don't
24  want him answering.  What's your answer?

Page 202

1       MS. KIRKPATRICK:  You are twisting his
2  words.  You just don't like the fact that he's
3  never heard her called a bitch.
4       MS. GURMANKIN:  What's your answer?
5       THE WITNESS:  I haven't heard her --
6  BY MS. GURMANKIN:
7       Q.  I didn't ask whether you called her a
8  bitch.  My question, if you told Kloosterman that
9  you had heard people call her a bitch, would that
10  be a lie?
11       MS. KIRKPATRICK:  Objection.  Tell her
12  again.
13       THE WITNESS:  I have never --
14  BY MS. GURMANKIN:
15       Q.  If you told Kloosterman --
16       A.  I've never heard --
17       Q.  I didn't ask you if you've heard.  If
18  you told Kloosterman that you heard people call
19  Jesse a bitch, would that be a lie?
20       MS. KIRKPATRICK:  Objection.  You can
21  keep telling her.
22       THE WITNESS:  I didn't tell her that.
23  BY MS. GURMANKIN
24       Q.  If she says you did, is she lying?

Page 203

1       MS. KIRKPATRICK:  Objection.  That's,
2  again, an improper hypothetical, not based upon
3  evidence or fact.
4       THE WITNESS:  I didn't -- I don't know.
5  I don't know.
6  BY MS. GURMANKIN:
7       Q.  If Kloosterman testified that you told
8  her that people -- that you heard people call
9  Jesse a bitch, is she lying?
10       MS. KIRKPATRICK:  Objection.
11       THE WITNESS:  I don't know what her
12  testimony would be.
13  BY MS. GURMANKIN:
14       Q.  That's not my question.  If she
15  testified that you told her that you heard people
16  call Jesse a bitch, is that a lie?
17       MS. KIRKPATRICK:  Objection.  He just
18  said he doesn't know.  You keep telling her.
19       MS. GURMANKIN:  That wasn't my
20  question.
21       MS. KIRKPATRICK:  Yes.  You don't like
22  the answer.  He's going to keep giving you the
23  answer.
24       THE WITNESS:  Yeah.  I don't know.

Page 204

1       MS. KIRKPATRICK:  Besides the fact that
2  it's an improper question.
3       MS. GURMANKIN:  Hypotheticals are
4  permitted under the rules.  You know that, or you
5  should.
6       MS. KIRKPATRICK:  Not when they are
7  based on nothing in the record.
8  BY MS. GURMANKIN:
9       Q.  If Kloosterman testified that you told
10  her that you heard people call Jesse a bitch, is
11  that a lie?
12       MS. KIRKPATRICK:  Objection.
13       THE WITNESS:  I don't know.
14  BY MS. GURMANKIN:
15       Q.  Why don't you know?
16       A.  Because I just -- I don't know how all
17  that works.
18       Q.  Well, you didn't tell her that.  Right?
19       MS. KIRKPATRICK:  Objection.
20       THE WITNESS:  I didn't tell her what?
21  BY MS. GURMANKIN:
22       Q.  You didn't tell Kloosterman -- did you
23  tell Kloosterman that you heard people call Jesse
24  a bitch?

51 (Pages 201 to 204)

Page 205

1        MS. KIRKPATRICK:  Objection.
2        THE WITNESS:  I don't think so.
3    BY MS. GURMANKIN:
4        Q.  Is it possible you did?
5        A.  I don't believe so, no.
6        Q.  So if she testifies that you told her
7    that, is that a lie?
8        MS. KIRKPATRICK:  Objection.  I'm going
9    to instruct the witness not to answer.  You have
10    asked him this five times already and he has
11    answered it.
12        MS. GURMANKIN:  What's the basis for
13    your instruction?
14        MS. KIRKPATRICK:  You have -- it's an
15    improper hypothetical.  You are asking a question
16    that is not based upon any facts in the record.
17    And you've asked him numerous times already, and
18    he has given you an answer.  You are fishing for a
19    different answer.
20        MS. GURMANKIN:  Where's the basis for
21    your instruction not to answer --
22        MS. KIRKPATRICK:  I just told you.
23        MS. GURMANKIN:  -- under the rules.
24    Where in the rules does it say you can make an

Page 206

1    instruction not to answer based --
2        MS. KIRKPATRICK:  I just told you the
3    basis.
4        MS. GURMANKIN:  Where in the rules does
5    it --
6        MS. KIRKPATRICK:  I do not have an
7    obligation to cite to a specific rule or a
8    specific case to you, as I sit here in a
9    deposition.
10        MS. GURMANKIN:  You do have an
11    obligation to follow the rules, which you know
12    you're not.
13        Are you listening to your attorney's
14    instruction not to answer?
15        THE WITNESS:  I'm not going to answer.
16        MS. GURMANKIN:  You are following your
17    attorney's instruction?
18        THE WITNESS:  I am.
19    BY MS. GURMANKIN:
20        Q.  All right.  Looking at page three at
21    the bottom.  Beneath the chart, it says "I would
22    like to review some claims made regarding your
23    work relationship with Jesse and specific
24    situations you may have been involved in.  Please

Page 207

1    share your perspective on these matters."
2        Do you see that?
3        A.  Yes.
4        Q.  The claim on left side, "This coworker
5    had lied to me saying that my supervisor was mad
6    at me because I was falling behind on work.  When
7    I asked my supervisor what I needed to catch up
8    on, he denied that he had said anything."
9        Do you see that?
10        A.  I do.
11        Q.  And you recall Kloosterman asking you
12    about that allegation.  Correct?
13        A.  I do.
14        Q.  And you say in response, according to
15    Kloosterman, "I did her job before she did her
16    job.  We didn't have an MA before.  Her mom and I
17    worked together for 20 years and her dad and I
18    worked together for ten years, paren, not at
19    Shell."
20        Did you and her dad work together?
21        A.  Ward Manufacturing.
22        Q.  "Her mom was a MA where we worked
23    before.  When I left to come to Shell, Shell said
24    they needed a secretary.  I recommended her mom.

Page 208

1    She got hired, East Resources, and there were a
2    lot of open jobs.  Help wanted signs everywhere.
3    Jesse got hired at ER."
4        What's that?  What's ER?
5        A   (Witness nodded in the affirmative.)
6        Q.  Do you know?
7        A.  East Resources.
8        Q.  "And Wendy was moved into scheduler
9    role for half of the field, and I had the other
10    half.  I had way more training than she did.  They
11    trained her for a week or so, me for months."
12        Do you know why they trained Wendy
13    Barnes for a week or so and you for months?
14        A.  The trainer came in from Louisiana, and
15    he had just left the role and he was retiring from
16    the company.  And I was the only person that was
17    the planner or scheduler at that point.  And then
18    he retired from the company.
19        So they didn't really have a trainer to
20    offer.  We did get another trainer that came but
21    it wasn't nearly as good.
22        Q.  All right.  "She was delivering,
23    competent enough.  When we moved offices, we sat
24    side by side, same office.  I was the MA, Wendy

Page 209

1  did the scheduling, Matt did the planning."
2      That's Matt Skolny?
3      A.  It is.
4      Q.  "Then Shell came and needed to cut
5  costs. Two roles were cut, one of them was
6  Wendy's."
7      What was the other one?
8      A.  I don't know.
9      Q.  You don't remember?
10     A.  Yeah, I don't remember. "Jesse was
11 very upset."
12     Q.  I'll stop there for second. In the
13 question about the claim, was there anything asked
14 about what you said to Kloosterman according to
15 the first paragraph there?
16     A.  What's the question?
17     Q.  In response to the claim that's on the
18 left side, the left column, is there anything that
19 you say, according to Kloosterman in the first
20 paragraph on the right side, that is at all
21 responsive to the issue of the claim?
22     A.  It doesn't look like it.
23     Q.  So you are volunteering information --
24     A.  Yes.

Page 210

1      Q.  -- even though you weren't specifically
2  asked?
3      A.  I would say yes.
4      Q.  Next paragraph, "Jesse has a hatred for
5  Robin Grouette. Robin recognized it was a mistake
6  to sever Wendy. They identified we needed an
7  analyst. We were understaffed. Jesse got hired
8  as analyst."
9      Q.  Anything in that paragraph that is
10 responsive to the claim that's on the left side?
11     A.  No.
12     Q.  You're volunteering info, even though
13 you are not specifically asked?
14     A.  Yes.
15     Q.  What was the basis for you saying that
16 Jesse had a hatred for Robin Grouette?
17     A.  She did. Matt would get her to tell
18 the story, and Jesse would then tell the story of
19 how bad she hated Robin.
20     Q.  Matt Skolny?
21     A.  Yes.
22     Q.  Did she say why she hated Robin?
23     A.  For laying off her -- for laying off
24 her mother, I think.

Page 211

1      Q.  Did she say that?
2      A.  Well, Robin -- here is what she said
3  for sure. That when we all had an interview and
4  Jesse went into the interview, the first thing
5  that Robin told her is I had to let your mom go.
6  And I think that's where the hatred stemmed from.
7      Q.  Did Jesse say she hated Robin because
8  Robin let her mom go?
9      A.  I don't know that she said those words.
10     Q.  Next paragraph, "She was overloaded" --
11 you're referring to Jesse here. Right?
12     A.  Yes.
13     Q.  "She was overloaded. She doesn't say
14 no to things. She's a hard worker. She had a lot
15 to do, so people were coming to me to do some
16 things and she got upset that I was doing some of
17 her work. She was upset that I was doing work
18 that was in her remit. We haven't ever yelled at
19 each other. I'm not one for arguing. But she
20 stomped away and muttered under her breath."
21     That paragraph is not responsive to the
22 issue of the claim that's on the left side.
23 Correct?
24     MS. KIRKPATRICK: Objection.

Page 212

1      THE WITNESS: They don't look like they
2  go together, no.
3  BY MS. GURMANKIN:
4      Q.  You are volunteering information that
5  wasn't specifically asked by her.
6      A.  It looks that way.
7      Q.  According to what Kloosterman wrote
8  here on the right side of that claim about what
9  you say in your interview, is there anything that
10 you say that actually responds to the claim?
11     A.  It doesn't look like it.
12     Q.  Do you remember Kloosterman ever
13 following up and actually asking if you said what
14 Jesse claims that you said?
15     A.  I don't believe so.
16     Q.  Did you tell Jesse that Turney was mad
17 at her because she was falling behind on work?
18     A.  I don't remember that happening.
19     Q.  Is it possible it did?
20     A.  I don't remember.
21     Q.  Right. So is it possible?
22     A.  I don't know.
23     Q.  Did Turney ever tell you that he was
24 mad at Jesse because she was falling behind on

53 (Pages 209 to 212)

Page 213

1    work?
2        A.   Yeah.  I don't remember that happening.
3        Q.   Page four.  The claim on the left side,
4    "I've been told by coworkers that maybe if they
5    wore tight pants and batted their eyes, they could
6    get what they wanted, suggested that this is what
7    I do."
8            According to Kloosterman you say, "I
9    would never say that, and I haven't heard anyone
10   say that to her.  She played the female card for
11   as long as it benefited her."
12           What did you mean by that last
13   sentence, she played the female card for as long
14   as it benefited her?
15       A.   Well, it had to do with the way she
16   dressed.
17       Q.   I'm sorry?
18       A.   Had to do with the way she dressed.
19       Q.   What was that?
20       A.   So her attire was on the edge of
21   appropriate for work.
22       Q.   How so?
23       A.   Tight pants, plunging neckline and
24   blouses, stuff like that.

Page 214

1        Q.   The plunging necklines and blouses, how
2    low was the neckline?
3        A.   (Indicating.)
4        Q.   You are pointing to your chest.  Could
5    you see cleavage?
6        A.   I would say yes.
7        Q.   How many inches?
8        A.   I don't know that.  It would depend on
9    the garment.
10       Q.   Sometimes more than others?
11       A.   Yes.
12       Q.   What was the most amount?
13       A.   I don't know.
14       Q.   How come this was something that you
15   noticed?
16       A.   I work with her and seen her every day.
17       Q.   Were you paying attention to what she
18   wore?
19       A.   She would -- she would show us what she
20   was wearing.  She was proud of what she wore to
21   work.
22       Q.   And you're concluding this based on the
23   fact that she wore tight pants and she wore
24   plunging necklines and blouses showing cleavage?

Page 215

1            MS. KIRKPATRICK:  Objection.
2            MS. GURMANKIN:  Right?
3            THE WITNESS:  What is the question?
4    BY MS. GURMANKIN:
5        Q.   You concluded that she was proud of
6    herself based on the fact that she wore tight
7    pants and plunging neckline and blouses showing
8    cleavage.
9        A.   No.
10           MS. KIRKPATRICK:  Objection.
11   BY MS. GURMANKIN:
12       Q.   What led you to that conclusion that
13   she was proud?
14       A.   She liked her clothes.
15       Q.   She liked clothes based on the fact
16   that she wore tight pants and showed cleavage?
17       A.   No.
18       Q.   Okay.  Then --
19       A.   She told us about her clothes.
20       Q.   But you thought her dress, based on the
21   fact that she wore tight pants and showed
22   cleavage, was the edge of appropriate.  Right?
23   You just testified to that.
24       A.   I would say yes.

Page 216

1        Q.   Did you stare at her when she wore
2    tight pants and showed cleavage?
3        A.   No.
4        Q.   Then how did you know that she showed
5    cleavage and wore tight pants?
6        A.   We're coworkers.  She was right there
7    all the time.
8        Q.   How often did she wear tight pants?
9        A.   Every day.
10       Q.   Okay.  How often did she wear plunging
11   necklines and blouses that showed cleavage?  Was
12   that every day, too?
13       A.   No.
14       Q.   How often?
15       A.   I don't know.  But it did happen.
16       Q.   Multiple times a week?
17       A.   Depend on the weather.  Depend on all
18   the different circumstances.
19       Q.   On average?
20       A.   I don't know that there would be an
21   average.
22       Q.   Multiple times?
23       A.   It happened many times.
24       Q.   More than 20?

54 (Pages 213 to 216)

Page 217

1     A.  In the course of all the years we
2  worked together?
3     Q.  Um-hmm.
4     A.  Yes.
5     Q.  More than 50?
6     A.  I don't know.
7     Q.  Somewhere between 20 and 50?
8     A.  I'll stick with more than 20.
9     Q.  More than 30?
10     A.  I'll stick with more than 20.
11     Q.  So between 20 and 30?
12     A.  I'm not going to say that.
13     Q.  You don't remember if it was more than
14  20?
15     A.  I know it was more than 20.
16     Q.  You don't know if it was more than 30?
17     A.  Fair enough.
18     Q.  Is that true?
19     A.  That's what -- I'm saying more than 20.
20     Q.  Do you remember if it was more than 30
21  or not?
22     MS. KIRKPATRICK:  You can keep telling
23  her.  Objection.
24     THE WITNESS:  Yeah, it's --

Page 218

1  BY MS. GURMANKIN:
2     Q.  Do you remember or don't you?
3     MS. KIRKPATRICK:  He's approximating.
4     THE WITNESS:  Yes, I just -- it was
5  more than 20 times.
6  BY MS. GURMANKIN:
7     Q.  Did you talk to anyone about the fact
8  that you thought that she was on the edge of
9  appropriate with her dress?
10     A.  No.
11     Q.  Did anyone else say that to you?
12     A.  I don't think so.
13     Q.  All right.  So when you said she played
14  the female card for as long as it benefited her,
15  you say it had to do with the way she dressed.
16  What did you mean by that?
17     MS. KIRKPATRICK:  He just told you.
18     THE WITNESS:  Yeah.
19  BY MS. GURMANKIN
20     Q.  What did you mean when you said she
21  played the female card for as long as it benefited
22  her, in connection with the way that she dressed?
23     MS. KIRKPATRICK:  Objection.  He just
24  told you that.

Page 219

1     MS. GURMANKIN:  How did she play the
2  female card?
3     MS. KIRKPATRICK:  Objection.  He just
4  told you that.
5     MS. GURMANKIN:  No, I didn't ask that
6  question.
7     MS. KIRKPATRICK:  Asked and answered.
8     MS. GURMANKIN:  No, I haven't asked
9  that.  How did she play the female card?
10     MS. KIRKPATRICK:  That's exactly what
11  you asked.
12     MS. GURMANKIN:  No, I did not.
13     MS. KIRKPATRICK:  You can tell her
14  again.
15     THE WITNESS:  She just wore fitting,
16  un-- clothes that other people didn't wear to
17  work.
18  BY MS. GURMANKIN
19     Q.  What's the female card that you are
20  referring to?
21     MS. KIRKPATRICK:  Objection.  Asked and
22  answered.  He just told you.
23     MS. GURMANKIN:  I haven't asked that
24  before.

Page 220

1     MS. KIRKPATRICK:  That's what you've
2  been asking.
3  BY MS. GURMANKIN:
4     Q.  No.  What's the female card that you
5  are referring to?
6     A.  Just that.
7     Q.  What does that mean?
8     MS. KIRKPATRICK:  What does what mean?
9  He just told you.
10     MS. GURMANKIN:  The female card.
11     MS. KIRKPATRICK:  He just told you.
12  Objection.  Asked and answered.  You can keep
13  telling her.
14     THE WITNESS:  That she wore tight
15  clothing and tried to use that for advantage.
16  BY MS. GURMANKIN
17     Q.  How did she try to use that to her
18  advantage?
19     A.  I don't know.  It just seemed like
20  that's what she was doing.
21     Q.  You said it.  So what did you mean when
22  you said it?
23     A.  I don't know why.  I don't know why I
24  said that.

55 (Pages 217 to 220)

Page 221

1      Q.  Any basis to your saying that to
2  Kloosterman?
3      A.  I don't know.
4      Q.  No explanation for why you said it,
5  though.  Right?
6      A.  No, I don't know.
7      Q.  It was to portray Jesse in a negative
8  way, wasn't it?
9      A.  No.  I think it was more to state the
10  facts.
11      Q.  Well, you don't have any facts to
12  support it, do you?
13      A.  I don't.
14      Q.  It was to portray Jesse in a negative
15  way, wasn't it?
16      A.  No.  I would say it was just more that
17  that was a fact.  It went on.
18      Q.  You were trying to make her seem like a
19  slut, weren't you?
20      A.  Was not.
21      Q.  In the last row it says, on the left
22  side, regarding the claim, "During the visit
23  to" -- I'm going to assume that's -- "Calgary in
24  2014 at the social after hours, were you there

Page 222

1  when Will shared a photo of himself in his
2  underwear?"
3          You say, "I did not see that.  I'm not
4  saying that didn't happen.  There was a lot of
5  alcohol involved.  People were drinking too much.
6  I was with them the whole time.  There wasn't any
7  talk from Will of I got this plan with her or
8  anything like that.  Something may have happened
9  between them."
10          Is that correct?
11      A.  Yes.
12      Q.  When you said something may have
13  happened between them, what were you talking
14  about?
15      A.  About the picture.
16      Q.  You weren't suggesting that something
17  sexual may have happened between them?
18      A.  No.
19      Q.  Why didn't you say the picture, he may
20  have shown her the picture?
21      A.  That's not I was being asked about.
22      Q.  You were being asked about the picture.
23  Look at the left side.  It's exactly what you were
24  being asked about.

Page 223

1      A.  So what was your question again then?
2      Q.  If what you meant when you said
3  something may have happened between them was that
4  he may have shown her the picture, why didn't you
5  say that?
6      A.  That is what I'm saying.
7      Q.  Why did you say something have happened
8  between them?  Why didn't you say he may have
9  shown her the picture?
10      A.  That's not how I talk.
11      Q.  What's not how you talk?
12      A.  I'm just having a conversation.  You're
13  asking if a picture was shown, and I'm saying that
14  may have happened.  I don't know.  I don't know
15  what happened between them.
16      Q.  You think something sexual happened
17  between them?
18          MS. KIRKPATRICK:  Objection.  Asked and
19  answered.  He already said no.
20          THE WITNESS:  No.
21  BY MS. GURMANKIN:
22      Q.  Did you ever think that?
23      A.  No.
24      Q.  Did Turney ever suggest that something

Page 224

1  sexual or romantic happened between them?
2      A.  No.
3      Q.  Did you ever hear any rumors that
4  something sexual or romantic was going on between
5  Turney and Jesse?
6      A.  No.
7      Q.  Part of your response, according to
8  Kloosterman, to this claim about Will sharing a
9  photo on his phone of himself in his underwear is
10  not responsive to that claim.  Is that right?
11          MS. KIRKPATRICK:  Objection.
12          THE WITNESS:  What's your question?
13  BY MS. GURMANKIN:
14      Q.  The claim that you're being asked
15  about, according to the chart, is whether you were
16  there when Will shared a photo of his phone of
17  himself in his underwear.  Do you see that?
18      A.  I do.
19      Q.  And part of your response that she
20  documents is not responsive to that claim.  Right?
21      A.  Yes.
22          MS. KIRKPATRICK:  Objection.
23          THE WITNESS:  That is true.
24

56 (Pages 221 to 224)

Page 225

BY MS. GURMANKIN:

Q. Okay. So according to her notes, you are volunteering information that you were not specifically asked about here. Is that correct?

A. It is.

Q. Right under that you say, "I don't joke around with her anymore because I learned." What did you learn that led you not to joke around with her anymore?

A. I learned that she gets mad fast and there's no reason to do it.

Q. What did you joke around with her about before you were --

A. Just anything in the office; we laughed at lots of different things.

Q. What did you joke with her about?

A. I don't have any examples, but I know that it happened.

Q. Anything sexual?

A. No.

Q. Are you sure about that?

A. I'm positive about that.

Q. Even though you can't remember a single thing that you did actually joke about?

Page 226

MS. KIRKPATRICK: Objection.

THE WITNESS: I'm positive it wasn't sexual.

BY MS. GURMANKIN:

Q. But you can't remember a single thing that you did joke about?

MS. KIRKPATRICK: Objection.

MS. GURMANKIN: Right?

THE WITNESS: Yes.

BY MS. GURMANKIN:

Q. "I think it may have taken Will a little longer to realize this when he started working for him." I assume that to be she.

"Did he make her upset? Probably. Did he make advances on her? I don't know. I would say probably not, but I don't know. It seems like trying to flatter her."

I'll stop there for a second. Why did you say you don't know when it came to whether he made advances on her?

A. Because I don't know.

Q. You don't know what happened between them. Right?

A. That is true.

Page 227

Q. And it looks like, at least from this document, that you are talking in response to her saying on page three that she would like to review some claims made regarding your work relationship with Jesse and specific situations you may have been involved in. Please share your perspective on these matters. Right?

A. Yeah. I don't know what she meant by asking right before this. But that's the header that it's under.

Q. Okay. There is no other question above that paragraph?

A. Right.

Q. And then you go on to say, "I feel like he treats her same as others on the team, but she doesn't feel that way. I've heard her complain about that, but I know it's not true." I'll stop there for a second.

What did you hear Jesse complain about what you are referencing here?

A. This was that incident of I don't know what he wants as far as the work instructions, when I don't know what he's asking me to do. At that point she's like he wouldn't ask anyone else

Page 228

to do it.

But he wouldn't ask anyone else to do it because it wasn't anyone else's job.

Q. All right. Are you talking about something that's different from the time that she came over to her desk and said I don't know what he wants me to do?

A. No. I'm not talking about that incident.

Q. Well, according to your testimony earlier, that's all she said. She didn't say he wouldn't ask anyone else to do this. Right? Or did you forget that part?

A. Did I forget what part?

Q. Earlier you testified that when she came over to her desk, she said I don't know what he wants me to do. And then that was it. Remember that testimony?

A. Yep.

Q. Okay. And now you're saying that as part of that incident she also said he wouldn't ask anyone else do this.

A. I remember that now, yes.

Q. You remember that now. Any reason why

Page 229

1 you didn't remember it earlier?

2  A. No.

3  Q. That's what your testimony is, that

4 you're referencing when you're saying that she

5 doesn't feel that he treats her the same as others

6 on the team?

7  A. I am, yes.

8  Q. And that you heard her complain about

9 that?

10  A. I heard her complain about that, yes.

11  Q. Are you talking about any other

12 incidents or just that one?

13  A. Just that one.

14  Q. Was she the only woman who reported

15 directly to Turney at this time?

16  A. I don't know.

17  Q. Can you think of any other women who

18 reported directly to Turney at this time?

19  A. I can't. I already just said I don't

20 know. I don't know. So there was -- our team was

21 changing, and I don't know who reported to who.

22  Q. Question number four, "Is there

23 anything else you would like to share related to

24 the items we discussed today that hasn't been

Page 230

1 asked yet?"

2  Do you see that?

3  A. I do.

4  Q. Why didn't you say in response to that

5 question all the stuff that we have talked about

6 that you hadn't said because you weren't

7 specifically asked?

8  MS. KIRKPATRICK: Objection.

9  THE WITNESS: I don't know.

10 BY MS. GURMANKIN:

11  Q. No explanation then?

12  A. No.

13  MS. KIRKPATRICK: Objection.

14 BY MS. GURMANKIN:

15  Q. And you say, according to her notes,

16 "Will is really outgoing. Maybe Jesse would find

17 it offensive." Stop there for a sec.

18  You thought maybe Jesse would find

19 offensive the fact that Turney is really outgoing?

20  A (Witness nodded in the affirmative.)

21  Q. Is that yes?

22  A. Yes.

23  Q. Why?

24  A. Because it seemed to me like she did.

Page 231

1  Q. Why?

2  A. That was her demeanor when he was

3 around.

4  Q. What?

5  A. That she didn't like that he was

6 outgoing.

7  Q. Her demeanor indicated that she didn't

8 like he was outgoing?

9  A. Yeah.

10  Q. What about her demeanor suggested to

11 you that she didn't like that he was outgoing?

12  A. Like, she didn't want to hear about,

13 you know, what he was doing or, you know, what he

14 was talking about to other people or anything like

15 that.

16  Q. That would be similar demeanor that she

17 would have when he was around if he were sexually

18 harassing her?

19  MS. KIRKPATRICK: Objection as to what

20 demeanor -- I'm instructing the witness not to

21 answer. His demeanor would have when he was

22 hypothetically sexually harassing her.

23 Instructing the witness not to answer.

24  MS. GURMANKIN: That wasn't my

Page 232

1 question.

2 BY MS. GURMANKIN

3  Q. Do you agree that Jesse would have a

4 similar demeanor to what you noticed when Turney

5 was around if he was sexually harassing her?

6  MS. KIRKPATRICK: That is your

7 question. Objection. Instructing the witness not

8 to answer as to what Mr. Turney's demeanor may

9 have been when he was hypothetically sexually

10 harassing her.

11  MS. GURMANKIN: For the third time, I'm

12 not asking about Turney's demeanor.

13  MS. KIRKPATRICK: Well, then I don't

14 understand the question.

15  MS. GURMANKIN: Okay. Well, instead of

16 instructing him not to answer, why don't you ask

17 me to repeat it?

18  MS. KIRKPATRICK: I thought I

19 understood the question. I'm instructing him not

20 to answer the question that I don't understand.

21 And I'm telling you how I understand it.

22 BY MS. GURMANKIN:

23  Q. Would you consider that Jesse may have

24 had that demeanor when Turney was around because

Page 233

1  he was sexually harassing her?
2       MS. KIRKPATRICK: Objection.
3       THE WITNESS: Ask me that question
4  again.
5  BY MS. GURMANKIN:
6       Q.  Sure.  Did you consider that Jesse has
7  the demeanor that you just referenced when Turney
8  was around because he was sexually harassing her?
9       MS. KIRKPATRICK: Objection.
10      THE WITNESS: I did not consider that.
11 BY MS. GURMANKIN:
12      Q.  Did you consider that he -- she -- I'm
13 sorry.  Did you consider that he made her
14 uncomfortable by his conduct?
15      A.  I did not say that.
16      Q.  Did you ever ask her why it was that
17 she -- her demeanor was a certain way when he was
18 around?
19      A.  I did not.
20      Q.  Did you ever talk to anyone about that
21 at Shell prior to your meeting with Kloosterman?
22      A.  I did not.
23      Q.  And then you go on to say, "I would say
24 he doesn't mean anything by it."

Page 234

1       What were you referencing there?
2       A.  His outgoing nature.
3       Q.  Did you hear him say anything that you
4  thought was offensive?
5       MS. KIRKPATRICK: Objection.  Asked and
6  answered.
7       THE WITNESS: No.
8  BY MS. GURMANKIN
9       Q.  What did you hear him say that was
10 outgoing?
11      A.  Everything that he talked about.  When
12 I worked on my tools, no one could keep up with
13 me.  And you know, things like that.  It was just
14 very outgoing.
15      Q.  You mean from what you described with
16 him as narcissistic?  He was proud of his
17 accomplishments?
18      MS. KIRKPATRICK: Objection.
19      THE WITNESS: Proud of his
20 accomplishments, yes.
21 BY MS. GURMANKIN:
22      Q.  So did you think he was outgoing or
23 narcissistic?
24      MS. KIRKPATRICK: Objection.

Page 235

1       THE WITNESS: Outgoing.
2  BY MS. GURMANKIN:
3       Q.  And not narcissistic?
4       A.  More outgoing than narcissistic, yes.
5       Q.  But some narcissism?
6       MS. KIRKPATRICK: Objection.
7       THE WITNESS: He was proud of himself.
8       MS. GURMANKIN: So yes?
9       MS. KIRKPATRICK: Objection.
10      THE WITNESS: I wouldn't say that, no.
11 BY MS. GURMANKIN:
12      Q.  So not narcissistic?
13      MS. KIRKPATRICK: Objection.
14      THE WITNESS: Sure.
15 BY MS. GURMANKIN:
16      Q.  So earlier when you described him as
17 narcissistic, that wasn't true?
18      MS. KIRKPATRICK: He went through that
19 and he clarified it.  Objection.  Misleading.
20 Mischaracterizing.
21      THE WITNESS: We're right back to the
22 same place.
23 BY MS. GURMANKIN:
24

Page 236

1       Q.  Is that not true when you earlier
2  described him as narcissistic?
3       MS. KIRKPATRICK: Objection.  It's not
4  what he said.  You can answer.
5       THE WITNESS: Ask the question again.
6  BY MS. GURMANKIN:
7       Q.  Sure.  Earlier when you described him
8  as narcissistic, is that true?
9       MS. KIRKPATRICK: Objection.  Asked and
10 answered.  He's already talked to you about the
11 narcissistic comment.  You can tell her again.
12      THE WITNESS: I didn't describe him as
13 narcissistic.
14 BY MS. GURMANKIN:
15      Q.  Actually you did.  But are you saying
16 now that you did not find him to be narcissistic?
17      MS. KIRKPATRICK: Objection.
18 Objection.
19      THE WITNESS: In -- when are you
20 saying -- I don't get the question again.  I'm
21 sorry.
22 BY MS. GURMANKIN:
23      Q.  Did you think he was narcissistic or
24 just outgoing?

59 (Pages 233 to 236)

Page 237

1         MS. KIRKPATRICK:  Objection.
2         THE WITNESS:  Outgoing.
3    BY MS. GURMANKIN:
4         Q.   Okay.  You go on to say that she,
5    meaning Jesse, takes things the wrong -- I'm
6    sorry.  "That she lives so much on the edge.  She
7    says things that are not meant to be offensive."
8         What were you talking about?
9         A.   Read that again.  I'm not --
10        Q.   Sure.  Third sentence under number
11   four.  "She lives so much on the edge.  She says
12   things that are not meant to be offensive."
13        MS. KIRKPATRICK:  Second sentence in
14   number four.
15        THE WITNESS:  I have no idea what that
16   means.
17   BY MS. GURMANKIN:
18        Q.   No basis for saying that?
19        A.   Again, please.
20        Q.   Sure.  Did you have any basis for
21   telling Kloosterman that?
22        A.   I have no idea what it means.
23        Q.   You are saying to Kloosterman that
24   Jesse says things that are not meant to be

Page 238

1    offensive.  Do you see that?
2         A.   Yep.
3         Q.   Which suggests that they do offend
4    people.  Right?
5         MS. KIRKPATRICK:  Objection.
6    BY MS. GURMANKIN:
7         Q.   That's what you were suggesting.  Yes?
8         MS. KIRKPATRICK:  Objection.
9         THE WITNESS:  There's a question?
10        MS. GURMANKIN:  Yep.  Do you need it
11   repeated?
12        THE WITNESS:  Please.
13   BY MS. GURMANKIN:
14        Q.   You are suggesting to Kloosterman that
15   Jesse says things that are offensive even if they
16   are not meant to be offensive.  Right?
17        MS. KIRKPATRICK:  Objection.
18        THE WITNESS:  I'm sorry.  I'm a little
19   lost here.  Could you please say it again?
20   BY MS. GURMANKIN:
21        Q.   Do you see where I'm talking about?
22        A.   I don't.
23        Q.   Under four on page four, on Exhibit 22.
24   Do you see number four?

Page 239

1         A.   I do.
2         Q.   Do you see the third sentence that
3    starts with, She lives so much on the edge?
4         A.   Yes.
5         Q.   "She lives so much on the edge.  She
6    says things that are not meant to be offensive."
7         Do you see that?
8         A.   I do.
9         Q.   You were suggesting to Kloosterman
10   there that Jesse says things that are offense even
11   if she doesn't mean them to be offensive.
12   Correct?
13        MS. KIRKPATRICK:  Objection.
14        THE WITNESS:  I don't know that that's
15   correct.  I don't know what it means.
16   BY MS. GURMANKIN:
17        Q.   You don't know what you're saying
18   there?
19        A.   I don't.  I don't know what she -- what
20   I was saying that she wrote down.
21        Q.   "She takes things the wrong way often."
22   Do you see that?
23        A.   Yes.
24        Q.   Have we talked about all of the things

Page 240

1    that you thought Jesse took the wrong way?
2         A.   I believe so.
3         Q.   Anything else that we haven't
4    discussed?
5         A.   Not that I'm aware of, no.
6         Q.   "I recognized that a long time ago that
7    she is an edgy one."  What was your basis for
8    that?  Well, strike that.
9         What did you mean by edgy?
10        A.   Gets mad quick.
11        Q.   Anything else?
12        A.   No.  That's what that means.
13        Q.   Have we talked about all the ways in
14   which she got mad quick?
15        A.   I believe so, yes.
16        Q.   Anything else to add?
17        A.   No.
18        Q.   "She's been treated wrong for her looks
19   in past."  Do you see that?
20        A.   I do.
21        Q.   What's that about?
22        A.   Back in the East Resources days,
23   something happened between her and other
24   coworkers, and Jesse told me about it.  And I

60 (Pages 237 to 240)

Page 241

1  thought it was wrong, whatever happened.  I don't
2  even remember what the complete situation was, but
3  I thought it was wrong.
4       Q.  Do you remember anything about what she
5  told you?
6       A.  That someone was IM'ing her or
7  something like that, and it had to do with her
8  appearance.
9       Q.  Did she tell you something along the
10 lines of that she was sexually harassed, even if
11 she didn't use those words?
12      A.  I don't know that.
13      Q.  Is that your understanding, based on
14 what she said to you?
15      A.  I don't know that, either.  I would
16 just say that it was wrong.  I don't know that she
17 was sexually harassed.
18      Q.  What was wrong?  The conduct that she
19 was subjected to that she told you about?
20      A.  Yes.
21      Q.  You concluded it was wrong based on
22 what she told you?
23      A.  Yes.  From her side of the story, yes.
24      Q.  Had you heard this from anyone else?

Page 242

1       A.  I had not.
2       Q.  Is she just telling you this, or are
3  there other people involved?
4       A.  I don't remember where it happened.
5       Q.  Or whether anyone else was there?
6       A.  Exactly, yes.
7       Q.  And what was the context in which she
8  is telling you this?  I mean, did she just start
9  telling you?
10      A.  I don't know that, either.
11      Q.  Why are you telling Kloosterman that
12 she has been treated wrong for her looks in past?
13      A.  Because I remembered her telling me
14 that story.
15      Q.  Okay.  Do you think that was relevant?
16      A.  Yeah.
17      Q.  Okay.  Why?
18      A.  Why?
19      Q.  Um-hmm.
20      A.  Because it seemed like that's what she
21 was talking about, that there was harassment.  I
22 believe, from Jesse's side of story, that there
23 was harassment.
24      Q.  So you wanted to make sure Kloosterman

Page 243

1  knew that Jesse had complained previously of
2  harassment?
3       A.  That's what I'm saying there.
4       Q.  Okay.  Why?  Why do you want to share
5  that with Kloosterman?  Or why do you want to make
6  sure Kloosterman knows that?
7       A.  I don't know.  I don't know if there
8  was any -- because I like Jesse.
9       Q.  What does that have to do with you
10 wanting Kloosterman to be aware that Jesse had
11 complained of harassment before?
12      A.  I don't know.  I don't know.
13      Q.  Do you think the fact that she
14 complained of harassment before makes it any less
15 likely that her complaints should be taken
16 seriously?
17      A.  What's the question again?
18      Q.  Do you believe that the fact that she
19 complained of harassment before has any bearing on
20 her current complaints of harassment or any
21 relevance to her current complaints of harassment?
22      A.  I'm sorry.  One more time.
23      Q.  Did you believe that the fact that
24 Jesse had complained previously of harassment had

Page 244

1  any relevance to the fact that she currently is
2  complaining of harassment?
3       A.  I don't think it had any bearing on it,
4  no.
5       Q.  Then why are you sharing with
6  Kloosterman?  Why did you want to make sure that
7  Kloosterman is aware that Jesse previously
8  complained of harassment?
9       MS. KIRKPATRICK:  Objection.  Asked and
10 answered.
11      THE WITNESS:  Yeah.  I don't know.
12 BY MS. GURMANKIN:
13      Q.  Do you think that knowing that Jesse
14 had previously complained of harassment would make
15 it less likely that her current complaint would be
16 believed?
17      A.  I don't -- no.
18      Q.  Is that why you were sharing that with
19 Kloosterman?
20      A.  I would say no.
21      Q.  Did you share that with anyone else at
22 Shell?
23      A.  Share what?
24      Q.  That Jesse had told you that she had

61 (Pages 241 to 244)

Page 245

1    previously complained of harassment?
2        A.   No.
3        Q.   After your meeting with Kloosterman, up
4    until the time -- well, strike that.
5            After your meeting with Kloosterman, do
6    you remember how long it was that Priest called
7    you the second time and told you her thought was
8    that you had not done anything wrong?
9        MS. KIRKPATRICK:  Objection.
10       THE WITNESS:  I don't know that.
11   BY MS. GURMANKIN:
12       Q.   You don't remember the timing?
13       A.   No.
14       Q.   Other than that phone call from Priest,
15   did you have any other conversations with anyone
16   at Shell about Jesse's allegations or your
17   complaints or -- I'm sorry -- or the
18   investigation?
19       A.   Counsel.
20       MS. KIRKPATRICK:  Other than counsel.
21   BY MS. GURMANKIN:
22       Q.   Let's exclude counsel for now.
23       MS. KIRKPATRICK:  I'm sorry?  Other
24   than counsel?

Page 246

1        MS. GURMANKIN:  I said let's exclude
2    counsel for now.
3        THE WITNESS:  I didn't hear that.  Then
4    the answer is no.
5    BY MS. GURMANKIN:
6        Q.   At some point Jesse is moved out of the
7    group.  Right?
8        A.   She is.
9        Q.   Were you told why?
10       A.   No.
11       Q.   Did you ask anyone?
12       A.   No.
13       Q.   So as far as you knew, no explanation
14   is given?
15       MS. KIRKPATRICK:  Objection.
16       THE WITNESS:  I knew that Michelle had
17   talked to me and then Jesse was moved.  I didn't
18   talk to anyone about it.
19   BY MS. GURMANKIN:
20       Q.   Are we talking about the second call
21   with Priest in which she tells you her thought is
22   that you hadn't done anything wrong?
23       A.   I don't know.
24       Q.   Well, was Jesse moved before your

Page 247

1    meeting with Kloosterman?
2        MS. KIRKPATRICK:  Objection.
3        THE WITNESS:  I don't know.
4    BY MS. GURMANKIN
5        Q.   You said all you know is after your
6    conversation with Priest, Jesse was moved.  Right?
7        MS. KIRKPATRICK:  Objection.
8        THE WITNESS:  I don't know the
9    timeline.  I know that I talked to HR and Jesse
10   was moved afterwards.
11   BY MS. GURMANKIN:
12       Q.   Who in HR, Priest or Kloosterman?
13       A.   Priest.
14       Q.   Was that the first conversation or the
15   second conversation with Priest?
16       A.   I don't know that.
17       Q.   Is it possible Jesse was moved before
18   you talked to Kloosterman?
19       A.   It may have been.  I don't know.
20       Q.   And are you ever given any explanation
21   by anyone at Shell as to why Jesse was moved?
22       A.   No.
23       Q.   Other than you, did you ever learn
24   whether allegations had been made by Jesse against

Page 248

1    anyone else?
2        A.   I see against Will by the questioning.
3        Q.   You understood that in the meeting with
4    Kloosterman?
5        A.   Yes.
6        Q.   Other than the meeting with
7    Kloosterman, any other discussions you had with
8    Will or anyone in the group about allegations that
9    Jesse made?
10       A.   I never discussed any allegations with
11   anyone.
12       Q.   Or your interview with anyone.  Right?
13       A.   Or my --
14       Q.   Did you discuss your interview with
15   Turney or anyone in his group?
16       A.   With the Kloosterman interview?
17       Q.   Yes.
18       A.   No, I did not.  I did not discuss it
19   with anyone.
20       Q.   After Jesse is moved out of the group,
21   did you still have any interactions with her?
22       A.   I've seen her occasionally.
23       Q.   Where?
24       A.   Out in the field.

62 (Pages 245 to 248)

Page 249

1      Q.  How about around the building?
2      A.  Sometimes.
3      Q.  Would you talk to her?
4      A.  No.
5      Q.  You would ignore her?
6      A.  No.
7      Q.  Would you just nod at her?
8      A.  I waved at her.  We would wave when we
9  would pass on the road.  We were doing two
10  completely separate jobs.  So it was -- I don't
11  interact with a lot of people in our building.
12      Q.  Have you been told not to speak to her?
13      A.  No.
14      Q.  Did you talk to her before you found
15  out about her allegations?
16      A.  When she worked with us?
17      Q.  Yeah.
18      MS. KIRKPATRICK:  Talk to her about
19  what?  About anything?
20  BY MS. GURMANKIN:
21      Q.  Talked to her about work-related issue
22  obviously.  Right?
23      A.  When she worked with our group, I
24  talked to her.  When she moved out of our group, I

Page 250

1  didn't work with her anymore, I didn't see her
2  very often, I didn't get the chance to talk to
3  her.
4      Q.  Well, when you saw her in the field or
5  in the building, would you say hello?
6      A.  Yes.
7      Q.  Oh.  So you would talk to her?
8      A.  (Indicating.)
9      Q.  You would just wave?
10      A.  Yes.
11      Q.  So you would say hi?
12      A.  Yeah.
13      Q.  Would you make small talk?
14      A.  Yeah, I would say occasionally we have.
15      Q.  Were you annoyed when you found out
16  that Jesse had made allegations against you?
17      A.  No.  No, I don't think so.
18      Q.  Why not?
19      A.  Why not?
20      Q.  Um-hmm.
21      A.  Because it is what it is.  Right?  I
22  didn't mean any harm.  I didn't do any harm.  So
23  it's just -- just allegations.  That's all.
24      Q.  Did you conclude from Kloosterman's

Page 251

1  questions to you about Jesse's allegations that
2  Jesse had lied in connection with her allegations?
3      A.  I thought that she had a different
4  point of view.  I wouldn't say that she lied.
5      Q.  Okay.  You never concluded that she
6  lied?
7      A.  No.
8      Q.  Is that correct?
9      A.  I just thought she had a different
10  point of view.
11      Q.  Is that correct?
12      A.  Yes.
13      MS. GURMANKIN:  Let me take two minutes
14  and see if I have anything else for you.
15      THE VIDEOGRAPHER:  We are now going off
16  the record.  Time on the camera is 4:26 p.m.
17      (A recess was taken from 4:26 to 4:36
18  p.m.)
19      THE VIDEOGRAPHER:  We are now back on
20  the record at 4:36 p.m.
21  BY MS. GURMANKIN:
22      Q.  Were you ever disciplined at all in
23  connection with Jesse's allegations?
24      A.  No.

Page 252

1      Q.  Were you ever disciplined at all in
2  connection with what you told Kloosterman during
3  the meeting with her?
4      A.  No.
5      Q.  The record retention e-mail that you
6  got telling you to make sure not to delete
7  anything from your e-mail and phone, did you
8  delete anything from your e-mail or phone before
9  you got that?
10      A.  No.
11      Q.  How about since?
12      A.  No.
13      Q.  What kind of phone do you currently
14  have?
15      A.  I don't know.
16      Q.  Is it an iPhone?
17      A.  No.
18      Q.  Android?
19      A.  It's an Android phone, but I don't even
20  know what brand name or anything like that.
21      Q.  How long have you had your current
22  phone?
23      A.  One year.
24      Q.  What did you have before, an Android?

63 (Pages 249 to 252)

Page 253

1      A.  Yep.
2      Q.  Do you still have the one you had
3   before your current one?
4      A.  No.
5      Q.  What happened to that?
6      A.  When I got this phone, I sold it to the
7   Verizon people.
8      Q.  Was all of the information, to your
9   knowledge, downloaded from the old phone into the
10  new phone?
11     A.  I think so.
12     Q.  Are you guessing or do you have any
13  knowledge as to whether that was done?
14     A.  They transferred my contacts and stuff
15  like that.
16     Q.  How about text messages?
17     A.  I don't know if they come along or not.
18     Q.  Does Android have a cloud service, do
19  you know?
20     A.  I don't know.
21     Q.  Did you ever look at your text messages
22  from 2016 through today to see if there was
23  anything that you had that was relevant to Jesse
24  or her allegations?

Page 254

1      A.  Through my text messages?
2      Q.  Um-hmm.
3      A.  There is no text history.
4      Q.  Did you ever look through your texts to
5   confirm that there is nothing in there that
6   relates to Jesse or her allegations?
7      A.  There is no text history.
8      Q.  What does that mean?
9      A.  There's -- there's nothing there.
10     Q.  Did you look?
11     A.  Yes.
12     Q.  When?
13     A.  Whenever they told me to make sure that
14  I saved all of the information.
15     Q.  When you got that e-mail?
16     A.  Yes.
17     Q.  You looked through your texts when you
18  got that e-mail?
19     A.  Yes.
20     Q.  And you didn't see anything related to
21  Jesse or her allegation?
22     A.  There's nothing there.
23     Q.  Was there before or after you got your
24  current phone, the record retention e-mail that

Page 255

1   you got?
2      A.  I don't know.
3      Q.  You don't remember?
4      A.  No.  I'm thinking my phone is new.  But
5   now it's paid for, so maybe it isn't as new as I'm
6   thinking it is.
7      Q.  It may have been before a year ago that
8   you got the current one?
9      A.  I believe so.
10     Q.  When you say there is no text history,
11  I just want to make sure.  Did you text with
12  employees of Shell during your employment?
13     A.  All the time.
14     Q.  But when you say there is no text
15  history, you mean there's nothing regarding Jesse
16  or her claim.  Is that correct?
17     A.  Right.  When I looked between the two
18  of us, there was nothing there at all.
19     Q.  What do you mean?
20     A.  There's no text history.  Her contact
21  is there, and if you hit the text button there is
22  nothing there.  It's as if we've never texted.
23     Q.  But you have texted with Jesse?
24     A.  Oh, yeah.

Page 256

1      Q.  So what happened to the text exchanges?
2      A.  I don't know.
3      Q.  Did do you anything to try to retrieve
4   them?
5      A.  No.
6      Q.  Did you look through your texts with
7   other employees at Shell to see if there is
8   anything in there regarding Jesse or her
9   allegations?
10     A.  I did not.
11         MS. GURMANKIN:  Okay.  That's all I
12  have for you right now.
13         MS. KIRKPATRICK:  I have no questions.
14         THE VIDEOGRAPHER:  This will conclude
15  file number three in the videotaped deposition of
16  Ken Foreman in the matter of Barnes v. Shell, et
17  al.
18         We are going off the record at
19  4:35 p.m., concluding this deposition for today.
20         (4:35 p.m., deposition concluded.)
21
22
23
24

64 (Pages 253 to 256)

Page 257

```
 1   COUNTY OF LYCOMING        :
 2   COMMONWEALTH OF PENNSYLVANIA :
 3
 4            I, Lori A. Fausnaught, RMR/CRR, do
 5   hereby certify that personally appeared before me,
 6   KEN FOREMAN; the witness, being by me first duly
 7   sworn to testify the truth, the whole truth and
 8   nothing but the truth, in answer to oral questions
 9   propounded to him by the attorneys for the
10   respective parties, testified as set forth in the
11   foregoing deposition.
12            I further certify that before the taking
13   of said deposition, the above witness was duly
14   sworn, that the questions and answers were taken
15   down stenographically by the said Lori A.
16   Fausnaught, Court Reporter, Williamsport,
17   Pennsylvania, approved and agreed to, and
18   afterwards reduced to typewriting under the
19   direction of the said Reporter.
20            In testimony whereof, I have hereunto
21   subscribed my hand this 23rd day of September,
22   2020.
23            s/Lori A. Fausnaught, RMR, CRR
             ----------------------------
24            Lori A. Fausnaught, RMR, CRR
```

Page 258

```
 1        INSTRUCTIONS TO THE WITNESS
 2            Read your deposition over carefully
 3   It is your right to read your deposition and make
 4   changes in form or substance.  You should assign a
 5   reason in the appropriate column on the errata
 6   sheet for any change made.
 7            After making any changes in form or
 8   substance which have been noted on the following
 9   errata sheet along with the reason for any change,
10   sign your name on the errata sheet and date it.
11            Then sign your deposition at the
12   end of your testimony in the space provided.  You
13   are signing it subject to the changes you have
14   made in the errata sheet, which will be attached
15   to the deposition before filing.  You must sign it
16   in front of a witness.  Have the witness sign in
17   the space provided.  The witness need not be a
18   notary public.  Any competent adult may witness
19   your signature.
20            Return the original errata sheet to
21   your counsel promptly.  Court rules require filing
22   within thirty days after you receive the
23   deposition.
24
```

Page 259

```
 1            ERRATA SHEET
 2   Attach to Deposition of:  KEN FOREMAN
     Taken on:  February 14, 2020
 3   In the matter of: Barnes v. Shell Exploration and
                Production Co. Appalachia, et al.
 4
 5   PAGE     LINE NO.    CHANGE       REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
```

Page 260

```
 1        SIGNATURE PAGE
 2
 3            - - -
 4
 5            I hereby acknowledge that I have
 6   read the aforegoing transcript, dated February 14,
 7   2020, and the same is a true and correct
 8   transcription of the answers given by me to the
 9   questions propounded, except for the changes, if
10   any, noted on the Errata Sheet.
11
12            - - -
13
14
15
16
17   SIGNATURE:  _____
             KEN FOREMAN
18
19   DATE:  _____
20
21   WITNESSED BY:  _____
22
23
24
```

65 (Pages 257 to 260)

Exhibit 9



# Compressed Transcript of the Testimony of
# HONDO BLAKLEY, 8/16/19

**Case:** Barnes v. Shell Exploration & Production Company Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

JESSE BARNES,          :  CIVIL ACTION-LAW
          Plaintiff,  :
                       :
     vs.               :
                       :
SHELL EXPLORATION AND  :
PRODUCTION COMPANY     :
APPALACHIA; SHELL      :
EXPLORATION AND        :
PRODUCTION COMPANY;    :
SHELL OIL COMPANY,     :
          Defendants.  :  NO. 18-1497

- - -

Videotaped deposition of HONDO BLAKLEY,

taken at the Holiday Inn Express, Conference Room,

100 Pine Street, Williamsport, Pennsylvania,

17701, on Friday, August 16, 2019, beginning at

8:56 a.m. before Nancy J. Taguinot, RPR, CCR(NJ),

Registered Professional Reporter and Notary Public

in and for the Commonwealth of Pennsylvania.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800)447-8648
www.summitreporting.com

## Page 2

```
 1   A P P E A R A N C E S :
 2     CONSOLE MATTIACCI LAW
         BY:  CAREN N. GURMANKIN, ESQUIRE
 3       1525 Locust Street, 9th Floor
         Philadelphia, Pennsylvania 19102
 4       TEL: (215) 545-7676
         EMAIL: GURMANKIN@CONSOLELAW.COM
 5
         -- Representing the Plaintiff
 6
       TUCKER LAW GROUP
 7       BY:  JOE H. TUCKER, JR., ESQUIRE
         1801 Market Street, Suite 2500
 8       Philadelphia, Pennsylvania 19103
         TEL: (215) 875-0609
 9       EMAIL: jtucker@tlgattorneys.com
10     -- Representing the Defendants
11
     A L S O  P R E S E N T :
12
       JESSE BARNES, Via Cell Phone
13     BRYCE CONNOR, Videographer
14                - - -
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1              I N D E X
 2                - - -
 3   WITNESS:  HONDO BLAKLEY
 4   QUESTIONED BY:              PAGE
 5     Ms. Gurmankin        8, 370
       Mr. Tucker           366
 6
 7           E X H I B I T S
 8                - - -
                       MARKED
 9   NUMBER      DESCRIPTION      FOR ID
10   Exhibit 1   Email, 2/9/2017, Thomas    55
               Underholt to Michelle
11             Priest, and attachments,
               Shell_0000883 through
12             Shell_0000892
13   Exhibit 2   Training session for       58
               supervisors on the Shell
14             Code of Conduct, took place
               February 8th, and
15             attachments, Shell_0000802
               through Shell_0000806
16
     Exhibit 3   Our Code of Conduct,       62
17             Shell_0000588 through
               Shell_0000631
18
     Exhibit 4   Shell Anti-Harassment Policy   67
19             and Shell Equal Opportunity
               Policy, Shell_0001056 and
20             Shell_0001057
21   Exhibit 5   Interview Questions: Hondo    119
               Blakley, 12/7/2016,
22             Shell_0001132 through
               Shell_0001136
23
24
```

## Page 4

```
 1           E X H I B I T S
                 (Continued)
 2                - - -
                       MARKED
 3   NUMBER      DESCRIPTION      FOR ID
 4   Exhibit 6   Experienced Hire JG6-10,    188
               Individual Performer, Final
 5             Assessment Interview Rating
               Form, Shell_0000087 through
 6             Shell_0000111
 7   Exhibit 7   Civil Cover Sheet and       211
               attached Complaint
 8
     Exhibit 8   Answer with Affirmative     251
 9             Defenses to Plaintiff's
               Complaint
10
     Exhibit 9   Case Details                257
11             SHELL-16-11-0050,
               Confidential Memorandum,
12             Shell_0001106 through
               Shell_0001110
13
     Exhibit 10  Email, 4/12/13, Hondo       268
14             Blakley to David Summers and
               attachment, Shell_0000076
15             through Shell_0000078
16   Exhibit 11  39102BR-Scheduler Job       350
               Description, Shell_0000878
17             through Shell_0000881
18   Exhibit 12  Email, 8/1/2017, William    358
               Turney to Michelle Priest,
19             Shell_0000642 through
               Shell_0000668
20
21
22
23
24
```

1 (Pages 1 to 4)

Page 5

```
 1              - - -
 2       DEPOSITION SUPPORT INDEX
 3              - - -
 4    Direction to Witness Not to Answer
 5            PAGE   LINE
 6             25    20
               26    23
 7             73    23
               74    12
 8             74    18
               75     7
 9            180    13
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

```
 1              - - -
 2          (It is hereby stipulated and agreed by
 3    and between counsel for the respective
 4    parties that sealing, certification, and
 5    filing are waived and that all objections,
 6    except as to the form of the question, are
 7    reserved until the time of trial.)
 8              - - -
 9          VIDEOGRAPHER:  We are on the record,
10    8:56 a.m.  The date today is August 16, 2019.
11    This is the start of media unit number one in
12    the videotaped deposition of Hondo Blakley in
13    the matter of Jesse Barnes v. Shell
14    Exploration and Production Company
15    Appalachia, et al., filed in the U.S.
16    District Court, Middle District of PA, Number
17    18-1497.
18          This deposition is being held at 100
19    Pine Street, Williamsport, PA, 17701.
20          My name is Bryce Connor from the firm
21    of Summit Court Reporting, Incorporated, and
22    I am the videotape operator.
23          The court reporter today is Nancy
24    Taguinot, also from the firm of Summit Court
```

Page 7

```
 1    Reporting, Incorporated.
 2          Counsel will now please state their
 3    appearance and firm affiliation for the
 4    record.
 5          MS. GURMANKIN:  Caren Gurmankin of
 6    Console Mattiacci Law for the Plaintiff.
 7          MR. TUCKER:  Joe Tucker on behalf of
 8    Shell Oil.
 9          VIDEOGRAPHER:  Will the court reporter
10    now please swear in the witness.
11              - - -
12          HONDO BLAKLEY,
13      having been first duly sworn, was
14      examined and testified as follows:
15              - - -
16          MR. TUCKER:  I think the record should
17    reflect that Ms. Jesse Barnes is also
18    attending this deposition via speakerphone.
19    So I think that should be noted for the
20    record, that her appearance is not physically
21    here, but she is listening and hearing the
22    deposition that's going on.
23              - - -
24          EXAMINATION
```

Page 8

```
 1              - - -
 2    BY MS. GURMANKIN:
 3      Q.   Mr. Blakley, good morning.
 4      A.   Good morning.
 5      Q.   We met out in the hallway, but just
 6    for the record, my names Caren Gurmankin and I
 7    have the privilege of representing Jesse Barnes in
 8    a lawsuit that she's filed against Shell for sex
 9    discrimination and retaliation.
10          Have you ever had your deposition
11    taken before?
12      A.   Yes.
13      Q.   How many times?
14      A.   One.
15      Q.   When?
16      A.   Four years ago or five years ago.
17      Q.   Okay.  I'm sure you're familiar with
18    the rules, but I'm going to go through them again
19    with you so that you and I are on the same page.
20          I'm going to go ask you a series of
21    questions today.  If I ask you a question and you
22    don't understand my question, I need you to tell
23    me so I can rephrase it.
24      A.   (Witness nods head.)
```

2 (Pages 5 to 8)

Page 9

1     Q.    If I ask you a question and you answer
2  my question, I'm going to assume that you've
3  understood it and that you've answered it
4  accordingly.
5         Do you understand that?
6     A.    Yes.
7     Q.    As you've been doing, we need you to
8  keep giving verbal responses to my questions.  The
9  deposition is being recorded by video, but it will
10 also result in a written transcript and the court
11 reporter can't note if you shake your head or say
12 uh-huh.
13        Do you understand that?
14    A.    Yes.
15    Q.    Even though the deposition is being
16 conducted in a boardroom at a hotel, it has the
17 same force and effect as if you were testifying in
18 federal court in front of a federal judge and
19 jury.
20        You've just taken an oath to tell the
21 truth.  If you don't tell the truth, and that
22 includes saying you don't know when you do know or
23 you don't remember when you do remember, that's
24 considered perjury and that's a felony.

Page 10

1         Do you understand that?
2     A.    Yes.
3     Q.    Just for the sake of the written
4  transcript, even if you anticipate what my
5  question's going to be, try to let me finish my
6  entire question before you answer it; and
7  likewise, I'll try to let you finish your entire
8  answer before I ask you the next question.
9         Do you understand that?
10    A.    Yes.
11    Q.    Is there any reason why you would not
12 be able to testify truthfully today regarding
13 events that have occurred in the past?
14    A.    No.
15    Q.    What's your date of birth?
16    A.    ███████████
17    Q.    The deposition that you testified in
18 about four or five years ago, what was that in
19 connection with?
20    A.    Some other work-related issues.
21    Q.    Connected to your employment with
22 Shell?
23    A.    Yes.
24    Q.    What was the nature of that issue?

Page 11

1     A.    Hiring of an employee.
2     Q.    Were you a witness?
3     A.    Yes.
4         MR. TUCKER:  Hondo, take your hands
5  away from your microphone.
6         THE WITNESS:  Sorry about that.
7  BY MS. GURMANKIN:
8     Q.    What was a summary of the issue
9  regarding the hiring of an employee that led to
10 you being deposed?
11    A.    I don't know that I can answer that.
12        MR. TUCKER:  Yes, you can.  You can.
13        THE WITNESS:  Could you repeat the
14 question?
15 BY MS. GURMANKIN:
16    Q.    Sure.
17        What was the nature of the issue
18 regarding the hiring of the employee that led to
19 you being deposed about four or five years ago?
20 ████████████████████████████████████████████████
21 ████████████████████████████████████████████████
22 ████████████████████████████████████████████████
23 ████████████████████████████████████████████████
24 ████████████████████████████████████████████████

Page 12

1  ████████████████████████████████████████████████
2  ████████████████████████████████████████████████
3  ████████████████████████████████████████████████
4  ████████████████████████████████████████████████
5  ████████████████████████████████████████████████
6  ████████████████████████████████████████████████
7  ████████████████████████████████████████████████
8  ████████████████████████████████████████████████
9  ████████████████████████████████████████████████
10 ████████████████████████████████████████████████
11 ████████████████████████████████████████████████
12 ████████████████████████████████████████████████
13 ████████████████████████████████████████████████
14 ████████████████████████████████████████████████
15 ████████████████████████████████████████████████
16 ████████████████████████████████████████████████
17 ████████████████████████████████████████████████
18 ████████████████████████████████████████████████
19 ████████████████████████████████████████████████
20 ████████████████████████████████████████████████
21 ████████████████████████████████████████████████
22 ████████████████████████████████████████████████
23 ████████████████████████████████████████████████
24 ████████████████████████████████████████████████

3  (Pages 9 to 12)

Page 13



Page 14

MS. GURMANKIN: Okay. And we're lifting the confidentiality designation on that topic?
MR. TUCKER: Correct.
BY MS. GURMANKIN:
Q. You're currently employed with Shell, correct?
A. Yes.
Q. When did you start working with Shell?

Page 15

A. Fourteen years ago.
Q. So around 2005?
A. Yeah.
Q. As a full-time employee?
A. Yes.
Q. Had you worked as a contractor before 2005?
A. No.
Q. During your entire employment with Shell, up through today, have you ever done anything to violate company policy?
A. No.
Q. Have you ever done anything inappropriate during your entire employment at Shell?
MR. TUCKER: Objection to what the term inappropriate may mean, but you may answer.
THE WITNESS: No.
BY MS. GURMANKIN:
Q. You worked with Jesse Barnes while she was employed at Shell, correct?
A. Yes.
Q. For about how many years did you work

Page 16

with her?
MR. TUCKER: While employed at Shell or a total time of employment?
BY MS. GURMANKIN:
Q. Yeah, at Shell. At Shell.
MR. TUCKER: You understand just while she was employed at Shell, how long did you work with her.
BY MS. GURMANKIN:
Q. She started full time in September of 2015, if that helps?
A. So from 2015 until this past year.
Q. Until 2019?
A. (Witness nods head.)
Q. Yes?
A. Yes.
Q. Did you work with her when she was a contractor at Shell before September 2015?
A. Yes.
Q. During the entire time that you worked with her, did you ever think that she was dishonest?
MR. TUCKER: Objection to the use of the term "dishonest."

4 (Pages 13 to 16)

Page 17

1　　　You may answer.
2　　　THE WITNESS:  No.
3　BY MS. GURMANKIN:
4　　　Q.　During the entire time that you worked
5　with her, did you ever conclude that she violated
6　company policy?
7　　　A.　No.
8　　　Q.　During the entire time that you worked
9　with her, did you ever conclude that she did
10　anything inappropriate?
11　　　MR. TUCKER:  Objection to the use of
12　　　the term "inappropriate."
13　　　You may answer.
14　　　THE WITNESS:  No.
15　BY MS. GURMANKIN:
16　　　Q.　Do you know who Wayne Fletcher is?
17　　　A.　Yes.
18　　　Q.　Who is he?
19　　　A.　The safety tech.
20　　　Q.　You've worked with him?
21　　　A.　Yes.
22　　　Q.　For about how many years?
23　　　A.　Approximately the same amount of
24　years.

Page 18

1　　　Q.　As what?
2　　　A.　As a -- he was a safety tech.
3　　　Q.　Approximately the same amount of years
4　as what?
5　　　A.　Since 2014.
6　　　Q.　Okay.  Through the present?
7　　　A.　Yup.
8　　　Q.　As a result of your working with
9　Fletcher, do you have any reason to doubt his
10　honesty or integrity?
11　　　A.　No.
12　　　Q.　Who's Matt Empsen?
13　　　A.　A former Shell employee.
14　　　Q.　Do you know when he left?
15　　　A.　He still works for Shell, just not in
16　Appalachia.
17　　　Q.　Okay.  When did you work with him?
18　　　A.　2016 through 2018 probably, end of
19　2017.
20　　　Q.　In 2017, 2018, is that when he moved
21　to another area of Shell?
22　　　A.　Yes.
23　　　Q.　Where did he go, do you know?
24　　　A.　The chemical plant in Pittsburgh.

Page 19

1　　　Q.　Do you know why he went to the
2　chemical plant in Pittsburgh?
3　　　A.　No.
4　　　Q.　But you worked with him before he went
5　to the chemical plant in Pittsburgh?
6　　　A.　Yes.
7　　　Q.　As a result of your working with him,
8　do you have any reason to doubt his honesty or
9　integrity?
10　　　A.　No.
11　　　Q.　Do you have a phone that the company
12　pays for?
13　　　A.　Yes.
14　　　Q.　And how long has the company paid for
15　your phone?
16　　　A.　My entire employment.
17　　　Q.　From 2005?
18　　　A.　Yes.
19　　　Q.　Do you still have the same phone that
20　you had in 2016?
21　　　A.　Yes.
22　　　Q.　Do you have any text messages to or
23　from Jesse Barnes on your phone?
24　　　A.　Yes.

Page 20

1　　　Q.　Has anyone from the company asked you
2　to send text messages that you have on your phone
3　to or from Jesse Barnes?
4　　　MR. TUCKER:  Objection.  Do not
5　　　have -- you are not to talk about any
6　　　conversations that you may or may not have
7　　　had with an attorney.  Outside of --
8　　　MS. GURMANKIN:  He has --
9　　　MR. TUCKER:  Outside of that, you may
10　　　answer her question.
11　　　MS. GURMANKIN:  It's a yes or no
12　　　question.  It doesn't go to the substance of
13　　　any communications.
14　　　THE WITNESS:  Yes.
15　BY MS. GURMANKIN:
16　　　Q.　Have you done that?
17　　　A.　Yes.
18　　　Q.　Who did you send them to?
19　　　A.　One of the legal counsel.
20　　　Q.　Who?
21　　　A.　Rosa.
22　　　Q.　Last name?
23　　　A.　Garcia.
24　　　Q.　When?

5 (Pages 17 to 20)

Page 21

1  A.    The end of last year.
2  Q.    The end of 2018?
3  A.    Yeah.
4  Q.    Did you check to see if you had any
5  other documents or pictures or anything else on
6  your phone related to Jesse Barnes?
7  A.    Yes.
8  Q.    What else did you look for?
9  A.    That was it.
10  Q.    Did you look for anything else?
11  A.    Other than text messages?
12  Q.    Yeah.
13  A.    Yeah.  Nothing was there.
14  Q.    What did you look for?
15  A.    Emails.
16  Q.    Anything else?
17  A.    No.
18  Q.    Did you look to see if you had any
19  pictures?
20  A.    No.
21  Q.    Has anyone from Shell ever asked you
22  if you had any pictures on your phone related to
23  Jesse Barnes or the allegations that she's making
24  in this case?

Page 22

1  A.    Yes.
2  Q.    And did you look?
3  A.    No.
4  Q.    Why not?
5  A.    I know I didn't have any.
6  Q.    But you didn't look to check, correct?
7  A.    Correct.
8  Q.    As of 2016, did you have an office at
9  Shell or a cubicle?
10  A.    Yes.
11  Q.    A dedicated space that you used?
12  A.    Yes.
13  Q.    Okay.  Do you still have that same
14  dedicated space?
15  A.    No.
16  Q.    When did you move?
17  A.    2018.
18  Q.    And where did you relocate to?
19  A.    Another space across the hall.
20  Q.    Same area?
21  A.    Yes.
22  Q.    Did you ever look in your space to see
23  if you had any hard copies of documents, papers
24  related to Jesse Barnes or the allegations that

Page 23

1  she's making in this case?
2  A.    Yes.
3  Q.    When?
4  A.    When I first was requested in 2018.
5  Q.    By whom?
6  A.    HR rep -- rep.
7  Q.    Who?
8  A.    Megan Kloosterman.
9  Q.    And that was 2018?
10  A.    I believe so.
11  Q.    Was it at the time that Megan
12  Kloosterman interviewed you as part of --
13  A.    Yes.
14  Q.    -- an investigation?
15       MR. TUCKER:  Let her -- let her finish
16  her question before you answer.  Even though
17  you may anticipate her question, the young
18  lady seated there to you right can't take
19  down if both you and she are talking at the
20  same time, and also you cannot hear her
21  question or understand her question if you're
22  answering it while she's asking it.  Okay?
23       THE WITNESS: (Witness nods head.)
24  BY MS. GURMANKIN:

Page 24

1  Q.    Did Megan Kloosterman ask you to look
2  for documents in your office space to see if you
3  had anything related to Jesse Barnes at the time
4  that she interviewed you as part of an
5  investigation into complaints that Jesse was
6  making?
7  A.    Yes.
8  Q.    Okay.  And did that happen before
9  2018?
10  A.    Right at the end of 2017, 2018, when
11  the allegations were made.
12  Q.    Did you look for documents in your
13  office space or your work space at that time?
14  A.    Yes.
15  Q.    Did you find anything?
16  A.    No.
17  Q.    Have you looked at any point since
18  then to see if you have any documents related to
19  Jesse in your work space?
20  A.    No.
21  Q.    Has anyone from Shell ever asked you
22  if they could see your phone and check the
23  contents on it?
24  A.    Yes.

6 (Pages 21 to 24)

Page 25

1    Q.    Who?
2    A.    Our legal counsel.
3    Q.    Name?
4         MR. TUCKER:  Let me see my client
5    outside for a second.  Let's go off the
6    record.
7         VIDEOGRAPHER:  We're now going off the
8    record.  The time on the camera is 9:12 a.m.
9              - - -
10        (Whereupon, a recess was taken from
11   9:12 a.m. until 9:14 a.m.)
12             - - -
13        VIDEOGRAPHER:  We are now back on the
14   record at 9:14 a.m.
15   BY MS. GURMANKIN:
16   Q.    What's the name of the legal counsel
17   at Shell who asked to see your phone?
18   A.    Rosa Garcia.
19   Q.    And did you hand it over to her?
20        MR. TUCKER:  Objection.  Don't answer.
21        MS. GURMANKIN:  Why not?
22        MR. TUCKER:  Attorney/client
23   privilege.
24        MS. GURMANKIN:  The answer to the

Page 26

1    question did you hand it over to her --
2         MR. TUCKER:  Yes.
3         MS. GURMANKIN:  -- yes, no?
4         MR. TUCKER:  Yes.
5         MS. GURMANKIN:  What communications
6    does that go to?
7         MR. TUCKER:  He's not going to answer
8    the question, Counsel.  You can move on.
9         MS. GURMANKIN:  What communications
10   does that go to?
11        MR. TUCKER:  He's not going to answer
12   the question, Counsel.
13   BY MS. GURMANKIN:
14   Q.    Did she look at your phone?
15        MR. TUCKER:  You can answer that.
16        THE WITNESS:  Repeat the question.
17   BY MS. GURMANKIN:
18   Q.    Did she look at your phone?
19   A.    No.
20   Q.    Why not?
21   A.    I don't recall exactly why.
22   Q.    When did she ask you?
23        MR. TUCKER:  Don't answer that
24   question, counselor.  I mean --

Page 27

1         MS. GURMANKIN:  When is not
2    attorney/client privileged.
3         MR. TUCKER:  Don't answer that
4    question.
5         MS. GURMANKIN:  You're instructing him
6    not to answer --
7         MR. TUCKER:  Yes.
8         MS. GURMANKIN:  -- based
9    on attorney/client privilege based on the
10   question when?
11        MR. TUCKER:  Yes.
12        MS. GURMANKIN:  It's Defendants'
13   assertion that when is a privileged
14   communication?
15        MR. TUCKER:  He's not going --
16        MS. GURMANKIN:  A date is a privileged
17   communication?
18        MR. TUCKER:  He's not going to answer
19   the question, Counsel.
20   BY MS. GURMANKIN:
21   Q.    Are you listening to your attorney's
22   instruction not to answer the question --
23        MR. TUCKER:  Yes, he is.
24        MS. GURMANKIN:  -- as to when that

Page 28

1    happened?
2         MR. TUCKER:  Yes, he's going to listen
3    to that question.  Yes, he's going to follow
4    my advice too.
5         MS. GURMANKIN:  Are you going to
6    answer the question, Joe, of what is the
7    basis for the assertion that when is an
8    attorney-client privilege objection?
9         MR. TUCKER:  I'm not here to be
10   deposed, Counsel, and I will never -- I'm not
11   here to answer questions being posed to me
12   during the deposition.
13   BY MS. GURMANKIN:
14   Q.    Has anyone else from Shell other than
15   Rosa Garcia asked to see your phone?
16   A.    No.
17   Q.    What's your educational background?
18   A.    I graduated high school.
19   Q.    When?
20   A.    1997.
21   Q.    You have your high school degree?
22   A.    Uh-huh.
23   Q.    Yes?
24   A.    Yes.

7 (Pages 25 to 28)

Page 29

1    Q.    Do you have a college degree?
2    A.    No.
3    Q.    Have you ever represented anywhere
4  that you have a college degree?
5    A.    No.
6    Q.    You sure?
7    A.    Yes.
8    Q.    Have you taken any college coursework?
9    A.    Yes.
10   Q.    Where?
11   A.    Online.
12   Q.    I'm sorry?
13   A.    Online.
14   Q.    With what institution?
15   A.    I don't recall the name.
16   Q.    When?
17   A.    Probably around 2007.
18   Q.    What coursework did you take?
19   A.    Safety.
20   Q.    How many classes?
21   A.    Ten.
22   Q.    Ten?
23   A.    (Witness nods head.)
24   Q.    Yes?

Page 30

1    A.    Yes.
2    Q.    All with the same online institution?
3    A.    Yes.
4    Q.    All in 2007?
5    A.    Yes.
6    Q.    Did Shell pay for that?
7    A.    No.
8    Q.    Other than your high school diploma,
9  do you have any other degrees post high school or
10 certifications?
11   A.    Yes.
12   Q.    What?
13   A.    I'm certified in CPR and first aid.
14   Q.    Anything else?
15   A.    OSHA certification.
16   Q.    Anything else?
17   A.    No.
18   Q.    When did you get the CPR/first aid
19 certification?
20   A.    Two years ago.
21   Q.    How about OSHA?
22   A.    Ten years ago.
23   Q.    Shell pay for either of those?
24   A.    Yes.

Page 31

1    Q.    Did you take them at Shell?
2    A.    Can you repeat the question?
3    Q.    Yeah.
4          Did you take the classes that led to
5  the certification at Shell?
6    A.    I don't understand what "at Shell"
7  means.
8    Q.    At the workplace or another
9  institution?
10   A.    Yes.
11   Q.    At Shell?
12   A.    One was at Shell.
13   Q.    Which one?
14   A.    CPR/first aid.
15   Q.    Where was OSHA?
16   A.    Red Rocks Community College in Denver,
17 Colorado.
18   Q.    Immediately prior to working at Shell
19 in 2005, where were you employed?
20   A.    Sure Safe.
21   Q.    Sure Safe?
22   A.    (Witness nods head.)
23   Q.    Yes?
24   A.    Yes.

Page 32

1    Q.    For what years?
2    A.    Two thousand -- from 2005 to -- back
3  to 2003, approximate.
4    Q.    What -- what position were you in at
5  Sure Safe?
6    A.    Safety consultant.
7    Q.    Were you a full-time employee?
8    A.    Yes.
9    Q.    Why did you leave?
10   A.    Better opportunity.
11   Q.    At Shell?
12   A.    Yes.
13   Q.    You left voluntarily?
14   A.    Yes.
15   Q.    To your knowledge, was there ever a
16 complaint made about you while you were employed
17 at Sure Safe?
18   A.    No.
19   Q.    Were you ever disciplined at Sure
20 Safe?
21   A.    No.
22   Q.    At Sure Safe did you take any training
23 on the anti-harassment or anti-discrimination
24 laws?

8 (Pages 29 to 32)

Page 33

1      A.    No.
2      Q.    Ever report to a woman during your
3    employment at Sure Safe?
4      A.    No.
5      Q.    Immediately prior to Sure Safe, where
6    were you?
7      A.    Could you repeat that?
8      Q.    Sure.
9            Immediately prior to Sure Safe, where
10   were you employed?
11     A.    I don't recollect the name.
12     Q.    How long were you employed at that
13   company that you can't remember the name of?
14     A.    Four years.
15     Q.    Is that from about '99 through 2003?
16     A.    Yeah.
17     Q.    What position did you hold there?
18     A.    Roustabout.
19           THE REPORTER:  I'm sorry?
20           THE WITNESS:  Roustabout.
21   BY MS. GURMANKIN:
22     Q.    Full-time employee?
23     A.    Yes.
24     Q.    Why did you leave?

Page 34

1      A.    Better opportunity.
2      Q.    At Sure Safe?
3      A.    Yes.
4      Q.    You left voluntarily?
5      A.    Yes.
6      Q.    To your knowledge, was there ever a
7    complaint made about you at this company you were
8    at immediately prior to Sure Safe?
9      A.    No.
10     Q.    Were you ever disciplined --
11     A.    No.
12     Q.    -- during your employment with that
13   company?
14     A.    No.
15     Q.    Did you ever report to a woman while
16   you were at that company?
17     A.    No.
18     Q.    Immediately prior to that company,
19   from '99 through 2003, where were you?
20     A.    Weldon's Construction.
21     Q.    I'm sorry.  What was the first name?
22     A.    Weldon's.
23     Q.    From when?
24     A.    The end of '98 to 2003.

Page 35

1      Q.    Were you working at Weldon's while you
2    were employed at this company you were at
3    immediately prior to Sure Safe?
4      A.    Yes.
5      Q.    Were you working at both companies the
6    entire time from '99 through 2003?
7      A.    Could you repeat that?
8      Q.    Sure.
9            Were you working at Weldon's
10   Construction at the same time you were working at
11   this company that you can't remember the name of
12   the entire period from '99 through 2003?
13     A.    No.  Not at the same time.
14     Q.    All right.  But you were at Weldon's
15   from '99 through 2003?
16     A.    I was at Weldon's Construction.
17     Q.    I'm sorry, from '98 to 2003?
18     A.    I left Weldon's to go to work for
19   the -- that other company, and then Sure Safe.
20     Q.    When did you leave Weldon's?
21     A.    Right before I went to work for the
22   other company.
23     Q.    So you were there -- you were at
24   Weldon's from about '98 through '99?

Page 36

1      A.    Yeah.
2      Q.    What position were you in at Weldon's?
3      A.    Roustabout.
4      Q.    You were a full-time employee?
5      A.    Yes.
6      Q.    To your knowledge, was there ever a
7    complaint made about you while you were at
8    Weldon's?
9      A.    No.
10     Q.    Ever subject to any discipline while
11   you were at Weldon's?
12     A.    No.
13     Q.    Did you ever take any training on the
14   anti-discrimination or anti-harassment laws while
15   you were at Weldon's?
16     A.    No.
17     Q.    How about at that company you were at
18   between Weldon's and Sure Safe, ever take any
19   training on the anti-discrimination or
20   anti-harassment laws there?
21     A.    No.
22     Q.    Ever report to a woman while you were
23   at Weldon's?
24     A.    No.

9 (Pages 33 to 36)

Page 37

1    Q.    And immediately prior to Weldon's
2  starting in '98, where were you?
3    A.    Prior to?
4    Q.    Yeah.
5    A.    Wendy's.
6    Q.    Was that since your graduation from
7  high school?
8    A.    Yes.
9    Q.    Did you leave Wendy's when you started
10  at Weldon's in '98?
11    A.    Yes.
12    Q.    Any other places that you've been
13  employed since you graduated from high school?
14    A.    No.
15    Q.    How was it that you started working at
16  Shell in 2005?
17    A.    I applied for the HSE job and was
18  successful.
19    Q.    Was it posted?
20    A.    Yes.
21    Q.    Where did you see it posted?
22    A.    The local newspaper.
23    Q.    Did you interview?
24    A.    Yes.

Page 38

1    Q.    With whom?
2    A.    George Cook, Ken Brown.
3    Q.    Anyone else?
4    A.    No.
5    Q.    When you started, what was your first
6  position?
7    A.    HSE tech.
8    Q.    Who did you report to?
9    A.    Ken Brown.
10    Q.    What was his position?
11    A.    Operations manager.
12    Q.    How long were you HSE tech?
13    A.    Several years.
14    Q.    Until about when?
15    A.    2012, 2013.
16    Q.    And then what happened?
17    A.    I got a promotion.
18    MR. TUCKER:  Excuse me.  Are you
19  picking up this air here?  Are you getting
20  it?
21    MS. GURMANKIN:  Let's go off for a
22  sec.
23    VIDEOGRAPHER:  We're now going off the
24  record.  The time on the camera is 9:26 a.m.

Page 39

1    - - -
2    (Whereupon, a recess was taken from
3  9:26 a.m. until 9:29 a.m.)
4    - - -
5    VIDEOGRAPHER:  We're now back on the
6  record at 9:29 a.m.
7  BY MS. GURMANKIN:
8    Q.    What position were you promoted into
9  in 2012, 2013?
10    A.    Staff associate.
11    Q.    Did your reporting structure change?
12  Did you still report to Ken Brown or were you
13  reporting to someone else after you were promoted?
14    A.    I was reporting to someone else.
15    Q.    Who?
16    A.    I was reporting to Tomas Hinojosa.
17    Q.    Male, correct?
18    A.    Yes.
19    Q.    And his title?
20    A.    Superintendent.
21    Q.    How long did you hold the staff
22  associate position?
23    A.    Two, three years.
24    MS. GURMANKIN:  Can you hand me the

Page 40

1  phone for a second?
2    MR. TUCKER:  Do you want to go off the
3  video record?
4    MS. GURMANKIN:  Okay.
5  BY MS. GURMANKIN:
6    Q.    What happened after two, three years?
7    A.    I had got a role as an HSE tech again.
8    Q.    Was that a demotion?
9    A.    No.
10    Q.    If you were promoted from HSE tech to
11  staff associate, how is it not a demotion to go
12  from staff associate back to HSE tech?
13    A.    Because I asked for it.
14    Q.    Why?
15    A.    Because to get the staff associate
16  promotion, I had to take a relocation to Texas.
17  The field was being sold in Texas and we just
18  purchased a field in Pennsylvania, and my ability
19  and knowledge, training as an HSE tech made me a
20  prime candidate to go to Pennsylvania.
21    Q.    Did you have your option to stay in
22  Texas?
23    A.    Yes.
24    Q.    You wanted to come back to

10 (Pages 37 to 40)

Page 41

1  Pennsylvania?
2      A.    I wanted to go to Pennsylvania.
3      Q.    Were you in Texas from 2005?
4      A.    No.
5      Q.    When did you relocate to Texas?
6      A.    2007.
7      Q.    In order to come to Pennsylvania, was
8  it your understanding that you would have to
9  become an HSE tech again?
10     A.    Yes.
11     Q.    Who told you that?
12     A.    Rick Mykitta.
13     Q.    Who was he?
14     A.    The operations manager for
15 Pennsylvania.
16     Q.    So you came to Pennsylvania as an HSE
17 tech?
18     A.    Yes.
19     Q.    When?
20     A.    2010.
21     Q.    Well, you had said that you were
22 promoted to staff associate in 2012, 2013; is that
23 accurate?
24     A.    No.

Page 42

1      Q.    When were you promoted to staff
2  associate?
3      A.    Around 2008.
4      Q.    You were a staff associate for about
5  two years?
6      A.    (Witness nods head.)
7      Q.    Yes?
8      A.    Yes.
9      Q.    And then you went back to being HSE
10 tech?
11     A.    No.  I went to be an HSE tech, not
12 back.
13     Q.    You started as an HSE tech?
14     A.    Correct.
15     Q.    And then you were a staff associate --
16     A.    Yes.
17     Q.    -- for about two years?  Right?
18     A.    Yes.
19     Q.    And then in 2010 you went back to
20 being an HSE tech?
21     A.    No.  I went to be an HSE tech.
22     Q.    A position that you had already held
23 before your promotion as staff associate, correct?
24     A.    Correct.

Page 43

1      Q.    And that was in Pennsylvania?
2      A.    Yes.
3      Q.    So you relocated to Pennsylvania in
4  around 2010?
5      A.    Yes.
6      Q.    When you relocated to Pennsylvania and
7  became an HSE tech again, who were you reporting
8  to?
9      A.    Rick Mykitta.
10     Q.    What was his title?
11     A.    Operations manager.
12     Q.    Where in Pennsylvania were you
13 working?
14     A.    Wellsboro.
15     Q.    How long did you hold the HSE position
16 the second time?
17     A.    Two years.
18     Q.    Until about 2012?
19     A.    Yeah.
20     Q.    And then what happened?
21     A.    I got promoted to a field supervisor.
22     Q.    Was that position posted?
23     A.    Yes.
24     Q.    Did you apply?

Page 44

1      A.    Yes.
2      Q.    Were you interviewed?
3      A.    Yes.
4      Q.    By whom?
5      A.    Danny Echols.
6      Q.    Anyone else?
7      A.    No.
8      Q.    Do you know if anyone else applied for
9  the position of field supervisor?
10     A.    No.
11     Q.    You got that promotion?
12     A.    Yes.
13     Q.    Who were you reporting to when you
14 became field supervisor?
15     A.    Danny Echols.
16     Q.    His title?
17     A.    Production superintendent.
18     Q.    Still working in Wellsboro as field
19 supervisor?
20     A.    Was I?
21     Q.    Yeah.
22     A.    After I was promoted, yes.
23     Q.    How long did you hold the position of
24 field supervisor?

11  (Pages 41 to 44)

Page 45

1　　A.　Approximately two, three years.
2　　Q.　Till around 2015?
3　　A.　Yeah, approximately.
4　　Q.　And then what happened?
5　　A.　I got a role as a process improvement
6　lead.
7　　Q.　Was that a promotion?
8　　A.　Yes.
9　　Q.　Was that position posted?
10　　A.　Yes.
11　　Q.　Did you apply for it?
12　　A.　Yes.
13　　Q.　Were you interviewed?
14　　A.　Yes.
15　　Q.　By whom?
16　　A.　Robin Grouette.
17　　Q.　Anyone else?
18　　A.　No.
19　　Q.　When you were promoted into process
20　improvement lead, were you still based in
21　Wellsboro?
22　　A.　No.
23　　Q.　Where were you based?
24　　A.　Pittsburgh.

Page 46

1　　Q.　How long were you based in Pittsburgh?
2　　A.　Almost two years.
3　　Q.　To around 2017?
4　　A.　Yeah.
5　　Q.　When you were based in Pittsburgh from
6　about 2015 through about 2017, did you work at all
7　out of Wellsboro?
8　　A.　Yes.
9　　Q.　About how often?
10　　A.　A few times a month I would drive up.
11　　Q.　And about how long would you stay each
12　visit?
13　　A.　No longer than a week.
14　　Q.　So you would stay for about a week or
15　no longer than a week a few times a months from
16　2015 through 2017?
17　　A.　Yes.
18　　Q.　And how long did you remain process
19　improvement lead?
20　　A.　Through two, three years.  So probably
21　through 2018.  The end of 2017 right into '18.
22　Somewhere right in there.
23　　Q.　What happened then?
24　　A.　I got the production superintendent

Page 47

1　role.
2　　Q.　That was a promotion?
3　　A.　Yes.
4　　Q.　Was that position posted?
5　　A.　Yes.
6　　Q.　Did you apply?
7　　A.　Yes.
8　　Q.　Did you interview?
9　　A.　Yes.
10　　Q.　With who?
11　　A.　Greg Larsen and Steve Craig.
12　　Q.　Do you know if anyone else applied?
13　　A.　Yes.
14　　Q.　Who else?
15　　A.　I don't know who.  I just know there
16　were other applicants.
17　　Q.　How do you know?
18　　A.　You can see it on the posting.
19　　Q.　That there were other applicants, but
20　not who?
21　　A.　Correct.
22　　Q.　Who told you that you got that
23　position?
24　　A.　Steve Craig.

Page 48

1　　Q.　When you got that position, where did
2　you work?
3　　A.　Wellsboro, Pennsylvania.
4　　Q.　Full time?
5　　A.　Yes.
6　　Q.　Reporting to whom?
7　　A.　Greg Larsen.
8　　Q.　Do you still hold that position?
9　　A.　No.
10　　Q.　When did that change?
11　　A.　2000 -- I'm sorry.  Could you repeat
12　the question?
13　　Q.　Sure.
14　　　When did that change that you were no
15　longer production superintendent?
16　　A.　So let me rephrase.  I am -- I thought
17　you meant if Greg Larsen still held that position,
18　but I still hold my position.
19　　Q.　As production superintendent?
20　　A.　Superintendent.
21　　Q.　You've held that position since around
22　late '17, early '18?
23　　A.　Correct.
24　　Q.　What was Greg Larsen's title when you

12 (Pages 45 to 48)

Page 49

1  started reporting to him when you were promoted
2  into the production superintendent role?
3      A.    Operations manager.
4      Q.    Did you report to anyone else other
5  than Larsen during the time that you were
6  production superintendent?
7      A.    Yes.
8      Q.    Who else?
9      A.    Steve Craig.
10     Q.    Did you report to both of them at the
11  same time?
12     A.    For a short period.
13     Q.    When?
14     A.    The end of 2017.  The last two months
15  probably.
16     Q.    So right around the time that you were
17  promoted into that position?
18     A.    Correct.
19     Q.    And then what happened after a couple
20  months?
21     A.    Greg Larsen retired.
22     Q.    After that, did you report directly to
23  Craig?
24     A.    Steve Craig, yes.

Page 51

1      Q.    What happened after about a year and a
2  half that led to you no longer reporting to her?
3      A.    Her work visa ran out.  She had to
4  accept another role in her home country.
5      Q.    Which is what?
6      A.    Canada.
7      Q.    So she left?
8      A.    Yes.
9      Q.    Did she leave Shell altogether?
10     A.    No.
11     Q.    To your knowledge, is she still
12  employed with Shell?
13     A.    Yes.
14     Q.    Other than Robin Grouette, have you
15  ever reported to another woman during the entire
16  time that you've been employed at Shell?
17     A.    No.
18     Q.    Was Robin Grouette, as operations
19  manager, the highest level female that you've
20  known during your entire employment at Shell?
21     A.    No.
22     Q.    What woman have you known to be in a
23  higher level position than Robin Grouette as
24  operations manager?

Page 50

1      Q.    Anyone else other than Steve Craig?
2      A.    No.
3      Q.    Do you still report to him?
4      A.    Yes.
5      Q.    And you've reported to him
6  consistently since Larsen retired?
7      A.    Yes.
8      Q.    And Steve Craig's position?
9      A.    Operations manager.
10     Q.    During your employment at Shell, have
11  you ever reported to a woman?
12     A.    Yes.
13     Q.    Who?
14     A.    Robin Grouette.
15     Q.    When was that?
16     A.    When I was the process improvement
17  lead.
18     Q.    What was Robin's position?
19     A.    Operations manager.
20     Q.    How long did you report to her?
21     A.    Approximately a year and a half.
22     Q.    So that wasn't the entire time that
23  you were process improvement lead?
24     A.    No.

Page 52

1          MR. TUCKER:  Objection, because that's
2  confusing.  Are you asking what woman has
3  been an operations manager or since he's been
4  operations manager?
5          MS. GURMANKIN:  No.
6  BY MS. GURMANKIN:
7      Q.    Do you understand the question?
8      A.    I don't.
9      Q.    Have you known any other female who's
10  been in a higher level position than the
11  operations manager position that Robin Grouette
12  held?
13         MR. TUCKER:  Objection.
14         You may answer.
15         THE WITNESS:  I don't -- what does
16  "know" mean?  I don't understand what you
17  mean "known."
18  BY MS. GURMANKIN:
19     Q.    You don't know what that word means?
20     A.    Well, I know what it means, but I
21  don't know the -- to it in the context of the
22  question.
23     Q.    Are you aware of any female at Shell
24  who's been in a position higher than the

Page 53

1    operations manager position that Robin Grouette
2    held?
3         A.   Yes.
4         Q.   Who?
5         A.   Tonya Williams.
6         Q.   What position was she in?
7         A.   VP.
8         Q.   Of what?
9         A.   Appalachia.
10        Q.   When was she VP of Appalachia?
11        A.   The middle of 2018, approximately.
12        Q.   Is she still VP of Appalachia to your
13   knowledge?
14        A.   Yes.
15        Q.   Anyone else?
16        A.   Gretchen Watkins.
17        Q.   What's her position?
18        A.   She's the country chair for
19   unconventionals.
20        Q.   To your knowledge, when was she
21   country chair of unconventionals?
22        A.   Just about a year ago.
23        Q.   2018?
24        A.   Yeah.

Page 54

1         Q.   Anyone else?
2         A.   No.
3         Q.   Do you consider yourself to be a coach
4    or a mentor to the staff?
5         A.   Yes.
6         Q.   To your knowledge, has there ever been
7    a complaint made about you during your entire
8    employment at Shell?
9              MR. TUCKER:  Go ahead.
10             THE WITNESS:  No.  Other than this,
11   no.
12   BY MS. GURMANKIN:
13        Q.   Other than complaints that Jesse
14   Barnes has made?
15        A.   Correct.
16        Q.   No other complaints about you that
17   you're aware of?
18        A.   No.
19        Q.   Have you ever been subjected to
20   disciplinary actions during your entire employment
21   at Shell?
22        A.   No.
23        Q.   Ever gotten a verbal warning?
24        A.   No.

Page 55

1         Q.   Written warning?
2         A.   No.
3         Q.   Placed on a performance improvement
4    plan?
5         A.   No.
6         Q.   Ever been suspended?
7         A.   No.
8         Q.   Ever been told or threatened with
9    termination?
10        A.   No.
11        Q.   During your employment with Shell,
12   have you had training on the anti-discrimination,
13   anti-harassment laws?
14        A.   Yes.
15             - - -
16             (Whereupon, Exhibit 1 was marked for
17   identification by Ms. Gurmankin.)
18             - - -
19   BY MS. GURMANKIN:
20        Q.   All right.  On the screen in front of
21   you you're being shown what's been marked as
22   Barnes Exhibit 1, which is Bates stamped Shell 883
23   through 892.  If you look at the second page.  You
24   should be able to scroll down to get to the second

Page 56

1    page.
2         A.   (The witness complies.)
3         Q.   All right.  Do you see your name at
4    the top?
5         A.   Yes.
6         Q.   Do you recall taking Ethics Training,
7    Code of Conduct Refresher in 2017?
8         A.   Yes.
9         Q.   And if you go to page four.
10        A.   Yes.
11        Q.   And that's your signature on the
12   second page that we looked at, right, next to your
13   typed name?
14        A.   Yes.
15        Q.   If you go to page four.
16        A.   (The witness complies.)
17        Q.   You see your name typed second from
18   the bottom?
19        A.   Yes.
20        Q.   And that's your signature next to
21   that?
22        A.   Yup.
23        Q.   And the date of 2/9/17, do you see
24   that?

Page 57

1    A.    Yes.
2    Q.    Is that in your handwriting as well?
3    A.    Yes.
4    Q.    And that was the Ethics Training, Code
5    of Conduct Refresher?
6    A.    Yup.
7    Q.    And you took that training in 2017?
8    A.    I did.
9          MR. TUCKER:  Counsel, will these be
10    physically attached to the deposition?
11          MS. GURMANKIN:  They'll be emailed to
12    you at the end.
13          MR. TUCKER:  Okay.  But I think for
14    purposes of him -- read/sign, I'd still like
15    them physically attached to the deposition.
16          MS. GURMANKIN:  The court reporter
17    will get them as well, so you can attach
18    them.  She can attach them.
19          Thank you, Nancy.
20          MR. TUCKER:  I'm coughing so much, I'm
21    trying to keep the microphone away from me.
22    BY MS. GURMANKIN:
23    Q.    In 2017, did you take any other
24    training other than ethics training on the code of

Page 58

1    conduct refresher?
2    A.    Not that I remember.
3          - - -
4          (Whereupon, Exhibit 2 was marked for
5    identification by Ms. Gurmankin.)
6          - - -
7    BY MS. GURMANKIN:
8    Q.    You're being shown what's been --
9    being marked as Exhibit 2, Bates stamped Shell 802
10    through 806.
11          So if you look at the first page it
12    says, "Training session for supervisors on the
13    Shell Code of Conduct."
14          Do you see that?
15    A.    Yes.
16    Q.    Did you take that in 2017?
17    A.    I don't recall this one.
18    Q.    Do you recall the topics that are
19    listed being covered in the training that you took
20    on the Code of Conduct Refresher, Ethics Training?
21    A.    Could you just repeat that question?
22    Q.    Yeah.
23          The topics that are listed, do you
24    recall those topics being included in the Ethics

Page 59

1    Training, Code of Conduct Refresher that you took
2    around February 2017?
3    A.    I don't recall the specific line
4    items.
5    Q.    Does seeing these topics on page one
6    refresh your recollection as to whether those were
7    included in the training that you took in 2017?
8    A.    Page one is Exhibit 002, correct?
9    Q.    Page one of Exhibit 2, right.
10    A.    Most of those topics are things that
11    are covered in code of conduct training.
12    Q.    Do you recall if they were covered in
13    the Code of Conduct Refresher, Ethics Training
14    that you took in 2017?
15    A.    I don't recall each one in detail.
16    BY MS. GURMANKIN:
17    Q.    I'm sorry?
18          MR. TUCKER:  He said, "I don't recall
19    each one in detail."
20    BY MS. GURMANKIN:
21    Q.    Go to page 3, please.
22    A.    (The witness complies.)
23    Q.    Did you take this training in 2017?
24    A.    Are these documents part of the first

Page 60

1    document where the signatures are?
2    Q.    No.
3    A.    I don't recall this one specifically.
4    Q.    How about page four?
5    A.    I do recall page four.
6    Q.    You recall taking training on these
7    topics that are listed?
8    A.    Yeah, I remember some of those topics.
9    Q.    And it says that this took place on
10    July 27th.  Do you recall taking training on at
11    least some of these topics around that time in
12    2017?
13    A.    Yeah.
14    Q.    How about the training on page five,
15    did you take that in 2017?
16    A.    Yeah.  I recall some of those.
17    Q.    Prior to 2017 and during your entire
18    employment at Shell, did you ever have any
19    training on any of those topics listed in Exhibit
20    2 that we just looked at?
21    A.    Yes.
22    Q.    When?
23    A.    During my time in south -- in Texas.
24    Q.    When did you take training regarding

Page 61

1    the topics that we just looked at?
2        A.    I don't --
3            MR. TUCKER:  Objection, asked and
4        answered.
5            You may answer it further.
6            THE WITNESS:  I don't recall specific
7        days.  I just recall going through training.
8    BY MS. GURMANKIN:
9        Q.    That would have been sometime between
10   2008 and 2010?
11       A.    Yes.
12       Q.    And do you recall what topics you had
13   during that training in Texas at some point
14   between 2008 and 2010?
15       A.    No.
16       Q.    That was one training session?
17       A.    It would have been a few different
18   occasions depending on topics.
19       Q.    Between 2008 and 2010?
20       A.    Yeah.
21       Q.    Other than training sessions between
22   2008 and 2010 and the training that you took in
23   2017, any other training that you had at Shell on
24   the topics that we looked at that are listed in

Page 62

1    Exhibit 2?
2        A.    No.
3                - - -
4            (Whereupon, Exhibit 3 was marked for
5        identification by Ms. Gurmankin.)
6                - - -
7    BY MS. GURMANKIN:
8        Q.    You're being shown what's been marked
9    as Exhibit 3, Shell 588 through 631.
10           The code of conduct refresher that you
11   took in 2017, am I correct it was a refresher
12   because you had seen the code of conduct
13   previously?
14       A.    Yes.
15       Q.    You were familiar with the policies in
16   it?
17       A.    Yes.
18       Q.    And it was part of your job as an
19   employee at Shell to make sure that you adhered to
20   the policies in the code of conduct?
21       A.    Yes.
22       Q.    And it was part of your job when you
23   were a supervisor to make sure that employees
24   adhered to the policies listed in the code of

Page 63

1    conduct?
2        A.    Yes.
3        Q.    When is the first time during your
4    employment at Shell that you had employees
5    reporting directly to you?
6        A.    When I became a field supervisor in
7    2012.
8        Q.    Since then, have you had employees
9    reporting directly to you?
10       A.    Yes.
11       Q.    And since then you've also had
12   employees who are an indirect report to you?
13       A.    Yes.
14       Q.    If you can go to page 16 of this code
15   of conduct, Exhibit 3, the page at the bottom is
16   603 in the bottom right-hand corner.
17           MR. TUCKER:  Give us a moment.
18           MS. GURMANKIN:  Uh-huh.
19   BY MS. GURMANKIN:
20       Q.    Let me know when you're there.
21       A.    Page 16?
22       Q.    Yup.  It says Harassment at the top.
23       A.    Yeah, I'm there.
24       Q.    Okay.  This says, "Shell will not

Page 64

1    tolerate harassment.  We will not tolerate any
2    action, conduct or behavior which is humiliating,
3    intimidating or hostile.  Treat others with
4    respect and avoid situations that may be perceived
5    as inappropriate."
6            I read that correctly?
7        A.    Yes.
8        Q.    And the section right next to that
9    that says "Your Responsibilities," you understood
10   that those were your responsibilities as an
11   employee and supervisor at Shell, right?
12           MR. TUCKER:  Can he read them, please?
13           MS. GURMANKIN:  Sure.
14           THE WITNESS:  Yes.
15   BY MS. GURMANKIN:
16       Q.    All right.  And they say, "You must
17   treat others with respect at all times.  You must
18   not physically or verbally intimidate or humiliate
19   others.  You must not make inappropriate jokes or
20   comments.  You must not display offensive or
21   disrespectful material.  Challenge someone if you
22   find their behavior hostile, intimidating,
23   humiliating, or disrespectful.  You may always
24   contact your line manager, the Shell Ethics and

16  (Pages 61 to 64)

Page 65

1　Compliance Office, human resources, Shell legal or
2　the Compliance [sic} Helpline."
3　　　　Did I read that correctly?
4　A.　Yes.
5　Q.　Can you go two pages down from that.
6　It says Equal Opportunity at the top.
7　　　　MR. TUCKER:　Page 18, Counsel?
8　　　　MS. GURMANKIN:　Uh-huh.
9　BY MS. GURMANKIN:
10　Q.　Are you there?
11　A.　Yeah.
12　Q.　It says, "At Shell, we offer equal
13　opportunities to everyone.　This helps us ensure
14　we always draw on the widest possible talent pool
15　and attract the very best people.　We rely on
16　everyone at Shell to continue our record on equal
17　opportunity.
18　　　　"Sometimes people can breach equal
19　opportunity policies without even realizing it.
20　For example, if they are unconsciously biased
21　towards recruiting people like themselves.
22　Therefore, you should always strive to be
23　objective and ensure your personal feelings,
24　prejudices and preferences are not influencing

Page 66

1　your employment-related decisions.　You also need
2　to be aware of local legislation that may impact
3　employment decisions."
4　　　　I read that correctly?
5　A.　Yeah.
6　Q.　And the responsibilities next to that,
7　again you understood as an employee and supervisor
8　at Shell, those were part of your
9　responsibilities, correct?
10　A.　Yes.
11　Q.　First one says, "When making
12　employment decisions, including hiring,
13　evaluation, promotion, training, development,
14　discipline, compensation and termination, you must
15　base them solely on objective factors, including
16　merit, qualifications, performance and business
17　considerations."
18　　　　Second bullet says, "You should
19　understand the value of diversity and must not
20　discriminate in any way based on race, color,
21　religion, age, gender, sexual orientation, gender
22　identity, marital status, disability, ethnic
23　origin or nationality."
24　　　　I read those correctly?

Page 67

1　A.　Yes.
2　　　　　- - -
3　　　　(Whereupon, Exhibit 4 was marked for
4　identification by Ms. Gurmankin.)
5　　　　　- - -
6　BY MS. GURMANKIN:
7　Q.　You're being shown what's been marked
8　as Exhibit 4, Bates stamped Shell 1056 through
9　1057.
10　　　　Have you seen that Shell
11　Anti-Harassment Policy and Equal Opportunity
12　Policy before?
13　　　　MR. TUCKER:　Page two is the Equal
14　Opportunity Policy she's referring to.
15　　　　THE WITNESS:　Yes.
16　BY MS. GURMANKIN:
17　Q.　When did you first see these policies?
18　A.　When I started working for Shell.
19　Q.　In 2005?
20　A.　Not this exact one, but yes.
21　Q.　Something substantively similar?
22　A.　(Witness nods head.)
23　Q.　Yes?
24　A.　Yes.

Page 68

1　Q.　And part of your role as an employee
2　of Shell was to make sure that you adhered to the
3　anti-harassment and EEO policies, correct?
4　A.　Correct.
5　Q.　And part of your job as supervisor was
6　to make sure that people under your supervision at
7　Shell adhered to these policies, correct?
8　A.　Correct.
9　Q.　Do you know why -- well, strike that.
10　　　　Were you required to take the Ethics
11　Training, Code of Conduct Refresher that you took
12　in 2017?
13　　　　MR. TUCKER:　Objection.
14　　　　You may answer.
15　　　　THE WITNESS:　Was I required to?
16　BY MS. GURMANKIN:
17　Q.　Yeah.　Was that a requirement?
18　A.　Yeah.
19　Q.　Who told you that?
20　A.　No specific person told me.　It was
21　just a meeting notice.
22　Q.　Do you know why that came about?
23　A.　No.
24　Q.　Has Will Turney ever had a reporting

Page 69

1　relationship to you?
2　　A.　Yes.
3　　Q.　When?
4　　A.　When I started the production
5　superintendent role.
6　　Q.　So around 2015?
7　　A.　No.
8　　Q.　When?
9　　A.　The superintendent role was two
10　thousand -- end of 2017, beginning of 2018.
11　　Q.　And what was his reporting
12　relationship to you at that point?
13　　A.　He was maintenance supervisor.
14　　Q.　Did he report directly to you?
15　　A.　Yes.
16　　Q.　Okay.  Does he still report directly
17　to you?
18　　A.　No.
19　　Q.　When did that change?
20　　A.　The end of 2018.
21　　Q.　Why?
22　　A.　He took another job.
23　　Q.　As what?
24　　A.　As a maintenance supervisor.

Page 70

1　　Q.　How did that come about?
2　　A.　A job was posted.
3　　Q.　He applied?
4　　A.　Yes.
5　　Q.　When he reported to you directly from
6　the end of 2017 through the end of 2018, where was
7　he located?  Where did he work out of?
8　　A.　Wellsboro.
9　　Q.　The maintenance supervisor position
10　that he applied to at the end of 2018, where was
11　that located?
12　　A.　Midland, Texas.
13　　Q.　Did he tell you when he applied to
14　this -- this position in Midland, Texas?
15　　A.　Yes.
16　　Q.　Did he tell you why?
17　　A.　Why he applied?
18　　Q.　Uh-huh.
19　　A.　Yes.
20　　Q.　What did he say?
21　　A.　To get closer to home.
22　　Q.　Where was home?
23　　A.　Florida.
24　　Q.　Did he give you any other reason?

Page 71

1　　A.　No.
2　　Q.　Was that a promotion for him?
3　　A.　Yes.
4　　Q.　How so?
5　　A.　A job grade promotion.
6　　Q.　So that would have been an increase in
7　compensation?
8　　A.　Yes.
9　　Q.　And an increase in responsibilities?
10　　A.　Yes.
11　　Q.　Do you know if he was interviewed?
12　　A.　I don't know.
13　　Q.　Did anyone ask you what your opinion
14　was about whether or not he should get that
15　promotion?
16　　A.　No.
17　　Q.　Did you talk to anyone at Shell about
18　what your thoughts were about him getting that
19　promotion?
20　　A.　No.
21　　Q.　Were you supportive of it?
22　　A.　Yes.
23　　Q.　Why?
24　　A.　It got him closer to home.

Page 72

1　　Q.　Any other reason?
2　　A.　It's always -- it's always good for
3　people to have different opportunities, new
4　challenges anybody can get.
5　　Q.　Any other reason?
6　　A.　No.  That's pretty much -- different
7　opportunities and challenges.
8　　Q.　He ended up getting that promotion,
9　correct?
10　　　MR. TUCKER:  Objection, asked and
11　　answered.
12　BY MS. GURMANKIN:
13　　Q.　You can answer.
14　　A.　I would assume.  I mean, I don't get
15　an email saying he got it or not, but the job was
16　pro -- posted that way, so I would assume that he
17　did get the promotion.
18　　Q.　Well, he left your organization,
19　right?
20　　A.　He did.
21　　Q.　And he relocated to Texas?
22　　A.　Yup.
23　　Q.　And your understanding was it was in
24　that role of maintenance supervisor?

18 (Pages 69 to 72)

Page 73

1      A.    Correct.
2      Q.    I mean, at some point he told you that
3  he got the promotion and he would be relocating,
4  right?
5           MR. TUCKER:  Objection.
6           You may answer.
7           THE WITNESS:  He told me he got the
8      job and he would be relocating.
9  BY MS. GURMANKIN:
10     Q.    Which you understood --
11     A.    That he was the successful candidate.
12     Q.    Which you understand to be a
13 promotion?
14          MR. TUCKER:  Objection.
15          You may answer.
16          THE WITNESS:  It was posted as a job
17     grade three.
18 BY MS. GURMANKIN:
19     Q.    So, yes, you understood it was a
20 promotion?
21          MR. TUCKER:  Objection, asked and
22     asked.
23          Don't answer it again.  She'll ask you
24     another question.  Don't answer it again.

Page 74

1           MS. GURMANKIN:  I haven't asked that
2      question.
3  BY MS. GURMANKIN:
4      Q.    Was job grade three a promotion?
5           MR. TUCKER:  He said it was a grade
6      change.
7  BY MS. GURMANKIN:
8      Q.    Was it a promotion?  Was going to job
9  grade three a promotion?
10     A.    It was an increase in job grade.
11     Q.    So yes?
12          MR. TUCKER:  Objection.  Do not answer
13     the question.  You've answered it the way you
14     wanted to answer it.
15 BY MS. GURMANKIN:
16     Q.    Was going to job grade three a
17 promotion for him, as you understood it?
18          MR. TUCKER:  Don't answer the
19     question.
20          MS. GURMANKIN:  What's your basis?  He
21     hasn't answered that question.  You're not
22     saying the basis for your instruction not to
23     answer, Joe?
24          MR. TUCKER:  He's answered it.

Page 75

1           MS. GURMANKIN:  No, he hasn't.
2           MR. TUCKER:  He's not going to answer
3      it again.
4  BY MS. GURMANKIN:
5      Q.    Your understood that going to job
6  grade three was a promotion for him, correct?
7           MR. TUCKER:  Don't answer the
8      question.
9           MS. GURMANKIN:  What's the basis for
10     that instruction?
11          MR. TUCKER:  You can move on, Counsel,
12     he's not going to answer it again.
13          MS. GURMANKIN:  You're not stating the
14     basis?
15          MR. TUCKER:  He's not going to answer
16     it again, Counsel.
17 BY MS. GURMANKIN:
18     Q.    And you're listening to your
19 attorney's instruction?
20          MR. TUCKER:  Yes, he will.
21          MS. GURMANKIN:  I need him to answer
22     that question, Joe.
23          THE WITNESS:  Yes.
24          MS. GURMANKIN:  All right.

Page 76

1           MR. TUCKER:  Let me see you outside
2      for a second.
3           VIDEOGRAPHER:  We're now going off the
4      record.  The time on the camera is 10:07 a.m.
5                  - - -
6           (Whereupon, a recess was taken from
7      10:067 a.m. until 10:09 a.m.)
8                  - - -
9           VIDEOGRAPHER:  We're now back on the
10     record, 10:09 a.m.
11 BY MS. GURMANKIN:
12     Q.    What did you discuss with your
13 attorney when you just went out into the hallway
14 during the break?
15     Mr. Blakley?
16          MR. TUCKER:  Answer the question.
17          THE WITNESS:  When to listen to my
18     lawyer.
19 BY MS. GURMANKIN:
20     Q.    What did he say?
21     A.    When instructed not to answer a
22 question, to not answer the questions.
23     Q.    Anything else?
24     A.    No.

19 (Pages 73 to 76)

Page 77

1      Q.    Did you think that Turney deserved
2    that promotion to maintenance supervisor in
3    Midland, Texas?
4          MR. TUCKER:  Objection.
5          You may answer.
6          THE WITNESS:  Yes.
7    BY MS. GURMANKIN:
8      Q.    Why?
9      A.    He's a hard worker.
10     Q.    Any other reason?
11     A.    No.
12     Q.    Did you give him a reference?
13     A.    I don't recall giving him a reference.
14     Q.    Prior to you becoming production
15   superintendent, sometime around the end of 2017,
16   did Turney have any reporting relationship to you,
17   direct or indirect?
18     A.    No.
19     Q.    Did you work with him?
20     A.    Yes.
21     Q.    When did you start working with him?
22     A.    Around that time frame that I was a
23   process improvement lead.
24     Q.    Starting around 2015?

Page 78

1      A.    Yeah.
2      Q.    What capacity did you work with him?
3      A.    Depended on what my roles would have
4    me work with him.  Just depended on what was going
5    on.
6      Q.    In what capacity would you work with
7    him?
8      A.    What's the definition of "capacity"?
9      Q.    How would you work with him?
10     A.    Oh, when I had processes that I was
11   improving to make the field better and his
12   maintenance role, a lot of those processes
13   affected him and his guys, so I would be working
14   with him to implement processes.
15     Q.    Okay.  During your employment at
16   Shell, did you ever use the term "bitch" or
17   "bitchy" to refer to a woman?
18     A.    No.
19     Q.    Never?
20     A.    No.
21     Q.    Did you ever hear anyone else at Shell
22   refer to a female as bitch or bitchy?
23     A.    No.
24     Q.    Have you ever been to a strip club

Page 79

1    with another employee of Shell?
2      A.    No.
3      Q.    Have you ever commented on a woman's
4    physical appearance during your employment at
5    Shell?
6      A.    In what context?
7      Q.    Any context.
8      A.    Yes.
9      Q.    In what context?
10     A.    If they were dressed nice or had a
11   different hairdo.
12     Q.    Who have you -- what females have you
13   discussed were dressed nice or had a different
14   hairdo during your employment at Shell?
15     A.    Names of females?
16     Q.    Yup.  Yup.
17     A.    April.
18     Q.    April Heater?
19     A.    Yup.
20     Q.    Anyone else?
21     A.    Penny Robins.
22     Q.    Anyone else?
23     A.    No.
24     Q.    What have you said about April

Page 80

1    Heater's physical appearance?
2      A.    Haircut change.
3      Q.    What did you say?
4      A.    That she had shorter hair.
5      Q.    You said she had shorter hair?
6      A.    No, I said, "You cut your hair.  It's
7    shorter."
8      Q.    Anything else that you said?
9      A.    I asked her if she liked it.
10     Q.    What did she say?
11     A.    It was too early to tell.
12     Q.    Anything else that you said about
13   that?
14     A.    I said, "I like short hair," and
15   pointed to my short hair.
16     Q.    Did you say you like short hair on
17   women or you just like short hair?
18     A.    Just like short hair.
19     Q.    Anything else about that conversation?
20     A.    No.
21     Q.    Any other occasions on which you
22   commented on April Heater's physical appearance?
23     A.    No.
24     Q.    How about Penny Robins, what did you

Page 81

1  say about her physical appearance?
2      A.    She changed her hair color one time.
3      Q.    From what to what?
4      A.    Just redid the same color.  So from
5  faded to fresh.
6      Q.    What color?
7      A.    Red.
8      Q.    And what did you say to her?
9      A.    Just recognized that it was red.
10     Q.    What did you say?
11     A.    I said, "You changed your hair, got it
12 red."  She said, "Yes."
13     Q.    Anything else about that conversation?
14     A.    No.
15     Q.    Any other occasions on which you've
16 commented on a female's physical appearance during
17 your employment at Shell?
18     A.    Not that I recall.
19     Q.    Have you ever heard anyone at Shell
20 refer to a female's physical appearance during
21 your employment?
22     A.    Nah, not that I recall.
23     Q.    Have you ever heard a male employee at
24 Shell refer to a female employee's breasts?

Page 82

1      A.    No.
2      Q.    Have you ever done that during your
3  employment at Shell?
4      A.    No.
5      Q.    Have you ever heard a male employee at
6  Shell say that a female employee -- employee or
7  contractor was pretty or attractive even if they
8  didn't use those exact words?
9          MR. TUCKER:  Objection.
10 BY MS. GURMANKIN:
11     Q.    You can answer.
12     A.    Could you repeat the question?
13     Q.    Sure.
14          Have you ever heard a male employee at
15 Shell say that a female employee or contractor was
16 pretty or attractive even if they did not use
17 those exact words?
18     A.    What words would they have used?
19     Q.    Words indicating that the female
20 employee or contractor was pretty or attractive.
21     A.    Yes.
22     Q.    Who have you heard say that?
23     A.    I don't really recollect any one
24 specific time.

Page 83

1      Q.    It happened multiple times?
2      A.    No.
3      Q.    Just happened once?
4      A.    So -- I mean, when you ask a question
5  like that, it's hard to say one time or one
6  conversation when somebody says something that
7  leads to me thinking somebody's pretty or nice.
8  So you can say she looks nice today, but that has
9  nothing to do with anything.  That's a standard
10 conversation.
11     Q.    Do you recall --
12          MR. TUCKER:  Can we take our first
13 bathroom break.
14          MS. GURMANKIN:  Let me just finish
15 this one.
16          MR. TUCKER:  No.  Stop.  Don't answer
17 questions.  Take your microphone off and come
18 on outside.  Take a break.
19          VIDEOGRAPHER:  This concludes file
20 number one in the videotaped deposition of
21 Hondo Blakley in the case Barnes v. Shell, et
22 al.
23          We are going off the record at 10:16
24 a.m.

Page 84

1          - - -
2          (Whereupon, a recess was taken from
3  10:16 a.m. until 10:23 a.m.)
4          - - -
5          VIDEOGRAPHER:  This will begin file
6  number two in the videotaped deposition of
7  Hondo Blakley in the matter of Jesse Barnes
8  v. Shell, et al.
9          We are going on the record at 10:23
10 a.m.
11 BY MS. GURMANKIN:
12     Q.    Do you recall if it was once or more
13 than once that you heard a male employee at Shell
14 use words that would describe a female employee or
15 contractor as nice looking or pretty or
16 attractive?
17          MR. TUCKER:  Objection, asked and
18 answered.
19          You may answer again.
20          THE WITNESS:  I don't recall.
21 BY MS. GURMANKIN:
22     Q.    Who were the male employees that you
23 heard use words that would describe a female
24 employee or contractor as attractive or nice

21 (Pages 81 to 84)

Page 85

1  looking?
2      A.    I don't recall.
3      Q.    Have you ever described a female
4  employee or contractor at Shell as pretty or
5  attractive or nice looking even if you didn't use
6  those exact words?
7      A.    No.
8      Q.    Have you ever touched a female
9  employee at Shell?
10          MR. TUCKER:  Objection.
11          THE WITNESS:  Yes.
12  BY MS. GURMANKIN:
13      Q.    Who?
14      A.    Jen.
15      Q.    I'm sorry?
16      A.    Jen.
17      Q.    Jen who?
18      A.    Card.
19      Q.    Anyone else?
20      A.    Yeah.  Penny Robins.
21      Q.    Anyone else?
22      A.    No.
23      Q.    When did you touch Jen Card?
24      A.    When did I touch Jen Card?

Page 86

1      Q.    That's the question.
2      A.    I don't recollect any specific time.
3      Q.    Did it happen multiple times?
4      A.    No.
5      Q.    Just once?
6      A.    Yes.  Well, maybe two or three times,
7  but not multiple.
8      Q.    And how did you touch her?
9      A.    Handshake.
10      Q.    Anything else?
11      A.    I got a hug once.
12      Q.    She gave you a hug?
13      A.    Uh-huh.
14      Q.    Yes?
15      A.    Yes.
16      Q.    Do you recall when that was?
17      A.    July of last year.
18      Q.    July of 2018?
19      A.    Yes.
20      Q.    Did you hug her back?
21      A.    I did.
22      Q.    Where did that happen?
23      A.    Where?
24      Q.    Yes.

Page 87

1      A.    The Shell office.
2      Q.    Where?
3      A.    In the hallway.
4      Q.    At Wellsboro?
5      A.    (Witness nods head.)
6      Q.    Yes?
7      A.    Yes.
8      Q.    Do you know why she hugged you?
9      A.    Yes.
10      Q.    Why?
11      A.    Because my 18-year-old sister was
12  killed in a car accident.
13      Q.    I'm very sorry to hear that.
14          Any other occasion in which she hugged
15  you or you hugged her?
16      A.    No.
17      Q.    Any other times -- or any other
18  circumstances in which you touched Jen Card?
19      A.    No.
20      Q.    How about Penny Robins, when did you
21  touch her?
22      A.    Just before she stopped working for
23  Shell.
24      Q.    Do you recall when that was?

Page 88

1      A.    Twenty -- sometime in 2018.
2      Q.    How did you touch her?
3      A.    A handshake.
4      Q.    Was that in the context of her
5  leaving?
6      A.    Yes.
7      Q.    Were you saying good-bye?
8      A.    Yes.
9      Q.    Any other female employees that you
10  touched at Shell?
11      A.    No.
12      Q.    Have you ever seen any other male
13  employees at Shell touch a female employee or
14  contractor?
15      A.    Yes.
16      Q.    Who?  Which male employees?
17      A.    Steve Craig.
18      Q.    Anyone else?
19      A.    Greg Larsen.
20      Q.    Anyone else?
21      A.    Will Turney.
22      Q.    Anyone else?
23      A.    So do I name off -- if there's 150
24  guys, you want 150 names?

22 (Pages 85 to 88)

Page 89

1 Q. Yup.
2 A. Probably Ricky Dake.
3 Q. Ricky what?
4 A. Dake.
5 Q. Anyone else?
6 A. Wayne Fletcher.
7 Q. Anyone else?
8 A. No.  That's probably about it.
9 Q. Which female employees or contractors
10 did Steve Craig touch that you saw?
11 A. Tonya Williams.
12 Q. How did he touch her?
13 A. Handshake.
14 Q. Any other ways in which you saw him
15 touch her?
16 A. No.
17 Q. Any other female employees or
18 contractors that you saw Steve Craig touch?
19 A. No.
20 Q. Greg Larsen, which female employees
21 did he touch or contractors?
22 A. Jen Card.
23 Q. Any others?
24 A. No.

Page 90

1 Q. How did you see Larsen touch Jen Card?
2 A. Handshake.
3 Q. Any other ways?
4 A. No.
5 Q. Will Turney, which female employees or
6 contractors did you see him touch?
7 A. April.
8 Q. Heater?
9 A. Yeah.
10 Q. How did -- how did Turney touch April
11 Heater that you saw?
12 A. Handshake as well.
13 Q. Any other ways in which you saw Turney
14 touch April Heater?
15 A. No.
16 Q. Any other female employees or
17 contractors that you saw Turney touch?
18 A. No.
19 Q. Ricky Dake, which female employees or
20 contractors did you see him touch?
21 A. Tonya.
22 Q. Williams?
23 A. Williams.
24 Q. How did you see Dake touch Williams?

Page 91

1 A. Handshake.
2 Q. Any other ways?
3 A. No.
4 Q. Wayne Fletcher, which female employees
5 did you see him touch?
6 A. Tonya Williams.
7 Q. Any others?
8 A. No.
9 Q. How did you see him touch Tonya
10 Williams?
11 A. Handshake.
12 Q. Any other ways?
13 A. No.
14 Q. Any other male employees that you saw
15 touch female employees or contractors?
16 A. Not that I recall.
17 Q. Who is Tonya Williams?
18 A. The VP of Appalachia.
19 Q. She's the one that became VP last
20 year?
21 A. Correct.
22 Q. Did Tonya Williams ever have a
23 reporting relationship to you?
24 A. Indirect.

Page 92

1 Q. When was that?
2 A. Could you repeat that?
3 Q. When?
4 A. Starting when she become the VP of
5 Appalachia.
6 Q. She reported to you?
7 A. No.  I report to her.
8 Q. Okay.  Did she ever have a reporting
9 relationship to you?
10 A. No.
11 Q. To your knowledge, did Tonya Williams
12 ever complain that she was being treated
13 differently because she's a black woman?
14 A. No.
15 Q. Have you ever talked about sex at work
16 during your employment at Shell?
17 A. Yes.
18 Q. To whom?
19 A. Ricky Dake.
20 Q. Anyone else?
21 A. Will Turney.
22 Q. Anyone else?
23 A. Mark Hoover.
24 Q. Anyone else?

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Page 93

1      A.    No.
2      Q.    Were these separate conversations or
3   all together?
4      A.    General conversation.
5      Q.    I mean separately or did you have it
6   with the three of them together?
7      A.    It was together.
8      Q.    One or more?
9      A.    One.
10      Q.    When was that?
11      A.    I don't recall the exact time.
12      Q.    Do you recall the year?
13      A.    Yup.  I'd say probably 2017.
14      Q.    Where were you?
15      A.    In the hall.
16      Q.    Where?
17      A.    Wellsboro.
18      Q.    During the workday?
19      A.    Yes.
20      Q.    Do you recall the time of day it was?
21      A.    No.
22      Q.    What did you guys discuss?
23      A.    It was over stuff that was on TV.
24      Q.    What?

Page 94

1      A.    Like the sexual innuendos that's on
2   television.
3      Q.    Were you talking about a particular TV
4   show?
5      A.    I was talking about Nickelodeon.
6      Q.    You were talking about sexual
7   innuendos that were on Nickelodeon?
8      A.    Yup.
9      Q.    What?
10      A.    Pregnant 16-year-old girls.
11      Q.    What are the sexual innuendos that you
12   were discussing?
13      A.    How difficult it was to keep my
14   12-year-old -- well, he's 12 now, but at the time
15   he was younger -- away from stuff like that on
16   television.
17      Q.    That's what you said?
18      A.    Yes.
19      Q.    What did the others say, Dake, Turney,
20   and Hoover?
21      A.    They agreed.
22      Q.    Anything else that was said?
23      A.    No.  It was a -- it's a children's
24   cartoon network and you see stuff like that.  It

Page 95

1   just was a conversation about how difficult it is
2   to keep young children from seeing stuff like
3   that.
4      Q.    Is there anything else that was said
5   during this conversation other than you talking
6   about how hard it was to keep your currently
7   12-year-old son away from this stuff and Dake,
8   Turney, and Hoover agreeing with you?
9      A.    Not that I recall.
10      Q.    That was a pretty short conversation?
11      A.    Yes.
12          MR. TUCKER:  Objection.
13          You may answer.
14   BY MS. GURMANKIN:
15      Q.    Yes?
16      A.    Yes.
17      Q.    Less than five minutes?
18      A.    I don't recall.
19      Q.    How did the conversation start?
20      A.    I initiated the conversation.
21      Q.    By saying what?
22      A.    I don't recall exactly.
23      Q.    Do you recall -- even if you don't
24   recall the exact words, what do you recall?

Page 96

1      A.    It started over me saying I got home
2   from work and my son was watching TV.  I walked
3   around the corner and it was a show that had young
4   pregnant teenagers on it and it's disappointing.
5   And then it went from there.
6      Q.    And those guys just separately said
7   that they agreed?
8      A.    Yeah.
9          MR. TUCKER:  That's not what he said
10      earlier.  He said it was difficult to keep
11      your kids away from that.  He said that's
12      what they agreed to.  So you mischaracterized
13      his testimony.
14   BY MS. GURMANKIN:
15      Q.    And they all agreed?
16          MR. TUCKER:  Objection, asked and
17      answered, but you may answer it again.
18          THE WITNESS:  They agreed that it was
19      difficult to keep the young kids away from
20      that kind of stuff.
21   BY MS. GURMANKIN:
22      Q.    And that was the entirety of the
23   conversation?
24      A.    Yes.

24 (Pages 93 to 96)

Page 97

1    Q.    How did it end?
2    A.    We went back to work.
3    Q.    You all just dispersed after they all
4    agreed that it was difficult to keep your kids
5    away from this?
6    A.    Yeah. I think somebody got a phone
7    call, actually.
8    Q.    Who?
9    A.    I don't recall who.
10   Q.    And then you all just walked away?
11   A.    Yes.
12   Q.    Was anyone else around in the hallway
13   when you were having this conversation with Dake,
14   Hoover, and Turney?
15   A.    Not that I recall.
16   Q.    Was it in front of other employees'
17   desks or work spaces?
18   A.    No.
19   Q.    You're married, correct?
20   A.    Yes.
21   Q.    Have you ever talked about your
22   marriage to other Shell employees?
23   A.    Yes.
24   Q.    Who?

Page 98

1    A.    Steve Craig.
2    Q.    Anyone else?
3    A.    Ricky Dake.
4    Q.    Anyone else?
5    A.    Wayne Fletcher.
6    Q.    Anyone else?
7    A.    Not that I recall.
8    Q.    Did you ever hear any male employees
9    talking about sex during your employment at Shell?
10   A.    To what context?
11   Q.    Any context.
12   A.    Yes.
13   Q.    Who?
14   A.    Mark Hoover.
15   Q.    Anyone else?
16   A.    Some of the hourly guys.
17   Q.    Who?
18   A.    Chris Citrino.
19   Q.    Anyone else?
20   A.    No.
21   Q.    You said Chris Citrino, is it?
22   A.    Uh-huh.
23   Q.    Yes?
24   A.    Yes.

Page 99

1    Q.    What did Mark Hoover say about sex?
2    A.    I don't recall the exact conversation.
3    Q.    What do you recall about it?
4    A.    Nothing.
5    Q.    Just that it -- he talked about sex?
6    A.    Just pops up for a second and then
7    disappears.
8    Q.    Was it just the two of you?
9    A.    I don't recall who all was there.
10   Q.    Do you recall when it was?
11   A.    No.
12   Q.    Do you recall the year?
13   A.    Yeah. Probably 2016, 2017.
14   Q.    Where were you when you had the
15   conversation with him?
16   A.    Lunch.
17   Q.    And you don't recall anything that he
18   said that was about sex?
19        MR. TUCKER: Objection, asked and
20   answered.
21   BY MS. GURMANKIN:
22   Q.    Go ahead.
23   A.    I don't.
24   Q.    Where were you having lunch?

Page 100

1    A.    One of the local restaurants.
2    Q.    During the workday?
3    A.    Yes.
4    Q.    Which restaurant?
5    A.    I don't recall which one.
6    Q.    How is it that you recall it was
7    during lunch?
8    A.    It's when the conversation happened.
9    We typically don't talk about that kind of stuff
10   at work.
11   Q.    What kind of stuff?
12   A.    Sex.
13   Q.    How is it that you recall that
14   conversation was at lunch but you can't remember
15   anything that Hoover said about sex?
16        MR. TUCKER: Objection.
17        You may answer to the extent you can.
18        THE WITNESS: Just lucky, I guess.
19   BY MS. GURMANKIN:
20   Q.    How is it lucky that you can recall
21   that it was at lunch but you can't remember
22   anything that Hoover said about sex during that
23   conversation?
24        MR. TUCKER: Objection.

25 (Pages 97 to 100)

Page 101

1      You may answer.
2      THE WITNESS:  Because it was several
3  years ago and it was a high-level
4  conversation at lunch that probably had zero
5  meaning whatsoever.
6  BY MS. GURMANKIN:
7      Q.    A high-level conversation about sex?
8      A.    No, a high-level conversation that
9  included many things, I'm sure.
10     Q.    Do you recall anything else that was
11 said during that lunch?
12     A.    We talked a lot about football, so I'm
13 sure we did.
14     Q.    Are you guessing based on other
15 conversations or do you remember talking about
16 football during that lunch?
17     A.    I don't recollect for sure.
18     Q.    Did just Hoover say something about
19 sex during that lunch or did you also say
20 something about sex?
21     A.    Just Hoover.
22     Q.    What did Chris Citrino say about sex?
23     A.    During our conversation?  Chris
24 Citrino?

Page 102

1      Q.    Did Chris Citrino say something about
2  sex during a conversation that you had with him?
3      A.    Yes.
4      Q.    What was it?
5      A.    His 16-year-old son, we had a
6  conversation about girlfriends and having the talk
7  and trying to make sure he's safe.
8      Q.    Is this what Citrino is telling you?
9      A.    Yeah.
10     Q.    When is this?
11     A.    When?
12     Q.    Uh-huh.
13     A.    It was probably last year.
14     Q.    2018?
15     A.    Yeah.
16     Q.    Anyone else involved or just the two
17 of you?
18     A.    Just the two of us.
19     Q.    Where?
20     A.    Out in the field.
21     Q.    Where?
22     A.    At a location.
23     Q.    Where?
24     A.    In Wellsboro.

Page 103

1      Q.    Did you say anything in response?
2      A.    I agreed the difficulty with having
3  teenage boys and trying to make sure that they're
4  responsible and respectful.
5      Q.    Anything else about that conversation?
6      A.    No.
7      Q.    Have you ever heard any male employees
8  at Shell talk about their marriages or their
9  relationships with significant others?
10     A.    Yes.
11     Q.    Who?
12     A.    Will Turney.
13     Q.    Anyone else?
14     A.    Wayne Fletcher.
15     Q.    Anyone else?
16     A.    Steve Craig.
17     Q.    Anyone else?
18     A.    Greg Larsen at the time.
19     Q.    Anyone else?
20     A.    No.
21     Q.    What did Turney say about his marriage
22 or relationship with a significant other?
23     A.    I knew she was -- he talked about her
24 being a nurse.

Page 104

1      Q.    Uh-huh.
2      A.    Some of the things that she'd seen.
3      Q.    As a nurse?
4      A.    Yeah.
5      Q.    Anything else?
6      A.    He did -- he discussed that they had
7  some marital issues in the past.
8      Q.    What did he say about that?
9      A.    He never really went into details,
10 just that they had worked it out.
11     Q.    Just that they had marital issues?
12     A.    Yup.
13     Q.    He didn't tell you --
14     MR. TUCKER:  And he said that they had
15 worked it out is also what he said.
16 BY MS. GURMANKIN:
17     Q.    Yeah.  My question is did he tell you
18 anything about the marital issues?
19     A.    No.  No details.
20     Q.    Was it just the two of you talking?
21     A.    Yes.
22     Q.    Where?
23     A.    In the truck driving in the field.
24     Q.    When?

26 (Pages 101 to 104)

1    A.    A couple years ago.  Probably 2016.
2    Q.    Anything else that Turney said about
3  his marriage?
4    A.    No.
5    Q.    What did Wayne Fletcher say about his
6  marriage or relationship with a significant other?
7    A.    He talked about his wife and their
8  future plans, retirement, things like that.
9    Q.    Anything else?
10    A.    No.  Usually around that kind of
11  stuff.
12    Q.    Just the two of you?
13    A.    Yeah.
14    Q.    When?
15    A.    It's last year, this year.
16    Q.    2018 and 2019?
17    A.    Yeah.
18    Q.    What did Steve Craig say about his
19  marriage or relationship with a significant other?
20    A.    It was -- when he first came here he
21  was giving me a background, get-to-know-you-type
22  conversation.  Hobbies, things like that.
23    Q.    So what did he say about his marriage
24  or a significant other?

1    A.    Who she was, what she liked to do, how
2  long they'd been married for.
3    Q.    Anything else?
4    A.    No.
5    Q.    And when was that?
6    A.    When he first got here would have been
7  2017 -- no, it was earlier than that.  2014, 2015.
8    Q.    Just the two of you?
9    A.    A group conversation.
10    Q.    Who else?
11    A.    Will.
12    Q.    Will Turney?
13    A.    Mark Hoover.
14    Q.    Will Turney?
15    A.    Will Turney, Mark Hoover.
16    Q.    Anyone else?
17    A.    Chris Anderson.
18    Q.    Anyone else?
19    A.    No.
20    Q.    You said Craig Larsen at the time.
21  Did you mean at the time he was employed?
22    A.    Yes.
23    Q.    What did he say?
24    A.    It was a meet and greet as well when

1  he first became the OM.
2    Q.    When are we talking?
3    A.    It would have been twenty -- around
4  2015 as well.
5    Q.    What did he say?
6    A.    Background.  How long you been
7  married?  Where he went to school.  His wife also
8  went to school.  Got a little bit about his
9  children.  Just standard meet and greet
10  conversation.
11    Q.    Other than Turney telling you about
12  marital issues that he and his wife had in the
13  past, have you ever heard a male employee at Shell
14  complaining about their wives or girlfriends?
15    A.    Yes.
16    Q.    Who?
17    A.    Will's complained before.  Mark
18  Hoover.  Even Wayne's complained before.
19    Q.    I'm sorry.  What was the last name?
20    A.    Wayne Fletcher.
21    Q.    Anyone else?
22    A.    No.
23    Q.    What did Turney complain about before?
24    A.    He complained -- he was thinking about

1  going hunting, wasn't going to go.  His wife felt
2  he want -- he should go, but he didn't want to
3  spend the money.
4    Q.    So what was he complaining about his
5  wife?
6    A.    That there was a hunting trip that he
7  did not want to spend the money on but she thought
8  he should go.  So it was a financial conversation.
9        MR. TUCKER:  Wish I had a wife like
10  that.
11        THE WITNESS:  Right.
12        MR. TUCKER:  Yeah.
13  BY MS. GURMANKIN:
14    Q.    He was complaining about her because
15  she wanted him to go on the hunting trip?
16    A.    Correct.
17    Q.    Did he say anything about her other
18  than she wanted him to go?
19    A.    No.
20    Q.    Did he say she likes to spend money,
21  or words to that effect?
22    A.    Not in that conversation, no.
23    Q.    In another conversation?
24    A.    In another conversation, yes.

Page 109

1    Q.    What did he say about that?
2    A.    That she likes to spend money.
3    Q.    When was that?
4    A.    Probably just before they moved.  Just
5    before -- so it would have been late fall of last
6    year.
7    Q.    What was the context in which he said
8    it?
9    A.    He was talking about looking for a new
10   truck.
11   Q.    A new what?
12   A.    A new truck.
13   Q.    Tell me what he said.
14   A.    That he was looking for a bigger truck
15   because they were possibly going to have to pull a
16   tractor around on a trailer, and he was looking
17   for a gas engine and she was talking about a
18   diesel motor.  And I said, "Diesels are much more
19   expensive."  And he said, "Yes.  She likes to
20   spend money."  And then there was a bit of
21   laughter.
22   Q.    Who laughed?
23   A.    Who laughed?
24   Q.    Uh-huh.

Page 110

1    A.    Me and him both.
2    Q.    Was it just the two of you?
3    A.    I believe so, yeah.
4    Q.    Anything else he said about his wife
5    in that conversation?
6    A.    No.  We moved on to which truck was
7    better.
8    Q.    And this is after he had gotten the
9    Midland, Texas job?
10   A.    No.  It was prior to.
11   Q.    After he applied?
12   A.    Yeah.
13   Q.    Any other times when Turney complained
14   about his wife?
15   A.    No.
16   Q.    How about Mark Hoover?  When did he
17   complain about -- was that a wife or a girlfriend?
18   A.    Wife.
19   Q.    When did he complain about his wife?
20   A.    Probably around 2016-ish, 2017.
21   Q.    What did he say?
22   A.    They weren't getting along.
23   Q.    What did he say?
24   A.    That they weren't getting along.

Page 111

1    Q.    Did he say why?
2    A.    They were having differences in
3    opinions for better life and how it was going.
4    Q.    Did he say what the differences of
5    opinion were?
6    A.    He didn't go into details.
7    Q.    Did you ask?
8    A.    No.
9    Q.    Was it just the two of you?
10   A.    Yes.
11   Q.    How did that come up?  Did he just
12   bring it up?
13   A.    We were driving around the field doing
14   some field checks and he said, "Just in case you
15   start to see me having some problems, me and my
16   wife is going through a rough patch and we may be
17   looking at divorce."  I --
18   Q.    What did you say?
19   A.    I said I'm sorry to hear that.  If you
20   need anything, let me know.
21   Q.    Did he say anything else about it at
22   that time?
23   A.    No.
24   Q.    Any other times when Hoover complained

Page 112

1    about his wife?
2    A.    Once -- once the divorce started, he
3    complained about how it was going.
4    Q.    What did he say?
5    A.    He said it was -- "this is rough."
6    Q.    Anything else?
7    A.    No.
8    Q.    Did he say that more than once?
9    A.    No.
10   Q.    Do you know if the divorce is final?
11   A.    I don't know for sure, honestly.
12   Q.    Did Hoover ever report to you either
13   directly or indirectly?
14   A.    No.
15   Q.    Wayne Fletcher.
16   MR. TUCKER:  Before you go to him, let
17   me take my next bathroom break.  Don't go too
18   far away.
19   VIDEOGRAPHER:  We are now going off
20   the record.  Time on the camera, 10:53 a.m.
21   - - -
22   (Whereupon, a recess was taken from
23   10:53 a.m. until 10:56 a.m.)
24   - - -

28 (Pages 109 to 112)

Page 113

1      VIDEOGRAPHER:  We're now back on the
2  record, 10:56 a.m.
3  BY MS. GURMANKIN:
4      Q.    Did anyone ever tell you that they
5  were aware that Tonya Williams had made complaint
6  about -- complaints about being treated
7  differently because of her race or her sex?
8      A.    No.
9      Q.    Never heard anything about that?
10     A.    I never had anybody tell me that Tonya
11 had complaints based on her race or sex.
12     Q.    Did anyone tell you that Tonya had
13 complaints about anything?
14     A.    No.
15     Q.    What complaints did you hear Wayne
16 Fletcher make about his wife?
17     A.    Financial.
18     Q.    What about it?
19     A.    Standard spending.  She wanted to buy
20 something and he didn't want her to or if he was
21 going to buy something and she didn't want him to.
22     Q.    Was it more about her spending money
23 or him spending money?
24     A.    It was even.

Page 114

1      Q.    How many times did he talk about this?
2      A.    A few times.
3      Q.    Was this just with you or when other
4  people were around?
5      A.    Mixture.
6      Q.    Who else was around when he said this?
7      A.    Like Ricky Dake.  Steve Craig
8  sometimes would even be around.
9      Q.    Anyone else?
10     A.    Will Turney.
11     Q.    Anyone else?
12     A.    No.
13     Q.    Who's Ken Foreman?
14     A.    Planner.
15     Q.    You work with him?
16     A.    Yes.
17     Q.    Did he ever report to you directly or
18 indirectly?
19     A.    No.
20     Q.    When did you work with him?
21     A.    What's your definition of "with"?
22     Q.    Well, you answered the question yes.
23 So what did you mean by that?
24     A.    He works in the office that I work in.

Page 115

1  He works in the maintenance department.
2      Q.    And did you ever work with him on any
3  task or project?
4      A.    Yes.
5      Q.    Okay.  Multiple times?
6      A.    Yes.
7      Q.    Over what period?
8      A.    From 2010 till present.
9      Q.    Did you ever see him touch Jesse
10 Barnes' hair?
11     A.    Yes.
12     Q.    How many times?
13     A.    Once.
14     Q.    When?
15     A.    2017, approximately.
16     Q.    Where?
17     A.    In the office.
18     Q.    Where were they?
19     A.    In front of her computer screen.
20     Q.    They were both in front of her
21 computer screen?
22     A.    No -- yeah.
23     Q.    Sitting or standing?
24     MR. TUCKER:  I'm sorry.  Did you say

Page 116

1  no yeah or --
2      THE WITNESS:  Yeah.
3  BY MS. GURMANKIN:
4      Q.    Yes, they were both in front of her
5  computer screen?
6      A.    Yes.
7      Q.    Were they both sitting or standing?
8      A.    I think sitting and standing.
9      Q.    Who was sitting and who was standing?
10     A.    She was sitting and he was standing.
11     Q.    Behind her or next to her?
12     A.    Behind.
13     Q.    How close was he standing to her?
14     A.    A couple feet.
15     Q.    And where were you?
16     A.    To the right of them.
17     Q.    To the right of her work space?
18     A.    Yeah.
19     Q.    How far were you?
20     A.    Back probably three, four feet away.
21     Q.    And what were you doing there?
22     A.    Was part of their conversation.
23     Q.    What was the conversation about?
24     A.    Some work.

29 (Pages 113 to 116)

Page 117

1    Q.    I'm sorry?
2    A.    SAP work stuff.
3    Q.    Were you facing the -- the two of
4    them?
5    A.    No.  I was looking at the computer
6    screen as well.
7    Q.    So were you behind Jesse?
8    A.    To the right.
9    Q.    To the right --
10   A.    Behind and to the right.
11   Q.    Okay.  About three, four feet?
12   A.    Yeah.
13   Q.    And was Foreman directly behind her?
14   A.    Nah.  To the left a little bit
15   probably.
16   Q.    Behind a couple feet and to the left
17   how much?
18   A.    Just slightly.
19   Q.    And what did you see regarding his
20   touching her hair?
21   A.    I recollect he picked -- just kind of
22   picked it up and moved it.
23   Q.    Picked her hair up?
24   A.    Uh-huh.

Page 118

1    Q.    Yes?
2    A.    Yes.
3    Q.    Was it in a pony tail or was it
4    straight back?
5    A.    Straight back.
6    Q.    Where did he move it?
7    A.    To the side.
8    Q.    Over her shoulder?
9    A.    It didn't go over the shoulder.  It
10   just kind of went to the right a little bit.
11   Q.    He moved it to the right a little bit?
12   A.    Yeah.
13   Q.    How long did he hold onto her hair?
14   A.    Seconds.
15   Q.    Do you recall how many seconds?
16   A.    It was just a few.  Just enough to
17   pick it up and move it to the side.
18   Q.    More than ten?
19   A.    No.
20   Q.    More than five?
21   A.    Probably not.  Less than five.
22   Q.    Did he move closer to her to pick up
23   her hair or he reached forward over the couple
24   feet and picked it up?

Page 119

1    A.    Reached forward.
2    Q.    He didn't move at all?
3    A.    Not that I recall.
4    Q.    Did you say anything?
5    A.    No.
6    Q.    Did Jesse say anything?
7    A.    No.
8    Q.    Did Ken say anything when he was doing
9    this?
10   A.    No.
11   Q.    Did you ever report this to anyone at
12   the company, that you saw him do that?
13   A.    Not until after the allegations were
14   made.
15   Q.    So, yes, you did at some point?
16   A.    Yes.
17   Q.    When?
18   A.    During my interview with Megan.
19   Q.    Megan Kloosterman?
20   A.    Yes.
21                    - - -
22          (Whereupon, Exhibit 5 was marked for
23   identification by Ms. Gurmankin.)
24                    - - -

Page 120

1    BY MS. GURMANKIN:
2    Q.    All right.  You should have in front
3    of you what's been marked as Exhibit 5, Bates
4    stamped Shell 1132 through 1136.
5          Have you seen this document before?
6    A.    Yes.
7    Q.    When?  When is the first time you saw
8    this document?
9    A.    Last week.
10   Q.    Was that in preparation for your
11   deposition today?
12   A.    Yes.
13   Q.    Had you seen it at all before last
14   week?
15   A.    No.
16   Q.    Did you review it when you saw it last
17   week?
18   A.    Yes.
19   Q.    Is everything accurate?
20                    - - -
21             (Pause)
22                    - - -
23   A.    Yes.
24   Q.    Based on your review last week and

30 (Pages 117 to 120)

Page 121

1   your review just now, does that seem to be a
2   thorough depiction of your interview with Megan
3   Kloosterman?
4       A.   Yeah.
5       Q.   Was that in person?
6            MR. TUCKER:  The meeting with
7   Ms. Kloosterman you're referring to?
8            MS. GURMANKIN:  Uh-huh.  Yup.
9            THE WITNESS:  Yes.
10  BY MS. GURMANKIN:
11      Q.   Where?
12      A.   Wellsboro.
13      Q.   Where?
14      A.   In the Shell office.
15      Q.   In an office or a conference room?
16      A.   Conference room.
17      Q.   Just the two of you?
18      A.   Yes.
19      Q.   How long?
20      A.   Approximately an hour.
21      Q.   Did you bring anything with you?
22      A.   No.
23      Q.   From what you could tell, did she have
24  anything in front of her?

Page 122

1       A.   Yes.
2       Q.   What?
3       A.   Notepad.
4       Q.   Was she taking notes while you were
5   talking?
6       A.   Yes.
7       Q.   She was handwriting on the notepad?
8       A.   Yeah.
9       Q.   Anything else in front of her other
10  than the notepad that she was writing things down
11  in?
12      A.   No.
13      Q.   Did she look --
14      A.   Not that --
15      Q.   I'm sorry.
16      A.   Not that I recall.
17      Q.   If you look at the first page.  It
18  says, Attendees, Hondo Blakley, Megan Kloosterman,
19  HR.  Date: 12/7/2016.
20           Do you see that?
21      A.   Uh-huh.
22      Q.   Yes?
23      A.   Yes.
24      Q.   All right.  Do you have any reason to

Page 123

1   dispute that that's the date on which the two of
2   you met?
3       A.   I don't.
4       Q.   So does that mean that you saw Foreman
5   touch Jesse's hair, pick it up and move it over,
6   prior to 12/7/2016?
7       A.   I believe so, yeah.
8       Q.   Any other occasion on which you saw
9   Foreman touch Jesse's hair?
10           MR. TUCKER:  Objection, asked and
11  answered.
12           You may answer it again.
13           THE WITNESS:  No.
14  BY MS. GURMANKIN:
15      Q.   Do you recall how soon it was prior to
16  12/7/2016 that you saw it?
17      A.   I don't recall.
18      Q.   Do you recall if it was months or days
19  or weeks or no idea?
20      A.   I don't.
21      Q.   Prior to discussing it with
22  Kloosterman during her interview, did you mention
23  it to anyone else at Shell?
24      A.   No.

Page 124

1       Q.   Did you document in any way that you
2   saw Foreman touch Jesse's hair?
3       A.   No.
4       Q.   Did you ever take a picture of Jesse?
5       A.   No.
6       Q.   After you saw Foreman touch Jesse's
7   hair, did you say anything to Foreman about it at
8   any point?
9            MR. TUCKER:  Objection, asked and
10  answered.
11           You may answer it again.
12           THE WITNESS:  No.
13  BY MS. GURMANKIN:
14      Q.   Who's Michelle Toothman?
15      A.   Is an ex-field operator.
16      Q.   She's no longer at Shell?
17      A.   No.
18      Q.   Is that correct?
19      A.   Yes.
20      Q.   When did she leave?
21      A.   I don't recall.
22      Q.   Do you recall the year?
23      A.   No.
24      Q.   Did you report to her?

31 (Pages 121 to 124)

Page 125

1  A.  For a brief time.
2  Q.  When?
3  A.  I don't recall when she worked at
4  the -- the years.
5  Q.  Do you recall about how long she was
6  at Shell?
7  A.  Approximate, I would say, six months
8  to a year.
9  Q.  Was she reporting to you at the time
10  that she left?
11  A.  I believe so, yes.
12  Q.  Why did she leave?
13  A.  She was pregnant.
14  Q.  Did she resign?
15  A.  I don't remember what the official --
16  how it officially went down.
17  Q.  So she may have been terminated?
18  A.  She was a contractor.  So I would say
19  no, it wasn't a termination.
20  Q.  So then she resigned voluntarily?
21  A.  I think due to being pregnant, but I
22  don't recall for sure.
23  Q.  Who was she a contractor through?
24  A.  Danos.

Page 126

1  Q.  How do you spell that?
2  A.  D-a-n-o-s.
3  Q.  Was she a contractor through Danos the
4  entire time that she worked at Shell to your
5  knowledge?
6  A.  To my knowledge.
7  Q.  Do you ever hire a female employee
8  during your employment at Shell?
9  MR. TUCKER:  Outside of Ms. Barnes
10  or --
11  BY MS. GURMANKIN:
12  Q.  Did you hire any female employees
13  during your employment at Shell?
14  MR. TUCKER:  And I'm just asking other
15  than Ms. Barnes?
16  BY MS. GURMANKIN:
17  Q.  I'm asking, did you hire any female
18  employees during your employment at Shell?
19  A.  Yes.
20  Q.  Who?
21  A.  April Heater and Jennifer -- I don't
22  remember Jennifer's last name.  Jen Compton.  I
23  think those are the main ones.
24  Q.  Any others that you can think of?

Page 127

1  A.  No.
2  Q.  What position was April Heater hired
3  into?
4  A.  Water.
5  Q.  What was her title?
6  A.  Environmental technician.
7  Q.  When did you hire her?
8  A.  At the beginning of the year.
9  Q.  This year?
10  A.  Yes.
11  Q.  2019?
12  A.  Yup.
13  Q.  Does she have a reporting relationship
14  to you?
15  A.  Yes.
16  Q.  Direct or indirect?
17  A.  Direct.
18  Q.  Did she work at Shell in any capacity
19  prior to being hired in 2019?
20  A.  As a contractor.
21  Q.  Do you know when she started as a
22  contractor?
23  A.  Probably around 2012 or '13.
24  Q.  And did she work as a contractor

Page 128

1  consistently through her hire earlier in 2019?
2  A.  Yes.
3  Q.  Did she have a reporting relationship
4  to you as a contractor?
5  A.  Yes.
6  Q.  And Jennifer Compton, when was she
7  hired?
8  A.  Around that 2013, '14 time frame.
9  Q.  Into what position?
10  A.  Environmental inspector.
11  Q.  Is that higher than technician or on
12  the same level?
13  A.  Same level.
14  Q.  Did Compton report to you when she was
15  hired?
16  A.  Yes.
17  Q.  Directly?
18  A.  Yes.
19  Q.  Does she still report to you?
20  A.  No.
21  Q.  When did that stop?
22  A.  Three years ago.
23  Q.  Around 2016?
24  A.  Yeah, give or take.  That time frame.

32 (Pages 125 to 128)

Page 129

1    Q.    And why did that stop?
2    A.    I believe she found another job.
3    Q.    Outside of Shell?
4    A.    Yes.
5    Q.    Do you know where?
6    A.    At the time I believe it was another
7    environmental company.
8    Q.    You don't recall the name?
9    A.    I don't.
10   Q.    Did you promote any women during your
11   employment at Shell?
12   A.    No.
13   Q.    Based on your experience working with
14   and interacting with Jesse Barnes, do you agree
15   with the following statement?  That she performed
16   satisfactorily during her employment with Shell.
17   A.    No, I don't agree with that.
18   Q.    Okay.  Why not?
19   A.    Towards the end of her employment
20   performance was -- did need some improvement.
21   Q.    So she left around April of 2019.
22   When did that start to show?
23   A.    Around the end of summer, beginning of
24   fall of 2017.

Page 130

1    Q.    And how did that begin to show?
2    A.    I was coaching her at the time because
3    she was struggling with some of the duties that
4    her role had.
5    Q.    What role was she in at the time that
6    she started struggling?
7    A.    Maintenance analyst.
8    Q.    What duties was she struggling with?
9    A.    Continuous improvement lean
10   initiatives.
11   Q.    L-e-a-n?
12   A.    Yes.
13   Q.    How was she struggling with those
14   duties?
15   A.    There was a lot of visual boards and
16   graphs and charts that needed to be done and
17   not -- put up for display, and there was
18   struggling with getting some of that stuff done.
19   Q.    What in particular was she struggling
20   with?
21   A.    Charts and graphs.
22   Q.    Actually doing them?
23   A.    Yeah.  The finished product wasn't
24   what was requested.

Page 131

1    Q.    So did she actually do the charts and
2    graphs, but she didn't do them right?
3    A.    Correct.
4    Q.    How many times did this happen?
5    A.    A few times.
6    Q.    More than five?
7    A.    Yeah.
8    Q.    Starting around the end of summer
9    2017?
10   A.    No, two-thousand -- it was around
11   2016.
12   Q.    End of summer 2016?
13   A.    Yeah.  Around there.  In the beginning
14   fall, in that time frame.
15   Q.    Any other duties she was struggling
16   with starting at the end of summer, fall 2016?
17   A.    There was some teamwork stuff that I
18   was coaching her on as well.
19   Q.    Was she struggling with any other
20   duties starting in the end of summer, fall 2016?
21   A.    No.
22   Q.    These teamwork issues, when did they
23   first show?
24   A.    Through that first year of 2016 and it

Page 132

1    just started increasing more and more.
2    Q.    When in 2016?
3    A.    Spring.
4    Q.    Can you pinpoint it any further?
5    A.    To the date?  No.
6    Q.    Month?
7    A.    It would have been springtime.  I
8    can't rec -- recollect anything more detailed than
9    that.
10   Q.    What happened in the spring of 2016?
11   A.    There were some conversations about
12   other people getting her -- getting assignments
13   which she thought were -- was part of her role and
14   she would be angry about it.  That's -- and it
15   would be comments made like, "That's my job.  What
16   is he doing that for?"
17   Q.    These were complaints -- so Jesse was
18   complaining that other people were getting tasks
19   that she thought were her responsibility?
20   A.    Correct.
21   Q.    Did she complain to you about this?
22   A.    Some, yes.
23   Q.    How many times?
24   A.    Three or four times.

33 (Pages 129 to 132)

Page 133

1      Q.    Starting in the spring of 2016?
2      A.    Yes.
3      Q.    What tasks, during the three or four
4   times that she complained to you about this,
5   what -- who was she saying got tasks that she
6   thought were her responsibility?
7      A.    It was a mixture in between Dan Krise
8   and Ken Foreman.
9      Q.    Okay. Anyone else?
10     A.    No.
11     Q.    What tasks was she saying that Krise
12   got that she thought she was responsible for?
13     A.    I don't remember specifically.
14     Q.    Do you remember generally?
15     A.    It was around -- it was around stuff
16   in SAP work, work prep.
17     Q.    You don't remember more specifically
18   than that?
19     A.    No.
20     Q.    Were the things that she was
21   complaining about that Dan got, was she right,
22   that those should have been her responsibility?
23     A.    No.
24     Q.    Those were Dan's responsibilities?

Page 134

1      A.    It was a -- there was never a
2   responsibility tied to one person when you look at
3   planning and scheduling. So anybody could do the
4   task. It was up to the supervisor to dictate who
5   does what.
6      Q.    That was Turney?
7      A.    Yes.
8      Q.    All right. So she could have done
9   those responsibilities --
10     A.    Right.
11     Q.    -- that she was telling you were
12   assigned to Dan Krise?
13     A.    Yeah.
14     Q.    And when she came to you and
15   complained that Dan Krise was getting
16   responsibilities regarding the SAP work prep that
17   she thought should have gone to her, what did you
18   say?
19     A.    It wasn't a responsibility, it was a
20   task.
21     Q.    And when she's complaining to you
22   about these tasks that were going to Dan Krise
23   regarding SAP work prep, what did you say to her?
24     A.    I asked her if she talked to Will

Page 135

1   about it.
2      Q.    What did she say?
3      A.    At first it was no. So then I
4   directed her to talk to him because that was her
5   supervisor.
6      Q.    Did she tell you why she hadn't talked
7   to Turney before coming to you?
8      A.    No.
9      Q.    Did you ask her?
10     A.    No.
11     Q.    How come?
12     A.    The question just didn't come up.
13     Q.    And what tasks was she saying were
14   assigned to Ken Foreman that she thought should
15   have gone to her?
16     A.    More stuff around the SAP planning
17   type scenario, maintenance. You know, you --
18   analyzing some of the stuff. Work package prep, I
19   believe, was some of it as well.
20     Q.    She was a maintenance analyst at the
21   time?
22     A.    Yeah.
23     Q.    And again, the tasks that she was
24   complaining about that went to Foreman, these were

Page 136

1   things that anyone could have done?
2      A.    In that group.
3      Q.    Including Jesse?
4      A.    Yeah.
5      Q.    All right. When she came to you on
6   these -- on these three or four occasions and
7   complained about these tasks going to Krise and
8   Foreman instead of her, did you talk to Turney
9   about that?
10     A.    I did.
11     Q.    After the third or fourth time or
12   what?
13     A.    After the second.
14     Q.    Where did you talk to Turney? Where
15   were you?
16     A.    In the office.
17     Q.    In person?
18     A.    Yes.
19     Q.    Where in the office?
20     A.    In a conference room.
21     Q.    Did you schedule a meeting with him
22   just to talk about this?
23     A.    No.
24     Q.    What was the meeting about?

34 (Pages 133 to 136)

1    A.    It wasn't a meeting.
2    Q.    What was the conversation about?
3    A.    We had several things we were
4 conversing over, then this was one of the topics.
5    Q.    What did you say to Turney?
6    A.    I said that Jesse was angry that Will
7 had given what she thought was her tasks to other
8 people to do, and he listened.
9    Q.    Did you tell him specifically she had
10 complained to you three or four times about
11 tasks --
12        MR. TUCKER:  Objection.  He said this
13    was after the second time that she spoke to
14    him.
15        MS. GURMANKIN:  I'm not even finished
16    my question.
17        MR. TUCKER:  So it couldn't have been
18    three or four times because he had the
19    conversation after the second time.  So your
20    question's assuming a fact which is contrary
21    to what he said the timing of his test -- if
22    his meeting was with Will.  He said the
23    second time she said something he spoke to
24    Will.  So it couldn't have been times three

1 or four.
2        MS. GURMANKIN:  Okay.  Are you done?
3    I'm going to take that as a yes, since
4    you didn't answer.
5 BY MS. GURMANKIN:
6    Q.    Did you tell Will that during that
7 meeting in the conference room, that Jesse had
8 complained to you that tasks were going to Krise
9 and Foreman that she thought should have gone to
10 her?
11        MR. TUCKER:  Objection, asked and
12    answered.
13        You can answer it again.
14        THE WITNESS:  Yes.
15 BY MS. GURMANKIN:
16    Q.    Did you tell him what tasks she had
17 talked to you about?
18    A.    We had discussed it, yes.
19    Q.    What did he say?
20    A.    That she was busy doing some other
21 tasks and it's a team -- we try to promote a team
22 work environment.  Just because somebody else was
23 doing something that time, it doesn't mean he was
24 taking anything away or doing anything different,

1 it was just trying to load level.
2    Q.    Did you do anything to ascertain
3 during that conversation with Turney whether he
4 was assigning tasks to Krise and Foreman instead
5 of Jesse because he was discriminating against her
6 because she's a woman?
7    A.    No.
8    Q.    Did you even ask him that question?
9    A.    I didn't.
10    Q.    Did you document any of the three or
11 four times that Jesse came to you and complained
12 that Turney was assigning tasks to Krise and
13 Foreman instead of her?
14    A.    No.
15    Q.    Did you document that conversation
16 that you had with Will in the conference room?
17    A.    No.
18    Q.    Any other discussions that you had
19 with Turney in the conference room after the
20 second time that Jesse came to you?
21    A.    No.
22    Q.    Did you go back to Turney after the
23 third or fourth time that Jesse came to you and
24 complained about this?

1    A.    We did have one follow-up
2 conversation.  I didn't -- I didn't go to him.  He
3 actually came to me because he was trying to work
4 out -- trying to work out the load leveling stuff
5 to keep those complaints from happening.
6    Q.    Was this after the third or fourth
7 time that Jesse came to you?
8    A.    Probably the fourth.
9    Q.    Well, had you told him that she was
10 continuing to complain?
11    A.    When he came to me, he asked if I had
12 heard anything else, and I said, yes, we had had
13 another conversation or two.  And he said he was
14 working on trying to load level the work better to
15 stop the complaining.
16    Q.    But if you -- he came to you to tell
17 you that he was trying to do the load leveling
18 better to stop the complaints, right?
19    A.    Yeah.  Trying to load level the work,
20 correct.
21    Q.    But how would he know that the
22 complaints were continuing at the time that he
23 comes to you to tell you that he's working on
24 leveling the work?

Page 141

1    A.    He didn't know.  He asked me.  "Have
2  you heard more?"  And I said, "Yes."  And he said,
3  "I'm still working on trying to get the work load
4  leveled."
5    Q.    So had he told you that during your
6  conversation with him in the conference room after
7  the second time that Jesse complained, that that's
8  what he was working on?
9    A.    No.  After the second conversation he
10  said he would look into it.  That was my first
11  conversation with him.
12    Q.    Right.  So he told you he would look
13  into that?
14    A.    Yup.
15    Q.    Okay.  You hadn't testified to that
16  before.  Anything else that you guys discussed
17  during the meeting you had with him in the
18  conference room after the second time Jesse comes
19  to complain to you that you haven't already
20  testified to?
21    A.    No.
22    Q.    So he comes to you after the fourth --
23  after the fourth time and says that he's
24  working -- still working out the load leveling?

Page 142

1    A.    Yes.
2    Q.    Anything else that you guys discussed
3  during that conversation?
4    A.    No.
5    Q.    Where is that meeting?
6    A.    Same conference room.
7    Q.    Did you document your conversations
8  with Turney about this?
9    A.    No.
10    Q.    Did you tell anyone at the company at
11  the time about your conversations with Jesse about
12  this?
13    A.    No.
14    Q.    Other than Turney?
15    A.    Correct.
16    Q.    Did you tell anyone at the company
17  about your conversations with Turney?
18    A.    Other than Jesse, no.
19    Q.    So you told Jesse that you spoke with
20  Turney about it?
21    A.    I did.
22    Q.    And what did she say?
23    A.    Acknowledged that I had the
24  conversation with him and that he was working on

Page 143

1  the load leveling.
2    Q.    Where were your three to four
3  conversations with Jesse?
4    A.    In a conference room.
5    Q.    Which one?
6    A.    The ones -- like an actual number?
7    Q.    Uh-huh.
8    A.    108.
9    Q.    All three or four conversations?
10    A.    Yeah.
11    Q.    How long did they last?
12    A.    Most times no more than five or ten
13  minutes.
14    Q.    Did she tell you during any of those
15  three or four conversations that she thought that
16  Turney treated her differently because she's a
17  woman or words to that effect?
18    A.    No.
19    Q.    Did she ever tell you during those
20  three to four conversations that Turney was acting
21  inappropriately towards her or words to that
22  effect?
23    A.    No.
24    Q.    Did she ever tell you during those

Page 144

1  three to four conversations that she was
2  uncomfortable with Turney or words to that effect?
3    A.    No.
4    Q.    Anything else you recall about those
5  three or four conversations that Jesse had with
6  you other than what you testified to?
7    A.    I was providing coaching because she
8  was angry.  So I was trying to help her.
9    Q.    Was she angry during all three to four
10  conversations?
11    A.    Yeah.
12    Q.    How did that show?
13    A.    Raised voice.
14    Q.    Anything else?
15    A.    The fact that she said she was.
16    Q.    She said, "I'm angry"?
17    A.    (Witness nods head.)
18    Q.    Yes?
19    A.    Yeah.
20    Q.    During all three to four
21  conversations?
22    A.    Two of them at least.
23    Q.    Which two?
24    A.    Probably the second and third one.

36 (Pages 141 to 144)

Page 145

1    Q.    Any reason why you didn't testify to
2  that before when I asked you to tell me everything
3  about those conversations?
4    A.    No.
5    Q.    Anything else you omitted?
6    A.    No.
7    Q.    When you say she raised her voice, was
8  she yelling?
9    A.    I wouldn't say yell, just loud talk.
10   Q.    During all three to four?
11       MR. TUCKER:  He said two of them, the
12   second and third.
13 BY MS. GURMANKIN:
14   Q.    Actually, I thought you said she said
15 I'm angry during the second and third
16 conversations; is that right?
17   A.    Yes.
18   Q.    Okay.  Was she --
19   A.    That was the loud voice as well, the
20 second and third.
21   Q.    All right.  Did she raise her voice at
22 all during the first and possibly fourth
23 conversation?
24   A.    Not that I recall.

Page 146

1    Q.    Was it raised to the extent that you
2  had to tell her to lower her voice or be quiet or
3  something like that?
4    A.    No.
5    Q.    Did she do anything that you thought
6  was inappropriate during these three to four
7  conversations?
8    A.    No.
9    Q.    Other than saying I'm angry and
10 raising her voice, anything else she did that led
11 you to conclude that she was angry?
12   A.    No.
13   Q.    At any time before your 12/7/2016
14 interview with Megan Kloosterman, did Jesse tell
15 you that Turney acted inappropriately towards her
16 or words to that effect?
17   A.    No.
18   Q.    Did she ever tell you, prior to the
19 12/7/2016 interview with Kloosterman, that he
20 sexually harassed her?
21   A.    No.
22   Q.    Ever tell you, prior to that 12/7/2016
23 interview with Kloosterman, that Turney did
24 anything inappropriate towards her?

Page 147

1    A.    I don't understand the question.
2  You're saying prior to the --
3    Q.    Prior to your 12/7/2016 interview with
4  Kloosterman --
5    A.    Yup.
6    Q.    -- did Jesse ever tell you that Turney
7  acted in ways that she thought were inappropriate
8  or made her uncomfortable?
9    A.    No.  It was -- it -- no.
10       MR. TUCKER:  Do you want to say
11   something?
12       THE WITNESS:  Well, it sounds like --
13       MR. TUCKER:  Was it responsive to
14   her -- is it responsive to her question?
15       THE WITNESS:  Yeah.  It just sounds
16   like it's -- it was said in the interview and
17   I didn't say it in the interview either.  So
18   I never said that.
19 BY MS. GURMANKIN:
20   Q.    You never said what?
21   A.    What you just asked me.  Prior to
22 the -- repeat your question.
23   Q.    Well, explain to me what you're
24 saying.  Prior to the interview what?  You didn't

Page 148

1  say what?
2    A.    That I was never approached about any
3  of those things that you just said.
4    Q.    Prior to the interview with
5  Kloosterman, Jesse never came to you and told you
6  that Turney had sexually harassed her; is that
7  correct?
8    A.    Correct.
9    Q.    Prior to the interview with
10 Kloosterman, Jesse never came to you and told you
11 that Turney did anything inappropriate or anything
12 that made her uncomfortable, correct?
13   A.    Correct.
14   Q.    Prior to the interview with
15 Kloosterman, did Jesse ever complain to you about
16 anything regarding Turney other than the fact that
17 he was assigning tasks to Krise and Foreman that
18 she thought should have been assigned to her?
19   A.    It was all around the work.  It was
20 around the work, the SAP, that kind of stuff.
21   Q.    Well, did she complain to you that
22 Turney did anything other than assign tasks to
23 Krise and Foreman that she thought should have
24 gone to her?  Did she make any other complaints to

37 (Pages 145 to 148)

Page 149

1  you prior to your interview with Kloosterman about
2  Turney?
3      A.    No.
4      Q.    Did she complain to you about anything
5  other than that Turney was assigning work to Krise
6  and Foreman that she thought should have gone to
7  her prior to your interview with Kloosterman?
8      A.    She complained outside of those
9  meetings about them not being able to communicate
10 well.
11     Q.    All right.  So we're talking outside
12 of those three to four conversations that she had
13 with you that we just talked about, correct?
14     A.    Yup.
15           MR. TUCKER:  Okay.  No one go
16 anywhere.  Take a break.
17           VIDEOGRAPHER:  This concludes file
18 number two in the videotaped deposition of
19 Hondo Blakley in the case of Jesse Barnes v.
20 Shell, et al.
21           We are going off the record as 11:37
22 a.m.
23              - - -
24           (Whereupon, a recess was taken from

Page 150

1  11:37 a.m. until 11:46 a.m.)
2              - - -
3           VIDEOGRAPHER:  This begins file number
4  three in the videotaped deposition of Hondo
5  Blakley in the matter of Jesse Barnes v.
6  Shell, et al.
7           We are going on the record at 11:46
8  a.m.
9  BY MS. GURMANKIN:
10     Q.    These three to four conversations that
11 started in the spring of 2016 that Jesse had with
12 you complaining about tasks that were being
13 assigned to Krise and Foreman that she thought
14 should have been assigned to her, did you believe
15 that that indicated some sort of performance
16 deficiency on her part?
17     A.    No.
18     Q.    All right.  So aside from those three
19 to four conversations, you also testified that she
20 complained to you about them not communicating
21 well.
22     A.    There were communication issues.
23     Q.    That she was complaining to you about?
24     A.    (Witness nods head.)

Page 151

1      Q.    Yes?
2      A.    Yes.
3      Q.    With whom?
4      A.    With Will Turney.
5      Q.    Okay.  Anyone else?
6      A.    No.
7      Q.    When did she start complaining to you
8  about communication issues with Turney?
9      A.    Around that same time.
10     Q.    Spring of 2016?
11     A.    Yeah.
12     Q.    About how many times did she complain
13 to you about that?
14     A.    One or two times.
15     Q.    Any documentation that you made
16 regarding those conversations?
17     A.    No.
18     Q.    What did she complain to you about
19 communication issues with Turney?
20     A.    Not understanding what was requested.
21     Q.    What did she say about that?
22     A.    "I don't know what he wants all the
23 time.  I don't understand the direction."
24     Q.    Anything else that she said during

Page 152

1  these one to two times?
2      A.    No.
3      Q.    And what did you say?
4      A.    I just gave her some coaching on
5  questions to ask just to make sure the direction
6  was clear on what the -- whatever task it was
7  that -- that needed to be done.
8      Q.    So you basically said something to the
9  effect of, you need to ask him for clear
10 instructions so you're sure about what he wants or
11 what needs to be done?
12     A.    Yup.
13     Q.    Anything else?
14     A.    And ask clarifying questions.
15     Q.    Okay.  Anything else that you would
16 say?
17     A.    There were occasions where she would
18 complain to me about issues in her personal life
19 as well.
20     Q.    Are -- is that part of the one to two
21 times where she complained to you about
22 communication issues with Turney or are they
23 separate?
24     A.    The one time it was the same

38 (Pages 149 to 152)

Page 153

1   conversation.
2       Q.   Okay.  I just want to make sure we've
3   covered everything that she said and you said
4   about communication issues with Turney during
5   those one to two times where she complained to you
6   about that.  Have you told me everything?
7       A.   Yes.
8       Q.   All right.  And during those one --
9   during one of those occasions in which she
10  complained to you about communication issues with
11  Turney, she talked to you about personal issues?
12      A.   She was having an issue with a
13  boyfriend at one time.
14      Q.   Okay.  And was it during those --
15  during one of those one to two times where she
16  talked to you about communication issues with
17  Turney that she talked to you about issues she was
18  having with her boyfriend?
19      A.   Yeah.  It was a follow-up
20  conversation.
21      Q.   It was separate from those one or two?
22      A.   Same time.  Moved on from one
23  conversation to another.
24      Q.   Okay.  So it was the same

Page 154

1   conversation?
2       A.   Right.
3       Q.   What did she talk to you about the
4   personal issue?
5       A.   She didn't like her boyfriend.
6       Q.   So you done -- she talks to you about
7   communication issues with Turney and then she goes
8   on to say she doesn't like her boyfriend?
9       A.   After we talked about the
10  communication, I said, "Everything else going
11  good?"  And she said -- that's when she referenced
12  that she was having issues with her boyfriend.
13      Q.   Did she say, "I don't like my
14  boyfriend"?
15      A.   They were not getting along.
16      Q.   Did she tell you her boyfriend's name?
17      A.   No, I don't know which one -- recall
18  which one was it.
19      Q.   Did she talk to you about more than
20  one?
21          MR. TUCKER:  On that occasion or on
22      other occasions?
23          MS. GURMANKIN:  No, on any occasion.
24          THE WITNESS:  There were multiple

Page 155

1   boyfriends that she complained about at one
2   point or another, yes.
3   BY MS. GURMANKIN:
4       Q.   All right.  And this conversation that
5   followed the conversation about the communication
6   issues with Turney and she said that she's not
7   getting along with her current boyfriend, did she
8   tell you why?
9       A.   There wasn't great detail, but high
10  level she -- they had differences in opinions on
11  stuff.
12      Q.   Did she tell you what stuff?
13      A.   No.
14      Q.   Did you ask?
15      A.   No.
16      Q.   So did you say anything in response to
17  her saying during this conversation we're talking
18  about that she's not getting along with her
19  boyfriend at the time, they have differences of
20  opinion?
21      A.   I hoped she was able to work it out.
22      Q.   Anything else?
23      A.   No, not -- not --
24      Q.   Did she --

Page 156

1       A.   Not --
2       Q.   Did she say anything else during that
3   conversation about her boyfriend issues?
4       A.   No.
5       Q.   And there were other times where she
6   spoke with you about other boyfriends?
7       A.   At my desk.  There was a boyfriend
8   that had kids, and I don't know his name.  He had
9   a couple kids that she liked, but was not getting
10  along with him as well.
11      Q.   All right.  So this is a conversation
12  that she's having with you at your desk?
13      A.   Yes.
14      Q.   This is separate from the one
15  following the conversation in which she's talking
16  to you about communication issues with Turney?
17      A.   Correct.
18      Q.   When is this conversation she's having
19  with you at your desk?
20      A.   It was earlier in 2016.
21      Q.   Before the conversation --
22      A.   Yup.
23      Q.   -- about the boyfriend?
24      A.   Around end of 2015, somewhere around

Page 157

1   there.
2      Q.   Okay.  So before the conversation
3   about the boyfriend who she's not getting along
4   with?
5      A.   Yes.
6      Q.   How do you know they were two
7   different boyfriends?
8      A.   Because one boyfriend had kids and the
9   other one didn't.
10     Q.   She had told you that?
11     A.   Yup.
12     Q.   When did she tell you that the
13   boyfriend she was complaining about around the
14   spring of 2016 didn't have kids?
15     A.   You'll have to repeat that.  I didn't
16   quite catch it all.
17     Q.   Sure.
18         At some point you knew that the
19   boyfriend that she was complaining about when she
20   told you she wasn't getting along with him
21   following the conversation she had with you about
22   the communication issues with Turney, that that
23   boyfriend didn't have kids.
24     A.   It was -- it was just a part of the

Page 158

1   conversation, single.
2      Q.   Was that -- was it part of that
3   conversation where she says they're not getting
4   along that she told you that that boyfriend didn't
5   have kids or was different from the boyfriend she
6   previously complained about who had kids?
7     A.   It was different.
8     Q.   She told you that in that conversation
9   where she says they're not getting along?
10     A.   No.  It was another conversation.
11     Q.   Okay.  So at some point before that
12   conversation where she tells you she's not getting
13   along with that boyfriend, she had another
14   conversation with you about that same boyfriend
15   where she tells you that he doesn't have kids?
16     A.   Yes.
17     Q.   And in that conversation where she
18   tells you that the boyfriend didn't have kids, how
19   did that come up?  What were you guys talking
20   about?
21     A.   It wasn't even -- or -- it wasn't a
22   question of do you have kids or not, it was he's
23   single.
24     Q.   All right.  The conversation in which

Page 159

1   she told you that that boyfriend is single, how
2   did that come up?  Did she just walk up and tell
3   you that?
4     A.   It was a hey-how's-it-going
5   conversation.  Everything's good, and then you
6   just have a standard morning conversation and
7   it -- you talk about different things.  I talk
8   about going to school, all that kind of stuff, and
9   then it just -- it comes up in conversation.
10     Q.   How did it come up that she was dating
11   someone who's single who's different from the one
12   she had previously talked to you about who had
13   kids?
14     A.   She told me.
15     Q.   She just said, I'm dating someone
16   who's single?
17     A.   No.  She said something about her
18   boyfriend and it was different than the one
19   with -- that had the children.
20     Q.   What did she say about him?
21     A.   That it was different than the one
22   with the children.
23     Q.   Did she tell you this one didn't have
24   kids?

Page 160

1     A.   Yes.
2     Q.   What did she say about him other than
3   he's different from the one who had kids?
4     A.   That he didn't have kids.
5     Q.   Was she complaining about him in that
6   conversation or just telling you that it was a
7   different boyfriend?
8     A.   In that one it was just different.
9     Q.   Anything else she told you about him
10   in that conversation?
11     A.   No.
12     Q.   Is that conversation at your desk too?
13     A.   I think that one was in the hallway.
14     Q.   All right.  And the one previously
15   that -- I'm sorry.  Did you say that happened in
16   like late 2015 where she complained about the
17   boyfriend who had kids?
18     A.   Yeah.  '15, '16, somewhere in there.
19     Q.   And what was she complaining about?
20     A.   They weren't getting along.  I didn't
21   get details.  But she liked the kids.
22     Q.   Did she ever tell you any of her
23   boyfriends' names?
24     A.   Yeah.

40 (Pages 157 to 160)

Page 161

1     Q.    What?
2     A.    I don't remember them.
3     Q.    You don't remember.  Did she tell you
4  more than one?
5     A.    Yeah.
6     Q.    But you don't remember any of them?
7     A.    Some of them I know because they work
8  in the -- like Clint Slocum, he was a boyfriend.
9     Q.    Uh-huh.
10    A.    Matt Bedridge.
11    Q.    I'm sorry.  What was it?
12    A.    Bedridge, I think, if I'm pronouncing
13  it right, was a boyfriend.
14    Q.    Uh-huh.
15    A.    I remember a Duncan in a conversation
16  and T. J. Hall.
17    Q.    T. J. Hall?
18    A.    Yeah.  If I remember, that's about all
19  of them.
20    Q.    Clint, was a Shell employee?
21    A.    Yes.
22    Q.    The same with Matt?
23    A.    Yes.
24    Q.    And did she tell you at the time that

Page 162

1  she was dating them?
2     A.    Yes.  Well, Clint -- Clint I knew.  I
3  did not know about Matt until after.
4     Q.    After what?
5     A.    After the relationship was over, I
6  guess.  I wasn't -- that was earlier in the
7  timing.
8     Q.    And how did you find out about it
9  after it was over?
10    A.    In a conversation.
11    Q.    With her?
12    A.    Yes.
13    Q.    Did she tell you while she was dating
14  Clint that she was dating him?
15    A.    Yes.
16    Q.    Did she complain about Clint when she
17  talked to you?
18    A.    Not that I recall.  Well, there after
19  the -- after they broke up, she complained about
20  losing a dog.
21    Q.    To Clint?
22    A.    Yup.
23    Q.    Did she complain about Clint while she
24  was dating him to you?

Page 163

1     A.    No.
2     Q.    So do you remember how it came up that
3  she was dating him?
4     A.    I think she brought it up.
5     Q.    Do you remember the context?
6     A.    I don't recall the specific context of
7  that.
8     Q.    Okay.  Other than complaining about
9  Turney assigning tasks to Krise and Foreman that
10  she thought should have gone to her and
11  complaining about communication issues with
12  Turney, prior to your interview with Kloosterman
13  on 12/7/2016, did Jesse complain to you about
14  anything else regarding Turney?
15    A.    No.
16    Q.    Other than those two topics and
17  complaining about boyfriends, did Jesse complain
18  to you about anything prior to your interview with
19  Kloosterman on 12/7/20 16?
20          MR. TUCKER:  Objection.
21          You may answer.
22          THE WITNESS:  Repeat the question.
23  BY MS. GURMANKIN:
24    Q.    Sure.

Page 164

1          Other than Jesse's complaints to you
2  about communication issues with Turney and Turney
3  assigning tasks to Krise and Foreman that she
4  thought should have gone to her and complaining
5  about boyfriends, did Jesse make any other
6  complaints to you about anything prior to your
7  interview with Kloosterman on 12/7/2016?
8     A.    Yes.
9     Q.    What?
10    A.    She complained about Dan Krise.
11    Q.    When was that?
12    A.    Initially would have been around that
13  2015, beginning of 2016.  Around that same time
14  frame.
15    Q.    How many times did she complain to you
16  about Krise?
17    A.    A couple times.
18    Q.    What about?
19    A.    That he was stinky.
20    Q.    I'm sorry.  What was it?
21    A.    That he was stinky.
22    Q.    Stinky?
23    A.    Stinky.  Smells funny.
24    Q.    Okay.

41 (Pages 161 to 164)

Page 165

1        A.      And he would bring in, like, leek dip.
2    Do you know what leek dip is?
3        Q.      No.
4        A.      It's an onion dip that's homemade in
5    the country of Wellsboro.  Onions grow wild.  He
6    would bring it in.  She'd complained about it
7    smelling.  She complained once that she didn't
8    even like talking to him.
9        Q.      Her complaint about Krise being
10   stinky, was that in connection with him bringing
11   the leek dip in or was that a separate issue?
12       A.      Separate.  The leek dip -- the leek
13   dip does smell funny.
14           MR. TUCKER:  Let -- even though you
15       may anticipate the question, let her complete
16       it.
17   BY MS. GURMANKIN:
18       Q.      Did she say what he smelled like
19   separate from the leek dip issue?
20       A.      Just that he stinks.
21       Q.      Did you ask her what he smelled like?
22       A.      Actually, I said, "He stinks like
23   what?"  And she said, "Just stinks."
24       Q.      Did you have anything to say about her

Page 166

1    complaining about him being stinky after that?
2        A.      I actually referred her to her
3    supervisor to -- if it was a -- that if it was an
4    issue, that she needed to follow the chain of
5    command.
6        Q.      Did you ask her why she was coming to
7    you and complaining that Krise was stinky?
8        A.      No.
9        Q.      How come?
10       A.      I never thought to ask that question.
11       Q.      Were you wondering why she was coming
12   to you and complaining that Krise was stinky?
13       A.      No.
14       Q.      I'm sorry.  Did you say she didn't
15   like communicating with Krise?  Did she also
16   complain about that, along with the leek dip and
17   about him being stinky?
18       A.      No, I didn't say communicate.
19       Q.      Okay.  Any other complaints about
20   Krise other than he's stinky and his leek dip
21   smelled?
22       A.      No.
23       Q.      Did you say anything to her other than
24   you need to talk to your supervisor?

Page 167

1        A.      I didn't.
2        Q.      Did you notice Krise was stinky?
3        A.      No.
4        Q.      Any other complaints that Jesse made
5    to you about anything prior to your interview with
6    Kloosterman on 12/7/2016?
7        A.      Not that I recall.
8        Q.      Her complaints to you about the
9    communication issues that she was having with
10   Turney, did you believe that that was indicative
11   of some sort of performance deficiency on her
12   part?
13       A.      No, not -- I didn't.  Sometimes people
14   just have trouble communicating.
15       Q.      Okay.  So other than the struggles she
16   was having with the continuous improvement lean
17   initiative, anything else that causes you to
18   disagree with the statement that she performed
19   satisfactorily during her employment with Shell?
20       A.      Would you repeat that one more time?
21       Q.      Sure.
22           Other than her struggles with the
23   continuous improvement lean initiatives that you
24   testified to earlier, any other issues with her

Page 168

1    performance that causes you to disagree with the
2    statement that she has performed satisfactorily
3    during her employment with Shell?
4        A.      And what was that statement around?
5        Q.      I had asked you if you agreed with it
6    and you said no, and you testified that you did
7    not because she had struggles with her duties, and
8    then you testified that she had struggles with
9    continuous improvement lean initiatives.
10       A.      Okay.
11       Q.      Any other performance deficiencies
12   that she had other than her struggle with
13   continuous improvement lean initiatives that
14   causes you to disagree with the statement that she
15   performed satisfactorily during her employment
16   with Shell?
17       A.      Nothing more.
18       Q.      What position is Ricky Dake currently
19   in?
20       A.      Operations supervisor.
21       Q.      Is that organizationally above the
22   level of an environmental technician?
23       A.      Yes.
24       Q.      Have you heard anything about April

42 (Pages 165 to 168)

1    Heater and Ricky Dake having a relationship?
2        A.    Yes.
3        Q.    What have you heard about that?
4        A.    That they have a relationship.
5        Q.    Who did you hear that from?
6        A.    Ricky.
7        Q.    And just so we're on the same page,
8    we're talking about a romantic or sexual
9    relationship?
10       A.    We're talking about a relationship.  I
11   can't speak to how romantic.
12       Q.    A dating relationship?
13       A.    Okay.  Dating relationship.
14       Q.    Right?  That's what you heard?
15       A.    Yes.
16       Q.    What did Ricky tell you?
17       A.    That they've had a relationship.
18       Q.    What did he tell you?
19       A.    That's what he told me.
20       Q.    He said they're having a relationship?
21       A.    That they were dating.
22            MR. TUCKER:  Hondo, keep your hands
23   down.
24            THE WITNESS:  Sorry.

1    BY MS. GURMANKIN:
2        Q.    Does Ricky currently have a reporting
3    relationship to you?
4        A.    Yes.
5        Q.    Direct?
6        A.    Yes.
7        Q.    When did he tell you that they were
8    having a dating relationship?
9        A.    It's been over -- it's been over a
10   year ago, a year and a half ago.
11       Q.    He told you over a year and a half
12   ago?
13       A.    Yeah, probably.
14       Q.    While she was a contractor?
15       A.    Yes.
16       Q.    Do you know why he came to you and
17   told you that he was having a dating relationship
18   with her?
19       A.    Transparency.
20       Q.    Is that what he said?
21       A.    He just wanted to make sure that there
22   were no includes, you know, perceived secrets or
23   anything like that.
24       Q.    He told you after the relationship had

1    started, correct?
2        A.    I don't know exactly when it started
3    versus when he told me.
4        Q.    Well, did you ask?
5        A.    No.
6        Q.    But he came to you and told you that
7    they were already in a dating relationship?
8        A.    He came to me and said that they were
9    dating.
10       Q.    Did you ask him any questions about
11   it?
12       A.    I did not.
13       Q.    Did you report it to anyone at the
14   company?
15       A.    Yes.
16       Q.    Who?
17       A.    His supervisor.
18       Q.    Who is that?
19       A.    It was Rory Hunter.
20       Q.    Rory?
21       A.    Yeah.
22       Q.    This is before Ricky had a reporting
23   relationship to you?
24       A.    It was.

1        Q.    Did you ask Ricky why he was coming to
2    you instead of his direct supervisor?
3        A.    He had talked to his direct
4    supervisor.
5        Q.    Rory Hunter?
6        A.    Yes.
7        Q.    So he came to you and told you that he
8    had already told this to his direct supervisor?
9        A.    Uh-huh.
10       Q.    Yes?
11       A.    Yes.
12       Q.    Rory Hunter?
13       A.    Yes.
14       Q.    Did you ask him why he was sharing
15   this with you?
16       A.    Yes.
17       Q.    And what did he say?
18       A.    To be open and transparent so nobody
19   thought there was anything going on.
20       Q.    Did he have any reporting relationship
21   to you at the time that he told you?
22       A.    No.
23       Q.    Well, did you ask him why he wanted to
24   share that with you?

Page 173

1    A.   I did.
2    Q.   What did he say?
3    A.   To be open and transparent, to make
4  sure everybody knew there was nothing -- there was
5  no secrets.
6    Q.   To your knowledge, did he tell
7  everybody?
8    A.   I don't -- I don't know.
9    Q.   Did he tell anyone other than you and
10  Rory Hunter to your knowledge?
11    A.   I don't know.
12    Q.   So if he told you that he had already
13  told Rory Hunter, why did you report it to Rory
14  Hunter?
15    A.   I didn't.  I asked him if he had and
16  he said yes.
17    Q.   Well, you said you told Rory Hunter.
18    A.   No.  I said, "Did you tell Rory?"
19  That was my question to him.  "Did you tell Rory?"
20  He said, "Yes."
21    Q.   My question to you was did you tell
22  anyone at the company?
23    A.   I talked to my supervisor.
24    Q.   Who is that?

Page 174

1    A.   Steve Craig.
2    Q.   Why?
3    A.   To make sure he knew.
4    Q.   Why did you want to make sure Craig
5  knew?
6    A.   To be open and transparent.  If
7  there's, you know, a relationship in the -- in
8  that area, it's good that everybody's aware of it.
9    Q.   If Ricky didn't have any reporting
10  relationship to you at the time, then why did you
11  feel the need to tell your supervisor?
12    A.   Because as the process improvement
13  lead, I was not going to get a question as to did
14  you know this and why didn't I say anything?  It's
15  always best to be open and transparent.
16    Q.   So this was before your promotion to
17  production superintendent?
18    A.   Yeah.
19    Q.   And when you told Steve Craig about
20  it, did he indicate that he already knew?
21    A.   He did not indicate either way.
22    Q.   Did he say anything to you?
23    A.   Thanks for telling him.
24    Q.   Any other conversations you had with

Page 175

1  anyone at the company about it?
2    A.   No.  Not that I recollect.
3    Q.   When Heater was hired into a full-time
4  position earlier this year, you had conversations
5  with HR about her being hired into a full-time
6  position, correct?
7    A.   Yes.
8    Q.   And who in HR did you talk to?
9    A.   Oh, I cannot remember her name.  It
10  was a hiring manager, but I can't remember her
11  name.
12    Q.   Okay.  If it comes to you later, let
13  me know.  Okay?
14    A.   Yup.
15    Q.   Did you tell that person that you were
16  aware that April had been having a relationship
17  with an operations supervisor?
18    A.   No.
19    Q.   How come?
20    A.   I don't have a -- I just didn't.  I
21  didn't think it was pertinent.
22    Q.   It wasn't important to be open and
23  transparent in your conversations with the HR
24  hiring manager?

Page 176

1         MR. TUCKER:  Objection.
2  BY MS. GURMANKIN:
3    Q.   You can answer.
4         MR. TUCKER:  You may answer.
5         THE WITNESS:  No.  I didn't believe
6  so.
7  BY MS. GURMANKIN:
8    Q.   I'm sorry?
9    A.   No.
10    Q.   Who hired Jesse into a full-time
11  position with Shell?
12    A.   Will Turney.
13    Q.   Anyone else involved or just Turney?
14         MR. TUCKER:  Move your hands away from
15  your mouth.
16         THE WITNESS:  Will Turney was the
17  hiring manager.
18  BY MS. GURMANKIN:
19    Q.   So was anyone else involved or he was
20  the decision maker?
21    A.   He was the decision maker.
22    Q.   Okay.  The sole decision maker?
23    A.   HR would have been involved in the
24  decision.

44 (Pages 173 to 176)

Page 177

1    Q.    Was HR involved in the decision?
2    A.    Yeah.
3    Q.    Who?
4    A.    I don't know.  I was not involved.
5    Q.    Okay.
6        MR. TUCKER:  Well, then are you
7    guessing?
8        THE WITNESS:  Yeah.  I don't know who
9    was involved.
10        MR. TUCKER:  Let's do this.  Let's
11    testify about what you know, not speculate or
12    guess.  Okay?
13    BY MS. GURMANKIN:
14    Q.    Do you know if anyone other than
15    Turney was involved in the decision to hire Jesse
16    into a full-time position at Shell?
17    A.    I don't know.
18    Q.    But you were not, correct?
19    A.    Correct.
20    Q.    Did you interview Jesse before she was
21    hired into a full-time position?
22    A.    Yes.
23    Q.    If you weren't involved in the
24    decision to hire her, why did you interview her?

Page 178

1    A.    To be part of the interview team.
2    Q.    Why, if you were not involved in the
3    decision to hire her?
4    A.    There's always more than one person on
5    an interview board.
6    Q.    Generally, based on your experience at
7    Shell, is everyone on the interview board involved
8    in the decision to hire someone?
9    A.    They provide input.
10    Q.    So yes?
11        MR. TUCKER:  His answer was his
12    answer.
13    BY MS. GURMANKIN:
14    Q.    So yes?
15        MR. TUCKER:  His answer was they
16    provide input.
17        MS. GURMANKIN:  Please stop
18    testifying, Joe.
19        MR. TUCKER:  I'm not testifying.
20    BY MS. GURMANKIN:
21    Q.    So the answer is yes?
22        MR. TUCKER:  Objection.  He's answered
23    the question.
24    BY MS. GURMANKIN:

Page 179

1    Q.    Is your answer yes?
2        MR. TUCKER:  Or he sticks by his
3    question.
4        MS. GURMANKIN:  Joe, please stop
5    testifying.
6        MR. TUCKER:  I'm not testifying.
7    BY MS. GURMANKIN:
8    Q.    Is your answer yes, Mr. Blakley?
9    Please answer the question.
10        MR. TUCKER:  You can answer the
11    question if you stick by your prior answer if
12    you want or have her read back.
13    BY MS. GURMANKIN:
14    Q.    No.  Please answer the question.
15        MR. TUCKER:  If you want it read back
16    because you can't recall the question, you
17    can have the question -- the prior question
18    read back.
19    BY MS. GURMANKIN:
20    Q.    Do you need the question read back?
21    A.    Please.
22        MR. TUCKER:  And his prior answer
23    also.
24    BY MS. GURMANKIN:

Page 180

1    Q.    Generally --
2        MR. TUCKER:  I'm going to -- I asked
3    the court reporter --
4        MS. GURMANKIN:  No, I'm redoing the
5    question.
6        MR. TUCKER:  And I'm going to have it
7    read back.
8        MS. GURMANKIN:  No, we're not doing it
9    that way.  It's my dep.
10    BY MS. GURMANKIN:
11    Q.    Generally, based on your experience at
12    Shell --
13        MR. TUCKER:  He's not -- you're not
14    going to answer the question until the court
15    reporter -- you asked for it to be read back.
16        MS. GURMANKIN:  It's inappropriate,
17    Joe.
18        MR. TUCKER:  You're not going to
19    answer the question unless the court reporter
20    reads back your prior question and answer.
21    Okay?
22        MS. GURMANKIN:  That's inappropriate,
23    Joe, and you know that.
24    BY MS. GURMANKIN:

45 (Pages 177 to 180)

1      Q.    Generally, based on your experience at
2   Shell, if people -- if multiple people are on the
3   interview board for a particular position, do all
4   of those individuals -- are all of those
5   individuals involved in the decision to hire?
6           Please answer the question.
7           MR. TUCKER:  Do you recall your prior
8   answer?
9           MS. GURMANKIN:  Are you really -- are
10  you really -- you're interfering with my
11  questioning.
12          MR. TUCKER:  I'm not interfering with
13  questioning.
14          MS. GURMANKIN:  You are.
15          MR. TUCKER:  He asked for the question
16  to be read.  You read it back.
17          MS. GURMANKIN:  I'm repeating the
18  question now.
19          MR. TUCKER:  You are not the court
20  reporter.  He asked for the court reporter to
21  read his prior question and answer back.  Why
22  you're trying to trick or trap him is just --
23          MS. GURMANKIN:  Why are you trying to
24  coach him?

1           MR. TUCKER:  I'm just trying to get
2   his question and answer read back and he said
3   he would like it read back.
4           MS. GURMANKIN:  Your instructions are
5   inappropriate but if -- since you're
6   apparently going to instruct him not to
7   answer and he's going to follow your
8   instructions, then we'll have to do it that
9   way, even though you know that that's
10  inappropriate.
11          MR. TUCKER:  No.
12          MS. GURMANKIN:  Well, you should.
13          MR. TUCKER:  I want him to have his
14  question and answer read back.  I don't
15  understand why you're trying to trick or trap
16  the witness when he asked for his prior
17  question and answer to be read back.
18          MS. GURMANKIN:  No, I'm not.  I don't
19  understand why you're trying to coach him,
20  but we'll do it since you're instructing him
21  not to answer in violation of the rules.
22          Would you mind, Nancy, going back?
23          Thank you.
24                   - - -

1           (Whereupon, the court reporter read
2      from the record.)
3                   - - -
4   BY MS. GURMANKIN:
5      Q.    So aside from providing input, are
6   people on the interview board also involved in the
7   decision to hire based on your experience at
8   Shell?
9      A.    They provide input on who is the best
10  person for the job.
11     Q.    So does that mean they also get
12  involved in the decision by providing input?
13     A.    It depends on the level of what you're
14  referring to as decision.
15     Q.    I don't understand that answer.  Can
16  you explain it?
17     A.    So if you provide input, then there's
18  a certain level that you're involved in with the
19  decision.
20     Q.    Okay.
21     A.    On who you think is the best person
22  for the job.
23     Q.    Right.  So you provided input on the
24  decision to hire Jesse into a full-time position

1   with Shell, correct?
2      A.    Yes.
3      Q.    All right.  So based upon that, you
4   were involved in the decision?
5           MR. TUCKER:  Objection.
6   BY MS. GURMANKIN:
7      Q.    You nodded.  Is that yes?
8      A.    I didn't nod.
9      Q.    What's your answer?
10          MR. TUCKER:  You may answer.
11          THE WITNESS:  I did provide input for
12     the hiring of Jesse, yes.
13  BY MS. GURMANKIN:
14     Q.    Okay.  So my question was, were you
15  involved in the decision based on your providing
16  input?
17     A.    They do take my input into account, so
18  yes.
19     Q.    Anyone other than you and Turney?
20     A.    I don't know.
21     Q.    Was anyone else on the interview
22  board?
23     A.    No.
24     Q.    What were the reasons why you and

46 (Pages 181 to 184)

Page 185

1    Turney decided to hire Jesse into a full-time
2    position with Shell?
3              MR. TUCKER:  Objection.  That is a
4    mischaracterization of his testimony.
5              MS. GURMANKIN:  You can object to
6    form.
7              MR. TUCKER:  I'm -- objection, you
8    have mischaracterized his testimony.
9    BY MS. GURMANKIN:
10       Q.    Please answer the question, Mr.
11   Blakley.
12             MR. TUCKER:  Do you want the question
13   read back?
14             THE WITNESS:  Please.
15   BY MS. GURMANKIN:
16       Q.    Did you not understand it?
17       A.    I would like to be more clear.
18       Q.    Did you understand my question?
19       A.    No.  Please redo it.
20       Q.    Sure.
21             MS. GURMANKIN:  Do you mind, Nancy.
22                    - - -
23             (Whereupon, the court reporter read
24    from the record.)

Page 186

1                    - - -
2              MS. GURMANKIN:  Thank you.
3              THE WITNESS:  As a contractor, she was
4    performing the role and I already understood
5    the general rules and responsibilities.
6    BY MS. GURMANKIN:
7        Q.    Was that you already understood the
8    general rules and responsibilities or she did?
9        A.    She did.
10       Q.    Okay.  Any other reasons?
11       A.    And was the most qualified out of the
12   candidates.
13       Q.    Did you guys interview anyone else?
14       A.    There were other interviews.
15       Q.    This is for the maintenance analyst
16   position at Wellsboro that she was hired into?
17       A.    Yeah.
18       Q.    Who else did you interview?
19       A.    I did not interview anybody else.
20       Q.    Did Turney interview anyone else, to
21   your knowledge?
22       A.    Yes.
23       Q.    Who?
24       A.    I don't know who it was.

Page 187

1        Q.    Just one person?
2        A.    I don't know.  I don't recall.
3        Q.    And how do you know he interviewed at
4    least someone else?
5        A.    Because there were some other possible
6    interviews schedules.  I don't know who it was.
7        Q.    How do you know they were scheduled?
8        A.    Because I remember him telling me they
9    were scheduled.
10       Q.    One or more than one?
11       A.    I don't know.
12       Q.    You don't remember?
13       A.    Nope.
14             MR. TUCKER:  Let's take a two-minute
15   break.
16             MS. GURMANKIN:  Uh-huh.
17             MR. TUCKER:  Please don't go anywhere.
18             VIDEOGRAPHER:  We are now going off
19   the record.  The time on the camera, 12:21
20   p.m.
21                    - - -
22             (Whereupon, a luncheon recess was
23    taken from 12:21 p.m. until 1:07 p.m.)
24                    - - -

Page 188

1              VIDEOGRAPHER:  We are now back on the
2    record.  The time on the camera, 1:07 p.m.
3    BY MS. GURMANKIN:
4        Q.    The struggles that you testified that
5    Jesse had regarding the continuous improvement
6    lean initiatives, did you document in any way that
7    you thought that she struggled with that or
8    somehow wasn't fulfilling her duties with regard
9    to those initiatives?
10       A.    No.
11       Q.    Has anyone else, other than Jesse,
12   complained to you about Will Turney?
13       A.    No.
14       Q.    How about Dan Krise?  Anyone other
15   than Jesse complain about Dan?
16       A.    Nope.
17                    - - -
18             (Whereupon, Exhibit 6 was marked for
19    identification by Ms. Gurmankin.)
20                    - - -
21   BY MS. GURMANKIN:
22       Q.    All right.  You should have on the
23   screen in front of you what's been marked as
24   Exhibit 6, Shell 87 through 111.

47 (Pages 185 to 188)

Page 189

1        This appears to be an assessment that
2  you filled out for Jesse, if you look at the
3  second page, on March -- around March 23, 2015; is
4  that correct?
5     A.    Yes.
6     Q.    And this says Individual Performer,
7  Final Assessment Interview?
8     A.    It does.
9     Q.    What is that?
10     A.    It was the interview for the
11  maintenance analyst role.
12     Q.    The position that she got full time?
13     A.    Yes.
14     Q.    Was this part of the interview
15  process?
16     A.    It is.
17     Q.    Are these filled out, based on your
18  experience at Shell, for anyone who's applying for
19  a full-time position at Shell?
20     A.    Yes.
21     Q.    How about people who are already
22  employed at Shell but are applying for an
23  interview, are these filled out for those
24  individuals?

Page 190

1     A.    Yes.
2     Q.    Any exceptions that you know of to
3  this Individual Performer, Final Assessment
4  Interview being required to be completed for
5  people applying for positions or applying for
6  promotions?
7     A.    I'm not aware of any.
8     Q.    Can you just skim through this?  I
9  want to know if that's your handwriting throughout
10  the entire document.
11             - - -
12         (Pause)
13             - - -
14     A.    Yes.
15     Q.    Okay.
16         MR. TUCKER:  You looked at all the
17  pages?
18         THE WITNESS:  (Witness nods head.)
19  BY MS. GURMANKIN:
20     Q.    Was that yes?
21     A.    Yes.
22     Q.    And is this something that you filled
23  out while you were interviewing Jesse or
24  subsequent to the interview or both?

Page 191

1     A.    Both.
2     Q.    Okay.  Do you remember what parts you
3  filled out during the time you were actually
4  meeting with her and what parts you filled out
5  after?
6     A.    Not that much detail.  Mostly note
7  taking.
8     Q.    Did you and Turney interview her
9  together or separately?
10     A.    We interviewed her together.
11     Q.    Do you remember about how long it
12  took?
13     A.    Approximately an hour.
14     Q.    Can you turn to page 13?  Bates Number
15  is 99.
16     A.    Okay.  Page 13.
17     Q.    Yeah.  It say Functional Competency at
18  the top.
19     A.    Yeah.
20     Q.    What are these?
21     A.    Functional competencies are
22  competencies that have to do with the job itself.
23     Q.    Okay.  So there are check marks that
24  you made, correct, on this page?

Page 192

1     A.    Uh-huh.  Correct.
2     Q.    Okay.  And they're all under the meets
3  expectations category, right?
4     A.    Yes.
5     Q.    All right.  So am I correct that for
6  all of the functional competencies on this page,
7  you thought that Jesse met expectations?
8     A.    We -- so if you look underneath that
9  meets expectations.
10     Q.    Uh-huh.
11     A.    Most of the band three, acceptable
12  level for the job with so scope development.  So
13  the basic expectations for the maintenance analyst
14  role, yes, but there was room for development,
15  room for growth.
16     Q.    All right.  So, for example, if you
17  look at the first one, "Shows a solid
18  understanding of some the more complex
19  technical/functional theories, models and/or
20  concepts."
21         Do you see that one?
22     A.    I do.
23     Q.    All right.  And there you put a check
24  mark under the four column, right?

48 (Pages 189 to 192)

Page 193

1     A.   Uh-huh.
2     Q.   Yes?
3          MR. TUCKER:  You have to say.
4  BY MS. GURMANKIN:
5     Q.   You just have to say yes for the
6  record.
7     A.   That's correct.
8     Q.   Okay.  And it looks like that
9  indicates at the bottom that you thought she fell
10  between meets expectations and exceeds
11  expectations on that competency; is that correct?
12     A.   Yes.
13     Q.   The next one, "Provides clear evidence
14  on how she applies functional skills consistently
15  and effectively."
16          Did you check the three box for that
17  one?
18     A.   I did.
19     Q.   Indicating that you felt she met
20  expectations for that, correct?
21     A.   Yes.
22     Q.   The next one, "Shows commitment to
23  best practices."
24          You felt she fell between meets

Page 194

1  expectations and exceeds expectations.  You gave
2  her a four or that, correct?
3     A.   Correct.
4     Q.   Next one, "Is able to communication
5  complex technical or functional information in
6  simple terms for people from different
7  professional backgrounds."
8          You thought she met expectations on
9  that one, correct?
10     A.   Correct.
11     Q.   Next one, "Cleary describes the impact
12  and potential impact of her functional expertise
13  on the wider business."
14          You gave her a meets expectations on
15  that, correct?
16     A.   Correct.
17     Q.   Next one, "Shows a clear understanding
18  of own strengths and development needs in own
19  professional area and has some ideas on how to
20  address development areas."
21          You gave her a meets expectations on
22  that, correct?
23     A.   I did.
24     Q.   Next one, "Is enthusiastic

Page 195

1  about own profession and shows motivation to
2  develop professionally."
3          You gave her a four.  So she fell
4  between meets expectations and exceeds
5  expectations on that one, correct?
6     A.   Yes.
7     Q.   The next one, "Demonstrates eagerness
8  to keep up to date with the latest developments in
9  own professional area."
10          You also gave her a four on that one,
11  correct?
12     A.   Yes.
13     Q.   Next page.
14          Actually, sorry.  If we go back to
15  page 13 for a second.  I apologize.
16          See at the bottom it says, "Overall
17  functional competency."
18     A.   Uh-huh.
19     Q.   "Please circle one box."  Do you see
20  that?
21     A.   Yeah.
22     Q.   You gave -- you circled four on that
23  one, right?
24     A.   I did.

Page 196

1     Q.   All right.  So does that indicate that
2  your overall assessment for the functional
3  competencies on this page, that you thought she
4  fell between meets expectations and exceeds
5  expectations?
6     A.   Overall.
7     Q.   All right.  Page 14.
8          How does this differ from the page
9  that we just looked at?
10          MR. TUCKER:  How does 14 differ from
11  13?
12          MS. GURMANKIN:  Yeah.
13          THE WITNESS:  The questions are the
14  same.
15  BY MS. GURMANKIN:
16     Q.   Right.  So is it any different?
17     A.   I don't believe so.
18     Q.   Okay.
19          MR. TUCKER:  Actually, it says on page
20  13 "Overall Functional Competency 1 Rating."
21  14 says "Overall Functional Competency 2
22  Rating."
23  BY MS. GURMANKIN:
24     Q.   Yeah, right.  But are the functional

49 (Pages 193 to 196)

Page 197

1  competencies any different?
2      A.   They both would have been about
3  functional competencies of the job role.
4      Q.   Are they the same on both pages?
5      A.   I don't recollect any difference.
6      Q.   You don't see any difference on here,
7  do you?
8      A.   Not for the questions, no.
9      Q.   Okay.  So, for example, if you look on
10  page 13, look at the third one from the bottom.
11  This "Shows a clear understanding" one.  Do you
12  see that?
13      A.   Yeah.
14      Q.   All right.  And on page 13 you checked
15  off meets expectations for that one, right?
16      A.   Yup.
17      Q.   And then on page 14, if you look at
18  that one, you checked a four, between meets
19  expectations and exceeds expectations.  Do you see
20  that?
21      A.   Yes.
22      Q.   Why?  I mean, what was the difference?
23      A.   I don't recollect what the difference
24  was.

Page 198

1      Q.   Okay.  And then on page 13 you looked
2  at the overall -- you checked off -- you circled
3  four, right?
4      A.   Yup.
5      Q.   And then on 14, it looks like you
6  circled both three and four; is that right?
7      A.   I don't recall which one I circled.
8      Q.   Well, it looks like you circled both,
9  doesn't it, just from looking at it?
10      A.   It does look like that.
11      Q.   Do you remember why?
12      A.   I don't.
13      Q.   All right.  Next page, 15.
14          All right.  So am I correct that these
15  functional competencies on page 15 are the same as
16  the ones we just looked at on 13 and 14?
17      A.   Yup.
18      Q.   But it looks like here for the second
19  one and the fourth one that you checked off a
20  five, that she exceeds expectations?
21      A.   Uh-huh.
22      Q.   Do you see that?
23      A.   (Witness nods head.)
24      Q.   Yes?

Page 199

1      A.   I do see it, yes.
2      Q.   All right.  Can you -- can you, first
3  of all, explain why there's three pages with the
4  same functional competencies on it?
5      A.   So you can have different functional
6  competencies that you ask the same questions to.
7  So functional competency is a -- depending on the
8  job, it could be something -- computer skills or
9  skills in Word, skills in Excel, skills in
10  whatever else.
11      Q.   Got it.  So is that the case with this
12  document?
13      A.   I don't recall the functional
14  competencies that we discussed.
15      Q.   All right.  But that's the only
16  explanation that would make sense --
17      A.   Yup.
18      Q.   -- as to why there's the same
19  functional competencies on multiple pages, right?
20          MR. TUCKER:  Objection.
21  BY MS. GURMANKIN:
22      Q.   Right?
23      A.   Could you repeat the question?
24      Q.   Yeah.

Page 200

1          That's the explanation that makes
2  sense, that there's the same functional
3  competencies that apply to different skills.
4  That's the only explanation that would make sense
5  as to why there's the same functional competencies
6  on multiple pages of this assessment form.
7          MR. TUCKER:  Objection.
8          THE WITNESS:  There can be different.
9  BY MS. GURMANKIN:
10      Q.   I'm sorry.
11      A.   There can different functional
12  competences in a -- in a job, yes.
13      Q.   I'm sorry.  I didn't understand that
14  answer.  I just want to make sure we're on the
15  same page.
16          You just testified that the same
17  functional competencies can apply to different
18  skills for the same job, right?
19      A.   Yes.
20      Q.   Okay.  So is that your understanding
21  as to why there is the same functional
22  competencies that you're rating Jesse on on
23  multiple pages of this assessment form, that they
24  just apply to different skills of the maintenance

50 (Pages 197 to 200)

1    analyst position that she was being considered
2    for?
3        A.    I don't recall these pages in
4    particular.
5        Q.    Right.  But is there any other
6    explanation that you can think of, as you sit here
7    today, as to why the same functional competencies
8    would show up on multiple pages on this assessment
9    form?
10            MR. TUCKER:  Objection.
11            THE WITNESS:  No, I don't know.
12   BY MS. GURMANKIN:
13       Q.    Anything else --
14       A.    I don't recall.
15       Q.    Anything else that you can think of?
16       A.    Not at this time.
17       Q.    Okay.  Go to page 16, please.
18            And by the way, you -- you were
19   truthful throughout this assessment form when you
20   completed it, right?
21       A.    Yes.
22       Q.    All right.  Page 16, the first -- I'm
23   sorry, actually this says Authentic.  Do you see
24   at the top?

1        A.    Yes.
2        Q.    What does that refer to?  What does
3    that mean?
4        A.    It's the behavioral portion of the
5    interview.
6        Q.    Okay.  So on the first category under
7    meets expectations it says, "Acts with personal
8    integrity in most cases but may be less
9    transparent and open in situations that present a
10   personal risk."
11            And on that one you gave Jesse a four,
12   falling between meets and exceeds expectations,
13   correct?
14       A.    Correct.
15       Q.    The next one, "Is clear about own
16   personal values and beliefs and acts in ways that
17   are consistent with them in most situations."
18            And you gave her a four, falling
19   between meets and exceeds expectations, correct?
20       A.    Correct.
21       Q.    Next one, "Conveys humility in sharing
22   own views, displays openness to others' views."
23            You gave her a three, meets
24   expectations, correct?

1        A.    Yes.
2        Q.    The next one, "Shows resilience under
3    pressure, recovering quickly from all but the most
4    difficult situations."
5            You gave her a four, falling between
6    meets and exceeds expectations, correct?
7        A.    Yes.
8        Q.    The next one, "Manages own wellbeing
9    and maintains composure most of the time."
10            And you gave her a three, correct?
11       A.    Correct.
12       Q.    And the overall authenticity rating
13   that you gave her was a four, falling between
14   meets and exceeds expectations, correct?
15       A.    Correct.
16       Q.    Okay.  Next page, 17.  All right.  So
17   this is Growth.  What does that category relate
18   to?
19       A.    Around performance and some competency
20   stuff.  So how -- based on interviews you could
21   perform the job.
22       Q.    All right.  So the first one under
23   meets expectations, "Seeks out some information
24   about the organization's business direction and

1    demonstrates recognition of how it impacts own
2    area."
3            You gave her a three, meets
4    expectations, right?
5        A.    Yes.
6        Q.    Next one, "Demonstrates interest in
7    and knowledge of relevant developments outside of
8    the organization, (for example, general business
9    and industry trends.)"
10            You gave her a three, meets
11   expectations, right?
12       A.    Yup.
13       Q.    Next one, "Applies innovative
14   approaches to own work as appropriate."
15            You gave her a three, meets
16   expectations, correct?
17       A.    Correct.
18       Q.    The next one, "Adapts appropriately to
19   change."
20            You gave her a four, falling between
21   meets and exceeds expectations, correct?
22       A.    Yes.
23       Q.    The next one, "Makes timely decisions
24   on most problems or issues, though struggles when

51 (Pages 201 to 204)

Page 205

1    ambiguity exists."
2         You gave her a three, meets
3    expectations, correct?
4         A.    Yes.
5         Q.    Next one, "Follows established safety
6    and ethical policies and practices."
7         You gave her a four, falling between
8    meets and exceeds expectations, correct?
9         A.    Yes.
10        Q.    Next one, "Behaves in ways that align
11   with a positive reputation for the organization."
12        And you gave her a four, falling
13   between meets and exceeds expectations, correct?
14        A.    Yup.
15        Q.    It looks like for the overall growth
16   rating, correct me if I'm wrong, but it looks like
17   you initially gave her a four and then crossed it
18   out and gave her a three?
19        A.    Correct.
20        Q.    Do you know remember why that was?
21        A.    I had more checked boxes in the
22   threes, so I averaged it out to be meets
23   expectations.
24        Q.    All right.  Next page, 18.

Page 206

1    Collaboration.  What does that refer to?
2         A.    Being able to ask questions and talk
3    to different people.
4         Q.    The first one under meets
5    expectations, "Establishes effective working
6    relationships with appropriate stakeholders."
7         You gave her a four, falling between
8    meets and exceeds expectations, correct?
9         A.    Yes.
10        Q.    The next one, "Listens to understand
11   customer/stakeholder needs and perspectives."
12        You gave her a three, meets
13   expectations, correct?
14        A.    Yes.
15        Q.    The next one, "Engages in behavior
16   that builds trust and cooperation within immediate
17   team."
18        You gave her a four, falling between
19   meets and exceeds expectations, correct?
20        A.    Yes.
21        Q.    The next one, "Adapts to key cultural
22   differences."
23        It looks like you initially gave her a
24   four and then you crossed that out and put not

Page 207

1    applicable; is that right?
2         A.    Yes.
3         Q.    Next one -- and actually, strike that.
4         Do you remember why you did that?  Why
5    you crossed out the four and put not applicable?
6         A.    After I thought about it, it wasn't
7    pertinent to the -- to the interview.
8         Q.    Next one, "Deploys a range of
9    different communication and influencing
10   strategies."
11        You gave her a four, falling between
12   meets and exceeds expectations, correct?
13        A.    Correct.
14        Q.    An overall collaboration rating, you
15   gave her a four, falling between meets and
16   exceeds, correct?
17        A.    Yes.
18        Q.    All right.  The next one, page 19.
19   Performance.  What does that refer to?
20        A.    Performance in -- in the -- in a job.
21   How you're performing in the day-to-day stuff.
22        Q.    So would that be for people who are
23   already, I guess, not officially working in a
24   particular job who are applying to make it a

Page 208

1    full-time position?
2         A.    It would -- some -- based on some
3    interview questions, you can judge performance
4    when you're asking some of the questions that's in
5    the book -- in the interview packet.
6         Q.    How does that differ from the
7    functional competencies?
8         A.    A functional competency is more
9    technical.
10        Q.    So technical skills?
11        A.    Yeah.
12        Q.    So if someone's not working in the
13   particular job at the time that this assessment's
14   being done, how would you judge their performance
15   category?
16        A.    On a question and answer.  On an
17   interview -- on the interview process you would
18   ask the questions that's in the packet.
19        Q.    Okay.  So for the first one here under
20   meets expectations, "Puts in whatever effort is
21   necessary to ensure timely delivery of
22   commitments."
23        You gave her a three, meets
24   expectations, correct?

52 (Pages 205 to 208)

Page 209

1    A.    Yes.
2    Q.    The next one, "Performs tasks outside
3 of own responsibility as requested to support the
4 team's ability to deliver."
5         You gave her a three, meets
6 expectations, correct?
7    A.    Yes.
8    Q.    Next one, "Demonstrates an acceptable
9 understanding of how the organization generates
10 value and makes money."
11        You gave her a three, meets
12 expectations, correct?
13   A.    Yes.
14   Q.    "Provides some coaching" -- I'm sorry,
15 "Provides some feedback and coaching to peers."
16        You gave her a three, meets
17 expectations, correct?
18   A.    Yes.
19   Q.    And the next one, "Identifies and
20 implements some solutions to support improvements
21 in the quality and efficiency of own work."
22        And you gave her a three, meets
23 expectation, correct?
24   A.    Correct.

Page 210

1    Q.    And overall you gave her a three,
2 meets expectation?
3    A.    Yes.
4    Q.    The maintenance analyst position in
5 Wellsboro that she was hired into on a full-time
6 basis, was that position vacant before she started
7 working in it?
8    A.    Yes.
9    Q.    Had anyone had it before she started
10 working in that position?
11   A.    Not that I recollect.
12   Q.    Was she the first maintenance analyst
13 in Wellsboro that you were aware of?
14   A.    That I'm aware of, yes.  That I
15 recall.
16   Q.    Who determined what job grade she
17 would come in at?
18   A.    I do not know.
19   Q.    You did not make that determination?
20   A.    No.
21   Q.    Do you know if Turney made it?
22   A.    I don't.
23   Q.    Do you recall any discussions that you
24 were involved in with anyone about that issue?

Page 211

1    A.    I was in a discussion with -- I had a
2 conversation with Will about it.  Just the
3 conversation was what the grade was going to be,
4 which I -- I didn't know, and at the time he
5 didn't know.
6    Q.    So was there really anything to the
7 discussion other than you guys didn't know what --
8    A.    That was it.
9    Q.    Do you recall any discussions with
10 anyone in HR that you had about hiring Jesse as a
11 full-time employee before she was hired?
12   A.    No.
13        - - -
14        (Whereupon, Exhibit 7 was marked for
15 identification by Ms. Gurmankin.)
16        - - -
17 BY MS. GURMANKIN:
18   Q.    All right.  You should have on your
19 screen in front of you what has been marked as
20 Exhibit 7.  This is -- this is Jesse's Complaint
21 that she filed in federal court.  Have you seen
22 this document before?  And, you know, take your
23 time, look through it, whatever you need to do to
24 answer that question.

Page 212

1         - - -
2         (Pause)
3         - - -
4    MR. TUCKER:  Counsel, was your
5 question has he seen this before?
6    MS. GURMANKIN:  Yeah.
7    THE WITNESS:  I've seen parts of it
8 before, yes.
9 BY MS. GURMANKIN:
10   Q.    Which parts, do you know?
11   A.    The first few pages.
12   Q.    Up till when?
13   A.    Page four.
14   Q.    When did you see up till page four?
15   A.    I think when the official -- when this
16 became official.
17   Q.    Do you recall when?
18   A.    No.
19   Q.    When you say "this became official,"
20 what are you referring to?
21   A.    The lawsuit.
22   Q.    And who showed you up to page four?
23   A.    I don't recall who it was.
24   Q.    Okay.  At the end of the Complaint

53 (Pages 209 to 212)

Page 213

1  there's an EEOC charge attached. Have you seen
2  that before?
3      A.   All the way to page 32?
4      Q.   Yeah, after the Complaint.
5      MR. TUCKER: Go to page 24.
6      THE WITNESS: Okay. I'm there.
7  BY MS. GURMANKIN:
8      Q.   Have you seen the EEOC charge that's
9  attached before?
10     A.   I don't recall seeing this.
11     MR. TUCKER: Can you say that again?
12  What did you say?
13     THE WITNESS: I don't recall seeing
14  this.
15  BY MS. GURMANKIN:
16     Q.   All right. If you get back to page 10
17  of the Complaint, paragraph what. Are you there?
18     A.   Yup. Page 10, paragraph what?
19     Q.   Thirty-two. Do you see that at the
20  bottom?
21     A.   Is that (aa) or (z)?
22     Q.   No, it's after that, paragraph 32.
23  It's at the bottom of page 10.
24     A.   Okay. I see it.

Page 214

1      Q.   It says, "In or about May 2016,
2  Plaintiff," meaning Jesse Barnes, "complained of
3  sexual harassment to Blakley." I'll stop there.
4      Is that true or do you dispute that?
5                  - - -
6              (Pause)
7                  - - -
8      A.   That's not true.
9      Q.   Okay. Did she complain to you about
10  anything in May 2016?
11     A.   It was around the time that she was
12  complaining about work.
13     Q.   About Turney assigning tasks to Krise
14  and Foreman that she thought should have been
15  given to her?
16     A.   Yes.
17     Q.   And about her complaining that she had
18  communication issues with Turney?
19     A.   Yes.
20     Q.   Okay. Anything else around May 2016?
21     A.   Not around May 2016. Not that I
22  recall.
23     Q.   All right. The next sentence,
24  "Blakley has supervisory authority over Plaintiff

Page 215

1  and Turney."
2      Is that true?
3      A.   No.
4      Q.   At some point did you?
5      A.   Yes.
6      Q.   When was that?
7      A.   November -- when did I become a
8  production superintendent?
9      Q.   You said late 2017, early 2018.
10     A.   Yup. Yeah. November --
11     Q.   Starting around that time?
12     A.   Yeah. November 2017, late fall.
13     Q.   Okay. Through when?
14     A.   Until he transferred to Permian.
15     Q.   Did you continue to have supervisory
16  authorities over Jesse until she left earlier this
17  year?
18     A.   I've never had supervisory authority
19  over Jesse.
20     Q.   So it's only accurate that you had
21  supervisory authority over Turney?
22     A.   Correct.
23     Q.   Okay. But you never had any
24  supervisory authority over Jesse?

Page 216

1      A.   No.
2      Q.   Whether indirect or direct, right?
3      A.   No.
4      Q.   That is correct? Yes?
5      A.   It's correct that I never had
6  supervisory authority over Jesse.
7      Q.   Okay. During the time that you were
8  process improvement lead and you worked with
9  Turney on improving processes, Jesse was reporting
10  to Turney during that time, correct?
11     A.   Yes.
12     Q.   All right. Next sentence, "Plaintiff
13  asked Blakley for help, and expressed that she was
14  upset at the way she was being treated by Turney
15  and other male managers and employees because she
16  is female."
17     Is that true?
18     A.   No.
19     Q.   Did you ever tell Jesse that at any
20  time?
21     MR. TUCKER: That being what?
22     MS. GURMANKIN: Anything in that
23  sentence that I just read.
24  BY MS. GURMANKIN:

54 (Pages 213 to 216)

1     Q.    I'm sorry.  Did Jesse tell you
2  anything in that sentence at any time?
3     A.    No.
4     Q.    All right.  Paragraph 33.  "In
5  response to Plaintiff's complaint, Blakley told
6  Plaintiff that the same was out of character for
7  her, and that she needed to make sure to control
8  her emotions."  I'll stop there.
9           Did you ever tell Jesse that she
10 needed to make sure to control her emotions or
11 words to that effect?
12    A.    Yes.
13    Q.    When was that?
14    A.    It was shortly after she had an
15 emotional outburst that she had to leave work for.
16    Q.    When was her emotional outburst?
17    A.    Around that same time frame.
18    Q.    May 2016?
19    A.    Yeah.  May, June, summertime.
20    Q.    Did you see her emotional outburst?
21    A.    I did not.
22    Q.    Someone told you about it?
23    A.    Yes.
24    Q.    Who?

1     A.    I believe it was -- who was it?  Steve
2  Craig.
3     Q.    Did he tell you about it on the same
4  day that it happened?
5     A.    No.
6     Q.    When?
7     A.    It was the day after.
8     Q.    What did Craig tell you about Jesse's
9  emotional outburst?
10    A.    Just that he was disappointed that it
11 had happened.
12    Q.    Well, did he tell you what exactly
13 happened?
14    A.    No.  It was high level.  It was that
15 she had an -- was -- had an emotional outburst,
16 was very upset, and had taken the rest of the day
17 and went home.
18    Q.    All right.  Did he use the words
19 emotional outburst?
20    A.    He said outburst.
21    Q.    So he comes to you at some point and
22 where do you have this conversation with Steve
23 Craig?  Is it in person?
24          MR. TUCKER:  Is it where?  I'm sorry,

1  Caren.
2  BY MS. GURMANKIN:
3     Q.    Is it in person?
4     A.    Yes.
5     Q.    Where?
6     A.    In a office.
7     Q.    In whose office.
8     A.    Probably at the cubicle.
9     Q.    Whose?
10    A.    His.
11    Q.    So did you come over to talk to him
12 about something else?  Did he call you over?
13    A.    We were talking about other stuff.
14    Q.    And in the middle of that conversation
15 he tells you that Jesse had an outburst the day
16 before?
17    A.    Yes.
18    Q.    And that she went home --
19    A.    Uh-huh.
20    Q.    -- for the rest of the day?
21    A.    That's correct.
22    Q.    And that he was disappointed in her?
23    A.    No, not -- it -- it was disappointment
24 that -- that it had occurred.  Just general

1  disappointment that somebody has to get that
2  angry.  The -- the statement that it was
3  disappointed in her is not accurate.
4     Q.    Okay.  So what did he express to you
5  caused him disappointment?
6     A.    The fact that that stuff occurs in a
7  professional setting.  It should be -- you
8  shouldn't have outbursts.  You should be able to
9  communicate issues and problems without losing
10 tempers, things like that.
11    Q.    So wasn't he expressing to you, as you
12 understood it, that he was disappointed in her
13 because she acted like that in a professional work
14 setting?
15          MR. TUCKER:  Objection, asked and
16 answered.
17          You may answer again.
18          THE WITNESS:  He did not express
19 the -- that he was disappointed in her.  It
20 was just those things need to be -- need to
21 not occur in the workplace.
22 BY MS. GURMANKIN:
23    Q.    Was it your understanding that when he
24 was expressing to you that he was disappointed,

55 (Pages 217 to 220)

1　that those things should not occur in the
2　workplace, that he was disappointed that she acted
3　that way in the workplace?
4　　　　MR. TUCKER:  Objection, asked and
5　answered two times at least.
6　　　　MS. GURMANKIN:  No, it hasn't.
7　　　　MR. TUCKER:  Yes, it has been.
8　BY MS. GURMANKIN:
9　　Q.　Is that what you understood he was
10　expressing to you?
11　　　　MR. TUCKER:  He has said something
12　different, but he may answer it again.
13　　　　THE WITNESS:  He was expressing that
14　it's -- he's disappointed that stuff occurs.
15　We ought to be able to have communications in
16　a work environment that does not -- where
17　that stuff does -- doesn't occur.
18　BY MS. GURMANKIN:
19　　Q.　Was he saying that in the context of
20　telling you that anyone other than Jesse acted
21　that way?
22　　A.　I don't know the context in which he
23　said it in.
24　　Q.　Well, isn't that the same conversation

1　in which he's telling you that she had an
2　outburst?
3　　A.　It was.
4　　Q.　Okay.
5　　A.　But I didn't ask the context.  This
6　was we need to make sure that we have a work
7　environment that does not sustain that type of
8　situations.
9　　Q.　Meaning what?
10　　A.　Meaning having that kind of situation
11　happen in a work environment.
12　　Q.　Well, what was it about the work
13　environment that caused her to have an outburst
14　according to Steve Craig?
15　　A.　I don't know.  He didn't say.
16　　Q.　So he tells you she had an outburst.
17　Did you ask what it was about?
18　　A.　I did.
19　　Q.　And did he give you an answer?
20　　A.　No.
21　　Q.　And what did he say?
22　　A.　It was -- it was a personal thing.
23　I'm not a supervisor at the time.  It just was as
24　a process improvement lead, I need to try to help

1　foster work environments where that -- we don't
2　have people that get angry like that.
3　　Q.　No, no.  When you asked Steve Craig
4　what was her outburst about, what did he say?
5　　A.　He did not give me details.
6　　Q.　Well, what did he answer when you said
7　what was her outburst about?
8　　A.　He said, I can't give you details.
9　　Q.　Well, did you ask why not?
10　　A.　No.
11　　Q.　Why?
12　　A.　Because it's a supervisor/subordinate.
13　I wasn't a direct report.  A lot of personnel
14　issues you don't have open conversations about.
15　　Q.　I'm asking you about this one.  Did
16　you ask why he couldn't give you any details?
17　　A.　No.
18　　Q.　Did you ask if he had seen it or heard
19　about it from somebody else?
20　　A.　No.
21　　Q.　Do you have a understanding of whether
22　he saw it himself or whether he heard about it
23　from someone else?
24　　A.　I don't.  I don't know that.

1　　Q.　Okay.  Am I correct that till this day
2　you have no idea what that outburst was about?
3　　A.　You are correct.
4　　Q.　Okay.  Do you have any idea how she
5　acted that led Steve Craig to tell you that she
6　had an outburst?
7　　A.　Not the details.
8　　Q.　Anything?
9　　A.　No.
10　　Q.　I mean, do you know if she yelled?
11　　A.　I do not recollect any of the details.
12　　Q.　Did he tell you?
13　　A.　No.
14　　Q.　Did you ask who witnessed the
15　outburst?
16　　A.　No.
17　　Q.　How come?
18　　A.　Because it's a personal situation in
19　between leadership, supervisors, and their direct
20　reports.
21　　Q.　So did you ask Craig even why he was
22　sharing this with you since this was between
23　supervisors and direct reports?
24　　A.　I did not ask him why he was sharing

56 (Pages 221 to 224)

Page 225

1   it with me.
2       Q.    Did you wonder?
3       A.    No.
4       Q.    Why?  If it was between supervisors
5   and direct reports, why weren't you even wondering
6   why he was bothering to share this with you?
7       A.    Because I -- in my -- as a process
8   improvement lead, there's a lot of opportunity for
9   me to lead people, coach, and mentor, and those
10  are things that I should be looking for to help
11  make sure you foster an open environment for --
12  with communication and that kind of stuff.
13      Q.    So did you think that's why he was
14  sharing it with you?
15      A.    Yeah.  To help make sure that's --
16  that type of situation doesn't occur in the
17  workplace.
18      Q.    Well, how would you be able to lead,
19  coach, and mentor if you have no idea what it was
20  about or what caused it or how she even acted?
21      A.    Because I can lead, coach, and mentor
22  about having an open transparent work environment
23  without knowing when -- when something happens.
24      Q.    I'm not talking about when something

Page 226

1   happened.  He told you when it happened.  I'm
2   talking about why it happened.  Don't you need
3   that information to be able to lead, coach, and
4   mentor?
5       A.    No.
6       Q.    Why?
7       A.    Because you -- when you lead, coach,
8   and mentor, it's about getting people to work as a
9   team and communicate openly.  It's not about
10  talking about something that happened in the past
11  when it's private.
12      Q.    Am I correct you were concerned when
13  Steve Craig tells you that an employee in the
14  group had an outburst at work?
15      A.    Could you repeat the question?
16      Q.    Sure.
17            Am I correct that that was concerning
18  to you, that you have an employee here in the
19  group who's having outbursts in the workplace?
20      A.    Yeah, it concerned me.
21      Q.    Yeah.  I mean, you don't want to have
22  a work environment that leads to employees having
23  outbursts in the workplace.
24      A.    Correct.

Page 227

1       Q.    You want to do everything you can to
2   make sure that there's not anything going on in
3   the work environment that causes employees to have
4   outbursts.
5       A.    Yes.
6       Q.    Okay.  So you documented what Steve
7   Craig told you about Jesse having an outburst?
8       A.    No.
9       Q.    Have you ever done that?
10      A.    No.
11      Q.    Did you report it to anyone in HR?
12      A.    No.
13      Q.    Did you report it to your supervisor?
14      A.    Steve was my supervisor.
15      Q.    Did you report it to anybody in the
16  company?
17      A.    No.
18      Q.    How come?
19      A.    Because my supervisor was aware of it
20  and there's a chain of command and he's directly
21  over me for chain of command.  So whoever he is
22  reporting to, he would have reported it.
23      Q.    So what did you do to lead, coach, and
24  mentor when you found out that Jesse had an

Page 228

1   outburst in the workplace?
2       A.    So if anybody brought it up, I would,
3   one, say we need to move past it.  Not to dwell on
4   things that happened in the past.  And if you have
5   issues, they need to be brought up and made
6   transparent before -- before it gets out of hand.
7       Q.    He said whenever -- whenever someone
8   brought it up.  Who brought it up?
9       A.    I don't recall.
10      Q.    Do you recall anyone ever bringing it
11  up other than Steve Craig to you?
12      A.    I did talk to Will Turney once about
13  it.
14      Q.    When?
15      A.    After the fact.
16      Q.    How soon?
17      A.    Probably a week.
18      Q.    About a week after Steve Craig tells
19  you it happens?
20      A.    Yeah.
21      Q.    And tell me about your conversation
22  with Turney.
23      A.    It was pretty short.  I didn't get any
24  details.  I asked him if he had had any follow-up

57 (Pages 225 to 228)

Page 229

1  with Steve. He said he had. And that was
2  probably as far as the conversation went.
3      Q.   Well, did you initiate the
4  conversation with Turney to talk to him about
5  Jesse's outburst?
6      A.   No.
7      Q.   So how did it come up?
8      A.   We were talking about other stuff that
9  was going on, maintenance stuff, and some
10  processes that we're working on.
11     Q.   Who brings it up?
12     A.   I believe -- I believe Will brought it
13  up.
14     Q.   What did he say?
15     A.   Asked if I'd heard about it.
16         MS. GURMANKIN: All right. We need to
17  take a break to change tape.
18         VIDEOGRAPHER: This concludes file
19  number three in the videotaped deposition of
20  Hondo Blakley in the matter of Jesse Barnes
21  v. Shell, et al.
22         We are going off the record at 1:52
23  p.m.
24              - - -

Page 230

1          (Whereupon, a recess was taken from
2  1:52 p.m. until 2:02 p.m.)
3              - - -
4          VIDEOGRAPHER: This will begin file
5  number four in the videotaped deposition of
6  Hondo Blakley in the matter of Jesse Barnes
7  v. Shell, et al.
8          We are going back on the record at
9  2:02 p.m.
10  BY MS. GURMANKIN:
11     Q.   So at some point about a week after
12  Steve Craig tells you about Jesse's outburst,
13  you're talking to Will Turney and he asks you if
14  you've heard about it, correct?
15     A.   Yes.
16     Q.   And you say?
17     A.   I did.
18     Q.   Did he tell you anything about it?
19     A.   No details.
20     Q.   Did he tell you that he witnessed it?
21     A.   No.
22     Q.   Do you know whether he witnessed it?
23     A.   I don't.
24     Q.   Any other conversation that you guys

Page 231

1  have about it?
2      A.   High level coaching-type conversation
3  as far as my role in trying to ensure that that --
4  those type of -- that isn't fostered in the work
5  environment. We need to make sure it doesn't
6  happen.
7      Q.   Tell me everything that you talked to
8  Turney about Jesse's outburst.
9      A.   He asked if I'd heard about it. I
10  said yes. And I said, we have to make sure that
11  we make sure that stuff doesn't happen. Right?
12  Make sure that people have -- all the employees
13  can have conversations and have coaching
14  conversations and/or conversations about
15  improvement opportunities, wherever they might be,
16  and you can have an open work environment.
17     Q.   Any other conversation that you had
18  with Turney about Jesse's outburst?
19     A.   No.
20     Q.   Why were you even talking to Turney
21  about essentially we have to be able to talk to
22  people about developmental opportunities and
23  coaching without that happening if you didn't even
24  know what led to the outburst?

Page 232

1      A.   It doesn't matter what led to the
2  outburst. We don't want a work environment where
3  that stuffs occurs.
4      Q.   Well, it -- I'm sorry. Go ahead.
5      A.   I had a conversation about a general
6  workplace environment.
7      Q.   Well, for example, if an outburst
8  resulted from an employee being sexually harassed,
9  then that would certainly make a difference,
10  wouldn't it?
11     A.   Yes.
12     Q.   All right. So it would matter why the
13  outburst happened, wouldn't it?
14     A.   To the people that it affected, yes.
15     Q.   And to you, in terms of your role in
16  coaching and mentoring and leading and making sure
17  the workplace environment isn't one that leads to
18  that type of conduct, right?
19     A.   Of outbursts?
20     Q.   Yeah.
21     A.   Correct.
22     Q.   And sexually harassing conduct, right?
23  You want to make sure the workplace is free of
24  sexually harassing conduct --

58 (Pages 229 to 232)

Page 233

1     A.    Absolutely.
2     Q.    -- in your role as a supervisor at
3    Shell, right?
4     A.    Absolutely.
5     Q.    Okay.  So why wouldn't you ask why the
6    outburst happened?
7          MR. TUCKER:  Objection, asked and
8    asked.
9          You may answer it again.
10         THE WITNESS:  I was the process
11    improvement lead at the time and when you
12    have personnel issues, it's not shared with
13    everybody.
14   BY MS. GURMANKIN:
15    Q.    Did anyone tell you that they couldn't
16   share it with you?
17    A.    No.
18    Q.    All right.  So that's not the reason
19   that you didn't ask, right?
20    A.    I already knew.
21    Q.    You didn't know why it happened, did
22   you?
23    A.    No.  I know why it can't be shared.
24    Q.    Why?

Page 234

1     A.    Because it's a situation in between a
2    supervisor and a subordinate.  It's a personnel
3    issue.
4     Q.    In your role as process improvement
5    lead, were you not allowed to know about personnel
6    issues?
7     A.    No.  Some of them are -- personnel
8    issues are personnel issues.  They have a chain of
9    command through supervisors and their reports.
10   You don't get a lot of that information.
11    Q.    Did you -- did anyone tell you that
12   they couldn't tell you why the outburst happened
13   because it was a personnel issue?
14    A.    No.
15    Q.    When you asked Steve Craig and he said
16   I can't give you details, did he tell you it's
17   because it was a personnel issue?
18    A.    When he said he couldn't give me
19   details, it was clear, based on my knowledge, that
20   it was a personnel issue and that you can't talk
21   about that stuff.
22    Q.    Did he tell you that?
23    A.    No.
24    Q.    He may not have been able to give you

Page 235

1    details because he may not have seen it, right?
2    That would be another reason why he wouldn't have
3    been able to give you details.
4          MR. TUCKER:  Objection.
5          You may answer.
6          THE WITNESS:  I can't speak to that
7    because I don't know if he did or didn't see
8    it.  I don't know.
9    BY MS. GURMANKIN:
10    Q.    Well, if he didn't see it, then that
11   could be another reason why he couldn't give you
12   details, right?
13         MR. TUCKER:  Objection, hypothetical.
14         You may answer.
15         THE WITNESS:  Yeah.  I guess if that's
16   the case.
17   BY MS. GURMANKIN:
18    Q.    Did you even ask Will Turney if -- why
19   it happened?
20    A.    No.
21    Q.    Did you ask if he saw it?
22    A.    No.
23    Q.    Other than the conversation with Steve
24   Craig that you testified to and this conversation

Page 236

1    with Will Turney that you testified to about a
2    week later, any other conversations with anyone
3    else at Shell about Jesse allegedly having an
4    outburst?
5     A.    Nope.
6     Q.    Did you ever talk to Jesse about it?
7     A.    I did not.
8     Q.    You testified that at some point, as a
9    result of you learning of her outburst, you told
10   her that she needed to make sure she controlled
11   her emotions.
12    A.    That conversation wasn't specifically
13   about the outburst.
14    Q.    What was it specifically about?
15    A.    The communication issues.
16    Q.    When did --
17    A.    She would get -- there would be some
18   anger in it and I said you can't get mad all the
19   time.  You have to control your emotions.
20    Q.    Are you referring to the second and
21   third conversations she had with you in the spring
22   of 2016 when she raised her voice and said "I'm
23   angry"?
24    A.    One of those conversations.

59 (Pages 233 to 236)

Page 237

1    Q.    In one of them she said that?
2    A.    That she was angry?
3    Q.    Yeah.
4    A.    Yeah.
5    Q.    All right.  And in one of them did she
6  raise her voice?
7    A.    Yup.
8    Q.    The same one in which she said she's
9  angry?
10    A.    From what I remember, yes.
11    Q.    All right.  And did you tell her she
12  needed to make sure to control her emotions as a
13  result of her saying in one of those meetings that
14  she was angry and she raised her voice?
15    A.    Correct.
16    Q.    Have you ever heard a male employee at
17  Shell raising their voice during your entire
18  employment?
19    A.    Yes.
20    Q.    Who?
21    A.    Wayne Fletcher.
22    Q.    Anyone else?
23    A.    Tom Underholt.
24    Q.    Underholt?

Page 238

1    A.    Uh-huh.
2    Q.    Yes?
3    A.    Yes.
4    Q.    Anyone else?
5    A.    Ricky Dake.
6    Q.    Anyone else?
7    A.    Danny Echols.
8    Q.    Anyone else?
9    A.    No.
10    Q.    Have you ever raised your voice during
11  your entire employment at Shell?
12    A.    Yes.
13    Q.    Multiple times?
14    A.    No.
15    Q.    Just once?
16    A.    Yes.
17    Q.    When?
18    A.    I don't recall a specific time.
19    Q.    Year?
20    A.    Several years ago.
21    Q.    Anyone tell you that you needed to
22  learn to control your emotions after you raised
23  your voice?
24    A.    Yes.

Page 239

1    Q.    Who?
2    A.    Craig Atkins.
3    Q.    Who is he?
4    A.    My supervisor at the time.
5    Q.    What did he say?
6    A.    That I needed to control my emotions.
7  That adding, losing my temper or even seeming like
8  it doesn't -- it closes people down and it
9  makes -- makes it hard to communicate.
10    Q.    Have you ever seen that documented
11  anywhere that you were told?
12    A.    No.
13    Q.    Wayne Fletcher, when did he raise his
14  voice that you heard?
15    A.    Last year.
16    Q.    2018?
17    A.    Yeah.
18    Q.    Multiple times or just once?
19    A.    Probably two times.
20    Q.    Anyone else around or just you and
21  Wayne?
22    A.    Me and Wayne, and I think there was
23  one more person.
24    Q.    Who?

Page 240

1    A.    John Goetsch.
2    Q.    Who's he?
3    A.    The current process improvement lead.
4    Q.    After you were promoted --
5    A.    Yeah.
6    Q.    -- he took over?
7         Where were you all the two times that
8  this happened?
9    A.    In the hallway.
10    Q.    In Wellsboro?
11    A.    Yes.
12    Q.    And what did you say to Wayne on these
13  occasions in which he raised his voice, anything?
14    A.    To -- yeah.  To calm down.
15    Q.    Uh-huh.
16    A.    And that that doesn't -- it doesn't
17  solve anything if you get frustrated and do that.
18    Q.    Did you tell him that he needed to
19  learn to control his emotions or he needed to make
20  sure he controlled his emotions?
21    A.    Yup.
22    Q.    How come you didn't just testify to
23  that when I asked you what you said?
24    A.    That he needed to calm down?

60 (Pages 237 to 240)

Page 241

1    Q.    You said that you told him he needed
2  to calm down and it doesn't help to get
3  frustrated.  You did not say that you told him he
4  needed to make sure to control his emotions.
5    A.    Those specific words?
6    Q.    Yeah.  Did you say that?
7    A.    No.  I just said that you would need
8  to calm down.  The first -- when -- the first of
9  the two that you're referring to.
10   Q.    And how about the second time, did you
11 say anything?
12   A.    The second time?
13   Q.    Yeah.
14   A.    I said, "Raised emotions don't help
15 the situation."
16   Q.    Did you tell him on either occasion
17 that he needed to make sure to control his
18 emotions?
19   A.    No.  Not those words.
20   Q.    Tom Underholt, when did he raise his
21 voice that you heard?
22   A.    2011.
23   Q.    Multiple times?
24   A.    Once.

Page 242

1    Q.    Anyone else around?
2    A.    Yeah.  There was a projects engineer.
3    Q.    Do you remember the name?
4    A.    I don't.  I don't recall.
5    Q.    Did you -- I'm sorry?
6    A.    I don't recall.
7    Q.    Did you say anything when you heard
8  Tom raise his voice?
9    A.    Yes.
10   Q.    What?
11   A.    I said, "Calm down."
12   Q.    Anything else?
13   A.    "You don't need to get so angry."
14   Q.    How come that sticks out in your mind
15 what you said in 2011?
16   A.    Because he was angry.
17   Q.    Very angry?
18   A.    He was angry.
19   Q.    Did he curse?
20   A.    No.
21   Q.    Was he yelling?
22   A.    He was visibly upset.
23   Q.    Is he the angriest that you've seen an
24 employee during your entire employment at Shell?

Page 243

1    A.    Yeah, probably.
2    Q.    Is that why that sticks out in your
3  mind, that conversation from 2011?
4    A.    Yeah.
5    Q.    Ricky Dake, when did you hear him
6  raise his voice?
7    A.    Probably a couple years ago.
8    Q.    Just once?
9    A.    Yeah.
10   Q.    Anyone else around?
11   A.    It was in an operations meeting, so
12 there was a few people around.
13   Q.    Who else?
14   A.    Operators.
15   Q.    Who?  Who?
16       MR. TUCKER:  What operators?
17       THE WITNESS:  Danny Oakes, Jeff
18 DeHaven, and Rob Skolney.
19 BY MS. GURMANKIN:
20   Q.    Did you say anything when Ricky raised
21 his voice?
22   A.    Yes.
23   Q.    What?
24   A.    I asked him to calm down and to

Page 244

1  control his emotions when he was talking.
2    Q.    You said specifically he needed to
3  control his emotions?
4    A.    Yup.
5    Q.    And this was 2016?
6    A.    Yeah.  Probably closer to 2015.
7    Q.    How come you remember that incident
8  specifically from four years ago?  Why does that
9  stick out in your mind?
10   A.    Because you asked for times.
11   Q.    Uh-huh.
12   A.    And there are not that many.
13   Q.    Well, what is it about that situation
14 that you remember exactly what you said to Ricky
15 four years ago?
16       MR. TUCKER:  Objection.  He's just
17 told you why.
18       THE WITNESS:  There weren't that many
19 times.  It's rare.
20 BY MS. GURMANKIN:
21   Q.    What's rare?
22   A.    To have that happen.
23   Q.    Employees raise their voice?
24   A.    Uh-huh.

Page 245

1      Q.     Yes?
2      A.     Yes.
3      Q.     All right.  You've told me about,
4  including Jesse, five employees who did it,
5  including Wayne who did it twice.  Each of those
6  situations sticks out in your mind because it's so
7  rare?
8      A.     Correct.
9      Q.     Do you ever document any of these
10 occasions?
11     A.     Nope.
12     Q.     Danny Echols, when did he raise his
13 voice?
14     A.     2010.
15     Q.     What was the context?
16     A.     I don't recall the details of that one
17 too much.
18     Q.     Do you recall anything?
19     A.     We had a spill.
20     Q.     I'm sorry?
21     A.     I think we just had a spill.
22     Q.     Uh-huh.
23     A.     And the reporting structure didn't
24 work right.

Page 246

1      Q.     What did he -- what did he raise his
2  voice about?
3      A.     I don't recall the details of that
4  one.  I think high level it was a lack -- we
5  didn't get a call into the DEP about the spill.
6      Q.     Did you say anything when he raised
7  his voice?
8      A.     Uh-uh.
9      Q.     No?
10     A.     (Witness nods head.)
11     Q.     You just --
12     A.     No.
13            MR. TUCKER:  Can we just stop?  I have
14 to take this call.
15            VIDEOGRAPHER:  We're now going off the
16 record at 2:18 p.m.
17                  - - -
18            (Whereupon, a recess was taken from
19 2:18 p.m. until 2:19 p.m.)
20                  - - -
21            VIDEOGRAPHER:  We're now back on the
22 record, 2:19 p.m.
23 BY MS. GURMANKIN:
24     Q.     What was the context of Ricky Dake

Page 247

1  raising his voice?
2      A.     Housekeeping.
3      Q.     What?
4      A.     Like, field housekeeping, work
5  related, making sure everybody's area is cleaned
6  up and that kind of stuff.
7      Q.     Well, what specifically led him to
8  raise his voice or what specifically did he raise
9  his voice about?
10     A.     Housekeeping.  That --
11     Q.     What did he -- I'm sorry, go ahead.
12     A.     The people needed to do better
13 housekeeping.
14     Q.     Is that why he raised his voice?
15     A.     Yes.
16     Q.     When he said that?
17     A.     Yeah.
18     Q.     Is that what he said?
19     A.     It was around cleanliness,
20 housekeeping.  I don't recall his exact words.
21     Q.     Tom Underholt, what was he -- what did
22 he raise his voice about?
23     A.     Gosh, I don't recall the exact details
24 of that one either.

Page 248

1      Q.     Do you recall any of them?
2      A.     I think it was some projects.  There
3  in the beginning of the asset there was some
4  projects communications about work being done in
5  the field, but I don't remember the details other
6  than that.
7      Q.     How about the two occasions on which
8  Wayne Fletcher raised his voice that you heard?
9      A.     Having to redo PowerPoints.
10     Q.     Both times?
11     A.     Yeah.
12     Q.     What did he say?
13     A.     He doesn't like redoing PowerPoints.
14     Q.     He said that twice?
15     A.     On different occasions, yeah.
16     Q.     He said I don't like doing -- redoing
17 PowerPoints twice in a raised voice on two
18 separate occasions?
19     A.     Yup.
20     Q.     All right.  Back to paragraph 33 in
21 Exhibit 7, second sentence.  "Blakley also" --
22            MR. TUCKER:  Bear with me one sec.
23            MS. GURMANKIN:  Sure.
24            MR. TUCKER:  Paragraph 33.

62 (Pages 245 to 248)

Page 249

1     MS. GURMANKIN:  Uh-huh.
2     THE WITNESS:  Page 11.
3     MR. TUCKER:  Go ahead.  I'm sorry.
4  BY MS. GURMANKIN:
5     Q.   "Blakley also told Plaintiff that
6  Turney was inappropriate and not qualified to be a
7  supervisor."  I'll stop there for a sec.
8     Did you tell that to Jesse?
9     A.   No.
10     Q.   At any point?
11     A.   No.
12     Q.   It goes on to say, "and that she
13  should start documenting Turney's conduct."
14     Did you tell Jesse at any point that
15  she should start documenting what Turney was
16  doing?
17     A.   No.
18     Q.   The next sentence, "Blakley
19  acknowledged that Plaintiff was the lowest-paid
20  maintenance analyst."
21     Did you ever tell Jesse that?
22     A.   No.
23     Q.   Did you believe that she was the
24  lowest-paid maintenance analyst?

Page 250

1     A.   I don't know what other maintenance
2  analysts get paid.
3     Q.   So you don't have a belief about that?
4     A.   I don't have enough data.
5     Q.   Did you believe -- did you ever
6  believe that Turney was inappropriate?
7     A.   No.
8     Q.   Did you ever believe that he was not
9  qualified to be a supervisor?
10     A.   No.
11     Q.   Did you believe that he was a good
12  supervisor based on your working with him?
13     A.   I believe he met the qualifications to
14  be a supervisor.
15     Q.   Did you believe he was a good
16  supervisor?
17     A.   What's your definition of good?
18     Q.   What's your definition of good
19  supervisor?
20     A.   He showed up every day, done his job,
21  kept everybody safe, and managed the day-to-day
22  maintenance operations.
23     Q.   So was he a good supervisor?
24     A.   In that respect, yes.

Page 251

1     Q.   Are there any respects in which you
2  did not believe that he was a good supervisor?
3     A.   No.
4                 - - -
5     (Whereupon, Exhibit 8 was marked for
6  identification by Ms. Gurmankin.)
7                 - - -
8  BY MS. GURMANKIN:
9     Q.   All right.  You're being shown what's
10  been marked as Exhibit 8.  This is Shell's Answer
11  to Jesse's Complaint.  Have you seen this before?
12
13     (Pause)
14
15     MR. TUCKER:  What's your question
16  again, Counselor?
17     MS. GURMANKIN:  Has he seen it before.
18     THE WITNESS:  I don't recall seeing
19  this.
20  BY MS. GURMANKIN:
21     Q.   All right.  Can you go to paragraph
22  32?
23     A.   What page?
24     MR. TUCKER:  12.

Page 252

1  BY MS. GURMANKIN:
2     Q.   Are you with me?
3     A.   Okay.  Yeah.
4     Q.   Okay.  Second sentence, "To the
5  contrary, Plaintiff complained that Mr. Turney was
6  a, quote, micromanager, and that she wanted to
7  perform certain tasks that he had assigned to
8  others on her team rather than the tasks she had
9  been assigned."
10     I read that correctly?
11     A.   You did.
12     Q.   Did Jesse ever complain to you that
13  Turney was a micromanager?
14     A.   Not that I recall.
15     Q.   Last sentence says, "At no time did
16  Plaintiff mention to Mr. Blakley anything about
17  issues relating to sexual harassment or
18  discriminatory treatment."
19     Is that correct?
20     A.   At no time did -- that's correct.
21     Q.   All right.  Paragraph 33, second
22  sentence, "By way of further response, Mr." -- and
23  I assume it should be Blakley -- "once suggested
24  to Plaintiff, in an effort to coach her, that she

63 (Pages 249 to 252)

Page 253

1   try to control her emotions when dealing with
2   teammates, which was in response to Plaintiff
3   yelling at two of her teammates when they made
4   minor mistakes."
5        Did I read that correctly?
6   A.   Where are you?
7   Q.   Second sentence in paragraph 33.  It
8   starts with "By way of further response."
9   A.   Oh, okay.  Go ahead.
10  Q.   "By way of further response, Mr." --
11  and I assume it should say Blakley -- "once
12  suggested to Plaintiff, in an effort to coach her,
13  that she try to control her emotions when dealing
14  with teammates, which was in response to Plaintiff
15  yelling at two of her teammates when they made
16  minor mistakes."
17       I read that correctly?
18  A.   Yes.
19  Q.   Is that true?
20  A.   Trying to control emotions is correct.
21  I don't recall yelling at her two teammates.
22  Q.   But you don't recall every knowing
23  that information; is that correct?
24  A.   Yeah.

Page 254

1        MR. TUCKER:  You asked if he recalled
2   it.  He doesn't recall it is what he said.
3        THE WITNESS:  Yes.  I don't recall.
4   BY MS. GURMANKIN:
5   Q.   I'm sorry?
6   A.   I don't recall.
7   Q.   As you sit here today, do you recall
8   ever hearing from anyone at Shell that she yelled
9   at two of her teammates at all?
10  A.   No.
11  Q.   Next sentence, "Additionally, he
12  suggested that she write down" what "she was
13  supposed to do in an effort to address her lack of
14  clear direction from Mr. Turney."
15       I read that correctly?
16  A.   Yes.
17  Q.   Is that true?
18  A.   Yes.
19  Q.   When did you tell her that?
20  A.   One of the times that I had coached
21  her on the -- when we were referencing
22  communication.
23  Q.   That's during the one to two times
24  that she spoke with you about communication issues

Page 255

1   with Turney?
2   A.   Yes.
3   Q.   Did you speak with Turney about being
4   more clear when he gave direction?
5   A.   I did.
6   Q.   Is that documented anywhere?
7   A.   No.
8   Q.   At some point you learned that Jesse
9   has made a complaint to the company, correct?
10  A.   Yes.
11  Q.   Okay.  And who do you learn that from?
12  A.   Steve Craig.
13  Q.   When?
14  A.   It would have been around the same
15  time that Megan interviewed me.  Probably just
16  before that.
17  Q.   All right.  So the date on Megan's
18  interview notes says that she interviewed you on
19  12/7/2016, and you testified that you don't have
20  any reason to dispute that.  Can you tell me about
21  how much before then Steve Craig told you that
22  Jesse had made a complaint?
23  A.   I don't recollect how much before
24  then.

Page 256

1   Q.   Do you recall if it was days or weeks?
2   A.   I don't.
3   Q.   Where were you when Steve Craig told
4   you?
5   A.   In the office.
6   Q.   Where were you specifically?
7   A.   I don't recall the specific spot.
8   Q.   But it was an in-person discussion?
9   A.   Yes.
10  Q.   What did he tell you?
11  A.   That there had been a complaint made
12  and that there would be an investigation.
13  Q.   Did he tell you that Jesse had made
14  the complaint?
15  A.   Yes.
16  Q.   Did he tell you anything about the
17  nature of the complaint?
18  A.   No.
19  Q.   After that con -- does he tell you
20  anything else in that conversation about the
21  complaint?
22  A.   Just that there would be an
23  investigation.
24  Q.   Did he tell you that you would be

64 (Pages 253 to 256)

Page 257

1   interviewed?
2       A.   As part of the investigation.
3       Q.   Yes.  Okay.  Anything else?
4       A.   I don't recall, no.
5       Q.   Between that conversation and the
6   conversation or the interview that you had with
7   Megan Kloosterman on 12/7/2016, did you talk to
8   anyone else at Shell about Jesse's complaint?
9       A.   No.
10                      - - -
11          (Whereupon, Exhibit 9 was marked for
12  identification by Ms. Gurmankin.)
13                      - - -
14  BY MS. GURMANKIN:
15      Q.   I'm showing you what's marked --
16  what's been marked as Exhibit 9, Shell 1106
17  through Shell 1110.
18          Have you seen this before today?
19      A.   No.
20      Q.   All right.  So how is it that your
21  interview is set up with Megan Kloosterman?
22          MR. TUCKER:  You mean scheduled?
23          MS. GURMANKIN:  Yeah.
24          THE WITNESS:  I want to say meeting

Page 258

1   notice.
2   BY MS. GURMANKIN:
3       Q.   I'm sorry?
4       A.   Meeting notice.
5       Q.   That she sends you?
6       A.   No.  I think Steve sent it to me.
7       Q.   Steve Craig?
8       A.   Yeah.  That I recall.
9       Q.   Before you -- and did you meet with --
10  I apologize if I asked you, but you did meet with
11  Megan in person, correct?
12      A.   Yes.
13      Q.   Before you met with her in person on
14  December 7, 2016, did you ever meet her before?
15      A.   No.
16      Q.   Had you ever spoken with her before?
17      A.   No.
18      Q.   Had you ever communicated with her
19  before?
20      A.   No.
21      Q.   Ever heard her name before?
22      A.   No.  Not that I recollect.
23      Q.   All right.  So looking back at Exhibit
24  5, the interview notes with you and Megan, how did

Page 259

1   the meeting start?  What did she say to you?
2           MR. TUCKER:  Is there a particular
3   thing you're drawing his attention to on
4   Exhibit 5 or are you just --
5           MS. GURMANKIN:  No, not yet.
6           THE WITNESS:  Can you repeat the
7   question?
8   BY MS. GURMANKIN:
9       Q.   Sure.
10          What did she say to you?  How did --
11  how did it start?  Did she explain what the
12  purpose was?
13      A.   First it was standard introduction and
14  then she did give a description of the purpose.
15      Q.   What did she say?
16      A.   That there had been a complaint that
17  she was investigating and following up on.
18      Q.   Did she tell you anything about the
19  nature of the complaint in the intro?
20      A.   I don't recall.  No, I don't recall.
21      Q.   Before you met with her, you knew that
22  she worked at Shell, right?
23      A.   Yes.
24      Q.   How did you know that?

Page 260

1       A.   When Steven told me that there was an
2   investigation, he just made the statement that HR
3   would be investigating.
4       Q.   All right.  Do you see section two
5   under questions, "Describe your working
6   relationship with Will Turney and Jesse Barnes"?
7       A.   Yeah.
8       Q.   So under that it looks like it's your
9   answer as you relayed to her.  It says, "I relieve
10  the superintendent when Steve is not here and I
11  work with Will on that level."
12          Do you remember saying something to
13  that effect?
14      A.   Yes.
15      Q.   And that's accurate?
16      A.   Yes.
17      Q.   You meant Steve Craig?
18      A.   I did.
19      Q.   And at the time Will reported directly
20  to Steve Craig?
21      A.   Correct.
22      Q.   You say, "We have a good" -- you say,
23  according to her notes, "We have a good working
24  relationship.  Open relationship.  Work with him

Page 261

1  on a daily basis, sometimes down to the hours."
2        What does that mean "sometimes down to
3  the hours"?
4        A.    Just how long -- how much I work with
5  him.  So if it was hourly, daily, weekly.  It was
6  sometimes hourly.
7        Q.    And the next paragraph, according to
8  Megan, you told her about Jesse.  "I think it's a
9  good relationship.  She has come to me before in
10  the past with other issue, for advice, and I have
11  helped her through stuff."
12        Is there anything that you meant by
13  that other than what we've already talked about?
14        A.    Yes.
15        Q.    What else?
16        A.    She came to me prior to -- when she
17  was a contractor about an alleged sexual
18  harassment issue, and I helped her through that.
19        Q.    Who was she complaining about?
20        A.    ███████
21        Q.    Anyone else?
22        A.    Not to me.
23        Q.    Did you become aware that she
24  complained to other people?

Page 262

1        A.    Yes.
2        Q.    About who?
3        A.    ███████
4        Q.    But she didn't complain to you about
5  that?
6        A.    No.
7        Q.    How did you find out that she was
8  complaining about
9        A.    We talked about it after the fact.
10        Q.    You and Jesse?
11        A.    Yeah.  After the complaint was
12  official.
13        Q.    All right.  So at some point she comes
14  to you and complains about ███████
15        A.    Correct.
16        Q.    What does she tell you about ███
17  ███
18        A.    That he had sent her some
19  inappropriate text messages and I responded, "We
20  need to turn it in."
21        Q.    She sent you the text messages?
22        A.    No.
23        Q.    She just comes to you and says he sent
24  her inappropriate text messages?

Page 263

1        A.    Yes.
2        Q.    Did she tell you inappropriate how?
3        A.    Yeah.  There were some details.
4        Q.    What did she tell you?
5        A.    He was hitting on her, flirting with
6  her, things like that.
7        Q.    Based on what she was telling you, did
8  you believe that ███████ was violating company
9  policy?
10        A.    Based off of her -- what she told me,
11  I didn't have enough to judge one way or the
12  other, I just knew it needed to be turned in.
13        Q.    Why?  Why did you come to that
14  conclusion?
15        A.    Because if there's a possibility for
16  harassment, then you have to turn it in.  There's
17  no question.
18        Q.    Okay.  That's the policy?
19        A.    Yes.
20        Q.    Because it's a zero-tolerance policy
21  at Shell?
22        A.    Yup.
23        Q.    And you were aware of that?
24        A.    Absolutely.

Page 264

1        Q.    Okay.  Who did you turn it in to?
2        A.    David Summers.
3        Q.    Who was he?
4        A.    The acting production superintendent.
5        Q.    Did you have a conversation with him?
6        A.    We did.
7        Q.    At some point does Jesse send to you
8  the text messages that ███ had sent to her that
9  she says are inappropriate?
10        A.    No.
11        Q.    Did you ever see them?
12        A.    Yes.
13        Q.    How?
14        A.    From her phone.
15        Q.    She showed you on her phone?
16        A.    Yup.
17        Q.    Other than that conversation that you
18  had with Jesse and then your subsequent
19  conversation with David Summers, did you speak
20  with anyone else about Jesse's complaint to you
21  about ███████
22        A.    David Summers asked me about it on one
23  other occasion, if I had known -- knew anything
24  else, but other than that, I did not have any

66 (Pages 261 to 264)

Page 265

1  other conversations.
2      Q.    And at some point -- when you say at
3  some point after the fact we had a conversation
4  with Jesse about
5      A.    Yes.
6      Q.    Can you tell me about that?
7      A.    After it had been turned in, she
8  initiated a conversation, asked if I knew about
9  it.  I said that I did not officially know
10 anything.
11     Q.    She asked if you knew about what?
12     A.    If I knew about the complaint against
13        .
14     Q.    And you said?
15     A.    I had not -- nobody had officially
16 said anything yet.
17     Q.    Had anyone unofficially said
18 something?
19     A.    You always have the rumor mill.
20     Q.    What did you hear in the rumor mill?
21     A.    I actually hadn't heard nothing.
22     Q.    Okay.  So you didn't hear anything
23 officially or unofficially?
24     A.    No.

Page 266

1      Q.    All right.  At some point after that
2  conversation with Jesse, do you learn anything
3  about her allegations against
4      A.    She told me about them.
5      Q.    What did she tell you?
6      A.    That he had IM'd her and approached
7  her via the IM on our computers.
8      Q.    Do you do anything with that
9  information?
10     A.    I made sure that the superintendent at
11 the time was aware of it.
12     Q.    Summers?
13     A.    Yes.
14     Q.    Did Jesse send you anything in writing
15 regarding her allegations about
16     A.    Not that I recall.
17     Q.    And her coming to you about
18        , that was after you had talked to
19 Summers about her allegations about
20     A.    No.  I think              was
21 first.
22     Q.    All right.  But you had said
23              was --
24     A.    No.

Page 267

1      Q.    -- after the fact?
2      A.    No, no.                  she --
3  everybody had been made aware of
4            .  So after the fact was -- I was made
5  aware of it after it was turned in.           I
6  went with her to turn it in.
7      Q.    Before she talks to you about
8        did you know anything about allegations she
9  was making against            ?
10     A.    That was prior to, yes.
11     Q.    Okay.  So she comes to you first about
12
13     A.    No.
14     Q.    All right.  Then you have to help me
15 out here.  I'm confused.  Go through the
16 chronology with me.
17         MR. TUCKER:  Listen -- explain -- do
18 you mind if he just explains it?
19         MS. GURMANKIN:  No.  That's fine.
20         MR. TUCKER:  Explain the order,
21 please.
22         THE WITNESS:  Timeline?
23         MS. GURMANKIN:  Yeah.
24         THE WITNESS:                    had

Page 268

1  made the IM's and she had turned it in
2  through alternate means other than myself.
3  BY MS. GURMANKIN:
4      Q.    Do you know how?
5      A.    I don't know for sure.
6      Q.    Okay.
7      A.    I heard about that after the fact or
8  after the fact that it was turned in.
9      Q.    Okay.  From whom?
10     A.    From -- yes.
11     Q.    From Jesse?
12     A.    Yes.
13     Q.    Okay.
14     A.    That had -- then after that occurred,
15 David Summers was fixing to move on and
16 was there as the field supervisor and she came to
17 me about            And we immediately turned it
18 over to the production superintendent.
19     Q.    Okay.
20              - - -
21         (Whereupon, Exhibit 10 was marked for
22 identification by Ms. Gurmankin.)
23              - - -
24 BY MS. GURMANKIN:

67 (Pages 265 to 268)

Page 269

```
 1        Q.    You are being shown what's been marked
 2   as Exhibit 10.  This is Bates stamped Shell 76
 3   through 78.  The first page is an email first that
 4   Jesse sends to you on April 12 -- 12th, 2013 and
 5   then you forward that to David Summers on that
 6   same date.
 7             Do you see that on the first page?
 8        A.    Yup.
 9        Q.    And on the second page is a statement
10   from Jesse that it appears that she signed on that
11   date.  Do you see that?
12        A.    Yup.
13        Q.    Do you remember where this came in the
14   order?
15        A.    That was -- it was after it was turned
16   in.
17        Q.    After she --
18        A.    Had told somebody that he had made
19   approaches.
20        Q.    And is this after Jesse tells us that
21   she's made complaints about          ?
22        A.    Correct.
23        Q.    Before she comes to you about ███████
24   ████
```

Page 270

```
 1        A.    Yes.
 2        Q.    Okay.
 3        A.    Yes.
 4        Q.    Do you know why she's sending this to
 5   you?
 6        A.    This was right in the very beginning,
 7   after she had told people about it, and she
 8   trusted me to do the right thing.
 9        Q.    But do you know specifically why she's
10   sending her statement to you?
11        A.    I don't recall specifically.
12        Q.    You read it when she sent it to you?
13        A.    Did I?
14        Q.    Uh-huh.
15        A.    Yes.
16        Q.    And you saw in the second paragraph
17   that she says that        flirted with her.
18             MR. TUCKER:  Where it says, "He
19        referred to me as his, quote, close
20        quote, that he flirted with"?
21   BY MS. GURMANKIN:
22        Q.    No, before then.  Do you see in the
23   fourth sentence it says, '        then over
24   communicator" -- do you see that?
```

Page 271

```
 1        A.    Yeah.
 2        Q.    -- "said that he did not want me to
 3   get mad at him, but wanted to be upfront about his
 4   marriage and his intentions on wanting to continue
 5   to flirt with me.  I then replied, quote, Wow.
 6   Well, good luck with that.  He persistently tried
 7   communicating with me throughout the day in fear I
 8   may be mad at him.  He stated, quote, cat got my
 9   tongue if I did not respond.  I tried my best not
10   to communicate with him because of
11   position within the company.  I was afraid that I
12   may anger him by not replying.  He referred to me
13   as his, quote, friend that he flirted with."
14             You saw that when you read it?
15        A.    This was the IM initially.
16        Q.    Right.  But you saw that in her
17   statement when you got it?
18        A.    Uh-huh.
19        Q.    When she sent it to you, yes?
20        A.    Uh-huh.
21        Q.    Right?
22        A.    Correct.
23        Q.    Did you talk to anyone about it?
24        A.    This statement?
```

Page 272

```
 1        Q.    Yeah.
 2        A.    No.
 3        Q.    At any point?
 4        A.    Not that I recall.
 5        Q.    To your knowledge, was there an
 6   investigation conducted into Jesse's allegations
 7   about ███████ and                 ?
 8        A.    To my knowledge, yes.
 9        Q.    And how did you find out about it?
10        A.    David Summers --
11        Q.    He told you?
12        A.    -- said that -- said there would have
13   to be an investigation.
14        Q.    Was there an investigation, to your
15   knowledge?
16        A.    Other than David Summers telling me
17   there would be one, I don't know.
18        Q.    ███████ was a field supervisor at
19   that point?
20        A.    He was.
21        Q.    And          do you know
22   what position he was in?
23        A.    He was also a field supervisor.
24        Q.    Do you know if ███████ was promoted
```

Page 273

1    at any point after these allegations?

2    A.    He was.

3    Q.    To what?

4    A.    Production superintendent.

5    Q.    When was that?

6    A.    Probably around the beginning of 2014.

7    Q.    To your knowledge, was

8            promoted at any point after these

9    allegations?

10    A.    No.

11    Q.    You don't know?

12    A.    To my knowledge, no.

13    Q.    Did you have any concerns when you

14    heard that ██████ was promoted, given the

15    allegations that Jesse had made?

16    A.    No.

17    Q.    How come?

18    A.    It was after the fact and I just

19    didn't think about it.

20    Q.    Any other conversations that you had

21    with Jesse or David Summers or anyone else from

22    the company about her allegations regarding ██ or

23    ██████ other than what we talked about?

24    A.    Not that I recall.

Page 274

1    Q.    Did you ever follow up with anyone to

2    see if the company took any action against ██ and

3    ██████ in connection with Jesse's

4    allegations?

5    A.    No.

6    Q.    Are they both still employed?

7    A.    No.

8    Q.    When did ██ leave?

9    A.    2014.

10    Q.    Do you know why?

11    A.    I don't.

12    Q.    Do you know whether he resigned or was

13    terminated?

14    A.    No.

15    Q.    How about ██████, is he still

16    there?

17    A.    No.

18    Q.    When did he leave?

19    A.    Probably around 2015.

20    Q.    Do you know why?

21    A.    I don't.

22    Q.    Do you know whether it was a

23    resignation or a termination?

24    A.    I don't know that either.

Page 275

1    Q.    How did you know that they both left?

2    A.    There was announcements.

3    Q.    About both of them?

4    A.    Yes.

5    Q.    Do you remember what they said?

6    A.    It was a standard community meeting

7    that ██████ would no longer -- was no longer

8    employed for Shell, and that they would be looking

9    for his backfill.

10    Q.    At some point was there a similar

11    announcement about ██████?

12    A.    Yes.

13    Q.    All right.  Going back to the

14    interview notes about your meeting with

15    Kloosterman, is there anything else that you were

16    referencing when you told Kloosterman that Jesse

17    had come to you before in the past with other

18    issues for advice and I have helped her through

19    stuff?

20    MR. TUCKER:  I'm sorry.  Can we start

21    that over again?  Can you just read that

22    back?

23    MS. GURMANKIN:  Sure.  I'll do it

24    again.

Page 276

1    MR. TUCKER:  Okay.

2    BY MS. GURMANKIN:

3    Q.    Is there anything else other than what

4    we just talked about with ██████ and ██ and

5    the other issues we talked about with what Jesse

6    spoke to you about in 2016 that you meant her when

7    you told Kloosterman, according to her notes, that

8    Jesse had comes to you before in the past with

9    other issues for advice and you have helped her

10    through stuff?

11    A.    Not that I recall.

12    MR. TUCKER:  I'm sorry, Counsel.  What

13    exhibit number is Kloosterman?  That's where

14    I'm lost.

15    MS. GURMANKIN:  Five.

16    MR. TUCKER:  That's where I'm lost.

17    MS. GURMANKIN:  Oh, sure.

18    MR. TUCKER:  Now, what page number on

19    Kloosterman were you referring to?

20    MS. GURMANKIN:  One.

21    BY MS. GURMANKIN:

22    Q.    To your knowledge, Mr. Blakley, do you

23    know if anybody got back to Jesse regarding

24    anything that was done in connection with her

69 (Pages 273 to 276)

Page 277

```
 1   allegations about ███████ and ████████
 2       A.   Not to my knowledge.
 3       Q.   Did you ever follow up with anyone at
 4   the company to see if anything was done regarding
 5   her allegations about ████ and ████████?
 6       A.   No.
 7       Q.   Okay.  Under Perceptions of the
 8   Team/Work Environment -- do you see where I am?
 9       A.   Yes.
10       Q.   Second sentence Kloosterman writes,
11   "In some cases I see Jesse has issues with some of
12   the schedulers.  It seems like there's always a
13   rift between Dan/Jesse."
14           Is that what you told Kloosterman?
15           MR. TUCKER:  I'm having trouble
16   keeping up.  You're on Exhibit 5 -- you're
17   Exhibit 5, what page?
18           MS. GURMANKIN:  Page one.
19           MR. TUCKER:  Page one still.  Okay.
20   And could you tell me exactly where you just
21   read from, Counsel?
22           MS. GURMANKIN:  Yeah.  Under
23   Perceptions of the Team/Work Environment,
24   second sentence.
```

Page 278

```
 1           MR. TUCKER:  Okay.  I got it.  Thank
 2   you.
 3           MS. GURMANKIN:  Uh-huh.
 4           THE WITNESS:  So your question was
 5   around what again?
 6   BY MS. GURMANKIN:
 7       Q.   Was that what you told Kloosterman,
 8   that Jesse has issues with some of the schedulers?
 9       A.   Yes.  Yes.
10       Q.   Did you mean anyone other than Dan
11   Krise?
12       A.   Dan Krise?
13       Q.   Krise.
14       A.   That's who I was referring to.
15       Q.   And he was a scheduler at the time?
16       A.   Yes.
17       Q.   Is what you told Kloosterman here
18   based on Jesse's complaints to you about Dan?
19       A.   Yes.
20       Q.   Was it based on anything other than
21   Jesse's complaints to you about Dan?
22       A.   No.
23       Q.   Did you tell Kloosterman what she
24   writes here, "I don't know why, but they don't get
```

Page 279

```
 1   along"?
 2       A.   Yes.
 3       Q.   Would she -- she goes on to write,
 4   "The team as a whole isn't too bad.  In the past I
 5   have tried to coach Will to get higher up than he
 6   was.  Trying to be friends.  Too chummy maybe with
 7   the employees."  I'll stop there for a sec.
 8           Did you tell her that?
 9       A.   Yes.
10       Q.   What did you mean by that?
11       A.   There should be a bit of a separation
12   in between a supervisor and employee.  Sometimes a
13   supervisor can get, like I said, to be friends
14   with employees; and then when you have to be a
15   supervisor, it makes it more difficult.
16       Q.   And did you think that was an issue
17   with Turney's supervising?
18       A.   I wouldn't go -- I wouldn't say that
19   it was an issue, it just was an improvement
20   opportunity.
21       Q.   Well, according to Kloosterman's
22   note --
23           MS. GURMANKIN:  Bless you.
24           MR. TUCKER:  Thank you.
```

Page 280

```
 1   BY MS. GURMANKIN:
 2       Q.   You said that you tried to get --
 3   you've tried to coach Will to get up higher than
 4   he was.  Trying to be friends.  Too chummy maybe
 5   with the employees.
 6           Did you think that Will was too chummy
 7   with his employees at this point?
 8           MS. GURMANKIN:  Bless you.
 9           MR. TUCKER:  Thank you.
10           THE WITNESS:  I think there were
11       examples that I had seen and when I was
12       trying to coach him there were just examples
13       of that I could reference where he needed to
14       get up a little bit higher.
15   BY MS. GURMANKIN:
16       Q.   Who did you think he was too chummy
17   with?
18       A.   I don't know that there was any one in
19   particular person.  It was more of a philosophy.
20       Q.   I'm not sure I understand that.  Can
21   you explain it?
22       A.   When you try to be a good leader, you
23   try to know your employees and know their -- know
24   their wives, know their children, things of that
```

70 (Pages 277 to 280)

Page 281

```
 1    nature, to have a connection.  Sometimes if
 2    there's -- there's a -- there should be an
 3    opportunity to draw a line there where -- where
 4    there's still a border in between employee and
 5    supervisor.  So too chummy was just a high level
 6    phrase that I used to say, you know, if you're --
 7    get too close to employees, then it's difficult to
 8    be a supervisor.
 9         Q.    All right.  But you didn't think that
10    Will was too chummy with any actual employees as
11    of this time?
12         A.    It was just a philosophy that he used
13    that I was referencing --
14         Q.    And it --
15         A.    -- not any one person.
16         Q.    Okay.  And how was that -- how did --
17    how was that demonstrated, his philosophy that he
18    was -- or your opinion that his philosophy was
19    that he was too chummy with his employees?
20         A.    How was that demonstrated?
21         Q.    Uh-huh.  What led you to conclude that
22    there was a philosophy?
23         A.    Well, if I sat in meetings, you know,
24    there was maybe some joking or some stuff like
```

Page 282

```
 1    that.
 2         Q.    What other stuff like that?
 3         A.    Stuff like joking?
 4         Q.    Yeah.
 5         A.    Or -- yeah, mainly it's joking in some
 6    of the conversations or -- have -- expecting
 7    people to do stuff without having that supervisor
 8    I-need-you-to-do-it-type attitude.  You know, like
 9    he'll do it just because, you know, there's got to
10    be expectations set, things like that.
11         Q.    Anything else?
12         A.    Not that I recall.
13         Q.    And who did you hear him doing this
14    stuff with?
15         A.    The maintenance group.
16         Q.    Who?
17         A.    Luke, Brian, Ken -- Ken Foreman
18    sometimes.  Even -- even Jesse in the maintenance
19    meetings.
20         Q.    Anyone other than Luke, Brian, Ken
21    Foreman, and Jesse?
22         A.    Eric Pequignot.
23         Q.    I'm sorry?
24         A.    Eric Pequignot.
```

Page 283

```
 1         We'll have to do that name later.
 2         And Ken Phelps.
 3         Q.    Were those all of his direct reports?
 4         A.    Yeah.
 5         Q.    So you thought he did it with all of
 6    his direct reports?
 7         A.    Say that again.
 8         Q.    You thought he did this with all of
 9    his direct reports that led you to conclude --
10         A.    Yup.
11         Q.    -- that he was too chummy with his
12    employees?
13         A.    Yeah.
14         Q.    Okay.  Luke's last name?
15         A.    I'm trying to remember.
16         I don't remember Luke's last name.
17         Q.    Male?
18         A.    Yes.
19         Q.    Brian, his last name?
20         A.    He doesn't work there either.  I don't
21    remember his last name.  I can see his face, but I
22    can't remember his last name.
23         Q.    All right.  Also male?
24         A.    Yes.
```

Page 284

```
 1         Q.    Other than Luke, Brian, Ken Foreman,
 2    Jesse, Eric Pequignot, and Ken Phelps, did Turney
 3    have any other direct reports as of 2016?
 4         A.    Yeah.
 5         Q.    Who else?
 6         A.    I don't know.  I'm not even -- I'm not
 7    going to try to name them all.  I mean, there
 8    was -- there was a number of people that was
 9    direct reports over him.  If I even tried -- I
10    mean, there was probably 20 people that reported
11    to him.
12         Q.    Anyone else that you can think of?
13         A.    Calvin Flynn.
14         Q.    Was Shane Solinger another one?
15         A.    No.  Shane never reported to him.
16         Q.    Dan Krise?
17         A.    Yes.
18         Q.    Mark Hoover?
19         A.    No.
20         Q.    Anyone else?  Matt Empsen?
21         A.    No.
22         Q.    Jeremy Greene?
23         A.    Yeah, I think Jeremy did at the time.
24         Q.    Anyone else that you can think of?
```

71 (Pages 281 to 284)

Page 285

1   A.   No.  I can't recollect anybody else.
2   Q.   Okay.  Back to Exhibit 5.  Last
3  sentence in that paragraph that we were looking
4  at.  "On a regular basis - with Dan, I think it's
5  a personality conflict."
6       Were you relating to Megan that you
7  thought the issues that Jesse was complaining
8  about with Dan were personality conflict?
9   A.   Yes.
10   Q.   And what was your basis for believing
11  that it was a personality conflict?
12   A.   Some of the prior complaints that she
13  had talked to me about as far as like stinking,
14  those kind of things.  It's not work related.
15   Q.   But that's not a personality conflict
16  as much as she thought he smelled, right?
17   A.   It probably should say personal
18  conflict.
19   Q.   Okay.  Is that what you believe?
20   A.   That's what I meant.
21   Q.   Did you tell Megan that Jesse's
22  complaints about Dan were that he was stinky and
23  that his leek dip that he brought in smelled?
24   A.   I don't recall if I went into detail

Page 286

1  like that.  Into that detail.
2   Q.   All right.  Under section a., the
3  question at the bottom of the first page.  It
4  says, "Jesse shared that you have coached her to
5  control her temper.  Can you share details on
6  this?"
7       And she relates that you said, "She
8  has come to me when she had issues with Will.  She
9  was upset because he would just tell her things
10  that were wrong.  She got so angry one time that
11  she got sent home to take a break."  I'll stop
12  there for a sec.
13       Did you tell Kloosterman that Jesse
14  got so angry one time that she got sent home to
15  take a break?
16   A.   Yeah.
17   Q.   And was that in connection with Steve
18  Craig telling you that --
19   A.   Correct.
20   Q.   -- that he sent her home after her
21  outburst?
22   A.   Yeah.
23   Q.   Did you tell Kloosterman that you had
24  no personal knowledge of that?

Page 287

1   A.   I don't recall if I went into that
2  much detail.
3   Q.   Did you go into any details?
4   A.   Other than what's written here, I
5  don't remember.
6   Q.   And you don't remember telling
7  Kloosterman that you had no personal knowledge of
8  that?
9   A.   Right.
10   Q.   Do you remember if she actually asked
11  you what Jesse got so angry about one time that
12  she got sent home to take a break?
13   A.   I don't know that I remember she even
14  asked me.
15   Q.   It goes on to say, "She was so angry
16  she was crying when talking to me."
17       Did you tell Kloosterman at one point
18  that Jesse was so angry when she was talking to
19  you that she was crying?
20   A.   In one of those conversations that we
21  previously discussed, she did have some tears, so
22  I used the word crying.
23   Q.   Okay.  And that was part of your basis
24  for saying that Jesse was angry in those meetings,

Page 288

1  that she had tears in her eyes?
2   A.   That she was angry, yeah.  And that
3  she had said she was angry at one time.
4   Q.   But also the fact that she had tears
5  in her eyes?
6   A.   Yeah.
7   Q.   Was that in the second or third
8  meeting or another one?
9   A.   Probably the -- I don't -- I don't
10  remember which one for sure.
11   Q.   Okay.  Either the second or the third?
12   A.   Yeah.
13   Q.   Any reason when I asked you earlier
14  the basis for your concluding that Jesse was angry
15  that you didn't tell me that she had tears in her
16  eyes?
17   A.   No basis.
18   Q.   Did you just forget about that?
19   A.   Yeah.
20   Q.   It goes on to say, "Coaching was to
21  try not to cry."
22       Did you tell Jesse to try not to cry?
23   A.   Yes.
24   Q.   Did you ask her what made her so upset

72 (Pages 285 to 288)

Page 289

1    that she actually had tears in her eyes?
2       A.    The conversation was around her
3    struggling with not knowing what to do in some of
4    her job.
5       Q.    But did you ask her what about that
6    made her so angry that she had tears in her eyes?
7       A.    I didn't --
8       MR. TUCKER:  Objection.  He just
9    answered that.
10   BY MS. GURMANKIN:
11      Q.    What's your answer?
12      A.    I didn't ask her.
13      Q.    How come?
14      A.    I didn't -- it didn't cross my mind to
15   ask her.
16      Q.    Kloosterman goes on to write, "If she
17   doesn't understand something, make sure she
18   understands it and be clear.  Participate in
19   meetings.  She doesn't participate in much."
20         Did you tell Kloosterman that Jesse
21   didn't participate in many meetings?
22      A.    Yes.
23      Q.    Did you think that was a deficiency of
24   some kind on Jesse's part?

Page 290

1      A.    Yes.
2      Q.    Did you document that at any point?
3      A.    No.
4      Q.    How come?
5      A.    How come it was a deficiency?
6      Q.    No.  Why didn't you document that at
7    any point?
8      A.    It was things that I noticed in
9    meetings that she was supposed to be in to provide
10   data or to be getting information from and she
11   wasn't in the meetings, but she wasn't a direct
12   report of mine, so it would be nothing that I
13   would document.
14      Q.    But you only documented stuff
15   regarding your direct reports?
16      A.    If it was needed.
17      Q.    How did you determine whether it was
18   needed?
19      A.    Based on the situation.
20      Q.    What meetings did you notice that
21   Jesse wasn't in that you thought she should have
22   been in?
23      A.    The morning maintenance meetings.
24      Q.    How often do they occur?

Page 291

1      A.    Every morning.
2      Q.    And how often did she miss them?
3      A.    Most of the time.  You --
4      Q.    Four out of five times a week?
5      A.    Probably three out of five.
6      Q.    Three out of five.  Starting when?
7      A.    The beginning of that year, 2016,
8    2017.  2016.
9      Q.    Did she continue to miss three out of
10   five morning maintenance meetings throughout the
11   rest of 2016?
12      A.    Yes.  And sometimes more.
13      Q.    Sometimes?
14      A.    Missed -- missed safety meetings as
15   well.
16      Q.    Well, let's stick with the morning
17   maintenance meetings.  Sometimes she missed, what,
18   four out of five or five out of five?
19      A.    Sometimes four out of five.
20      Q.    Ever five out of five?
21      A.    Not that I recall.
22      Q.    So was -- every week was it either
23   three out of five or four out of five that she
24   missed?

Page 292

1      A.    Yes.
2      Q.    Okay.  Did you ever talk to anyone
3    about that?
4      A.    Yes.
5      Q.    Who?
6      A.    Her.
7      Q.    Why?
8      A.    I had conversations with her about and
9    during the one coaching she needed to make sure to
10   attend the meetings.
11      Q.    Did you ask her why she missed three
12   out of five or four out of five?
13      A.    I did ask her one time, yes.
14      Q.    When did you ask her?
15      A.    In that coaching -- the same coaching
16   conversations that we had when she was angry.
17      Q.    So the spring of 2016?
18      A.    Yeah.
19      Q.    And what did she say?
20      A.    She was angry because she was having
21   communication issues and did not -- when she was
22   having issues with her work and the lean
23   continuous improvement and all the communication
24   issues with Will.

Page 293

1    Q.    Well, did she tell you that's why she
2  had -- she missed three out of five or four out of
3  five?
4    A.    Because she was angry, frustrated.
5    Q.    Wait.  Hold on a second.  Let me just
6  get my question.
7          When you coached her in the spring of
8  2016 about missing three out of five or four out
9  of five morning maintenance meetings, did she tell
10  you that she missed the meetings because she was
11  angry and frustrated?
12    A.    Yes.
13    Q.    And did you say anything in response?
14    A.    I was coaching her on getting past
15  that anger and frustration, working on the
16  communication to be able to get through that
17  stuff.
18    Q.    You were not her direct supervisor at
19  the time you're giving her the coaching, right?
20    A.    That's correct.
21    Q.    Did you coach Turney to have a
22  conversation with her about her missing three out
23  of five or four out of five morning maintenance
24  meetings?

Page 294

1    A.    Yes.
2    Q.    When?
3    A.    Around that same time.
4    Q.    And what did he say?
5    A.    He was going to have a conversation
6  with her.
7    Q.    Did he tell you that he also noticed
8  that she missed three out of five or four out of
9  five morning maintenance meeting?
10    A.    He was aware of her attendance record,
11  yes.
12    Q.    Did you ask him if he had addressed
13  this with her?
14    A.    When we had the conversation he was
15  still preparing to.
16    Q.    So you had this conversation with him
17  around the same time you talked to Jesse.  So
18  sometime around spring of 2016?
19    A.    Yup.
20    Q.    And this is something you had noticed
21  since the beginning of 2016, right?
22    A.    Yeah.
23    Q.    So we're talking at least a few months
24  after you first noticed this?

Page 295

1    A.    Correct.
2    Q.    And Turney tells you that he had also
3  noticed this?
4    A.    Uh-huh.
5    Q.    Yes?
6    A.    That's correct.
7    Q.    And did he tell you why a few months
8  in he was still preparing to talk to her about
9  this?
10    A.    He did not.
11    Q.    Did you ask?
12    A.    So there had been some smaller -- he
13  had said that there had been some smaller
14  conversations about this, but I didn't have the
15  details of those conversations.
16    Q.    So he had told you that he had
17  previously addressed her missing three out of five
18  or four out of five morning maintenance meetings
19  with her at the time that you speak to him about
20  this in the spring of 2016?
21    A.    He didn't say addressed, that he had
22  had some prior conversations.
23    Q.    About her missing these meetings?
24    A.    Yes.

Page 296

1    Q.    And did he tell you what her response
2  was?
3    A.    He didn't.
4    Q.    Did you ask him?
5    A.    No.
6    Q.    Why?
7    A.    I was just providing some coaching is
8  all.
9    Q.    But in your providing coaching, didn't
10  you -- why wouldn't you ask him how the
11  conversation went when he talked to Jesse about
12  this?
13    A.    When I was providing the coaching,
14  there was -- it was more of a high level, have you
15  had the conversation.
16    Q.    Right.  And he said yeah.
17    A.    (Witness nods head.)
18    Q.    And wouldn't part of your coaching be
19  to tell me how it went so I can further coach you
20  in how to do this effectively?
21    A.    When we had the conversation, it was
22  conversation about coaching to show up at the
23  meetings, but the details as why they didn't -- or
24  why she didn't attend the meetings wasn't part of

Page 297

1    it.  So having a conversation -- coaching the
2    conversation was what I was doing, not the content
3    of it.
4         Q.    So really all you were doing was
5    coaching him to have the conversation, right?
6         MR. TUCKER:  Objection.
7         You can answer.
8         THE WITNESS:  I was providing coaching
9    about having -- making sure that she had
10    showed up to the meetings and then making
11    sure that he was having those conversations.
12    BY MS. GURMANKIN:
13        Q.    Right.  And he told you -- at the time
14   that you're doing this coaching in the spring of
15   2016, he tells you that he's already had
16   conversations with her about her missing meetings,
17   right?
18        A.    Yes.
19        Q.    So is there any other coaching that
20   you did at that point?
21        A.    To make sure to keep having
22   conversations with her if there was still an
23   issue.
24        MR. TUCKER:  Now I have my first after

Page 298

1    lunch bathroom break.
2         MS. GURMANKIN:  Okay.
3         VIDEOGRAPHER:  This will conclude file
4    number four of the videotaped deposition of
5    Hondo Blakley in the matter of Jesse Barnes
6    v. Shell, et al.
7         We're going off the record at 3:12
8    p.m.
9              - - -
10        (Whereupon, a recess was taken from
11   3:12 p.m. until 3:24 p.m.)
12             - - -
13        VIDEOGRAPHER:  This will begin file
14   number five in the videotaped deposition of
15   Hondo Blakley in the matter of Jesse Barnes
16   v. Shell, et al.
17        We are going back on the record at
18   3:24 p.m.
19   BY MS. GURMANKIN:
20        Q.    Jesse also missed safety meetings?
21        A.    Yes.
22        Q.    How often were safety meetings?
23        A.    I don't recall ever seeing her at one.
24        Q.    How often did safety meetings happen?

Page 299

1         A.    Once a month.
2         Q.    And from -- did they -- were they
3    happening in 2015?
4         A.    Yes.
5         Q.    Was she there in 2015?
6         A.    Yes.
7         Q.    Okay.
8         A.    It was the later time.
9         Q.    Did they happen in 2016?
10        A.    They always happen.
11        Q.    Okay.  Did she show up for any in
12   2016?
13        A.    Yup.  It was in two-thousand -- into
14   2017, 2018 when she started not showing up, to the
15   best of my recollection.
16        Q.    And did you speak to anyone as to your
17   observation that she wasn't showing up to safety
18   meetings at the end of 2017, 2018?
19        A.    No.
20        Q.    Did you talk to her about it?
21        A.    No.
22        Q.    But as it relates to what Kloosterman
23   writes that you're relaying to her on Exhibit 5,
24   that she doesn't participate in much, were you

Page 300

1    just referring to the morning maintenance
2    meetings?  Because this interview was on
3    12/7/2016.
4         A.    Yes.
5         Q.    Did Kloosterman ask you what you were
6    referring to when you said, "she doesn't
7    participate in much"?
8         A.    Yes.
9         Q.    And you told her morning maintenance
10   meetings?
11        A.    Correct.
12        Q.    And you told her that she didn't show
13   up three out of five or four out of five times?
14        A.    Three out of five times.
15        Q.    Did you ever tell her it was four out
16   of five times?
17        A.    Not that I recall.
18        Q.    But you remember telling Kloosterman
19   that in this interview?
20        A.    Three out of five?
21        Q.    Yes.
22        A.    Yeah.
23        Q.    Anything else you told her about Jesse
24   not participating in much other than three out of

75  (Pages 297 to 300)

1  five morning maintenance meetings?
2      A.    Not that I recall.
3      Q.    And did you also tell Kloosterman that
4  that was the case throughout all of 2016?
5      A.    I don't recall that.
6      Q.    At the end of page one, the last
7  sentence it says, "We were talking" and then going
8  onto page two, "about the SPS and trying to get
9  people to give feedback, and she was on her phone
10 the whole time."
11          Do you see that?
12     A.    I do.
13     Q.    When was this?
14     A.    It would have been October, end of --
15 it would have been around September, October.
16     Q.    2016?
17     A.    Yeah.
18     Q.    Was this during a meeting?
19     A.    It was.
20     Q.    A morning maintenance meeting or
21 another meeting?
22     A.    No.  It was a Shell People Survey
23 report out.
24     Q.    And who was in the meeting?

1      A.    The operations personnel.
2      Q.    About how many people?
3      A.    Probably 50 or 60.  Well, it was just
4  operations, 50.
5      Q.    Where was it?
6      A.    In the conference room 108.
7      Q.    Where was Jesse sitting?
8      A.    In the back of the room.
9      Q.    In the last row?
10     A.    Yeah.  There's not really rows, but it
11 was in the back of the room compared to where
12 the -- where the speaker was.
13     Q.    Where were you sitting?
14     A.    I was at the front of the room.
15     Q.    So about how many people are between
16 the two of you?
17     A.    Probably 20, 25.
18     Q.    And when you say she was on her phone
19 the whole time, was she talking?
20     A.    No.  It was like this (indicating).
21 Scrolling.
22     Q.    All right.  So you've got your phone
23 in front of you and you're saying Jesse was
24 scrolling on her phone the whole time?

1      A.    Correct.
2      Q.    Were you watching her the whole time?
3      A.    Just obser -- room observation as you
4  are sitting there looking for participation or
5  lack thereof, you just -- it's an observation.
6      Q.    Were you watching her the whole time?
7      A.    Not the whole time.
8      Q.    All right.  So how did you know that
9  she was on her phone the whole time?
10     A.    Every time I observed, it was the
11 same.
12     Q.    But you weren't watching her the whole
13 time, right?
14     A.    Every time I observed her, she was on
15 her phone.
16     Q.    Is it accurate -- was it accurate to
17 say that she was on her phone the whole time?
18     A.    Based on my observations, I would
19 still say yes.
20     Q.    Were you observing her the whole time?
21     A.    Not the whole time, but if you scroll
22 your eyes this way and you scroll your eyes back
23 that way, you're talking seconds.
24     Q.    When you scrolled your eyes away from

1  her, could you tell whether she was on her phone
2  or what she was doing?
3      A.    No.
4      Q.    Did you speak with Turney about what
5  you observed during that meeting?
6      A.    No.
7      Q.    How come?
8      A.    Never came up.
9      Q.    Well, why didn't you bring it up?
10     A.    I never thought to bring it up.
11     Q.    Did you tell anyone this before you're
12 having this interview with Kloosterman?
13     A.    Not that I recall.
14     Q.    Next paragraph on page two, "Some
15 conversations I've had with Will is you need to
16 help her more.  His response is I might have done
17 it myself."
18          What did -- what did that mean?
19     A.    That's -- I don't know.
20     Q.    Well, do you remember him saying that
21 to you?
22     A.    I don't know what "I might have done
23 it myself" means.  It has to be a typo of some
24 sort.  It doesn't -- it doesn't make sense in the

Page 305

1 sentence.
2      Q.    Do you remember what you said to
3 Kloosterman about conversations you've had with
4 Will about needing to help Jesse more?
5      A.    So this -- this was around the
6 communication.
7      Q.    Uh-huh.
8      A.    And it was part of the statement say
9 repeat to me the direction or what I want you to
10 do so you -- so I know you understand it.  So it
11 was around that communication, trying to improve
12 that communication.
13      Q.    The next paragraph, it says, "I see a
14 lot of banter back and forth, joking, friendly."
15            Did you tell that to Kloosterman?
16      A.    Yes.
17      Q.    Did you use the term "banter" with
18 her?
19      A.    Yes.
20      Q.    What did you mean by that?
21      A.    Back and forth jokes.
22      Q.    What kind of jokes?
23      A.    Simple -- simple banter back and
24 forth.

Page 306

1      Q.    What kind of banter would you hear?
2      A.    There was some stuff about, if I
3 remember looking down through, she had bought a
4 Jeep.  So there was some banter back and forth
5 about the Jeep.
6      Q.    What was said about the Jeep that was
7 banter?
8      A.    It was different than the other
9 vehicle she was driving, so it was like, you know,
10 if she could drive it or not, ever drove a Jeep,
11 things like that.  Because it was from a car to an
12 SUV.
13      Q.    Any other banter that you were
14 referring to?
15      A.    It was all pretty much stuff like
16 that.
17      Q.    Anything else other than banter about
18 the Jeep?
19      A.    She would bring up stuff about her
20 boyfriends, making fun of them from time to time.
21 That was part of the banter.
22      Q.    Any other banter that you referred to?
23      A.    Yeah.  That -- that.
24      Q.    Any other banter?

Page 307

1      A.    Not that I recall.
2      Q.    You said banter back and forth.  Who
3 was giving it back and forth?
4      A.    You know, from -- like, from Jesse to
5 Will or Jesse to Mark.
6      Q.    And what would Turney say that was
7 banter that you were referring to when you told
8 Kloosterman there was a lot of banter back and
9 forth?
10      A.    What would he say?
11      Q.    Yeah.  What did Will say that was
12 banter that you referred to when you told it to
13 Kloosterman?
14      A.    So for one, she had a boyfriend and a
15 fancy bracelet and he -- she said something about
16 the bracelet, and he asked where it came from, and
17 she said, "My boyfriend.  That's all they're good
18 for."  And he said, "That's all who's good for?"
19 She said, "My boyfriends, to buy me jewelry."
20      Q.    Any other banter that Will Turney
21 engaged in?
22      A.    Not that I recall.
23      Q.    What banter did Mark Hoover engage in?
24      A.    Oh, they were talking back and forth

Page 308

1 about -- I think it was about -- it was the one
2 about the Jeep and the car.
3      Q.    What did Hoover say that you
4 classified as banter?
5      A.    He wanted to know if she knew how to
6 drive a Jeep.
7      Q.    And why did you classify that as
8 banter?
9      A.    It's harm -- it's harmless, in my
10 view, when you ask somebody if they know how to
11 drive something.  And that's kind of what I'm
12 referring to as banter, just back and forth.
13      Q.    You meant banter means harmless back
14 and forth comments?
15      A.    Yeah.
16      Q.    Any other banter that Hoover engaged
17 in?
18      A.    Not that I recall.
19      Q.    All right.  Under the next header,
20 Inappropriate, Kloosterman writes, "There was a
21 statement made whether her boyfriend gave her
22 permission."
23            Did you tell -- did you say that to
24 Kloosterman?

77 (Pages 305 to 308)

Page 309

1    A.    Say that again.
2    Q.    You see under the Inappropriate
3  header --
4    A.    Oh, yeah.
5    Q.    -- it says, "There was a statement
6  made about whether her boyfriend gave her
7  permission."
8          Did you say something like that to
9  Kloosterman?
10   A.    Yes.
11   Q.    And what did that refer to?
12   A.    I think if -- it was around -- it was
13 around the Jeep that she bought, if she had gotten
14 permission to buy the Jeep.
15   Q.    From her boyfriend?
16   A.    Uh-huh.
17   Q.    Yes?
18   A.    Yes.
19   Q.    Who said that?
20   A.    I don't recall who said it.
21   Q.    Next paragraph it says, "Getting
22 Hired.  Will pushed for her to get hired.  She
23 showed ability to get hired.  To be honest, I
24 think she is one of the sharpest employees as far

Page 310

1  as ability, but she lacks energy/motivation for
2  some reason."  I'll stop there for a sec.
3          What was your basis for saying --
4  well, strike that.
5          Did you tell Kloosterman that you
6  thought she lacked energy/motivation?
7    A.    Yes.
8    Q.    And what was your basis for that?
9    A.    Just prior engagements before this
10 interview.
11   Q.    I'm sorry.  I didn't understand that.
12   A.    Prior engagements.  All the
13 conversations and stuff that I had been a part of
14 before this interview.  There was a lot of issues
15 around that.
16   Q.    What engagements are we talking about?
17   A.    Well, if I think about some of the
18 coaching conversations that I've had or further up
19 with like missing some meetings and -- and that
20 kind of stuff, there was --
21   Q.    Wait.  You mean your engagement with
22 Jesse?
23   A.    A few of them, yes.
24   Q.    All right.  So you determined that she

Page 311

1  lacked energy and motivation based on your
2  interactions with her, is that what you're saying?
3    A.    It was a mixture of my interactions
4  plus group interactions.
5    Q.    It goes on to say, "She was angry
6  about the woman statement, parens, getting paid
7  well."
8          Did you tell Kloosterman that Jesse
9  was angry about that statement?
10   A.    Yes.
11   Q.    And what was that statement?
12   A.    So she had told me that she had gotten
13 told that she -- to the best of my recollection,
14 made good money for where -- for being a female.
15   Q.    When did she tell you that?
16   A.    In one of our conversations.
17   Q.    Is this in the spring 2016 time
18 period?
19   A.    Yeah.
20   Q.    Did you document that?
21   A.    No.
22   Q.    Did you report it to anyone at the
23 time?
24   A.    No.

Page 312

1    Q.    How come?
2    A.    Because I didn't know if it was true
3  or not and I never thought about reporting it.
4    Q.    Well, did she give you any reason to
5  doubt that she was telling the truth?
6    A.    No.
7    Q.    Did you ask her who said it?
8    A.    She told me that Will had said it.
9    Q.    Did you ask Will if it was true?
10   A.    I don't recall if I ever talked
11 anymore about that or not to be honest.
12   Q.    Did Kloosterman ask you about it when
13 you said she was angry about the woman statement?
14   A.    We didn't go into any detail that I
15 can recollect.
16   Q.    All right.  Under the next section
17 there's a chart.  Do you see the second one under
18 Claim?  It says, "My supervisor touches my arm
19 and/or leg the majority of the time I have a
20 meeting or talk to him one on one."
21          Do you see that?
22   A.    Yup.
23   Q.    And then if you look two columns over,
24 is that what you told Kloosterman?

Page 313

1     MR. TUCKER:  What's written two
2  columns -- what's typed two columns over you
3  mean, Counsel?
4     MS. GURMANKIN:  I'm sorry?
5     MR. TUCKER:  You're asking him is what
6  he told Kloosterman that's under.
7  BY MS. GURMANKIN:
8     Q.   Yes.  That I have seen that, scooting
9  up close to look at the computer, two legs
10 touching, touching an arm/leg, but not other
11 direct reports.  Nothing inappropriate like
12 rubbing her back.
13        Is that what you told Kloosterman?
14    A.   Yes.
15    Q.   All right.  So you had seen Will and
16 Jesse's legs touching?
17    A.   I've seen when you try to look at a
18 computer screen and two people are sitting next to
19 each other that there might be, you know, some
20 type of inadvertent touch.
21    Q.   Did you see that on multiple
22 occasions?
23    A.   I don't recall multiple occasions.
24    Q.   Do you just recall one time?

Page 314

1     A.   I can recall one time.
2     Q.   When?
3     A.   I don't know the exact date.
4     Q.   What's the year?
5     A.   2016.
6     Q.   Where were they sitting?
7     A.   At his computer.
8     Q.   And how did you know that the touching
9  was inadvertent?
10    A.   There was no -- they were sitting side
11 by side just looking at a computer screen.
12    Q.   How did you know -- and you saw their
13 legs touching?
14    A.   Yeah.
15    Q.   How did you --
16    A.   Well --
17    Q.   I'm sorry.  Go ahead.
18    A.   It's leg, chair, whatever else when
19 you sit side by side.
20    Q.   Were their legs touching?
21    A.   I wouldn't say full length, maybe
22 knees.
23    Q.   Their knees were touching?
24    A.   Uh-huh.

Page 315

1     Q.   Yes?
2     A.   Yes.
3     Q.   And how did you know that was
4  inadvertent?  How did you come to that conclusion?
5     A.   Nobody pulled away, nobody said
6  anything.  They sat there for a few minutes,
7  talked about whatever was on the screen, and then
8  got up and left.
9     Q.   At the time that you saw that, Jesse
10 was reporting directly to Turney?
11    A.   Yes.
12    Q.   And after you saw that, did you ask
13 Jesse if she was okay with that or if that made
14 her uncomfortable or anything along those lines?
15    A.   No.
16    Q.   It says also "touching an arm/leg."
17 Did you see Turney touch her leg on any other
18 occasion?
19    A.   No.
20    Q.   Did you see Turney touch her arm?
21    A.   No.
22    Q.   Did you -- did you tell Kloosterman
23 that you saw Turney touch her arm?
24    A.   No.

Page 316

1     MS. GURMANKIN:  Okay.  Let's go off
2  for one second.
3     VIDEOGRAPHER:  We're now going off the
4  record.  The time on the camera is 3:43 p.m.
5        - - -
6     (Whereupon, a recess was taken from
7  3:43 p.m. until 3:44 p.m.)
8        - - -
9     VIDEOGRAPHER:  We're now back on the
10 record at 3:44 p.m.
11 BY MS. GURMANKIN:
12    Q.   All right.  Looking at page three of
13 Exhibit 5, you see where it says "Supervisor
14 gestures cat claws and makes a hissing noise."
15        Do you see that?
16    A.   Yes.
17    Q.   And you had seen Turney do that?
18    A.   Yes.
19    Q.   On multiple occasions?
20    A.   Yes.
21    Q.   Have you ever heard the term cat fight
22 before this?
23    A.   I have.
24    Q.   And have you heard it referred to

79 (Pages 313 to 316)

Page 317

1    conflicts or fights between women?
2         A.    Yes.
3         Q.    Had you heard it used in any other
4    context?
5         A.    No.
6         Q.    Right under that it says, "I have been
7    asked by supervisor multiple times if I thought
8    about him over the weekends."
9              Do you see that?
10        A.    I see that.
11        Q.    Did you hear Turney say that to
12    anyone?
13        A.    I remember him saying it to a lot of
14    people.
15        Q.    Who?
16        A.    Excuse me?
17        Q.    Who?
18        A.    He said it to me before.
19        Q.    Anyone else?
20        A.    He said it to Mark Hoover, Jesse
21    Barnes, Penny Robins, maintenance guys.
22        Q.    Last line on that page, "I've been
23    called a bitch by numerous people in the office."
24             Do you see that?

Page 318

1         A.    Yes.
2         Q.    Did you tell Kloosterman that you had
3    heard Jesse being referred to as a bitch?
4         A.    Well, I had heard that it had
5    happened, but I was not there when -- when it took
6    place.
7         Q.    But at some point you heard Hoover
8    reference the fact that he had previously called
9    Jesse a bitch?
10        A.    Yes.
11        Q.    And did you say anything to Hoover
12    when he stated that he had previously called Jesse
13    a bitch?
14        A.    So I recall the statement being a
15    you-know-what.  I don't know that he ever actually
16    went into details to actually say the word other
17    than saying you're being a you-know-what.
18        Q.    So you just heard Hoover reference the
19    fact that he had previously said to Jesse that he
20    called her a you-know-what?
21             MR. TUCKER:  No, that's not what he
22    said.  He said Hoover told him that he called
23    Jesse a you-know-what.
24             THE WITNESS:  She was -- yeah.  She

Page 319

1    was being a you-know-what.
2    BY MS. GURMANKIN:
3         Q.    All right.  Then why did you tell
4    Kloosterman that story in reference to her asking
5    about Jesse's claim that she's been called a bitch
6    by numerous people in the office?
7         A.    That's what I said that -- I
8    referenced she was being a you-know-what.
9         Q.    Right.  My question is, why did you
10    tell that story to Kloosterman in response to her
11    talking about Jesse's claim that she's been called
12    a bitch by numerous people in the office?
13        A.    That was what I had told her I had
14    heard when that was being referenced.  So I never
15    said that -- tied the two together.  I just told
16    her what I had heard.
17        Q.    Did you believe that Hoover was
18    referencing that he had called Jesse a bitch?
19        A.    Based on the facts, I didn't believe
20    one way or the other.  I just told him that he
21    needed to be careful when he was talking to people
22    like that, or if those conversations were going
23    on.
24        Q.    Well, was it a violation of any policy

Page 320

1    if Hoover called Jesse a you-know-what?
2         A.    I don't know if you-know-what is
3    against policy.
4         Q.    Did you ask Hoover if he had said --
5    if he had called her a you-know-what or if he had
6    called her something else?
7         A.    I didn't -- he had stated it.
8         Q.    He stated what?
9         A.    That he said you're being a
10    you-know-what.
11        Q.    Right.  And when he said that, did you
12    say, did you call her previously a you-know-what
13    or did you call her something else?
14        A.    I didn't.  I said you need to be
15    careful what conversations you have.
16        Q.    Well, is it a -- is it a problem if he
17    had just referred to her as a-you-know what?
18        A.    It's possible, yes.
19        Q.    Why?
20        A.    Because it could lead to further
21    issues.
22        Q.    Do you see in the column where it says
23    "I have heard Mark Hoover."  Do you see that part?
24        A.    Yup.

80 (Pages 317 to 320)

Page 321

1　　Q.　It says, "I have heard Mark Hoover. I
2　was not there when it originally took place. I
3　knew it happened because it came back up."
4　　　　Did you tell Kloosterman that?
5　　A.　Yeah. I knew something had happened
6　because it came back up or something was said.
7　　Q.　Did you tell Kloosterman that you
8　believed that Hoover had previously referred to
9　Jesse as a bitch?
10　　A.　No. I never told Megan that I -- that
11　I thought that was it.
12　　Q.　In that section that starts with "I
13　have heard Mack Hoover," in that box, is that an
14　accurate reflection of what you told Kloosterman?
15　　　　MR. TUCKER: Is the entire box?
16　　　　MS. GURMANKIN: Yeah, that starts with
17　　"I have heard Mark Hoover."
18　　　　THE WITNESS: Let me look at the
19　　entire box. It says I just told her she was
20　　being a you-know-what.
21　BY MS. GURMANKIN:
22　　Q.　No. It says, "I have heard Mark
23　Hoover. I was not there when it originally took
24　place. I knew it happened because it came back

Page 322

1　up. Mark was talking a week later and he stopped
2　me and said she started on him first on being
3　grouchy and was giving him a hard time and I just
4　told her she was being a you-know-what. They were
5　going at each other. She followed up after the
6　fact. At the time I perceived it as a joke back
7　and forth. But I did tell him to be careful doing
8　that stuff."
9　　　　Is that what you told Kloosterman?
10　　A.　Yes.
11　　Q.　Did you ever tell Jesse that she had
12　a -- she needed to stop playing the victim or
13　words to that effect?
14　　A.　Yes.
15　　Q.　When?
16　　A.　During one of our coaching
17　conversations.
18　　Q.　Is that in the spring of 2016?
19　　A.　Yeah. It was one of the later ones, I
20　think, but I don't recall the day.
21　　Q.　In 2016, though?
22　　A.　Yeah.
23　　Q.　What was that in context? What was
24　the context?

Page 323

1　　A.　When you're -- when you have issues,
2　you need to make sure that you don't always think
3　that some -- something at work was being done to
4　you. You should take the initiative to make sure
5　that you understand your job directions and that
6　you are -- have a clear communication in between
7　the -- the employee and the supervisor.
8　　Q.　Did you ever tell a male employee at
9　Shell to stop playing the victim or words to that
10　effect?
11　　A.　Yes.
12　　Q.　Who?
13　　A.　I had that conversation with Wayne
14　Fletcher one time.
15　　Q.　When?
16　　A.　When he was having issues with putting
17　some safety stuff together. I said, "You
18　shouldn't be a victim. Take the bull by the horns
19　and make sure you understand what you got to do,
20　you have a clear direction."
21　　Q.　When?
22　　A.　It was probably last year.
23　　Q.　2018?
24　　A.　Yeah.

Page 324

1　　Q.　Any other male employee that you've
2　told to stop playing the victim or words to that
3　effect?
4　　A.　Not that I recall.
5　　Q.　All right. On page four, first
6　paragraph under the chart, it says -- second
7　sentence -- I'm sorry, third sentences second
8　line. "Chris Anderson cautioned" --
9　　　　MR. TUCKER: Hold on for a second.
10　　Let me get there.
11　　　　MS. GURMANKIN: Uh-huh.
12　　　　MR. TUCKER: Under the box, second --
13　　second line.
14　　　　MS. GURMANKIN: Yup.
15　　　　MR. TUCKER: Okay.
16　BY MS. GURMANKIN:
17　　Q.　"Chris Anderson cautioned hiring her
18　because she is, quote, trouble, and we will end
19　up in the same position as the last guy."
20　　　　Did you tell Kloosterman that?
21　　A.　Yes.
22　　Q.　Did Chris Anderson say that to you?
23　　A.　To my recollection.
24　　Q.　And do you know what he meant when he

81 (Pages 321 to 324)

1    said that she's trouble?
2        A.    Just based off of past -- I don't know
3    what -- I don't know what he meant when she
4    said -- when he said that.
5        Q.    You didn't ask him?
6        A.    No.
7        Q.    He says that someone that you're
8    considering hiring is trouble and you don't ask
9    him what he means?
10       A.    We didn't go into details.
11       Q.    Did you ask him what he meant?
12       A.    Did I ask him what he meant about the
13   statement?
14       Q.    Yes.
15       A.    Yes.
16       Q.    And what did he say?
17       A.    Based on the past allegations that she
18   had had against other employees.
19       Q.    Meaning ████████ and
20   ████████
21       A.    Yes.
22       Q.    When he said, "We will all end up in
23   the same position as the last guy," did you
24   understand that to refer to her allegations

1    against ███ and ████████ as well?
2        A.    Yes.
3        Q.    The last line of that paragraph says,
4    "I think he felt bad for how he was treated in the
5    past.  He never told me that, but maybe."
6            Did you tell Kloosterman that?
7        A.    I don't know what that sentence means.
8        Q.    Do you remember telling her that?
9        A.    No.  I don't recollect that sentence.
10       Q.    Paragraph three, "Understand you had
11   observed an instance in March of this year when
12   Will referred to Jesse as a hot blonde.  Share
13   your perception of this event.  Confirmed, made a
14   statement about it."
15           Did you hear Turney refer to Jesse as
16   a hot blonde?
17       A.    I do not remember that event.
18       Q.    That would have been something you
19   remembered, wouldn't it, if a male supervisor
20   referred to a female subordinate as a hot blonde?
21       A.    Can you say it again?
22       Q.    That would have been something that
23   would stick out in your memory, wouldn't it,
24   having a male supervisor at Shell refer to a

1    female subordinate as a hot blonde?
2        A.    Most likely, yes, but I do not
3    remember that event in question.
4        Q.    Paragraph four, "Understand you were
5    at the golf tournament this past summer with Jesse
6    and Will."
7            Do you remember a golf tournament in
8    two-thousand -- in the summer of 2016?
9        A.    Yes.
10       Q.    Where was that?
11       A.    In Wellsboro at the Tioga Golf Course.
12       Q.    It goes on to say, "What were the
13   group dynamics at this event?  Do you recall Will
14   and others asking Jesse why she was not wearing
15   shorts?  Did you take a picture of her backside at
16   this event?  No recollection.  The whole golf
17   tournament, I remember a lot of booze.  She had a
18   friend acting inappropriately.  No recollection,
19   but everyone was taking pictures.  I'm sure there
20   were pictures of her in it."
21           Were you drinking at the golf
22   tournament?
23       A.    Moderately, yes.
24       Q.    What were you drinking?

1        A.    Beer.
2        Q.    How many beers did you have?
3        A.    I don't recall the exact number.
4        Q.    Do you recall approximately?
5        A.    A few.
6        Q.    More than five?
7        A.    No.
8            MR. TUCKER:  Take your hand away from
9    your mouth.  Okay?
10           Sorry.
11   BY MS. GURMANKIN:
12       Q.    More than one?
13       A.    Yes.
14       Q.    Were you drunk?
15       A.    No.
16       Q.    Buzzed?
17       A.    No.
18       Q.    Do you recall if Turney was drinking?
19       A.    Yes.
20       Q.    Beer?
21       A.    I don't recall.
22       Q.    Do you know how many drinks he had?
23       A.    No.
24       Q.    Jesse had a friend there?

Page 329

1    A.    She did.

2    Q.    And you recall the friend acting

3  inappropriately?

4    A.    Yes.

5    Q.    How?

6    A.    She was visibly intoxicated and had

7  made some -- was having a hard time even standing

8  up.

9    Q.    Did Jesse act inappropriately?

10    A.    Not that I recall.

11    Q.    Did you tell Kloosterman that you

12  didn't recall whether or not Turney and others

13  asked Jesse why she's not wearing shorts?

14    A.    Yes.

15    Q.    And do you recall telling Kloosterman

16  that you didn't have a recollection of whether or

17  not you took a picture of Jesse's backside at this

18  event?

19    A.    There was a lot of pictures taken.

20  There was never one specifically for that purpose.

21    Q.    My question was, did you tell

22  Kloosterman that you did not have a recollection

23  of whether or not you took a picture of Jesse's

24  backside at this event?

Page 330

1    A.    There was no recollection.

2    Q.    You told Kloosterman that?

3    A.    Yes.

4    Q.    The second paragraph under number

5  five, it says in the third line, "Hindsight is

6  always 20/20. There was nothing I saw that told

7  me to escalate that."

8        Did you tell -- did you say that to

9  Kloosterman?

10    A.    That -- that statement doesn't make

11  sense.

12    Q.    You don't remember saying that?

13    A.    I don't recall that exact statement.

14    Q.    How about the next one, "I have had

15  some conversations with Steve about it because we

16  would talk about employees in general."

17        Do you remember saying that?

18    A.    Yes.

19    Q.    Conversations with Steve Craig?

20    A.    Yes.

21    Q.    About what?

22    A.    Just general employee. So, like, some

23  coaching sessions, different stuff like that.

24  Just standard conversations if I'm -- as I'm

Page 331

1  working through my process improvement stuff.

2    Q.    Did you tell Kloosterman that you'd

3  had some conversations with Steve Craig about

4  this -- about the comments that Kloosterman was

5  asking you about?

6    A.    Yes.

7    Q.    What did you talk to Craig about that

8  issue?

9    A.    Repeat the question.

10    Q.    What did you talk to Steve Craig about

11  the comments that Kloosterman was asking you

12  about?

13    A.    Oh, just general coaching. Just

14  general coaching sessions that I've had and

15  working on some of the frustrations.

16    Q.    Anything regarding comments that

17  Turney made?

18    A.    No. Not that I recall.

19    Q.    Paragraph 6, it says, "In working with

20  both of them, it was always assumed as harmless

21  banter. She dealt as much as she received. In

22  some situations she started it. It seemed a

23  joking banter back and forth. He has done that

24  stuff, or still does, trying to keep the stress

Page 332

1  low."

2        What did -- did you tell Kloosterman

3  that?

4    A.    Yes.

5    Q.    What did you mean when you said, "He

6  has done that stuff, or still does, trying to keep

7  the stress low"?

8    A.    You know, make some of those comments

9  like, "Did you miss me?" That kind of stuff.

10    Q.    Anything else other than comments

11  about did you miss me?

12    A.    I know the -- some of the back and

13  forth stuff that's referred to in there where --

14  in some situations she started it. It would be

15  she would call Will names as back and forth. I

16  recall that.

17    Q.    You heard Jesse call Will names?

18    A.    Yeah.

19    Q.    What names?

20    A.    She called him a whore.

21    Q.    Anything else?

22    A.    She used that phrase quite a bit.

23    Q.    She referred to Will as a whore quite

24  a bit?

83 (Pages 329 to 332)

Page 333

1    A.    Uh-huh.
2    Q.    Yes?
3    A.    Yes.
4    Q.    How many times?
5    A.    More than five.
6    Q.    When?
7    A.    Usually in the mornings.
8    Q.    No, no. When? What year?
9    A.    Oh. In the beginning of -- end of
10   2015 into 2016.
11   Q.    You heard this personally?
12   A.    I did.
13   Q.    Did you say anything when she did
14   that?
15   A.    During conversations I would recommend
16   that the name calling be kept to a minimum.
17   Q.    Did you specifically address the fact
18   that you heard her call Will a whore more than
19   five times?
20   A.    It's in my coaching conversations.
21   Q.    You specifically discussed that with
22   her?
23   A.    Yes.
24   Q.    What did you say?

Page 334

1    A.    That Will is a supervisor. You
2    shouldn't be name calling.
3    Q.    Did you address it with her when you
4    heard it? I mean, when you heard her say it, did
5    you say something at the time?
6    A.    Not specifically at that time.
7    Q.    Why?
8    A.    Because it was usually a group setting
9    and I didn't want to demean anybody for -- you
10   know, with a group conversation like that.
11   Q.    Did you ever pull her aside into
12   another room or into the hallway or anywhere away
13   from the group and tell her that she shouldn't be
14   calling her supervisor a whore?
15        MR. TUCKER: Objection. He's just
16        said he did.
17   BY MS. GURMANKIN:
18   Q.    At the time that you heard her call
19   Will Turney a whore more than five times from the
20   end of 2015 through the end of 2016, did you ever
21   pull her aside, anywhere other than the group
22   setting, and tell her that she shouldn't be saying
23   that or it wasn't appropriate?
24   A.    Yes.

Page 335

1    Q.    You did. When?
2    A.    During the -- those times when she
3    would have those -- make those statements.
4    Q.    Well, you testified that you talked to
5    her about it in your coaching sessions, right?
6    A.    Correct.
7    Q.    Did you actually pull her aside when
8    she did it, when you heard her doing it?
9    A.    One time I pulled her aside and said,
10   "We've got to stop calling each other names."
11   Q.    Did anyone call anyone a name other
12   than Jesse calling Will a whore at the time that
13   you pulled her aside?
14   A.    No.
15   Q.    Did you document the more than five
16   times that you heard Jesse referred to Will as a
17   whore?
18   A.    No.
19   Q.    Did you tell anyone at the company?
20   A.    Yes.
21   Q.    Who?
22   A.    I would -- I had -- it was in one
23   conversation with Steve Craig.
24   Q.    When?

Page 336

1    A.    2016, in the beginning.
2    Q.    So as of that time how many times had
3    she called Turney a whore?
4    A.    I don't recall.
5    Q.    Do you recall if it was more than
6    once?
7    A.    No.
8    Q.    What did Steve Craig say?
9    A.    He asked if I'd had a conversation. I
10   said yes.
11   Q.    Anything else?
12   A.    No.
13   Q.    Did you tell anyone other than Steve
14   Craig?
15   A.    No.
16   Q.    Did you tell Kloosterman during the
17   interview that you had with her?
18   A.    No.
19   Q.    How come?
20   A.    It didn't come up in that detail.
21   Q.    Well, she was asking you questions,
22   you met for about an hour, and in number six,
23   according to her notes, she asked you, "Is there
24   anything else you'd like to share related to the

Page 337

1 items we discussed today that hasn't been asked
2 yet?"
3   Do you see that?
4 A.  Yup.
5 Q.  Do you recall her asking that?
6 A.  Yup.
7 Q.  Any explanation as to -- for why you
8 didn't tell her that Jesse called her supervisor a
9 whore more than five time?
10 A.  In that conversation, it just didn't
11 come up in that much -- that detail.
12 Q.  Well, you could have brought it up,
13 right?
14 A.  I could have.
15 Q.  Any reason why you didn't?
16 A.  No.
17 Q.  Up through today, have I told anyone
18 in the company, other than Steve Craig, that Jesse
19 referred to Will Turney as a whore more than five
20 times?
21 A.  Not that I recall.
22 Q.  Who else was around when she did that?
23 A.  Mark Hoover.
24 Q.  Anyone else?

Page 338

1 A.  Probably Wayne Fletcher.
2 Q.  Anyone else?
3 A.  That would be all that I would recall.
4 Q.  Were Wayne and Mark Hoover around
5 during each of these more than five times that she
6 did this?
7 A.  I don't recall each one.
8 Q.  After this conversation with -- this
9 interview with Kloosterman, did you have a
10 discussion with anyone else at the company about
11 Jesse's complaints?
12 A.  No.
13   MR. TUCKER: Other than counsel you
14 mean?
15   MS. GURMANKIN: No, I mean anyone at
16 the company.
17   MR. TUCKER: Answer.
18 BY MS. GURMANKIN:
19 Q.  Is your answer the same?
20 A.  Repeat the question.
21 Q.  Sure.
22   After that interview with Kloosterman
23 on 12/7/2016, did you speak with anyone at the
24 company about Jesse's complaints?

Page 339

1 A.  Does that include --
2 Q.  That includes everybody. It's just a
3 yes-or-no question. Did you have any other
4 conversations --
5   MR. TUCKER: You can answer that
6 question.
7 BY MS. GURMANKIN:
8 Q.  -- with anybody after that 12/7/2016
9 interview with Kloosterman about Jesse's
10 complaints?
11 A.  Up to today?
12 Q.  Yeah.
13 A.  Yes.
14 Q.  Who?
15 A.  HR people.
16 Q.  Who?
17 A.  Michelle Priest.
18 Q.  Anyone else?
19 A.  And Shell legal.
20 Q.  Who?
21 A.  Rosa Garcia.
22 Q.  Anyone else?
23 A.  Cynthia Blevins [ph], I believe.
24 Q.  Is she in legal?

Page 340

1 A.  Yes.
2 Q.  Anyone else?
3 A.  Joe Tucker.
4 Q.  At Shell.
5 A.  Oh.
6 Q.  Anyone else?
7 A.  No, I believe those are the only --
8 that's it, to the best of my recollection.
9 Q.  When did you speak with Michelle
10 Priest?
11 A.  There was a follow-up interview in
12 2017, the end of 2017, and she had further
13 questions.
14 Q.  How did that -- how did you come to --
15 strike that.
16   How did you come to talk to Michelle
17 Priest at the end of 2017?
18 A.  She asked for me to.
19 Q.  Did you speak in person?
20 A.  No.
21 Q.  Over the phone?
22 A.  Yes.
23 Q.  Did she tell you why?
24 A.  No. At the time there was just -- she

85 (Pages 337 to 340)

Page 341

1    said she had some follow-up interview questions.
2        Q.    What did she ask you?
3        A.    I don't recall the questions
4    specifically.
5        Q.    What do you recall generally about
6    them?
7        A.    They were follow-up to some of the
8    stuff that was on Megan's initial question set.
9        Q.    What do you recall her asking?  I
10    understand you don't remember the exact questions.
11    Do you remember anything about them?
12        A.    I don't recall enough to say.  It was
13    a short conversation.
14        Q.    Do you recall them being related to
15    the questions that Kloosterman asked you or
16    similar in nature?
17        A.    Yes.
18        Q.    How long was that conversation?
19        A.    Half hour.
20        Q.    Other than that and the conversations
21    you had with Rosa Garcia and Cynthia Blevins [ph],
22    any other conversations you had with anyone at
23    Shell regarding Jesse's complaint?
24        A.    Not that I recall.

Page 342

1        Q.    Were you ever given an update as to
2    how the investigation turned out?
3        MR. TUCKER:  Other than through
4        conversations you may have had with counsel,
5        including current counsel.
6    BY MS. GURMANKIN:
7        Q.    Were you ever given an update?  Just a
8    yes-or-no question.
9        MR. TUCKER:  Other than -- you can
10        tell her anything that you know from anyone
11        who's not a lawyer.
12    BY MS. GURMANKIN:
13        Q.    Right now it's just a yes-or-no
14    question.  Were you ever given an update as to the
15    results of the investigation?
16        A.    No.
17        Q.    Were you aware that Turney was given a
18    warning?
19        A.    Warning pertaining to?
20        Q.    Were you aware that he was given a
21    warning, period?
22        A.    I don't recall.
23        Q.    You don't recall if you're aware of
24    that?

Page 343

1        A.    I don't understand what the warning --
2    what the warning was around.
3        Q.    Are you aware that he was given a
4    warning, period?
5        A.    I don't recall being aware of that,
6    no.
7        Q.    Did you ever talk to Turney about your
8    interview with Kloosterman?
9        A.    No.
10        Q.    At some point after your interview
11    with Kloosterman, did Jesse's position change at
12    all?
13        A.    Yes.
14        Q.    How?
15        A.    She was moved to the HSE group.
16        Q.    How did you become aware of that?
17        A.    I was told that she was moving to the
18    HSE group.
19        Q.    Who told you?
20        A.    Steve Craig.
21        Q.    What did he tell you about that?
22        A.    That Jesse would be moving to the HSE
23    group.
24        Q.    Did he tell you why?

Page 344

1        A.    No.
2        Q.    Did he tell you into what role?
3        A.    Not at that time.
4        Q.    At some point?
5        A.    Yeah.  It was a -- it was an HSE role
6    I later learned.
7        Q.    When did -- when did Craig initially
8    have the discussion with you in which he told you
9    that Jesse was moving to the HSE group?
10        A.    Well, it would have been the spring of
11    2018.
12        Q.    And when does he tell you that she's
13    moved into an HSE role?
14        A.    I think it was shortly after that
15    there was a community -- had a group meeting and
16    one of them was that Jesse was going to take a
17    role as an HSE person in the HSE group.
18        Q.    Anything else that Steve Craig tells
19    you about that?
20        A.    Just said she would be reporting to
21    Steve Ellis.
22        Q.    Anything else?
23        A.    Not that I recall.
24        Q.    Did you continue to interact with

86 (Pages 341 to 344)

Page 345

1  Jesse after your 12/7/2016 interview with
2  Kloosterman?
3      A.   Yes.
4      Q.   Through earlier this year?
5      A.   Yes.
6      Q.   Sometime around late 2016 did there
7  become a position -- a scheduler position open?
8      A.   Yes.
9      Q.   And was that -- what group was that
10  in?
11     A.   Maintenance.
12     Q.   Who was the hiring manager for that
13  position?
14     A.   Will Turney.
15     Q.   Do you know who was hired for that
16  position?
17     A.   Jeremy Greene.
18     Q.   Do you know who else applied for the
19  position?
20     A.   Jesse Barnes.
21     Q.   Anyone else?
22     A.   Not that I recall.
23     Q.   Who made the decision to select Jeremy
24  Greene for that position?

Page 346

1      A.   Will Turney.
2      Q.   Was that solely Will's decision?
3      A.   He was the hiring manager, yes.
4      Q.   Were you involved in the decision?
5      A.   I provided input.
6      Q.   Other than providing input, were you
7  involved in the decision?
8      A.   Ultimately, it was Will's decision
9  being the hiring manager.  So I provided input to
10  the decision, but ultimately it was his to make.
11     Q.   Other than providing input, did you
12  have any involvement in the decision?
13     A.   No.
14     Q.   Were you involved in interviewing
15  Jesse?
16     A.   Yes.
17     Q.   Was Jeremy interviewed?
18     A.   Yes.
19     Q.   Were you involved in that interview as
20  well?
21     A.   Yes.
22     Q.   Were both of them qualified for the
23  position?
24     A.   Both of them had different levels of

Page 347

1  qualification.
2      Q.   Was Jesse qualified for the position?
3      A.   No.
4      Q.   Then why was she interviewed?
5      A.   Because she applied for it.
6      Q.   Does Shell have a practice of
7  interviewing everybody who applies for a position
8  whether or not they're qualified?
9          MR. TUCKER:  Objection.
10  BY MS. GURMANKIN:
11     Q.   You can answer.
12     A.   Repeat the question.
13     Q.   Sure.
14          Does Shell have a practice of
15  interviewing every employee who applies for a
16  position even if they're not qualified?
17          MR. TUCKER:  Objection.
18          THE WITNESS:  It does occur, yes.
19  BY MS. GURMANKIN:
20     Q.   I'm sorry?
21     A.   It can occur, yes.
22     Q.   Is it a practice?
23          MR. TUCKER:  Objection.
24          THE WITNESS:  It can occur.  I

Page 348

1  won't -- I'm not going to say it's a
2  practice.  It just depends on the situation.
3  BY MS. GURMANKIN:
4      Q.   Is there anything in writing that
5  states that employees should be interviewed for a
6  job even if they're not qualified for it?
7      A.   I've never seen it in writing to the
8  best of my recollection.
9      Q.   Is there any other occasion in which
10  you've been involved in interviewing a candidate
11  for a position even if the determination has been
12  made that they're not qualified?
13          MR. TUCKER:  Objection.  It's
14  confusing, but you may answer it if you
15  understand it.
16          THE WITNESS:  I didn't.
17  BY MS. GURMANKIN:
18     Q.   You didn't understand the question?
19     A.   No.
20          MS. GURMANKIN:  Would you mind, Nancy,
21  reading that back?
22          Thank you.
23              - - -
24          (Whereupon, the court reporter read

87 (Pages 345 to 348)

Page 349

```
1    from the record.)
2         - - -
3         MR. TUCKER:  Objection.  They're not
4    qualified before the position or not
5    qualified after the interview for the
6    position?  Which one?
7         MS. GURMANKIN:  Object to form.
8         THE WITNESS:  Say that again.
9         MR. TUCKER:  Your question is unclear,
10   qualified before or qualified after.
11        MS. GURMANKIN:  You can object to the
12   form, but Mr. Blakley, can you answer the
13   question?
14        MR. TUCKER:  If he understand the
15   question, you can answer it.
16        THE WITNESS:  We've had both occasions
17   where they've been unqualified before and
18   unqualified after.
19   BY MS. GURMANKIN:
20        Q.    Other than interviewing Jesse for the
21   scheduler position, during your entire employment
22   at Shell, have you interviewed any other
23   individual for a position who you've determined is
24   not qualified?
```

Page 350

```
1         A.    Yes.
2         Q.    Who?
3         A.    Some operators.
4         Q.    Who?
5         A.    I don't recall any names.  I haven't
6    interviewed an operator for a while, but it was
7    after the interview.
8         Q.    Was there a determination made before
9    or after the interview that Jesse was not
10   qualified?
11        A.    After.
12        Q.    Based on what?
13        A.    Work knowledge.
14        Q.    Based on the interview?
15        A.    Yeah.
16        Q.    What did she say during the interview
17   that led you to determine that she wasn't
18   qualified?
19        A.    Maintenance field experience.
20            - - -
21        (Whereupon, Exhibit 11 was marked for
22   identification by Ms. Gurmankin.)
23            - - -
24   BY MS. GURMANKIN:
```

Page 351

```
1         Q.    You're being shown what's been marked
2    as Exhibit 11, Shell 878 through 881.  This has
3    been produced by the company as the scheduler job
4    description.
5         Have you seen this before?
6         A.    Yes.
7         Q.    And this is in connection with the
8    scheduler position that Jeremy Greene was selected
9    for?
10        A.    Yes.
11        Q.    What is it on here that Jesse wasn't
12   qualified for?
13        MR. TUCKER:  Objection to the
14   question.
15        THE WITNESS:  Can you repeat the
16   question?
17   BY MS. GURMANKIN:
18        Q.    Sure.
19        What skill or requirement or anything
20   that's listed on this job description did -- was
21   Jesse not qualified to handle?
22        A.    When you look -- the experience in
23   maintenance work and projects.
24        Q.    Where are you?
```

Page 352

```
1         A.    Page two.
2         Q.    Where?
3         A.    Under skills and requirements.
4         Q.    Uh-huh.
5         A.    "Maintenance scheduler should be
6    skilled in producing an integrated schedule of
7    operational and maintenance activities.  An
8    industry background and experience of working in a
9    trade discipline is essential."
10        So a trade discipline and then, "A
11   minimum of five years experience in maintenance
12   work and projects."
13        Q.    All right.  I want to make sure I got
14   this accurate.  So she was determined to be not
15   qualified because she was not skilled in producing
16   an integrated schedule of operational and
17   maintenance activities?
18        MR. TUCKER:  He's talking about from
19   his perspective.
20        MS. GURMANKIN:  Yeah.  Right.
21        MR. TUCKER:  Yes.
22   BY MS. GURMANKIN:
23        Q.    Right?
24        A.    Yes.
```

88 (Pages 349 to 352)

Page 353

1 Q. And how did you make that
2 determination that she was not skilled in
3 producing an integrated schedule of operational
4 and maintenance activities?
5 A. The lack of experience in maintenance
6 work.  So to be able to schedule maintenance work,
7 you need to understand the field side of
8 maintenance, how long it takes to do a job.
9 Q. Did you know that before the
10 interview?
11 A. Yes.
12 Q. So why was she interviewed?
13 MR. TUCKER:  Objection, asked and
14 answered.
15 You may answer again.
16 BY MS. GURMANKIN:
17 Q. Well, let me ask it this way.  Did you
18 determine before the interview, based on your
19 knowledge, that she was not qualified?
20 A. Before the interview?
21 A. Yup.
22 A. We don't make any determination until
23 we interview everybody that's applied.
24 Q. But you knew before the interview that

Page 354

1 she was not skilled in producing an integrated
2 schedule of operational and maintenance activities
3 based on your knowledge of her work and your
4 experience with her, right?
5 A. Yeah.
6 Q. You knew that before the interview,
7 right?
8 A. Correct.
9 Q. Okay.  So based on your knowledge, you
10 determined before the interview that she wasn't
11 qualified for the scheduler position, correct?
12 A. We did not make any determinations.
13 Q. You.  Based on your knowledge prior to
14 the interview that she was not skilled in
15 producing an integrated schedule of operational
16 and maintenance activities, you determined before
17 the interview that she was not qualified for this
18 position, correct?
19 MR. TUCKER:  Objection.  He said no,
20 he didn't make a determination, and you keep
21 asking --
22 MS. GURMANKIN:  He said we.  I'm
23 asking about you.
24 THE WITNESS:  I did not make any

Page 355

1 determinations.
2 BY MS. GURMANKIN:
3 Q. Well, how is it that you didn't make
4 any determinations before the interview if you
5 knew before the interview that she would not be
6 skilled in producing an integrated schedule of
7 operational and maintenance activities?
8 A. Repeat the question.
9 A. Sure.
10 MS. GURMANKIN:  Do you mind, Nancy?
11 Thank you.
12 - - -
13 (Whereupon, the court reporter read
14 from the record.)
15 - - -
16 THE WITNESS:  Because everybody has --
17 has gaps.  That's what part of the interview
18 process is for, if you have to go through
19 that to understand what the gaps are.
20 BY MS. GURMANKIN:
21 Q. Okay.  Jeremy Greene also had gaps?
22 A. Yes.
23 Q. What were his gaps?
24 A. I don't recall.

Page 356

1 Q. Did Turney ever tell you why he made
2 the decision to select Jeremy over Jesse for the
3 scheduler position?
4 A. No.
5 Q. So at some point he tells you he's
6 made that decision, correct?
7 A. He would have said that the decision
8 was made, yes.
9 Q. Do you recall that?
10 A. Uh-huh.
11 Q. Yes?
12 A. Yes.
13 Q. And you don't ask why?
14 A. I asked what the conclusion was.  He
15 said, based off of the interviews and the
16 different backgrounds, they decided to go with
17 Jeremy.
18 Q. Did he ever tell you he made the
19 determination that Jesse wasn't qualified?
20 A. I would say yes.
21 Q. Do you recall him saying that?
22 A. That she wasn't qualified?
23 Q. Yeah.
24 A. Not those specific words.

89 (Pages 353 to 356)

Page 357

1    Q.    What do you recall him saying about
2  that?
3    A.    That they decided to go with Jeremy.
4    Q.    Other than saying that he based it on
5  the interviews, did he give you any information as
6  to why he made that decision?
7    A.    I don't recall specifically.
8    Q.    Do you recall generally?
9    A.    That Jeremy was better qualified.
10   Q.    Did he tell you why?
11   A.    So it wasn't that Jesse wasn't
12 qualified, it was that Jeremy had more
13 qualifications.  He had SAP qualifications and he
14 also had a maintenance background.
15   Q.    Did Turney tell you that he determined
16 that Jeremy was better qualified?
17   A.    Better qualified, yes.
18   Q.    And that's why he selected Jeremy?
19   A.    Yes.
20   Q.    Did he tell you why he made the
21 determination that Jeremy was better qualified?
22   A.    He had a maintenance background.
23   Q.    Any other reason that Turney gave you?
24   A.    He had -- he had a maintenance

Page 358

1  background was the main one.
2    Q.    Any other reason that Turney gave you?
3    A.    No.
4    Q.    When did you interview Jesse?
5    A.    Oh, I guess it would have been in
6  about October, November.
7          THE WITNESS:  I need to take a break.
8  Can I?
9          MS. GURMANKIN:  Sure.
10         MR. TUCKER:  Yes, you can.  Just take
11 your microphone off.
12         VIDEOGRAPHER:  This will conclude file
13 number five in the videotaped deposition of
14 Hondo Blakley in the matter of Jesse Barnes
15 versus Shell, et al.
16         We are going off the record at 4:28
17 p.m.
18            - - -
19         (Whereupon, a recess was taken from
20 4:28 p.m. until 4:37 p.m.)
21            - - -
22         (Whereupon, Exhibit 12 was marked for
23 identification by Ms. Gurmankin.)
24            - - -

Page 359

1          VIDEOGRAPHER:  This will begin file
2  number six in the videotaped deposition of
3  Hondo Blakley in the matter of Jesse Barnes
4  v. Shell, et al.
5          We're going back on the record at 4:37
6  p.m.
7  BY MS. GURMANKIN:
8    Q.    All right.  I'm showing you what's
9  been marked as Exhibit 12, Shell 642 through 668.
10 I just want you to go through it.  I believe, and
11 correct me if I'm wrong, that your handwriting
12 starts on page eight, but if you could let me
13 know.
14   A.    Yes, that's my handwriting on page
15 eight.
16   Q.    And where does it go to?
17         MS. GURMANKIN:  Bless you.
18         Bless you.
19         MR. TUCKER:  Thank you.
20         THE WITNESS:  Fourteen.
21 BY MS. GURMANKIN:
22   Q.    Fourteen?
23   A.    Uh-huh.
24   Q.    Yes?

Page 360

1    A.    Yes.
2    Q.    These are your interview notes?
3    A.    Yes.
4    Q.    Just of Jesse or Jeremy as well?
5    A.    Jeremy would be -- start at page 21.
6    Q.    So 8 through 14 are just you interview
7  notes regarding Jesse, correct?
8    A.    Yes.
9    Q.    Is there anywhere on those pages --
10 and sorry.  Are you -- did you take those notes
11 during the interview?
12   A.    Yes.
13   Q.    Is there anywhere on those pages where
14 you indicate that she's not qualified for the
15 position or she doesn't meet the qualifications
16 for the position?
17   A.    No.
18   Q.    Did you ever see documentation
19 anywhere up through today indicating why Jeremy
20 was given the position over Jesse?
21   A.    No.
22   Q.    The scheduler position, I'm correct,
23 would have been a promotion for Jesse?
24   A.    Yes.

90 (Pages 357 to 360)

1    Q.   All right.  Going back to Exhibit 7,
2    which is now in front of you.  This is Jesse's
3    Complaint that she filed in federal court.  Can
4    you look at page 12, paragraph 38.
5         Are you there?
6    A.   Yes.
7    Q.   It says, "Turney and Blakley conducted
8    Plaintiff's interview for the scheduler position."
9    True, correct?
10   A.   Yes.
11   Q.   "During the interview Turney and
12   Blakley laughed when Plaintiff told them that she
13   wanted the position because she wanted to advance
14   her career at Defendants."  I'll stop there for a
15   second.
16        Did -- did Jesse say during the
17   interview something to the effect of that she
18   wanted the position because she wanted to advance
19   in her career at Shell?
20   A.   Yes.
21   Q.   And did you or Will laugh?
22   A.   No.
23   Q.   What was your response?
24   A.   We agreed.  There's no reason for us

1    not to want her to -- to make her expand her
2    career.
3    Q.   So did you say anything when she said
4    that?
5    A.   We agreed that that was a good goal to
6    have.
7    Q.   Both of you said that?
8    A.   Yes.
9    Q.   "Turney and Blakley also told
10   Plaintiff that they did not think she would do
11   well in the position."
12        Is that true?
13   A.   No.
14   Q.   At any point did you say that?
15   A.   No.
16   Q.   Did you speak with Jesse at any point
17   after the interview regarding this position or her
18   not getting it?
19   A.   Not that I recall.
20   Q.   Did anyone from HR or from -- did
21   anyone at Shell ever ask you, up through today,
22   about Jesse not getting the scheduler position?
23   A.   Yes.
24   Q.   Who?

1    A.   Legal counsel.
2    Q.   Within Shell?
3    A.   Yes.
4    Q.   Is this Rosa Garcia again?
5    A.   Her or Cynthia.
6    Q.   Okay.  When?
7         MR. TUCKER:  And just for purpose of
8    the record it's Bivins, B-i-v-i-n-s.
9    BY MS. GURMANKIN:
10   Q.   When were you asked about that?
11   A.   The initial conversations --
12        MR. TUCKER:  Let's stop right there.
13        MS. GURMANKIN:  The answer is when.
14   When?
15        MR. TUCKER:  Do you know the date?
16        THE WITNESS:  No.
17   BY MS. GURMANKIN:
18   Q.   Do you know the year?
19   A.   No, I do not recall the date.
20   Q.   Do you recall the year?
21   A.   It would have been 2018.
22   Q.   Prior to that, did anyone from Shell
23   ask you about Jesse not getting the scheduler
24   position?

1    A.   No.
2         MS. GURMANKIN:  Okay.  Let me just
3    take a five-minute break and see if I have
4    anything else for you and then we should be
5    close to be being done.
6         VIDEOGRAPHER:  We're now going off the
7    record.  The time on the camera is 4:44.
8              - - -
9         (Whereupon, a recess was taken from
10   4:44 p.m. until 4:49 p.m.)
11             - - -
12        VIDEOGRAPHER:  We are now back on the
13   record at 4:49 p.m.
14   BY MS. GURMANKIN:
15   Q.   Did you ever hear any rumors of male
16   supervisors or managers having sexual or romantic
17   relationships with female subordinates at Shell?
18   A.   No.
19   Q.   When you heard Jesse refer to Will
20   Turney as a whore more than five times, did you
21   think that you had an obligation, per the
22   policies, to report that?
23   A.   Other than to -- no.
24   Q.   Why not?

Page 365

1      A.    In the context that it was said, it
2  was back and forth banter.
3      Q.    Did you ever hear Turney refer -- call
4  Jesse a name?
5      A.    No.
6      Q.    Other than hearing Jesse call Will
7  Turney a whore more than five times, did you ever
8  hear any other employee at Shell refer to any
9  other employee or contractor by a name?
10     A.    Yes.
11     Q.    Who?
12     A.    A maintenance guy called another
13  maintenance guy a jerk once.
14     Q.    Who were those two guys?
15     A.    Ken Phelps and it was Don Coolidge.
16     Q.    Who called whom a jerk?
17     A.    Ken referred to Don as a jerk.
18     Q.    Any others?
19     A.    Not that I recall.
20           MS. GURMANKIN:  Okay.  That's all I
21  have for you at this time.
22           MR. TUCKER:  I have a couple of
23  questions.
24                - - -

Page 366

1               EXAMINATION
2                  - - -
3  BY MR. TUCKER:
4      Q.    Did you know of Ms. Barnes carrying on
5  sexual relationships with a married Shell employee
6  who was a supervisor?
7      A.    Yes.
8      Q.    Could you tell us about that?
9      A.    When Shell first came to the area, we
10  had a construction supervisor named T. J. Hall.
11     Q.    Uh-huh.
12     A.    And he was working on assignment in
13  this area and she was with him and he was married.
14     Q.    Was she living with him?
15     A.    She was living with him.
16     Q.    And where was she living with him at?
17     A.    A hotel that she was renting.
18     Q.    You were talking about the golf
19  tournament where Ms. Barnes' friend was
20  intoxicated.  Do you recall answering questions
21  about that?
22     A.    Yes.
23     Q.    What was Ms. Barnes' level of
24  intoxication on that day, if you recall?

Page 367

1      A.    She was intoxicated.
2      Q.    How do you know this?
3      A.    By mannerisms, talking about it, how
4  much -- that she had drank a lot.
5      Q.    Speaking of drinking, did Ms. Barnes
6  tell you that she drank a lot?
7      A.    She said, "I've had a lot to drink
8  today."
9      Q.    On other occasions, separate from this
10  golfing incident, after weekends, would Ms. Barnes
11  tell you about any events that she would have
12  during the weekend as far as drinking is
13  concerned?
14     A.    Yes.
15     Q.    Tell us about that, please.
16     A.    There were instances where she would
17  come in Monday morning and her conversation would
18  start with, "I was so drunk over the weekend."
19     Q.    Did you ever respond in turn?
20     A.    At first I would listen to the stories
21  and then I'd coached her to let her know that
22  those were not appropriate to talk about all the
23  time in the -- in an office setting.
24     Q.    Earlier in the morning counsel was

Page 368

1  asking you questions about training on Shell's
2  sexual harassment policy and you talked about two
3  specifics trainings in 2010 and 2017.  Do you
4  recall that?
5      A.    Yes.
6      Q.    In between 2010 and 2017, were you
7  also getting training on Shell -- on Shell's
8  sexual harassment and equal employment policies?
9            MS. GURMANKIN:  Objection, asked and
10  answered.
11  BY MR. TUCKER:
12     Q.    You can answer the question.
13     A.    Yes.
14     Q.    Were these in-person trainings?
15     A.    No.
16     Q.    Those are the two types of training
17  that counsel went over with you?
18           MS. GURMANKIN:  Objection to the form.
19  BY MR. TUCKER:
20     Q.    Were those the two types -- when
21  counsel was showing you those documents earlier
22  today, those are the in-person trainings?
23     A.    Yes.
24     Q.    Could you tell us the other type of

92 (Pages 365 to 368)

Page 369

1  training that you received between 2010 and 2017?
2     A.    CBT's.
3     Q.    What are CBT's?
4     A.    Computer-based training.
5     Q.    And how frequently did you receive
6  computer-based training?
7     A.    Annually.
8     Q.    And what -- and was this training on
9  Shell's sexual harassment policy?
10    A.    Ethics and compliance.
11    Q.    When Ms. Barnes complained to you
12 about sexual harassment when she was an employee
13 of Serajen [ph], what did you do with that
14 complaint?
15          MS. GURMANKIN:  I'm sorry.  What --
16 could you --
17 BY MR. TUCKER:
18    Q.    Do you recall questioning from
19 Plaintiff's counsel pertaining to Ms. Barnes
20 making a complaint to you of an employee allegedly
21 sexually harassing her?  Do you recall that
22 questioning?
23    A.    Yes.
24    Q.    When that complaint was given to you,

Page 370

1  what did you to?
2     A.    Took it to the supervisor.
3     Q.    And why did you do that?
4     A.    That's the rules.
5     Q.    Did Ms. Barnes ever complain to you
6  that Mr. Turney or any other employee, once she
7  became an employee of Shell, sexually harassed
8  her?
9     A.    No.
10    Q.    If she would have, what would you have
11 done?
12    A.    Immediately turned it in.
13    Q.    Are you sure that she has never
14 complained to you about sexual harassment?
15    A.    Yes.
16          MR. TUCKER:  I have nothing further.
17          MS. GURMANKIN:  I have a few
18 follow-ups.
19               - - -
20          EXAMINATION
21               - - -
22 BY MS. GURMANKIN:
23    Q.    T. J. Hall, how did you find out that
24 Jesse had a relationship with him?

Page 371

1     A.    He told me.
2     Q.    When?
3     A.    2011, 2012.
4     Q.    Was that while the relationship was
5  going on?
6     A.    After it had ended.
7     Q.    Was he still an employee of Shell at
8  the time that he told you?
9     A.    Yes.
10    Q.    And at the time Jesse was a contractor
11 of Shell?
12    A.    Yes.
13    Q.    Did you think that Jesse engaging in a
14 relationship with him was a violation of some sort
15 of company policy?
16    A.    No.
17    Q.    Did you report it to anyone at the
18 company?
19    A.    No.
20    Q.    Based on what T. J. Hall told you, did
21 you conclude that Jesse had done anything
22 inappropriate in connection with that
23 relationship?
24    A.    No.

Page 372

1          MR. TUCKER:  As it relates to Shell
2  policy or morally?
3  BY MS. GURMANKIN:
4     Q.    Nope.  That's the question.  Your
5  answer is no?
6     A.    No policy was broken.
7     Q.    I didn't ask that.  Did you conclude
8  that Jesse had done anything inappropriate?
9          MR. TUCKER:  Answer the question.
10         THE WITNESS:  Yes.
11 BY MS. GURMANKIN:
12    Q.    What?
13    A.    She had a relationship with a married
14 man.
15    Q.    You testified no earlier before there
16 was an objection made by your lawyer.  You're
17 changing your testimony now?
18    A.    Yes.
19    Q.    Based on what?
20    A.    My morals.
21    Q.    Did your morals change in the time
22 between when you initially answered no and two
23 minutes later when you answered yes?
24    A.    No.

93 (Pages 369 to 372)

Page 373

1      MR. TUCKER: It wasn't two minutes
2   later, but you may answer.
3      THE WITNESS: No.
4   BY MS. GURMANKIN:
5      Q.    So what changed --
6      A.    The way --
7      Q.    -- between your initially answering no
8   and you're now answering yes?
9      A.    The way I perceived the question.
10     Q.    How did you perceive it initially that
11  led you to answer no?
12     A.    Company policy.
13     Q.    Did the company policy change between
14  the time you answered no --
15     MR. TUCKER: No, he said --
16  BY MS. GURMANKIN:
17     Q.    -- and the time you answered yes?
18     MR. TUCKER: No. That's not what he
19  said. He perceived the question didn't
20  violate a company policy.
21  BY MS. GURMANKIN:
22     Q.    Initially or the second time?
23     A.    Initially I perceived the question
24  that it was around company policy.

Page 374

1      Q.    And did you perceive it differently
2   the second time?
3      A.    Yes.
4      Q.    How did you perceive it differently?
5      A.    That immorally it's not right.
6      Q.    Did you believe that T. J. Hall
7   engaged in any inappropriate conduct in engaging
8   in this relationship?
9      A.    Yes.
10     Q.    In connection with company policy or
11  just morally or both?
12     A.    From what I understood of the
13  relationship, morally.
14     Q.    Did you also understand it to be a
15  violation of company policy?
16     A.    I don't know enough details to -- to
17  say what was said on his -- on his behalf.
18     Q.    I didn't ask what you knew about what
19  was said on his behalf. Based on your knowledge
20  of the relationship, did you believe that he
21  violated company policy by engaging in this
22  relationship?
23     A.    No.
24     Q.    And am I correct that you didn't

Page 375

1   report it to anyone at the company because you
2   didn't think that anyone did anything
3   inappropriate or that anyone violated any company
4   policy in connection with the relationship?
5      MR. TUCKER: Objection. It's a
6   compound question.
7   BY MS. GURMANKIN:
8      Q.    You can answer.
9      A.    I didn't report it because it was
10  after the fact.
11     Q.    You can still report conduct that's
12  after the factor, right? Or is your understanding
13  is you can only report something at the time that
14  it's happening?
15     A.    It was after the fact and there was
16  no -- I mean, you're free to have relationships.
17     Q.    Is it your understanding that company
18  policy requires only that you report something
19  that's happening at the time that it's happening?
20     A.    No.
21     Q.    So it has nothing to do with the fact
22  that you knew after the fact that it happened,
23  right?
24     A.    Correct.

Page 376

1      Q.    You testified that based on Jesse's
2   mannerisms and talking about how much she had to
3   drink, that you concluded that she was intoxicated
4   at the golf event, correct?
5      A.    Yes.
6      Q.    What about her mannerisms led you to
7   conclude that she was intoxicated?
8      A.    Slurred speech.
9      Q.    Anything else?
10     A.    Referencing the amount of alcohol that
11  she had to drink through the day.
12     Q.    Yeah. We're going to talk about how
13  much she said she had to drink. I just want to
14  know what was it about her mannerisms other than
15  slurred speech that led you to conclude that she
16  was intoxicated?
17     A.    Slurred speech, visual, wobbly, stuff
18  like that.
19     Q.    She was wobbly?
20     A.    (Witness nods head.)
21     Q.    Yes?
22     A.    Yes.
23     Q.    Other than slurred speech and
24  wobbling, any other mannerisms that led you to

94 (Pages 373 to 376)

Page 377

```
1    conclude that she was intoxicated?
2        A.    No.
3        Q.    How long did you speak with her in
4    which she slurred her speech?
5        A.    A few minutes.
6        Q.    More than one?
7        A.    Yes.
8        Q.    More than five?
9        A.    Around five.
10       Q.    And the company -- this was a company
11   event, right?
12       A.    Yes.
13       Q.    And there was alcohol being served at
14   the event?
15       A.    Yes.
16       Q.    Did you witness anyone else's
17   mannerisms at the event that led you to concluded
18   that they were intoxicated or was it only Jesse?
19       A.    There were others that I concluded
20   were intoxicated.
21       Q.    Who?
22       A.    I don't have specific names.
23       Q.    Multiple employees?
24       A.    Yeah.
```

Page 378

```
1        Q.    Will Turney?
2        A.    No.
3        Q.    Did Will Turney -- did you see him
4    drink alcohol?
5        A.    No.
6        Q.    Did he tell you whether or not he had
7    drunk any alcohol?
8        A.    No.
9        Q.    At some point Jesse said to you that
10   she had a lot to drink today?
11       A.    Yes.
12       Q.    Were those her exact words?
13       A.    Yes.
14       Q.    Did she just walk up to you and say
15   that or was there -- was that part of a
16   conversation?
17       A.    It was a short conversation.
18       Q.    What did she say?
19       A.    I asked how the day went.  She said
20   good, but she had a lot to drink.
21       Q.    Anything else?
22       A.    Not that I recall.
23       Q.    When she had that conversation, was
24   her speech slurred?
```

Page 379

```
1        A.    Yes.
2        Q.    And what time was that conversation?
3        A.    Late afternoon.
4        Q.    What time did the event start?
5        A.    Early -- in the morning.
6        Q.    What time?
7        A.    I think tee off is like 9 o'clock.
8        Q.    What time did it end?
9        A.    Five.
10       Q.    When did you first speak with Jesse
11   where she was slurring her speech?
12       A.    Earlier that afternoon.
13       Q.    What time?
14       A.    I can't recall specifically.
15       Q.    What was the conversation about?
16       A.    How the day went.
17       Q.    Tell me what you recall her saying;
18   tell me what you recall you saying.
19       A.    I asked her how the day was going.
20   She said good, but she had had a lot to drink.
21       Q.    Is that the conversation that you just
22   testified to?
23       A.    Yes.
24       Q.    Is that the first time you noticed her
```

Page 380

```
1    speech slurred?
2        A.    Yes.
3        Q.    Is that the only time you talked to
4    her that day, period?
5        A.    No.
6        Q.    Did you talk to her at some point
7    where her -- where her speech was not slurred?
8        A.    Yes.
9        Q.    When did you see her wobbling?  What
10   time was that?
11       A.    Around the same time I had the
12   conversation, early afternoon.
13       Q.    Where was she walking?
14       A.    Around the tent.
15       Q.    Did you tell anyone at the time that
16   you thought she was intoxicated?
17       A.    No.
18       Q.    When you met with Kloosterman, you
19   told her that you were completely truthful, right?
20       A.    Yeah.
21       Q.    Did you tell her that you concluded
22   that Jesse was intoxicated at this golf event?
23       A.    No.
24       Q.    Did you tell her that there were times
```

Page 381

1  where Jesse came in and talked about how much she
2  drank over the weekend?
3      A.    No.  Not that I recall.
4      Q.    The computer-based training based on
5  ethics and compliance that you just testified to
6  in response to your lawyer's questions that you
7  took between 2010 and 2017, do you have any
8  explanation for why you didn't think about that
9  when I asked you about training this morning that
10  you took during that same time period?
11      A.    The documentation you had -- had me
12  review was all face-to-face training, so my
13  assumption that was what you were referring to was
14  like face-to-face classroom style training.
15      Q.    I didn't ask about face to face.  I
16  asked you if you had any training.
17      MR. TUCKER:  But his assumption was
18      that you were asking that, so he's answered
19      your question.  That's how he understood your
20      question.
21  BY MS. GURMANKIN:
22      Q.    And when did you figure out that I
23  made -- that you made an assumption that may have
24  been incorrect?

Page 382

1      A.    When I was thinking about training.
2      Q.    When?
3      A.    Earlier this afternoon.
4      Q.    During the time --
5      A.    Because there is --
6      Q.    I'm sorry.  Go ahead.
7      A.    There -- there's other training that
8  we've done.
9      Q.    You realized that earlier this
10  afternoon?
11      A.    Yes.
12      Q.    During the time before I completed my
13  questioning?
14      A.    Which time?
15      Q.    Before I completed my questioning of
16  you before your lawyer asked you questions you
17  reached the conclusion that you may have made an
18  incorrect assumption regarding my questions about
19  training?
20      A.    When I got asked the question is when
21  I had made the -- when he asked me the question.
22      Q.    When your lawyer asked you the
23  questions?
24      A.    Yeah.

Page 383

1      Q.    When your lawyer asked you the
2  questions you reached the conclusion that you may
3  have made an incorrect assumption about my
4  questions about training this morning?
5      MR. TUCKER:  Objection.  He didn't say
6      he made an incorrect assumption.  He said he
7      assumed you were talking about face to face.
8      It wasn't incorrect.  That's how he
9      understood your question to be.  So that's
10      incorrect.
11  BY MS. GURMANKIN:
12      Q.    Your lawyer didn't ask you questions
13  about face-to-face training.  What about his
14  questioning made you testify to this
15  computer-based training that you took between 2010
16  and 2017 when you didn't testify to that when I
17  asked you about training during that same time
18  period this morning?
19      MR. TUCKER:  Objection.  That's not
20      the way I asked my questions.  But the record
21      stands as it is.
22      Please answer her question.
23      THE WITNESS:  The question was based
24      on all training.  So I made an incorrect

Page 384

1      assumption that you were talking about
2      face-to-face training and the question I got
3      asked was all training.
4  BY MS. GURMANKIN:
5      Q.    Did your lawyer's question involve all
6  training?
7      A.    I don't remember it word for word.
8      Q.    And you recall my question not
9  including face-to-face training?
10      A.    So we had documents pulled out that I
11  was looking at --
12      Q.    I asked a question --
13      MR. TUCKER:  Could you -- could you
14      let him answer the question, please.
15      MS. GURMANKIN:  Well, I need my
16      question answered.
17      MR. TUCKER:  Well, he's answered as
18      best he can.  You may not like the answer,
19      but his answer was -- he started saying he
20      had documents pulled up.
21  BY MS. GURMANKIN:
22      Q.    Okay.  I'm not asking about documents.
23  Do you recall that I never used the phrase face to
24  face?  Do you recall that?

96 (Pages 381 to 384)

Page 385

1    A.    Yes.
2    Q.    And what made you assume that I was
3  asking about face-to-face training when I never
4  asked you about face-to-face training?
5    A.    The documents that you were referring
6  to me to review on the screen were all signed
7  documents, like written out, as if it was a
8  face-to-face training.
9    Q.    Is there anything else that you
10 testified to incorrectly today or is that it?
11   A.    That's it.
12   Q.    You sure about that?
13   A.    Yes.
14       MS. GURMANKIN:  Okay.  That's all.
15   Thank you.
16       MR. TUCKER:  I have no questions.
17       VIDEOGRAPHER:  This concludes file
18   number six in the videotaped deposition of
19   Hondo Blakley in the matter of Jesse Barnes
20   v. Shell, et al.
21       This will conclude the deposition for
22   today.  We are going off the record at 5:08
23   p.m.
24              - - -

Page 386

1           (Witness excused.)
2              - - -
3           (Whereupon, the deposition was
4       concluded at 5:08 p.m.)
5              - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 387

1       C E R T I F I C A T E
2
3       I, Nancy J. Taguinot, RPR, CCR(NJ),
4  Registered Professional Reporter and Notary Public
5  in and for the Commonwealth of Pennsylvania,
6  certify that the foregoing is a true and accurate
7  transcript of the deposition of said witness, who
8  was first duly sworn by me on the date and place
9  hereinbefore set forth.
10
11       I further certify that I am neither
12  attorney nor counsel for, nor related to or
13  employed by, any of the parties to the action in
14  which this deposition was taken, and further, that
15  I am not a relative or employee of any attorney or
16  counsel employed in this action, nor am I
17  financially interested in this case.
18
19
20
21
22       Nancy J. Taguinot, RPR, CCR(NJ)
         Notary Public
23       New Jersey License No. XI01005
24

Page 388

1   INSTRUCTIONS TO WITNESS FOR READING & SIGNING
2       Read your deposition over carefully.
3  It is your right to read your deposition and make
4  changes in form or substance.  You should assign a
5  reason in the appropriate column on the errata
6  sheet for any change made.
7       After making any changes in form or
8  substance which have been noted on the following
9  errata sheet along with the reason for any change,
10 sign your name on the errata sheet and date it.
11      Then sign your deposition at the
12 end of your testimony in the space provided.
13 You are signing it subject to the changes you have
14 made in the errata sheet, which will be attached
15 to the deposition before filing.  You must sign it
16 in front of a witness.  Have the witness sign in
17 the space provided.  The witness need not be a
18 notary public.  Any competent adult may witness
19 your signature.
20      Return the original errata sheet to your
21 counsel promptly.  Court rules require filing
22 within 30 days after you receive the deposition.
23
24

97 (Pages 385 to 388)

Page 389

1      ERRATA SHEET

2  Attach to Deposition of: HONDO BLAKLEY

     Taken on: August 16, 2019

3  Case: BARNES V. SHELL EXPLORATION AND PRODUCTION

       COMPANY APPALACHIA, et al.

4

5  PAGE  LINE NO.  CHANGE      REASON

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

Page 390

1      SIGNATURE PAGE

2

3        - - -

         I hereby acknowledge that I

4

  have read the aforegoing transcript, dated

5

  August 16, 2019, and the same is a true and

6

  correct transcription of the answers given by

7

  me to the questions propounded, except for

8

  the changes, if any, noted on the errata

9

  sheet.

10        - - -

11

12

13  SIGNATURE: _____

      HONDO BLAKLEY

14

15  DATE: _____

16

17  WITNESSED BY: _____

18

19

20

21

22

23

24

Exhibit 10

**Attendees:** Wayne Fletcher, Megan Kloosterman (HR)
**Date:** 12/7/2016

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- Allegations have not been made against you specifically, but you were identified as someone that may have information that will help me understand the overall picture
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Questions

1. Describe your current role and responsibilities.

   Support all of the different groups – any type of safety or health concerns. For example, if someone is out on an accident. I organize all safety meetings, the training, security I take care of the building itself, make sure everything is plowed, shatter proof glass, multiple drills throughout the year, spills on pads, Environmental – I track all leaks and spills, sit on boards to eliminate violations. I spend 50/50 in the office and field, hearing equipment, walk-downs, noise surveys for compressors for community involvement and ear plugs.

2. Describe your working relationship with Will Turney and Jesse Barnes (understand not on their team).

   Will – Maintenance supervisor; I help his folks to make sure they stay safe, investigations if something goes wrong in the field. I have a seat at the table, they value my opinion because I've been in the field for 20 years. I talk through different things not HSE related too. I have a lot of f2f with Will. Worked with him for 3 years.

   Have known Jesse almost 6 years- have always utilized her as needed with excel/powerpoint. She helps with those things for me sometimes. She has also helped me buy Christmas party planning, making communications, etc.

3. What are your observations/perceptions of the work dynamics on that team? What are your perceptions of their working relationship?

   He is a nice guy, I can see how he manages people different, I don't know if its because of their skillset. I could see how he may treat his lead maintenance guys, compared to schedulers and the people working on that side (Jesse). It might be that he doesn't trust her capabilities, he would tell his maintenance guys to do something and doesn't follow up but he might micro-manage that. It seems like he might not be giving her a fair shake because she is a woman.

EXHIBIT

023

Expressed a concern? – She has come to me, she will come over to my desk and say I need to vent for a minute, Will is under my skin today. He won't leave me alone, he won't give me time to do it. He will give a guy 6 hours to do it and her only 2, or something. She has made a comment that she doesn't like the way he looks at her. I don't think he gives her the credit that's due to her. She is very smart, capable of doing any task here. I think he still looks at her as an Admin. It has always been this way – it did not start at a certain point in time.

Inappropriate comments towards her? – he has at water cooler talk, just mentioned that she's a good looing girl, saying oh did you see what she is wearing today? I don't think it's ever been voiced to her.

4. I understand you were at the golf outing this summer with them. How was the dynamic between them at this event?
   a. Asking why not wearing shorts; cutting shorts; taking picture of her backside

I don't recall but that's very possible. Very vaguely; don't recall that. I know she had a friend of hers that was flirtatious. She ran a booth at hole 1 – they serve food and drinks there. As the golf outing goes around for a few hours. They jump in a golf cart once everyone has hit that hole and travel around to see what players are doing, they take alcohol and give to those players that are finishing up. They take the pictures.

Just the atmosphere itself, I would believe it would be possible. I've heard guys make comments to other women and they might not take it as serious. For example, compared to what an operator says versus her boss.

5. I understand you had asked Jesse to do some work for you (outside of her normal duties) and Will was near. Do you recall this specific situation?

   a. Did Will tell you to tell her she was pretty and she would do it? yes
   b. Do you recall her response? No, I don't think she said anything, rolled her eyes and gave you the look. I do recall her saying I don't come to work to be told I am pretty.
   c. Do you know whether Will teased her for her response (I don't come to work to be told I'm pretty?)? I don't recall.

6. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet? I've never had any concerns with her, I've been to both of their houses, they are both considered friends. I don't want to lose the trust between either one of them.

Inappropriate things to her – I think things have been directed towards her.

7. Is there anyone specifically you think I should talk to regarding the concerns raised?
8. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

## Conclusion
- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know

- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 11

**Attendees:** Matt Empsen, Megan Kloosterman (HR)
**Date:** 12/7/2016

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- Allegations have not been made against you specifically, but you were identified as someone that may have information that will help me understand the overall picture
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Questions

1. Describe your current role and responsibilities.

   Integrity Inspector – before this role pipeline lead in operations – work with everyone in the field and the office.

2. Describe your working relationship with Will Turney and Jesse Barnes (understand not on their team).

   Will – interfaced with him often in previous role, resources we needed, allocation of people, sat in a lot of meetings with him and his team in previous role. Current role, inspections go through SAP and maintenance aspect, understanding what work we have taking place, well pads, closing items in SAP, etc. (basis)

   Jesse – generated PMs for us on the pipeline side, would work with her closing out work orders in SAP, asset integrity, SIMS roll out, etc. (weekly basis)

   a. What are your observations/perceptions of the work dynamics on that team, specifically between Jesse and Will.

   Cubicles sit right next to them; their work group dynamic from my perspective, Will is very condescending to them and more specifically Jesse. The way he talks to her is very demeaning, doesn't respect her in her role; Not afraid to blame her for something that has nothing to do with her; if my boss treated me that way I would talk to them because it is disrespectful. He has demeaned her in meetings, blamed her, and talked down to her. On a daily basis, it's very condescending and sarcastic, like he is better than they are. It seems like every day there is always something. An example would be how he asks her if he needs something, he would tell her he needs it but that it should already have been done. For example, updating a board, saying you should already know you should do this. it's the tone, the body language. More frequently towards her.

EXHIBIT
020

You can tell after their conversations she gets very quiet and doesn't talk to anybody. You can tell she is bothered by it. Other guys on the team 'give it back to him' or stand up for themselves, but it affects her. Over the past year or two it's gotten progressively worse.

I have seen Will say inappropriate comments to all women in the office; body language, things he would say, how he postures himself around other females. With Jesse, a little closer to her than he should be, how close you are, how you sit next to her, mannerisms, example sit beside her and lean on her, impeding on her comfort zone, too close.

*I would like to review a few specific examples of their work relationship with you. Please share any information or perspective you have related to these matters.*

| Claim | Timing (from Jesse) | Test whether you see this amongst Will and others on the team (self) or just between Jesse. |
|---|---|---|
| • I am continuously asked about my personal life by my supervisor. | He asked about my significant other recently in November 2016 | Yes, that is one of Will's things and he is one to share his. He thinks its ok to ask about relationship status. I've noticed he's done that with people on his team. |
| My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one. | This is ongoing, continues to happen even when I've asked him to stop. | I've seen it at her desk going over stuff with her, personal space that he crosses.<br><br>He does not get close to other males, only noticed it with her. |
| • Supervisor gestures cat claws and makes a hissing noise. | on-going | No, I don't think I've seen that. |
| • I have been asked by my supervisor multiple times if I thought about him over the weekends. | Aug-16 | I've heard the 'miss me' comment on numerous occasions – to her specifically. I have not heard him say that to male coworkers. |

| | | |
|---|---|---|
| • My supervisor has told me that he has thought about me while showering. | Sep-16 | n/a – I could see him saying something like that. |
| • My supervisor encourages arguments among my team. | In meetings and team discussions. | He's not a confrontational person, if it was his fault or directed towards him, he would deflect it to others going at it. I have been in some heated arguments with Will. He will try to blame others to get them to take the blame off of him.. Does not step in when arguments are amongst the team. It's a blame game during the meeting – not a productive meeting. It usually becomes who was right/wrong. |
| I have been called a bitch by numerous people in the office. | More near the beginning of 2016 | Over the past 6 months I have seen her become more introverted; the work environment has made her uncomfortable and not wanting to put herself out there. She tries to avoid people, they can be condescending. She is always very helpful to me. It goes to how you treat her and how she treats you. She will respect you if you respect her. If you try to treat her that she is not competent in her job, she is going to be stand off-ish. |

3. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet? Will treats her like she's not competent in her job; when he talks to her he slows down his speech like she can't understand. He will talk to someone else, he sits down and breaks it all down slow and methodical.

Her co-workers on that team treat her disrespectfully – they see how he treats her, so they see that it's ok. Dan Krise, Ken Foreman would be others that treat her that way – they feed off of Will. They think it's OK and it's funny and Will can do it. They poke fun at her about it. They don't have bad intentions but they think it's funny. Will is setting the example. For Will, it seems like a power thing for him, he thinks he's in a position he can treat his subordinates how he wants and get away with it. In my opinion he is a womanizer.

When someone can talk to a male or female and have two different postures, how they speak, body language. You should treat everyone with respect. I noticed it since I started. I've seen it affect Jesse in the past 6 months to a year. Her attitude, she feels uncomfortable, she sits at her desk and does her work.

4. Is there anyone specifically you think I should talk to regarding the concerns raised?
5. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

**Conclusion**
- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis

- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 12

**Attendees:** Jeremy Greene, Megan Kloosterman (HR)
**Date:** 12/7/2016

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- Allegations have not been made against you specifically, but you were identified as someone that may have information that will help me understand the overall picture
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Questions

1. Describe your current role and responsibilities.
   Hired on with Shell in maintenance in July 2015 – just got the Scheduling effective 12/1.

2. Describe the work environment and team dynamics on your immediate team (i.e. direct reports of Will).

   I don't have any issues with the work environment; I don't see anyone being mistreated or anything. I think it's a normal work environment, it's better than many jobs that I've had. People work hard; there are some people who should not be here in my opinion (Dan Krise). Sometimes things are stressful. There aren't many arguments, work load is high.

3. Describe your working relationship with Will Turney and Jesse Barnes.

   Will Turney: good relationship; talk a couple of times every day – he approves the schedules, jobs that come up that are on the fence about – we can do it now or hold off.  Enjoy working for him as a leader.

   Jesse: she sits directly behind me; we talk multiple times per day. Metrics she is pulling is involved in what I am doing and the rest of the team are doing. She does last minute checks with my schedule. Jobs are intertwined – we get along.

   a. What are your observations/perceptions of their relationship?
      Pretty positive there is misunderstandings between the two of them. We are all a team and supposed to be equals, some things can't be treated the same in some ways. I don't say the same things to her as I would to a guy. She gets offended if treated differently and if saying the same thing as you would say to a guy. Example: Dan will belch or say something, she gets offended. She has talked to me about the Will situation before and I can see her points. She has told me things that have been said that I would say is borderline offensive, but I don't think it's something that's meant to be offensive. There are things she has taken offense to that she shouldn't have. From what I have seen or heard there is nothing that is over the line.

Confidential

EXHIBIT
026

There is a perception that he doesn't know anything or his job because he won't know details sometimes. – but that is a misunderstanding on their part.

I like Will I don't want to have any issues with him I don't see anything that has been out of line, but I have only seen what I have seen. It seems like there was one thing that was on the border line.

*I would like to review a few specific examples of their work relationship with you. Please share any information or perspective you have related to these matters.*

| Claim | Timing (from Jesse) | Test whether you see this amongst Will and others on the team (self) or just between Jesse. |
|---|---|---|
| I was told I am a hot blonde by my supervisor.<br><br>(witnessed story telling back in the office) | Mar - 16 | Yes I did hear that ; it just seems like normal talk, he repeated the story. I don't think it's that inappropriate, normal guy talk.<br><br>I don't remember her being offended or noticeable. |
| • I expressed a concern to my supervisor a CPR trainer that instructed at our office that when I was performing CPR the instructor told me to "pick my ass up" in front of male colleges. My supervisor said "well did you pick it up?" in a laughing manner.<br><br>(witnessed the CPR training) | | Not a significant memory |
| • I am continuously asked about my personal life by my supervisor. | He asked about my significant other recently in November 2016 | Trying to relate; not prying; it seems the same treatment for everyone. Brief conversations. |

| | | |
|---|---|---|
| My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one. | This is ongoing, continues to happen even when I've asked him to stop. | More than I am but not that bad; I haven't noticed it. |
| • Supervisor gestures cat claws and makes a hissing noise. | on-going | As a joke, yes. |
| • My supervisor encourages arguments among my team. | In meetings and team discussions. | I wouldn't call them arguments; it's a healthy productive debate; everyone is involved and people make their points. |
| I have been called a bitch by numerous people in the office. | More near the beginning of 2016 | No – Sometimes she is in a pretty good mood, you can tell though sometimes that people are getting to her and she is frustrated. |

4. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet?
5. Is there anyone specifically you think I should talk to regarding the concerns raised?
6. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

**Conclusion**
- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know

- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 13

**EXHIBIT**

**022**

**Attendees:** Ken Foreman, Megan Kloosterman (HR)
**Date:** 12/7/2016

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Questions

1. Describe your current role and responsibilities.

Role just changed – was the scheduler, now the maintenance planner – I put the parts/time/resources on the job, and the scheduler picks a day. Interface with everybody, very outgoing and talk to everyone.

2. Describe the work environment and team dynamics on your immediate team (i.e. direct reports of Will).

I have worked in way worse teams. It's not bad; I really don't think it's bad. We are like a family, spats do erupt now and then, if someone says the wrong thing and it's not taken how it's meant. As far as a negative vibe, I don't it at all. I would describe it in three words – semi-professional, we could do better, but there is worse out there. It is a collaborative environment, we have to work together. It is the mandate, our group has to work well together. The people in the office are one team and the people are another team in the field. The jobs overlap and we hand off to one another daily, through work processes. We are each other's customers.

3. Describe your working relationship with Will Turney and Jesse Barnes.

Will – fine, easy to get a hold of, he understands real life. We have freedom/autonomy to do our work is very positive. I can identify issues. Know what to do, don't need a lot of guidance. It is our goal to teach Will how to do our jobs, he doesn't know the details. We are trying to teach him, and he is understanding. As a planner I need to know whether we are going to do this work – I share with him the cost and he makes the decision.

Jesse: she received my product when I was a scheduler. She is a different girl, she is super smart. If you go with stereotypes, she is surprisingly smart. She gets offended by things that are not meant to be offensive. She thinks things are personal when they are not. I have had to deal with that. I have learned. She is not a morning person at all – from noon on she is happy Jesse. There was a while when she did not know her role (a year ago or so), I knew her role better than she did, I did not know her role as well as she knows it now – she has improved a lot. She was offended that I would do things that were supposedly in her wheelhouse when I knew what she didn't know what to do. But that has changed, and I saw it coming. It got to the point

where will said it's time to let her fly or fail. She has a peer group through the different assets. She has met the other MA's (only deals well with the female MA's – doesn't reach out to the males). New role does not interact with her role. She has permissions in SAP that none of us have, so we need her to do them.

- GETS OFFENDED? There have been lots of times when she has been mad at me and Dan. She gets set off pretty easily. She has something against Dan.

*I would like to review a few specific examples of the work environment and team environment with you. Please share any information or perspective you have related to these matters.*

| Claim | Timing (from Jesse) | Test whether you see this amongst Will and others on the team (self) or just between Jesse. |
|---|---|---|
| • I am continuously asked about my personal life by my supervisor. | He asked about my significant other recently in November 2016 | She is a very private person, she doesn't talk about enough to let people into her life enough to be able to help her. She doesn't like to take advice from older people; occasionally she has taken time off and things become known. She keeps them separate way better than the guys do.<br><br>As far as Will prying in on that,... a lot of times conversations between those two don't happen at our cubicle. Will is always talking. I've never seen him talk with an agenda, he likes to hear himself talk. I've worked for narcissistic people who were way worse. |
| My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one. | This is ongoing, continues to happen even when I've asked him to stop. | Any touch is too much, she does not like to be touched; I don't know if she has touched her. If it happened, and I was a witness to it, it wasn't in a sexual way. We always are looking at each other's' screens, in each other's personal spaces. When I am there with her, I tell her right out you know I can't see the screen I have to be in your space.<br><br>He is outgoing, so friendly touches would not be surprising. |
| • Supervisor gestures cat claws and makes a hissing noise. | on-going | I don't think so |
| • My supervisor encourages arguments among my team. | In meetings and team discussions. | This happens. There are disagreements all the time on how we should manage the business, what is important, who should be doing what, etc. One of Will's famous sayings is, it's just business. To someone who doesn't recognize what he means is it's not personal. It's not me trying to be negative against you or whatever. It's just business. It's your job, your responsibility. He says that all the time. He is becoming more professional at doing his job, he doesn't say it very often any more. It does rub people the wrong way.<br><br>Jesse gets offended by it because it does affect her, because she will have to do the work. She will say certain 'crap' is beneath her – and it will be |

| | | once she gets to a new role/promotions. |
|---|---|---|
| | | Will is very smart and hardworking too. But those two, in the beginning it was a very happy/friendly/outgoing, Will came in as a new supervisor. We were in the storming phase of our team, figuring out how to work together. It seemed like things were on the up and up and it wasn't as professional as it was today. Then Jesse started getting offended by whatever. It really doesn't take much. I can remember riding to lunch one time. I can't remember. I was riding with Will, -- Dalton from CA gave her a hug and you could see her cringe. Dalton said to Jesse he didn't realize she didn't like to be hugged and she looked at me right away bc I was there when it happened. |
| I have been called a bitch by numerous people in the office. | More near the beginning of 2016 | Yes, but it is because of her mood. |

*I would like to review some claims made regarding your work relationship with Jesse and specific situations you may have been involved in. Please share your perspective on these matters.*

| Claim | Ken Interview |
|---|---|
| This co-worker had lied to me saying that my supervisor was mad at me because I was falling behind on work. When I asked my supervisor what I needed to catch up on he denied that he had said anything. | I did her job before she did her job, we didn't have an MA before. Her mom and I worked together for 20 years and her dad and I worked together for 10 years (not at Shell). Her Mom was a MA where we worked before. When I left to come to Shell, Shell said they needed a secretary, I recommended her mom. She got hired, (East Resources) and there were a lot of open jobs – help wanted signs everywhere. Jesse got hired at ER, and Wendy moved into scheduler role for half of the field and I had the other half. I had way more training than she did, they trained her for a week or so, me for months. She was delivering, competent enough. When we moved offices we sat side by side, same office. I was the MA, wendy did the scheduling, matt did the planning. Then Shell came and needed to cut costs, 2 roles were cut, one of them was Wendy's. Jesse was very upset.

Jesse has a hatred for Robin Grouette. Robin recognized it was a mistake to sever Wendy. They identified we needed an analyst, we were understaffed. Jesse got hired as analyst.

She was overloaded; she doesn't say no to things, she is a hard worker. She had a lot to do, so people were coming to me to do some things and she got upset that I was doing some of her work. She was upset that I was doing work that was in her remit. We haven't ever yelled at each other, I am not one for arguing. But, she stomped away and muttered under her breath. |

| | |
|---|---|
| • I have been told by co-workers that maybe if they wore tight pants and batted their eyes they could get what they wanted, suggested that this is what I do. | I would never say that; and I haven't heard anyone say that to her. She played the female card for as long as it benefitted her. |
| A co-worker had put his hands through my hair without permission. | I've touched her before, and she does not like to be touched. And I stopped when she told me. Don't ever touch me. |
| During the visit to CA in 2014 at the social after hours, were you there when Will shared a photo on his phone of himself in his underwear? | I did not see that; I'm not saying that didn't happen. There was a lot of alcohol involved, people were drinking too much. I was with them the whole time, there wasn't any talk from Will of I got this plan with her or anything like that. Something may have happened between them. |

I don't joke around with her anymore because I learned. I think it may have taken Will a little while longer to realize this when he started working for him. Did he make her upset, probably, did he make advances on her, I don't know. I would say probably not, but I don't know. It seems like trying to flatter her. I feel like he treats her same as others on the team, but she doesn't feel that way. I've heard her complain about that but I know it's not true. She is very hard on herself, she expects a lot.

4. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet?

Will is really outgoing, maybe Jesse would find it offensive. I would say he doesn't mean anything by it. She lives so much on the edge she says things that are not meant to be offensive. She takes things the wrong way often. I recognized a long time ago that she is an edgy one. She has been treated wrong for her looks in the past.

5. Is there anyone specifically you think I should talk to regarding the concerns raised?
6. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

## Conclusion
- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed