# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
                         :

**JESSE BARNES**                  :
                         :
             **Plaintiff,**    :
                         :    **CIVIL ACTION NO.  18-1497**
       **v.**                    :
                         :
**SHELL EXPLORATION**     :
**AND PRODUCTION COMPANY** :
**APPALACHIA; SHELL**       :
**EXPLORATION AND**         :
**PRODUCTION COMPANY;**   :
**SHELL OIL COMPANY**       :
                         :
                         :
          **Defendants.:**
_____

## INDEX OF PLAINTIFF'S EXHIBITS SUBMITTED IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 1 | Deposition of Plaintiff |
| 2 | Deposition of William Turney |
| 3 | Maintenance Analyst Job Description (Shell 65) |
| 4 | Plaintiff's Resume (Shell 1092-1093) |
| 5 | Interview of Plaintiff (Dep. Ex. P-18) |
| 6 | Plaintiff's Hotline Complaint (Dep. Ex. P-14) |
| 7 | Steve Craig Handwritten Notes (Dep. Ex. P-39) |
| 8 | Deposition of Ken Foreman |
| 9 | Deposition of Hondo Blakley |
| 10 | Interview of Wayne Fletcher (Dep. Ex. P-23) |
| 11 | Interview of Matt Empsen (Dep. Ex. P-20) |
| 12 | Interview of Jeremy Greene (Dep. Ex. P-26) |
| 13 | Interview of Ken Foreman (Dep. Ex. P-22) |
| 14 | Deposition of Steve Craig |
| 15 | Kelly Soudelier Handwritten Notes (Dep. Ex. P-59) |

| 16 | July 2017 emails re Plaintiff's performance review rating (Dep. Ex. P-60) |
|----|---|
| 17 | January 2018 email from Plaintiff re continued discriminatory and retaliatory conduct (Dep. Ex. P-61) |
| 18 | March 2017 emails from Plaintiff re discriminatory and retaliatory conduct (Dep. Ex. P-58) |
| 19 | Plaintiff's April 2017 email forwarding her EEOC Charge (Dep. Ex. P-48) |
| 20 | Deposition of Mark Hoover |
| 21 | Interview of William Turney (Dep. Ex. P-19) |
| 22 | Expert Report of Michael Torchia |
| 23 | Deposition of Megan Kloosterman |
| 24 | Investigation Overview (Dep. Ex. P-32) |
| 25 | December 2016 emails between Plaintiff and Greg Larsen re her job "options" (Dep. Ex. P-35) |
| 26 | Deposition of Greg Larsen |
| 27 | Will Turney Memo re Plaintiff's 2015 Performance (Dep. Ex. P-54) |
| 28 | Deposition of Penny Robbins |
| 29 | Notes of Interviews for Scheduler Position (Dep. Ex. P-12) |
| 30 | Jeremy Greene Resume (Shell 1193-1196) |
| 31 | November 2016 email from Will Turney to Michelle Priest re issues with Plaintiff (Dep. Ex. P-55) |
| 32 | November 2016 email from Michelle Priest to Megan Kloosterman enclosing documents for the investigation (Dep. Ex. P-15) |
| 33 | December 2016 email from Michelle Priest to Megan Kloosterman regarding Plaintiff's previous complaints (Dep. Ex. P-16) |
| 34 | Interview of Shane Sollinger (Dep. Ex. P-28) |
| 35 | Interview of Dan Krise (Dep. Ex. P-24) |
| 36 | Interview of Kelvin Flynn (Dep. Ex. P-27) |
| 37 | Interview of Mark Hoover (Dep. Ex. P-21) |
| 38 | Interview of Hondo Blakley (Dep. Ex. P-5) |
| 39 | February 2017 emails between Plaintiff and Michelle Priest re performance review (Dep. Ex. P-68) |
| 40 | January 2017 emails between Greg Larsen; Steve Craig; Will Turney re Plaintiff's 2016 performance (Dep. Ex. P-47) |
| 41 | March 2017 emails including from Plaintiff re her performance review (Dep. Ex. P-57) |
| 42 | January 2017 email from Plaintiff re her unfair performance review rating (Dep. Ex. P-46) |

Exhibit 14



# Compressed Transcript of the Testimony of
# **STEVE CRAIG, 9/20/19**

**Case:** Barnes v. Shell Exploration & Production Company
Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

JESSE BARNES,          : CIVIL ACTION NO. 18-1497
                       :
        Plaintiff,     :
                       :
    VS.                :
                       :
SHELL EXPLORATION AND  :
PRODUCTION COMPANY     :
APPALACHIA; SHELL      :
EXPLORATION AND        :
PRODUCTION COMPANY;    :
SHELL OIL COMPANY,     :
                       :
        Defendants.    :

- - -
September 20, 2019
- - -

Videotaped deposition of STEVE CRAIG,
held at Holiday Inn Williamsport, 100 Pine Street,
Williamsport, Pennsylvania 17701, commencing at
1:22 p.m., on the above date, before PATRICIA R.
CHAPIN, CSR, Notary Public.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

Page 2

1    APPEARANCES:
2
3    CONSOLE MATTIACCI LAW, LLC
     BY: CAREN N. GURMANKIN, ESQUIRE
4    1525 Locust Street, 9th Floor
     Philadelphia, PA 19102
5    (215) 545-7676
     gurmankin@consolelaw.com
6    Counsel for Plaintiff
7
8    TUCKER LAW GROUP
     BY: KATHLEEN KIRKPATRICK, ESQUIRE
9    Ten Penn Center
     1801 Market Street, Suite 2500
10   Philadelphia, PA 19103
     (215) 875-0609
11   kkirkpatrick@tlgattorneys.com
     Counsel for Defendants
12
13
14   ALSO PRESENT:
15   BRYCE CONNOR, VIDEOGRAPHER
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2    TESTIMONY OF
3    STEVE CRAIG
4
5    EXAMINATION                      PAGE
6    BY MS. GURMANKIN                   5
7    BY MS. KIRKPATRICK               216
8    FURTHER BY MS. GURMANKIN             220
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1           E X H I B I T S
2
3    DEPOSITION EXHIBITS           PRODUCED
4                        AND MARKED
5
6    EX P39   HANDWRITTEN NOTES            54
7
8    EX P40   HSE ANALYST ROLE DESCRIPTION     167
9
10   EX P41   EMAILS              172
11
12   EX P42   EMAILS              182
13
14   EX P43   REQUISITION FOR SCHEDULER POSITION  202
15
16   EX P44   EMAILS              232
17
18
19
20
21
22
23
24

1 (Pages 1 to 4)

Page 5

1　　　　　　PROCEEDINGS
2　　　　THE VIDEOGRAPHER:  We're on the record at
3　1:22 p.m. on September 20, 2019.  This is the start
4　of File Number 1 in the videotaped deposition of
5　Steve Craig in the matter of Jesse Barnes v Shell
6　Exploration and Production Company Appalachia, et al.
7　filed in the US District Court, Middle District of
8　PA.
9　　　　This deposition is being held at 100 Pine
10　Street, Williamsport, PA 17701.  My name is Bryce
11　Connor from Summit Court Reporting, Incorporated, and
12　I am a videotape operator.  The court reporter is
13　Patricia Chapin, also from Summit Court Reporting.
14　　　　Counsel will be noted on the stenographic
15　record.  Will the court reporter now please swear in
16　the witness.
17　　　　　　STEVE CRAIG,
18　called as a witness, after being first duly sworn,
19　was examined and testified as follows:
20　　　　EXAMINATION BY MS. GURMANKIN:
21　　　Q　Mr. Craig, good afternoon.
22　　　A　Good afternoon.
23　　　Q　We just met, but for the record, my name is
24　Caren Gurmankin, and I have the privilege of

Page 6

1　representing Jesse Barnes in a lawsuit that she has
2　filed against Shell for sex discrimination and
3　retaliation.
4　　　　Have you ever had your deposition taken
5　before today?
6　　　A　No.
7　　　Q　I'm going to ask you a series of questions
8　today.  If I ask you a question and you don't
9　understand my question, I need you to tell me, and
10　I'll rephrase it.  Do you understand that?
11　　　A　Yes.
12　　　Q　If I ask you a question and you answer my
13　question, I'm going to assume that you understood my
14　question and you've answered it accordingly.  Do you
15　understand that?
16　　　A　Yes.
17　　　Q　As you've been doing, you need to keep giving
18　verbal responses to all of my questions so we can
19　make sure that your answers are captured in the
20　written transcript that will result from the
21　deposition.  Do you understand that?
22　　　A　Yes.
23　　　Q　Even though this deposition is taking place
24　in a conference room at a hotel, it has the same

Page 7

1　force and effect as if you were testifying in federal
2　court before a federal judge and jury.
3　　　　You've just taken an oath to tell the truth.
4　If you do not tell the truth, and that includes
5　saying you don't know when you do know or you don't
6　remember when you do remember, that's considered
7　perjury and that's a felony.  Do you understand that?
8　　　A　Yes.
9　　　Q　If you need a break at any time, just let me
10　know.  We can take a break whenever you like.  If
11　there's a question pending, you just need to answer
12　the question before we take a break.  Do you
13　understand that?
14　　　A　Yes.
15　　　Q　Is there any reason why you would not be able
16　to testify truthfully today?
17　　　A　No.
18　　　Q　What's your date of birth?
19　　　A　███████████
20　　　Q　And you are currently represented by Shell's
21　counsel today, correct?
22　　　A　Correct.
23　　　Q　That's Ms. Kirkpatrick sitting on the other
24　side of the table?

Page 8

1　　　A　Correct.
2　　　Q　You're currently employed at Shell?
3　　　A　Yes.
4　　　Q　When did you start working at Shell?
5　　　A　May 13, 1992.
6　　　Q　What position were you hired into, do you
7　remember?
8　　　A　I was hired into as an entry-level operator.
9　　　Q　Was that your first full-time position?
10　　　A　With Shell?
11　　　Q　Yeah.
12　　　A　Yes.
13　　　Q　Okay.  I mean was that your first full-time
14　position, period.
15　　　A　No.
16　　　Q　Where did you work prior to that in a
17　full-time capacity?
18　　　A　I worked for Penn Canadian Petroleum.
19　　　Q　For how long?
20　　　A　For eight months.
21　　　Q　Was that your first full-time position?
22　　　A　Yes.
23　　　Q　All right.  So you started as an entry-level
24　operator at Shell on May 13, 1992?

2  (Pages 5 to 8)

Page 9

1     A   Correct.
2     Q   And about how long did you hold that
3 position?
4     A   I held an operations position for 18 years,
5 but I did progress through different levels of
6 operations.
7     Q   Okay. So let's go through those. Your first
8 position was entry-level operator. What was your
9 next position?
10    A   So that was classified as an Operator Number
11 5. The next would be an Operator Number 4, 3, 2, 1,
12 lead. So there was multiple progression levels in
13 the hourly operations ranks.
14    Q   Got it. So did you go -- did you progress
15 through all of the levels of operator?
16    A   Correct.
17    Q   Okay. So you started out at as 5, you went
18 to 4, then 3, then 2, then 1?
19    A   Correct.
20    Q   Over the course of how many years are we
21 talking?
22    A   12 years.
23    Q   And those were all promotions?
24    A   Yes.

Page 10

1     Q   All right. So we're at about 2004 now,
2 right?
3     A   Correct.
4     Q   All right. And then what happened?
5     A   I remained as a lead operator until
6 approximately 2010 at which time I moved to a
7 supervisory position with Shell. I became the chief
8 steam engineer and operations supervisor.
9     Q   That was a promotion?
10    A   Correct.
11    Q   So as of your promotion in 2010, where were
12 you working?
13    A   Caroline Gas Plant, Alberta, Canada.
14    Q   And who were you reporting to when you were
15 promoted into the chief steam engineer and operation
16 supervisor role?
17    A   Darren Van Curen.
18    Q   How long did you hold that role?
19    A   For three years.
20    Q   Through around 2013?
21    A   Yep.
22    Q   Working in Alberta, Canada the whole time?
23    A   Correct.
24    Q   What happens in 2013?

Page 11

1     A   2013 I took a role in Calgary as -- the title
2 of the role was senior advisor asset operations.
3     Q   That was a promotion?
4     A   No, it was not.
5     Q   Lateral?
6     A   It was a lateral move.
7     Q   Why did you take that role?
8     A   Why?
9     Q   Uh-uh.
10    A   It was an opportunity to do something new in
11 my career.
12    Q   Who'd you report to in that role?
13    A   I initially reported to Dave Todd,
14 David Todd.
15    Q   At some point that changed?
16    A   Yes.
17    Q   When?
18    A   David retired. After only maybe five months
19 in the role, he retired.
20    Q   And then who'd you start reporting to?
21    A   Then I reported to Murray Elliot.
22    Q   How long did you hold that senior advisor
23 role?
24    A   For approximately 18 months.

Page 12

1     Q   So sometime in 2014?
2     A   So it was -- yeah. May of 2015 is when I
3 exited.
4     Q   And what did you do when you exited?
5     A   I came to Pennsylvania to the Appalachia
6 asset.
7     Q   Where?
8     A   To Wellsboro, Pennsylvania.
9     Q   To do what?
10    A   I became the superintendant of operations,
11 production superintendant.
12    Q   That was a promotion?
13    A   Correct.
14    Q   Who did you report to when you started in
15 that role in May of 2015?
16    A   Greg Larson.
17    Q   His position at the time?
18    A   Operations manager.
19    Q   How long did you hold that role?
20    A   Two years and seven months.
21    Q   So are we at the very end of 2017?
22    A   Yeah. January of 2018.
23    Q   Okay. Did you report to Larson the whole
24 time that you were production superintendant?

3 (Pages 9 to 12)

Page 13

1   A  Yes.
2   Q  And what happens in January of 2018?
3   A  I became the operations manager.
4   Q  It was the role that Larson had held?
5   A  Correct.
6   Q  Was that the position that he had held?
7   A  Correct.
8   Q  What happened to him?
9   A  He retired.
10  Q  Was that a promotion for you?
11  A  Yes, it was.
12  Q  Was that a position that you had applied for?
13  A  Yes, it was.
14  Q  So it was posted?
15  A  Yes.
16  Q  And you submitted an application?
17  A  Correct.
18  Q  Did you interview?
19  A  Yes.
20  Q  With whom?
21  A  Not with Greg; with Mike DeWitt who was the
22  general manager or exiting general manager.
23  Q  Anyone else?
24  A  There was an HR representative.

Page 14

1   Q  Do you know who?
2   A  No, I don't.  I don't recall.
3   Q  Do you know if anyone else was interviewed
4   for the role?
5   A  Not to my knowledge.  I don't know.
6   Q  Had Greg talked to you about applying for or
7   getting the role before you interviewed?
8   A  Yes.
9   Q  What did he talk to you about?
10  A  Just as part of succession planning what my
11  next potential role might be.  And I had expressed
12  interest in the operations manager job.
13  Q  When did you find out that he was going to
14  retire?
15  A  Maybe in the fall of 2017, late 2017.
16  Q  Is that around the time that he had the
17  succession planning discussion with you?
18  A  No.  Succession planning discussions happen
19  as part of an annual review process.  So we would
20  have the discussion every year.
21  Q  All right.  So at some point you were told
22  that you got the position?
23  A  I was the successful candidate, yes.
24  Q  And who'd you report to when you started?

Page 15

1   A  Tanya Williams.
2   Q  Her role at the time?
3   A  At the time she was the general manager for
4   Appalachia.  The title has since changed to vice
5   president.
6   Q  When did that change?
7   A  The title?
8   Q  Yeah.
9   A  I believe earlier this year, so maybe March
10  timeframe.
11  Q  So then Tanya became the VP?
12  A  Yeah.  Her role didn't change; just the title
13  of the role changed.
14  Q  Are you still operations manager?
15  A  Yes.
16  Q  Do you still report to Tanya Williams?
17  A  Yes.
18  Q  And you've reported to her consistently since
19  January 2018?
20  A  Yes.
21  Q  Was Tanya the first female that you reported
22  to during your employment at Shell?
23  A  Yes.
24  Q  Since you've been operations manager starting

Page 16

1   in January of 2018, have you had direct reports,
2   people who report directly to you?
3   A  Yes.
4   Q  Who?
5   A  Since 2018?
6   Q  Uh-huh.
7   A  I've had the superintendant report to me, the
8   instrumentation electrical team lead report to me,
9   the surveillance team lead, an administration
10  professional.  Just thinking if there's anyone else.
11  I had a cost leadership focal report to me.  And I
12  think that's it.
13  Q  So those are all --
14  A  Oh, actually one more.  Sorry.  The asset
15  integrity team lead.
16  Q  What was the first word?
17  A  Asset integrity.
18  Q  Team lead?
19  A  Team lead.
20  Q  So these are all the positions that have
21  reported to you since you became operations manager
22  in January 2018?
23  A  Correct.
24  Q  Who has held the superintendant role?

Page 17

1    A   Hondo Blakley.
2    Q   Has that been the case since January 2018?
3    A   Yes.
4    Q   Was he already in that role when you became
5  operations manager?
6    A   Yes.
7    Q   So you inherited him?
8    A   I was part of the hiring committee, yes.
9    Q   Well, he was already superintendant when you
10  got the operations manager role, correct?
11   A   Yes.  So he succeeded me in my position.  I
12  was in that position before.
13   Q   Okay.  So Greg Larson vacated his position,
14  you got his role, you vacated yours, Blakley got your
15  role?
16   A   Correct.
17   Q   Okay.  And you were involved in Blakley's
18  selection?
19   A   Yes.
20   Q   Was he interviewed?
21   A   Yes.
22   Q   That position was posted?
23   A   Yes.
24   Q   He applied for it?

Page 18

1    A   Yes.
2    Q   Had you spoken with him about getting that
3  position before the selection process?
4    A   As part of succession planning in the annual
5  individual planning, yes.
6    Q   Did you speak with anyone else other than
7  Blakley about getting that role?
8    A   Not that I recall.
9    Q   Was anyone else interviewed other than
10  Blakley?
11   A   Not that I recall.
12   Q   He was the only applicant?
13   A   I don't recall for sure how many applicants.
14   Q   Are you sure whether he actually applied?
15   A   He had to apply in order to receive the role.
16       So there's an online application process, and
17  that's how the roles are.  You create an online
18  posting, and he has to apply for it.
19   Q   Who interviewed him, do you know?
20   A   So I interviewed, and Greg Larson, I believe,
21  interviewed.
22   Q   Anyone else?
23   A   We would have had an HR representative.  I
24  believe it was Michelle Priest.

Page 19

1    Q   Did you all do the interview together or
2  separately?
3    A   No.  Interviews are done together.
4    Q   Who has held the implementation electrical
5  team lead role?
6    A   Kyle Vessel.
7    Q   Since January of 2018?
8    A   He's been in that role -- I don't recall
9  exactly when Kyle took that position.
10   Q   Was he the first person who held that role
11  under you as operations manager?
12   A   Yes.
13   Q   And he still holds that role?
14   A   Correct.
15   Q   The surveillance team lead.  Who's that?
16   A   Dan Blackwell.
17   Q   Has he been in that role since you became
18  operations manager?
19   A   Yes.
20   Q   The admin professional.  Who's that?
21   A   Jennifer Card.
22   Q   Is that basically an administrative assistant
23  role?
24   A   Yes.

Page 20

1    Q   Has she held that role since you became
2  operations manager?
3    A   Yes.
4    Q   Did she hold that role under Larson?
5    A   The timing was, I think, just after I became
6  operations manager that she took that role.
7    Q   Do you know who was the admin assistant under
8  Larson?
9    A   Penny Robins.
10   Q   What happened so that Penny Robins was no
11  longer the admin professional and Jennifer Card
12  became the admin professional under you?
13   A   Penny decided to take a package, a severance
14  package, and exit.
15   Q   Do you know who offered that to her?
16   A   It was done through human resources.
17   Q   Whose decision was it to offer her a
18  severance package?
19   A   Human resources.
20   Q   You didn't have a role in that decision?
21   A   No.
22   Q   So at some point HR tells you that the
23  decision has been made to offer her a severance
24  package?

5 (Pages 17 to 20)

Page 21

1    A   Yes.  That a severance package was available
2   if she was interested.
3    Q   Who in HR told you that?
4    A   Would be Michelle Priest was our HR
5   representative.
6    Q   Was this before or after you became
7   operations manager?
8    A   I believe it was after.
9    Q   So was there a period of time where Penny
10   Robins was acting as your admin assistant?
11    A   Yes.
12    Q   So were you surprised when HR comes to you
13   and says we're going to offer her a severance
14   package?
15    A   There was a reduction in the -- on the
16   drilling side of the organization where Jennifer Card
17   was working, and so there was not a position for
18   Jennifer.  And there was an opportunity for a
19   severance package.  And Penny had asked that if she
20   could be -- if she was able to have a severance
21   package and Jennifer could take over her position,
22   that she would be interested.
23    Q   Did you learn all this from HR when they
24   called -- when Michelle Priest calls and tells you

Page 22

1   that they've decided to offer Penny a severance
2   package?
3    A   So I would have communicated that to HR that
4   Penny was interested in a potential severance package
5   if one was to come available.
6    Q   Okay.  So at some point does Penny come to
7   you and say that she's interested in taking a
8   severance package?
9    A   Correct.
10    Q   Okay.  And did you know what prompted that?
11    A   The reduction on the drilling side prompted
12   that.  So she was interested in staying -- or helping
13   Jennifer retain employment.  Because I think they're
14   sisters-in-law with each other.
15    Q   Had you had any conversations with Penny
16   about a reduction or her losing her position or that
17   that was even a possibility before she comes to you
18   and proposes a severance package?
19    A   No.  So I made it very clear to Penny that I
20   supported her remaining in her position and that her
21   position was not at risk at all and that she could
22   remain in her position regardless of what was
23   happening on the drilling side.
24    Q   You tell her this in response to her coming

Page 23

1   to you?
2    A   Yes.  I made it very clear that she -- and I
3   was an advocate for Penny, that she was meeting
4   expectations and that I was happy to have her stay in
5   her position.
6    Q   So you didn't have a conversation with her
7   about reductions or the possibility of anyone losing
8   their job before she comes to you and talked to you
9   about a severance package?
10    A   It was aware that there was reductions
11   happening in the office on the drilling project side
12   of the organization, so she was aware of that.  And
13   so she would have been aware that Jennifer's position
14   was potentially a reduction.
15    Q   My question was:  Before she comes to you and
16   proposes a severance package, did you have any
17   conversations with her about a reduction or the
18   possibility of anyone losing their job.
19    A   I don't recall, no.
20    Q   Okay.  Did you ever tell her that both -- the
21   company could not retain both her and Jennifer, that
22   if one of them stayed, the other had to go?
23    A   No, I don't recall that.
24    Q   So is it possible you told her that?

Page 24

1    A   Could you just repeat the question?
2    Q   Sure.  Is it possible you told her something
3   to the effect of that the company couldn't retain
4   both her and Jennifer Card, so if one of them stayed,
5   the other one would have to go?
6    A   There was going to be a reduction of the
7   administrative professional on the drilling side.
8   That would have been communicated to Penny.
9    Q   Does that mean that there were not positions
10   for both Penny and Jennifer Card?
11    A   No.  That means that the position that
12   Jennifer held was not going to be sustained, and so
13   that Jennifer's position was at risk, but not
14   Penny's.
15    Q   Did you share that with Penny at some point?
16    A   I don't recall sharing that with Penny.
17    Q   So did you -- after Penny comes to you and
18   proposes a severance package, did you communicate
19   that to HR?
20    A   Yes.  There was going to be severance
21   packages available for those that were displaced.
22   And so that was -- so there was the discussion of
23   could -- you know, would that -- could that severance
24   package be moved from the drilling side to an

Page 25

1 operations position, still the same severance, one
2 severance. And so it was just who would get that.
3     Q   And at some point, Michelle Priest or someone
4 else in HR gets back to you and says yes, we can do
5 that?
6     A   Correct. If Penny was interested, that would
7 be something they could -- they would have to vet it
8 with I think the -- I don't know if it was the VP of
9 HR at the time in order to make a change like that.
10 They would have to check. But if it was approved,
11 that that would be acceptable.
12     Q   And at some point you got back to Penny and
13 said basically yes, we can do this?
14     A   Yes. If you're interested, it's your choice.
15 We would offer you a severance package.
16     Q   And did you tell her that if she didn't take
17 the severance package, then it would be offered to
18 Jennifer?
19     A   No, I don't think I told her that.
20     Q   Did you ever tell Penny that you wanted her
21 to stay in her position or words to that effect?
22     A   I told Penny that I supported her in her
23 position and that I was happy to have her stay as the
24 administrative professional.

Page 26

1     Q   So as a result of her taking the severance
2 package, Jennifer Card moved over to your admin
3 assistant position?
4     A   Correct.
5     Q   And you were okay with that?
6     A   I was fine with that. I had no issues with
7 either.
8     Q   Is she still your admin assistant?
9     A   Yes.
10     Q   All right. The -- I'm sorry. The cost
11 leadership focal.
12     A   Uh-huh.
13     Q   Who is in that position?
14     A   His name is Jordan Dondey.
15     Q   And has he been in that position since you
16 became operations manager?
17     A   He was. He resigned about, I'm going to say,
18 approximately one -- or maybe 14 months ago.
19     Q   And then did he come back?
20     A   No. He moved to Colorado due to family --
21 for family reasons.
22     Q   Okay. So after you started, he was only in
23 the role for like six months?
24     A   Yeah. He was in the role as -- when I was a

Page 27

1 superintendant. And then he carried that on for a
2 short time while I was operations manager.
3     Q   After he left, did someone else move into
4 that role?
5     A   No. We eliminated the role.
6     Q   Okay. So that position no longer exists?
7     A   Correct.
8     Q   The asset integrity team lead. Who is in
9 that position?
10     A   Dan Blackwell.
11     Q   Is he also the surveillance team lead?
12     A   No.
13     Q   Sorry. Who's the surveillance team lead?
14     A   Ernesto Fonseca.
15     Q   Sorry. I thought you said Dan Blackwell was.
16     A   No.
17     Q   How long has Ernesto been surveillance team
18 lead?
19     A   For approximately 18 months.
20     Q   So shortly after you became ops manager?
21     A   Correct.
22     Q   Who was the first one in that lead under you?
23     A   Trevor Winter.
24     Q   Was he in that position when you took over?

Page 28

1     A   Correct.
2     Q   And why did he move out of that position?
3     A   He took a new position as part of his normal
4 cadence of rotation.
5     Q   What does that mean?
6     A   So in staff -- in staff, there's a -- when
7 you take a role, it's typically a four-year term, and
8 you have an availability date. You can -- so after
9 your availability date comes up, then you need to
10 look for a new opportunity. And it's more prevalent
11 in the higher job grades, focussed more on
12 professionals where you're working through different
13 jobs through your career.
14     Q   All right. And Dan Blackwell is asset
15 integrity team lead?
16     A   Correct.
17     Q   How long?
18     A   Dan started about the same time as Ernesto,
19 so in about March-ish of 2018.
20     Q   Was someone in that role before Dan?
21     A   Yes. Shane Sollinger.
22     Q   Male, correct?
23     A   Correct.
24     Q   What happened to him?

7 (Pages 25 to 28)

Page 29

1　A　Shane went to Penn Can plant near Pittsburgh.
2　Q　Why?
3　A　As part of a cadence of change, he applied
4　and took that job.
5　Q　Any other direct reports you've had since you
6　became operations manager in January of 2018?
7　A　No.
8　Q　When you were -- during the time that you
9　have been operations manager, have you worked out of
10　Wellsboro?
11　A　Yes.
12　Q　And during the time that you were production
13　superintendant, operations supervisor, did you also
14　work out of Wellsboro?
15　A　I wasn't the operations supervisor in
16　Wellsboro.  I was only the superintendant in
17　Wellsboro.
18　Q　Okay.
19　A　I was the operations supervisor at the
20　Caroline complex in Alberta, Canada.
21　Q　Okay.  Since May 2015, have you worked out of
22　Wellsboro?
23　A　Yes.
24　Q　During your employment at Shell, have you had

Page 30

1　a female direct report who is not an admin assistant?
2　A　Since I've worked here in Appalachia?
3　Q　No.  During your employment at Shell.
4　A　I've had other female reports, yes.
5　Q　When's the last time?
6　A　In 2013.
7　Q　Who was that?
8　A　Wendy Murphy.
9　Q　Her role?
10　A　Lead operator.
11　Q　Any others?
12　A　Dawn Bleakley.
13　Q　Was that also in 2013?
14　A　Yes.
15　Q　Her role?
16　A　Dawn was, I think, a number one operator.
17　Q　Is she related to Hondo?
18　A　No.  Totally different country, different
19　locations.
20　Q　Any other female?
21　A　And sorry.  It's Bleakley, not Blakely.
22　Bleakley.
23　Q　Any other female direct reports who were not
24　admin assistants?

Page 31

1　A　Right.  Not that I recall.  I think that's
2　all.
3　Q　Okay.  Since May of 2015 when you were
4　production superintendant through the present, are
5　you aware of any complaints that any female employees
6　or former employees have made about sex
7　discrimination or sexual harassment?
8　A　No.
9　Q　Other than Jesse Barnes, right?
10　A　So I'm not aware of sexual complaints
11　regarding Jesse other than what was -- like during
12　the course of the work, I was not made aware of any
13　sexual complaints of Jesse.
14　Q　At some point, you were -- you became aware
15　that Jesse was making complaints?
16　A　Yeah.  Yes.
17　Q　And when was that?
18　A　So the first knowledge that I had was on
19　November 21st of 2016.
20　Q　How did you become aware on that date?
21　A　I was asked to enter a meeting that was
22　happening between Jesse and Mr. Turney, her
23　supervisor.
24　Q　Who asked you?

Page 32

1　A　Mr. Turney asked if I would come in and
2　attend a meeting that he was having.
3　Q　And he reported to you at that time?
4　A　Yes.
5　Q　When did he start reporting to you?
6　A　When I became the production superintendant
7　in May of 2015.
8　Q　How long did he report to you?
9　A　From that period until I became operations
10　manager.
11　Q　In January 2018?
12　A　Correct.
13　Q　How does Turney come to ask you to join him
14　in his meeting with Jesse on November 21, 2016?
15　A　He just came and asked if I would join into
16　the conversation.
17　Q　He came to get you in person?
18　A　Yes.
19　Q　Okay.  Did he say why he wanted you there?
20　A　That he and Jesse were having a discussion
21　and he wanted me present to listen.
22　Q　Did he say why?
23　A　He didn't say why that I recall.
24　Q　Did you ask him?

8　(Pages 29 to 32)

Page 33

1        A  No.  I don't recall.
2        Q  Was that the first time that Turney, during
3    the time that he reported directly to you, asked you
4    to sit in on a meeting between him and one of his
5    employees?
6        A  I don't recall.  Yeah, I don't.  I don't
7    recall it happening.
8        Q  You don't recall it happening before then?
9        A  No.
10        Q  Do you recall any other time during the
11    period when Turney reported directly to you when he
12    asked you to sit in on a meeting between him and one
13    of his employees?
14        A  Can you repeat it again.
15        Q  Sure.  During the time that Turney reported
16    directly to you, do you recall any other occasion in
17    which he asked you to come in to be in with a meeting
18    between him and one of his employees?
19        A  So for annual IPF discussion, I sat in with
20    my supervisors to help as a coaching opportunity.  So
21    I would sit and listen.  And then after the event was
22    done, I would then provide feedback on how well did
23    he engage with his end-of-year review, that type of
24    thing.

Page 34

1        Q  That was part of the performance-review
2    process?
3        A  Correct.
4        Q  Other than that occasion on November 21,
5    2016, in which Turney asked you to join him in the
6    meeting he was having with Jesse, do you recall any
7    other times in which he came to you and asked you to
8    sit in on a meeting he was having with one of his
9    employees?
10        A  I don't recall any other times.
11        Q  Okay.  So do you go right with him to meet
12    with him and Jesse?
13        A  Yes.
14        Q  Where were they meeting?
15        A  They were meeting in a conference room, a
16    meeting room, 120A.
17        Q  And prior to going in, you don't know what
18    the meeting is about?
19        A  No.  Other than that -- well, that he was --
20    it was a performance discussion.
21        Q  Oh.  He told you that when he came to get
22    you?
23        A  Yeah.  That he was having a performance
24    discussion with Jesse and wanted me to be present.

Page 35

1        Q  Did he tell you anything else?
2        A  Not that I recall.
3        Q  And you didn't ask him?
4        A  No.  Not that I recall.
5        Q  So what happens when you go into the
6    conference room?
7        A  It was a short time after, Will left and
8    allowed me to have time with Jesse one-on-one.
9        Q  All right.  Before we talk about that, let's
10    talk about when Turney is still there.
11             How long were the three of you in the meeting
12    together?
13        A  I don't recall for sure.  Maybe 15 minutes,
14    10 minutes.
15        Q  And what's discussed during those 10 or 15
16    minutes?
17        A  That Will has been providing Jesse feedback,
18    that Jesse is also providing feedback regarding
19    Will's leadership.
20        Q  So what did Turney say during those 10 or
21    15 minutes?
22        A  I don't recall exactly.
23        Q  Do you recall generally?
24        A  No.  Just that he was -- just that it was a

Page 36

1    performance discussion.
2        Q  Was he critical of Jesse during those 10 or
3    15 minutes?
4        A  I know that they're -- well, I don't recall
5    exactly what their discussion was.  I more recall
6    Jesse providing feedback.
7        Q  During those 10 or 15 minutes?
8        A  Yeah.
9        Q  What did she say?
10        A  Just that she was frustrated with Will.  But
11    I don't recall specifics beyond that.
12        Q  So other than Turney talking about
13    performance issues and Jesse saying that she was
14    frustrated with Will, you don't remember anything
15    else that was said during those 10 or 15 minutes when
16    all three of you were in the room together?
17        A  Correct.
18        Q  And then Turney leaves the room?
19        A  Correct.
20        Q  Why?
21        A  I think to allow Jesse to be able to have a
22    discussion with me one-on-one to better understand.
23    I can't recall exactly if I suggested that Will leave
24    so that I could listen and hear what Jesse had to say

Page 37

1  without him in the room.
2      Q  And why would you have done that?  Like what
3  about the 10 or 15 minutes would have led you to
4  suggest that?
5      A  I wanted to make sure that Jesse had an
6  opportunity to speak freely without Will present,
7  given that she was frustrated with his leadership, if
8  you will.
9      Q  Is that what she said, she was frustrated
10  with his leadership?
11      A  I don't remember that exactly, not in those
12  words.  But in general, that was -- that was what was
13  communicated.
14      Q  But you don't remember what she said about
15  it?
16      A  No, I don't.
17      Q  Is it possible that in those 10 to 15 minutes
18  in which all of you were together, Jesse referenced
19  that Turney was engaging in inappropriate conduct or
20  sexist conduct or words to that effect?
21      A  I don't recall that while all three of us
22  were in the room, no.
23      Q  Is it possible?  Or you have a specific
24  recollection that she didn't say anything like that?

Page 38

1      A  I don't recall either way.
2      Q  Did she say anything during those 10 to 15
3  minutes indicating that she was uncomfortable with
4  Turney?
5      A  Not to my recollection.
6      Q  Did she say anything during those 10 to 15
7  minutes that indicated that Turney treated her
8  differently than he did his male employees?
9      A  No.  I don't recall that.
10      Q  All right.  So at some point after those 10
11  to 15 minutes, Turney exits.  And then how long were
12  you in there alone with Jesse?
13      A  I'm going to say maybe 20 minutes.
14      Q  All right.  And tell me what's discussed
15  during those 20 minutes.
16      A  So Jesse shares that she is frustrated with
17  Turney's leadership as a supervisor and that he has
18  touched her on, I think, her leg, that she brought up
19  that she didn't get the scheduler role and that she
20  found it difficult to work for Mr. Turney.
21      Q  What else did she say?
22      A  She mentioned that Ken Foreman had touched
23  her hair.  And yeah -- just in general she wasn't
24  happy with -- oh, that she wasn't happy with -- just

Page 39

1  with her -- with working, you know, with that group,
2  with that team, the maintenance team.
3      And she did say that she felt harassed.  And
4  she said that she had launched a complaint on the
5  Shell 800 number.
6      Q  On the ethics hotline?
7      A  Yeah.
8      Q  And from what she told you about Turney
9  touching her on her leg and Ken Foreman touching her
10  hair, that she was making complaints about being
11  treated differently based on the fact that she's
12  female?
13      MS. KIRKPATRICK:  Objection.
14      THE WITNESS:  No.  There was no...
15      MS. KIRKPATRICK:  You can answer.
16      THE WITNESS:  There was no reference to being
17  treated differently because she was a female.
18      Q  BY MS. GURMANKIN:  Did you take from that
19  discussion that she felt that she was being harassed
20  based on her sex?
21      A  No, I did not.
22      Q  She told you her male supervisor touched her
23  on her leg and you didn't take from that discussion
24  that she was making a complaint of sexual harassment;

Page 40

1  is that correct?
2      A  That's correct.
3      Q  And she also told you in that discussion that
4  a male coworker was touching her hair, and you did
5  not take from that discussion that she was
6  complaining about harassment based on her sex; is
7  that correct?
8      A  That is correct.
9      Q  Did you say anything to her during that
10  20-minute discussion when it was just the two of you?
11      A  No.  Well, that we take allegations very
12  seriously and that I would follow up with HR right
13  away on that.
14      Q  Anything else?
15      A  I don't remember.  Yeah, I don't remember
16  exact details.  But the goal of having a safe
17  workplace, but I can't remember specifics of exactly
18  what I said.
19      Q  Did you believe that anything she was telling
20  you violated company policy?
21      A  So the code of ethics or code of conduct --
22  sorry -- that parts of what would be termed
23  harassment could potentially, depending on the
24  circumstances and the context, may violate policy.

10  (Pages 37 to 40)

Page 41

1    Q   Is that -- I'm sorry.
2    A   That's okay.
3    Q   Is that why you told her that you would
4  follow up with HR?
5    A   Correct.
6    Q   Because you were concerned that her
7  allegations could violate company policy?
8    A   Depending on the circumstance and the
9  context, that they potentially could.
10   Q   Including the company's policy on harassment?
11   A   Correct.
12   Q   Were you concerned that depending on the
13 circumstances and the context that what she was
14 telling you could violate the company's
15 antidiscrimination or antiharassment policies based
16 on sex?
17   A   No.  That didn't -- I was not.  I was not.  I
18 didn't see any evidence or hear anything that made me
19 concerned based on the information that she provided
20 me that it was sexual undertones to the discussions.
21   Q   Do you think it's appropriate for a male
22 supervisor to touch a female subordinate on her leg?
23   A   I think it depends on the circumstance and
24 the context.

Page 42

1    Q   Are there circumstances, based on your -- in
2  your capacity as a manager at Shell, in which it
3  would be appropriate for a male supervisor to touch a
4  female subordinate on her leg?
5        MS. KIRKPATRICK:  Objection.  Asked and
6  answered.  He just told you.
7        MS. GURMANKIN:  No.
8    Q   Are there any circumstances that you can
9  think of as you sit here today in which it would be
10 appropriate and not a violation of company policy for
11 a male supervisor to touch a female subordinate on
12 her leg?
13       MS. KIRKPATRICK:  Objection.  You can answer.
14       THE WITNESS:  I think it depends on the
15 circumstance and the context whether that would be
16 appropriate or not.
17   Q   BY MS. GURMANKIN:  And I'm just asking.  As
18 you sit here today, can you think of any circumstance
19 in which a male supervisor touching a female
20 subordinate on her leg would not violate company
21 policy?
22       MS. KIRKPATRICK:  Objection.  Asked and
23 answered.  He already told you it depends on the
24 circumstances and the context.

Page 43

1    Q   BY MS. GURMANKIN:  Right.  As you sit here
2  today, can you think of a single circumstance in
3  which a male supervisor touching a female subordinate
4  on her leg would not violate company policy?
5        MS. KIRKPATRICK:  Same objection.
6        You can tell her again.
7        THE WITNESS:  So I think it depends on
8  circumstances and the context of the touch that --
9  yeah.
10   Q   BY MS. GURMANKIN:  Would there be a touch
11 that a male supervisor on a female subordinate's leg
12 that, as you sit here today, would not violate
13 company policy?
14       MS. KIRKPATRICK:  Objection.  This is the
15 fifth time I think.
16       MS. GURMANKIN:  I haven't gotten an answer.
17   Q   As you sit here today, can you think of a
18 single situation, a single circumstance, in which a
19 male supervisor touching a female subordinate on her
20 leg would not violate company policy?
21       MS. KIRKPATRICK:  Objection.  Asked and
22 answered.
23       You can answer it again.
24   Q   BY MS. GURMANKIN:  Answer the question,

Page 44

1  please.
2    A   I think it depends on the circumstance and
3  the context.
4    Q   I understand.  Can you think of a single
5  circumstance or context in which a male supervisor
6  touching a female subordinate on her leg would not
7  violate company policy?
8        MS. KIRKPATRICK:  Objection.  I'm instructing
9  him not to answer.
10       MS. GURMANKIN:  He didn't answer the
11 question.
12       MS. KIRKPATRICK:  It's the same question five
13 times.  You may not like the answer.
14       MS. GURMANKIN:  He hasn't answered.
15   Q   Can you think of a circumstance --
16       MS. KIRKPATRICK:  I'm instructing him not to
17 answer.
18   Q   BY MS. GURMANKIN:  -- in which a male
19 supervisor touching a female subordinate on her leg
20 would not violate company policy?
21       MS. KIRKPATRICK:  I'm instructing him not to
22 answer.
23       MS. GURMANKIN:  Okay.  Well, then we're going
24 to call the judge.

11 (Pages 41 to 44)

Page 45

1    THE VIDEOGRAPHER:  We are now going off the
2  record.  The time on the camera is 2:08 p.m.
3    (Break taken from 2:08 to 2:18 p.m.)
4    (Judge called)
5    THE VIDEOGRAPHER:  We're now back on the
6  record at 2:18 p.m.
7    Q  BY MS. GURMANKIN:  What were you discussing
8  with your lawyer over the break?
9    MS. KIRKPATRICK:  Objection.  Instructing the
10  witness not to answer.
11    MS. GURMANKIN:  What's the basis?
12    MS. KIRKPATRICK:  Attorney-client privilege.
13    Q  BY MS. GURMANKIN:  And you're following your
14  attorney's instructions?
15    A  Yes.
16    Q  Did you discuss your deposition testimony
17  with your attorney on the break?
18    MS. KIRKPATRICK:  Objection.  Same objection.
19    Q  BY MS. GURMANKIN:  You're following your
20  attorney's instruction not to answer that question?
21    A  Yes.
22    Q  Have you ever touched a lower-level female
23  employee on the leg at Shell?
24    A  No.  Not to my recollection.

Page 46

1    Q  Do you believe it would be a violation of
2  policy for you to do so?
3    A  Depending on the circumstances.
4    Q  What would be the circumstances in which you
5  touching a lower-level female employee would not be a
6  violation of company policy?
7    A  If there was a -- let's say a hornet or
8  something on your leg that I thought was going to put
9  you in danger and I was going to swat it off would be
10  an example, I guess.
11    Q  Okay.  Other than trying to swat off a hornet
12  or something on a female subordinate's leg, are there
13  any other circumstances in which you touching a
14  lower-level female employee's leg at Shell would not
15  be a violation of company policy that you can think
16  of?
17    A  I think as long as it didn't have any
18  harassment or sexual connotation.  We're at a close
19  table in a tight meeting room and a leg brushes up or
20  touches another leg, that would be an example of
21  where I don't think that would be a violation of
22  policy.  It would be unintended, no sexual undertone,
23  no sexual context in the circumstance.
24    Q  As a management-level employee at Shell, how

Page 47

1  would you determine whether a male supervisor
2  touching a lower-level female employee on the leg had
3  harassment or sexual connotations?
4    A  I would have to understand the situation and
5  listen to the individual's -- and the circumstances.
6    Q  So how would you make that determination?
7    A  Based on the facts presented and based on the
8  situation and the facts presented.
9    Q  What would you do to get the facts that you
10  would need to determine whether or not there was
11  harassment or sexual connotations?
12    A  I guess I would seek to understand the
13  situation.  And if there was any doubt at all, I
14  would treat it with -- you know, treat it carefully
15  and get HR involved.  If there was any real
16  allegations, I would get HR involved immediately.
17    Q  If there were allegations including a male
18  supervisor touching a female subordinate on the leg?
19    A  Yes.
20    Q  And one of the ways in which you would
21  ascertain the facts to determine if there was sexual
22  connotations would be to talk to the person who's
23  making the complaint, right?
24    A  Potentially, yes.

Page 48

1    Q  Would there be any circumstances in which you
2  wouldn't want to talk to the person making the
3  complaint to determine if there were sexual
4  connotations?
5    A  If I felt that it was outside of, you know,
6  my role as a supervisor to dig into the details, I
7  wouldn't see -- I would more accept what they said
8  and let them know that I would get HR involved.  In
9  my role, it's not to be an investigator of sexual
10  allegation -- of sexual allegations.  So I would --
11  you know, I've been taught to call HR, talk to HR if
12  anything like that were to come up.
13    Q  In your management role at Shell, did you
14  understand that harassment was -- there was a policy
15  against harassment even if it wasn't based on a
16  characteristic like sex or race or age?
17    A  Yeah.  There's a harassment policy.
18    Q  And at the time that you were having this
19  conversation with Jesse on November 21, 2016, you had
20  had training at Shell about EEO policies and
21  antiharassment and antidiscrimination policies,
22  correct?
23    A  EEO?
24    Q  Equal employment opportunity?  Have you heard

12  (Pages 45 to 48)

Page 49

1  that term before?
2      A  Yes.
3      Q  You've had training in that?
4      A  I have had training, yes.
5      Q  As of November 21, 2016, what kind of
6  training have you had on those topics at Shell?
7      A  So we've had -- so I went through an
8  operation supervisory development program before
9  becoming a supervisor.
10      Q  What did that include?
11      A  So it was a nine-week program, three weeks
12  per year spread over three years of which one of the
13  sessions was -- included harassment, sexual
14  harassment, ethics and compliance, the Shell's golden
15  rules and our comply, intervene, and respect.
16      Q  When was the three-year period that you took
17  that training?
18      A  So that began in 2007.
19      Q  Ended in 2010?
20      A  Correct.
21      Q  Other than that program -- actually going
22  back to that, do you remember how long the portion
23  was about sexual harassment and related topics?
24      A  There was a -- the one-week session was all

Page 50

1  geared towards management requirements.  So ethics
2  and compliance.  There was a section on legal.  There
3  was a section on managers', you know, practices on
4  how to lead people to do performance evaluations, to
5  do interviewing, and things like that.
6      Q  So that was one three-week program?
7      A  That was one one-week program.
8      Q  Okay.  And part of that one week was on the
9  sexual harassment, EEO issues?
10      A  Yeah.  Harassment, yeah.
11      Q  Do you remember how long that portion was out
12  of the one week?
13      A  It was an -- it all kind of blended together,
14  but it was that one-day session.  There were certain
15  focus periods.  So you know, that one may have been
16  two hours and then we did interview for two hours.  I
17  don't remember exactly how long.
18      Q  That's all I'm asking.
19      A  I don't know.  Three hours.
20      Q  Other than that development program, did you
21  have any other training at Shell on EEO,
22  antiharassment, discrimination issues?
23      A  Yes.  So every year we do mandatory code of
24  conduct training that includes sexual or harassment.

Page 51

1      Q  Does that include sexual harassment?
2      A  Yeah.
3      Q  And discrimination?
4      A  Yes.
5      Q  And that's computer-based training?
6      A  That is computer-based training.
7      Q  Any other training on those topics?
8      A  Yeah.  In December of 2015, we did a session
9  onto the overall organization on general, call them,
10  working principles for our office.  It was led by the
11  operations manager at the time.
12      Q  Who was that?
13      A  Greg Larson.  So there was a new code of
14  conduct that was issued in November of 2015.  So we
15  did a session with the team after that of just
16  general, you know, best practices that we want in our
17  office.
18      Q  Did that include about sexual harassment?
19      A  Yes.
20      Q  And discrimination?
21      A  Yep.
22      Q  Any other training that you've had at Shell
23  on those topics?
24      A  We did a training session on biases, so being

Page 52

1  able to recognize biases in ourselves and how we may
2  be biassed towards certain demographics of people.
3      Q  Like unconscious bias?
4      A  Yes, exactly.  Unconscious bias training.
5      Q  When was that?
6      A  That training would have been -- it was while
7  I was superintendant, so I'm going to say probably in
8  maybe the summer of '16.  I don't remember exactly.
9  I just know I was superintendant at the time.
10      Q  Before your conversation with Jesse on
11  November 21, 2016?
12      A  Yes.
13      Q  Any other training on those topics?
14      A  When I started with Shell, I know that we
15  took training, because I remember it as a new joiner
16  learning about Shell's requirements for code of
17  conduct, ethics and compliance, the three golden
18  rules.  So that was part of my on-boarding.
19      Q  Any other training on those topics?
20      A  We did a session with Michelle Priest, I
21  think, in December of 2016 as well as on code of
22  conduct and harassment, things like that.
23      Q  That would have been after your conversation
24  with Jesse?

13  (Pages 49 to 52)

Page 53

1     A   Correct.
2     Q   Any other training before your conversation
3 with Jesse?
4     A   No.  Other than the annual training.
5     Q   The computer-based?
6     A   The computer-based.
7     Q   All right.  So anything else that you
8 discussed during the 20 minutes that you and Jesse
9 were alone on November 21, 2016?
10    A   No.  Just that I took her allegations very,
11 very seriously and that I would follow up right away
12 on it and get HR involved so that they could, you
13 know, work an investigation.
14    Q   That's what you told her?
15    A   Yeah.
16    Q   And did you document that conversation with
17 Jesse?
18    A   I did.
19    Q   Did you document the 10 to 15 minutes that
20 you were with Will and Jesse before you talked to
21 Jesse alone?
22    A   No, I didn't.
23    Q   How come?
24    A   I don't know.  I guess I viewed the

Page 54

1 discussion with Jesse and myself as the one that was
2 the most important one of her disclosing the
3 allegations.
4     Q   You've been handed what's been marked as
5 Exhibit 15.  If you can go to the third page, Bates
6 Stamp 347.
7     A   Uh-huh.
8     Q   This is an email from you on November 22,
9 2016, correct?
10    A   Correct.
11    Q   All right.  And is this your documentation of
12 those 20 minutes with Jesse the prior day?
13    A   Yes.  This is referencing that discussion.
14    Q   Well, is that what you meant when you said
15 you had documented it?
16    A   I had some handwritten notes.
17    Q   Okay.
18        (Exhibit P39 was marked.)
19    Q   BY MS. GURMANKIN:  You've been handed what's
20 been marked Exhibit P39, Bates Stamp Shell 1244.
21        Are these your handwritten notes?
22    A   Yes, they are.
23    Q   Is this your handwriting on the entire page?
24    A   Yes, it is.

Page 55

1     Q   It looks like on the right edge that it's
2 from a spiral notebook.
3     A   Uh-huh.
4     Q   Yes?
5     A   Yes.
6     Q   Is this a notebook that you would keep during
7 the course of your workday?
8     A   Yeah.
9     Q   Did you bring it in with you to the meeting?
10    A   Yes, I would have.  I always packed it with
11 me wherever I went.
12    Q   Okay.  So are these -- am I correct that the
13 notes regarding the meeting start under the header
14 Jesse one-on-one, November 21, 2016?
15    A   Yep.
16    Q   Okay.  So are you taking these at the time
17 that she's talking?
18    A   I don't remember specifically if I wrote them
19 while we were talking or if I wrote them down
20 immediately after.  I don't recall.
21    Q   But it would have been that day?
22    A   Yes.
23    Q   So these are a list of bullet points that she
24 told you in the meeting, right?

Page 56

1     A   Uh-huh.
2     Q   Yes?
3     A   Yes.
4     Q   All right.  So the first thing, that she
5 applied for scheduler?
6     A   Correct.
7     Q   Right?  And that as of the time of the
8 meeting, she told you that she did not get the
9 scheduler role, correct?  That's what you testified
10 earlier.
11    A   Okay.  Yeah.  The timing was -- I didn't
12 recall.  I don't know of the exact timing, but she
13 applied.  I don't recall whether -- when the decision
14 was made on the scheduler role.
15    Q   Well, is your testimony earlier correct, that
16 she had -- one of the things she complained to you
17 about on November 21st was that she did not get the
18 scheduler role?  Or did she not tell you that as of
19 that meeting?
20    A   So I don't know, when I see this, that she
21 applied for the role.  It doesn't state -- or I
22 didn't write down that she didn't get the role.  But
23 I don't exactly recall the sequence, whether this was
24 after.

14  (Pages 53 to 56)

Page 57

1      Q   When you say "this," you're talking about
2  P39, your handwritten notes?
3      A   Yeah, P39.
4      Q   Whether it was after what?
5      A   After the decision had been made on the
6  scheduler role.
7      Q   So is it possible that she didn't share with
8  you on November 21st that she had not gotten the
9  scheduler role?
10      A   It's possible.
11      Q   Okay.  Because your memory was better when
12  you were writing these notes than it is today about
13  the events that you're writing about?
14      MS. KIRKPATRICK:  Objection.
15      Q   BY MS. GURMANKIN:  You can answer.  Is that
16  fair?
17      A   Yeah.
18      Q   Okay.  All right.  And then the next one you
19  wrote "issues with how Will treats her," right?
20      A   Uh-huh.  Right.
21      Q   Okay.  Why didn't you write here that she
22  told you that he touched her on the leg?
23      A   I don't know that I recall her specifically
24  saying that he touched her on the leg.

Page 58

1      Q   That's what you testified to earlier, that
2  she told you that he had touched her on the leg.
3      A   That she told me?
4      Q   Uh-huh.
5      A   Okay.  Why I didn't write down specifically?
6      Q   Yep.
7      A   I don't know.  I documented that he touched
8  her.
9      Q   Right.  But --
10      A   Why I didn't write --
11      Q   Yeah.  Just let me finish my question so
12  we're clear.
13      A   Sorry.
14      Q   Do you have any explanation for why you did
15  not include in your handwritten notes marked as P39
16  that she told you on November 21st that Turney
17  touched her on her leg?
18      A   No, I don't.
19      Q   Okay.  And then you say "don't want to be
20  touched."  Is that what she relaid to you?
21      A   Yes.
22      Q   Okay.  Next one is Ken.  That's Ken Foreman?
23      A   Correct.
24      Q   Hands through hair.  That's what she relaid

Page 59

1  to you.  So it wasn't just that Ken touched her hair;
2  it was that he put his hands through her hair?
3      A   Correct.
4      Q   Okay.  And then it says -- is that witnessed
5  with Hondo?
6      A   By.
7      Q   By Hondo.  Okay.  She told you that Hondo saw
8  Ken put his hands through her hair?
9      A   Correct.
10      Q   And then next one, is that feels harassment?
11      A   Yes.
12      Q   And what did that refer to?
13      A   I think just in general her -- how Will was
14  treating her.
15      Q   Is that what she told you?  Or was that your
16  conclusion as a result of what she told you?
17      A   I guess it's in the context of the whole of
18  this discussion that she felt harassment.
19      Q   But is that what she relaid to you?  Or
20  that's what you believed that she was feeling as a
21  result of what she told you?
22      A   I don't know.
23      Q   You don't remember?
24      A   I don't remember.

Page 60

1      Q   Okay.  You wrote under that "has touched
2  other women."  She told you that Turney touched other
3  women?
4      A   Yes.
5      Q   Okay.  You remember her saying that now?
6      A   I don't recall specifically, but I see it
7  here.
8      Q   Okay.  Did you ask her what other women he
9  touched?
10      A   I did not.  Or I don't recall asking that
11  question.
12      Q   Is that a question you would have asked?
13      A   I wouldn't be in a position to be
14  investigating.  But given the serious nature of the
15  allegations that my job is to engage human resources
16  for to investigate, something like this.
17      Q   Yeah.  I'm not talking about conducting a
18  whole investigation.  I'm just asking is that a
19  question you would have asked, what other women are
20  you saying he's touched?
21      A   Possibly.
22      Q   Do you remember doing that?
23      A   I do not.
24      Q   Under that you wrote "not a joke."  What did

15 (Pages 57 to 60)

Page 61

1   that refer to?
2       A   That would have been a statement that Jesse
3   made that this isn't -- you know, not a joking
4   matter.
5       Q   Were you laughing at all when she was talking
6   to you?
7       A   Definitely not.  Absolutely not.
8       Q   You took it seriously?
9       A   Absolutely.
10      Q   You were concerned about the allegations she
11  was making?
12      A   Correct.
13      Q   And based on what you wrote in your
14  handwritten notes, including what she told you about
15  Turney having touched other women, did you understand
16  her to be making a complaint of harassment or
17  discrimination based on sex?
18      A   No, I didn't.
19      Q   Okay.  The next header under what we just
20  looked at on P39says November 22nd.  Is that a
21  meeting --
22      A   Yeah.  Meeting with Will and Jesse.
23      Q   All right.  So was there another meeting with
24  the three of you the day after?

Page 62

1       A   Yeah.
2       Q   And how did that come about?
3       A   My recollection is that I asked for them to
4   get together to share with Will specifically that he
5   needed to, you know, improve his leadership.  And so
6   it was really a coaching session for Will to
7   demonstrate that any behaviors like that wouldn't be
8   tolerated and that he needed to not -- you know, not
9   touch Jesse or do anything that would be considered
10  harassment.
11      Q   What time was the meeting on November 21st?
12      A   I think it's in the later afternoon.
13      Q   Okay.  Do you talk to anyone at the company
14  about that meeting on that day?
15      A   Greg Larson as my supervisor.  I would have
16  informed Greg.
17      Q   Did you inform Greg on that day?
18      A   That's my -- I believe so.
19      Q   I'm just trying to distinguish --
20      A   That's my -- protocol would have been for me
21  to immediately inform my supervisor.  I don't recall
22  specifically where Greg was, if he was in the office.
23      Q   Yeah.  I'm just trying to distinguish between
24  protocol and what you actually recall doing.  Do you

Page 63

1   have a recollection of talking to Greg on the 21st?
2       A   Yeah.  Well, either the 21st or 22nd.  But I
3   know I talked to Greg.
4       Q   Well, let's -- after the meeting that you had
5   with Jesse and Turney on the 21st, and before the
6   meeting on the 22nd, do you talk to Larson about the
7   issues that Jesse has raised with you?
8       A   Between the first and the second meetings?
9       Q   Yeah.  Uh-huh.
10      A   I think I'm confident that I did.
11      Q   Okay.  What do you recall about that?
12      A   It would have just been -- I would have
13  communicated what I learned from the discussion with
14  Jesse and that I would raise it with HR.
15      Q   Just to distinguish again, you said "would
16  have."  Do you have a specific recollection of having
17  a conversation with Larson about the issues that were
18  raised in the November 21st meeting, between that
19  meeting and the November 22nd meeting?
20      A   I don't have a specific -- I can't in my mind
21  specifically recall that discussion, I don't think.
22  No, I can't specifically recall.
23      Q   Okay.  That's fine.  All right.  So at some
24  point after the November 21st meeting, you decide on

Page 64

1   your own to get Will and Jesse together the following
2   day, on the 22nd?
3       A   Correct.
4           MS. KIRKPATRICK:  Objection.
5       Q   BY MS. GURMANKIN:  And why do you make that
6   decision to get them together on the 22nd?
7       A   I wanted to demonstrate to Jesse that I
8   supported her and that Will would not -- you know,
9   that he needed to change his behaviors immediately.
10  So it was a -- it was a way to acknowledge and
11  demonstrate to Jesse that I was taking the
12  allegations seriously and that Will had to change his
13  behavior.
14      Q   Okay.  And you believed that it was -- it
15  would be constructive to get them together in a
16  meeting despite the allegations that Jesse had talked
17  to you about in the November 21st meeting?
18      A   Correct.
19      Q   So how did you go about setting up that
20  meeting?
21      A   It would have been -- it was an ad hoc
22  meeting.
23      Q   Meaning?
24      A   Meaning I didn't book it in calendar.

16 (Pages 61 to 64)

Page 65

1      Q   Did you go and get them from their desks?
2  How did it come about?
3      A   I don't recall specifically.
4      Q   Okay.  But you recall -- was it the three of
5  you meeting on the 22nd?
6      A   Correct.
7      Q   Where?
8      A   In 120A, Meeting Room 120A.
9      Q   Did you ask Jesse if she was comfortable
10  having this meeting on the 22nd?
11      A   I don't recall.
12      Q   How long was the 22nd meeting?
13      A   It was quite short, I think.  Only -- my
14  recollection would be maybe five minutes.
15      Q   Tell me about it.
16      A   Like I said, it was to demonstrate or to talk
17  to -- mainly to talk to Will to let him know that
18  behaviors -- you know, that he needed to act in a
19  professional manner and as Jesse's supervisor.
20      Q   What did you say during the meeting?
21      A   I don't recall exactly.
22      Q   Do you recall generally?
23      A   What I just described.
24      Q   Did you tell Turney during that meeting any

Page 66

1  of the allegations that Jesse had talked to you about
2  the day before?
3      A   No.  I don't recall telling him anything.
4      Q   Did you tell him anything other than
5  basically he needed to act in a more professional
6  manner?
7      A   I don't recall.
8      Q   That's all you remember?
9      A   Correct.
10      Q   What else was said during the meeting?
11      A   I don't recall the specifics.
12      Q   Was anything else said?  Or was that
13  basically the gist?
14      A   I cannot recall the details.
15      Q   Did you tell Turney why you were telling him
16  to act in a more professional manner?
17      A   I don't recall disclosing that, no.
18      Q   Do you remember anything that either Turney
19  or Jesse said?
20      A   Not definitively.
21      Q   Did you tell Turney during that meeting that
22  Jesse had filed a complaint with the ethics hotline?
23      A   No, I don't recall saying that.
24      Q   Did you tell him that at any point?

Page 67

1      A   I don't recall.
2      Q   How did the meeting end?
3      A   Again, I'm sorry.  I just don't recall the
4  details.
5      Q   Do you recall anything else about the
6  meeting?
7      A   No.
8      Q   The notes back on P39 for that meeting, it
9  says "short discussion on concerns with Jesse and
10  Will," right?
11      A   Yep.  By Jesse with Will.
12      Q   By Jesse with Will.  Are those your notes
13  that you're planning the meeting?  Or is that your
14  notes at the meeting?
15      A   No.  Just that I had had a short discussion.
16      Q   Other than what's on P39, is there any other
17  documentation of that November 22nd meeting?
18      A   No.
19      Q   Did you advise Turney in that meeting that
20  you would be going to HR so that they could start an
21  investigation?
22      A   No.  Not to my recollection.
23      Q   All right.  So then if you go back to what's
24  been marked as 15, the third page that wee were

Page 68

1  looking at earlier.
2      A   Yeah.
3      Q   So this email that you send on November 22nd,
4  is that before or after the meeting on that day, the
5  five-minute meeting?
6      A   I think it would have been before 8:44 a.m.
7      Q   Who's Jarred?
8      A   Jarred is the HR representative.
9      Q   For your group?
10      A   Yeah.
11      Q   And you copied Michelle Priest.  Why?
12      A   I think Michelle at some point -- I don't
13  know if she was out.  We worked with both Jarred and
14  Michelle in HR.
15      Q   So you say "Jarred, I had a meeting yesterday
16  with Jesse Barnes who has formally submitted an
17  online complaint to HR regarding harassment in the
18  workplace.  Can you provide me any guidance on next
19  steps that will be initiated by HR or follow-up that
20  I need to take.  I was only made aware of this
21  yesterday and have not discussed with Michelle yet.
22  It was reported on 11/15/2016.  The report number is
23  Shell 16110050."
24      I read that correctly?

17 (Pages 65 to 68)

Page 69

1    A   Correct.
2    Q   How did you know that Jesse had called the
3   hotline on November 15th?
4    A   She told me that in the November 21st
5   meeting.
6    Q   Did she also give you the report number?
7    A   I believe she did.
8    Q   And how had you remembered the report number
9   from November 21st until the following day?
10   A   I don't recall if I asked her.  Yeah, I don't
11  recall when I got that information.
12   Q   I'm sorry?
13   A   I said I don't recall exactly when I got the
14  report number from Jesse.
15   Q   Well, you just said that you thought she gave
16  it to you on November 21st.
17   A   She told me about it on November 21st in the
18  meeting, that she had made a complaint to the
19  hotline.
20   Q   Right.  But I asked you where you got the
21  date information and the report number information,
22  and you said that Jesse gave it to you on that
23  November 21st meeting; is that right?
24       MS. KIRKPATRICK:  Objection.

Page 70

1       THE WITNESS:  Yeah.  I don't recall
2   specifically if that's -- if she gave me the -- I
3   know that she told me that she had made a complaint
4   to the HR hotline during the one-on-one meeting.  But
5   I don't remember if I got the when and the number.  I
6   don't think I got it in the meeting.  Because yeah, I
7   would have written it down.  I would have made a note
8   of it.  And I don't know that she had that detail in
9   that meeting, that she has that on her.
10   Q   BY MS. GURMANKIN:  What -- I'm sorry.  Were
11  you done?
12   A   Uh-huh.
13   Q   Okay.  Where else would you have gotten that
14  information, the date of the complaint and the
15  report number?
16   A   I think from -- only from Jesse, is my
17  recollection.
18   Q   All right.  So at some point before you sent
19  this email on page 347, you would have gotten the
20  date on which Jesse made the complaint and the report
21  number from her?
22   A   Yeah.
23   Q   You're just not sure if it was in the
24  November 21st meeting?

Page 71

1    A   I'm confident it wasn't in that first meeting
2   because I think in that meeting my recollection is
3   just that I've made a complaint or have called.  And
4   then in writing the email, that I asked for the date
5   and the report number so I could reference it.
6    Q   So you would have had a separate discussion
7   with her before the November 22nd meeting asking her
8   the date of her report and the report number?
9    A   Correct.
10   Q   Do you recall that?
11   A   I don't recall it specifically.
12   Q   Do you recall if it was in person or over the
13  phone?
14   A   It would have -- wouldn't have been over the
15  phone.
16   Q   I'm sorry.  Are you done?
17   A   Yeah.
18   Q   Why didn't you include on the third page of
19  Exhibit 15 in your email to Jarred and Michelle that
20  Jesse had told you that Will touched her on the leg?
21   A   I didn't provide any of the details in the
22  email, just merely that there had been a complaint.
23  I know that Jesse had provided details, she said, in
24  her report.  So I don't think I -- yeah, just that

Page 72

1   I -- again, I'm not in the business of doing the
2   investigation.  So rather my job is to inform HR
3   which is protocol.  That's what the training has
4   taught me to do.
5    Q   Right.  Now, I know you did not include it in
6   your email.  My question is:  Why didn't you include
7   in your email the things Jesse told you about Turney
8   touching her, that Foreman puts his hands through her
9   hair, and that Turney has touched other women?
10       MS. KIRKPATRICK:  Objection.  Asked and
11  answered.  He just told you why.  But he can tell you
12  again.
13   Q   BY MS. GURMANKIN:  Can you answer the
14  question?
15   A   Sure.  I didn't include it because my job
16  isn't to do -- you know, isn't to do the
17  investigation.  I sat and listened to Jesse's
18  allegations, and I thought the best course of action
19  is to let HR formally investigate the allegations.
20   Q   Did you think that that information that she
21  gave you would be relevant to their investigation?
22   A   It would be relevant.  But the fact that
23  we -- I was asking for -- one, there's already been
24  an online complaint registered and that HR would be

18  (Pages 69 to 72)

Page 73

1    initiating an investigation. That was clear to me,
2    that there would be an investigation. And I know
3    that I had communicated that to Jesse as well, was
4    that Will -- you know, this will be investigated and
5    Will to understand it.
6        Q    At some point, there was an investigation by
7    HR?
8        A    Yes.
9        Q    At any point during the course of that
10   investigation, did you tell anyone that Jesse had
11   told you in the initial meeting that Turney touched
12   her on the leg, that Foreman put his hands through
13   her hair which was witnessed by Hondo Blakley, and
14   that Turney has touched other women?
15       A    Yeah. So I would have provided this as -- or
16   I did provide this as part of the investigation.
17       Q    P39?
18       A    Yes.
19       Q    Your handwritten notes?
20       A    The information -- like I was interviewed as
21   well as part of the investigation.
22       Q    And you relaid that information during the
23   course of the investigation?
24       A    I don't recall specifically.

Page 74

1        Q    All right. Well, that's my question. Did
2    you ever, during the course of the investigation --
3    let's take it one by one.
4        A    Okay.
5        Q    Tell anyone that Jesse had told you that
6    Turney touched her on the leg?
7        A    I don't specifically recall either way.
8        Q    You don't recall doing that?
9        MS. KIRKPATRICK: Objection. He said he
10   doesn't recall either way.
11       Q    BY MS. GURMANKIN: So you don't recall doing
12   that?
13       A    I don't recall not doing it. I don't recall.
14   I know as part of the investigation these items were
15   discussed and disclosed, so I knew that that was...
16       Q    I'm talking about what you relaid. Do you
17   have a recollection of relaying that to anyone during
18   the course of the investigation?
19       A    I don't recall either way.
20       Q    Did you tell anyone during the course of the
21   investigation that Jesse had told you that
22   Ken Foreman puts his hands through her hair?
23       A    I don't recall one way or the other. And it
24   was -- as Jesse described, it was not like a single

Page 75

1    event as she described it to me.
2        Q    Does that have anything to do with whether or
3    not you recall telling anyone that during the course
4    of the investigation?
5        A    No.
6        Q    Did you tell anyone during the course of the
7    investigation that Jesse had told you that Turney has
8    touched other women?
9        A    I don't recall.
10       Q    Did you show anyone your handwritten notes
11   marked as P39 during the course of the investigation?
12       A    I don't recall that.
13       Q    Up through today, have you shown anyone at
14   the company your handwritten notes marked as P39?
15       A    As part of this deposition, I provided copies
16   of what you're seeing now.
17       Q    Prior to that?
18       A    Not to my recollection.
19       Q    And that was in connection with Jesse's
20   complaint that she filed against the company in
21   court?
22       A    Correct.
23       Q    All right. Did you get a response to your
24   email on page 3 of Exhibit 15?

Page 76

1        A    I don't recall.
2        Q    What happens next in connection with this
3    issue, as far as you know?
4        A    That HR initiates an investigation of the
5    case.
6        Q    When's the next time anyone talks to you
7    about it?
8        A    I don't remember.
9        Q    All right. Looking back at P39, your
10   handwritten notes.
11       A    Yeah.
12       Q    It says on the bottom -- is that December 1st
13   through December 6th?
14       A    No. 2016.
15       Q    Oh, 2016. Okay. And it says
16   Megan Kloosterman, Kelly Soudeleir, Greg,
17   investigation Tuesday Wednesday next week, Megan?
18       A    Yeah.
19       Q    Is that indicating that Megan will be
20   conducting the investigation?
21       A    That's my belief, yeah.
22       Q    Are you talking about a call here with those
23   three people?
24       A    No. I think it's a face-to-face in-person

Page 77

1  investigation.
2      Q   No, I'm sorry.  Are you talking about a call
3  with Kloosterman, Soudeleir, and Greg where that was
4  discussed?
5      A   Yes.  That would have been a phone call with
6  Megan, Kelly, and Greg that there will be an
7  investigation beginning next week on Tuesday and
8  Wednesday and that Megan would come to the field.
9      Q   Was anything discussed on that call other
10  than logistics?
11     A   I don't remember.
12     Q   Would you have written it down here if there
13  were?
14     A   Possibly.  Maybe not.
15     Q   Okay.  You wrote "Jen C April."  What's that
16  refer to?
17     A   Jen Card, April.  I'm not sure.  I don't know
18  what that meant.
19     Q   Was there a discussion about who Megan should
20  interview?
21     A   Possibly.  I don't recall.
22     Q   Okay.  You don't recall being involved in any
23  discussion?
24     A   Not on who was going to be interviewed, just

Page 78

1  that I was aware that they were going to do some
2  interviews as part of the investigation.
3      MS. GURMANKIN:  All right.  We just need to
4  take a break to change the tape.
5      THE VIDEOGRAPHER:  This concludes File Number
6  1 in the videotaped deposition of Steve Craig in the
7  matter of Barnes v Shell, et al.  We're going off the
8  record at 2:57 p.m.
9      (Break taken from 2:57 to 3:01 p.m.)
10     THE VIDEOGRAPHER:  This begins File Number 2
11  in the videotaped deposition of Steve Craig in the
12  matter of Barnes v Shell, et al.  We're going on the
13  record at 3:01 p.m.
14     Q   BY MS. GURMANKIN:  On Exhibit 15 in front of
15  you, can you please turn to the second page, Bates
16  Stamp 346.  This is an email that Turney sends to you
17  and Michelle Priest on November 23, 2016, correct?
18     A   Correct.
19     Q   So he's saying that on Monday afternoon,
20  November 21st 2016, I called Jesse Barnes into Room
21  120A to have a one-on-one discussion about recent
22  performance concerns.  After talking with her for a
23  few minutes, she started saying that I was the
24  problem.  I asked why I was the problem, and she

Page 79

1  stated that I always put her down, telling her
2  nothing was ever done correctly, et cetera.  After
3  only a few minutes, I asked her to hold tight until I
4  went and got Steve.  She agreed to this, and Steve
5  joined the conversation.  Talking with Steve today, I
6  don't want to let this go.  I'll stop there for a
7  second.
8      Do you remember a discussion that you had
9  with Turney on November 23rd?
10     A   Yeah.  I don't remember specifics, but I
11  remember.  Yeah, I don't remember specifics, but...
12     Q   What do you recall?
13     A   Just take a minute and finish reading this.
14     Q   Sure.
15     A   Yeah.  So just that my only recollection is
16  telling Will that this was serious and that -- yeah.
17     Q   Who initiated that discussion?
18     A   I don't recall.
19     Q   And do you recall anything about the
20  discussion other than you telling Turney that it was
21  serious?
22     A   That it would be good for him to reach out to
23  HR.
24     Q   Why'd you tell him that?

Page 80

1      A   Just as a supervisor, that it would be
2  important that he communicate with HR as well.
3      Q   Any particular reason?
4      A   Well, if there's an issue with an employee,
5  that would be protocol, that if you're having
6  employee challenges, that you may engage with HR to
7  seek guidance from them on next steps.
8      Q   Did you document that November 23rd meeting
9  you had with Turney?
10     A   No.  Not to my knowledge.
11     Q   How come?
12     A   I don't recall.  I don't think it was a, you
13  know, a big meeting.  Or you know, just a discussion.
14     Q   Do you only document big meetings?
15     A   In my book for employee discussions, I have a
16  section at the back where I document ones that I
17  think are relevant to keep.  I don't document
18  everything, no.
19     Q   So your notes on P39, was that from the back
20  of your notebook?
21     A   Yep.  It would be from that section where I
22  had my people engagements.
23     Q   So you thought the November 21st, 2016,
24  meeting was relevant enough to document, right?

Page 81

1      A   Yes.
2      Q   And the November 22nd, 2016, meeting was
3   relevant enough to document, right?
4      A   Yeah.
5      Q   Why not the November 23rd meeting?  Why did
6   you determine that wasn't relevant enough to
7   document?
8      MS. KIRKPATRICK:  Objection.  Asked and
9   answered.
10      You can answer.
11      THE WITNESS:  I didn't see it as a -- I
12   didn't see it as important -- as that discussion to
13   be important enough to document.
14      Q   BY MS. GURMANKIN:  What was it about the
15   November 21st and November 22nd meetings that you
16   thought were important enough to document that
17   distinguish them from the November 23rd meeting with
18   Turney?
19      A   Certainly the one on November 22nd where
20   Jesse was expressing concerns to me about how she was
21   being treated was worthy of documenting.
22      Q   You mean the November 21st meeting?
23      A   21st.  Pardon me.  Yeah.
24      Q   And what made the November 22nd meeting

Page 82

1   relevant enough to document that distinguished it
2   from the November 23rd meeting that was not
3   documented?
4      A   That it was together -- or that it was with
5   Will and Jesse.  So demonstrating that I was looking
6   out for Jesse's best interest and to make sure Jesse
7   understood that I was taking this seriously.
8      Q   That was to protect yourself as well?
9      MS. KIRKPATRICK:  Objection.
10      Q   BY MS. GURMANKIN:  I mean that's partly why
11   you documented that, right?
12      MS. KIRKPATRICK:  Objection.
13      THE WITNESS:  The meeting was to demonstrate
14   to Jesse that we were taking it, the allegations,
15   seriously.
16      Q   BY MS. GURMANKIN:  And you documented that
17   because you wanted to protect yourself, right?
18      MS. KIRKPATRICK:  Objection.
19      THE WITNESS:  No.  I don't -- I don't know
20   how that would protect me.
21      Q   BY MS. GURMANKIN:  You thought that would
22   protect the company if you documented those meetings
23   with Jesse, right?
24      MS. KIRKPATRICK:  Objection.

Page 83

1      Q   BY MS. GURMANKIN:  You thought that -- well,
2   let me ask it this way.
3      You thought that documenting those meetings,
4   the November 21st and the November 22nd meeting,
5   would show that the company was taking her
6   allegations seriously, right?
7      MS. KIRKPATRICK:  Objection.  You can answer.
8      THE WITNESS:  I wasn't doing it for
9   demonstration of -- for the company.  I was
10   documenting it to demonstrate that we had -- I had
11   taken -- was taking it seriously.
12      Q   BY MS. GURMANKIN:  Why did you want to
13   document that?
14      A   I thought the meeting was worthy of taking a
15   note of it.  We had that discussion.
16      Q   Why?
17      A   Again, to -- because it was a demonstration
18   to Jesse that we were taking it seriously and felt it
19   was worthy to make a note that we had a follow-up
20   meeting.
21      Q   But Jesse didn't see your notes marked as
22   P39, right?
23      A   No.  She would not have.
24      Q   Okay.  So you didn't document it to

Page 84

1   demonstrate to her that you were talking her
2   allegation seriously, right?
3      A   Can you repeat that, please.
4      Q   Sure.  You didn't document the meeting on
5   November 21st and November 22nd to demonstrate to
6   Jesse that you were taking her concerns seriously
7   because she never saw your notes marked as P39,
8   right?
9      MS. KIRKPATRICK:  Objection.
10      THE WITNESS:  I don't know if Jesse would
11   have witnessed me writing some of the points down.
12   My recollection is that I would have had that and I
13   would have made some note as we were talking.
14      Q   BY MS. GURMANKIN:  You testified you might
15   have taken notes about the November 21st meeting
16   after the meeting, right?
17      MS. KIRKPATRICK:  Objection.
18      THE WITNESS:  Yeah.  I don't recall
19   specifically.
20      Q   BY MS. GURMANKIN:  All right.  But if Jesse
21   never saw your notes marked as P39, then what was it
22   about you documenting the November 21st and November
23   22nd meetings that you thought would demonstrate to
24   her that you were taking her allegations seriously?

Page 85

1      A   So that I could follow up with HR on an
2   email.  They were probably more for my own
3   recollection to make sure to document what I heard.
4      Q   You don't recall what was said with Turney on
5   the November 23rd meeting, correct?
6         MS. KIRKPATRICK:  Objection.
7      Q   BY MS. GURMANKIN:  Other than he should talk
8   to HR --
9      A   Right.
10     Q   -- and take this seriously?
11     A   Yes.  That's my recollection.
12     Q   There may have been other things that he said
13  in that meeting that would have been relevant to
14  Jesse's allegations or the upcoming investigation,
15  but you don't remember because they weren't
16  documented, right?
17        MS. KIRKPATRICK:  Objection.
18        THE WITNESS:  I don't recall.
19     Q   BY MS. GURMANKIN:  You don't recall one way
20  or the other, right?
21     A   Yeah.  I don't recall having any specific
22  discussion.  And I recognize that with the situation
23  that I wouldn't -- it would be not appropriate to
24  discuss the details with Will.

Page 86

1      Q   Yeah.  No.  All I'm asking is:  There may
2   have been other things that Turney said during that
3   November 23rd meeting that were relevant to Jesse's
4   allegations or the investigation, but because they're
5   not documented, you don't remember, right?
6      A   Possibly.  I don't -- yeah, I don't.  If I
7   thought they would be relevant, I think I would have
8   written them down.
9      Q   One would hope.  Now if you go back to page
10  346 of Exhibit 15 --
11        MS. KIRKPATRICK:  Objection to the comment.
12     Q   BY MS. GURMANKIN:  -- he goes on to say "I
13  haven't (in my opinion) ever done anything wrong.
14  Now, I know I have said some things that I shouldn't
15  have, but apologized for saying it.  I guess what I'm
16  wondering is if we can discuss this."  I'll stop
17  there for a sec.
18        When you read that he wrote about I know I've
19  said some things that I shouldn't have, but
20  apologized for saying it, that concerned you, right?
21     A   Yeah.  As a supervisor, I want to make sure
22  that it's a respectful workplace.
23     Q   Had he said that during the meeting with you
24  on that day, that he said some things that he

Page 87

1   shouldn't have?
2      A   I don't recall that, no.
3      Q   Okay.  You don't recall one way or the other?
4      A   I don't recall.
5      Q   One way or the other, right?
6      A   Correct.
7      Q   Okay.  When you read that in his email, did
8   you talk to him about it and ask him what are the
9   things that he shouldn't have said but did say?
10     A   Yeah.  I don't recall asking any particulars
11  about this email.
12     Q   Did you talk with Michelle Priest about his
13  statement that I know I've said some things I
14  shouldn't have?
15     A   I don't recall talking to Michelle
16  specifically, no.
17     Q   He goes on to say "everything has been fine
18  this week (between her and me as far as business
19  goes) I don't want this to get out of hand or fear
20  that I cannot coach her because of this.  Anyway,
21  let's discuss, Michelle, when you return to work.
22  Thank you very much."  Did I read that correctly?
23     A   Correct.
24     Q   And you don't recall any discussions with

Page 88

1   either Turney or Michelle Priest about this email
2   after you got it, right?
3      A   I do not, no.
4      Q   Did you forward it to anyone else at the
5   company?
6      A   Not that I recall, no.
7      Q   Prior to the November 21st, 2016, meeting,
8   with Turney and Jesse and then with Jesse, had you
9   heard Turney complain at all or express any concerns
10  about Jesse's performance?
11     A   Yes.  As his supervisor, I was aware that he
12  felt she was having some delivery issues in her role.
13     Q   What is the first time that you heard Turney
14  express concerns about Jesse's performance to you?
15     A   I don't remember specifically.
16     Q   Do you recall the year?
17     A   It would have been in 2016.
18     Q   Do you recall how soon before the
19  November 21st meeting?
20     A   I don't recall.
21     Q   Okay.  You don't recall if it was months or
22  weeks or days, right?
23     A   I don't recall.
24     Q   Did you document that discussion or those

22  (Pages 85 to 88)

Page 89

1    discussions with Turney about that?
2        A   No.
3        Q   And what did he talk to you about his
4    concerns regarding her performance issues in 2016?
5        A   What did he talk about?
6        Q   Yeah.
7        A   Just in general, her ability to do her
8    analyst role.  But I don't recall specifics.  I just
9    know he was working with her on her role and
10   providing coaching to her.
11       Q   Do you recall him talking to you about any
12   specifics or actually telling you anything other
13   than --
14       A   My only real recollection is when we did our
15   RPF ranking session where we talked about all of the
16   employees and we talked about Jesse's -- Jesse's
17   performance as a team.
18       Q   Would that be the 2015 performance review
19   process?
20       A   Correct.
21       Q   Which would have been when?
22       A   So this would have been actually the 2016
23   performance review.  So which would have happened mid
24   October, I think.

Page 90

1        Q   Of '16?
2        A   Of '16, yeah.
3        Q   So was around mid October 2016 the first time
4    he talked to you about performance concerns with
5    Jesse?
6        A   I was aware, I think, that he was working
7    with her, which isn't uncommon for supervisors to be
8    coaching and mentoring their employees.  I don't know
9    that it was -- you know, that I can pinpoint a
10   specific discussion.  But as part of -- as part of a
11   supervisor, we provide coaching and mentoring to all
12   of our employees.  I receive it, and we -- and I gave
13   it to my employees as part of normal business.
14       Q   Constructive feedback, right?
15       A   Yeah.
16       Q   Okay.  Were the concerns that Turney
17   expressed to you about Jesse prior to November 21,
18   2016, anything different than the typical coaching
19   and constructive feedback that supervisors give to
20   their employees?
21       A   Not to my knowledge, no.
22       Q   All right.  So do you recall Turney
23   expressing concerns beyond the typical coaching and
24   constructive feedback that supervisors give to their

Page 91

1    employees prior to November 21, 2016?
2        A   No.
3        Q   Okay.  Just so we're clear, prior to
4    November 21, 2016, the only issues that you remember
5    Turney talking to you in connection with Jesse were
6    the typical coaching and constructive feedback issues
7    that a supervisor gives to an employee?
8        A   Right.
9            MS. KIRKPATRICK:  Objection.
10       Q   BY MS. GURMANKIN:  Back on Exhibit 15, can
11   you turn to the page Bates Stamp 349, the number at
12   the bottom right.  This is the complaint that Jesse
13   submitted to the ethics hotline on November 15, 2016.
14           Have you seen this before?
15       A   Yes, I have.
16       Q   Did you see it -- well, what's the first time
17   that you saw it?
18       A   As part of some pre-read I received.
19       Q   I'm sorry?
20       A   As part of this deposition.
21       Q   Okay.  As part of your preparation for your
22   deposition?
23       A   Correct.
24       Q   You had not seen it prior to that?

Page 92

1        A   Not to my knowledge, no.
2        Q   Okay.  Did you read it when you received it
3    in preparation for your deposition?
4        A   I did read through it.
5        Q   And would you agree that the allegations that
6    she's making in this indicate that she's complaining
7    about harassment or discriminatory treatment based on
8    the fact that she's a women?
9            MS. KIRKPATRICK:  He said he hasn't read it
10   before.  Do you want him to read it?
11           MS. GURMANKIN:  He said he read it in
12   preparation for his deposition.
13           MS. KIRKPATRICK:  Okay.
14       Q   BY MS. GURMANKIN:  Do you need the question
15   repeated?
16       A   Sure.
17       Q   Okay.  When you read it when you got it for
18   preparation for your deposition, do you agree with me
19   that Jesse is relating harassing treatment based on
20   the fact that she's a woman?
21           MS. KIRKPATRICK:  Objection.
22           THE WITNESS:  If I can take a minute to read
23   it.
24       Q   BY MS. GURMANKIN:  Sure.  Take your time.

Page 93

1    A   So I would say that is possible.
2    Q   You don't know for certain?
3    A   It's -- I think it's possible that that could
4  be correct.
5    Q   Turn to page 350, please.
6    A   Okay.
7    Q   You there?
8    A   Yeah.
9    Q   So third sentence from the top, she says
10  "I've been shown a selfie of my supervisor in his
11  underwear by him."  Do you see that?
12    A   Yes.
13    Q   And you were aware of that allegation around
14  the time of the investigation, correct?
15    A   Correct.
16    Q   And you would agree with me that that would
17  be a violation of Shell's policies?
18    A   Depending on the -- depending on the context
19  or the circumstances of when that occurred, possibly.
20    Q   All right.  So when it occurred would
21  determine whether or not it would violate company
22  policy?
23    A   I think the -- yeah.  So depending on the
24  circumstance, the totality of the circumstances and

Page 94

1  context, it could impact the situation.
2    Q   When would it not violate company policy?
3  Like when would it happen so that you would determine
4  it would not violate company policy?
5    A   So depending on, you know, where it took
6  place and under what situation and if there was any
7  sexual undertones to it.  I think you'd have to
8  understand the circumstance around it.
9    Q   You don't think there were sexual undertones
10  by a female subordinate being shown a selfie of her
11  male supervisor in his underwear by him?  Is that
12  your testimony?
13    MS. KIRKPATRICK:  Objection.
14    THE WITNESS:  I think it depends on -- you'd
15  have to look at the totality of the circumstance.
16    Q   BY MS. GURMANKIN:  What would you need to
17  know to make that determination, whether that
18  violates company policy?  What information would you
19  need?
20    A   I think you'd have to understand the
21  situation and the context that it was -- who was
22  present, you know, when that took place, what was the
23  circumstances.  So whether it -- whether it would
24  seem -- yeah.  If it's -- you know, if there's an --

Page 95

1  if it would be deemed harassment or sexual
2  connotations to it.
3    Q   So you would need to know -- in order to make
4  the determination of whether that violated company
5  policy or whether it had sexual undertones, you would
6  need to know who else was present, right?
7    A   Uh-huh.
8    Q   Yes?
9    A   Yes.
10    Q   You need to know when it happened?
11    A   Yes.
12    Q   What does that mean?  Like the time of day?
13    A   Yeah.  Is it -- what's the circumstances
14  around the event?  Is it at work?  Is it away from
15  work?  Is it -- you know, what's the -- what would be
16  the circumstances around the event.
17    Q   All right.  So you would need to know
18  location, whether it was at work or away from work,
19  right?
20    A   Correct.
21    Q   All right.  But you mentioned when it
22  happened.  Does that mean time of day?
23    A   Yes.
24    Q   Okay.  And what difference would that make as

Page 96

1  to your determination as to whether or not it
2  violates company policy for a male supervisor to show
3  a female subordinate a selfie of himself in his
4  underwear?
5    A   So I think it's, again, the context of where
6  and when and under what circumstances that took place
7  and then was there a sexual undertone to the -- to
8  the statement.
9    Q   Right.  No, I understand.  But I'm following
10  up on your testimony that when it happened would be
11  one of the factors that you would need to know to
12  make the determination as to whether or not it
13  violated company policy, right?
14    MS. KIRKPATRICK:  Objection.  You can answer.
15    THE WITNESS:  I think it's all part of the --
16  you need to look at the totality of the situation.
17  And so yeah.
18    Q   BY MS. GURMANKIN:  Right.  And we're talking
19  about what factors or what information you would need
20  to make that determination.
21    A   Yeah.
22    Q   And one of the factors you said you would
23  need to know is when it happened, right?
24    A   I did.  Correct.

24 (Pages 93 to 96)

Page 97

1    Q  Okay.  So I want to make sure I understand
2  that.  Are you saying -- by when it happened, are you
3  talking about the time of day that it happened?
4    A  I think that the situation, when it happened.
5  And it wouldn't be specific to the time of day.
6    Q  Okay.
7    A  But what's the general situation around the
8  context of whether -- you know, when that happened.
9  Was it -- you have to look at the totality of the
10  whole, the whole situation and what was the dialogue
11  that was happening, what was the situation, was an
12  individual asked, was there -- you know, I don't know
13  without knowing all of the facts around that.
14    Q  So if a male supervisor came to you in your
15  capacity as operations manager and said is it okay if
16  I show my female subordinate a selfie of myself in my
17  underwear, would your response be it depends on the
18  totality of the circumstances?
19    A  If I was asked that?
20    Q  Yep.
21    A  I'm not sure how I'd respond to that.  I
22  can't imagine that question.  I think it's -- so can
23  you just repeat it for me?
24    Q  Sure.  If a male supervisor at Shell came to

Page 98

1  you in your capacity as operations manager and said
2  is it okay if I show a female subordinate a selfie of
3  myself in my underwear --
4    A  Right.
5    Q  -- would you respond it depends on the
6  totality of circumstances?
7    MS. KIRKPATRICK:  Objection.
8    Q  BY MS. GURMANKIN:  You can answer.
9    A  Okay.  I would advise that's probably --
10  would be not a thing that I would recommend in doing.
11    Q  You'd advise probably that you wouldn't
12  recommend it?
13    A  Yeah.  Like that would be something that I
14  would not -- I wouldn't suggest that would be a good
15  thing to do.
16    Q  Why?
17    A  Why?
18    Q  Uh-huh.
19    A  I think that's -- could be not something that
20  a supervisor would do for -- you know, to a female
21  subordinate.
22    Q  Well, why would you probably not suggest that
23  they do it?
24    A  It could be perceived as inappropriate.

Page 99

1    Q  But wouldn't it depend on the totality of
2  circumstances and what it happened and who else was
3  around and what was said and whether there was sexual
4  undertones?
5    A  Yeah, it would.
6    Q  Okay.  So why wouldn't that be your response
7  to a male supervisor coming and asking you about
8  that?
9    A  I think it's a best practice of a supervisor.
10  It wouldn't be -- I wouldn't support that.  But had
11  it happened, then I think you would have to look at
12  the circumstance.  But it would not be something that
13  I would suggest would be a good practice.
14    Q  Going back to page 350 of Exhibit 15, a
15  couple down from the one that we just looked at about
16  the selfie of the supervisor in his underwear,
17  there's a sentence that starts "I was told in my mid
18  year review."  Do you see where I am?
19    A  Uh-huh.
20    Q  "I was told in my review that I make good
21  money for a woman and should not be upset with my pay
22  grade by my supervisor."  Did I read that correctly?
23    A  Yes.
24    Q  And if that were said, that would be a

Page 100

1  violation of company policy, correct?
2    A  Yes.  I believe that depends -- yeah.  I
3  guess it depends like on the context of the
4  statements, if there was -- I don't know if there was
5  something that preceded that that would have made
6  that -- that would provide some context that I can't
7  read into that statement.
8    Q  All right.  So I just want to be clear.  Is
9  your testimony that that statement would be a
10  violation of company policy if it were said or it
11  would depend on the context?
12    MS. KIRKPATRICK:  Objection.  Asked and
13  answered.
14    You can answer.
15    THE WITNESS:  Again, I think -- so company
16  policy -- you know, is that a harassment statement?
17  I think in the context of if it was said as a -- you
18  know, as a joke, it wouldn't be appropriate.  But
19  would it be construed as harassment?  I don't know.
20  Again, I think you need to look at all the
21  statements, you know, in the totality of the
22  situation that they were made and...
23    Q  BY MS. GURMANKIN:  Based on all the training
24  you've had at Shell about EEO matters and

1  antidiscrimination, you agree that that statement is
2  a violation of Shell's EEO and antidiscrimination
3  policies?
4      MS. KIRKPATRICK: Objection. Asked and
5  answered.
6      You can tell her again.
7      THE WITNESS: Again, I think it's -- you
8  know, it's how it was said and in what manner and
9  whether or not it would be seen as a violation. I
10 certainly don't think it's a best practice by a
11 supervisor to say anything like that. Does it
12 cross the -- you know, would it be a blatant
13 violation? Again, you'd have to look at the whole
14 situation. Was it said as a -- you know, what was
15 the context of the comment? Was it said as a joke?
16 Or was it -- not -- not that that makes it okay. I'm
17 not saying that. But I think it's -- you gotta look
18 at the situation too.
19     Q  BY MS. GURMANKIN: If it's said as a joke,
20 would it violate the company's policy?
21     A  If it's hurtful and taken in a discriminatory
22 way, possibly.
23     Q  And you never know whether someone is going
24 to take something in a discriminatory way, right?

1      A  Correct.
2      Q  Which is why that conduct -- there should be
3  zero tolerance for that type of conduct, right?
4      A  Yeah.
5      Q  Do you agree that that comment on its own
6  would violate company policy?
7      MS. KIRKPATRICK: Objection. Asked and
8  answered five times.
9      Q  BY MS. GURMANKIN: Or no?
10     A  I think you gotta look at the situation in
11 totality to really make a definitive answer or
12 definitive decision whether or not it's a violation.
13 In some cases, yes. But in other cases, possibly no.
14     Q  You became aware during the course of the
15 investigation that Turney admitted saying that to
16 Jesse?
17     MS. KIRKPATRICK: Objection.
18     THE WITNESS: I don't recall when exactly I
19 learned that particular statement.
20     Q  BY MS. GURMANKIN: Was it before you saw the
21 internal complaint in preparation for your deposition
22 today?
23     A  Honestly, I don't recall when I first saw it.
24     Q  Right under the one we just looked at, it

1  says "I was told I work well with male employees
2  because I'm a woman by my supervisor."
3      Do you see that?
4      A  I see that.
5      Q  Do you agree that would be a violation of the
6  company's EEO and antidiscrimination policy?
7      A  Again, I think in the context of how it was
8  stated, when, with who, it may be, but it may not be.
9  And depending on how it's received by those that were
10 present.
11     Q  You finished your answer?
12     A  Yes.
13     Q  Right under that it says "I was told I'm a
14 hot blonde by my supervisor."
15     Do you see that?
16     A  Yes.
17     Q  Is that statement a violation of company
18 policy, if true?
19     A  Again, I think you need to see the whole
20 context. Was there something said prior to that?
21 But that certainly is not a best practice or
22 something that we at Shell would want a supervisor
23 saying.
24     Q  A few down from that, you see where it starts

1  "At a work charity golf tournament"?
2      A  Yes.
3      Q  "At a work charity golf tournament, I was
4  asked more than once why I was not wearing shorts at
5  this event and if my supervisor could cut my pants
6  into shorts as well as other supervisors joined in
7  and took a picture of my backside (buttock) and saved
8  on the phone."
9      Did I read that correctly?
10     A  Yes.
11     Q  If that's true, would that be a violation of
12 company policy?
13     A  Not necessarily. I think that again in the
14 context of the statement, it may be, but it may not
15 be. So if it was a hot day and someone is wearing
16 jeans, that maybe you could make a statement that
17 way.
18     Q  How about calling a female employee a bitch?
19 Is that a violation of company policy?
20     A  I think that would be considered -- am I
21 reading somewhere here?
22     Q  No. It's just a question.
23     A  Yeah. I think -- I mean statements like that
24 are not -- you know, not acceptable in the workplace.

Page 105

1   Q   A violation of company policy?
2   A   In the harassment, yeah.
3   Q   The EEO, antidiscrimination, harassment
4   context.  Is calling an female employee a bitch a
5   violation of company policy?
6   A   I think that would be a fair statement.
7   Q   So you agree with that?
8   A   Yes, I think so.  Yes.
9   Q   Okay.  Are you sure?
10  A   Yes.
11  Q   Did you meet with or speak with
12  Megan Kloosterman when she came up to conduct her
13  interviews as part of the investigation?
14  A   Yes.
15  Q   You had a one-on-one meeting with her?
16  A   I think so.  Yes, I think so.
17  Q   Was that before she actually started her
18  investigation?
19  A   I don't recall.
20  Q   Do you remember what you discussed?
21  A   Not specifically, no.
22  Q   How about generally?
23  A   I mean it was generally around the
24  investigation.

Page 106

1       MS. KIRKPATRICK:  I have to take a break to
2   take this call.
3       THE VIDEOGRAPHER:  We are going off the
4   record.  The time on the camera is 3:35 p.m.
5       (Break taken from 3:35 to 3:43 p.m.)
6       THE VIDEOGRAPHER:  We are now back on the
7   record at 3:43 p.m.
8   Q   BY MS. GURMANKIN:  What did you discuss with
9   your lawyer on the break?
10      MS. KIRKPATRICK:  Objection.  I'm instructing
11  the witness not to answer.
12  Q   BY MS. GURMANKIN:  And you're listening to
13  that instruction, correct?
14  A   Correct.
15  Q   You testified that you had a discussion with
16  Megan Kloosterman when she came to Wellsboro to
17  conduct the investigation.  You don't remember
18  specifically what you discussed?
19  A   I don't remember the specific details, no.
20  Q   Just generally about the investigation?
21  A   Correct.
22  Q   Did you provide any input as to who she
23  should interview?
24  A   I don't recall providing that input.

Page 107

1   Q   Do you know if anyone did?
2   A   I'm sure.  Yeah, she would have needed to get
3   input on who.
4   Q   Right.  I'm asking if you know specifically
5   if anyone provided that information to her.
6   A   I don't know specifically.
7   Q   Okay.  In the discussion that you had with
8   her when she came to Wellsboro to conduct the
9   investigation, did she interview you as to your
10  knowledge about the allegations?
11  A   I don't remember the specific details of her
12  questioning to me.
13  Q   Well, did she question you as part of that
14  initial meeting that you had with her?
15  A   I don't recall.
16  Q   Do you recall her ever questioning you about
17  your knowledge as part of her investigation?
18  A   About my knowledge of the items?
19  Q   Of the issues, the allegations, yeah.
20  A   I don't recall specific questions that she
21  asked me.
22  Q   Do you recall her questioning you about your
23  knowledge about the allegations or the issues, even
24  if you don't remember specifically what she asked

Page 108

1   you?
2   A   I know that Megan did have discussions with
3   me about the event, yes.  Or the events, the
4   investigation.
5   Q   Did you say discussions?
6   A   Discussion.
7   Q   One discussion or multiple discussions?
8   A   There were more than one discussion that I
9   would have had with Megan.
10  Q   Did you have more than one discussion with
11  Megan about the allegations or her investigation?
12  A   Not necessarily the allegations, but the
13  investigation in totality.
14  Q   All right.  Tell me -- we talked about the
15  meeting you had with Megan that you just recalled
16  generally being about the investigation when she came
17  up to Wellsboro to do the interviews.
18  A   Uh-huh.
19  Q   You had other discussions with her while she
20  was in Wellsboro?
21  A   Yeah.  We discussed -- so it was part of the
22  consequence management on what would be appropriate
23  consequence or how to deal with the allegations and
24  the outcome of the investigation.  I don't recall

27 (Pages 105 to 108)

1    exactly when that was.  But I know that we met with
2    her about that.
3        Q   What is consequence management?
4        A   So if there's been a violation of one of our
5    practices, procedures, code of conduct, then we apply
6    consequence management based on the severity and what
7    happened.
8        Q   All right.  So that's like another term for
9    discipline or punishment issue?
10       A   Correct.
11       Q   Is consequence management a term that's used
12   at Shell?
13       A   Yeah, I think so.
14       Q   You've heard that used at Shell?
15       A   Yes.
16       Q   All right.  So that would have been after the
17   conclusion of her investigation; is that right?
18       A   Yes.
19       Q   Okay.  So between your initial meeting when
20   she came up to Wellsboro when you discussed the
21   investigation generally, which is all you recall, and
22   the discussion after the conclusion of her
23   investigation about consequence management, did you
24   have any other discussions with Kloosterman about the

1    investigation or Jesse's allegations?
2        A   Not to my recollection, no.
3        Q   Did you speak with anyone at the company
4    about the investigation between your initial
5    conversation with Kloosterman when she came to
6    Wellsboro to do the interviews and your discussion
7    about consequence management after she concluded the
8    investigation?
9        A   Not that I recall.
10       Q   Okay.  So tell me about this meeting with her
11   about consequence management.
12       A   So at the conclusion of the investigation
13   when it was determined that there was a violation in
14   the code of conduct, then we needed to decide what
15   would be appropriate consequences for Mr. Turney and
16   Mr. Hoover based on the evidence.
17       Q   Is this a discussion in person or over the
18   phone with Kloosterman?
19       A   I think there were more than one discussion,
20   but I can't specifically remember.  I think it was
21   over the phone after the investigation was concluded.
22       Q   Just the two of you?
23       A   No.  Greg Larson was part of it.
24       Q   Okay.  Did you take notes of that meeting or

1    that phone call?
2        A   Not to my recollection, no.
3        Q   You didn't think that one was relevant enough
4    to document?
5            MS. KIRKPATRICK:  Objection.
6            THE WITNESS:  Well, it was being documented
7    through HR, so I didn't take my own specific notes.
8        Q   BY MS. GURMANKIN:  You understood that the
9    phone call was being documented through HR?
10       A   Yeah.  It was being -- it was led by HR who
11   was -- who was -- my assumption is that they were
12   leading the meeting and that they were taking the
13   notes.
14       Q   Did you check that assumption to make sure
15   that someone in HR was documenting the phone call
16   that you had?
17           MS. KIRKPATRICK:  Objection.
18           THE WITNESS:  So I know that that happened
19   because there was the outcome.  They were tasked --
20   we rely on HR to administer -- you know, to help with
21   consequence management determination and then help
22   with administration of that.  It's an HR-led
23   function.
24       Q   BY MS. GURMANKIN:  My question is different.

1    You testified that you did not take notes of that
2    consequence management call with Kloosterman and
3    Larson because you assumed that HR would document
4    that.
5            Did you check that assumption with anyone to
6    make sure that HR was documenting the call?
7            MS. KIRKPATRICK:  Objection.
8        Q   BY MS. GURMANKIN:  Go ahead.
9        A   I don't recall asking that specifically.  But
10   it would -- that's the protocol with HR is that that
11   was -- it was their meeting that they booked to get
12   input into what did we think would be the right
13   consequence to apply.
14       Q   Did you ever see any documentation of that
15   phone call?
16       A   No.  No, I don't think so.
17       Q   Do you still have your notebook that P39 was
18   part of?
19       A   Yeah.
20       Q   Where is it?
21       A   It would be at the office.
22       Q   In Wellsboro?
23       A   Yep.
24       Q   So tell me what you recall of that phone

28  (Pages 109 to 112)

Page 113

1  call. And it's just you, Kloosterman, and Larson,
2  right?
3      A  That's my recollection, yeah.
4      Q  All right. What do you recall?
5      A  Just what the consequences should be. So
6  anywhere from termination of Mr. Turney all the way
7  through to -- I don't think there was any discussion
8  around no consequence. But stemming from termination
9  through to, you know, whether it's a letter on his
10  file, just what the severity of consequence would be.
11  It was clear that there would be consequence
12  management for Mr. Turney.
13      Q  So at some point you find out that there's
14  been a conclusion as a result of the investigation
15  that Turney and Mark Hoover violated the code of
16  conduct?
17      A  Correct.
18      Q  Did you find that out on this phone call with
19  Larson and Kloosterman? Or did you find that out
20  beforehand?
21      A  I don't recall specifically when I found that
22  out.
23      Q  You don't recall any discussions with anyone
24  at the company between your initial meeting with

Page 114

1  Kloosterman when she came to Wellsboro and this phone
2  call that you had about consequence management,
3  right?
4      A  Correct.
5      Q  So based on your recollection, it would have
6  been on this phone call that you would have found
7  that out?
8      A  Yes.
9      Q  Do you remember what Kloosterman told you
10  about the conclusion that Hoover and Turney violated
11  the code of conduct?
12      MS. KIRKPATRICK: Objection.
13      Q BY MS. GURMANKIN: Go ahead.
14      A  Sorry. Can you repeat that again?
15      Q  Sure. Do you remember what you were told on
16  that phone call about the conclusion that Hoover and
17  Turney violated the code of conduct?
18      MS. KIRKPATRICK: Objection.
19      THE WITNESS: The conclusion of it? I'm not
20  sure if I understand your question.
21      Q BY MS. GURMANKIN: Sure. Based on your
22  recollection that you didn't have discussions with
23  anyone at the company about the investigation between
24  your initial meeting with Kloosterman when she comes

Page 115

1  to Wellsboro --
2      A  Yeah.
3      Q  -- and this phone call on consequence
4  management that you have with Larson and Kloosterman
5  at the conclusion of the investigation --
6      A  Uh-huh.
7      Q  -- you believe that you found out during that
8  consequence management phone call --
9      A  Uh-huh.
10      Q  -- that there was a conclusion as a result of
11  the investigation that Turney and Hoover violated the
12  company's code of conduct, correct?
13      A  Correct.
14      Q  Okay. What were you told about that
15  conclusion on this phone call?
16      A  So what was I told about what the code of
17  conduct violations were?
18      Q  Sure.
19      A  That there was harassment, that it was a
20  violation of the harassment policy.
21      Q  Were you told what Turney and Hoover actually
22  did that was to have violated the code of conduct?
23      A  I don't remember specifically the details of
24  the violation. But that there was -- there was

Page 116

1  violation of the code of conduct.
2      Q  Were you told about any of the things that
3  employees told Kloosterman during the course of the
4  investigation, about things that were said or done?
5      A  Not that I recall, no.
6      Q  Did you ask if that was information that you
7  could get?
8      A  No, I didn't ask.
9      Q  How come?
10      A  I didn't see it as my place to ask. HR -- I
11  mean I rely on HR to do their job and to conduct a
12  thorough investigation based on an impartial, outside
13  eyes. That's why there's someone external from the
14  asset, the entire asset, that comes in and leads the
15  investigation.
16      Q  All right. So Kloosterman tells you -- do
17  you know if, by the way, Larson had had any
18  conversations about the investigation with anyone
19  before this consequence management phone call?
20      A  Not to my knowledge.
21      Q  All right. So Kloosterman tells you on that
22  call that there's been a finding that Hoover and
23  Turney violated the code of conduct?
24      A  Correct.

29 (Pages 113 to 116)

Page 117

1     Q  But she doesn't give you specifics?
2        MS. KIRKPATRICK:  Objection.
3        THE WITNESS:  Not that I recall.
4     Q  BY MS. GURMANKIN:  Did you see any documents,
5   any documentation about the investigation as of the
6   time of this call?
7     A  Not that I recall, no.
8     Q  All right.  And then you discussed the
9   consequence that will be applied to Turney and Hoover
10  as a result of this finding that they violated the
11  code of conduct?
12    A  Correct.
13    Q  So what was discussed about that?
14    A  So like I said, whether -- so what are the
15  options available.  So anywhere from termination of
16  Mr. Turney to the potential demotion out of that
17  particular role as a supervisor, a letter on a file,
18  reduction in IPF ranking.  So yeah, you know, just
19  quite a broad range of options available.
20    Q  So can you explain to me how was it that you
21  were able to have a constructive discussion about
22  what consequence to apply if you didn't know what
23  exactly Turney and Hoover did that invited the code
24  of conduct?

Page 118

1        MS. KIRKPATRICK:  Objection.  He said he
2   doesn't recall if he was told.
3        THE WITNESS:  Yeah, I don't recall the
4   specifics.
5     Q  BY MS. GURMANKIN:  Well, you don't recall if
6   you were even given specifics, right?
7     A  So it was a -- my recollection is that it's a
8   phone call.  I was in my -- I have a little break-out
9   room near my office that I was in.  And we do our
10  calls on the speaker.  And so you know, I just can't
11  specifically remember all the details of what we
12  discussed.
13    Q  And you do not have a recollection of being
14  given specifics as to how Hoover and Turney violated
15  the code of conduct, right?
16       MS. KIRKPATRICK:  Objection.  Asked and
17  answered.  He said ten times that he doesn't recall.
18    Q  BY MS. GURMANKIN:  Right?
19    A  Yeah, the details.  I'm sorry.  I don't
20  recall.
21    Q  But you don't even recall if you were given
22  details.
23       MS. KIRKPATRICK:  He doesn't recall either
24  way.  He said that ten times.

Page 119

1        THE WITNESS:  I don't recall being given any
2   email or paper copies of anything.  We had a
3   dialogue, we had a discussion on the phone to talk
4   about -- you know, to talk about what the appropriate
5   consequences would be.
6     Q  BY MS. GURMANKIN:  Yeah.  My question was not
7   whether you were given documents or emails.
8        But as of today, you do not have a
9   recollection if you and Larson on that call about
10  consequence management were even given details about
11  what Turney and Hoover did to violate the code of
12  conduct?
13       MS. KIRKPATRICK:  Objection.  Asked and
14  answered.  He said he doesn't recall.  He's given
15  specifics.
16    Q  BY MS. GURMANKIN:  Right?
17    A  Yeah.  I relied on -- yeah, it's with HR.
18    Q  I just want an answer.
19       MS. KIRKPATRICK:  You got an answer.  He told
20  you five times.
21    Q  BY MS. GURMANKIN:  You do not have a
22  recollection -- well, let me ask it this way.
23       At some point a decision was made to give
24  Turney a warning, right?

Page 120

1     A  I'm not sure what you mean by warning.
2     Q  What was the decision about what consequence
3   to give Turney?
4     A  Right.  So there was a reduction in his IPF
5   was one of the consequences and a letter on his file.
6     Q  Okay.  Was that a warning or a letter?
7        MS. KIRKPATRICK:  Was that it?  Were you
8   finished with your answer?
9        THE WITNESS:  There was -- yeah, a letter on
10  a file and the IPF reduction.
11    Q  BY MS. GURMANKIN:  Okay.  The letter on the
12  file, was that a warning?
13    A  So we have -- we can provide verbal,
14  documented verbal warnings or a formal letter on
15  file.  So I'm not sure -- I'm not sure how -- if it's
16  described as a warning, I haven't heard it described
17  as a warning.  It's called a letter on your file,
18  which is documented in your personal file for a
19  period of time.
20    Q  Whose decision was it to reduce his IPF --
21  and that's his performance review rating?
22    A  Correct.
23    Q  Whose decision was it to reduce his IPF
24  rating and give him a letter on the file?

Page 121

1　　　A　So HR -- my recollection is that HR provided
2　the suggestion, and we talked through it.  We being
3　Greg and myself and Megan.  That would be an
4　appropriate response to the -- to the code of conduct
5　violation.
6　　　Q　Was that decision made on this consequence
7　management phone call with Larson and Kloosterman?
8　　　A　My recollection, yes.  But I think it also
9　had to be validated -- so by like our general manager
10　was also made aware of that decision before it was
11　taken.
12　　　Q　Who's that?
13　　　A　Michael DeWitt.
14　　　Q　So tell me if this is correct.  On the phone
15　call, you, Larson, and Kloosterman -- well, strike
16　that.
17　　　　Kloosterman makes the suggestion on the phone
18　call to reduce Turney's IPF rating and give him a
19　letter on the file; is that correct?
20　　　A　Correct.
21　　　Q　And then you and Larson, on that phone call,
22　decide to take her recommendation?
23　　　A　Correct.
24　　　Q　And make the decision on that phone call

Page 122

1　which is subsequently approved by Mike DeWitt?
2　　　A　My understanding, yes.
3　　　Q　Okay.  What was your understanding based on
4　that DeWitt approved the decision that you and Larson
5　made on that phone call?
6　　　A　Please repeat the question.
7　　　Q　Sure.  What's the basis for you testifying
8　that you believe that Mike DeWitt approved the
9　decision that you and Larson made on that phone call
10　to reduce Turney's IPF rating and give him a letter
11　on his file?
12　　　A　Right.  It was my understanding that -- and I
13　don't recall specifically.  I'm aware that it had to
14　be vetted through Mike DeWitt for kind of final
15　approval of the consequence that was going to be
16　applied.  And I think that was done by HR after our
17　meeting.
18　　　Q　I'm just asking what your source is for that
19　belief.  Did someone tell you?
20　　　A　No.  I think Megan provided that information
21　that we would test this with Mike DeWitt and get
22　confirmation.  That's my recollection.
23　　　Q　Megan said that on this phone call?
24　　　A　As best I can recall.  That would be the next

Page 123

1　step, that they would need to get senior manager
2　approval.  Because I don't think it was her final
3　decision, but this was the recommendation.  And it
4　had to be approved by the general manager.
5　　　Q　Well, you and Larson made the decision based
6　on Megan's recommendation on that phone call,
7　correct?
8　　　　MS. KIRKPATRICK:  Objection.  That's not what
9　he said.
10　　　　MS. GURMANKIN:  That is what he said.  But
11　let's confirm that.
12　　　Q　Is that what happened?
13　　　A　So we didn't make the decision, Greg and I.
14　We provided input into the HR suggestion and agreed
15　that that would be appropriate.  So it wasn't our --
16　I didn't see it as our decision that we were going to
17　do it.  We rely on HR to ensure that consequence
18　management is applied consistently across the
19　business.  That's why we rely on HR.  It's not the
20　supervisor's ability to make decisions on --
21　especially on something like this -- around what's
22　the appropriate consequence management.  Because I
23　don't have the detail or the background to know what
24　is the right level.  That's why we have HR is to help

Page 124

1　determine what is the right level.  They test it with
2　us.  Do you think this seems appropriate.  And we
3　agreed that it felt appropriate for the
4　circumstances.
5　　　Q　What circumstances?  I mean you weren't
6　aware, as of this time, what the circumstances were
7　regarding Turney's violations of the code of conduct.
8　　　　MS. KIRKPATRICK:  Objection.  He said he
9　doesn't recall if he was given specifics.
10　　　　THE WITNESS:  Other than what Jesse initially
11　provided as the evidence.  I know that we had
12　discussion around the event and the outcome.  I
13　just -- I cannot give you specifics of exactly what
14　the -- you know, all the allegations and what we
15　explicitly talked about.  But we talked about the
16　investigation and what was found and then the
17　recommendation of what would be appropriate
18　consequence for Mr. Turney and Hoover.
19　　　Q　BY MS. GURMANKIN:  Okay.  So who were the
20　decision-makers regarding the decision to reduce
21　Turney's IPF rating and give him a letter on the
22　file?
23　　　　MS. KIRKPATRICK:  Objection.  He already told
24　you that he and Larson weighed in --

Page 125

1       MS. GURMANKIN:  Please don't testify.
2       MS. KIRKPATRICK:  -- to HR to make the
3  decision.  You're asking the same question over and
4  over again.
5       MS. GURMANKIN:  No.  He's been all over the
6  place.
7       MS. KIRKPATRICK:  And I'm not going to be
8  here late because of it.
9       MS. GURMANKIN:  Then stop interrupting and
10  stop taking really long breaks, Kathy.
11       MS. KIRKPATRICK:  No.  No.  Stop asking the
12  same questions over and over again.  Just because you
13  don't like the answer, that's not --
14       Q   BY MS. GURMANKIN:  So who made the decision?
15       A   So HR makes the decision and gets our
16  feedback.
17       Q   So did Kloosterman make the decision?
18       A   She, I think, made the recommendation.
19       Q   You just said HR made the decision.
20       A   Okay.
21       Q   Who's HR?
22       A   Human resources.
23       Q   No.  Who?  Who in HR made the decision?
24       A   So Megan was the representative.  I don't

Page 126

1  know above Megan if there was someone else within the
2  HR organization that had to weigh in and also approve
3  it.  I don't know that.
4       Q   Was the decision made on this consequence
5  management phone call with you, Larson, and
6  Kloosterman that subject to senior management
7  approval, Turney's IPF rating was going to be reduced
8  and he was going to get a letter on his file?
9       A   I would say the recommendation was made on
10  that phone call, but that would be the recommendation
11  by myself, Greg, and Megan for consequence.  So I
12  don't know that I would call it a final decision, but
13  rather that was our recommendation following the
14  investigation, was to -- that would be the
15  appropriate consequence management.
16       And I know that it was needed to get vetted
17  with the general manager, but I don't know if there
18  was anyone else -- for example, the VP of HR, who
19  maybe also had to sign off on it.  That, I don't
20  know.
21       Q   All right.  So am I correct that on this
22  phone call Kloosterman makes the suggestion that as a
23  consequence of Turney's violation of the code of
24  conduct he subject to a reduction of his IPF and a

Page 127

1  letter on the file?
2       MS. KIRKPATRICK:  Objection.
3       THE WITNESS:  Correct.
4       Q   BY MS. GURMANKIN:  And you and Larson agreed
5  with that recommendation?
6       A   Correct.
7       Q   And as a result of Kloosterman's
8  recommendation and you and Larson agreeing with that,
9  Kloosterman told you she was going to go back and get
10  senior management approval?
11       A   That's my recollection.
12       Q   Okay.  But do you recall specifically if she
13  said she needed -- or she was going to get senior
14  management approval or DeWitt approval?
15       A   I don't recall specifically the approvals.
16       Q   All right.
17       A   But I do know that the general manager was
18  going to be informed and brought up to speed.
19       Q   DeWitt?
20       A   Yeah.  Mr. DeWitt.
21       Q   Did Kloosterman tell you that on the phone
22  call?
23       A   That's my recollection.
24       Q   Okay.  All right.  And anything else that you

Page 128

1  recall -- oh, actually strike that.
2       What was discussed about Hoover's consequence
3  on that phone call?
4       A   That there -- my recollection of that was
5  that there would be a verbal discussion with
6  Mr. Hoover around making inappropriate comments to
7  employees and to, you know, be professional and...
8       Q   Right.  So similar to the Turney consequence,
9  am I correct that Kloosterman suggested that?
10       A   Correct.
11       Q   You and Larson on the phone call agreed with
12  her recommendation?
13       A   Correct.
14       Q   And she informed you she was going to go get
15  senior management approval for that recommendation?
16       A   I don't recall that for one -- specifically
17  for Mark's consequence management.  But they were --
18  it was done in the same meeting, and so I think that
19  can be implied.
20       Q   Well, was a decision made on that phone call
21  that this was going to be Hoover's consequence?  Or
22  was just a recommendation made that Kloosterman was
23  going to take back to whomever in senior management
24  and they were going to approve this?

32 (Pages 125 to 128)

Page 129

1     A  For Mark's, I think it was a recommendation,
2  and they were both reviewed with Mr. DeWitt. That's
3  my recollection.
4     Q  Okay. All right. Anything else you recall
5  about this consequence management phone call with
6  you, Kloosterman, and Larson?
7     A  No.
8     Q  Did either you or did any one of the three of
9  you recommend that Turney be terminated as a result
10  of his violations of the code of conduct?
11     A  Did we recommend termination?
12     Q  Yeah.
13     A  No.
14     Q  Why?
15     A  Based on the information and the level of the
16  code of conduct, we relied on HR to provide the
17  direction for that consequence.
18     Q  Okay. So because --
19     A  So really we -- I rely on HR to provide the
20  direction of what the consequence should be so that
21  it's consistent and fair and within the company's, I
22  guess, guidelines. Yeah. Because that's not my area
23  of expertise is trying to deliver consequence
24  management for code of conduct breaches.

Page 130

1     Q  So if Kloosterman had recommended termination
2  for Turney, you would have agreed with that
3  recommendation because it was coming from HR?
4     MS. KIRKPATRICK: Objection.
5     THE WITNESS: I would have -- we would have
6  discussed it and listened to the totality of the
7  investigation and the recommended consequence. So I
8  would have -- I mean HR ultimately, I think, leads
9  this consequence decision.
10     Q  BY MS. GURMANKIN: But during the call,
11  Kloosterman never suggested termination for Turney,
12  correct?
13     MS. KIRKPATRICK: Objection.
14     THE WITNESS: I don't recall specific. I do
15  know that we talked about the bookends of, you know,
16  what would be potential termination -- or sorry,
17  potential consequence could range anywhere from
18  termination through to, you know, a discussion. And
19  that's just, you know, in the business. There's
20  multiple different layers of consequence management.
21  But I don't specifically recall that we talked about
22  termination.
23     Q  BY MS. GURMANKIN: Other than the discussion
24  that that was a possible option along the spectrum of

Page 131

1  consequence?
2     A  Yeah.
3     Q  Okay. But you don't recall Kloosterman ever
4  suggesting termination for Turney?
5     A  I don't recall.
6     Q  And you did not because Kloosterman never
7  suggested it, right?
8     A  I don't think -- yeah. I don't recall
9  suggesting it.
10     Q  Because Kloosterman didn't?
11     A  Yeah. Because I was relying on HR.
12     Q  And Kloosterman never recommended anything
13  beyond a verbal discussion with Hoover?
14     A  Not to my recollection, no.
15     Q  And that's why you never recommended anything
16  else for Hoover?
17     A  Correct.
18     Q  And as far as you know, that's why Larson
19  didn't recommend termination for Turney or anything
20  beyond the verbal discussion with Hoover?
21     A  Correct.
22     Q  I'm showing you what's been marked as
23  Exhibit 32. You can pass one on.
24     Have you seen this document before?

Page 132

1     A  I did see it in pre-read, yes.
2     Q  In the preparation for your deposition?
3     A  Correct.
4     Q  Did you see it prior to that?
5     A  No.
6     Q  Did you read it once you got it in
7  preparation for your deposition?
8     A  I did read through it.
9     Q  And does this document -- and if you need to,
10  feel free to look at it now. But does this refresh
11  your recollection as to whether you were given any
12  details as to how Turney and Hoover violated the code
13  of conduct?
14     A  So the three points -- again, I don't -- I
15  mean I read this before, but I cannot conclusively
16  say that I remember these points being discussed. I
17  can't say that I remember either way. It's almost
18  three years ago, and I just don't remember
19  specifically these things being said.
20     Q  Even if you don't remember specifically these
21  things being said, are you referring to the things
22  under summary of findings on the first page?
23     A  Correct. Yeah.
24     Q  All right. Even if you don't remember

33 (Pages 129 to 132)

Page 133

1　specifically these details being discussed with you,
2　does seeing this document refresh your recollection
3　as to whether you were given details about how Turney
4　and Hoover violated the code of conduct?
5　　A　Yeah.　We would have discussed the findings
6　from the report in our discussion around consequence
7　management and what the next steps were.
8　　Q　Did you?
9　　A　Did we discuss it?
10　　Q　Yeah.　You said you would have.
11　　A　Well, yeah.
12　　　MS. KIRKPATRICK:　Objection.　He said he
13　doesn't recall at that time.
14　　　THE WITNESS:　I just don't recall
15　specifically talking about these points.
16　　Q　BY MS. GURMANKIN:　Right.　That's all I'm
17　asking is your recollection.
18　　A　Okay.
19　　Q　All right?　So all I want to know is when you
20　saw Exhibit 32 in preparation for your deposition,
21　did that help you remember as to whether you were
22　given specific details about what Turney and Hoover
23　did to violate the code of conduct in that
24　consequence management phone call?

Page 134

1　　　MS. KIRKPATRICK:　Objection.　Asked and
2　answered.
3　　　THE WITNESS:　I read it.　It didn't -- I
4　can't explicitly place these comments in my mind
5　during that discussion.
6　　Q　BY MS. GURMANKIN:　How about any detail?　Did
7　it refresh your recollection as to whether you got
8　any detail about how Hoover and Turney violated the
9　code of conduct in that discussion?
10　　　MS. KIRKPATRICK:　Objection.　Asked and
11　answered.
12　　　THE WITNESS:　Not specific to that meeting.
13　　Q　BY MS. GURMANKIN:　How about at any point?
14　　A　The only thing that I recall around Mark was
15　the comments I read somewhere around the window
16　licker and --
17　　Q　Where are you?
18　　A　But I don't recall when I --
19　　Q　What are you looking at?
20　　A　I don't know that it's in here.
21　　Q　Oh, I'm sorry.　I thought you were pointing
22　to something.
23　　A　No.
24　　Q　So at some point you remember that there was

Page 135

1　confirmation that Hoover had called Jesse a window
2　licker?
3　　A　That was just --
4　　　MS. KIRKPATRICK:　Objection.
5　　　THE WITNESS:　-- one of the allegations that
6　were made.　But I don't recall specifically where I
7　learned that or whether I read that.　Because that
8　was in some of the pre-read material, I think.
9　　Q　BY MS. GURMANKIN:　When you say "pre read,"
10　you're talking about in preparation for your
11　deposition?
12　　A　Yeah.
13　　Q　All right.　After that consequence management
14　phone call with Larson and Kloosterman, at some point
15　you learned that senior management had approved the
16　recommendations that the three of you made regarding
17　Hoover and Turney's consequence, right?
18　　A　Right.
19　　Q　Okay.　And who tells you that?
20　　A　I don't remember if it was Megan or Michelle.
21　I think probably Megan.
22　　Q　Are you guessing?　Or do you have a
23　recollection?
24　　A　I can't say with a hundred percent certainty.

Page 136

1　I believe it was Megan that would have told me that.
2　　Q　You and Larson together or just you?
3　　A　I don't remember.　I think it probably came
4　through Greg.
5　　Q　Oh.　So you think Greg told you?
6　　A　I don't recall.
7　　Q　Okay.　You don't recall who told you?
8　　A　No.
9　　Q　All right.　But at some point you learned
10　that your recommendation had been approved for Hoover
11　and Turney?
12　　A　Correct.
13　　Q　And did you learn as to who approved the
14　recommendations?
15　　A　I'm aware that Mike DeWitt approved it.
16　That's the only person that I'm aware of.
17　　Q　And how are you aware that DeWitt approved
18　the recommendations for Hoover and Turney?
19　　A　From Ms. Kloosterman.
20　　Q　Okay.　Did she call you?
21　　A　I don't recall.　I just know that Mike was
22　going to be briefed on the recommendations.　Before
23　we could move forward, they needed to test it with
24　Mike DeWitt.　And they came back approved, so...

34　(Pages 133 to 136)

1   Q   All I'm asking is if you remember who told
2   you that DeWitt approved the recommendations for
3   Turney and Hoover.
4   A   I don't remember who told me, whether it came
5   through Greg or -- I don't remember specifically who
6   told me.
7   Q   Did you document the conversation in which
8   you learned that your recommendations regarding
9   consequences for Hoover and Turney's violation of the
10  code of conduct had been approved?
11  A   No, I did knot.
12  Q   Did you ever see any documentation confirming
13  that those recommendations were approved?
14  A   Not to my recollection.  But Greg is the
15  operations manager at the time.  I don't know if
16  he -- if he had information or some paperwork that I
17  didn't have.
18  Q   I'm just asking if you saw any documentation.
19  A   Not to my recollection.
20  Q   What happens next that you're involved in
21  regarding the delivery of the consequences to Hoover
22  and Turney?
23  A   So my recollection is that Greg Larson and
24  myself delivered the consequence discussion to both

1   Mark and to Will.
2   Q   Okay.  Tell me -- and how soon was it after
3   you learned of the approval that you and Larson had
4   the conversations with Turney and Hoover?
5   A   I don't remember explicitly how many days,
6   but it would have been quickly after.
7   Q   Tell me about the conversation that you and
8   Larson had with Turney.  Where was it?
9   A   So I think it was in our little break-out
10  room, in our -- Greg and I's office area where we had
11  Will come in first and then Mark after.
12  Q   Okay.  Tell me about the discussion with
13  Will.
14  A   That he would be -- yeah, given the written
15  warning, put on his file.  He would have to do --
16  he'd be enrolled in the leadership training, would
17  continue to be coached, and that he would have a
18  reduction in his IPF.
19  Q   Where did the leadership training come from?
20  A   Where did it come from?
21  Q   Yeah.
22  A   It's a Shell -- it's a Shell leadership
23  course that's put on.
24  Q   Who made that recommendation?

1   A   Who made it?
2   Q   Uh-huh.  That wasn't discussed.  You told me
3   all that was recommended on the phone call was a
4   reduction in his IPF and a letter in the file.
5   A   Okay.
6   Q   So where did that come from?
7   A   I guess I didn't recall that that was one of
8   the items that was going to be part of his -- because
9   I didn't see that as a consequence.  We talked about
10  consequence, letter in the file, reduction of IPF.
11  So the lead training -- I guess it could be seen as
12  consequence.
13  Q   Did you see it as a consequence?
14  A   Normally that type of training is given as
15  something just to help staff improve their leadership
16  ability.  So I think it was -- yeah, it could be
17  viewed as a consequence.
18  Q   Is that generally part of a leadership
19  development program?
20  A   Yeah.  That we put our supervisors through
21  leadership development.
22  Q   Okay.  Is that part of the leadership
23  development program that you took from 2007 to 2010?
24  A   It's actually the evolution of it, so it's

1   changed over the years.  They don't do what I did
2   back in the day.
3   Q   But it's similar?
4   A   This is a replacement for it.
5   Q   Got it.  All right.  How long is your meeting
6   with Turney?
7   A   Estimate, maybe 15 minutes.
8   Q   Did you give him the warning in the meeting?
9   Or I'm sorry, the letter in the file?
10  A   I don't recall if the letter was given to him
11  in that meeting.  Normally you would give a letter,
12  read through it, and both sign it.  But I don't
13  recall doing that specifically in that meeting or if
14  Greg did that separately.  Yeah, I don't remember
15  specifically.
16  Q   Did you see the letter before it was given to
17  Turney?
18  A   I can't remember explicitly.
19  Q   Do you remember ever seeing it?
20      MS. KIRKPATRICK:  Objection.  He just told
21  you he doesn't remember.
22      THE WITNESS:  I don't recall.
23      MS. GURMANKIN:  He said before he met with
24  Turney.  My question now is if he ever remembered

Page 141

1    seeing it.
2          THE WITNESS:  Not explicitly.
3          Q   BY MS. GURMANKIN:  Okay.  I'll show you
4    what's been marked as Exhibit 33.  You can pass one
5    copy.
6          Is this is the letter that he signed?  Have
7    you seen this before?
8          A   Yeah.  I don't remember seeing this specific
9    letter before.  I may have, but I -- let's see.  It's
10   from Greg to Will.  So I don't remember explicitly
11   reading it.
12         Q   Do you remember seeing it but not explicitly
13   reading it?  Or you don't remember seeing it?
14         A   I don't remember seeing it.
15         Q   Do you remember if you saw a draft?
16         A   I don't recall.
17         Q   Okay.  So am I correct that you were not
18   involved in drafting it?
19         A   I think that's correct.
20         Q   Okay.  Is it just you and Turney and Larson
21   in that meeting in the break-out room?
22         A   I think Megan was also on the line.
23         Q   She was on the phone?
24         A   Yep.

Page 142

1          Q   All right.  So tell me what else you recall
2    about that meeting.
3          A   I don't think there's anything else.  Yeah.
4    And I don't recall -- yeah.  I can't remember if the
5    letter was at the meeting as well, and Will signed it
6    there.
7          Q   Seeing this doesn't help you recall?
8          A   You know, I think it probably was at the
9    meeting.  I just can't explicitly remember Will --
10   yeah, I think it was.  I think we did go through this
11   with him there.  That Greg read this to him, and I
12   observed that and Will signed it.  And that we went
13   through the consequence that would be done and where
14   he violated the code of conduct.
15         Q   Did Turney say anything during the meeting?
16         A   Yeah.  I recall him being very sorry that he
17   had -- you know, that this had happened, that he
18   didn't -- he certainly didn't mean anything, no ill
19   intent with any of his -- any of his comments or
20   anything like that.  That's Will's -- you know, his
21   demeanor and his leadership style is one of that was
22   really -- I guess, you know, more on a friendship
23   type of basis than of a professional leader,
24   something that we had chatted about and that he was

Page 143

1    working to improve.
2          Q   Anything else that was said in that meeting?
3          A   Just that -- yeah, I remember him talking
4    that he would learn from this and that it would
5    not -- something like this would not happen again,
6    that this was a -- certainly a strong learning
7    opportunity for him on how he had behaved.  And he
8    took ownership of it and you, know, that he would
9    improve from it.
10         Q   Did you say anything during the meeting?
11         A   Did I say anything?
12         Q   Uh-huh.
13         A   No.  Not that I recall.  Because it was
14   really Greg as the ops manager delivering this
15   message.  So I don't recall having to interject on
16   top of Greg's comments.
17         Q   Did Kloosterman say anything?
18         A   Not that I recall.
19         Q   Was there any discussion in that meeting as
20   to what Turney specifically did to violate the code
21   of conduct?
22         A   So I'm, you know, reading through this
23   specifically harassment in the workplace including
24   jokes and comments.

Page 144

1          Q   You're looking at Exhibit 33, right?
2          A   Correct.
3          Q   Okay.  So was there a discussion during the
4    meeting as to what Turney specifically did to violate
5    the code of conduct?
6          A   I don't recall going into the specific list
7    of allegations.  But just that he had violated the
8    code of conduct with his -- with his -- yeah,
9    inappropriate jokes and comments.  But I can't recall
10   specifically going through a list of these or the
11   specific things you've done in that particular
12   meeting.
13         Q   Were you involved in any other meetings after
14   that one with Turney in connection with the
15   investigation or the findings?
16         A   Not to my recollection.
17         Q   Do you know if anyone met with Hoover to talk
18   to him about the conclusion that he violated?
19         A   Yeah.  We did the same thing with Mark after
20   Will.
21         Q   So you were involved in that meeting?
22         A   Yeah.
23         Q   You just testified that you weren't involved
24   in any other meetings regarding the investigation or

36 (Pages 141 to 144)

Page 145

1  the --
2      A  Oh.  I thought you were referencing with
3  Will.
4      Q  No.
5      A  Okay.  Sorry.  Yeah.  So we did Mark right
6  after Will.  We had Mark come into the same room and
7  delivered the message to Mark.
8      Q  What message was that?
9      A  Just that there was -- you know, it was a
10  serious allegation made against him on his comment
11  towards Jesse.  And he acknowledged it, apologized,
12  and said it would never -- never happen again.
13      Q  What comment was that you were referring
14  to?
15      A  The window-licker comment.
16      Q  Is that the only one referenced in the
17  meeting?
18      A  Well, I can't remember if it was -- I don't
19  think it was explicitly referenced.  But just that,
20  you know, any type of inappropriate comment to an
21  employee wouldn't be tolerated and is, you know,
22  potential code of conduct violation.  And he
23  acknowledged that and apologized and said that it
24  would not happen again.

Page 146

1      Q  But you specifically referenced that there
2  was discussion about the comment he made to Jesse.
3  Was that discussed in the meeting or not?
4      A  Not to my recollection, the details of the
5  comment.  Just that he had made an inappropriate
6  comment to Jesse.
7      Q  All right.  Your understanding that there was
8  a conclusion that he made one inappropriate comment
9  to Jesse?
10      A  Yes.
11      Q  And do you have an understanding from someone
12  as a result of the investigation that that
13  inappropriate comment that he was found to make
14  involved a window-licker or something to that effect?
15      A  Yes.
16      Q  And you don't remember who you learned that
17  from?
18      A  No, I don't.
19      Q  Okay.  How long was that meeting with Hoover?
20      A  I think that one was really quite short.  It
21  was five or seven minutes.
22      Q  Have you ever seen any documentation -- well,
23  strike that.
24          Did you ever document the meeting with Turney

Page 147

1  in which he got the letter for his file?
2      A  Not to my recollection, no.
3      Q  Have you ever seen any documentation of that
4  meeting?
5      A  That we sat down with Will and talked about
6  it?  No.
7      Q  The meeting with Turney in which you gave him
8  the letter and talked to him about his violation.
9      A  No.
10      Q  Did you document the meeting with Hoover?
11      A  Not to my recollection.
12      Q  Have you ever seen any documentation
13  regarding the meeting with Hoover?
14      A  No, not to my recollection.
15      Q  You didn't think that either of those
16  meetings were relevant enough to document in your
17  notebook?
18      A  No.  Again, it was led by HR, and the letter
19  here confirms the discussion.  So I guess...
20      Q  With Turney, right?
21      A  Yeah.
22      Q  Well, it doesn't confirm the discussion.  It
23  confirms being given a letter.
24      A  It says this memo confirms our discussion on

Page 148

1  December 15, top sentence.
2      Q  Well, you discussed things other than were in
3  this letter, right?  I mean, for example, you
4  testified that he was very apologetic in that
5  meeting.  That's not covered in Exhibit 33, right?
6      A  Okay.  Correct.
7      Q  So there were things that were discussed at
8  that meeting that were not documented in Exhibit 33,
9  right?
10      A  Correct.
11      Q  So you didn't feel that the discussions with
12  Hoover and Turney about the conclusions that they
13  violated the code of conduct and the consequences
14  were relevant enough to document?
15      MS. KIRKPATRICK:  Objection.  That's not what
16  he said.
17      THE WITNESS:  It was -- again, it was a
18  meeting that was led by HR and Greg.  And so I didn't
19  take additional notes as I wasn't the main leader of
20  that meeting.
21      Q  BY MS. GURMANKIN:  So you only document notes
22  in which you're the main leader?
23      A  Not necessarily.  But so I'll take notes on
24  various meetings, but I didn't -- for that particular

37 (Pages 145 to 148)

Page 149

1  one, I didn't -- I didn't choose to take notes.
2  　　Q  Because you were not the main leader, right?
3  　　MS. KIRKPATRICK:  Objection.
4  　　THE WITNESS:  Correct.  And my belief was
5  that HR was documenting this exchange and that it
6  was, you know, documented through a letter.  And so
7  that -- I wouldn't need to document it as well.
8  　　Q  BY MS. GURMANKIN:  Well, we've already
9  discussed the fact that not everything said in the
10  meeting with Turney was documented in Exhibit 33,
11  right?
12  　　A  Right.
13  　　MS. KIRKPATRICK:  But there could have been
14  other --
15  　　Q  BY MS. GURMANKIN:  And Hoover was not given
16  any documentation regarding his violations of the
17  code of conduct, correct?
18  　　THE WITNESS:  To my knowledge.
19  　　MS. KIRKPATRICK:  Objection.
20  　　Q  BY MS. GURMANKIN:  All right.  So did you
21  confirm with HR or Larson that someone was going to
22  be documenting these discussions with Turney and
23  Hoover?
24  　　A  I did not.

Page 150

1  　　Q  Any other meetings or discussions that you
2  had with anyone about the investigation or the
3  conclusions?
4  　　A  Not to my recollection, no.
5  　　Q  You ever talk to Jesse about the
6  investigation or the conclusion?
7  　　A  No, I did not.
8  　　Q  Did you follow up to make sure that someone
9  did?
10  　　A  I knew that HR was communicating with her.
11  　　Q  Who told you that?
12  　　A  Yeah.  I don't know if Megan explicitly said
13  that.  But as part of the investigation process, that
14  would be HR's role to follow up with the person.
15  　　Q  I'm just asking if you know if anyone
16  followed up with her.
17  　　A  Do I know if anyone followed up with Jesse?
18  I don't know specifically who followed up with Jesse.
19  　　Q  Do you know if someone did?
20  　　A  Based -- yeah, I know that somebody did based
21  on our company's thoroughness on, you know,
22  conducting a full investigation like this, that it
23  would only make sense that HR or someone in the
24  organization is going to follow up on a complaint.

Page 151

1  　　Q  Okay.  Other than your belief about the
2  company's thoroughness in the investigative process,
3  do you have specific knowledge as to whether anyone
4  followed up with Jesse?
5  　　A  Not that I can recall.
6  　　MS. GURMANKIN:  Okay.  Let's take a quick
7  break to change the tape.
8  　　THE VIDEOGRAPHER:  This concludes File Number
9  2 in the deposition of Steve Craig in the matter of
10  Barnes v Shell, et al.  We're going off the record at
11  4:35 p.m.
12  　　(Break taken from 4:35 to 4:42 p.m.)
13  　　THE VIDEOGRAPHER:  This begins File Number 3
14  in the videotaped deposition of Steve Craig in the
15  matter of Barnes v Shell, et al.  We are going back
16  on the record at 4:42 p.m.
17  　　Q  BY MS. GURMANKIN:  You testified earlier that
18  you didn't have a specific recollection of talking to
19  Greg Larson after that initial November 21st, 2016,
20  meeting with Jesse and Turney and before the meeting
21  that you had with the two of them on the following
22  day, correct?
23  　　A  Correct.
24  　　Q  After the November 22, 2016, meeting that you

Page 152

1  had with Turney and Jesse and before the consequence
2  management phone call that you had with Kloosterman
3  and Larson at the conclusion of the investigation,
4  did you and Larson have discussions about the
5  investigation or Jesse's complaints?
6  　　A  So I know because of the confidentiality of
7  it, we didn't have any detailed discussions around --
8  like when the investigation is going on, then I don't
9  recall any specific discussions.  Yeah, when I read,
10  you know, the decision on what would be best for
11  Jesse in her -- you know, from a work perspective,
12  how could we allow her to, you know, exit this and
13  come out in a positive -- with a positive
14  opportunity.  I don't recall exactly.  You know, I
15  think Greg and Megan were having the discussions
16  around what would be the best for Jesse.  And I don't
17  recall specific discussions that Greg and I had
18  around that.
19  　　Q  Do you recall specific conversations that you
20  had with Larson or communications with Larson after
21  the meeting you had with Turney and Jesse on
22  November 22nd and before you and Larson have the
23  phone call with Kloosterman about the consequence
24  management?

38 (Pages 149 to 152)

Page 153

1　　A　So I would have informed Greg that I had
2　communicated this to HR and that we were aware that
3　investigation would happen, that we would have Megan
4　come to location, so the discussion here with Kelly
5　and Megan and Greg, that we would have the
6　investigation.
7　　Q　You're talking about the bottom of your
8　handwritten notes marked as P39?
9　　A　Correct.
10　　Q　Okay.  That's with you and Kloosterman and
11　Larson and Kelly Soudeleir?
12　　A　Correct.
13　　Q　On December 1st?
14　　A　Correct.
15　　Q　Okay.  Other than that discussion with the
16　four of you, I just want to know if you recall any
17　one-on-one communications that you had with Larson --
18　　A　With Greg?
19　　Q　-- between November 22nd and the consequence
20　management phone call that the two of you had with
21　Kloosterman.
22　　　　MS. KIRKPATRICK:  Objection.  Asked and
23　answered.
24　　　　THE WITNESS:  Yeah.  I don't remember

Page 154

1　anything -- any specific conversations that Greg and
2　I had.
3　　　　MS. KIRKPATRICK:  Are you finished with your
4　answer?
5　　　　THE WITNESS:  Yeah.  I'm just trying to think
6　if I can remember any conversations that Greg and I
7　had about -- I guess my only -- my only recollection
8　is discussing -- and I don't remember when, but what
9　would be a potential -- you know, a potential
10　opportunity for Jesse.  How could we -- how could we,
11　you know, provide a new opportunity or what would
12　be -- what would be in Jesse's best interest.
13　　Q　BY MS. GURMANKIN:  Was that after the
14　conclusion of the investigation?
15　　A　Yes.  Because it wasn't something that we --
16　we didn't really -- I mean we waited.  The premise
17　was wait with the investigation.  And Greg was really
18　good at making sure, you know, so this is a
19　confidential investigation and we shouldn't -- none
20　of us should be discussing anything about the
21　investigation with anybody in the office.
22　　Q　All right.  Let me ask it this way.
23　　　　After the conclusion of the investigation,
24　did you and Larson have a discussion about how to

Page 155

1　handle Jesse or whether to offer her different
2　options?
3　　A　Yes.
4　　Q　Okay.  Any other discussions that you recall
5　with Larson between November 22nd and the conclusion
6　of the investigation?
7　　A　No.  None that I remember.
8　　　　MS. KIRKPATRICK:  Objection.
9　　Q　BY MS. GURMANKIN:  All right.  And in the
10　discussion -- did you have discussions with anyone
11　other than Larson about options to provide to Jesse?
12　　A　Not to my recollection, no.
13　　Q　In the discussions that you had with Larson
14　about that, was there discussion about moving Turney
15　out of his group or his role?
16　　A　Yes.  We talked about that as one of the
17　options.
18　　Q　What were the other options that you and
19　Larson discussed?
20　　A　So moving Will or moving Jesse.  And we
21　recognized that Jesse wasn't happy in her current --
22　with her current work group.  That was, I understand,
23　brought up.  And so how could we -- you know, how
24　could we do what's best for Jesse and give her, you

Page 156

1　know, a new opportunity.
2　　Q　Well, one way to do what was best for her was
3　to remove the supervisor who was sexually harassing
4　her.
5　　　　MS. KIRKPATRICK:  Objection.  He never
6　testified --
7　　　　MS. GURMANKIN:  Right.  I'm asking.
8　　Q　That would be one option, wouldn't it?
9　　　　MS. KIRKPATRICK:  I'm instructing him not to
10　answer that question.
11　　　　MS. GURMANKIN:  Based on what?
12　　　　MS. KIRKPATRICK:  That's a misleading
13　question.  He never testified to that.
14　　　　MS. GURMANKIN:  You know that's not in the
15　rules, Kathy.  Please don't do that.
16　　　　MS. KIRKPATRICK:  And you know that's --
17　　Q　BY MS. GURMANKIN:  One of the ways to do
18　what's best for her would be to take the supervisor
19　who's sexually harassing her out of his role, right?
20　　　　MS. KIRKPATRICK:  Objection.  Instructing him
21　not to answer.
22　　　　MS. GURMANKIN:  What's the basis?
23　　　　MS. KIRKPATRICK:  Because you are assuming
24　that there was a finding that he was sexually

1    harassing her. That's part of your question.
2          MS. GURMANKIN: You can object to the form.
3          MS. KIRKPATRICK: No. I'm not going to let
4    you mislead the witness.
5          MS. GURMANKIN: Do you know what the rules
6    are, Kathy? There's very specific circumstances in
7    which you may instruct him not to answer, and you are
8    very well aware that misleading questions in your
9    opinion are not one of them.
10         MS. KIRKPATRICK: You are not permitted to
11   distort the facts.
12         MS. GURMANKIN: Are you seriously instructing
13   him not to answer that question?
14         MS. KIRKPATRICK: Yeah. Did you hear it? Do
15   you want me to say it again?
16         MS. GURMANKIN: Yeah. Say it again.
17         MS. KIRKPATRICK: You heard it.
18     Q   BY MS. GURMANKIN: Are you listening to your
19   attorney's instruction not to answer that question?
20     A   Yes.
21     Q   Did you consider removing -- well, you
22   understood that Turney was making Jesse
23   uncomfortable. You knew that from November 21st,
24   2016.

1      A   Correct.
2      Q   And did you consider, when you were talking
3    to Larson about this, removing the supervisor who was
4    making her uncomfortable? Did you ever consider
5    that?
6      A   We did.
7      Q   And what did you discuss about that?
8      A   Well, so Jesse was also having challenges
9    with her -- with her work group, with others in the
10   work group that she didn't -- she wasn't getting
11   along with. Her performance was also discussed as we
12   had, you know, previous to all this brought up, you
13   know, in our performance evaluation how she was doing
14   in her role. And that played into the discussion
15   too, that maybe because she was struggling in the
16   role to deliver, as evidenced by the IPF value that
17   she received that year, that it may be in her best
18   interest to give her a new opportunity where she
19   could learn some new skills and get a fresh start and
20   not have to go back and try to work with the same
21   group of individuals that were -- that she was having
22   trouble with before.
23     Q   And you understood as of November 21, 2016,
24   that one of the individuals that she was having

1    trouble with was Ken Foreman who she said was putting
2    his hands through her hair, right?
3          MS. KIRKPATRICK: Who she said put his hands
4    through her hair.
5      Q   BY MS. GURMANKIN: Right?
6          MS. KIRKPATRICK: Again, objection. Because
7    you're misstating the testimony.
8          You can answer.
9      Q   BY MS. GURMANKIN: Right?
10     A   Well, I've only -- so when you say putting
11   hands through hair implies more than once. Jesse
12   only indicated that it happened once. But she would
13   be going back and working with the same group.
14         And so in our discussion with Greg is, again,
15   genuine care for people, how could we help improve
16   Jesse's situation given everything that had
17   transpired. So providing her a new opportunity
18   seemed like a good alternative as opposed to putting
19   Jesse back into the same role as she had before where
20   she was stressed out and having difficulty
21   delivering.
22         And her ability to deliver in that role was
23   part of that discussion. And my observations of
24   Jesse were such that I wasn't -- you know, I wasn't

1    seeing the quality of work that I believed was
2    necessary to, you know, do a good job in that role.
3      Q   Did you notice that prior to November 21st,
4    2016?
5      A   Yes.
6      Q   Any documentation of that prior to
7    November 21, 2016?
8      A   I don't recall putting -- like writing her --
9    writing that down other than during our IPF session
10   when all of the group has to rank all of the
11   individuals. It was documented there.
12     Q   Where is that?
13     A   So in the 2016 IPF session, that's -- it's in
14   the -- I think it was one of the documents that was
15   in the pre-read items.
16     Q   In the documents you looked at in preparation
17   for your deposition?
18     A   Yeah.
19     Q   And this is a session you had with your
20   direct reports?
21     A   Yes. It's the operations manager, human
22   resources, and the supervisors. And then as you --
23   because we evaluate everyone, including myself. So
24   as it moves up, then other people leave the room. So

Page 161

1  you know, when it's time to evaluate the supervisors,
2  they leave the room. And then it would be like
3  myself and Greg. And Honda would do the evaluation
4  of the supervisors. And then once that's done, Honda
5  leaves the room, and Greg and I would do the
6  evaluation of him. And then my evaluation would be
7  done by Greg and HR.
8      Q  So there's a document -- there's one document
9  that would have the feedback that was discussed about
10  all of these employees in these sessions that you
11  that you had with your direct reports, correct?
12      A  Correct.
13      Q  And you wrote that information down?
14      A  Greg was the note-taker for that meeting, so
15  I have some notes as well.
16      Q  Did you see those in preparation for your
17  deposition?
18      A  I saw the notes that Greg provided.
19      Q  How about your notes?
20      A  I don't recall if I had anything that was --
21  I'm not sure.
22      Q  Did you turn those over?
23      A  I turned over everything that I could find as
24  part of the investigation, yes.

Page 162

1      Q  To your lawyers?
2      A  I'm sorry?
3      Q  To your lawyers?
4      A  Yes. Yes.
5      Q  Including those notes?
6      A  Yeah. Everything that I could find, I turned
7  over.
8      Q  Could you find those notes?
9      A  I don't see -- I don't have them in here, so
10  I would say no.
11      Q  You don't have them in where?
12      A  So they're not as part of the investigation
13  documents that I've seen here.
14      MS. KIRKPATRICK: You mean that you've been
15  handed by counsel?
16      THE WITNESS: Right.
17      Q  BY MS. GURMANKIN: Have you seen them at all
18  in preparation for your deposition today?
19      A  Only the -- so Greg was the note-taker for
20  the -- for that particular IPF ranking session. So
21  we would all provide feedback. Greg was taking the
22  notes. And I have that document, and I provided
23  that, so...
24      Q  How about your notes that you took?

Page 163

1      A  I didn't -- I don't have any. I wasn't able
2  to find any additional notes. I went through all of
3  my notebooks and...
4      Q  Where are they?
5      A  They're at work.
6      Q  No. Where are those notes?
7      MS. KIRKPATRICK: He said he wasn't able to
8  find them.
9      MS. GURMANKIN: Yeah.
10      Q  Where are they?
11      A  I don't know if like on -- we had -- we had,
12  for example, loose pieces of paper with the ranking
13  during that meeting. And that's probably not
14  something that I kept because Greg was the formal
15  note-taker to document all of the comments in the
16  meeting.
17      Q  So other than the notes you took in your
18  spiral notebook, these notes you took on a loose
19  piece of paper?
20      A  Yeah. We had -- it's a nine-grid model.
21  It's a -- it has the nine boxes where you slot people
22  on the IPFs. So I know I was taking some notes as we
23  were putting people in the boxes.
24      Q  On a loose piece of paper?

Page 164

1      A  Yeah. I don't -- I didn't keep it. I don't
2  have it as evidence. Because again, Greg was the
3  note-taker on behalf of the whole room. So we passed
4  the -- you know, the form around so we could
5  reference it and look at it.
6      Q  Did you throw it away?
7      A  Yeah. I think there was multiple notes. But
8  I don't have specific -- there wouldn't be specific
9  details of any of the descriptions, but rather names
10  trying to kind of piece were people were being
11  slotted.
12      Q  When did you throw it away?
13      A  I don't recall throwing it away.
14      Q  You just said yeah. So do you recall?
15      A  So it would have been after the meeting was
16  done and we cleaned up the meeting room and Greg was
17  the prescribed note-taker for that.
18      Q  Did you throw it away or not?
19      A  I don't remember personally throwing it away
20  throwing it away, whether it was me or someone that
21  cleaned up the room once we were all done.
22      Q  Did you see it again at any point after the
23  meeting?
24      A  No.

41 (Pages 161 to 164)

Page 165

1　　Q　Did you ever ask Kloosterman if Jesse's
2　allegation about Foreman putting his hands through
3　her hair was substantiated?
4　　A　Did I ever ask Kloosterman?  No, I didn't
5　ask.
6　　Q　Why?
7　　A　HR is conducting the investigation.  I
8　wouldn't see it as my place to be probing into the
9　investigation that HR is doing.  The investigations
10　are treated confidential, and it's not -- I
11　wouldn't -- it would be inappropriate of me to be
12　asking about details of the investigation --
13　incidence of the investigation.
14　　Q　It would be inappropriate for you as the
15　supervisor who leads this group to find out if a male
16　employee was putting his hands through a female
17　employee's hair?  You think that would be
18　inappropriate of you?
19　　　MS. KIRKPATRICK:  Objection.  Not what he
20　said.
21　　　MS. GURMANKIN:  I'm asking.
22　　Q　Do you think that would be inappropriate of
23　you?
24　　A　I think that I need to let HR do their job.

Page 166

1　And so part of the -- part of the investigation is
2　that it's confidential, what the investigation finds
3　out.  And that's why we bring a third-party,
4　impartial, non asset person in to do the
5　investigation.  So I rely on HR to do their job.  And
6　I didn't see it as my role to be asking or probing
7　into, you know, any of the allegations that are being
8　made.
9　　Q　Sorry.  Are you finished?
10　　A　Yeah.
11　　Q　My question was:  Did you think it would be
12　inappropriate for you to ask Kloosterman if Jesse's
13　allegation about Foreman putting his hands through
14　her hair was substantiated.
15　　　MS. KIRKPATRICK:  Objection.  Asked and
16　answered.  You can tell her again.
17　　　MS. GURMANKIN:  No, it hasn't been answered.
18　　　MS. KIRKPATRICK:  You don't like the answer,
19　but it has been answered.
20　　Q　BY MS. GURMANKIN:  No.  Did you think it
21　would be inappropriate?  That's all I want to know.
22　For you to do that.  That's it.
23　　A　Yeah.  It's the investigation's job as to
24　let -- I want to let them do their investigation.

Page 167

1　　Q　Well, Kloosterman did her investigation,
2　right?
3　　A　Yeah.
4　　Q　So at the conclusion of her investigation,
5　did you think it would be inappropriate for you to
6　ask her if that allegation had been substantiated?
7　　　MS. KIRKPATRICK:  Objection.  Asked and
8　answered.
9　　　THE WITNESS:  I never thought about it, to be
10　honest.
11　　Q　BY MS. GURMANKIN:  That's why you didn't ask
12　her, right?
13　　A　I guess, yes.
14　　Q　Okay.  Is there any documentation that you
15　and Larson had discussed as a possibility removing
16　Turney from his position or his group?
17　　A　Not that I know of.
18　　　(Exhibit P40 was marked.)
19　　Q　BY MS. GURMANKIN:  You've been handed what's
20　been marked as P40, Bates Stamp Shell 1276.
21　　Do you know what this is?
22　　A　Sorry.  Do I know what this is?
23　　Q　Yes.
24　　A　So this is an HSE analyst role description

Page 168

1　that was created for a potential role for Jesse.
2　　Q　It relates to what you and Larson were
3　discussing about what to do for her, right?
4　　A　Right.
5　　Q　Yes?
6　　A　Yes.
7　　Q　There's a copy of a PostIt on here saying
8　Steve, this is my notes from a discussion with Jesse
9　about her role options, Greg.
10　　A　Yeah.
11　　Q　Did Greg give this document to you?
12　　A　Yes, I guess.  I don't -- yeah, I don't
13　recall this.  Yeah, based on the sticky.  So I don't
14　know if this was in his file when he turned it over
15　to me.  So he had a bunch of notes that he provided
16　for me when he left.  So I believe that this sticky
17　was when he did his hand-over in the staff documents
18　that he provided.
19　　Q　Oh, I see.  When he retired?
20　　A　Yeah.
21　　Q　And you took over his documents?
22　　A　Like he gave me his IPF notebook and said
23　here's all the IPF documentation in case you ever
24　need it, and here's this on Jesse's role, and you

Page 169

1  know, just his little people folder, if you will.
2      But I don't recall this being handed to me.
3  You know, this was my notes from the discussion
4  around Jesse. I don't recall seeing this or getting
5  this at the time of Jesse getting the HSE analyst
6  role.
7      Q  I got it. When he transitioned his file to
8  you, was there a file on Jesse?
9      A  Not a specific file on Jesse.
10     Q  Were there documents related to Jesse?
11     A  Not to my recollection, no.
12     Q  Well, other than this marked as P40?
13     A  There's one letter that I have which is the
14  letter from the Pennsylvania whatever, labor board,
15  that states that she's filing a petition against
16  Shell. I have that letter.
17     Q  Okay.
18     A  In my file.
19     Q  And P40 he gave to you, right? As part of
20  his transition?
21     A  Yeah, I guess so.
22     MS. KIRKPATRICK: We don't want you to guess.
23     THE WITNESS: I don't know.
24     Q  BY MS. GURMANKIN: Have you seen this before

Page 170

1  today?
2      A  I don't recall seeing this piece of paper.
3      Q  And I'm correct that none of the handwriting
4  on here is yours?
5      A  None of the handwriting is mine.
6      Q  Do you recognize it all as Larson's?
7      A  Yes, I do.
8      Q  Okay. Did you actually have discussions --
9  in the discussions that you and Larson had about what
10  to do for Jesse or with Jesse after the conclusion of
11  the investigation, did you get into specifics?
12     A  After the investigation on what to do with
13  Jesse?
14     Q  Yeah. When you and Larson were having that
15  discussion, did you get into specifics?
16     A  Yeah. I think we talked about -- you know,
17  again what would be best for Jesse and that this
18  analyst role is something that we could get her to
19  help and add some value to the business.
20     Q  So there was discussion about an HSE analyst
21  role?
22     A  Correct.
23     Q  Anything else?
24     A  No, not to my recollection.

Page 171

1      Q  Did you document that discussion?
2      A  No.
3      Q  Not relevant enough?
4      MS. KIRKPATRICK: Objection.
5      THE WITNESS: I didn't -- you know, yeah. I
6  didn't -- yeah, I guess I didn't think so.
7      Q  BY MS. GURMANKIN: Other than P40 which
8  you've now seen, which I understand you haven't seen
9  before, have you seen any documentation regarding the
10  options that Jesse was provided?
11     A  No. Other than the P32 that talks about --
12  as discussed with you previously, we'll be able to
13  offer you an HSE analyst role as an opportunity to
14  broaden your skills and work on a different team.
15     Q  And you're referring to the second page of
16  P32?
17     A  Correct, yeah.
18     Q  Under the key messages for Jesse Barnes?
19     A  Under Bullet Number 5.
20     Q  Okay. And you were not involved in that
21  discussion, correct?
22     A  With Jesse? No, I was not.
23     Q  And you've only seen Exhibit 32 in connection
24  with preparation for your deposition?

Page 172

1      A  Correct.
2      Q  Any other discussions that you had with
3  anyone at Shell regarding the investigation or the
4  findings of the investigation?
5      A  Not to my recollection, no.
6      (Exhibit P41 was marked.)
7      Q  BY MS. GURMANKIN: You've been handed what's
8  been marked as P41, Shell 46 and 47. These are
9  emails from Jesse to a few people including you,
10  Larson, Priest, and Kloosterman.
11     Can you just read through them and let me
12  know when you're done.
13     A  Okay.
14     Q  Had an opportunity to review P41?
15     A  Yep.
16     Q  All right. Looking at the first page, it's
17  the email that starts in the middle of the page.
18  This is from Jesse to Larson, you, Kloosterman, and
19  Priest on January 24th, 2017, correct?
20     A  Uh-huh.
21     Q  Yes?
22     A  Yes.
23     Q  All right. And you read it when you got it?
24     A  Yes.

Page 173

1    Q  All right.  And then in the last paragraph,
2  she's saying that she's having a hard time accepting
3  her IPF ranking, right?
4    A  Uh-huh, yep.
5    Q  And this is for 2016?
6    A  Correct.
7    Q  And she was given that ranking -- when would
8  she have been given that ranking?
9    A  Probably in the new year.  So we do the
10  sessions, the ranking sessions, in October.  And then
11  the IPFs are delivered in the new year.  So probably
12  around that January 24th time.
13    Q  Was -- after the allegations were made
14  against Turney by Jesse in November of 2016, was
15  there any discussion that you were involved in about
16  reviewing her IPF ranking again to make sure that his
17  feedback was fair and accurate?
18    MS. KIRKPATRICK:  Objection.
19    THE WITNESS:  Will's feedback was fair and
20  objective?
21    BY MS. GURMANKIN:  Yeah.
22    A  So Will was only one of probably five people
23  providing feedback of Jesse's performance in October
24  during the IPF ranking session.  So it wouldn't have

Page 174

1  been strictly Will's feedback.  Will would be one
2  person providing feedback.
3    Q  And who were the other four?
4    A  So it would have been Greg Larson, myself, HR
5  would be there but not really providing feedback, the
6  operations supervisor.
7    Q  Who's that?
8    A  Mark Hoover.  And Kyle Vessel as the I&E,
9  instrumentation electrical supervisor.  And Shane
10  Sollinger at the time as the assets integrity
11  supervisor.
12    Q  So and in that discussion providing feedback
13  on Jesse and -- well, on Jesse, Turney, you, Larson,
14  Hoover, Kyle Vessel, and Shane Sollinger?
15    A  Yeah.
16    Q  Anyone else?
17    A  Not to my recollection, no.  That should have
18  been the group of supervisors, superintendent.
19    Q  Okay.  But Turney was the only one who was
20  her direct supervisor?
21    A  He was her supervisor, Yes.
22    Q  All right.  So was there anything discussed
23  that you were involved in about going back and making
24  sure that the feedback that he was giving to Jesse

Page 175

1  was fair and unbiassed?
2    A  I'm aware, based on this email, that there
3  was a review of her IPF.
4    And again, I think it's important to
5  understand in the IPF ranking session that it's
6  relative to others in the organization.  So it's not
7  just strictly based on the individual's performance,
8  but it's relative to the performance of the rest of
9  your peers and within your group, within a group
10  of -- a group of staff.  And so the system has us
11  rank people from .8.  You know, we have to have .8
12  all the way up to 1.2.  So if we have all super-star
13  performers, you still have to deliver .8 as part of
14  the process.
15    So when we rank our staff against each other,
16  then that can influence -- not just for Jesse but for
17  any staff -- that can influence what IPF ranking they
18  get.  And there's a big component on behaviors in the
19  IPF ranking.  So it's one, can you do your job,
20  demonstration by Jesse that she gives examples of
21  where she does her job.  But then the behaviors piece
22  is equally as important on how do you -- how do you
23  show up at your job, are you there to -- as I say,
24  are you paddling the boat or are you dragging your

Page 176

1  oar.
2    And so back to your question on if there was
3  input or review of Will's input.  I'm aware that the
4  IPF went up to .9 based on the review and the
5  evidence that was provided from Greg's notes and
6  Jesse's input and the input that we provided at the
7  IPF session.
8    Q  All Right.  So the behavior aspect is
9  subjective, right?
10    A  Yes.
11    Q  Okay.  So to go back, there was a review
12  after Jesse complained about her rating?
13    A  Yes.
14    Q  Who was involved in the review?
15    A  I think Greg.  I don't remember.  Well, I
16  guess -- let me think if I...
17    Q  Were you?
18    A  I don't remember specifically discussing
19  this.  I know like Greg was really managing it.  I
20  mean the email was sent to me.  I guess I did have --
21  I do recall discussion with Greg around our IPF
22  session and what -- you know, what our comments were
23  to just confirm or validate that what we said was, in
24  fact, fair and as part of this discussion.  And then

44 (Pages 173 to 176)

Page 177

1  I think Greg took it up with HR and made the decision
2  as to what -- you know, to increase it.
3      Q  So your understanding was that it was
4  Larson's decision to increase the rating?
5      A  I don't know if it was exclusively Greg's
6  decision, but made in conjunction with HR.
7      Q  Who in HR?
8      A  I think Michelle at the time.
9      Q  Okay.  So above in the top email on the first
10  page, that's an email from Jesse.  This is
11  January 25, 2017, to the same people.  And she said I
12  want to point out that I reached out to Steve in May
13  2016 for input in my role before and I didn't receive
14  a response.  I attached the email.  In addition to my
15  first email, I attached three high-5s I received this
16  year as well.
17      The second page is her May 17, 2016, email to
18  you, correct?
19      A  Uh-huh.
20      Q  Yes?
21      A  Yes.
22      Q  And is she correct that she didn't get a
23  response from you?
24      A  No, that is not.  She did not get an email

Page 178

1  response from me, but she did get a response from me
2  verbally.
3      Q  Any documentation of that?
4      A  No.  Not that I -- no.
5      Q  How come?
6      A  We had a -- and I can provide the context to
7  this email.  We had a cross-asset engagement where we
8  had another superintendant -- his name is Bob Carsh,
9  who was a superintendant who I knew and was visiting.
10  And I know we were outside of 108C meeting room.  I
11  was talking to Bob, and Jesse was there.  And I
12  suggested to -- I introduced Bob, this is Jesse, our
13  maintenance analyst.  And I suggested to Jesse that
14  you should reach Bob's maintenance analyst back at
15  Caroline.  Her name is Jennifer Evans, and I've
16  worked with her, and she's -- she's really strong in
17  the maintenance analyst role and has done that role
18  for a long time, it would be a great opportunity for
19  you to link up with Jennifer.
20      And so this was all in the spirit of
21  collaboration and helping Jesse grow in her role.  So
22  this is in May of '16.  So Jesse's, you know, not
23  quite a year into the role.  And so this was a
24  genuine -- a genuine opportunity for Jesse to reach

Page 179

1  out and to get some coaching or mentoring from a peer
2  in the business.  And that's something that's common
3  that we do that with others, our other roles.  I do
4  that with my peers, and as does the superintendant.
5      And so Jesse wrote this email after.  And I
6  remember following up with her on this and clarifying
7  because she -- I also remember Will coming to me and
8  saying you've got -- Jesse thinks you've got problems
9  with -- with her.  And that's why I was providing
10  this suggestion.  I was doing it more in the spirit
11  of helping her have an external coach or mentor or
12  somebody that she could reach out to if she had a
13  question or, you know, something that she was
14  struggling with just to be able to make a contact for
15  her.
16      So I talked to Jesse about it and just
17  clarified that, you know, I -- you know, that that
18  suggestion was made in, you know, the most -- you
19  know, in a positive manner that giving you -- you
20  know, just helping you reach out in case if you're
21  having trouble -- trouble in your role, there's ways
22  for you to improve.
23      Q  Why was Jesse's IPF rating lower than the
24  subsequent determination was that it should have

Page 180

1  been?
2      A  Why was it rated lower than the subsequent?
3  Based on the process that we went through and the
4  five individuals who rated her and every other
5  employee, her performance was not -- was not as
6  strong as the rest of the employees.
7      Q  But there was a subsequent determination that
8  that was not correct, right?
9      MS. KIRKPATRICK:  Objection.  That is not
10  what he testified to.
11      MS. GURMANKIN:  I'm asking.  It's a leading
12  question, Kathy.  It's a leading question.
13      THE WITNESS:  So --
14      MS. KIRKPATRICK:  Objection.
15      MS. GURMANKIN:  That's how you take a
16  deposition.
17      MS. KIRKPATRICK:  Okay.
18      THE WITNESS:  I won't say that the .8 was
19  wrong.  That was -- based on all the evidence that we
20  had, Jesse was not performing as well as her peers.
21  And that was -- you know, that was discussed and
22  documented in there.  And we -- you need to
23  understand too that when we do an IPF session, we go
24  through, you know, 30 or 40 employees and we do our

**45 (Pages 177 to 180)**

Page 181

1 best to make it a fair transparent documented process
2 where we weigh all the facts, and then we adjust the
3 IPFs based on -- and it's a battle with supervisors
4 as well where people -- you know, I stand up and I
5 give evidence of my staff of why I think they've done
6 good. You may give evidence of your staff. And we
7 have to come -- we've got to get the number to 1.03
8 overall average, we need to have some at the bottom
9 at .8, and some at the top at 1.2. And so we have a
10 long deliberation about what IPF people are going to
11 get. And we do it -- we try to be fair, and we focus
12 a lot on behaviors. And Jesse's behaviors were
13 not -- and that's part of why she landed at the
14 bottom of that session.
15     In my observations of her of being, you know,
16 disengaged and lots of visiting, lots of visiting
17 with the admin administrative professional, she
18 was -- she wasn't, in my opinion and others' opinion
19 in the room, viewed as being a really strong
20 performer.
21   Q  Any discussion at any time that you were
22 involved in about the fact that the people giving
23 feedback were subsequently found to have violated the
24 code of conduct against Jesse?

Page 182

1     MS. KIRKPATRICK: Objection. That's assuming
2 facts not in evidence. He said the people. That was
3 one person.
4     MS. GURMANKIN: Please don't give speaking
5 objections.
6   Q  Mark Hoover and Will Turney, those two. Was
7 there any discussion that you were involved in about
8 the fact that two of the people involved in giving
9 feedback on Jesse's performance were subsequently
10 found to have violated the code of conduct against
11 her?
12   A  Not to my knowledge. But I would reiterate
13 that -- I just want to state that -- yeah, that Mark
14 wouldn't have worked with her exclusively. That
15 it's -- but yeah, that there's multiple people in
16 that it wasn't Mark's or Will's determination, but
17 rather the collective group.
18     (Exhibit P42 was marked.)
19   Q  BY MS. GURMANKIN: All right. P42 is a
20 series of emails.
21   A  Okay.
22   Q  And I want to direct you to the second page.
23 Actually why don't you take whatever time you need
24 and go through the whole thing.

Page 183

1     THE VIDEOGRAPHER: This will conclude File
2 Number 3 in the videotaped deposition of Steve Craig
3 in the matter of Barnes v Shell, et al. We are going
4 off the record at 5:22 p.m.
5     (Break taken from 5:22 to 5:28 p.m.)
6     THE VIDEOGRAPHER: This will begin File
7 Number 4 in the videotaped deposition of Steve Craig
8 in the matter of Barnes v Shell, et al. We're going
9 back on the record at 5:28 p.m.
10   Q  BY MS. GURMANKIN: You've been handed what's
11 been marked as P42, Bates Stamp 770 through 773.
12 You've had an opportunity to review this, correct?
13   A  Yes.
14   Q  So if you go to the second page --
15   A  Uh-huh.
16   Q  -- is it correct -- it looks like from the
17 emails that you're the one who met with Jesse to give
18 her the 2016 performance review, correct?
19   A  Correct.
20   Q  Why was that?
21   A  Because after the investigation -- well, it
22 wouldn't be in -- it wouldn't seem appropriate to
23 have Will deliver the performance rating. That it
24 would make more sense for me to do it.

Page 184

1   Q  Why?
2   A  Because of the investigation and the code of
3 conduct violations of Will.
4   Q  There could be a perception that he was
5 retaliating against her by giving her a poor
6 performance review?
7     MS. KIRKPATRICK: Objection.
8     THE WITNESS: The poor performance review or
9 the IPF was done well in advance of the ranking
10 session. And the IPF was done well in advance of the
11 allegations made.
12   Q  BY MS. GURMANKIN: And the rating was
13 warranted?
14   A  Yeah.
15   Q  It was fair?
16   A  Yes.
17   Q  Based on the feedback --
18   A  Correct.
19   Q  -- that was given?
20     Well, then why was -- who made the decision
21 that Turney wasn't going to give her the review but
22 you were?
23   A  I think -- so it says here Megan from HR
24 wanted me to contact you and how I would proceed. I

46 (Pages 181 to 184)

Page 185

1  would prefer to go through the year-end with just
2  you. Let me know your thoughts.
3      So I had no problems with that. So I guess
4  that was just discussed, and I had no issues with
5  doing that with Jesse.
6      Q  Is that how -- I mean Jesse asked you to do
7  it in the email?
8      A  Yes.
9      Q  Okay. So there was never a decision made
10 that it would be inappropriate for Turney to give it
11 to her and that you should do it instead. This
12 happened because Jesse said she'd prefer to meet with
13 you, right?
14     MS. KIRKPATRICK: Objection.
15     THE WITNESS: No. No, I disagree with that.
16 I think that based on this, that Megan and Jesse had
17 a discussion around that. So I don't know that to be
18 factual.
19     Q  BY MS. GURMANKIN: Well, Jesse says in her
20 email Megan from HR wanted me to connect with you on
21 how I should proceed with this. She says I would
22 prefer to go through my end-of-year with just you,
23 but realize that that may not be possible, right?
24     A  That's what it states.

Page 186

1      Q  Did anyone from HR tell you that it would be
2  inappropriate, given your complaints about Turney and
3  the investigation, that it would be inappropriate for
4  him to give her her review?
5      A  Not that I recall.
6      Q  Before you got this email from Jesse, did you
7  ever come to that conclusion?
8      A  Yes. I would say that, given the
9  circumstances and the code of conduct violation of
10 Will, that it would not be appropriate to have Will
11 give her the end-of-year review.
12     Q  And you came to that conclusion before you
13 got her email at the bottom of 771, dated
14 December 20, 2016?
15     A  I don't know if I made that conclusion before
16 or after. But I agreed that I would not have no
17 problem doing the end-of-year evaluation.
18     Q  You decided to meet with her as a result of
19 her reaching out to you in her email of December
20 2016, at the bottom of 771, correct?
21     A  Correct.
22     Q  Okay. And you believed -- you agreed to meet
23 with her instead of having Turney meet with her
24 because you had concerns that it would be

Page 187

1  inappropriate for Turney to meet with her based on
2  her complaints about him and the investigation?
3      A  Yes.
4      Q  Even though the rating was completely fair?
5      A  Yes.
6      Q  So why would you have concerns? I mean if
7  the rating were completely fair and justified -- let
8  me finish my question.
9      If the rating were completely fair and
10 justified, then why would it matter who was actually
11 delivering the message to her?
12     MS. KIRKPATRICK: Objection.
13     THE WITNESS: So it wasn't about the rating
14 at all, but rather about having to put Jesse with
15 her -- you know, with someone who's conducted a code
16 of conduct violation against her. So in the spirit
17 of care for Jesse, it would -- I wouldn't want to put
18 her in that position.
19     Q  In the spirit of care for Jesse, did that
20 cross your mind before she reached out to you and
21 asked you to meet with her to give her the review in
22 December of 2016?
23     MS. KIRKPATRICK: Objection.
24     THE WITNESS: I don't recall if I thought --

Page 188

1  if I was thinking about that. Mid year -- these
2  reviews weren't scheduled yet. Or sorry. The
3  end-of-year reviews are usually done into the new
4  year, so maybe it wasn't on my radar yet.
5      Q  BY MS. GURMANKIN: In the spirit of care for
6  Jesse, did anyone from the company reach out to you
7  and say hey, maybe you should meet with her instead
8  of having to put her through sitting down with the
9  person who violated the code of conduct against her?
10     MS. KIRKPATRICK: Objection.
11     THE WITNESS: It was not in the timeframe yet
12 of the -- of when the end-of-year reviews would
13 normally be done.
14     Q  BY MS. GURMANKIN: Is that no?
15     MS. KIRKPATRICK: Objection. He gave you his
16 answer.
17     Q  BY MS. GURMANKIN: Is your answer no? Did
18 anyone from the company reach out to you before Jesse
19 reaches out to you in December 20, 2016 -- let me
20 finish my question -- and suggest that it may not be
21 in Jesse's best interest or comfortable for her to
22 have to sit down to have her review with the person
23 who was found to have violated the code of conduct?
24     MS. KIRKPATRICK: Objection.

47 (Pages 185 to 188)

Page 189

1          THE WITNESS: Not that I recall.
2          Q   BY MS. GURMANKIN: All right. So did you
3   meet with her?
4          A   Yes.
5          Q   And if you look at 771, your email, second
6   from the top to Turney on December 20, 2016, and you
7   reference that you had a discussion with Jesse today.
8   Was that the performance review discussion?
9          A   Yep.
10         Q   Other than this email, is there any
11  documentation of that meeting that you had with her?
12         A   Not that I'm aware of, no.
13         Q   Not relevant enough to take notes on?
14         MS. KIRKPATRICK: Objection.
15         THE WITNESS: Yeah. I don't -- I didn't
16  document it.
17         Q   BY MS. GURMANKIN: Because it wasn't relevant
18  enough?
19         MS. KIRKPATRICK: Objection.
20         THE WITNESS: Something -- yeah. I wouldn't
21  normally document that discussion.
22         Q   BY MS. GURMANKIN: Performance reviews with
23  employees?
24         A   I write up a performance review for the

Page 190

1   employee, we sit down and we go through it, and that
2   goes into their file. So we -- like for all the
3   employees, I write up the performance review, we book
4   a meeting, we sit down, and we talk about it, and
5   then I put that into the file. So I don't take
6   additional notes on the performance review. It goes
7   into the online system, is where it goes.
8          Q   Is that why you didn't take notes of your
9   discussion with Jesse?
10         A   Yes.
11         Q   Any other reason?
12         A   No.
13         Q   All right. So you're asking Turney to please
14  give you a paragraph or two based on her performance
15  from your point of view that I can use to help frame
16  up what will go into HR online.
17         What are you -- can you explain to me what
18  you're asking him for here?
19         A   I'm -- as the supervisor who's been working
20  with her all year, can you provide me some of the
21  feedback that you have.
22         Q   Why are you asking about this after you have
23  the performance review meeting with her?
24         A   So I had information ahead of that. I

Page 191

1   reviewed her attached accomplishments in the
2   end-of-year review. And so she provided some
3   feedback to me relative to her performance, as I read
4   that. I reviewed her attached accomplishments and
5   did an end-of-year review as best I could. But I
6   wanted to get his opinion as well based on the IPF
7   ranking that we all together came up with.
8          Q   Yeah. My question was: Why are you asking
9   him for that after you meet with Jesse to give her
10  the performance review?
11         A   Because he was her supervisor for the year,
12  and I wanted to get his feedback as her supervisor.
13         Q   Right. But why are you asking him for that
14  after you had the performance review discussion with
15  her?
16         A   To be able to put that into HR online.
17         Q   But wouldn't you want his feedback before you
18  had the performance review discussion with her as the
19  person who's been working with her all year?
20         A   So the GPA -- I think it's important to
21  recognize that. The question that Jesse is asking --
22         Q   Where are you?
23         A   So I'm on the bottom of page 2 of 771. So
24  this is around 2017 GPA and performance contract. So

Page 192

1   that's not -- it's not -- this is framing up what
2   we're going to do next year, what are the goals
3   and items going to be for the following year.
4          So when I read this now, when I read the
5   subject, I don't know why I jumped to the year-end
6   review because this is really -- like it's out of
7   sequence for the end-of-year review. So I think -- I
8   don't know why I turned this to an end-of-year
9   discussion. Yeah. I don't recall why that happened.
10         But the beginning of this email chain on page
11  772 is around preparing for the following year's GPA
12  and performance contract. So it's like what are we
13  going to do in 2017, what are your goals. We all
14  have to do those in the company, and we put those
15  into HR online. So that was the first email.
16         And then it's a question of how do we want to
17  connect -- or Megan from HR wanted me to conduct with
18  you on how I should proceed. I would prefer to go
19  through my end-of-year review with you. And so I
20  guess I asked for, you know, probably her information
21  and I would try to do the end-of-year as best I
22  could. And then knowing that there's a potential
23  shift for Jesse to a new opportunity, that her GPA
24  would be followed up in the new year.

48 (Pages 189 to 192)

Page 193

1    So I don't know if that answers your
2  question.  Can you...
3    Q   Sure.  I'll try it again.
4        You testified a few minutes ago that in
5  your -- the first full email on 771 where you're
6  emailing Turney on December 20, 2016, and you say I
7  had a discussion with Jesse today.  You testified
8  that discussion was her performance review meeting,
9  right?
10   A   I did a year-end discussion.
11   Q   All right.  You had testified earlier it was
12  her performance review meeting.  Is that true or not?
13   A   I think that was the intent of that
14  discussion, yes.
15   Q   Was that the discussion?
16   A   I reviewed her accomplishments at that
17  meeting.
18   Q   So was that her performance review meeting?
19   A   She was not given her IPF ranking in that
20  meeting.
21   Q   Okay.
22   A   So normally your year-end would go with your
23  performance review.  Once they're allowed to be
24  published, then you sit down with your supervisor and

Page 194

1  you go through your review and you get your IPF at
2  the same time.  So this was out of sequence.  And so
3  I guess I tried my best to listen to see what Jesse's
4  accomplishments were, and then -- but I needed -- if
5  I was going to close that out in HR online, I would
6  need additional information.
7    Q   All right.  So as of December 20, 2016, the
8  IPF ratings were not published yet?
9    A   No.  Not until towards the end of January.
10   Q   All right.  Is that normally the case?
11   A   Yes.  Every year.
12   Q   In any case, on December 20, you had a
13  discussion with Jesse about her accomplishment for
14  2016?
15   A   Correct.
16   Q   Okay.  So why are you emailing Turney for his
17  feedback about her performance after you speak with
18  her about her accomplishments for that year?
19   A   In order to be able to have something to put
20  into HR online.
21   Q   And what is HR online?
22   A   That's the human resources online database
23  that has their -- the employees' performance reviews,
24  how long you've been in your role, all that stuff.

Page 195

1    Q   But so that -- does that information go into
2  HR online after the IPF rankings are published?
3    A   Does that go into -- it can go in before or
4  it can go in after.  There's no -- it can go
5  in anytime really.  If you change roles mid year,
6  then your outgoing supervisor would put in your
7  performance review at that time, and then the new
8  supervisor would put it in as well.  So the system
9  doesn't prevent you from putting anything in there.
10   Q   Yeah, I understand that.
11       But so the IPF rankings go into HR online,
12  right?
13   A   Correct.  Well, yes, they're in HR online.
14   Q   Okay.  Does anything else about the
15  performance review go into HR online other than the
16  IPF ranking?
17   A   The written description of the performance
18  goes into HR online.
19   Q   That's part of -- that's the performance
20  review?
21   A   Correct.
22   Q   Okay.  So the performance review itself and
23  the IPF ranking is the information that goes into HR
24  online?

Page 196

1    A   As well as the performance contract and your
2  GPA.
3    Q   Okay.
4    A   So there's three -- maybe call it four
5  pieces:  Your GPA and performance contract, how did
6  you deliver, and then your IPF.  But amongst a whole
7  bunch of other data, when did you start, the
8  availability date, all that.
9    Q   All right.  And the GPA and performance
10  contract are more related to the plan and the goals
11  for the following year?
12   A   Correct.
13   Q   Okay.  So the IPF rankings and the
14  performance reviews, you just testified, aren't
15  released every year until the end of January of the
16  following year, right?
17   A   Correct.
18   Q   So as of December 20, 2016, there's no need
19  for you to put anything in HR online because the IPF
20  ratings and the performance reviews haven't yet been
21  released?
22   A   That's true.  I didn't need to put anything
23  in there yet.
24   Q   All right.  So why are you asking Turney on

49 (Pages 193 to 196)

Page 197

1  this day after you talked to Jesse about her
2  accomplishments for the year but at least a month
3  before you needed to put anything on HR online before
4  the IPF rankings and the performance reviews are even
5  published or released, why are you asking him for --
6      A  Because Jesse's --
7      Q  -- his feedback about her performance on this
8  date?
9      A  Jesse had asked about doing her end-of-year
10 review to me.  And so I guess I -- right or wrong, I
11 went and I did that with her.
12     Q  Okay.  And you're telling Turney to make sure
13 that the feedback that he gives you aligns with her
14 IPF rating?
15     A  Yeah.  Based -- I wanted his feedback.  And
16 based on the feedback that others also gave in
17 the IPF ranking session, that we needed to take that
18 into consideration.
19     Q  Well, you're telling him from your point of
20 view, please give me a paragraph based on her
21 performance that will align with her IPF.  That's
22 what you're telling him in this email, right?
23     A  Yeah.
24         MS. KIRKPATRICK:  Objection.

Page 198

1         THE WITNESS:  So align with the IPF is
2  meaning we need to take into consideration the
3  feedback that the group provided, not just your
4  feedback, but the IPF, which is standard that we
5  would provide based on what that person's IPF is,
6  that we would take into consideration the person's
7  IPF.
8      Q  BY MS. GURMANKIN:  You wanted to make sure
9  that the paragraph or two that he gives you justifies
10 the IPF rating that as of this time she's going to
11 get?
12         MS. KIRKPATRICK:  Objection.
13     Q  BY MS. GURMANKIN:  Right?
14         MS. KIRKPATRICK:  You can answer.
15         THE WITNESS:  It's to make sure that it's --
16 it could be on the positive or negative side.  But we
17 as a collective team come up with an IPF.  So the
18 supervisor's job is to write a year-end review that
19 is inclusive of everyone's comments and not just --
20 so if I think an individual has done a great job but
21 the rest of the organization sees it otherwise, then
22 I need to take that into consideration.  That was the
23 meaning behind that, is that we need to...
24     Q  BY MS. GURMANKIN:  Okay.  And you're asking

Page 199

1  this of the guy who she's complained about, who has
2  been found to have violated the code of conduct,
3  right?
4         MS. KIRKPATRICK:  Objection.
5         THE WITNESS:  Her supervisor, yes.
6      Q  BY MS. GURMANKIN:  Who she's complained
7  about, right.
8      A  Correct.
9      Q  And who's been found to have violated the
10 code of conduct, right?
11         MS. KIRKPATRICK:  Objection.
12     Q  BY MS. GURMANKIN:  Right?
13         MS. KIRKPATRICK:  Asked and answered.
14 You can tell her again.
15         THE WITNESS:  Yes.  I asked Will for that
16 feedback.
17     Q  BY MS. GURMANKIN:  And you're asking him to
18 incorporate -- when you say align with her IPF,
19 you're asking him to incorporate the feedback that is
20 including Mark Hoover, right?
21     A  Correct.  All of the other supervisors.
22     Q  Yep.  And you didn't have any concern as of
23 this time, December 20, 2016, about asking Turney
24 who's been given a letter for the file and told his

Page 200

1  IPF rating has been reduced as a result of the
2  investigation into Jesse's complaints to have him
3  write up her performance review, right?
4         MS. KIRKPATRICK:  Objection.  He didn't write
5  up the performance review.  Go ahead.
6         THE WITNESS:  Yeah.  So it was input.  I was
7  seeking to get input from Will and then also taking
8  into account the other feedback from the IPF session
9  as I -- as I did her end-of-year review.
10     Q  BY MS. GURMANKIN:  And you didn't have any
11 concerns about asking the guy who she's complained
12 about and who's been found to have violated the code
13 of conduct to do that?
14     A  No.  Because he reported -- she worked for
15 him for the majority of the year.  So he would have
16 the best view of her performance.
17     Q  And by the way -- sorry.  Go ahead.  Were you
18 done?
19     A  Yes.
20     Q  Okay.  On the first page of P41.
21     A  Uh-huh.
22     Q  Do you see that -- so Turney at the bottom of
23 the first page sends you information about Jesse's
24 2015 review, right?

50 (Pages 197 to 200)

Page 201

1     A   Uh-huh.
2     Q   Yes?
3     A   Yes.
4     Q   And then above, he sends Larson issues that
5   he says are related to Jesse's performance, right?
6         MS. KIRKPATRICK:  Missed opportunities?
7         THE WITNESS:  Yes.
8     Q   BY MS. GURMANKIN:  And then Larson forwards
9   that to you and Michelle Priest.
10    A   Yes.
11    Q   Did anyone from the company, including Larson
12   or Michelle Priest or anyone, tell you that maybe
13   Turney should not be involved at all in Jesse's
14   performance review process?
15    A   Not that I recall.
16    Q   On November 21, 2016, one of the things that
17   Jesse had talked to you about was that she had
18   applied for the scheduler position, correct?
19    A   Correct.
20    Q   That was a position that was open in your
21   organization?
22    A   Correct.
23    Q   In November of 2016?
24    A   Correct.

Page 202

1     Q   Were you involved in the selection process?
2     A   For the scheduler role?
3     Q   Yeah.
4     A   Not to my recollection.
5     Q   Were you involved in the hiring panel?
6     A   No.  I was aware of it, but I wasn't part of
7   the interview group.
8     Q   Who were the people who were the
9   decision-makers regarding that position?
10    A   I think Hondo was the PIL.
11    Q   What's that?
12    A   A process improvement lead.  And Will Turney
13   was the supervisor for the position.
14        (Exhibit P43 was marked.)
15    Q   BY MS. GURMANKIN:  You've been handed what's
16   been marked as P43.  This is a document about the --
17   it looks like the requisition for the scheduler
18   position, if you look at the very top.
19    A   Uh-huh.
20    Q   And it looks like the projected start date is
21   November 20, 2016, at the top.  Do you see that?
22    A   Okay.  Yep.
23    Q   And then you see the selection panel in
24   the -- close to the middle of the page?

Page 203

1     A   Uh-huh.
2     Q   It lists you and Meg Toto, which she's listed
3   as the HR business partner right above that?
4     A   Right.
5     Q   And then Michelle Priest and Will Turney.  Do
6   you see that?
7     A   I do.
8     Q   Is this correct?
9     A   This is what was entered into HR online, but
10   it wasn't -- it wasn't who conducted the interviews.
11   So the selection panel would be based on the
12   interviews.  Then HR and myself would have input
13   based on the recommendation from the interview panel
14   on who was going to get.  So I would have been part
15   of the decision process, but not necessarily in the
16   interview.
17    Q   So then you were involved in the selection
18   process?
19    A   So I wasn't involved in the interview, but I
20   was, I guess, briefed or updated on the
21   recommendation from the interviewers.
22    Q   I asked if you were involved in the selection
23   process.  Were you or weren't you?
24        MS. KIRKPATRICK:  Objection.

Page 204

1     Q   BY MS. GURMANKIN:  You said earlier that you
2   weren't.  This P43 says that you are.  Which is
3   right?
4         MS. KIRKPATRICK:  He did not say that.
5         MS. GURMANKIN:  Yes, he did.
6         MS. KIRKPATRICK:  Mischaracterization.  He
7   said he wasn't involved in the --
8         MS. GURMANKIN:  He said the selection
9   process.
10        THE WITNESS:  Okay.  So when you asked the
11   question in the beginning, my mind was on the
12   interview.  So I was not involved in the interview,
13   but I was involved as part of the final decision for
14   the selection, yes.
15    Q   BY MS. GURMANKIN:  So at some point,
16   people -- there's discussion about the applicants for
17   the position.
18    A   Correct.
19    Q   And who did you talk to about that?
20    A   Who do I talk to?
21    Q   Did you talk to anyone about that?
22    A   I would have talked to Will and Hondo based
23   on who was -- yeah, who applied for the role.
24    Q   All right.  So do you remember the discussion

51 (Pages 201 to 204)

Page 205

1   with them about this?
2       A   Not explicitly.
3       Q   How about generally?
4       A   About who was -- who applied?
5       Q   About the selection process for the position.
6       A   It followed our normal -- our normal
7   selection process that we repeatedly do at the
8   location.
9       Q   Did you have a discussion with Turney and
10  Blakley about the selection process for the scheduler
11  position?
12      A   Not explicitly.
13      Q   Generally?
14      A   I don't recall.
15      Q   Well, how were you involved in the selection
16  process?
17      MS. KIRKPATRICK:  Objection.  He just --
18  asked and answered.
19      You can let her know again.
20      THE WITNESS:  So once the interview team
21  makes their -- they go through the interviews, they
22  provide the evidence, they would present it to me and
23  HR and say we think that this individual is the best
24  candidate based on our interview.  And I usually go

Page 206

1   with the recommendation of the interview team.
2       Q   BY MS. GURMANKIN:  Did that happen?  Did
3   Turney and Blakley present you and HR with the
4   evidence?
5       A   Yes.
6       Q   Okay.  When?
7       A   When?
8       Q   Yes.
9       A   It would have been after the interview and
10  before the offer was made.  I don't know the date.
11      Q   Was that in an in-person discussion?
12      A   Yes, it would have been in person.
13      Q   Was it?
14      A   I don't recall specifically.
15      Q   Do you recall a discussion with Blakley and
16  Turney about this position?
17      A   Not explicitly.  Let me think.  I guess I do.
18  I do recall talking about who would be the best
19  candidate based on the interview, the outcome of the
20  interview.
21      Q   With Turney and Blakley?
22      A   Yes.
23      Q   And someone in HR?
24      A   Michelle.

Page 207

1       Q   Priest?
2       A   That's my recollection.
3       Q   Do you know why she was involved as opposed
4   to Ria Toto?
5       A   Michelle was our main point of contact in HR.
6       Q   Okay.  So you knew that the only applicants
7   were Jesse and Jeremy Green?
8       A   Correct.
9       Q   And what did Blakley and Turney tell you
10  about the interviews with them or the evidence that
11  they presented?
12      A   That Jeremy was seen as the better candidate.
13  And based on his experience in particular for this
14  role, the scheduling work, he had worked in the field
15  as a mechanic for --
16      Q   As a what?
17      A   As a mechanic for quite some time.  So his
18  ability to schedule the work would be -- he would
19  have a stronger skill set to do that job.  Having
20  done the jobs himself before, he would be a better
21  scheduler than Jesse would be.
22      Q   Any documentation of this discussion?
23      A   No.
24      Q   How come?

Page 208

1       A   Didn't -- I just -- I didn't make a
2   specific -- I know that the -- like the interview
3   information was there.  We do the ranking tool, and
4   we have a discussion, and then we -- we use the HR
5   online system to update, to send an offer.
6       Q   Any explanation as to why you didn't document
7   this discussion?
8       A   Why I didn't document it?
9       Q   Uh-huh.
10      A   No.
11      Q   Was a decision made in that discussion with
12  Blakley, Turney, and Priest?
13      A   My recollection is yes.  We would have come
14  to the conclusion that Jeremy was the better
15  candidate.
16      Q   Who actually made the decision?
17      A   It would have been a collective decision.
18      Q   So all four of you were decision-makers?
19      A   Yes.
20      Q   You, Turney, Blakley, and Priest?
21      A   Correct.
22      Q   Made the decision to hire -- or select
23  Jeremy Green over Jesse?
24      A   That's my recollection.

52 (Pages 205 to 208)

Page 209

1    Q   Did you ask them to see their notes from the
2  interviews?
3    A   No, I don't recall asking for the notes.  It
4  was just a discussion.
5    Q   If you can go back to your handwritten notes
6  that were marked as P39 which should be in front of
7  you.
8    Okay.
9    Q   So at the top above the Jesse one-on-one
10  header, there's a -- it says planner Ken, and then
11  scheduler Jeremy.  Do you see that?
12    A   Uh-huh.
13    Q   Yes?
14    A   I see it.
15    Q   Is that indicating that, as of this time
16  whenever your notes are from, the decision had been
17  made?
18    A   No.
19    Q   What is that?
20    A   I don't recall exactly what this -- you know,
21  what this represents.  So it may have been a
22  potential -- a potential opportunity.  We look at
23  succession planning and write down opportunities.
24  But we go through the process to make sure that it's

Page 210

1  a fair and transparent process that we -- you know,
2  we do -- that's why we do the interviews and make
3  sure that we've got the right person for the job.
4    Q   Do you know what "scheduler-Jeremy" refers to
5  in your notes?
6    A   No.  I don't know if this was -- yeah, if
7  this was -- the timing of this was after we had made
8  the decision that Jeremy was the preferred candidate.
9    Q   Could have been before?
10    A   I don't know.
11    Q   You don't remember?
12    A   I don't remember.
13    Q   Was anything done -- strike that.
14    Did you have one discussion with Priest,
15  Turney, and Blakley regarding the decision as to who
16  to hire into the selection -- I'm sorry -- into the
17  scheduler position?
18    A   Did we have one discussion?
19    Q   Yeah.  Was it one discussion with the four of
20  you or multiple discussions?
21    A   We would have had discussions leading up to,
22  you know, as part of our whole succession planning
23  and who we think will be a fit.  And but then we
24  follow the process with HR's involvement to make sure

Page 211

1  that we are giving everyone a fair chance at the
2  jobs.
3    Q   Was there anything in any discussions that
4  you had with Michelle Priest, Will Turney, or
5  Hondo Blakley that was done to ascertain whether sex
6  was a decision -- was a factor in the decision to
7  hire Green over Jesse?
8    A   No.
9    Q   Do you remember when that discussion was with
10  you, Priest, Turney, and Blakley in which the
11  decision was made to select Green over Jesse?
12    A   Not explicitly, no.
13    Q   Could it have been after November 21, 2015?
14    A   No, it wouldn't have been after.  Because the
15  job closed on the 7th.  So and the start date -- I
16  mean that's the start date of the 20th.  We would
17  have done it much more quickly than that.  We
18  typically -- yeah, it wasn't after.
19    Q   You're looking at the date listed on P43?
20    A   Yeah.
21    Q   Is there any documentation anywhere that
22  you've seen that indicates that the decision to
23  select Green over Jesse was made before November 21,
24  2015?

Page 212

1    A   I don't recall explicitly.
2    Q   Could it have been after November 15, 2015?
3    A   It's possible.
4    Q   If you look at P39, your handwritten notes.
5    A   Okay.
6    Q   So it says -- above "scheduler-Jeremy," it
7  says "planner-Ken."  What's that refer to?
8    A   Planner dash Ken.  So Ken is our planner.
9    Q   Is that Ken Foreman?
10    A   Yeah.  Yep.
11    Q   Okay.  Were you just writing what his job
12  was?
13    A   I don't recall what I was writing there.
14    Q   And then under scheduler, it says maintenance
15  analyst dash and then there's no name.  What were you
16  writing that for?
17    A   I don't recall.
18    Q   And then under that, "planner-Dan."  What's
19  that?
20    A   Dan Krise who's another planner.
21    Q   Do you know why you were writing that?
22    A   No.
23    Q   At the top it says PIL, and then -- is that
24  Enrique?

53 (Pages 209 to 212)

Page 213

1      A   Enrique.

2      Q   Enrique and Alan?

3      A   Alan.  They're in the Permian organization.

4      Q   Why were you writing that?

5      A   I don't know.

6      Q   You don't remember?

7      A   No.

8          MS. GURMANKIN:  Okay.  Can we take two

9    minutes and see if I have anything else for you.

10         THE VIDEOGRAPHER:  We now are going off the

11   record.  The time on the camera is 6:03 p.m.

12         (Break taken from 6:03 to 6:08 p.m.)

13         THE VIDEOGRAPHER:  We're now back on the

14   record at 6:08 p.m.

15     Q   BY MS. GURMANKIN:  At any point up through

16   today, had you been made aware by anyone at Shell

17   that Jesse's -- that the nature of Jesse's complaints

18   in 2016 were related to her sex?

19         MS. KIRKPATRICK:  Objection.

20         Not including what counsel may have said to

21   you.

22         THE WITNESS:  No.

23         MS. GURMANKIN:  I said anyone at Shell.

24         MS. KIRKPATRICK:  But there's counsel at

Page 214

1    Shell.

2          THE WITNESS:  No.

3      Q   BY MS. GURMANKIN:  Were you ever -- have you

4    ever been disciplined for any issues related to your

5    employment at Shell?

6      A   No, never.

7      Q   Have you ever been accused, while you've been

8    at Shell, of any type of discrimination or harassment

9    or any inappropriate conduct?

10     A   Never.

11     Q   Are you aware of any complaints that any

12   women have made at Shell about sexual harassment or

13   sex discrimination of any kind?

14     A   Against me?

15     Q   No.  Against anyone.

16     A   Against sexual -- no.  Just trying to think.

17   No.

18     Q   Are you aware of any complaints of

19   retaliation that any employees have made during your

20   employment at Shell?

21     A   No.

22     Q   The investigation in 2016 that Kloosterman

23   conducted -- is that the first time that you were

24   aware of HR conducting an investigation into

Page 215

1    complaints during your employment at Shell?

2      A   I'm aware of one investigation, probably

3    1995, against a male employee who had a confrontation

4    with another male employee.

5      Q   Other than that?

6      A   Can you repeat the question?

7      Q   Sure.  Are you aware of any -- other than the

8    HR investigation that Kloosterman conducted in 2016

9    into Jesse's complaints, are you aware of any other

10   HR investigations that have been conducted into

11   employee complaints?

12     A   Into complaints?

13     Q   Yeah.  Or --

14     A   No.

15     Q   How about HR investigations, period?

16     A   We've had some terminations due to substance

17   abuse events that I'm aware of, one, two substance

18   abuse events.  Yeah, two.

19     Q   Other than that?

20     A   Not to my recollection.

21     Q   After December of 2016, has anyone from Shell

22   questioned you or talked to you about any complaints

23   that Jesse made after that time?

24     A   Not to my recollection.  So complaints that

Page 216

1    Jesse has made?  No.  Okay.  All right.  That's all

2          MS. GURMANKIN:  Okay.  All right.  That's all

3    I have for you at this time.  Thank you.

4      A   You're welcome.

5          MS. KIRKPATRICK:  I have a couple, maybe one

6    question.

7          EXAMINATION BY MS. KIRKPATRICK:

8      Q   You talked about an IPF ranking session for

9    2016.  Do you remember when that occurred?

10     A   It was in October.

11     Q   Of 2016?

12     A   Yeah.  That's my recollection.  But I don't

13   know if it's on the -- actual date.  But yeah,

14   it's normally -- normally in October.

15     Q   And was there a ranking given for all

16   employees at the Wellsboro asset during that session?

17     A   Correct.

18     Q   And what was Ms. Barnes -- go ahead.

19     A   So it was all of the employees underneath my

20   umbrella at the Wellsboro asset as well as employees

21   that would report.  So actually -- sorry --

22   underneath Greg Larson, including employees that

23   worked in the Houston office.

24     Q   Okay.  And you're talking approximately how

54 (Pages 213 to 216)

Page 217

1　many employees?
2　　A　Probably 60.
3　　Q　And during that meeting in October of 2016,
4　what was the decision as it relates to Ms. Barnes'
5　IPF?
6　　A　So the IPF given to Ms. Barnes was 0.8.
7　　Q　And was that decided at that meeting in
8　October of 2016?
9　　A　Yes.　That's when that gets made.　And then
10　it gets reviewed by HR and...
11　　Q　So that's the recommendation?
12　　A　That's the recommendation, yeah.
13　　Q　Coming out of that meeting?
14　　A　The overall asset has criteria that they have
15　to meet around 1.03 is the average across the entire
16　organization.　So I represented operations, but there
17　would also be a technical team in Houston.　And
18　everything has to kind of funnel together to meet the
19　overall criteria.
20　　Q　So at the time that the recommendation of .8
21　was made for the IPF, Ms. Barnes had not yet
22　complained?
23　　A　Correct.
24　　　MS. GURMANKIN:　Objection.　Leading.

Page 218

1　　Q　BY MS. KIRKPATRICK:　And what was
2　Mr. Turney's input about Ms. Barnes' behavior around
3　that time?　I'm sorry.　Performance.　I'll repeat the
4　question.
5　　　What was Mr. Turney's input surrounding
6　Ms. Barnes' performance around that time,
7　October 2016?
8　　A　Right.
9　　　MS. GURMANKIN:　Objection to form.
10　　　THE WITNESS:　So the IPF ranking session
11　intent is to look at the performance of our employees
12　for that year up until the time of the IPF ranking
13　session.　So his -- sorry.　Can you just repeat that
14　again?　It was Will's?
15　　Q　Yes.　I'm saying what input, if any, did you
16　receive from Mr. Turney about Ms. Barnes' performance
17　around that time, in October of 2016?
18　　　MS. GURMANKIN:　Objection to form.
19　　　THE WITNESS:　So that her performance was
20　not -- so I think she was -- if we look at the IPF
21　ranking session, she was performing parts of her
22　role, but she was unable to do the analytical side of
23　the role.　So she was performing more the
24　administrative processing but was having difficulty

Page 219

1　in completing the analyst-type of activities that
2　would be more the insights into the data.
3　　　And that her behaviors would be -- or were
4　not always, you know, getting along with staff and
5　not being engaged, fully engaged, in the role at all
6　times.
7　　Q　Did Mr. Larson take notes of these
8　discussions during the IPF meeting in October of
9　2016?
10　　A　Yes.　There was -- there was a -- some bullet
11　points made around all staff's performance.
12　　Q　So that was documented?
13　　A　Correct.
14　　　MS. GURMANKIN:　Objection.　Leading.
15　　Q　BY MS. KIRKPATRICK:　And did you -- strike
16　that.
17　　　Was Ms. Barnes' .8 rating recommendation in
18　part based upon your input?
19　　A　Yes.
20　　Q　And what was your input as it relates to
21　Ms. Barnes' performance back in October of 2016?
22　　A　So my observations of Ms. Barnes was a lack
23　of engagement, specifically observing her visiting
24　with an employee, specifically the administrative

Page 220

1　assistant Penny Robins, as well as not observing her
2　participate actively in meetings that I would be
3　present in.　And yeah.
4　　　MS. KIRKPATRICK:　I have no other questions.
5　　　MS. GURMANKIN:　A few follow-ups.
6　　　FURTHER EXAMINATION BY MS. GURMANKIN:
7　　Q　On the last break, did you talk with your
8　attorney about your deposition testimony?
9　　　MS. KIRKPATRICK:　Objection.　Instruct the
10　witness not to answer.
11　　Q　BY MS. GURMANKIN:　You're listening to that
12　instruction?
13　　A　Yes.
14　　Q　The .8 rating that was recommended and then
15　approved for Jesse in October of 2016, was that based
16　on any documents or just verbal feedback?
17　　A　It was based on observations.　And from a
18　documentation point of view, the work that she would
19　produce, I suppose, could be considered.　So like the
20　products that she would could create as part of her
21　job.　But I don't know of any specific documents that
22　were brought into the IPF session.
23　　Q　So it was just based on verbal feedback?
24　　A　Correct.

55 (Pages 217 to 220)

Page 221

1      MS. KIRKPATRICK: Objection.
2      Q  BY MS. GURMANKIN: Now, your lawyer asked you
3  about the feedback that you got from Will Turney
4  around that October of 2016 timeframe, and you
5  answered her. Do you recall that from a couple
6  minutes ago?
7      A  Yes.
8      Q  Were you answering about the feedback that
9  Turney had given during the IPF ranking session or
10 just around that October 2016 timeframe?
11     A  So Will's provided feedback on a -- you know,
12 around how employees are doing and -- yeah. So in
13 the session as well as throughout the year, he would
14 have discussions around how employees are doing.
15     Q  All right. My question was very specific.
16     In your response to your lawyer's question
17 when she asked you what feedback did Turney give you
18 about Jesse around that October 2016 timeframe, was
19 the answer that you gave her based on what Turney
20 said around that timeframe or what he said during the
21 IPF ranking session?
22     A  My answer was based on the IPF ranking
23 session.
24     Q  Okay. How is it that you remember what he

Page 222

1  said about her during the IPF ranking session?
2      A  So the feedback that we -- that I recall from
3  that session was that she was not -- you know, not
4  performing well in the role.
5      Q  I'm just wondering how was it that you recall
6  Turney's specific feedback during the IPF ranking
7  session, which at this point was close to three years
8  ago.
9      A  Based on -- that's just what I recall
10 having -- because we had had discussions around her
11 performance previously.
12     Q  So what did Kyle Vessel say about her during
13 the IPF ranking session in October of 2016?
14     A  I don't recall Kyle's comments. I recall
15 Greg talking about her being -- not how she showed up
16 and...
17     Q  What does that mean, how she showed up?
18     A  So how she would engage in the meetings and
19 how she would participate. So we didn't -- you know,
20 not seeing evidence. And the reason I remember that
21 is that was one of the behavioral criteria that Greg
22 would always ask and put his input in. It was one of
23 his, because he didn't always observe the actual
24 working function. So his lens was through his

Page 223

1  observations in things like meetings.
2      Q  What was Mark Hoover's feedback about Jesse
3  in the IPF ranking session from October of 2016?
4      A  I don't remember Mark's comments.
5      Q  That, you don't remember?
6      How about Shane Sondeleir?
7      A  I don't recall comments from Shane.
8      Q  Why is it that you remember Turney's but not
9  Hoover's or Shane's?
10     A  Because Will was her direct supervisor. And
11 so he would be the one that would be providing most
12 of his reports, not just Jesse but all of his
13 reports, feedback. Just like other supervisors would
14 provide the synopsis -- so each supervisor, as part
15 of the process, provides their synopsis, their
16 summary of their employee as part of the beginning of
17 the ranking session, good, bad. And then others
18 challenge and provide additional input.
19     Q  What did he say about Ken Foreman?
20     A  So Ken, I think, was -- I remember -- I don't
21 know if I remember Ken. Dan Krise was -- was -- as a
22 planner was --
23     MS. KIRKPATRICK: She's asking about Ken
24 Foreman.

Page 224

1      THE WITNESS: Ken. Yeah, I don't recall
2  specifics on Ken.
3      Q  BY MS. GURMANKIN: How about Dan Krise?
4      A  How about Dan?
5      Q  Dan Krise. What did Turney say about
6  Dan Krise in the IPF ranking session in October of
7  2016?
8      A  I don't recall Dan. I think why I would
9  recall Jesse's more is because as a .8, that's a low
10 IPF. And so more discussion around the low IPFs.
11     Q  So you don't recall Dan; is that right?
12     A  Correct.
13     Q  All right. Jeremy Green?
14     A  Jeremy -- this is in 2016?
15     Q  Yep.
16     A  So Jeremy wasn't a Shell employee and would
17 not have had a ranking session done against him.
18     Q  Calvin Flynn?
19     A  Calvin -- so I think Calvin had a stronger
20 performance as the EWINS focal that Will provided.
21     Q  What did he say specifically about Calvin?
22     A  I don't recall exactly.
23     Q  Do you recall anything?
24     A  Just that he -- I know he was doing really

Page 225

1   well in the EWINS space which is a well monitoring.
2   So that was his role.
3       Q   Is that what Turney said?
4       A   Yes.
5       Q   How about Matt Epsins?  What did Turney say
6   about him in the October 2016 IPF ranking session?
7       A   I don't recall Will's -- Mr. Turney's
8   comments around Matt.
9       Q   None of them?
10      A   No.  But Shane Sollinger was Matt's
11  supervisor, so...
12      Q   What did he say?
13      A   So Matt was a strong performer, one of their
14  strongest performers in the group.
15      Q   Did you interact with Matt?
16      A   I did periodically.
17      Q   Any reason to question his honesty or
18  integrity?
19      A   Matt's honesty and integrity?
20      Q   Yeah.
21      A   No.
22      Q   And you testified that your feedback was that
23  there was a lack of engagement with Jesse, right?
24      A   Correct.

Page 226

1       Q   Okay.  Specifically you observed her visiting
2   with Penny Robins?
3       A   Correct.
4       Q   How often?
5       A   Daily.
6       Q   And were they discussing work?
7       A   No.
8       Q   How do you know?
9       A   Because I sat across the cubicle from them,
10  directly across from Penny.
11      Q   And you heard what they were discussing every
12  day?
13      A   I wouldn't say every day, but on a regular --
14  regular frequency.
15      Q   How regular?
16      A   How -- can you repeat?
17      Q   How regularly were they not discussing work
18  issues when Jesse would visit Penny?
19      A   So Jesse would not have -- would have very
20  little work topics to discuss with Penny in Penny's
21  role.
22      Q   You testified you saw her visiting with Penny
23  every day and you did not believe, based on where you
24  sat, that they were discussing work, right?

Page 227

1       A   Yes.  If I could state that I would say most
2   every day.  That was a common -- I would say it was a
3   common occurrence to see Jesse visiting with Penny.
4       Q   Was it every day or not?
5       A   I can't say conclusively that it was every
6   single day.
7       Q   When did it start?
8       A   I don't recall.
9       Q   2015, 2016, no idea?
10      MS. KIRKPATRICK:  Objection.
11      THE WITNESS:  I don't specifically recall.
12      Q   BY MS. GURMANKIN:  You don't recall the year?
13      A   I think it was a common behavior of Jesse's
14  even when she was working as a contractor.
15      Q   My question was:  Do you recall the year.
16      A   The year was -- when I arrived in 2015, I
17  observed the behavior, so 2015.
18      Q   Through 2015?
19      A   Yes.
20      Q   And through 2016?
21      A   Periodically, yes.
22      Q   Was it less in 2016 than it was in 2015?
23      A   I don't know.
24      Q   You don't remember?

Page 228

1       A   I would say it was -- I don't know that there
2   was a difference.  I don't remember a difference.
3       Q   Did you document this at any point?
4       A   No.
5       Q   Did you talk to Jesse about it at any point?
6       A   No.
7       Q   You said that you observed Jesse not
8   participating actively in the meetings.  Which
9   meetings are you talking about?
10      A   Safety meetings, planning and scheduling
11  meetings, notification review meetings.
12      Q   Anything else?
13      A   Those would be the main ones.
14      Q   Any others?
15      A   Not to my recollection.
16      Q   When did you see her not actively
17  participating in safety meetings?  When did you first
18  observe that?
19      A   I guess when I -- when I arrived at the asset
20  in May of 2015.
21      Q   And you noticed that throughout the rest of
22  2015?
23      A   Correct.
24      Q   Throughout 2016?

57 (Pages 225 to 228)

Page 229

1    A   Correct.
2    Q   How often were the safety meetings?
3    A   Monthly.
4    Q   You noticed this every month?
5    A   Yes.
6    Q   Ever document it?
7    A   No.
8    Q   Ever say anything to Jesse?
9    A   No.
10   Q   The planning and scheduling meetings that she
11   did not actively participate in, according to your
12   testimony.  When did you first notice that?
13   A   Those meetings I only would participate in
14   periodically.  So 2015.
15   Q   So how many in 2015?
16   A   I may attend one per month.
17   Q   Did you attend one per month from May of 2015
18   through the remainder of 2015?
19   A   Approximately.
20   Q   Could have been less?
21   A   Could have been less.
22   Q   And at each of the ones you attended, you
23   observed Jesse not actively participating?
24   A   Correct.

Page 230

1    Q   2016, were they still once a month?
2    A   I would attend periodically.  I wasn't a
3    normal attendee.  I would go periodically to see how
4    the process was working.
5    Q   So how often in 2016?
6    A   Maybe once every couple of months.
7    Q   And all the ones that you were at, you
8    observed Jesse not actively participating, correct?
9    A   Correct.
10   Q   Ever document that you believed that Jesse
11   was not activity participating in the planning and
12   scheduling meetings?
13   A   No.
14   Q   Ever talk to her about it?
15   A   Not her, no.
16   Q   Anyone?
17   A   I brought my observations up to Will.
18   Q   When?
19   A   At the time of hiring Jesse for -- as a Shell
20   conversion from a contractor.
21   Q   That was September of 2015?
22   A   Correct.
23   Q   Okay.  Before she was hired as a full-time
24   employee?

Page 231

1    A   Yes.  I expressed my concern about Jesse
2    before we hired her.  That is, is she -- is she the
3    strongest candidate that we can find for this role.
4    I had my concerns about her performance then.
5    Q   Did you talk to him about that in the context
6    of her not actively participating in the safety
7    meetings and the scheduling and planning meetings?
8    A   In the context, yes.
9    Q   And what did Turney say?
10   A   He assured me that she would grow into the
11   role, that she was -- was doing okay as a contractor,
12   and that we should give her an opportunity to --
13   yeah, work in that position.
14   Q   Okay.  How about --
15   A   So he was supporting her.
16   Q   How about the notification review meetings?
17   When did you notice Jesse not actively participating
18   in those?
19   A   It would be the same periodic attendance that
20   I would make in that meeting, maybe once every couple
21   of months.
22   Q   Through 2015 and 2016?
23   A   Correct.
24   Q   Ever document that you noticed her not

Page 232

1    actively participating?
2    A   Documenting things like that wouldn't be my
3    normal protocol.
4    Q   So yes or no?
5    A   No.
6    Q   Ever talk to her about it?
7    A   No.
8        (Exhibit P44 was marked.)
9    Q   BY MS. GURMANKIN:  You've been handed what's
10   been marked as P44, Shell 860 through 863.  So I want
11   to ask you about your email at the top of the second
12   page.  So if you need to read the whole thing to
13   answer questions, that's fine.  Just let me know.
14   A   Okay.
15   Q   You've reviewed P44?
16   A   Just a minute.
17   Q   Sure.
18   A   Okay.
19   Q   You have had an opportunity to review P44?
20   A   I have, yes.
21   Q   There's a reference in this series of emails
22   to maintenance conversions.  What does that refer to?
23   A   It's referring to converting contractors to
24   Shell staff.

58 (Pages 229 to 232)

Page 233

1    Q  Okay.  And that's what happened with Jesse?

2    A  Yes.  But this -- on the bottom of page 862,

3  operators and maintenance, these are all hourly

4  roles.  And so I think the reference to Jesse on the

5  right-hand side is around the staff position, whether

6  or not we would fill a staff position or not.

7    Q  Okay.  And then if you look at page 861, the

8  second page, your email at the top on July 14, 2015

9  at 3:44.  Do you see that?

10    A  Yep.

11    Q  You're sending an email to Greg Larson,

12  Will Turney, Michelle Priest, and Hondo Blakley among

13  other people.  And you say Greg, I have discussed

14  this with Will/Hondo, and Jesse is the top choice for

15  upcoming maintenance conversion.

16    Do you see that?

17    A  I see that.

18    Q  And that was the case as of July 2015?

19    A  Correct.

20    MS. GURMANKIN:  Thank you.  That's all I

21  have.

22    MS. KIRKPATRICK:  I have no questions.

23    THE VIDEOGRAPHER:  This will conclude File

24  Number 4 in the videotaped deposition of Steve Craig

Page 234

1  in the matter of Barnes v Shell, et al.  We're going

2  off the record at 6:36 p.m.  This will conclude this

3  deposition for today.

4    (The deposition was concluded at 6:36 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 235

1  COMMONWEALTH OF PENNSYLVANIA:

2  COUNTY OF BLAIR:

   I, Patricia R. Chapin, CSR, Notary Public in

3  and for the County of Blair, Commonwealth of

   Pennsylvania, hereby certify that the said witness

4  was by me first duly sworn to testify to the truth,

   the whole truth, and nothing but the truth and that

5  the within deposition was recorded in stenotype and

   reduced to typewriting by me.

6    I FURTHER CERTIFY that the reading and

   signing of the said deposition were NOT waived by

7  the said witness and the said deposition

   constitutes a true record of the testimony given by

8  said witness.

   I FURTHER CERTIFY that the deposition was

9  taken before me at the place specified in the

   caption And was concluded the same day.

10    I FURTHER CERTIFY that I am not a relative

11  or employee or attorney or counsel of any of the

12  parties or a relative or employee of such attorney

13  or counsel, or financially interested directly or

14  indirectly in this action.

15    IN WITNESS WHEREOF, I have set my hand and

16  affixed my seal of office this 3rd day of October,

17  2019.

18

19

20

21    Patricia R. Chapin, CSR

22    Notary Public

23

24    Commission expires 2/23/2022

Page 236

1    INSTRUCTIONS TO THE WITNESS

2    Read your deposition over carefully

3  It is your right to read your deposition and make

4  changes in form or substance.  You should assign a

5  reason in the appropriate column on the errata

6  sheet for any change made.

7    After making any changes in form or

8  substance which have been noted on the following

9  errata sheet along with the reason for any change,

10  sign your name on the errata sheet and date it.

11    Then sign your deposition at the

12  end of your testimony in the space provided.  You

13  are signing it subject to the changes you have

14  made in the errata sheet, which will be attached

15  to the deposition before filing.  You must sign it

16  in front of a witness.  Have the witness sign in

17  the space provided.  The witness need not be a

18  notary public.  Any competent adult may witness

19  your signature.

20    Return the original errata sheet to

21  your counsel promptly.  Court rules require filing

22  within thirty days after you receive the

23  deposition.

24

59 (Pages 233 to 236)

Page 237

1          ERRATA SHEET
2      Attach to Deposition of: STEVE CRAIG
       Taken on:  September 20, 2019
3      In the matter of: Barnes v. Shell Exploration and
           Production Co. Appalachia, et al.
4
5      PAGE      LINE NO.      CHANGE        REASON
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____

Page 238

1            SIGNATURE PAGE
2
3               - - -
4
5          I hereby acknowledge that I have
6      read the aforegoing transcript, dated September 20,
7      2019, and the same is a true and correct
8      transcription of the answers given by me to the
9      questions propounded, except for the changes, if
10     any, noted on the Errata Sheet.
11
12               - - -
13
14
15
16
17     SIGNATURE: _____
             STEVE CRAIG
18
19     DATE: _____
20
21     WITNESSED BY: _____
22
23
24

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Exhibit 15

4/12/17

Jesse Barnes (notes of conversation)

purpose

after gone through steps w/ Megan

Megan did great - no problems

felt treated unfairly by shee, planted seeds

after Megan left + things proceeded n

had not rec'd end of year review

in Jan, asked shee, can I get my IPF

trying to get IPF sent to new boss Steve Ellis

didn't know

I had a lot of questions, Steve couldn't give

got a .8,                          me info

  ⟶ doesn't make sense

must be a link to what happened w

Supervisor

told me I had underperformed, how

all I did was my job + nothing else

did push, I waited couple weeks

talked to Michelle — still didn't have any feedback

discussed concerns w/ Michela

when had code of conduct in past —

doesn't make sense

lower than last year + I

shee told her would give feedback

more on behavior side, not work performan—

don't you think that some behaviors direct

result of how treated or what

⟶ Michelle was there + went thru 9 box

process

IPF before claim, but had been going on through

whole year

shee hadn't received the feedback

EXHIBIT

059

trying to find ways to get to field, more
told well ie was going to go to field
he said ie don't think you need to go
all day / no nothing ie need you to do
ie'm trying to meet my goals....

another time ie went to drilling rig - took
me aside + "scolded" me for leaving office
was very educational, learned

reached out to Steve Craig — May
    asked him before role had never existing a
    office before— they had no job where he
came from in Canada, showed him
spreadsheets — he never responded but
    stopped me— thank you for email, ie'll
provide you w/ feedback as soon as he can

never told = bad attitude or not doing my job

<u>present</u>   Steve E. has been very accepting / supportive
    some parts going in to this role        of me
just had transferred 2 safety people out
of role, some bad blood about me coming in

when went thru diff roles w/ greg
    Env. Technician, had changed to
    HSSE cunalipt (more admin)
        not going backwards, not doing anything
presented to her

    a) first — more ad mis role
        now — more field work / volest responsibilities
takes time, learning

another co/worker supervisor putting hands on me

KS- what IPF do you feel was appropriate? ~~seekly increase to IPF~~
@ least 1.0 ___ seekly increase to IPF
JB    considering - up against people | subjective
heart broken                            ( result of
had gone down- undisputrming        Mlee

people not willing to consider support me

what will do 1ly
stopped invitting me to meetgs
supervisors argue for them

didn't care

nobody in office

~~Og middle of next week~~

compare to peers @                      ┌ during
                                    "balked" responces
anything else ( no ? )
                                    ( depending his supervisor
U told her?
Mike Dewitt - knows                 greg larson
+ took seriously                    wasn't as supportive

→ 4 women in a building of 200 men    don't
mov                                    want to
fran  feel lost in crowd               happen
Jessi
        "good ole boys" clubs
→Michelle, can speak for some, times ~ shared story    dont
                                    working w/Michelle  even
                                                        try

notes from follow up
conversation

4-27-17

(1:30-
2:12pm
by phone

1) 4 items to discuss
today in follow up to last meeting

- first, gpa, glad to insert your
comments on performance.
if you send, we will have entered

- 2 - we will increase your IPF to
same level as last yr. we
do not agree there was any bias
in the room, decision made by
multiple people w/ HR present,
but have agreed to keep same

3) job elimination - your job is
not at risk of being eliminated
Steve will follow up w/ you if
he hasn't already

4) certainly want to understand if
others had any experiences
similar to you - Michele from
HR will visit (please encourage
reporting should you hear anything

J.B. - notes cont'



JB    I'm done making everyone
feel like it's OK - when it's
not. Will is still there
How I was treated (paid
differently) was based on my
sex. People are very stud around
me. When Chris Anderson left
in 2015, I felt like I was
being watched

IS   Have you had any concerns
since the investigation into the
concerns you brought forward?

JB   Will spoke to me twice - work
related. Mark and Hondo still
talk to me like normal - not out
of ordinary  I forgive Mark +
Hondo, don't think I will ever
forgive Will

Meg has made me feel 10x worse,
I felt pressured to move to new role,
therefore I took it. Steve Ellis has
been great - I can't complain
about anything w/ Steve except
thinking I was going to lose my
job.

JB. I didn't know I could stay in

Confidential

JB notes cont'd
my current role.

KS (what did Megan say)

JB She told me you can absolutely
stay in your current role if
that what you want to do.
Megan stood up to thee and
said it was my choice

KS So, what role do you want
to be in okay?

JB I think about this a lot. The
work I do is really easy it's
not really stressed. I don't know
if I'm going backward or forward.
my intent one day is for a
leadership position.

I applied for a scheduler role
I felt qualified but didn't get

KS What do you want to see happen?
JB to advance my career w/
Shell, to get a different
position. It's really hard to
get another position

Confidential

JB cont'd

JB (laughed) but really for the money? Well, it's really to the money right?

Steve is trying. One week I'm super busy.

(didn't answer question clearly)

JB = (went back to investigation) this all started w/ the issue in Canada, when I had to go to Canada!

JB
I am hoping for a settlement, laws were broken, whoever was involved needs to be there.

JB
I want Shell to help me in my leadership, feel abandoned by them (Greg Carson)

JB I don't know if I ever want to work for this company any more, I have done nothing wrong.

KS Anything else to discuss today?

JB nothing else today

Exhibit 16

| | |
|---|---|
| **From:** | Barnes, Jesse A SEPCO-UPS/U/UE [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=JESSE.A.BARNES] |
| **Sent:** | 7/7/2017 12:29:22 PM |
| **To:** | Soudelier, Kelly H SEPCO-HRN/AT [kelly.soudelier@shell.com] |
| **CC:** | Priest, Michelle L SCC-HRD/LC [michelle.priest@shell.com] |
| **Subject:** | RE: Discussion Follow Up |

Hi Kelly,

I apologize for my overdue email. Thank you again for reaching out to me.

Here is a list form of what I would like to see in my review for accomplishments;

• Saved 16K in maintenance costs thru auditing preventative maint. plans
• Streamlined and managed all Z6 inquiries and submissions
• Reduction of 400 unnecessary preventative maintenance plans and over 800 hours
• Initiated redlining process with lead maintenance technicians
• Audited cost reports and found hundreds of thousands of dollars being allocated incorrectly on a month basis, took actions to fix issues.
• Identified gap in training process on SAP training, created job aides, and incorporated training with on-boarding process of new hires.
• Strategically designed maintenance lean boards for KPI awareness and continuous improvement opportunities
• Reduced over 1200 standing orders that weren't being cost tracked correctly, minimized risk of cost tracking errors
• Managed all building maintenance vendors and contracts, acted as an OSR for building maintenance crews
• Created an equipment tracking online system for lean initiative for improvement opportunities for planning and scheduling jobs accurately
• Filled in for maintenance scheduler and planner as needed
• Displays strong leadership skills as well as managerial techniques

However, I believe my 2016 performance review is discrimination based on my sex and retaliation because I complained about sex discrimination and sexual harassment. Also, in my 2016 year-end review, I was criticized for my performance and my attitude, and that I have not been criticized for my performance or attitude in my past performance reviews before I had complained about sexual harassment. I believe I was criticized for my attitude because I complained about sexual harassment, and that the criticism is unlawful retaliation for my complaints.

Please let me know if there's anything else you need me to provide.

Thank you,
Jesse Barnes

---

**From:** Soudelier, Kelly H SEPCO-HRN/AT
**Sent:** Monday, June 19, 2017 12:16 PM
**To:** Barnes, Jesse A SEPCO-UPS/U/UE <Jesse.A.Barnes@shell.com>
**Subject:** Discussion Follow Up

Hi, Jesse. I wanted to follow up with you from our last discussion on April 27th.

First, we discussed your concern on your 2016 IPF (Individual Performance Factor). I shared that HR was present during the 2016 IPR discussion, and your relative performance was fairly represented in the room and assessed by the group. However, understanding your concerns regarding your supervisor, I had communicated we would increase your

EXHIBIT
060

2016 IPF from .8 to .9 and provide the associated pay benefits. This has been completed and details are provided below. You will see these monies in the coming weeks on your regular paycheck.

**Merit:**
*Old Merit = 800 USD*
*New Merit = 1000 USD*
*Salary as of 1.31.2017 = 56200 + 800 = 57000 USD*
*Revised Salary with New merit amount =* **57200 USD effective 2.1.2017**

**Bonus:**
*Old Bonus amount 56100 x .1 x .8 x 1.15* **= 5200 USD Paid**
*Revised Bonus amount 56100 x .1 x .9 x 1.15 = 5900 USD Difference owed to employee is* **700 USD**

Additionally, you had shared with me several notes regarding 2016 performance, and you had agreed to summarize these and send HR (Michelle or myself) the summary for input to your 2016 GPA. I've not seen this from you yet. Could you send it by June 30th or let us know if you will more time so that we can close it out? Regarding 2017 performance, you shared that you had set 2017 goals with your new supervisor and he was being supportive of your performance and development.

Lastly, I had agreed that we would speak with other women in the office to ensure a positive work environment exists. Michelle and I have done this through various engagements, as well as conducted trainings with all staff and leadership on diversity and inclusion. As you know, Shell is committed to a workplace free of harassment and discrimination. HR and line leadership also continue to visit the office regularly to ensure a positive working environment.

Michelle Priest and I both remain available if you would like to reach out to discuss any of these items further.

Thank you,

**Kelly Soudelier**
HR Manager – Upstream & Integrated Gas
U.S. HR Operations

Shell Woodcreek Complex
150 N. Dairy Ashford
Houston, TX 77079
Room F-0396J

+1 832-337-2132 (Office)
+1 713-628-2131 (Mobile)

Exhibit 17

Message

| | |
|---|---|
| **From:** | Priest, Michelle L SCC-HRD/LC [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USMPR9] |
| **Sent:** | 1/29/2018 4:54:04 PM |
| **To:** | Barnes, Jesse A SEPCO-UPU/S/UE [jesse.a.barnes@shell.com] |
| **Subject:** | RE: Negative Comments |

Hi Jesse,

Thanks for reaching out and letting me know about these comments and behaviors. While I have moved on from supporting Appalachia, I will call you tomorrow to discuss whether you feel comfortable with Natalie Gawecki (who took my role in Upstream HR) to reach out to you to learn more about these events. These comments do not sound appropriate, and I would recommend that Natalie understands more about what is happening so that she can address it accordingly.

Michelle

---

Michelle Priest | Learning & OD Advisor

Shell Chemicals, Americas Region | Phone: +1 (832) 762 2279 | Email: michelle.priest@shell.com

---

**From:** Barnes, Jesse A SEPCO-UPU/S/UE
**Sent:** Monday, January 29, 2018 7:37 AM
**To:** Priest, Michelle L SCC-HRD/LC <Michelle.Priest@shell.com>
**Subject:** Negative Comments

Hi Michelle,

I want to make you aware of my current workplace environment.
Male employees have been ignoring and avoiding me, and have made comments to me such as "we've heard stories about you" and have asked me about my complaints of sex discrimination against the company.  I believe that the hostile and dismissive comments and conduct to which I am being subjected are discriminatory because of my sex and retaliatory because I filed an EEOC Charge.

If you would like to discuss further, you can contact me anytime.

Regards,
Jesse

<div style="border:2px solid black; display:inline-block; padding:10px">

**EXHIBIT**

061

</div>

Confidential

Exhibit 18

| | |
|---|---|
| **From:** | Barnes, Jesse A SEPCO-UPS/U/UE [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=JESSE.A.BARNES] |
| **Sent:** | 3/13/2017 4:55:50 PM |
| **To:** | Dunlop, Leslie SCAN-LSX/W [leslie.dunlop@shell.com] |
| **CC:** | Priest, Michelle L SCC-HRD/LC [michelle.priest@shell.com] |
| **Subject:** | Re: Appalachia Visit |

Hi Leslie/Michelle,

Thank you for looking into the possible retaliation on not receiving my written narrative prior to it being put into HR online. I did not take into consideration I was transitioning under a new manager which may have some glitches in the process.

I feel as if I possibly wasn't being completely clear on what I was trying to say to you both about my IPF and written narrative that comes along with it. My written part has comments in it where it talks about my behaviors not being to standards but what I am trying to explain is that those behaviors were a direct result of what working conditions I was put in. "Jesse is seen as not working well with others and appeared isolated which can contribute to lower productivity of the planning and scheduling department." Is one quote from my review that is a direct result from how my supervisor(s) and team members were treating me and violating the code of conduct. Also, "Jesse can also become frustrated in her job and has missed work as a result." Is another direct result of my working conditions which were all documented on the information I put into the HR complaint. I have a screen shot of my text messages to my supervisor the day I left in frustration of me asking for approval to go home and he approved. That same day was a day that a team member put his hands thru my hair and I went to the bathroom and was crying and that's when I text my supervisor. Shortly after is when I knew everything I was going thru was affecting more than I wanted it to and I had a conversation with another supervisor about some of the things I was going thru which I believe my supervisor knew I talked to this supervisor about him and it made him upset.
My supervisor started to intentionally not invite me to meetings which I believe is retaliation to my "attitude" or rejecting his advancements towards me. And this same person was deemed fit to give me my review and IPF? I realize Greg and Steve helped but I did not even talk to Greg before this HR complaint and only worked with Steve a few times last year.
I apologize for the lengthy email, I have a lot of unanswered questions and I know this situation isn't right.
Michelle please let me know when you have some free time to talk.

Thanks,
Jesse

Sent from my iPad

On Mar 13, 2017, at 1:20 PM, Dunlop, Leslie SCAN-LSX/W <Leslie.Dunlop@shell.com> wrote:

> Hi, Jesse
>
> Sorry for the delay in responding – I needed to follow up with Michelle, who had looked at your concerns again. She explained to me that she created a timeline and was satisfied that there did not appear to have been retaliation against you by reducing your IPF. The IPFs were decided in late October/early November, which was before you raised your initial complaint. She explained to me that the feedback from supervisors at the time that the IPF was determined was related to behaviours and not to your work responsibilities, and that the IPF ranking was appropriate using the 9 box model.
>
> Your concern about not getting the feedback in writing before it was put into HR Online seems to unfortunately be a breakdown in communication. Greg and the various supervisors involved a[ssumed] that the others had given you the feedback in writing, and as a result none of them did it. Whil[e] unfortunate, this can happen when you change supervisors late in the year. I had a similar thin[g]

**EXHIBIT**

058

Shell_0000730

to me this past year as a former supervisor closed out my GPA in HR Online with no feedback in it and the two supervisors I had over year end weren't sure who was supposed to put feedback in. We ended up having to reopen my GPA after the deadline to get any feedback in there at all.

I know that when you have lost trust in your leaders, it is hard to see any of their actions in an innocent light, but I know Michelle did look at your situation carefully and I can agree that it does not appear to be retaliation based on the explanations she provided. I know that is not the answer you wanted to hear. If you encounter specific incidents that feel like they could be retaliation in the future, please contact me again and we will look into them.

Michelle will touch base to answer any specific questions that you may have.

Kind Regards,
Leslie

*Leslie Dunlop, CPA, CMA*
Ethics & Compliance Manager – Unconventionals, Mexico, and New Energies

+1-403-691-2672

---

**From:** Barnes, Jesse A SEPCO-UPS/U/UE
**Sent:** March-07-17 11:14 AM
**To:** Dunlop, Leslie SCAN-LSX/W <Leslie.Dunlop@shell.com>
**Subject:** Re: Appalachia Visit

Hi Leslie,

I am writing to follow up about our conversation last week. We talked about my IPF and my concerns that throughout 2016 I was working under leadership that was in violation of the code of conduct. I appreciate you taking the time to talk with me, unfortunately, I have not heard back from Michelle yet. I am reaching out to you per our conversation and your suggestion to follow up with you if nobody contacted me.

What should my next steps should be in addressing my IPF and a section of the written feedback?

Thanks in advance for your help,
Jesse Barnes

On Feb 20, 2017, at 6:57 PM, Dunlop, Leslie SCAN-LSX/W <Leslie.Dunlop@shell.com> wrote:

> Hi, Jesse
>
> Thanks for contacting me. I in Mexico in meetings this week, but my calendar for next week is up to date. Please set up a meeting anytime that is free and works for you and we can speak then.
>
> Kind Regards,
> Leslie
>
> Leslie Dunlop
>
> +1-403-691-2672

**From:** Barnes, Jesse A SEPCO-UPS/U/UE
**Sent:** February-20-17 1:09 PM
**To:** Dunlop, Leslie SCAN-LSX/W <Leslie.Dunlop@shell.com>
**Subject:** Appalachia Visit

Hi Leslie,

Recently, you visited us here at Appalachia and provided a code of conduct review. I was wondering if you had some time to talk about an incident I am dealing with and offer some guidance, if you can.
Please let me know when a good time for you would be.

Thanks,
Jesse

Jesse A. Barnes
Safety & Environmental Support
Shell Appalachia
12880 Route 6, Wellsboro, Pa 16901
Office: (570) 662-9547
Cell: (570) 404-0861
Email: Jesse.A.Barnes@Shell.com

Shell_0000732

Exhibit 19

Message

| | |
|---|---|
| **From:** | Barnes, Jesse A SEPCO-UPS/U/UE [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=JESSE.A.BARNES] |
| **Sent:** | 4/26/2017 4:07:23 PM |
| **To:** | Ellis, Steve E SEPCO-UPU/S/UE [steve.ellis@shell.com]; Burow, Randy R SEPCO-UPU/S/U [randy.burow@shell.com] |
| **CC:** | Soudelier, Kelly H SEPCO-HRN/AT [kelly.soudelier@shell.com]; Priest, Michelle L SCC-HRD/LC [michelle.priest@shell.com] |
| **Subject:** | EEOC Charge Notice |
| **Attachments:** | 20170425162406379.pdf; ATT00001.txt |

Confidential

EXHIBIT

048

Shell_0000546

<table>
<tr><td colspan="2"><b>CHARGE OF DISCRIMINATION</b><br><br>This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form.</td><td>AGENCY<br>Q FEPA<br>X EEOC</td><td>CHARGE NUMBER</td></tr>
</table>

| | | |
|---|---|---|
| **CHARGE OF DISCRIMINATION**<br><br>This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | AGENCY<br>Q FEPA<br>X EEOC | CHARGE NUMBER |

STATE OR LOCAL AGENCY: <u>Pennsylvania Human Relations Commission</u>

| NAME (Indicate Mr., **Ms.**, Mrs.)<br>**Jesse Barnes** | HOME TELEPHONE NUMBER *(Include Area Code)* |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP<br>Tioga, PA 16946 | DATE OF BIRTH |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>**Shell; Shell Global;**<br>**Shell Oil Company** | NUMBER OF EMPLOYEES, MEMBERS<br>> 15 | TELEPHONE (Include Area Code)<br>(570) 662-9415 |
|---|---|---|

| STREET ADDRESS<br>12880 Route 6 | CITY, STATE AND ZIP<br>Wellsboro, PA 16901 | COUNTY<br>Tioga |
|---|---|---|

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>Q Race  Q Color  **X Sex**  Q Religion  Q National Origin<br>**X Retaliation**  Q Age  Q Disability  Q Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br><br>*Earliest* 09/2014  *Latest* 04/06/2017 (ongoing) |
|---|---|

**The Particulars Are:**

A.    1.    Relevant Work History

I began working at Respondent as a contractor in or about November 2010, until I was hired by Respondent in or about September 2015 as a Maintenance Analyst. As Maintenance Analyst, I reported to William Turney (male), Maintenance Supervisor. Turney reported to Steve Craig (male), Operations Superintendent. On January 1, 2017, I transferred to the position of Environmental Technician. As Environmental Technician, report to Steve Ellis (male), Health, Safety, Security & Environmental Manager. Ellis reports to Randy Burow (male), US/LA Assets Security & Environmental Manager.

Respondent has discriminated against me because of my sex (female), including subjecting me to a hostile work environment because of my sex, and has retaliated against me because of my complaints of discriminatory conduct. Respondent has failed to promote me to a position for which I applied, interviewed, and was qualified; Respondent instead promoted a male employee to the position.

I have consistently demonstrated excellent performance and dedication to Respondent. I performed my job duties and responsibilities in a highly competent manner. Prior to complaining about discrimination, I received positive performance reviews.

| **X** I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements)<br><br>I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
|---|---|

I declare under penalty or perjury that the foregoing is true and correct.

| Date:<br>04/25/17 | Charging Party *(Signature)* | SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day Month, and year) |
|---|---|---|

Confidential

2.    Harm Summary

I have been discriminated against, including being subjected to a hostile work environment, because of my sex (female), and retaliated against because of my complaints of discriminatory conduct. Evidence of the discriminatory and retaliatory conduct to which I have been subjected includes, but is not limited to, the following:

(a)  Out of the approximately one hundred eighty-eight (188) employees at Respondent's Wellsboro location, there are eight (8) full time female employees and approximately one hundred eighty (180) male employees. There is only one (1) female supervisor at Respondent's Wellsboro location.

(b)  For the years that I reported to Turney, I was his only female direct report that did not also report to another supervisor.

(c)  On one occasion, Turney showed me a photo he took of himself in his underwear.

(d)  Turney regularly touched my arm, stomach, and leg during our one-on-one meetings. Turney continued to touch me even when I ask him to stop. I complained to Turney that I do want him or other male coworkers touching me.

(e)  Turney has told me I am "a hot blonde."

(f)  Turney regularly asked me about and commented on my personal life and my personal relationships.

(g)  Turney regularly sent me text messages of a personal nature, including but not limited to the following: asking me if I miss him; asking me if I am thinking about him; telling me to smile; and telling me about my coworkers' personal lives and relationships.

(h)  Turney told me that he thinks it is funny when I get into a disagreement with female coworkers. If Turney overhears such disagreements, Turney imitates cat claws with his hands and makes hissing noises. Turney does this in team meetings, in front of my coworkers. I complained to Turney that I do not like when he does this.

(i)  Turney whispered in my ear during work meetings, in front of my coworkers.

(j)  Male coworkers have indicated to me that they believe I use my sexuality to "get what I want." Male coworkers have told me that, maybe if they "wore tight pants and batted [their] eyes, [they] could get what [they] wanted," suggesting that this is what I do.

(k)  Males coworkers have called me a "bitch" at work.

(l)  Male coworkers have referred to me as pretty. Turney has mocked me when I told him that I do not come to work to hear that I am pretty.

(m)  Kenneth Foreman (male), Scheduler, ran his fingers through my hair without my consent. Turney mocked me when I told Foreman to stop, and that I do not like to be touched.

(n)  Foreman told me that I "sound like [his] wife bossing [him] around."

(o) On or about March 8, 2016, during a required CPR training course at Respondent, the male instructor told me to "pick my ass up" in front of my male coworkers. When I complained to Turney about this comment, following the training, he laughed and asked me, "well, did you pick it up?" I understood these comments to be harassing and discriminatory based on my sex.

(p) In or about April 2016, Mark Hoover (male), Operations Supervisor, told me that I was not smart enough to be able to perform a task because I am a woman and have blonde hair.

(q) Turney degrades me and treats me differently than he treats male employees. I complained to Turney that I feel like he criticizes my work, and does not recognize how hard I work, in a way that he does not criticize male employees.

(r) In or about May 2016, I complained of sexual harassment to Hondo Blakley (male), Process Improvement Lead. I asked Blakley for help, and expressed that I was upset at the way I have been treated by Turney and male coworkers because I am female. In response to my complaint, Blakley told me that this was "out of character" for me, and that I needed to "make sure to control [my] emotions."

(s) After my complaint to Blakley, Turney excluded me from work-related meetings. Turney became short-tempered with me, and exercised increased control over me and my actions. He commented that he "need[s] to watch what [he] say[s] around [me]," alluding to my complaint about him to Blakley.

(t) In or about May or June 2016, Turney told me that I work well with male employees because I am a woman.

(u) On or about June 10, 2016, at an outdoor work event, several male supervisors and male coworkers asked me why I was not wearing shorts, and asked me if Turney could cut my pants into shorts. Male supervisors then took a picture of my buttocks, without my consent, and saved the photo on their phones. Turney commented that another female at the event was wearing shorts and kissed him on the cheek, suggesting that I do the same.

(v) On or about July 18, 2016, during my mid-year performance review, Turney told me that I "make good money for a woman and should not be upset" with my pay grade. I was the lowest-paid Maintenance Analyst, and the only female Maintenance Analyst at Respondent's Wellsboro location. Despite my repeated requests for an explanation as to why I was the lowest-paid Maintenance Analyst, I did not receive an explanation.

(w) In or about August 2016, Turney asked me several times if I thought about him over the weekend.

(x) In or about September 2016, Turney told me that he thought about me while he was showering.

(y) In or about October 2016, Foreman asked me what I accomplished in 2016, "other than not dying [my] my hair for a whole year."

(z) In or about October 2016, I complained of sex discrimination to Blakley and Turney. In response to my complaint, Blakley and Turney told me that I "need to stop playing the victim."

(aa) In or about November 2016, I was denied a promotion to a Scheduler position for which I was qualified, applied, and interviewed. This promotion would have provided me with an increased salary.

(bb) The Scheduler position for which I had applied and interviewed, was qualified, and was denied, was given to Jeremy Greene (male) instead of me.

(cc) Turney and Blakley conducted the interviews and made the hiring decision. During my interview, Turney and Blakley laughed when I told them that I wanted the position because I wanted to advance my career at Respondent. During the interview, Turney and Blakley emphasized reasons why they believed I would not do well in the position.

(dd) After Greene was promoted to the position, Turney told me that he was "worried" that I might have received the promotion because I had more time in the group than Greene.

(ee) In or about November 2016, I complained to Respondent's Human Resources Department that I was being sexually harassed.

(ff) In or about November 2016, I complained to Craig that I did not receive the promotion. I was provided no rationale or explanation as to why I was not promoted. I complained to Craig that Turney has been sexually harassing me, and that I have submitted a complaint to Human Resources.

(gg) In or about November 2016, I contacted a doctor because I was experiencing anxiety and crying spells. I was diagnosed with situational anxiety and depression. I have continued to experience anxiety, insomnia, and diarrhea because of the sexual harassment and discrimination to which I have been subjected at Respondent.

(hh) Respondent assigned Megan Kloosterman (female), Human Resources Account Manager, to my internal complaint of sexual harassment. Kloosterman met with me in or about the end of November 2016. I provided Kloosterman with a two- (2) page document that included many of the instances of sexual harassment included in this Charge. I also provided this two- (2) page document to Craig.

(ii) Kloosterman conducted an investigation, and reported to me in December 2016 that Turney and Hoover, were found to have violated Respondent's Code of Conduct. Kloosterman did not address my complaints of sexual harassment.

(jj) Following the investigation, Greg Larsen (male), Operations Asset Manager, told me that I "need to think about how [I] present [my]self in the office and what [I] talk about at work." I asked him what he meant by this comment. He responded that I must "make sure [I] think about how [I] may come across." I understood Larsen's comments to be blaming me for the sexual harassment to which I have been subjected at Respondent.

(kk) In December 2016, Respondent transferred me to a new, less-desirable position. Following the outcome of the investigation, I was not provided the option of remaining in my then-current position.

(ll) I am the lowest-paid Environmental Technician, and the only female Environmental Technician.

(mm) I am the only female employee directly reporting to Ellis.

(nn) In or about the end of January 2017, I was provided with my 2016 year-end performance review. I was criticized for my performance and my attitude; I had not been criticized for my performance or attitude in my performance reviews before I had complained about sexual harassment.

(oo) I received a smaller bonus as a result of my 2016 year-end performance review.

(pp) On or about April 6, 2017, Ellis told me that my position is in jeopardy of being eliminated.

(qq) The continuous sexual harassment and retaliation that I have experienced has caused me physical and emotional distress.

(rr) Respondent has not taken action to remedy or prevent the hostile work environment to which I have been subjected.

(ss) Respondent's sexual harassment constitutes a continuing violation going back to my date of hire.

(tt) Several of my coworkers at Respondent are aware of the sex-based hostile environment and sex discrimination to which I have been subjected at Respondent.

(uu) Respondent's comments and conduct evidenced a bias against female employees. In addition to the above, male employees at Respondent regularly make comments of a sexual nature, including but not limited to the following: comments about porn; comments about women in bikinis; and comments degrading women.

B.  1.  Respondent's Stated Reasons

    (a)  Respondent has not offered any explanation for discriminating against me, including subjecting me to a hostile work environment, because of my sex.

    (b)  Respondent has not offered any explanation for retaliating against me because of my complaints of discriminatory conduct.

    (c)  Respondent has not offered any explanation for failing to promote me to the Scheduler position.

    (d)  Respondent has not offered any explanation for failing to remedy or take corrective action regarding the discrimination against me, including the hostile work environment to which I was subjected, because of my sex, and regarding the retaliation against me because of my complaints of discriminatory conduct.

C.  1.  Statutes and Basis for Allegations

I believe that Respondent has discriminated against me, including subjecting me to a hostile work environment, because of my sex (female), and retaliated against me because of my complaints of discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), *et seq.* ("Title VII) and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq.* ("PHRA") as set forth herein.  Respondent's failure to pay me as much as it pays its male employees is also in violation of 29 U.S.C. § 206, *et seq.* ("Equal Pay Act").

D.  1.  Class Charge

**I bring this Charge as a class and pattern and practice Charge on behalf of myself and any and all current or former similarly situated employees of Respondent who are female, and have been discriminated against based on sex, in connection with compensation, hiring, promotion, or termination decisions, and/or have been subjected to a hostile work environment.**

INFORMATION FOR COMPLAINANTS & ELECTION OPTION
TO DUAL FILE WITH THE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

**Jesse Barnes v. Shell; Shell Global; Shell Oil Company**

EEOC No. _____

You have the right to file this charge of discrimination with the Pennsylvania Human Relations Commission (PHRC) under the Pennsylvania Human Relations Act. Filing your charge with PHRC   protects your state rights, especially since there may be circumstances in which state and federal laws   and procedures vary in a manner which would affect the outcome of your case.

Complaints filed with the PHRC must be filed within 180 days of the act(s) which you believe are   unlawful discrimination. If PHRC determines that your PHRC complaint is untimely, it will be   dismissed.

If you want your charge filed with the PHRC, including this form as part of your EEOC charge, with   your signature under the verification below, will constitute filing with the PHRC. You have chosen   EEOC to investigate your complaint, so PHRC will not investigate it and, in most cases, will accept   EEOC's finding. If you disagree with PHRC's adoption of EEOC's finding, you will have the chance to   file a request for preliminary hearing with PHRC.

Since you have chosen to file your charge first with EEOC, making it the primary investigatory agency,   the Respondent will not be required to file an answer with PHRC, and no other action with PHRC is   required by either party, unless/until otherwise notified by PHRC.

If your case is still pending with PHRC after one year from filing with PHRC, you have the right to file   your complaint in state court. PHRC will inform you of these rights and obligations at that time.

**[Sign and date appropriate request below]**

  X   I want my charge filed with PHRC. I hereby incorporate this form and the verification below into the attached EEOC complaint form and file it as my PHRC complaint. I request EEOC to transmit it to PHRC.

  X    *I understand that false statements in this complaint are made subject to the penalties of 18   Pa. C.S. § 4904, relating to unsworn falsification to authorities.*

X   _____  04/25/17
      Signature and Date

_____   I do not want my charge dual filed with PHRC

_____
Signature and Date

Confidential

As a courtesy, I want to inform you that I have filed a charge of discrimination with the EEOC.

Thank you,
Jesse Barnes

Shell_0000554

Exhibit 20



# Compressed Transcript of the Testimony of
# MARK HOOVER, 2/14/20

**Case:** Barnes v. Shell Exploration & Production Company
Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page  3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jesse Barnes,                    :
        Plaintiff,               :
                                 :
                                 :
    vs                           :
                                 : 4:18-CV-01497
                                 :
Shell Exploration and Production :
Company Appalachia, Shell        :
Exploration and Production       :
Company, Shell Oil Company,      :
        Defendants.              :

        Videotaped deposition of MARK HOOVER, taken
at Holiday Inn, 100 Pine Street, Williamsport,
Pennsylvania, on Friday, February 14, 2020
beginning at 9:02 a.m., before Lori A. Fausnaught,
Registered Merit Reporter/Certified Realtime
Reporter.


        SUMMIT COURT REPORTING, INC.
    Certified Court Reporters and Videographers
        1500 Walnut Street, Suite 1610
        Philadelphia, Pennsylvania  19102
    424 Fleming Pike, Hammonton, New Jersey  08037
    (215) 985-2400 * (800) 447-8648 * (609) 567-3315
            www.summitreporting.com

1       INDEX TO WITNESSES
2
3   WITNESS                    PAGE
4   MARK HOOVER
5   EXAMINATION
6   By Ms. Gurmankin            5
7
8
9
10      PREVIOUSLY MARKED EXHIBITS
11
    EXHIBIT     DESCRIPTION     REFERENCED
12
    Exhibit 21  Interview Notes   66
13
14
15
16
17
18
19
20
21
22
23
24

Page  4

1
2   APPEARANCES:
3
4   CONSOLE MATTIACCI LAW, LLC
    By:  CAREN N. GURMANKIN, ESQUIRE
5   1525 Locust Street, Ninth Floor
    Philadelphia, PA  19102
6   (215) 545-7676
    gurmankin@consolelaw.com
7
        Counsel for Plaintiff
8
9
    TUCKER LAW GROUP
10  By:  KATHLEEN KIRKPATRICK, ESQUIRE
    Ten Penn Center
11  1801 Market Street, Suite 2500
    Philadelphia, PA  19103
12  (215) 875-0609
    kkirkpatrick@tlgattorneys.com
13
        Counsel for Defendants
14
15  ALSO PRESENT:
16  Bryce Connor, Videographer
17
18
19
20
21
22
23
24

1           STIPULATION
2       It is hereby stipulated by and between
3   counsel for the respective parties that sealing
4   and certification and filing are hereby waived;
5   and that all objections, except as to the form of
6   the question, are waived until time of trial.
7
            *    *    *    *
8
9       THE VIDEOGRAPHER:  We are now on the
10  record at 9:02 a.m. on February 14th, 2020.  This
11  is the start of the file number one in the
12  videotaped deposition of Mark Hoover in the matter
13  of Jesse Barnes v. Shell Exploration and
14  Production Company, Appalachia, et al., filed in
15  the U.S. District Court, Middle District of PA,
16  18-1497.  This deposition is being held today at
17  100 Pine Street, Williamsport, PA, 17701.
18      My name is Bryce Connor from the firm
19  of Summit Court Reporter, Incorporated, and I am
20  the videotape operator.  The court reporter is
21  Lori Fausnaught, also from Summit Court Reporter,
22  Incorporated.
23      Would counsel now, please, state their
24  appearance and firm affiliations for the record.

1 (Pages 1 to 4)

Page 5

1          MS. GURMANKIN:  Caren Gurmankin at
2    Console Mattiachi Law for the plaintiff.
3          MS. KIRKPATRICK:  Kathleen Kirkpatrick
4    for the defendants.
5          THE VIDEOGRAPHER:  Would the court
6    reporter now please swear in the witness?
7          THE COURT REPORTER:  Sir, if you could
8    raise your right hand for me, please.
9          MARK HOOVER,
10   called as a witness by the Plaintiff, having been
11   duly sworn or affirmed according to law, testified
12   as follows:
13         THE COURT REPORTER:  Thank you, sir.
14         DIRECT EXAMINATION
15   BY MS. GURMANKIN:
16   Q.  Mr. Hoover, good morning.
17   A.  Good morning.
18   Q.  We just met.  For the record, my name
19   is Caren Gurmankin, and I have the privilege of
20   representing Jesse Barnes in a lawsuit that she
21   has filed against Shell for sex discrimination,
22   sexual harassment and retaliation.
23   A.  Um-hmm.
24   Q.  Have you ever had your deposition taken

Page 6

1    before today?
2    A.  I have.
3    Q.  I'm sure you're familiar with the
4    rules.  I'll go through them with you so that you
5    and I are on the same page.  I'm going ask --
6         Did you want to say something?
7    A.  Yeah, it's been quite some time.  It
8    was a personal injury deposition down in -- well,
9    I was working off-shore at the time.  I've been
10   through it before.
11   Q.  Got it.  I'm going to ask you a series
12   of questions today.  If I ask you a question that
13   you don't understand, I need you to tell me and
14   I'll rephrase it.
15   A.  Okay.
16   Q.  If I ask you a question and you answer
17   the question, I'm going to assume that you have
18   answered -- that you understood my question and
19   you've answered it accordingly.  Do you understand
20   that?
21   A.  Yes.
22   Q.  We just need you to keep doing exactly
23   what you have been doing in giving verbal
24   responses to all of my questions so we can make

Page 7

1    sure that they are captured accurately in the
2    written transcript.  Okay?
3    A.  Yes.
4    Q.  Your deposition is being taking in a
5    conference room at a hotel.  It has the same force
6    and effect as if you were testifying in a federal
7    courtroom in front of a federal judge and jury.
8    A.  Um-hmm.
9    Q.  You have just taken an oath to tell the
10   truth.  Do you understand that?
11   A.  I do.
12   Q.  And do you understand that if do you
13   not tell the truth, and that includes saying you
14   don't know when you do know or you don't remember
15   when you do remember, that's considered perjury
16   and that's a felony?
17   A.  I do know.
18   Q.  Is there any reason you would not be
19   able to testify truthfully today?
20   A.  No.
21   Q.  There may be times where you think you
22   anticipate what my question is going to be.  Just
23   make sure that, for the sake of the written
24   transcript, you let me get out my entire question

Page 8

1    before you answer.  And likewise, I'll try to make
2    sure I let you finish you entire answer before I
3    ask the next question.  Okay?
4    A.  Okay.
5    Q.  If you need a break at any time, just
6    let us know.  We can take a break whenever you
7    like.  If there's a question pending, we just need
8    the question answered before we can take a break.
9    Okay?
10   A.  Yep.
11   Q.  What's your date of birth?
12   A.  ████████
13   Q.  Are you currently employed?
14   A.  I am.
15   Q.  With whom?
16   A.  I work for Crosby Energy.
17   Q.  When did you start working for Crosby?
18   A.  Last April.
19   Q.  Of 2019?  Of 2019?
20   A.  2019, yes.
21   Q.  Prior to working at Crosby, were you
22   working at Shell?
23   A.  I was.
24   Q.  What were your approximate dates of

Page 9

1    employment at Shell?
2        A.   Total employment was December of 1998
3    until July 1st, 2017.
4        Q.   At some point did you retire from
5    Shell?
6        A.   I took a voluntary severance package,
7    yes.
8        Q.   When was that?
9        A.   It was in the end of June, 2017.
10       Q.   Why did you take that, the voluntary
11   severance package?
12       A.   It was a personal decision only.  I
13   just thought it was a good move on my part.  And
14   the offer was there so I stuck my hand up.  It
15   was -- I had to be vetted through the process.  It
16   was not given to me immediately as I applied for
17   it.
18       Q.   Was this a voluntary severance package
19   that was offered to multiple employees at Shell?
20       A.   Yes.
21       Q.   Were there certain criteria, as you
22   understood it, that you had to meet in order to
23   get the package?
24       A.   The -- well, it was just the vetting

Page 10

1    process.  There were some people that would
2    possibly apply or want to take the voluntary
3    severance and because of business need would be
4    turned down.
5        Q.   Okay.  So at some point you learned
6    there is this voluntary severance package that's
7    being offered to employees.  Right?
8        A.   That's correct.
9        Q.   Okay.  And you basically raised your
10   hand and say that you'll take it?
11       A.   Yes.  I'm -- yeah.  It wasn't like the
12   day I found out.  Yeah.
13       Q.   Sure.  And when you say you had to be
14   vetted, what was your understanding --
15       A.   Well, they -- the leadership -- I don't
16   even know who's involved in it, but the leadership
17   gets together and says okay, Mark Hoover has
18   requested a voluntary severance, do we think we
19   would want to allow him to take it or not.
20            I'm just going off of what I assume.
21   That's not what I know.  I've never sat in one of
22   those conversations.
23       Q.   Sure.
24       A.   But that's kind of the way it's

Page 11

1    explained to me.  And if they say yeah, you know,
2    yep, if he wants it, let him have it.
3        Q.   So just to make sure I understand.
4    You're aware that you were vetted, you are not
5    entirely certain of everything that went into the
6    vetting process?
7        A.   No, I do not know everything that -- I
8    mean, I just know I was -- it was punched through,
9    rubber stamped, if you will, and I was allowed to
10   take it.
11       Q.   Okay.
12       A.   It took about a month to find out after
13   I initially expressed interest in taking the
14   package.  It took me about a month to find out if
15   I was going to get it or not.
16       Q.   Did you continue working at Shell
17   during that month?
18       A.   I did.
19       Q.   Nothing changed about your
20   responsibilities?
21       A.   No.
22       Q.   Prior to you basically raising your
23   hand and saying that would you accept the package,
24   did anyone suggest to you that you should?

Page 12

1        A.   No.
2        Q.   And why did you think it was a good
3    move on your part to accept the package?
4        A.   Um, I was just at a point in my life
5    where I said you know what, I want to find out if
6    there's life after Shell.
7        Q.   After July -- so the effective date of
8    your termination, was that July 1, 2017?
9        A.   Correct.
10       Q.   What was the voluntary package that you
11   accepted?  What did you get?
12       A.   What was it?
13       Q.   Yeah.
14       A.   It was three weeks pay for years of
15   service, I believe.
16       Q.   For each year?  Three weeks for each
17   year of service?
18       A.   Correct.
19       Q.   Anything else?
20       A.   I carried insurance for, I think it
21   was, six months.  I did not get any type of
22   benefit package.
23       Q.   When you say you carried insurance for
24   six months, does that mean you remained on Shell's

3 (Pages 9 to 12)

Page 13

1  health benefit?
2      A.  Yes, I had to pay my share that I
3  normally would pay under employ per month, and
4  then they paid their share.
5      Q.  Did the same arrangement continue in
6  connection with your health benefits as it did
7  when you were an employee?
8      A.  Up to -- for the --
9      Q.  The six months?
10     A.  For the six -- I think it was six
11 months.
12     Q.  Until the end of 2017?
13     A.  Right pretty close to it, yeah.
14     Q.  At any point after July 1, 2017, did
15 you return to Shell in any capacity?
16     A.  Actually I'm contracting to Shell right
17 now through Crosby.
18     Q.  So you're a Crosby employee?
19     A.  I am.
20     Q.  You are paid through Crosby?
21     A.  That is correct.
22     Q.  But you are a contractor at Shell?
23     A.  Yes.
24     Q.  You do Shell work?

Page 14

1      A.  I do.
2      Q.  Has that been the case since you
3  started at Crosby in April of 2019?
4      A.  That is correct.
5      Q.  Are you working in the same capacity as
6  the Shell contractor as you did at the time that
7  you left on July 1, 2017?
8      A.  No.
9      Q.  All right.  At the time that you took
10 the voluntary severance package on July 1, 2017,
11 what position did you hold?
12     A.  I was operations supervisor of the
13 Appalachia asset.
14     Q.  Reporting to who?  Who did you report
15 to?
16     A.  Steve Craig, at the time.
17     Q.  About how long had you had that
18 operations supervisor of Appalachia position?
19     A.  Approximately -- I -- approximately
20 February 2014.  So a little over two years, I
21 guess, or -- yeah, a little -- going on three
22 years, I guess.  Yeah.
23     Q.  How long had you reported to Craig?
24     A.  Wow.  I'm trying to remember when Steve

Page 15

1  came into the asset.  I don't remember exactly
2  when Steve came into the asset.  I don't know.
3  I'm going to guess and say maybe a year.  I don't
4  know.  Maybe a year, year and a half.  That's
5  definitely a guess, because we did have some
6  changes in that position.
7          MS. KIRKPATRICK:  We don't want you to
8  guess.  If you don't know or you don't remember,
9  you can say that.
10         THE WITNESS:  I don't know.  I'm sorry.
11 BY MS. GURMANKIN:
12     Q.  Approximately a year, a year and a half
13 is fair?
14     A.  That's fair.
15     Q.  Okay.  Immediately prior to Craig, who
16 was your direct supervisor?
17     A.  A fellow by the name of Chris Anderson.
18     Q.  What happened to him so that you
19 stopped reporting to him and started reporting to
20 Steve Craig?
21     A.  Took another assignment.  Actually, I
22 think -- he took another assignment.  I think he
23 might have been getting ready to go into
24 retirement.  I don't know that for a fact.

Page 16

1      Q.  Did he take another assignment within
2  Shell?
3      A.  I believe so, yes.
4      Q.  Is it your understanding that to work
5  as a Shell contractor through Crosby, as you have
6  been since April of 2019, that Shell had to
7  approve you working as a contractor?
8      A.  Yes.
9      Q.  During your entire employment with
10 Shell as an employee, so from 1998 through July of
11 2017, did you ever violate company policy or the
12 company code of conduct?
13     A.  No.
14     Q.  Did anyone tell you that you violated
15 company policy or the company code of conduct?
16     A.  No.
17     Q.  Were you ever disciplined for any
18 reason during your entire employment with Shell
19 from 1998 through 2017?
20     A.  No.
21     Q.  To your knowledge, did anyone complain
22 about your contact -- I'm sorry -- did anyone
23 complain about your conduct as an employee at
24 Shell from 1998 through 2017?

4 (Pages 13 to 16)

Page 17

1      A.  One complaint of a direct report
2  because we had a disagreement.
3      Q.  Who is the direct report?
4      A.  Who?
5      Q.  Yes.
6      A.  His name is Kevin Knowles.
7      THE COURT REPORTER:  Could you spell
8  his last name?
9      THE WITNESS:  K-N-O-W-L-E-S.
10     THE COURT REPORTER:  Thank you.
11  BY MS. GURMANKIN:
12     Q.  When did you become aware of Kevin
13  Knowles's complaint?
14     A.  Within a day after it happened.
15     Q.  When are we talking?
16     A.  Wow.  I'm going to say -- I don't know
17  exactly.  2015, maybe.
18     Q.  During your time as operations
19  supervisor?
20     A.  Actually I was also -- I was flow-back
21  supervisor before I was operations supervisor in
22  this asset.  I believe I was still only holding
23  the flow-back supervisor position.
24     Q.  All right.  So we're talking at some

Page 18

1  point before February of 2014?
2     A.  2014?
3     Q.  Yeah.  You testified that you were
4  operations supervisor in Appalachia from February
5  of 2014 through the time that you took a voluntary
6  severance package.  Right?
7     A.  Yes.  But I did hold -- I wore two hats
8  at one time.  I still carried flow-back for a
9  while as well as operations.
10     Q.  Okay.  So do you remember how long you
11  carried the dual roles approximately?
12     A.  Not exactly.  No, I don't.
13     Q.  Do you recall if we're talking weeks,
14  months, years?
15     A.  Oh, it was months.  It was months.  It
16  was not -- it was not years but it was months.
17     Q.  So the complaint from Kevin Knowles
18  about you, did you become aware of that while you
19  were performing the role of operations supervisor?
20     A.  Yes.
21     Q.  Okay.  You think sometime around 2015?
22     A.  I'm guessing, yes.
23     Q.  And what was the complaint that you
24  became aware of?

Page 19

1      A.  That I used the wrong language towards
2  him.
3      Q.  Was Kevin Knowles a direct report?
4      A.  He was.
5      Q.  And what was the wrong language that he
6  said you used?
7      A.  I told him to 'F' off.
8      Q.  So we're clear, you told him to fuck
9  off?
10     A.  Yes.
11     Q.  And you understood that he complained
12  about you telling him that?
13     A.  Um-hmm.
14     Q.  Yes?
15     A.  Yes.
16     Q.  Who told you about the complaint?
17     A.  Steve Craig.
18     Q.  Did you tell Kevin Knowles to fuck off?
19     A.  I did.
20     Q.  What was the context?
21     A.  He called me a liar.
22     Q.  What was the context?
23     A.  He just -- he said -- he stated -- we
24  were having a morning meeting, and he stated well,

Page 20

1  you're lying to us all the time.  And I said ah,
2  fuck off.
3      Q.  So this was in front of other --
4      A.  It was.
5      Q.  -- direct reports?
6      A.  It was.
7      Q.  Was it in front of any other
8  supervisors or managers?
9      A.  No.
10     Q.  So it was in a meeting of your group?
11     A.  Yes.
12     Q.  Did he say what he was accusing you of
13  lying about?
14     A.  No.  He didn't get specific.
15     Q.  Did you know in the meeting?
16     A.  No.
17     Q.  How soon after the meeting did you
18  become aware that he had complained?
19     MS. KIRKPATRICK:  Objection.  Asked and
20  answered.  Go ahead.
21     THE WITNESS:  I believe it was the same
22  day.  It might have been the next day.  No longer
23  than that.
24

5 (Pages 17 to 20)

Page 21

BY MS. GURMANKIN

Q.  Okay.  So tell -- when what happens, when Steve Craig comes to you, what does he tell you?

A.  He sat down.  We had a one-on-one meeting.  He said you know, you were out of line with the language that you used, and you shouldn't have done it.  I explained the situation and I said I do know that.

And I did apologize to Kevin Knowles both after the fact directly, before he placed the complaint, and I apologized again after the meeting with Steve Craig pointing out my wrongdoing.

Q.  Okay.  So right after the meeting you apologized to Knowles?

A.  I did.

Q.  Was it just the two of you, one on one?

A.  No.  Actually it was while we were breaking up so there was still people present.

Q.  Do you know if anyone else heard?

A.  I don't know that for a fact.  I can assume they did because I didn't whisper it.  So...

Page 22

Q.  What did you say to Knowles?

A.  I said look, I'm sorry for saying what I did, but I don't deserve -- I don't deserve what you said, as well.

Q.  What did he say?

A.  He didn't really give me much of a response.

Q.  Did you ask him what he was accusing --

A.  I didn't.

Q.  -- you of lying about?

Just try to let me finish my question before you answer.  Okay?

A.  Sure.  Sorry.

Q.  That's alright.  So Steve Craig tells you you are out of line.

A  (Witness nodded in the affirmative.)

Q.  Yes?

MS. KIRKPATRICK:  Objection.

THE WITNESS:  Yes.

BY MS. GURMANKIN

Q.  You told Craig you had apologized to Knowles right after the meeting?

A.  I did.

Q.  Did you tell Craig that you would

Page 23

apologize to Knowles again?

A.  I didn't tell him that, but I did on my own because I thought it was the right thing to do.

Q.  Anything else that Craig tells you when he tells you that you're out of line?

A.  That it could possibly -- that I need to hold myself to a higher standard than that, being a manager.

Q.  Anything else that Craig tells you?

A.  Those two things stick out.  I don't remember the exact conversation.

Q.  This is an in-person conversation?

A.  It was.  It was a one on one.

Q.  Anything else that you say to Craig other than telling him that you had apologized to Knowles after the meeting?

A.  I -- we just had the conversation.  I don't remember the exact conversation.  You know, I mean, he just basically said, you know, you were out of line and you need to hold yourself to a higher standard.

Q.  Did you ever receive any documentation regarding this complaint from Knowles?

Page 24

A.  No.

Q.  Were you ever disciplined for it?

A.  No.

MS. KIRKPATRICK:  Objection.

BY MS. GURMANKIN

Q.  How long after that meeting with Craig did you talk to Knowles again?

A.  The next day.

Q.  And what did you say?

A.  I got the same response.  Not much of a -- an acknowledgment, nothing more.  Not a thank you, just an acknowledgment.  Nothing more.

Q.  What did you say, was my question?

A.  I just said look, I'm sorry that I said what I said.  I was out of line.

Q.  And he basically just acknowledged what you said?

A  (Witness nodded in the affirmative.)

Q.  Yes?

A.  Yes.

Q.  No real response other than that?

A.  That's it.

Q.  Did Knowles continue reporting to you directly after that?

6 (Pages 21 to 24)

Page 25

1      A.  Yes.
2      Q.  Aside from that complaint from Knowles,
3  during your employment with Shell as a full-time
4  employee from '98 to 2017, any other complaints
5  about your conduct that you're aware of?
6      A.  No.
7         MS. KIRKPATRICK:  Objection.  Just wait
8  because I may object, and two people can't talk to
9  each other -- talk over each other at the same
10  time.
11  BY MS. GURMANKIN
12      Q.  Who was Stacy Burd?
13      A.  I'm sorry?
14      Q.  Who was Stacy Burd?
15      A.  She is my girlfriend.
16      Q.  Did she work at Shell in any capacity?
17      A.  She did.
18      Q.  When?
19      A.  Oh, they had a big -- they cut back on
20  her team -- oh, boy.  I don't know.  20 -- 2015,
21  2016.  I don't know exactly.
22      Q.  What capacity did she work at Shell;
23  what was her position?
24      A.  I just know she worked with what was

Page 26

1  called the water team.
2      Q.  Where?
3      A.  Where?
4      Q.  Um-hmm.
5      A.  They used to have an office away from
6  the main office in Wellsboro.  And then when Shell
7  moved into the Penn Tech building, what we call
8  the Penn Tech building, the office now, they
9  brought everybody together because they had the
10  room for it.
11      Q.  When did you start dating?
12      A.  Um, after I was -- after I was
13  divorced.
14      Q.  When?
15      A.  I was separated in February of 2016.
16      Q.  Did you start dating at some point
17  after February 2016?
18      A.  Yes.
19      Q.  So while you were separated but before
20  you were divorced?
21      A.  Yes.
22      Q.  And she was working at Shell at that
23  time that you started dating?
24      A.  No.

Page 27

1      Q.  You said she was working there around
2  2015, 2016.  Is that accurate?
3      A.  Yes.  But I don't know exactly when
4  they left.  She was not working there, no.
5      Q.  Where was she working when you started
6  dating?
7      A.  At -- for Citizens Bank.
8      Q.  You met her during your employment at
9  Shell?
10      A.  I did.
11      Q.  Did you start any kind of romantic or
12  sexual relationship with her while she was
13  employed at Shell?
14      A.  No.
15      Q.  Did you have any romantic or sexual
16  relationship with any employee or contractor at
17  Shell?
18      A.  No.
19      Q.  You're familiar with the company's code
20  of conduct.  Is that right?
21      A.  I am.
22      Q.  And you've had training during your
23  employment at Shell from '98 through 2017 on the
24  EEO policies, anti-discrimination,

Page 28

1  anti-harassment?
2      A.  Yes.
3      Q.  When did you have training in those
4  policies?
5      A.  Shell had an annual computer-based
6  training that you had to take.  And then there was
7  also at times, I don't think there was any set
8  time for it, but usually a manager would lead an
9  awareness, high-level training maybe during a
10  Thursday safety meeting, or what have you, around
11  the code of conduct.  It was high-level awareness.
12      Q.  Did that include discussion or a
13  reference to the company's EEO, anti-harassment,
14  anti-discrimination policy?
15      A.  Yes.
16      Q.  Did that happen on a regular basis or
17  just periodically?
18      A.  Periodically.
19      Q.  No set times for that?
20      A.  No.
21      Q.  As a supervisor who had training at
22  Shell, do you agree that referring to a female
23  employee as bitchy would violate the company's
24  policy?

7 (Pages 25 to 28)

Page 29

1	A.  I would say that it would depend on the
2	context.
3	Q.  That's your understanding from the
4	policies and the training?
5	A.  That's my understanding, yes.
6	Q.  And what context -- in what context
7	would it not be a violation of company policy or
8	code of conduct to refer to a female employee as
9	bitchy?
10	A.  Well, it depends on the relationship
11	and what type of conversation is going on.  It's
12	strictly context.  As it stands right now, it may
13	be outside the lines.  But I think you have to
14	understand exactly how it was delivered and why it
15	was delivered.
16	Q.  And that's what you were taught from
17	the Shell's computer-based training and the
18	periodic manager training that you received?
19	A.  That's how I took it.
20	Q.  That's what you understood from the
21	training?
22	A.  (Witness nodded in the affirmative.)
23	Q.  Yes?
24	A.  Yes.

Page 30

1	Q.  Based on your experience as a
2	supervisor at Shell, your familiarity with the
3	policies and your training on the policies and the
4	code of conduct, is a male supervisor touching a
5	female employee, does that violate the company
6	policy?
7	A.  Um, so, I don't know that it would
8	violate it.  Again, I would have to look at it in
9	context.  I mean, there are different forms of
10	touching.  A pat on the back because you did a
11	good job is touching.  I don't know that violates
12	the code.  So I think context has to be
13	understood.
14	Q.  How about touching a female employee's
15	thigh?
16	A.  Again, context.
17	Q.  That's what you understand from the
18	company's training.  Correct?
19	A.  Yes.
20	Q.  And your experience --
21	A.  They are reviewed.
22	Q.  And your experience as a supervisor --
23	A.  Yes.
24	Q.  -- in 2015, 2016 -- actually, let's

Page 31

1	start with the time that you were operations
2	supervisor, February of 2014 in Appalachia, where
3	were you based?  Where did you work out of?
4	A.  2014?
5	Q.  Yeah.
6	A.  We started working out of the -- the
7	existing office right now, what we call the Penn
8	Tech building.
9	Q.  And where was that?
10	A.  It's in Wellsboro.
11	Q.  Did you work out of Wellsboro through
12	your effective date of separation on July 1, 2017?
13	A.  Yes.
14	Q.  Was Will Turney's group there, as well?
15	A.  Yes.
16	Q.  And where were you seated in connection
17	with Turney's group?
18	A.  We sat in cubicles.  They were like
19	quad cubicles.  Seat, seat (indicating).  I sat
20	catty-corner from Will.  My desk was in the
21	corner.  Will was behind me in the other open
22	corner.
23	Q.  But your group was right next to his
24	group?

Page 32

1	A.  My desk was right next to his desk.
2	His group was not necessarily -- it was not in
3	that same area.  It was my desk and his desk.
4	Q.  Some of his employees were in that
5	area.  Correct?
6	A.  No.
7	Q.  No?
8	A.  No, not in that area there.
9	Q.  You worked with Turney's group during
10	your time as operations supervisor.  Correct?
11	A.  Yes.  His maintenance group and my
12	operations group had to interact, yes.
13	Q.  Why?
14	A.  Why?
15	Q.  Um-hmm.
16	A.  Maintenance takes care of corrective
17	maintenance, preventive maintenance issues on the
18	equipment that allows for seamless production.
19	Q.  So there was a lot of overlap between
20	your groups?
21	A.  Correct.
22	MS. KIRKPATRICK:  Objection.
23	BY MS. GURMANKIN
24	Q.  Were you ever in meetings with Turney

8 (Pages 29 to 32)

Page 33

1  and his group?
2      A. Very seldom. We had common meetings
3  amongst everybody, but I very seldom went into
4  Will's meetings with his group.
5      Q. Did you ever see Turney act
6  inappropriately in any way?
7      A. No.
8      Q. Did you ever hear him make any comments
9  that you thought were inappropriate?
10     A. No.
11     Q. Did you ever see him touch a female
12  employee?
13     A. No.
14     Q. Did you ever hear him comment on Jesse
15  Barnes's physical appearance or her looks?
16     A. No.
17     Q. Did you ever see him touch Jesse
18  Barnes?
19     A. No.
20     Q. Who's Ken Foreman?
21     A. Ken Foreman was -- I don't know his
22  exact title. I think he carried the title of
23  planner/scheduler for Mr. Turney's maintenance
24  group. I think that was his title.

Page 34

1      Q. Did you have interactions with him in
2  your capacity was operations manager --
3      A. Yes, I used to deal with Ken. Mostly
4  what I dealt with Ken was was getting charge code
5  numbers because he kind of handled that.
6      Q. Did you ever see Ken Foreman do
7  anything that you felt was inappropriate?
8      A. No.
9      Q. Did you ever see him touching a female
10  employee?
11     A. No.
12     Q. Ever see him touching Jesse Barnes?
13     MS. KIRKPATRICK: Objection.
14     THE WITNESS: No.
15  BY MS. GURMANKIN:
16     Q. Ever see him putting his hands through
17  Jesse Barnes's hair?
18     MS. KIRKPATRICK: Objection.
19     THE WITNESS: No.
20  BY MS. GURMANKIN:
21     Q. Ever hear him say anything to Jesse
22  that you felt was inappropriate?
23     MS. KIRKPATRICK: Objection.
24     THE WITNESS: No.

Page 35

1  BY MS. GURMANKIN:
2      Q. Did you ever hear him say or do
3  anything to Jesse Barnes that you felt was
4  inappropriate?
5      A. No.
6      Q. Have you ever referred to a female as a
7  bitch or bitchy?
8      A. I don't recall ever -- any specific
9  instance when I did.
10     Q. In your life?
11     A. In my life?
12     Q. Yeah. Have you ever referred to a
13  female as a bitch or bitchy?
14     A. Yes.
15     Q. How about at Shell?
16     A. No.
17     Q. You say that with certainty? You've
18  never referred to a female employee as a bitch or
19  bitchy at Shell?
20     A. I just do not recall. I do not recall
21  a specific instance. It's a possibility, yes.
22     Q. You said no earlier. Is that not true?
23     MS. KIRKPATRICK: Objection.
24     THE WITNESS: There's a possibility.

Page 36

1  BY MS. GURMANKIN:
2      Q. Have you ever heard a male employee at
3  Shell refer to women as bitches or bitchy?
4      A. Not that I recall.
5      Q. Have you ever talked about sex at
6  Shell?
7      A. Not that I recall.
8      Q. Did you talk about your divorce at
9  Shell?
10     A. Minimal. I let it be known to
11  leadership that it was coming and asked them
12  for -- if I would start having -- you know, if I
13  would get off track or maybe wandering, just kind
14  of nudge me in the right direction.
15     Q. Who's leadership?
16     A. Steve Craig, Hondo Blakely, Will
17  Turney. This was it.
18     Q. And why did you tell them?
19     A. Because we worked together and I
20  thought maybe, you know, if I got -- maybe I
21  wasn't focusing on where I needed to focus, they
22  might just give me a little reminder.
23     Q. When was this? Was this around
24  February of 2016 timeframe --

9 (Pages 33 to 36)

Page 37

1      A.  Yes.
2      Q.  -- when you separated?
3      A.  Yes.
4      Q.  And you told Turney, Blakely and Craig
5  because they were considered leadership at
6  Wellsboro?
7      A.  Correct.
8      Q.  Other than that, did you talk about
9  your divorce at Shell?
10     A.  Not that I recall.
11     Q.  Did they ever come back to you and do
12  what you wanted, tell you that you were getting
13  off track or anything to that effect?
14     A.  Nothing like that.  Just asked me, you
15  know, if there were any updates that I wanted to
16  share, how's it going.  That's about it.
17     Q.  When was the divorce effective?
18     A.  It just became effective this past
19  August.
20     Q.  August of 2019?
21     A.  Correct.
22     Q.  Prior to that, did you ever talk about
23  your marriage at Shell?
24     A.  Very little.  No.  Very little.

Page 38

1      Q.  Very little or no?
2      A.  Very little.
3      Q.  What about?
4      A.  Just what we were doing.  If we were
5  going somewhere.  Things we had done in the past.
6      Q.  Did you ever say that a female employee
7  or contractor at Shell was pretty or attractive or
8  words to that effect?
9          MS. KIRKPATRICK:  Objection.
10         THE WITNESS:  I don't recall.
11  BY MS. GURMANKIN
12     Q.  Is it possible you did?
13     A.  Possible.
14     Q.  Did you ever hear a male employee at
15  Shell say that a female employee or contractor was
16  pretty or attractive or words to that effect?
17         MS. KIRKPATRICK:  Objection.  Asked and
18  answered.  You can answer.
19         THE WITNESS:  I don't know.
20  BY MS. GURMANKIN
21     Q.  Possible?
22     A.  Possible.
23     Q.  Did you ever comment on the physical
24  appearance of a female employee or a contractor at

Page 39

1  Shell?
2          MS. KIRKPATRICK:  Objection.
3          THE WITNESS:  I don't recall.
4  BY MS. GURMANKIN
5      Q.  It's possible you did?
6      A.  Possible.
7      Q.  Did you ever hear a male employee of
8  Shell comment on the physical appearance of a
9  female employee or contractor of Shell?
10         MS. KIRKPATRICK:  Objection.  You can
11  answer.
12         THE WITNESS:  I don't recall.
13  Possible.
14  BY MS. GURMANKIN
15     Q.  Ever been to a strip club?
16     A.  Yes.
17     Q.  About how many times?
18     A.  Ah --
19         MS. KIRKPATRICK:  In his life?
20         MS. GURMANKIN:  Yes.  Counsel is
21  laughing.
22         THE WITNESS:  Okay.  I'm going to guess
23  and say probably 20, 25.
24

Page 40

1  BY MS. GURMANKIN
2      Q.  Any during your employment at Shell
3  from '98 through 2017?
4          MS. KIRKPATRICK:  Objection.
5          THE WITNESS:  Yes.
6  BY MS. GURMANKIN
7      Q.  How many times, approximately?
8      A.  Three or four.
9      Q.  When was the last time?
10     A.  This will take a little bit of thinking
11  here.
12     Q.  Sure.  Take your time.
13     A.  The last time I lived in Louisiana, and
14  I left Louisiana in 2011.  I'm going to say it was
15  probably in the mid to late '90s.  1995.  That's a
16  guess.
17     Q.  Well, you started at Shell in '98.
18  Right?
19     A.  Um-hmm.
20     Q.  Yes?
21     A.  Yeah.  So maybe I hadn't been to one
22  since I've been with Shell.  See, I worked
23  off-shore for a lot of years, almost 30 years, and
24  I lived down in the Gulf.  So there were times.

1    It might have been prior to my Shell employment.
2        Q.  You don't recall?
3        A.  I don't recall.
4        Q.  Ever go to a strip club with a Shell
5    employee or contractor?
6        A.  No.
7        Q.  Ever talk about your going to strip
8    clubs while you were at Shell?
9        A.  I don't recall.  It's possible.
10       Q.  Ever hear a male employee talk about
11   going to strip clubs while you were at Shell?
12       A.  I don't recall.
13       Q.  Did you ever refer to a female employee
14   or contractor at Shell as hot?
15       A.  As -- no.
16       Q.  Have you ever referred to a female as
17   hot?
18       A.  In my life?
19       Q.  Yes.
20       A.  Sure.
21       Q.  But never a female employee or
22   contractor at Shell?
23       A.  No.
24       Q.  Did you ever hear a male employee at

1    Shell refer to a female as hot?
2        A.  Not that I recall.
3        Q.  Did you ever touch a female employee or
4    contractor at Shell?
5        MS. KIRKPATRICK:  Objection.
6        THE WITNESS:  No.  Not that I recall.
7    BY MS. GURMANKIN
8        Q.  Possible?
9        A.  It's possible.  But I don't recall
10   doing it.
11       Q.  Ever see a male employee at Shell touch
12   a female employee?
13       MS. KIRKPATRICK:  Objection.
14       THE WITNESS:  No.
15   BY MS. GURMANKIN
16       Q.  Did you ever see a male employee flirt
17   with a female employee or contractor at Shell?
18       A.  No.
19       Q.  Ever hear any rumors that a male
20   supervisor or manager at Shell was having a sexual
21   or romantic relationship with a female employee or
22   contractor?
23       A.  I don't recall.
24       Q.  You don't recall one way or the other?

1        A.  Right.
2        Q.  In your capacity as operations
3    supervisor at Appalachia in which you interacted
4    and overlapped with Turney's group, you worked
5    with Jesse Barnes.
6        A.  Yes.
7        Q.  In what capacity?
8        A.  It was -- it was minimal as far as her
9    interaction.  She handled a lot of the scheduling
10   of work through the SAP system.  So there were
11   times when maybe if she was having a question or
12   some problems with either work getting closed out,
13   which means that the operator would have to
14   actually write or type in to a computer database
15   that they have completed the job, Jesse may let me
16   know that maybe hey, these guys are running behind
17   so I could follow up on it because they were my
18   employees.
19       That was pretty much it.  I mean, it
20   was mostly around the SAP work ord -- and what
21   they call work orders.
22       Q.  In your capacity working with her, did
23   you ever have any issues with her work
24   performance?

1        A.  No.
2        Q.  Any issues with her conduct?
3        A.  No.
4        Q.  Ever hear any complaints about her work
5    performance or conduct?
6        A.  I never heard any major complaints, no.
7        Q.  Any minor complaints?
8        A.  I heard some minor complaints that
9    maybe she was not picking up on some things quite
10   a quick as she should have or was expected.  But
11   they were minor.
12       Q.  Who did you hear that from?
13       A.  William Turney.
14       Q.  Anyone else?
15       A.  No.
16       Q.  And this is Turney telling you this
17   directly?
18       A.  Yes.
19       Q.  When?
20       A.  Oh, I don't remember.  I don't know.
21       Q.  Do you recall the year?
22       A.  No.
23       Q.  How many times did he tell you that?
24       A.  Once, maybe twice.  No more.

Page 45

1      Q.  Do you recall if it was 2017, the year
2  in which you separated from Shell?
3      A.  No, I don't recall if it was or wasn't.
4      Q.  Anything else about minor complaints or
5  any complaints that you heard about Jesse from
6  anyone at Shell?
7      A.  Nothing.
8      Q.  At some point, were you interviewed by
9  HR?
10     A.  Yes.
11     Q.  Okay.  When was that?
12     A.  End of the year of '16, I believe.
13     Q.  And how was it that you came to be
14  interviewed by HR at that time?
15     A.  They asked me about interactions with
16  Jesse Barnes.
17     Q.  Who asked you?
18     A.  I believe her name is Kloosterman
19  maybe.
20     Q.  Was it Megan Kloosterman?
21     A.  Yeah, I think it was.  I'm not
22  100 percent sure.
23     Q.  Was that the only time that you've been
24  interviewed by HR during your employment with

Page 46

1  Shell as a full-time employee?
2     A.  Repeat the question, please.
3     Q.  Sure.  Was that the only time that
4  you've been interviewed by HR during your
5  employment with Shell as a full-time employee from
6  '98 to 2017?
7     A.  The only one that I recall.  I think
8  so.
9     Q.  And how did you come to meet with her?
10     A.  She came to the asset.
11     Q.  She came to Wellsboro?
12     A.  Um-hmm.
13     Q.  Yes?
14     A.  Yes.
15     Q.  But how did you come to meet with her
16  specifically?
17     A.  I was asked to meet with her.
18     Q.  By who?
19     A.  Steve Craig.
20     Q.  What did he tell you about why?
21     A.  He just told me that we were going to
22  have some conversation with HR around some
23  complaints that Ms. Barnes had put in.
24     Q.  Is this Craig just telling you or were

Page 47

1  there other people around when he told you this?
2     A.  Told me.
3     Q.  Did he tell you what were the
4  complaints that Jesse had put in?
5     A.  Not specifically, no.
6     Q.  Generally?
7     A.  Just -- yeah, you're going to have to
8  go -- you need to talk to HR around some
9  complaints that Jesse has.
10     Q.  Did he tell you generally the nature of
11  her complaints?
12     A.  No.
13     Q.  Did he tell you that the complaints
14  involved your conduct?
15     MS. KIRKPATRICK:  Objection.
16     THE WITNESS:  I don't recall if he
17  specifically said that.  I do not recall.  He just
18  told me I needed to meet with HR concerning this
19  matter.
20  BY MS. GURMANKIN:
21     Q.  At any point do you learn that her
22  complaints involved your conduct?
23     A.  Repeat again.
24     Q.  Sure.  At any point do you learn that

Page 48

1  her complaints involved your conduct?
2     A.  During the interview, yes.
3     Q.  With Kloosterman?
4     A.  Yes.
5     Q.  How soon after Craig talked to you
6  about having conversations about complaints that
7  Jesse had made did you meet with Kloosterman?
8     A.  Oh, I believe it was the same day.  I'm
9  not 100 percent sure about that.  But I believe it
10  was the same day.
11     Q.  And nothing else you recall Craig
12  telling you?
13     A.  No.
14     Q.  Tell me what you recall about the
15  interview with Kloosterman.
16     A.  She asked me some specific questions.
17  Did I call Jesse bitchy.  Did I tell her that she
18  wasn't smart enough to do the job, I believe.  And
19  did I call her a window licker.
20     Q.  Anything else you recall about the
21  meeting with Kloosterman?
22     A.  Just that, just what we talked about
23  there.
24     Q.  How long was the meeting?

12  (Pages 45 to 48)

Page 49

1      A.   Do you want approximate, because I
2  don't recall exact?
3      Q.   Yeah.  Yeah.
4      A.   I'm going to guess and say 20 minutes.
5      Q.   Did you take any notes?
6      A.   Notes?
7      Q.   Yes.
8      A.   I did not.
9      Q.   Did you document the meeting in any
10  way?
11      A.   I did not.
12      Q.   Did she, Kloosterman?
13      A.   I don't know.  I don't recall signing
14  anything, if she did.
15      Q.   When she asked if you called Jesse
16  bitchy, what did you say?
17      A.   I said it's possible that I did.  I
18  don't recall an instance.
19      Q.   Why did you think it was possible that
20  you did?
21      A.   It might have been something in
22  passing.
23      Q.   Is that a term that you use to refer to
24  female employees?

Page 50

1      A.   Not on a regular basis, no.
2      Q.   Then why did you think it was possible,
3  even if you didn't recall it?
4      A.   That it's possible I did.  I just -- it
5  could have been just in passing, maybe a complaint
6  thrown my way.
7      Q.   Did you ever touch Jesse?
8          MS. KIRKPATRICK:  Objection.
9          THE WITNESS:  No.
10  BY MS. GURMANKIN
11      Q.   Is it possible you did?
12      A.   I guess it's possible.
13          MS. KIRKPATRICK:  We don't want you to
14  guess.
15          MS. GURMANKIN:  He answered.
16          THE WITNESS:  It is possible.
17          MS. KIRKPATRICK:  It's possible that
18  you touched her.  Okay.
19  BY MS. GURMANKIN
20      Q.   Did Kloosterman ever ask you if you
21  touched Jesse?
22      A.   I don't recall being asked that.
23      Q.   I'm sorry.  You don't recall it what?
24      A.   I do not recall being asked that.

Page 51

1      Q.   When Kloosterman asked you whether you
2  told Jesse she wasn't smart enough to do the job,
3  what did you say?
4      A.   I said I do not recall saying that in
5  that manner.
6      Q.   Did you recall saying something along
7  those lines?
8      A.   No.
9      Q.   Did you ever comment on Jesse's
10  intelligence or ability to do her job?
11      A.   Not that I recall.
12      Q.   So why didn't you tell Kloosterman
13  absolutely not, I didn't say that.
14          MS. KIRKPATRICK:  Objection.  You can
15  answer.
16          THE WITNESS:  I'm sorry?
17  BY MS. GURMANKIN
18      Q.   Did you tell Kloosterman you didn't say
19  that to Jesse?
20      A.   I don't remember.  I may have, but I
21  don't remember saying that to Jesse, no.
22      Q.   Is it possible you did?
23      A.   No, I don't think so.
24      Q.   So did you tell Kloosterman no, I

Page 52

1  didn't say that?
2      A.   I don't remember.
3      Q.   Well, wouldn't you have if you don't --
4  if you're saying that you never said anything like
5  that to Jesse?
6          MS. KIRKPATRICK:  Objection.
7          THE WITNESS:  Question again, please.
8  BY MS. GURMANKIN
9      Q.   Sure.  You testified that your response
10  to Kloosterman was no, you didn't say to Jesse
11  that she wasn't smart enough to do the job.
12  Right?
13          MS. KIRKPATRICK:  Objection.
14          THE WITNESS:  Yes.
15  BY MS. GURMANKIN
16      Q.   But it's possible that did you say that
17  to Jesse; you're testifying now?  Right.
18      A.   No, I don't think I did.
19      Q.   So did you tell Kloosterman no, I
20  didn't say that?
21      A.   I don't remember if I told her no.  I
22  think I told her no.  I don't remember.
23      Q.   Did you ever call Jesse a window
24  licker?

13 (Pages 49 to 52)

Page 53

1      A.  I did do that.
2      Q.  What did you mean when you called her
3  that?
4      A.  Of low intelligence.
5      Q.  Did you tell Kloosterman that you
6  called Jesse that?
7      A.  I did.
8      Q.  How many times did you say that to
9  Jesse?
10      A.  One.
11      Q.  When?
12      A.  I have no idea when exactly it was.
13      Q.  Do you recall the year?
14      A.  No.
15      Q.  Why did you say that to Jesse?
16      A.  We were probably laughing about
17  something that -- I'm sure we were laughing about
18  something, a mistake she made.  And I let that
19  fly, that particular comment.  And she chuckled
20  about it, and we went on about our way.
21      Q.  What were you laughing about?
22      A.  Probably a mistake she made.  I don't
23  remember exactly what it was.
24      Q.  Are you guessing it was about a mistake

Page 54

1  she made or --
2      MS. KIRKPATRICK:  Objection.
3  BY MS. GURMANKIN
4      Q.  Do you remember what you were laughing
5  about?
6      A.  No, I don't.
7      Q.  Do you remember that you were both
8  laughing?
9      A.  Yes.
10      Q.  That, you are certain of?
11      A.  Yes.
12      Q.  But you have no idea what it was about?
13      THE WITNESS:  No, I don't.
14      MS. KIRKPATRICK:  Objection.
15  BY MS. GURMANKIN
16      Q.  How is it you remember that you were
17  both laughing, but you don't remember what you
18  were both laughing about?
19      MS. KIRKPATRICK:  Objection.
20      THE WITNESS:  I just remember saying
21  it, and she laughed at it and that was it.
22  BY MS. GURMANKIN
23      Q.  Where were you?
24      A.  In the office.

Page 55

1      Q.  Where?
2      A.  I don't remember exactly.
3      Q.  Do you remember generally?
4      A.  I want to say it was probably up by her
5  work area.  But I'm not 100 percent sure that's
6  exactly where it took place.
7      Q.  Was that during the workday?
8      A.  Yes.
9      Q.  What time?
10      A.  Couldn't tell you.  Don't know.
11      Q.  Anyone else around?
12      A.  I don't recall that, either.
13      Q.  And you have no idea when this was?
14      MS. KIRKPATRICK:  Objection.
15      THE WITNESS:  No.
16  BY MS. GURMANKIN
17      Q.  But you remember that she was laughing?
18      A.  Yes.
19      MS. KIRKPATRICK:  Objection.
20  BY MS. GURMANKIN
21      Q.  Did you ever call a male employee of
22  Shell a window licker?
23      A.  Not that I recall.
24      Q.  What does that mean?

Page 56

1      A.  A person of low intelligence.
2      Q.  Where is that from?  Is that something
3  you made up or have you heard that?
4      A.  I have heard it.
5      Q.  And you've heard it to mean of someone
6  of low intelligence?
7      A.  Yes.
8      Q.  And at the time that you said this to
9  Jesse, you were in your operations supervisor of
10  Appalachia role?
11      A.  Yes.
12      Q.  And what position was she in?
13      A.  Maintenance analyst.
14      Q.  She was not a supervisor?
15      A.  No.
16      Q.  Anything else that you recall about
17  your conversation with Kloosterman?
18      A.  No.
19      Q.  And you told Kloosterman that you had
20  called Jesse a window licker?
21      A.  I did.
22      Q.  Did you tell Kloosterman that it meant
23  someone of low intelligence?
24      A.  I did.

14  (Pages 53 to 56)

Page 57

1    Q.   Did she say anything to you when you
2  admitted saying that to Jesse?
3    A.   She asked me why did I do it, asked me
4  the reason behind it.
5    Q.   And what did you say?
6    A.   The same thing I just told you here; it
7  was over a mistake -- I thought was a mistake that
8  Jesse made.  And again, I did not know the exact
9  conversation.
10    Q.   Did Kloosterman ask you whether you
11  ever called any male employee of Shell a window
12  licker?
13    A.   I do not recall if she asked me that,
14  no.
15    Q.   Were you completely honest with
16  Kloosterman during the interview?
17    A.   Yes.
18    Q.   How did the interview end?
19    A.   I don't remember exactly.  I mean,
20  it -- I think it was thank you for your time.  I
21  don't remember exactly.
22    Q.   Did she ask you anything about what you
23  observed or heard about Turney's interactions with
24  Jesse?

Page 58

1    A.   I do not recall.
2    Q.   And you don't recall anything other
3  than the three questions that we talked about?
4    A.   Correct.
5    Q.   And you were never, as far as you can
6  recall, sent anything or shown anything to review
7  or sign reflecting the interview that you had?
8    A.   I do not recall signing anything.
9    Q.   At any point after that interview with
10  Kloosterman, did you have any conversations with
11  anyone at Shell about the interview or the
12  allegations that Jesse made or the complaints that
13  she made?
14    A.   There were -- there was a meeting with
15  leadership -- my leadership concerning code of
16  conduct and going back over the allegations and
17  reiterating, you know, stay within the lines.  Do
18  not overstep the lines.  So it was basically
19  another training.
20    Q.   Who is your leadership that you are
21  referring to?
22    A.   Steve Craig, Greg Larsen.
23    Q.   Was it two of them together?
24    A.   Yes.

Page 59

1    Q.   The three of you have a meeting?
2    A.   Yes.
3    Q.   About how soon is this after you were
4  interviewed with Kloosterman?
5    A.   I don't remember exactly.  I don't
6  remember.
7    Q.   Are we talking weeks, months, the
8  following year?
9    A.   No.  It wasn't -- it wasn't months.  I
10  would say within a month, probably weeks.
11    Q.   And how were you invited to that
12  meeting or how was it set up?
13    A.   I don't recall exactly.  Probably
14  through an e-mail meeting notice.  Again, I don't
15  recall exactly.
16    Q.   Where did you meet?
17    A.   Where?
18    Q.   Um-hmm.
19    A.   At the office, at the Shell office.
20    Q.   Where?
21    A.   Couldn't tell you.
22    Q.   Don't remember?
23    A.   Don't remember.
24    Q.   How long was the meeting?

Page 60

1    A.   That, I don't remember, either.
2    Q.   Do you remember, are we talking two
3  minutes, an hour?
4    A.   No.  No.  It would have been more along
5  the half hour to an hour timeframe.
6    Q.   That's what you recall?
7    A.   Yes.
8    Q.   So what was discussed during that 30
9  minutes to an hour?
10    A.   Code of conduct and how you need to
11  conduct yourself as a manager.
12    Q.   Well, tell me what you recall each of
13  them saying to you and you saying to them during
14  that 30 to 60 minute meeting?
15    A.   I don't recall the exact -- what they
16  said.  And I don't recall saying anything myself,
17  to be honest with you.  Maybe agreeing with
18  something.  But I do not recall.
19    Q.   Who talked more?
20    A.   I don't remember.  Probably equally but
21  that's -- I don't remember.
22    Q.   Did they tell you that you violated the
23  code of conduct?
24    A.   I don't remember them coming straight

Page 61

1　out and saying that.
2　　Q.　Okay.　What did they tell you about the
3　code of conduct?
4　　A.　To stick to it.　Review it.
5　　Q.　Anything that you recall them saying to
6　you other than that you need to stick to the code
7　of conduct and review the code of conduct?
8　　A.　I don't recall.
9　　Q.　But that was the gist?
10　　A.　I'm sorry?
11　　Q.　That was the gist?
12　　A.　Yes.
13　　Q.　And as far as you can recall, you were
14　never told that you violated any company policy or
15　the code of conduct?
16　　A.　I don't remember no.
17　　　　MS. KIRKPATRICK:　Objection.
18　BY MS. GURMANKIN:
19　　Q.　I'm sorry?
20　　A.　I do not remember, no.
21　　Q.　And you were never given any
22　documentation regarding this discussion or the
23　investigation.　Right?
24　　　　MS. KIRKPATRICK:　Objection.

Page 62

1　　　　THE WITNESS:　No.
2　BY MS. GURMANKIN:
3　　Q.　And as far as you know, you weren't
4　disciplined in connection with anything regarding
5　the investigation.　Correct?
6　　A.　I would think that this meeting was a
7　form of discipline as in re-training.　But as far
8　as formal discipline, like time off without pay or
9　anything, no, I did not receive that.
10　　Q.　Did you think that that was a form of
11　discipline, this meeting?
12　　A.　(Witness nodded in the affirmative.)
13　　Q.　Yes?
14　　A.　Yes.
15　　Q.　When I asked you earlier if you had
16　ever been disciplined during your employment as a
17　full-time employee with Shell, you said no.　Is
18　that true?
19　　A.　I did say that.
20　　Q.　Is that true?
21　　A.　Besides this little, what I would
22　consider, discipline, that is true.
23　　Q.　Well, you hadn't mentioned that
24　earlier.　So were you disciplined or not during

Page 63

1　your --
2　　A.　So I was disciplined with this meeting.
3　At least I would consider it disciplined.
4　　Q.　Okay.　So what you testified earlier,
5　that you were not disciplined, is not a true
6　statement.　Is that correct?
7　　　　MS. KIRKPATRICK:　Objection.
8　　　　THE WITNESS:　My mistake.
9　BY MS. GURMANKIN:
10　　Q.　That's not a true statement.　Correct?
11　　　　MS. KIRKPATRICK:　Objection.
12　　　　MS. GURMANKIN:　Correct?
13　　　　MS. KIRKPATRICK:　Objection.
14　　　　THE WITNESS:　Again?
15　　　　MS. GURMANKIN:　That is correct?
16　　　　MS. KIRKPATRICK:　Objection.
17　　　　THE WITNESS:　That is correct.
18　BY MS. GURMANKIN:
19　　Q.　Were you ever told by Larsen or Craig
20　in this meeting that this was a form of
21　discipline?
22　　A.　No.　I just took it as such.
23　　Q.　Sure.　Were you ever told by anyone at
24　Shell that you were being disciplined?

Page 64

1　　A.　No.
2　　Q.　What about this meeting led you to
3　conclude that you were being disciplined?
4　　A.　That was just my assumption, my take on
5　things.
6　　Q.　Sure.　Why?　What was the basis of --
7　　A.　Because normally you wouldn't reconvene
8　over something like that unless there was a
9　reason.　So I would consider it a form of
10　discipline.　A reminder.
11　　Q.　Just based on the fact that based on
12　your experience at Shell, normally you wouldn't
13　have a meeting like this unless you were being
14　disciplined?
15　　　　MS. KIRKPATRICK:　Objection.
16　BY MS. GURMANKIN:
17　　Q.　Is that what you're saying?
18　　　　MS. KIRKPATRICK:　Objection.
19　　　　THE WITNESS:　Yes.
20　BY MS. GURMANKIN:
21　　Q.　Any other basis that led to your
22　conclusion that this was a form of discipline?
23　　A.　No.
24

16　(Pages 61 to 64)

Page 65

1    Q.   You did not have to attend re-training
2  on the code of conduct, did you?
3         MS. KIRKPATRICK:  Objection.
4         MS. GURMANKIN:  As a result of the
5  investigation or this meeting.
6         MS. KIRKPATRICK:  Objection.
7         THE WITNESS:  No.
8  BY MS. GURMANKIN:
9    Q.   Anything else that you were told in
10 this meeting other than stick to the code of
11 conduct and review it?
12   A.   I don't recall.
13        MS. KIRKPATRICK:  Objection.
14 BY MS. GURMANKIN:
15   Q.   Did you review it?
16   A.   Yes.
17   Q.   You had reviewed it before.  Right?
18   A.   Yes.
19   Q.   Did you review it after?
20   A.   Yes.
21   Q.   Did you sign anything --
22   A.   No.
23   Q.   -- saying that you reviewed it?
24   A.   No.

Page 66

1    Q.   Did anyone follow up with you to see if
2  you had reviewed it?
3    A.   No.
4    Q.   And any other conversations that you
5  had with anyone at Shell regarding Jesse's
6  allegations or the interview with HR?
7    A.   No.
8    Q.   Do you know whether anyone else was
9  interviewed other than you?
10   A.   I don't know that for a fact.  No.
11   Q.   Did you hear rumors about that?
12   A.   I didn't hear rumors.  I mean, you see
13 somebody go into an office that you just left, so
14 you assume that that's what it's around.  I don't
15 know that for a fact.
16   Q.   Who did you see going into the office?
17   A.   Will Turney.
18   Q.   Anyone else?
19   A.   No.
20   Q.   Did you talk to Turney about your
21 interview or his interview?
22   A.   No.
23   Q.   Did you talk to him about the
24 allegations?

Page 67

1    A.   No.
2    Q.   Anyone else that you saw go into the
3  office to meet with Kloosterman?
4    A.   No.
5    Q.   Hopefully up on your screen should be
6  what has been previously marked as Exhibit 21.
7  Could you take a look at this and tell me if you
8  have seen this before?
9    A.   Yes, I have seen this.
10   Q.   Okay.  Did you see this in preparation
11 for your deposition today?
12   A.   I did.
13   Q.   Did you see it prior to that?
14   A.   No.
15   Q.   That was the first time you had seen
16 it?
17   A.   Yes.
18   Q.   When was that?  When?
19   A.   When?  When was what?  Sorry.
20   Q.   Did you see it in preparation for your
21 deposition?
22   A.   Yesterday.  The 13th.
23   Q.   Did you review it when you saw it
24 yesterday?

Page 68

1    A.   We did not review that in the
2  preparation.  I reviewed that prior to the
3  preparation.
4    Q.   How did you get it prior to the
5  preparation?
6    A.   Um, E-mail.
7    Q.   When?
8    A.   Monday, I believe.  Sunday night or
9  Monday.
10   Q.   This past?
11   A.   Yes.
12   Q.   Did you review it then?
13   A.   I did.
14   Q.   Did it seem completely accurate to you?
15   A.   Yes.
16   Q.   Based on your recollection, was
17 anything omitted from the interview?
18   A.   I don't think so, no.
19   Q.   All right.  So let's take a look at
20 that.  It says the date that you met with
21 Kloosterman was 12/14/2016.  Any reason to dispute
22 that?
23   A.   No.
24   Q.   If you look under the questions, the

17 (Pages 65 to 68)

Page 69

1    first one is, "Describe your current role and
2    responsibilities." Do you see that?
3        A. Yes.
4        Q. According to Kloosterman you say,
5    "Operations supervisor in Tioga. I oversee the
6    day-to-day operations, the flowing wells of this
7    asset. The operators are my direct reports.
8    There are about 23 direct reports."
9        Do you see that?
10       A. Yes.
11       Q. And that's what you told Kloosterman?
12       A. Yes.
13       Q. And that was accurate about your
14   responsibilities?
15       A. Yes.
16       Q. Of your 23 direct reports as of that
17   time, how many were male?
18       A. Let's see, '16, twenty-two.
19       Q. One female?
20       A. Yes.
21       Q. Who was that?
22       A. Jill Brueilly.
23       Q. Did you hire Jill?
24       A. No.

Page 70

1        Q. You inherited her?
2        A. Yes.
3        Q. Did the number of direct reports change
4    from the time that you became operations
5    supervisor through July 1, 2017?
6        A. Yes.
7        Q. Increase or decrease?
8        A. When I became operations supervisor, I
9    was also still flow-back supervisor. So it
10   decreased.
11       Q. So at some point your flow-back
12   supervisor responsibilities were removed?
13       A. Correct.
14       Q. How many direct reports did you have in
15   that role?
16       A. That one time I had -- let me think
17   now -- 18.
18       Q. Did it generally hover around 18? Did
19   it generally stay around --
20       A. No. It decreased. When I took over
21   flow-back and operations, I would have had ten, I
22   believe. Ten.
23       Q. When did you take over flow-back
24   operations?

Page 71

1        A. 2011.
2        Q. So it increased from 10 to 18 from 2011
3    through when you eventually gave that role up or
4    it was taken from you?
5        A. So I had --
6        MS. KIRKPATRICK: Objection.
7        THE WITNESS: So I had flow-back from
8    2011 to 2014, which then I continued with
9    flow-back and held on and took operations
10   responsibility, as well.
11   BY MS. GURMANKIN
12       Q. Okay. So from 2011 through 2014, the
13   number of direct reports when you were flow-back
14   supervisor increased from 10 to 18?
15       A. It increased from two to 18. Because
16   the asset was just getting started.
17       Q. Eighteen was the highest number of
18   direct reports you had as flow-back supervisor?
19       A. Correct.
20       Q. And at the time that that role was
21   removed from you, you had 18 direct reports?
22       MS. KIRKPATRICK: Objection.
23       THE WITNESS: No. No.
24

Page 72

1    BY MS. GURMANKIN
2        Q. How many?
3        A. There were, I believe, ten.
4        Q. Why did it go down that much?
5        A. Reduction in activity.
6        Q. Of the 18 that was your highest level
7    of direct reports when you were a flow-back
8    supervisor, how many were male?
9        A. All of them.
10       Q. Did you have any female direct reports
11   as operations -- I'm sorry -- as flow-back
12   supervisor?
13       A. No.
14       Q. From during the time that you were
15   operations supervisor at Appalachia, any female
16   direct reports other than Jill Brueilly?
17       A. I did have an operator -- boy, I don't
18   remember her name. She worked in what we called
19   the Crouse area. I don't remember her name.
20       Q. Did you hire her?
21       A. No.
22       Q. How did she come in as an operator?
23       A. She was a contractor. She was not
24   Shell personnel.

18 (Pages 69 to 72)

Page 73

1      Q.   Okay.  She was not a Shell employee?
2      A.   Right.
3      Q.   Jill Brueilly was a Shell employee?
4      A.   Yes.
5      Q.   Other than Jill Brueilly, did you have
6   any other female direct reports who were Shell
7   employees during your time as operations --
8   supervisor of operations?
9      A.   No.
10      Q.   Going back to Kloosterman's notes of
11   your interview.  Second paragraph under question
12   one.  According to the notes you say, "There is a
13   huge overlap of maintenance.  Maintenance and
14   operations go hand in hand.
15          "we have problems that are not a quick
16   fix or something that needs some specialized
17   equipment, like a truck crane or something, then
18   we will interface with maintenance.  If it is
19   causing deferment or lost gas/revenue, we will try
20   to work on it.  Sometimes in conversation we talk
21   about it."
22          And this was the overlap between your
23   group and Turney's group?
24      A.   Um-hmm.

Page 74

1      Q.   Yes?
2      A.   Yes.
3      Q.   That's true what you told Kloosterman,
4   as she writes here about the overlap?
5      A.   Yes.
6      Q.   According to her notes, you said
7   sometimes in conversation we talk about it.  That
8   was not informal meetings.  Right?  That was
9   casual conversation?
10      A.   Yes.
11      Q.   And that was both between you and
12   Turney and also members of your group.  Right?
13      A.   Repeat.
14      Q.   That -- those were conversations
15   between you and Turney.  Right?
16      A.   Yes.
17      Q.   And those were also conversations
18   between the members of your respective groups?
19      A.   Yes.
20      Q.   All right.  Question number two,
21   "Describe your working relationship with Jesse
22   Barnes as the maintenance analyst and how your
23   role interacts with hers.  How would you describe
24   the nature of your relationship?"

Page 75

1          According to Kloosterman's notes you
2   say, "I always had a good relationship with her.
3   I have known her for at least 4.5 years."
4          I'll stop there for a sec.  That's
5   true, what you told Kloosterman?
6      A.   Yes.
7      Q.   Okay.  So you knew Jesse from the time
8   that she started as a Shell contractor?
9      A.   Yes.
10      Q.   And you worked with her when she was a
11   Shell contractor?
12      A.   We were in same office.
13      Q.   Did you work with her?
14      A.   Not directly, no.
15      Q.   Indirectly?
16      A.   Yes.
17      Q.   Did you have any involvement in her
18   hire as a full-time employee of Shell?
19      A.   No.
20      Q.   You go on to say, according to the
21   notes, "The interaction there is some
22   interaction due to scheduling.  We might talk
23   about who will do what next week.  PMs that fire
24   through the SAP system."

Page 76

1          What does that mean, PMs that fire
2   through the SAP system?
3      A.   Preventive maintenance.  The SAP system
4   is a database that Shell uses to plan and schedule
5   work.  And you'll have certain tasks that need to
6   be performed maybe on a weekly basis, maybe on a
7   biweekly on down the line, up to annual, maybe
8   even every five years.
9          And SAP is a way to, like, generate
10   those.  You have to build that structure.  And
11   then if you build it properly, when it comes time
12   for a certain piece of equipment to have a
13   specific task performed on it, a preventive
14   maintenance task or maybe an inspection, then SAP
15   will fire -- what we call fire, that work order
16   and it comes to the planner/scheduler.
17          It's like okay, we're due to check
18   chokes on this particular pad on the week of
19   July 7th.  So it's how you plan your work,
20   schedule your work and do your work efficiently, I
21   guess.
22      Q.   So how did you and Jesse interact in
23   connection with what you just described?
24      A.   It was mostly around any kind of

1    scheduling concerning the operators and the tasks
2    that they need to do.  Again, if she had questions
3    around maybe somebody wasn't what we call closing
4    out a task that was performed in a timely matter,
5    then she would let me know, hey, you need to talk
6    to the guys, they're not closing those out
7    properly.  No problem.  I'll take care of it.
8        There are key performance indicators
9    around performing your tasks in a timely manner
10   because they are time sensitive.  So...
11       Q.  And the last sentence, that if
12   operators are not up to getting paperwork in, then
13   we will talk about that.  Is that what you just
14   described as to --
15       A.  That's what I just described to you,
16   that's correct.  It could be a hard copy paper or
17   it could be done on computer.
18       Q.  And you never had any issues in
19   connection with what you interacted with Jesse on,
20   as described to Kloosterman here?
21       A.  No.
22       Q.  Subparagraph A, she is asking about the
23   working relationship with Turney as maintenance
24   supervisor.  According to her notes, you say,

1    "Primarily interface with him as supervisor.  Our
2    working relationship is outstanding.  We have a
3    strong relationship.  We aren't butting heads."
4        Is that correct?
5        A.  Yes.
6        Q.  And that's what you told Kloosterman?
7        A.  Yes.
8        Q.  You and Turney were on the same
9    organizational level.  Right?
10       A.  Yes.
11       Q.  Subparagraph B, "Do you have any
12   observations of the team for the maintenance
13   team?"  You said, "From what I have seen, the
14   maintenance planner, schedulers, field guys, they
15   have their own separate meetings that I usually
16   don't attend.  From what I have seen they function
17   very well.  They get a lot of accolades across UPU
18   for things they have done over the past year, year
19   and a half."
20       The separate meetings, you were
21   referring to the meeting that Turney had with his
22   group?
23       A.  Um-hmm.
24       Q.  Yes?

1        A.  Yes.
2        Q.  You say you usually don't attend them
3    or you didn't at the time.  There were times when
4    you did?
5        A.  I would stop in on my own accord just
6    to see how the meetings were flowing.  Maybe I
7    could take notes from his meetings and apply them
8    to mine.
9        Q.  You thought he was a good supervisor,
10   from what you saw?
11       A.  I did.
12       Q.  You tell her, "From what I have seen
13   they function very well."
14       What was your basis for saying that?
15       A.  The amount of work they get done.  No
16   backlog in work not getting done.  Anything
17   that -- any corrective-type maintenance,
18   breakdowns, if you will.  Things that happen at
19   the spur of the moment, Will's group was always
20   willing to, you know, gear up, get out there to
21   where the problem is and get it fixed in a timely
22   manner.
23       Q.  During your full-time employment at
24   Shell, did you ever hear any complaints from

1    anyone about Turney?
2        A.  No.
3        Q.  All right.  You go on to say, "They get
4    a lot of accolades across UPU."  What's UPU?
5        A.  It was an acronym for -- uh, it's -- it
6    was an acronym for what they called the shale --
7    on-shore shale place in U.S./Canada, and I think
8    they included Argentina in that, as well.  I don't
9    remember exactly what the acronym stood for
10   because we had many of them.
11       Q.  What was your basis for saying they got
12   a lot accolades across UPU?
13       A.  They got a lot of atta-boys and
14   recognition over some sharing of best practices
15   across UPU, which is the overall group.
16       They actually put out a little film of
17   how they were doing a specific task on a well pad
18   that showed some pretty innovative efficiency;
19   being prepared to do your work, time saving
20   matters.  They had gotten a lot of -- they got a
21   lot of talk -- a lot of really good, really good
22   feedback from the different assets across UPU.
23       Q.  When was that film?
24       A.  When?

Page 81

1    Q.  Um-hmm.
2    A.  It had to have been somewhere around
3  summer or fall of '16.  That's -- that, again, is
4  a guess.
5    Q.  Was that showed as part of the
6  training?
7    A.  There was a talk about possibly using
8  that as training.  But it was actually
9  demonstrating -- I don't know if you ever heard of
10  the work process that goes by LEAN.  So it was
11  created by Toyota.
12    It was a way to do work, evaluating
13  your work and changing your way of doing work,
14  maybe habits that you're in, about how you prepare
15  or perform a task, to do it more efficiently and
16  possibly with less people.
17    So there was a lot of push to go --
18  Shell had -- was going to adopt the LEAN process,
19  as it is -- as it was, I guess, invented by
20  Toyota, if you will.  And there were third-party
21  personnel, third-party contractors coming in to
22  coach around the LEAN process.  So this particular
23  film actually demonstrated -- very well
24  demonstrated a LEAN mindset, if you will.

Page 82

1    Q.  That Turney's group was doing?
2    A.  Correct.
3    Q.  Was Turney in the film?
4    A.  I think it was -- I think he might have
5  narrated to a point.  I never sat down and watched
6  the whole film, to be honest with you.
7    Q.  But you saw part of it?
8    A.  Yes.
9    Q.  How did you come to see part of it?
10    A.  Well, they showed it around.  You know,
11  finished product.  This is what we're doing.  It
12  got distributed.  It was shared across the
13  different assets.  It got some pretty heavy
14  accolades.
15    Q.  Who showed it?  Do you know?
16    A.  To the rest of the people?
17    Q.  Yes.
18    A.  I have no idea.  I guess it was just
19  basically sent out computer based, and maintenance
20  supervisors, operational managers were able to see
21  it.  Hey, this is a little film around LEAN and
22  Appalachia put it together, look at it when you
23  can.  I can't remember if there was a formal,
24  like, hey, everybody needs to watch this film and

Page 83

1  we're going to watch it today.  I don't think it
2  worked like that.
3    Q.  Do you know anything about the film's
4  distribution after it went out in the way you just
5  described?  Was it used for any other purpose?
6    A.  No.  I wouldn't know what other
7  purposes it would be used for.
8    Q.  And do you know who it was distributed
9  to?  I mean, was it company wide?
10    A.  I don't know the extent of how far into
11  the company it got.  I don't know it that went
12  off-shore.  I don't think so.  I mean, Shell is a
13  big company, and they are global.  I don't know
14  how far it went.  I just know that it went into
15  like the shale assets.
16    Q.  Which assets were those as of
17  summer/fall of 2016?
18    A.  There is one in Permian, in Texas.  I
19  think -- I'm not going to -- probably not going to
20  get this exactly right.  But I think there were
21  four in Canada.
22    Q.  How many altogether are we talking?
23    A.  Seven, eight.
24    Q.  And it also went out to Appalachia?

Page 84

1    A.  Well, it was done here in Appalachia,
2  so Appalachia was aware of it and got a chance to
3  see it.
4    Q.  Any other assets in Pennsylvania that
5  you're aware of that it was distributed here?
6    A.  No, not that I'm aware of.
7    Q.  Any other basis for you telling
8  Kloosterman that Turney's group gets a lot of
9  accumulates across UPU, other than the accolades
10  and this film?
11    MS. KIRKPATRICK:  Objection.
12    THE WITNESS:  They were recognized in
13  meetings for work that they did, work that they
14  did around incorporating the LEAN process, work
15  that they did on keeping -- I mentioned the key
16  performance indicator; KPIs is the acronym.
17  Keeping KPIs green as opposed to yellow or red,
18  which we all know green means good, red means not
19  so good.  Maybe late.  Or -- you know, a lot of
20  work put into that.  A lot of focus on that.
21    MS. GURMANKIN:  Um-hmm.
22    THE WITNESS:  Because these were new
23  processes that were being added.
24

21 (Pages 81 to 84)

Page 85

BY MS. GURMANKIN
Q.  Do you know how it was that Turney's group was working on incorporating the LEAN concept?  Was that something that he initiated or was that something that the company had wanted him to try?
A.  They wanted all of us to try it.
Q.  Turney's group was successful, as you understood it?
A.  For the mast part, yes.  As I understood it, yes.
Q.  They were the group being highlighted for their work?
A.  At that particular time, yes.
Q.  Okay.  At the bottom of page one, back on Exhibit 21.  Kloosterman said here, "I would like to review a few specific examples of the work environment and team environment with you.  Please share any information or perspective you have related to these matters."
If you go on to page two.  So the first claim in this chart here is, "I was told I was not smart enough by a supervisor to be able to do something."  And the second column, timing from

Page 86

Jesse, this is April 2016.  And there is a column Mark Hoover responds.  Do you see that?
A.  Yes.
Q.  According to Kloosterman you said, "If I did, it was most certainly in a joking manner.  We pretty much had a back-and-forth joke with one other throughout the -- once we got to know each other.  We do jabs back and forth.  We are both somewhat sarcastic people, not in a negative way.  We like to laugh and jab.  I always thought it made the day pass.  I understand there are limitations.  I don't remember this specifically, but it would not surprise me."
I read that correctly?
A.  You did.
Q.  And you remember saying that to Kloosterman?
A.  Yes.
Q.  What jabs did Jesse do to you?
A.  Well, one of the things that was quite common was she called me Pops.
Q.  When?
A.  Whenever I would say hey, thanks for getting that for me, Jesse.  Oh sure, Pops.

Page 87

Q.  How many times?
A.  Oh, I don't know.
Q.  Did you think that was a jab?
A.  Yeah.
Q.  Were you offended?
A.  Not at all.
Q.  Did you report that to anyone?
A.  No.
Q.  Because you weren't offended by it?
A.  Correct.
Q.  Anything else?
A.  As far as straight jabs, I don't remember anything specifically.  I mean, we had a pretty informal relationship.  We used to share, you know, stories about going to concerts.  And you know, I would tell her stories about me back in the day.  And you know, Mardi Gras in Louisiana and drinking establishments.  And nights that we may not always feel so great about.
And I do recall Jesse at one time telling me -- actually she told me this twice.  I don't remember the exact conversation.  But she said boy, I wish I would have known you back then.  We would have had fun.

Page 88

But it was just that type of relationship.  And we would laugh.  And you know, just share experiences.  And hey, I'm going to a concert this weekend.  Oh, who are you going to go see.  I remember I went and seen so-and-so.  I went and seen -- maybe I went and seen that same person back in -- so many years ago, you know.  Just those kind of things.  Shared experiences and that type of stuff.
Q.  What stories did you tell her about Mardi Gras in Louisiana?
A.  Oh, it was just -- you have to kind of -- if nobody has ever attended it, you kind of got give an idea of a scope.  You don't realize the size, the amount of people.  You know, if you've ever seen a picture of a Mardi Gras tree in New Orleans or Lafayette, which I lived in Lafayette, they just have, like, thousands of beads hanging off of them.  And you would think it was staged, but it's not.  It's from being thrown from the parade.
Believe it or not, you have grown people almost fighting one another over some cheap plastic beads that don't even cost a penny apiece

22  (Pages 85 to 88)

Page 89

1 when you buy them in bulk. It's just giving a
2 flavor of, you know, the bead throwing and the
3 floats and the parades and the balloons.
4   And let's face it, there's a lot of
5 drinking involved. And there is drinking right
6 out on the streets with Mardi Gras. It's just,
7 you know, trying to relate a scope and a size,
8 because you normally don't see things like that in
9 this particular part of the world. It's a little
10 bit unique to that area and some other areas but
11 to that area especially. You know, south of
12 Louisiana and New Orleans is known for Mardi Gras.
13   So it's just relating the size and the
14 scope and just -- it's kind of -- it's kind of a
15 free for all.
16  Q. It can get pretty wild?
17  A. It does.
18  Q. Did you talk to her about that?
19  A. Just the simple fact that, you know,
20 there are -- there's a lot of drinking so -- you
21 know, put two and two together; you know what
22 people are going to be like. Usually there's not
23 a whole lot of problems as far as violence goes.
24 But you know, it's just kind of relaying the

Page 90

1 scope.
2   And again, I fall back on the fact
3 that, you know, you can -- you just party right
4 out on the streets. And if you grew up in
5 Pennsylvania, which I did, you don't see that.
6 That's not allowed. And it basically have-at-it
7 in Mardi Gras. So it's just -- you know, and some
8 of the traditions behind it, like king cakes and
9 everything.
10  Q. Like what?
11  A. King cakes.
12  Q. You saw women who were topless in your
13 experience in attending Mardi Gras in Louisiana?
14  MS. KIRKPATRICK: Objection.
15  THE WITNESS: Yes.
16 BY MS. GURMANKIN
17  Q. Did you talk to Jesse about that?
18  A. No, not that I recall.
19  Q. Is it possible you did?
20  A. Not that I recall.
21  Q. But it's possible?
22  A. Not that I recall.
23  Q. Are you saying no under oath, that you
24 never spoke with her --

Page 91

1  A. No. I don't think I did, no.
2  MS. GURMANKIN: All right. Let's take
3 a break and change the tape.
4  THE VIDEOGRAPHER: We're going off the
5 record at 10:22 a.m.
6  (A recess was taken from 10:22 to 10:36
7 a.m.)
8  THE VIDEOGRAPHER: We are going back on
9 the record at 10:36 a.m.
10 BY MS. GURMANKIN
11  Q. What stories did you talk to Jesse
12 about drinking establishments?
13  A. Repeat the question. I'm sorry.
14  Q. Sure. You said you told Jesse old
15 stories like Mardi Gras in Louisiana, drinking
16 establishments, nights that may not make you feel
17 great.
18  What did you talk to her about drinking
19 establishments?
20  A. Oh, just, you know, like being out.
21 You know, just relating stories. I don't remember
22 exact stories. But you know, I had a couple of
23 places that I used to go to on a regular basis and
24 different places that I have lived over the years.

Page 92

1 Just you know, kind of telling old war stories. I
2 don't remember exactly, to be honest.
3  Q. Do you recall generally what you talked
4 to her about drinking establishments?
5  A. Just, you know, I had a place I used to
6 go to. We used to have a good time. We used to
7 play this one song all the time and sing it. Just
8 things like that. Just kind of relating
9 experiences.
10  Q. What song? What song?
11  A. I don't remember.
12  Q. What did you talk to her about nights
13 that you may not have felt great about?
14  A. Oh, I mean, come on, there's a lot of
15 nights where you probably took it a little bit
16 over the edge and got a little bit -- too much to
17 drink. That's it. That's what I'm talking about,
18 right there.
19  Q. Ever talk to Jesse about you going to
20 strip clubs?
21  A. No. Not that I recall.
22  Q. Okay. Possible did you?
23  A. Possibly. But I don't recall doing it.
24  Q. All right. When you told Kloosterman

23 (Pages 89 to 92)

Page 93

1    that we do jabs back and forth -- I'm sorry if I
2    asked you this -- but did you view Jesse calling
3    you Pops as a jab?
4         MS. KIRKPATRICK:  Objection.
5         THE WITNESS:  Yes.
6    BY MS. GURMANKIN
7         Q.  But you weren't offended.  Right?
8         A.  No.
9         Q.  And you never told anyone?
10        A.  No.
11        Q.  Anyone else around you that heard that?
12        A.  I'm sure they did.  But I don't know
13   that for a fact.  Nobody ever mentioned it to me.
14        Q.  Who was around that you think might
15   have heard?
16        A.  Will Turney, Wayne Fletcher, Kenny
17   Foreman.
18        Q.  Anyone else?
19        A.  Maybe Hondo.  I don't know.  That's
20   just kind of a guess.
21        MS. KIRKPATRICK:  We don't want you to
22   guess.
23        THE WITNESS:  Yeah.  So I don't know
24   exactly who was around, but chances are they were

Page 94

1    around at one time or another.
2    BY MS. GURMANKIN
3         Q.  Did you tell Kloosterman that Jesse
4    called you Pops?
5         A.  No, I didn't.
6         Q.  What jabs -- I'm sorry.  What jabs did
7    you do to Jesse?
8         A.  Well, I don't recall specifically any
9    like -- I didn't have a nickname like Pops for her
10   or anything like that.  I remember one time -- it
11   wasn't really a jab.
12        One time I was watching her -- she
13   didn't -- she was ahead of me.  The office has a
14   very long hallway.  It used to be a school.  So it
15   has a very long main hall.  She was pushing an
16   office cart that you would normally, you know,
17   haul around paper or whatever on, one those
18   four-wheel office carts.  Right.
19        As she went to go around the corner,
20   for some odd reason -- and I mean, nobody was
21   around, and she didn't know I was behind her
22   because I was a pretty good ways in the hallway --
23   she just decided to jump up and click her heels
24   like Mr. Bojangles as she went around the corner.

Page 95

1    And I started laughing.
2         Well, she heard me.  And it was kind of
3    a joke, you know, going forward.  It was like
4    yeah, you know, don't forget, Jesse, I saw you
5    clicking your heels out in the hall.  Just kind of
6    stuff like that.
7         Q.  Was that a jab that you told
8    Kloosterman about that you and Jesse --
9         A.  No.  I did not tell Kloosterman about
10   that, no.
11        Q.  When you told Kloosterman we do jabs
12   back and forth, what specifically were you
13   referencing?
14        THE WITNESS:  Objection.
15        MS. KIRKPATRICK:  The Pops thing and,
16   you know, the seeing her in the hall doing the
17   crazy little dance moves she did when nobody was
18   looking and that kind of stuff.
19   BY MS. GURMANKIN
20        Q.  Just those two?
21        A.  I'm sorry?
22        Q.  Just those two things?
23        MS. KIRKPATRICK:  Objection.
24        THE WITNESS:  Yeah, as far as I know.

Page 96

1    I mean, I can't think of anything else
2    specifically.
3    BY MS. GURMANKIN
4         Q.  And that's what you were referencing
5    when you told Kloosterman we do jabs back and
6    forth?
7         THE WITNESS:  Yeah.
8         MS. KIRKPATRICK:  Objection.
9    BY MS. GURMANKIN
10        Q.  Did Kloosterman ask what; what jabs did
11   do you back and forth?
12        A.  No.
13        Q.  When you told Kloosterman that we are
14   both somewhat sarcastic people, not in a negative
15   way, we like to laugh and jab, anything else than
16   Jesse calling you Pops and you referencing her
17   jumping up and clicking her heels like Mr.
18   Bojangles?
19        MS. KIRKPATRICK:  Objection.
20        THE WITNESS:  I don't recall anything
21   specifically.
22   BY MS. GURMANKIN
23        Q.  You said also to Kloosterman, "I
24   understand there are limitations."  What did you

24  (Pages 93 to 96)

Page 97

1   mean by that?  At the top of page two under Mark
2   Hoover responds on the first row.
3       A.  Well, just like we're talking here.
4   You know, what you perceive to not be may be
5   crossing a boundary or overstepping a line.  Maybe
6   somebody takes it that it was.
7       Q.  And you don't deny that Kloosterman
8   here -- that you told Jesse she was not smart
9   enough to be able to do something.  Right?
10      MS. KIRKPATRICK:  Objection.
11      THE WITNESS:  I don't totally deny it,
12  but I do not recall ever saying that.  I said if I
13  did.
14  BY MS. GURMANKIN:
15      Q.  Right.  And you said, "I don't remember
16  this specifically, but it would not surprise me."
17  Do you see that at the end of your response?
18      A.  Yes, I do.  But I do not recall doing
19  it.
20      Q.  Why would it not surprise you if you
21  did do it?
22      MS. KIRKPATRICK:  Objection.
23      THE WITNESS:  I mean, again, we might
24  have gone back and forth, and I might have said

Page 98

1   ah, hey, come on, are you telling me you're not
2   smart enough to do this job.
3   BY MS. GURMANKIN:
4       Q.  Well, that's not what the claim is.
5   The claim is, I was told I was not smart enough by
6   a supervisor to be able to do something.  And you
7   said to Kloosterman that you don't remember this
8   specifically, but it would not surprise you.
9       Why would it not surprise you that you
10  said that?
11      MS. KIRKPATRICK:  Objection.  Asked and
12  answered.  You can tell her again.
13      THE WITNESS:  Okay.  I do not recall
14  doing that.  And I don't recall saying that
15  specifically.
16  BY MS. GURMANKIN:
17      Q.  Right.  My question was why did you
18  tell Kloosterman it wouldn't surprise you if you
19  told Jesse that she's not smart enough to do
20  something?
21      A.  I think I would have --
22      MS. KIRKPATRICK:  Objection.  Asked and
23  answered.  Go ahead.
24      THE WITNESS:  I would have said ah,

Page 99

1   come on, you're not smart enough to do this job?
2   I don't think I would have said that directly.  I
3   don't recall saying that directly.
4   BY MS. GURMANKIN:
5       Q.  So why didn't you tell Kloosterman that
6   if you said something like that, it would have
7   been oh, come on, you don't think that you're
8   smart enough to do this job; not what Jesse said
9   that you said?
10      MS. KIRKPATRICK:  Objection.
11      THE WITNESS:  I don't recall why I
12  would have said that that way.  She asked me --
13  she said people have told her that.  I don't
14  recall doing it.  Maybe I did do it.  I do not
15  recall doing it.
16  BY MS. GURMANKIN:
17      Q.  All right.  Because you told
18  Kloosterman it would not surprise you if you said
19  what Jesse alleged, not what you said you would
20  have said.
21      MS. KIRKPATRICK:  Objection.
22      THE WITNESS:  Maybe I was taking with
23  what I thought Jesse alleged with what I would
24  have said.  I do not recall saying that.

Page 100

1   BY MS. GURMANKIN:
2       Q.  You were confused when Kloosterman
3   asked you that?
4       MS. KIRKPATRICK:  Objection.
5       THE WITNESS:  Not confused.  I just
6   maybe took it the way -- it wasn't specific.
7   You're not smart enough to do this job.  I would
8   not have said that.  And I don't recall saying
9   that.
10  BY MS. GURMANKIN:
11      Q.  Did you tell Kloosterman that you would
12  not have said that?
13      A.  I told Kloosterman that I may have said
14  the way I explained it.
15      Q.  Which is --
16      A.  I was kind of generalizing, maybe
17  lumping everything into one category.
18      Q.  So you told Kloosterman something to
19  the effect of you would have said it along the
20  lines of oh, come on, you don't think you're smart
21  enough to do this?
22      A.  I didn't --
23      MS. KIRKPATRICK:  Objection.
24      THE WITNESS:  -- say that in so many

25 (Pages 97 to 100)

Page 101

1　words.
2　BY MS. GURMANKIN:
3　　　Q.　But that was the gist?
4　　　　MS. KIRKPATRICK:　Objection.
5　　　　THE WITNESS:　Correct.
6　BY MS. GURMANKIN
7　　　Q.　And that's not included in
8　Kloosterman's notes of your response.　Right?
9　　　　MS. KIRKPATRICK:　Objection.
10　　　　THE WITNESS:　I don't see it in there.
11　BY MS. GURMANKIN
12　　　Q.　Any reason why, when I asked you
13　earlier if anything was omitted or that if you
14　agreed this was completely accurate, that you
15　didn't mention that?
16　　　　MS. KIRKPATRICK:　Objection.
17　　　　THE WITNESS:　No reason.　As we're
18　going there, I mean, that could have been what I
19　meant.　That probably was what I meant.　That is
20　what I meant.
21　BY MS. GURMANKIN
22　　　Q.　Did you forget about it when I asked
23　you if anything was omitted?
24　　　　MS. KIRKPATRICK:　Objection.

Page 102

1　　　　THE WITNESS:　I didn't forget about it.
2　BY MS. GURMANKIN
3　　　Q.　Any reason why you didn't mention it?
4　　　　MS. KIRKPATRICK:　Objection.
5　　　　THE WITNESS:　No.　No reason.
6　BY MS. GURMANKIN
7　　　Q.　Anything else that was omitted from
8　here?
9　　　A.　Not that I know of.
10　　　Q.　All right.　Next claim, "Have been
11　referred to as a, quote, window licker, which I
12　believe was to insult my intelligence."
13　　　　And according to Jesse that was
14　July 16.　And the Mark Hoover response is, "Yes, I
15　did do that.　We were -- it was probably similar
16　or maybe the same instance about being not smart
17　enough to do something.　I think that may have
18　been what it was.　She laughed and called me one
19　right back, or something similar.　Or just said
20　Mark Hoover, you're a pain or whatever."
21　　　　I read that correctly?
22　　　A.　You did.
23　　　Q.　And that's what you told Kloosterman?
24　　　A.　Yes.

Page 103

1　　　Q.　So when you said that to Jesse, she
2　laughed.　Right?
3　　　A.　Um-hmm.
4　　　Q.　Yes?
5　　　A.　Um-hmm.　Yes.
6　　　Q.　And she called you a window licker
7　back?
8　　　　MS. KIRKPATRICK:　Objection.
9　　　　THE WITNESS:　I didn't recall
10　specifically.　I said possibly she called me one
11　right back or said that I was a pain.
12　BY MS. GURMANKIN:
13　　　Q.　You said, "Called me one right back or
14　something similar or just said Mark Hoover, you're
15　a pain or whatever."　Right?　That's what you told
16　Kloosterman.
17　　　A.　Right.
18　　　Q.　What was it?
19　　　A.　What was --
20　　　Q.　Did she call you a window licker or did
21　she call you something similar?
22　　　A.　I don't recall.
23　　　Q.　Or did she say you're a pain or
24　whatever?

Page 104

1　　　A.　I don't recall exactly.
2　　　Q.　But it was one of those three?
3　　　A.　Yes.
4　　　Q.　What would have been the something
5　similar to window licker that you're saying Jesse
6　may have called you?
7　　　A.　I don't know.　I -- I don't know what
8　you -- you know, I don't know.　You big dummy or
9　something like that.　I don't recall.
10　　　Q.　Are you making that up or is that
11　something she may have called you?
12　　　A.　That's something I'm just grabbing
13　because that's similar.　I don't know.　I don't
14　know what similar would have been.
15　　　Q.　It's possible she said nothing right
16　back?
17　　　A.　No.　She said something right back.　I
18　just don't recall if she called me one, too, or
19　told me I was a pain.
20　　　Q.　Or whatever?
21　　　A.　Or whatever.
22　　　Q.　What does or whatever mean?
23　　　A.　Or whatever she told me.　I don't
24　recall exactly.

26　(Pages 101 to 104)

Page 105

1    Q.  Did you tell Kloosterman that you
2  didn't actually recall what Jesse said in
3  response?
4    A.  Yes.  Yeah.  Yes.
5    Q.  So what she wrote here is not exactly
6  accurate, is it?
7    MS. KIRKPATRICK:  Objection.  It says
8  it right here.  You are mischaracterizing the
9  interview notes.
10    THE WITNESS:  Yes, that was my
11  interview.  So that's what I said.
12  BY MS. GURMANKIN
13    Q.  You testified a moment ago that you
14  told Kloosterman you didn't remember exactly what
15  Jesse said in response.  Is that right?
16    MS. KIRKPATRICK:  Objection.
17    THE WITNESS:  Yeah.  Okay.  She may not
18  have taken it down.
19  BY MS. GURMANKIN
20    Q.  Right.  That's not included in the Mark
21  Hoover response column.
22    A.  I guess.  Yeah.
23    MS. KIRKPATRICK:  Objection.
24    THE WITNESS:  Yes.

Page 106

1  BY MS. GURMANKIN
2    Q.  Next row, the allegation is, "I have
3  been called a bitch by numerous people in the
4  office."  Timing more near the beginning of 2016.
5  And Mark Hoover responds, "Bitchy, yes."
6    Does that mean that did you call Jesse
7  bitchy?  Is that what you were telling
8  Kloosterman?
9    A.  I was trying to get across that I said
10  bitchy, yes, but did not call her a bitch.
11    Q.  Is there a difference?
12    A.  I think there is.  Bitchy can mean a
13  state of mind.  Where a bitch is a person, like
14  you are a.  Where being bitchy can be ah, you're
15  complaining about something you shouldn't complain
16  about or you're a little cranky today.
17    Q.  Is calling a female bitchy as opposed
18  to a bitch better in some way?
19    A.  In my estimation?
20    Q.  Um-hmm.
21    A.  Yes.  And it depends on context.
22    Q.  Right.  And that's what you got from
23  Shell's training and your review of their
24  policies?

Page 107

1    A.  That is Mark Hoover.
2    Q.  That is what you got from Shell's
3  training and policies?
4    A.  I got that from myself.  I didn't take
5  that away from Shell's training or policy.
6    Q.  You testified earlier that whether or
7  not calling a female employee bitchy violates
8  policy is that by context which you understood
9  from Shell's training.  Right?
10    A.  Right.
11    Q.  And your review of their policies?
12    A.  Right.
13    Q.  And according to Kloosterman's notes,
14  you go on to say, "It was strictly in a joking
15  manner.  It was never -- there was no malice or
16  meanness involved."
17    You said that to Kloosterman?
18    A.  I did.
19    Q.  How many times did you call Jesse
20  bitchy?
21    A.  I have no idea.
22    Q.  More than one?
23    A.  I don't recall.
24    Q.  You don't recall one way or the other?

Page 108

1    A.  No.
2    Q.  Did Kloosterman ask you how times you
3  called her bitchy?
4    A.  No, not that I recall.  I'm not going
5  to say that with certainty.  I do not recall her
6  asking me that.
7    Q.  When you told Kloosterman it was
8  strictly in a joking manner, why were you sharing
9  that?
10    A.  Because it was.
11    Q.  Why did you think that was relevant to
12  her question?
13    A.  I didn't -- I certainly wasn't out to
14  offend anybody.  And it was in a joking manner
15  because of the informal relationship we had.  I
16  didn't think it was taken wrong.
17    Q.  Did you understand that from Shell's
18  training and your review of their policies that
19  calling a female employee bitchy in a joking
20  manner does not violate the policies?
21    A.  There was a possibility that it could
22  violate the policy, I suppose.  It depends on
23  context.
24    Q.  Right.  Were you sharing with

27 (Pages 105 to 108)

Page 109

1    Kloosterman that it was strictly in a joking
2    manner, because you understood from Shell's
3    training and your review of their policies that
4    saying it in a joking manner would not violate the
5    policies?
6        A.  Yes.  It boils down to context.  It
7    would be reviewed as such.
8        Q.  Right.  So did you understand from your
9    training and your review of Shell's policies that
10   calling a female employee bitchy in a joking
11   manner did not violate the policies?
12       MS. KIRKPATRICK:  Objection.
13       THE WITNESS:  I just took it that in
14   context that it would not violate.
15   BY MS. GURMANKIN:
16       Q.  Right.  And a context is whether it's
17   said in a joking manner.  That's one --
18       A.  Correct.
19       MS. KIRKPATRICK:  Objection.
20   BY MS. GURMANKIN:
21       Q.  Right.  Did you understand from Shell's
22   training and your review of their policies that
23   calling a female employee bitchy in a joking
24   manner did not violate the policy?

Page 110

1        MS. KIRKPATRICK:  Objection.
2    BY MS. GURMANKIN:
3        Q.  In that context you didn't violate the
4    policy?
5        A.  I just took it upon myself to use that.
6    Again, I fall back on context.
7        Q.  Right.
8        A.  It's not specific in the policy, so I'm
9    just going by what I think would -- was right or
10   wrong.  But I take it that I did not violate
11   policy.
12       Q.  Because you said it in a joking manner?
13       A.  Correct.
14       Q.  And that's why you were sharing that
15   with Kloosterman?
16       A.  Correct.
17       Q.  That's what you understood from Shell's
18   training and your review of their policies?
19       A.  That's what I --
20       MS. KIRKPATRICK:  Objection.
21   BY MS. GURMANKIN:
22       Q.  And when you told Kloosterman there was
23   never any meanness or malice involved, were those
24   your words?

Page 111

1        A.  I'm sorry?
2        Q.  Were those your words?
3        A.  Yes.
4        Q.  Again, you are saying that because you
5    understood in that context that calling a female
6    bitchy would not violate the company's policies?
7        MS. KIRKPATRICK:  Objection.
8        THE WITNESS:  Yes.
9    BY MS. GURMANKIN:
10       Q.  All right.  If we go to right under the
11   chart, according to Kloosterman's notes you say,
12   "I never sensed she was upset by any comments.
13   The way I see it if it was one of those days where
14   she was overwhelmed or busy, if the conversation
15   started that way, or it was pretty obvious that
16   she didn't want to joke around, then I wouldn't
17   have.  If I had the impression that I set her off,
18   I would have apologized.  I think she is nice" --
19   I assume that is supposed to be and -- "smart and
20   I wouldn't want to do that."
21       Is that what you told Kloosterman?
22       A.  Yes.
23       Q.  You say that you wouldn't have, if it
24   was one of those days where she was overwhelmed or

Page 112

1    busy, if the conversation started that way or it
2    was pretty obvious she didn't want to joke around.
3        You wouldn't have what?  What are you
4    talking about there?
5        A.  I wouldn't have joked around.
6        Q.  Including calling her bitchy?
7        A.  I wouldn't have joked around in any
8    way.  I would have left her alone.
9        Q.  Including calling her bitchy?
10       A.  Right.
11       Q.  Including calling her a window licker?
12       A.  Correct.
13       Q.  Including telling her she was not --
14   possibly telling her she was not smart enough to
15   be able to do something?
16       MS. KIRKPATRICK:  Objection.
17   BY MS. GURMANKIN:
18       Q.  Right?
19       A.  Correct.
20       Q.  Because you were joking around with all
21   of those comments?
22       A.  Correct.
23       Q.  Because you did think she was smart?
24       A.  Yes.

28  (Pages 109 to 112)

Page 113

1    Q.  Did you ever tell her that?
2    A.  I don't recall.
3    Q.  Did you think she was good at her job?
4    A.  I did.
5    Q.  Did you ever tell her that?
6    A.  Yes.
7    Q.  When?
8    A.  I don't recall exactly when.
9    Q.  How many times?
10   A.  More than once.  Less than five maybe.
11 I don't know.
12   Q.  Did you ever tell Kloosterman that you
13 said that?
14   A.  No.  Not that I recall.
15   Q.  Second paragraph under the chart, "Most
16 certainly she has made jokes to me, as well."
17       Why did you tell Kloosterman that?
18   A.  Because I wanted to let it be known
19 that we had a good informal working relationship.
20 We talked.  We laughed.
21   Q.  And during your good informal working
22 relationship, you were a supervisor.  Correct?
23   A.  Correct.
24   Q.  And she was not.  Correct?

Page 114

1    A.  Correct.
2    Q.  You go on to tell Kloosterman, "I have
3 had Jesse told me to go, quote, F myself."  Did I
4 read that correctly?
5    A.  You did.
6    Q.  Did Jesse tell you to go 'F' yourself
7 or go fuck yourself.
8    A.  Go fuck yourself.
9    Q.  How many times?
10   A.  I don't recall the exact number.  Once
11 for sure, maybe twice.
12   Q.  When was the once for sure?
13   A.  Don't remember exactly.
14   Q.  Do you recall the year?
15   A.  No, I don't.
16   Q.  Do you recall the context?
17   A.  I don't remember the exact context.  I
18 just know she was very busy.  And I don't -- no, I
19 don't remember the exact context.  I do not.
20   Q.  Do you recall generally?
21       MS. KIRKPATRICK:  Objection.  He just
22 said she was very busy.
23       THE WITNESS:  Work in general.  That's
24 all I remember.

Page 115

1 BY MS. GURMANKIN:
2    Q.  So you are certain that she said that
3 to you.  You don't recall when, including the
4 year, or the context except she was busy.  Right?
5       MS. KIRKPATRICK:  Objection.
6       THE WITNESS:  I remember her being
7 busy, yes.
8 BY MS. GURMANKIN:
9    Q.  Anything else you recall about that
10 time?
11   A.  No.
12   Q.  Did you ever tell anyone at Shell about
13 that prior to you telling Kloosterman during this
14 interview?
15   A.  No.
16   Q.  Did it offend you?
17   A.  No.
18   Q.  What did you say back?
19   A.  I said okay and I left.
20   Q.  Any male employee of Shell ever say
21 that to you?
22   A.  Yes.
23   Q.  You're laughing.  Did that happen a
24 lot?

Page 116

1    A.  Not in an office setting, no.  But keep
2 in mind, I worked off-shore for many years for
3 Shell.  So yes.
4    Q.  That was common?
5    A.  Sure.
6    Q.  Any other language that was common
7 other than male employees telling you to fuck off?
8       MS. KIRKPATRICK:  Objection.
9       THE WITNESS:  No.
10 BY MS. GURMANKIN:
11   Q.  That was it?
12   A.  Yes.
13       MS. KIRKPATRICK:  Objection.
14 BY MS. GURMANKIN:
15   Q.  The other possible time when Jesse told
16 you to go fuck yourself, when was that?
17   A.  Repeat question.
18   Q.  Sure.  You said she did it once for
19 certain and possibly twice.  Are you guessing or
20 do you remember her doing it twice?
21   A.  I don't remember --
22       MS. KIRKPATRICK:  Objection.
23       THE WITNESS:  -- exactly her doing it
24 twice, and I couldn't tell you when it was if she

29 (Pages 113 to 116)

Page 117

1  did.  I don't remember.
2  BY MS. GURMANKIN
3      Q.  All you remember is her doing it once.
4      A.  Yes.
5      MS. KIRKPATRICK:  Objection.
6  BY MS. GURMANKIN
7      Q.  You go on to say, according to
8  Kloosterman's notes, "It was banter.  I don't
9  remember why she told me.  It might have been one
10  of those times where the pressure was there a
11  little bit.  I don't know what I said, to be
12  honest.  It had to do with scheduling or
13  something.  She said Mark Hoover, go 'F' yourself.
14      And again, she said Mark Hoover, go
15  fuck yourself?
16      A.  Yes, that's correct.
17      Q.  Did she actually use your full name?
18      A.  Yes.
19      Q.  And I said, "Okay, I'm good.  Right now
20  specifics, honestly, I can't nail down where I
21  could give you verbatim."
22      Did I read that correctly?
23      A.  Correct.
24      Q.  Next paragraph.  "I don't interact with

Page 118

1  her enough.  Any conversations we had about
2  scheduling, we were able to straighten out issues
3  we've had with scheduling.  I always felt we had a
4  friendly working relationship and no problems to
5  speak of.  I would have hoped it would have been
6  brought forward."
7      What did you mean by that?
8      A.  If there would have been any problems
9  or if something I said just didn't set well, I
10  would have hoped Jesse would have said hey, Mark
11  Hoover, I don't appreciate that.  And that is
12  basically what I was reaching for there.
13      Q.  As opposed to being brought into a
14  meeting with HR and being questioned?
15      MS. KIRKPATRICK:  Objection.
16      THE WITNESS:  Yes.
17  BY MS. GURMANKIN
18      Q.  You go on to say, "She can be
19  outspoken, and I felt strongly if I did something,
20  she would let me know.  And I would make sure it
21  didn't happen again.  I never felt a strained
22  relationship with her at all."
23      Do you remember saying that to
24  Kloosterman?

Page 119

1      A.  Yes.
2      Q.  Number three question, "Is there
3  anything else you would like to share related to
4  the items we discussed today that hasn't been
5  asked yet?"
6      According to Kloosterman's notes you
7  say, "I've always enjoyed working with her.  I
8  don't work with her on a regular basis.  There is
9  an overlap.  It's not as big from my perspective.
10  But I have worked with her for quite a long time.
11  We have shared stories of going to the concerts
12  and have laughed and joked.  I gave her the
13  back-in-the-day stories and we laughed about it.
14  I always thought it was quite good."
15      Were you talking about your working
16  relationship?
17      A.  Yes.
18      Q.  Did Kloosterman ask you what were the
19  back-in-the-days stories that you gave Jesse?
20      A.  I don't recall her asking me that, no.
21      Q.  Did she ask you any questions about
22  what you joked about?
23      A.  I do not recall that as well, no.
24      Q.  Number four, "Is there anyone

Page 120

1  specifically you think I should talk to regarding
2  the concerns raised?"
3      At this point do you have any knowledge
4  of whether there are any concerns raised other
5  than about your conduct?
6      MS. KIRKPATRICK:  Objection.
7      THE WITNESS:  Repeat the question.  I'm
8  not sure I understand.
9      MS. GURMANKIN:  Sure.
10  BY MS. GURMANKIN:
11      Q.  As a result of the meeting --
12      A.  Um-hmm.
13      Q.  -- do you have any knowledge that there
14  are complaints about anyone's conduct other than
15  yours?
16      A.  After this meeting?
17      Q.  Yes.
18      A.  Yeah.  I was led to believe that there
19  were complaints against other people as well as
20  myself.
21      Q.  And who led you to believe that?
22      A.  I believe -- I don't remember
23  Ms. Kloosterman telling me that.  I don't remember
24  exactly who told me first, right off.  I don't

30 (Pages 117 to 120)

Page 121

1  remember exactly who told me right away.  I could
2  sit here and guess that it was Steve Craig and I
3  might be --
4  　　　MS. KIRKPATRICK:  We don't want to you
5  guess.
6  　　　THE WITNESS:  So I don't remember
7  exactly who told me.
8  BY MS. GURMANKIN:
9  　　Q.  Okay.  Even if you don't remember who
10  told you first, who do you remember --
11  　　A.  I do remember Steve Craig mentioned it.
12  Sorry, I cut you off.
13  　　Q.  That's alright.  Anyone other than
14  Craig?
15  　　A.  Well, I mean, Will Turney, myself and
16  Hondo would have talked about it, because we all
17  ended up talking to HR.
18  　　Q.  Okay.
19  　　A.  I mean, made aware of hey, I'm going to
20  to talk to HR, as well.
21  　　Q.  Let's first talk about Steve Craig.
22  Did you learn from him that there's complaints
23  about people other than you before you talked to
24  Kloosterman?

Page 122

1  　　　MS. KIRKPATRICK:  Objection.  He
2  already said no.
3  　　　THE WITNESS:  I don't remember.  I
4  don't remember if I did or not.
5  BY MS. GURMANKIN:
6  　　Q.  Okay.  But at some -- do you remember
7  learning that from Craig before you sit down with
8  Craig and Larsen where they talk to you about
9  reviewing the code of conduct?
10  　　A.  Yes.  Before that review, yes.
11  　　Q.  Okay.  Tell me what Craig tells you
12  about complaints about other people.
13  　　A.  He said -- I don't remember exactly.
14  Just that Jesse has some complaints.  And there
15  were some of us in the office that were directly
16  involved.
17  　　Q.  Does he tell you who?
18  　　A.  I'm sorry?
19  　　Q.  Does he tell you who?
20  　　A.  I don't remember.
21  　　Q.  You don't remember if he did or not?
22  　　A.  No.  I don't remember if did he or not,
23  no.
24  　　Q.  Did you ask him?

Page 123

1  　　A.  No, I didn't ask him.
2  　　Q.  Is this a separate conversation with
3  Craig than the one in which he tells you that he
4  wants you to meet with Kloosterman or you need to
5  meet with Kloosterman?
6  　　A.  I don't recall the actual timing on
7  that.  I really don't.
8  　　Q.  Okay.  You said you were also aware
9  that Blakely was interviewed in connection with
10  complaints from Jesse.
11  　　A.  I seem to recall Hondo being
12  interviewed.
13  　　Q.  Did you learn that from seeing him go
14  into the office to --
15  　　A.  No.  I didn't see Hondo go in.
16  　　Q.  So how did you come to be aware that he
17  was interviewed?
18  　　A.  I don't remember exactly.  I don't
19  think Steve told me.  I think it might have been
20  Hondo and Will and myself talking.  Yes, I am
21  interviewed, as well.
22  　　Q.  Do you recall a conversation with
23  Turney and Blakely before you had the meeting with
24  Craig and Larsen about the code of conduct?

Page 124

1  　　A.  Repeat -- yeah, because I'm trying to
2  get the chronological order here.  Repeat, please.
3  　　Q.  Sure.  The conversation that you had
4  with Blakely and Turney, the three of you --
5  　　A.  Um-hmm.
6  　　Q.  -- do you recall if that was before or
7  after your meeting with Larsen and Craig about the
8  code of conduct?
9  　　A.  I didn't have a meeting with Hondo and
10  Turney around code of conduct.
11  　　Q.  No.  The conversation that you had with
12  Blakely and Turney --
13  　　A.  Um-hmm.
14  　　Q.  -- in which Blakely says that he's been
15  interviewed.
16  　　A.  Okay.
17  　　Q.  I want to know if you had that
18  conversation before or after your meeting with
19  Craig and Larsen about the code of conduct.
20  　　　MS. KIRKPATRICK:  Objection.
21  　　　THE WITNESS:  I don't remember.
22  BY MS. GURMANKIN:
23  　　Q.  You don't remember when it was?
24  　　A.  No.

31 (Pages 121 to 124)

Page 125

1      Q.  And in any case, tell me about your
2  discussion with Blakely and Turney.
3      A.  There wasn't much of a discussion.
4  It's just that we're going -- we are talking to
5  HR.  Yeah, we're going in to talk to HR, as well.
6  That was about it.
7      Q.  How did that start?
8      A.  Just in passing.  I mean, we sat in the
9  same area, all three of us actually.
10      Q.  So who first said we're going --
11      A.  I don't remember.
12      Q.  Just try to let me finish, okay, before
13  you answer.
14      A.  I'm sorry.
15      Q.  That's alright.  Was that discussion in
16  passing before or after you talked to Kloosterman?
17      A.  I don't remember.
18      Q.  And nothing of substance, just that
19  we're going in to talk to HR?
20      A.  Yes.
21      Q.  Did you ever talk to Blakely or Turney
22  in substance about the allegations?
23      A.  No.  More logistics than anything.
24  Like, when are -- have you been contacted,

Page 126

1  anything like that.
2      Q.  Anything other than that?
3      A.  No.
4      Q.  Do you ever find out who is involved
5  other than you in the complaints that Jesse made?
6      A.  I know of Wayne Fletcher.
7      Q.  Anyone else?
8      A.  Well, I heard this morning Kenny
9  Foreman.
10      MS. KIRKPATRICK:  You do not want to
11  disclose anything that you and I have talked
12  about.  So anything you may have heard from your
13  counsel is not something that she is asking you
14  about.  So --
15  BY MS. GURMANKIN:
16      Q.  Prior to this morning, did you know
17  that Foreman was involved?
18      A.  I knew he was being interviewed.
19      Q.  Okay.  From seeing him?
20      A.  I mean, like in the --
21      Q.  In that time period?
22      A.  Well, lately.  Lately.  Like, in the
23  past four, five, six months.
24      Q.  How did you find that out?

Page 127

1      MS. KIRKPATRICK:  Again, do not
2  disclose anything that your counsel has said to
3  you.
4  BY MS. GURMANKIN
5      Q.  Did you find out from your lawyer from
6  Shell or --
7      A.  No, I did not find that out from a
8  lawyer at Shell.
9      Q.  Who did you find that out from?
10      A.  At work.  I don't remember who exactly
11  told me that.
12      Q.  What was that discussion, even if you
13  don't remember who you had with it?
14      A.  That Kenny Foreman's getting
15  interviewed.  Period.
16      Q.  Meaning deposed, like you are today?
17      MS. KIRKPATRICK:  Objection.
18      THE WITNESS:  Interviewed.
19  BY MS. GURMANKIN
20      Q.  In connection with Jesse's complaints?
21      A.  Yes.
22      Q.  Did you know before the past five or so
23  months that Foreman was involved?
24      A.  No.

Page 128

1      Q.  Okay.  When did you find out that Wayne
2  Fletcher was involved?
3      A.  It was while I was retired, because I
4  stayed in contact with some of the men that I
5  worked with.  And they said yeah, Wayne has to --
6  has to go to an interview, as well.  That was all
7  that was said about it.
8      Q.  But you understood it was in connection
9  with Jesse's complaint?
10      A.  Yes.
11      Q.  All right.  Other than Turney, Blakely,
12  Fletcher, Foreman and yourself, anyone else that
13  you're aware that was involved in Jesse's
14  complaint?
15      A.  No.
16      Q.  Did you ever talk with anyone,
17  excluding lawyers, about the substance of Jesse's
18  complaints?
19      A.  No.
20      Q.  Did you ever talk to anyone at Shell
21  about their depositions?
22      A.  No.
23      Q.  Did you talk to anyone at Shell about
24  your deposition today?

32  (Pages 125 to 128)

Page 129

1 A. No.

2 Q. Did you ever find out from anyone about

3 the investigation or interviews that Kloosterman

4 was conducting whether there were any conclusions?

5 A. No.

6 Q. Do you know Jeremy Greene?

7 A. Yes, I know Jeremy.

8 Q. Did you know that he was selected for

9 an open scheduler position sometime in late 2016?

10 A. I seem to recall that. I don't know

11 the ins and outs of it.

12 Q. Were you involved in that decision?

13 A. No.

14 Q. Did anyone talk to you about his

15 performance?

16 A. No.

17 Q. Did you work with him in any capacity?

18 A. Very little. Very little with Jeremy.

19 Q. Did you know him just from both working

20 at Shell?

21 A. Yes.

22 Q. Did you ever hear anyone say to Jesse

23 something to the effect of that maybe if she wore

24 tight pants that she could get what she wanted?

Page 130

1 A. No.

2 Q. Ever hear anyone say to Jesse that if

3 she batted her eyes that she could get what she

4 wanted or something to that effect?

5 A. No.

6 Q. Ever see anyone touch Jesse's hair?

7 MS. KIRKPATRICK: Objection.

8 THE WITNESS: No.

9 BY MS. GURMANKIN

10 Q. If you saw a male employee run his

11 fingers or his hands through Jesse's hair, would

12 that be a violation of Shell's policies and code

13 of conduct, as you understood it from the

14 training?

15 MS. KIRKPATRICK: Objection.

16 THE WITNESS: It would depend on

17 context.

18 BY MS. GURMANKIN

19 Q. As you sit here today, can you think of

20 a context in which a co -- a male employee running

21 his hands through Jesse's hair would not violate

22 company policy or the code of conduct?

23 MS. KIRKPATRICK: Objection.

24 THE WITNESS: Could I think of a

Page 131

1 context in which it wouldn't?

2 MS. GURMANKIN: Yes.

3 THE WITNESS: Yeah. Maybe she had a

4 knot in her hair and asked him to get it out.

5 BY MS. GURMANKIN

6 Q. Did you ever hear that Will Turney

7 showed Jess a selfie of himself in his underwear?

8 A. I did not.

9 Q. From your understanding from Shell's

10 training and the review of the policies, is it

11 your understanding that whether or not that

12 violates policy depends on the context?

13 A. You always got to look at the whole

14 story. So yes, I would say it depends on context.

15 Q. That's your understanding from Shell's

16 training that you received?

17 A. (Witness nodded in the affirmative.)

18 Q. Yes?

19 A. Yes.

20 Q. Did you ever hear anyone say to Jesse

21 that she makes good money for a woman or words to

22 that effect?

23 A. No.

24 Q. Did you ever hear anyone say to Jesse

Page 132

1 that she works well with male employees because

2 she's a woman?

3 A. No.

4 Q. Ever hear anyone say to Jesse that

5 she's a hot blonde?

6 A. No.

7 Q. Ever hear anyone describe her as hot?

8 A. No.

9 Q. Or pretty?

10 A. No.

11 Q. Did you ever hear Turney ask Jesse if

12 she missed him over the weekend or words to that

13 effect?

14 A. No.

15 Q. Ever hear Turney talk about his

16 personal life?

17 A. Very little. We -- I mean, we talked

18 amongst our -- myself and him. But --

19 Q. What did Tourney -- I'm sorry.

20 A. You know, it was just how, you know,

21 they had bought a house out in Elkland, how it was

22 going. He was doing some work on it for deer

23 hunting. His wife would help him. She was job

24 hunting in the area. She's a nurse. That kind of

33 (Pages 129 to 132)

Page 133

1    thing.
2        Q.   Did you ever hear Turney talk about his
3    personal life with anyone in the area near where
4    you were sitting?
5        A.   Repeat the last part, please.
6        Q.   Sure.  Did you ever her Turney talk
7    with anyone about his personal life to anyone in
8    the geographic area that you were sitting in in
9    the office?
10       A.   Yeah, Hondo.
11       Q.   What did you hear him talk about with
12   Hondo?
13       A.   Same thing.  Same as what I just stated
14   that we talked about.
15       Q.   Did you ever see Turney make cat claw
16   gestures and make a hissing noise?
17       A.   Yes.
18       Q.   How many times?
19       A.   Once.
20       Q.   When was that?
21       A.   I don't recall.
22       Q.   Do you recall the context?
23       A.   No, I don't recall the context.
24       Q.   How did you come to see that?

Page 134

1        A.   In a conversation.  And I don't recall
2    who he was having it with, but yeah, I saw him do
3    it.
4        Q.   Okay.  You were not having the
5    conversation with him?
6        A.   No, it wasn't with me.
7        Q.   Okay.  Was it in your cubicle area?
8        A.   I believe that is correct.
9        Q.   Did you hear what he was talking about?
10       A.   Snippets.
11       Q.   What?
12       A.   It was work related.  I mean, I
13   couldn't give you specifics.
14       Q.   So you don't recall who that was with?
15       A.   No, I don't.
16       Q.   Did anyone ever tell you that they
17   thought that Turney had a crush on Jesse or liked
18   her in a way that wasn't work related or something
19   to that effect?
20       A.   No.
21       Q.   Did you ever get that impression from
22   your observation?
23       A.   No.
24           MS. GURMANKIN:  Let me take a break and

Page 135

1    see if I have anything else for you.
2            THE VIDEOGRAPHER:  We are now going off
3    the record.  The time of the camera is 11:08 a.m.
4            (A recess was taken from 11:08 to 11:16
5    a.m.)
6            THE VIDEOGRAPHER:  We are now back on
7    the record at 11:16 a.m.
8    BY MS. GURMANKIN
9        Q.   Between the time that you were
10   interviewed by Kloosterman, which looks like it
11   was December 14, 2016, from her notes, and your
12   retirement on July 1, 2017, did do you any
13   training at the company?
14       A.   I'm sorry?
15       Q.   Did you attend any training at the
16   company in that time period?
17       A.   There would have been some
18   computer-based training that we're required on an
19   annual basis.  But as far as going to a training,
20   no.
21       Q.   You're saying there would have been
22   computer-based training.  Is that based on your
23   experience in the past as to when that generally
24   happened?

Page 136

1        A.   Yes.
2        Q.   Which was when?
3        A.   It happened throughout the year.
4        Q.   How many times?
5        A.   A lot.  I don't know the exact number.
6    Shell had a lot of things that they required you
7    to do computer based.  It would be, you know, more
8    virtual than the actual physical meeting and
9    having training.
10       Q.   Okay.  Okay.  If you can take a look at
11   what should be showing up on your screen.  It was
12   previously marked as Exhibit 1.  The cover page is
13   an e-mail including training rosters.  Then if
14   would you go to page two.
15       A.   Okay.
16       Q.   Two?
17       A.   Yep.
18       Q.   So if you look at the top on the right,
19   it says that it's ethics training, code of conduct
20   refresher, supervisor session.  Do you see that?
21       A.   Yeah.
22       Q.   Do you recall attending that in or
23   around February of 2017?
24       A.   I don't recall.  Obviously I did, but I

34 (Pages 133 to 136)

Page 137

1  don't recall the exact training.  I mean, this was
2  normal stuff.  We did a lot of it.  I don't recall
3  that.
4          Q.  If you look in around the middle of the
5  list of the names, there's your name on the left,
6  it's typed.  Right?
7          A.  Um-hmm.
8          Q.  Yes?
9          A.  Yeah.  That's my name, yes.
10         Q.  Is that your signature two columns
11 down?
12         A.  It is.
13         Q.  Is that your handwriting for the
14 employee number?
15         A.  Yep.  Yes.
16         Q.  Does this refresh your recollection as
17 to whether you attended that training or no?
18         A.  No.
19         Q.  You still don't have a recollection?
20         A.  No.
21         Q.  And there is no date under the training
22 completion date column.  Correct?
23         A.  No.
24         Q.  Would that indicate that you did not

Page 138

1  attend?
2          MS. KIRKPATRICK:  Objection.
3          THE WITNESS:  No, because that is my
4  signature right there.
5  BY MS. GURMANKIN:
6          Q.  Right.  But you don't --
7          A.  So I may have signed it as it was
8  passed around and just didn't put the completion
9  date on it there.
10         Q.  Or you may not have completed it.
11         MS. KIRKPATRICK:  Objection.
12         THE WITNESS:  If I signed it, I was
13 there.
14 BY MS. GURMANKIN:
15         Q.  Then why wouldn't you have dated it?
16         A.  I probably overlooked the dating -- the
17 actual dating.
18         Q.  You're guessing.  Right?
19         MS. KIRKPATRICK:  Objection.  He didn't
20 say he was guessing.
21         MS. GURMANKIN:  Right?
22         THE WITNESS:  Yes.
23         MS. KIRKPATRICK:  Objection.
24

Page 139

1  BY MS. GURMANKIN:
2          Q.  The film that we talked about earlier
3  that was about Turney's group and the LEAN
4  process, what was that -- if we were to ask for
5  that film, what would we ask for?  Do you know?
6          A.  The LEAN demonstration for choke
7  inspections performed by Appalachia maintenance.
8  You could probably -- I mean, that would probably
9  get you where you need to be.
10         Q.  Okay.  Let me make sure; the LEAN
11 demonstration for choke inspections performed by
12 Appalachia maintenance?
13         A.  Correct.
14         Q.  Is it the only film or presentation you
15 saw that Turney was part of in some way or his
16 group was part of?
17         A.  It's the only one I know of, yes.
18         MS. GURMANKIN:  All right.  That's all
19 I have for you at this time.  Thank you.
20         MS. KIRKPATRICK:  I have no questions.
21         MS. GURMANKIN:  You're done.
22         THE WITNESS:  I'm done?
23         MS. GURMANKIN:  Um-hmm.
24         THE VIDEOGRAPHER:  This concludes file

Page 140

1  number two in the videotaped deposition of Mark
2  Hoover in the case Barnes v. Shell, et al.
3          We are going off the record at
4  11:20 a.m., concluding this deposition for today.
5          (11:20 a.m., deposition concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

35 (Pages 137 to 140)

Page 141

```
 1    COUNTY OF LYCOMING        :
 2    COMMONWEALTH OF PENNSYLVANIA  :
 3
 4          I, Lori A. Fausnaught, RMR/CRR, do
 5    hereby certify that personally appeared before me,
 6    MARK HOOVER; the witness, being by me first duly
 7    sworn to testify the truth, the whole truth and
 8    nothing but the truth, in answer to oral questions
 9    propounded to him by the attorneys for the
10    respective parties, testified as set forth in the
11    foregoing deposition.
12          I further certify that before the taking
13    of said deposition, the above witness was duly
14    sworn, that the questions and answers were taken
15    down stenographically by the said Lori A.
16    Fausnaught, RMR/CRR, Williamsport, Pennsylvania,
17    approved and agreed to, and afterwards reduced to
18    typewriting under the direction of the said
19    Reporter.
20          In testimony whereof, I have hereunto
21    subscribed my hand this 23rd day of February,
22    2020.
23
            s/Lori A. Fausnaught, RMR/CRR
24          ----------------------------
```

Page 142

```
 1          INSTRUCTIONS TO THE WITNESS
 2          Read your deposition over carefully
 3    It is your right to read your deposition and make
 4    changes in form or substance.  You should assign a
 5    reason in the appropriate column on the errata
 6    sheet for any change made.
 7          After making any changes in form or
 8    substance which have been noted on the following
 9    errata sheet along with the reason for any change,
10    sign your name on the errata sheet and date it.
11          Then sign your deposition at the
12    end of your testimony in the space provided.  You
13    are signing it subject to the changes you have
14    made in the errata sheet, which will be attached
15    to the deposition before filing.  You must sign it
16    in front of a witness.  Have the witness sign in
17    the space provided.  The witness need not be a
18    notary public.  Any competent adult may witness
19    your signature.
20          Return the original errata sheet to
21    your counsel promptly.  Court rules require filing
22    within thirty days after you receive the
23    deposition.
24
```

Page 143

```
 1               ERRATA SHEET
 2    Attach to Deposition of:  MARK HOOVER
      Taken on:  February 14, 2020
 3    In the matter of: Barnes v. Shell Exploration and
                Production Co. Appalachia, et al.
 4
 5    PAGE      LINE NO.    CHANGE       REASON
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
```

Page 144

```
 1             SIGNATURE PAGE
 2
 3             - - -
 4
 5          I hereby acknowledge that I have
 6    read the aforegoing transcript, dated February 14,
 7    2020, and the same is a true and correct
 8    transcription of the answers given by me to the
 9    questions propounded, except for the changes, if
10    any, noted on the Errata Sheet.
11
12             - - -
13
14
15
16
17    SIGNATURE:  _____
            MARK HOOVER
18
19    DATE:  _____
20
21    WITNESSED BY:  _____
22
23
24
```

36 (Pages 141 to 144)

Exhibit 21

Interview Questions: Will Turney

**Attendees:** Will Turney, Megan Kloosterman (HR)
**Date:** 12/6/16

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised by Jesse Barnes
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- I ask that you be honest and transparent in your responses so I can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Interview Questions

1. Describe your current role and responsibilities.

   Been in role since January 2015 – over maintenance, planner/schedulers, was over compression/ES/warehouse, but the last few months we made changes to the asset. Now just mechanics, planning, scheduling.

2. Describe what event led you to send the email to Michelle with your concerns? (Attachment 1)
   It's been building based on things Jesse has been doing; It's been around the A3 which is on a visual board – I told her I wanted her to manage this board; Assigned this to her in October; she will send an email/ping/text that she's not ready; then we will review what she does have. She created the board and I critiqued it; Rory helped her and I said just remember LEAN is on this board, Rory won't know everything to put on our board; A week later she didn't have any changes to the board. When I questioned her on why, she said you know I have another job besides this board. She had Jeremy do this – he said Jeremy said "I have another job to do". She got really upset and said "that's not funny" – she looked really mad. I said that isn't funny, this is important. I called her in to talk about it and she started flooding out all of these issues and how I treat her. She brought up a few examples- Pulse survey meeting – I apologized for saying- what is the value of doing these things, I said Jesse it isn't about you it's about business. And I apologized. I was hurt when she brought up that she has felt this way about me since she's been working with me. She says I put her down.

   Text messages – have all of the messages from the past and you can see that I haven't put her down.

Confidential

EXHIBIT

019

She gets upset with the feedback of the board; and she gets upset about things. She gets mad about everyone. Matt Scorney used to be my backfill and I would ask him – she gets furious quick. It's never been brought up to me before, I was stunned and I couldn't believe it.

Mark is my peer and Hondo is one role above me –I've been sharing these things with me.

I stopped sending her to meetings because she seems disinterested and wants to leave; she acts like she has no interest; blames others for why things aren't right.

I get complaints from a lot of people about her attitude; she was really upset at Ken Foreman. I told her she doesn't play nice in the sandbox.

When I told her I wanted her to train the CATS people how to do it themselves; She thinks everyone is incompetent and they can't do it; she did not want them to do it themselves; we came up with a whole list of things that weren't being done right.

She gets so mad – she said she was going to go to the field; she texted me that she would be gone all day. I asked her if we could make it 4 hours and se got very upset and wouldn't talk to me for 3-4 days. The week before that to ask if she could take April/Tonia out to dinner on the Shell card. I said sure, keep it reasonable if you want to get together. She gets very mad at me when I say no as my supervisor.

I found out that she and someone else went out on a drilling rig. I didn't know that she did it, but why would you do that if you had other work for me to do.

No other performance related concerns before the board- just her attitude, so I was trying to be accommodating and work with her – i.e. not attending meetings.

We've always told her too, people made sure I knew what I was doing when I was trying to hire her. I hired her; I fought to get her hired, she worked with me when she was a contractor.

JG7 issue – I was trying to build her up, I told her, I'm sorry I said this, but you're making good money as a woman. My intent was good but I was trying to make her feel good about it. I won't lie to you.

3. Overall, describe your working relationship with Jesse. How has the relationship been this year?
   - Recently not very good.
   - I have a lot of text messages from before, we were friends, we would be friendly; that's why this was so surprising, it broke my heart, I'm confused, I don't know if it is because of the recent performance things.
   - Told an individual that hugged her that she doesn't like to be hugged; I was looking out for her; and she was upset that I did that.
   - When Jeremy said the comment about he "has other work to do" she got mad that I didn't intervene.
   - They mess around a lot and joke around and then she gets mad at me for not intervening

4. Are you aware of any concerns she has with your working relationship? Has she made you aware of any concerns that she has?

*In Jesse's hotline call she provided various examples that I would like to review with you and gather additional information on. I would like to walk through each one to get your response. I understand some of these may come as a shock to you and may be upsetting. Let me know if you need to take a break.*

**Supervisor**

- I have been shown a "selfie" of my supervisor in his underwear by him.
  - o Me Ken and Jesse were there
  - o We were showing pictures – Chad was showing a picture of him boxing posing in his shorts so I showed a picture of me in my underwear to the group.
- I have been brought into situations with an employee that were not necessary because my supervisor thought it was funny that the other employee and myself did not like each other (Robin G.).
  - o Jesse said she hoped she ran into Robin's husband in Canada because she'd hit on him.
  - o Jesse hates Robin Grouette
  - o I would always joke and say hey your favorite person is here.
  - o Don't remember bringing Jesse into a meeting unless Robin wanted me to bring her into a meeting.
- I was told in my mid-year review that I make good money for a woman and should not be upset with my pay grade by my supervisor.
  - o It was when we first hired her and when she got her salary. But I did say that yes.
- My supervisor told me I was intended to be a pay grade 7 but was told by OM that I would be an 8 with no explanation.
  - o The decision was made for lack of experience, once you prove yourself it's easier to raise you up. That was the real reason.
  - o No one has ever told me why they questioned me hiring her.
- I was told I work well with male employees because I am a woman by my supervisor (project with lead mechanics – PMPs).
  - o I said that; I said we saved this money, let's put it on the board, let's keep going. I said that's good it's because you are a girl. Tim Brewerly and Luke are who she said she works well with and you gotta know them to understand. You need to know Tim.
- Superintendent had written me a note to tell me he thought I did a good job regarding certain projects and CC's my supervisor on the email. I was then taken a side by my supervisor and a door was closed so the superintendent could not hear supervisor talk down to the things the superintendent just gave me recognition for.
  - o I would not close the door because it was the superintendent (wouldn't hide anything); but i don't remember what we were speaking about
- I was told I am a hot blonde by my supervisor (Supermarket story – "saw a hot blonde at supermarket").
  - o Confirmed supermarket story; at last year's Christmas party she was showing me the picture of me and her boyfriend at the Christmas party and referenced two handsome gentleman.

- I am continuously asked about my personal life by my supervisor (ex: do you drink wine when you get home?).
  - o I do talk with her; we will all sit there in a group, she talked about buying a house, asked her about buying a house; she confided in my one time that she had to go to the doctor; I asked if she was OK, and she shared with me;

- o She used to tell us all the time to her office and up until 3-4 months ago tell me that she was drunk and out blacking out and getting in fights/kicked out of the bars.
  - o I'm sure I have asked that if she drank wine when she got home; I know she doesn't sleep well at night
  - o She tells everyone how she gets drunk and drinks all night long – she brings it up herself.
  - o I would describe my relationship with everyone on my team is friendly like that. I try to be really nice to everyone

- My supervisor has referred to my significant other as a nerd.
  - o Probably so.
  - o One day I saw her passing and I asked who that goofball was that was driving her car
  - o I am always asking about how he's doing. My wife is an RN.

- At a work charity golf tournament I was asked more than once why I was not wearing shorts at this event and if my supervisor could cut my pants into shorts as well as other supervisors joined in and took a picture of my backside (buttock) and saved on phone.
  - o She told us she would get swamp ass walking around in those pants
  - o It doesn't sound like something out of the ordinary to cut her pants
  - o I don't know who took the picture; this past year se brought a very attractive blonde to hang out at the tent, in my opinion it wasn't proper. This was her best friend and she was all over everybody. She was very drunk. When you have that kind of situation, there was alcohol there. Anything could have happened; Jesse and her friend were going around hole to hole and asking people for beers.
  - o The whole leadership team was at this event, Mayor of Wellsboro

- I was informed to "bullshit" my superintendent on what my position competency by my supervisor.
  - o Steve would share with Will that their MA is doing work
  - o I would back her up and say what she is doing
  - o They talk to her and she clams up – I told her she needs to show them what you're doing; I didn't say bullshit, you tell them what you are doing.
  - o Hondo can contest to that. We tell her since we hired her, you need to be on you're A game, you always need to be improving. Telling her that feedback. When you present in front of superintendent, don't clam up.
  - o Steve was questioning her performance because he would ask her to do something and she wouldn't understand.

- My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one.
  - o I never touch her leg, but I do this to everybody, I tap people's arms.
  - o I have never touched her leg, unless I am scooting in to talk to her.
  - o She has never asked me to stop.

- I was told I am only right if my supervisor allows me to be by my supervisor.
  - o That doesn't make any sense, I would never say that
  - o I don't recall saying that in a joking manner

- I have addressed my supervisor about an issue I was having with a co-worker and was told that is the way it was going to be. (Ken Foreman completing some of her work)
  - o She expressed concern that he was going to screw it up, she said she doesn't want others to do her job. I told her she needs the help, he's here to help you.
  - o We have a huge backlog of work to do and she couldn't finish it all; this is where she gets defensive if people get in her territory.

- - I told her that I did not say that I was upset with her; I will address it with her.
  - She asked if she could work from home that day so she did.
  - I think she hates Ken, she hates Dan. It's not a secret that she hates these guys
  - She is the controller of the Z-6 log because she wrote an email to you saying she could handle this.
- This co-worker had lied to me saying that my supervisor was mad at me because I was falling behind on work. When I asked my supervisor what I needed to catch up on he denied that he had said anything.
- My supervisor said he thinks it's funny when I get into a disagreement with other women co-workers. (ex: Tonia P in Pittsburgh – pointing out an issue).
  - I don't think it's funny, its aggravating to me.
  - I have to have someone replace Jesse if she gets promoted or moves on
  - When I call someone in to help her she gets aggravated, she said don't send Jill over here. She does that about Jen, Robin G, Jen Card. She's got her favorites and people hse doesn't want to work with
  - I don't tell her it's funny, but what am I Supposed to do. I try to coach her on it
  - Example: Tonia is very aggressive, she will send a note that Jesse can't do her job. Tonia said she sent you the procedure and she is asking you if you know how to do it. I told her to get with Tonia to figure it out.

- Supervisor gestures cat claws and makes a hissing noise.
  - I have done that, I'm sorry Megan. I do that to everyone, you don't single anyone out.

- I expressed a concern to my supervisor a CPR trainer that instructed at our office that when I was performing CPR the instructor told me to "pick my ass up" in front of male colleges. My supervisor said "well did you pick it up?" in a laughing manner.
  - I was in the class with her, she was doing something incorrectly
  - I recall him calling her out on something she was doing wrong.
  - I don't recall saying that.
- In my goals on HR online I entered I would attempt to visit the field every quarter for I am office based and want to gain knowledge of the field. When I asked permission to spend the day in the field with a female colleague I was told by my supervisor I was only allowed to go for 4 hours. When I asked why and/or if he needed me for something that prevented me from spending an 8 hour day in the field, he responded with no I just don't think you need to spend the whole day in the field. (April Heater visit)
  - Field visits did not affect her IPF this year.

- I have been asked by my supervisor multiple times if I thought about him over the weekends.
  - I do say this to a lot of people; I asked people "did you miss me?"; I could have said "did you miss me this weekend" because I don't do that.

- My supervisor has told me that he has thought about me while showering.
  - I've said this in front of everyone; I think about work all the time; it was business related, when I was in the shower I thought about "oh" – I think about stuff all the time in the shower, it wasn't in that context.

- My supervisor encourages arguments among my team.
  - That's not true; I hate them.
  - I do let people argue it out, working out differences right here.
  - People might make comments during meetings like "oh here it's the scheduler's fault again"
  - If she is in a meeting she acts like she doesn't want to be there. Someone might call on her because we want her input and active in the meeting. She seems 'disgusted to be there'

- My supervisor mocks me when I have informed people I do not like to be touched.

- o Trying to look out for her;
- o She's told everybody that she doesn't like to be touched.

- My supervisor has mocked me when I told him I do not come to work to hear that I am pretty when a co-worker referred to be as pretty. My supervisor kept saying it when I addressed him "I don't come to work to hear I am pretty" he would say to me.
  - o Fletch came in and asked her to do something
  - o I didn't make the comment; I promise you I have never said that.

- I have received non work related text messages. (While on vacation in May – if she missed him, if she had been drinking yet).
  - o Yes – I have texted her before; am I allowed to go through your town? She is the town mayor of Tioga
  - o Probably texted that.
  - o She texts stuff too – saying we forgot her birthday.
- I have been referred to as a "window licker", which I believe was to insult my intelligence.
  - o No
  - o People mess with her because she dishes it back

- I was told when I voiced some of my concerns that "I need to stop playing the victim". (When she told Penny that Ken asked what she accomplished this year outside of not dying her hair)
  - o I have said that to her; When she says Ken's taking my work, she's playing like it's something bad. I did tell her that, it's not because she was voicing her concerns. She gets so mad when someone is trying to help her
  - o Example is Tonia trying to help her (one minute she hates her, one minute she's takin gher to dinner)
- A co-worker had put his hands through my hair without permission.
  - o No recollection.
  - o If you talk to Kenny you will see he means nothing by it.

5. At any point did Jesse notify you that any of these instances were unwelcomed or she was concerned with any of these situations?
   a. No she did not, that is why I am so stunned.
   b. When I said the comment in the SPS meeting I knew that I did the wrong thing; but other than that this is all total shock.
   c. What was your reaction? What did you do?

6. (If applicable) Do you have any reasons to believe why Jesse may not be telling the truth with her claims?

   They seem to be taken out of context, there is some truth, but not the whole truth

7. Is there anything else you'd like to share with me related to either Jesse's concerns or yours, that have not already been discussed?

   Why wait two years to bring this up, what is the end game? Why wasn't it brought up a long time ago?

I don't take notes like that, there are times when things people do are not appropriate. I feel like since she hasn't said anything, how do we know to correct it? When Steve was in there I asked what do we need to make this right? She said I don't think we can fix it. To me she is saying that whatever I've done, it can't be fixed and she's not willing to work to fix it.

I'll be friendly but there will be no extra. She said, how can I come into work knowing this is going on?

8.   Is there anyone specifically you think I should talk to regarding the concerns raised?

Hondo, April Heater used to work for me, Penny Robbins (might get out), Ken Foreman, Dan Krise, Matt Scorney is on vacation this week.

9.   Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of the investigation.

**Conclusion**
- Please keep this conversation and the information we discussed confidential and do not share others
- Stress this is a on-going investigation, I will be talking to a number of people and this needs to remain most confidential.
- I will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let me know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, I will not draw any conclusions until the investigation has been completed

Attachments:

Attachment 1:

**From:** Turney, William E SEPCO-UPU/N/EO
**Sent:** Wednesday, November 23, 2016 1:09 PM
**To:** Priest, Michelle L SEPCO-HRN/AT <Michelle.Priest@shell.com>
**Cc:** Craig, Steve SEPCO-UPU/N/EO <Steve.Craig@shell.com>

**Subject:** Potential Employee Issue
**Importance:** High


Michelle,

Monday afternoon (11/21/2016) I called Jesse Barnes into room 120A to have a one on one discussion about recent performance concerns. After talking with her few a few minutes she started saying that I was the problem. I asked why I was problem and she stated that I always put her down, telling her nothing was ever done correctly etc....After only a few minutes into this, I asked her to hold tight until I went and got Steve. She agreed to this and Steve joined the conversation. Talking with Steve today, I don't want to let this go. I haven't (In my opinion) ever done anything wrong. Now, I know I have said some things that I shouldn't have but apologized for saying it...I guess what I'm wondering is if we can discuss this. Everything has been fine this week (between her and me) and far as business goes. I don't want this to get out of hand or I fear that I cannot coach her because of this. Anyway, let's discuss Michelle when you return to work. Thank you very much.


Thanks,


## William Turney


Shell Appalachia

Operations Field Support Supervisor

12880 State Route 6

Wellsboro, PA 16901

Cell: 570-404-8901

Office (Soft Phone): 570-662-9744

William.Turney@Shell.com



Exhibit 22



Montgomery County Office
2617 Huntingdon Pike
Huntingdon Valley, PA
19006-5125
(215) 887-0200

Bucks County Office
140 East Butler Avenue
Chalfont, PA 18914

(215) 822-5600

www.sogtlaw.com

August 13, 2020

<u>Via email and Regular Mail</u>

Caren N. Gurmankin, Esq.
Console Mattiacci Law LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102

   Re: Expert Report re Workplace Investigation
     *Jesse Barnes v. Shell Exploration and Prod. Co. Appalachia, et al.*
     <u>U.S.D.C., M.D. Pa., Civil Action No. 18-cv-01497 (MWB)</u>

Dear Ms. Gurmankin:

You have asked me to provide my expert opinion about whether the Defendants in this matter (collectively **"Shell"**) properly conducted a workplace investigation relating to various incidents and complaints of alleged gender discrimination, sexual harassment and retaliation made by your client Plaintiff Jesse Barnes.

My findings and opinions stated throughout this report are all made within a reasonable degree of professional certainty.

## I. ISSUE

Was Shell's investigation of Ms. Barnes' various complaints of gender discrimination, sexual harassment and retaliation reasonable, sufficient and consistent with workplace investigation standards?

## II. CONCLUSIONS

No. It is my opinion that Shell's method of investigation was not reasonable or sufficient as it failed to meet accepted standards for workplace investigations for a variety of reasons, including but not limited to (in general order of the investigatory process):

  A. The investigator did not possess the necessary skills or experience to
    conduct the investigation.

B.    The investigator did not properly plan or prepare for an effective investigation

C.    The investigation was not conducted in a manner to reliably obtain relevant information

D.    The investigator failed to include facts sufficient for the decision makers to judge the credibility of the complainant, witnesses and alleged harassers

E.    The investigator failed to prepare an Investigative Report, and the "Investigation Overview" failed to provided necessary information.

F.    The investigator was unfamiliar with the application of company policies and the applicable law.

G.    The company failed to investigate all of Ms. Barnes' complaints


## III.    DOCUMENTS REVIEWED

In addition to the reference materials, cases, statutes and regulations referenced herein, in connection with this report, I had access to and/or was provided with the following documents:

1.     Filed documents as per PACER docket entries
2.     Jesse Barnes deposition transcript and exhibits
3.     Hondo Blakley deposition transcript and exhibits
4.     Steve Craig deposition transcript and exhibits
5.     Matt Empsen deposition transcript and exhibits
6.     Ken Forman deposition transcript and exhibits
7.     Mark Hoover deposition transcript and exhibits
8.     Megan Kloosterman deposition transcript and exhibits
9.     Wayne Fletcher deposition transcript and exhibits
10.    Greg Larsen deposition transcript and exhibits
11.    Penny Robbins deposition transcript and exhibits
12.    Kelly Soudelier deposition transcript and exhibits
13.    Will Turney deposition transcript and exhibits
14.    Michelle Priest deposition transcript and exhibits
15.    Documents produced by Plaintiff, Barnes 1 through 1008
16.    Documents produced by Defendant, Shell 1 through 1479
17.    Documents produced by Cenergy in response to a subpoena

## IV.   GENERAL CHRONOLOGY OF EVENTS[1]

| | |
|---|---|
| November 2010 | Ms. Barnes hired at Shell as a contractor |
| September 2015 | Ms. Barnes hired as a full time employee as Maintenance Analyst |
| May 2016 | Ms. Barnes complained to Hondo Blakley, Supervisor, about Mr. Turney |
| 2016 | Ms. Barnes made it clear to Mr. Turney that she was rejecting his sexual advances |
| November 15, 2016 | Ms. Barnes complained to HR through email Helpline re sex discrimination and sexual harassment; Ms. Barnes complained to Steve Craig re failure to be selected for Scheduler position and sexual harassment |
| November 29, 2016 | Investigation assigned to Megan Kloosterman |
| December 6, 2016 | Investigative interview of Jesse Barnes and Will Turney |
| December 7, 2016 | Investigative interviews of Matt Empsen, Ken Foreman, Wayne Fletcher, Dan Krise, Penny Robbins, Jeremy Greene, Kelvin Flynn, Shane Sollinger, Hondo Blakley |
| December 8, 2016 | Investigative interview of Greg Larsen |
| December 14, 2016 | Investigative interview (via phone) of Mark Hoover |
| December 15, 2016 | Ms. Barnes informed by Megan Kloosterman and Greg Larsen that investigation was completed |
| January 1, 2017 | Demoted to Senior Safety/Environmental Tech |
| January 2017 (end) | Ms. Barnes received negative 2016 performance review and smaller bonus |
| March  2017 | Ms. Barnes complained about her performance review and that review was in retaliation for her complaints. |
| March 13, 2017 | Ms. Barnes informed no retaliation found in connection with her ranking |

---

[1] This general chronology is not intended to list every action taken by anyone involved or every document involved in this matter, but only to provide a context in which to place certain key events.

| April 2017 | Ms. Barnes complained via telephone call to Kelly Soudelier |
| April 26, 2017 | Ms. Barnes filed an EEOC Charge and notifies Shell of her filing |
| June 19, 2017 | Ms. Soudelier responded to Ms. Barnes' previous complaints regarding her performance review and associated pay benefits, including confirming that Shell would change the review after Ms. Barnes complained |
| July 2017 | Ms. Barnes complained of continued sex discrimination and retaliation |
| October 2017 | Ms. Barnes complained about continued sex discrimination and retaliation |
| January 29, 2018 | Ms. Barnes notified Michelle Priest of continued sex discrimination and retaliation |
| March 6, 2018 | Ms. Barnes informed that no discrimination or retaliation is found |
| July 27, 2018 | Federal court complaint filed |
| April, 2019 | Ms. Barnes left Shell |

## V. WORKPLACE INVESTIGATIONS OVERVIEW

### A. A Reasonable Investigation Is Required

Numerous state and federal civil cases from across the nation have found workplace investigations to be fatally flawed because they were delayed or conducted in an ineffective or negligent manner. There are opinions and guidelines from a number of sources developed by a variety of cases, administrative agencies and private organizations that address the question of how a proper workplace investigation should be conducted. For example, the EEOC has periodically provided guidance about how it believes a proper workplace investigation should be conducted. *See* EEOC Notice 915.002, June 18, 1999 "Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors." Appropriate investigative procedures, however, are generally determined under the standard of reasonableness under the circumstances, sometimes in conjunction with the employer's own policies and procedures regarding workplace investigations.

Pursuant to the United States Supreme Court cases of *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742 (1998) (commonly referred to collectively as "*Faragher* and *Ellerth*") an employer may assert an affirmative defense to a claim of sexual harassment if it can demonstrate (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the alleged harassed employee

unreasonably failed to take advantage of preventative or corrective procedures provided by the employer.

That the employer "exercised reasonable care to *prevent and correct promptly* any harassing behavior" has been universally interpreted to require a prompt and thorough workplace investigation. Employers, therefore, have a duty to "prevent and correct promptly" the harassment being complained of. The "complaint" triggering an investigation can be an oral or written complaint, and if written, could be as informal as an email or short note or as formal as an EEOC Charge of Discrimination or a civil action complaint. Furthermore, extensive case law supports that the type of investigation contemplated by *Faragher* and *Ellerth* has expanded well beyond sexual harassment into other areas of discrimination such as gender, religion, national origin, age, race, disability and retaliation.

Courts are often asked, or decide on their own, to comment on the adequacy of workplace investigations. *See, e.g., Walters v. Washington County,* 415 Fed. Appx. 374 (3d Cir. 2011) (affirming district court's determination that workplace investigation was adequate); *Richards v. Centre Area Transp. Auth.*, 414 Fed. Appx. 501, 503 (3d Cir. 2011) (same); *Fairclough v. Wawa, Inc.,* 412 Fed. Appx. 465, 469 (3d Cir. 2010) (same); *Miller v. Patterson Motors, Inc.*, Civil No. 3:2007-33, 2009 WL 789897 at *18 (W.D. Pa. March 24, 2009) (defendant's inadequate workplace investigate created a genuine issue of material fact as to whether employer had actual or constructive knowledge of the existence of a sexually hostile environment and whether employer took appropriate steps to stop the alleged harassment prior to employee's complaint to her immediate supervisor, precluding summary judgment on the issue of respondeat superior in a Title VII sexual harassment action); *Lake v. Ak Steel Corp.,* No. 2:03CV517, 2006 WL 1158610 at *50 (W.D. Pa., May 1, 2006) (investigations lacked confidentiality mechanisms, which put complainants at risk of adverse treatment).

In addition to guidance from the EEOC and other sources setting forth what is required to perform an effective investigation, techniques, protocols and standards can be found in many published sources, for example:

Brad D. Brian, Barry F. McNeil, Lisa J. Demsky eds., *Internal Corporate Investigations* (ABA Press, 4th ed., 2017)

Charles Sennewald and John K. Tsukayama, *The Process of Investigation* (Elsevier Press, 4th ed., 2015)

Association of Workplace Investigators, *Guiding Principles for Conducting Workplace Investigations* (2017)

Ragnar Benson, *Ragnar's Guide to Interviews, Investigations, and Interrogations: How to Conduct Them, How to Survive Them* (Paladin Press 2002)

Amy Oppenheimer & Craig Pratt, *Investigating WorkPlace Harassment: How to Be Fair, Thorough and Legal* (Society for Human Resource Management 2002)

Cynthia B. Schroeder, *The Art and Science of Conducting Interviews and Investigations*, (Pennsylvania Bar Institute 2002)

Stan B. Walters, *Principles of Kinesic Interview and Interrogation* (CRC Press 2d ed. 2002)

William L. Fleisher & Nathan J. Gordon, *Effective Interviewing and Interrogation Techniques* (Academic Press, Inc. 2001)

"The Law of Workplace Investigations: Attorney Investigators and Related Privilege Issues," Janice Goodman, Practicing Law Institute, Litigation and Administrative Practice Course Handbook Series, 662 PLI/Lit 783 (October 2001)

"Lawyers as Investigators: How Ellerth and Faragher Reveal A Crisis Of Ethics And Professionalism Through Trial Counsel Disqualification And Waivers Of Privilege In Workplace Harassment Cases," Jeffrey A. Van Detta, 24 J. Legal Prof. 261 (Spring, 2000)

David E. Zulawski & Douglas E. Wicklander, *Practical Aspects of Interview and Interrogation* (CRC Press 2d ed. 2001)

Paul J.J. Zwier & Anthony J. Bocchino, *Fact Investigation: A Practical Guide to Interviewing, Counseling and Case Theory Development* (National Institute for Trial Advocacy 2000)

Don Rabon, *Interviewing and Interrogation* (Carolina Academic Press 1992)

Suzette Haden Elgin, *The Gentle Art of Verbal Self Defense,* (Dorset Press 1980)

**B.      Examples of Investigations Not Reasonably Conducted**

In addition to the employer's legal duty to investigate, it is important for complainants and others involved to know that complaints are "taken seriously," and investigated promptly and thoroughly and in an unbiased manner. Employees involved in the investigation as complainants, alleged harassers, witnesses, or just those who are "in the know" about what is happening, anxiously await "to see what will happen." If the consensus is that "nothing happened" to the alleged harassers, or a serious investigation was not conducted, bad-acting

employees may feel empowered to continue to engage in the wrongful behavior and complainants may not speak up.

Workplace investigations are routinely reviewed in civil proceedings, and courts will occasionally mention the investigation if it is relevant to the case outcome. For example, in *Weist v. Tyco Elec. Corp.,* 812 F.3d 319 (3d Cir. 2016), the Third Circuit Court of Appeals affirmed the district court's dismissal of plaintiff's retaliation claim under the Sarbanes-Oxley Act, finding that any adverse employment actions that may have occurred were unrelated to the employee's protected activity. The court detailed each step of the investigation, and stated:

> We conclude that Wiest has failed to offer any evidence to establish that his protected activity was a contributing factor to any adverse employment action that Tyco took against him. Specifically, the record is devoid of any evidence that Wiest's conduct frustrated personnel in management or that, even if he frustrated management personnel, any such individual was involved in the investigation and an ultimate recommendation to terminate his employment. Further, even if Wiest could satisfy those threshold requirements, Tyco has demonstrated that it would have taken the same actions with respect to Wiest in the absence of Wiest's accounting activity *given the thorough, and thoroughly documented, investigation conducted by its human resources director.*

*Id.* at 321, 324-25 (emphasis added).

The following cases illustrate examples of unreasonable internal investigations:

1. *Connearney v. Main Line Hosp., Inc.*, CIV. A. No. 15-02730, 2016 WL 6440371 at *5 (E.D. Pa. Oct. 28, 2016). In partially denying summary judgment, the Court held "a reasonable factfinder could conclude that Defendants' investigation was flawed with inconsistencies and weaknesses and that Defendants could not have relied on it in good faith." In this matter, the investigator failed to speak with the supervisor who supposedly made the decision to terminate about the events leading up to the plaintiff's alleged infraction, nor did anyone from Human Resources investigate or become involved. The Court also found there was evidence that one of the supervisors with significant involvement with the investigation could have discriminated against the plaintiff, therefore her participation could lead a jury to believe the investigation was tainted, citing the so-called "Cat's Paw" theory of liability. *Id.* (citing *McKenna v. City of Philadelphia*, 649 F.3d 171, 179 (3d Cir. 2011) ("[I]t is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." (quoting *Ambramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001)); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 412, 422 (2011) ("We...hold that if a supervisor performs an act motivated by...animus that

is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable....")).

2. *Zielinski v. SPS Techs. LLC*, No. 10-CV-3106, 2011 WL 5902214 (E.D. Pa., Nov. 22, 2011). The jury awarded the plaintiff $85,000 in back pay, $100,000 in front pay, $250,000 in emotional distress damages and $500,000 in punitive damages. The failure of SPS to show any evidence of meaningful investigation into multiple complaints of the plaintiff supported the award of punitive damages (which was more than 50% of the total verdict). The trial court said the investigation into the claims of race discrimination were "brief and, in some instances, non-existent." *Id.* at *6. Further the court said the jury "was permitted to further infer that SPS's failure to thoroughly investigate his complaints of discrimination and to discipline the alleged offenders was indicative of its unlawful motives. *Id.* (citing *Woodson v. Scott Paper Co.,* 109 F.3d 913, 923 (3d Cir. 1997) ("[A]n atmosphere of condoned racial harassment in a workplace increases the likelihood of retaliation for complaints in individual cases")).

3. *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 435-36 (E.D. Pa. 2010) (Title VII liability may arise where an employer merely investigates a complaint of harassment without taking any remedial action, or the investigation is so flawed that any remedial measures are destined to fail, as here where the employer told the alleged harasser to stay away from the victim, but did not separate them, had only short discussions with employees, and failed to take any meaningful steps to cease and prevent further harassment).

4. *Cain v. Wellspan Health,* 419 Fed. Appx. 213, 215 n. 2 (3d Cir. 2011). In affirming the district court's decision to grant summary judgment to the defendant in a race and gender discrimination action, the Third Circuit touched upon how investigations need to be consistent, and how disparate treatment could occur if investigations are conducted differently for different employees:

> Appellant also maintains that the District Court did not consider that her federal discrimination claims arose out of Wellspan's failure to "allow her to confront her accusers and have an opportunity to be represented by an attorney during the termination process." We disagree with appellant's characterization of the District Court opinion. The District Court *did* consider the "procedures employed by Wellspan to investigate the allegations of wrong doing by Cain" but found these procedures were relevant only if Cain "had produced evidence that Wellspan used some other procedures where similar complaints were lodged against Caucasian or male employees." However, Cain "has produced no such evidence, and, thus, her focus on the underlying investigation is merely a distraction." In short, Judge Rambo concluded that "[t]he

> record is devoid of any evidence that Wellspan approached
> other similarly situated allegations of dishonesty differently.

*See also Moussa v. Pennsylvania Dept. of Public Welfare*, 413 Fed. Appx.
484, 487 (3d Cir., 2011) (investigation adequate as plaintiff was not treated
differently in the investigation than others).

5.   *Spagnola v. Morristown,* Civ. A. No. 05-577, 2006 WL 3533726
(D.N.J. Dec. 7, 2006) (employer's motion to dismiss was denied because there
was enough evidence to establish a cause of action against defendant for negligent
misrepresentation after its outside counsel was hired to conduct a sexual
harassment investigation, and told the complainant that no policy of the employer
had been violated, in addition to attempting to intimidate the complainant and
communicate that no action would be taken against the alleged harasser).

6.   *Lake v. Ak Steel Corp.,* No. 2:03CV517, 2006 WL 1158610 at *50
(W.D. Pa., May 1, 2006). The Court held defendant's policy failed to contain
adequate mechanisms to further thorough investigations. Investigations lacked
confidentiality mechanisms, which put complainants at risk of adverse treatment.
As a result, employees were unlikely to file justified complaints. The lack of
avenues for informal reporting and the lack of confidentiality in investigating
undermined the reasonableness and effectiveness of defendant's policy toward
eliminating hostile environments.

7.   *Vasquez v. Empress Ambulance Serv., Inc.,* 835 F.3d 267, 276 (2d Cir.
2016). Court of Appeals held "an employer may be held liable for an employee's
animus under a "cat's paw" theory, regardless of the employee's role within the
organization, if the employer's own negligence gives effect to the employee's
animus and causes the victim to suffer an adverse employment action." Plaintiff
filed a complaint against her co-worker for sexual harassment. When plaintiff's
co-worker discovered her complaint, he provided the employer with false
documents purporting to show his relationship with the plaintiff was consensual.
In reliance on those false documents, and notwithstanding plaintiff's offers to
produce evidence in refutation, plaintiff was promptly fired on the ground that she
had engaged in sexual harassment. *Id.* at 271. Because the employer conducted an
unreasonable investigation by failing to verify the co-worker's account against the
plaintiff's refutable evidence, the employer acted negligently and may be held
liable for an adverse employment action.

8.   *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009). Court of
Appeals held "We conclude that this evidence – [defendant/supervisor's] alleged
comment on the propensity of men to engage in sexual harassment and
defendants' arguable failure to investigate properly the charges of sexual
harassment lodged against Sassaman – was sufficient to permit a jury to infer
discriminatory intent."

9. *Roberts v. Texaco Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997), African-American employees of Texaco settled a class action lawsuit in 1996 for $141 million after a botched investigation. A second-year associate in Texaco's legal department, appointed to coordinate discovery in a class action harassment suit, was unaware that several Texaco departments were withholding information. The personnel manager secretly taped – and eventually released – conversations of high-ranking Texaco executives making alleged racial epithets and plotting to destroy evidence in the case. The tapes revealed that executives involved in the investigation process plotted to "purge" and "shred" documents to avoid "unnecessary questions which might arise when the lawyers review the books." An independent investigatory report concluded that Texaco's treasurer "had a cynical view of the discovery process as a whole and had decided that he, rather than the in-house lawyers, should decide what was relevant."

10. *EEOC v. Mitsubishi Motor Mfg. of Amer., Inc.*, 102 F.3d 869 (D. Ill. 1996). The EEOC sought class action status for sexual harassment claims of more than 300 female employees in one of Mitsubishi Motor Manufacturing of America, Inc.'s Illinois plants. The female employees made numerous allegations, including off-premises sex parties, circulation of pornographic pictures, male employees' leaning against female employees and simulating sex with them, and male employees fondling themselves in front of female employees. The employer took no action regarding the sex parties until 14 months after the females had filed a harassment suit. Further, in response to a female employee's complaint that a male co-worker terrorized women, talked about oral sex, and said he wanted to kill women, the manager allegedly stated, "He is a good worker. He deserves a chance." The EEOC found the workplace had "spun out of control" because the employer:

    (a)   lacked adequate policies and procedures to deter harassment
    (b)   did not investigate complaints and did not respond to reports of harassment
    (c)   failed to maintain meaningful progressive discipline in its policies
    (d)   responded reactively -- instead of proactively -- to the charges. For example, the company shut down its assembly lines and encouraged its employees to march on the EEOC's offices; manager did not stop circulation of pornographic pictures because he "looked at them as the same as guys coming in after a hunting trip and showing pictures of the deer." Both examples demonstrate a tolerance for a sexually hostile work-environment.

11. *Kimzey v. Wal-Mart Stores, Inc.*, 907 F. Supp. 1306 (W.D. Mo. 1995), *aff'd in part and rev'd in part*, 107 F.3d 568 (8th Cir. 1997). A jury awarded a retail employee $50 million in punitive damages in a sexual harassment suit. The

trial court noted Wal-Mart's failure to initiate an investigation after the plaintiff-employee reported the harassment to her supervisor.

12.     *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995) (investigator's failure to review all records, to interview the accused's corroborating witnesses, and to credit contradicting evidence tainted an internal harassment investigation).

13.     *Kestenbaum v. Pennzoil*, 766 P.2d 280 (N.M. 1988), *cert. denied*, 490 U.S. 1109 (1989). A jury awarded $1 million in contract damages to a vice president discharged as a result of a faulty harassment investigation. The court cited the investigator's failure to distinguish between direct evidence and hearsay, failure to make credibility determinations, and failure to conform to professional investigation standards, and admonished the employer for not actively overseeing the investigation.

The following are selected decisions in Pennsylvania and within the Third Circuit that illustrate the benefit of a proper investigation:

1.     *Peace-Wickham v. Walls*, 409 Fed. Appx. 512, 521 (3d Cir. 2010) (employer took adequate remedial measures in response to racial harassment by coworkers, which included conducting timely investigations, reprimanding employees, transferring employees as needed, arranging for mandatory diversity training, and requiring employees to attend anti-harassment classes).

2.     *Young v. Temple Univ. Hosp.*, 359 Fed. Appx. 304, 309 (3d Cir. 2009) (actions in response to harassment complaints by an employee were promptly taken and reasonably calculated to end the harassment).

3.     *McCloud v. United Parcel Serv., Inc.*, 328 Fed. Appx. 777, 780-81 (3d Cir. 2009) (employer was not liable under Title VII or Pennsylvania Human Relations Act for racially harassing conduct (insults written on an orange cone) as employer investigated incident within 24 hours of employee informing his supervisor, interviewed all employees possibly involved, obtained handwriting samples from each of them, consulted handwriting expert, and instructed supervisors to meet with and inform employees such conduct was not tolerable; although no employee was punished because investigation was inconclusive, investigation and required meetings were reasonably calculated to prevent further harassment.

4.     *Morrison v. Carpenter Tech. Corp.*, 193 Fed. Appx. 148, 153 (3d Cir. 2006) (following African-American employee's discovery of large cardboard drawing of man who had upraised noose around his neck, employer took prompt and adequate remedial action which stopped the alleged harassment, precluding employee's hostile work environment claim under Title VII and Pennsylvania Human Relations Act; employer undertook extensive investigation involving

interviews of dozens of employees and several departmental meetings at which management reviewed company's policy against harassment.

5. *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) abrogated on other grounds as recognized by *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006) ("After the Supreme Court's *Faragher/Ellerth* decisions, employers must do more than [sic] merely take corrective action to remedy a hostile work environment situation. Employers also have an affirmative duty to prevent sexual harassment by supervisors").

6. *Taylor v. JFC Staffing Assoc.*, 690 F. Supp.2d 357, 368-69 (M.D. Pa. 2009) (actions taken by employer once it became aware that coworker had given racially offensive birthday card to African-American employee were reasonably calculated to stop further harassment, precluding employer's liability for hostile work environment under Title VII and Pennsylvania Human Rights Act, where, on next business day after employee informed his supervisor about card, employer had begun investigation into what transpired, employer concluded, after its investigation, that coworker's actions were not taken with intent to discriminate or harass employee, and, six days after alleged harassment occurred, coworker was disciplined by receiving written warning and counseling session about employer's anti-harassment and anti-hostile work environment policies).

7. *Preston v. Bell Atlantic Network Serv., Inc.*, Civ. A. No. 96-3107, 1997 WL 20853, at *10 (E.D. Pa. Jan. 16, 1997) (employer escaped liability for an allegedly hostile work environment by establishing and following a clear sexual harassment policy and implementing "energetic measures" to thwart sexual harassment (including an investigation procedure, with protection against retaliation). *Id.* (citing *Gary v. Long,* 59 F.3d 1391 (D.C. Cir. 1995))).

## VI.    INVESTIGATION STANDARDS

The following are the relevant standards[2] which must be adhered to when conducting workplace investigations into complaints of sexual harassment, discrimination and retaliation:

**Standard 1:**  The investigator must possess the necessary skills and experience to conduct the investigation.

**Standard 2:**  The investigator must properly plan and prepare for an effective investigation.

---

[2]There are various additional standards relevant to workplace investigations not included here as they are not implicated by the facts of this case.

**Standard 3:** The investigation must be conducted in a manner to reliably obtain relevant information.

**Standard 4:** The investigative report must contain facts sufficient for the decision makers to judge the credibility of the complainant, witnesses and alleged harassers.

**Standard 5:** The Investigative Report must provide the decision makers with information to reasonably make a determination.

**Standard 6:** If asked to draw conclusions, the investigator must be familiar with the application of company policies and the applicable law.

**Standard 7:** All complaints must be investigated.

## VII. SHELL FAILED TO MEET RELEVANT INVESTIGATION STANDARDS AND DID NOT ACT REASONABLY IN INVESTIGATING MS. BARNES' COMPLAINTS

### A. Shell Failed to Meet Standard 1 – The Investigator Did Not Possess The Necessary Skills Or Experience To Conduct The Investigation.

The Barnes investigation was conducted by Megan Kloosterman, UP HR Account Manager. Kloosterman. Kloosterman Dep. at 25. Her supervisor, Kelly Soudelier, did not personally investigate any claims brought by Ms. Barnes. Soudelier Dep. at 115.

Ms. Kloosterman had conducted only two other workplace investigations prior to the Barnes investigation. The first was co-conducted, and the second may have been co-conducted. Kloosterman Dep. at 26, 31-32. Kloosterman conducted the Barnes investigation by herself. She had no formal training but obtained "on the job training" by shadowing a colleague during the first investigation. Kloosterman Dep. at 39-40. Ms. Kloosterman graduated from college in December 2014 and her first job was at Shell beginning in February, 2015. Kloosterman Dep. at 23. She had been working approximately one year and ten months when this investigation was assigned to her by Ms. Soudelier.

It is well settled that the adequacy of an investigation is based in large part on the credentials of the investigator. Courts have consistently considered the investigator's background, training and demeanor. *See Casiano v. AT&T Corp.*, 213 F.3d 278, 286 (5th Cir. 2000) (court of appeals affirmed summary judgment for defendant employer who suspended alleged harasser in part as a result of using two "E.O. Specialists" to conduct investigation); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 245 (4th Cir. 2000) (court of appeals reversed summary judgment for defendant employer finding inadequate investigation where investigator

had never before conducted a sexual harassment investigation, investigation focused on alleged harasser's management style rather than complaints of sexual harassment, and did not even mention the allegations of sexual harassment to the alleged harasser).

The employer must consider the following characteristics (among others) when selecting an investigator:

a. <u>Company Familiarity</u>. An in-house investigator may be more familiar with company policies, personnel and the context and significance of facts, and may be able to investigate more quickly, but investigations can often be emotional and involve embarrassing information. Witnesses may discuss the situation more freely with someone they know and trust rather than with an outsider, but they also may be more suspicious that an insider has preconceived ideas of the people involved or the situation.

b. <u>Unbiased</u>. An internal investigation must do more than arrive at the truth. If the participants and workforce in general suspect the investigation result is preordained, the employer loses many long-term benefits of a thorough investigation. It is therefore imperative that the investigator be, and be perceived as fair and impartial. *See Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir. 1989) (human resources department that typically conducted internal investigations precluded from investigation when allegation involved a Human Resources staff member), *overruled on other grounds by, Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 n.12 (7th Cir. 1993) (the court noting the employer's investigation was timely and resulted in appropriate remedial action that protected employer from an adverse ruling for employment violations) (internal quotations and citation omitted).

c. <u>Trained</u>. The need for a trained investigator increases in proportion to the severity of the allegation. Supervisors and human resources representatives may conduct small-scale investigations, but thoroughly trained and experienced investigators are necessary for large-scale or complex or serious matters, or those where litigation is likely or that involve high profile personnel.

Regardless of whether the employer uses an inside or outside expert, the investigator must follow generally accepted investigation techniques. *See Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995) (investigator's failure to review all records, to interview the accused's corroborating witnesses, and to credit contradicting evidence tainted an internal harassment investigation).

d. <u>Professional</u>. The investigator must be able to obtain information from nervous, hostile, emotional, untrusting and unwilling witnesses without exacerbating the problem in the process. Consider demeanor, appearance, speech patterns, experience, and presentation style when choosing an investigator.

Choosing an internal investigator rather than an outside investigator can be problematic. In-house investigators can have the advantage of not adding any additional expense, and can be

familiar with the company, the complainant, alleged harasser and witnesses, and may even be aware of past complaints involving the parties.

But the "advantages" of an in-house investigator are ultimately disadvantages. Often, in-house investigators are not objective and may be unfamiliar with the laws relevant to harassment, discrimination and retaliation claims. Frequently they had not received adequate training or had previously conducted similar investigations.

In this particular case, Megan Kloosterman's supervisor Kelly Soudelier, Human Resources Manager, assigned her to the investigation. Ms. Soudelier testified that she wanted someone who was "independent from this organization, who to the best of my knowledge had not worked with any of these employees previously." Soudelier Dep. at 112. That is a legitimate consideration, however, Ms. Soudelier did not do anything to ascertain whether Ms. Kloosterman had previously worked with any of the employees in the group. Soudelier Dep. at 112.

Surprisingly, Ms. Soudelier did not know anything about Ms. Kloosterman's specific experience in investigating complaints or harassment or discrimination prior to assigning the matter to her. Soudelier Dep. at 112. Ms. Soudelier did not consider hiring someone outside the company to investigate the claims even though Shell had hired a third-party investigator previously. Soudelier Dep. at 113-114.

Ms. Soudelier could not recall if:

- Ø Ms. Kloosterman had previously conducted investigations into discrimination or harassment
- Ø Ms. Kloosterman was trained on how to conduct investigations into discrimination or harassment
- Ø she considered getting someone from outside the company to investigate

Soudelier Dep. at 113-114. Furthermore, Michelle Priest (HR Account Manager) said that Ms. Kloosterman was chosen because she "could come to Wellsboro quite quickly to be there in person to conduct the investigation." Priest Dep. at 78-79.

Despite Ms. Kloosterman's obvious inexperience, Ms. Soudelier did not get a full report from Ms. Kloosterman at the conclusion of the investigation "because [Kloosterman] was a competent investigator," "I trusted the investigation she had conducted, the conclusions she had made," "I trusted Ms. Kloosterman was competent and did a thorough job in the investigation," "I did not need to go back and double-check everything she had done," "I recall that she had done a thorough investigation" and "Again, I'll say Ms. Kloosterman conducted a thorough and robust investigation, and I reviewed and supported her conclusions and recommendations." Soudelier Dep. at 121-123, 128, 161. Ms. Soudelier made those statements, however, not having specific knowledge of Mr. Kloosterman's background, training or experience in conducting workplace investigations, and furthermore, not hearing from or asking Ms. Kloosterman for all of the relevant information she obtained in the investigation. *See, e.g.,* Soudelier Dep. at 163, 237.

Despite not recalling any details about Ms. Kloosterman's previous experience, Ms. Soudelier testified the basis of stating Ms. Kloosterman had "conducted a thorough and robust investigation" as:

> My basis for that is Megan Kloosterman reported to me and I knew that she had a Human Resources master's degree, had been working for Shell, had been trained and would conduct a thorough and robust investigation.

Soudelier Dep. at 165.

Ms. Soudelier said about herself, that "I can make the appropriate decision [about discipline and termination] based on a competent investigator's conclusions." Soudelier Dep. at 124. So it follows that if the investigator was not competent, Ms. Soudelier could not have made an appropriate decision about discipline and termination.

Indeed, Ms. Soudelier did not have the background and experience to choose a competent investigator in the first place. Although Ms. Soudelier had many years of experience in various HR roles, she could not recall conducting any investigations in previous positions at other companies or at Shell. Soudelier Dep. at 20-21, 24, 48, 50-52.[3] When she was an employee relations team leader of the Norco facility, she oversaw investigations but could not recall even an estimate of how many, putting her estimate between one and fifty. Soudelier Dep. at 31-32. And even of those – however many there were – Ms. Soudelier could not recall if she actively participated in the investigations of discrimination. Regarding her own training, Ms. Soudelier could not recall where or when she received the training, by whom or the kind of training, or whether it was a one-time event. Soudelier Dep. at 33-35.

In Ms. Soudelier's role at HR Manager for Manufacturing she could not recall any investigations she oversaw. Soudelier Dep. at 38, 50-52. In Ms. Soudelier's role at HR Manager Projects and Technology she could not recall any investigations she oversaw. Soudelier Dep. at 41-42, 50-52. In Ms. Soudelier's role at HR Manager Upstream and Integrated Gas she could not recall any investigations she oversaw. Soudelier Dep. at 45, 50-52.

Stated simply, Ms. Soudelier was not qualified to choose an investigator. But even if she had been so qualified, Ms. Soudelier did not have sufficient information to conclude that Ms. Kloosterman was the proper choice to conduct the investigation, nor could she reasonably conclude the investigation was done competently and thoroughly.

Nonetheless, however she was chosen to conduct this investigation, the fact remains that Ms. Kloosterman was a very junior HR generalist with little or no training and little or no

---

[3] Ms. Soudelier recalled discussing one matter with one of her direct reports "recently" but did not oversee the matter nor was she involved in the decision making process. Soudelier Dep. at 52-55.

experience conducting sexual harassment, discrimination and retaliation investigations. Considering the inadequacies of the investigation as further stated in this Report, it is clear Ms. Kloosterman was too inexperienced and had not yet obtained a proficiency in the investigative process sufficient to allow a thorough and adequate investigation consistent with workplace investigation standards.

**B.      Shell Failed To Meet Standard 2 – The Investigator Did Not Properly Plan Or Prepare For An Effective Investigation**

**1.      Delay in starting the investigation**

Ms. Barnes made her initial formal complaint via the Shell Hotline on November 15, 2016. *See* Shell 525-529.

Cari Otto forwarded the complaint to Michelle Priest on November 28, 2016. *See* Shell 523-524. Michelle Priest then forwarded the complaint to Kelly Soudelier later that same day. *See* Shell 523-524. Despite the fact Ms. Soudelier stated that Ms. Barnes' "complaints were quite – quite serious and we needed to make sure that a thorough investigation, a prompt investigation was done," the complaint was not assigned to the investigator, Megan Kloosterman, until November 29, 2016, a full two weeks after it was received by the Shell Hotline. There is no indication of a reason for the delay.

Even if the actual interviews did not begin for two weeks, the investigatory process should have started almost immediately to determine the nature of the claim, and more importantly, whether the complaint warranted immediate action (such as removing one or more employees from the physical space or from each other). There is no indication that was done.

There is also no indication that Ms. Kloosterman took any steps to investigate other than keep her notes and conduct interviews of the witnesses. Kloosterman Dep. at 272.

During the two week delay, Ms. Kloosterman gave no directive to any individual or to the company IT department (for example) to preserve documents, emails, texts or other information, nor was there any indication she attempted to gather, obtain or secure documents or other pertinent information. In her pre-interview outlines, Ms. Kloosterman included a statement to read to each witness to send her any supporting documentation but there is no indication anyone did or that Ms. Kloosterman followed up (assuming she made the request in the interviews). *See, e.g.* Shell 1152.

In addition to not gathering or securing documents prior to the interviews, there is no indication Ms. Kloosterman (nor anyone else) even asked the witnesses to bring relevant documents with them, nor is there any indication that the witnesses were asked during the interviews if there were relevant documents, emails, text messages, etc. There is no indication any attempt was made to locate video surveillance or audio recordings of any reported incident.

These deficiencies are violations of accepted workplace investigation standards.

**2.    The investigator failed to review background information on the complainant and alleged harassers.**

The Association of Workplace Investigators in its "Guiding Principles" under its "Investigation Planning" section states (emphasis added):

> The investigator should consider what documents, if any, are needed and how to obtain them. Documents may include e-mails and e-files, text messages, *personnel and sensitive files,* timelines, policies, procedures, handbooks, and *relevant prior investigation materials.*

The investigator could not recall asking for Mr. Turney's personnel file or other documentation, and there is no indication otherwise that she did. Kloosterman Dep. at 75-77. There is also no indication Ms. Kloosterman sought the personnel files for the other three alleged harassers.

While it would be improper to use a previous complaint and "hold it against" the complainant or the alleged harassers, a previous complaint could be relevant for several purposes, including:

> ∅  To determine if the previous complainant, alleged harassers or witnesses are involved in the present matter;
> ∅  To more fully gauge whether the recommended remedial measures are appropriate under the circumstances;
> ∅  Possibly to aid in determining credibility

Likewise, background information, personnel files and disciplinary records would be relevant for the same purposes.

Despite the relevance of previous incidents, Ms. Kloosterman disagrees, and stated previous complaints and previous relationships have no relevance to the current complaint. Kloosterman Dep. at 70-71. Obviously, her colleague Michelle Priest (HR Account Manager, Unconventionals) thought previous complaints were relevant because she forwarded to Ms. Kloosterman details of a previous complaint that Ms. Barnes made of inappropriate conduct from a male supervisor. *See* Shell 510 email of Dec. 5, 2016. Ms. Priest also forwarded to Ms. Kloosterman an email from Turney (that he sent after Ms. Barnes complained about sex discrimination and sexual harassment involving him) advising that he had performance concerns about her. Shell 345-346.

This lack of review or reference to the previous complaints is a breach of investigative standards and unreasonable in the context of Ms. Barnes' complaints.

C.  **Shell Failed To Meet Standard 3 – The Investigation Was Not Conducted In A Manner To Reliably Obtain Relevant Information**

1.  **The order of witness interviews was incorrect**

Ms. Kloosterman interviewed the complainant Ms. Barnes first, which was correct. Kloosterman Dep. at 97. But after Ms. Barnes' interview, Ms. Kloosterman interviewed the primary alleged harasser Mr. Turney, which is incorrect and an indication of her inexperience. The alleged harasser should be interviewed after the complainant and other witnesses to be efficient, *but also to be fair to the alleged harasser.*

The investigator should gather and organize any allegation or statement to which the alleged harasser should reply to give that person an opportunity to defend the actions taken or not taken. Some commentators liken this to a criminal defendant being able to "confront the accuser." To conduct an investigation fair to all parties, the alleged harasser should have the opportunity to be confronted with those facts.

By interviewing Mr. Turney second, the investigator could not ask him about facts or statements made by the other eleven witnesses.[4]

Furthermore, in this case, in addition to Mr. Turney, there were allegations against several male employees including Ken Foreman, Hondo Blakley and Mark Hoover. Ms. Kloosterman should have interviewed as many others as possible and scheduled those with allegations against them until the end, with Mr. Turney being last of the first round of interviews.

The order of the interviews as conducted by Ms. Kloosterman was a violation of accepted workplace investigation standards.

2.  **The investigator failed to ask complete set of questions to the witnesses**

In most investigations, the investigative interview is a primary method of obtaining pertinent facts. In his book *Principles of Kinesic Interview and Interrogation*, Walters stresses the importance of the investigative interview itself:

> The extreme importance that the interview of a victim, witness, complainant, or subject has on the outcome of any investigation cannot be overstated. A Rand Corporation study found that in any investigative process, the single most important determinant of

---

[4] In addition to Ms. Barnes and Mr. Turney, Ms. Kloosterman interviewed Matt Empsen, Ken Foreman, Wayne Fletcher, Dan Krise, Penny Robins, Jeremy Greene, Kelvin Flynn, Shane Sollinger, Hondo Blakley, Greg Larsen and Mark Hoover.

> whether a case will be satisfactorily resolved is the information
> gained from the interview of the witness or victim of a crime.

Stan B. Walters, *Principles of Kinesic Interview and Interrogation* (CRC Press 2d ed. 2002) at 30 (citing Greenwood, P.W., The Rand Corporation Study: Its Findings and Impacts to Date; The Rand Corporation, Santa Monica, CA July, 1979).

Ms. Barnes made a variety of complaints both in writing and when she spoke with Ms. Kloosterman. Each one of Ms. Barnes' complaints and concerns needed to be addressed. Unfortunately, they were not.

Quite simply, Ms. Kloosterman failed to inquire about certain direct and very serious allegations made by Ms. Barnes. Ms. Kloosterman conducted thirteen interviews total, but *nine* investigative interviews in just one day, December 7, 2016 which means she did not spend very long with each witness.[5] It is possible she was concerned about having to complete the investigation no later than January 14, 2017. Kloosterman Dep. at 165-166.

But more than just not obtaining relevant facts from the witnesses, *the reasons* Ms. Kloosterman did not inquire are disturbing in the context of workplace investigations, and illustrate her inexperience and/or misunderstanding of the workplace investigative process. By way of example:

a. Ms. Kloosterman failed to investigate Ms. Barnes' complaint about Mr. Turney driving by her house which is 30 minutes away on a dead end street. Kloosterman Dep. at 249-250. This is related to the investigation because it could be determined if Mr. Turney was stalking or was infatuated with Ms. Barnes or was trying to harass her as a form of retaliation. It would also help the decision makers determine proper disciplinary remedies if it turned out to be true.

b. Ms. Kloosterman failed to investigate Ms. Barnes' allegation that Mr. Turney sent to her a "selfie of underwear" because it was something that occurred "after work." In fact, the incident occurred after a work conference. Kloosterman Dep. at 276. Ms. Kloosterman also defended her actions by stating the underwear selfie was an "isolated incident" and was not reported at the time of the incident. Kloosterman Dep. at 278.

i. Ms. Kloosterman did not ask questions about Mr. Turney sending a selfie of his underwear (even though Ms. Barnes listed it as a complaint) because Ms. Kloosterman felt that was out-of-work incident and therefore irrelevant to the investigation – a shockingly erroneous conclusion by any workplace investigator. *See* Kloosterman Dep. at 276.

---

[5] Ms. Kloosterman interviewed Greg Larsen the next day on December 8, 2016 and Mark Hoover on December 14, 2016.

      ii.    Ms. Kloosterman did not ask questions about Mr. Turney sending a selfie of his underwear because she felt it was an isolated incident. But Ms. Kloosterman would not know it was an isolated incident unless she investigated. But even assuming it was a one-time occurrence, her belief demonstrates a fundamental misunderstanding of the investigative process and what is or could be relevant to establish a violation of the law. It certainly highlights the lack of Ms. Kloosterman's knowledge about the "severe or pervasive" standard under Title VII and related statutes, even though she made reference to it. Kloosterman Dep. at 328. As a matter of law, an isolated incident can be sexual harassment or discrimination, as can an incident that was not reported by the complainant at the time it occurred.

      iii.    At the very least, Ms. Kloosterman should have recognized that *Shell's own policies* do not limit incidents to just those that occur "once" or only those in the physical space of the work buildings or during work hours. *See* Shell policies at Shell 1056-1057, and Shell Code of Conduct at Shell 588-631.

      iv.    Furthermore, there were other incidents that could be considered "isolated" that Ms. Kloosterman *did* inquire about, for example, Mr. Turney telling Mr. Fletcher to tell Ms. Barnes she was pretty, and the "hot blond" comment. Kloosterman Dep. at 186, 207, 283. More notably, however, Ms. Kloosterman investigated and recommended to reprimand Ms. Barnes for using the phrase "fuck off" even though that appeared to be a one-time isolated incident. Kloosterman Dep. at 291-293.

      c.    Ms. Kloosterman conducted no investigation into Ms. Barnes' complaint regarding her low pay grade and the reasons given to her why that was. This could obviously result in a finding of gender discrimination, gender harassment, retaliation, or an Equal Pay Act violation. Ms. Soudelier could not recall any investigation into gender pay disparity or other complaint. Soudelier Dep. at 203-210.

      d.    On December 8, 2016, Ms. Kloosterman said she interviewed Greg Larsen, the Operations Manager, which was the highest ranking position at Shell's Appalachia location.[6] Ms. Kloosterman did not inquire about preventative or correction action even though that was a question on her outline. Kloosterman Dep. at 193; Shell 450. She did not ask Mr. Larsen when Ms. Barnes spoke with him directly, nor did she ask about previous allegations

---

[6] Mr. Larsen said several times that he was never interviewed by Ms. Kloosterman. Larsen Dep. at 12, 81-82.

against any alleged harasser, which included not just Mr. Turney but at least three others as Ms. Barnes identified.

       e.       Ms. Kloosterman did not ask all of the witnesses about all of Ms. Barnes' allegations unless Ms. Barnes or Mr. Turney identified them as a witness. Kloosterman Dep. at 146-147. As a workplace investigation standard, this is only partially reasonable. Although it is frequently unnecessary to ask every witness about every allegation, the investigator must ask those witnesses about allegations where it can reasonably be expected they have information, can clarify the incident or put it into a clearer context. Ms. Kloosterman's mistake was she did not employ that flexibility and apparently as one of her investigative protocols, asked witnesses about allegations *only* if those witnesses were identified.

One explanation for Ms. Kloosterman's limited questioning could be that she saw her role as having to protect the company from liability. After all, in the Introduction section of her written "Interview Questions" for the various witnesses, she never notifies the complainant, alleged harassers or witnesses that she is a neutral investigator or read to them what is commonly referred to as an "Upjohn" or "corporate Miranda" warning – i.e., letting the witness know where her loyalty lies.[7] Kloosterman Dep. at 97, Interview Questions for J. Barnes, Shell 1111.

Furthermore, in Ms. Kloosterman's document "Questions for Jesse Barnes" (Shell 506-509), she makes reference to the "purpose" of certain questions to be:

> "Affirmative Defense, 1st Prong: Employer must take reasonable care to prevent and promptly correct harassment; to test agency's burden to take immediate and appropriate corrective action."

> "Affirmative Defense, 2nd Prong: Employee's duty to exercise reasonable care."

These references are to affirmative defenses an *employer* like Shell has available to it to defend against complaining employees like Ms. Barnes in a civil lawsuit pursuant to the dual United States Supreme Court cases of *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Ind., Inc. v. Ellerth*, 524 U.S. 742 (1998). *See supra* at section V(A).

Failure to ask about these subjects was a violation of accepted workplace investigation standards.

---

[7] This notice comes from *Upjohn Co. v. United States*, 449 U.S. 383 (1981) and is required to be given by attorneys, especially in-house attorneys, conducting investigations, but is commonly provided by non-attorneys so there is no confusion about the investigator's role and to make certain that internal attorney-client communications are protected.

### 3. The investigator failed to follow up or cross-check a multitude of responses

Permeating investigative interviews are witness statements provided to the investigator which the investigator had not previously heard. If the fact or statement relates to the subject matter of the investigation, the investigator must, of course, ask follow up questions to determine whether the fact or statement is sufficiently relevant to include it in the report for consideration by the decision makers.

"Following-up" primarily means asking the declarant witness additional questions, but might also mean asking the complainant, the alleged harasser and other witnesses about the statement, as well as exploring whether any documents exist relative to the subject.

One of the serious violations of investigative standards was Ms. Kloosterman not returning to Ms. Barnes and Mr. Turney for second interviews to ask them follow-up questions based on what she heard in the previous witness interviews. There were allegations and negative comments made against both Ms. Barnes and Mr. Turney that they should have had the opportunity to rebut and explain.

Ms. Kloosterman failed to follow-up on many witness statements relevant to the investigation. By way of example:[8]

      a.      Mr. Turney's contradictory statements about Ken Forman running his hands through Ms. Barnes' hair at first saying he had "no recollection" then "If you talk with Ken, you will see he means nothing by it." Kloosterman Dep. at 261.

      b.      Mr. Turney's statement, "[Jeremy and Ms. Barnes] mess around a lot and joke around and then she gets mad at me for not intervening." Shell 1123; Kloosterman Dep. at 251.

      c.      Mr. Turney's statement, "There are times when things people do are not appropriate." Kloosterman Dep. at 264.

      d.      Mr. Turney's statement "I'll be friendly but there will be no extra." Kloosterman Dep. at 267.

---

[8] These are only examples of Ms. Kloosterman's failure to follow-up, because there is no way to know how many facts or statements were told to her during the interviews that she did not note, especially if it was her judgment that the facts or statements were not relevant to the investigation. With an experienced investigator, that would be within investigatory standards, but given Ms. Kloosterman's inexperience, I am confident she was unable to determine relevant facts and statements from those that would eventually be determined to be irrelevant. Ms. Kloosterman said "Not all follow-up questions were included in the notes if they were asked" although the witness response would have been included. Kloosterman Dep. at 138.

e.     Matt Empsen's statement about Mr. Turney being "very condescending to them and more specifically Jesse." Kloosterman Dep. at 102-104.

f.     Mr. Empsen's statement about Mr. Turney, "I have seen [Mr. Turney] say inappropriate comments to all women in the office, body language, things he would say, how he postures himself around other females." Kloosterman Dep. at 105-107.

g.     When asked if Mr. Turney asks others about their personal lives, Mr. Empsen's response, "Yes. That is one of [Mr. Turney's] things, and he's one to share his. He thinks it's okay to ask about relationship status. I have noticed he has done that with people on his team." There was no question about whether Mr. Empsen heard Mr. Turney make similar comments to men. Kloosterman Dep. at 105-107.

h.     Ken Forman's statements about Ms. Barnes, "She played the female card as long as it benefitted her," "She takes things the wrong way often. I recognized a long time ago that she is an edgy one. "She's been treated wrong for her looks in the past." Kloosterman Dep. at 144.

i.     Mr. Foreman was not clear in his answer about whether or not he put his hands through her hair. Kloosterman Dep. at 145, 155-156.

j.     Wayne Fletcher's comment, "I have heard guys make comments to other women" and "Inappropriate things to her - I think things have been directed towards her." Kloosterman Dep. at 162-164.

k.     Wayne Fletcher's comment that, "It seems like he might not be giving her a fair shake because she is a woman." Shell 1164.

l.     Dan Krise's statement that Shell is a "men-dominated environment" and "I think it is a tough work environment for women." Kloosterman Dep. at 167-168.

m.     Penny Robbins' comment about Mr. Turney, "He thinks he is a ladies' man. Him and Robin Grouette would flirt." Kloosterman Dep. at 178.

n.     Ms. Barnes telling Jeremy Greene she thought certain comments by Mr. Turney were "borderline offensive." Kloosterman Dep. at 184.

o.     Mr. Greene's statement, "[Ms. Barnes] has talked to me about the [Mr. Turney] situation before, and I can see her points." Kloosterman Dep. at 184.

p.     Mr. Greene's statement, "There are things she has taken offense to that she shouldn't have." Kloosterman Dep. at 185.

q.     Mr. Greene's statement that a male supervisor referring to a female subordinate as a "hot blond" was normal talk. Kloosterman Dep. at 186.

    r. Shane Sollinger's statements "I have been disappointed in the way [Mr. Turney] conducts his business and things he talks about" and "But one of my team members he has taken it out of context and I confronted it. He backed down. He has a tendency to talk about his people to other people even in negative ways." Kloosterman Dep. at 193.

    s. Ms. Barnes' allegation about a comment to her about cutting shorts at the golf outing, the identifying a witness, "Tina could have heard." She helped me set up the tent." Ms. Kloosterman did not even ask who Tina was or her last name, much less try and speak with her. Kloosterman Dep. at 217-222.

    t. Ms. Kloosterman did not ask Mr. Turney if he told others he thought about them in the shower. Kloosterman Dep. at 255.

    u. Hondo Blakley's statement, "I see a lot of banter back and forth, joking, friendly." Kloosterman Dep. at 203.

    v. Mr. Blakley's statement that Ms. Barnes was "Talking about her personal life, boyfriend." Kloosterman Dep. at 203.

    w. Mr. Blakley's statement that Mark Hoover called Ms. Barnes a name, but did not fill in the blank and actually say "bitch." Kloosterman Dep. at 206.

    x. Mr. Blakley's statement, "Chris Anderson cautioned hiring her because she is 'trouble' and we will all end up in the same position as the last guy." Kloosterman Dep. at 207.

    y. Mr. Blakley's statement about Ms. Barnes, "She has dealt as much as she received. In some situations she started it but seemed joking banter back and forth." Kloosterman Dep. at 208-209.

    z. In Penny Robbins' interview (the only female witness other than Ms. Barnes) there were no questions about Ms. Barnes' specific allegations Kloosterman Dep. at 174-179.

  These twenty-five examples (and again, there are sure to be many more) indicate a departure from acceptable workplace investigation standards, and illustrate Ms. Kloosterman's inexperience (or her unwillingness or inability) to forcefully question witnesses in this context.

  Failure to follow-up on these subjects was a violation of accepted workplace investigation standards.

**D.    Shell Failed To Meet Standard 4 – The Investigator Failed To Include Facts Sufficient For The Decision Makers To Judge The Credibility Of The Complainant, Witnesses And Alleged Harassers**

It is well established that making credibility determinations is clearly within the province of a workplace investigator. *See, e.g., Kestenbaum v. Pennzoil*, 108 N.M. 20, 766 P.2d 280 (1988), *cert. denied*, 490 U.S. 1109 (1989) (A jury awarded $1 million in contract damages to a vice president discharged as a result of a faulty harassment investigation. The court cited the investigator's failure to distinguish between direct evidence and hearsay, *failure to make credibility determinations*, and failure to conform to professional investigation standards, and admonished the employer for not actively overseeing the investigation).

The Association of Workplace Investigators in its "Guiding Principles" under its "Witness Interviews" section states:

> The interview presents a unique opportunity to assess witness credibility. The investigator should put himself or herself in a position to determine the credibility of witnesses relative to one another.

Ms. Kloosterman conceded that part of her job as an investigator is to assess the credibility of the witnesses and reach conclusions. Kloosterman Dep. at 41. She assesses credibility in an investigation by validating and corroborating the evidence and partially by assessing the witnesses' demeanor. Kloosterman Dep. at 42-43.

Up to that point in her explanation, Ms. Kloosterman's comments were reasonable and well-grounded in workplace investigation standards. Unfortunately, her actions in this investigation belie those general statements.

Ms. Kloosterman said that in order to believe an allegation of harassment "there needs to be some type of [documentary] evidence or a witness." Kloosterman Dep. at 225, 254. The standard that Ms. Kloosterman articulates is entirely contrary to established workplace investigation standards and applicable law, and is another example of Ms. Kloosterman's inexperience with investigations and her unfamiliarity with Shell's own company policies and the law.

Workplace standards do not require objective or corroborating evidence before an allegation of discrimination or harassment can be believed. In fact, that is much of the point of assessing credibility, because objective evidence is so often non-existent, the decision makers must rely on who they believe or who is most likely to be providing an accurate account of the events.

Shell's human resources policies certainly do not require objective or corroborating evidence in order to determine harassment or discrimination occurred. In fact, Shell does not establish *any* standard for determining when a complainant is to be believed.

Ms. Kloosterman also does not seem to understand how disciplinary decisions might be made, that is, many alleged harassers are disciplined or even terminated not because allegations against them are "proven," but merely because the allegations are likely to have occurred or even because they might possibly have occurred. And is certainly not uncommon for a jury to believe the complainant over the alleged harasser in a so-called "he said she said" case.

Ms. Kloosterman's belief that an allegation has to be objectively substantiated to be believed, led her to her conclusion that not one of the witnesses she interviewed was lying, and everyone was telling truth. Kloosterman Dep. at 96, 166. Taken to the extreme, this would lead to a ridiculous result. Hypothetically, if Ms. Kloosterman was investigating the allegation that John Doe sexually attacked Mary Smith while they were alone in an elevator, and John admitted being in the elevator but having no physical contact with Mary, and there was no objective evidence of the attack, Ms. Kloosterman would report that both John and Mary were telling the truth, which could not be. Ms. Kloosterman might say that both could be telling the truth because they just had different perceptions of the event, but that would be an unreasonable conclusion given the facts.

Because she could not find objective evidence to validate certain allegations, Ms. Kloosterman provided no information to the decision makers regarding the "pick up your ass" comment during CPR training (Kloosterman Dep. at 254); that Hondo Blakley took a picture of Ms. Barnes' behind (Kloosterman Dep. at 220-242); or that Mr. Turney told Ms. Barnes he thinks about her in the shower. (Kloosterman Dep. at 240-245).

Even further than not making credibility determinations or providing her thoughts or observations in an investigative report, Ms. Kloosterman said the witnesses were telling the truth (including the alleged harassers) because they did not have a reason to lie. Kloosterman Dep. at 117-119, 145, 166. It is one thing for Ms. Kloosterman to determine that a witness was not lying, but quite another to believe alleged sexual harassers have no reason to lie. Obviously there are many reasons an alleged harasser might lie, including: not to be disciplined; not to be demoted; not to be fired; not to lose money; not to expose his actions to family, friends and co-workers; not to expose himself to potential criminal action; not to have the allegations be made public; to be consistent with prior falsehoods; and not to lose a license or certification.

Ms. Kloosterman was asked about Mr. Turney saying he did not recall to several questions, rather than her conclusion that he was being untruthful. Her very naïve statement was, "Because for the investigations we ask and require all employees to be honest in their responses and share their recollection. And if they are not honest, that could be ground for discipline." Kloosterman Dep. at 258-259.

But in fact, Ms. Kloosterman, again, was inconsistent throughout the investigation. Even though there was corroboration of the allegation, Ms. Kloosterman failed to conclude that Mr. Turney mocked Ms. Barnes after she told him, "I do not come to work to hear that I'm pretty." Kloosterman Dep. at 255. Both Ms. Barnes and Wayne Fletcher confirmed Mr. Turney's comment. Kloosterman Dep. at 256-258.

Ms. Kloosterman did not even "consider" that Mr. Turney was lying when there were two people stating a fact to the contrary. Kloosterman Dep. at 258:

> Q: Do you really believe than an employee accused of sexual harassment is going to be completely honest about everything when you're interviewing him?
> A: Yes, I believe they should be.
> Q: You believe they should be. Do you believe they are?
> A: Yes.

Kloosterman Dep. at 259.

Ms. Kloosterman's failure to make meaningful credibility determinations, combined with the fact that she did not produce an investigative report violates workplace investigation standards of providing sufficient information to the decision makers.

> **E.** **Shell Failed to Meet Standard 5 – The Investigator Failed To Prepare An Investigative Report, And The "Investigation Overview" Failed To Provided Necessary Information**

Although Ms. Kloosterman may think she prepared an investigative report, for this investigation, no investigative report was in fact prepared. Instead, at the conclusion of the investigation, Ms. Kloosterman prepared an "Investigation Overview." Shell 1167-1169. At best, the document is indeed merely an "overview" of the investigation, but even as an overview it hardly paints an accurate or complete picture.

The entire Investigative Overview is only 2½ pages long, but the actual "Summary of Findings" is only two paragraphs. This Investigative Overview fails to provide myriad information necessary for the decision makers to reasonably make a determination of discipline and remedial action.

Although sometimes expressed in different ways, the Association of Workplace Investigators ("AWI") has summarized the contents of the investigative report as may containing:

a. A statement of the scope and the issues;
b. An explanation of the investigation process;
c. A discussion of the evidence relied upon by the investigator;
d. An identification of the employer policies involved, if any;
e. An identification of any evidentiary standard used; and,
f. A statement of the investigator's findings and conclusions.

Reviewing those standards against what Ms. Kloosterman produced, the Overview is woefully deficient:

a. *A statement of the scope and the issues:* The Investigative Overview states the "Allegation" but not the scope or the issues. In fact, the Investigative Overview doesn't enumerate (even by reference) Ms. Barnes' detailed allegations. Someone reading this Investigative Overview would literally have no idea of the nature of Ms. Barnes' allegations other than she alleged "harassment, specifically name calling, belittling, inappropriate touching and comments."

The scope of possible allegations with that vague description is limitless.

b. *An explanation of the investigation process:* The Investigative Overview provides absolutely no explanation of the investigation process. Ms. Kloosterman fails to disclose facts that would place the investigation into context for the decision makers, such as:

1. the complainant and alleged harasser were interviewed (there is literally no indication that Ms. Kloosterman spoke with either the complainant or the harasser)
2. the witnesses interviewed
3. any sense of how long the investigator spent with the interviewees
4. summary of Ms. Barnes' complaints
5. summary of Mr. Turney's responses, including what he admitted and what he denied (in fact at his interview Mr. Turney admitted several allegations)
6. summary of the other alleged harassers' responses, including what they admitted and what they denied
7. summaries of statements of any witness
8. an analysis of the statements pointing out support or discrepancies
9. credibility determinations and an analysis supporting those determinations
10. documents reviewed (documents reviewed are not attached to the Investigative Overview)
11. whether or not any further information was necessary to complete the investigation

c. *A discussion of the evidence relied upon by the investigator:* Not provided.

d. *An identification of the employer policies involved, if any:* Not provided, except that Ms. Kloosterman references that Mr. Turney violated Shell's Code of Conduct, Section 3.3 Harassment. There is no reference to Shell's "zero tolerance" policy or any other policy at issue in this investigation including the Shell's Anti-Harassment Policy and Equal Employment Opportunity. Shell 1056-1057.

    e.   An identification of any evidentiary standard used: Not provided. Ms. Kloosterman's floating phrase "evidence to support" in the "Summary of Findings" section with no further explanation is not at all helpful for the decision makers to determine a remedial or punitive course of action. The decision makers should be told whether Mr. Turney and the other alleged harassers admitted the allegations, or if they denied them but other witnesses were found credible and made statement to the contrary, or there documents that show these events occurred, etc.

    f.   *A statement of the investigator's findings and conclusions*: Ms. Kloosterman provides a "Summary of Findings" but does not address all of Ms. Barnes' allegations, for example the following are not included which include allegations of inappropriate touching, pay differential and potentially sexually harassing conduct:[9]

        1.   "I have been shown a 'selfie' of my supervisor in his underwear by him."

        2.   "I have been brought into situations with an employee that were not necessary because my supervisor thought it was funny that the other employee and myself did not like each other."

        3.   "My supervisor has referred to my significant other as a nerd."

        4.   "During a pulse survey meeting, when I spoke up about an opinion I had, I was told the meeting was not about me by my supervisor."

        5.   "At a work charity golf tournament, I was asked more than once why I was not wearing shorts at this event and if my supervisor could cut my pants into shorts, as well as other supervisors joined in and took a picture of by backside (buttock) and saved on phone."

        6.   "I was informed to 'bullshit' my superintendent on what my position competency [sic] by my supervisor."

        7.   "My supervisor touches my arm and/or leg the majority of the time I have a meeting or talk to him one on one."

        8.   "I was told I am only right if my supervisor allows me to be by my supervisor."

---

[9] Some typographical errors have been corrected from the original document at Shell 526.

9. "I have addressed my supervisor about an issue I was having with a co-worker and was told that is the way it was going to be."

10. "This co-worker had lied to me saying that my supervisor was mad at me because I was falling behind on work. When I asked my supervisor what I needed to catch up on, he denied that he had said anything."

11. "My supervisor told me I was intended to be a pay grade 7 but was told by OM that I would be an 8 with no explanation."[10]

12. "I expressed a concern to my supervisor a CPR trainer that instructed at our office that when I was performing CPR the instructor told me to 'pick my ass up' in front of male colleagues. My supervisor said 'well did you pick it up?' in a laughing manner."

13. "In my goals on HR online I entered I would attempt to visit the field every quarter for I am office based and want to gain knowledge of the field. When I asked permission to spend a day in the field with a female colleague, I was told by my supervisor I was only allowed to go for 4 hours. When I asked why and/or if he needed me for something that prevented me from spending an 8 hour day in the field, he responded with no, I just don't think you need to spend the whole day in the field."

14. "I have been called a bitch by numerous people in the office."

15. "I was told when I voiced some of my concerns that 'I need to stop playing the victim.'"

16. "I have been told by co-workers that maybe if they wore tight pants and batted their eyes they could get what they wanted, suggesting that this is what I do."

17. "I have been referred to as a 'window licker' which I believe was to insult my intelligence."

---

[10] Ms. Kloosterman did not investigate Ms. Barnes' paygrade complaint (being a level 8 instead of moving up to a level 7) except to speak with HR Account Manager Michelle Priest. Kloosterman Dep. at 248. However, even that information was not included in the Investigative Overview.

18. "Superintendent had written me a note to tell me he thought I did a good job regarding certain projects and CC's my supervisor on the email. I was then taken aside by my supervisor and a door was closed so the superintendent could not hear supervisor talk down to the things the superintendent just gave me recognition for."

19. "I have been asked by my supervisor multiple times if I thought about him over the weekends."

20. "My supervisor has told me that he has thought of about me while showering."

21. "My supervisor encourages arguments among my team."

22. "I was told I was not smart enough by a supervisor to be able to do something."

23. "A co-worker had put his hands through my hair without permission."

24. "My supervisor mocks me when I have informed people I do not like to be touched."

25. "My supervisor has mocked me when I told him I do not come to work to hear that I am pretty when a co-worker referred to me as pretty. My supervisor kept saying it when I addressed him 'I don't come to work to hear I am pretty' he would say to me."

26. "I feel like I am bullied at work. On a daily basis I feel upset and frustrated. I have become very unhappy while at work. My motivation level has decreased and my communication is lacking. This is affecting my work and personality at work."

*See* Ms. Barnes' complaint at Shell 526. The decision makers have no idea that the six listed items are really six of at least *thirty-two* issues raised by Ms. Barnes. The report would give the indication that all Mr. Turney did, or all Ms. Barnes complained about, was what is included in the Summary of Findings.

The failure to draft an investigative report is fatal to the investigative process. Combined with the fact that the investigator did not provide details of the investigation to her supervisor/decision maker, it is clear Shell's internal investigatory protocols, at least in this working group, are entirely deficient and contrary to accepted workplace investigation standards.

**F.    Shell Failed To Meet Standard 6 – The Investigator Was Unfamiliar With The Application Of Company Policies And The Applicable Law**

As previously stated above, Ms. Kloosterman exhibited a fundamental misunderstanding of the investigative process and what is or could be relevant to demonstrate a violation of the law, and her lack of knowledge about the "severe or pervasive" standard under Title VII and related statutes.

Also previously stated was Ms. Kloosterman's failure to recognize that *Shell's own policies* do not limit a determination of harassment, discrimination or retaliation to just those that "isolated incidents" or only those occurring in the physical space of the work buildings or during work hours. *See* Shell policies at Shell 1056-1057, and Shell Code of Conduct at Shell 588-631.

Shell has a "zero tolerance" policy for harassment and a parallel Code of Conduct. Shell 588-631, 1056-1057. Despite those policies and the fact that Ms. Kloosterman found that Mr. Turney and others committed various violations of the harassment policy and the Code of Conduct, she did not conclude the behavior constituted a hostile work environment for Ms. Barnes. Kloosterman Dep. at 326-327. Given the deficiencies of the investigation, Ms. Kloosterman could not have drawn that conclusion and Ms. Soudelier and other decision makers should not have relied on those conclusions. As stated throughout this Report, her investigation was fatally flawed, she was inexperienced and she exhibited a shallow understanding of the applicable law.

**G.    Shell Failed to Meet Standard 7 – The Company Failed To Investigate All Of Ms. Barnes' Complaints**

The Shell Anti-Harassment Policy addresses workplace investigations in one sentence: "All matters will be promptly and confidentially investigated." Dep. Ex. 4, Shell 1056. The Shell Equal Employment Opportunity Policy reads the same. Dep. Ex. 4, Shell 1057.

Shell initiated an investigation in response to Ms. Barnes' complaints in November, 2016. After the investigation was completed in December, 2016, Ms. Barnes filed an EEOC Charge of Discrimination on April 25, 2017. Dep. Ex. 48, Shell 546. Ms. Soudelier could not recall whether any investigation was conducted after the Charge was filed but there is no indication otherwise that one had. Soudelier Dep. at 217-218.

At the time of Ms. Barnes' EEOC filing, Michelle Priest was an HR Account Manager Upstream Appalachia Asset who reported to Kelly Soudelier. Priest Dep. at 15-16. At her deposition Ms. Priest testified as follows about the extent to which there was an investigation into Ms. Barnes' new EEOC claims, i.e., claims in the EEOC Charge that were not previously investigated:

1. There was no investigation of the allegation that "Turney whispered in my ear during work meetings in front of my co-workers." Priest Dep. at 160.

2. There was no investigation of the allegation that "Foreman told me that I sound like his wife bossing me around." Priest Dep. at 172-173.

3. There was no investigation into the allegation "In or about May 2016, I complained of sexual harassment to Hondo Blakley (male), Process Improvement Lead. I asked Blakley for help and expressed that I was upset at the way that I have been treated by Turney and male co-workers because I am a female. In response to my complaint, Blakley told me that this was out of character for me and that I needed to make sure to control my emotions." Priest Dep. at 195-196.

4. There was no investigation into the allegation "After my complaint Blakley, Turney excluded me from work-related meetings. Turney became short-tempered with me and exercised increased control over me and my actions. He commented that he needs to watch what he says around me alluding to my complaint about him to Blakley." Priest Dep. at 198. Ms. Priest had no recollection if she spoke with Mr. Turney or if she did whether she spoke with anyone else other than Mr. Turney. Priest Dep. at 199-200, 202-203.

5. There was no investigation into the allegation "In or around October 16, Foreman asked me what I accomplished in 2016 'other than not dyeing (my) hair for a whole year.'" Priest Dep. at 217. Ms. Priest thought there may have been an investigation in the first eleven days of August, 2017 prior to the EEOC Position Statement being submitted but could not recall details or who might have conducted the investigation. Priest Dep. 221-222.

6. There was no investigation into the allegation "Turney and Blakley conducted the interviews and made the hiring decisions. During my interview, Turney and Blakley laughed when I told them that I wanted the position because I wanted to advance my career at Respondent. During the interview, Turney and Blakley emphasized reasons why they believed I would not do well in the position." Priest Dep. at 233. Mr. Priest did not recall any details of an investigation or who may have conducted it. Priest Dep. at 234.

7. There was no investigation into the allegation "After Green was promoted to the position, Turney told me that he was worried that I might have received the promotion because I had more time in the group than Green." Priest Dep. at 236.

8. There was no investigation into the allegation that "Greg Larsen (male), Operations Asset Manager, told me that I 'need to think about how [I] present [my]self in the office and what [I] talk about at work.'" Priest Dep. at 246.

Ms. Priest explained that the new EEOC claims were not investigated because they "were not materially different" than the allegations previously investigated in December, 2016. Priest Dep. at 176. Although Ms. Priest thought she recalled speaking with Mr. Turney regarding some of the new claims, there was clearly no proper investigation conducted. Ms. Barnes was not interviewed by the company and no written report was ever prepared.

Ms. Priest also said she "took a look" at the new claims in the EEOC Charge to determine "if a more thorough internal investigation needed to be conducted." She determined a further investigation was not necessary and that the company would leave it in the hands of the EEOC. Priest Dep. at 203. Given the fact that Ms. Priest herself was an inexperienced workplace investigator,[11] she was in no way qualified to make that determination.

Ms. Barnes made additional complaints in October, 2017, and again in writing on January 29, 2018. Dep. Ex. 61, Shell 799. Michelle Priest responded to Ms. Barnes that she would notify Natalie Gawecki in the Human Resources department. Soudelier Dep. at 235. Ms. Soudelier could not recall whether any investigation was conducted after the Charge was filed but there is no indication otherwise that one had.

Ms. Barnes complained about her performance review in a March 3, 2017 email to Leslie Dunlop (Ethics & Compliance Manager). Dep. Ex. 58, Shell 729; Soudelier Dep at 169. On March 13, 2017, Ms. Barnes was informed that no retaliation had been found by the Company related to her additional complaints. Dep. Ex. 58, Shell 730.

On April 12, 2017, Ms. Barnes again complained to Ms. Soudelier in a telephone conversation and Ms. Soudelier took multiple pages of handwritten notes. Dep. Ex. 59, Shell 1049-1055. Soudelier did not ask follow up questions to Ms. Barnes' concerns. Soudelier Dep. at 202. Ms. Soudelier responded in June 19, 2017 email to Ms. Barnes that her paygrade was being increased and she would be receiving the associated pay benefits. Dep. Ex. 60, Shell 793. Ms. Barnes responded that she felt she had been criticized as a result of discrimination and retaliation for making complaints of sexual harassment. Dep. Ex. 60, Shell 792. There was no investigation into these complaints. Soudelier Dep. at 231, 233-234.

---

[11] Ms. Priest only received an initial training session at Shell on investigations when she first started with the company in February, 2007, and could not recall what it covered. Priest Dep. at 7, 23-24. When asked how many investigations she had conducted, she said it was "most likely" more than one, but doesn't remember more than five. She then said she thought there were two investigations that she was involved in, one being a previous investigation regarding Jesse Barnes. Priest Dep. at 24-25.

On January 29, 2018, Ms. Barnes notified Michelle Priest via email that she was being subjected to retaliation as a result of filing an EEOC Charge. Dep. Ex. 61, Shell 799. Ms. Priest responded the same day and said she would reach out to Ms. Barnes to discuss. Dep. Ex. 61, Shell 799.

On March 6, 2018, Ms. Barnes was informed that no discrimination or retaliation had been found by the Company related to her additional complaints.

Failing to investigate is a fundamental flaw of workplace investigation standards.

## VIII.    EXPERT QUALIFICATIONS, TESTIMONY AND COMPENSATION

A copy of my current curriculum vitae is attached to this report, which contains my qualifications and a list of my publications authored in the previous 10 years.

Among other matters in which I have been retained as an expert, I have testified and been qualified as an expert witness in workplace investigations by the Honorable William H. Yohn, Jr., U.S.S.J. in the federal court trial of *Dunn v. Mercedes-Benz of Fort Washington, Inc.*, Docket No. 10-cv-1662 (E.D. of Pa. 2012), April, 2012.

In the past four years, I have testified as an expert by deposition in the matter of *Debra Confer v. State of New Jersey and Craig Reiner*, Superior Court of NJ, Law Division, Mercer County, Docket No. MER-L-1727-15; and anticipate testifying as an expert by deposition shortly in *Gregory Sherrill v. Care Point Health Management Associates, LLC, Brian McDonough, Roberto Gonzalez and John Does 1-10,* Superior Court of New Jersey; Law Division: Hudson County, Docket No.: HUD-L-3217-17.

I am charging a fixed fee of $8,500 for the study and preparation of this report. My fee for preparation for, and testimony at, a deposition, hearing or trial will be an hourly rate of $450/hr unless otherwise agreed upon with you.

I reserve the right to amend or supplement any portion of this report, including my findings and opinions, if and when additional relevant information is discovered and provided to me.

Please let me know if you need any further information or an explanation of any portion of this report.

Michael J. Torchia, Esq.

Exhibit 23



# Compressed Transcript of the Testimony of
# MEGAN KLOOSTERMAN, 8/27/19

**Case:** Barnes v. Shell Exploration & Production Company Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

JESSE BARNES,　　　: CIVIL ACTION
　　　　　　　　　:
　　　Plaintiff,　　:
　　　　　　　　　:
v.　　　　　　　　:
　　　　　　　　　:
SHELL EXPLORATION AND　:
PRODUCTION COMPANY　　:
APPALACHIA; SHELL　　:
EXPLORATION AND　　　:
PRODUCTION COMPANY;　:
SHELL OIL COMPANY,　　:
　　　　　　　　　:
　　　Defendants.　: NO. 18-1497

- - -

ORAL AND VIDEOTAPED DEPOSITION of MEGAN

KLOOSTERMAN, taken at Shell Woodcreek, 150 N. Dairy

Ashford Road, Houston, Texas 77079 on August 27,

2019, beginning at 9:05 a.m., before Constance

Koenig, RMR and CSR in and for the State of Texas.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

## Page 2

1　APPEARANCES:
2
3　CONSOLE MATTIACCI LAW
　　BY: CAREN N. GURMANKIN, ESQUIRE
4　1525 Locust Street
　　9th Floor
5　Philadelphia, Pennsylvania 19102
　　(215) 545-7676
6　Gurmankin@consolelaw.com
　　Counsel for Plaintiff
7
8
　　TUCKER LAW GROUP
9　BY: JOE H. TUCKER, JR., ESQUIRE
　　1801 Market Street
10　Suite 2500
　　Philadelphia, Pennsylvania 19103
11　(215) 875-0609
　　Jtucker@tlgattorneys.com
12　Counsel for Defendants
13
14　ALSO PRESENT:
15　　Cynthia Bivins
　　　Jesse Barnes (By Telephone)
16　　Trey Solis, Videographer
17
18
19
20
21
22
23
24

## Page 3

　　　　　I N D E X
1
2　　　　　---
3　WITNESS:
4　MEGAN KLOOSTERMAN
5　EXAMINATION
6　By Ms. Gurmankin　　　　7
7
　　　　　EXHIBITS
8
　EXHIBIT NO.　　DESCRIPTION　　MARKED
9
10　Exhibit 13　LinkedIn Profile of Megan　23
　　　　　Kloosterman
　　　　　(NO BATES NUMBERS)
11
12　Exhibit 14　Chain of Emails with　48
　　　　　Attachments
13　　　　(Shell_0000523-529)
14　Exhibit 15　Chain of Emails with　55
　　　　　Attachments
15　　　　(Shell_0000345-353)
16　Exhibit 16　Email (from Priest to　68
　　　　　Kloosterman)dated December 5,
17　　　　2016 (Shell_0000510)
18　Exhibit 17　Questions for Jesse Barnes　77
　　　　　(Shell_0000506-509)
19　Exhibit 18　Interview Questions: Jesse　97
　　　　　Barnes (Shell_0001111-121)
20
21　Exhibit 19　Interview Questions: Will　98
　　　　　Turney (0001122-129)
22　Exhibit 20　Interview Questions: Matt　101
　　　　　Empsen (0001153-156)
23
24　Exhibit 21　Interview Questions: Mark　127
　　　　　Hoover (Shell_0001157-159)

## Page 4

1　Exhibit 22　Interview Questions: Ken　132
　　　　　Foreman (Shell_0001149-152)
2
　　Exhibit 23　Interview Questions: Wayne　158
3　　　　Fletcher (Shell_0001164-166)
4　Exhibit 24　Interview Questions: Dan　166
　　　　　Krise (Shell_0001130-131)
5
　　Exhibit 25　Interview Questions: Penny　175
6　　　　Robins (Shell_0001160-161)
7　Exhibit 26　Interview Questions: Jeremy　179
　　　　　Greene (Shell_0001141-144)
8
　　Exhibit 27　Interview Questions: Kelvin　190
9　　　　Flynn (Shell_0001145-148)
10　Exhibit 28　Interview Questions: Shane　192
　　　　　Sollinger
11　　　　(Shell_0001162-163)
12　Exhibit 29　Questions for Responsible　193
　　　　　Official in Complainant's
13　　　　Chain of Command/in
　　　　　Agency's Anti-Harassment
14　　　　Chain (Shell_0000450)
15　Exhibit 30　Email (from Barnes to　269
　　　　　Kloosterman) dated
16　　　　December 6, 2016 with
　　　　　Attachments
17　　　　(Shell_0000339-344)
18　Exhibit 31　Chain of Emails with　270
　　　　　Attachments
19　　　　(Shell_0000451-485)
20　Exhibit 32　Jesse Barnes –　273
　　　　　Investigation Overview
21　　　　(Shell_0001167-169)
22　Exhibit 33　Memo (from Larsen to　311
　　　　　Turney) dated December 15,
23　　　　2016 (Shell_0000851)
24

Page 5

```
 1        Exhibit 34   Chain of Emails with      312
 2                     Attachments
                       (Shell_0000501-503)
 3        Exhibit 35   Chain of Emails           315
                       (Shell_0000498-500)
 4
          Exhibit 36   Chain of Emails           326
 5                     (Shell_0000639-641)
 6        Exhibit 37   Chain of Emails           329
                       (Shell_0000669-671)
 7
          Exhibit 38   Chain of Emails           333
 8                     (Shell_0000737-740)
 9                         - - -
10           PREVIOUSLY MARKED EXHIBITS
                       PAGE FIRST
11    EXHIBIT NO.    DESCRIPTION      REFERENCED
12        Exhibit 2    Training session for      325
                       supervisors on the Shell
13                     Code of Conduct
                       (Shell_0000802-806)
14
          Exhibit 3    Our Code of Conduct       36
15                     (Shell_0000588-631)
16        Exhibit 4    Shell Anti-Harassment Policy  38
                       and Shell Equal Opportunity
17                     Policy
                       (Shell_0001056-057)
18
          Exhibit 5    Interview Questions: Hondo   202
19                     Blakley, 12/7/2016
                       (Shell_0001132-1136)
20
21
22
23
24
```

Page 6

```
 1           THE VIDEOGRAPHER:  We are now on
 2    record.  The time is 9:05 a.m.  The date is
 3    August 27, 2019.
 4           This is the start of Media Unit No. 1
 5    of the videotaped deposition of Megan Kloosterman in
 6    the matter of Jesse Barnes v. Shell Exploration and
 7    Production Company Appalachia, et al., filed in the
 8    United States District Court for the Middle District
 9    of Pennsylvania.
10           This deposition is being held at Shell
11    Woodcreek in Houston, Texas.  My name is Trey Solis
12    from the Summit Court Reporting Service Company.
13    The Court Reporter is Connie Koenig, also from
14    Summit Court Reporting.
15           Counsel, would you please state your
16    appearances for the record, after which the Court
17    Reporter will swear in the witness.
18           MS. GURMANKIN:  Caren Gurmankin,
19    Console Mattiacci Law, for the Plaintiff.
20           MR. TUCKER:  Joe Tucker and Cynthia
21    Bivins on behalf of Shell Oil.
22           THE WITNESS:  Megan Kloosterman.
23
24
```

Page 7

```
 1           MEGAN KLOOSTERMAN, having been first
 2    duly sworn to tell the truth, was examined and
 3    testified as follows:
 4                      ---
 5              EXAMINATION
 6                      ---
 7    BY MS. GURMANKIN:
 8       Q.  Ms. Kloosterman, good morning.
 9       A.  Good morning.
10       Q.  We just met but for the record, my name is
11    Caren Gurmankin, and I have the privilege of
12    representing Jesse Barnes in a lawsuit that she has
13    filed against Shell for sex discrimination and
14    retaliation.
15           Have you ever had your deposition taken
16    before?
17       A.  I have not.
18       Q.  Okay.  I will go through the rules with you
19    so that you and I are on the same page.
20       A.  Okay.
21       Q.  I'm going to ask you a series of questions
22    today.  If I ask you a question that you don't
23    understand, just let me know and I'll be happy to
24    rephrase it.
```

Page 8

```
 1       A.  Okay.
 2       Q.  If I ask you a question and you answer my
 3    question, I'm going to assume that you've understood
 4    it and you have answered it accordingly.
 5           Do you understand that?
 6       A.  I do.
 7       Q.  Okay.  As you have been doing perfectly, we
 8    need you to keep giving verbal responses to all of
 9    my questions.  The deposition is being recorded by
10    video but will also result in a written transcript
11    and we need to make sure that the Court Reporter can
12    capture everything that you are trying to get
13    across.  Okay?
14       A.  Yes.
15       Q.  Even though this deposition is taking place
16    in a conference room at Shell in Houston, it has the
17    same force and effect as if you were testifying in a
18    Federal courtroom in front of a Federal Judge and
19    jury.
20       A.  Uh-huh.
21       Q.  You have just taken an oath to tell the
22    truth.  If you don't tell the truth, and that
23    includes saying you don't know when you do know or
24    you don't remember when you do remember, that's
```

2 (Pages 5 to 8)

Page 9

1   considered perjury, and that's a felony.
2          Do you understand that?
3     A. Yes.
4          MR. TUCKER: That's your
5   interpretation, Counsel, but she'll answer the
6   questions as asked.
7     Q. (BY MS. GURMANKIN) Do you understand lying
8   under oath is a perjury?
9     A. Yes.
10     Q. Okay. And you understand perjury is a
11   felony?
12     A. Yes.
13     Q. Okay. Is there any reason why you wouldn't
14   be able to testify truthfully today regarding events
15   that have occurred in the past?
16     A. There is no reason, no.
17     Q. For the sake of transcript and the Court
18   Reporter, even if you anticipate what my question is
19   going to be, try to let me finish my entire question
20   before you answer, and I'll try to make sure I let
21   you finish your entire answer before I ask the next
22   question. Okay?
23     A. Yes.
24     Q. What is your date of birth?

Page 10

1     A. ████████
2     Q. You're currently employed at Shell?
3     A. I am, yes.
4     Q. You currently work in the Philippines?
5     A. I do.
6     Q. How long have you been in the US?
7     A. Prior to moving to the Philippines?
8     Q. No. I'm sorry. On this trip.
9     A. Okay. I have been in the US since
10   August 9.
11     Q. And how long do you plan to remain?
12     A. I am leaving on the 31st of August.
13     Q. Back to the Philippines?
14     A. Yes.
15     Q. What's your educational background?
16     A. My educational background? I have a
17   bachelor's of business administration from Western
18   Michigan University. There my major was in human
19   resources management. And then directly after that
20   I went to the University of Illinois and received my
21   master's of HR and industrial relations.
22     Q. When did you get the bachelor's?
23     A. I graduated from Western in 2013.
24     Q. And from the University of Illinois?

Page 11

1     A. I graduated from there in December of 2014.
2     Q. When did you start working at Shell?
3     A. In February of 2015.
4     Q. And that was as a full-time employee?
5     A. Yes.
6     Q. Prior to that, you interned at Shell for a
7   period of time?
8     A. I did intern for Shell in the summer of
9   2014.
10     Q. Prior to starting work at Shell as a
11   full-time employee in February of 2015, did you have
12   any other full-time employment?
13     A. I was employed when I was receiving my
14   undergraduate degree as an HR intern, but it was for
15   the duration of two years.
16     Q. And who was that with?
17     A. It's a company called Humanex Ventures.
18     Q. Did you hold any position other than HR
19   intern there?
20     A. No.
21     Q. Any other employment prior to starting work
22   full-time at Shell in February of 2015?
23     A. No. I -- in my undergrad I had worked as a
24   waitress and then worked in the graduate career

Page 12

1   center, but that was part time.
2     Q. The graduate career center, that was at the
3   University of Illinois?
4     A. That's correct.
5     Q. That was when you were in your graduate --
6     A. Yes.
7     Q. -- program?
8          MR. TUCKER: Even though you may
9   anticipate her question, let her complete her
10   question so that you can hear the question,
11   understand the question and answer the question
12   asked. This is not a conversation you are having.
13   This is a question-and-answer period. Okay?
14          THE WITNESS: Yes.
15          MR. TUCKER: All right. So let her
16   finish her question, please.
17     Q. (BY MS. GURMANKIN) You're fine.
18          When you started working at Shell as
19   a -- as an intern, was that in HR?
20     A. Yes.
21     Q. What department?
22     A. I was at the Puget Sound refinery in HR.
23     Q. And what sort of duties were you handling
24   as an intern?

3 (Pages 9 to 12)

Page 13

1      A. My project -- I had -- it was on a project
2 basis, and my project was to help prepare for the
3 upcoming contract negotiations.
4      Q. When you started full time in February of
5 2015, what position were you hired into?
6      A. My job title was human resources account
7 manager.
8      Q. Which division or department?
9      A. I was in the unconventionals business in
10 the upstream department.
11      Q. Where were you based at that point?
12      A. Houston Woodcreek.
13      Q. Who did you report to when you were hired?
14      A. Erin Verdon.
15      Q. Her title?
16      A. As best I can recall, her job title at the
17 time was either HR team leader, HR manager.
18      Q. Do you remember who she reported up to?
19      A. I believe she reported to Rebecca McGarr.
20      Q. Do you recall Rebecca's title?
21      A. She would have been the VP of HR for
22 upstream.
23      Q. And just tell me what were your duties as
24 HR account manager for conventionals upstream?

Page 14

1      A. It was an HR generalist position where I
2 had a client group in the unconventionals business,
3 and I supported them with kind of end-to-end HR
4 queries or issues.
5      Q. Would that include employee relations
6 issues?
7      A. Yes.
8      Q. EEO matters?
9      A. Uh-huh.
10      Q. Yes?
11      A. Yes.
12      Q. Sorry; I didn't give you this instruction.
13 Also, for the record, just try to say yes --
14      A. Okay.
15      Q. -- so we make sure our Court Reporter gets
16 it down.
17      A. Okay.
18      Q. Performance management?
19      A. Yes.
20      Q. Benefits? Or did that -- was that someone
21 else's responsibility?
22      A. Our benefits is outsourced, but I handled
23 basic questions.
24      Q. But pretty much anything else HR related?

Page 15

1      A. Uh-huh.
2      Q. Yes?
3      A. Yes.
4      Q. And about how long did you hold that HR
5 account manager position?
6      A. Almost two years.
7      Q. Would that be until early 2017?
8      A. Let me think about the dates here.
9 February of 2015 -- until the end of 2016.
10      Q. And then what happened?
11      A. Then I was transferred to a new position.
12      Q. What was that?
13      A. That was also an HR account manager
14 position in New Orleans.
15      Q. Was that a promotion or a lateral move?
16      A. A lateral move.
17      Q. Why did that happen?
18      A. It was another job opportunity.
19      Q. Is it something that you applied for?
20      A. Yes.
21      Q. You saw a posting and you applied?
22      A. It -- so it wasn't managed via posting. It
23 was a job offer, a placement offer.
24      Q. So, in other words, someone came to you and

Page 16

1 said, We have this opening. Do you want to take it,
2 essentially?
3      A. Yeah.
4      Q. The job was not posted, as far as you knew?
5      A. It was not posted but I received a job
6 offer.
7      Q. Did it come with an increase in
8 compensation?
9      A. No.
10      Q. Were you still in the unconventionals
11 upstream division --
12      A. I was --
13      MR. TUCKER: Let her -- even though you
14 may anticipate, please let her finish. Okay?
15      THE WITNESS: Yeah.
16      A. (Continuing.) Deepwater.
17      Q. (BY MS. GURMANKIN) That was separate from
18 unconventionals?
19      A. Yes.
20      Q. Were your responsibilities essentially the
21 same?
22      A. Not exactly.
23      Q. How did they differ?
24      A. It was a mix. I still was an HR

4 (Pages 13 to 16)

Page 17

1    generalist, but I also reported directly to the VP
2    of HR and supported her on strategic priorities.
3        Q.  Who was that?
4        A.  Name was Vrissiis Katapodi.
5        Q.  Was she VP of HR for Deepwater?
6        A.  Yes.
7        Q.  Did you report to her the entire time you
8    were HR account manager for Deepwater?
9        A.  Yes.
10       Q.  Were you in New Orleans that whole time you
11   held that position?
12       A.  Yes.
13       Q.  About how long did you hold that position?
14       A.  Almost two years.
15       Q.  What were the strategic issues that you
16   helped the VP of HR with?
17       A.  An example is globally planning how many
18   employees we needed to support the business.
19       Q.  Anything else?
20       A.  Also talent agenda, talent agenda.
21       Q.  Is that like succession planning?
22       A.  Succession planning.
23       Q.  Performance management, or is that
24   separate?

Page 18

1        A.  Performance management was included in my
2    other duties.
3        Q.  Any other strategic initiatives that you
4    helped the VP of HR with during this period?
5        A.  To the best of my recollection, those are
6    the major items.
7        Q.  So you were in that position sometime until
8    about late 2018?
9        A.  Yes.
10       Q.  And then what happened?
11       A.  Then I was transferred to the Philippines.
12       Q.  And how did that come about?
13       A.  We were going through a reorganization in
14   HR, and we were posting on different -- everyone had
15   to post.  And there was an opportunity to go to the
16   Philippines to support the reorganization.
17       Q.  When you say "Everyone had an opportunity
18   to post," what does that mean?
19       A.  So it was a reorganization, and
20   everyone -- and there was a reduction in HR roles.
21   So everyone had to post on a new job.
22       Q.  So everyone had to apply for a new job?
23       A.  Yeah.
24       Q.  And interview?

Page 19

1        A.  Not necessarily interview.
2        Q.  So did you see an opening in the
3    Philippines?
4        A.  The overseas roles, the Philippines roles
5    were not posted.
6        Q.  How did you find out about them?
7        A.  My manager.
8        Q.  Did your job title change when you
9    transferred to the Philippines?
10       A.  Yes.
11       Q.  How so?
12       A.  My new title was HR transformation coach.
13       Q.  Was that a promotion?
14       A.  No.
15       Q.  Lateral?
16       A.  Yes.
17       Q.  When you transferred to the Philippines,
18   who did you report to?
19       A.  My manager's name was Stephanie Finn.
20       Q.  Her title?
21       A.  US operations manager.
22       Q.  Which division were you in at that point
23   when you transferred?
24       A.  It's our HR operations division.

Page 20

1        Q.  Do you still hold the HR transformation
2    coach position?
3        A.  When I was -- no.
4        Q.  When did that change?
5        A.  February of this year.
6        Q.  In your capacity as HR transformation coach
7    in the Philippines, just tell me what your
8    responsibilities were.
9        A.  I was helping to build the capability of
10   the HR advisors in Manila.
11       Q.  Can you explain what that means?
12       A.  So as they received different queries and
13   HR issues, I would help them with how to manage
14   those cases.
15       Q.  Did that include questions about employee
16   relation matters?
17       A.  Yes.
18       Q.  EEO matters?  I guess it's different in the
19   Philippines.
20       A.  In the Philippines they are supporting the
21   US.
22       Q.  Okay.  Were you also advising them on EEO
23   matters, how to answer questions about that?
24       A.  No.

Page 21

1      Q.  Was someone else engaged in that
2  responsibility?
3      A.  They don't manage those cases.
4      Q.  Who does over there?
5      A.  Nobody.  It's completed here.
6      Q.  All right.  Any other responsibilities as
7  HR transformation coach?
8      A.  No.
9      Q.  How did your position change in February of
10  2018?
11      A.  I was the team lead for the HR advice team.
12      Q.  Was that the team that you were a part of?
13      A.  A different team.
14      Q.  Still in the Philippines?
15      A.  Yes.
16      Q.  Was that a promotion?
17      A.  No.
18      Q.  Was that something that you had applied
19  for?
20      A.  I'm trying to recall if there was a posting
21  for this job.  It was a placement offer, as well.
22      Q.  Did you ever see a posting?
23      A.  Not that I can recall.
24      Q.  So someone came to you and said, We have

Page 22

1  got this open position.  Do you want it, basically?
2      A.  Yes.
3      Q.  Do you still report to Stephanie Finn?
4      A.  Yes.
5      Q.  You have reported to her consistently since
6  you transferred to the Philippines?
7      A.  Yes.
8      Q.  What are your responsibilities as team lead
9  for the HR -- is it advice team?
10      A.  Yes.  So I am responsible to supervise and
11  lead the team of about ten advisors.  They are
12  handling all -- any queries from my managers on HR
13  matters.  So I am supporting them and leading them
14  to do that.
15      Q.  Including regarding employee relations
16  matters?
17      A.  Yes.
18      Q.  And you have been in that position since
19  February of 2019?
20      A.  That's correct.
21      Q.  Do you have a LinkedIn page?
22      A.  Yes.
23      Q.  Is that something that you created?
24      A.  Yes.

Page 23

1      (Exhibit 13 was marked.)
2      Q.  (BY MS. GURMANKIN)  All right.  Hopefully
3  showing up on your screen is what's been marked as
4  Exhibit 13.  This is your LinkedIn page that I
5  accessed yesterday.
6      Does this look accurate?
7      A.  Yes.
8      Q.  You can take your time and go through it.
9      MR. TUCKER:  Take your time to look at
10  any documents she shows you.
11      A.  Yes, this looks accurate.
12      Q.  (BY MS. GURMANKIN)  For the first two
13  positions at Shell, the first two full-time
14  positions, it says "HR business partner."  Is that
15  the same as HR account manager?
16      A.  It is.
17      Q.  During your time at Shell, have you
18  conducted any training sessions regarding EEO
19  matters or antidiscrimination or antiharassment
20  laws?
21      A.  Is the question if I personally conducted
22  any training?
23      Q.  Yes.
24      A.  No, I have not.

Page 24

1      Q.  Have you taken any trainings at Shell since
2  you have been a full-time employee?
3      A.  Yes.
4      Q.  What training have you taken at Shell?
5      MR. TUCKER:  Any particular area of
6  training or general?
7      MS. GURMANKIN:  Training in general.
8      A.  There is been a lot of training, yes.
9      Q.  (BY MS. GURMANKIN)  Any HR-related
10  training?
11      A.  Yes.
12      Q.  What?
13      A.  As best I can recall, there's -- like I
14  said, there has been a lot of training.  Performance
15  rewards and benefits, data analytics, diversity and
16  inclusion, and a lot of on-the-job training.
17      Q.  Putting aside the on-the-job training for
18  the moment, any other HR-related training that you
19  have taken at Shell other than performance rewards,
20  data analytics and diversity and inclusion?
21      A.  There have been.  Our Centers of Excellence
22  such as policy delivers training, and team leads
23  also deliver training.  So I'm trying to recall what
24  have been specific topics have been covered.  They

6 (Pages 21 to 24)

Page 25

1  have ranged from how to -- coaching line managers,
2  various policies at Shell.
3      Q.  The diversity and inclusion training, did
4  that include EEO-related issues, or was that
5  separate?
6      A.  EEO was not a dedicated topic covered in
7  that training.
8      Q.  Have you had any training at Shell
9  regarding EEO-related issues or policies?
10     A.  I have had on-the-job training regarding
11  that at Shell.
12     Q.  Other than on-the-job training?
13     A.  I can't recall a specific training on this
14  topic, but there may have been.
15     Q.  And in connection with on-the-job training
16  related to EEO matters, tell me about that.
17     A.  So through on-the-job training, a lot of
18  job shadowing and partnering with more experienced
19  HR account managers and HR managers.
20     Q.  You conducted the investigation into the
21  complaints that Jesse Barnes made about sexual
22  harassment, correct?
23     A.  Yes.
24     Q.  Other than that investigation, have you

Page 26

1  conducted any other investigations during your time
2  at Shell into complaints of harassment or
3  discrimination?
4      A.  Yes.
5      Q.  About how many?
6      A.  Four.
7      Q.  Including that one?
8      A.  Yes.
9      Q.  Was that the first one, the Jesse Barnes
10  one?
11     A.  No.
12     Q.  Tell me about the other three.  What was
13  the first one?  Or if you don't recall the order,
14  just tell me what you recall.
15     A.  I don't recall specifics on -- on what
16  exactly it involved, but it was that type -- that
17  nature.
18     Q.  Sexual harassment?
19     A.  Harassment or discrimination.
20     Q.  And what position were you in at the time?



Page 29



Page 30



Page 33

Page 34

MR. TUCKER:  I ask that we mark the confidential portion of the deposition right now.

(The requested portion was marked confidential.)

MS. GURMANKIN:  Thank you.

Q.  (BY MS. GURMANKIN)  To your knowledge, does Shell require training on a regular basis on EEO-related issues for its employees?

A.  For all employees?

Q.  Yes.

A.  Yes.

Page 35

Q.  Do you recall -- or do you know what that is?

A.  On an annual basis employees need to complete an online training around the Code of Conduct.  So I misstated before.  It's not related to EEO.  It's Shell's Code of Conduct.

Q.  When -- you are referring to what, what did you misstate?

A.  You -- the question that you asked was whether Shell requires employees to complete training on EEO.

Q.  I see.  It's around the Code of Conduct?

A.  Yes.

Q.  On an annual basis?

A.  Yes.

Q.  Okay.  So part of that annual online training includes as part of Code of Conduct training the EEO antiharassment policy?

A.  Yes, I believe so.

Q.  And you take that training every year?

A.  Yes.

Q.  And based on your HR knowledge and your experience at Shell, you believe that training is effective, at least the part that talks about

Page 36

EEO-related matters?

A.  Yes.

Q.  Any other EEO or antidiscrimination or antiharassment training that Shell requires its employees to take at any level?

A.  To my knowledge, that is the required training for all employees.

Q.  I show you what's been previously marked as Exhibit 3.  This is Shell's Code of Conduct.

You are familiar with this, correct?

A.  I am.

Q.  And part of your job --

MS. GURMANKIN:  I'm sorry?

MR. TUCKER:  Okay.

Q.  (BY MS. GURMANKIN)  Part of your job as an HR account manager and HR business partner is to make sure that the employees in the group that you support are adhering to the policies in the Code of Conduct?

A.  Yeah.

Q.  All right.  If you can please go to -- you can scroll down.  It's page 12 of the Code of Conduct.  The Bates number on the bottom right is Shell 603.  It says "Harassment" at the top.

9  (Pages 33 to 36)

Page 37

1      A.  Okay.
2      Q.  You see Section 3.3, "Harassment"?
3      A.  Yes.
4      Q.  This is Shell's antiharassment policy,
5  correct?
6      A.  Yeah.
7      Q.  As included in the Code of Conduct?
8      A.  Uh-huh.
9      Q.  Yes?
10      A.  Yes.
11      Q.  And if you skip ahead two pages to page 14
12  of the Code of Conduct, Section 3.4, "Equal
13  Opportunity"?
14      A.  Okay.
15      Q.  And this is Shell's EEO policy that's
16  included in the Code of Conduct, correct?
17      A.  Yes.
18      Q.  You are familiar with both of these
19  policies?
20      A.  Yes.
21      Q.  And again, part of your job as HR
22  generalist or HR business partner is to ensure that
23  the employees that you work with adhere to these
24  policies?

Page 38

1      A.  Yes.
2      Q.  I'm showing you what's been marked as
3  Exhibit 4.  Page 1 is Shell's antiharassment policy.
4         You are familiar with this, correct?
5      A.  Yes.
6      Q.  And page 2 is Shell's equal opportunity
7  policy, correct?
8      A.  Yes.
9      Q.  And you are familiar with this policy?
10      A.  Yes.
11      Q.  And again, part of your job in HR is to
12  ensure that the employees that you interact with
13  adhere to these policies, correct?
14      A.  Correct.
15      Q.  And as an HR professional at Shell, you
16  believe that these policies were effective at
17  preventing or correcting harassing conduct or
18  discriminatory conduct?
19      A.  Yes.
20      Q.  Prior to you conducting your first
21  investigation at Shell into a complaint of
22  discrimination or harassment that was made by ███
23  ████, did you take any training into how to conduct
24  investigations into those issues?

Page 39

1      A.  The training that I completed was in job
2  shadowing and partnering for the first
3  investigation.
4      Q.  And that was with Laura?
5      A.  Yes.
6      Q.  She had more experience with you in
7  investigating?
8      A.  Uh-huh.
9      Q.  Yes?
10      A.  Yes.  She...
11      Q.  And did you learn from Laura and in going
12  through these other -- the two investigations prior
13  to Jesse Barnes, did you put together your own
14  process for how investigations into complaints of
15  discrimination or harassment should be conducted?
16         MR. TUCKER:  Objection.
17         You may answer.
18      A.  Can you repeat the question?
19      Q.  (BY MS. GURMANKIN)  Sure.  In the two
20  investigations that you completed prior to the one
21  into Jesse Barnes's complaint, did you come up with
22  or develop your own process for how investigations
23  into complaints of that nature should be conducted?
24         MR. TUCKER:  Objection.

Page 40

1         You may answer.
2      A.  I did not develop my own process, no.
3      Q.  (BY MS. GURMANKIN)  Did you have a process
4  in these first two -- an informal process in
5  connection with these first pre-Jesse Barnes
6  investigations that you conducted?
7      A.  That was part of the learning that I had in
8  partnering with Laura Moses and then also my boss at
9  the time of the second one was how do you prepare
10  for an investigation, yes.
11      Q.  Okay.  And part of what you learned in
12  partnering with Laura and from your boss was you
13  need to interview all relevant witnesses?
14         MR. TUCKER:  Objection.
15         You may answer.
16      A.  That is correct.
17      Q.  (BY MS. GURMANKIN)  And how do you
18  determine who the relevant witnesses are that you
19  need to speak with as part of an investigation?
20         MR. TUCKER:  In general or in this
21  particular case, Counsel?
22         MS. GURMANKIN:  I don't understand
23  that.  In terms of conducting investigations into
24  complaints of discrimination or harassment.

10  (Pages 37 to 40)

1       MR. TUCKER: Objection.
2       You may answer.
3    A. Is the question how do I determine who I
4  need to interview?
5    Q. (BY MS. GURMANKIN) Yep.
6    A. It depends on the case, but in general
7  you -- I talk to the individual who is making the
8  claim and who the claim is about and also the others
9  that I interview to ask who may be relevant
10 witnesses and who they recommend that I talk to.
11   Q. And you also want to interview the accused,
12 of course, correct?
13   A. Yes.
14   Q. And one of the people that you want to make
15 sure that you ask who they think is relevant would
16 be the individual making the accusation, correct?
17   A. Yes, absolutely.
18   Q. And part of your job as investigator is to
19 assess the credibility of the witnesses, correct,
20 since you will be reaching conclusions as to whether
21 or not this conduct occurred?
22   A. Yes.
23   Q. And how do you assess the credibility of
24 the witnesses?

1       MR. TUCKER: Objection.
2    Q. (BY MS. GURMANKIN) Let me ask it this way.
3  Do you do it in part from whether other people
4  corroborate what the allegations are?
5       MR. TUCKER: Objection.
6       You may answer.
7    A. I understand your question now.
8       That is part of the investigation
9  process, is trying to validate or corroborate the
10 evidence.
11   Q. (BY MS. GURMANKIN) And is it also
12 assessing the tone or the body language of the
13 witnesses when you are interviewing them?
14      MR. TUCKER: Objection.
15   Q. (BY MS. GURMANKIN) Is that partly how you
16 assess credibility?
17   A. As a part of my investigation, I also ask
18 that everyone be very truthful and honest in the
19 investigations. And so I trust that they are
20 sharing truthful in their perception of the events.
21   Q. But as part of your job to assess
22 credibility is one of the things that you look at,
23 how they come -- the witnesses come across, how
24 their body language is, their mannerisms --

1       MR. TUCKER: Objection.
2    Q. (BY MS. GURMANKIN) -- that kind of thing?
3       MR. TUCKER: Objection.
4       You may answer.
5    A. I would say yes.
6    Q. (BY MS. GURMANKIN) And one of the -- one
7  of the things you do is take notes contemporaneous
8  with your interviews of the witnesses so that you
9  can ensure you are capturing accurately what they
10 are telling you, correct?
11   A. I take notes during the interview as I'm
12 speaking with the person.
13   Q. And has that been your practice during the
14 four investigations you have conducted at Shell, to
15 type or handwrite your notes, or does it just
16 depend?
17   A. Type.
18   Q. You have a laptop with you?
19   A. Yes.
20   Q. Did you do that with Jesse Barnes's
21 investigation?
22   A. Yes.
23   Q. Is it your practice to show the witnesses
24 your write-ups of what they said during the

1  interview so that they can confirm that you
2  accurately captured what they told you?
3    A. That has not been my practice, no.
4    Q. Okay. Why not?
5    A. I am typing as they speak, so I am
6  capturing what they are saying.
7    Q. So you are just comfortable because you are
8  typing that you are accurately capturing what they
9  are telling you?
10      MR. TUCKER: Objection. She said why
11 she did it.
12      But you may answer the question again
13 without her characterization.
14   A. I haven't felt the need to have to share
15 the interview notes following the investigation
16 because I'm typing as they are talking, capturing
17 what they are saying. I'm not summarizing or using
18 my own words.
19   Q. (BY MS. GURMANKIN) So you type fast?
20   A. Yes.
21   Q. Okay. So you feel that you are able to
22 type exactly what they are saying to you, as much as
23 possible?
24   A. As much as possible.

11 (Pages 41 to 44)

Page 45

1    Q. But you are not paraphrasing when you type?

2    A. Not typically.

3    Q. And you are not summarizing?

4    A. Not typically.

5    Q. And one of the things you want to do as an

6 investigator is make sure you ask follow-up

7 questions regarding something that a witness has

8 said so that you can make sure that you have

9 exhausted any knowledge they have about an issue

10 relevant to the complaint?

11    MR. TUCKER: Objection.

12    Q. (BY MS. GURMANKIN) Fair?

13    A. Yes.

14    Q. And one of the things you do as an

15 investigator is reach conclusions about whether you

16 think the allegations are substantiated --

17    A. Yes.

18    Q. -- either fully or partially?

19    A. Yes.

20    Q. And you write up a report of the

21 investigation and your conclusions?

22    A. Yes.

23    Q. And you have done that for all four of the

24 investigations that you have conducted?

Page 46

1    A. Can you repeat your question?

2    Q. Sure. You have written up a report about

3 the investigation and your conclusions for all four

4 of the investigations that you have conducted at

5 Shell?

6    A. Yes.

7    Q. How did you get assigned to investigate the

8 complaint that Jesse Barnes had made?

9    A. From my bosses.

10    Q. And who was that at the time?

11    A. Kelly Soudelier.

12    Q. And when did you report to Kelly?

13    A. I reported to Kelly in my unconventionals

14 role. I don't remember when she replaced Erin

15 Verdon.

16    Q. She held the same title as Erin?

17    A. Her title was HR manager.

18    Q. Did Kelly come talk to you about this

19 issue? How did it come about?

20    MR. TUCKER: When you say "this issue,"

21 what are you referring to?

22    MS. GURMANKIN: Jesse Barnes's

23 complaint.

24    MR. TUCKER: When you asked her about

Page 47

1 the investigation, you said how did she come to do

2 the investigation.

3    MS. GURMANKIN: Right.

4    Q. (BY MS. GURMANKIN) And you talked to Kelly

5 Soudelier, right?

6    A. Can you repeat your question?

7    Q. Sure. How was it that you were assigned to

8 investigate Jesse Barnes's complaints?

9    MR. TUCKER: Objection; asked and

10 answered.

11    You may answer again.

12    A. My boss assigned the claim to me.

13    Q. (BY MS. GURMANKIN) How did she assign it

14 to you?

15    A. So the claim came in via our hotline. So

16 there was a write-up, and my boss sent that to me

17 and assigned me as the investigator.

18    Q. Did she speak to you first, or did she just

19 send you the internal complaint?

20    A. I can't recall the specifics. I -- I am

21 sure her as a boss gave me a heads-up that she

22 wanted me to investigate it and then also sent me

23 the claim.

24    Q. All right. You should have on your screen

Page 48

1 in front of you what's been marked as Exhibit 14,

2 which is Bates stamped Shell 523 through 529.

3    Is this the email that you received?

4    (Exhibit 14 was marked.)

5    A. From Kelly, yes. This would have been the

6 email that had the claim attached, I believe.

7    Q. (BY MS. GURMANKIN) And if you scroll

8 through, that's the complaint from Jesse, the

9 internal complaint?

10    A. This is the internal complaint from Jesse.

11    Q. And Kelly sends this to you on November 29,

12 2016, and it's look like from the complaint that it

13 was filed on November 15, 2016.

14    Do you see that on page 3?

15    A. I see a report initiated on November 15,

16 2016.

17    Q. Okay. Do you know why there was that delay

18 between the complaint being filed and it being

19 assigned to you to investigate?

20    MR. TUCKER: Objection to the use of

21 the term "delayed." There has been no suggestion

22 that is was delayed. That is counsel's

23 characterization. So she is not going to answer the

24 question with the word "delay."

Page 49

1          MS. GURMANKIN: I'm sorry; you are
2  instructing her not to answer?
3          MR. TUCKER: Yeah. If you want to
4  say --
5          MS. GURMANKIN: Based on what?
6          MR. TUCKER: Because your term is
7  inappropriate. It's not --
8          MS. GURMANKIN: You can object to form,
9  Joe. You know that's not a basis for instructing
10  her not to answer.
11          MR. TUCKER: I just did. She's not
12  going to answer.
13          If you want to ask her why it started
14  here as opposed to then you may ask her. But I'm
15  not going to have her answer a question with your
16  factual statement. That's not true --
17          MS. GURMANKIN: You know there is no
18  basis in the rules for your objection.
19     Q. (BY MS. GURMANKIN) Why was there that gap
20  between the complaint being filed on November 15 and
21  it being assigned to you on November 29, 2016?
22          MR. TUCKER: Objection to the use of
23  the term "gap."
24     Q. (BY MS. GURMANKIN) Do you know?

Page 50

1          MR. TUCKER: You are assuming she
2  believes there was a gap.
3          MS. GURMANKIN: Joe, make objections to
4  form if you have them. You are violating the Rules.
5          MR. TUCKER: I'm not violating the
6  Rules, Caren.
7          MS. GURMANKIN: You are. You are.
8     Q. (BY MS. GURMANKIN) What's the answer?
9          MR. TUCKER: Carin, you are
10  misstating -- you are stating conclusionary
11  statements, that there is a gap or delay --
12          MS. GURMANKIN: You can object to form.
13          MR. TUCKER: -- and the
14  mischaracterization is just not appropriate --
15          MS. GURMANKIN: You can object to
16  form --
17          MR. TUCKER: -- you know that.
18          THE REPORTER: One at a time. I can
19  only take one at a time.
20          MS. GURMANKIN: Sorry.
21          You know there is no basis for
22  instructing her not to answer these questions, Joe.
23  You are violating the Civil Rules.
24     Q. (BY MS. GURMANKIN) Do you need it

Page 51

1  repeated, Ms. Kloosterman?
2     A. I can say that this call was received on
3  November 15. Cari Otto sent this to Michelle on
4  November 28. Cari Otto at the time was the
5  individual who receives all the hotline complaints
6  or calls and then shares them to the HR account
7  manager.
8     Q. Do you have any knowledge as to why it
9  wasn't shared until 13 days after the complaint was
10  initiated?
11          MR. TUCKER: Objection.
12          You may answer.
13     A. I do not have knowledge of why Cari sent it
14  at the time that she did.
15     Q. (BY MS. GURMANKIN) And do you have any
16  knowledge why it was not assigned to you until
17  November 29, 2016?
18     A. My knowledge is that Michelle received this
19  on November 28 and then based on her email asked
20  Kelly if I could have the investigation, and then I
21  received it the next day.
22     Q. And you are referring to the emails that
23  are in this exhibit?
24     A. Yes.

Page 52

1     Q. All right. But do you have any knowledge,
2  other than what you are seeing in the emails, as to
3  why it wasn't assigned to you until August 29?
4          MR. TUCKER: Objection; asked and
5  answered.
6          You may answer it again.
7     A. Can I ask a clarifying question?
8     Q. (BY MS. GURMANKIN) Sure.
9     A. Are you asking why Cari assigned this to
10  Michelle?
11     Q. No. I'm asking do you have any knowledge
12  why it wasn't assigned to you until November 29,
13  2016?
14          MR. TUCKER: Objection; asked and
15  answered.
16          You may answer again.
17     A. It was assigned to me on November 29
18  because that is when my boss discussed with Michelle
19  and was able to confirm that I would be the
20  investigator.
21     Q. (BY MS. GURMANKIN) How do you know this?
22     A. As far as I can recall, from my
23  conversation with Kelly.
24     Q. Okay. Do you -- do you -- excuse me. Do

13 (Pages 49 to 52)

Page 53

1  you recall a conversation with Kelly before she sent
2  you this email about that?
3      A.  I don't recall specifics.
4      Q.  Do you recall having one; you just don't
5  recall --
6      A.  Yes.  But I don't recall the timing.
7      Q.  So is it possible that you didn't have a
8  conversation with anyone about the fact that you'd
9  be investigating Jesse Barnes's complaint before you
10 got this email marked as Exhibit 14?
11     MR. TUCKER:  Objection.
12     A.  I -- I would have received -- I would have
13 had a conversation with Kelly either before sending
14 the email or shortly after.
15     Q.  (BY MS. GURMANKIN)  Do you recall anything
16 about that conversation, either whether it was
17 shortly before or shortly after you got the email?
18     A.  I can't recall specifics.
19     Q.  Do you recall anything?
20     A.  No.
21     Q.  Did you have conversations with anyone at
22 Shell about Jesse's complaints before you started
23 your investigation?
24     A.  About this claim?

Page 54

1      Q.  Yeah.
2      A.  I did not talk to -- can you repeat your
3  question?
4      Q.  Uh-huh.  Did you have conversations with
5  anyone at Shell that you recall about investigating
6  Jesse's claims before you started your
7  investigation?
8      A.  I see.  I don't recall specifics, as this
9  was a long time ago, but I believe I had a
10 conversation with Kelly about how to approach the
11 investigation.
12     Q.  What do you recall about that?
13     A.  I believe I had reviewed the claim with her
14 and talked her -- talked to her about how I would
15 approach the investigation.
16     Q.  What did you talk to her about then?
17     A.  About whether or not I would complete it
18 face to face or virtually, about who I would talk to
19 and about the types of questions.
20     Q.  Any more specific that you recall?
21     A.  No, I don't recall the specific
22 conversation.
23     Q.  At this time you did not support the group
24 that Jesse was a part of, correct?

Page 55

1      A.  That's correct.
2      Q.  Do you know why you were being assigned to
3  investigate this particular claim?
4      A.  It was because I was a neutral person, as I
5  had not been to that asset or had supported this
6  group of employees.  I didn't have a connection.
7      Q.  Is that what you were told?
8      A.  As far as I can recall.
9      Q.  By Kelly?
10     A.  Yes.
11     Q.  You were employed at Shell at the time,
12 correct?
13     A.  That's correct.
14     (Exhibit 15 was marked.)
15     Q.  (BY MS. GURMANKIN)  You are being shown
16 what's been marked as Exhibit 15, Bates stamped
17 Shell 345 to 353.  Looking at the first page, this
18 is an email from Michelle Priest to you on
19 November 30, 2016.
20         You see that?
21     A.  Yes.
22     Q.  And who was Michelle Priest at this time?
23 What position was she in?
24     A.  She was also an HR account manager.

Page 56

1      Q.  For what group?
2      A.  She -- as far as -- as best I can recall,
3  she was for the Appalachia asset.
4      Q.  Was that the one that Jesse was a part of
5  at this time?
6      A.  Yes.
7      Q.  All right.  So she sends you a bunch of
8  attachments.  If you go to the second page, this is
9  an email from Will Turney.  And you understood from
10 reading Jesse's internal complaint by this time that
11 she was making complaints about him?
12     A.  Uh-huh.
13     Q.  Right?
14     A.  Yes.
15     Q.  As her supervisor?
16     A.  Yes.
17     Q.  Do you know why Michelle was sending you
18 this document, page 2 of Exhibit 15?
19     A.  Can I read it?
20     Q.  Of course.  Take your time.
21     A.  What was your question?
22     Q.  Do you know why Michelle Priest was sending
23 you this?
24     A.  I would assume she sent me this because I

Page 57

1    was investigating a complaint, and this was related
2    to it.
3        Q.  Do you know why she sent you this?
4            MR. TUCKER:  Objection; asked and
5    answered.
6        Q.  (BY MS. GURMANKIN)  I mean, you just said
7    you assume.  Do you have knowledge as to why she was
8    sending you this?
9        A.  I don't recall the specifics, but this --
10   this is related to the claim.
11       Q.  And this is an email from Jesse's
12   supervisor expressing concerns about her
13   performance, right?
14           MR. TUCKER:  Object to the
15   characterization of the document.
16           But you may answer.
17       A.  My interpretation of this email it is a
18   concern from William Turney about a conversation
19   that did not go well with Jesse Barnes and having
20   some concerns about it.
21       Q.  (BY MS. GURMANKIN)  The subject matter is
22   "Potential Employee Issue."  You see that?
23       A.  I see the subject line.
24       Q.  It says, "Michelle" -- do you see that it

Page 58

1    says "potential employee issue"?
2        A.  Yes, I read that.
3        Q.  And it says, "Michelle, Monday afternoon
4    11/21/ 2016 I called Jesse Barnes into Room 120A to
5    have a one-on-one discussion about recent
6    performance concerns."
7            Do you see that?
8        A.  I see that.
9        Q.  All right.  So did you understand after you
10   read this email that Turney was expressing he had
11   performance concerns about Jesse?
12       A.  I understand from this email that he had --
13   was having a conversation with her about performance
14   concerns, but the intent of sending this email is
15   that the conversation did not go well.
16       Q.  And did you also understand from reading
17   this email that he had performance concerns about
18   Jesse that he was expressing to Michelle Priest?
19       A.  I understand he had some performance
20   concerns, and he was having a discussion with her
21   about it.
22       Q.  And you thought this was relevant to your
23   investigation, correct?
24           MR. TUCKER:  Objection.

Page 59

1            You may answer.
2        A.  Yes.
3        Q.  (BY MS. GURMANKIN)  Why?
4        A.  I believe that this is relevant because he
5    was having a discussion with her, and it was not
6    going well between the two of them.
7        Q.  And how would a discussion with her that
8    wasn't going well in his opinion relate to Jesse's
9    concerns that she was being sexually harassed by
10   him?
11       A.  She made a number of concerns about her
12   relationship with Mr. Turney, him as her supervisor.
13       Q.  Right.  So how would the conversation that
14   he's relating didn't go well about his belief about
15   performance concerns be relevant to her allegations?
16       A.  I would have to look at the specific
17   allegations, but I know that there were some
18   allegations made about him as her supervisor and
19   working with her on her performance.
20       Q.  Sure.  Well, let's look at Exhibit 14,
21   which is Kelly's email to you, including the
22   internal complaints.  Take your time and go through
23   them and let me know how the email --
24           MR. TUCKER:  Well, the internal

Page 60

1    complaint is actually part of document Exhibit 15,
2    which is the actual email that she got --
3            MS. GURMANKIN:  That's fine.
4            MR. TUCKER:  -- where -- where the --
5    where the email is attached.
6            MS. GURMANKIN:  I wasn't even finished
7    with my question, but you can look at either one.
8        Q.  (BY MS. GURMANKIN)  But in any case, if you
9    can look through the internal complaint and tell me
10   what about her allegations makes
11   Turney's -- Michelle sending Turney's email to her
12   about his conversation with Jesse about performance
13   concerns relevant to her allegations.
14           MR. TUCKER:  So if you look at
15   Document 5, which is Exhibit 15, this is what she
16   sent you.
17       A.  There are two comments in here that I can
18   see after quickly reviewing it.  One around the
19   superintendent had written me a note to tell me he
20   thought I did a good job regarding --
21       Q.  (BY MS. GURMANKIN)  I'm sorry; where are
22   you?
23       A.  In her list of complaints.
24       Q.  Yeah, which page?  You can look at the

Page 61

1    Bates number on the bottom or the page number.
2        A. 350.
3        Q. Okay. And where is that?
4        A. About three-fourths of the way down, starts
5    with "superintendent."
6        Q. Okay. "Superintendent had written me a
7    note to tell me he thought I did a good regarding
8    certain projects and CC's my supervisor on the
9    email. I was then taken aside by my supervisor and
10   the door was closed so the superintendent could not
11   hear supervisor talk down to the things the
12   superintendent just gave me recognition for."
13           Is that the one?
14       A. Yes.
15       Q. And why did you think that that part was
16   relevant -- or why did you think that you getting
17   Turney's email to Michelle Priest about her meeting
18   with Jesse about her performance concerns was
19   relevant to this investigation?
20       A. Because my interpretation of this claim is
21   that there is some disagreements on her performance.
22       Q. And how -- if there were disagreements
23   about her performance, how would that be relevant to
24   claims she's making of sexual harassment?

Page 62

1        A. I didn't believe that was the question.
2        Q. That's my question now. If there were
3    disagreements about her performance, would that be
4    relevant to claims she's making of sexual
5    harassment?
6        A. I don't believe that -- that a claim about
7    sexual harassment was also related to her claims
8    about work -- about performance.
9        Q. I'm sorry; I didn't understand your answer.
10   Do you mind explaining that?
11       A. So her issue summary was that she had been
12   dealing with harassment issues, specifically name
13   calling, belittling, inappropriate touching and
14   comments. And then in her examples she did that as
15   an example of where I see it as regarding
16   performance and how her supervisor was handling it.
17       Q. Okay. So am I correct that you saw that as
18   separate from her claims of sexual harassment?
19       A. Yes. I did not view this as a sexual
20   harassment claim, this specific example.
21       Q. Okay. Did you view it as a sex
22   discrimination claim?
23       A. This specific example?
24       Q. Yeah.

Page 63

1        A. No.
2        Q. You just -- you just read that and thought
3    there is a disagreement about performance?
4        A. There is something going on with
5    performance.
6        Q. Okay. Did you also consider that it might
7    be an issue regarding miscommunication from a
8    supervisor to a subordinate, or did you assume that
9    there was an issue regarding performance when you
10   read that?
11       A. No, I did not assume that there was an
12   issue with performance, that there may be a
13   communication issue with her supervisor.
14       Q. You considered that, as well?
15       A. Yes.
16       Q. All right. Anything else -- you were
17   looking through the internal complaint. Anything
18   else that led you to believe that Michelle Priest
19   sending you Turney's email to her regarding his
20   conversation with Jesse about performance concerns
21   was relevant to her internal complaints?
22       A. There is one more about half the way down.
23       Q. On that same page?
24       A. "I have addressed this to my supervisor."

Page 64

1        Q. Okay. "I have addressed this to my
2    supervisor about an issue I was having with a
3    coworker and was told that is the way it was going
4    to be. This coworker had lied to me saying that my
5    supervisor was mad at me because I was falling
6    behind on work. When I asked my supervisor what I
7    needed to catch up on, he denied that he had said
8    anything." That one?
9        A. Yes.
10       Q. And what about that made you think that
11   Priest sending you Turney's email to her was
12   relevant to Jesse's complaint?
13       A. I see the two as related because this is
14   talking about falling behind on work, and between a
15   coworker and a supervisor I'm not sure what was
16   really communicating -- communicated, but I see that
17   as related to having a conversation around work and
18   performance.
19       Q. Similar to your thoughts about the
20   other --
21       A. Yes.
22       Q. -- allegation that we just looked at?
23       A. Yeah.
24       Q. Anything else in the internal complaint

16 (Pages 61 to 64)

Page 65

1   that led you to believe that that email that Priest
2   forwarded you from Turney was relevant to Jesse's
3   complaint?
4       A. I don't believe so.
5       Q. And page 3 of this document, Exhibit 15,
6   this is an email from Steve Craig to Jared Orr,
7   copying Michelle Priest.
8           Did you know who Jared Orr was?
9       A. Yes.
10      Q. Who was he?
11      A. He was an HR advisor on the same team.
12      Q. The Appalachia team?
13      A. On the unconventionals team.
14      Q. And Craig writes, "Jared, I had a meeting
15  yesterday with Jesse Barnes who has formally
16  submitted an online complaint to HR regarding
17  harassment in the workplace. Can you provide me any
18  guidance on next steps that will be initiated by HR
19  or follow-up that I need to take? I was only made
20  aware of this yesterday and have not discussed it
21  with Michelle yet. It was reported on 11/15/2016."
22  And then he goes on to give the report number.
23          Do you know -- did you know who Steve
24  Craig was at the time that you saw this?

Page 66

1       A. I knew what his title was.
2       Q. You had --
3       A. And his position at Appalachia.
4       Q. Had you interacted with him before this?
5       A. No, I had not interacted with him before
6   this.
7       Q. And do you know why Michelle was forwarding
8   you this one?
9       A. Based on my knowledge, she forwarded this
10  because it was -- Steve knew there was a claim filed
11  and he had a conversation with Jesse Barnes.
12      Q. Did you know at that time what relationship
13  Steve Craig had to Jesse's group?
14      A. My understanding was that Steve Craig was a
15  leader in Appalachia.
16      Q. Did you know that Turney had a reporting
17  relationship to him at this time?
18      A. Not that I can recall.
19      Q. Did you have a conversation with Michelle
20  Priest before you commenced your investigation about
21  Jesse's complaint or anything related?
22      A. I don't recall having a conversation with
23  her.
24      Q. Other than the internal complaint and these

Page 67

1   emails that Michelle Priest forward to you that are
2   part of Exhibit 15, did you look at any documents
3   before starting your investigation?
4       A. Michelle sent me an org chart.
5       Q. Of whose group? Do you remember?
6       A. I don't remember.
7       Q. That was over email?
8       A. Yeah.
9       Q. Anything else?
10      A. Any other documents?
11      Q. Yeah. That you looked at before you
12  started investigating.
13      A. I would have looked at my previous
14  investigation to have an understanding and to
15  prepare for this one about what questions I wanted
16  to ask.
17      Q. Do you remember doing that? You said you
18  would have. I just want to make sure if you
19  remember.
20      A. No, I don't have a memory of doing that,
21  but I may have.
22      Q. Anything -- any other documents that you
23  looked at before starting your investigation?
24      A. By "documents," you mean?

Page 68

1       Q. Any files, paper, emails, anything in
2   written form.
3       A. I recall Michelle also forwarding me an
4   email on a previous matter involving Ms. Barnes.
5       Q. Before you started your investigation?
6       A. I -- I don't recall the timing, but I
7   believe it was before.
8       Q. Do you know how soon after you got the
9   internal complaint on November 29 you actually
10  started the investigation?
11      A. I believe I was there the first week of
12  December.
13      Q. In Willsboro?
14      A. Yes.
15      Q. Meeting with people in person?
16      A. Yes.
17          (Exhibit 16 was marked.)
18      Q. (BY MS. GURMANKIN) All right. You are
19  being shown what's been marked Exhibit 16,
20  Shell 510.
21          Is this the email that you just
22  referred to?
23      A. Let me read it.
24      Q. Yes, of course.

17 (Pages 65 to 68)

Page 69

1　A. Yes, this is the email I was referring to.
2　Q. This is dated 12/5/2016. Is that the week
3　you were actually in Willsboro?
4　A. I believe so, yes. But this was before I
5　started my discussions.
6　Q. Do you know why Michelle is sending you
7　this?
8　A. No.
9　Q. Did you have a conversation with her about
10　it?
11　A. Not that I can recall.
12　Q. Or anyone at the company?
13　A. Not that I can recall. I can't recall a
14　conversation, no.
15　Q. Or any other communication?
16　A. Right.
17　Q. Did you believe it was relevant to Jesse's
18　current complaints of sexual harassment, the fact
19　that she previously made a complaint?
20　A. I kept them separate and I wanted to
21　evaluate her current claim.
22　Q. But did you think it was relevant to her
23　current claim, the fact that she had previously made
24　a complaint?

Page 70

1　A. She didn't make -- no, because she didn't
2　make complaints about Mr. Turney in this one.
3　Q. The fact that she had previously made a
4　complaint, would that make it more or less likely
5　that her complaints about Turney were -- had merit?
6　A. No.
7　Q. By the way, if Jesse had relationships with
8　other Shell employees during the course of her
9　employment, does that have any relevance to her
10　complaints of harassment?
11　MR. TUCKER: Objection. She's not
12　indicated any knowledge of your client's -- knew her
13　sexual relations with other Shell employees. So I
14　don't want you stating that as a fact to her. Just
15　note that the witness has not indicated any
16　knowledge of your client's sexual --
17　MS. GURMANKIN: You can make an
18　objection to form.
19　MR. TUCKER: But you stated --
20　A. Can you --
21　Q. (BY MS. GURMANKIN) Sure. If Jesse had
22　relationships with other Shell employees during her
23　employment, does that have any relevance to her
24　complaints that she's making in November of 2016

Page 71

1　about sexual harassment?
2　A. I was only aware of personal friendships,
3　and that did not impact or have any relevance to my
4　investigation.
5　Q. Right. I'm asking as an HR professional
6　and as the investigator. If Jesse had relationships
7　with other Shell employees, would that be relevant
8　at all to her complaints of sexual harassment?
9　MR. TUCKER: Objection; it's a
10　hypothetical.
11　A. It depends on the situation, but I would
12　not -- I would investigate the claims separately.
13　Q. (BY MS. GURMANKIN) When might it have
14　relevance to a complaint of sexual harassment, an
15　employee having relationships with other Shell
16　employees?
17　MR. TUCKER: Objection.
18　A. I can't speak to that, as I have not had
19　that experience.
20　Q. (BY MS. GURMANKIN) You said it might be
21　relevant. And as you sit here today, can you think
22　of any circumstance in which an employee having
23　relationships with other Shell employees would be
24　relevant to her complaints of sexual harassment?

Page 72

1　MR. TUCKER: Objection.
2　A. No.
3　Q. (BY MS. GURMANKIN) How did you determine
4　which witnesses to interview?
5　A. When I interviewed Ms. Barnes, I asked her
6　who may have been witnesses to the claims that she
7　made. I also asked her who she recommended that I
8　talk to. To the best of my recollection, I also
9　discussed that with Mr. Turney, and then I also
10　looked at who was on the team or who interacted with
11　the team that may have also been witnesses.
12　Q. So did you have a list coming into your
13　investigation about who you wanted to interview?
14　Other than, I guess, Jesse and Will Turney.
15　A. I don't recall.
16　Q. Had you spoken with Kelly or Michelle
17　Priest or anyone at Shell about who they thought
18　should be interviewed?
19　A. I don't recall.
20　Q. Prior to going into the investigation, did
21　you know anything about Jesse Barnes other than the
22　fact that Will Turney thought that she had some
23　performance concerns, as he expressed in his email
24　to Michelle Priest, and that she has previously made

18　(Pages 69 to 72)

Page 73

1  a complaint of inappropriate conduct? Did you know
2  anything else about her before you started your
3  investigation?
4       A.  Before I started my investigation, to the
5  best of my knowledge, or as far as I can recall, I
6  received this email, which states that she had made
7  a claim before, and then the email from Will Turney
8  to Michelle Priest stating that he was having a
9  performance conversation that did not go well.
10      Q.  Anything else that you knew about Jesse
11 before you started your investigation?
12      A.  Not that I can recall.
13      Q.  Anything that you knew about Turney before
14 you started your investigation, anything at all?
15      A.  I don't believe so.
16      Q.  And you never reviewed his personnel file,
17 correct, before you starting your investigation?
18      A.  I don't recall.
19      Q.  How about any time during the investigation
20 before you wrote up your report with your
21 conclusions? Did you ever review Turney's personnel
22 file?
23      A.  I don't recall specifics, but I believe
24 I -- I would have had to review some part of his

Page 74

1  personnel file because I knew his job grade and IPF.
2       Q.  Couldn't you have gotten that from asking
3  someone in the organization, and would you have to
4  review his personnel file to get that?
5       A.  I would want to look up in the system to
6  validate it.
7       Q.  His job grade?
8       A.  Yes.
9       Q.  Okay. But do you have a recollection of
10 ever reviewing any part of his personnel file before
11 completing your investigation?
12           MR. TUCKER:  Objection; asked and
13 answered.
14           You may answer it again.
15      A.  What do you mean by "personnel file"?
16      Q.  (BY MS. GURMANKIN)  His file at Shell. His
17 performance reviews, anything connected with his
18 employment.
19           Well, let me ask you this: Does Shell
20 keep personnel files on their employees, files
21 related to their employment?
22      A.  We do. There are performance reviews that
23 are documented.
24      Q.  Okay. Anything else that Shell keeps on

Page 75

1  its employees other than performance reviews?
2       A.  Job history.
3       Q.  That would include positions held?
4       A.  Yes, positions held and performance
5  ratings.
6       Q.  Compensation?
7       A.  Correct.
8       Q.  Anything else in the job history?
9       A.  There may be other files just attached, but
10 those can vary. It's not standard.
11      Q.  Anything else that Shell keeps on its
12 employees other than performance reviews and job
13 histories?
14      A.  Those are the main ones that I can recall.
15      Q.  Employment applications, are they generally
16 in the files?
17      A.  No.
18      Q.  Résumés?
19      A.  It depends.
20      Q.  On whether they have applied for positions
21 where they might have to submit that?
22      A.  They are not kept in -- résumés are not
23 kept always in employment files. Some -- some
24 employees may have it because they have asked for it

Page 76

1  to be uploaded.
2       Q.  If an employee's been disciplined, that
3  would be part of the personnel file?
4       A.  Not necessarily.
5       Q.  Where would that be kept?
6       A.  It would -- it may have been in the file,
7  or it would have been kept with the HR account
8  manager and the manager of the employee.
9       Q.  Was there a policy that HR account managers
10 or HR business partners keep files on all of the
11 employees that they supported?
12      A.  That's not a written policy.
13      Q.  A practice?
14      A.  Yes.
15      Q.  Did Michelle Priest -- was Michelle Priest
16 HR business partner for Jesse's group at this time?
17      A.  Yes.
18      Q.  Did you ask her if she had any files on
19 Will Turney?
20      A.  At what point?
21      Q.  At any point from the time that you got the
22 assignment to the time that you completed your
23 investigation.
24      A.  I don't recall specifically.

19 (Pages 73 to 76)

Page 77

1     Q.  Did you review Turney's performance reviews
2  at any point during your investigation from the time
3  you got the assignment to the time you completed it?
4     A.  I don't recall if I did that.
5     Q.  Did you review his job history?
6     A.  I don't recall.
7     Q.  Did you ask his manager whether he had any
8  files on Will Turney?
9     A.  I don't recall specifically.
10     (Exhibit 17 was marked.)
11     Q.  (BY MS. GURMANKIN)  All right.  You are
12  being shown what's been marked as Exhibit 17, Shell
13  506 through 509.
14     Have you seen this document before?
15     A.  Yes.
16     Q.  Is this something you drafted?
17     A.  Yes.
18     Q.  In preparation for your investigation?
19     A.  I drafted this in this preparation.  It was
20  used in preparation for my investigation, yes.
21     Q.  Is this to help you put together what
22  questions to ask Jesse and Turney?
23     A.  Yes.
24     Q.  In the second question it says, "How did

Page 78

1  the harassment affect you?  Has your job been
2  affected in any way?  This is under questions for
3  Jesse Barnes.
4     Do you see that?
5     A.  Yeah.
6     Q.  And it says under that, "Purpose:  To
7  examine whether there was tangible employment
8  action, to examine the impact."
9     Why was it -- why did you want to know
10  whether there was tangible employment action?
11     MR. TUCKER:  Objection.
12     You may answer.
13     A.  I don't know what that means.  I was using
14  this as a draft.
15     Q.  (BY MS. GURMANKIN)  But you wrote it?
16     A.  I did not write the purpose statements that
17  are italicized.
18     Q.  Who wrote that?
19     A.  I got that from research that I did.
20     Q.  On what?
21     A.  On interview questions that you should ask.
22     Q.  In a sexual harassment investigation?
23     A.  On an -- I don't recall if it was
24  specifically for a sexual harassment investigation.

Page 79

1     Q.  But harassment?
2     A.  Yeah.
3     Q.  So somewhere in your research it said that
4  you should ask a question about how the harassment
5  affected the complainant, has your job been affected
6  in any way, to determine whether there was tangible
7  employment actions to examine the impact?
8     A.  Yes.
9     Q.  Did the research say why?
10     A.  Not that I recall.
11     Q.  And you don't have an understanding as to
12  why that information should be asked as part of an
13  investigation into a complaint of harassment?
14     A.  Based on my education and background, I
15  would think you're trying to understand if there has
16  been employment action taken because of this
17  harassment.
18     Q.  Okay.  And why would that be relevant?
19     A.  That's relevant to understand if there's
20  been discrimination.
21     Q.  How so?
22     A.  If there's been an action taken because of
23  the harassment or gender of the employee.
24     Q.  Do you remember what specifically -- what

Page 80

1  research you were looking at?
2     A.  This was online.
3     Q.  Right.  Do you remember what site?
4     A.  No.
5     Q.  Do you remember if it was SHRM?
6     A.  I don't remember.
7     Q.  All right.  No. 6 on page 1, "Did the
8  person who harassed you harass anyone else?  Do you
9  know whether anyone complained about harassment by
10  that person?  Purpose:  Affirmative defense:  First
11  prong:  Employer must take reasonable care to
12  prevent and promptly correct harassment, to test
13  quality of evidence."
14     I read that correctly?
15     A.  Yes.
16     Q.  And what was your understanding as to what
17  that means from your research?
18     A.  The question or the purpose?
19     Q.  Either one.
20     A.  Let me read it one more time.
21     Q.  Sure.
22     A.  My understanding of this is to understand
23  if it happened before, if there were complaints made
24  and if the employer knew about them and took action

Page 81

1 or not.
2      Q. And how would that be relevant?
3      A. Because an employer must take action if
4 there's a complaint made.
5      Q. Right. And you had an understanding that
6 if an employer did not take reasonable care to
7 prevent or correct harassment, including sexual
8 harassment, then they might be liable for that kind
9 of conduct?
10      A. My understanding is that employers must
11 take action.
12      Q. Or they're liable for that type of conduct
13 occurring in the workplace?
14      A. I don't exactly know what we mean by them
15 being liable.
16      Q. They might be responsible for that type of
17 conduct occurring in the workplace.
18      A. If they knew about it and didn't do
19 anything, yes.
20      Q. Or if they didn't take action, reasonable
21 care to prevent and correct that type of conduct
22 from occurring in the workplace?
23      A. Yes.
24      Q. No. 8, "Did you complain or make known your

Page 82

1 rejection of the alleged discriminatory conduct?
2 Who did you tell, when, what did you tell the
3 person? Purpose: Goes to issue of unwelcomeness."
4      What was your understanding from the
5 research about what that meant?
6      A. So again, this was a draft format, and I
7 was really using it as a brainstorm. So I -- as I'm
8 sharing with you what my understanding of this is, I
9 don't recall -- I don't have good memory of what I
10 was thinking at the time when I was reviewing this.
11 So I'm just sharing what my knowledge of it is at
12 this time.
13      Q. Well, you did research at the time when you
14 were putting together this draft, correct?
15      A. Yes.
16      Q. Okay. And did you understand that if the
17 employee welcomed the conduct, that that might take
18 away from their claim that they were being sexually
19 harassed?
20      A. So my understanding of this No. 8 is that
21 if they -- I would -- I would want to use this to
22 understand if they made it known or, yeah, if it was
23 unwarranted.
24      Q. Right. That if they -- and did you

Page 83

1 understand that one of the things that an employee
2 had to show to demonstrate that there was sexual
3 harassment or a hostile work environment was that
4 they found the conduct to be unwelcome?
5      A. Yes.
6      Q. And that was one of the things that you
7 wanted to investigate as part of your investigation
8 into Jesse's complaint?
9      MR. TUCKER: Objection.
10      Q. (BY MS. GURMANKIN) Whether she welcomed
11 the conduct that she was complaining about.
12      MR. TUCKER: Objection.
13      A. I did want to know whether or not the
14 conduct was unwarranted or not, and if she told
15 anyone.
16      Q. (BY MS. GURMANKIN) I'm sorry; you said
17 "unwarranted." Did you mean "unwelcome"?
18      A. Unwelcome.
19      Q. All right. No. 9, "Are you aware of the
20 agency's antiharassment policy? How are you aware?
21 Did you complain pursuant to that policy?"
22      Then on to page 2, "Purpose:
23 Affirmative defense, Second Prong: Employee's duty
24 to exercise reasonable care to minimize the damages

Page 84

1 that result from violations of the statute."
2 I read that correctly?
3      A. Yes.
4      Q. Okay. And what were you trying to get at
5 with No. 9?
6      A. My understanding of these questions is that
7 a company is responsible to ensure that employees
8 are aware of their antiharassment policy.
9      Q. And did you understand that if an employee
10 doesn't take advantage of the employer's policies or
11 the procedures they have in effect, that the company
12 may not be responsible for conduct that occurs, like
13 sexual harassment?
14      A. I didn't -- I don't necessarily know that
15 that is a fact.
16      Q. But you got that from the research that you
17 did, based on the purpose that's written on No. 9?
18      A. My understanding of this is just that an
19 employee is responsible to have a policy in place
20 and that employees are aware of it.
21      Q. You said employees are responsible for
22 having a policy in place --
23      A. Employers.
24      Q. No. 10, did you complain about the

Page 85

1  harassment --
2          MR. TUCKER:  Excuse me a second.  Take
3  your time, hear her question, understand the
4  question and make sure you answer the question.
5  Okay?
6          THE WITNESS:  Okay.
7      Q.  (BY MS. GURMANKIN)  Is there
8  anything -- that was the instruction I gave you at
9  the beginning.  Have you had any problems
10  understanding my questions?
11     A.  I am understanding your questions.
12         MR. TUCKER:  Well, she obviously just
13  misspoke because you corrected her, Counsel.  I'm
14  just telling her --
15         MS. GURMANKIN:  She said "employee"
16  instead of "employer."  She didn't misspeak.
17         MR. TUCKER:  So she obviously misspoke,
18  and you should let me finish talking before you
19  interrupt me --
20     Q.  (BY MS. GURMANKIN)  No. 10.
21         MR. TUCKER:  Right then.  Like you
22  should stop and let me finish.
23         MS. GURMANKIN:  Are you finished?
24         MR. TUCKER:  No, I'm not.

Page 86

1          Megan, you should take your time and
2  hear the question, understand the question, make
3  sure your answers are responsive.  Okay?
4          THE WITNESS:  Okay.
5          MR. TUCKER:  And just because she
6  speaks quickly doesn't mean that you have to, also.
7  Okay?
8          Go ahead.
9          MS. GURMANKIN:  Finished now?  I'm
10  going to take that as a yes.
11     Q.  (BY MS. GURMANKIN)  No. 10, "Did you
12  complain about the harassment/hostile work
13  environment?  Who did you tell, when, and what did
14  you tell the person?  Purpose:  Affirmative defense,
15  Second Prong:  Employee's duty to exercise
16  reasonable care to minimize the damages that result
17  from violations of the statute to test whether
18  agency knew or should have known of the harassment
19  and failed to take immediate and appropriate
20  corrective action."
21          I read that correctly?
22     A.  Yes.
23     Q.  And what did you mean by that one?
24     A.  Let me reread.

Page 87

1      Q.  Sure.  Take your time.
2      A.  My understanding of this one is in that if
3  the employer -- if the employee has complained and
4  the employer knew about it, they are -- they have
5  some responsibility or liability for not -- for
6  failing to take action.
7      Q.  No. 11, "What happened as a result of your
8  complaint?  Did the harassment/hostile work
9  environment stop?  When did it stop?  Promptly?
10  Purpose:  Affirmative defense, First Prong:
11  Employer must take reasonable care to prevent and
12  promptly correct harassment, to test agency's burden
13  to take immediate and appropriate corrective
14  action."
15          What did you mean by that one?
16     A.  This is a follow-up question to No. 10,
17  that if there was a complaint made, what happened as
18  a result of it and did it stop.  My understanding is
19  that to see if the employer took action and if it
20  stopped.
21     Q.  No. 12, "Did you take any action to avoid
22  further harm -- bless you -- further harm by the
23  perpetrator?  Purpose:  Affirmative defense, Second
24  Prong:  Employee's duty to exercise reasonable

Page 88

1  care."
2          What did you mean by that one?
3      A.  I see this also as a follow-up question.
4      Q.  To No. 10?
5      A.  Yes.
6      Q.  Along those same lines?
7      A.  Yes.
8      Q.  Trying to figure out -- although, this one
9  asks the employee if they did anything, right?
10     A.  Uh-huh.
11     Q.  Yes?
12     A.  Yes.
13     Q.  This is different from 10 or 11, which
14  focused more on what did the employer do; is that
15  right?
16     A.  That's what I'm reading here, yes.
17     Q.  13, "How would you like to see the
18  situation resolved?  Remedy or ADR -- Purpose:
19  Remedy or ADR."
20          What did that one mean?
21     A.  I don't know -- I don't remember what "ADR"
22  stands for.  But I think this is a question to ask
23  to understand what the employee is looking for as
24  a -- as a resolution or a solution to the

Page 89

1  complaints.
2      Q.  All right.  And then at the bottom there is
3  questions for William Turney.  Do you see that?
4      A.  Yes.
5      Q.  All right.  And then No. 3 says, "Did the
6  complainant notify you that the conduct was
7  unwelcome?  What form did this notification take?
8  What did the complainant say or write to you?
9  Purpose:  To ascertain/clarify complainant's facts
10 re: unwelcomeness."
11         And then No. 4, "What was your
12 reaction?  What did you do?"  And then the purpose
13 on the next page, "Affirmative defense, First
14 Prong:  Employer must take reasonable care to prevent
15 and promptly correct harassment, to test
16 complainant's facts."
17         What does that one -- what does that
18 all mean?
19     A.  These questions are to understand if the
20 person who made the claim notified Mr. Turney that
21 his conduct was unwelcome, if he was ever aware; and
22 if so, how he reacted.
23     Q.  And why would that be relevant?
24     A.  To understand and to validate the

Page 90

1  unwelcomeness.
2      Q.  No. 3 -- I'm sorry; page 3 there is -- at
3  the very bottom there's a header of questions for
4  responsible official and complainant's chain of
5  command in agency's antiharassment chain.
6         Do you see that?
7      A.  Yeah.
8      Q.  And if you go to the next page, there is a
9  list of questions to ask that individual.
10     A.  Okay.
11     Q.  You see that?
12     A.  Yes.
13     Q.  Who was that person in this case?
14     A.  Are you asking who I asked these questions
15 to or who -- or what is -- can you rephrase your
16 question?
17     Q.  Yeah.  The first question is did you ask
18 these questions of anyone in this -- in connection
19 with your investigation of Jesse's complaints?
20     A.  To the best of my recollection, I asked
21 some of these questions to leaders in the
22 organization.
23     Q.  Who?
24     A.  Greg Larsen.

Page 91

1      Q.  Anyone else?
2      A.  I don't recall specifically, but I may have
3  asked Steve Craig.
4      Q.  But definitely Greg Larsen?
5      A.  I believe so.
6      Q.  Okay.  There would be notes of your
7  conversations with Greg and/or Steve?
8      A.  I recall there are notes with Greg.
9      Q.  Do you recall seeing notes with Steve?
10     A.  I don't recall.
11     Q.  The notes with Greg, those were part of
12 your investigation?
13     A.  That is my recollection.
14     Q.  How long were you in Willsboro?
15     A.  As far as I can recall, about 2 1/2 days,
16 2 1/2 to 3 days.
17         MR. TUCKER:  Caren, this will be my
18 first bathroom break.
19         MS. GURMANKIN:  Sure.
20         THE WITNESS:  Can I go, as well?
21         MR. TUCKER:  Yes, you can.
22         THE VIDEOGRAPHER:  This is Media 1.  We
23 are off the record.  The time is 10:33.
24         (A recess was taken.)

Page 92

1          THE VIDEOGRAPHER:  This begins Media 2.
2  We're back on the record.  The time is 10:41 a.m.
3      Q.  (BY MS. GURMANKIN)  All right.  So I think
4  when we left off you had said you were in Willsboro
5  for 2 1/2 to 3 days interviewing all the witnesses?
6      A.  That's my recollection.
7      Q.  Did you meet with all of the witnesses in
8  person?
9      A.  No.
10     Q.  Who did you not meet with in person?
11     A.  I recall I did not meet with Mark Hoover in
12 person because he was on vacation.
13     Q.  Okay.  You subsequently spoke with him over
14 the phone?
15     A.  Yes.
16     Q.  So you never met him in person, correct?
17     A.  Correct.  As far as I can recall, yeah.
18     Q.  Had you met any of the witnesses before you
19 had interviewed them?
20     A.  No.
21     Q.  Had you interacted with them at all before
22 you interviewed them, any of them?
23     A.  Well, I interacted with Mr. Larsen and
24 Mr. Craig before I interviewed them.

23  (Pages 89 to 92)

Page 93

1　　Q. In connection with this complaint or about
2　different issues?
3　　A. In connection to this complaint.
4　　Q. How did you interact with Larsen before?
5　　A. As far as I can recall, he -- he was the
6　leader on-site, so he knew that I was coming, booked
7　a room for me, kind of showed me where to go.
8　　Q. Did you have any conversations with him
9　about these allegations before you started
10　interviewing the witnesses?
11　　A. I did not have any conversations with him
12　about the allegations specifically.
13　　Q. Generally?
14　　A. He knew I was coming for the investigation,
15　that there was a complaint made but not about this,
16　yeah.
17　　Q. How about Steve Craig?  What were your
18　interactions with him?
19　　A. I don't recall.
20　　Q. Do you recall if it was about these
21　allegations?
22　　A. No.
23　　　　MR. TUCKER:  No, you don't recall, or
24　no, it wasn't about these allegations?

Page 94

1　　　　THE WITNESS:  I don't recall.
2　　Q. (BY MS. GURMANKIN)  Okay.  You just
3　remember you had some sort of interaction with him
4　before your interviews?
5　　A. I recall that I might have.  I don't -- I
6　don't remember specifics, but I may have interacted
7　with him before I had an interview with him.
8　　Q. Okay.  Was -- was there anyone other than
9　you and the witness in the room when you were
10　interviewing them?
11　　A. No.
12　　Q. Do you recall where you met them?  Was it
13　the same room?
14　　A. Yes, I believe so; it was the same room.
15　　Q. Conference room?
16　　A. Yes.
17　　Q. In the Willsboro location?
18　　A. Yes.
19　　Q. Other than typing on your laptop, did you
20　record any of the interviews?
21　　A. No.
22　　Q. When you meet with the witnesses, did you
23　introduce yourself?
24　　A. I introduced myself when I met with the

Page 95

1　witnesses.
2　　Q. Did you tell them you were employed at
3　Shell?
4　　A. I don't recall if I specifically said that,
5　but I think it was assumed.
6　　Q. How would you know?
7　　A. I introduced myself with my title, that I'm
8　human resources account manager for
9　unconventionals.
10　　Q. You said that to each of the witnesses?
11　　A. I believe so.  That's my recollection.
12　　Q. Did you say that you were a neutral
13　investigator or something to that effect?
14　　A. I don't recall.
15　　Q. So am I correct that prior to you meeting
16　with Jesse Barnes and Will Turney, you did not know
17　who else you would be interviewing?
18　　A. I don't recall that I knew who else I would
19　be interviewing.
20　　Q. Because your source as to who else to
21　interview came from the two of them?
22　　A. It came from the two of them and also who
23　else may -- was on the team.
24　　Q. You mean during your interviews of other

Page 96

1　witnesses?
2　　A. Yes.
3　　Q. They may have mentioned someone else that
4　you added to your list?
5　　A. Right.
6　　Q. But you didn't get any names from anyone
7　other than the individuals that you interviewed?
8　　A. As far as I can recall.
9　　Q. As a result of your interviews, did you
10　conclude that any of the witnesses were not
11　credible?
12　　A. What do you mean by that?
13　　Q. That any of them were lying?  Did you reach
14　a conclusion that any of the witnesses were not
15　telling the truth when you interviewed them?
16　　A. No.
17　　Q. You concluded that all were credible?
18　　　　MR. TUCKER:  You may answer.
19　　A. My -- I did not conclude that anyone was
20　not credible.
21　　Q. (BY MS. GURMANKIN)  Okay.  So you concluded
22　that they were all telling the truth?
23　　A. I concluded that they were telling the

24　(Pages 93 to 96)

Page 97

1    truth, yes.
2        Q.  Who did you interview first?
3        A.  My recollection is that I interviewed Jesse
4    Barnes first.
5        Q.  And then who?
6        A.  I believe it was Mr. Turney.
7            (Exhibit 18 was marked.)
8        Q.  (BY MS. GURMANKIN)  All right.  So you are
9    being shown Exhibit 18, Shell 1111 through 1121.
10   These are your typed notes of your interview with
11   Jesse, right?
12       A.  Yes.
13       Q.  So did this document start as the document
14   that you were typing your notes during your
15   interview with her?  In other words, was there one
16   document?
17       A.  Yes.
18       Q.  Okay.  And am I correct that you cleaned it
19   up and edited it after the interview?
20       A.  No.
21       Q.  Okay.  So this is exactly how you typed it
22   up when you were meeting with her?
23       A.  Yes.
24       Q.  Is that the case for all the witnesses?

Page 98

1        A.  Yes.
2        Q.  There was no editing or cleaning up
3    afterwards for anyone?
4        A.  As far as I can recall.
5        Q.  The introduction and the interview
6    questions, did you type those up beforehand?
7        A.  The interview questions?
8        Q.  Yeah.  The introduction that's on page 1
9    and then the interview questions throughout, did you
10   type those up before the interview?
11       A.  Yes.
12       Q.  For each of the witnesses?
13       A.  Yes.
14       Q.  After Jesse and Turney -- I'm going to look
15   at Turney's interview.
16           (Exhibit 19 was marked.)
17       Q.  (BY MS. GURMANKIN)  You are being shown
18   Exhibit 19, Shell 1122 through 1129.  This
19   is -- these are your typed notes of your interview
20   with Turney, correct?
21       A.  Correct.
22           MR. TUCKER:  Can she look at the entire
23   document?
24           MS. GURMANKIN:  Sure.

Page 99

1            MR. TUCKER:  I'm going to ask you to
2    look at the document before you verify that.  So
3    take your time and look at the documents.
4        A.  This document is my interview questions,
5    but I also am seeing an attachment that I did not --
6    that is not part of my interview notes.
7        Q.  (BY MS. GURMANKIN)  To Turney's?
8        A.  Yes.
9        Q.  Where do you see that?
10       A.  1128, bottom of the page.
11       Q.  Okay.  That looks like an email.
12       A.  Yes.
13       Q.  If you go into the next page, it looks like
14   the -- he's sending -- or you're including the email
15   that Michelle Priest had initially forwarded you
16   before you started your investigation about his
17   performance concerns about Jesse and his
18   conversation with her.  Correct?
19       A.  I don't recall attaching that to my
20   interview questions.
21       Q.  Okay.  So you are saying that the
22   attachment starting on the bottom of page 7, you
23   don't recall that being part of your interview
24   notes?

Page 100

1        A.  Right.
2        Q.  Okay.  Do you know how it got here?
3        A.  No.
4        Q.  You recall it ending with "conclusion" on
5    page 7?
6        A.  That's my recollection.
7        Q.  Okay.
8            MR. TUCKER:  Counsel, looks like -- I
9    think that's part of production, but I believe the
10   actual interview notes are Shell 377 to Shell 383.
11   You'll see in a lot of our production it's
12   duplicative, but it's the same documents without the
13   attachments.
14           MS. GURMANKIN:  And is the other one
15   just without that attachment at the bottom?
16           MR. TUCKER:  Yes.
17           MS. GURMANKIN:  Okay.  Thank you.
18           MR. TUCKER:  The exact same document,
19   just a different Shell Bates stamp number.
20       Q.  (BY MS. GURMANKIN)  All right.  So it looks
21   like from the dates on both your interview notes for
22   Jesse and Will Turney that they are on the same
23   date.
24       A.  Yes.

25 (Pages 97 to 100)

1　　Q.　Okay.　Do you recall -- and do you
2　recall -- do you recall meeting with Jesse first?
3　　A.　That's my recollection.
4　　Q.　Do you recall how long the interview took
5　with her?
6　　A.　I don't recall specifically.　I know it was
7　at least about two hours.
8　　Q.　How about Turney?
9　　A.　I don't recall specifically.
10　　Q.　More than that?
11　　A.　No.　I don't know.　They were both quite
12　long.
13　　Q.　Did you have any documents in front of you
14　other than your laptop when you were doing the
15　interviews with the witnesses?
16　　A.　As far as I can recall, it was my laptop
17　with the interview questions up that I was typing
18　and that was it.
19　　(Exhibit 20 was marked.)
20　　Q.　(BY MS. GURMANKIN)　All right.　You are
21　being shown what's been marked as Exhibit 20, Shell
22　1153 to 1156.　These are your interview notes with
23　Matt Empsen, correct?
24　　A.　Yes.

1　　Q.　And this is the day after you interview
2　Jesse and Turney, right?
3　　A.　Yes.
4　　Q.　And the dates are actually when you met
5　with these people, right?
6　　A.　Yes.
7　　Q.　Who is Matt Empsen?
8　　A.　I don't recall.
9　　Q.　Do you recall him being in Turney's group?
10　　A.　I don't recall.
11　　Q.　If you look at the bottom under your
12　questions, the last paragraph on the bottom of
13　page 1, second -- I'll read from the first line.
14　"Cubicles sit right next to them.　Their work group
15　dynamic from my perspective, Will is very
16　condescending to them, and more specifically Jesse.
17　The way he talks to her is very demeaning.　Doesn't
18　respect her in the role.　Not afraid to blame for
19　something that has nothing to do with her.　If my
20　boss treated me that way, I would talk to them
21　because it is disrespectful.　He has demeaned her in
22　meetings, blamed her and talked down to her.　On a
23　daily basis is very condescending and sarcastic like
24　he is better than they are.

1　"It seems like every day there is
2　something.　An example would be how he asks her if
3　he needs something, he would tell her he needs it
4　but that it should already have been done.　For
5　example, updating a board, saying 'You should
6　already know how to do this.'　It's the tone, the
7　body language, more frequently towards her?"
8　　I read that correctly?
9　　A.　Yes.
10　　Q.　From that part did you believe that Turney
11　may have been treating Jesse differently because
12　she's a woman?
13　　A.　From this?
14　　Q.　From that part that I just read.
15　　A.　There is nothing in here that indicates
16　it's because she -- she is a woman.
17　　Q.　Well, he's indicating that Turney treats
18　Jesse -- for example, the second -- "Will is very
19　condescending to them and more specifically Jesse."
20　The last part "more frequently towards her."　Right?
21　　He's saying that Will treats Jesse in a
22　certain way, right?
23　　A.　That it's more frequently towards her.
24　　Q.　So did you take from that that Turney might

1　be treating her differently because she's a woman?
2　　A.　Not necessarily.
3　　Q.　Why not?
4　　A.　Because he's not saying that it's
5　necessarily because she is a woman.
6　　Q.　Did you ask him?
7　　A.　Let me review.　I did not specifically ask
8　him that question based on these notes and my
9　recollection.
10　　Q.　Why not?
11　　A.　I don't know.
12　　Q.　And he could have been suggesting here that
13　Turney treats Jesse different because she's a woman,
14　right?
15　　MR. TUCKER:　Objection.
16　　Q.　(BY MS. GURMANKIN)　That he does things
17　more frequently with her because she's a woman?
18　　A.　That's not my understanding from this.
19　　Q.　You assumed that -- you assumed what from
20　that paragraph that he -- that we just read that he
21　was telling you?
22　　MR. TUCKER:　She didn't say that she
23　assumed anything.　She said that was not her
24　understanding.

26　(Pages 101 to 104)

1    Q. (BY MS. GURMANKIN) That you reached the
2  conclusion that it wasn't about sex, right?
3    A. I had to look at everything in totality.
4  This was one observation that Matt Empsen had. So I
5  did not reach a conclusion based on this
6  specifically.
7    Q. One way or the other?
8    A. Right.
9    Q. All right. Let's go on to page 2. Second
10 paragraph, "I have seen Will say inappropriate
11 comments to all women in the office, body language,
12 things he would say, how he postures himself around
13 other females." I'll stop there for a sec.
14       Did you ask him what inappropriate
15 comments that he heard Turney say to all women in
16 the office?
17    A. I can't recall.
18    Q. That would have been relevant to your
19 investigation, right?
20    A. Yes.
21    Q. If it's not in here, can you assume that
22 you didn't ask him?
23    A. In the second sentence in that paragraph?
24    Q. No. If it's not anywhere in your interview

1  notes, then can you assume that you never asked him
2  that question?
3    A. No.
4    Q. Why would you omit that if you had asked
5  him that question?
6    A. I would not omit it.
7    Q. Right.
8    A. I --
9    Q. So --
10       MR. TUCKER: Let her finish, please.
11    A. I drafted the interview questions
12 beforehand and I -- I didn't have in there ask for
13 examples, but I may have asked for examples as we
14 were going and I just didn't put in there that that
15 was a question that I asked.
16       But he says -- there is an example that
17 he said besides here. So I could have asked for
18 examples without it being written as a question.
19    Q. Well, if you had asked in a sexual
20 harassment investigation and someone is telling you
21 that he has seen the accused sexual harasser say
22 inappropriate comments to all women in the office,
23 body language, things that he would say, how he
24 postures himself around other females, you would

1  certainly want to know what he's heard Turney say
2  and how he's seen him act. That heard Turney say
3  to your investigation, right?
4    A. Yes.
5    Q. Okay. And if you had asked him that
6  question, then that would be included in your
7  interview notes, right?
8    A. If I had asked the question, the question
9  might not -- the question, for example, might not
10 necessarily be in this notes.
11    Q. His answers would have been, right?
12    A. Right.
13    Q. Okay. So if his answers aren't in here,
14 then can we assume that you never asked him that
15 question?
16    A. Or he did not have any examples, specific
17 examples.
18    Q. But you don't have a specific recollection
19 of asking him what he meant when he said that he has
20 seen Turney say inappropriate comments to all women
21 in the office, right?
22    A. I don't recall specifically just given how
23 long ago this was.
24    Q. "With Jesse" -- you go on to write what he

1  says. "With Jesse, a little closer to her than he
2  should be, how close you are, how you sit next to
3  her, mannerisms, example sit beside her and lean on
4  her, impeding on her comfort zone, too close."
5        I read that correctly?
6    A. Yeah.
7    Q. And you got from this that he was saying
8  that Will is engaging in inappropriate conduct with
9  Jesse?
10    A. Can you repeat your question?
11    Q. Sure.
12       MS. GURMANKIN: Do you mind, Connie?
13       (Requested portion was read.)
14    A. I didn't gather that conclusion from this
15 specifically. I gathered that Matt Empsen's
16 observations is that with Jesse he sits beside her,
17 can lean on her and is near her comfort zone, that
18 that's his perception.
19    Q. (BY MS. GURMANKIN) And you certainly were
20 concerned in an investigation of sexual harassment
21 that you have an employee who's saying that he has
22 seen the male supervisor who's being accused sitting
23 closer to his subordinate than he should be, leaning
24 on her, impeding her comfort zone, getting too

27 (Pages 105 to 108)

Page 109

1  close, right?
2          MR. TUCKER:  Objection.
3      A.  Can you repeat your question?
4      Q.  Sure.
5          MS. GURMANKIN:  Do you mind, Connie?
6          I'll ask you again.
7      Q.  (BY MS. GURMANKIN)  When a male employee is
8  telling you in a sexual harassment investigation
9  that he's seen the male supervisor being accused
10 getting a little too close to his female
11 subordinate, leaning on her, impeding her comfort
12 zone, getting too close to her, that concerns you
13 that there might be inappropriate conduct going on
14 here?
15         MR. TUCKER:  Objection.
16         You may answer.
17     A.  I believe that that -- that is a validation
18 that there has been an observation.
19     Q.  (BY MS. GURMANKIN)  And, in fact, if you
20 look at the second item in the chart -- bless you --
21 in the chart below, where it says, "My supervisor
22 touches my arm and/or leg a majority of the time I
23 have a meeting or talk to him one or one," and then
24 the column all the way over the on the right is --

Page 110

1  the answer is that you are getting from Matt Empsen,
2  right?
3      A.  Yes.
4      Q.  And he says, "I have seen him at her desk
5  going over stuff with her, personal space that he
6  crosses.  He does not get close to other males.
7  Only noticed it with her," correct?
8      A.  Correct.
9      Q.  And that concerned you?
10     A.  This -- yes.
11     Q.  The first claim says, "I'm continuously
12 asked about my personal life by my supervisor."  And
13 then you're writing Matt Empsen's statements to you.
14 He says, "Yes.  That is one of Will's things, and
15 he's one to share his.  He thinks it's okay to ask
16 about relationship status.  I have noticed he has
17 done that with people on his team."
18         I read that correctly?
19     A.  Yes.
20     Q.  Did you ask him if Turney only did it with
21 females, or whether he did it with males and females
22 on his team?
23     A.  I don't recall.  I don't believe I asked
24 that specifically.

Page 111

1      Q.  All right.  Last claim on that page, "I
2  have been asked by my supervisor multiple times if I
3  thought about him over the weekends.  I have heard
4  the term and he says" -- according to your notes --
5  "I have heard the 'miss me' comment on numerous
6  occasions to her specifically.  I have not heard him
7  say that to male coworkers."
8      I read that correctly?
9      A.  Yes.
10     Q.  The getting too close to Jesse, the
11 invading her personal space, the leaning on her that
12 Matt's telling you about, that would be a violation
13 of Shell's EEO and antiharassment policies, correct?
14     A.  Can I review the policies?
15     Q.  Sure.  I'll bring them up.
16         Do you need to see them in order to
17 answer that?
18     A.  I would like to review them in order to
19 answer that.
20     Q.  I understand that.  I just want to make
21 sure before I bring them up, do you need to see them
22 in order to answer that question?
23     A.  It's been a while since I have reviewed it,
24 so yes.

Page 112

1      Q.  So I am showing you the antiharassment and
2  EEO policies.  Let me know when you are done.
3      A.  Can you repeat your question?
4      Q.  Sure.  Let me just show you the -- I just
5  wanted to know if that conduct -- getting too close
6  to Jesse, leaning on her, invading her personal
7  space, touching her -- if that would violate the
8  company's EEO and antiharassment policies.  And just
9  so we're complete, I'll show you the Code of
10 Conduct.
11         So you should have the harassment page
12 up.  You see that?
13     A.  Yes.
14     Q.  And then when you have done that, if you
15 scroll forward two pages, there is the EEO policy.
16     A.  I didn't necessarily find that claim
17 violated the -- Shell's EO -- EEO or harassment
18 policy, but I found it to be inappropriate
19 supervisor behavior.
20     Q.  And why did you conclude that it didn't
21 violate the company's policy?
22     A.  Can you pull up the --
23     Q.  Yeah.  The Code of Conduct or the
24 antiharassment?

                              28  (Pages 109 to 112)

Page 113

1          A. Antiharassment, please.
2              I did not find that rise to the level
3     under Shell's antiharassment policy that it was
4     sexual harassment, a request for a date, favor or
5     other verbal or physical conduct of a sexual nature.
6     I didn't view it at that level, that it was a sexual
7     nature.
8              Mr. Turney in his investigation
9     mentioned that that is something that he does kind
10    of to relate to people.  He will touch someone's
11    shoulder or arm.  And he said he may have
12    accidentally touched her leg if scooting up closer.
13         Q. Do you have Matt Empsen telling you that
14    he's seen Turney only treat Jesse this way, getting
15    too close, leaning on her, impeding her comfort zone
16    and invading her personal space and not doing it to
17    other males, only noticing it with her, right?
18    That's what Empsen is telling you?
19         A. That's what Empsen said.
20         Q. Okay.  And do you agree that the conduct
21    that Empsen is describing to you would constitute
22    physical behavior of a sexual nature of Turney
23    towards Jesse?
24         A. I had to look at everything in totality and

Page 114

1     validate against everyone's observations, but I
2     don't necessarily think what Empsen saw validates
3     that it is of a sexual nature.
4          Q. If he is saying that Turney is only doing
5     this to Jesse, why not?
6          A. I had to look at everything in totality to
7     validate this, and that is just his observation
8     of -- that it is just toward Jesse.  It doesn't
9     necessarily validate that it's not for others.
10         Q. Right.  But I'm just asking about Empsen's
11    allegations about Turney getting too close to Jesse,
12    leaning on her, invading her personal space and only
13    doing it with her, not the male members of his team.
14             Why, in your opinion, did that not
15    constitute physical behavior of a sexual nature?
16             MR. TUCKER:  She's answered three
17    times --
18             MS. GURMANKIN:  No, not that one.
19             MR. TUCKER:  She said she looked at --
20    had to look at totality of circumstances.
21             MS. GURMANKIN:  I'm not asking about
22    totality.  I'm asking about that conduct
23    specifically.
24             Why didn't you conclude that that was

Page 115

1     physical behavior of a sexual nature.
2              MR. TUCKER:  She's answered that.  She
3     had --
4              MS. GURMANKIN:  No.
5              MR. TUCKER:  -- to look at it in the
6     context of totality of circumstances.
7              MS. GURMANKIN:  I'm not asking about
8     totality of circumstances.
9          Q. (BY MS. GURMANKIN)  I'm asking why didn't
10    you conclude -- you testified you concluded that
11    that conduct did not violate the company's policy.
12    And I'm asking why did you conclude that that
13    conduct was not physical behavior of a sexual
14    nature?
15             MR. TUCKER:  Objection; asked and
16    answered several times.
17             You may answer it again.
18         A. My view and what I took away was that this
19    was inappropriate behavior and should not be done by
20    a supervisor.  But I did not view that it rose to
21    the level or didn't have information to validate
22    that this was of a sexual nature.
23         Q. (BY MS. GURMANKIN)  If you concluded it was
24    inappropriate behavior that should not have been

Page 116

1     done by a supervisor, how did you conclude that that
2     did not violate the company's policies?
3          A. I concluded that it did not violate the
4     antiharassment policy here, but it was
5     inappropriate.
6          Q. Right.  I'm asking how did you conclude
7     that it was inappropriate and should not have been
8     done by a supervisor but that it didn't violate the
9     company's policies?
10         A. I could not validate that it was of a
11    sexual nature.
12         Q. Well, if he's only doing it to the woman,
13    then wouldn't that indicate that it is being done in
14    a sexual nature?
15         A. I had to look at everything in totality,
16    and that was Mr. Empsen's observation.
17         Q. Of course.  You are interviewing him.  But
18    my question is, if Empsen's telling you that
19    Turney's only doing this to the woman and not the
20    men, wouldn't that indicate that it's behavior of a
21    sexual nature?
22         A. That may indicate that, but I did have to
23    look at everything in totality, and that was his
24    view.

29 (Pages 113 to 116)

Page 117

1　　Q. Well, did you ever conclude that Empsen was
2　lying to you?
3　　A. No.
4　　Q. Okay. You concluded that he was truthful?
5　　A. From what he saw.
6　　Q. What does that mean?
7　　A. He may not observe that Mr. Turney does
8　this with male colleagues.
9　　Q. So what about the totality of circumstances
10　with what Empsen was telling you led you to conclude
11　that, while this was inappropriate behavior that
12　shouldn't have been done by a supervisor, it didn't
13　violate company policy?
14　　A. Mr. Turney admitted that he has done this
15　in a friendly way and that he does it with others,
16　as well. I can't recall specifically if this was
17　validated by others. I would have to look through
18　those notes.
19　　Q. Well, Turney has reason to lie here; Empsen
20　doesn't, right?
21　　A. I didn't conclude that Mr. Turney had
22　reason to lie.
23　　Q. Well, Turney's being accused of sexual
24　harassment; Empsen is not, right?

Page 118

1　　A. That's true.
2　　Q. All right. So Turney has reason to lie;
3　Empsen doesn't?
4　　MR. TUCKER: Objection; she's answered
5　the best she can. He didn't believe he had a reason
6　to lie.
7　　Q. (BY MS. GURMANKIN) Right?
8　　A. I did not conclude that Mr. Turney was
9　untruthful.
10　　Q. That wasn't my question.
11　　Turney has reason to lie; Empsen
12　doesn't, right?
13　　MR. TUCKER: Objection; asked and
14　answered.
15　　A. That's not my conclusion.
16　　Q. (BY MS. GURMANKIN) You don't believe that
17　Turney has reason to lie when he's being the one
18　accused of sexual harassment?
19　　MR. TUCKER: Objection; asked and
20　answered three times now.
21　　MS. GURMANKIN: No, it hasn't been
22　answered.
23　　MR. TUCKER: Yes, it has.
24　　Q. (BY MS. GURMANKIN) You don't believe that

Page 119

1　Turney has reason to lie when he's being accused of
2　sexual harassment by a female employee at Shell?
3　　A. I believe Mr. Turney was honest.
4　　Q. Do you believe that he had reason to lie?
5　　A. No.
6　　Q. Wouldn't inappropriate behavior that should
7　not have been done -- should not have been done by a
8　supervisor automatically violate Shell's policy?
9　　A. It violates Shell's Code of Conduct.
10　　Q. All right. So based on what Empsen is
11　telling you, Turney's conducted violated the
12　company's Code of Conduct, right?
13　　A. My findings were that Mr. Turney's behavior
14　did violate Shell's Code of Conduct.
15　　Q. But I'm asking you specifically about the
16　allegations that Empsen is making about Turney
17　touching Jesse, getting too close to her, invading
18　her personal space in a way he doesn't with the male
19　employees, only with her.
20　　Did that violate the company's Code of
21　Conduct?
22　　A. I can't specifically just take one person's
23　observation and say that that -- it was for sure a
24　violation. I have to look at everything in totality

Page 120

1　to make those conclusions.
2　　Q. I'm asking you as you sit here today. Did
3　you conclude that based on what Empsen is telling
4　you about Turney touching Jesse and getting too
5　close to her in a way he didn't with the male
6　employees, which you say was inappropriate behavior
7　that should not have been done by a supervisor, did
8　that conduct violate the company's Code of Conduct?
9　　A. I did not make that conclusion based on one
10　interview.
11　　Q. So a supervisor engaging in inappropriate
12　behavior that should not have been done by getting
13　too close to a female employee, leaning on her,
14　impeding her comfort zone, invading her personal
15　space does not violate the company's policy? Is
16　that what you are saying?
17　　A. That is not what I'm saying.
18　　Q. Does it violate the company's policy?
19　　A. Yes.
20　　Q. You agree that a reasonable woman would be
21　offended by that type of conduct, a male supervisor
22　getting too close to her, invading her personal
23　space, leaning on her in a way that he doesn't with
24　male employees?

30 (Pages 117 to 120)

Page 121

1    A. I think it depends on the person.
2    Q. Right. But a reasonable woman could be
3  offended by that type of conduct, right?
4    A. A reasonable woman could be offended.
5    Q. The "miss me" comment that we looked at,
6  that Empsen is telling you that he heard Turney ask
7  Jesse if he -- if she missed him in a way that he
8  did not hear him say to male coworkers, does that
9  violate the company's policy?
10   A. Can you pull up the investigation, please?
11   Q. Sure. Your interview notes with Empsen?
12   A. Yes.
13   Q. Yes. There you go. It's on the last part
14  of page 2.
15   A. And your question was?
16   Q. What Empsen is telling you about Turney
17  telling Jesse, repeatedly asking if she missed him
18  in a way he's not heard him say to male coworkers,
19  does that violate the company's policy?
20   A. I don't believe so.
21   Q. Why not?
22   A. Making a comment or a joke around "miss me"
23  on a number of occasions doesn't necessarily violate
24  the company's policies.

Page 122

1    Q. It could, though?
2    A. Again, I had have to look at the totality,
3  but this specifically what we are looking at doesn't
4  necessarily violate them.
5    Q. Well, if you are saying it doesn't
6  necessarily, is that right?
7    A. What we're looking at right now, no.
8    Q. Okay. So that what Empsen is telling you
9  does not violate the company's policy, even though
10  he's telling you that Turney only does that to the
11  woman, not to the men.
12       Is that what you are saying?
13   A. This is not enough information to validate
14  that it's violating a company policy.
15   Q. So did you ask for more information?
16   A. I don't recall.
17   Q. If you had it, it would have been included
18  in here?
19   A. I believe so.
20   Q. Why wouldn't you have asked for more
21  information?
22   A. I was discussing this with a number of
23  individuals to get their observations, as well. So
24  I didn't feel like I needed to ask for more

Page 123

1  information.
2    Q. But Empsen is telling you something
3  particular, and you are saying now that you would
4  need more information to validate that. So why
5  didn't you ask Empsen for more information when you
6  had him in the conference room?
7    A. I didn't mean that I need more information
8  from Empsen, but I would have to look at the
9  totality of my investigation and my conversations
10  with Ms. Barnes, Mr. Turney and other individuals
11  who may or may not have witnessed this to come to
12  that conclusion.
13   Q. Next page on Exhibit 20, page 3. "My
14  supervisor has told me that he has thought about me
15  while showering," and then Empsen says, according to
16  your notes -- did he say "not applicable," or is
17  that you writing that?
18   A. As far as I can recall, that was me writing
19  them.
20   Q. And why did you write that?
21   A. As far as I can recall, he did not hear him
22  say that comment.
23   Q. Right. But he did tell you, according to
24  your notes, that "I could see him saying something

Page 124

1  like that," right?
2    A. Correct.
3    Q. Did you ask him why?
4    A. Not that I recall.
5    Q. Might be related to Empsen saying that he's
6  heard Turney making inappropriate comments to all
7  women in the office, that you wrote down on page 2?
8    A. I can't make that connection or make that
9  call myself.
10   Q. Because you didn't ask him about that,
11  right?
12   A. Right.
13   Q. On page 3 under No. 3, "Her coworkers on
14  that team treat her disrespectfully. They see how
15  he treats her, so they see that it's okay. Dan
16  Krise, Ken Foreman would be others that treat her
17  that way. They feed off of Will. They think it's
18  okay and it's funny and Will can do it. They poke
19  fun at her about it. They don't have bad
20  intentions, but they think it's funny. Will is
21  setting the example. For Will it seems like a power
22  thing for him. He thinks he's in a position he can
23  treat his subordinates how he wants and get way with
24  it." I'll stop there for a second.

31 (Pages 121 to 124)

Page 125

1       So Empsen is telling you that males on
2  the tream -- on the team treat Jesse disrespectfully
3  because of the way that Turney treats her, right?
4      A.  That is Mr. Empsen's observations, yes.
5      Q.  And that would be a violation of the
6  company's EEO policy, wouldn't it?
7      A.  What specifically?
8      Q.  Having male employees treat a female
9  employee on the team disrespectfully because they
10  are feeding off the way that the male supervisor
11  treats that female employee?
12      A.  Yes.
13      Q.  And then you go on to write that Empsen
14  told you "In my opinion, Turney is a womanizer."
15       You see that?
16      A.  Yes.
17      Q.  Did you ask him what he meant by that?
18      A.  I don't recall specifically, but his
19  statement below leads me to believe I may have.
20      Q.  The statement below says, "When someone can
21  talk to a male or female and have two different
22  postures, how they speak, body language.  You should
23  treat everyone with respect.  I noticed it since I
24  started.  I have seen it affect Jesse in the past

Page 126

1  six months to a year.  Her attitude, she feels
2  uncomfortable.  She sits at her desk and does her
3  work."
4       I read that correctly?
5      A.  Yes.
6      Q.  You think that's an answer to your
7  follow-up about what he meant by saying Turney's a
8  womanizer?
9      A.  I think.  That's my -- I think so.
10      Q.  He's certainly expressing in that paragraph
11  that you just pointed out that Turney treats men and
12  women differently, right?
13      A.  He says that he talks to males and females
14  and has different postures.
15      Q.  So he's indicating that Turney treats men
16  with respect and does not treat Jesse with respect,
17  right?
18      A.  He's saying you should treat everyone with
19  respect.
20      Q.  Well, didn't you get from this full
21  paragraph that he was telling you that Turney does
22  not treat Jesse with respect; he treats her
23  differently than the men?
24      A.  Yes, I did understand that that was Matt

Page 127

1  Empsen's view.
2      Q.  And that would be a violation of the
3  company's EEO policy?
4      A.  Yes.
5      Q.  And a reasonable woman could certainly be
6  offended by that, right?
7      A.  Yes.
8      Q.  Do you recall how long your interview with
9  Empsen was?
10      A.  No.
11      (Exhibit 21 was marked.)
12      Q.  (BY MS. GURMANKIN)  Showing you what's been
13  marked as Exhibit 21, Shell 1157 through 1159.
14  These are your notes of your interview with Mark
15  Hoover, correct?
16      A.  Yes.
17      Q.  And this is on 12/14/2016?
18      A.  Yes.
19      Q.  This was the one you did by phone because
20  he was on vacation while you were in Willsboro?
21      A.  That is my recollection.
22      Q.  And did you do in this same way, take notes
23  on your laptop while you were talking to him over
24  the phone?

Page 128

1      A.  That's my recollection.
2      Q.  Before we talk about Mark Hoover, do you
3  recall how you got to Matt Empsen?  In other words,
4  why was he on your list as a witness?
5      A.  I don't recall specifically.
6      Q.  Okay.  How about Mark Hoover?
7      A.  I don't recall specifically, but my
8  recollection is that there was some claims that
9  Jesse made specifically about him.
10      Q.  So if you look at the bottom of page 1, it
11  says, "I'd like to review a few specific examples of
12  the work environment and team environment with you.
13  Please share any information or perspective you have
14  related to these matters."
15      If you go on to page 2, you're asking
16  him about certain allegations.  Are these the
17  allegations that directly related to him?
18      A.  Yeah.
19      Q.  So looking at the third one, "I have been
20  called a 'bitch' by numerous people in the office."
21  And Mark Hoover responds, according to your notes,
22  "Bitchy, yes.  It was strictly in a joking manner.
23  It was never -- there was no" -- should that be
24  malicious?

Page 129

1 A. Malice.

2 Q. Malice or?

3 A. Meanness.

4 Q. Okay. "Involved." All right.

5 So he's admitting to you that he called

6 Jesse bitchy?

7 A. Yes.

8 Q. And that would be a violation of the

9 company's EEO and antiharassment policies?

10 A. It would be a violation of the Code of

11 Conduct.

12 Q. Including the EEO and antiharassment

13 policy?

14 A. I think they are two separate policies, my

15 understanding.

16 Q. Let's go back to -- look at Exhibit 3, Code

17 of Conduct, page 16. That's the company's

18 antiharassment policy?

19 A. There is -- this is the Code of Conduct,

20 and Section 3.3 has harassment included in the Code

21 of Conduct.

22 Q. Right. It says there is a zero tolerance

23 policy for harassment at Shell?

24 A. Yes.

Page 130

1 Q. The antiharassment policy that we looked at

2 separately goes into a bit more detail?

3 A. Yes. That is the US policy.

4 Q. And the Code of Conduct is international?

5 A. It's our global.

6 Q. Okay. And then page 18 of the Code of

7 Conduct has the EEO policy?

8 A. Equal opportunity, yes.

9 Q. Okay. So the Code of Conduct includes the

10 same policies that the US had separately, right?

11 A. Yes.

12 Q. Okay. So calling -- a male employee

13 calling a female "bitchy" would violate the

14 company's EEO and antiharassment policies, right?

15 A. It is disrespectful, yes.

16 Q. Yes, it would violate the policy?

17 A. Yes.

18 MR. TUCKER: It's disrespectful and

19 that it would violate what policy you're referring

20 to?

21 MS. GURMANKIN: She answered.

22 A. Code of Conduct Section 3.3, Harassment.

23 Q. (BY MS. GURMANKIN) It would violate the

24 company's EEO and antiharassment policies, correct,

Page 131

1 being called -- a male employee calling a female

2 colleague "bitchy"?

3 A. It would violate the Code of Conduct

4 Section 3.3 harassment.

5 Q. And the company's EEO policy as set forth

6 in the Code of Conduct?

7 A. I don't believe that it violates the EEO

8 policy.

9 Q. And is it your testimony that it does not

10 violate the Shell US antiharassment policy?

11 A. Can you pull it up, please?

12 Q. Sure.

13 A. I do see this as something that is in

14 violation with Shell's antiharassment policy.

15 Q. You mean in substance the antiharassment

16 and EEO policies in both the separate policy and the

17 Code of Conduct are there to prohibit the same type

18 of conduct, right?

19 A. Right, but I don't see that as a violation

20 of Shell's EEO policy.

21 Q. Right. But you see it as a violation of

22 the antiharassment policy?

23 A. Yes.

24 Q. How long was your interview with Hoover?

Page 132

1 A. I don't recall.

2 (Exhibit 22 was marked.)

3 Q. (BY MS. GURMANKIN) You are being shown

4 Exhibit 22, Bates stamped Shell 1149 through 1152.

5 These are your interview notes with your interview

6 with Ken Foreman, correct?

7 A. Yes.

8 Q. Do you remember how he got on your witness

9 list?

10 A. As far as I can recall, he was on Jesse's

11 team and may have also reported to Mr. Turney, and

12 there was some examples that he was a witness and/or

13 also involved in.

14 Q. And did you get his name from Jesse or

15 Turney or someone else?

16 A. I believe, as far as I can recall, I got it

17 from both.

18 Q. So Jesse and Turney?

19 A. I believe so.

20 Q. All right. So if you go to the last

21 paragraph on page 1, says, "Jesse, she received my

22 product when I was a scheduler. She is a different

23 girl. She is supersmart. If you go with

24 stereotypes, she is surprisingly smart." I'll stop

Page 133

1  there for a second.
2        So he's saying -- and did you
3  understand him to be saying if you go with
4  stereotypes about women, she's surprisingly smart?
5        A. Yes.
6        Q. And that would violate the company's EEO
7  policies, wouldn't it?
8        A. Him telling me that in an interview doesn't
9  necessarily violate it.
10       Q. That he's telling you, if you go with
11  stereotypes about women, she's surprisingly smart,
12  you didn't think that violated the company's EEO or
13  antiharassment policy?
14       A. Can you pull them up again?
15       Q. Sure. I'm showing you the antiharassment
16  and EEO policy.
17       A. I can't conclude him making that comment to
18  me in an interview is in violation of Shell's
19  policies.
20       Q. All right. Look at page 2, the EEO policy,
21  in the second paragraph. Last sentence, "In
22  addition, all employees are expected to support this
23  policy and contribute to an environment of equal
24  opportunity."

Page 134

1        Do you see that?
2        A. I do.
3        Q. So when you have an employee telling you
4  that, based on stereotypes of women, this one is
5  surprisingly smart, do you think that violates the
6  EEO policy?
7        MR. TUCKER: He said, "If you go with
8  stereotypes" is what he said.
9        MS. GURMANKIN: You can object to form,
10  if you have one.
11       Please answer the question.
12       MR. TUCKER: You can't, though, just
13  blatantly lie about something that's not there.
14       MS. GURMANKIN: Please stop -- please
15  stop coaching.
16       MR. TUCKER: I'm not coaching. I will
17  not let you just blatantly make up something.
18       MS. GURMANKIN: You know I'm not making
19  up stuff. Please don't accuse me of something
20  that's not true.
21       MR. TUCKER: It says right here -- "If
22  you go with stereotypes" is what he said.
23       MS. GURMANKIN: Joe, object to form.
24       Please answer the question.

Page 135

1        THE WITNESS: What was your question
2  again?
3        (Requested portion was read.)
4        A. I think that's an offhand comment that
5  should not have been made, but I don't think that
6  comment alone is a violation.
7        Q. (BY MS. GURMANKIN) Well, he's telling you
8  that that's what he thinks about women, that --
9        MR. TUCKER: Objection --
10       MS. GURMANKIN: Joe, stop. I haven't
11  even finished my question.
12       MR. TUCKER: He's not talking --
13       MS. GURMANKIN: Joe, Joe, you're being
14  discourteous.
15       MR. TUCKER: I'm not. You are making
16  things up, Caren.
17       MS. GURMANKIN: Stop. Stop.
18       MR. TUCKER: No, I'm not going to stop.
19  I'm not your child, unfortunately.
20       MS. GURMANKIN: But you are being
21  inappropriate.
22       MR. TUCKER: No. You are being
23  inappropriate by making things up. She doesn't have
24  the exhibit in front of her, and you're saying

Page 136

1  things the exhibit doesn't say.
2        MS. GURMANKIN: Object to form. Object
3  to form.
4        MR. TUCKER: I will not allow her to
5  answer a blatantly misleading question.
6        MS. GURMANKIN: I understand you are
7  not following the rules, but you really need to.
8        Q. (BY MS. GURMANKIN) He is saying, "If you
9  go with stereotypes" -- first, "She is a different
10  girl. She is supersmart. If you go with
11  stereotypes, she is surprisingly smart."
12       So you testified that it's clear that
13  he's expressing that if you go with stereotypes
14  about females, she's surprisingly smart.
15       Do you think that that's an employee
16  who supports an environment of equal opportunity
17  pursuant to the company's EEO policy?
18       A. I can't make that conclusion based on one
19  offhand comment that he made.
20       Q. Why not?
21       A. This was an isolated just one comment that
22  he was making in the interview.
23       Q. Does that matter, if it's an isolated
24  comment?

Page 137

1        A.  I believe it does.
2        Q.  An isolated comment could violate the
3    policy, couldn't it?
4        A.  Depending on the -- comment.
5        Q.  Right.  Calling a female a bitch would
6    violate the policy, right?
7        A.  Which policy?
8        Q.  The company's antiharassment and EEO
9    policies.  A male employee referring to a female as
10   a bitch or bitchy would violate the company's
11   policy.  So it doesn't matter that it's an isolated
12   comment, right?
13       A.  I can't conclude this one comment that he
14   made is in violation of the company's policy.
15       Q.  Did it concern you when you have a male
16   employee who's saying about a female employee "She's
17   a different girl.  She's supersmart.  If you go with
18   stereotypes, she's surprisingly smart"?
19       A.  It is concerning that a male employee has
20   that view.
21       Q.  It's inappropriate, isn't it?
22       A.  I don't have evidence that he has made
23   those statements to her or others.
24       Q.  The fact that he thinks it, doesn't that

Page 138

1    concern you?
2        A.  It is concerning.
3        Q.  "She gets offended by things that are not
4    meant to be offensive.  She thinks things are
5    personal when they are not."
6            Did you ask him what things she gets
7    offended by that are not meant to be offensive?
8        A.  I don't recall specific questions.
9        Q.  If you had, that would have been included
10   in your notes?
11       A.  Not all follow-up questions were included
12   in the notes if they were asked.
13       Q.  So there may have been things that people
14   said or you asked that you omitted from your notes?
15       A.  I didn't purposefully omit that from my
16   notes, but if I asked a follow-up question, I didn't
17   always capture what the question was, but I would
18   have captured the follow-up response.
19       Q.  All right.  So if you had asked him about a
20   follow-up and he answered, then you would have
21   included that in here, right?
22       A.  Correct.
23       Q.  And the fact that it is not in here
24   indicates either that you didn't ask him or he

Page 139

1    ignored your question and didn't answer it, right?
2        A.  Or didn't have specifics.
3        Q.  Next page.  The second full sentence, "She
4    has met the other MEs" -- did you understand that to
5    be maintenance analyst?
6        A.  Yes.
7        Q.  That was the position Jesse was in at the
8    time?
9        A.  Yes.
10       Q.  Parens, "only deals well with the female
11   MEs.  Doesn't reach out to the males."
12           Did you ask him what he meant by that?
13       A.  I don't recall.
14       Q.  All right.  Under "Claims," the second one
15   from Jesse, "My supervisor touches my arm and/or leg
16   the majority of the time I have a meeting or talk to
17   him one on one."  And according to your notes,
18   Foreman says, "Any touch is too much.  She does not
19   like to be touched.  I don't know if she has touched
20   her."  I assume you meant "if he has touched her."
21       A.  Yes.
22       Q.  "If it happened and I was a witness to it,
23   it wasn't in a sexual way.  We are always looking at
24   each other's screens, in each other's personal

Page 140

1    spaces.  When I'm there with you [sic], I tell her
2    right out, 'You know I can't see the screen.  I have
3    to be in your space.'  He is outgoing, so friendly
4    touches would not be surprisingly."  All right.
5            So I read that correctly?
6        A.  You said -- the correct statement, the last
7    two sentences, "When I am there with her, I tell her
8    right out, 'You know I can't see the screen.  I have
9    to be in your space.'"
10       Q.  Okay.  Thank you.
11           So he's not denying that he's seen
12   Turney touch her, right?
13       A.  He's saying he doesn't know if he has
14   touched her.
15       Q.  Right.  But he's saying, "He's outgoing.
16   So friendly touches would not be surprising," right?
17       A.  Yes.
18       Q.  But he said, according to your notes, "If
19   it happened and I was a witness to it, it wasn't in
20   a sexual way."
21           Did you ask him if he had actually seen
22   it happen?
23       A.  He says that he has not seen it happen.
24       Q.  Well, he said, "I don't know if she" --

Page 141

1   meaning he" -- has touched her. If it happened and
2   I was a witness to it, it wasn't in a sexual way."
3          Did you follow up and say -- how can --
4   I mean, does it make sense that he's saying, "If it
5   happened and I was a witness to it, it wasn't in a
6   sexual way?" In other words, how can he say it
7   wasn't in a sexual way if he never saw it?
8      A.  I -- he -- what he said to me was that he
9   hasn't seen it.
10      Q.  Did you ask him what he meant when he said,
11  "If it happened and I was a witness to it, it wasn't
12  in a sexual way"?
13      A.  As far as I can recall, I did not ask him
14  that question.
15      Q.  How come?
16      A.  I didn't think it was necessary.
17      Q.  Why not?
18      A.  He's saying that he didn't have -- has not
19  witnessed it.
20      Q.  Well, he's not saying he's saying -- he's
21  not saying he hasn't witnessed it. Is there
22  anywhere on what you reflect in your notes where he
23  says that he has not witnessed it?
24      A.  He says, "I don't know if -- if he has

Page 142

1   touched her."
2      Q.  All right. So when he goes on to say, "If
3   it happened and I was a witness to it, it wasn't in
4   a sexual way," why didn't you ask him what that
5   meant?
6      A.  My conclusion to his response is that he
7   hasn't seen anything that has been inappropriate and
8   that there are often friendly touches or being in
9   each other's space. So it could have happened, but
10  he is not saying an example that he can recall.
11      Q.  Right. But when he said he doesn't know if
12  Will has touched her, "but if it happened and I was
13  a witness to it, it wasn't in a sexual way," did you
14  ask him how can you say it wasn't in a sexual way if
15  it happened if you don't know whether or not he has
16  touched her?
17          MR. TUCKER: Objection.
18          You may answer again.
19      A.  I did not ask him that question.
20      Q.  (BY MS. GURMANKIN) Page 3, "I have been
21  called a bitch by numerous people in the office."
22  He says, "Yes, but it is because of her mood."
23          And as we discussed earlier, that would
24  be a violation of the company's EEO and

Page 143

1   antiharassment policies, correct, referring to a
2   female employee as a bitch?
3      A.  That would be in violation of Code of
4   Conduct and antiharassment.
5      Q.  But not the EEO policy?
6      A.  Right.
7      Q.  What's the difference?
8      A.  Name calling is inappropriate.
9      Q.  It's not just name calling. This is a name
10  that's usually used to refer to women in a
11  derogatory way, right?
12      A.  If he is -- she has been called -- can you
13  repeat your question?
14      Q.  Yeah. This is just not name calling. I
15  mean, "bitch" is a term that's used to refer to
16  women in a derogatory way, right?
17      A.  Sometimes.
18      Q.  It's generally what it's known as, right?
19          MR. TUCKER: Objection.
20      A.  Sometimes.
21      Q.  (BY MS. GURMANKIN) When have you heard it
22  used in a different context?
23      A.  I can't recall specifics but I think the
24  term "bitch" has been used not just to refer to

Page 144

1   women in a derogatory way.
2      Q.  Next page, page 4, Jesse's claim is "I have
3   been told by coworkers that maybe if they wore tight
4   pants and batted their eyes, they could get what
5   they wanted, suggested this is what I do." He says,
6   according to your notes, "I would never say that and
7   I haven't heard anyone say that to her. She played
8   the female card for as long as it benefited her."
9          Did you ask him what he meant by that?
10      A.  Not that I recall.
11      Q.  Why wouldn't you ask that?
12      A.  I can't recall specifically why I didn't
13  ask a follow-up question to that.
14      Q.  It would certainly be relevant in a sexual
15  harassment investigation, wouldn't it?
16      A.  Depends on the situation.
17      Q.  When would it not be?
18      A.  I don't know.
19      Q.  You can't think of anything as you sit here
20  today, right?
21      A.  Right.
22      Q.  Under No. 4, "Is there anything else you
23  would like to share related to the items we
24  discussed today that hasn't been asked yet?" He

36 (Pages 141 to 144)

Page 145

1  says, in the fourth sentence, "She takes things the
2  wrong way often. I recognized a long time ago that
3  she is an edgy one. She has been treated wrong for
4  her looks in the past."
5       Did you ask him what he meant by his
6  comment that "She takes things the wrong way often"?
7       A. I don't recall.
8       Q. It could mean that sexist or sexually
9  harassing comments are made and he thinks that she
10  takes them the wrong way, right? That could be a
11  possibility?
12       A. I'm not -- I can't say.
13       Q. Why wouldn't you ask that?
14       A. I can't recall why I didn't ask that at the
15  time.
16       Q. Did you ask him what he meant when he said,
17  "She's been treated wrong for her looks in the
18  past"?
19       A. I don't -- as far as I can recall, I did
20  not.
21       Q. Did you think Foreman was truthful with
22  you?
23       A. I had no reason to believe why he would be
24  lying.

Page 146

1       Q. Except that he was accused of engaging in
2  certain conduct, right?
3       A. Can you rephrase your question?
4       Q. Yeah. He was accused of engaging in
5  certain conduct towards Jesse that was
6  inappropriate, wasn't he?
7       A. I believe so, yes.
8       Q. So that might be motivation for him to lie?
9       MR. TUCKER: Objection.
10       A. I had no conclusion that he was lying to
11  me.
12       Q. But the fact that he'd been accused might
13  be motivation for him to lie, right?
14       A. I can't say. I can't make that conclusion.
15       Q. How did you decide what allegations to
16  include in your chart in your discussion with
17  Foreman?
18       A. I can't recall specifically but I believe
19  it would have been either situations that he was
20  involved in, accused of or had witnessed.
21       Q. But you wouldn't know if he had witnessed
22  something unless someone told you or unless you
23  asked him specifically, right?
24       A. That's correct.

Page 147

1       Q. So why wouldn't you ask everybody you
2  interviewed about all of the allegations?
3       A. There were some allegations that
4  individuals were not named as a witness.
5       Q. But you never know what might lead to their
6  knowledge about something or what they might have
7  seen or heard that someone didn't know about until
8  you ask, right?
9       A. Well, I did as a part of my investigation
10  ask general questions around any observations that
11  they had had between the two of them.
12       Q. Right. But why didn't you ask everybody
13  about all of the allegations?
14       A. I didn't find it necessary to ask everyone
15  about every single allegation if they were not
16  someone that either Ms. Barnes or Mr. Turney said
17  had observed it.
18       Q. So Jesse or Turney may not have noticed if
19  someone had specifically observed a particular
20  incident, right? You wouldn't know that until you
21  asked everybody?
22       A. There were certain situations where there
23  were only a few individuals there.
24       Q. According to what Jesse or Will were

Page 148

1  telling you?
2       A. Correct.
3       Q. If one of the other -- if one of the
4  witnesses you interviewed observed -- strike that.
5       Did you conclude as a result of your
6  interview with Foreman that he had violated any
7  company policies?
8       A. I need to review the --
9       Q. Sure.
10       A. I did not conclude from my investigation
11  that Ken was in violation of the company policy.
12       MS. GURMANKIN: Can we go off the
13  record for a second?
14       THE VIDEOGRAPHER: This ends Media 2.
15  We're off record. The time is 11:47 a.m.
16       (A recess was taken.)
17       (Jesse Barnes appears by telephone.)
18       THE VIDEOGRAPHER: This begins Media 3.
19  We are back on record. The time is 12:30 p.m.
20       Q. (BY MS. GURMANKIN) Looking back at
21  Exhibit 22, which is your interview with Ken
22  Foreman --
23       MR. TUCKER: Counsel, has your client
24  joined us via telephone?

37 (Pages 145 to 148)

Page 149

1    MS. GURMANKIN: Yes, she has.
2    Q. (BY MS. GURMANKIN) Page 4. You have that
3  up in front of you?
4    A. I do.
5    Q. Okay. So the top of that page where,
6  according to your notes, Foreman said, "She played
7  the female card for as long as it benefited her."
8  You see that?
9    A. Yes.
10   Q. Okay. You have heard the term before
11  someone plays the sex card or the race card? You
12  have heard that term?
13   A. I can't recall a specific time I have heard
14  it, but yeah, I probably have.
15   Q. And you have heard it in the context of
16  someone trying to use their sex or their race or a
17  characteristic like that to gain some sort of
18  illegitimate advantage?
19   A. Yes.
20   Q. And were you offended by the fact that
21  Foreman is suggesting that a female who complains of
22  sexual harassment is playing the female card?
23   A. You are asking if I was offended?
24   Q. Yes.

Page 150

1    A. I would not say I was offended.
2    Q. Did you find that to be inappropriate?
3    A. I -- can you rephrase your question?
4    Q. Did you think it was inappropriate that a
5  male says about a female making a complaint of
6  sexual harassment that she played the female card
7  for as long as it benefited her?
8    A. Yeah, it's a bit inappropriate for him to
9  say, but I have no evidence that he said that to her
10  or to anyone else instead of just in the interview
11  with me.
12   Q. The fact that he believed that a female
13  complaining of sexual harassment was playing the
14  female card for as long as it benefited her, did
15  that violate, in your opinion as an HR professional,
16  Shell's EEO or antiharassment policies?
17   A. No, I didn't find that to violate the
18  policy.
19   Q. Does that kind of opinion contribute to an
20  environment of equal opportunity, that a female who
21  complains of sexual harassment is playing the female
22  card for as long as it benefited her?
23   MR. TUCKER: Objection.
24   You may answer.

Page 151

1    A. If he is saying that to other people and
2  spreading that around, then it does not contribute
3  to that type of environment.
4    Q. (BY MS. GURMANKIN) He is saying it to you,
5  the fact that he believes it, that he's expressing
6  to you, does that contribute to an environment of
7  equal opportunity?
8    MR. TUCKER: He believed that as it
9  related to your client. There is no indication he
10  believed that in general.
11   MS. GURMANKIN: You can make an
12  objection to form.
13   Q. (BY MS. GURMANKIN) Can you answer the
14  question, please?
15   A. I don't believe that him sharing that with
16  me confidentially in an interview contributes to
17  that type of environment or just if he believed it
18  and didn't share it with anyone.
19   Q. Do you recall that Shell should address
20  employees who believe that a woman bringing forth a
21  complaint of sexual harassment is playing the female
22  card for as long as it benefited her?
23   MR. TUCKER: Objection.
24   You may answer.

Page 152

1    Q. (BY MS. GURMANKIN) Do you think Shell
2  should address employees who express that belief to
3  HR managers?
4    MR. TUCKER: Objection.
5    You may answer.
6    A. I believe that we can't always change
7  people's beliefs, but we should -- they should be
8  aware of what Shell's Code of Conduct and policies
9  are as it relates to this.
10   Q. (BY MS. GURMANKIN) Do you believe that an
11  employee who believes that a female who makes a
12  complaint of sexual harassment is playing the female
13  card as long as it benefited her is someone Shell
14  wants to have in the workplace?
15   MR. TUCKER: Objection.
16   You may answer.
17   A. I don't think that we can always change
18  what people believe. As long as they are not making
19  those comments to others, that it may be okay. It
20  depends on the circumstance and how they are using
21  those beliefs to treat other people.
22   Q. (BY MS. GURMANKIN) Do you know if he was
23  making those comments to other people?
24   A. I have no evidence to believe that he was.

38 (Pages 149 to 152)

Page 153

1    Q.  Did you ask him?

2    A.  Not that I recall.

3    Q.  Did you ask anyone during the course of

4  your investigation -- during your investigation

5  whether Foreman was expressing to other people that

6  Jesse was playing the female card as long as it

7  benefited her, or words to that effect?

8    A.  I don't recall specifically, but I don't

9  believe I asked that specific question.

10    Q.  Did you ask anything along those lines?

11    A.  I don't recall.

12    Q.  Did you ask Jesse if he ever expressed that

13  to her?

14    A.  If he expressed if she played the female

15  card?

16    Q.  That he believed she was playing the female

17  card as long as it benefited her.

18    A.  I don't believe that I asked her that

19  question.

20    Q.  Did you address that with him when he made

21  the comment?

22    A.  I don't recall.

23    Q.  Did you tell him it was inappropriate?

24    A.  I don't recall.

Page 154

1    Q.  Did you tell him it did not support an

2  environment of equal opportunity pursuant to Shell's

3  EEO policy?

4    A.  I do not believe that I shared that with

5  him.

6    Q.  Did you share with Greg Larsen or Steve

7  Craig that there was an employee in their group who

8  believed that a female making a complaint of sexual

9  harassment was playing the female card as long as it

10  benefited her?

11    MR. TUCKER:  Objection; there is no

12  evidence of that.  He was specifically referring to

13  a specific person.

14    Q.  (BY MS. GURMANKIN)  Did you share that with

15  Larsen or Craig?

16    A.  I don't recall specifically, but I -- I

17  don't think so.

18    Q.  Did you share it with anyone else in HR?

19    A.  I don't recall but I don't think so.

20    Q.  Next one, "A coworker has put his hands

21  through my hair without permission."  That's Jesse's

22  claim.  And according to your notes, Foreman said,

23  "I have touched her before, and she does not like to

24  be touched.  And I stopped when she told me, 'Don't

Page 155

1  ever touch me.'"

2    I read that correctly?

3    A.  Yes.

4    Q.  So he is not answering your questions

5  specifically about whether he put his hands through

6  Jesse's hair without permission, right?  According

7  to your notes.

8    A.  According to my notes, that's correct.

9    Q.  Did you ask him that?

10    A.  Ask him what?

11    Q.  Did you follow up and say, My question is

12  whether you put her hands -- your hands through

13  Jesse's hair without permission?

14    A.  I don't recall specifically.

15    Q.  Why wouldn't you follow up and try to get

16  that information regarding her specific claim?

17    A.  As far as I can recall, I believe his

18  response was addressing that he had done that one

19  time.

20    Q.  Okay.  So you understood his response to

21  mean that he was admitting to putting his hands

22  through her hair?

23    A.  As far as I can recall.

24    Q.  Did he say that and you just didn't write

Page 156

1  it?

2    A.  I don't remember the specifics.  It may

3  have been through either his interview or discussion

4  with someone else where that was shared.

5    Q.  Yeah, but I'm talking about what he told

6  you.  Did he tell you specifically, yes, I did run

7  my hands through her hair, or something like that?

8    A.  I cannot recall that specifically.

9    Q.  What you wrote down about what he told you,

10  that's accurate -- an accurate reflection of what he

11  told you, correct?  "I have touched her before.  She

12  doesn't like to be touched, and I stopped when she

13  said, 'Don't ever touch me'"?

14    A.  Yes.

15    Q.  He didn't address what you were asking him

16  about whether or not he put his hands through her

17  hair?

18    MR. TUCKER:  Objection.

19    You can answer.

20    A.  As far as I can recall, I took his response

21  to mean him admitting that he had put his hands

22  through her hair.

23    Q.  (BY MS. GURMANKIN)  And you agree that a

24  male employee putting hands through a female's hair

Page 157

1   without permission would be a violation of the
2   company's policies?
3      A. I think it depends on the situation, but if
4   the individual did not want the other person to be
5   touching their hair, then that would be
6   inappropriate, so yes.
7      Q. Right. And so here it's saying "without
8   permission." So based on what Jesse's claim is,
9   according to your notes, that would be a violation
10  of company policy, right?
11     A. That would be a violation of the Code of
12  Conduct.
13     Q. Including the antiharassment and EEO
14  policies in the Code of Conduct?
15     A. In Section 3.3 harassment that it is
16  violating.
17     Q. The next one, "During the visit to
18  California in 2014 at the social after hours, were
19  you there when Will shared a photo on his phone of
20  himself and his underwear"?
21      And he says, "I did not see that. I'm
22  not saying that didn't happen. There was a lot of
23  alcohol involved. People were drinking too much. I
24  was with them the whole time. There wasn't any talk

Page 158

1   from Will, 'I have got this plan with her' or
2   anything else. Something may have happened between
3   them."
4      I read that correctly?
5     A. Yes.
6     Q. Did you take his last point, "Something may
7   have happened between them," to be suggesting that
8   something sexual or romantic happened between Turney
9   and Jesse?
10     A. I did not take that to mean that.
11     Q. All right. How did you take that to mean?
12     A. That there may have been an interaction
13  where there -- where he was sharing this photo.
14     Q. Where Turney was sharing this photo?
15     A. Yes.
16      (Exhibit 23 was marked.)
17     Q. (BY MS. GURMANKIN) Showing you what's been
18  marked as Exhibit 23, Shell 1164 through 1166.
19      These are your interview notes with
20  Wayne Fletcher, correct?
21     A. Yes.
22     Q. All right. And how long was your interview
23  with Fletcher?
24     A. I don't recall.

Page 159

1     Q. Did you ever conclude that he was not
2   telling you the truth?
3     A. I did not conclude that he was not telling
4   the truth.
5     Q. Do you remember how Wayne Fletcher got on
6   your witness list?
7     A. Off the top of my head, I don't recall
8   that.
9     Q. Who was he?
10     A. I don't recall.
11      MS. GURMANKIN: Let's go off for one
12  second, Trey.
13      THE VIDEOGRAPHER: We are off record.
14  Time is 12:41 p.m.
15      (Off the record.)
16      THE VIDEOGRAPHER: We are back on
17  record. Time is 12:42.
18     Q. (BY MS. GURMANKIN) At the bottom of
19  page 1, last sentence in the last paragraph,
20  according to your notes, Fletcher tells you it seems
21  like he -- meaning Turney -- might not be given
22  her -- meaning Jesse -- a fair shake because she is
23  a woman.
24      Do you see that?

Page 160

1     A. I do.
2     Q. All right. And if that were true, that
3   would be a violation of the company's EEO policy,
4   right?
5     A. Treating -- not giving someone a fair shake
6   because of their gender?
7     Q. Yes.
8     A. Yes.
9     Q. On page 2, second paragraph, you're asking
10  about inappropriate comments towards Jesse and
11  according to your notes --
12      MR. TUCKER: I'm sorry, Counsel, the
13  second -- what number?
14      MS. GURMANKIN: Second page.
15      MR. TUCKER: I'm sorry.
16      MS. GURMANKIN: That's okay.
17     Q. (BY MS. GURMANKIN) "Inappropriate comments
18  toward her?" And according to your notes, he says,
19  "He has" -- "he" meaning Turney -- "has at
20  watercooler talk just mentioned that she's a
21  good-looking girl saying, Oh, did you see what she
22  was wearing today? I don't think it's ever been
23  voiced to her."
24      I read that correctly?

40 (Pages 157 to 160)

Page 161

1    A.  Yes.
2    Q.  If Turney made those comments, that would
3    be a violation of the company's policies, correct?
4    A.  Those are inappropriate comments.
5    Q.  Would they be violation of the company's
6    policy?
7    A.  That could be a violation of the Code of
8    Conduct.
9    Q.  Under the second paragraph under No. 4,
10   this is, according to your notes, what he says to
11   you.  "Just the atmosphere itself, I would believe
12   it would be" -- I'll go back to the beginning.
13        You're asking him about a golf outing
14   over the summer.  How was the dynamic between the
15   them at this event.  Asking why not wearing shorts,
16   cutting shorts, taking pictures of her backside.
17        These are Jesse's claims, right?
18   A.  Uh-huh.
19   Q.  Yes?
20   A.  Yes.
21   Q.  And he says, "I don't recall but that's
22   very possible, very vaguely don't recall that.  I
23   know she had a friend of hers that was flirtatious.
24   She ran the booth at Hole 1.  They served food and

Page 162

1    drinks there.  As the golf outing goes around for a
2    few hours, they jump in a golf cart once everyone
3    has hit that hole and travel around to see what
4    players are doing.  They take alcohol and give to
5    those players that are finishing up.  They take the
6    pictures.  Just the atmosphere itself, I would
7    believe it would be possible.  I have heard guys
8    make comments to other women and they may not take
9    it as serious.  For example, compared to what an
10   operator says versus her boss.
11        Did you ask Fletcher what he was
12   referring to when he said "I have heard guys make
13   comments to other women"?
14   A.  I can't recall that.
15   Q.  If you did, it would be included in your
16   notes?
17   A.  What his response was?
18   Q.  That you asked the question and that he
19   gave a response?
20   A.  That I asked the question it might not
21   necessarily be included in here.  But he if had a
22   response, there would be some notes.
23   Q.  No. 5, "I understand you had asked Jesse to
24   do some work for you (outside of her normal duties)

Page 163

1    and Will was near.  Do you recall the specific
2    situation?
3        a. Did Will tell you to tell her she
4    was pretty and she would do it?"  Answer, "yes."
5        Is that a violation of company policy,
6    for Turney to tell Fletcher -- in front of Jesse --
7    to tell her she's pretty?
8    A.  Yes.
9    Q.  "B, do you recall her response?  No, I
10   don't think she said anything, rolled her eyes and
11   gave you the look.  I do recall her saying, 'I don't
12   come to work to be told I am pretty.'"
13        That would indicate that Jesse found
14   that comment to be unwelcome, right?
15   A.  Yes.
16   Q.  Under No. 6, "Is there anything you'd like
17   to -- anything else you would like to share related
18   to the items we discussed today that hasn't been
19   asked yet?"
20        He says, "I have never had any concerns
21   with her.  I've been to both their houses.  They are
22   both considered friends.  I don't want to lose the
23   trust between either of them."
24        And then is this you asking him were

Page 164

1    there inappropriate things said to her, or is that
2    him telling you?
3    A.  I can't recall specifically.
4    Q.  All right.  But the part where it says, "I
5    think things have been directed towards her," that's
6    him telling you that, right?
7    A.  As far as I can see, I believe so, yes.
8    Q.  Okay.  Did you follow up and ask him what
9    things?
10   A.  I can't recall.
11   Q.  Why didn't you ask Fletcher about any of
12   the other allegations?
13   A.  I can't recall that off the top of my head.
14   Q.  Were you under some sort of timeline?  And
15   did anyone tell you that you had to get this done in
16   a certain period of time?
17   A.  There is a due date on the response, but I
18   don't recall what that date is off the top of my
19   head.
20   Q.  On which response?
21   A.  On the -- I don't remember which document
22   was it, but on the one that outlined the claim,
23   there is a due date.
24   Q.  The internal complaint?

41 (Pages 161 to 164)

Page 165

1    A. Yeah.
2    Q. I'm showing you Exhibit 15. If you look at
3   page 5, that's the internal complaint. Tell me when
4   you get to page 5.
5        There is a case due date on the bottom
6   of Section 1. Is that what you are referring to?
7    A. Yes.
8    Q. All right. And that says January 14, 2017?
9    A. Yes.
10    Q. So did that mean that the investigation had
11   to be completed by January 14, 2017?
12    A. That date means that there must be a
13   response or an investigation summary provided to --
14   back to that team. I am not sure what the process
15   is for requesting an extension, but there may be
16   one.
17    Q. Okay. But that due date means that the
18   investigation must be completed and your report has
19   to be completed by that date?
20        MR. TUCKER: Objection.
21    A. It should be, but there may be a process
22   for extension that I'm not aware of.
23    Q. (BY MS. GURMANKIN) Okay. But when you got
24   this, you believed that you had to have everything

Page 166

1   finished and your report completed by that date?
2    A. That is the target due date, yes.
3    Q. And you never asked for an extension?
4    A. I did not ask for an extension.
5        (Exhibit 24 was marked.)
6    Q. (BY MS. GURMANKIN) All right. Showing you
7   Exhibit 24, Shell 1130 to 1131. These are your
8   interview questions with Dan Krise.
9        Do you remember how he got on your
10   list?
11    A. I don't recall specifically.
12    Q. Do you remember who he is?
13    A. No.
14    Q. Did you believe that he was telling the
15   truth?
16    A. I did believe that he was telling the
17   truth, along with everyone that I interviewed.
18    Q. All right. So in No. 2 you're asking him
19   to describe the work environment and team dynamics
20   on your immediate team, i.e., direct reports of
21   Will.
22        You see that?
23    A. Yes.
24    Q. And second paragraph -- I'm sorry; in his

Page 167

1   second paragraph of his answer he says, "A lot of
2   men work here. It doesn't surprise me. No
3   specifics come to mind. It is a men-dominated
4   environment."
5        You see that?
6    A. I don't.
7    Q. Have you heard complaints before this
8   investigation that Shell is a male-dominated
9   environment? Have you heard people say that before?
10    A. I have not heard any people say that before
11   about Shell.
12    Q. Second page. No. 6, "Is there anything
13   else you'd like to share related to the items we
14   discussed today that hasn't been asked yet?
15        He says, according to your notes, "In
16   general, I think it is a tough work environment for
17   women, just generally. It could be a respect issue,
18   culturally, socioeconomically, feeling respected.
19   It might be the type of environment where if you
20   were a man you would be treated differently."
21        I read that correctly?
22    A. Yes.
23    Q. So what he was telling you goes even beyond
24   the complaints that Jesse's making about sexual

Page 168

1   harassment, right? He's talking about a cultural
2   issue at Shell?
3    A. He is saying it could be.
4    Q. He is saying, "I think it is a tough work
5   environment for women," right?
6    A. He does say that, yes.
7    Q. So that is a cultural issue, right?
8    A. It could be.
9    Q. How wouldn't it be?
10    A. It would depend on what he means by that.
11    Q. So you asked him?
12    A. I don't recall specifically, but I don't
13   believe I have any more specifics on that comment.
14    Q. Why wouldn't you ask him for specifics on
15   that comment?
16    A. I don't recall.
17    Q. I mean, that would certainly be important
18   to a complaint of sexual harassment, wouldn't it?
19    A. I think I didn't feel at the time that I
20   needed more information on that comment in order to
21   validate the claim.
22    Q. Looking at it now, do you think you should
23   have gotten more information about that
24   allegation -- about that assertion that he's making?

42 (Pages 165 to 168)

Page 169

1  A. I don't think that it would have changed
2  the outcome of the findings.
3  Q. My question was, looking at it now, do you
4  feel you should have gotten more information about
5  what he's saying about it being a tough work
6  environment for women?
7  MR. TUCKER: Objection; asked and
8  answered.
9  You may answer it again.
10  A. I don't feel like I needed to ask for
11  information on that question in order to validate
12  the claim.
13  Q. (BY MS. GURMANKIN) So is that no?
14  A. That's a no.
15  Q. Did you raise that issue with Greg Larsen
16  or Steve Craig, that you have an employee in the
17  group who's saying it's a tough work environment for
18  women?
19  A. I don't recall if I specifically shared
20  that, but one of my recommendations was that there
21  is this type of training for all employees at the
22  site.
23  Q. What type of training?
24  A. Code of Conduct, how we treat each other.

Page 170

1  Q. But why wouldn't you tell the people
2  leading the group that you have an employee in
3  connection with the sexual harassment investigation
4  who is saying that this is a tough work environment
5  for women?
6  A. I don't recall specifically if I said that
7  or not.
8  Q. Did you raise it with anyone in HR?
9  A. I don't recall.
10  Q. Did you raise it with anyone in senior
11  management?
12  A. I don't recall if I raised this specific
13  comment.
14  Q. How could you not raise the comment an
15  employee is making about this being a tough
16  environment for women?
17  MR. TUCKER: She didn't say she didn't;
18  she said she didn't recall.
19  A. I may have raised it. I just don't -- I
20  don't recall specifically if I did. So I don't want
21  to say that I did for sure because I can't recall
22  that.
23  Q. (BY MS. GURMANKIN) Can you imagine any
24  circumstance in which you wouldn't have shared that

Page 171

1  with other people at the company, that you have an
2  employee in this group who's saying it's a tough
3  work environment for women?
4  A. I would think that I would share that, but
5  I can't recall that I specifically did.
6  Q. Have you seen anything in writing where you
7  shared that information with anyone at all at the
8  company?
9  A. I can't -- I don't believe I have anything
10  in writing, as far as I can recall.
11  Q. Did you share any of your interview notes
12  with anyone at the company?
13  A. I can't recall. I -- my supervisor may
14  have had them, but I don't know. I don't remember
15  if for sure.
16  Q. In one of your jobs as an HR business
17  partner, account manager is to make sure that this
18  isn't happening, that it's not a tough work
19  environment for women, right?
20  A. That's correct.
21  Q. And what did you do to address this?
22  A. One of my recommendations was to have a
23  training at that location, multiple trainings that
24  would be delivered by leaders and HR about our Code

Page 172

1  of Conduct and our policies and how we should treat
2  others in the workplace.
3  Q. But employees were already required to go
4  through that type of training on an annual basis,
5  weren't they?
6  A. An online training. But my recommendation
7  was an in-person, face-to-face training.
8  Q. Well, if you -- even with the annual online
9  training that includes the Code of Conduct, if you
10  have an employee saying to you -- you think is
11  truthful saying, "I think it's a tough work
12  environment for women," would that mean that the
13  training that has been offered up until then hasn't
14  been effective?
15  A. I can't gather that conclusion from someone
16  saying it may be a tough work environment for women,
17  that that means the training has not been effective.
18  Q. Well, that could be a possibility, couldn't
19  it?
20  A. It is a possibility.
21  Q. Could also be a possibility that the
22  policies aren't effective if you have an employee
23  saying to you, "I think it's a tough work
24  environment for women"?

43 (Pages 169 to 172)

Page 173

1      A. In the circumstance that is why I
2  recommended a more -- more training for this
3  location.
4          MS. GURMANKIN:  I'm sorry; could you
5  read back that answer?
6          (Requested portion was read.)
7      Q. (BY MS. GURMANKIN)  So, yes, it's a
8  possibility that the policies weren't effective, if
9  you have an employee saying to you that it's a tough
10 work environment for women?
11         MR. TUCKER:  She didn't say the policy.
12 She said the training.
13         MS. GURMANKIN:  My question was not
14 about the training.
15     Q. (BY MS. GURMANKIN)  If you have an employee
16 saying to you it's a tough work environment for
17 women, do you agree that Shell's policies may not
18 have been effective?
19     A. I don't believe that that is an indicator
20 that the policy is not effective, but potentially,
21 yeah, the online training has not been effective.
22     Q. It's a possibility that the policies, as
23 well, are not effective, right?
24     A. Not necessarily.

Page 174

1      Q. Could be?
2      A. I wouldn't draw that conclusion.
3      Q. Could be a possibility, couldn't it?
4          MR. TUCKER:  Objection.  She said she
5  wouldn't draw that conclusion.
6      A. No.
7      Q. (BY MS. GURMANKIN)  So you are saying
8  that's impossible?
9      A. I do not personally have that view.
10     Q. Do you have that view even after everything
11 that was admitted in connection with your
12 investigation about Jesse's allegations?  You still
13 share the view that the policies were effective?
14     A. I believe the policies are effective.
15     Q. Did you interview any other women other
16 than Jesse?
17     A. As far as I can recall, I interviewed one
18 other woman.
19     Q. Who was that?
20     A. Penny Robins.
21     Q. And who was she?
22     A. As far as I can recall, she was an admin
23 assistant.
24     Q. How did you get her name?

Page 175

1      A. I don't recall specifically.  I believe
2  Jesse gave me her name.
3          (Exhibit 25 was marked.)
4      Q. (BY MS. GURMANKIN)  You are being shown
5  what's been marked Exhibit 25, Shell 1160 to 1161.
6  These are your interview notes regarding your
7  meeting with Penny Robins, correct?
8      A. Yes.
9      Q. Under No. 2 it says, "Describe your working
10 relationship with Will Turney and Jesse Barnes,"
11 then in parens, "Understand not on their team."
12         That means that you understood that
13 Penny was not on -- in their group?
14     A. As far as I can recall, yes, that's what
15 that means.
16     Q. And then first bullet point says -- this is
17 what she's saying to, according to your notes.
18 "Will, I do what's asked.  He does not have a lot of
19 requests.  He uses Jesse instead of me.  Treats her
20 like an admin.  (Order supplies, whatever, frequency
21 that is.)  He has to sign the time sheets and if I
22 have any questions."
23         In terms of her saying that Turney
24 treated Jesse like an admin, you understood that she

Page 176

1  was not in an administrative position at that time,
2  correct?
3      A. Can you rephrase your question?
4      Q. Sure.  You understood at this time that
5  Jesse was not an administrative assistant?
6      A. Correct.
7      Q. So when you have someone saying that Turney
8  nonetheless uses Jesse as administrator, did you
9  consider the fact that that was because he was
10 discriminating against her based on her sex?
11     A. No.
12     Q. That didn't cross your mind?
13     A. That was not the conclusion that I made
14 from this comment.
15     Q. Did you consider that?
16     A. No.
17     Q. Why?
18     A. I -- as I was looking at everything in
19 totality, as far as I can recall, this was the only
20 time that this was brought up.  It was not raised by
21 Ms. Barnes or anyone else on the team as an issue.
22 And -- yeah, that's what I would...
23     Q. Did you ask anyone else that you
24 interviewed if they perceived that Turney treated

44 (Pages 173 to 176)

Page 177

1   Jesse like an admin assistant?
2       A. I don't recall.
3       Q. But, certainly, you would have wanted to
4   find out if anyone else had that perception when you
5   heard about it from Penny Robins, right?
6           MR. TUCKER: Objection.
7       A. This was not an issue that was raised by
8   Jesse, and I was investigating her claims. So I did
9   not feel that it was necessary to look further into
10  that.
11      Q. (BY MS. GURMANKIN) No. 5, "Is there
12  anything else you would like to share related to the
13  items we discussed today that hasn't been asked
14  yet?"
15          According to your notes, she says, "She
16  worked very hard. The woman comment was that okay."
17  What did that -- I'm sorry; "The woman comment was
18  not okay."
19          What did that refer to?
20      A. As far as I can recall, this was a comment
21  around that Ms. Barnes makes good money for a woman.
22      Q. That Turney said that to her?
23      A. Yes.
24      Q. And Turney's admitted saying that to her?

Page 178

1       A. Yes.
2       Q. And that was a violation of company policy?
3       A. Yes.
4       Q. Third -- the last line on the first page,
5   "He thinks he is a ladies' man. Him and Robin
6   Grouette would flirt. (That is my perception.)"
7           Did you know who Robin Grouette was?
8       A. I knew of her, that she used to be a leader
9   there.
10      Q. Female?
11      A. Yes.
12      Q. Did you ask Penny about her perception that
13  Turney thinks he's a ladies' man?
14      A. Not that I can recall.
15      Q. Did you know what position Robin Grouette
16  was in at this time?
17      A. I believe that I had, but I can't recall
18  now off the top of my head what position that was.
19      Q. But you looked into it at the time, or you
20  knew it at the time?
21      A. I believe that I did.
22      Q. Did you ask anyone else that you
23  interviewed in connection with this investigation
24  whether they saw Turney flirt with any female

Page 179

1   employees at Shell?
2       A. As far as I can recall, I did not ask
3   questions related to him flirting with other women
4   outside of the claims that were made
5   towards -- about Ms. Barnes.
6           (Exhibit 26 was marked.)
7       Q. (BY MS. GURMANKIN) Showing you what's been
8   marked as Exhibit 26, Shell 1141 through Shell 1144.
9           These were your interview notes with
10  Jeremy Greene, correct?
11      A. That's correct.
12      Q. And who was he?
13      A. I don't recall off the top of my head, but
14  I can see here he was in the maintenance department.
15      Q. So if you look at Question No. 3, "Describe
16  your working relationship with Will Turney and Jesse
17  Barnes," subparagraph A, "What are your
18  observations, perceptions of their relationship?"
19          His answer, according to your notes,
20  "Pretty positive. There was misunderstandings
21  between the two of them. We are all a team and
22  supposed to be equals. Some things can't be treated
23  the same in some ways." I'll stop there for a sec.
24          What did you understand that to mean?

Page 180

1       A. I don't recall off the top of my head.
2       Q. That would suggest that women can't be
3   treated the same way as males in some ways, correct?
4       A. I can't draw that conclusion just based on
5   those two sentences.
6       Q. As you sit here today, can you think of
7   anything else that that refers to?
8       A. Can I read the full paragraph?
9       Q. Sure.
10      A. Okay. Can you repeat your question,
11  please?
12      Q. Yeah. Is there anything else that that
13  would refer to other than the fact that women can't
14  be treated the same way as guys in some ways?
15      A. I see that he is referring to saying the
16  same things to her as he might to a guy because she
17  may get offended.
18      Q. That's his next sentence, right?
19      A. Uh-huh.
20      Q. Yes?
21      A. Yes.
22      Q. So can you think of anything else that that
23  would refer to when he says, "We are all a team and
24  supposed to be equals. Some things can't be treated

45 (Pages 177 to 180)

Page 181

1   the same in some ways," other than the fact that you
2   can't treat women the same as guys in some ways?
3      A. I take it as not necessarily treating but
4   things that you might say to a male peer or
5   colleague versus a female because she may take
6   offense to it.
7      Q. You have to say things differently to women
8   than you do to men?
9      A. That's how I take what he's saying.
10      Q. After he says, "I don't say the same things
11   to her as I would to a guy," he goes on to say, "She
12   gets offended if treated differently and if saying
13   the same things as you would to a guy." I'll stop
14   there for a sec.
15      So Jesse getting offended if treated
16   differently, that would -- well, strike that.
17      If she were treated differently because
18   of her sex, that would be a violation of the
19   company's EEO policies, correct?
20      A. I think it depends on the situation.
21      Q. Would there be any situation that you can
22   think of in which a woman were treated differently
23   than a guy that it wouldn't violate the company's
24   EEO policies?

Page 182

1      A. I believe -- as far as I can recall, what I
2   believe that he is saying in here is that he would
3   say things differently or he would say things
4   differently to male colleague or a female colleague
5   because a female colleague may get offended. So
6   that is how he's saying he may treat differently.
7   So I think by not saying that may offend someone,
8   that would not be a violation of the policy.
9      Q. No. No. If women are treated differently,
10   if Jesse were treated differently based on her sex,
11   that would be a violation of the company's EEO
12   policy, right?
13      A. It depends on how you're treating someone
14   differently.
15      Q. So you're saying that if male colleagues
16   speak differently to other male colleagues than they
17   do to female colleagues, that that would not violate
18   the EEO policy? Is that what you are saying?
19      A. It depends on what they are saying. I
20   think in this situation what he's saying is that he
21   may not say something to a female colleague because
22   it would offend them. And I think that would not
23   violate the policy because that is trying to respect
24   what someone might be offended by.

Page 183

1      Q. Well, if you're saying something in the
2   workplace that you are not going to say to a female
3   colleague because you believe it would offend them,
4   wouldn't that comment violate the company's
5   policies?
6      A. Right.
7      Q. So a female colleague not being talked to
8   in the same way as a male colleague would violate
9   the company's policies?
10      MR. TUCKER: Objection.
11      A. The comments that they are making, if it
12   would offend someone so you are not going to say it
13   to them, then they shouldn't be said at all. So if
14   they are being said and they are offensive, then
15   that would be a violation of the company's policies.
16      Q. Okay. So then did you say to him because
17   he might be saying things in the workplace or others
18   in the group might be saying things in the workplace
19   that would violate the policy if they can't say them
20   to Jesse, a female, did you ask him what were those
21   comments that he's referring to so you could address
22   them?
23      A. I did, I believe. As far as I can recall,
24   I did.

Page 184

1      Q. And that question is not in here, correct?
2      A. No, but I can see it says "example."
3      Q. Right. But your question -- the fact that
4   you followed up with him is not in here, correct?
5      A. Correct.
6      Q. "Example, Dan will belch or something. She
7   gets offended."
8      Did you ask if he had any other
9   examples. Or that was the only one?
10      A. I can't recall.
11      Q. "She has talked to me about the Will
12   situation before, and I can see her points."
13      Did you ask him what she had talked to
14   him about?
15      A. I don't recall.
16      Q. Not in here, right?
17      A. Correct.
18      Q. "She has told me things that have been said
19   that I would say is borderline offensive, but I
20   don't think it's something that's meant to be
21   offensive."
22      Did you ask him what he meant?
23      A. I don't recall.
24      Q. Not in here, right?

46 (Pages 181 to 184)

Page 185

1  A. Correct.
2  Q. "There are things she has taken offense to
3  that she shouldn't have."
4      Did you ask him what he meant by that?
5  A. Can't recall.
6  Q. Not in here, is it?
7  A. No.
8  Q. And by the way, whether or not something
9  violates the company's policies is not dependent on
10  whether or not it is meant to be offensive, correct?
11  A. Correct.
12  Q. Page 2 under "Claim," "I was told I'm a hot
13  blond by my supervisor." According to your notes,
14  he said, "Yes, I did hear that. It just seems like
15  normal talk. He repeated the story. I don't think
16  it's that inappropriate normal guy talk. I don't
17  remember her being offended or noticeable."
18      That last part, "I don't remember her
19  being offended or noticeable," that's irrelevant,
20  correct?
21  A. Can you rephrase?
22  Q. Yeah. I mean, that has nothing to do with
23  whether or not the conduct violates the policy,
24  right? Whether or not he remembers Jesse being

Page 186

1  offended or noticeable.
2  A. Correct.
3  Q. So did it concern you that you have a guy
4  confirming that a male supervisor referred to his
5  female subordinate as a hot blond and this male
6  employee thinks that's just normal talk?
7  A. That is concerning, yes.
8  Q. Because being a female subordinate being
9  referring to as a hot blond by her male supervisor
10  would violate the company's policies, correct?
11  A. Correct.
12  Q. Did you address with Greene the fact that
13  he thinks a male supervisor referring to a female
14  subordinate as a hot blond is just normal talk? Did
15  you address that with him?
16  A. I can't recall.
17  Q. Not anywhere in here, is it?
18  A. No.
19  Q. Did you talk to Larsen or Craig about the
20  fact that you had a male employee who believes that
21  a male supervisor calling a female subordinate a hot
22  blond is just normal talk?
23  A. I can't recall specifically if I shared
24  this specific example, but this was a part of my

Page 187

1  recommendation of having that training that we spoke
2  about.
3  Q. Next one, "I expressed a concern to my
4  supervisor a CPR trainer that instructed at our
5  office that when I was performing CPR, the
6  instructor told me to, 'Pick my ass up' in front of
7  male colleagues. My supervisor said, 'Well, did you
8  pick it up?' in a laughing manner." And then in
9  parens, "Witnessed this CPR training."
10      Does that mean that Greene witnessed
11  it?
12  A. As far as I can recall, I believe he was
13  named by Ms. Barnes that he may have witnessed this.
14  Q. He says, according to your notes, "It's not
15  a significant memory." What does that mean?
16  A. As far as I can recall, it means that he
17  did not remember that.
18  Q. So not at all?
19  A. Correct.
20  Q. Why didn't you write that instead of "not a
21  significant memory"?
22  A. I can't recall.
23  Q. Next page, 3, "My supervisor touches my arm
24  and/or leg the majority of the time I have a meeting

Page 188

1  or talk to him one-on-one." And according to your
2  notes, Greene says, "More than I am, but not that
3  bad, I haven't noticed it."
4      What did -- what did he tell you, more
5  than -- Turney touched her more than he touched
6  Greene?
7  A. I don't recall.
8  Q. Next one, "Supervisor gestures cat claws
9  and makes a hissing noise."
10      And you have heard the term "cat fight"
11  before, right?
12  A. Yes.
13  Q. Okay. And that refers to two women
14  engaging in some sort of conflict?
15  A. Yes.
16  Q. Okay. And you have also heard before that
17  there are times where men describe enjoying watching
18  that, two women engaged in a cat fight.
19  A. I haven't personally heard that.
20  Q. You haven't heard that before?
21  A. No.
22  Q. You think the term "cat fight" is a sexist
23  term?
24  A. Not necessarily.

47 (Pages 185 to 188)

Page 189

1    Q.  Could be?
2    A.  Yeah, could be.
3    Q.  And he said -- Greene tells you, according
4  to your notes, that he's heard it and he says as a
5  joke.  Whether or not something was meant as a joke
6  has nothing to do with whether it violated the
7  policy, correct?
8    A.  Correct.
9    Q.  And Turney gesturing cat claws and making a
10 hissing noise would violate the company's policies,
11 correct?
12   A.  Correct.  It's inappropriate.
13   Q.  Last claim, "I have been called a bitch by
14 numerous people in the office."  He tells you, "No,
15 sometimes she is in a pretty good mood.  You can,
16 tell though, sometimes that people are getting to
17 her and she is frustrated."
18       Do you know why Greene was telling you
19 this in the context of being asked about her claim
20 that she's been called a bitch by numerous people in
21 office?
22   A.  I don't recall specifically, no.
23   Q.  You thought that Greene was telling you the
24 truth, correct?

Page 190

1    A.  Yes.
2    MR. TUCKER:  Ready to go on to another
3  document?
4    MS. GURMANKIN:  Yes.
5    MR. TUCKER:  I'll take my first
6  bathroom break.
7    THE VIDEOGRAPHER:  This ends Media 3.
8  We are going off record.  The time is 1:15 p.m.
9    (A recess was taken.)
10   THE VIDEOGRAPHER:  This begins Media 4.
11 Back on record.  The time is 1:22 p.m.
12   (Exhibit 27 was marked.)
13   Q.  (BY MS. GURMANKIN)  I am showing you what's
14 been marked as Exhibit 27 Shell 1145 through 1148.
15 These are your interview notes with Kelvin Flynn,
16 correct?
17   A.  Yes.
18   Q.  Going to page 2.  Under "Claim chart,"
19 "Supervisor gestures cat claws and makes a hissing
20 noise," and he says that he has seen that once in a
21 while, correct?
22   A.  Correct.
23   Q.  Page 3, last paragraph above No. 4, "Every
24 once in a while people will joke back and forth, and

Page 191

1  occasionally things will get said that I don't think
2  is appropriate for an office environment.  They
3  cross the line sometimes, not too often, but
4  sometimes.  I can't recall a specific example.  Once
5  or twice have been about women probably."
6       I read that correctly?
7    A.  Yes.
8    Q.  Did you ask him if he remembered what had
9  been said about women?
10   A.  I can't recall specifically, but it seems
11 based on this note that I did ask about women and he
12 didn't have a specific example, but I can't recall
13 specifically.
14   Q.  Did you tell Larsen or Steve Craig that
15 they had an employee in the group who's saying that
16 people were saying things that aren't appropriate
17 for an office environment and they crossed the line,
18 including about women?
19   A.  I don't recall specifically what examples
20 that I shared with Mr. Larsen.
21   Q.  Did you share any examples with Larsen?
22   A.  I don't recall.
23   Q.  Did you share any examples with Craig?
24   A.  I can't recall.  I believe that I did, but

Page 192

1  I don't -- I can't say specifically.
2    (Exhibit 28 was marked.)
3    Q.  (BY MS. GURMANKIN)  Showing you what's been
4  marked as Exhibit 28, Shell 1162 to 1163.  These are
5  your interview notes with Shane Sollinger, correct?
6    A.  Correct.
7    Q.  Under No. 2, "Describe your working
8  relationship with Will Turney and Jesse Barnes
9  (understand not on their team)."
10       Again, that's you saying you understood
11 that he was not on their team, correct?
12   A.  Correct.
13   Q.  Do you remember where you got his name
14 from?
15   A.  No.
16   Q.  So second line under No. 2, he says, "I
17 have been disappointed in the way he" -- meaning
18 Will Turney -- "conducts his business and things he
19 talks about."
20       Did you ask him what he meant by that?
21   A.  I don't recall.
22   Q.  It's not in here, right?
23   A.  I can't say for sure.  I -- the rest of the
24 paragraph he's talking about some examples, and that

48 (Pages 189 to 192)

Page 193

1    may be why, but I don't recall the specifics.
2         Q.  So all he says after that is "Nothing
3    serious.  But one of my team members he has taken it
4    out of context and I confronted it.  He backed down.
5    He has a tendency to talk about his people to other
6    people even in negative ways.  I don't think he was
7    properly trained as a supervisor.  He's a little
8    blunt with his people instead of being
9    understanding.  I heard a lot from his employees.
10   They will say, 'I can't stand working for that
11   guy.'"
12        That's the rest of that paragraph?
13        A.  Yes.
14        Q.  Did you ask him whether anyone had
15   complained to him about not being able to work for
16   him because he's sexist?
17        A.  I can't recall.
18        Q.  Did you ask any -- did you ask him if
19   anyone had told him that they can't stand working
20   for Turney because he engages in sexual harassment?
21        A.  I don't believe so, as far as I can recall.
22        (Exhibit 29 was marked.)
23        Q.  (BY MS. GURMANKIN)  Showing you what's been
24   marked Exhibit 29, Shell 450.

Page 194

1         Are these your interview notes with
2    Greg Larsen?
3         A.  These are the notes that I have, yes.
4         Q.  I think earlier you testified that you
5    thought you had talked to Greg Larsen during the
6    course of the investigation.  Is this your notes
7    reflecting that?
8         A.  Yes.
9         Q.  I haven't seen similar notes regarding
10   Steve Craig.
11        A.  Okay.
12        Q.  Do you recall -- I know you don't have a
13   specific recollection of talking to Steve Craig
14   during the investigation.  Correct?
15        A.  I don't, no.
16        Q.  Was this an in-person meeting with Larsen?
17        A.  I don't remember.
18        Q.  This 12/8 would have been -- you started
19   the interviews it looks like on 12/6.  Would you
20   have still been in Willsboro on the 8th?
21        A.  Yeah.  Yes.
22        Q.  And he was in Willsboro?
23        A.  He was.  So this would have been in person.
24        Q.  No. 2, you're asking Larsen "What actions

Page 195

1    did you take once you became aware of the
2    harassment/hostile work environment complaint.
3    Provide events and dates."
4         According to your notes, he says, "She
5    came by my desk before I had a chance to take any
6    actions.  We sat in here and had a conversation with
7    her.  She wanted me to know about the complaint.  I
8    didn't talk to her about details.  I thanked her for
9    the courage to submit the complaint.  I didn't see
10   any signs that she was in trouble or felt" -- is
11   that "unable to do her work"?
12        A.  I don't know.
13        Q.  Okay.  Did you ask -- so if you look at
14   No. 1 and No. 2, it looks like Larsen is saying in
15   No. 1 that he first found out about the complaints
16   when Steve Craig talked to him about it during the
17   week of November 26.  You see that?
18        A.  Yes.
19        Q.  And then No. 2, it looks like he's saying
20   that he heard from Jesse that she had made
21   complaints.
22        A.  Okay.  Let me read this.
23        Q.  Sure.  Take your time.
24        A.  I'm understanding this that he first became

Page 196

1    aware through Steve when Steve let him know.  But
2    then Jesse also talked to him that she had filed a
3    complaint.
4         Q.  Did you ask him when?
5         A.  I may have but I can't recall specifically.
6         Q.  And it's not in here, right?
7         A.  Correct.
8         Q.  There's no answers to Nos. 3 and 4.  Did
9    you ask him those questions?
10        A.  I can't recall.  But he said that he did
11   not take any actions.  So that may be why I did not
12   ask that.
13        Q.  No. 5, "Are you aware of any previous
14   complaints against this alleged harasser."
15        Did you mean Turney?
16        A.  Yes.
17        Q.  And at this point you knew there were
18   allegations -- allegations against other employees
19   engaging in inappropriate conduct other than Turney,
20   right?
21        A.  I was aware of there was a previous
22   investigation, yes.
23        Q.  No.  I'm talking about in this
24   investigation, that Jesse had alleged that other

49 (Pages 193 to 196)

Page 197

1    employees engaged in inappropriate conduct other
2    than Turney.
3        A. Yes.
4        Q. Okay. And other employees had told you
5    that they engaged in inappropriate conduct during
6    the course of the investigation?
7        A. Yes.
8        Q. So did you ask Larsen if he was aware of
9    any previous complaints against any of them?
10       A. As far as I can recall, I asked if he was
11   aware of previous complaints against Mr. Turney.
12       Q. Did you ask if he was aware of previous
13   complaints against anyone else who had admitted they
14   engaged -- engaged in inappropriate conduct or who
15   Jesse had alleged engaged in inappropriate conduct?
16       A. I can't recall that specifically.
17       Q. Did you do anything to look into whether
18   there had been any previous complaints against
19   Turney during the course of your investigation?
20           MR. TUCKER: Objection; asked and
21   answered.
22           You may answer it again.
23           MS. GURMANKIN: I didn't ask that.
24           MR. TUCKER: She said that she had

Page 198

1    looked -- she believes she may have looked in his
2    personnel file.
3            MS. GURMANKIN: I didn't hear you, but
4    I didn't ask that question before.
5        A. Can you -- can you repeat your question?
6        Q. (BY MS. GURMANKIN) Yeah. Did you do
7    anything during the course of the investigation to
8    look into whether there had been any previous
9    complaints against Turney?
10       A. I can't recall specifically. I believe
11   Ms. Michelle Priest would have informed me, and I
12   would have been aware if there were. I can't recall
13   specifics.
14       Q. But you don't recall anything that you did
15   to look into that?
16       A. I can't recall.
17       Q. And once you became aware during the course
18   of the investigation that there were other people
19   whom Jesse was alleging engaged in inappropriate
20   conduct and who admitted that they engage -- engaged
21   in inappropriate conduct, did you do anything to
22   look into whether there were any previous complaints
23   against those people?
24       A. I can't recall.

Page 199

1        Q. Does Shell have an employment application
2    that they use for new hires?
3        A. Yes.
4        Q. Have you -- you have seen it?
5        A. At one point in my career, yes, I have.
6        Q. Was there -- when you saw it, was there any
7    questions on there about whether or not the
8    applicant had been previously accused of sexual
9    harassment or discrimination?
10       A. I can't recall if there's a specific
11   question around sexual harassment or harassment, but
12   I recall questions around previous -- what is the
13   word? -- what was your question?
14       Q. About had they been accused of sexual
15   harassment.
16       A. Okay. I think -- I believe there is a
17   question around being accused or just in general
18   unlawful activity.
19           MR. TUCKER: Do you know?
20           THE WITNESS: But I don't know.
21           MR. TUCKER: Stop guessing, okay?
22   Because we are not here to guess.
23       A. There are some types of questions around
24   that but I don't know specifically.

Page 200

1        Q. (BY MS. GURMANKIN) Around being accused
2    of -- being previously accused of sexual harassment?
3        A. No. I can't recall if that is specifically
4    asked. I just know there's questions around
5    something with the law.
6        Q. Okay. Whether they have ever broken the
7    law?
8        A. Yeah.
9            MR. TUCKER: Let's take a break. Let's
10   take a break. See you outside.
11           THE WITNESS: Okay.
12           THE VIDEOGRAPHER: We good to go off?
13   We are off record. Time is 1:34 p.m.
14           (A recess was taken.)
15           THE VIDEOGRAPHER: We are back on the
16   record. Time is 1:41 p.m.
17       Q. (BY MS. GURMANKIN) Are you aware of any
18   questions on Shell's employment application that
19   asks if the job candidate or the applicant has been
20   previously accused of sexual harassment?
21       A. As far as I know, there are no questions on
22   the job applications asking about sexual harassment
23   or harassment.
24       Q. Are you aware of any actions that Shell

50 (Pages 197 to 200)

Page 201

1    takes regarding applicants or job candidates to
2    ascertain whether or not they have been previously
3    accused of sexual harassment?
4        A.  I am not aware.
5        Q.  Back to Exhibit 29, the interview with Greg
6    Larsen.  Is that up on your screen?
7        A.  Yes.
8        Q.  No. 6, "Where is the agency's
9    antiharassment policy posted?  How/when is it
10   disseminated to staff?"
11       He said, according to your notes, "I
12   think it is available.  I don't know where it is
13   posted."  I'll stop there.
14       Did you do anything to see if the
15   policy actually was posted?
16       A.  I do not recall taking action to see if the
17   policy was posted specifically.
18       Q.  Did you do anything to ascertain whether it
19   had been disseminated to staff?
20       A.  I can't recall specifically if I took that
21   action, no.  But I know that the policy is shared
22   via email with all staff.
23       Q.  When?
24       A.  As far as I'm aware, it's shared on an

Page 202

1    annual basis.
2        Q.  The antiharassment policy?
3        A.  That is my understanding.
4        Q.  And the EEO policy?
5        A.  I believe so.  And the Code of Conduct
6    training is -- is required on an annual basis.
7        Q.  Right, the online training?
8        A.  Yes.
9        Q.  Looking at Exhibit 4, these two policies
10   are the ones that are emailed to all employees on an
11   annual basis?
12       A.  That is my understanding.
13       Q.  Well, do you get them?
14       A.  I believe so but I can't say with
15   100 percent confidence that I have received this on
16   an annual basis, but I believe so.
17       Q.  Who sends them?
18       A.  I believe it comes from the country chair.
19       Q.  I'm showing you what's been marked as
20   Exhibit 5.  These are your interview notes with
21   Hondo Blakley, correct?
22       A.  Yes.
23       Q.  And how did you get him on your list?
24       A.  I don't recall specifically, but as far as

Page 203

1    I can recall, I believe Ms. Barnes recommended his
2    name.
3        Q.  Page 2, third paragraph, "I see a lot of
4    banter back and forth, joking, friendly."
5        Did you ask him what kind of banter
6    he's talking about?
7        A.  Not that I can recall.  There's a question
8    below asking about inappropriate.  I may have asked,
9    as far as I can recall, if there was inappropriate
10   banter.
11       Q.  And in response he says, "Talking about
12   personal life, boyfriend.  She recently bought a
13   Jeep, was pretty proud.  I said 'good job.'  There
14   was a statement made whether her boyfriend gave her
15   permission.  Getting pretty personal."
16       That seems to indicate that he's
17   telling you banter that Jesse engaged in; is that
18   right?
19       A.  Correct.
20       Q.  He said he saw a lot of banter back and
21   forth right above that.  Did you ask him what banter
22   that Turney and others engaged in?
23       A.  I can't recall specifically.
24       Q.  No follow-up mentioned in here, right?

Page 204

1        A.  Correct.
2        Q.  Under the next header, it says, "Getting
3    hired.  Will pushed for her to get hired.  She
4    showed ability to get hired.  To be honest, I think
5    she's one of the sharpest employees as far as
6    ability, but she lacks energy/motivation for some
7    reason.  She was angry about the woman statement
8    getting paid well."
9        That's the statement that we talked
10   about earlier, that Turney admitted he made to Jesse
11   about being paid well for a woman?
12       A.  That's correct.
13       Q.  And Blakley is also confirming that he made
14   that statement?
15       A.  Correct.
16       Q.  Under the first claim, "I am continually
17   asked about my personal life by my supervisor."  And
18   he says, according to your notes, "I have seen it a
19   little more with her, but it is common," correct?
20       A.  Correct.
21       Q.  Next one, "My supervisor touches my arm
22   and/or leg the majority of the time I have a meeting
23   or talk to him one-on-one."  According to your
24   notes, he says, "I have -- is that -- I'm sorry; I

51 (Pages 201 to 204)

Page 205

1　have something covering.  Is that "scooching"?
2　　　A.  Scooting.
3　　　Q.  -- "scooting up close to look at the
4　computer two legs touching, touching an arm/leg but
5　not other direct reports.  Nothing inappropriate
6　like rubbing her back."
7　　　　So he's, according to your notes,
8　telling you that Turney engages in that conduct with
9　her but not with his other direct reports, correct?
10　　　A.  That's what he's observed, yes.
11　　　Q.  And when he says "nothing inappropriate
12　like rubbing her back," you are aware that touching
13　arm or leg could be inappropriate, as well, right?
14　　　A.  Yeah.
15　　　Q.  And could be a violation of the company's
16　policies?
17　　　A.  Yes.
18　　　Q.  Page 3, first claim at the top, "Supervisor
19　gestures cat claws and makes a hissing noise."  He
20　tells you, according to your notes, "Yes, I have.
21　Any time there has been -- there is a bit of an
22　issue between two people, he tries to do it to
23　lighten the issue to avoid confrontation.  It is
24　frequent, common when there is a conflict."

Page 206

1　　　　That's correct?
2　　　A.  Let me read it.  Yes.
3　　　Q.  And last one on that page, "I have been
4　called a bitch by numerous people in the office."
5　　　　And what did you understand that he was
6　saying to you?
7　　　A.  In his response?
8　　　Q.  Uh-huh.
9　　　A.  Okay.  I will read it.
10　　　Q.  Sure.
11　　　A.  My understanding from what he said is that
12　there was a back-and-forth conversation or banter
13　between Ms. Barnes and Mr. Hoover.  She was calling
14　him a grouch; he was calling her either a bitch or a
15　you-know-what.  And then at some point this was
16　expressed to Mr. Blakley.  But it was an issue.
17　　　Q.  Okay.  But Blakley did not tell you that he
18　heard Hoover refer to Jesse as a bitch?
19　　　A.  Correct.
20　　　Q.  Page 4, Jesse's claim, "I was told when I
21　voiced some of my concerns that 'I need to stop
22　playing the victim.'  She mentioned that you have
23　coached her on this, as well.  And he admits that he
24　told her that," correct?

Page 207

1　　　A.  He told her she needed to stop playing the
2　victim when she lost her temper, got angry about
3　work and was blaming someone else.
4　　　Q.  Did you ask him if he ever told a male
5　employee to stop playing the victim?
6　　　A.  Not that I can recall.
7　　　Q.  All right.  First paragraph under the
8　chart, second line, "Chris Anderson cautioned hiring
9　her because she is 'trouble' and we will all end up
10　in the same position as the last guy."
11　　　　What did that mean?
12　　　A.  I don't know.  I don't recall.
13　　　Q.  Did you ask him?
14　　　A.  Not that I recall.
15　　　Q.  How come?
16　　　A.  I don't remember.
17　　　Q.  No. 3, "Understand you had observed an
18　instance in March of this year when Will referred to
19　Jesse as a hot blond.  Share your perception of this
20　event."
21　　　　And he confirmed that Turney referred
22　to Jesse as a hot blond?
23　　　A.  Yes.
24　　　Q.  And according to your notes, he says that

Page 208

1　he made a statement about it?
2　　　A.  I can't recall what that means.
3　　　Q.  Did you ask him?
4　　　A.  I -- I'm not -- I can't -- I'm not sure
5　what my note means here.  I believe that Mr. Blakley
6　confirmed the situation that happened, but I don't
7　know what the statement means.
8　　　Q.  No. 6, "Is there anything else you'd like
9　to share related to the items we discussed today
10　that hasn't been asked yet?"
11　　　　He says, according to you, your notes,
12　"In working with both of them, it was always assumed
13　as harmless banter.  She dealt as much as she
14　received.  In some situations she started it but
15　seemed joking banter back and forth.  He has done
16　that stuff or still does, trying to keep the stress
17　low.  People are frustrated, our SPS is low, trying
18　to find ways to keep morale up.  He tried to make
19　people laugh, joke, et cetera.  At the time you go
20　back and forth."  I'll stop there for a sec.
21　　　　When he told you he has done that stuff
22　or still does trying to keep the stress low, did you
23　ask him what he was referring to?
24　　　A.  I don't recall.

Page 209

1     Q. Did you ever consider that Blakley was not
2  telling you the truth?
3     A. No.
4        MR. TUCKER: No, you...
5     Q. (BY MS. GURMANKIN) Did not conclude that
6  Blakley was --
7     A. I did not conclude that Blakley was not
8  telling the truth.
9     Q. Okay. All right. Let's look at Exhibit 18
10 which we marked earlier. These are your interview
11 notes with Jesse, correct?
12    A. Yes, these are my interview notes with
13 Jesse.
14    Q. When you got her internal complaint before
15 you started your investigation, you reviewed her
16 internal complaint, correct?
17    A. Correct.
18    Q. All right. Page 2, the second paragraph
19 after the long one that starts with "Ken Foreman.
20 Ken Foreman would come up behind me and put his
21 hands through my hair. It became a joke between
22 Ken/Will that Jesse doesn't like to be touched."
23       If that were true, that would be a
24 violation of policy, correct?

Page 210

1     A. Which part?
2     Q. All of it.
3     A. Yes.
4     Q. Three down from that, it starts with "Will
5  hadn't noticed." You see where I am?
6     A. Yes.
7     Q. "Will hadn't noticed that he will touch
8  others on the team like putting hand on leg, but he
9  is friendly and gives high-fives, but haven't
10 noticed specifically touching on leg, arm, like with
11 me."
12       If that's accurate, that would be a
13 violation of policy?
14    A. Yes.
15    Q. And both of those things, the Ken Foreman
16 allegation and what I just read, that would cause a
17 reasonable woman to be offended?
18    A. Yes.
19    Q. Next one, "I think Will is the ringleader
20 of disrespect towards me. I mention Ken but feel
21 like as a group they get a vibe on how to treat
22 certain people. You can treat Jesse this way
23 because Will isn't showing how to be respectful.
24 The guys all joke around together, but I feel like I

Page 211

1  am treated differently. I don't feel like there is
2  a good vibe on our team, communication issues."
3        What she's describing there, that
4  conduct, that would be a violation of the company's
5  policies?
6     A. What specifically in that sentence or in
7  that paragraph?
8     Q. "I think Will is the ringleader of
9  disrespect towards me. As a group, they get a vibe
10 on how to treat certain people. You can treat Jesse
11 this way because Will isn't showing them how to be
12 respectful. The guys all joke around together, but
13 I feel like I am treated differently."
14    A. Will as the leader should -- all
15 employees should be respectful towards each other.
16    Q. And that could cause a reasonable woman to
17 be offended?
18    A. Yes.
19    Q. Next page. Top bullet point, "I have been
20 shown a selfie of my supervisor in his underwear by
21 him."
22       That would be a violation of company
23 policy, correct?
24    A. Yes.

Page 212

1     Q. And that could cause a reasonable woman to
2  be offended?
3     A. Yes.
4     Q. Two bullet points down, "I was told in my
5  mid-year review that I make good money for a woman
6  and should not be upset with my pay grade by my
7  supervisor."
8        That would be a violation of company
9  policy, correct?
10    A. That comment is a violation of company
11 policy, yes.
12    Q. And that would cause a reasonable woman to
13 be offended?
14    A. Yeah.
15    Q. Two bullet points down, "I was told I work
16 well with male employees because I am a woman by my
17 supervisor."
18       That would be a violation of company
19 policy, right?
20    A. Yes.
21    Q. And that could cause a reasonable woman to
22 be offended?
23    A. Yes.
24    Q. Next page. First bullet point on that

53 (Pages 209 to 212)

Page 213

1　page, "I was told I'm a hot blond by my supervisor."
2　　　　That would be a violation of company
3　policy, correct?
4　　A. Yes.
5　　Q. And that could cause a reasonable woman to
6　be offended?
7　　A. Yes.
8　　Q. Next one, "I'm continually asked about my
9　personal life by my supervisor. Will asks me what
10　do I do when I get home. Do you start drinking
11　wine? Do I cook? He asks me bizarre questions when
12　people are around. It is really uncomfortable. He
13　asks me about my boyfriend, what does he do, what
14　does he do, does he make good money. He has met him
15　once. I brought him to the holiday party, and ever
16　since he met him, there have been a lot of questions
17　about him.
18　　　　"My boyfriend had to get back surgery.
19　They called me and told me they were going to bring
20　him into surgery. I asked Will if I could take the
21　rest of the day off, and when I came back from work,
22　he asked how it went. Then he continually asked
23　about him. It's been four or five months, and he
24　still asks about it."

Page 214

1　　　　Would that be -- would Turney's
2　questions as Jesse is portraying them to you,
3　according to your notes, would that be a violation
4　of company policy?
5　　A. Not necessarily.
6　　Q. Could be?
7　　A. I think it depends on the circumstances.
8　　Q. Well, based on what she's telling you here,
9　is that a violation of company policy?
10　　A. I don't necessarily think so. I think it's
11　poor leadership behavior, but I don't think it
12　violates company policy.
13　　Q. Do you think it's inappropriate?
14　　A. I think it's poor leadership behavior.
15　　Q. Does that mean it's inappropriate?
16　　MR. TUCKER: Objection; asked and
17　answered. She said --
18　　MS. GURMANKIN: I'm not asking if it's
19　poor leadership behavior. I'm asking you if you
20　think it's inappropriate.
21　　MR. TUCKER: She obviously doesn't
22　characterize it as --
23　　MS. GURMANKIN: Please don't answer for
24　her.

Page 215

1　　MR. TUCKER: But she's answered the
2　question three times.
3　　MS. GURMANKIN: No, she's not.
4　　MR. TUCKER: Not to your satisfaction.
5　　Q. (BY MS. GURMANKIN) Do you think it was
6　inappropriate?
7　　MR. TUCKER: She has answered your
8　question that she thought it was poor leadership.
9　　MS. GURMANKIN: I didn't ask if it was
10　poor leadership behavior.
11　　Q. (BY MS. GURMANKIN) Did you think it was
12　inappropriate?
13　　A. I think that it would be inappropriate if
14　it was unwelcome.
15　　Q. Based on how Jesse's relaying it to you,
16　did you believe that that conduct was welcome or
17　unwelcome?
18　　A. Unwelcome.
19　　Q. Last bullet point on that page. "At a work
20　charity golf tournament, I was asked more than once
21　why I was not wearing shorts at this event and if my
22　supervisor could cut my pants into shorts, as well
23　as other supervisors joined in and took a picture of
24　my backside (buttock) and saved on phone.

Page 216

1　　　　"Will asked multiple times why I am not
2　wearing shorts. I said, 'I can't wear shorts around
3　you guys.' He repeatedly asked me. I organized the
4　tent for the golf tournament. In the morning he
5　asked multiple times, 'Maybe we can cut those
6　shorts.'"
7　　　　Violation of company policy as she's
8　describing there?
9　　A. Yes, that's inappropriate.
10　　Q. And a violation of company policy?
11　　A. It depends on the circumstances.
12　　Q. As she's related it to you there?
13　　A. Yes.
14　　Q. Would make a reasonable woman feel
15　offended?
16　　A. Yes, it could.
17　　Q. All right. Continued onto the next page,
18　next 5. "Hondo hasn't done anything other than
19　this, but he took a picture of my backside. He
20　asked how much I thought he could get for the
21　picture, and I said, 'I would delete that if I were
22　you.'"
23　　　　Hondo Blakely's conduct that she's
24　describing here, that's a violation of company

Page 217

```
1   policy?
2        A.  Yes.
3        Q.  And that could cause a reasonable woman to
4   be offended?
5        A.  It could.
6        Q.  According to your notes -- this is the
7   second-to-last bullet point under that allegation --
8   "Tina could have heard.  She helped me set up the
9   tent."
10            Did you try to talk to Tina or ask who
11  that was?
12       A.  I can't recall that.
13       Q.  Do you know why you wouldn't have done
14  that?
15       A.  I can't recall those specifics; no.
16       Q.  But you would have talked to anyone that
17  Jesse said may have heard an allegation that he was
18  making, right?
19       A.  My intent was to talk to as many
20  individuals as possible.
21       Q.  There's no notes regarding any conversation
22  with Tina.  Does that indicate that you never spoke
23  with her?
24       A.  Correct.
```

Page 218

```
1        Q.  And do you have any explanation for why you
2   never spoke with her?
3        A.  I can't recall specifically.  I didn't -- I
4   believe that I interviewed enough people to have a
5   thorough investigation.
6        Q.  But this is an allegation -- Blakley denied
7   taking a picture of Jesse's backside, right?
8        A.  Correct.
9        Q.  And Jesse is saying that she saw it,
10  correct?
11       A.  Correct.
12       Q.  And Jesse is saying that she had someone
13  else who she thinks saw it?
14       A.  And she also mentioned Mr. Fletcher.
15       Q.  Well, let's stick with Tina first.
16            So why didn't you talk with Tina?
17            MR. TUCKER:  Objection; asked and
18  answered.
19       A.  I can't recall specifically.
20       Q.  (BY MS. GURMANKIN)  There's a conflict
21  here, obviously, between what Jesse's alleging and
22  what Hondo Blakley is saying, correct?
23       A.  Correct.
24       Q.  How did you resolve that?
```

Page 219

```
1        A.  Can you rephrase the question?
2        Q.  Yeah.  Who did you determine was telling
3   the truth?
4        A.  Specifically around taking a picture of her
5   backside?
6        Q.  Correct.
7        A.  I was not able to validate that as -- I did
8   talk to multiple people who were at the golf
9   tournament.  And there was no evidence to support
10  it.
11       Q.  If you look at Hondo Blakely's interview --
12  this is No. 4 -- he actually does not deny taking a
13  picture of her backside.  He says he has no
14  recollection, correct?
15       A.  Correct.
16       Q.  So Jesse is saying it happened; he's saying
17  he has no recollection, right?
18       A.  Right.
19       Q.  So did you conclude that it didn't happen?
20       A.  I didn't conclude that it didn't happen,
21  but I concluded I could not corroborate that claim
22  that he purposefully took a picture of her backside.
23       Q.  But if Jesse is saying it happened and he
24  denied it, then why wouldn't you be able to
```

Page 220

```
1   corroborate that?
2        A.  I took his no recollection and not
3   remembering it that there was no picture as denying
4   it.
5        Q.  But he didn't -- I mean, denial is
6   different than saying "no recollection," right?
7        A.  I interpreted it as no recollection, that
8   it was -- that it didn't happened.
9        Q.  But it's different.  Some things he denied
10  in his interview, but this he said "no
11  recollection," correct?
12       A.  At the time I interpreted that as it did
13  not -- as a denial.
14       Q.  And looking at it now, you understand there
15  is a difference between no recollection and denying?
16       A.  I can see how technically there is a
17  difference, but I'm not sure how he meant that
18  statement.
19       Q.  But you assumed he was denying it?
20       A.  Yes.
21            MR. TUCKER:  Objection.
22       Q.  (BY MS. GURMANKIN)  So if he's denying it
23  and Jesse's saying it happened, then why did you
24  conclude that it couldn't be -- that you couldn't
```

55 (Pages 217 to 220)

Page 221

1   reach a conclusion that it happened?
2        A.  I also talked to other individuals who were
3   at the golf tournament, and no one was able to
4   corroborate that as well.
5        Q.  And, of course, Jesse's giving you someone
6   who she thinks saw it, and you didn't speak to her,
7   right?
8        A.  I did not speak to Tina.
9        Q.  You didn't even ask Jesse her last name,
10  according to your notes, right?
11       A.  According to my notes, her last name was
12  not in it.
13       Q.  Did you ask for her last name and you just
14  didn't include it in your notes?
15       A.  I can't recall.
16       Q.  Did you think Jesse was lying?
17       A.  No.
18       Q.  Well, if you didn't -- if you concluded
19  that she was telling the truth and she said it
20  happened, and you don't have anyone specifically
21  denying it, then why didn't you conclude that it
22  happened?
23       A.  I was not able to validate through other
24  individuals who were at the golf tournament that it

Page 222

1   happened or from the individual who was named.
2        Q.  You have no one actually denying it
3   happened, and you have someone saying that it did
4   happen, right?
5        A.  There was one person who said it did
6   happen, and I was not able to validate it.
7        Q.  And there's no one denying it, right?
8        A.  There was no one that observed it
9   or -- yeah.
10       Q.  There is no one denying that it happened,
11  right?
12       A.  I -- I don't recall.  I'd have to look at
13  the other interview questions where we asked about
14  it.  I believe, as far as I recall, people did not
15  see it.
16       Q.  Right.  And the person she's saying who did
17  it, Hondo Blakley, is not denying it.  He's just
18  saying no recollection, right?
19       A.  That is what he said, he does not recall
20  it.
21       Q.  And there were other allegations that Jesse
22  had made that people had admitted, right?
23       A.  Uh-huh.
24       Q.  Yes?

Page 223

1        A.  Yes.
2        Q.  All right.  So why didn't you just accept
3   what she was telling you as the truth, given the
4   circumstances?
5        A.  Because I was not able to validate that
6   example.
7        Q.  Well, what were you looking for that you
8   would need in order to validate that example?
9        A.  That someone else had seen it or confirmed
10  that it happened.
11       Q.  Well, why wouldn't you just take her word
12  for it when she's saying it happened and there is no
13  one who's denying it?
14       A.  I have to validate that other people were
15  witnesses or had seen this.
16       Q.  Why?
17       A.  With the investigation I need -- I don't
18  just take one side of the story.  I need to
19  corroborate or validate what the claims are in order
20  to validate.
21       Q.  But you never -- did you ever conclude that
22  Jesse lied to you during the course of this
23  investigation?
24       A.  I did not believe that Jesse was lying.

Page 224

1        Q.  Did you ever conclude that she engaged in
2   any inappropriate conduct as a result of her
3   investigation?
4        A.  As far as I can recall, there was -- there
5   were some examples that she did engage in some
6   inappropriate conduct, as well.
7        Q.  Did you ever conclude that she violated
8   company policy?
9        A.  There were some violations of the Code of
10  Conduct, as well.
11       Q.  So, yes, you concluded that she violated
12  company policy?
13       A.  Yes.
14       Q.  All right.  So if you never concluded that
15  she was lying at any point during the course of the
16  investigation, not a single person denies what she's
17  saying about Blakley taking a picture of her
18  backside, then why don't you just take her word for
19  it that it happened?
20       A.  I could not validate that it happened.
21       Q.  But why do you need someone else, a
22  witness, to confirm that it happened?
23            MR. TUCKER:  Objection; asked and
24  answered.

56 (Pages 221 to 224)

Page 225

1    Q. (BY MS. GURMANKIN) Why can't you just take
2 her word?
3           MR. TUCKER: Excuse me, Counsel.
4 Objection; asked and answered several times.
5    Q. (BY MS. GURMANKIN) Why can't you take her
6 word for it?
7    A. With all of her claims, I was trying to
8 validate either by the individual she was claiming
9 did the action or by someone else who had witnessed
10 it to corroborate what happened.
11    Q. Were you told by someone that you couldn't
12 just accept Jesse's word that something happened if
13 you believed her?
14    A. No, but with all investigations that I have
15 completed, we have always validated with another
16 person.
17    Q. So in order to believe an allegation of
18 harassment, there needs to be either, I guess, some
19 sort of documentary evidence or another witness
20 confirming that it happened in order for the
21 complainant to be believed?
22    A. There needs to be some type of evidence or
23 a witness.
24    Q. So by evidence, it would be like a picture

Page 226

1 or a video?
2    A. Yes.
3    Q. Why?
4    A. In order to confirm that it happened.
5    Q. And you agree there are certain times that
6 when an employee is being sexually harassed that
7 stuff is going to happen that's deliberately not in
8 view of other people who would witness it, right?
9    A. That could be.
10    Q. And you agree that harassers are going to
11 generally try to avoid to put themselves in
12 situations where their conduct can be recorded in
13 some fashion, right?
14    A. That could be, yes.
15    Q. So there is going to be a lot of situations
16 in these situations where there is not going to be
17 documentary evidence and there is not going to be
18 witness corroboration, right?
19    A. That could be.
20    Q. And in that case, Shell's practice is the
21 complainant, even though the conclusion is that
22 she's never lied, she is still not going to be
23 believed without documentary evidence or witness
24 corroboration?

Page 227

1    A. I was not able to validate that that
2 instance happened.
3    Q. But my question is that Shell's practice is
4 that if an employee making a complaint of harassment
5 doesn't have documentary evidence that it happened
6 or a witness to corroborate it, then the conclusion
7 is that it didn't happen?
8    A. I can't speak on behalf of Shell. I was
9 just stating that from my training and from the
10 investigations that I have completed, we have looked
11 to validate the claim.
12    Q. And your training came from Shell, right?
13    A. From other employees at Shell.
14    Q. Right. And your investigations were
15 conducted at Shell?
16    A. They were.
17    Q. So as far as you know, this is Shell's
18 practice?
19    A. I can't say that this is Shell's practice.
20    Q. Has anyone told you otherwise?
21    A. No one has told me otherwise, but I have
22 not asked that.
23    Q. So if you were looking to corroborate what
24 Jesse's telling you, why wouldn't you reach out to

Page 228

1 the witness that she's handing you who she's saying
2 she thinks can corroborate it?
3           MR. TUCKER: Objection. She did say
4 she spoke to Mr. Fletcher.
5           MS. GURMANKIN: No, she didn't speak
6 with Tina.
7           Any explanation.
8           MR. TUCKER: She said she spoke with
9 Mr. Fletcher.
10           MS. GURMANKIN: That's not my question,
11 Joe.
12           MR. TUCKER: But you said you didn't
13 speak to the person she identified --
14           MS. GURMANKIN: That's right. Tina.
15           MR. TUCKER: She also said she spoke to
16 Mr. Fletcher --
17           MS. GURMANKIN: Joe, Joe, why don't you
18 talk to Tina?
19           MR. TUCKER: Caren, Caren do not
20 interrupt me while I'm talking. Okay? I told you
21 that before.
22           MS. GURMANKIN: You have been
23 interrupting me, Joe.
24           MR. TUCKER: I let you complete your

57 (Pages 225 to 228)

Page 229

1 statement.
2    She said that she spoke to
3 Mr. Fletcher.
4    MS. GURMANKIN:  And that's not my
5 question.
6   Q.  (BY MS. GURMANKIN)  My question is, why
7 didn't you speak to Tina, the person who Jesse's
8 handing you as someone who can corroborate what
9 happened?
10    MR. TUCKER:  Objection; asked and
11 answered.
12   A.  I can't recall specifically.  There may
13 have been a reason why Tina wasn't available, but I
14 believed I talked to Mr. Fletcher, who she named as
15 a witness, and I was talking to others who were at
16 the golf event that may have been able to
17 corroborate it.
18   Q.  (BY MS. GURMANKIN)  Let's go to Exhibit 23.
19 This is from Wayne Fletcher's interview.  If you
20 look at Question 4, he also does not deny that there
21 was a picture taken of her backside, correct?
22   A.  He does not recall that, that's correct.
23 That's what he said.
24   Q.  In fact, he said, "Just the atmosphere

Page 230

1 itself I would believe it would be possible," right?
2   A.  But he did not witness it happen.
3   Q.  Well, he didn't -- he didn't say he didn't
4 witness it.  He said, "I don't recall but that's
5 very possible," right?
6    MR. TUCKER:  "It's asking why not wear
7 shorts: cutting shorts, taking pictures of her
8 backside."
9    MS. GURMANKIN:  If you have an
10 objection to form, you can make the objection.
11    MR. TUCKER:  Yeah.  The objection to
12 form is that you are misstating what the -- what his
13 response is.  At the end he says, "They take the
14 pictures," referring to Jesse, her girlfriend.
15   Q.  (BY MS. GURMANKIN)  He doesn't deny that it
16 happened, does he?
17   A.  He is -- his -- how I take his response, he
18 doesn't recall why someone was asking her why she's
19 not wearing shorts or cutting the shorts or that
20 there was a picture taken.
21   Q.  Is there anywhere, according to your notes,
22 where he denies that he saw someone taking a picture
23 of Jesse's backside?
24   A.  Not that I can recall.

Page 231

1   Q.  How come you didn't tell him that the
2 allegation was that Hondo Blakley took a picture of
3 her backside?
4   A.  I can't recall if I named Mr. Blakley or
5 not.
6   Q.  It's not in the interview notes, right?
7   A.  Right.
8   Q.  And giving Fletcher more detail might have
9 helped him recall whether or not it happened, right?
10   A.  That could have helped.
11   Q.  So why didn't you do that?
12   A.  I can't recall.
13   Q.  Back to Exhibit 18, your interview notes
14 with Jesse Barnes.  If -- if Blakley took a picture
15 of Jesse's backside, that would violate policies,
16 right, the company's policies?
17   A.  Yeah.
18   Q.  And that could cause a reasonable woman to
19 be offended?
20   A.  Yes.
21   Q.  All right.  Top of page 6.  "My supervisor
22 said he thinks it's funny when I get into a
23 disagreement with other women" --
24    MR. TUCKER:  Hold on, Counsel.  I need

Page 232

1 to catch up to where you are.  What document number
2 are you on?
3    MS. GURMANKIN:  18.
4    MR. TUCKER:  Exhibit 18 or Document 18?
5    MS. GURMANKIN:  Exhibit.
6    MR. TUCKER:  Page 6?
7    MS. GURMANKIN:  Yes.
8   Q.  (BY MS. GURMANKIN)  That's a violation of
9 company policy, right?
10   A.  What?
11   Q.  "My supervisor said he thinks it's funny
12 when I get into a disagreement with other women
13 coworkers."
14   A.  I think that's poor-- if that's true, it's
15 poor leadership behavior.
16   Q.  Is it a violation of company policy?
17    MR. TUCKER:  Objection; asked and
18 answered.
19    MS. GURMANKIN:  No, I didn't and if it
20 was poor leadership.  I asked if it was a violation
21 of company policy.
22    MR. TUCKER:  Her answer was it's poor
23 leadership.
24    MS. GURMANKIN:  That wasn't my

58 (Pages 229 to 232)

Page 233

1  question.
2      Q.  (BY MS. GURMANKIN)  What's the answer to my
3  question?
4      A.  It depends on the situation, but not
5  necessarily.
6      Q.  Based on what she's telling you, is that
7  violation of company policy?
8      A.  I would say no.  It's poor leadership.
9      Q.  "Supervisor gestures cat claws and makes a
10  hissing noise," violation of company policy?
11     A.  I think that it's poor leadership behavior.
12     Q.  Is that a no to violation of company
13  policy?
14     A.  I think it depends on the context.
15     Q.  Based on what she's telling you here?  Read
16  what she's telling you about that allegation,
17  according to your notes.
18     A.  I think it's a poor leadership.  I don't
19  think it's necessarily a violation of company
20  policy.
21     Q.  Why not?
22     A.  Based on my understanding of the situation,
23  Mr. Turney would use these tactics to try to lighten
24  the mood when there was a conflict.  He didn't like

Page 234

1  conflict.  That's why I think it is just poor
2  leadership behavior in not being able to address the
3  conflict.
4      Q.  Whether or not a comment's being made to
5  lighten the mood, that has nothing to do with
6  whether or not conduct violates company policy,
7  correct?
8      A.  Can you repeat your question?
9      Q.  Sure.  Whether or not a comment's being
10  made to lighten the mood or conduct's being engaged
11  in to lighten the mood, that has nothing to do with
12  determining whether or not conduct violates company
13  policy, correct?
14     A.  I think it depends.
15     Q.  Taking a look at Exhibit 4, the
16  antiharassment and EEO policies, is there anything
17  where it says in here that if conduct is being
18  engaged in to lighten the mood, that it may not
19  violate company policy?
20     A.  Can you repeat your question?
21     Q.  Is there anything in the antiharassment or
22  EEO policies where it says that if conduct is being
23  engaged in to lighten the mood that it doesn't
24  violate the policies?

Page 235

1      A.  No.
2      Q.  Looking at the harassment policy and the
3  Code of Conduct, which should be on your screen,
4  does it say anything in there about whether or not
5  something violates company policy depends on whether
6  it was being done to lighten the mood?
7      A.  No.
8      Q.  How about in the Code of Conduct's equal
9  opportunity policy, which is on your screen now?
10  Does it say anything there about that?
11     A.  No.
12     Q.  All right.  So whether or not Turney was
13  making hissing noises and making cat call gestures,
14  whether or not he violated policy would not depend
15  on whether he was doing it to lighten the mood,
16  correct?
17     A.  Correct.
18     Q.  So the situation that Jesse describes on
19  page 6 of your interview notes, second-to-top bullet
20  point, would that violate company policy?
21     A.  Could be perceived as inappropriate or
22  offensive.  So, yes, it could -- it could violate
23  the company policy.
24     Q.  And that could cause a reasonable woman to

Page 236

1  be offended?
2      A.  Yes.
3      Q.  Next one, "I expressed a concern to my
4  supervisor a CPR trainer that instructed at our
5  office that when I was performing CPR, the
6  instructor told me to 'pick my ass up' in front of
7  male colleagues.  My supervisor said, 'Well, did you
8  pick it up' in a laughing manner."
9         Would that violate company policy?
10     A.  Yes.
11     Q.  And that could cause a reasonable woman to
12  be offended?
13     A.  Yes.
14     Q.  Second-to-last bullet point on that page,
15  "I have been asked by my supervisor multiple times
16  if I thought about him over the weekends."
17        Would that be a violation of company
18  policy, a male supervisor asking a female
19  subordinate if she thought about him over the
20  weekends?
21     A.  I don't think so.
22     Q.  Why not?
23     A.  From what I understand from the situations,
24  it's him making a joke and he has made this to male

59 (Pages 233 to 236)

Page 237

1  and female colleagues.
2       Q.  Last one on that page, "My supervisor has
3  told me that he has thought about me while
4  showering."
5            That would be a violation of company
6  policy?
7       A.  I don't think so.
8       Q.  Why not?
9       A.  Based on what I can recall from this
10 investigation, he mentioned this a number of times
11 to men and women, that he thought about a specific
12 work thing while showering.
13      Q.  Who else said that?
14      A.  I don't recall off the top of my head, but
15 I believe this was validated.
16      Q.  You mean it was corroborated that he said
17 that to men and women?
18      A.  I believe so.  That's my under- -- that's
19 my recollection.
20      Q.  If he just said it to Jesse, that would be
21 a violation of company policy, correct?
22      A.  It could be, yes.
23      Q.  Can you think of a situation where it
24 wouldn't be, as you sit here today?

Page 238

1       A.  If it was just an offhand comment made one
2  time, where he was thinking about a work item, I
3  don't think that it -- if in a stand-alone instance
4  would be a violation.
5       Q.  She's saying, "My supervisor has told me
6  that he has thought about me while showering."
7            If he said that to her and not male
8  employees, would that be a violation of company
9  policy?
10           MR. TUCKER:  Objection; asked and
11 answered.
12      Q.  (BY MS. GURMANKIN)  What's your answer?
13           MR. TUCKER:  Excuse me; can you go back
14 and read the prior question, the one before?
15           (Requested portion was read.)
16           MR. TUCKER:  Then what was her question
17 again?
18           (Requested portion was read.)
19           MR. TUCKER:  Read the prior question
20 again, that question -- the prior question now one
21 more time.
22           MS. GURMANKIN:  We are not wasting time
23 with this again.
24           MR. TUCKER:  Excuse me --

Page 239

1            MS. GURMANKIN:  No, excuse me.  This is
2  my dep.  We are not going to do this.  You have to
3  stop, Joe.  Stop.
4            (Simultaneous crosstalk.)
5            THE REPORTER:  One person at a time.
6            MR. TUCKER:  I am not going to have my
7  witness asked a question where I don't understand
8  the question.
9            MS. GURMANKIN:  Is that your issue, you
10 don't understand the question?
11           MR. TUCKER:  Yeah.  And I want the
12 question read back.
13           MS. GURMANKIN:  I'll rephrase it.
14           MR. TUCKER:  Well, rephrase a new
15 question, then.
16      Q.  (BY MS. GURMANKIN)  My -- her allegation
17 was not that he thought about a work item when he
18 was in the shower.  Her allegation was "My
19 supervisor has told me that he has thought about me
20 while showering."
21           Does that violate company policy?
22      A.  The Code of Conduct says that if something
23 could be perceived as inappropriate, so this could
24 violate company policy.

Page 240

1       Q.  As you sit here today, is there any
2  circumstance in which a male supervisor would say to
3  his female subordinate that he's thought about her
4  while showering and it would not violate company
5  policy?
6            MR. TUCKER:  Objection.  She gave an
7  answer to that earlier.
8       A.  I can see a situation where a male
9  supervisor saying "I thought about you and this work
10 item in the shower this morning" and proceeded to
11 talk about the work item, I can see how that would
12 not be a violation of company policy, if it was not
13 perceived as.
14      Q.  (BY MS. GURMANKIN)  But her allegation is
15 not that he said that, I thought about you and a
16 work item in the shower.  Her allegation is, "My
17 supervisor has told me that he has thought about me
18 while showering."
19           As you sit here today, can you think of
20 a circumstance where a male supervisor saying that
21 to a female subordinate would not violate company
22 policy?
23           MR. TUCKER:  Objection; asked and
24 answered.

60 (Pages 237 to 240)

Page 241

1   You may answer again for the fourth
2 time.
3   A. I don't necessarily think that that would
4 always be a violation of company policy.
5   Q. (BY MS. GURMANKIN) When would that
6 specific allegation, that my supervisor has told me
7 he's thought about me while showering, when would
8 that not violate company policy?
9   MR. TUCKER: Objection.
10   You can answer it for the fifth time
11 now.
12   A. It depends on what he said he was thinking
13 about, if it was just about you or if it was about
14 you and something else. It just depends on exactly
15 what he said.
16   Q. (BY MS. GURMANKIN) I'm asking specifically
17 about her allegation as you wrote, "My supervisor
18 has told me he's thought about me while
19 showering." That's it.
20   Are there any circumstances that you
21 can think of as you sit here today that that
22 allegation -- I'm sorry; that comment made by a male
23 supervisor to his female subordinate would not
24 violate company policy?

Page 242

1   MR. TUCKER: Objection.
2   You can answer again, if you like.
3   A. He says, I thought about you in the shower
4 this morning and he said he was thinking about you
5 and how you're buying your vehicle." I think it's a
6 little bit offhand to say "I was in the shower."
7 You didn't have to say that. But I don't think it's
8 necessarily on its own a violation.
9   Q. (BY MS. GURMANKIN) All right. You do not
10 think her -- his comment as he's telling -- as she's
11 relating it to you does not violate company policy?
12   A. Right.
13   Q. Okay. But there are times where you think
14 that a male supervisor telling his female
15 subordinate that he's thinking about her while
16 showering would violate company policy?
17   A. It's depends on the nature of what's saying
18 he was thinking about then.
19   Q. When would it violate company policy?
20   MR. TUCKER: Objection.
21   A. If he was saying maybe something of a
22 sexual nature or something that's very
23 inappropriate.
24   Q. (BY MS. GURMANKIN) But in your opinion as

Page 243

1 an HR professional doing this investigation, a male
2 supervisor telling his female subordinate that he's
3 thinking about her while showering, on its own does
4 not -- is not of a sexual nature?
5   A. Not necessarily.
6   Q. Is it possible it is?
7   A. It could be. That's why I think it depends
8 on the nature of what he -- what continued on in
9 that conversation.
10   Q. You think it's inappropriate for a male
11 supervisor to tell his female subordinate that he's
12 thinking about her while he's showering?
13   A. I think it's poor leadership behavior, poor
14 judgment to make an offhand comment like that.
15   Q. If he had not said the part about "buying
16 your vehicle" and just said "I thought about you in
17 the shower this morning," would that be a violation
18 of company policy?
19   MR. TUCKER: Objection; hypothetical.
20   Q. (BY MS. GURMANKIN) You can answer.
21   THE WITNESS: Do I have to answer it?
22   MR. TUCKER: You can answer.
23   A. I think if he just made that comment, I
24 think that's a poor judgment offhand comment. In

Page 244

1 isolation I don't know that that would be a
2 violation of company policy.
3   Q. (BY MS. GURMANKIN) Is there anything in
4 the policies that states that if a comment is made
5 as an offhand comment or isolation, that that may
6 determine whether or not it violates company policy?
7   A. Can I look at the policies again?
8   Q. Sure.
9   A. There is nothing in here that specifically
10 states, yeah, an offhand comment or in isolation.
11 But I had to look at everything in totality. I
12 wasn't just looking at this one comment.
13   Q. What does that mean?
14   A. We are asking about just this one -- this
15 one particular comment. He didn't just say the
16 comment "I thought about you while I was in the
17 shower this morning." He said that he was thinking
18 about her buying her car. So it wasn't just that a
19 one comment.
20   Q. Do you think a reasonable woman could be
21 offended by her male supervisor telling her that
22 he's thinking about her in the shower?
23   A. It could be.
24   Q. And if a supervisor -- male supervisor came

61 (Pages 241 to 244)

Page 245

1  to you in your capacity as an HR professional at
2  Shell and said, Is it okay if I tell my female
3  subordinate that I was thinking about her in the
4  shower, am I correct that you would say no?
5      A.  I would tell them that that is poor
6  judgment and they should not say that.
7      Q.  And you would say no also because it could
8  violate company policy for them to do that?
9      A.  I would say it could violate, yes.
10     Q.  All right.  Page 7, third bullet point from
11 the top.
12     A.  Which document?
13     Q.  I'm sorry; Exhibit 18, your interview notes
14 with Jesse.
15         "My supervisor" --
16     MR. TUCKER:  What page?
17     MS. GURMANKIN:  Seven.
18     Q.  (BY MS. GURMANKIN)  "My supervisor has
19 mocked me when I told him I do not come to work to
20 hear that I am pretty when a coworker referred to
21 the" -- but I assume it should be "me as pretty."
22         That comment would be a violation of
23 company policy?
24     A.  You're on the third bullet "My supervisor

Page 246

1  has mocked me"?
2      Q.  Uh-huh.
3      A.  And repeat your question, please.
4      Q.  Sure.  You agreeing that that comment that
5  she's alleging here would be a violation of company
6  policy?
7      A.  Yes.
8      Q.  And that could cause -- that could cause a
9  reasonable woman to be offended?
10     A.  Yes.
11     Q.  Last bullet point on that page, "I have
12 been called a bitch by numerous people in the
13 office."
14         We have discussed the fact that that
15 would violate company policy, correct?
16     A.  Yes.
17     Q.  And that could cause a reasonable woman to
18 be offended?
19     A.  Yes.
20     Q.  On page 8, second bullet point that says,
21 "I have been told by coworkers."
22         You see where I am?
23     A.  No -- yeah, the second --
24     Q.  Yes.

Page 247

1      A.  -- bullet point?  Yes.
2      Q.  "I have been told by coworkers that maybe
3  if they wore tight pants and batted their eyes they
4  could get what they wanted, suggested this is what I
5  do."
6          You agree that that comment is a
7  violation of company policy?
8      A.  Yes.
9      Q.  And that could cause a reasonable woman to
10 be offended?
11     A.  Yes.
12     Q.  Two down from that, "A coworker has put his
13 hands through my hair without permission.  Ken has
14 done this multiple times.  I have asked him to stop
15 and he did stop, but they joked about it and he has
16 his hands up in the air when he approaches me."
17         If Foreman did that multiple times,
18 that would be a violation of company policy, right?
19     A.  Yes.
20     Q.  And that could cause a reasonable woman to
21 be offended?
22     A.  Yes.
23     Q.  At the bottom of page 10, you ask on
24 Question No. 9, "Is there anyone specifically you

Page 248

1  think we should talk to regarding the concerns
2  raised.  Right under that it says, "It's hard
3  because you don't want to get people involved."
4          Is that something she's saying to you
5  or you're saying to her?
6      A.  As far as I can recall, she said that.
7      Q.  And then on the next page she tells you
8  Matt Empsen, Kelvin Flynn, Penny Robins, all of whom
9  you spoke with, right?
10     A.  Yes.
11     Q.  Go back to page 10 for a sec.  No. 8, you
12 said, "Is there anything else you would like to
13 share with us related to your concerns that have not
14 already been discussed?"
15         Subparagraph A she says, "Pay grade
16 question:  Whether I was brought in as a" -- is that
17 Job Grade A?
18     A.  Yes.
19     Q.  -- "because I am a female (you are supposed
20 to be a 7 and now you are an 8)."
21         Did you do anything to look into that?
22     A.  As far as I can recall, I asked the
23 HR Account Manager Michelle Priest.
24     Q.  And what did she say?

Page 249

1 　　A. As far as I can recall, she shared with me
2 that this was -- this job was posted a Job Grade 8
3 before it was even determined that she was the
4 selected candidate.
5 　　Q. Did you document that conversation
6 anywhere?
7 　　A. As far as I can recall, no, but there may
8 be an email on this topic.
9 　　Q. Between you and Michelle?
10 　　A. Yes, there may be.
11 　　Q. Subparagraph D, Jesse is relating to you
12 that when her mom worked here the government came in
13 and did a review on paying and found the woman and
14 male were paid different. She was a scheduler.
15 　　　　Did you do anything to look into that?
16 　　A. Not that I recall.
17 　　Q. Subparagraph C, "Will has told me that he
18 has driven by my house before. I purchased a Jeep.
19 I don't drive it to work. I drive a beater car I
20 would rather put my miles on. I live 30 minutes
21 away, and it's a dead-end street. He told me he has
22 seen my Jeep because he has driven past my house
23 before I got my jeep in September."
24 　　　　Did you ask Will whether he had driven

Page 250

1 past Jesse's house?
2 　　A. I don't recall off the top of my head. I
3 would have to review my interview notes.
4 　　Q. Did that concern you for her?
5 　　A. It would be a bit weird without knowing the
6 context.
7 　　Q. All right. Showing you what's been marked
8 as Exhibit 19. These are your interview notes with
9 Turney, right?
10 　　A. Yes.
11 　　Q. All right. On page 2, No. 3 at the bottom,
12 "Overall describe your working relationship with
13 Jesse. How has the relationship been this year?
14 Recently not very good."
15 　　　　Did you ask him when that started?
16 　　A. Not that I can recall.
17 　　Q. He goes on to say, according to your notes,
18 "I have a lot of text messages from before. We were
19 friends. We would be friendly. That's why this was
20 so surprising. It broke my heart. I'm confused. I
21 don't know if it is because of the recent
22 performance things."
23 　　　　He's referring to her complaints,
24 right, all of this was so surprising, broke my

Page 251

1 heart?
2 　　A. As all -- as far as I can recall, yes.
3 　　Q. Last bullet point on that page, "They mess
4 around a lot and joke around, and then she gets mad
5 at me for not intervening."
6 　　　　Did you ask what he was referring to?
7 　　A. Not that I can recall.
8 　　Q. What was Turney's demeanor during this
9 meeting?
10 　　A. Let me think about it. As far as I can
11 recall, he was surprised, like a bit in disbelief;
12 otherwise, just sharing his memory of the events
13 that I was questioning him about.
14 　　Q. Page 3. The allegation "I have been shown
15 a selfie of my supervisor in his underwear by him,"
16 he admits that he did that, right?
17 　　A. Correct.
18 　　Q. Third bullet point, "I was told in my
19 mid-year review that I make good money for a woman
20 and should not be upset with my pay grade by my
21 supervisor."
22 　　　　And he admits saying that, right?
23 　　A. Yes.
24 　　Q. Two bullet points down, "I was told I work

Page 252

1 well with male employees because I'm a woman by my
2 supervisor (project with lead mechanics, PMPs)."
3 　　　　He admits saying that, right?
4 　　A. Yes.
5 　　Q. And that would be a violation of company
6 policy?
7 　　A. Yes.
8 　　Q. Two down from that, "I'm a told I am a hot
9 blond by my supervisor."
10 　　　　And he admits doing that, right?
11 　　A. Yes.
12 　　Q. Page 4, second bullet point, "At a work
13 charity golf tournament I was asked more than once
14 why I was not wearing shorts at this event and if my
15 supervisor could cut my pants into shorts, as well
16 as other supervisors joined in and took a picture of
17 my backside (buttock) and saved on phone."
18 　　　　He says in the third bullet point
19 underneath, according to your notes, "I don't know
20 who took the picture." You see that?
21 　　A. Yes.
22 　　Q. And that means he's acknowledging that a
23 picture was taken, correct?
24 　　　　MR. TUCKER: Objection.

63 (Pages 249 to 252)

Page 253

1    A. Not necessarily.
2    Q. (BY MS. GURMANKIN) Could be, right?
3         MR. TUCKER: Objection.
4    A. I can't make that conclusion.
5    Q. (BY MS. GURMANKIN) Page 5, third bullet
6  point, "Supervisor gestures cat claws and makes a
7  hissing noise." He says, according to your notes,
8  "I have done that. I'm sorry, Megan. I do that to
9  everyone. You don't single anyone out."
10        Do you see that?
11    A. Yes.
12    Q. Next bullet point about the comment that
13  Jesse alleges he made when she told him about the
14  CPR trainer.
15    A. Uh-huh.
16    Q. He's saying, "I don't recall saying that."
17  So he's saying, "I don't recall"; Jesse's saying it
18  happened.
19        What did you conclude?
20    A. Can you rephrase your question?
21    Q. Yeah. Jesse had said that it happened, his
22  comment, "Well, did you pick it up," right?
23    A. Right.
24    Q. And he's saying, "I don't recall saying

Page 254

1  that." Right?
2    A. Right.
3    Q. According to your notes.
4    A. Right.
5    Q. So what did you conclude? You have one
6  person saying it happened; one person saying, "I
7  don't recall saying that."
8    A. I can't recall off the top of my head. I
9  don't believe that that was validated by anyone
10  else. So I am inconclusive on if that happened.
11    Q. Meaning, you did not conclude that it
12  happened?
13    A. Correct. I was not able to conclude.
14    Q. Okay. And that was because there was no
15  documentary evidence or witnesses who testified it
16  had happened --
17    A. Yes.
18    Q. -- is that right?
19        Third bullet point from the bottom, "My
20  supervisor has told me that he has thought about me
21  while showering." And he tells you, according to
22  your notes, "I have said this in front of everyone.
23  I think about work all the time. It was business
24  related. When I was in the shower, I thought

Page 255

1  about" -- oh, "I think about stuff all the time in
2  the shower. It wasn't in that context."
3         Did you ask anyone else whether he
4  talked about thinking about them in the shower or
5  work in the shower?
6    A. I'm sorry; if I can recall, I believe that
7  I did.
8    Q. Did you ask him who else he said this to?
9    A. I can't recall that.
10    Q. Page 6. Second -- I'm sorry; first bullet
11  point, "My supervisor has mocked me when I told him
12  I do not come to work to hear that I am pretty when
13  a coworker referred to me as pretty. My supervisor
14  kept saying it when I addressed him, 'I don't come
15  to hear I am pretty,' he would say to me."
16         He says, according to your notes,
17  Fletch came in and asked her to do something."
18         That was Wayne Fletcher, right?
19    A. Uh-huh.
20    Q. Yes?
21    A. Yes.
22    Q. And he says, "I didn't make the comment. I
23  promise you I have never said that." Right?
24    A. Correct.

Page 256

1    Q. Now, Jesse said it happened, right?
2    A. Correct.
3    Q. And Fletcher said it happened, right?
4    A. Did he? Can I review his notes, please?
5    Q. Sure.
6         MR. TUCKER: What -- what document or
7  exhibit number is that?
8         MS. GURMANKIN: I'm getting it. It's
9  ==Exhibit 23.==
10         It should be on your screen.
11    A. Yes, I see that Wayne Fletcher confirmed
12  that Mr. Turney did say this.
13    Q. (BY MS. GURMANKIN) Okay. So you had
14  corroboration here, right?
15    A. Yes.
16    Q. All right. So when Turney denied it, you
17  concluded that he was lying, right?
18    A. I can't conclude that he was lying, but I
19  concluded that he didn't recall that situation. So
20  he didn't believe that that happened.
21    Q. Well, he didn't say, "I don't recall."
22  Because with other stuff he said "I don't recall,"
23  right?
24    A. Uh-huh.

64 (Pages 253 to 256)

Page 257

1    Q. Yes?
2    A. Yeah.
3    Q. This one he says, "I didn't make the
4 comment. I promise you I have never said that."
5        That page is on your screen, first
6 bullet point. You see that?
7    A. Yeah.
8    Q. He is emphatically denying that he made
9 that comment, correct?
10   A. Page 6?
11   Q. Yep.
12   A. I believe that he -- from his memory he
13 believes he didn't say that.
14   Q. How could you not conclude that he's lying
15 when he says "I didn't make the comment. I promise
16 you I have never said that," if you have not only
17 Jesse but Wayne Fletcher, who you believed was
18 telling the truth, confirming that he did?
19   A. I believe that he doesn't recall making
20 that comment.
21   Q. Why would you believe that as opposed to
22 he's lying?
23   A. Because for the investigations we ask and
24 require all employees to be honest in their

Page 258

1 responses and share their recollection. And if they
2 are not honest, that could be grounds for
3 discipline.
4    Q. All right. Well, one way to determine
5 whether someone is dishonest is that they deny
6 saying something when you have two people confirming
7 that they did, right?
8    A. Could be.
9    Q. All right. So why didn't you -- how could
10 you not conclude that he's lying here when he
11 emphatically denies making that comment and you have
12 Jesse, who you conclude is telling the truth, and
13 Wayne Fletcher, who you conclude is telling the
14 truth, confirming that he did?
15   A. I believe these situations are hard when
16 you are going off of your memory and what has
17 happened, and I believe that he just doesn't
18 remember this situation.
19   Q. Why are you reaching that conclusion as
20 opposed -- well, strike that.
21        Did you ever consider that he's lying
22 when he denies making this comment and you have two
23 people saying that he did?
24   A. No.

Page 259

1    Q. Why?
2    A. Because we ask all employees in an
3 investigation that they are honest and forthcoming
4 with their memories of these events. And if not, it
5 could be grounds for discipline.
6    Q. Do you really believe that an employee
7 accused of sexual harassment is going to be
8 completely honest about everything when you're
9 interviewing him?
10   A. Yes, I believe they should be.
11   Q. You believe they should be. Do you believe
12 they are?
13   A. Yes.
14   Q. Do you believe there are people who are
15 going to be dishonest who are accused of sexual
16 harassment when they are being interviewed by HR
17 about these allegations?
18   A. I believe -- I believe that Mr. Turney was
19 being honest with his memory.
20   Q. That wasn't my question. Do you need it
21 repeated?
22   A. Yes.
23        MS. GURMANKIN: Do you mind, Connie?
24        (Requested portion was read.)

Page 260

1    A. There could be people that are dishonest.
2 I'm not saying that there has never been a person
3 that's been dishonest.
4    Q. (BY MS. GURMANKIN) So did you never
5 consider -- why did you give Turney the benefit of
6 the doubt here and assume that he's just not
7 remembering when he emphatically denies something,
8 as opposed to the fact that he's lying about it when
9 you have two people that confirm that it happened?
10   A. As far as I can recall, there were not
11 other instances similar to this.
12   Q. What does that mean?
13   A. Where someone had validated something and
14 he denied it. I felt that Mr. Turney was very
15 forthcoming and admitted things that he had done.
16 So I didn't have a reason to believe that he would
17 not share this if he had said -- if he had said
18 this, if he had remembered that he said it.
19   Q. Other than the fact that he's lying?
20   A. I can't draw that conclusion that he's
21 lying. I believe that sometimes your memory -- you
22 don't remember things that that have happened. So I
23 gave him that benefit of the doubt.
24   Q. Did you think that he just created a false

65 (Pages 257 to 260)

Page 261

1   memory?
2       A.  Not necessarily, no, I don't.  I can't draw
3   that conclusion.
4       Q.  You concluded that he honestly didn't
5   remember saying that, and he was telling the truth
6   when he honestly --
7       A.  I believe that Mr. Turney was very
8   forthcoming and admitted to things, and I believe
9   that he was honest and would have admitted to this
10  if he remembered it.
11      Q.  Do you believe he just didn't remember?
12      A.  I believe him that he said he
13  doesn't -- that he didn't do that, that he recalls
14  that he didn't do that.
15      Q.  Well, he didn't say he didn't recall.  He
16  said, "I promise you I have never said that," right?
17      A.  Right.
18      Q.  Three bullet points down from that, "A
19  coworker had put his hands through my hair without
20  permission."  You see that?
21      A.  Yes.
22      Q.  First, he says, "no recollection," then
23  right under that he says, "If you talk to Ken, you
24  will see he means nothing by it."

Page 262

1           Do you see that?
2       A.  Yes.
3       Q.  Those are contradictory, aren't they?
4       A.  Based on the way they are written, yes.
5       Q.  So which was it?
6       A.  I can't recall that.
7       Q.  Did you ask him?
8       A.  I can't recall.
9           MR. TUCKER:  Let's take a quick
10  bathroom break.
11          THE VIDEOGRAPHER:  This ends Media 4.
12  We are off record.  Time is 2:54 p.m.
13          (A recess was taken.)
14          MR. TUCKER:  For the stenographic
15  record, counsel knows this to be true, my client
16  wants to read and sign the deposition transcript.
17          THE VIDEOGRAPHER:  This begins Media 5.
18  We are back on the record.  Time is 3:07.
19      Q.  (BY MS. GURMANKIN)  You have your interview
20  notes with Turney still in front of you?
21      A.  Yes.
22      Q.  Looking at page 6.
23      A.  Okay.
24          MR. TUCKER:  I'm sorry; Caren.  What

Page 263

1   exhibit number is that?
2           MS. GURMANKIN:  19.
3       Q.  (BY MS. GURMANKIN)  No. 7 -- actually,
4   No. 6.  "Do you have any reason to believe why Jesse
5   may not be telling the truth with her claims?"
6           Why did you ask him that?
7       A.  I -- I don't recall.  It must have been, as
8   far as I can recall, from the research that I did
9   online or from other investigations that I have
10  completed.  I don't recall specifically.
11      Q.  Did you ask anyone whether they had any
12  reason to believe that Turney may not be telling the
13  truth regarding his responses to her allegations?
14      A.  I can't recall that off the top of my head.
15      Q.  No. 7, "Is there anything else you would
16  like to share with me related to either Jesse's
17  concerns or yours that have not already been
18  discussed?"
19          He said to you, according to your
20  notes, "Why wait two years to bring this up?  What
21  is the end game?  Why wasn't it brought up a long
22  time ago?"
23          You didn't think that that had anything
24  to do with whether or not her claims were true,

Page 264

1   right?
2       A.  Correct.
3       Q.  And did you explain to him that that
4   shouldn't matter in terms of the allegations she's
5   making?
6       A.  Not that I recall did I tell him that.
7       Q.  Next page, 7, he said at the top, "I don't
8   take notes like that."
9           What was he referring to?
10      A.  I can't recall specifically.  I can guess
11  that it may be --
12          MR. TUCKER:  We are not going to guess.
13          THE WITNESS:  Okay.
14      Q.  (BY MS. GURMANKIN)  Well, what do you think
15  based on what you recall and the context?
16      A.  Documenting what other -- what he witnesses
17  other people or interaction that he has or what
18  other people say.
19      Q.  He goes on to say, according to you, "There
20  are times when things people do are not
21  appropriate."
22          Did you ask him what he meant by that?
23      A.  Not that I can recall.
24      Q.  How come?

66 (Pages 261 to 264)

Page 265

1    A.  I don't remember.
2    Q.  He says in the next paragraph, "I'll be
3  friendly but there will be no extra."
4        Do you see that?
5    A.  I do.
6    Q.  And did it cross your mind that when he
7  said "There will be no extra," that he was being
8  retaliatory towards her?
9    A.  Not that I recall.
10    Q.  Should you have considered that, when he
11  said "I'll be friendly but there will be no extra"?
12    A.  At the end of the interview, I told him
13  that we don't tolerate retaliation for sending in a
14  complaint.
15    Q.  Other -- I'm sorry; are you done?
16    A.  Yeah.
17    Q.  Other than telling him that the company
18  doesn't tolerate retaliation, was there anything
19  that you did to ensure that she wasn't retaliated
20  against for her complaints?
21    A.  I also told her, if she feels like she is
22  being retaliated against, to report it immediately.
23    Q.  Anything else?
24    A.  Not that I can recall.

Page 266

1    Q.  Do you know if anyone at the company did
2  anything other than you telling Jesse to report it
3  if she felt retaliated against and Turney that he
4  shouldn't retaliate?
5    A.  I also told Mr. Larsen and maybe Mr. Craig
6  that they should look out for this.
7    Q.  Do you remember telling Craig?
8    A.  Not -- no, I don't remember telling Craig
9  specifically.
10    Q.  And what was Larsen supposed to look out
11  for to determine whether Jesse was being retaliated
12  against?
13    A.  I don't recall specifically what I told
14  him.
15    Q.  What would you have told him?  I mean, what
16  are managers supposed to look for to be able to
17  ascertain whether an employee is being retaliated
18  against?
19    A.  I think it depends on the situation, but,
20  you know, in performance reviews, in selection
21  decisions, that there is no bias or decisions made
22  because of this or different treatment.
23    Q.  When he says "I'll be friendly but there
24  will be no extra," if he gave "extra" to his other

Page 267

1  direct reports who had not complained, this could
2  be -- this could indicate that he is going to
3  retaliate against Jesse for complaining?
4    A.  I don't -- I can't recall if that's what he
5  meant by that statement and I can't --
6    Q.  I am going based on what he said.  I'll be
7  friendly but there will be no extra."
8        So did you look into whether -- what he
9  meant by that, first of all?
10    A.  I can't recall.
11    Q.  Did you look into whether he gave "extra"
12  to his direct reports who didn't complain?
13    A.  No, not that I recall.
14    Q.  Because that could indicate that he was
15  intending to retaliate against Jesse for complaining
16  by not giving her "extra," right?
17    A.  I don't interpret it that way.
18    Q.  Well, you didn't ask him what he meant,
19  so -- right?  You don't know?
20    A.  Not that I recall I did not ask him that.
21    Q.  So that's certainly a possibility, isn't
22  it?
23    A.  I can't draw that conclusion.
24    Q.  Well, if you don't -- if you didn't ask

Page 268

1  what he meant, you agree that it's a possibility
2  that that's what he meant, right?
3    A.  No.
4    Q.  How can you rule out a possibility if you
5  didn't ask him what he meant?
6    A.  I can't necessarily say that that is the
7  conclusion.
8    Q.  I didn't say it was the conclusion.  You
9  agree it's a possibility?
10    A.  Can you rephrase your question?
11        MS. GURMANKIN:  Do you mind reading
12  that back, Connie?  Thank you.
13        (Requested portion was read.)
14    Q.  (BY MS. GURMANKIN)  How can you rule out
15  the possibility that he was being retaliatory when
16  you didn't ask him what he meant?
17    A.  I can't recall if I asked him what he meant
18  or not or what he said.
19    Q.  You said you didn't recall asking him.  So
20  if you don't recall asking him, how can you rule out
21  the possibility that he's being retaliatory with
22  that comment?
23    A.  I'm not saying I'm ruling it out, but I
24  can't draw that conclusion or say that

67 (Pages 265 to 268)

Page 269

1  affirmatively.
2       Q.  Right.  I'm asking you if you agree it's a
3  possibility?
4       A.  Okay.  It's a possibility.
5       Q.  Did you do anything to follow up with Jesse
6  at all after the conclusion of your investigation to
7  see if she felt she was being retaliated against?
8       A.  As far as I can recall, I asked her to
9  report it immediately if she felt she was, either to
10 me, Mr. Larsen or through the hotline again.  And I
11 was having -- I did have a follow-up conversation
12 with her one-on-one, but I don't recall if I asked
13 her this question specifically.
14      (Exhibit 30 was marked.)
15      Q.  (BY MS. GURMANKIN)  You're being shown
16 what's been marked as Exhibit 30, Shell 339 to 344.
17 This is an email that Jesse sent you on 12/6 at
18 11:59 a.m.
19          This is after you had interviewed with
20 her, right?
21      A.  It's not on my screen.
22      Q.  Oh, I'm sorry.  You see it now?
23      A.  Yes.  Exhibit 30?
24      Q.  Uh-huh.

Page 270

1       A.  Okay.
2       Q.  This is the day that you interviewed her,
3  right?
4       A.  December 6, yes.
5       Q.  All right.  And you reviewed what she sent
6  you?
7       A.  Let me look at this.  Yes.
8       Q.  It's a detailed timeline of her allegations
9  with the timing of when they happened?
10      A.  Yes.
11      Q.  And did you review that as part of your
12 investigation?
13      A.  Yes.
14      Q.  Did you show that to anyone?
15      A.  I don't recall sharing this specific
16 document with anyone.
17      (Exhibit 31 was marked.)
18      Q.  (BY MS. GURMANKIN)  You have been shown
19 what's been marked as Exhibit 31, Shell 451 to 485.
20          This is an email that Jesse sends you
21 the day after your interview with her, right?
22      A.  Yes.
23      Q.  If you can take a moment, just read through
24 her email on the first two pages.

Page 271

1       A.  I have read her email.
2           MR. TUCKER:  Did you read the second
3  page, too?
4           THE WITNESS:  No.
5           MR. TUCKER:  It goes on.
6       A.  I have read the emails.
7       Q.  (BY MS. GURMANKIN)  Did you share this with
8  anyone?
9       A.  I don't recall.
10      Q.  In the second-to-last paragraph she
11 references -- she gives you three names for
12 maintenance technicians that feel that Turney was
13 not qualified to be a supervisor or leader.
14          Did you ever reach out to any of them?
15      A.  I did not interview them.
16      Q.  How come?
17      A.  I interviewed a number of people that
18 report to Will or work with Will in his leadership
19 capacity.  So I didn't feel like it was necessary to
20 interview them on their views on his leadership.
21      Q.  On the second page she references at least
22 two instances where she caught Turney lying.
23          Did you ask Turney about those
24 instances?

Page 272

1       A.  Not that I recall.
2       Q.  How come?
3       A.  I don't know.  I don't recall.
4       Q.  Other than interviewing the witnesses whose
5  notes we looked at, did you do anything else as part
6  of your investigation?
7       A.  Can you repeat your question?
8       Q.  Yes.  Other than interviewing the witnesses
9  whose notes that we looked at, did you do anything
10 else as part of your investigation?
11      A.  As far as I can recall, no.
12      Q.  And you wrote up a report?
13      A.  I did, yes.
14      Q.  Who did you share that with?
15      A.  Kelly Soudelier, my boss, and as far as I
16 can recall, it was also shared with Greg Larsen.
17      Q.  Did you share it with Greg?
18      A.  As far as I can recall, yes.
19      Q.  Anyone else?
20      A.  It was submitted to the central group who
21 manage -- who requires the response to go back, as
22 well.
23      Q.  Cari Otto's group?
24      A.  Yes.

68 (Pages 269 to 272)

1      Q. Do you know if Michelle Priest got a copy?
2      A. As far as I can recall, I don't know for
3   sure. She may have.
4      Q. You didn't send it to her?
5      A. I don't remember.
6           (Exhibit 32 was marked.)
7      Q. (BY MS. GURMANKIN) All right. I'm showing
8   you what's been marked as Exhibit 32, Shell 1167
9   through 1169.
10          Is this the report that you drafted?
11     A. Yes.
12     Q. Did you have help in drafting it?
13     A. I -- I would have had help from my
14  supervisor, Kelly.
15     Q. Did you have help from Kelly?
16     A. As far as I can recall, yes.
17     Q. What did she do to help?
18     A. Reviewed it and provided comments.
19     Q. After you drafted?
20     A. Yes.
21     Q. Did you make changes based on comments she
22  made?
23     A. I don't remember.
24     Q. So there should be an initial draft that

1   you sent to Kelly -- right? -- and then the final
2   draft?
3      A. As far as I can recall.
4      Q. Did she -- how did she send back her edits?
5      A. I don't remember. It may have been a
6   verbal conversation.
7      Q. But you did -- you do recall making changes
8   as a result of --
9      A. I don't remember specifically.
10     Q. All right. So under "Dates of
11  investigation," so it says 12/6/16 to 12/8/16.
12  Those are the dates where you interviewed the
13  witnesses, correct?
14     A. They are but now I also understand I
15  interviewed Mark Cooper.
16     Q. On 12/14?
17     A. Yes.
18     Q. Did you just forget about that when you
19  were writing this?
20     A. It was an oversight.
21     Q. Okay. Under "Summary of Findings," you
22  wrote "Evidence to support Will Turney's behavior
23  violated Shell's Code of Conduct, specifically
24  Section 3.3 harassment, 'You must treat others with

1   respect at all times' and 'You must not make
2   inappropriate jokes or comments.'"
3           And then you cite three instances:
4   "Will told Jesse that she makes good money for a
5   woman and should not be upset with her pay grade;
6   Will told Jesse that she works well with male
7   employees because she is a woman, and Will referred
8   to Jesse as a 'hot blond' in a joking manner."
9           Why didn't you include in there that
10  Turney showed Jesse a selfie of himself in his
11  underwear?
12     A. As far as I can recall, because that
13  incident was in 2014, it was an isolated incident,
14  and it was -- I concluded that was just after-work
15  banter between a group of employees.
16     Q. So you left it out because it happened in
17  2014, it was an isolated incident and because you
18  concluded it was after-work banter between a bunch
19  of employees?
20     A. Between a number of employees outside of
21  work.
22     Q. Why did you leave it out because it
23  happened in 2014? What about the timing led you to
24  conclude that you should leave it out of this

1   report?
2      A. It was an isolated incident two years
3   before the rest of these examples and claims were
4   made.
5      Q. And what about that led you to conclude
6   that you should leave it out of the report?
7      A. So it wasn't just that. It was also that
8   it was after-work banter with a number of employees
9   outside of work, just the one incident.
10     Q. So a supervisor showing a female
11  subordinate a selfie of himself in his underwear is
12  just after-work banter?
13     A. There was other -- another photo shared by
14  someone else. It was after work.
15     Q. It at a conference, wasn't it?
16     A. I believe it was after the conference, is
17  my understanding.
18     Q. But you testified it was a violation of
19  policy, right?
20     A. It could be.
21     Q. How would it not be?
22     A. I was looking at everything in totality.
23  These were the three instances that stood out that
24  were a violation of Section 3.3 of the Code of

69 (Pages 273 to 276)

Page 277

1  Conduct.  I didn't include that specific allegation
2  in this example because it happened in 2014.  And it
3  was an isolated incident then.  It was not reported
4  at that time, and it was after-work banter between a
5  number of employees outside of work.
6      Q.  Let's go back to my question.  You
7  testified earlier that that was a violation of
8  company policy.
9          Is that still your testimony?
10     A.  It could be but I have to look at
11 everything in totality of everything that happened.
12     Q.  As you sit here today, are there any
13 circumstances in which a male supervisor showing a
14 female subordinate a selfie of himself in his
15 underwear would not be a violation of company
16 policy?
17     A.  I would say it's a violation of company
18 policy if it would have been reported at that time.
19 We would have taken action that as a violation of
20 the conduct but I -- your question was why is it not
21 included in this report along with the other
22 examples that I had named, and that was my response.
23     Q.  My most recent question was, was it a
24 violation of company policy?  Is that still your

Page 278

1  testimony?
2      A.  I believe it could be, yes.
3      Q.  Okay.  Any circumstances in which it would
4  not be?
5      A.  No.
6      Q.  When you say it was an isolated incident,
7  you mean it only happened once that he showed her a
8  selfie of himself in his underwear?
9      A.  Yes.
10     Q.  These other three things that you mentioned
11 in the report, they only happened once, right?
12     A.  Correct.
13     Q.  Okay.  But you still included them in your
14 report, right?
15     A.  Yes.
16     Q.  Did anyone tell you that you should not
17 include certain things because they happened a
18 couple years before?
19     A.  I can't recall that specifically.
20     Q.  So why did you make that determination?
21     A.  What determination?
22     Q.  To leave it out.
23     A.  I made the determination to leave it out
24 because it happened in 2014, and I concluded that it

Page 279

1  was after-work banter.  I can't recall specifically
2  but I don't believe I only included in here all of
3  the examples that were validated.  These were just
4  some of them.
5      Q.  What does that mean, that you concluded it
6  was after-work banter for Turney to show Jesse a
7  selfie of himself in his underwear?
8      A.  There was also another photo that was shown
9  by another employee.  They were out having drinks
10 outside of work, talking about their personal lives.
11 I don't know all that was said in that setting.  So
12 it was just a personal conversation outside of work
13 that was happening.
14     Q.  Does that make it okay?
15     A.  It doesn't make it okay.
16     Q.  Does that make it any less of a violation
17 of company policy, for a male supervisor to show his
18 female subordinate a selfie of himself in his
19 underwear?
20     A.  No.
21     Q.  And specifically about the fact that it
22 happened in 2014, what about that led you to
23 conclude that it shouldn't be included in here?
24     A.  It happened more than two years before I

Page 280

1  was looking into these claims, and it wasn't
2  reported at that time, and there was, I believe,
3  just -- as far as I can remember, just that one
4  incident that happened in 2014.
5      Q.  And what does that have to do with
6  concluding that you shouldn't include it in your
7  report?
8      A.  I can't recall off the top of my head if I
9  included every single example in here that I
10 corroborated or that I validated would have violated
11 policy.
12     Q.  I understand.  But what specifically about
13 the fact that Turney showing Jesse a selfie of
14 himself in his underwear in 2014 led you to conclude
15 that because it happened in 2014 it shouldn't be in
16 here?
17     A.  It's not just because it happened in 2014.
18     Q.  Understood.  And we talked about your
19 testimony about the banter.  But what was it about
20 the fact that it happened in 2014 that led you to
21 conclude that it shouldn't be in here?
22         MR. TUCKER:  She said all three of
23 those things.  She didn't --
24         MS. GURMANKIN:  I'm asking about the

70 (Pages 277 to 280)

Page 281

1  fact that it happened in 2014.
2  Q. (BY MS. GURMANKIN) What about that led you
3  to conclude it shouldn't be in here?
4  MR. TUCKER: But she's not isolated one
5  over the other. She said it was all of them.
6  MS. GURMANKIN: Right.
7  Q. (BY MS. GURMANKIN) And what about the fact
8  that it happened in 2014 -- how was that a factor in
9  your decision not to include it in the report?
10  MR. TUCKER: It was one of the several
11  factors, Carin. She didn't say it was any one.
12  MS. GURMANKIN: Right.
13  Q. (BY MS. GURMANKIN) And again, how was it a
14  factor in your decision not to include it in your
15  report, the fact that it happened in 2014?
16  A. I don't believe I included every single
17  example. I included three of the most recent
18  examples and the ones that I felt were the biggest
19  violation. It had happened two years ago and wasn't
20  reported, and that was one of -- I think the only
21  instance that happened in that year.
22  Q. So were you only including the three most
23  recent incidents and the ones that you thought were
24  the biggest violations?

Page 282

1  A. As far as I can recall, I -- it wasn't the
2  recency. It was the ones that I felt like were the
3  most -- the biggest violation of the policy.
4  Q. Is that, in part, why you left out the --
5  Turney showing Jesse the picture of himself in his
6  underwear?
7  A. Yeah.
8  Q. What specifically was it -- it wasn't
9  recency that you were considering. What was it
10  about the fact that happened in 2014? What about
11  that led you to leave it out of your report?
12  A. Can you rephrase your question?
13  Q. Sure. You testified that you weren't
14  including violations based on recency. So what was
15  it about the fact that that allegation or that
16  incident happened in 2014 that led you to leave it
17  out of your report?
18  A. It wasn't just the fact that it happened in
19  2014.
20  Q. Right. But that was partly the reason?
21  A. It was one of three.
22  Q. Right. So I'm asking what was it about
23  that that led you to leave it out? How did that
24  play into your decision?

Page 283

1  A. It's hard to recall my decision making in
2  2016, but as far as I can recall, it was more so not
3  the recency or the 2014. It was more so that this
4  was after work, off-site. There were -- they were
5  drinking, having a personal conversation, and that
6  had happened two years ago before all these claims
7  were made. And so that was just a onetime isolated
8  incident outside of work.
9  Q. You also did not include what Jesse and
10  Wayne Fletcher had confirmed about Turney telling
11  Fletcher to tell Jesse she's pretty and to get her
12  to do work, right?
13  A. That is not on here, correct.
14  Q. Why didn't you include that one?
15  A. As far as I can recall, I did not include
16  every single example that was corroborated.
17  Q. Was there a particular reason why you left
18  that one out?
19  A. Not that I can recall.
20  Q. Did you ever tell anyone at the company
21  that Turney had admitted that he showed Jesse a
22  selfie of himself in his underwear?
23  A. I don't remember.
24  Q. Did you ever tell anyone at the company

Page 284

1  that Fletcher had confirmed Jesse's allegation about
2  Turney telling Fletcher to tell Jesse she's pretty
3  to get her to do work?
4  A. I don't recall. I -- I -- I don't recall.
5  I would think that I would have reviewed this with
6  my supervisor, but I can't say I for sure did this.
7  Q. When you say "this," you mean the report or
8  the investigation?
9  A. The -- all of the claims that were
10  validated.
11  Q. But you don't have a specific recollection
12  of reviewing it with Kelly, correct?
13  A. Or documented, correct.
14  Q. Or what?
15  A. Or documented.
16  Q. That you reviewed it with her?
17  A. Correct.
18  Q. All right. The recommended actions, next
19  steps at the bottom of the first page, these are
20  things that you came up with?
21  A. I came up with these in partnership with my
22  supervisor.
23  Q. Kelly?
24  A. Yes.

71 (Pages 281 to 284)

Page 285

1    Q. Was that other than her reviewing your
2 draft and providing comments? I mean, did you have
3 a separate discussion about recommended actions,
4 next steps?
5    A. As far as I can recall, I had a
6 conversation with her about what would be
7 appropriate actions and next steps.
8    Q. When was that in connection with your
9 investigation?
10   A. I don't remember. It would have been that
11 week shortly -- it -- it would have been throughout
12 the investigation. I recall talking to Kelly every
13 single day of the investigation about what -- the
14 conversations I was having and what was occurring.
15   Q. Did you document any of those
16 conversations?
17   A. No.
18   Q. So at some point do you say to her or
19 something to the effect of, This what I'm thinking
20 in terms of recommended actions, next steps, and you
21 had a discussion about that?
22   A. As far as I can recall, or it could have
23 looked like These are the findings. What do you
24 recommend? I don't remember specifically if I made

Page 286

1 the recommendation first or she did.
2    Q. And no documentation about that?
3    A. No.
4    Q. All right. So the first bullet point is
5 "Will Turney provided written warning on file for
6 18 months. Reduced IPF" -- what is that?
7    A. Individual performance factor.
8    Q. -- "to ▓ for 2016." From -- reduce it
9 from what?
10   A. I don't recall.
11   Q. And how would that impact him?
12   A. That impacts his bonus for that year, his
13 merit increase for the following year, and it
14 impacts his performance record, and that performance
15 record is used in selection for job decisions,
16 promotions, et cetera.
17   Q. How did it impact his bonus?
18   A. The ▓ is used in a calculation that will
19 determine the bonus amount.
20   Q. So it would have been a lower calculation
21 than he otherwise would have been entitled to?
22   A. Yes.
23   Q. Did he still get a bonus for 2016?
24   A. Yes. Yeah.

Page 287

1    Q. How did it impact his merit increase?
2    A. If it was a lower amount than what it would
3 have been.
4    Q. How much lower?
5    A. I don't know.
6    Q. How much lower was the bonus?
7    A. I don't know.
8    Q. And you said it would impact his
9 performance record for when he would have applied
10 for other jobs?
11   A. So the IPF is used as a performance record
12 in selection decisions, other decisions around
13 employment as a performance history.
14   Q. Okay. So does that mean if a hiring
15 manager was considering him, they could look up his
16 records?
17   A. Correct.
18   Q. Would they see that the IPF was reduced?
19   A. No.
20   Q. They would just see what it was?
21   A. Correct.
22   Q. And what did that -- did ▓ mean
23 something?
24   A. We don't have any labels for the numbers.

Page 288

1    Q. So would there be anything to indicate to a
2 hiring manager looking that he got an IPF of ▓
3 that that meant anything bad?
4    A. It's a -- it's -- it's pretty much a
5 standard across Shell that a ▓ is a bit lower than
6 a good performance year.
7    Q. Like a meets-expectations year?
8    A. Lower than a meets-expectations year.
9    Q. Does not meet expectations?
10   A. We don't have any labels. We try to avoid
11 that. But it's lower than what you would expect for
12 someone who did meet expectations. It's a relative
13 number.
14   Q. And the hiring manager would have no idea
15 why Turney got the ▓ rating, right?
16   A. A hiring manager would not know why unless
17 they asked or had those conversations or were shared
18 that information.
19   Q. Would a hiring manager in a different group
20 have access to that information?
21   A. Not unless they asked.
22   Q. Right. I mean, if they asked, could they
23 get access to that information, why his rating was
24 reduced or why his IPF was reduced to ▓?

72 (Pages 285 to 288)

Page 289

1     A.  Only if Mr. Turney or his current line
2  manager shared that information.
3     Q.  Would HR share that information, if asked?
4     A.  No, I don't believe so.
5     Q.  And I'm sorry if I asked you this, but he
6  did get a merit increase for the following year?
7     A.  I don't know that for a fact, but I believe
8  so.
9     Q.  A hiring manager would not be able to see
10  the written warning, right?
11     A.  Correct.
12     Q.  All right.  Continues on, Participate in
13  LEED leadership training offered in 2017.  LEED is
14  all in caps.  What did that refer to?
15     A.  It's a leadership training.  It stands for
16  Leading to Engage and Deliver.
17     Q.  Was that a training that was already
18  planned?
19     A.  I don't believe so.
20     Q.  Was that something you had recommended that
21  Shell do?
22     A.  Is it something I recommended that Shell do
23  or that Mr. Turney do?
24     Q.  That -- well, this is -- you're

Page 290

1  recommending actions that Shell take in connection
2  with Turney, right?
3     A.  Correct.
4     Q.  Okay.  So did you -- were you recommending
5  that Shell have Turney participate in LEED
6  leadership training?
7     A.  As far as I can recall, yes.
8     Q.  "Participating in Code of Conduct
9  training," and that was -- you are referring to the
10  online training that he was required to undertake
11  every year anyway?
12     A.  Online training and also the additional
13  trainings that would be held at the asset.
14     Q.  "And continued coaching from Greg and
15  Steve."  What did you mean by that one?
16     A.  So, since one of my findings that
17  Mr. Turney demonstrated poor leadership behavior,
18  receive coaching from Greg and Steve on leadership
19  behaviors and appropriate leadership behaviors.
20     Q.  Did you do anything to follow up and make
21  sure that that happened?
22     A.  No.
23     Q.  You testified earlier that you concluded as
24  part of your investigation that Jesse had violated

Page 291

1  the Code of Conduct.
2     What did she do to violate the Code of
3  Conduct?
4     A.  As far as I can recall off the top of my
5  head without reviewing all of the interview notes, I
6  recall there was a couple of examples and she also
7  shared this, I believe, where she had name called,
8  as well, and swore at work.
9     Q.  What names did she call people?
10     A.  I can't recall off the top of my head.
11     Q.  What swear words did she use?
12     A.  I think "fuck off" is what I recall.
13     Q.  And that was a Code-of-Conduct violation?
14     A.  It's disrespectful or inappropriate in the
15  workplace.
16     Q.  Is it a Code-of-Conduct violation?
17     A.  Yeah.
18     Q.  To say "fuck" in the workplace?
19     A.  To tell someone to "fuck off."
20     Q.  But not to say "fuck" in the workplace?
21     A.  I would say, yes, it's inappropriate.
22  Yeah, it would be a violation.
23     Q.  To use the word at all, "fuck"?
24     A.  Yeah.

Page 292

1     Q.  Do you know if anyone else that you
2  interviewed ever used the word "fuck" at Shell?
3     A.  No, I don't recall.
4     Q.  Was it your belief that she was the only
5  one out of all witnesses you interviewed who ever
6  said the word "fuck" at Shell?
7     A.  Can you rephrase your question?
8     Q.  Sure.  Of all of the witnesses you
9  interviewed in connection with this investigation,
10  did you have an understanding that Jesse was the
11  only one who used the word "fuck" at Shell?
12     A.  I did not because I did not ask the
13  questions.
14     Q.  Who told you that -- I apologize -- strike
15  that.
16     Have you ever heard anyone at Shell use
17  the word "fuck"?
18     A.  Yes.
19     Q.  Who?
20     A.  I don't recall who it was off the top of my
21  head.  I don't recall.  But I know I have heard
22  individuals use that word.
23     Q.  Multiple people?
24     A.  Uh-huh.

73 (Pages 289 to 292)

Page 293

1　Q. Yes?
2　A. Yes.
3　Q. Have you reported them for Code-of-Conduct
4　violations?
5　A. No.
6　Q. How come?
7　A. I didn't find it necessary.
8　Q. Why not?
9　A. Personally I didn't take offense to it, and
10　everyone does complete the Code of Conduct training.
11　So I -- I just didn't.
12　Q. If everyone completed the Code of Conduct
13　training, wouldn't everyone know that to use the
14　word "fuck" in the workplace is a violation of the
15　Code of Conduct?
16　A. They should.
17　Q. Any other policy violations or
18　Code-of-Conduct violations that you haven't reported
19　or just that one?
20　A. That's the only one I can recall off the
21　top of my head.
22　Q. Next bullet point under Jesse -- under
23　Recommended Actions/Next Steps. "Jesse Barnes:
24　Transfer to new role as HSE analyst for the HSE

Page 294

1　team, provide coaching on professional behavior,
2　coaching to raise concerns early."
3　So the decision for Jesse was to take
4　her out of the group and transfer her, correct?
5　A. That wasn't the decision.
6　Q. What was the recommendation?
7　A. That is the recommendation as documented on
8　this summary, yes. But there was conversations that
9　happened.
10　Q. Why wasn't there a recommendation to take
11　Turney out of his role?
12　A. Jesse was very insistent that she could not
13　work with Mr. Turney, but Mr. Turney shared that
14　he -- he was willing to continue working with her.
15　Q. But if she said she couldn't work with
16　him -- and that was understandable given her
17　allegations and the stuff that he admitted, correct?
18　MR. TUCKER: Objection to the use of
19　the word "understandable."
20　Q. (BY MS. GURMANKIN) Right?
21　A. Can you repeat your question?
22　A. Sure. I mean, you understood her not
23　wanting to work with Turney, given her allegations
24　and what he admitted to and what other people told

Page 295

1　you about his conduct?
2　MR. TUCKER: Objection.
3　A. She expressed that she could no longer work
4　with him.
5　Q. (BY MS. GURMANKIN) And you understood
6　that, right?
7　A. What do you mean by that?
8　Q. I mean, you were understanding of why she
9　didn't want to work with him, given the allegations
10　and what people told you about his conduct that you
11　interviewed, that made sense?
12　A. There have been other situations or
13　circumstances that I have dealt with where the
14　individuals have continued to work together.
15　Q. Giving the allegations here and what other
16　people told you about Turney's conduct and what
17　Turney admitted to, it made sense to you why Jesse
18　didn't want to continue working with him, right?
19　MR. TUCKER: Objection.
20　You may answer.
21　A. I can understand in this situation why she
22　chose that she did not want to work with him.
23　Q. (BY MS. GURMANKIN) All right. So was
24　there ever a discussion that you were involved in

Page 296

1　about moving Turney?
2　A. I raised that as an option.
3　Q. With whom?
4　A. Mr. Larsen and Kelly Soudelier, to my
5　knowledge.
6　Q. And what was the response?
7　A. We explored that as an option and -- I'm
8　sorry; I got distracted -- and ultimately decided
9　since Mr. Turney was willing to continue working
10　with her and he -- it would be difficult to backfill
11　his role, and there were other opportunities for
12　Ms. Barnes to continue developing in her career.
13　And she also shared concerns with others on the team
14　that she was interacting with that it would be
15　beneficial for her to explore other options outside
16　of the team.
17　Q. How did you explore moving Turney as an
18　option with Kelly and Greg Larsen?
19　A. I asked them if it would -- if that would
20　be viable.
21　Q. And the response?
22　A. I don't recall specifics of the
23　conversation, but I recall Mr. Larsen saying that it
24　would cause some hardship on the business if we were

74 (Pages 293 to 296)

Page 297

1  to -- to move him.
2      Q. Anything else that was done to explore
3  moving Turney as an option?
4      A. Not that I recall.
5      Q. Is that documented anywhere that it was --
6  it was even discussed?
7      A. Not that I recall.
8      Q. Next one under Recommended Actions,
9  "Provide Code of Conduct training for all Appalachia
10 employees."
11         Is that the regular online training or
12 this additional training?
13     A. The additional training.
14     Q. "Hold leadership engagements for entire
15 Appalachia leadership team with a focus on Code of
16 Conduct and diversity and inclusion." What was
17 that?
18     A. So that's a dedicated session for the
19 leaders, supervisors, managers, that work for the
20 Appalachia asset to focus on D&I and Code of
21 Conduct.
22     Q. And last bullet on that page, "Documented
23 coaching for Mark Hoover on leadership behaviors."
24         Hoover had admitted that he referred to

Page 298

1  Jesse as bitchy, right?
2      A. Correct.
3      Q. And you had testified that that was a
4  violation of the company's policies, right?
5      A. Correct.
6      Q. Why wasn't he disciplined?
7      A. Coaching is the first step of our
8  discipline process, documented coaching is.
9      Q. So why was the first step taken with him?
10     A. Can I review his interview, please?
11     Q. Sure. Do you need to see that in order to
12 answer?
13     A. I do need to remind myself.
14     Q. Okay. Go ahead.
15         MR. TUCKER: What exhibit number is
16 this?
17         MS. GURMANKIN: 21.
18     A. Can you repeat your question, please?
19     Q. (BY MS. GURMANKIN) Yes. Why was the
20 decision made to go to the first step of the
21 disciplinary process with Hoover?
22     A. As far as I can recall, there were -- he
23 was under -- he had never been disciplined for this
24 type of behavior. So the first step was

Page 299

1  appropriate.
2      Q. And how did you know that?
3      A. Based on my experience and also in
4  consultation with my supervisor.
5      Q. I'm sorry; what about you knew based on
6  your experience that he had never been disciplined
7  for this type of --
8      A. Oh, I --
9      Q. Yeah, that was my question.
10         How did you know that he had never been
11 disciplined before?
12         MR. TUCKER: Can you answer her
13 question, how did you know that he had never been
14 disciplined before?
15     A. As far as I can recall, in conversation
16 with Michelle Priest and checking his record.
17     Q. (BY MS. GURMANKIN) Did you check his
18 record?
19     A. I believe so, as far as I can recall.
20     Q. What did you check?
21     A. We can check Shell People and see if there
22 is any uploaded warnings.
23     Q. Shell People is the program?
24     A. Yeah.

Page 300

1      Q. Do warnings have to be in that program?
2      A. No.
3      Q. Who's responsible for putting documents
4  into Shell People?
5      A. It would be the HR person at the time a
6  discipline is issued. But you asked who is
7  responsible. It's not a policy that we have to do
8  that.
9      Q. Understood. It's just the HR people,
10 basically, if they get around to it?
11     A. They may -- well, they may or may not
12 upload it there or keep it in their files.
13     Q. Right. So you specifically checked Shell
14 People?
15     A. As far as I can recall.
16     Q. Did you check Shell People to see if there
17 was anything on Turney?
18     A. As far as I can recall.
19     Q. How about Foreman?
20         MR. TUCKER: As far as you recall yes
21 or no?
22         THE WITNESS: Yes.
23         MR. TUCKER: Okay.
24     A. I don't recall checking Foreman.

75 (Pages 297 to 300)

Page 301

1    Q. (BY MS. GURMANKIN) Did you check anyone
2  other than Hoover and Turney?
3    A. I don't believe so.
4    Q. When did you check for Hoover and Turney?
5    A. I don't recall when.
6    Q. Is there any documentation that you did
7  this?
8    A. There would not be, no.
9    Q. Did you see -- well, did you make any
10  documentation?
11    A. No.
12    Q. Did you see anything for Turney?
13    A. No.
14    Q. And Michelle -- you also asked Michelle
15  Priest about Hoover?
16    A. Correct.
17    Q. And she told you there was nothing?
18    A. Correct.
19    Q. What did she check? Do you know?
20    A. I don't know.
21    Q. Did you ask her about Turney?
22    A. Yes, I believe so.
23    Q. And her response?
24    A. There was also no previous discipline

Page 302

1  issue.
2    Q. And when -- and do you know what she
3  checked regarding Turney?
4    A. No.
5    Q. When did she tell you this during the
6  course of the investigation?
7    A. I don't recall.
8    Q. Is this documented at all?
9    A. No.
10    Q. These were verbal conversations?
11    A. Yes.
12    Q. Was there any discussion about terminating
13  Turney?
14    A. As far as I can recall, no.
15    Q. Shell's antiharassment policy is zero
16  tolerance, correct?
17    A. Correct.
18    Q. And there was a conclusion that Turney had
19  repeatedly engaged in conduct that violated the
20  policy, correct?
21    A. Correct.
22    Q. So why didn't Shell follow through on its
23  zero tolerance policy in connection with Turney?
24    A. I believe Shell did follow through on our

Page 303

1  zero tolerance policy with the actions that we took.
2    Q. Well, zero tolerance means that it would
3  terminate Turney for engaging in confirmed conduct
4  that violated the policy.
5    MR. TUCKER: Objection.
6    You may answer.
7    A. No. Zero tolerance policy, I believe,
8  means that we will take action and discipline
9  appropriately up to and including termination.
10    Q. (BY MS. GURMANKIN) So why was the decision
11  made to give him a warning instead of firing?
12    A. This was the first time that a complaint
13  was made about him.
14    Q. Did you actually have discussions about
15  terminating him with anyone?
16    A. Not that I can recall.
17    Q. And you never recommended that?
18    A. Not that I can recall.
19    Q. And no one ever raised that with you?
20    A. Not that I can recall.
21    Q. So as far as you know, it was never
22  considered?
23    A. Correct.
24    Q. And you never considered it as part of your

Page 304

1  recommended action?
2    A. Correct, as far as I can recall.
3    Q. Same with Hoover, that was never
4  considered, to your knowledge, terminating him?
5    A. Termination was not considered with Hoover.
6    Q. Did you consider what kind of message it
7  sent to the female employees at the company that
8  employees who are confirmed to have engaged in
9  conduct that violates the policies are retained?
10    A. Can you repeat your question?
11    Q. Sure. Did you consider in your role as
12  HR professional and investigator what kind of
13  message it sent to female employees of the company
14  like Jesse Barnes that male employees who engaged in
15  this type of conduct are retained by the company?
16    A. Did I consider what type of message it
17  sends to her?
18    Q. Uh-huh.
19    A. I can't recall that -- specifically what I
20  was thinking at that time.
21    Q. You agree it's a possibility it might send
22  the message that the company tolerates that kind of
23  conduct, when it retains male employees who engage
24  in that type of conduct?

Page 305

1    A. I can see that.
2    Q. Back to Exhibit 32, page 2 of your
3  investigative report.
4        Did you type up pages 2 and 3?
5    A. Yes.
6    Q. These were messages to be delivered to
7  Jesse and Turney and Mark Hoover, right?
8    A. Yes.
9    Q. Are these messages that you wrote up before
10  the fact?  Like this is a script or bullet points of
11  what we are going to tell these people, or is this a
12  summary of what was told to them after the fact?
13    A. This was a -- talking points before the
14  conversation had happened.
15    Q. Okay.  And then did you -- so, for example,
16  at the top of page 2, it says, "Key Messages for
17  Jesse Barnes:  Delivered on 12/15/2016 by Megan
18  Kloosterman and Greg Larsen."
19        Did you guys have that scheduled, or
20  did you go back in and add that this was delivered
21  on X date?
22    A. I can't recall.
23    Q. All right.  But you and Larsen did meet
24  with Jesse around -- either on or around

Page 306

1  December 15?
2    A. Correct.
3    Q. Where?
4    A. I would have been virtual, based in
5  Houston, and I don't recall if Greg and Jesse were
6  in a room together in Willsboro or not.
7    Q. When did you deliver this report, by the
8  way, the investigation report?
9    A. Repeat that, please.
10    Q. When did you deliver this investigation
11  report?  There is no date on the first page.
12    A. What do you mean "deliver"?
13    Q. When did you finish it and send it to Kelly
14  and Greg Larsen?
15    A. I don't know off the top of my head.
16    Q. So -- I'm sorry; you were virtual when you
17  and Greg talked to Jesse?
18    A. Yes.
19    Q. Were you on video or over the phone?
20    A. Over the phone.
21    Q. How long did that meeting last?
22    A. I don't remember.
23    Q. And what do you recall about it?  You are
24  looking at Exhibit 32.  Is your recollection based

Page 307

1  on what's written here?
2    A. Yes.
3    Q. So you told her that Turney engaged in
4  conduct that violated the Code of Conduct?
5    A. Yes.
6    Q. Did you tell her that Shell would be giving
7  him a written warning?
8    A. We did not tell her specifics.  We told
9  her -- I recall in the Bullet Point No. 4 that we
10  were taking appropriate action.
11    Q. Did you tell her that Turney would be
12  disciplined in some fashion?
13    A. I don't recall saying that, no.
14    Q. Did you tell her anything about the
15  investigation other than there was a conclusion that
16  Turney engaged in conduct that violated the Code of
17  Conduct?
18    A. Not that I recall.
19    Q. Did you tell her that Hoover -- that there
20  was confirmation that Hoover engaged in conduct that
21  violated the Code of Conduct?
22    A. I don't recall.
23    Q. If that's not included in the bullet
24  points, would you assume that you didn't share that

Page 308

1  with her?
2    MR. TUCKER:  Say that again.
3    Q. (BY MS. GURMANKIN)  If it's not included in
4  the bullet points, would you assume that you didn't
5  share that with her?
6    MR. TUCKER:  Well, there is a bullet
7  point about it.
8    MS. GURMANKIN:  No, not about Hoover
9  violating the Code of Conduct.
10    MR. TUCKER:  Appropriate consequences
11  will be actions for Will and Mark.
12    MS. GURMANKIN:  Right.  It doesn't say
13  that there is a conclusion that Hoover violated the
14  Code of Conduct.
15    Q. (BY MS. GURMANKIN)  If that's not included
16  in here, can we assume that you didn't tell her?
17    A. No.  Because I think in saying that
18  appropriate consequences will be action for him that
19  we may have said that there was a violation found.
20    Q. Did you tell Jesse that you had explored
21  moving Turney out of his role?
22    A. I don't believe I shared that with her.
23    Q. And that's not included anywhere in the
24  bullet points, right?

77 (Pages 305 to 308)

Page 309

1      A.  Correct.
2      Q.  And I'm sorry; I just want to make sure I
3  asked you this.  There is no documentation that that
4  was explored, correct?
5      A.  Correct.
6      Q.  Did Jesse have any questions?
7      A.  I don't recall.
8      Q.  Who did the talking, you or Greg or both?
9      A.  Both, as far as I can recall.
10     Q.  And after that, there is a few bullet
11  points under "Key messages for Jesse Barnes
12  delivered on 12/15/2016 by Megan Kloosterman."
13         Is this the separate follow-up
14  discussion you had with Jesse that you testified to
15  earlier?
16     A.  I recall there being two separate
17  follow-ups between just Jesse and I.  I recall one
18  that happened after we had the first conversation
19  with Mr. Larsen talking about the different role
20  opportunities and then this one.  So I recall two
21  separate --
22     Q.  When you say "this one," you're talking
23  about what's listed on page 2 --
24     A.  Yes.

Page 310

1      Q.  -- of Exhibit 32?
2      A.  Yes.
3      Q.  But this one says delivered on 12/15.  So
4  there would have been another one between that one
5  and the conversation that the two of you had, you
6  and Larsen had with her that's right above that on
7  the top of page 2?
8      A.  Yes, because as far as -- what my memory is
9  is that we had -- Greg, Jesse and I had a different
10  conversation where we were exploring and sharing
11  different role opportunities for her before she had
12  selected the HSE role.  And then following that
13  conversation I also got a follow-up with her.
14     Q.  What was that about?
15     A.  Just making sure that she had all the
16  questions answered and if she had any concerns.
17     Q.  All right.  And starting at the bottom of
18  page 2, there's messages regarding a meeting that
19  you, Larsen and Craig had with Turney, right?
20     A.  Yes.
21     Q.  And these are actually all on 12/15?
22     A.  As far as I can recall.
23     Q.  And you were on the phone for this one,
24  too, I assume.

Page 311

1      A.  Yes.
2      Q.  Did he have any questions?
3      A.  Not that I can recall.
4      Q.  Did you draft the written warning to
5  Turney?
6      A.  Can I look at it?
7      Q.  Yes.
8         MS. GURMANKIN:  Let's go off the record
9  for one second.
10        THE VIDEOGRAPHER:  We are off record.
11  Time is 4:06 p.m.
12        (A recess was taken.)
13        THE VIDEOGRAPHER:  Back on the record.
14  Time is 4:12 p.m.
15        (Exhibit 33 was marked.)
16     Q.  (BY MS. GURMANKIN)  You are being shown
17  what's been marked as Exhibit 33, Shell 851.  This
18  is the warning that was given to Will Turney from
19  Greg Larsen on December 15, 2016.
20         Did you draft this?
21     A.  I just finished reading it.
22     Q.  Yeah, take your time.
23     A.  As far as I can recall, we have a template
24  that I used but then I modified it and edited it to

Page 312

1  fit this warning.
2      Q.  Shell has a template for written warnings?
3      A.  Yes.
4      Q.  Okay.  And then you put in the information
5  specific to this situation?
6      A.  Yes.
7      Q.  And did you show it to anyone before it was
8  given to Turney?
9      A.  I believe I shared this with my supervisor.
10     Q.  Kelly?
11     A.  Yes.
12     Q.  Did you and Larsen give it to Turney during
13  that postinvestigation update?
14     A.  Yes.
15     Q.  That's referenced in your investigation
16  overview?
17     A.  That's my recollection, yes.
18     Q.  Did he say anything about it?
19     A.  This is -- that is a meeting when he
20  acknowledged it and signed it.
21        (Exhibit 34 was marked.)
22     Q.  (BY MS. GURMANKIN)  You are being shown
23  what's been marked as Exhibit 34, Shell 501 to 503.
24  This is an email that Larsen sent to you on

78 (Pages 309 to 312)

Page 313

1    December 15, 2016, and he is emailing you Turney's
2    signed version of the warning, right?
3        A.  Correct.
4        Q.  And is he just doing that as an FYI, to
5    your knowledge, or are you responsible for storing
6    it somewhere?
7        A.  This is because HR typically holds these
8    documents.
9        Q.  Okay.  So what did you do with it?
10       A.  I believe -- my recollection is that I sent
11    it to our HR service desk, who then uploads it to
12    his file and then also shared it with Michelle
13    Priest.  That's my recollection.
14       Q.  And when you say the HR -- is it service
15    center?
16       A.  Yeah.
17       Q.  -- uploads it to his file?
18       A.  Correct.
19       Q.  Is that his personnel file?
20       A.  Correct.
21       Q.  Okay.  And who is that person?
22       A.  There is a lot of employees at our HR
23    service center.
24       Q.  Oh, you meant Turney's file?

Page 314

1       A.  Yes.
2       Q.  I thought you meant the employee's file.
3       A.  Yes.
4       Q.  So that person uploaded it into Turney's
5    file?
6       A.  Correct.
7       Q.  His hard copy file or the Shell People
8    file?
9       A.  We don't have a hard copy file.  It would
10    have been his Shell People file.
11       Q.  Did you ever check to see if it was there?
12       A.  Not that I can recall.
13       Q.  All right.  If you go to page 3 of
14    Exhibit 34.  What is this?
15       A.  Let me read that.
16           I can't -- I remember seeing this.  I
17    can't recall how I received it, if it was in person
18    or via email, but I recall this is from Mr. Turney.
19       Q.  So this is at the end of Larsen's email to
20    you.  Do you recall seeing it then?
21       A.  I -- I don't believe that this is
22    attached -- was attached to Larsen's email to me.
23       Q.  Okay.  You think that was separate?
24       A.  Yes.

Page 315

1       Q.  Okay.  But you did see it around this time?
2       A.  I can't recall the timing that I saw this.
3    I -- my recollection is that I saw this during the
4    investigation phase.
5       Q.  Okay.
6       A.  Before --
7       Q.  You had completed the investigation?
8       A.  That's my recollection, yes.
9       Q.  And you don't remember how you got it?
10       A.  I -- my recollection is I received it from
11    Mr. Turney, but I don't recall how.
12       Q.  Okay.  Either he handed it to you, or he
13    emailed it to you?
14       A.  Must have been.
15       Q.  Okay.  Did you do anything with the
16    information that he was sharing?
17       A.  These are not related to the claims that I
18    was investigating.  So I didn't do anything with
19    this specifically.
20       Q.  Am I correct that you did not think that
21    this was relevant information?
22       A.  Correct.
23          (Exhibit 35 was marked.)
24       Q.  (BY MS. GURMANKIN)  You are being shown

Page 316

1    what's been marked as Exhibit 35, Shell 498 to 500.
2    So if you look at the second page, this is an email
3    from --
4        MR. TUCKER:  Let me catch up with you,
5    Counsel.  All right.
6       Q.  (BY MS. GURMANKIN)  This is an email from
7    Larsen to Jesse copying you on December 12, 2016.
8    He says, "Thanks for the time this afternoon to
9    discuss potential roles for you going forward."
10         So this was before you guys had the
11    12/15 conversation with her to update her on the
12    investigation?
13       A.  That's correct.
14       Q.  And then is this the one where you had a
15    follow-up conversation with her after the three of
16    you talked?
17       A.  That's my recollection.
18       Q.  So why were you discussing with her before
19    you were giving her an update on the investigation
20    her rules for her?
21       A.  One of the results of the investigation was
22    that I knew that they could -- that Jesse was
23    adamant that she could no longer work with
24    Mr. Turney.  So we were exploring options for her of

Page 317

1　where she would like to go so that we could have
2　that finalized before we had the final outcome
3　conversation with Mr. Turney and her.
4　　　　Q. So during this conversation on December 12
5　before Larsen sends you this email, you are on the
6　phone for this one, too, right?
7　　　　A. Yes.
8　　　　Q. Did she tell you at any point, either when
9　the three of you were talking about or the two of
10　you talked afterward, that she wanted to stay in her
11　role, she just didn't want to report to Turney?
12　　　　A. I recall her asking if that was still an
13　option.
14　　　　Q. When the three of you were talking or the
15　two of you?
16　　　　A. I don't recall when it -- when it was
17　asked.
18　　　　Q. And what was the response?
19　　　　A. I don't recall specifically.
20　　　　Q. At some point she was told that if she
21　wanted to -- at some point she was given the message
22　that if she wanted to stay in her role, it would be
23　reporting to Turney?
24　　　　A. That's my recollection.

Page 318

1　　　　Q. And if she didn't want to report to Turney,
2　she'd have to move elsewhere?
3　　　　A. That beads with the other opportunities
4　that we had.
5　　　　Q. And she'd have to go elsewhere if she
6　didn't want to report to him?
7　　　　A. To one of these positions.
8　　　　Q. Okay. Who came up with these positions
9　listed in this email on December 12, 2016?
10　　　　A. As far as I can recall, it was Greg Larsen,
11　but he may have had to -- I shouldn't think. It
12　was -- it was Greg Larsen.
13　　　　Q. And he brought them to you?
14　　　　A. Correct.
15　　　　Q. So before the conversation on December 12,
16　2016, that's referenced in his email to Jesse on
17　that date, had -- had you had a conversation with
18　Jesse about her not wanting to report to Turney?
19　　　　A. Can you clarify what you mean?
20　　　　Q. Yeah. So at some point before she's
21　presented with these three options on December 12,
22　2016, Jesse had conveyed to you that she wanted to
23　stay in her role but didn't want to report to
24　Turney?

Page 319

1　　　　A. No. I recall at some point she conveyed to
2　me multiple times that she did not want to work with
3　Mr. Turney. And then at some point -- I can't
4　recall exactly when -- she had asked if staying in
5　her role was an option.
6　　　　Q. And you don't recall if her asking if
7　staying in her role as an option, if that was before
8　or after this December 12, 2016, conversation?
9　　　　A. Correct.
10　　　　Q. Okay. But at some point during the course
11　of the investigation, she conveyed to you that she
12　did not want to report to Turney any longer?
13　　　　A. Correct, that she did not want to work with
14　him.
15　　　　Q. All right. And based on that, did you ask
16　Larsen to come up with other potential roles for
17　her?
18　　　　A. Yes, that's my recollection.
19　　　　Q. Okay. Resulting in him finding these three
20　options that are included in this email on
21　December 12?
22　　　　A. That is my recollection.
23　　　　Q. And your expertise is in HR. I mean, do
24　you know anything about the responsibilities of

Page 320

1　these roles to be able to give an opinion on if they
2　differed from her maintenance analyst role, and if
3　so, how?
4　　　　A. At a very high basic -- high level basic
5　level.
6　　　　Q. Okay. So what do you know about the first
7　one, backup control room operator?
8　　　　A. I know that this type of position is in
9　operations, and it is in a control room. But it's
10　kind of the front line working in operations.
11　　　　Q. Okay. As a backup? In this -- the title.
12　　　　A. Yes.
13　　　　Q. And filling in for, I guess, two other
14　control room operators when they were out sick or on
15　vacation?
16　　　　A. In my understanding with these types of
17　positions, that they work shift work and there is
18　common -- commonly vacancies to backup.
19　　　　Q. Do you know anything about -- or can you
20　give an opinion on whether the responsibilities of
21　backup control room operator were less prestigious
22　or significant than the responsibilities that Jesse
23　had as maintenance analyst? Do you know enough
24　about either role to give an opinion on that?

80 (Pages 317 to 320)

Page 321

1          MR. TUCKER:  Objection.
2     You may answer.
3          THE WITNESS:  Okay.
4     A.  All I can speak to is that they are very
5  different roles.  I don't personally believe that
6  there is a differing level of prestige.  I think
7  they are just both very different but both
8  important.
9     Q.  All right.  And your basis for that is?
10    A.  That I know operations.  That is our front
11 line.  That is a very critical part of the business
12 and so is maintenance.
13    Q.  Environmental tech.
14    A.  Uh-huh.
15    Q.  What group -- that would have been in
16 operations?
17    A.  That actually reports into our HSE
18 department, which is a different division than
19 operations.
20    Q.  Do you know what the responsibilities of
21 that role were?
22    A.  I -- not really.  I know that it has to do
23 with safety and the environment, but that's the
24 extent of it.

Page 322

1     Q.  Do you know how different at all from her
2  maintenance analyst role?
3     A.  What I know -- what I do know is that
4  they're -- it's more focused in the field operations
5  and the environmental aspect, as opposed to
6  analyzing things in the maintenance department.
7     Q.  What was going to happen to Pat Bernethy
8  who currently had that role?
9     A.  My recollection is he was moving to a
10 different assignment at some point.
11    Q.  Do you know when?
12    A.  No, I don't recall.  I think I did know
13 that information, but I don't recall it off the top
14 of my head.
15    Q.  And the second SLIR camera operator, what
16 did you know about that position?
17    A.  I don't know much about that one at this
18 point in time.
19    Q.  Do you know anything about that one?
20    A.  No.
21    Q.  Okay.  And do you know what was happening
22 to April Heater?
23    A.  No.
24    Q.  All right.  So tell me about the

Page 323

1  conversation that the three of you have before Greg
2  sends this December 12 email.
3     A.  From what I can recall, it was very similar
4  to the email.  It was Greg kind of describing and
5  explaining at a high level what these roles do and
6  what the responsibilities would be and where it
7  reports to.
8     Q.  He went through the three options
9  specifically?
10    A.  Yes, that's my recollection.  And there's
11 also a fourth option.
12    Q.  What was that?
13    A.  The one in the paragraph.
14    Q.  The data entry person?
15    A.  Yes.
16    Q.  Did that one ever come to fruition as a
17 possibility?
18    A.  As far as I can recall, it did.
19    Q.  When?
20    A.  I don't remember.
21    Q.  What did Jesse say on the conversation the
22 three -- that the three of you had?
23    A.  My recollection is she shared that it was
24 a lot to take in and a lot to consider, and she

Page 324

1  wanted some time to think about it.
2     Q.  Any specific questions about the different
3  options?
4     A.  I don't recall any of her specific
5  questions.
6     Q.  What did she end up taking?
7     A.  Option No. 2 in this email.
8     Q.  The environmental tech?
9     A.  That's my recollection, yes.  It's -- I
10 believe we refer to it as environmental tech or HSE
11 tech.
12    Q.  In Jesse's complaint she alleges that she,
13 in this position, has fewer job duties and
14 responsibilities and less complex work to do than in
15 her prior position.
16         Do you have any basis to dispute that?
17    A.  I can't speak to that.
18    Q.  At some point did Jesse get back to you
19 with the option that she had chosen?
20    A.  I don't recall who had the conversation
21 where it was finalized.
22    Q.  Was she upset on that initial meeting with
23 the three of you on December 12 when you are
24 discussing job options?

81 (Pages 321 to 324)

Page 325

1     A.  I don't recall her being upset.  I just
2  recall her maybe overwhelmed a lot, a big decision.
3     Q.  Was she crying?
4     A.  Not that I recall.
5     Q.  And why did you have a separate
6  conversation with her?
7     A.  Just to ensure that we -- since we had had
8  other conversations face-to-face, I just wanted to
9  follow up and check in with her and see if she had
10  any other questions that she wasn't comfortable
11  asking with Greg.
12     Q.  What did she say?
13     A.  I don't recall.  I don't recall it being a
14  long conversation.
15     Q.  I am showing you what's been marked as
16  Exhibit 2.  Have you seen -- if you can go through
17  all five pages and let me know if you have seen this
18  before.
19       Have you seen this before?
20     A.  No.
21     Q.  Okay.  Do you know what training actually
22  took place as a result of your recommended
23  actions/next steps from the investigation?
24     A.  No.  I transitioned that to Michelle Priest

Page 326

1  and Kelly.
2     Q.  So after your December 15 conversations
3  that are referenced in the memo after the
4  investigation of review, did you have anything else
5  to do with this investigation or the results?
6     A.  Can you repeat that?
7     Q.  Yes.  After -- Here.  Let me pull this up
8  for you.
9       After the conversations that are
10  referenced on page 2 and 3 --
11     A.  Yes.
12     Q.  -- did you have any further involvement
13  regarding this investigation or any -- any follow-up
14  actions in connection with the investigation?
15     A.  No, not that I can recall.
16       (Exhibit 36 was marked.)
17     Q.  (BY MS. GURMANKIN)  I'm showing you what's
18  been marked as Exhibit 36, Shell 639 through 641.
19       This is you sending a copy of your
20  investigation of review to Cari Otto, and that kind
21  of closes out your role in this; is that correct?
22     A.  Yes.
23     Q.  Did you conclude that Jesse was subjected
24  to a hostile work environment based on her sex as a

Page 327

1  result of your investigation?
2     A.  That was not one of my conclusions.
3     Q.  Did you conclude that she was not subjected
4  to a hostile work environment based on her sex, or
5  you just didn't reach a conclusion about whether or
6  not she was subjected to a hostile work environment
7  based on her sex?
8     A.  Can you rephrase your question?
9     Q.  Sure.  As part of your investigation, did
10  you reach a conclusion as to whether Jesse was
11  subjected to a hostile work environment based on her
12  sex?
13     A.  No.
14     Q.  Why not?
15     A.  I concluded that the behavior that she was
16  subjected to by Mr. Turney and Mr. Hoover was
17  inappropriate and not in line with Shell's Code of
18  Conduct, but it did not reach the level of that, of
19  a hostile work environment based on gender.
20     Q.  So did you conclude that the conduct did
21  not rise to the level of a hostile work environment
22  based on sex?
23     A.  Correct.
24     Q.  Okay.  And what -- why did you reach that

Page 328

1  conclusion?  What was your basis for that
2  conclusion, that the conduct did not rise to the
3  level of a hostile work environment based on sex?
4     A.  I believe that the claims and the examples
5  that I validated were not severe or pervasive enough
6  to rise to that level.
7       MS. GURMANKIN:  Let me take a break for
8  a few minutes and see if I have anything else.
9  Okay?
10       THE WITNESS:  Okay.
11       THE VIDEOGRAPHER:  We are off record.
12  The time is 4:35 p.m.
13       (A recess was taken.)
14       THE VIDEOGRAPHER:  Back on the record.
15  The time is 4:46 p.m.
16     Q.  (BY MS. GURMANKIN)  All right.  Looking
17  back at Exhibit 32, which is your investigative
18  report, is there anywhere in the report where it
19  says that you have concluded that Jesse violated the
20  Code of Conduct?
21     A.  No.
22     Q.  Is there anywhere in the bullet points of
23  the conversations that you and Greg had with her and
24  that you had with her on December 15 that are on

Page 329

1   page 2 of Exhibit 32 where it says that you
2   concluded that she violated the Code of Conduct?
3       A. No, not that I recall.
4       Q. Well, I mean, if you look at them.
5       A. Oh, in the notes.
6       Q. Yeah, in the notes.
7       A. No.
8       Q. Have you seen -- or did you document that
9   anywhere, that you concluded that Jesse violated the
10  Code of Conduct as part of your investigation?
11      A. Not that I recall.
12          (Exhibit 37 was marked.)
13      Q. (BY MS. GURMANKIN) You are being shown
14  what's been marked as Exhibit 37, Shell 669 through
15  671.
16          So at the bottom of the first page is
17  the email that you had sent to Cari Otto on
18  December 15, 2016, forwarding your investigative
19  report.
20      A. Uh-huh.
21      Q. And then Michelle Priest e-mails you in
22  April 2017, asks you to send all your notes on the
23  case, this issue was being revisited and she would
24  like to review some of the interview notes as she

Page 330

1   prepares additional information for Kelly, correct?
2       A. Yes.
3       Q. So it looks like you sent her all of your
4   interview notes. Right?
5       A. Correct.
6       Q. Your investigative report? That's in the
7   third-to-last line.
8       A. Yes.
9       Q. The questions for Steve and Greg, are those
10  the questions that we looked at earlier that -- the
11  questions you had drafted for Jesse and Will and
12  then the official who was responsible?
13      A. I don't know for sure.
14      Q. Was Exhibit 29 what you are referring to
15  there about questions for Steve and Greg?
16      A. That is my recollection.
17      Q. It wasn't Exhibit 17 that's on your screen
18  now?
19          MR. TUCKER: Hold on one second.
20      A. No. This was not my interview notes. So I
21  did not share that with her.
22      Q. (BY MS. GURMANKIN) Okay. And going back
23  to Exhibit 37, which is your email sending Michelle
24  your documents, the key messages for the follow-up

Page 331

1   meetings, are those the bullet points that we looked
2   at a little while ago?
3       A. I believe so.
4       Q. That are attached to the investigative
5   report?
6       A. Yes.
7       Q. Then you also attached Turney's written
8   warning, right?
9       A. Yes.
10      Q. And then there is a claims Excel document.
11  Do you know what that is?
12      A. Yes. I had an Excel document where it had
13  the individual claims and then her response to it
14  and his response and maybe any witnesses to it.
15      Q. Had you sent that to anyone before sending
16  this to Michelle in April of 2017?
17      A. Not that I recall. I may have sent it to
18  Kelly Soudelier at one point, but I don't know.
19      Q. Is that something you created during the
20  course of the investigation?
21      A. Yes.
22      Q. Did you have a conversation with Michelle
23  around this time, April of 2017, as to why this
24  issue was being revisited?

Page 332

1       A. Let me think. I recall having a
2   conversation -- Michelle asked me some questions
3   about actions that I -- or about my investigation
4   during this time.
5       Q. Around April 2017?
6       A. Yes.
7       Q. Before she sends you the email?
8       A. I don't remember if it was before or after.
9       Q. What did she ask you?
10      A. I don't recall specifically. I don't
11  recall specifically.
12      Q. Do you recall anything about what she
13  asked?
14      A. No. I would be guessing.
15          MR. TUCKER: We don't want you to
16  guess.
17      Q. (BY MS. GURMANKIN) Is that the only time
18  that you talked to Michelle Priest about the
19  investigation after -- other than that email and the
20  conversation that you referenced after you had sent
21  your investigative report and had the follow-up
22  conversations in December of 2016?
23      A. I believe I also sent an email following my
24  investigation with the additional actions I was

Page 333

1  handing over to her, but then that is everything to
2  my recollection.
3       Q.  Do you recall any conversations with anyone
4  other than Michelle after December 2016 about the
5  investigation?
6       A.  No.
7          (Exhibit 38 was marked.)
8       Q.  (BY MS. GURMANKIN)  You are being shown
9  what was been marked as Exhibit 38, Shell 737 to
10 740.  This is an email from -- well, first there is
11 an email from -- a series of emails between you and
12 Michelle Priest about Jesse's role that she went
13 into after the investigation.
14      A.  Okay.  Yeah, I did not recall this.  So on
15 page 2.  That was the email I was just referring to
16 when I remembered sending a follow-up email and
17 actions.  But I did not recall her reaching out to
18 confirm this.  But I see it now.
19      Q.  Okay.  And then she indicates on the first
20 page that Will's written warning was not in Shell
21 People --
22      A.  Uh-huh.
23      Q.  -- and that -- you said, "I believe I asked
24 Ria to upload this to his file."

Page 334

1          Is that the HR service center person?
2       A.  Yes.
3       Q.  What you testified to earlier about needing
4  either documentary evidence or witness corroboration
5  to confirm an allegation of sexual harassment or any
6  type of harassment, have you seen that document
7  anywhere at Shell?
8       A.  I can't recall seeing that anywhere.
9          MS. GURMANKIN:  That's all I have for
10 you right now.
11         THE WITNESS:  Okay.
12         MS. GURMANKIN:  Thank you.
13         MR. TUCKER:  I have no questions of
14 this witness.
15         THE REPORTER:  Are there any further
16 stipulations before I close the record?
17         MR. TUCKER:  Just read and sign.
18 That's all.
19         THE VIDEOGRAPHER:  This concludes
20 today's deposition.  We are off record.  The time is
21 4:54 p.m.
22         (Whereupon, the deposition was
23 concluded at 4:54 p.m.)
24

Page 335

1          REPORTER'S CERTIFICATE
2       I, CONSTANCE KOENIG, Certified Shorthand
3  Reporter in and for the State of Texas, do hereby
4  certify:
5       That the witness named in the foregoing
6  deposition was by me duly sworn; that the deposition
7  was then taken before me at the time and place
8  herein set forth; that the testimony and proceedings
9  were reported stenographically by me and were
10 transcribed through computerized transcription by
11 me; that the foregoing is a true record of the
12 testimony and proceedings taken at that time; and
13 that I am not interested in the event of the action.
14      Witness my hand dated September 6, 2019.
15
16
17
    _____
18 CONSTANCE KOENIG, Texas CSR 6577
   Expiration Date:  12/31/20
19 SUMMIT COURT REPORTING, INC.
   Certified Court Reporters and Videographers
20 1500 Walnut Street, Suite 1610
   Philadelphia, Pennsylvania 19102
21 424 Fleming Pike
   Hammonton, New Jersey 08037
22 (215) 985-2400 * (800) 447-8648 * (609) 567-3315
   www.summitreporting.com
23
24

Page 336

1       INSTRUCTIONS TO THE WITNESS
2          Read your deposition over carefully
3  It is your right to read your deposition and make
4  changes in form or substance.  You should assign a
5  reason in the appropriate column on the errata
6  sheet for any change made.
7          After making any changes in form or
8  substance which have been noted on the following
9  errata sheet along with the reason for any change,
10 sign your name on the errata sheet and date it.
11         Then sign your deposition at the
12 end of your testimony in the space provided.  You
13 are signing it subject to the changes you have
14 made in the errata sheet, which will be attached
15 to the deposition before filing.  You must sign it
16 in front of a witness.  Have the witness sign in
17 the space provided.  The witness need not be a
18 notary public.  Any competent adult may witness
19 your signature.
20         Return the original errata sheet to
21 your counsel promptly.  Court rules require filing
22 within thirty days after you receive the
23 deposition.
24

84 (Pages 333 to 336)

Page 337

1        ERRATA SHEET
2    Attach to Deposition of:  Megan Kloosterman
     Taken on:  August 27, 2019
3    In the matter of:  Barnes v. Shell Exploration, et al.
4    PAGE      LINE NO.     CHANGE         REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____

Page 338

1             SIGNATURE PAGE
2
3                  - - -
4
5             I hereby acknowledge that I have
6    read the aforegoing transcript, dated August 27,
7    2019, and the same is a true and correct
8    transcription of the answers given by me to the
9    questions propounded, except for the changes, if
10   any, noted on the Errata Sheet.
11
12                 - - -
13
14
15
16
17   SIGNATURE:  _____
             Megan Kloosterman
18
19   DATE:  _____
20
21   WITNESSED BY: _____
22
23
24

85 (Pages 337 to 338)

Exhibit 24

# Jesse Barnes – Investigation Overview

***Ethics & Compliance Case Received by HRiC:*** 11/28/2016
***Dates of Investigation:*** 12/6/2016 – 12/8/2016
***Investigator:*** Megan Kloosterman, UP HR Account Manager
***Parties Involved:***

| Name | Position Title | JG | Date to Position | Date to Shell | Relationship |
|------|---------------|----|-----------------|--------------|--------------|
| Jesse Barnes | Maintenance Analyst | 8 | 9/14/2015 | 9/14/2015 | Will's Direct Report |
| William Turney | Maintenance Supervisor | 4 | 1/16/2014 | 02/01/2012 | Supervisor of Jesse |

***Allegation:*** Jesse Barnes called the Ethics & Compliance hotline alleging harassment, specifically name calling, belittling, inappropriate touching and comments.

## Summary of Findings

- Evidence to support Will Turney's behavior violated Shell's Code of Conduct, specifically Section 3.3 Harassment: "You must treat others with respect at all times" and "You must not make inappropriate jokes or comments.":
  - Will told Jesse that she makes good money for a woman and should not be upset with her pay grade
  - Will told Jesse she works well with male employees because she is a woman
  - Will referred to Jesse as a "hot blonde" in a joking manner

- Evidence to support Will Turney demonstrated poor leadership behaviors:
  - Will consistently inquires about personal matters with his staff, particularly with Jesse
  - Will texts Jesse on her personal cell phone regarding both work and personal matters outside of work hours
  - Will gestures "cat claws" and makes a "hissing noise" during situations of conflict; this is perceived by some as Will's way of avoiding conflict and to lighten the mood

## Recommended Actions/Next Steps

- Will Turney: Provide a written warning on file for 18th months, reduce IPF to 0.9 for 2016, participate in LEAD leadership training offered in 2017, participate in code of conduct training, continued coaching from Greg and Steve.
- Jesse Barnes: Transfer to new role as an HSE Analyst for the HSE team, provide coaching on professional behavior, coaching to raise concerns early
- Provide code of conduct training for all Appalachia employees
- Hold leadership engagements for entire Appalachia leadership team with a focus on code of conduct and diversity and inclusion
- Documented coaching for Mark Hoover on leadership behaviors

EXHIBIT
032

Confidential

**Key Messages for Jesse Barnes: delivered on 12/15/2016 by Megan Kloosterman (HR) and Greg Larsen (Operations Manager)**

- Purpose of this meeting is to share a high level overview of the investigation findings of allegations
- Specific details of the investigation are confidential (including who was interviewed, details shared by individuals, etc.)
- The investigation concluded that Will did make inappropriate comments towards you which are against Shell's Code of Conduct.
- Appropriate consequences will be actioned for Will and Mark.
- As discussed with you previously, we would like to offer the HSE Analyst role to you as an opportunity to broaden your skills and work in a different team. In line with this, we are granting your request that you will not report to, or work directly with, Will.
- We ask for your professionalism to ensure a thorough handover of your current role.
- We will not tolerate any retaliation for making a claim, so if you have any concerns at all, please raise immediately with either Greg, HR (Michelle), or the E&C hotline.
- Reminder on confidentiality of the investigation and conclusions – do not discuss any of this with anyone other than Greg and HR.

**Key Messages for Jesse Barnes delivered on 12/15/2016 by Megan Kloosterman (HR)**

- Thank you for raising your concerns to the ethics & compliance hotline. Should you witness or encounter inappropriate behavior in the future, hope you feel comfortable to address it immediately. You may always contact your line management, the Shell Ethics & Compliance Office, Human Resources, Shell Legal or the Global Helpline.
- You and I have had a lot of conversations, and I wanted to follow up with you 1:1 separate from our conversation with Greg. You've shared a couple of times that you've reflected that some of your actions might have added to these situations. What are your learnings, what are you taking away from this? Thinking of your next role, how might you approach it differently?
- Coaching on personal brand at work.

**Key Messages for William Turney: delivered on 12/15/2016 by Megan Kloosterman (HR), Greg Larsen (Operations Manager), and Steve Craig (Superintendent)**

- Purpose of this meeting is to provide a high level overview of the investigation findings of allegations
- Specific details of the investigation are confidential (including who was interviewed, details shared by individuals, etc.)
- The investigation concluded there was evidence to support your behavior violated Shell's Code of Conduct, specifically Section 3.3 Harassment: "You must treat others with respect at all times" and "You must not make inappropriate jokes or comments".
- As a result of your behaviors, we will be taking the following actions:

- Written warning on your file for 18 months
- IPF reduction for 2016
- Leadership training: LEAD and code of conduct
- On-going coaching from Greg/Steve
- Jesse will no longer report to you and will be moving to a new role in HSE effective 1/1
- Coaching on leadership development – balance of being a friend/personal versus friendly/engaging, cat claws/making jokes, texting about non work-related topics
- What questions do you have? What do you need from us in order to be successful?
- Reminder on confidentiality and we don't tolerate retaliation

**Key Messages for Mark Hoover delivered on 12/16/2016 by Megan Kloosterman (HR), Greg Larsen (Operations Manager), and Steve Craig (Superintendent)**

- Purpose of this meeting is to discuss the findings of the allegations made against you
- Specific details of the investigation are confidential (including who was interviewed, details shared by individuals, etc.)
- Understand there had been jokes back and forth between yourself and Jesse, and you did not realize you had upset her. However, as a leader we expect you to hold yourself to a higher standard and not participate in these types of comments that can be perceived as inappropriate.
- This conversation is considered a coaching – any further examples of this could result in discipline.
- Reminder on confidentiality and we don't tolerate retaliation.

Exhibit 25

Message
| | |
|---|---|
| **From:** | Barnes, Jesse A SEPCO-UPU/N/EO [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=JESSE.A.BARNES] |
| **Sent:** | 12/13/2016 7:38:11 AM |
| **To:** | Larsen, Greg L SEPCO-UPU/N/EO [g.larsen@shell.com] |
| **CC:** | Kloosterman, Megan SEPCO-HRN/AT [megan.kloosterman@shell.com]; Priest, Michelle L SEPCO-HRN/AT [michelle.priest@shell.com] |
| **Subject:** | RE: Potential roles |

I will be returning back to school for an Associates Business Degree thru Corning College. It is all online and mostly at night. I will be taking general business courses to help develop opportunities for me.
I am 100% going back to school to further my career within Shell. My hopes are that it will not interfere with my work schedule but it may be possible it could overlap one day a week for an hour. I am still working out my schedule with the school.

---

**From:** Larsen, Greg L SEPCO-UPU/N/EO
**Sent:** Tuesday, December 13, 2016 8:27 AM
**To:** Barnes, Jesse A SEPCO-UPU/N/EO
**Cc:** Kloosterman, Megan SEPCO-HRN/AT; Priest, Michelle L SEPCO-HRN/AT
**Subject:** RE: Potential roles

Thanks for the information. I have sent you some additional details on the CIMS data entry role, which seems more plausible now.

I'm curious about the school comment at the end of your note. Is this a full time student? Will you be taking a sabbatical from work to go to school? What are you studying? If you are going back to school to further your Shell work career, we should talk more? I want to make sure we are aligned on expectations.

Greg

---

**From:** Barnes, Jesse A SEPCO-UPU/N/EO
**Sent:** Tuesday, December 13, 2016 8:17 AM
**To:** Larsen, Greg L SEPCO-UPU/N/EO
**Cc:** Kloosterman, Megan SEPCO-HRN/AT
**Subject:** RE: Potential roles

Greg,

Here is what I am struggling with;
My current role as a Maintenance Analyst I know holds its value to the business because I have obtained (SAP/PB-7) permissions/transactions that no one else has or knows at this point how to use. Overall in my current role, I do not believe anyone from my team and/or asset could fulfill my job (without training) which makes me believe I am more valuable as an employee in the Analyst role over the potential roles discussed. I do also hold the role dear to me because I am the first Analyst for our site.

With that being said, I have not ruled out the Back up Control Room Operator position, I just wanted to make sure it's best for me and my career with Shell. I feel as if my current role is unique, where the control room operator role, there are already 2 other people that currently do this role which makes me believe that possibly down the road I would be the probable layoff. I understand the control room operator position that I would fulfill would be more on the water management side, but again, the leads and more senior control room operators could potentially take this back over because they've already done it. Please do not think I am saying I feel there's no value, with the little I know about the position, these are scenarios I have come up with in my head.

Also, I do not like the title of "back up" control room operator. This may be nitpicking but it would ma[...] than the others in this role. As in, I would just be the backup. Possibly there is a different title that wo[...]

EXHIBIT
035

specific to the water team or just taking "back up" out altogether as an equal Control Room Operator. I realize a title is just a title but this is important to me. I have worked hard to get out of an Administrative role so when I received my current title it felt pretty awesome.

I would also like to hear more on the Environmental Tech. (Field vs office time and responsibilities) I do not know anything about it other than Pat Bernethy is currently filling the role.
I apologize for putting you in a tough spot on a tight schedule but my mind will not stop until I ask these questions. I hope you understand and can shed some light on my thoughts...

I also want to inform you that I will be returning back to college in January. This may be a later conversation - I do not have my full schedule for school at this current time.

Thanks,
Jesse

___

**From:** Larsen, Greg L SEPCO-UPU/N/EO
**Sent:** Monday, December 12, 2016 4:06 PM
**To:** Barnes, Jesse A SEPCO-UPU/N/EO
**Cc:** Kloosterman, Megan SEPCO-HRN/AT
**Subject:** Potential roles

Jesse,

Thanks for the time this afternoon to discuss potential roles for you going forward. As I outlined, we would like for you to quickly make a decision on which role you would like to pursue so we can close out the rest of the actions we will be taking.

1) Back up Control Room Operator. In this role you would keep your current job grade and work schedule. You would learn the control room operator position and fill in for Bob or Lynn in their absence (illness, vacation). You would learn extensively about water management, and be part of the broader water team – which is a critical aspect of our operations.
2) Move to the environmental team and work as an environmental tech. You would learn the field role that Pat Bernethy currently holds.
3) Become a second FLIR camera operator for Appalachia. Currently April Heater is in this role. There are forecasted increases in fugitive emission inspections related to methane.

Each of these roles would be a chance to broaden your skills.

I still need to check on the viability of working in the inspection team as a data entry person for CIMS. I talked with Shane about the possibility of adding a data entry clerk for CIMS to his team. Right now the inspectors are entering all the data themselves. Shane will get back to me by 9am tomorrow on the value to adding this role to his team. The inspection work won't go away, and the need to enter data will exist all the time. Future roles could grow under the inspection team, but unknown at this time. Hope this helps

Greg Larsen

Operations Manager - Appalachia
Upstream Americas Unconventionals
12880 Route 6, Wellsboro, PA 16901

**Tel:** Mobile +1 307 231 5041
**Email:** g.larsen@shell.com

Exhibit 26



# Compressed Transcript of the Testimony of
## GREG LARSEN, 1/23/20

**Case:** Barnes v. Shell Exploration & Production Company Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

JESSE BARNES,          : CIVIL ACTION NO. 18-1497

    Plaintiff,   :

    VS.          :

SHELL EXPLORATION AND   :
PRODUCTION COMPANY      :
APPALACHIA; SHELL       :
EXPLORATION AND         :
PRODUCTION COMPANY;     :
SHELL OIL COMPANY,      :

    Defendants.   :

- - -

    VIDEO DEPOSITION OF GREG LARSEN, on the 23rd
day of January, 2020, taken at 2422 East Madrid Avenue,
Springfield, Missouri, before TRACIE BRUMLEY, Certified
Stenographic Reporter (MO), Certified Court Reporter (MO),
within and for the State of Missouri, commencing at
approximately 9:06 a.m.

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

## Page 2

1  APPEARANCES:
2
3  CONSOLE MATTIACCI LAW, LLC
   BY:  CAREN N. GURMANKIN, ESQUIRE
4  1525 Locust Street, 9th Floor
   Philadelphia, PA  19102
5  (215) 545-7676
   gurmankin@consolelaw.com
6  Counsel for Plaintiff
7
8  TUCKER LAW GROUP
   BY:  KATHLEEN KIRKPATRICK, ESQUIRE
9  Ten Penn Center
   1801 Market Street, Suite 2500
10 Philadelphia, PA  19103
   (215) 875-0609
11 kkirkpatrick@tlgattorneys.com
   Counsel for Defendants
12
13
14
15 ALSO PRESENT:
16 Elisabeth Homer, Videographer
17
18 ALSO PRESENT Via Telephone:
19 Bianca Roberson
20 Jesse Barnes
21
22
23
24
25

## Page 3

1                    I N D E X
2  WITNESS
3  GREG LARSEN
4  EXAMINATION                          PAGE
5  By Ms. Gurmankin                       5
6
7                  E X H I B I T S
8  EXHIBIT        DESCRIPTION            PAGE
9  P 7    Court complaint                 32
10 P 14   Barnes internal complaint      183
11 P 18   Kloosterman interview notes w/ Barnes    136
12 P 19   Kloosterman interview notes w/ Turney    137
13 P 20   Kloosterman interview notes w/ Empsen    104
14 P 21   Kloosterman interview notes w/ Hoover    113
15 P 22   Ken Foreman interview          115
16 P 23   Wayne Fletcher interview questions        86
17 P 24   Interview Questions:  Dan Krise    131
18 P 25   Penny Robins interview questions        101
19 P 26   Jeremy Greene interview        119
20 P 27   Kloosterman interview w/ Flynn    118
21 P 32   Investigation overview         138
22 P 33   Turney written warning         139
23 P 34   Emails                         146
24 P 35   Email                          157
25 P 40   Job posting                    179

## Page 4

1  EXHIBIT        DESCRIPTION            PAGE
2         (Continued.)
3  P 41   E-mail                         195
4  P 44   E-mails                         59
5  P 46   E-mail                         190
6  P 47   E-mail                         198
7  P 48   E-mail                         199
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1　　IT IS HEREBY STIPULATED AND AGREED by and between
2　Counsel for Plaintiff and Counsel for Defendants that this
3　deposition may be taken by TRACIE BRUMLEY, Certified
4　Stenographic Reporter, Certified Court Reporter #620,
5　thereafter transcribed into typewriting.
6　　　　　* * * * *
7　　(Deposition commenced at 9:06 a.m.)
8　　VIDEOGRAPHER:  We are on the record.  Today's date is
9　January 23rd and the time is 9:06.  This is the video recorded
10　deposition of Greg Larsen in the matter of Barnes versus Shell,
11　et al.  Would the attorneys present please introduce
12　themselves.
13　　MS. GURMANKIN:  Caren Gurmankin of Console Mattiacci
14　Law for the Plaintiff.
15　　MS. KIRKPATRICK:  Kathleen Kirkpatrick on behalf of
16　the Defendants.
17　　VIDEOGRAPHER:  Would the court reporter please swear
18　in the witness.
19　　COURT REPORTER:  If you'll raise your right hand,
20　I'll swear you in.
21　　GREG LARSEN, of lawful age, having been produced,
22　sworn and examined on the part of Plaintiff, testified as
23　follows:
24　　　　EXAMINATION
25　QUESTIONS BY MS. GURMANKIN:

## Page 6

1　Q　All right.  Mr. Larsen, good morning.
2　A　Hi.
3　Q　We met a few minutes ago, but for the record, my name is
4　Caren Gurmankin and I have the privilege of representing Jesse
5　Barnes in a lawsuit that she has filed against Shell for sex
6　discrimination and retaliation.
7　A　All right.
8　Q　What's your date of birth?
9　A　　　　　　.
10　Q　And your current address?
11　A
12　Q　Are you currently employed?
13　A　No.
14　Q　When was your last employment?
15　A　December 31st, 2017.
16　Q　With whom?
17　A　Shell.
18　Q　What were your dates of employment with Shell?
19　A　June 4th, 1984, until my retirement.
20　Q　You worked there consistently from 1984 through the end of
21　2017?
22　A　Correct.  At a number of different locations.
23　Q　And I believe you testified a moment ago that you retired?
24　A　Yes.
25　Q　Is that why you left?

## Page 7

1　A　I retired, yes.
2　Q　That was voluntarily?
3　A　Yes.
4　Q　Did anyone suggest that you retire?
5　A　No.
6　Q　When did you make the decision to retire?
7　A　In -- I can't remember if it was April or May of that
8　year.
9　Q　Of 2017?
10　A　Yes.
11　Q　When did you first inform anyone at Shell that you had
12　made a decision to retire?
13　A　I talked to my boss about it at that time.
14　Q　Who was that?
15　A　Mike Dewitt.
16　Q　And did you officially put in for retirement at some point
17　or let the company know?
18　A　I believe at that time they had an offer, a staff
19　reduction offer.  I was under no obligation as was anybody to
20　accept it, but I looked at my current age and how long I was
21　planning to work and a severance package would put me right
22　where I needed to be, so economically I was doing -- or
23　financially I was doing fine.
24　Q　Did you make the decision to retire because the company
25　had offered this staff reduction offer?

## Page 8

1　A　Yes.
2　Q　Was it around April of 2017?
3　A　Yes, or it might have been March.  I'm not sure of the
4　exact date but it was that timeframe.  Earlier part of the
5　year.
6　Q　So around that time you told Mike Dewitt that you were
7　going to accept that staff reduction offer that the company was
8　making?
9　A　Yeah.  Actually I had to tell him I was interested and it
10　was the company's decision on whether I could be released or
11　not.
12　Q　So at some point you were informed that the company was
13　accepting --
14　A　Yes.
15　Q　-- your offer?
16　A　Yes.
17　Q　Was that shortly after you had this initial conversation?
18　A　I don't remember if it was a day or two weeks or a month,
19　but at some point after that, yes.
20　Q　Do you know, was the staff reduction offer directed to
21　particular groups or particular levels of employees or it was
22　just out for the whole?
23　A　I don't remember but I believe was it for everybody.  I
24　think it was a general staff reduction across the company.
25　Q　And was your last day of work actually December 31, 2017?

## Page 9

1    A   Yes.

2         COURT REPORTER:  Wait until she finishes.

3    A   Okay.

4    Q   Yeah, I failed to give you these instructions, but for the

5    sake of the written transcript, even if you anticipate what my

6    question is going to be, try to let me --

7    A   That's probably good for me to do that anyway.

8    Q   And I'll try to let you finish your whole answer before I

9    move on.

10   A   All right.  Thank you.

11   Q   Thank you.  Are you represented by Ms. Kirkpatrick today?

12   A   Yes.

13   Q   Are you paying her or her firm to represent you?

14   A   No.

15   Q   How did it come about that she's representing you?

16   A   I was contacted by Shell that there was a case, and then

17   at some point I was contacted through email.

18   Q   Who contacted you at Shell first to advise you that there

19   was a case?

20   A   I'm not sure.

21   Q   Do you remember the position or the department?

22   A   Legal.

23   Q   You don't remember the name of the person?

24   A   Rosa Garcia maybe.  I'm not sure exactly who it was.

25   Q   When you say that person advised you that there was a

## Page 10

1    case, did they advise you that Jesse Barnes had filed a case

2    against Shell?

3    A   I believe --

4         MS. KIRKPATRICK:  Objection.  This is attorney-client

5    privilege.  I'm instructing him not to answer.

6    Q   And you're following that instruction?

7    A   Yes.

8    Q   At some point after that initial discussion, were you

9    contacted again and told that you would have to be deposed in

10   this case?

11   A   At some point I was informed that, yes.

12   Q   Do you remember who you told that?

13   A   No.

14   Q   Was it the same person or someone different?

15   A   I don't remember.

16   Q   Have you had any other conversations with anyone at Shell

17   about this case or your deposition other than the two that you

18   just described?

19   A   No.

20   Q   How did you prepare for your deposition today?

21   A   I received some documents to review and I spent some time

22   with Kathy yesterday.

23   Q   What documents did you review in preparation for your

24   deposition?

25   A   A number of exhibits.  I don't know how many pages it was.

## Page 11

1    And Steve Craig's deposition.

2    Q   His deposition transcript?

3    A   Yes.

4    Q   Did you read the whole thing?

5    A   Yes.

6    Q   When?

7    A   Friday.

8    Q   This past Friday?

9    A   Yes.

10   Q   Did you see anything in there that jumped out at you as

11   inaccurate?

12   A   No.

13   Q   Do you remember what exhibits you reviewed?

14   A   Not really.

15   Q   Do you remember any?

16   A   A document that described the outcomes.

17   Q   Of the investigation?

18   A   Yes.

19   Q   Into Jesse's initial complaints?

20   A   Yes.

21   Q   Anything else that you recall reviewing?

22   A   Not specifically.

23   Q   Have you ever been deposed before today?

24   A   No.

25   Q   During your employment at Shell from 1984 through 2017,

## Page 12

1    did you ever violate company policy?

2    A   No.

3    Q   During your employment at Shell, did anyone ever make a

4    complaint about you to your knowledge?

5    A   No.

6    Q   During your employment at Shell, were you ever disciplined

7    for anything, given any type of verbal or written warning,

8    placed on a performance improvement plan, anything like that?

9    A   No.

10   Q   Were you ever interviewed in connection with a complaint

11   that was made during your employment at Shell?

12   A   No.

13        MS. KIRKPATRICK:  Are you talking about Jesse Barnes'

14   complaint?

15   Q   Nope.  He heard my question and answered it.

16        Were you interviewed in connection with Jesse Barnes'

17   complaint?

18   A   No.

19   Q   Were you ever reprimanded or disciplined in connection

20   with the complaints that Jesse made?

21   A   No.

22   Q   Can you give me the names of any female employees at Shell

23   who you think would testify under oath that you treat women

24   fairly?

25   A   Well it's hard to remember a lot of names.

Page 13

1    Q   Can you think of any?
2    A   First name's Patricia.  There were two engineers in the
3    Denver office.
4    Q   Is that different than Patricia?
5    A   Yes.  I hadn't thought about this.
6    Q   Take your time.
7    A   Susan Walker.  Jenn Carr.  I guess that's enough.
8    Q   Can you think of anyone else as you sit here today?
9    A   Can I think of someone else as I sit here today, that was
10   the question?
11   Q   As you sit here today, can you think of any other females
12   at Shell who you think would testify that you treat women
13   fairly?
14       MS. KIRKPATRICK:  Objection.  You can answer.
15   A   Andrea Reynolds.
16   Q   Anyone else?
17   A   Michelle Priest.  I'll stop there.
18   Q   You can't think of anyone else?
19   A   Right.
20   Q   If you think of another name later in the deposition --
21   A   Sure.
22   Q   -- just let me know, okay?
23   A   Sorry for talking over.
24   Q   Patricia, did you work with her at Shell?
25   A   No.

Page 14

1    Q   Does she work at Shell or did she work at Shell?
2    A   At the time, yes.
3    Q   What time are we talking?
4    A   1987.
5    Q   And you don't recall her last name?
6    A   No.
7    Q   If you recall later, you will let me know?
8    A   I won't recall.
9    Q   If it comes to mind, please let me know.
10   A   It's unlikely that it will come to mind, but yes.
11   Q   What position was she in; do you remember?
12   A   She was an engineer.
13   Q   In what location?
14   A   Woodriver Manufacturing Complex in Woodriver, Illinois.
15   Q   Did you have a reporting relationship to her?
16   A   No.
17   Q   And what about her or your working relationship with her
18   makes you think she would say that you treat women fairly?
19       MS. KIRKPATRICK:  Objection.  Calls for speculation.
20   You can answer.
21   Q   You can answer.
22   A   Oh, okay.  Ask the question again.
23   Q   Sure.  You mentioned that you think she would testify
24   under oath that you treat women fairly.  What's your basis for
25   saying that?

Page 15

1        MS. KIRKPATRICK:  Objection.
2    A   I had normal conversations with her.  She was in the
3    building that I was in.
4    Q   And to your knowledge, she never made any complaints about
5    you?
6    A   Definitely did not.
7    Q   To your knowledge?
8    A   Yes.
9    Q   The two engineers in Denver both are female?
10   A   Yes.
11   Q   Do you remember either of their names?
12   A   No.
13   Q   And did you work with them?
14   A   Yes.
15   Q   When?
16   A   From 2012 through 2014.
17   Q   In what capacity?
18   A   They were in my department.
19   Q   Did they report to you directly or indirectly?
20   A   No.  Indirectly.
21   Q   Who did they report to directly?
22   A   He was the -- I can't remember his name.  He was the
23   technical -- technical support manager.
24   Q   Do you know if he's still there?
25   A   No.  He's retired.  I think his first name was Dusty.

Page 16

1    Q   He worked out of Denver as well?
2    A   Yes.
3    Q   And what about your relationship with these two female
4    engineers makes you think that they would testify that you
5    treat women fairly?
6        MS. KIRKPATRICK:  Objection.  You can answer.
7    A   I had conversations with them.  They came into my office
8    to talk about issues of improving the department.  I listened
9    to them clearly, addressed their concerns, gave them the time
10   to make their -- make their causes known about how they can
11   improve the business.
12   Q   Susan Walker, who is she?
13   A   She was the project manager at the Deer Park -- she
14   actually worked projects at the Deer Park refinery in Houston.
15   Q   And did you work with her?
16   A   Yes.
17   Q   What time period did this happen?
18   A   19 probably like '95, around that timeframe.
19   Q   Did she report to you?
20   A   No.
21   Q   Was she a peer?
22   A   No.
23   Q   What was her --
24   A   She was project manager.
25   Q   Organizationally where was she to you, higher, same level?

4 (Pages 13 to 16)

Page 17

1   A  Higher.

2   Q  Did you report to her?

3   A  No.  Functionally, yes.  Not administratively.

4   Q  And what makes you think she would testify that you treat

5   women fairly?

6       MS. KIRKPATRICK:  Objection.

7   A  Because I was part of her team, basically led the

8   mechanical engineering side of the project, never had any

9   complaints and I worked with her on a number of different

10   projects so, you know, one after another.

11   Q  Jenn Carr, who is she?

12   A  She is an admin.

13   Q  You worked with her?

14   A  Yes.

15   Q  When?

16   A  In Wellsboro 2014 until I retired.

17   Q  By the way, let me go back to Walker for a sec.  Do you

18   know if she is still with Shell?

19   A  I don't know.  She is older than I am, so unlikely.

20   Q  And I'm sorry.  You said you worked with her in the Deer

21   Park?

22   A  Which person?

23   Q  Oh, Walker. I'm sorry.

24   A  Yeah, Deer Park.  She was actually in the projects

25   department that was based in central Houston and we were doing

Page 18

1   projects at the Deer Park refinery.

2   Q  All right.  Jenn Carr, you worked with her from 2014

3   through 2017?

4   A  Right.

5   Q  Was she your admin support during that time?

6   A  No, she was not.

7   Q  How did you work with her?

8   A  She was in the office.

9   Q  So how did you work with her?

10   A  Well I didn't physically work with her, but I talked to

11   her.

12   Q  Okay.

13   A  I -- why do I think she would believe me or --

14   Q  Sure.

15   A  -- whatever?  That's because I've kept in touch with her

16   relative to her smoking because I was very interested in her to

17   stop smoking, and I believe she has ceased doing that I would

18   like to think from my encouragement so.

19   Q  Any other basis for thinking that she would testify under

20   oath that you treat women fairly?

21       MS. KIRKPATRICK:  Objection.

22   A  No.  I never had any issues with her.

23   Q  Okay.  And she did not report to you during that 2014 to

24   2017 time period?

25   A  That's correct.

Page 19

1   Q  Andrea Reynolds, who is she?

2   A  She was a peer.  She was the exploration lead or manager

3   in the Houston office that was responsible for Appalachia.

4   Q  And during what time period did you interact with her?

5   A  The entire time I worked out of the Pennsylvania asset, so

6   2014 until I retired.

7   Q  She was in Houston during that time?

8   A  She was entirely in Houston.  That's where she's based.

9   Q  Do you know if she is still there?

10   A  She has relocated to London.  I don't know if she's still

11   there.

12   Q  London working with Shell as far as you know?

13   A  As far as I know, she still works for Shell.

14   Q  And what about your interactions with her makes you think

15   she would testify under oath that you treat women fairly?

16       MS. KIRKPATRICK:  Objection.

17   A  We were on the leadership team and we discussed all kinds

18   of business things and never had any reason to believe that she

19   felt otherwise.

20   Q  As far as you know, she never made a complaint about you?

21   A  As far as I know.

22   Q  Michelle Priest, who is she?

23   A  She's an HR representative.

24   Q  And did you work with her?

25   A  Yes.

Page 20

1   Q  In her capacity as an HR rep?

2   A  Yes.

3   Q  Did she support your groups?

4   A  Yes.

5   Q  When?

6   A  I think she was there when I got to the Pennsylvania asset

7   so that would have been 2014, and at some point, she

8   transferred out.  I'm not sure of the date of that.

9   Q  Before you retired?

10   A  Yes.

11   Q  Do you recall the year?

12   A  No.

13   Q  And then another HR rep took over?

14   A  Yes.

15   Q  Who was that?

16   A  I'm thinking it was Natalie.  I don't remember her last

17   name.

18   Q  During your time in Appalachia though, the only HR support

19   you had was Michelle Priest and then Natalie?

20   A  Correct.

21   Q  What about Michelle Priest makes you think she would

22   testify that you treated women fairly?

23   A  Similar to --

24       MS. KIRKPATRICK:  Objection.

25   A  Okay.  Similar to Andrea on the leadership team for our

5 (Pages 17 to 20)

Page 21

1    asset that Mike Dewitt led and, again, along the same lines
2    with Andrea. We talked about a number of leadership things and
3    I don't believe there was ever any issues that she raised.
4        Q    Do you think that Natalie would testify under oath that
5    you treat women fairly?
6            MS. KIRKPATRICK: Objection.
7        A    I have no idea.
8        Q    Other than Michelle and Natalie, did you have HR support
9    from any other employees in supervisory roles during your
10   employment at Shell?
11       A    Yes.
12       Q    Who?
13       A    Erin, I can't remember her last name, while I worked in
14   Pinedale, Wyoming.
15       Q    So what years are we talking?
16       A    2012 to 2014.
17       Q    Anyone else?
18       A    I don't remember any other HR people, no.
19       Q    And, I'm sorry, you said you don't remember Erin's last
20   name?
21       A    No.
22       Q    Do you think she would testify under oath that you treat
23   women fairly?
24       A    Yes.
25            MS. KIRKPATRICK: Objection.

Page 22

1        Q    How come you didn't mention her?
2        A    Because I didn't remember her at the time.
3        Q    What about your interactions with her makes you think she
4    would testify to that?
5            MS. KIRKPATRICK: Objection.
6        A    She worked with me as the asset manager for -- or excuse
7    me -- operations manager for the Pinedale asset while I was
8    there, again, on the leadership team and I don't recall any
9    issues.
10       Q    Now I think you said you reported functionally to Susan
11   Walker but not administratively; is that right?
12       A    Right.
13       Q    Can you explain what that means?
14       A    So she was responsible for the project. I was responsible
15   for delivering technical aspects of that project. So she had
16   overall financial safety, anything that went -- you know, she
17   was accountable for the entire project and I was responsible
18   for part of it.
19       Q    But when you say administratively, did she do your
20   performance reviews?
21       A    No.
22       Q    Did she decide whether or not you were going to get a
23   salary increase or a bonus?
24       A    No.
25       Q    Would you go to her and complain or talk to her about

Page 23

1    personnel issues or issues you had with your employment at
2    Shell other than the specific project?
3        A    No. Susan Walker?
4        Q    Mm-hmm.
5        A    No.
6        Q    And that's what you meant by you reported to her
7    functionally and not administratively?
8        A    Right. I was responsible to her to deliver the project
9    that she was responsible for or accountable for.
10       Q    Got it. Did you ever report to a female during your
11   employment at Shell?
12       A    Not that I recall.
13       Q    Did you ever hire a woman during your employment at Shell?
14       A    I guess I need to understand what you mean by hire.
15       Q    Sure. Were you ever involved in the decision to hire a
16   female employee during your employment at Shell? Bring them
17   into the company?
18       A    I was involved throughout the years in interviews of both
19   men and women into a variety of roles within the organization.
20       Q    Were you ever responsible for making a decision to hire a
21   female employee during your employment at Shell?
22       A    No.
23       Q    How about promoting a female, were you ever -- did you
24   ever make the decision to promote a female employee?
25       A    It would have been part of my job scope for female

Page 24

1    employees within our -- female employees within the
2    organization, yes.
3        Q    Meaning that you would have had input into the decision or
4    you would have been the decision-maker?
5        A    Input.
6        Q    But you were never the decision-maker; you just gave your
7    thoughts or feedback?
8        A    Correct.
9        Q    What's the highest level position that you can recall
10   having input into regarding a promotion of a female employee?
11   In other words, what's the highest level position that that
12   female employee was being considered for that you had input in?
13       A    When you say hiring, do you mean bringing in from the
14   outside or do you mean transferring from within the
15   organization?
16       Q    Well my question was about promotion but we can talk about
17   hiring. So let's talk about hiring from the outside. We'll
18   break it down.
19            Do you recall the highest level of position that a female
20   employee was hired into that you had input in?
21       A    No.
22       Q    How about transfer from the inside?
23       A    I don't recall details.
24       Q    How about promoting?
25       A    Not specifics, no.

6 (Pages 21 to 24)

## Page 25

1    Q   You're aware that part of Jesse Barnes' complaint that has
2   resulted in this case is that she was discriminated against
3   based on the fact that she is a woman and then retaliated
4   against when she complained?
5    A   As you say, yes.
6    Q   You're aware that's generally the nature of her complaint?
7    A   Yes.
8    Q   Other than that, are you aware of any other complaints of
9   sex discrimination or sexual harassment that have been made by
10  female employees during your employment at Shell?
11   A   No.
12   Q   During your employment at Shell, did you undergo any
13  training that the company provided on EEO laws or
14  anti-discrimination and anti-harassment?
15   A   Yes.
16   Q   You know what I mean when I say EEO?
17   A   Yes.
18   Q   Before your retirement on December 31, 2017, when was the
19  last time that you underwent that kind of training?
20   A   I can't remember that.
21   Q   Do you remember whether it was a year or two years before?
22   A   I believe those were annually, but I don't remember any
23  specifics.
24   Q   As you sit here today, do you believe that you underwent
25  that kind of training annually during your employment, or you

## Page 26

1   can't recall?
2    A   I was part of a road show to deliver some of this
3   training.
4    Q   When was that?
5    A   Again, I think it was -- I don't remember.  I can't
6   remember for sure.
7    Q   Do you remember the year?
8    A   No.
9    Q   Do you remember if it was a year or two years or however
10  many years before your retirement, or no idea?
11   A   Well I was only there for two years, so at some point we
12  did that during that two years.
13   Q   This is when you were at Appalachia?
14   A   Yes.
15   Q   Between 2014 and 2017?
16   A   Yes.
17   Q   You can't pinpoint it any further than that?
18   A   No.
19   Q   Do you recall if was the year of your retirement, or you
20  really have no idea?
21   A   I can't remember.
22   Q   Who else was part of the road show?
23   A   Michelle Priest.  I think there was another HR person
24  named Ria, R I A.  Steve Craig gave a presentation or a piece
25  of the presentation.  I don't remember anybody else.

## Page 27

1    Q   And where was the road show done?
2    A   In Wellsboro and in Bradford, and it would have also been
3   delivered to where our technical people were.  And at some
4   point, the Pittsburgh office closed and moved to Houston and I
5   don't remember where they were at the time we did it.
6    Q   Do you know why the decision was made to do a road show at
7   that -- whenever that was sometime between 2014 and 2017?
8    A   Do I remember?
9    Q   Mm-hmm.
10   A   Why?
11   Q   Yeah.
12   A   No.
13   Q   And did you know if that was typical to do a road show
14  about that kind of training or that was unusual?
15   A   I don't have any idea.
16   Q   Do you remember if the road show was done in connection
17  with or as a result of the complaints that Jesse Barnes made
18  about Will Turney and others?
19   A   I don't think so but I don't remember for sure.
20   Q   Was the road show specifically EEO anti-discrimination?
21   A   No.  It was all kinds of.
22       COURT REPORTER: Wait until she finishes.
23   A   Sorry.  I'm sorry.
24   Q   It happens.  We'll remind you.  Go ahead.
25   A   Ask the question again.

## Page 28

1    Q   Sure.  Was the road show just the EEO anti-discrimination
2   training or was that just part of it?
3    A   It was part of it.
4    Q   What was the road show?
5    A   Safety, reporting environmental leaks, that kind of thing.
6   Life-saving rules.
7    Q   Basically anything having to do with being employed at
8   Shell?
9    A   Yes.  Well not anything, but the specific things that we
10  talked about, yes.
11   Q   And do you remember what you presented?
12   A   No.
13   Q   All right.  Other than that, during your time at
14  Appalachia between 2014 through 2017, do you remember
15  undergoing any training, any training at all during that time
16  period from the company?
17   A   I thought you already asked that question but.
18   Q   Not specifically.
19   A   Okay.  Ask the question again.
20   Q   Sure.  During your time at Appalachia, so we're talking
21  2014 through the end of 2017, did you undergo -- not present
22  but were you -- did you attend any training that the company
23  provided on any topic?
24   A   Yes.
25   Q   What?

Page 29

1    A   I don't remember.
2    Q   During your employment at Shell, did you ever refer to a
3    female as a bitch?
4    A   Nope.
5    Q   Have you ever referred to a female employee as a bitch?
6    A   No.
7    Q   Ever?
8    A   No.
9    Q   Have you ever heard a male employee at Shell refer to a
10   woman as a bitch?
11   A   No.
12   Q   Did you ever go to a strip club with any Shell employees
13   or contractors or vendors?
14   A   No.
15   Q   Have you ever heard anyone who did?
16   A   Possibly when I first started.  I don't remember any
17   specifics.
18   Q   You just remember you possibly heard that but you can't
19   remember anything about what you possibly heard?
20   A   That's correct.
21   Q   Did you ever make a comment about a female employee or a
22   contractor or a vendor's body during your employment at Shell?
23   A   No.
24   Q   Did you ever hear a male employee at Shell make a comment
25   about a female employee or contractor or a vendor's body while

Page 30

1    you were employed at Shell?
2    A   Say that again.
3    Q   Sure.  Did you ever hear a male employee at Shell comment
4    on the body of a female employee, vendor or contractor during
5    the time --
6    A   Not that I recall.
7    Q   -- that you were employed at Shell?
8    A   No.
9    Q   Did you ever hear -- did you ever talk about sex at work
10   or a work-related event during your employment at Shell?
11   A   No.
12   Q   Did you ever hear a male employee talk about sex?
13   A   No.
14   Q   Ever hear a rumor that Will Turney had relationships with
15   female employees at Shell?
16   A   No.
17   Q   Who's Robin Grouette?
18   A   She was my predecessor.
19   Q   In Appalachia?
20   A   Mm-hmm.
21   Q   Yes?
22   A   Yes.
23   Q   Sorry.  That's another instruction I didn't give you but
24   just for the sake of the written record, you have to respond
25   affirmatively or negatively, whatever the answer is.

Page 31

1    Did you ever hear that she and Will Turney had a
2    relationship?
3    A   No.
4    Q   Did you ever hear any rumors that any male employees at
5    Shell had relationships with female employees?
6    A   I don't know how I can answer that question.
7    Q   Why?
8    A   It seems pretty ambiguous, doesn't it?
9    Q   No.  I don't think so.
10   A   Ask the question again.
11   Q   Sure.  Did you ever hear any rumors that male employees at
12   Shell had relationships with female employees?
13   A   Some employees were married to female employees.  I
14   mean, I don't recall any specifics about that, no.
15   Q   Did you ever hear any rumors that male employees had
16   relationships with -- and I'm talking obviously romantic sexual
17   relationships with female subordinates?
18   A   No.
19   Q   During your time at Appalachia, you were operations
20   manager?
21   A   Yes.
22   Q   Were you the highest level employee at the Appalachia
23   location or group?
24   A   Physically housed there, yes, for operations.
25   Q   I'm going to show you hopefully on your screen is a copy

Page 32

1    of Jessie Barnes' court complaint and if you go to the first
2    page of this document, you can take your time and scroll
3    through whatever you need to do.  I just need to know if you've
4    seen it before.
5    A   What's the first page that's up?  I'm on Page 14.
6    Q   Yeah.  You can scroll.
7    A   I don't know how to do this machine.
8        (Exhibit P 7 introduced.)
9    Q   So this is the first page of Ms. Barnes' court complaint.
10   Have you seen this before?
11   A   No.
12       MS. KIRKPATRICK:  Let me just ask when you scroll on
13   his, does it automatically scroll on mine too?
14       MS. GURMANKIN:  I don't know.
15       THE WITNESS:  Yeah, that's the same thing.
16       MS. KIRKPATRICK:  I did it but.  Okay.  I just want
17   to make sure that --
18       MS. GURMANKIN:  I'll be sure to be clear and let you
19   know where I am.
20   BY MS. GURMANKIN:
21   Q   All right.  So if you go to Page 7.  I'll help you with
22   this.  You see paragraph 28.
23       MS. KIRKPATRICK:  Oh, so it's Page 6.
24       MS. GURMANKIN:  Sorry.  I thought it was 7.
25   Q   So this is P 7, Exhibit P 7, Page 6 of the complaint,

8  (Pages 29 to 32)

Page 33

1  Paragraph 28.  Do you see where I am?
2  A  Yes.
3  Q  Okay.  So it says, Defendants have subjected Plaintiff to
4  sex discriminatory conduct including but not limited to the
5  following:  Subparagraph A, At an outdoor work event, several
6  male supervisors and male co-workers asked Plaintiff why she
7  was not wearing shorts and asked Plaintiff if attorney could
8  cut her pants into shorts.
9      Did I read that correctly?
10  A  You read it, yes.
11  Q  Okay.  If that allegation is true that that actually
12  happened, do you agree that that would violate Shell's EEO and
13  anti-discrimination policy?
14  A  I have no idea how to answer that question.
15  Q  Why not?
16  A  What's the context of it?
17  Q  Does it matter?  I'm asking just based on what that says,
18  is that in and of itself -- if that's true, is that a violation
19  of Shell's policies?
20  A  I can't make that determination.
21  Q  Why not?
22  A  That's not my role.  That was not my role.
23  Q  Okay.  So despite the fact that you took training on EEO
24  and anti-harassment issues during your employment at Shell, you
25  can't answer that question; is that correct?

Page 34

1  A  That's correct.
2  Q  Okay.  If you look through the rest of Paragraph 28,
3  there's several subparagraphs, and I can change the page
4  numbers if you need me to.
5  A  No, that's okay.
6  Q  If you can go through and read through the entire
7  paragraph and let me know when you're done.
8      MS. KIRKPATRICK:  All of those sub bullets A?
9      MS. GURMANKIN:  Mm-hmm.
10      MS. KIRKPATRICK:  My computer isn't scrolling.  Is it
11  just Page 6 that you're having him look at?
12      MS. GURMANKIN:  Yes.
13      THE WITNESS:  I'm still on Page 6.
14      MS. GURMANKIN:  If you go here, you can put in the
15  page number.
16      MS. KIRKPATRICK:  Okay.
17  A  And how do I get to another page or is that the last one?
18  BY MS. GURMANKIN:
19  Q  No, it's not.  You see that number sign up there, if you
20  hit that, you can put in the next page.
21  A  Okay.  So it would be Page 8 then because this says Page
22  7.
23  Q  Yes.
24  A  And then what do I do?
25  Q  You just hit return.

Page 35

1  A  Return.
2      (Brief interruption.)
3  A  How many pages are there?
4  Q  A few.  Through Page 10 of the complaint.
5  A  Okay.
6  Q  The number at the bottom of the page.
7  A  Okay.  I finished reading.
8  Q  So you have gotten through Subparagraph CC?
9  A  Yes.
10  Q  Okay.  So my question is the same as it was for
11  Subparagraph A.  Are you unable to answer the question as to
12  whether Subparagraphs B through Double C violated company
13  policy the same way you were unable to answer that question
14  regarding Subparagraph A?
15  A  Yes, that's what I would say.
16      MS. KIRKPATRICK:  Objection.
17  Q  Are any of these allegations new to you?
18  A  Yes.
19  Q  In other words, have you heard of any of them before?
20  A  Not really.
21  Q  When you say not really, are there any that you are?
22  A  The hot blonde item I saw in the exhibit.
23  Q  When you were preparing for your deposition?
24  A  Yes.
25  Q  Before you prepared for your deposition, were you aware of

Page 36

1  any of these allegations?
2  A  Not that I recall.
3  Q  So let me go back to your employment at Shell.  We'll go
4  through your initial years pretty quickly.  But when you
5  started in '84, can you remember what location you were?
6  A  Wood River Manufacturing Complex in Wood River, Illinois.
7  Q  And what position did you start in?
8  A  I was a mechanical engineer.  Position title was associate
9  engineer.
10  Q  About how long did you hold that position approximately?
11  A  Four years.
12  Q  So talking around '88?
13  A  Probably, yeah.
14  Q  And I know we're approximating.
15  A  Yeah, four or five years.
16  Q  All in Wood River, Illinois?
17  A  Yeah.
18  Q  And then what happens in around '88?
19  A  I got promoted to inspection supervisor.
20  Q  Where?
21  A  Same place.
22  Q  Is that a position that you had applied for?
23  A  Yes.
24  Q  Were you interviewed?
25  A  I don't recall.

Page 37

1    Q    But you were selected for promotion?
2    A    Yes.
3    Q    And about how long did you hold that position?
4    A    Another five years.
5    Q    So in around 1983?
6    A    Yes.
7    Q    All in Wood River?
8    A    Yes.
9    Q    And then what happened in about 1983?
10   A    I transferred to Houston.
11   Q    In what position?
12   A    I'm trying to remember what the title was.  It was still a
13   mechanical engineering role.  What was the title?  It was an
14   individual contributor role.  I don't remember what the title
15   was.
16   Q    What do you mean by individual contributor role?
17   A    I had no direct reports.
18   Q    Had you had direct reports as an inspection supervisor?
19   A    Yes, I did.
20   Q    And associate engineer?
21   A    No.
22   Q    So about how long did you hold the mechanical engineering
23   role in Houston?
24   A    About five years.
25   Q    All in Houston?

Page 38

1    A    Yes, all in Houston, supporting projects across the
2    country.
3    Q    But based in Houston?
4    A    Yes.
5    Q    Then what happened in around 1988?
6    A    At some point -- let me get this right -- I moved to Norco
7    Manufacturing Complex to lead the assurance part of our project
8    as the construction assurance manager.
9    Q    Was that a promotion for you?
10   A    Yes, that was.
11   Q    I'm sorry.  I don't think I asked that about the
12   mechanical engineering role in Houston.  Was that a promotion
13   for you?
14   A    I don't remember if that was a promotion or not.  It
15   didn't need to be but I don't remember.
16   Q    And the Norco role, where was that?
17   A    In -- it's by New Orleans.
18   Q    Did you have direct reports in that position?
19   A    Yes.
20   Q    About how long did you hold that role?
21   A    I think about two years.
22   Q    In New Orleans?
23   A    Yes.
24   Q    What happened in around 2000?
25   A    I took the same role at the Geismar Chemical Plant which

Page 39

1    was 30 miles further up the Mississippi river.
2    Q    Still with direct reports?
3    A    Not the same ones.
4    Q    But different ones?
5    A    I had different ones, yes.
6    Q    Is that a lateral move or promotion?
7    A    That was lateral.
8    Q    Why did you take that one?
9    A    The project -- the second project at Norco was not
10   approved and I needed to go work somewhere and they had a
11   project at Geismar that they needed construction assurance
12   manager for, so I fit that role and I didn't have to move.
13   Q    About how long did you work at Geismar?
14   A    Until 2001 I think, or maybe it was a little bit later
15   than that that.  I was in the construction assurance manager
16   role for about another five years.
17   Q    And then what happened in around 2001?
18   A    It might have been 2003, but somewhere in that timeframe I
19   moved to the Netherlands as an asset integrity assurance lead,
20   I think was the title.
21   Q    Promotion?
22   A    Yes.  That one was a promotion.
23   Q    Did you have direct reports in that role?
24   A    Not initially.
25   Q    At some point?

Page 40

1    A    At some point I did, yes.
2    Q    How long did you hold that role in the Netherlands?
3    A    It was fairly short, so, say, a year and a half.
4    Q    And then what happened?
5    A    I moved into the same -- I was in the same department and
6    I took a leadership -- a bigger larger leadership role in that
7    department.
8    Q    Was that an official promotion, or you just took over?
9    A    It was not a promotion.  It was a lateral move from what I
10   was doing into a larger department.
11   Q    Still in the Netherlands?
12   A    Still in the same location, yes.
13   Q    And after -- and about how long did you do that?
14   A    The whole time I was in the Netherlands was about five
15   years.
16   Q    So when you've done that, are we talking sometime in the
17   2007?
18   A    2008.
19   Q    2008?
20   A    Yeah.  2008 timeframe, that's when we moved back to the
21   US.
22   Q    And then what did you do?
23   A    The same job.
24   Q    Where?
25   A    It was a -- I had an office so I could go in and update my

Page 41

1 computer for software things and whatnot in Houston but it was
2 -- I was on the road.  It was a road job.  I traveled all
3 around the world.
4 Q Did you have direct reports?
5 A In that job, no.
6 Q And about how long did you do that?
7 A I did that until 2012.
8 Q Is that when you went to Pinedale?
9 A Yes.
10 Q That's in Miami?
11 A Yes.
12 Q And what position did you take there?
13 A Operations manager.
14 Q Is that the highest -- I'm sorry.  Go ahead.
15 A I thought of another female.  Elise Tjong.  Her last name
16 is spelled I think T J O N G.  And it was Elise so it's a Dutch
17 name so it's spelled E L I S E but she called herself Elise.
18 Q When you say another female, is that someone you think
19 would testify that you --
20 A Yes.  You said if I had thought of a person to bring them
21 up at any point.
22 Q Sorry.  I know it's hard but you just have to try to let
23 me finish.
24 A Okay.  I'm sorry.
25 Q It's okay.  It's okay.  So this is someone that you think

Page 42

1 would testify that you treated women fairly?
2 A Yes.
3 Q You worked with her while you were in the Netherlands?
4 A Yes.
5 Q Do you have any idea if she is still at Shell?
6 A I do not.
7 Q What's your basis for believing that she would testify
8 that you treated women fairly?
9  MS. KIRKPATRICK:  Objection.
10 A Okay.  She joined the team that was being formed around me
11 to work on this global program to assess assets within our
12 entire company, the integrity of those assets.
13 Q And what about that leads you to believe that she would
14 testify that you treated women fairly?
15 A Because I treated her fairly.  I don't know.  I had a good
16 relationship with her.
17 Q Do you know if she is still at Shell?
18 A I do not know that.
19 Q Was she there when you left the Netherlands?
20 A I do not know that because I was in a different role when
21 I left the Netherlands.
22 Q During what time period did you interact with her or work
23 with her?
24 A 2004 to 2007 timeframe.
25 Q All right.  So I think we had just gotten in your

Page 43

1 employment history to 2012 when you started working at the
2 Pinedale, Wyoming asset?
3 A In May of 2012.
4 Q And I'm sorry.  You said that was the operations manager?
5 A Operations manager.  That was a lateral move.
6 Q And that was the highest level position at Pinedale?
7 A In the office, yes.
8 Q Who did you report to in that position?
9 A Dave Todd initially who was vice president and then
10 Richard Newsome.  At some point Dave Todd either resigned or
11 retired or I'm not sure what but he was no longer working for
12 Shell.  Then I worked for Richard Newsome who was his
13 replacement.
14 Q Did you report to Newsome throughout the remainder of your
15 time in Pinedale?
16 A Yes.  We would that asset and at some point all the staff
17 was either being absorbed into the new company that bought us
18 or being transferred elsewhere, and I'm not sure exactly when
19 Richard moved on.
20 Q Would it surprise you if there were females who worked in
21 Pinedale when you were the operations manager there who would
22 testify that you said belittling and demeaning comments to
23 them?
24 A No.
25  MS. KIRKPATRICK:  Objection.

Page 44

1 Q That would not surprise you?
2  MS. KIRKPATRICK:  Objection.
3 A Excuse me.  Can you rephrase the question.
4 Q Sure.  Would it surprise you if there were women who
5 worked in Pinedale when you were the operations manager there
6 who would testify that you made belittling and demeaning
7 comments to them?
8  MS. KIRKPATRICK:  Objection.
9 A I would be very surprised.
10 Q Because you did not do that?
11 A That's correct.
12 Q Did you -- when the asset was sold, did you help the
13 employees get placements either into the new company or
14 elsewhere within Shell?
15 A Every single person at Pinedale that worked for me had an
16 opportunity to work for Shell, so yes.
17 Q And how did that opportunity come about?  I mean, did they
18 have the opportunity to apply?  Were they offered positions?
19 A Yes, and there were a number of different things that came
20 up.  There were -- HR was working to look for assets that
21 needed staff.  People were given their own decisions on what
22 way they wanted to go and we tried to accommodate those as best
23 as possible.
24 Q Do you know if there were any Pinedale employees for whom
25 alternate employment was not found as a result of the sale?

11 (Pages 41 to 44)

Page 45

1   A   One I think.

2   Q   Do you remember who that was?

3   A   I remember his role was a control room operator in our

4   south -- in the south part of the asset but I don't remember

5   his name, no.

6   Q   And why wasn't a position found for him?

7   A   I don't remember.

8   Q   When you were operations manager, did you see any conduct

9   go on at the Pinedale asset that involved male supervisors

10  engaging in inappropriate conduct towards female employees?

11  A   No.

12  Q   Did anyone ever mention that to you?

13  A   Mention what to me?

14  Q   That there were male supervisors or male employees were

15  engaging in inappropriate conduct towards female employees?

16      MS. KIRKPATRICK:  Objection.

17  Q   Or something to that effect?

18      MS. KIRKPATRICK:  Objection.  You can answer.

19  A   Okay.  It's hard to describe the situation, I mean, things

20  that happen in offices.  There was a restraining order that was

21  filed by a female admin against a male operator and his wife

22  over threats that she would be killed.

23  Q   Do you remember when this was?

24  A   No, not specifically, but while I was there.

25  Q   Who was the female admin?

Page 46

1   A   Katie Rutherford.

2   Q   And the male operator?

3   A   Kirby Peterson.

4   Q   Did you only become aware of this issue when Rutherford

5   filed the restraining order?

6   A   No.

7   Q   You were aware prior to that?

8   A   Yes.

9   Q   How did you become aware?

10  A   I was in my office on a Sunday.  The office was empty.

11  She came in and told me the story.

12  Q   And what do you recall her telling you?

13  A   That she had been threatened by the operator's wife and I

14  don't remember a whole lot of details.

15  Q   Do you remember anything else she told you other than she

16  had been threatened by the operator's wife?

17  A   That's what she was upset about and I don't remember

18  details.

19  Q   And did you do anything after she brought that to your

20  attention?

21  A   Called my boss.

22  Q   Was that Newsome or Todd at the time?

23  A   Newsome.

24  Q   You called him on that day?

25  A   Yes.

Page 47

1   Q   Tell me about your conversation with him.

2   A   I told him what I heard.  I don't remember details.

3   Q   And what happens next that you are aware of in connection

4   with that situation?  Rutherford talks to you, you call

5   Newsome.  Does anything happen after that?

6   A   I contacted HR.

7   Q   Was that Erin or someone else?

8   A   Erin.

9   Q   Are we still talking that Sunday?

10  A   I don't know if I had her mobile number or not.

11  Q   So it may have been --

12  A   It would have been as soon as I could contact her, I did.

13  Q   And was that something that Newsome directed you to do as

14  a result of your phone call with him?

15  A   Yes.

16  Q   Did he tell you to do anything else?

17  A   I don't remember.

18  Q   All right.  Do you recall anything about your conversation

19  with Erin about this issue?

20  A   No.

21  Q   Do you recall anything that happens in connection with

22  this situation after your conversation with Erin?

23  A   No.

24  Q   At some point after this, Rutherford files for a

25  restraining order against Peterson and his wife?

Page 48

1   A   Yes.

2   Q   And do you recall how long approximately that was after

3   she came to you on that Sunday?

4   A   A couple weeks maybe.  I don't know.

5   Q   Was anything done in the interim approximate

6   couple-week-long period by Shell that you are aware of?

7   A   Not that I can recall or not that I remember.  I don't

8   remember the details.

9   Q   Did you do anything to follow up with Katie after your

10  conversation with Newsome and Erin?

11  A   Did I do anything?  Say that again.

12  Q   Sure.  Did you follow up with Katie after you talked to

13  Newsome and Erin?

14  A   Her office was right next to mine so I'm sure at some

15  point I talked to her.  I don't remember any details.

16  Q   Are you guessing or do you specifically recall following--

17  A   I'm guessing.

18  Q   Let me just finish my question.

19  A   Sorry.

20  Q   It's okay.  Do you specifically recall following up with

21  her specifically about this situation that she tells you about

22  after you talked to Newsome and after you talked to Erin?

23  A   No.

24  Q   And how did you find out about the restraining order?

25  A   She told me.

1    Q    Rutherford?
2    A    Mm-hmm.
3    Q    Yes?
4    A    Yes.
5    Q    Did you do anything when she told you about that?
6    A    No.
7    Q    Did you tell anyone at Shell?
8    A    No, not that I recall.
9    Q    How come?
10   A    It had nothing to do with other than being two Shell
11   employees.  Nothing happened as far as I knew during Shell
12   hours on the payroll, with Shell devices, Shell phones.  This
13   was a thing that happened in the community.
14   Q    How was the threat made, did she tell you that, by
15   Peterson's wife against her?
16   A    How was the threat made?  I don't know.
17   Q    Do you know why she got a restraining order against
18   Peterson and his wife if the threat was made by his wife?
19   A    No.
20   Q    Did you ask her?
21   A    No.
22   Q    Did you ask her if Peterson did anything to her?
23   A    No.
24   Q    Do you know if anyone at Shell asked her that?
25   A    I don't know.

1    Q    After the conversation when Rutherford tells you about the
2    restraining order, did you have any other communications with
3    Rutherford about this issue?
4    A    Not that I recall.
5    Q    And did Peterson remain employed during this period?
6    A    Yes.
7    Q    Did you ever have any conversations or communications with
8    him about this issue?
9    A    No.
10   Q    Do you know if anyone did from Shell?
11   A    I don't know.
12   Q    Do you recall any other conversations or communications
13   with Newsome or Erin about this issue other than the initial
14   conversation?
15   A    I don't recall any other conversations.
16   Q    And both Rutherford and Peterson remained employed at the
17   Pindale asset after this situation came up?
18   A    Yes.
19   Q    How long did Rutherford remain employed?
20   A    Until he sold the asset.
21   Q    Then what happened to her?
22   A    She took an HR job with a competitor in the region.
23   Q    Do you remember who it was?
24   A    No.
25   Q    But it was a competitor within the Pindale --

1    A    Pinedale area, yes.
2    Q    Do you recall if an opportunity -- or anyone tried to do
3    anything to find an opportunity for her at Shell before she
4    resigned?
5    A    I don't think she resigned.  We closed the asset and
6    people moved on.
7    Q    I'm sorry.  I may have misunderstood you but I thought
8    there was only this one guy who was the only Pinedale employee
9    not to get another opportunity?  The name --
10   A    So when you said other opportunity, did they remain
11   employed with a company that we arranged and/or did they
12   transfer to the new company, there was only one person.  So
13   people were on their own to do what they needed to do to find
14   employment and she found employment elsewhere.
15   Q    Was she the only one in the asset to find employment other
16   than with the new company or elsewhere within Shell?
17   A    I don't think so.
18   Q    Can you think of anyone else?
19   A    No.
20   Q    So she did resign to take this job with the competitor?
21   A    I don't know if she waited until the very end and left and
22   then took the job.  I don't remember.
23   Q    Do you know if she got a severance package in connection
24   with the asset closing?
25   A    I don't know.

1    Q    And what happened to Peterson?
2    A    At some point he lost his job.
3    Q    Before the asset was sold?
4    A    Yes.
5    Q    Why?
6    A    He was not working.  We were told I believe that we could
7    only communicate with him through his lawyer and we told his
8    lawyer that he needed to show up to work, and if he didn't, he
9    would be terminated.  He didn't show up to work and he was
10   terminated.
11   Q    Do you recall how long this is after the conversations
12   that Rutherford has with you about the threat from his wife and
13   the restraining order?
14   A    Months.
15   Q    So at some point Peterson just stopped showing up to work,
16   right?  Is that it?
17   A    He was off work for -- I don't remember the details.  He
18   was not working.
19   Q    Did he go on leave?
20   A    We had a weird shift schedule there so people were on for
21   weeks.  Then they were off for weeks.  I don't remember the
22   details.
23   Q    Okay.  So you don't remember if there was some point where
24   he just abandon his job or whether he was on leave?
25   A    He didn't come into his job.

13 (Pages 49 to 52)

Page 53

1    Q    For scheduled shifts?
2    A    For his scheduled shifts that was reported to his lawyer.
3    Q    So I'm sorry.  How did you know he had a lawyer?
4    A    Somebody told us that we needed -- the only way management
5    could talk to Kirby was through his lawyer.
6    Q    Do you know why he had a lawyer or why he --
7    A    I have no idea.
8    Q    So do you ever communicate directly with the lawyer?
9    A    No.
10   Q    Do you know who did?
11   A    No.
12   Q    So at some point someone from -- that you're aware of
13   someone from Shell communicates with the lawyer and says
14   essentially if he doesn't show up he'll be terminated?
15   A    Mm-hmm.
16   Q    Yes?
17   A    Yes.
18   Q    And you don't remember who you heard that from?
19   A    No.
20   Q    And he didn't show up and then he was terminated?
21   A    Yes.
22   Q    And you don't know any other details or you can't recall
23   any other details?
24   A    No.
25   Q    Do you remember if you knew them at the time and you just

Page 54

1    can't remember or you don't think you --
2    A    I don't remember the situation.
3    Q    Any other situations in Pinedale during the time that you
4    were operations manager where you became aware that there were
5    complaints of inappropriate conduct or something along those
6    lines?
7    A    No complaints.
8         MS. KIRKPATRICK:  Objection.
9    Q    Any inappropriate conduct that you were aware of even if
10   there weren't complaints about it during the time that you were
11   office manager in Pinedale?
12   A    No.
13   Q    All right.  So the asset closed and what happens to you?
14   A    I stay there for as long as I can and then I move to
15   Appalachia.  When that job is open for me, I take the job in
16   Appalachia.
17   Q    And this is the operations manager job in Appalachia?
18   A    Yes, a lateral transfer.
19   Q    Same job you held in Pinedale?
20   A    Yes.
21   Q    Was there a period of time when you were in Appalachia but
22   you weren't working in that job?  In other words --
23   A    Say that again.
24   Q    Sure.  Did you move to Appalachia before the office
25   manager job in Appalachia was available?

Page 55

1    A    No.
2    Q    So you came and you immediately stepped into that
3    position?
4    A    I had never stepped in Pennsylvania ever before I moved
5    into that job.
6    Q    Okay.  When you came here, that job is available and you
7    have been picked for it?
8    A    Yes.
9    Q    Was that something that you had applied for?
10   A    I think it was part of the Pinedale closing.  Looking for
11   opportunites for people to move, that was an opportunity for
12   me, and Robin Grouette's scheduled role was she was ready to
13   move to something else.
14   Q    Do you know why she was leaving?
15   A    No.
16   Q    Did you interact with her at all to transition?
17   A    I had about a one-week transition, I think two days in the
18   field where we toured the site.  She introduced me to people.
19   I got to see parts of the asset and that was about it.
20   Q    Am I correct that approximately you had about 25 years at
21   least as a supervisor at Shell where you held a supervisory
22   role?
23   A    That's an overstatement.  So the first five years were no.
24   It was like a five-year thing.  First five years were no.  Next
25   five years yes.  Next five years no.  Next five years yes, so

Page 56

1    and it just kind of goes on that.  So roughly half my career I
2    had direct reports in supervisory capacity.
3    Q    Is around 18 years fair?
4    A    Yes.
5    Q    Okay.  And the office manager was one of those supervisory
6    roles?
7    A    Yes.
8    Q    So when you came to Appalachia to start as office manager,
9    that's 2014?
10   A    Appalachia operations manager, yes, in 2014.
11   Q    Do you remember when?
12   A    I think I officially took the job on December 1st, 2014.
13   Q    Was the transition before the official start date?
14   A    Yeah.  Thanksgiving was in there.  I don't remember the
15   details but it was a fast turnover, yes.
16   Q    All right.  So when you come in December of 2014, who were
17   your direct reports?
18   A    Trevor Winter.  Chris Anderson.  The admin in the office
19   in Pittsburgh.  I don't remember her name.  There was another
20   technical guy that was the -- so Trevor was the Wells technical
21   guy and the other guy -- oh my God, how can I not remember his
22   name?  He was the hard side guy, so the prod -- piping
23   projects, pumps, that kind of stuff.  I think that was it.
24   Q    During your time in 2014 through 2017 in Appalachia, you
25   held the office manager role the entire time?

Page 57

1  A  Yes.
2  Q  Did you have any female direct reports?
3  A  Not that I recall.  Oh, I had Penny.  Well the female
4  admin in the -- in Pittsburgh and I can't remember her name and
5  Penny Robins worked for me when I moved to the Wellsboro
6  office.
7  Q  Also in an admin capacity?
8  A  Yes.
9  Q  Other than in an admin capacity, any other female direct
10 reports during your time in Appalachia?
11 A  Not that I recall.
12 Q  As a supervisor at Shell, you understood it was part of
13 your responsibility to make sure that the employees under your
14 chain of command adhered to the company's policies and
15 procedures?
16 A  It was part of my role.
17 Q  And in that capacity, you want to make sure that
18 violations of the company's policies and procedures were not
19 tolerated?
20 A  Yes.
21 Q  When did you first meet Will Turney?
22 A  It was most likely on my tour, on my transitional tour
23 with Robin in November or December of 2014.
24 Q  So that tour would have included the Wellsboro asset?
25 A  Yes.  All of Shell's assets in Pennsylvania.

Page 58

1  Q  So Pittsburgh?  Wellsboro?
2  A  Well Pittsburgh was our office where technical staff were.
3  We had a small operation south of Pittsburgh.  We had a number
4  of properties north of Pittsburgh.  We had a physical operation
5  site in the Bradford area, and then we had the Wellsboro.
6  Q  Was that the case throughout your time in Appalachia?
7  A  It changed.  We sold the stuff south of Pittsburgh.  We
8  sold the stuff in Bradford.
9  Q  Did you ever supervise Turney directly?
10 A  No.
11 Q  Indirectly?
12 A  I don't know what that means.
13 Q  You reported to someone who reported directly to you?
14 A  Yes.
15 Q  Was that Steve Craig that was between you?
16 A  Yes.
17 Q  So do you recall when you started reporting or supervising
18 Turney indirectly?  Was that the whole time you were there?
19 A  It would have been, yes, because initially Will would have
20 reported to Chris Anderson, and then Steve Craig took
21 Chris's job, Will would have reported to Chris -- or to Steve.
22 Sorry.
23 Q  So am I correct that you are not involved in Turney
24 becoming a full-time employee of Shell?
25 A  Nope.

Page 59

1  Q  That is correct?
2  A  That is correct.
3  Q  When did you first meet Jesse Barnes?
4  A  I don't recall.
5  Q  Do you know if that would have been on the tour?
6  A  I don't -- I don't recall.
7  Q  She was hired full-time at Shell in September of 2015.
8  She was a contractor before that.  Were you involved in her
9  being hired full-time?
10 A  She was hired into my department, yes.
11 Q  Were you involved in that decision?
12 A  Not that I'm aware of, no.  Not that I recall.
13 Q  Do you know who was?
14 A  I don't remember.
15 Q  Do you recall any discussions you had about Jesse being
16 hired on a full-time basis?
17 A  Okay.  So you're showing me some documents now.
18         (Exhibit P 44 introduced.)
19 Q  Yes.  I'm showing you what's been marked as Exhibit 44.
20 MS. KIRKPATRICK:  I don't have this one on my screen.
21 I still have the complaint.
22         MS. GURMANKIN:  I'm not sure why it's not working.
23 Do you mind looking at hers for now?
24 Q  So if you can look through this series of emails.
25         MS. KIRKPATRICK:  How many pages is this?

Page 60

1         MS. GURMANKIN:  Four.
2  A  Okay.
3  Q  You have looked through the four pages?
4  A  Yeah.  Yeah.  Oh, there's four pages?
5  Q  Mm-hmm.
6  A  No, I haven't.  I read the first page.  Sorry.
7      Okay.
8  Q  All right.  So on the last page, Page 4, so this is a
9  communication from you to Michelle Priest copying Michael
10 Dewitt and Steve Craig.  Are you talking about conversions from
11 contractors to full-time employees?
12 A  Yes, I am.
13 Q  And then on the third page, there's an email from Steve
14 Craig and he's sending something to you saying, I have reviewed
15 with Hondo.  That's Hondo Blakely?
16 A  Mm-hmm.
17 Q  Yes?
18 A  Yes.
19 Q  And he's saying, Jesse Barnes part of the numbers or not.
20 What did you understand that to refer to?
21 A  Jesse was not in an hourly position all of the other roles
22 were in.  Are you on that page?
23 MS. KIRKPATRICK:  Yeah.
24 A  Are in an hourly, so all the operators and the maintenance
25 people -- all are spelled wrong -- were hourly staff, basically

15 (Pages 57 to 60)

Page 61

1  fieldworkers.
2  Q   And then there's an email from Turney at the top of that
3  page saying what about Jesse.  And if you go to Page 2.
4  There's an email from you.  It's the second from the bottom
5  which says, Steve and Will, Looking at this in the deepest way,
6  Jesse needs to be included as she takes the spot on our overall
7  staff head count.
8      So was that you saying that we need her to be converted
9  from temporary to full-time or from contractor to full-time?
10 A   No.  That was me saying that as far as the staff count
11 numbers, the way we looked at staff count was whether they were
12 hourly or office staff or what or including myself, everybody
13 gets counted as a person and that's what that's in reference
14 to.
15 Q   So you weren't talking at all about performance at that
16 point?
17 A   No.
18 Q   But then there's a response from Craig right above that
19 that says, He's discussed this with Will Hondo and Jesse is the
20 top choice for upcoming maintenance conversion.
21     Do you see that?
22 A   Yes.
23 Q   And you understood at least from their perspective, they
24 were talking about performance?
25 A   Not necessarily performance.

Page 62

1  Q   What then?
2  A   Who they thought the best person to convert at that time
3  would have been in that round of conversion.
4  Q   And what would be the basis of that have been other than
5  performance in her role as a contractor?
6  A   I have no idea.
7  Q   Can you think of any others other than performance in her
8  role as a contractor?
9  A   Business need.
10 Q   Business need is the need to hire someone for that
11 position, right?
12 A   Where the most backlog was.  I don't know.  It could have
13 been a whole bunch of different things I guess.
14 Q   Yeah.  I'm asking the question, business needs you're
15 talking about there's a need to fill a position, put someone in
16 that role, right?
17 A   Yes.
18 Q   When they're talking about top choice, that's the person
19 they have selected as the person they want in that role and
20 that's what you understood them to be telling you, right?
21 A   Not top choice necessarily based on performance but based
22 on need.
23 Q   Well would they -- did you understand that to fill a
24 business need, they would put someone in that position who
25 performed horribly as a contractor?  I mean is that what you

Page 63

1  thought that they would do?
2  A   No.
3  Q   Okay.  You thought that --
4  A   We were trying to hire the best contractors that were
5  good.
6  Q   Right.  And you understood based on that email that they
7  thought that she was the best contractor for the maintenance
8  conversion, right?
9  A   They said it was their top choice.
10 Q   And that's what you understood them to be saying, that she
11 was --
12 A   I don't know what this is actually saying but that's -- I
13 would have understood that Jesse was their top choice.
14 Q   Meaning that she was the best performer -- or strike that.
15 A   Not necessarily the performer.
16 Q   That they wanted someone good in that position and she
17 thought they -- and that they thought based on her performance
18 as a contractor that she would be good to convert into a
19 full-time employee position, I mean, that's what you understood
20 them to be saying?
21     MS. KIRKPATRICK:  Objection.  Asked and answered.
22 You can tell her again.
23 Q   I need you to answer that question.
24 A   Yes.  Ask the question again, please.
25 Q   Sure.  You understood that they believed that she was a

Page 64

1  good performer in the contractor position if they were saying
2  to you she's our top choice for conversion into a full-time
3  position?
4      MS. KIRKPATRICK:  Objection.  Asked and answered.
5  You can tell her again.
6      MS. GURMANKIN:  I haven't asked that question yet.
7      MS. KIRKPATRICK:  Yes, you have.
8      MS. GURMANKIN:  No, I haven't.
9  A   We did not convert individuals that worked for us as
10 contractors that were poor performers.
11 Q   So you understood when they told you she is our top choice
12 for the maintenance conversion that they believed she was a
13 good performer as a contractor?
14     MS. KIRKPATRICK:  Objection.  You can tell her again.
15 Q   That was your understanding?
16     MS. KIRKPATRICK:  Objection.
17 A   Not that she was necessarily a top performerr but that she
18 was from a business needs standpoint needed in our operation.
19 Q   And that she did a good job as a contractor?
20     MS. KIRKPATRICK:  Objection.
21 Q   Because you didn't hire poor performers as contractors
22 into full-time positions at Shell, right?
23     MS. KIRKPATRICK:  Objection.  Keep telling her.
24 Q   Right?
25 A   Correct.

16  (Pages 61 to 64)

1　Q　Up until you find out that Jesse's main complaints about
2　Turney and other employees -- and we'll talk about that in more
3　detail -- did you hear anyone complain about her performance?
4　A　Not that I recall.
5　Q　Or have any issues at all about the way she was performing
6　her job?
7　A　No.
8　Q　As part of your job as operations manager, did you review
9　performance reviews in the Appalachia asset?
10　A　Did I review performance reviews?
11　A　Mm-hmm.
12　A　So --
13　Q　Of other employees that your reports, direct or indirect,
14　were going to deliver to employees, was that part of your job?
15　A　No.
16　Q　You talked to your employees about the performance of
17　their employees, right?
18　A　If issues came up, I talked with them, yes.
19　Q　That would be part of the typical conversation with you
20　engaging as Appalachia operations manager?
21　A　With my Appalachia team, yes.
22　Q　Prior to your learning that Jesse's made complaints about
23　Turney and other employees in the group, did you have any
24　one-on-one interaction with her?
25　　　　MS. KIRKPATRICK:　Objection.

1　A　Did I what?
2　Q　Have any one-on-one interaction with her?
3　A　Not that I remember.
4　Q　Do you recall being in meetings with her even if it's not
5　one-on-one?
6　A　She would have been in the required meetings where, say, I
7　would have been leading a meeting, our monthly meeting, yeah.
8　Q　Do you recall any conversations with her?
9　A　No.
10　Q　How do you find out that she's made complaints about
11　Turney and other employees in the group?
12　　　　MS. KIRKPATRICK:　Objection.　You can answer.　It's
13　misstating the facts but you can answer.
14　A　How did I find out?
15　A　Mm-hmm.
16　A　Rephrase your question again.
17　Q　Sure.　At some point you learned that she's made
18　complaints about Will Turney and other employees in the group,
19　right?
20　　　　MS. KIRKPATRICK:　Objection.
21　A　Okay.　Yes.
22　Q　Okay.　When?
23　A　Steve Craig informed me that there were some issues after
24　he was brought into a session with Will and Jesse.
25　Q　Is that an in-person conversation with Craig that you

1　have?
2　A　Yes.
3　Q　Do you recall when that was?
4　A　No.
5　Q　Does around Thanksgiving of 2016 ring a bell?
6　A　Maybe.　I don't know.
7　Q　You don't recall?
8　A　I don't recall the date or the time.
9　Q　All right.　Where do you talk to Craig, in your office?
10　A　So we shared an office and we had a small cubicle to the
11　side of that.　We probably would have gone into the cubicle.
12　Q　And did he -- was he talking to you specifically about
13　this issue or were you guys talking about stuff going on with
14　the asset and this came up as one issue?
15　A　I don't remember any specifics about the conversation.
16　Q　What do you recall?
17　A　It's hard -- it's hard to remember.　I mean he was
18　reporting that there was an issue with Jesse.
19　Q　What did he tell you?
20　A　I don't remember.
21　Q　So you just remember that he told you there was an issue
22　with Jesse and that's it?
23　A　That's what I remember, yes.　I don't remember much.
24　Q　Do you recall if he told you that she had an issue with
25　Turney or she was making complaints about Turney?

1　A　I would imagine that was the case but I don't --
2　Q　You don't recall?
3　A　I don't recall.
4　Q　Based on the conversation with Craig, do you take any
5　action --
6　A　Yes.
7　Q　-- in connection with what he tells you?
8　A　Yes.
9　Q　What?
10　A　Called HR.
11　Q　Who?
12　A　Would have been Michelle.
13　Q　Priest?
14　A　Yes.
15　Q　With Craig or just you?
16　A　Me.　I don't remember.　I believe it was probably just me.
17　Q　Because that would have been your practice?
18　A　I don't remember.　I don't remember.
19　Q　And do you remember how soon this was after the
20　conversation with Craig?
21　A　Immediately.
22　Q　So is it fair to say that something happens -- or Craig
23　tells you something in the conversation that seriously
24　concerned you that leads you to immediately call HR?
25　A　These sorts of issues were escalated quickly.

## Page 69

1  Q   When you say these sorts of issues, what are you talking
2  about?
3  A   Any issues between what you're describing here.
4  Q   So is it fair to say in that initial conversation that
5  Craig tells you that Jesse's made complaints about
6  inappropriate conduct?
7  A   Possibly, but I don't remember any specifics.
8  Q   But in any case, it was enough to concern you to the point
9  where you knew you needed to call HR right away?
10  A   Yes.
11  Q   All right.  Let's take a break now.
12       VIDEOGRAPHER:  Going off the record at 10:30.
13       (Brief recess.)
14       VIDEOGRAPHER:  We're back on the record at 10:41.
15  Q   Going back to your direct reports for a sec.  Was Camilla
16  -- is it Rechenski?
17  A   That's it.
18  Q   She's the admin in Pittsburgh?
19  A   Yes.
20  Q   Okay.  And who's Darla Hooker?
21  A   You know, I recall the name, but I have no idea who she
22  was.
23  Q   Do you remember her reporting to you at some point?
24  A   No.
25  Q   Okay.  Do you remember what position?

## Page 70

1  A   I would remember that.  I don't know what job she was in.
2  I just remember her name.
3  Q   You would remember if she reported directly to you?
4  A   No.  I remember her name.  I remember that name.  I do not
5  remember that she ever reported to me.
6  Q   Right.  That's what I was clarifying.
7  A   Oh.  Okay.  I just want to make sure.
8  Q   So going back to the conversation you had with Craig where
9  he informs you that there's some issue with Jesse and that
10  causes you enough concern to immediately call Michelle Priest.
11  Tell me about your conversation with Michelle Priest.
12  A   I don't recall the conversation other than it happened.
13  Q   You don't recall anything about it?
14  A   No.
15  Q   Do you recall what happens next in connection with this
16  issue?
17  A   Not specifically, no.
18  Q   How about generally?
19  A   An investigation was going to happen.
20  Q   Do you recall how you became aware of that?
21  A   No.
22  Q   Do you recall anyone else who you talked to initially
23  other than the initial conversation with Craig and the initial
24  conversation with Priest?
25  A   Do I recall talking about this to anybody else?

## Page 71

1  Q   Mm-hmm.
2  A   No.
3  Q   And you don't recall how you learned that an investigation
4  is going to be done?
5  A   No.
6  Q   Let me just clarify something.  It's possible that Craig
7  told you in that initial conversation that Jesse had an issue
8  with Turney and other employees in the group, you just don't
9  recall; is that fair?
10  A   I don't remember.
11       MS. KIRKPATRICK:  Objection.
12  A   I don't remember.
13  Q   Right.  But is it fair to say that he may have told you
14  about that, you just don't remember in that initial
15  conversation?
16  A   I don't know how to answer that question.  Is it possible
17  that the moon crashes into the earth, yes.  I mean --
18  Q   I'm not asking you about that.
19  A   I know you're not.  I don't know how to answer that
20  question.  Ask it -- ask it again.
21  Q   Sure.  Is it possible in that initial conversation with
22  Craig you do recall him telling you that Jesse has had some
23  issues, right?
24  A   Yes.
25  Q   And it's also possible that he told you in that

## Page 72

1  conversation that her issues were regarding the fact that
2  Turney and other employees sexually harassed her?
3       MS. KIRKPATRICK:  Objection.
4  A   I don't recall that.
5  Q   But you don't recall the rest of the conversation, right?
6  All you recall him telling you is that Jesse has got issues?
7  A   Yes.
8  Q   So it's not that you don't recall him not telling you
9  anything else, it's you don't recall the rest of the
10  conversation?
11  A   That's correct.
12  Q   Okay.  And you don't recall anything about your
13  conversation with Priest that happened immediately after your
14  conversation with Craig?
15  A   I do not.
16  Q   Did you take notes of your conversation with Craig?
17  A   No.
18  Q   How about Priest?
19  A   No.
20  Q   How come?
21  A   It wasn't my normal part to take notes on these sorts of
22  issues and I reported to somebody else.
23  Q   What sorts of issues?
24  A   This sort of issue.
25  Q   Something that concerns you enough to immediately contact

## Page 73

1   HR once you learn about it, is that what you're talking about
2   when you say these issues?
3   A   Yes.
4   Q   How often did these sort of issues come up during the time
5   that you were operations manager in Appalachia?
6   A   Once.
7   Q   So you viewed it as a pretty serious issue when you
8   learned about it from Craig, right, that's why you immediately
9   contacted HR?
10  A   I contacted HR immediately, yes.
11  Q   Because you viewed it as a very serious issue?
12  A   Yes.
13  Q   And you understood based on what Craig was telling you
14  that it needed to be addressed right away?
15  A   Yes.
16  Q   And that you needed to get HR involved right away?
17  A   Yes.
18  Q   So understanding that it was a very serious issue and
19  something that you knew you needed to get HR involved in right
20  away, why didn't you take notes of either conversation with
21  Craig or with Priest?
22  A   I don't know why.
23  Q   All right.  Before the investigation actually starts, do
24  you recall any other conversations with anyone at Shell about
25  this?

## Page 74

1   A   No.
2   Q   Did you talk to Jesse?
3   A   Yes, I think so.
4   Q   Tell me about that.
5   A   She approached me.
6   Q   This is in person?
7   A   Yes.
8   Q   In Wellsboro?
9   A   Yes.
10  Q   Where did you work out of when you were operations
11  manager?
12  A   Out of Pittsburgh and then I moved to Wellsboro when the
13  Pittsburgh office closed.
14  Q   When was that?
15  A   I don't remember.
16  Q   You don't recall the year?
17  A   No.
18  Q   All right.  So she approaches you in Wellsboro, and this
19  is after your initial conversation with Craig, right?
20  A   Yes.
21  Q   And after your initial conversation with Priest?
22  A   I don't remember what the order was after I talked to
23  Steve.
24  Q   All right.  So tell me about your conversation with Jesse.
25  She approaches you?

## Page 75

1   A   I don't recall the details.
2   Q   Do you recall anything other than she approaches you?
3   A   We would have gone into the private room cubicle that was
4   on the side of my office.
5   Q   Are you guessing, or do you have a recollection of that?
6   I just want to make sure.
7   A   I'm guessing but that's what we normally would do or I
8   would normally do if somebody came to me with something to talk
9   about that I would consider confidential.
10  Q   Okay.  I just wanted to differentiate between what you
11  usually did as a matter of practice and what your recollections
12  are.
13      Do you have any other recollection of the conversation
14  that you had with Jesse other than she approached you and you
15  had a conversation?
16  A   No.
17  Q   Do you recall how long it was?
18  A   I have no idea.
19  Q   Did you take notes of that one?
20  A   No.
21  Q   Any explanation for that?
22  A   No.
23  Q   Do you report your conversation with Jesse to anyone at
24  the company?
25  A   I don't remember.

## Page 76

1   Q   And this is before the investigation actually begins?
2   A   Yeah.  It was the same day that everything was happening I
3   assume.
4   Q   Well are you guessing, or do you remember?
5   A   Yes, I'm guessing.
6   Q   But do you remember if the conversation with Jesse was
7   before the investigation actually started?
8   A   Most likely.  I'm guessing.
9   Q   I'm just asking what you recall.
10  A   I'm guessing, yes.
11  Q   I don't want you to guess.
12      MS. KIRKPATRICK:  We don't want you to guess.
13  A   Then I don't know.
14  Q   If you have a recollection, tell me.  If you don't, just
15  tell me.
16  A   I don't know.
17  Q   Before the investigation actually starts, did you see any
18  documents regarding Jesse's issues or the allegations that are
19  being made?
20  A   Not that I recall.
21  Q   Before the investigation starts, even if you don't recall
22  specifically the details, do you recall being told by anyone at
23  Shell what her allegations actually are?
24  A   No, I don't recall that.
25  Q   Did you ever ask anyone?

19 (Pages 73 to 76)

Page 77

```
 1   A   No.
 2   Q   How come?
 3   A   Not that I recall.
 4   Q   How come?
 5   A   I don't -- I don't know.
 6   Q   I mean wouldn't you have?  This is under your supervision
 7   as operations manager.  Wouldn't you want to know what one of
 8   your employees is alleging about one of your supervisors?
 9   A   When HR goes into an investigation, it's their ball.
10   Q   Did anyone tell you that they couldn't tell you what the
11   allegations are?
12   A   Not that I remember.
13   Q   So don't you want to know what one of your employees is
14   alleging about one your supervisors that is serious enough to
15   warrant an HR investigation?
16   A   I think my immediate issue would have been or was to make
17   sure that Jesse was safe, period.
18   Q   Okay.  And what did you do to ensure that?
19   A   Talked to her when she came and told me.
20   Q   When she approached you?
21   A   Yes.
22   Q   And that was your immediate concern from the second that
23   Craig tells you that there's an issue with her, right, to make
24   sure that she's safe?
25   A   I don't know what I was thinking at that time.
```

Page 78

```
 1   Q   So at some point after that conversation, your immediate
 2   thought is, we got to make sure Jesse is safe, right?
 3   A   I think the first thing I did was I talked to HR.  I
 4   think.  Again, I -- well that's guessing again so I don't know.
 5   Q   Well let's be clear on that because before you had
 6   testified clearly that immediately after you talked to Craig
 7   you understand that this issue was serious enough to involve HR
 8   and you immediately called Michelle Priest.
 9   A   Okay.
10   Q   Do you remember if you did that or not?
11   A   Yes.  I would have called HR.
12   Q   Do you have a recollection of calling Michelle Priest?
13   A   I don't recall the phone call, no.
14   Q   Is it possible that after you talked to Craig, you did not
15   call Michelle Priest?
16   A   It's unlikely.
17   Q   But possible?
18       MS. KIRKPATRICK:  Objection.  He just said it was
19   unlikely.
20   Q   Right.  Is it possible?
21   A   I would have to look up the definition of unlikely and
22   possible to see what the difference is, but yes.
23   Q   Is it possible you didn't call anyone about this issue
24   after Craig talked to you?
25   A   No.
```

Page 79

```
 1   Q   How come?
 2   A   These sorts of things from training we were to escalate.
 3   Q   What about this issue that you were told by Craig led you
 4   to conclude that you needed to escalate it?
 5   A   Any issue related to gender issues.
 6   Q   So you knew enough from that conversation with Craig to
 7   understand that there were issues -- or Jesse had issues with
 8   gender, something around that, right?
 9   A   Well, again, maybe it wasn't gender.  Just the issues that
10   Steve talked to me about were enough to warrant the phone call
11   to HR.
12   Q   What about did he talk to you about that led you to think
13   then, okay, I've got to escalate this?
14   A   I don't remember.
15       MS. KIRKPATRICK:  Objection.  He's told you he
16   doesn't remember.
17   Q   Was it gender?
18   A   I don't remember.
19   Q   What about the training that you got from Shell led you to
20   conclude as you just testified that what Steve Craig talked to
21   you about needed to be escalated?
22   A   There were a lot of rules at Shell, rules around theft,
23   rules around discrimination, rules around different things,
24   violations or potential violations, alleged violations, that
25   needed to be investigated.  HR conducts those investigations.
```

Page 80

```
 1   Q   That's what you learned from your training?
 2   A   Sure.  Yes.
 3   Q   All right.  Is it correct that aside from the conversation
 4   with Craig and when he tells you that there's some issues with
 5   Jesse and the conversation with Jesse in which she approached
 6   you, you don't have a specific recollection of talking to
 7   anyone else at Shell about this issue before the investigation
 8   starts?
 9       MS. KIRKPATRICK:  Objection.
10   A   No.
11   Q   That is correct or not?
12   A   I don't recall.
13   Q   You don't recall any others?
14   A   That's correct.
15   Q   All right.  But there was something about the conversation
16   with Craig that led you to conclude that you wanted to make
17   sure that Jesse was safe in your role as operations manager for
18   Appalachia, right?
19   A   I don't remember the details, but yes.
20       MS. KIRKPATRICK:  Objection.
21   Q   And before she approaches you, do you do anything to
22   ensure that she's safe after the conversation with Craig?
23   A   I don't remember.
24   Q   In the conversation that you had with Jesse that you have
25   because she approached you, is there anything that you did in
```

20  (Pages 77 to 80)

Page 81

1    that conversation to ensure that she was safe?
2    A    I don't remember.
3    Q    Is there anything before the investigation actually
4    commences that you do to ensure that she is safe?
5    A    I don't remember.
6    Q    Who conducts the investigation?
7    A    Megan.
8    Q    Klosterman?
9    A    Yes.
10    Q    Did that remind you of her last name?
11    A    Yes.
12    Q    And have you met her before she started the investigation?
13    A    No.
14    Q    Had you spoken with her?
15    A    No.
16    Q    When is the first time that you met her?
17    A    When she showed up at our office in Wellsboro.
18    Q    And can you approximate how long this is after that
19    initial conversation that you had with Steve Craig?
20    A    I don't recall.
21    Q    You don't recall if we're talking days, weeks, or no idea?
22    A    I have no idea.
23    Q    When Kloosterman shows up in Wellsboro, do you have any
24    conversations with her?
25    A    Make sure that she has the facilities she needs and agrees

Page 82

1    that those are private enough.  Go over the layout of the
2    office, the safety rules.  Visitors, that's the standard tact
3    for visitors coming in.
4    Q    Again, do you have a specific recollection of talking to
5    her about this stuff?
6    A    No.
7    Q    Or are you relying on what your general practice is?
8    A    General practice.
9    Q    Okay.  So when she comes to Wellsboro, did you have any
10    conversations with her before she starts her investigation?
11    A    No.
12    Q    Did you actually meet her when she came?
13    A    Yes.
14    Q    But aside from just kind of exchanging --
15    A    Hello.
16    Q    That was it?
17    A    Yes.
18    Q    During the course of her investigation -- and do you
19    remember how long she was up there?
20    A    No.
21    Q    Do you recall if it was days or no idea?
22    A    I have no idea.
23    Q    During the time that she was in Wellsboro conducting the
24    investigation, did you have any conversations with her?
25    A    No, not that I remember.

Page 83

1    Q    Does anyone talk to you about -- well at some point do you
2    learn that the investigation is being concluded?
3    A    Yes.
4    Q    Who do you learn that from?
5    A    I don't remember.
6    Q    Do you recall if it was HR, legal, someone else, or no
7    idea?
8    A    I don't remember.
9    Q    Do you recall how you found out?
10    A    No.
11    Q    Is it email, phone call?
12    A    I don't remember.
13    Q    Do you recall what you find out?
14    A    No.
15    Q    You just recall at some point being informed that the
16    investigation has been concluded?
17    A    Yes.
18    Q    And prior to you finding out the investigation has been
19    concluded, do you have a specific recollection of any
20    conversations about this other than the one that we talked
21    about with Steve Craig initially and Jesse when she approached
22    you?
23    A    Not that I recall.
24    Q    Did you ever see any -- well, strike that.
25         You are aware that Kloosterman interviewed certain

Page 84

1    employees in Wellsboro?
2    A    Yes.
3    Q    How did you become aware of that?
4    A    She had a list of people she wanted to talk to.
5    Q    How did you know that?
6    A    That would have been standard practice.  Did I see the
7    list, no.  I didn't see the list.  You can't conduct an
8    investigation without talking to people.
9    Q    So this is just you speculating --
10    A    Yes.
11    Q    -- that she came up to talk to employees?
12    A    Yes.  Sorry.
13    Q    But she never told you specifically who she was planning
14    on talking to?
15    A    No.
16    Q    At any point while she was up there?
17    A    Not that I -- not that I recall.
18    Q    Did you talk to any Shell employees who were interviewed
19    as part of the investigation about the investigation?
20    A    No.
21    Q    Did you see any documents related to the investigation at
22    any point while it was going on, after it was concluded, at any
23    time?
24    A    I saw a conclusion document at some point.
25    Q    Anything else?

21 (Pages 81 to 84)

Page 85

1    A   Not that I recall.
2    Q   Never saw any interviews that were documented?
3    A   No.
4    Q   Did you ever ask to see anything?
5    A   No.
6    Q   Did you ever ask Kloosterman at any point what certain
7    employees said?
8    A   No.
9    Q   How come?
10   A   Not my job.
11   Q   Well you were in charge of this group, right, the
12   complainant attorney?
13   A   Confidential investigation.
14   Q   What does that mean?
15   A   I'm not involved.
16   Q   Well these are employees under your supervision, right?
17   A   Sure.  HR is responsible to deliver the product of the
18   investigation.
19   Q   Does that mean that you can't ask what's going on about
20   employees who are part of your group that you're responsible
21   for?
22   A   I don't know.
23   Q   Did you ever ask anyone if you could get information?
24   A   No.
25   Q   Did you ever ask anyone for information?

Page 86

1    A   No.
2    Q   Were you ever told that you couldn't have access to
3    information?
4    A   I don't remember being told that one way or the other.
5    Q   I'm showing you what's been marked as -- I need to take a
6    quick break.
7        VIDEOGRAPHER:  Going off the record at 11:00.
8        (Brief recess.)
9        VIDEOGRAPHER:  We're back on the record at 11:05.
10       (Exhibit P 23 introduced.)
11   Q   So you have had an opportunity during the break to review
12   what's been marked as Exhibit P 23, correct?
13   A   Not the whole thing.
14   Q   Okay.  Well take your time.
15   A   Okay.  And I think I'm a slow reader.  I guess I am.
16   Q   Actually all I need you to do is read through it enough to
17   tell me whether or not you have seen it before.  If you need to
18   read through the whole thing, that's fine.
19   A   I have not seen this before.
20   Q   Okay.  So I want to direct your attention to the bottom of
21   the first page.
22   A   Okay.
23   Q   And you see at the top it says, Interview Questions Wayne
24   Fletcher, right?
25   A   Yeah, I saw that.

Page 87

1    Q   And Attendees Wayne Fletcher and Megan Kloosterman on
2    12/7/2016?
3    A   Yes.
4    Q   Does that feed help you recall when it was that Craig
5    first talked to you about these issues with Jesse Barnes?
6    A   Well Steve would have initially talked to me before this
7    day because the investigation wouldn't have started had it not
8    escalated.
9    Q   Sure.  Does it recall -- does it help you recall how long
10   it was before this that Craig talked to you?
11   A   No.
12   Q   Okay.  And who is Wayne Fletcher?
13   A   He was the operations safety -- you could say safety man.
14   He was basically our lead safety inspector, technician,
15   whatever.  He dealt with a lot of stuff in the safety area.
16   Q   Did he ever have a direct reporting relationship to you?
17   A   No.
18   Q   Indirect, in other words, he reported to someone who --
19   A   No.
20   Q   -- reported directly to you?
21   A   Totally separate organization.
22   Q   But he worked in Appalachia?
23   A   Yes.  He was a support op organization -- his organization
24   supported operations and Wells and projects but he only
25   supported operations.

Page 88

1    Q   You interacted with him?
2    A   Yes.
3    Q   All right.  So if you look at the Question Number 3 at the
4    bottom?
5    A   Yes.
6    Q   It says, What are your observations slash perception of
7    the work dynamics on that team?  What are your perceptions of
8    the working relationship?  In the last sentence, it says, It
9    seems like he might not be giving her a fair shake because
10   she's a woman.  Do you see that?
11   A   Yes.
12   Q   Did you ever hear that Fletcher told that to Kloosterman?
13   A   No.
14   Q   Did you ever hear that he believed that?
15   A   No.
16   Q   Page 2.  All right.  Top of the page where it says
17   expressly concerned.  Do you see where I am?
18   A   Yes.
19   Q   It says, She would come to me and she would come over to
20   my desk and say I need to vent for a minute.  Will is under my
21   skin today.  He won't leave me alone.  He won't give me time to
22   do it.  I will give a guy six hours to do it and her only two
23   or something.  He's made a comment that she doesn't like the
24   way he looked at her.
25       Did I read that correctly?

Page 89

1    A   Yes.
2    Q   Did you ever learn that Fletcher told Kloosterman that
3    during the investigation?
4    A   No.
5    Q   Ever hear that's what he thought?
6    A   No.
7    Q   Right under that before Number 4 there's a question
8    inappropriate comments towards her.  He has water cooler talk
9    just mentioned that she's a good-looking girl saying, oh, did
10   you see what she was wearing today.  I don't think it's ever
11   been voiced to her.
12       Did you ever hear that Fletcher told that to Kloosterman?
13   A   No.
14   Q   Did you ever hear that Turney said that Jesse is a
15   good-looking girl or something to that effect?
16   A   No.
17   Q   Next under Number 4, it says, I understand you were at the
18   golf outing this summer with them.  How is the dynamic between
19   them.  And then I'm looking at the second paragraph under the
20   answer that says just the atmosphere itself.  Do you see that?
21   A   Mm-hmm.
22   Q   It says just the atmosphere itself I believe it would be
23   possible.  I have heard guys make comments to other women and
24   they might not take it as serious, for example, compared to
25   what an operator says versus her boss.

Page 90

1        Anyone ever tell you that Fletcher said that?
2    A   No.
3    Q   Number 5, I understand you had asked Jesse to do some work
4    for you, parens, outside of her normal duties and Will was
5    near.  Do you recall the specific situation?  Subparagraph A,
6    Did Will tell you to tell her she was pretty and she would do
7    it.  Answer yes.  Do you recall her response?  No, I don't
8    think she said anything, rolled her eyes and gave you the look.
9    I do recall her saying I don't come to work to be told I am
10   pretty.
11       Were you ever told that Fletcher told that to Kloosterman?
12   A   Not that I recall.
13   Q   Number 6, Is there anything else you would like to share
14   related to the items we discussed today that hasn't been asked
15   yet?  And the second part under that where it says
16   inappropriate.  Do you see that?
17   A   Okay.
18   Q   Inappropriate things to her.  I think things have been
19   directed towards her.
20       Anyone tell you that Fletcher told Kloosterman that
21   inappropriate things have been directed towards Jesse?
22   A   Not that I recall.
23   Q   As the operations manager of Appalachia, is this
24   information that you would have wanted to know about employees
25   under your supervision?

Page 91

1    A   No.
2    Q   How come?
3    A   Again, this is part of the investigation.  I'm not part of
4    the investigation.
5    Q   Right.  But these are your employees.  Do you think this
6    is something --
7    A   Wayne Fletcher is not my employee but go ahead.
8    Q   This is happening in the Appalachia asset, right, you knew
9    that?
10   A   Yes.
11   Q   Turney works in Appalachia.
12   A   Yes, he does.
13   Q   Your group works in Appalachia?
14   A   Yes, they do.
15   Q   Jesse works in Appalachia?
16   A   Yes, she does.
17   Q   They're under your umbrella supervision, right?
18   A   Yes.
19   Q   And this is something that you're responsible?  You're
20   responsible for what goes on in the Appalachia asset as
21   operations manager, correct?
22   A   I'm responsible for, yes, the Appalachia asset.
23   Q   So why isn't this information that you would want to know
24   about what's going on in the asset that you are responsible
25   for?

Page 92

1        MS. KIRKPATRICK:  Objection.  Asked and answered.
2    You can tell her again.
3    A   It's an investigation that is managed and handled by HR
4    entirely.  They are the experts in this area.
5    Q   So you don't want to know about this stuff that goes on in
6    your asset, right?
7    A   I want them to finish their investigation.
8    Q   Would you have wanted to know this information?
9    A   No.
10   Q   You didn't care?
11       MS. KIRKPATRICK:  Objection.  It's not what he said.
12   Q   I'm asking?
13   A   Do I care?
14   Q   Yeah.  Let me ask you another question.  Seeing this now
15   what Fletcher told Kloosterman as part of the investigation,
16   does that concern you?
17       MS. KIRKPATRICK:  Objection as to what his thoughts
18   are now.  It's completely irrelevant.
19   Q   Did it concern -- does it concern you in the capacity as
20   operations manager at Appalachia, the position you held for
21   about three years?
22       MS. KIRKPATRICK:  He didn't know it then so how could
23   it have concerned him.
24       MS. GURMANKIN:  Go ahead.
25       MS. KIRKPATRICK:  Objection.

Page 93

1   A   Repeat the question.
2   Q   Yeah.  Does it concern you that you didn't know about this
3   information as the operations manager at Appalachia that this
4   was going on, does that concern you?
5       MS. KIRKPATRICK:  Objection as to what may concern
6   him now.  He's no longer an employee.  This is well far beyond.
7       MS. GURMANKIN:  You can object to the form.
8       MS. KIRKPATRICK:  Well you're not asking legitimate
9   questions.
10      MS. GURMANKIN:  You can object to the form.  Please
11  answer the question.
12      MS. KIRKPATRICK:  I'll object what I want to object
13  to.
14      MS. GURMANKIN:  I know.  You have already made
15  improper objections as the Court has noted.
16  A   I'm not involved in the investigation process.  I am
17  concerned about the performance of our asset when I was in that
18  role.
19  Q   Are you concerned about the way -- were you concerned
20  about the way that female employees were treated by male
21  supervisors?
22  A   Yes, certainly.  Yes.  I was concerned about every
23  employee and how they were treated.
24  Q   Including how female employees were treated by male
25  supervisors?

Page 94

1   A   Yes.  Regardless of gender, yes.
2   Q   Do you have an explanation for why you didn't ask anyone a
3   single question about what the employees revealed during the
4   investigation or what was found out as part of the
5   investigation?
6   A   It was not my business.
7       MS. KIRKPATRICK:  Objection.  Asked and answered.
8   You can tell her for the tenth time.
9   Q   No one ever told you it wasn't your business, did they?
10  A   I know it wasn't my business because HR conducts these
11  investigations.
12  Q   No one at Shell ever told you it wasn't your business,
13  right?
14  A   I can't answer that question.  I don't know.
15  Q   In fact, violations of policies of the asset that you are
16  responsible for are your business, aren't they?
17  A   Violations of policy, yes, I have a role in that.
18  Q   I mean it's your -- you testified earlier it's part of
19  your job as operations manager to ensure that the employees
20  under your supervision are adhering to the policies of the
21  company, right?
22  A   Yes.
23  Q   So when conduct that is going on is inappropriate, that is
24  your business, isn't it, as operations manager of the asset in
25  which this is going on?

Page 95

1   A   And that's why I reported it to HR.
2   Q   Is that a yes?
3   A   Yes, and that's why I reported it to HR.
4       MS. KIRKPATRICK:  He gave you the answer.  You may
5   not like it but he gave you the answer.  You're not going to
6   shut down what the answer is.
7   Q   Do you have an explanation for why you didn't ask anyone
8   at Shell a single question about what was going on?
9   A   I knew the investigation was being handled professionally
10  and it was not my business to interfere with the investigation.
11  Q   Did you think asking a question would be interfering?
12  A   Potentially.
13  Q   Did you ask anyone can I ask a question or would that be
14  interfering?
15  A   No.  I was answering your first question.
16  Q   I don't know what that means.
17  A   Did you ask anyone and then you asked a second question
18  which I didn't answer.
19  Q   Can you go back to my last question, please.
20      COURT REPORTER:  Which one?
21  A   She said did you ask anyone and I said no, and then she
22  asked a second question.
23  Q   Did you ask anyone whether you asking a question would be
24  interfering with the investigation?
25  A   Not that I recall.

Page 96

1   Q   And is it your testimony under oath that you thought that
2   you asking a question would interfere with the investigation
3   that HR was conducting?
4       MS. KIRKPATRICK:  Objection.  Asked and answered.
5   A   I haven't asked that.
6   A   Again, it's not my responsibility to interfere with this
7   investigation in any way.
8   Q   That wasn't my question.
9   A   Asking a question about anything that was going on in this
10  investigation in my opinion could have been seen as
11  interference on my part.
12  Q   By whom?
13  A   Anyone.
14  Q   Anyone at Shell?
15  A   Who am I asking the question to.  Yes, whoever I was
16  talking to.
17  Q   Did you ask Kloosterman can I ask you a question about the
18  investigation --
19  A   No.
20  Q   -- or would you see that as interfering?
21  A   Yes.
22      MS. KIRKPATRICK:  Objection.
23  A   I did not talk to Megan while she was conducting this
24  investigation.
25  Q   At any time before it was concluded, right?

24  (Pages 93 to 96)

Page 97

1   A   That's correct.
2   Q   Did you ask Michelle Priest can I ask a question about the
3   investigation, or would that be seen as interfering?
4   A   No.
5       MS. KIRKPATRICK:  Objection.
6   A   I did not ask any questions to anyone.
7   Q   Because you thought that would be viewed as interfering?
8       MS. KIRKPATRICK:  Objection.
9   A   Yes.
10  Q   Even though no one told you that.
11      MS. KIRKPATRICK:  Objection.
12  Q   Right?
13  A   I have answered the question.
14  Q   Even though no one told you that by asking a question you
15  would be seen as interfering; is that correct?
16  A   My opinion it would be potentially seen as interference,
17  yes.
18  Q   My question was not your opinion.  Did anyone at Shell
19  tell you -- hang on.  You got to let me finish.
20      Did anyone at Shell tell you that if you asked a question
21  while the investigation was going on before it was concluded
22  that they would view you as interfering with the investigation?
23  A   I don't know.
24  Q   You don't remember?
25  A   Yes.  I don't remember.  I don't know.

Page 98

1   Q   The issues that we just went over that according to
2   Kloosterman's notes Fletcher told her as part of the
3   investigation, does it concern you that according to Fletcher
4   that was going on?
5       MS. KIRKPATRICK:  Concerning nowadays?
6   A   No.  As the person who was the operations manager of the
7   Appalachia asset when this was going on?
8   Q   Ask the first part of the question again.
9   Q   Sure.
10  A   Sorry.
11      (Testimony read by the Court Reporter.)
12      MS. KIRKPATRICK:  Concern him nowadays?
13      MS. GURMANKIN:  I answered that already.
14      MS. KIRKPATRICK:  No, I don't think you did.
15      MS. GURMANKIN:  Yeah, I did.
16      MS. KIRKPATRICK:  I don't understand the question.
17      MS. GURMANKIN:  Well you don't have to.
18      MS. KIRKPATRICK:  No.  I have to understand the
19  question to know.
20      MS. GURMANKIN:  I said in his capacity as operations
21  manager of Appalachia asset.  I said that five years ago.
22  Q   Please answer the question.
23  A   Would this have concerned me?
24  Q   That this was going on according to Fletcher?
25  A   Possibly, but then I'm seeing this for the first time.

Page 99

1   I'm not involved in the investigation.
2   Q   Does it surprise you that you're seeing this for the first
3   time?
4   A   No.
5   Q   The stuff that we just talked about that according to
6   Kloosterman's notes Fletcher told her, do you understand that
7   to be a violation of company policy?
8   A   I don't know all the context of what the conversation was.
9   Q   Based on what we read, did you understand them to be
10  violations of company policy?
11  A   Let me go back to Page 1.  Sorry.
12  Q   Sure.
13  A   I don't know if I can answer the question.  I'm not an
14  expert in this sort of discussion, investigation, this process,
15  consequences, outcomes, conclusions.
16  Q   You're familiar with Shell's EEO and anti-discrimination
17  policy.  We talked about earlier, right?
18  A   Yes.
19  Q   You have taken training at Shell on that?
20  A   Yes.
21  Q   So based on the training that you have taken, can you
22  answer the questions as to whether what Fletcher told
23  Kloosterman that we just talked about would be a violation of
24  Shell's policy?
25      MS. KIRKPATRICK:  Objection.  Asked and answered.  He

Page 100

1   already told you.  You can tell her again.
2   A   Ask the question again.
3   Q   Sure.  Based on the training that you have taken at Shell,
4   can you answer the question as to whether what Fletcher told
5   Kloosterman according to Exhibit ==P 23== would be violations of
6   the company's EEO and anti-harassment policy?
7       MS. KIRKPATRICK:  Objection.
8   A   There's -- again, there's a lot of context that need to be
9   applied to situations and answering questions that I'm not
10  aware of.  I don't -- I don't know the accuracy of this.
11  Q   No.  I'm not asking if it's --
12      MS. KIRKPATRICK:  Let him finish.
13  Q   I'm saying based on what it --
14      MS. KIRKPATRICK:  Are you finished?
15  A   Yes.
16  Q   Based on what it says there, can you answer that question,
17  yes or no?
18      MS. KIRKPATRICK:  It's not a yes or no answer.
19  A   I don't think I can answer your question.
20  Q   Despite the training that you've taken at Shell?
21  A   Correct.
22  Q   Penny Robins was an admin while you were at Appalachia,
23  right?
24  A   She was.
25  Q   I'm sorry.  I don't remember if I asked you this, but did

25 (Pages 97 to 100)

## Page 101

1　you work with her directly?
2　A　She was a direct report for part of my time in that asset.
3　Q　Okay.  During the time that she reported to you, did she
4　ever do or say anything that led you to question her honesty or
5　integrity?
6　A　No, not that I remember.
7　Q　All right.  I'm showing you what is hopefully an interview
8　with Penny Robins.
9　A　Yeah, I see it.
10　　　(Exhibit P 25 attached.)
11　Q　This is Exhibit P 25.  And you see at the top it says,
12　Penny Robins and Megan Kloosterman?
13　A　Yes.
14　Q　And you have never seen this document before, correct?
15　A　No, not that I recall.
16　Q　And no one ever told you about information that Robins
17　told Kloosterman as part of the investigation?
18　A　That is correct.  I don't have any knowledge of this.
19　Q　By the way, before today, did you have any idea that
20　Kloosterman talked to Wayne Fletcher and Penny Robins as part
21　of their investigation?
22　A　No.
23　Q　So if you look at Number 5 at the bottom?
24　A　Five.
25　Q　It says, Is there anything else you would like to share

## Page 102

1　related to the items -- related the items we discussed today
2　that haven't been asked yet.  And the answer is, She works very
3　hard.  The women comment was not okay.  It doesn't seem like
4　she has a lot of conflict with others.  He says she's scared of
5　me so he doesn't do it to me.  He thinks he is a ladies man.
6　A　Who is he?  Who are they describing?
7　Q　Turney.
8　A　Okay.
9　Q　He thinks he is a ladies man.  Him and Robin Grouette
10　would flirt.  That is my perception.
11　　Did you ever hear from anyone that Turney was a ladies man
12　or words to that effect?
13　A　No.
14　Q　Did you ever hear from anyone that he and Robin Grouette
15　would flirt?
16　A　No.
17　Q　And Kloosterman, you never knew that she was interviewed
18　until today so Kloosterman never told you anything that Robin
19　said as part of the investigation, correct?
20　A　Correct.  So are you saying that Robin was interviewed as
21　well?
22　Q　Penny Robins was interviewed.  No, not Robin Grouette.
23　A　I thought you -- that's who I thought you meant.
24　Q　Okay.  No.  Penny Robbins.
25　A　No.  No on both.

## Page 103

1　Q　After Grouette transitioned out of Appalachia, did you
2　have any communications with her?
3　A　After who transitioned?
4　Q　Robin Grouette?
5　A　Yes.
6　Q　About work-related issues?
7　A　Yes.
8　Q　About the Appalachia asset?
9　A　No.
10　Q　What about?
11　A　She was working in China and wanted to bring a team of her
12　Chinese asset staff to visit Appalachia to see how we did
13　things.
14　Q　Did that happen?
15　A　Yes.
16　Q　When?
17　A　It was probably in the final year that I was there but I
18　don't remember precisely.
19　Q　Is Carmela still employed, do you know, with Shell?
20　A　I don't know for sure but I don't believe so.
21　Q　Was she there when you retired?
22　A　I don't -- I don't know.  I know after when we were
23　closing the Pittsburgh office, Carmela stayed on with I believe
24　it was the environmental department or it might have been the
25　Wells department filling out paperwork for them that they were

## Page 104

1　trying to digitize and that's what I remember.
2　Q　Who is Matt Empsen?
3　A　You know, I know he worked in my organization but I don't
4　remember what role he was in.
5　Q　Ever have any contact with him?
6　Q　Since I retired?
7　Q　No.  While you were there?
8　A　Certainly while I was there I would have talked to him at
9　some point but.
10　Q　Worked with him?
11　A　He was in our organization.  Okay.  I'm reading down now.
12　Integrity inspector.  Yeah, I would have at some point
13　certainly talked to him.
14　　　(Exhibit P 20 introduced.)
15　Q　Are you looking at Exhibit P 20?
16　A　Yes.
17　Q　And this is the interview notes of Megan Kloosterman or at
18　least her writeup of the interview she had with Empsen?
19　A　Okay.
20　Q　You have never seen this before?
21　A　No.
22　Q　And prior to now you didn't know Empsen was interviewed,
23　correct?
24　A　That's correct.
25　Q　So if you look at the last part of Page 1 under

26　(Pages 101 to 104)

Page 105

1    Subparagraph A.  It says, What are your
2    observations/perceptions of the work dynamics on that team
3    specifically between Jesse and Will.  Then the answer, Cubicles
4    sit right next to them.  Their work group dynamic from my
5    perspective.  Will is very condescending to them and more
6    specifically Jesse.  The way he talks to her is very demeaning.
7    Doesn't respect her new role.  Not afraid to blame her for
8    something that has nothing to do with her.  If my boss treated
9    me that way, I would talk to them because of this
10   disrespectful.  He has demeaned her in meetings, blamed her and
11   talked down to her on a daily basis.  It's very condescending
12   and sarcastic like he's better than they are.  It seems like
13   everyday there is something.  An example would be how he asks
14   her if he needs something, he would tell her he needs it but
15   that it should already have been done.  For example, updating a
16   board saying you should already know how to do this.  It's the
17   tone, body language, more frequently towards her.
18       If you go to the second page.  You can tell after their
19   conversations she gets very quiet and doesn't talk to anybody.
20   You can tell she is bothered by it.  Other guys on the team
21   give it back to him or stand up for themselves but it affects
22   her.  Over the past year or two it's gotten progressively
23   worse.  I have seen Will say inappropriate comments to all
24   women in the office, body language, things he would say, how he
25   postures himself around other females.  With Jesse a little

Page 106

1    closer to her than he should be, how close you are, how you sit
2    next to her, mannerisms.  Example sit beside her and lean on
3    her impeding on her comfort zone, too close.
4        Did you ever hear that that came out as part of the
5    investigation?
6    A   No.
7    Q   Does it concern you that you didn't hear about that?
8    A   Will's office was not adjacent to Jesse's when I worked
9    there.
10   Q   That wasn't my question.  Do you need it repeated?
11   A   Yes.  Please repeat the question.
12   Q   Does it concern you that you weren't aware of this
13   information that according to Kloosterman's notes Empsen told
14   her?
15   A   Again, it fell --
16       MS. KIRKPATRICK:  Objection as to what may concern
17   him nowadays.
18   Q   No.  Did it concern you in the fact that in the capacity
19   of operations manager that no one told you that?
20   A   No.
21       MS. KIRKPATRICK:  He didn't know about it at the
22   time.
23       MS. GURMANKIN:  You can make objection to form.
24       MS. KIRKPATRICK:  There's more than objection to
25   form.

Page 107

1        MS. GURMANKIN:  Well that's all you can make.
2    Q   If you look down at the chart, do you see the chart on the
3    second page?
4    A   Yes.
5    Q   Do you see the second one, my supervisor touches my arm
6    and/or leg?  Do you see that?
7    A   Yes.
8    Q   The majority of the time I have a meeting or talk to him
9    one-on-one.  So you see that's the claim underneath the header?
10   A   Yes, I see that.
11   Q   And then to the right, the last column, the header says
12   Test whether you see this amongst Will and others on the team,
13   self, or just between Jesse.  And the response is, I see it at
14   the desk going over stuff with her personal space that he
15   crosses.  He does not get close to other males, only noticed it
16   with her.
17       You never heard that before, right?
18   A   No, I did not.
19   Q   Then on Page 3.  First one on the chart, My supervisor has
20   told me that he has thought about me while showering and then
21   the response from Empsen is N/A and then I could see him saying
22   something like that.
23       And no one ever told you that at the time, right?
24   A   No.
25   Q   Or at any time?

Page 108

1    A   No.  I have not seen any of this.
2    Q   By the way, can you -- are you able to answer the question
3    as to whether if Turney showed Jesse a -- I'm sorry.  If Turney
4    told Jesse that he thought about her while showering, would
5    that be a violation of company policy?
6        MS. KIRKPATRICK:  Objection.
7    A   In the context of what was going on, I don't think I can
8    answer the question.  I would need a ton more information and
9    it's not my decision to make.  HR is involved in making
10   conclusions and doing the investigation into what the claims
11   are.
12   Q   And that's despite the training you have had at Shell you
13   can't answer that question, correct?
14   A   Yes.
15   Q   Under Number 3, the second -- actually the first
16   paragraph.  It says, Is there anything else you would like to
17   share related the items we discussed today that hasn't been
18   asked yet.  The answer, Will treats her like she is not
19   competent in her job.  When he talks to her, he slows down his
20   speech like she can't understand.  He will talk to someone
21   else.  He sits down and breaks it all down slow and methodical.
22       Next paragraph.  Her co-workers on that team treat her
23   disrespectfully.  They see how he treats her so they see it's
24   okay.  Dan Krise, Ken Foreman, would be others that treat her
25   that way.  They feed off of Will.  They think it's okay and

27 (Pages 105 to 108)

## Page 109

1   it's funny and Will can do it.  They poke fun at her about it.
2   They don't have bad intentions but they think it's funny.  Will
3   is setting the example.  For Will it seems like it's a power
4   thing for him.  He thinks he's in a position he can treat his
5   subordinates how he wants and get away with it.  In my opinion
6   he's a womanizer.  When someone can talk to male or female,
7   have two different postures, how they speak, body language.
8   You should treat everyone with respect.  I noticed it since I
9   started.  I have seen it affect Jesse in the past six months to
10  a year.  Her attitude, she feels uncomfortable.  She sits at
11  her desk and does her work.
12      Anyone ever tell you about that at any point?
13  A   No.
14  Q   Does that concern you that no one told you?
15      MS. KIRKPATRICK:  Objection as to what may concern
16  him nowadays.
17  Q   It's the same answer I've given about six times now.
18  Answer my question.
19  A   Again, HR conducts these investigations.  They found this
20  information and they are the ones that are best in place to
21  make conclusions on it.
22  Q   My question is only does it concern you that no one told
23  you about that at the time of the investigation or at any point
24  while you were operations manager?
25      MS. KIRKPATRICK:  Objection as to what concerns him

## Page 110

1   now.
2   A   As operations manager, did it concern me that nobody told
3   me about any of this?
4   Q   Mm-hmm.
5   A   Maybe a little.  But then again, I don't know the validity
6   of what anybody is saying here and in what context it was and
7   how they were coming up with this information.
8   Q   Why does it concern you maybe a little?
9   A   It's not -- it's not what we're taught how we're supposed
10  to be behave.
11  Q   What about it is not -- when you say we're taught, you
12  mean at Shell?
13  A   From the rules, yes, that Shell provides.
14  Q   And the training?
15  A   Yes.
16  Q   What about it leads you to say that it's not how you are
17  taught how you should behave as an employee of Shell?
18  A   That somebody didn't speak up earlier.
19  Q   I'm sorry.  What?  I didn't understand that.
20  A   These people have knowledge.  They didn't speak up.
21  Q   How do you know?
22  A   This person says they have talked to -- or they have heard
23  these things going on.
24  Q   This is Matt Empsen?
25  A   Yes.

## Page 111

1   Q   Do you have any knowledge as to whether he or any of the
2   others that we've looked at told anyone about this earlier?
3   A   I assume they didn't.
4   Q   Do you know that?
5   A   No, I don't know that.
6   Q   If they didn't, you would certainly as the operations
7   manager of Appalachia want to find out why they wouldn't come
8   forward with this information?
9   A   If they didn't tell anybody, how would I know to ask the
10  question why they didn't tell anybody.
11  Q   If you had found out at the time of the investigation that
12  they reported this stuff to Kloosterman, then that's a question
13  that you would follow up with?
14  A   Oh, no.  If that's your question, again, this
15  investigation is handled by HR.  They are the responsible
16  party.  They do -- this is their job to manage these processes.
17  The investigation process in this sort of a manner.
18  Q   Let's go back.  I want to make sure to make sure you and I
19  are on the same page with what I asked you and what your answer
20  was.  You said it concerns you maybe a little that you didn't
21  find out about this information that according to Kloosterman's
22  notes people are telling her.
23      Why does that concern you maybe a little?
24      MS. KIRKPATRICK:  Objection.  Asked and answered.
25  Tell her again.

## Page 112

1   A   I don't even know what I'm answering right now.
2   Q   I'll ask it again so we're clear because I want to make
3   sure you and I are on the same page.  You testified that the
4   fact that no one told you that this stuff was being reported to
5   HR in the investigation concerns you maybe a little.  I
6   want to know why it concerns you maybe a little.
7       MS. KIRKPATRICK:  Objection.
8   A   The investigation was handled by HR.  Human nature,
9   curiousness.  But I know that they are a responsible party to
10  deliver this sort of investigation and the outcomes that result
11  from it.  I'm not involved in that process in any way.
12  Q   What about human nature or curiousness concerns you maybe
13  a little?
14  A   Maybe I misspoke.
15  Q   All right.  Let me ask it this way so we're clear.
16      Does it concern you at all that you didn't find out about
17  this stuff that employees are reporting to Kloosterman that
18  we've gone over so far, the fact that no one told you when you
19  were operations manager of Appalachia?
20      MS. KIRKPATRICK:  Objection.  Asked and answered.
21  A   Does that concern me that I didn't understand what was
22  going on in the investigation?  No, that did not concern me.
23  Q   No, that's not my question.  Does it concern you that no
24  one told the operations manager of Appalachia that stuff
25  is being reported during the course of the investigation that

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

## Page 113

1 no one told you about this?  Does that concern you?
2   MS. KIRKPATRICK:  Objection.  Asked and answered.
3 A No.
4   (Exhibit P 21 introduced.)
5 Q All right.  You should be looking at Exhibit 21.
6 A Okay.
7 Q Is it up on your screen?
8 A Yes.
9 Q All right.  And these are -- you have never seen this
10 document, right?
11 A That is correct.
12 Q And you never saw the Empsen document?
13 A I did not.
14 Q So this appears to be interview notes of Kloosterman's
15 interview with Mark Hoover.  Do you see that?
16 A Okay.
17 Q And if you go to Page 2.  Under the claim chart, last one,
18 Jesse's claim is I have been called a bitch by numerous people
19 in the office.  Do you see that?
20 A Why are you?  Sorry.
21 Q Last claim in the --
22 A Page 2?
23 Q Yeah, in the chart.
24 A Okay.  Okay.  My eyes aren't very good.  All right.  Go
25 ahead.

## Page 114

1 Q And then do you see that?
2 A Yes, I see that box.
3 Q Okay.  And then the Mark Hoover response, do you see the
4 column to the right?
5 A Yes.
6 Q And the header that says Mark Hoover response?
7 A Yes.
8 Q And then it says, bitchy, yes.  It was strictly in a
9 joking manner.  It was never, there was no malice or meanness
10 involved.
11   Did anyone ever tell you that Hoover admitted in the
12 investigation to calling Jesse bitchy?
13 A No.
14 Q Does that concern you that no one told the operations
15 manager that?
16   MS. KIRKPATRICK:  Objection.
17 A As part of the investigation, no, it does not concern me.
18 Q And how come?
19 A It's not my responsibility to get involved in this
20 investigation.
21 Q Would you be involved if someone just told you this is
22 what's coming out, would that involve you?
23 A Would I be involved if what?
24 Q If someone just told you this is the information that
25 we're getting, would that inappropriately involve you?

## Page 115

1 A Yes.
2 Q How?
3 A I'm not part of the process.
4 Q And no one told you that you -- no one told you that,
5 right?
6 A No one told me anything about what was going on in this
7 investigation.  I think they were instructed, at least that's
8 what I thought I read at the end of each one of these
9 documents.
10 Q I'm talking Kloosterman.
11 A When I say no one, no one.
12 Q And all the employees that we've talked about so far whose
13 interview notes we've looked at, these were either under your
14 supervision or worked at the asset that you were responsible
15 for, right?
16 A I know the names of all these people, yes.
17 Q And they were either under your umbrella of supervision or
18 worked at the asset that you were responsible for?
19 A Yes.
20   (Exhibit P 22 introduced.)
21 Q So looking at Exhibit 22 which should be up in your
22 screen, the interview with Ken Foreman?
23 A I see it.
24 Q And you have never seen this, right?
25 A That's correct.

## Page 116

1 Q If you go down to Number 3 at the bottom?
2 A Okay.
3 Q Last paragraph.  Jesse, she received my product when I was
4 a scheduler.  She is a different girl.  She is super smart.  If
5 you go with stereotypes, she is surprisingly smart.  She gets
6 offended by things that are not meant to be offensive.  She
7 thinks things are personal when they are not.
8   Then I want to move on to Page 2.
9 A Okay.
10 Q If you look at the claim chart.
11 A Mm-hmm.
12 Q Second one, my supervisor touches my arm and/or leg the
13 majority of the time I have a meeting or talk to him
14 one-on-one.
15   By the way, are you able to answer the question as to
16 whether if that's true that would be a violation of company
17 policy?
18 A I don't know that statement.  So this is a claim that
19 Jesse is making?
20 Q Yes.
21 A Okay.  I'm just trying to understand.  Now ask your
22 question again.
23 Q Sure.  If that allegation is true, are you able to answer
24 the question as to whether that would be a violation of company
25 policy, Turney touching her arm and/or leg the majority of the

Page 117

1    time she has a meeting or talks to him one-on-one?

2    A   I would say that HR is the responsible party again to

3    manage these sorts of investigations and whether or not that is

4    a violation.

5    Q   So is your answer you cannot answer that?

6    A   I can't answer that question.

7    Q   Next page, Page 3. The claim, the first one on this page,

8    I have been called a bitch by numerous people in the office.

9    And then Foreman's answer is yes but it is because of her mood.

10   Do you see that?

11   A   Mm-hmm.

12   Q   Yes?

13   A   Yes, I do.

14   Q   Are you able to answer the question as to whether Jesse

15   being called a bitch by numerous people in the office violates

16   company policy?

17   A   Again HR is the organization that manages the

18   investigations as the expert in the field in doing this.

19   Q   So no?

20   A   No.

21   Q   And you were never told any of this information that we

22   talked about, correct?

23   A   No. I have not seen any of this that I recall.

24   Q   Who's Calvin Flynn?

25   A   I don't know. I know the name but I don't remember what

Page 118

1    job he was in.

2    Q   But you remember him being part of the asset?

3    A   Yes. He was there. I don't remember.

4    (Exhibit P 27 introduced.)

5    Q   You should be shown what's been marked as Exhibit 27 which

6    is Kloosterman's interview with him.

7    A   I'm there. Yes.

8    Q   You have never seen this, correct?

9    A   That's correct.

10   Q   So if you go to Page 3.

11   A   I'm just trying to remember what job he was in.

12   Q   If you look at the first page under Number 1.

13   A   Yeah. I'm reading it. Okay. Got it. Now you want me to

14   go to page what?

15   Q   Does that help you?

16   A   Yeah. Yeah.

17   Q   Page 3. All right. So right above Number 4 where it says

18   every once in a while. Do you see that?

19   A   Yes.

20   Q   This is him talking according to Kloosterman. Every once

21   in a while people will joke back and forth and occasionally

22   things will get said that I don't think is appropriate for an

23   office environment. They cross the line sometimes, not too

24   often, but sometimes. I can't recall specific example. Once

25   or twice have been about women probably.

Page 119

1    Were you told anything about this?

2    A   No.

3    Q   And you didn't know that -- well strike that.

4    Who's Jeremy Greene, does that ring a bell?

5    A   It's a familiar name, yes.

6    Q   From Appalachia?

7    A   Yes.

8    (Exhibit P 26 introduced.)

9    Q   Showing what's been marked as Exhibit 26, the interview

10   with Jeremy.

11   A   I see it.

12   Q   You never saw this, right?

13   A   That's correct.

14   Q   Page 2, please. Under the claim, the first one, I was

15   told I'm a hot blonde by my supervisor.

16   Do you see that?

17   A   Yes.

18   Q   It's the only allegation that you were aware of, right?

19   A   Yes.

20   Q   From what we looked at in the complaint earlier?

21   A   I'm trying to remember if that was part of the outcomes

22   document, but yes.

23   Q   As you sit here today, you don't remember how you learned

24   about that one?

25   A   No. It wasn't through this, I can tell you that.

Page 120

1    Q   Because you have never seen this before?

2    A   That's correct.

3    Q   And no one told you what Greene said?

4    A   That's correct.

5    Q   Or anyone said?

6    A   That's correct.

7    Q   All right. So on the column on the right, this is

8    Greene's response. Yes, I did hear that. It just seems like

9    normal talk. He repeated the story. I don't think it's that

10   inappropriate. Normal guy talk. I don't remember her being

11   offended or noticeable.

12   Do you see that?

13   A   Yes.

14   Q   Do you agree with what Greene says here according to

15   Kloosterman that it's not inappropriate for Turney to tell

16   Jesse that she's a hot blonde?

17   MS. KIRKPATRICK: Objection.

18   A   According to Kloosterman.

19   Q   This is Kloosterman's notes of her conversation with

20   Greene.

21   A   Okay. Okay.

22   Q   So my question is according to at least what Kloosterman

23   writes about what Greene told her, do you agree with what

24   Greene says that it's not inappropriate for Turney to tell

25   Jesse that she's a hot blonde?

30 (Pages 117 to 120)

Page 121

```
 1          MS. KIRKPATRICK:  Objection.
 2     A   It's not inappropriate for Turney.  So he's saying it's
 3     appropriate for Turney.
 4     Q   Yes.
 5     A   That's what you're saying?
 6     Q   He's saying it's not inappropriate.  Do you see that?
 7     A   Yeah.  Again, I would say that HR is the -- are the people
 8     that need to be answering these sorts of questions and they're
 9     the experts in these sorts of investigations.
10     Q   Right.  So you can't answer that question about --
11     A   Correct.
12     Q   -- whether it's appropriate for a male supervisor to call
13     his female subordinate a hot blonde; is that your testimony?
14          MS. KIRKPATRICK:  Objection.
15     A   I don't have the context.  I don't understand where, when,
16     how.  It's not my call.
17     Q   I'm just asking you were a manager of Shell, right?
18     A   Yes.
19     Q   For several years in two locations, right?
20     A   Yes.
21     Q   And you had about 18 years of supervisory responsibilities
22     at Shell, right?
23          MS. KIRKPATRICK:  Objection.
24     A   Yes.
25     Q   And you took multiple trainings that Shell provided about
```

Page 122

```
 1     EEO issues and anti-harassment issues, right?
 2     A   Yes.
 3          MS. KIRKPATRICK:  Objection.  Asked and answered.
 4     Q   And it's your testimony that you can't answer the question
 5     as to whether it would be inappropriate for a male supervisor
 6     to refer to a female subordinate at Shell as a hot blonde; is
 7     is that your testimony?
 8          MS. KIRKPATRICK:  Objection.  Asked and answered.
 9     A   Yes.
10     Q   Have you ever called a female a hot blonde during your
11     employment at Shell?
12     A   No.
13     Q   Have you ever called a female employee or contractor hot?
14     A   No.
15     Q   So if someone came to you, if an employee came to you at
16     Shell in your capacity as an operations manager at two
17     different assets and said, is it okay if I call my female
18     subordinate hot, you would say I can't answer that, go ask HR?
19     A   I would likely advise them that that would not be
20     appropriate.
21     Q   Why?
22     A   Because of my training.
23     Q   So then do you agree that if what Greene says here is true
24     according to Kloosterman's notes that Turney told Jesse that
25     she's a hot blonde, that that is inappropriate?
```

Page 123

```
 1     A   Again, in the context and situation, I'm not part of the
 2     investigation.  I don't know -- I don't know.  I'm not the
 3     expert in this.
 4     Q   Well then, why would you tell an employee that it would be
 5     inappropriate for them to do that if someone just came to you
 6     and asked if they could call a female employee hot?
 7     A   If somebody asked me that question, I suggested why I told
 8     them that, why I would tell them what I did or what I said
 9     which was I would advise against it.
10     Q   Based on your training?
11     A   Yes.
12     Q   So why can't you answer the question as to whether Turney
13     doing that is inappropriate?
14     A   There's not enough information for me.
15     Q   What else --
16     A   I'm not an expert at it.
17     Q   What else do you need to know in order to be able to
18     answer that question?
19     A   I think I need to be there.
20     Q   Be where?  Where he's actually calling her a hot blonde?
21     A   Yes.
22     Q   Because the context matters as to whether or not it's
23     inappropriate?
24     A   Of course.
25     Q   Does the context matter in terms of whether or not it
```

Page 124

```
 1     would violate company policy?
 2     A   Yes.
 3     Q   And what information would you need to know as to whether
 4     -- to be able to determine whether or not a male supervisor at
 5     Shell calling his female subordinate a hot blonde would violate
 6     company policy?
 7     A   Repeat that question.
 8     Q   Sure.  What other information do you need to know to
 9     determine whether or not a male supervisor calling his female
10     subordinate a hot blonde would violate company policy?
11     A   I think I already answered that question.
12     Q   No.  I haven't asked that one.
13     A   I said I had to be there.
14     Q   What information would you need?
15     A   The conversation.  Is that not what you asked and is that
16     not what I answered when I said if I was there?
17     Q   What about the conversation would you need to hear in
18     order to make that determination?
19     A   I can't make that determination.
20     Q   Well you said if you were there.  Well, if you were there,
21     would you be able to make that determination?
22     A   If somebody -- the first question you asked me in this
23     series was what would you say if somebody said I'm going to go
24     call somebody a hot blonde, and I said I would advise against
25     that based on my training.
```

## Page 125

1   Q  Okay.  Are you finished with your answer or no?
2   A  Yes, I'm finished.
3   Q  You said -- and correct me if I'm wrong -- I want to make
4  sure I understood you correctly -- that in order to determine
5  whether or not a male supervisor calling his female subordinate
6  a hot blonde would violate company policy is you would need to
7  be there to actually hear that conversation?
8   A  It would need to be investigated.
9   Q  But I'm asking you in your capacity as a former operations
10  manager at Shell in two different assets who had 18 years of
11  supervisory responsibility, would you need to have heard the
12  comment to determine whether or not it violated company policy?
13   A  I need it to be investigated.
14   Q  And what information would you need in order to make that
15  determination?
16   A  A completed investigation by professionals who do that
17  work.
18   Q  What specifically would you need to know in order to make
19  that determination?
20      MS. KIRKPATRICK:  Objection.
21   Q  What information do you, Greg Larsen, need to make that
22  determination?
23      MS. KIRKPATRICK:  Objection.  Asked and answered.
24   A  I'm not one that makes that determination.
25   Q  I'm asking you in your capacity as a supervisor, do you

## Page 126

1  agree that Turney saying that to Jesse would be a violation of
2  company policy?
3      MS. KIRKPATRICK:  Objection.  Asked and answered a
4  hundred times.
5   A  I'm not the expert at making determinations on what
6  somebody says.  HR does that in this sort of an issue, in this
7  sort of a complaint.
8   Q  So you can't answer the question as to whether or not
9  Turney saying that --
10   A  I don't think I can.
11   Q  Hang on. -- would be a violation of company policy?
12   A  I don't think I can.
13   Q  And that's because you're not an expert.
14      MS. KIRKPATRICK:  Objection.  It's a
15  mischaracterization of his testimony.
16   A  Correct.
17   Q  Is it also because you don't know the context of the
18  comment?
19      MS. KIRKPATRICK:  He also said it needs to be
20  investigated by HR before a conclusion is made.
21   Q  Is it because you don't know the context of the comment?
22  Is that also why you're not able to make that determination?
23      MS. KIRKPATRICK:  Objection.  Asked and answered.  He
24  told you that already.
25   A  It's both.

## Page 127

1   Q  Because you need to know the context and you're not an
2  expert?
3   A  I wouldn't provide advice unless I knew the context like
4  you said.
5   Q  I'm not asking --
6   A  I'm trying to answer the question.  And as far as the rest
7  of it, I'm not the expert that does the investigation that is
8  part of the organization that does this professionally.
9   Q  Okay.  That's fine.  I just -- my question is slightly
10  different so I want to make sure I understand.  I understand
11  that you are not able to answer the question as to whether
12  Turney calling Jesse a hot blonde would violate company policy?
13  Yes?
14   A  Correct.
15   Q  Is part of the reason that you're not able to do that is
16  because you're not an expert in terms of professional
17  investigations?
18   A  Correct.
19   Q  And is another reason why you're not able to do that is
20  because you don't know the context in -- or you need to know
21  the context in which that comment was made?
22      MS. KIRKPATRICK:  Objection.
23   A  I'm not part of the investigation, but yes.
24   Q  Any other reasons as to why you would not -- you're not
25  able to answer the question as to whether a male supervisor

## Page 128

1  calling his female subordinate a hot blonde would violate
2  company policy?
3   Q  Any other reasons?
4   Q  Yeah, other than we just discussed, you're not an expert
5  in terms of professional investigations and you don't know the
6  context?
7      MS. KIRKPATRICK:  Objection.  There's more than he
8  said than that.
9   Q  Anything else?
10   A  Jumping to conclusions is probably the worst thing a
11  manager can do.
12   Q  Okay.  Can you answer my question?
13   A  I thought I did.
14   Q  No.  I didn't ask about jumping to conclusions.
15  You said is there anything else and I said that was the
16  other thing.
17   Q  How would that be jumping to conclusions to determine
18  whether or not -- you got to let me finish.
19   A  Go ahead.  I'm sorry.
20   Q  -- as to whether Turney saying that to Jesse would violate
21  company policy?
22      MS. KIRKPATRICK:  You're assuming first of all that
23  it happened.
24   Q  Because according to Greene, according to what Kloosterman
25  wrote about her interview with Greene, you see Greene says it

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Page 129

1    happened, right, you see that?
2    A  Is this Greene's?
3    Q  Let me go back.
4         MS. KIRKPATRICK:  So if Greene says it happened, it
5    must have happened.
6         MS. GURMANKIN:  If you make an objection to form,
7    please make an objection to form.
8         MS. KIRKPATRICK:  Your questions are improper.
9         MS. GURMANKIN:  Then make an objection to form.
10        MS. KIRKPATRICK:  No, I'll make more than that.  Stop
11   asking improper questions.
12   BY MS. GURMANKIN:
13   Q  Go to P 26, that's what we were looking at.
14   A  I'm on P 26.
15   Q  Okay.  So are you on Page 2?
16   A  Yes.
17   Q  Okay.  So this is what we looked at.
18   A  This is Jeremy Greene?
19   Q  Mm-hmm.
20      Okay.
21   Q  And just so we're clear, go to Page 1.  You can confirm
22   that's Jeremy Greene?
23   A  That's okay.
24   Q  Do you see it?
25   A  Yes.

Page 130

1    Q  Back to Page 2.  You see under the first claim that we
2   looked at, the claim that Jesse made I was told I'm a hot
3   blonde by my supervisor, right?
4   A  Mm-hmm.
5   Q  Yes?
6         MS. KIRKPATRICK:  Objection.
7   Q  I just need you to say yes.
8   A  Yes.
9   Q  And then --
10        MS. KIRKPATRICK:  Asked and anwered.
11   Q  -- going over this, that Greene's response is according to
12   Kloosterman's notes, yes, I did hear that.  It just seems like
13   normal talk.  You repeated the story.  I don't think it's that
14   inappropriate, normal guy talk.  I don't remember her being
15   offended or noticeable.
16      So according to Kloosterman's notes, Greene is confirming
17   that Turney said that to Jesse.  Do you see that?
18   A  Yes.
19   Q  So is there any other information -- or are there any
20   other reasons other than you're not an expert in terms of
21   professional investigations and you don't know the context, any
22   other reasons as to why you can't answer the question --
23   A  No.
24   Q  -- as to whether that violated company policy?
25   A  No.

Page 131

1         MS. KIRKPATRICK:  Objection.  He gave you other
2   reasons.  You're mischaracterizing his testimony.
3   Q  I'm sorry.  I don't think I asked you this, but you never
4   saw this document, correct?
5   A  That is correct, I did not.
6         MS. KIRKPATRICK:  Objection.  Asked and answered.
7   Q  And no one ever told you what was in there or what was
8   being used?
9         MS. KIRKPATRICK:  Objection.
10   A  That is correct.
11   Q  Let me show you -- who's Dan Krise?
12   A  It's Krise.
13   Q  Krise?
14   A  He was in my organization.  I think he was in the
15   maintenance department.
16   Q  You should have P 24 in front of you.
17   A  I see it.
18   Q  The interview with him.
19   A  Yes.
20   Q  You have never seen this, right?
21   A  That's correct.
22   Q  No one ever told you anything that he said?
23   A  That's correct.
24   Q  If you look under Number 2.  On Page 1, the question is
25   describe the work environment and team dynamics on your

Page 132

1    immediate team, ie, direct reports of Will.  There are two
2   teams, the techs in the field who aren't here very often and
3   guys who are in cubicle team.  Awesome, things have been tough
4   and we have been working hard.  Next part, A lot of men work
5   here.  It doesn't surprise me.  No specifics come to mind.  It
6   is a men-dominated environment.
7      Do you see that?
8   A  Mm-hmm.
9   Q  Yes?
10   A  Yes.
11   Q  Do you agree with that?
12   A  Not necessarily.
13   Q  How come?
14   A  We had a number of women in our workforce.
15   Q  Any other reasons why you disagree with that?
16   A  I didn't know that they called themselves cubicle team
17   awesome.  I have no idea what that means.
18   Q  Based on your experience at Shell, you would agree that
19   the oil industry is generally dominated by male employees?
20   A  I have no idea.  Ask your question again.
21   Q  Sure.  Based on your experience at Shell, do you agree
22   that the oil industry is generally dominated by male employees?
23   A  The majority of the staff I believe in this industry are
24   male, yes.
25   Q  And is there anything that you did to make sure that the

33 (Pages 129 to 132)

Page 133

1   females in your organization when you were operations manager
2   of Appalachia felt comfortable in that environment?
3   A   Anything I did.
4   Q   Mm-hmm.
5   A   Other than provide training, talked to people.
6   Q   Anything else?
7   A   Nothing comes to mind specifically.
8   Q   Who did you talk to to make sure that women in your
9   organization when you were office manager of Appalachia felt
10  comfortable as women in that organization?
11  A   Who did I talk to?
12  Q   Yeah.  You said you talked to people, that was part of
13  what you did?
14  A   That was a different question I think relative to how
15  women are in the organization.
16  Q   No.  My question was what did you do to ensure that women
17  in your organization when you were office manager at Appalachia
18  felt comfortable in that environment, and your response was
19  provide training and talked to people.  Is that accurate?
20  A   Yeah.  I talked to women within our organization.
21  Q   Ever talk to Jesse about that?
22  A   About that, no.  I would have said hi, how's it going.
23  Q   I'm sorry.  Go ahead.
24  A   That would have been a standard, you know, hallway
25  conversation.

Page 134

1   Q   Did you ever talk to any females in the Appalachia
2   organization when you were operations manager to ensure that
3   they felt comfortable in the male-dominated environment?
4   A   I don't have any specifics.
5       MS. KIRKPATRICK:  Objection.
6   Q   What training did you provide?
7       COURT REPORTER:  Wait, wait, wait.  One at a time.
8       MS. GURMANKIN:  Object to form.
9       MS. KIRKPATRICK:  Objection.  It was a
10  mischaracterization of his testimony.  He said it was not a
11  male-dominated environment and in your question you assumed and
12  said it was a male-dominated environment.  So do not
13  mischaracterize his testimony.
14      MS. GURMANKIN:  Are you finished?
15      MS. KIRKPATRICK:  No.
16      MS. GURMANKIN:  What else?
17      MS. KIRKPATRICK:  Go ahead.
18      MS. GURMANKIN:  So you are finished?
19      MS. KIRKPATRICK:  Now I am.
20      MS. GURMANKIN:  Okay.  Great.  Thank you.
21  Q   Did you do anything when you were office manager of
22  Appalachia to ensure that the females in your organization felt
23  comfortable in an industry that was mainly male or primarily
24  male?
25      MS. KIRKPATRICK:  Objection.

Page 135

1   Q   Whatever words you used to describe it?
2       MS. KIRKPATRICK:  Objection.
3   A   I don't remember specifics of what I may have done.
4   Q   Did you do anything?
5   A   I don't recall.
6   Q   Okay.  Going to Page 2 of Krise which should be on your
7   screen.
8   A   You moved it that time so I didn't have to move it.
9   Q   Yeah.  Do you see Number 6?
10  A   Number 6, yes.
11  Q   Okay.  Is there anything else you would like to share
12  related the items we discussed today that hasn't been asked
13  yet.  His answer is, In general, I think it's a tough work
14  environment for women.  Just generally it could be a respect
15  issue culturally, socio-economically.  Feeling respected, it
16  might be the type of environment where if you were a man you
17  would be treated differently.
18      Anyone ever tell you that?
19  A   No.
20  Q   You think that's something that you should have known as
21  operations manager of Appalachia?
22  A   I don't agree with it.
23  Q   That wasn't my question.  Do you need my question
24  repeated?
25  A   Ask the question again.

Page 136

1   Q   Do you think that's something that you should have known
2   that Krise told Kloosterman as the operations manager of
3   Appalachia?
4   A   If somebody felt that way, they should have raised their
5   issue.
6   Q   That wasn't my question.  Do you think that's something
7   that you should have been told by Kloosterman or HR that this
8   was being reported?
9   A   No.
10  Q   How come?
11  A   It's not my business as part of the investigation.  HR is
12  involved in our -- so many of our processes, the ratings
13  process.  I'll stop there because I can't think of anything
14  else.
15      (Exhibit P 18 introduced.)
16  Q   All right.  You're being shown what's been marked as
17  Exhibit 18.  These are Kloosterman's notes of her interview
18  with Jesse.  You have never seen this, correct?
19  A   That's correct.
20  Q   No one ever told you anything that Jesse said?
21  A   That's correct.
22  Q   All right.
23  A   Other than the conclusion document that has hot blonde I
24  believe listed on it.
25  Q   Okay.  But nothing else?

34 (Pages 133 to 136)

Page 137

1   A   No.
2                (Exhibit P 19 introduced.)
3   Q   All right.  You're being shown what's been marked as P 19.
4   These are Kloosterman's interview notes with Turney.  You have
5   never seen this, right?
6   A   Correct, I've never seen it.
7   Q   And no one ever told you about anything that he said
8   during the course of the investigation?
9   A   That is correct.
10  Q   All right.  So at some point you learned that the
11  investigation has been concluded.  I think you said earlier you
12  don't remember how or from whom you learned that, right?
13  A   That's correct.
14  Q   But at some point you were shown the investigation
15  overview document?
16  A   I don't know which document you're referring.
17  Q   At some point you were shown a document that said what?
18  A   Conclusions of the investigation.
19  Q   And who showed you that?
20  A   Or outcomes or I can't remember what they called it.
21  Q   Who showed you that?
22  A   I don't remember.
23  Q   Do you remember what department they were from?
24  A   HR.
25  Q   Do you remember how you received it?

Page 138

1   A   No.
2                (Exhibit P 32 introduced.)
3   Q   You have been shown Exhibit 32.  Is this it?  It's three
4   pages.  Read through the whole thing, whatever you need to do
5   to answer the question as to whether this is the document you
6   referred to.
7   A   I was actually referring to I thought a one-page document
8   but maybe this was it.  I don't know.
9   Q   Go through and see if it's maybe one page of this
10  document.
11  A   I don't know if I have seen this to tell you the truth.
12  Q   Any part of it?
13  A   On Page 1.  Yeah, I don't remember if this particular
14  document was given to me or not.  I don't remember.
15  Q   Okay.  Do you remember seeing -- do you have a specific
16  recollection of seeing any part of this document before today?
17  Or I'm sorry, before preparation for your deposition?
18  A   Of this document, I don't remember.
19  Q   Did you see this document when you were prepping for your
20  deposition?
21  A   Yes.
22  Q   But you don't remember if you saw it before that?
23  A   No.
24  Q   Or any part of it?
25  A   Correct.

Page 139

1   Q   Do you remember what the document said that you saw?
2   A   I remember the document that Will had to sign at the final
3   conclusion which was the outcome where Will had to sign a
4   document that basically I read the document to him, turned the
5   paper to him, he signed it, and that was it.  And some of this
6   stuff I believe was on it there as far as conclusions.
7   Q   Okay.  The document that you just referred to that you
8   went over with Turney --
9   A   Yes.
10  Q   -- and had him sign, is that the only document that you
11  ever saw regarding the investigation?
12  A   Honest, I can't remember.
13  Q   As you sit here today?
14  A   I know that was a document that I did see.  I don't know
15  that I can honestly say that I saw this document before.
16                (Exhibit P 33 introduced.)
17  Q   I'm showing you what's been marked as Exhibit 33.  Is that
18  the document that you just referred to?
19  A   Yes.
20  Q   This is the written warning that Turney got, right?
21  A   Yes.
22  Q   This is the one that you went over with him?
23  A   I read every word on this document.
24  Q   Okay.  In person?
25  A   In person to him directly sitting across the table from

Page 140

1   me.
2   Q   And you had him sign it?
3   A   Yes, in front of me.
4   Q   As you sit here today, other than this document marked as
5   Exhibit 33, can you recall whether you saw any other documents
6   in connection with the investigation?
7        MS. KIRKPATRICK:  Objection.  Asked and answered.
8   A   Yeah, I can't remember.
9   Q   You don't remember one way or the other?
10  A   No.
11  Q   All right.  So at some point when you learned that the
12  investigation has been concluded, and you don't remember how or
13  from whom, are you told that there's been -- well, are you told
14  anything about the investigation conclusion?
15  A   Am I told anything about -- well, I had to deliver these.
16  Q   Okay.
17  A   So I'm sure I would have had to review these to make sure
18  that I understand them with HR.
19  Q   Just so we're on the same page, we're talking about one
20  document here?
21  A   I'm talking about this document that's on the screen right
22  now.
23  Q   Which is P 33?
24  A   Yes.
25  Q   Because you said plural, you used a plural --

35  (Pages 137 to 140)

Page 141

1    A    Well Mark Hoover had one as well if I remember.
2    Q    You got to let me try to finish my question.
3    A    I'm sorry.  I'm sorry.
4    Q    All right.  So at some point before you sit down with
5    Turney, do you have a specific recollection of someone telling
6    you that there's been a conclusion that Turney violated the
7    company's policies or words to that effect?
8    A    You're expected -- yeah, I mean, that's why we did this.
9    Q    Okay.
10   A    The conclusion of the investigation was this.
11   Q    This P 33?
12   A    Yes.
13   Q    The warning that Turney got?
14   A    Yes.
15   Q    Do you recall, did someone tell you when you were told
16   that the investigation has been concluded that there was a
17   decision -- well strike that.
18       Whose decision -- were you involved in the decision to
19   give Turney the written warning?
20   A    I don't remember.
21   Q    You don't remember one way or the other?
22   A    No.
23   Q    Well do you remember when you were told about the
24   conclusion of the investigation, were you also told that there
25   was a decision that Turney -- or I'm sorry -- that there was a

Page 142

1    conclusion that Turney had violated policy?  Do you have a
2    specific recollection of that?
3    A    No, I do not.
4    Q    You just assumed that you were because at some point you
5    were shown P 33?
6    A    I had to deliver it.  I was the person that did that.
7    Q    And do you remember being told that there's been a
8    decision that Turney is getting a written warning?
9    A    Do -- say that again.
10   Q    Sure.  Do you remember being told that there was a
11   decision that as a result of the investigation Turney is going
12   to get a warning?
13   A    I don't remember specifically, but like we talked before,
14   this would have been representation of that.
15   Q    Right.
16   A    P 33 or O 33.
17   Q    But you don't recall anything about whether you were
18   involved in deciding that Turney should get a warning?
19   A    No.
20   Q    And you don't remember anything you were told about why?
21   A    No.
22   Q    All right.  But you also recall being told -- or you saw a
23   similar document from Mark Hoover?
24   A    I thought I did, but then my memory may be bad, so if
25   there isn't one of those documents, then it didn't exist.

Page 143

1    Q    Did you ever see a document?
2    A    I can't remember.
3    Q    Were you ever told that there was a conclusion that Hoover
4    violated company conduct or company policy?
5    A    I don't remember.
6    Q    So is it fair to say that aside from remembering that at
7    some point you were informed somehow that the investigation had
8    been concluded, you don't recall anything about what you were
9    told or by whom?
10       MS. KIRKPATRICK:  Specifically.
11   A    Yeah, the specifics of that, I do not recall.
12   Q    All you recall is that at some point you were told that
13   the investigation has been concluded and then at some point you
14   saw P 33?
15   A    Yes, and I delivered P 33.
16   Q    Right.  But other than that you don't have --
17   A    I was not -- sorry.  I'm sorry.
18   Q    At some point -- I'm sorry.  Other than that, you don't
19   remember being told anything about the investigation or the
20   conclusion of the investigation, correct?
21   A    I was told possibly that the investigation was concluded
22   and that's the reason why this paper was done, was developed.
23   Q    Other than that, you don't have a recollection of being
24   told anything else about the investigation or the conclusion,
25   right?

Page 144

1    A    Right.
2    Q    You were not involved in drafting P 33; is that right?
3    A    That's correct.
4    Q    And you don't recall who gave it to you or told you to
5    deliver it to Turney?
6    A    That's correct.  But you asked me that question before and
7    I said HR.
8    Q    But you don't remember who?
9    A    That's correct.
10   Q    Do you remember if you were involved in any discussions
11   about the -- any consequences for Turney that would result as
12   part of the investigation?
13   A    I don't remember.
14   Q    And, I'm sorry, I just want to clarify you were told by
15   someone in HR that Turney was going to get a written warning
16   and you were handed the unsigned version of P 33 to give to
17   him?
18   A    This was the conclusion, yes.
19   Q    Yes.  Okay.  And were you told you had to meet with him to
20   deliver it?
21   A    Yes.
22   Q    It's dated December 15, 2016.  Do you recall if that's
23   actually when you met with him?
24   A    It would have been, yes.
25   Q    Do you remember if you were actually handed the unsigned

36 (Pages 141 to 144)

Page 145

1    document or someone emailed it to you?
2    A    I don't remember.
3    Q    Was it just you and Turney?
4    A    Steve Craig may have been in the room but I don't
5    remember.
6    Q    Was it the room, the cubicle --
7    A    Yes.
8    Q    -- off the office that you guys had?
9    A    Yes.
10   Q    What do you recall about the meeting with Turney?
11   A    It was fast.  I told him what was -- he sat down, I sat
12   down.  Whether Steve was there or not, again, I don't remember.
13   I told him I was going -- that I guess the investigation had
14   been concluded and that I was going to read this document to
15   him and he was to listen, and then sign it and that's what
16   happened.
17   Q    And then after you said that, you read through it?
18   A    I read through it.
19   Q    Word for word?
20   A    Every single word on this page.
21   Q    And did he say anything when you were done?
22   A    I don't recall.
23   Q    Did he interrupt you at all?
24   A    Not that I remember.
25   Q    And then what happened after that you finished reading

Page 146

1    word for word, then what happened?
2    A    I turned the paper to him, he signed the document, and I
3    took the paper back.  I don't remember anything else.
4    Q    Did the meeting end after that?
5    A    Yes.  Like I said, it was a quick meeting.
6    Q    And then what did you do with the signed document?
7    A    I don't remember specifically what I did with it but the
8    normal process would be -- because these go into personal files
9    would be to turn that over to HR.
10   Q    But you don't remember what you did?
11   A    I don't remember if I scanned it, emailed it, sent it by
12   US postal service.  I don't know.
13   Q    Is that the only time that you ever communicated with
14   Turney about the issues that Jesse had, the investigation or
15   the conclusion of the investigation?
16   A    As far as I know and can recall, yes.
17   Q    And other than the conversation -- well strike that.
18   After you have been told that the conclusion -- that the
19   investigation had been concluded, did you have any
20   conversations with Jesse?
21   A    I don't -- I don't recall.
22        (Exhibit P 34 introduced.)
23   Q    I'm showing you what's been marked as P 34.  If you can --
24   this is a three-page document.  If you can look at it, you see
25   on the first page there's an email from you to Kloosterman?

Page 147

1    A    Okay.
2    Q    Do you see that?
3    A    Yes.
4    Q    And the subject is signed letter, confidential, Will
5    Turney.  Do you see that?
6    A    Where does it say that?
7    Q    At the top.
8    A    Oh, signed letter, confidential, Turney.  Yes, I see that.
9    Q    That's dated the same day as the warning 12/15.  Do you
10   see that?
11   A    Yes.
12   Q    And you say, Megan, please do what you need with the
13   letter.  I assume this includes Michelle Priest.  I appreciate
14   the work you did to get us to this conclusion.
15        Do you see that?
16   A    Yes.
17   Q    And then there is the second page which is the signed
18   warning.  Do you see that?
19   A    Yes.
20   Q    So is that what you are scanning to her?
21   A    Yes.
22   Q    And then go to the third page which I just did for you.
23   What is this?
24   A    I have no idea.
25   Q    Never seen it before?  If you can just read through it and

Page 148

1    make sure.
2    A    I have no idea what this is.
3    Q    Okay.  You have never seen it?
4    A    Not that I recall, no.  Who is it about?
5    Q    Did you ever have any conversations with Kloosterman after
6    the initial small talk when she came to the Wellsboro office to
7    do the investigation about the investigation?
8        MS. KIRKPATRICK:  Objection.
9    A    I don't recall any specifics.
10   Q    How about Craig, any conversations with Steve Craig about
11   the issues, the investigation, or the conclusion or attorneys
12   written warning after that initial conversation when he first
13   comes to you?
14   A    No, not that I recall.
15   Q    Other than Turney's written warning, were you told that
16   there would be any other consequences for him?
17   A    No, not that I recall.
18   Q    Are you aware of any?
19   A    No.
20   Q    And you never suggested that there be any?
21   A    We implemented the paperwork that --
22   Q    But someone told you they were doing 00 the company was
23   doing that?
24   A    That was the conclusion of HR after they concluded the
25   investigation, correct.

## Page 149

1 Q And no one ever talked to you about any other things that
2 would be done to Turney or any other consequences?
3 A Correct, that I recall.
4 Q So if you go back to the written warning for a second
5 which I'm showing you P 33.
6 A Yep.
7 Q There's nowhere on here that it references that Turney
8 called Jesse a hot blonde, is there?
9 A If it's not, then it's not.
10 Q Can you just confirm?
11 A Rather than me reading every -- can you confirm it?
12 Q Yeah, I can confirm it, but I would like to have you
13 confirm it as well.
14 A I don't see it, no.
15 Q So where did you get that from?
16 A It must have been from somewhere else in the pre-read.
17 Q You mean in the dep prep?
18 A Yes. Yes. Sorry. From Friday.
19 Q Turney remains in his supervisory role, correct?
20 A Yes, he does.
21 Q And he remains in the group, correct?
22 A In what group?
23 Q In the same group. He wasn't reassigned or transferred or
24 anything?
25 A At that time, no.

## Page 150

1 Q At some point subsequent to that was he?
2 A Not while I was there but I don't know.
3 Q Were you aware that he was eventually promoted into a
4 maintenance supervisor position?
5 A He was in a maintenance supervisor position.
6 Q Were you aware that he was promoted after this
7 investigation?
8 A No.
9 Q Were you aware that at some point he started working in
10 Houston?
11 A No.
12 Q Is this the first time you are hearing that?
13 A Yes.
14 Q Both with Houston and the promotion?
15 A Both.
16 Q What happened with -- did anything happen with Jesse that
17 you are aware of as part of the investigation or resulting from
18 the investigation?
19 A She took a different position.
20 Q And how did that come about?
21 A She was provided some alternatives within our asset where
22 she could function outside of her current role, outside of her
23 current line.
24 Q And how did that come about?
25 A I don't remember specifics but it would have come about

## Page 151

1 somehow. I don't know. I don't remember. I do remember of
2 the list that I did coach -- Jesse had questions. I talked to
3 Jesse about options and encouraged her or at least suggested to
4 her, because she was interested in her advancement, in going
5 places with the company, that the agency job had the highest
6 top, if you understand what I'm saying, the highest end of the
7 roles that were on that sheet.
8 Q Did you present Jesse with these options?
9 A I know I talked to her about it. I don't remember if I
10 presented it or not. I don't know.
11 Q Was it your decision to offer her other options outside of
12 Turney's group?
13 A It was not my decision.
14 Q Whose decision was it?
15 A I don't know.
16 Q Do you remember which group made the decision? Was it
17 someone in HR?
18 A No, I don't know.
19 Q Well how were you told?
20 A I think it would have been operations working with HR to
21 look for opportunities for Jesse.
22 Q Were you involved in that?
23 A In someways, certainly, but I don't remember.
24 Q You remember being involved but you don't remember how; is
25 that fair?

## Page 152

1 A Yes. That's probably fair.
2 Q And the decision to move her out of Turney's group was a
3 result of the investigation?
4 A I think so, yes.
5 Q Why?
6 A I don't recall. I don't think I can answer that question
7 because I don't have any information.
8 Q Did you ever have it?
9 A I don't remember.
10 Q When you say it was operations working with HR, who are
11 you talking about in operations?
12 A Possibly me. Possibly Steve Craig.
13 Q Are you guessing?
14 A I am guessing.
15 Q All right. I don't want you to guess.
16 A I can't answer the question then.
17 Q So do you have any idea who made the decision --
18 A No.
19 Q Hang on. As you sit here today, do you have any idea who
20 made the decision to move Jesse out of Turney's group as a
21 result of the investigation?
22  MS. KIRKPATRICK: Objection. Asked and answered. Go
23 ahead.
24 A Jesse chose the alternative of the options from which she
25 was presented.

Page 153

1  Q   But how did she come to be presented with options that
2  would take her out of Turney's group?
3  A   I don't recall the specifics.
4  Q   Do you recall generally?
5  A   No.  I recall talking to her about those jobs.  I think
6  she respected me and I think she trusts my -- trusts my opinion
7  being a long-term Shell employee that I was providing good
8  advice about the different options that were there.
9  Q   Do you remember if you were were involved in the decision
10  to transfer her out of Turney's group into another position?
11  A   Was I involved in the decision?
12  Q   Yes.
13  A   I think that was her decision.  Jesse made the decision to
14  move to the agency department.
15  Q   So did Jesse come to someone and say, hey, I'd like to
16  move into an HSE position?
17  A   I don't know if that would have been me or somebody else
18  but certainly that's how it would have happened.
19  Q   All right.
20  A   She would have communicated to somebody.
21  Q   Well do you know that she communicated to someone that she
22  wanted to move out of Turney's group into an HSE position, or
23  are you guessing?
24  A   Do I -- ask the question again.
25  Q   Yeah.  I want to understand.  If you don't remember,

Page 154

1  that's fine, just tell me you don't remember but I want to
2  understand.  The result is that after the investigation is
3  concluded, Jesse is moved out of Turney's group, right?
4  A   Mm-hmm.
5  Q   Yes?
6  A   Yes.
7  Q   And she's moved into an HSE position?
8  A   Yes.
9  Q   Was that the only option she was presented with, or was
10  she presented with other options?
11  A   From my memory, there were at least two other options or
12  maybe three other options.  There were options.
13  Q   Who came up with those options?
14  A   I don't remember.
15  Q   Do you remember if you were involved in that, or you don't
16  remember?
17  A   I don't remember specifically.
18  Q   And how did it come about that Jesse moved out of Turney's
19  group into an HSE position?  Was that a decision that someone
20  at the company made, was that something that Jesse initiated,
21  or you don't remember?
22  A   I don't remember the specifics around how that was
23  actually -- how that actually occurred.
24  Q   Do you remember anything generally about how that
25  occurred?

Page 155

1  A   Jesse chose the position and then the action was to move
2  her into that role.
3  Q   Right.  But I want to understand if you remember anything
4  about how Jesse came to choose the position.  Was that
5  something she initiated, or was that a decision that the
6  company made?
7        MS. KIRKPATRICK:  Objection.  Asked and answered.
8  A   The company did not make that decision.
9  Q   So Jesse initiated it?
10  A   Jesse made the decision.
11  Q   So did Jesse come to you or someone else at the company
12  and say, I want to move into another position, what's
13  available, and then options were presented to her?  Is that
14  your recollection?
15  A   So that's a very gigantic question you just asked.  Could
16  you break that up?
17  Q   Yeah.  Did Jesse come to you and say something to the
18  effect of, I want to move out of Turney's group into another
19  position, are there any options available?  Not the exact words
20  but something to that --
21  A   I don't remember the specifics around how all of this came
22  about.
23  Q   So you don't remember whether it's a move that she
24  initiated or whether someone at the company made the decision
25  that she was going to go out of Turney's group into another

Page 156

1  position; is that fair?
2  A   I don't remember.  I don't remember.  I honestly don't
3  remember.
4  Q   Is it true that -- well strike that.
5        The options -- I think you said Jesse was given two or
6  three options, right?
7  A   Yeah.  I was thinking it was three or four including the
8  job that she ultimately took, but that's the best of my
9  recollection.
10  Q   Okay.  Was one of the options she was given was to stay in
11  her role that she was in then and for the company to reassign
12  Turney to a different role?
13  A   I believe that was a possibility, yes.
14  Q   Who came up with that?
15  A   I don't know.
16  Q   So she was presented with that option?  That was one of
17  the --
18  A   I think that was on the list, yes.
19  Q   Okay.  And you don't remember who came up with that?
20  A   No.
21  Q   And she said no to that?
22  A   She took the other job.
23  Q   So she said no staying in her current role?
24  A   I don't know that she said no to taking -- to staying in
25  her role.

## Page 157

1   Q   Did she indicate -- these are conversations you had with
2  her about this, right?
3   A   I discussed alternatives with her about the other
4  positions that she didn't know about.  I encouraged her to take
5  the role in HSE of those options.
6   Q   Why?
7   A   Because of the -- I already told you.  Because of the
8  value -- well I'll go into details.  I think because of the
9  value, because of the top end potential in that role, and what
10  she would learn.
11   Q   What was it specifically about that role that led you to
12  encourage her to take it?
13   A   She would be in the field and she could do that job.
14         (Exhibit P 35 introduced.)
15   Q   All right.  I'm showing you what's been marked as Exhibit
16  35.  If you can look through this and let me know when you're
17  done.
18         VIDEOGRAPHER:  Going off the record at 12:26.
19         (Brief recess.)
20         VIDEOGRAPHER:  Back on the record at 12:28.
21   Q   You have had an opportunity to review P 35?
22   A   Yes.
23   Q   So looking at the second page.
24   A   Yes.
25   Q   This is an email from you to Jesse copying Megan

## Page 158

1  Kloosterman December 12, 2016.  Do you see that?
2   A   Yes.
3   Q   And you meet with Turney on December 15 to give him the
4  written warning, right, I mean, we saw that?
5   A   Yes.
6   Q   So does this refresh your recollection as to how soon or
7  when you're told about the conclusion of the investigation?
8   A   No.  I don't know when the investigation concluded.
9   Q   But it would have been before the date of this email,
10  right?
11   A   I believe it would have had to have been before this.
12   Q   Because Jesse is being talked to about moving to a
13  different role as a result of the investigation, you testified
14  to that, right?
15   A   As a potential opportunity, yes.
16   Q   So where are these -- you presented her here with three
17  options, right?
18   A   Mm-hmm.
19   Q   Yes?  You have to say yes for the record.
20   A   Yes.  Sorry.
21   Q   First is backup control room operator?
22   A   Yes.
23   Q   Right?  Where was that -- where would have been, what
24  group?
25   A   In operations.

## Page 159

1   Q   In Wellsboro?
2   A   Yes.
3   Q   Reporting to whom?
4   A   Mark Hoover.  Or actually to -- I'm trying to remember.  I
5  don't remember what the organization looked like, if we had an
6  intermediate supervisor or a work lead or something like that
7  at that time.
8   Q   But it would have been under kind of Hoover's umbrella?
9   A   It was still under me and that was a shift into Mark
10  Hoover's role or Mark Hoover's group responsibility.
11   Q   So she would have had some indirect reporting
12  responsibility to Hoover?
13   A   Yes.
14   Q   And why was it just backup control room operator as
15  opposed to control room operator?
16   A   I think you could say that was a bad choice of words.  It
17  was a job to train as a control room operator.  We were trying
18  to automate our operation more significantly.  We were building
19  a control room.  We had two people at that time that
20  worked in the control room.  I don't think we were 24 hours a
21  day yet.  I mean we were trying to work-up this asset such that
22  we would be more automated.  Basically backups should have been
23  control room operator trainee.  Most control room operators had
24  come from the operating ranks themselves, actual field
25  operator.

## Page 160

1   Q   So it's wrong to say backup control room operator?
2   A   Yeah.  It was -- it was control room operator role.
3  That's where it ultimately leads.
4   Q   Okay.  But she would have been a trainee?
5   A   At first, of course, in any job you would be a trainee.
6   Q   Right.  Do you know if she was qualified for that role?
7   A   That's why we provide training.  I don't know.
8   Q   Where did you come up with this role, the backup control
9  room operator?
10   A   I don't know that I came up with this role.
11   Q   Do you know who did?
12   A   No.
13   Q   No idea where you got that from that you were able to put
14  it in this email?
15   A   No.  I imagine it was proposed and talked about and
16  thought a viable opportunity for Jesse.
17   Q   I don't want you to guess.  Do you have any idea --
18   A   I don't know.
19   Q   Let me just finish.  Do you have any idea how you came to
20  include backup control room operator as a possibility in this
21  email?
22   A   No.
23   Q   It says, In this role you will keep your current job grade
24  and work schedule.  Whose decision was that?
25   A   Say that again.  Where does it say that?

Page 161

1  Q   Right after backup control room operator, it says, In this
2  role you would keep your current job grade and work schedule?
3  A   I'm blind.  I can't see it.  Are you on one, two or three?
4  Q   One.
5  A   You're on one.
6  Q   Second sentence right after the title.
7      MS. KIRKPATRICK:  It's back.
8  A   Oh.  I was reading down.  I thought you said the last
9  sentence in there and I just couldn't see it.  It's in the
10  first line.
11  Q   Mm-hmm.
12  A   Yeah.  I see that.
13  Q   Whose decision was it that that would be her current job
14  grade and work schedule?
15  A   I don't know.
16  Q   It goes on to say, You would learn the control room
17  operator position and fill in for Bob and Lynn.
18      Were those the control room operators?
19  A   They were the two people that had those roles, yes.
20  Q   In their absence on this vacation.  What would she be
21  doing when they weren't sick or on vacation?
22  A   I believe that's what the reference is about the water
23  management.  I'm just, I'm guessing.  Sorry.  I shouldn't
24  guess.  I don't know.
25  Q   You don't remember?

Page 162

1  A   I don't know.  That's correct, I don't remember.
2  Q   Second option is move to the environmental team and work
3  as an environmental tech.  You would learn the field role that
4  Pat Bernethy currently holds.
5      Was he going somewhere?
6  A   I don't believe so.
7  Q   So would she be joining Pat Bernethy in the position that
8  he held?
9  A   Yes.
10  Q   Was that an open position?
11  A   It was a position that Pat was overloaded in.
12  Q   Was there a second position actually created at the time
13  you're sending this email?
14  A   Yes.  A second opportunity for Jesse.
15  Q   No, no, no.  Was there an actual open position for
16  environment tech?
17  A   No.
18  Q   So if Jesse said yes to that, would there be anything that
19  would have to be done from the company's perspective about
20  getting a new position approved and --
21  A   Sure.
22  Q   -- posting it and having people apply?
23  A   Yes.
24  Q   So it's something that she would have had to apply --
25  A   Well when you say --

Page 163

1  Q   Hang on.
2  A   I'm sorry.
3  Q   Is it something that she would have had to apply and be
4  interviewed for?
5  A   I don't recall.  I answered early and I shouldn't have
6  because the last part of your session said posted.  I don't
7  believe the job was posted.
8  Q   Well there was no actual environmental tech job yet,
9  right?
10  A   There was not a second environmental tech job.
11  Q   There was one that Pat Bernethy held?
12  A   Yes.  And we had a contractor named April Heater who
13  supported Pat I believe in that role doing -- and I take that
14  back.  That's option three.  That's option three.  Sorry.  I
15  was confused.
16  Q   All right.  So right now Pat Bernethy was the only
17  environmental tech, right?
18  A   Yes.
19  Q   So what you were talking about or someone was talking
20  about because you don't remember how you came up with Number 2
21  that you wrote here, right?
22  A   Yes.
23  Q   Is creating a second environmental tech position similar
24  to the one that Pat Bernethy currently held, right?
25  A   Yes.

Page 164

1  Q   But there was no such position as of the time that you are
2  sending this email, correct?
3  A   That is correct.
4  Q   So if Jesse had said yes to this, what would have needed
5  to have been done from the company's perspective to create
6  another position, get it approved, and go through all that
7  process?
8  A   I don't know the specifics.  HR would have been involved.
9  Q   Did you have discussions with anybody when you're sending
10  Jesse this email -- hang on -- and say what needs to be done
11  here if she chooses this option?
12  A   Ask your question again, please.
13  Q   Was there any discussion that you were involved in with
14  anyone at the company including HR about what would need to be
15  done from the company's prospective about creating this new
16  position, getting it approved, going through all that needed to
17  be done if Jesse said yes to Option Number 2?
18  A   I don't recall.
19  Q   By the way, Number 1, the backup control room operator,
20  was that actually an open position at the time that you are
21  sending this email?
22  A   I don't believe so.
23  Q   So that would have to go through the same process?
24  A   Yes.
25  Q   Any discussion with anyone about that that you were

41 (Pages 161 to 164)

Page 165

1  involved in?
2  A  Not that I recall.
3  Q  Number 3.  Number 2, by the way, who would Jesse be
4  reporting to?
5  A  That's part of the agency organization.
6  Q  So who would she be reporting to?
7  A  I don't know.  Possibly Steve Ellis.
8  Q  Any other possibilities?
9  A  I don't believe so.
10 Q  Number 3, become a second F L I R.  What does that refer
11 to?
12 A  It's forward looking infrared.
13 Q  Camera operator for Appalachia.  This is the role that
14 April Heater currently holds?
15 A  Yes.
16 Q  There are forecasted increases in fugitive emission
17 inspections relating to methane?
18 A  Yes.
19 Q  Was a second FLIR camera operator position open at the
20 time that you're sending this email?
21 A  April was a contractor.  I think the idea was that over
22 time the role would be that April would be leaving the role and
23 if Jesse took that role, that she would take over the entire
24 responsibility.
25 Q  Had a decision been made as of the time that you are

Page 166

1  sending this email on December 12, 2016, that April would be
2  leaving that role?
3  A  Read -- say that question again.  Sorry.
4  Q  Sure.  As of the time you're sending this email December
5  12, 2016, had a decision been made that April would be
6  leaving the FLIR camera operator for Appalachia role that she
7  held as a contractor?
8  A  So you said December 16th but it's 12th on the email.
9  Q  I'm sorry.  I thought I said December 12th.
10 A  So I think that's what threw me the first time so I
11 thought I was looking at the wrong email.  Did -- was April
12 aware that her job -- that she could lose her job?
13 Q  Nope.  Had a decision been made as of December 12, 2016,
14 that April was going to be moving out of the role that she held
15 as a contractor FLIR camera operator for Appalachia?
16 A  I don't believe.  I don't recall specifically, no.
17 Q  So if Jesse had said yes to this role, there would have
18 needed to be discussions about whether or not April could be
19 moved out of the role and then what would happen to her and
20 then going through the same discussions about what the process
21 would be?
22 A  It would have been different discussions because April is
23 a contractor.
24 Q  Right.  The discussions would have included are we going
25 to move her out of the role, what's going to happen to her,

Page 167

1  along those lines?
2  A  Not necessarily what's going to happen to her because a
3  contractor -- if we release a contractor, they're gone, it's
4  not our responsibility.
5  Q  All right.  So the discussions would have included moving
6  April out of that role?
7  A  At some point Jesse would have had to have learned the
8  role first and I don't think we had two FLIR cameras.  Maybe we
9  did.  I don't remember.
10 Q  And you don't recall -- well this says become a second
11 FLIR camera operator, right?
12 A  Yes.
13 Q  And April was the only one at the time, right?
14 A  Yes.
15 Q  So was the proposal that was being made here to Jesse was
16 that there would be a second position created; April would hold
17 one and Jesse would hold the second?
18 A  Initially, yes, I think that's where it was.
19 Q  But there was no -- at the time you're sending this email
20 there was no second FLIR camera operator Appalachia position
21 approved?
22 A  That is correct.
23 Q  There was nothing approved by the company?
24 A  We had no Shell person in that role.
25 Q  That wasn't my question.  The company hadn't approved

Page 168

1  creating a second FLIR camera operator for Appalachia at this
2  time, correct?
3  A  Yes.
4  Q  Who would -- if Jesse were in a FLIR camera operator for
5  Appalachia position at this time, who would she be reporting
6  to?
7  A  I don't remember.
8  Q  What group would she have been in?
9  A  I don't remember.
10 Q  And you don't remember how you came up with any of the
11 options that you put in your email or whether you even came up
12 with these options, right?
13 A  That's correct.
14 Q  Do you remember how you came to write this email?  Let me
15 ask it this way.
16 A  No.
17 Q  Did you write this email?
18 A  Yes, I wrote this email.
19 Q  But you don't remember anything about where you got the
20 information?
21 A  Did you remember -- I mean I know I'm not supposed to ask
22 these type questions, but do you remember an email that you
23 wrote two years ago?
24 Q  I'm just asking.
25 A  I don't.  I don't remember the specifics around writing

Page 169

1    this email.  I don't.
2    Q    You don't remember anyone you talked to to get the
3    information regarding this email?
4    A    I don't remember.
5    Q    In the last paragraph, it says, I still need to check on
6    the viability of working in the inspection team as a data entry
7    person for CIMS.  What's that?
8    A    Computer inspection management system, I believe, or
9    computer based inspection management system.  It's part of the
10   asset integrity function.
11   Q    And who's Shane?
12   A    Shane Sollinger (phonetic) was the leader supervisor of
13   that department.
14   Q    So Jesse would be reporting to him if she joined that
15   group?
16   A    Yes.
17   Q    You say I talked with Shane about the possibility of
18   adding data entry clerk for CMIS to his team.
19       Do you remember how that came about that you talked to
20   Shane about that?
21   A    No.
22   Q    You go on to say, Right now the inspectors are entering
23   all the data themselves.  Shane will get back to me by 9 a.m.
24   tomorrow on the value to adding this role to his team.  The
25   inspection work won't go away and the need to enter data will

Page 170

1    exist all the time.  Future roles could grow under the
2    inspection team but unknown at this time.  Hope this helps.
3        Was there any actual open positions in CIMS at the time
4    that you're sending this email?
5    A    I don't recall.
6    Q    In the first paragraph of this email, you say, Thanks for
7    taking the time this afternoon to discuss potential roles for
8    you going forward.
9        Do you see that?
10   A    Yes.
11   Q    Do you recall meeting with Jesse on December 12, 2016, or
12   around then?
13   A    The date, no, and this is December 12.  So the date I
14   don't recall the specifics, but I did tell you before that I
15   did discuss -- at least I think I told you before that I
16   discussed with Jesse options that she had.
17   Q    Do you recall doing that before you sent the email?
18   A    That's why I would have written it that way.  I don't
19   recall it but that's -- what other conclusion could I come to.
20   I pre -- there is no way I did this in advance.
21   Q    Was it just you and Jesse?
22   A    Yes.
23   Q    And you don't remember how that meeting came about?
24   A    No.
25   Q    And did you discuss in that meeting anything about the

Page 171

1    investigation or the conclusions of the investigation?
2    A    No.  I don't recall.
3    Q    Just other opportunities?
4    A    Yes.
5    Q    You go on to say, As I outlined I would like for you to
6    quickly make a decision on which role you would like to pursue
7    so we can close out the rest of the action we will be taking.
8        Do you see that?
9    A    Yes.
10   Q    What did you mean by that?
11   A    We were trying to expedite Jesse's situation to get her
12   out of the environment, that investigation and discovery.
13   Q    You mean Turney's group?
14   A    Yes.
15   Q    Why?
16   A    That was the conclusion of the investigation.
17   Q    So someone told you that you were trying to expedite
18   getting her out of that situation?
19   A    Someone told.  I don't know.
20   Q    Well where did you get the information you just testified
21   to?
22   A    Say what I just said.
23   Q    You said you were trying to expedite getting her out of
24   the situation she was in, meaning being in Turney's group.
25       MS. KIRKPATRICK:  Objection.

Page 172

1    Q    So where did you get that information from?
2    A    I don't know.
3    Q    Did someone tell you?
4    A    I don't know.  I don't recall.
5    Q    It wouldn't have been your conclusion, right?  You would
6    have gotten that from HR or someone else at the company?
7    A    Most likely, yes.
8    Q    Did you take notes of your conversation with Jesse?
9    A    No, not that I recall.
10   Q    Did anyone at the company tell you that Jesse engaged in
11   inappropriate conduct as part of the investigation or the
12   conclusion?
13   A    Let me go -- I'll answer that question but let me go back
14   to the prior question.  You said were these -- this I take as
15   notes from the conversation.  Thanks for the time this
16   afternoon to discuss potential roles.  As I outlined we would
17   like -- so this is what we talked about.
18   Q    So you presented Jesse with the three options listed here
19   in that meeting?
20   A    And the potentially fourth one.
21   Q    For the CIMS?
22   A    Yes.
23   Q    Okay.  Does this email reflect everything that you
24   discussed with Jesse in that meeting earlier that day as far as
25   you recall?

43 (Pages 169 to 172)

Page 173

1    A   As far as I know, yes.
2    Q   All right.  As part of the investigation or the conclusion
3    did anyone from Shell tell you at any time that there was a
4    conclusion that Jesse had acted inappropriately?
5    A   I don't remember.
6    Q   Is there anywhere -- well strike that.  In that
7    conversation that you had with Jesse in the meeting that you
8    had with her before you sent this email, did you discuss with
9    her the possibility of staying in her current position and the
10   company reassigning Turney?
11   A   I don't recall the specifics.
12   Q   So you don't recall if you mentioned that one?
13   A   At this meeting, no.
14   Q   But you would have, right, because that was a possibility
15   that was being presented to her?
16   A   I think it was but I don't recall.
17   Q   How come that's not included in your email?
18   A   Because maybe it wasn't what we discussed.  I don't know.
19   I don't remember.
20   Q   Is that documented anywhere that Jesse was offered the
21   option to stay in her current position and the company would
22   reassign Turney?
23   A   I don't have any information or recollection.
24   Q   Do you recall seeing that anywhere?
25   A   No.

Page 174

1    Q   In your preparation for your deposition today, do you
2    recall seeing that anywhere?
3    A   I thought that that was always a possibility from these
4    processes that that could be an outcome.
5    Q   Where did you get that from?
6    A   Training.
7    Q   Did anyone tell you that a possibility as a result of the
8    investigation was keeping Jesse in her current position and
9    reassigning Turney?
10   A   Did anybody tell me?  Not that I recall.
11   Q   Okay.  And you don't recall ever presenting that to Jesse,
12   correct?
13   A   I don't remember.
14   Q   And you haven't seen that documented anywhere, correct?
15   A   I don't remember.  I don't know.
16   Q   How about the documents you reviewed last Friday, did you
17   recall seeing it anywhere in there?
18   A   I don't remember.  I don't remember if it specifically
19   said what you said.
20   Q   No.  What you said.  You said that at some point Jesse--
21   A   No.  I meant what you said relative to Friday.  Sorry.  Go
22   ahead.
23   Q   You don't recall seeing that document anywhere in the
24   documents you reviewed on Friday in preparation for your
25   deposition today?

Page 175

1    A   That's what I don't remember.
2    Q   And it's not included in this email you sent to Jesse on
3    Page 2 of Exhibit 35?
4    A   That's correct.
5    Q   And then starting on the bottom of the first page, going
6    into the second page, Jesse is responding to your proposals,
7    right?
8    A   I think so, yes.
9        MS. KIRKPATRICK:  Which page?
10   A   Page 1 at the bottom.
11   Q   So looking at the first paragraph of her email on December
12   13, 2016, where she says, Here is what I'm struggling with, my
13   current role as a maintenance analyst.
14       Do you see that?
15   A   Mm-hmm.
16   Q   Yes?
17   A   Yes.
18   Q   She says, My current role as a maintenance analyst I know
19   holds its value to the business because I have obtained,
20   parens, SAP PB 7 permissions transactions that no one else has
21   or knows at this point how to use.  Overall in my current role
22   I do not believe anyone from my team and/or asset could fulfill
23   my job without training which makes me believe I'm more
24   valuable as an employee in the analyst role over the potential
25   roles discussed.  I do also hold the role dear to me because

Page 176

1    I'm the first analyst for our site.
2        Did I read that correctly?
3    A   Yes.
4    Q   And you respond to her up top, right?
5    A   Yes.
6    Q   Why don't you say something to the effect of, well, an
7    option that you have is staying in your current maintenance
8    analyst role and we'll just reassign Turney?
9    A   I don't know.
10   Q   No explanation?
11   A   No explanation.
12   Q   And that would make sense for you to respond that way
13   given what she is saying, right?
14   A   It may or may not make sense.
15   Q   But no explanation for why you didn't say anything about
16   that?
17   A   I said I don't know.
18   Q   She's also -- she also references -- let's look at the
19   second paragraph.  She is saying to you she has not ruled out
20   -- with that being said, she has not ruled out the backup
21   control room operator position.
22       Do you see that?
23   A   Mm-hmm.
24   Q   Yes?
25   A   Yes.

44 (Pages 173 to 176)

Page 177

1   Q   She says, I feel as if my current role is unique where the
2   control room operator role there are already two other people
3   that currently do this role which makes me believe that
4   possibly down the road I would be the probable layoff.
5      Do you see that?
6   A   Yes.
7   Q   And Bob and Lynn were the other two people who held the
8   control room operator role at this time?
9   A   Yes.
10   Q   Did you respond to her in any way addressing that concern?
11   A   Not in my email response.
12   Q   Did you have a conversation with her where you addressed
13   that concern?
14   A   I don't recall.
15   Q   Why wouldn't you do that?
16   A   I don't know that I didn't.
17   Q   So you may have had a separate conversation?
18   A   I don't remember.
19   Q   Why wouldn't you include that in your email?
20   A   I don't know.
21   Q   Do you have a specific recollection of having any other
22   conversations with Jesse after the December 12 conversation
23   referenced in your email on Page 2 of P 35?
24   A   I don't recall any specific conversations.
25   Q   She says in the third paragraph, Also I do not like the

Page 178

1   title of backup control room operator.  She says, This may be
2   nitpicking, and then she says, Possibly there's a different
3   title.
4      Do you see that?
5   A   You went to Page 2.  Yeah, I see what's at the bottom of
6   Page 1.
7   Q   So how come you didn't say in response -- in your email
8   response, I was wrong.  I shouldn't have called it a backup
9   control room operator, it should be trainee, or something to
10   that effect?
11   A   I don't know.
12   Q   No explanation for that?
13   A   No.
14   Q   She also references on Page 2 at the end of her email she
15   may be going back to college in January.
16      Do you see that?
17   A   Yes.
18   Q   And --
19   A   Back on Page 1.
20   Q   Yep.  In your response you say, I'm curious about the
21   school comment.  Is this a full-time student.  Will you be
22   taking a sabatical from work to go to school.  What are you
23   studying.  If you're going back to school to further your Shell
24   work career, we should talk more.  I want to make sure we are
25   aligned on expectations.

Page 179

1      Do you see that?
2   A   Yes.
3   Q   She responds to you that she is 100 percent going back to
4   school to further her career within Shell.
5      Do you see that?
6   A   Yes.
7   Q   You never thought in your communications with her that she
8   wasn't fully dedicated to the company, did you?
9   A   No.
10      (Exhibit P 40 introduced.)
11   Q   I'm showing you what's been marked as P 40.  Do you know
12   what this is?
13   A   I'm reading it, yes.
14   Q   Sure.  Let me know when you're done.
15   A   Okay.  I believe this is the role that she took.
16   Q   The HSE analyst?
17   A   Yes.
18   Q   But what is the document itself?
19   A   It is a -- I think, but I don't know for sure, but I think
20   it is a piece of our posting, the job posting for that role.
21   Q   Did someone pull it?
22   A   I have no idea.
23   Q   So you don't know how this document came to exist?
24   A   No.
25   Q   The Post-It on there that says, Steve this was --

Page 180

1   A   I read that.
2   Q   Okay.  It says, Steve, this was my notes from a planned
3   discussion with Jesse about her role options?
4   A   Yes.
5   Q   But what was that -- the context of that?
6   A   As I was leaving, there were lots of people on -- so it
7   was December, the last week of December.  There's lots of
8   people on vacation.  Steve was not there.  I was going through
9   my files.  I pulled out as he's taking over my role documents
10   that I felt were important for him to have and that's why that
11   Post-It Note was on there.  So rather than just piling them,
12   getting a pile of paper, I put a note on the papers that I gave
13   him to say what it was.
14   Q   Is this around the time of December 2017, is that what
15   you're talking about?
16   A   It would have had to have been, yes.
17   Q   When you retired?
18   A   Yes.
19   Q   He took over your role?
20   A   Yes.
21   Q   So this was part of your transitioning?
22   A   Yes.
23   Q   So this is about a year after this discussion was taking
24   place?
25   A   What is about a year after this discussion?

45 (Pages 177 to 180)

Page 181

1　Q　When you're getting the Post-It --
2　A　Yes.
3　Q　-- and you're giving this to Steve?
4　A　When I gave this to Steve, it would have been in the last
5　week in December of 2017.
6　Q　Did you have other documents in your office that you
7　transitioned to anyone else regarding Jesse?
8　A　Steve was my direct report.  He would have received every
9　document regarding anything I thought was important.
10　Q　Do you remember if there was anything else regarding Jesse
11　other than P 40?
12　A　I don't remember.
13　Q　The handwriting on the right side, other than the Post-It
14　Note, is that yours?
15　A　Yes.
16　Q　What does that say?
17　A　Stay in role to vacation.  So this would have been likely
18　at the end of 2016 a forward plan for Jesse that she would stay
19　in her role up to her vacation which I assume is over
20　Christmastime, move into the new role that she chose in 2017,
21　and then transition with a maintenance replacement who would be
22　taking her spot as the maintenance analyst.
23　Q　Who does that?
24　A　I didn't recall until I saw some documents that I believe
25　it was Tina king.

Page 182

1　Q　In reference to your deposition?
2　A　Yes.
3　Q　Had Tina been working at the company before?
4　A　I don't know how long she was working there.
5　Q　But she was at the company?
6　A　She was an employee, yes.
7　Q　Were you involved in the decision to move her into the
8　maintenance analyst position?
9　A　No.
10　Q　Do you know who made that decision?
11　A　No.
12　Q　So at some point does Jesse -- how does she end up in the
13　HSE analyst position?
14　A　She would have expressed an interest.
15　Q　I don't want you to guess.  Are you guessing?
16　A　The only way it can happen is if she expresses an interest
17　in the job.
18　Q　I understand but I want you to tell me what you recall.
19　A　I don't know.  If you're not accepting our standard
20　processes within the company that would have been required to
21　put in place, I can't answer your question.
22　Q　That's fine.  I just need to understand what you recall.
23　A　That's fine.
24　Q　So you have no idea after the communications you had with
25　her about proposals how she actually ended up in the HSE

Page 183

1　position, correct?
2　A　Correct.
3　Q　And you don't recall any other communications you had with
4　her about the investigation or the new role after that December
5　12 conversation?
6　A　No.
7　Q　After that initial conversation after Steve Craig comes to
8　you and tells you about the issues she is having, the initial
9　conversation that started the investigation?
10　A　Yes.
11　Q　And then Jesse approaches you and you have a conversation
12　with her, did you do anything to make sure that she was safe at
13　any point after that?
14　　　MS. KIRKPATRICK:  Objection.  Asked and answered.
15　A　I did answer that question and that was my immediate
16　concern when she approached me.
17　Q　Right.  Did you do anything after that to ensure that she
18　was safe?
19　A　I don't recall.
20　　　MS. KIRKPATRICK:  Objection.
21　　　(Exhibit P 14 introduced.)
22　Q　Did you ever -- let me show you this.  I'm showing you
23　what's been marked as Exhibit P 14, you're looking at Page 3.
24　This is Jesse's internal -- the first page of Jesse's internal
25　complaint that she made to the company.  You can look through

Page 184

1　whatever you need to do but I just want to know if you have
2　ever seen this before.
3　A　I've never seen this before.
4　Q　Let me go back to the complaint, Jesse's court complaint.
5　You're being shown Page 15.  Do you have Paragraph 49?
6　A　Yes.
7　Q　So Paragraph 49.
8　　　MS. KIRKPATRICK:  Which page is that?
9　　　MS. GURMANKIN:  15
10　Q　On or about December 2016, following the investigation
11　into Plaintiffs sex discrimination complaints, Greg Larsen,
12　male operations asset manager, told Plaintiff to think about
13　how to presents herself in the office and what she talks about
14　at work.
15　　　I read that correctly?
16　A　Yes, you did read it correctly.
17　Q　Is that true?
18　A　I don't recall.
19　Q　Is it possible that you said that?
20　A　Anything is possible.
21　Q　Paragraph 50.  When Plaintiff asked Larsen what he meant
22　by his comments, he said that Plaintiff must make sure she
23　thinks about how she may come across.  Is that true?
24　A　You read it correctly, yes.
25　Q　Is that true?

46 (Pages 181 to 184)

Page 185

1    A   I don't know.
2    Q   You don't recall?
3    A   I don't remember.
4    Q   You don't recall one way or the other?
5    A   No.
6    Q   Plaintiff understood Larsen's comments to be blaming her
7    for the sex discrimination including sexual harassment to which
8    she had been subjected.
9        Did I read that correctly?
10   A   You read it correctly.
11   Q   You laughed when I read it.  Why did you laugh?
12   A   I was surprised.
13   Q   Why?
14   A   I can't imagine a situation where I would blame her for
15   what's said here.
16   Q   What does that mean for what's said here?
17   A   Sex discrimination or sexual harassment.
18   Q   And you testified earlier you never had a conversation
19   with her about the investigation other than the December 12
20   conversation about other positions for her, right?
21       MS. KIRKPATRICK:  That he could recall.
22   Q   Right?
23   A   That's correct that I can recall.  I can't necessarily
24   agree the date that she has listed there.  I don't remember.
25   Q   You mean you may have had conversations with her around --

Page 186

1    hang on -- around the date that is listed there but you don't
2    recall what was said?
3    A   This is her claim.  I don't remember what date any of this
4    stuff happened other than the 12/15 date where Will Turney
5    signed his paperwork and any of these other emails that you
6    have shown as evidence.  It's not in the front of my mind.
7    Period.
8    Q   All right.  After December of 2016, did you have
9    conversations with anyone at the company about Jesse?
10   A   Say that one more time.
11   Q   Sure.  After December 2016, did you have conversations
12   with anyone at the company about Jesse?
13   A   I don't recall.
14   Q   Did you ever become aware that she was making complaints
15   of continued discrimination and retaliation?
16   A   I was unaware of that as far as I know.
17   Q   Were you aware that she was making any complaints about
18   her employment after the investigation was concluded?
19   A   I don't think so.
20   Q   Did you at some point become aware that she was
21   complaining about her 2016 performance review?
22   A   I think so.
23   Q   How did you become aware of that?
24   A   I don't remember.
25   Q   Turney was involved in putting together that review,

Page 187

1    wasn't he?
2    A   What review?
3    Q   The 2016 performance review?
4    A   So are you talking about the writeup that goes into Shell
5    people or are you talking about her IPF?  What specifically are
6    you talking about?
7    Q   What's the difference?
8    A   Were you specifically involved, I guess maybe there is no
9    difference, but they are separate entities as far as I'm
10   concerned.
11   Q   Right.  So what's the difference between the writeup and
12   the IPF?
13   A   The writeup goes into Shell people and is a document that
14   is written by either the employee or the manager or supervisor
15   and agreed to by both parties before it is entered into the
16   system.  If there is a disagreement, then that statement can be
17   listed on that document that there is a disagreement from
18   either party and that goes into Shell people as well.  So
19   that's the performance writeup.
20   Q   And IPF?
21   A   IPF is a process annually, conducted annually by HR with a
22   number of different people from the asset to review people's
23   performance in order to reach an IPF number, which is individual
24   performance factor.
25   Q   Were you aware that Turney was involved in one or both of

Page 188

1    those?
2    A   Yes.
3    Q   Which one?  One or both?
4    A   The second one for sure.
5    Q   The IPF?
6    A   Yes.
7    Q   And that affects -- that reading affects an employee's
8    compensation?
9    A   Their bonus.
10   Q   Right.  And how did you become aware that Turney was
11   involved in Jesse's IPF for 2016?
12   A   How was I aware?
13   Q   Mm-hmm.
14   A   It's a meeting that is held that I'm there at.
15   Q   And as her supervisor, he would have impacted her?
16   A   It's an expectation that every individual supervisor is in
17   attendance or somehow represented.  The supervisors comments
18   are represented through another supervisor or me or somebody if
19   they are in the hospital or whatever.
20   Q   So the 2016 IPF, when would that meeting have been?
21   A   October.
22   Q   Of 2016?
23   A   Yeah.
24   Q   When are the final decisions made?
25   A   What do you mean by final decision?

47 (Pages 185 to 188)

Page 189

1    Q   At some point a final decision is made about the IPF?
2    A   Yes.  At some point those decisions are made.
3    Q   When?
4    A   There are different phases of approval that the whole IPF
5    process goes through.  It's an HR function.
6    Q   When was the final approval done?
7    A   When the IPFs are rolled out, I guess, in January, late
8    January.
9    Q   So for 2016, the final decisions would have been made
10   sometime in January of '17?
11   A   The final approvals would have been made and issued and
12   the IPFs would have been issued, yes.
13   Q   And there are multiple meetings that go on between the --
14   you and the supervisors for your group, for example?
15   A   There was one big meeting.
16   Q   In October?
17   A   Yes.
18   Q   Are there discussions that happened after that?
19   A   No.
20   Q   Everything is decided pending approval in October of 2016?
21   A   Individuals are placed in a 9 box grid basis performance
22   against goals, performance against their peers and their
23   behaviors.
24   Q   So when you learned that Turney was the subject of Jesse's
25   complaints in 2016, did you do anything to ensure that he was

Page 190

1    being fair when discussing her feedback and IPF score?
2    A   I don't recall.
3    Q   Do you know if anyone did anything about that?
4    A   I don't recall.
5    Q   All right.  So at some point you become aware that she is
6    complaining about her writeup and/or her IPF rating for 2016?
7    A   Through the I'll say pre-read.  But what did you call it?
8    Q   The deposition prep?
9    A   Yes, then.
10   Q   But not before then?
11   A   I don't recall anything before then, no.
12               (Exhibit P 46 introduced.)
13   Q   Showing you what's been marked as P 46.  Is that up on
14   your screen?
15   A   Yes.
16   Q   It's Bates stamped Shell 0418.  Can you read this email
17   and let me know when you're done.
18   A   Okay.
19   Q   You're copied on this, right?
20   A   Yes.  Well it's to me but it's also to Steve.
21   Q   Right.  And Megan Kloosterman and Michelle Priest are
22   copied, right?
23   A   Yes.
24   Q   And this is from Dusty on January 24, 2017?
25   A   Yes.

Page 191

1    Q   Did this indicate to you that Jesse was complaining about
2    her performance ratings or her performance reviews?
3    A   I assume so, yes.
4    Q   If you look at the last paragraph?
5    A   Okay.
6    Q   So did you do anything when you got this?
7    A   This would have been Steve's responsibility to manage and
8    follow up.
9    Q   So no?
10   A   I don't recall what I did.
11   Q   If anything?
12   A   That's correct.
13   Q   At some point were you aware that Jesse's IPF was changed
14   for 2016?
15   A   Through the prep.
16   Q   Through the dep prep?
17   A   Yes.
18   Q   Not before then?
19   A   No, not that I recall.
20   Q   Were you at the level for approval for the IPF ratings as
21   operations manager at Appalachia?
22   A   Am I an approver?
23   Q   Yes.  You referenced I think multiple layers of approval.
24   Were you one?
25   A   It's a process.  Not each process necessarily is an

Page 192

1    approval.  It's a proposal.  People are, like I said, placed
2    into boxes.  Those boxes have indicators and ranges of IPFs.
3    So at the conclusion of our October 2016 with the input that we
4    had, I would have had no reason to object to any numbers that
5    were on that for any person in my organization.
6    Q   I'm saying when you have that meeting and people give
7    feedback, you're part of that discussion, right?
8    A   Yes.
9    Q   And sometimes you pose questions or pushback?
10   A   Sure.
11   Q   And then as the operations manager, are you I guess the
12   first level of approval?  If you're in agreement with what the
13   supervisor is proposing, then it goes on to the next level?
14   A   I don't know that it's an approval step.  It's part of the
15   process and, like I said, it's our proposal to go forward.  So
16   I won't say it's an approval because it's not.
17   Q   Okay.  Well let me ask it this way.  Just go through with
18   me the process for approving or coming up with the final IPF
19   rating for employees.
20   A   What's the entire process or from this meeting onward?
21   Q   We've covered the meeting.  What happens next?
22   A   That input goes into a bigger conglomeration of
23   unconventional assets.  They look at skews, gender, race, age,
24   to see if there's any level of discriminating factors that
25   cannot be justified.

48 (Pages 189 to 192)

Page 193

1    Q    Who's they?
2    A    HR.
3    Q    Okay.  Do you know who during the time for 2016?
4    A    In our meeting, we would have had a -- Michelle Priest
5    would have been managing some skew, preliminary skew data for
6    our stuff, so Appalachia as an asset cannot send in everybody's
7    high ranked.  We had to fit a range, there's an average that we
8    have to meet, and we can't -- we cannot exceed that average.
9    So all of those things are happening at the meeting.
10   Q    Got it.  Or conceivably if Priest noticed at the meeting
11   that all the men were being given high rankings and all the
12   women low rankings, she would presumably say something?
13   A    At the meeting and we would manage that.
14   Q    Got it.  So someone from HR, multiple people in HR,
15   reviewing the unconventional assets information?
16   A    Yeah.  So operations would be compared to all the other
17   operations -- operational assets, which I don't remember how
18   many there were at the time, but all this data gets merged and
19   then it gets merged with Canada.  It gets merged with drilling.
20   It gets merged -- because it's all unconventionals and every
21   single bit of information has to meet this average.  So you
22   send in your data as an average and if you have outliers, then
23   you explain those outliers, and hopefully another asset can
24   accommodate that adjustment either way if they need to provide
25   additional credit or there's a debit to be taken.

Page 194

1    Q    So how is that sent in for your group, would that have
2    been a spreadsheet?
3    A    I don't know how HR does it.  Probably a spreadsheet.
4    Q    Okay.  But you don't see that, do you?
5    A    No.  No.  We see the 9 box grid and how that all -- I
6    don't know.  At the meeting we see the 9 box and by job grade
7    we put people into boxes.
8    Q    So after this goes to HR and they are looking at the other
9    operations groups, they are comparing race, gender, and making
10   sure that everything is kosher for lack of a better word.  Then
11   what happens?
12   A    I don't know exactly but it just goes through successive
13   levels of approval and ultimately all of Shell has to meet that
14   average, so downstream, upstream, everything.  All the
15   organizations, including senior management is my understanding.
16   Q    But after Michelle Priest's involvement as the HR support
17   for your organization at the October 2016 meeting, is it
18   correct you are not aware of who the individuals are who were
19   involved in the process after that?
20   A    I have no idea.
21   Q    But at some point you get information back basically
22   saying this has been approved, these are the IPF scores for
23   your people or something like that?
24   A    Yeah.  We put in a proposal and what I would like to hear
25   back is were there any changes.

Page 195

1    Q    Do you remember if there were any changes for 2016?
2    A    I don't remember.
3    Q    Are there typically or not necessarily?
4    A    I have heard of them but that's through the process.
5    Where another asset may have a bunch of low performers or a
6    bunch of high performers, so if they have a bunch of high
7    performers, they're looking for them -- or more credit
8    from elsewhere.  If an asset has a bunch of low performers and
9    they come in with their average 1.01, say, then they have room,
10   there's money in the budget to give it to somebody else.  So
11   you look to people that are on the threshold and you provide
12   that to those people.  I'm not involved in that process but I
13   understand that's the way it works.  Or I was not involved in
14   that process.
15        (Exhibit P 41 introduced.)
16   Q    Showing you Exhibit P 41.  If you can just read through
17   this email exchange.
18   A    Okay.
19   Q    Just Page 1?
20   A    Yes.
21   Q    So this is --
22   A    So the lower document is the one that we've already
23   reviewed?
24   Q    Yes.  And then Jesse follows that up with another email
25   the following day to you, Craig, Kloosterman and Priest.  She

Page 196

1    is saying, I want to point out that I reached out to Steve in
2    May 2016 for input in my role before and I didn't receive a
3    response.  I touched the email.  That's the email on the second
4    page that she is referencing.  In addition to my first email, I
5    touched three high fives I have received as well.
6        What are high fives?
7    A    Peer-to-peer recognition.
8    Q    Did you do anything when you get this email?
9    A    I don't recall.
10   Q    Do you recall ever having a conversation with Will Turney
11   about Jesse's performance review or IPF for 2016?
12   A    I don't remember.
13   Q    How about Steve Craig?
14   A    A conversation with Steve Craig about Will Turney.
15   Q    No.  About Jesse's 2016 performance review IPF rating?
16   A    I don't recall that either.
17   Q    Showing you what I have marked as Exhibit 40 -- P 47,
18   Shell 770 through 772.  Can you read through these emails.  Let
19   me know when you're done.
20   A    Okay.
21   Q    So on the first page there is an email that Turney is
22   sending to you?
23   A    So I just read first page.  Was I supposed to read all
24   three pages?
25   Q    Yeah.

49 (Pages 193 to 196)

Page 197

1   A   Okay.  Let me read the other ones.
2   Q   So the first page includes an email that Turney is sending
3   to you with some forwards, correct?
4   A   Yes.
5   Q   And you forward that to Steve Craig and Michelle Priest.
6   Do you see that?
7   A   Yes.
8   Q   Do you know why Turney is sending this to you?
9   A   No.
10  Q   Did you have discussions with anyone about it?
11  A   I don't remember.
12  Q   Why did you forward it to Craig and Priest?
13  A   Steve was conducting her or actually delivering her
14  performance writeup.
15  Q   Why?
16  A   She -- at that time she was outside of our department and
17  there was no need to get Will Turney involved in this directly.
18  Q   Whose decision was that?
19  A   I don't know.
20  Q   You just testified to the reason why Craig was giving it.
21  What was your basis for that?
22  A   Disconnecting Will from Jesse and as many things as we
23  could.
24  Q   Was that your decision to have Craig deliver her
25  performance review?

Page 198

1   A   I don't think so but I don't remember.
2   Q   Did you talk to someone about that?
3   A   I don't know.
4   Q   How do you learn that Craig is giving her the performance
5   review as opposed to Turney?
6   A   Through the prep.
7   Q   Dep prep?
8   A   Yes.
9   Q   You didn't know that at the time?
10  A   I don't recall.
11      (Exhibit P 47 introduced.)
12  Q   When you got this email, did you look -- marked as P 47
13  did you look at the second page where Craig references that he
14  had the performance discussion with Jesse?
15  A   What do you mean did I reference?
16  Q   Did you read anything other than the email in the first
17  page from Larsen?  On the second page there's an email from
18  Craig where he's talking about meeting with Jesse about her
19  performance review.
20  A   Yeah.  But the information that I think is being provided
21  on Page 1 is what goes into the writeup that goes into Shell
22  people.
23  Q   Oh no, I understand.  You said you didn't know that Craig
24  gave Jesse her 2016 --
25  A   I think I said --

Page 199

1   Q   Hang on. -- performance review until dep prep.  So I'm
2   asking if you read the second page of this email where Craig is
3   indicating that he's met with Jesse about her performance
4   review?
5       MS. KIRKPATRICK:  He said he didn't remember, he
6   wasn't sure, not that he didn't know at the time.
7   A   Correct.
8   Q   What's correct?  You have to answer, not your lawyer.
9   A   Okay.  I will.  I don't recall the sequence of events
10  about all this -- how this played out.  I don't.
11  Q   All I'm asking is did you read past the first page of P 47
12  when you got it?
13  A   When I received it, I have no idea if I did that or not.
14  Q   So you don't remember if you read on Page 2 that Craig was
15  the one who met with Jesse about her performance review?
16  A   I don't remember.
17  Q   Did you learn at some point before you retired that Jesse
18  had filed an EEOC charge or a claim against the company?
19  A   I don't recall.
20      (Exhibit P 48 introduced.)
21  Q   Showing you what's been marked as Exhibit 48.  The first
22  page is an email from Jesse.  I understand you're not copied on
23  it but I just wanted to show you what is attached to that which
24  is the EEOC charge.
25  A   So the next page?

Page 200

1   Q   Next page, yeah.  So whatever you need to do, I just want
2   to to know if you have ever seen it before?
3   A   I don't recall seeing it before.
4   Q   Did anyone ever talk to you about the fact that you're
5   referenced in the EEOC charge?
6   A   I think if somebody would have referenced me, I would have
7   been inquisitive about that, so I can't say that I am or was.
8   Q   And no one ever asked you if you made the comments that we
9   looked at in paragraphs 49 and 50 of Jesse's complaint about
10  how she presented herself at work?
11  A   Did nobody -- say that again.
12  Q   Did anyone from Shell ask you if you made those comments
13  that she alleged you did in her complaint?
14      MS. KIRKPATRICK:  Other than communications with
15  counsel.
16  Q   No.  The question is did anyone ask you that.
17      MS. KIRKPATRICK:  No.  Then I'm instructing him not
18  to answer.
19      MS. GURMANKIN:  Are you instructing him not to
20  answer?
21      MS. KIRKPATRICK:  I'm instructing him not to answer
22  because your question seeks attorney-client privilege.
23      MS. GURMANKIN:  No, it doesn't.  It's a yes or no
24  question.
25  Q   Did anyone ever ask you if you made the comments that

50 (Pages 197 to 200)

1  Jesse alleged you did in her complaint that we went over
2  earlier?
3       MS. KIRKPATRICK:  Other than your counsel.
4  Q  Yes or no?
5  A  I don't recall.
6       MS. KIRKPATRICK:  Other than your counsel.
7  Q  Were you aware that in late 2016 Jesse applied for an open
8  scheduler position?
9  A  For a what?
10 Q  An open scheduler position?
11 A  For a scheduler position?
12 Q  Yes.
13 A  I don't know.
14 Q  You don't know if you were you're aware of that?
15 A  I don't know.
16 Q  Is this the first time you're hearing it?
17 A  In the dep prep.
18 Q  You learned it in the dep prep?
19 A  I don't recall if I knew about it or not.  I don't
20 remember.
21 Q  Did you learn about it in the dep prep?
22 A  If I don't recall, doesn't that mean -- well yes, I saw it
23 in the dep prep, but I don't recall remembering it from -- at
24 the time.
25 Q  Okay.  So as far as you know, the first time that you

1  learned about it was in the dep prep.
2       MS. KIRKPATRICK:  Object.  That's not what he said.
3  He said he doesn't recall if he had known about it at the time.
4  Q  Right.  So as far as you know the first time that you
5  learned it was when you were preparing for your deposition?
6       MS. KIRKPATRICK:  Objection.  Saying that he doesn't
7  recall doesn't mean it didn't happen.
8  Q  Is that right?
9  A  I don't remember.
10 Q  Were you aware that after the -- after Jesse complained
11 and the investigation was done, she applied for a preventive
12 maintenance planner position?  Are you aware of that?
13 A  Preventive maintenance planner.
14 Q  Mm-hmm.  Or any open position?
15 A  I don't recall.
16 Q  Have you had any contact with anyone -- have you talked to
17 Will Turney since you retired?
18 A  No.
19 Q  How about Hondo Blakley?
20 A  No.
21 Q  Steve Craig?
22 A  Yes.
23 Q  Talk or written communication or both?
24 A  Talk.
25 Q  Have you talked to him at all about Jesse or this case?

1  A  No.
2  Q  You are aware of course that he was deposed because you
3  read his transcript, right?
4  A  Yes.  But do I remember everything that he said, no.
5  Q  I didn't ask that.
6  A  Okay.  That was my complete answer.
7  Q  Did you talk to him at all about his deposition?
8  A  No.
9  Q  Let's take a break.  I'll see if I have anything else for
10 you.
11      VIDEOGRAPHER:  Going off the record at 1:27.
12      (Brief recess.)
13      VIDEOGRAPHER:  We are back on the record at 1:35.
14 Q  Were you ever told that as part of the investigation
15 Turney admitted that he showed Jesse a picture of himself in
16 his underwear?
17 A  No.
18 Q  Are you able to answer the question as to whether that
19 violates company policy?
20 A  I'll go back to the same line that I'm not the person that
21 makes those determinations.  HR does that.
22 Q  So no, you're not able to answer that question?
23 A  I can't answer that question.  HR does it.
24 Q  And that's despite the training that you have taken at
25 Shell on EEO and anti-harassment issues, correct?

1  A  Yes.
2  Q  In the conversations or the communications with Jesse that
3  you had about moving to another role after the conclusion of
4  the investigation?
5  A  Her moving to another role.
6  Q  Yeah.
7  A  Okay.
8  Q  The conversation you had on December 12 before you sent
9  that email that we looked at presenting her with the three
10 proposals plus the possible CIMS proposal.
11 A  Yes.
12 Q  In any of those communications, did you ever say to her
13 something along the lines of that there are a lot of women on
14 the HSE team or something to that effect?
15 A  The leader of that organization was a woman.
16 Q  Did you say that to Jesse?
17 A  I don't remember specifics.
18 Q  And you -- out of those three options, were you
19 encouraging her to take the environmental tech proposal?
20 A  HSSE analyst which doesn't correlate to either one of
21 those I guess, so I'm not even sure at this point which role
22 she went into.
23 Q  HSE analyst?
24 A  Yeah.  You said of the documents on December 12, those
25 three plus the one, one was agency tech, I think, or

Page 205

1    environmental tech and the other one was a FLIR camera.
2    Q    Let's look at it.  I'm showing P 35, Page 2.
3    A    Yes.  Okay.  I'm on Page 2, yes.
4    Q    So you see the proposals?
5    A    One, two and three.
6    Q    Yes.  So is the HSE analyst position even on here?
7    A    It possibly is a blend of two, three.  I don't know how.
8    Maybe we had to title it something.  I'm not sure.  I don't
9    remember.
10   Q    Okay.  But is the HSE position, is that one of the CIMS
11   possibility, is that one of these three proposals?
12   A    Yes.
13   Q    Which one?
14   A    I don't know.  Like I said, I don't know.  I don't
15   remember.  I don't remember how it came to be called HSSE
16   analyst or which of these jobs that actually was.
17   Q    All right.  But putting title aside, are the
18   responsibilities of one of these three proposals similar to the
19   responsibility of an HSE analyst?
20   A    I don't know.  I don't think I can answer the question.
21   Q    How come?
22   A    The FLIR camera operator was a camera -- was a contractor
23   and we don't have official titles for those people.  An
24   environmental tech may take on a certain job grade that we were
25   unable to push through the HR system, so agency analyst is

Page 206

1    likely the outcome of how we had to display the job in the
2    Shell people system.
3    Q    Again, you're speculating because you don't have a
4    specific recollection?
5    A    I don't remember specifically.
6    Q    Okay.
7    A    But I see this appointment, yes.
8    Q    What does that mean?
9    A    That these titles don't align with HSE analyst.
10   Q    Do you know, the position she ended up going into, do you
11   know if anything changed about her status other than the title
12   and the responsibilities?
13   A    What do you mean relative to status?
14   Q    Do you know if anything changed about her compensation?
15   A    I don't know.
16   Q    Do you know if anything changed about the prestige or
17   visibility of her responsibilities?
18   A    She would have been in the field so her environment would
19   have changed.
20   Q    Do you know anything about what she actually did after she
21   was moved off of Turney's team?
22   A    I assume that the role description described what she did.
23   Q    Do you know anything about what she actually did?
24   A    I don't remember precisely.
25   Q    Do you remember anything about it?

Page 207

1    A    She would have been assigned a truck I believe.
2    Q    Anything else?
3    A    I don't know.  I don't remember.
4    Q    Did you ever follow up with her at any point after she was
5    moved off of Turney's group to see if she was doing well or if
6    she had any concerns or any issues, anything?
7    A    I'm sure I would have said something to her at some point
8    but I don't know what that was.
9    Q    Do you have a specific recollection of following up with
10   her at any point after she was moved off of Turney's group
11   about anything?
12   A    A specific recollection, no.
13   Q    Do you have a general recollection of following up with
14   her and you just don't recall the conversation?
15   A    I don't think I can answer the question because I just
16   don't remember.
17   Q    You don't remember if you ever followed up with her,
18   right?
19   A    I don't remember.
20   Q    Have you talked to your attorney at any point during this
21   deposition today?
22   A    No.
23   Q    Have you talked to anyone during your deposition or
24   communicated to anyone?
25   A    No.

Page 208

1    Q    That's all I have for you at this time.
2         MS. KIRKPATRICK:  I have no questions.
3         MS. GURMANKIN:  Thank you.
4         VIDEOGRAPHER:  This concludes the deposition.  We're
5    off the record at 1:41.
6         COURT REPORTER:  I need orders on the record.
7         MS. GURMANKIN:  I think we have a standing order,
8    whatever that is.
9         MS. KIRKPATRICK:  Mini script and you can just send
10   me the mini script with the exhibits.
11
12         (Deposition concluded at 1:41 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

52 (Pages 205 to 208)

Page 209

CERTIFICATE OF STENOGRAPHIC REPORTER

1
2
3        I, TRACIE BRUMLEY, a Certified Court Reporter
4    #620 within and for the State of Missouri, do hereby certify
5    that the witness whose testimony appears in the foregoing
6    deposition was duly sworn by me; that the testimony of said
7    witness was taken by me to the best of my ability and
8    thereafter reduced to typewriting under my direction; that I am
9    neither counsel for, related to, nor employed by any of the
10   parties to the action in which this deposition was taken, and
11   further that I am not a relative or employee of any attorney or
12   counsel employed by the parties thereto, nor financially or
13   otherwise interested in the outcome of the action.
14
15
16        _____
17        TRACIE BRUMLEY
18        Missouri Supreme Court
19        Certified Court Reporter #620
20
21
22
23
24
25

Page 210

INSTRUCTIONS TO THE WITNESS

1
2        Read your deposition over carefully
3    It is your right to read your deposition and make
4    changes in form or substance.  You should assign a
5    reason in the appropriate column on the errata
6    sheet for any change made.
7        After making any changes in form or
8    substance which have been noted on the following
9    errata sheet along with the reason for any change,
10   sign your name on the errata sheet and date it.
11       Then sign your deposition at the
12   end of your testimony in the space provided.  You
13   are signing it subject to the changes you have
14   made in the errata sheet, which will be attached
15   to the deposition before filing.  You must sign it
16   in front of a witness.  Have the witness sign in
17   the space provided.  The witness need not be a
18   notary public.  Any competent adult may witness
19   your signature.
20       Return the original errata sheet to
21   your counsel promptly.  Court rules require filing
22   within thirty days after you receive the
23   deposition.
24
25

Page 211

ERRATA SHEET

1
2    Attach to Deposition of:  GREG LARSEN
     Taken on:  January 23, 2020
3    In the matter of:  Barnes v. Shell Exploration and
                       Production Company Appalachia, et al.
4
5    PAGE     LINE NO.     CHANGE        REASON
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 212

SIGNATURE PAGE

1
2
3        - - -
4
5        I hereby acknowledge that I have
6    read the aforegoing transcript, dated January 23,
7    2020, and the same is a true and correct
8    transcription of the answers given by me to the
9    questions propounded, except for the changes, if
10   any, noted on the Errata Sheet.
11
12       - - -
13
14
15
16
17   SIGNATURE:  _____
18        GREG LARSEN
19   DATE:  _____
20
21   WITNESSED BY:  _____
22
23
24
25

53  (Pages 209 to 212)

Exhibit 27

<u>Jesse Barnes</u> - 2015 End of year performance summary was held on 01/25/16.  Goals for 2016 were discussed and IDP was started.  No problems were identified and progress is doing well.  – Will Turney

Jesse was hired on with Shell in September 2015. Jesse continues to deliver strong performance as the Appalachia maintenance analyst. She is able to effectively manage a very large volume of inquiries and work order submissions to help maintain the MIE/HWGD process. Jesse is diligent in keeping up with our KPI's and ensures our processes are keep up to date. Jesse continues to learn and engage others to seek out answers when needed. Jesse also does a great job at managing our maintenance activities at our office and the 660 office.

Opportunities:

Jesse can allow her frustration of certain management decisions affect her ability to manage aspects of her role. She often doesn't see the big picture only what directly affects her. Active listening and seeking to understand first then providing constructive feedback will help such process to improve.  Be willing to engage in meetings and participate when needed. There are more times than not valuable information you will need to hear.


Will Turney – Field Support Supervisor

EXHIBIT

054

Exhibit 28



# Compressed Transcript of the Testimony of
# PENNY ROBBINS, 9/19/19

**Case:** Barnes v. Shell Exploration & Production Company
Appalachia, et al.

Summit Court Reporting, Inc.
Phone: 215.985.2400
Fax: 215.985.2420
Email: depo@summitreporting.com
Internet: www.summitreporting.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - -

JESSE BARNES,            : CIVIL ACTION NO. 18-1497
                         :
         Plaintiff,      :
                         :
  VS.                    :
                         :
SHELL EXPLORATION AND    :
PRODUCTION COMPANY       :
APPALACHIA; SHELL        :
EXPLORATION AND          :
PRODUCTION COMPANY;      :
SHELL OIL COMPANY,       :
                         :
         Defendants.  :

- - -

September 19, 2019

- - -

Videotaped deposition of PENNY ROBBINS,
held at Holiday Inn Williamsport, 100 Pine Street,
Williamsport, Pennsylvania 17701, commencing at
1:07 p.m., on the above date, before Kelly M. Bradley,
a Registered Professional Reporter and Notary Public.

- - -

SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (609) 567-3315 * (800) 447-8648
www.summitreporting.com

---

Page 2

1   APPEARANCES:
2
3   CONSOLE MATTIACCI LAW, LLC
    BY:  CAREN N. GURMANKIN, ESQUIRE
4   1525 Locust Street, 9th Floor
    Philadelphia, PA  19102
5   (215) 545-7676
    gurmankin@consolelaw.com
6   Counsel for Plaintiff
7
8   TUCKER LAW GROUP
    BY:  KATHLEEN KIRKPATRICK, ESQUIRE
9   Ten Penn Center
    1801 Market Street, Suite 2500
10  Philadelphia, PA  19103
    (215) 875-0609
11  kkirkpatrick@tlgattorneys.com
    Counsel for Defendants
12
13
    ALSO PRESENT:
14
    BRYCE CONNOR, VIDEOGRAPHER
15  CYNTHIA BIVINS, SHELL INHOUSE COUNSEL
    JESSE BARNES, APPEARING VIA TELEPHONE
16
17
18
19
20
21
22
23
24

---

Page 3

1              I N D E X
2              - - -
3   WITNESS                        PAGE
4   PENNY ROBBINS
5   EXAMINATION
6   By Ms. Gurmankin          5, 155, 159
7   By Ms. Kirkpatrick          122, 158
8
9
10
11              E X H I B I T S
12              - - -
13   EXHIBIT NO.    DESCRIPTION         PAGE
14   Robbins-1      Copy of Pages from       116
                    Ms. Robbins' Notebook
15
16
17              * * * * * *
18   (PREVIOUSLY MARKED EXHIBITS)
19   EXHIBIT NO.    DESCRIPTION      REFERENCED
20   Exhibit No. 7   Complaint          29
21   Exhibit No. 25  Megan Kloosterman      92
                     Interview Notes with
22                   Penny Robbins
23
     (Exhibits 7 and 25 retained by counsel.)
24

---

Page 4

1         (By agreement of counsel, the sealing,
2   certification and filing are waived; and all
3   objections, except as to the form of the
4   question, are reserved until the time of trial.)
5              - - -
6         THE VIDEOGRAPHER:  We are now on the
7   record at 1:07 p.m. on September 19th, 2019.
8   This is the start of File Number 1 in the
9   videotape deposition of Penny Robbins in the
10  matter of Jesse Barnes v. Shell Exploration and
11  Production Company Appalachia, et al., filed in
12  the U.S. District Court, Middle District of
13  Pennsylvania.  This deposition is being held at
14  100 Pine Street, Williamsport, PA, 17701.
15        My name is Bryce Connor from the firm
16  of Summit Court Reporting, Incorporated, and I
17  am the videotape operator.  The court reporter
18  today is Kelly Bradley, also from the firm of
19  Summit Court Reporting, Incorporated.
20        Counsel will now state their
21  appearance and firm affiliation for the record.
22        MS. GURMANKIN:  Caren Gurmankin of
23  Console Mattiacci Law for the Plaintiff.
24        MS. KIRKPATRICK:  Kathleen Kirkpatrick

---

1  (Pages 1 to 4)

## Page 5

1      for Shell Oil Company, et al., the Defendants.
2              THE VIDEOGRAPHER:  Will the court
3      reporter now please swear in the witness.
4                      - - -
5              PENNY ROBBINS, called as a witness,
6      being sworn/affirmed, testified as follows:
7                      - - -
8              EXAMINATION
9                      - - -
10     BY MS. GURMANKIN:
11         Q    Ms. Robbins, good afternoon.
12         A    Good afternoon.
13         Q    We've met, but for the record, my name is
14     Caren Gurmankin and I have the privilege of
15     representing Jesse Barnes in a lawsuit that she's
16     filed against Shell for sex discrimination and
17     retaliation.
18             Have you ever had your deposition taken
19     before today?
20         A    Never.
21         Q    Okay.  I'll go through the rules with you.
22     I'm gonna ask you some questions today.  If I ask
23     you a question and you don't understand my question,
24     just let me know and I'm happy to rephrase it, okay?

## Page 6

1          A    Yes.
2          Q    Okay.  If I ask you a question and you
3      answer it, I'm going to assume that you've
4      understood my question and you've answered it
5      accordingly; is that okay?
6          A    Okay.
7          Q    As you've been doing, I just need you to
8      keep giving verbal responses to my questions so we
9      can make sure that the court reporter can capture
10     everything that you're saying.
11         A    Okay.
12         Q    Thank you.  Even though the deposition is
13     taking place in a room at a hotel, it has the same
14     force and effect as if you were testifying in
15     federal court in front of a federal judge.
16             You've just taken an oath to tell the
17     truth.  If you don't tell the truth, that's
18     considered perjury; do you understand that?
19         A    Yes.
20         Q    Is there any reason why you would not be
21     able to testify truthfully today?
22         A    No.
23         Q    Okay.  Have you and I met before today?
24         A    Never.

## Page 7

1          Q    Okay.  Have you and I spoken on the phone
2      before today?
3          A    Yes.
4          Q    Have we talked at all about Jesse's case
5      or your deposition testimony today?
6          A    No.  That you represented Jesse --
7          Q    Um-hmm.  Okay.
8          A    -- is basically all that we've spoke about.
9          Q    Anything else about her case or your
10     deposition testimony?
11         A    No, just that you were sending the
12     subpoena.
13         Q    Okay.  And you're here pursuant to a
14     subpoena that my office served on you, correct?
15         A    Yes.
16         Q    Seated on the other side of the table is
17     Kathleen Kirkpatrick, she represents Shell.  Have
18     you met her before?
19         A    No.
20         Q    Okay.  Have you met Cynthia Bivins, who's
21     sitting next to her, before?
22         A    No.
23         Q    Have you spoken with Ms. Kirkpatrick or
24     anyone from her law firm before today?

## Page 8

1          A    Ms. Kirkpatrick.
2          Q    Okay.  Do you remember what you discussed
3      with her?
4          A    She wanted to know if I wanted Shell to
5      represent me in this deposition or anything else
6      pertaining to this.
7          Q    Okay.  And what did you say in response?
8          A    The first time we spoke, I said -- she
9      spoke and I asked questions, not a lot of questions.
10     Towards the end, I did ask her if -- I did hear her
11     tapping, and I said, well, you were recording every
12     word I say, and I didn't -- I just thought that was
13     dishonest.  But then I did -- she did call me -- I
14     said I would get back to her, but I did put it off
15     for a couple, three days, and then when she called
16     the second time, I said that, no, I would just throw
17     the hat in and see where it laid.
18         Q    Okay.  And am I correct that you're not
19     represented by a lawyer here today?
20         A    No, I'm not.
21         Q    Okay.  Did Ms. Kirkpatrick ask you any
22     questions about Jesse or about her case in the phone
23     conversations?
24         A    No, she did not.

SUMMIT COURT REPORTING, INC.
215.985.2400 * 609.567.3315 * 800.447.8648 * www.summitreporting.com

Page 9

1    Q   Okay.  Did she ask you anything other than
2  did you want to be represented by Shell --
3    A   No.
4    Q   -- or by her law firm?
5    A   No.
6    Q   Okay.  Have you spoken with anyone at
7  Shell in connection with Jesse's case --
8    A   No.
9    Q   -- or your deposition?
10   A   No.
11   Q   Okay.  And did you see Jesse --
12   A   Well, no, I can't say I haven't talked to
13  Shell people.
14   Q   Right.
15   A   As -- for this, just what they may have
16  said, that they have had a deposition or something,
17  but no details.
18   Q   Okay.  Do you remember talking to anyone
19  from Shell about a deposition they may have had in
20  connection with Jesse's case?
21   A   No.
22   Q   Okay.  Did you see Jesse today?
23   A   Yes, I did.
24   Q   Okay.  Was that right before --

Page 10

1    A   Outside of Perkins.  We were having lunch
2  and she was taking off, we hadn't seen each other
3  since May and we wanted to say hello.
4    Q   Okay.  Did you talk to her at all today
5  about her case?
6    A   No, just that we were meeting, and that
7  you were very nice and not to get nervous.
8    Q   Okay.  Did you talk about your deposition
9  testimony --
10   A   No.
11   Q   -- with Jesse?
12   A   No.
13   Q   Have you talked to -- well, strike that.
14       You're not currently employed at Shell,
15  correct?
16   A   No, I'm not.
17   Q   What were your dates of employment, do you
18  remember?
19   A   I told that -- that it was May of 2010,
20  but that's when I was hired by East Resources before
21  Shell took it over.  Then Shell, I do believe, took
22  it over completely, it was July, but completely that
23  January, which was 2011, and then June of last year,
24  2018.

Page 11

1    Q   So you were a Shell employee starting in
2  January of 2011?
3    A   Yeah, they took it -- they was purchasing
4  or whatever; in July is when they took over, but it
5  was completely done by January.
6    Q   Okay.  So they started --
7    A   It was -- I got employed by East Resources
8  in May, and then the -- I think it was the end of
9  July is when Shell purchased East Resources, and so
10  then it was officially completed as of the first of
11  January.
12   Q   So prior to the completed acquisition,
13  were you working at Shell facilities or doing Shell
14  work?
15   A   Not before I was hired by Shell.
16   Q   Right, you were working at East Resources?
17   A   Yes.
18   Q   From the time that you left Shell in June
19  of 2018 through today, have you spoken with Jesse
20  about her case?
21   A   Yeah, we've spoken, how is it doing, is
22  things going along.  Just very basics.  No details
23  of any sign, you know, of anything, just how's it
24  doing, how are you doing --

Page 12

1    Q   Okay.
2    A   -- how's the case doing, and that --
3  that's it.  No details.  She don't tell me details.
4    Q   Okay.  Did you leave Shell voluntarily or
5  involuntarily?
6    A   It was a you-stay-she-goes,
7  if-she-goes-you-stay.
8    Q   And who was the "she" that you're
9  referring to?
10   A   Jennifer Card.
11   Q   Are you related to her?
12   A   Yes, I am.
13   Q   Okay.  How so?
14   A   Sister-in-law.
15   Q   And who gave you that ultimatum?
16   A   Steve --
17       MS. KIRKPATRICK:  Objection.
18  BY MS. GURMANKIN:
19   Q   You can answer.
20   A   Steve Craig.
21   Q   Did he tell you why?
22   A   They were cutting back and they were going
23  to eliminate her position, but she could take over
24  my position or whatever.  But that's how it went

3 (Pages 9 to 12)

1　down.
2　　Q　Did you believe him when he told you that
3　Shell was cutting back and that's why it was gonna
4　have to be you or Jennifer Card?
5　　A　Yes, they had been -- they had been
6　letting people go.
7　　Q　Did Steve Craig or anyone from Shell tell
8　you that they were gonna try to find you another
9　position with the company?
10　　　MS. KIRKPATRICK:　Objection.
11　BY MS. GURMANKIN:
12　　Q　You can answer.
13　　A　Only -- not -- I mean, not another
14　position.　He said that -- where was it they were?
15　There was a position open up -- oh, down to the
16　cracker plant, or whatever used to be the cracker
17　plant, and that was all.　But I wouldn't move, my
18　family's up here.
19　　Q　Okay.
20　　A　But he didn't say he would look into it or
21　anything, he said when it was all done, when it was
22　all decided, that they would help me with my resume
23　to get a job somewhere else.
24　　Q　Okay.　And your decision was to let your

1　sister-in-law take the -- keep her position?
2　　　MS. KIRKPATRICK:　Objection.
3　BY MS. GURMANKIN:
4　　Q　Is that right?
5　　　MS. KIRKPATRICK:　Objection.
6　BY MS. GURMANKIN:
7　　Q　You can answer.
8　　A　Yes.
9　　Q　Okay.　Which would result in you losing
10　your job?
11　　A　Yes.
12　　　MS. KIRKPATRICK:　Objection.
13　BY MS. GURMANKIN:
14　　Q　What position did you hold during your
15　employment with Shell?
16　　A　Administrative assistant.
17　　Q　Okay.　Was that during the entire time you
18　were employed?
19　　A　When -- I thought I was administrator all
20　the way through, yes, I did.　I mean, when it
21　started out, I was -- there were so many people
22　there that I was just an assistant, I would help
23　everyone, and then I got the administrative
24　assistant position to the production supervisor.

1　　Q　When you became employed at Shell in
2　January of 2011, do you remember who you were
3　reporting to?
4　　A　At the beginning, it was Mark Farrell, who
5　was with East.
6　　Q　What department?
7　　A　Production.
8　　Q　Do you remember about how long you
9　reported to Farrell?
10　　A　He wasn't there that long before Danny
11　Echols took over for him, I wouldn't say six months.
12　　Q　And Danny Echols, this was still in
13　production?
14　　A　Yes.
15　　Q　And about how long did you report to Danny
16　Echols, approximately?
17　　A　I -- I really -- a year, maybe two.　And
18　then it went to, I think it was David Summers.
19　　Q　About how long?　I know I'm testing your
20　memory here.
21　　A　David Summers was not there very long, he
22　had conflict of interest with Robin Grouette, who
23　was the general manager.
24　　Q　Do you know what that was about?

1　　A　Ethics.
2　　Q　Do you know what in particular?
3　　A　There was an incident with an employee,
4　████ -- I think it's -- his initial was ███████
5　There was two different ████████ but I think this
6　was ████████
7　　Q　And what was the incident?
8　　A　████████ I would say he had financial
9　problems, and I reported to David Summers an
10　incident right around Christmastime -- now, I can't
11　remember, 2014 -- where ████████ asked if I would
12　pick up three credit cards of $300 apiece because he
13　had -- if I'd have known, I'd have brought the
14　paperwork -- he had -- something with the IRS had
15　taken his complete paycheck right around
16　Christmastime, he had no money.
17　　　I said -- I reported this to one of the
18　other supervisors, or whatever, that he had asked me
19　to do this, but I wouldn't do it with my card; if he
20　wanted it done, he had to do it with his own credit
21　card, I just took it and got it -- and got these
22　three cards.
23　　　And I came back, and the -- I can't
24　remember if it was a supervisor, if he was a

Page 17

1 supervisor at the time; it was Ricky Dake and Kyle
2 Vessel -- they took me in the room and I told them
3 what had gone down, and they advised me to talk to
4 Mr. Summers and Michelle Priest, which I did, and I
5 -- David Summers wasn't there at that time, he
6 had -- was in Bradford where we had the other asset
7 in Appalachia. But he did call me back. I told him
8 what had happened and what was going down.
9      The cards had been given to ███████.
10 And something -- I had asked him, before you talk to
11 ███████, tell me, because I want to be prepared
12 for what he might say. And before he could do that,
13 ███████ had gotten ahold of me to explain a whole
14 different venue for those credit cards.
15      And when Mr. Summers called me, I got very
16 upset, I said, I asked you to call me if you told
17 him so I could be prepared, and he said, I did not
18 tell him. I said, then you told somebody.
19 Nobody -- no names were taken, no -- was told at
20 that time, it was very professional.
21      And it was shortly thereafter that
22 Mr. Summers and Robin down to Warrendale, I guess he
23 turned in his -- he is still with Shell, or was at
24 Shell at that time, that he, I think, asked to be

Page 18

1 transferred.
2      Q   Okay. As of the time that you left Shell,
3 to your knowledge, was ███████ still employed?
4      A   No. Oh, no, it was shortly after that he
5 tendered his resignation, I do believe.
6      Q   Okay.
7      A   Chris Anderson had come in shortly
8 thereafter.
9      Q   As his replacement?
10      A   As his replace -- see, ███████ had
11 gotten the position after David Summers; he had
12 gotten the superintendent position, and they knew
13 there was a problem, and then Ms. Grouette, I guess,
14 pulled in Chris Anderson from Canada.
15      Q   Okay. So when ███████ asked you -- did
16 he ask you to pick up three credit cards or three
17 gift cards?
18      A   I guess -- they were Triple A gift cards.
19      Q   Okay. Was he in a supervisory role
20 when --
21      A   Yes, at that time, he had been given that
22 position, that he --
23           THE COURT REPORTER: Could you wait
24      until -- she didn't finish the question.

Page 19

1 BY MS. GURMANKIN:
2      Q   I didn't give you this instruction, that's
3 my fault, but just so the record is clear, the
4 written transcript, even if you think you know what
5 I'm gonna say, just try to let me --
6      A   I'm sorry.
7      Q   It's okay, it's my fault for not telling
8 you that. Just try to let me finish my whole
9 question and then you give your answer, okay?
10      A   Okay.
11      Q   Okay, thank you.
12      All right, so was ███████ in a
13 supervisory role when he asked you to pick up these
14 three Triple A gift cards?
15      A   Yes.
16      Q   What role was he in at that time?
17      A   Production supervisor.
18      Q   So he was above you?
19      A   Yes.
20      Q   Okay. And do you know who he reported to
21 at that time?
22      A   Robin Grouette.
23      Q   Who was general manager?
24      A   (Witness nods head.)

Page 20

1      Q   Yes?
2      A   I do believe that was her title --
3           MS. KIRKPATRICK: Objection.
4           THE WITNESS: -- at the time. I have
5      no idea.
6 BY MS. GURMANKIN:
7      Q   All right. And when ███████ asked you
8 to pick up these three Triple A gift cards, you did?
9      A   Yes.
10      Q   Okay. Did he tell you what he was going
11 to use them for?
12      A   He told me that he would give me back the
13 same gift cards, or the same amount of gift cards to
14 use for the next Christmas gift cards we gave out.
15 Yes, it was a year later -- would have been a year
16 later. He did not say, you know, what the cards
17 were to be used for.
18      Q   So when he asked you to pick him up three
19 Triple A gift cards, he didn't tell you why?
20      A   In -- he caught me in the hallway and said
21 that he was having financial difficulties, that the
22 IRS had attached his check and taken all the money,
23 he was not given any in his checking account, and
24 that he would be running short.

5 (Pages 17 to 20)

Page 21

1      Q   Did he indicate he was going to use them
2   for personal use?
3          MS. KIRKPATRICK:  Objection.
4          THE WITNESS:  He didn't say he was
5   using them for groceries, he did not say that.
6   BY MS. GURMANKIN:
7      Q   Okay.  And then after you picked them up,
8   is that when you had a conversation with Ricky and
9   Kyle?
10     A   I can't -- I wish I remembered...  I told
11  them that he had asked me, and then I had gone to
12  pick them up and then they had called me into the
13  conference room and then spoke to me about it.
14         Mr. Vessel told me that I should copy,
15  make a photostatic copy of those credit cards before
16  I handed them over, and we -- and I told David
17  Summers what had happened.
18     Q   Okay.  And did you talk to David Summers
19  and Michelle Priest together about this?
20     A   First I talked to David Summers, and then
21  he set up a meeting with him and Michelle Priest,
22  and we did that on a Friday.  I came in on my day
23  off.
24     Q   Okay.  And do you remember what that was

Page 22

1   about or what they asked you during that meeting?
2      A   They asked me how it went all down.
3      Q   Okay.
4      A   And I had wrote it all down because that
5   was what Hondo Blakley suggested that I do, because
6   that day, at the end of the day, he had called me --
7   I had left a message to him because Ricky and Kyle
8   asked me -- or told me that I should contact him for
9   his advice -- he was down to Warrendale at that
10  time -- he called me, he suggested that I write
11  everything down, which I did.
12         If I'd have known, I would have brought
13  that whole letter down.  But that -- and I did write
14  it all down at that time, so I was able to use that
15  as a guideline when I talked to David Summers and
16  Michelle Priest.
17     Q   Okay.  And then at some point after that,
18  ██████████ comes back to you and talks to you about
19  his --
20     A   He texted me, it had to be between the
21  time that I had talked to him, we had given him the
22  cards -- or ████████ the cards -- I had talked to
23  David Summers when I got angry and said you didn't
24  tell me, you said you would call me before you

Page 23

1   talked to him.
2          Then I called Hondo and we talked.  Then
3   it was after that when Michelle Priest -- and ██████
4   ██████ set us up in a meeting with Michelle Priest to
5   tell what had gone down, so I had that letter.
6      Q   And at some point, did you become aware
7   that Robin Grouette found out about this?
8      A   Yes.
9          MS. KIRKPATRICK:  Objection.
10  BY MS. GURMANKIN:
11     Q   How did you find out about --
12     A   Now, I didn't -- I cannot say that I knew
13  it was her.  It's just when David Summers, when I
14  got ahold of him when I was angry, he said, I did
15  not tell him; I said, you talked to somebody; and he
16  says, yes, I did.  That -- there was no names at
17  that time.
18     Q   Okay.  You had said earlier that David
19  Summers had a conflict of interest with Robin
20  Grouette in connection with this incident.  What is
21  your knowledge about that?
22     A   All I --
23         MS. KIRKPATRICK:  Objection.
24  BY MS. GURMANKIN:

Page 24

1      Q   Go ahead.
2      A   All I know is that when they were down to
3   Warrendale -- that's where they had a lot of their
4   meetings -- that they had a meeting and he -- he
5   asked to be released and to go to a different asset.
6      Q   David Summers or ████████?
7      A   David Summers.
8      Q   Okay.  And do you know why?
9      A   David -- I must be getting the David --
10  David Summers is the one that had the conflict of
11  interest with Robin Grouette.
12     Q   And what is your knowledge about what that
13  conflict was with Robin Grouette that he had?
14     A   How she was -- how she dealt with some of
15  the issues, ████████ being one of them.
16     Q   Okay.  Do you know what was it about her
17  handling of this particular incident that David
18  Summers had a conflict with or an issue with?
19     A   At that time, I did not.  Like I said, I
20  did not know who he had spoken to about this, and so
21  I really couldn't, it's just what was said.
22     Q   Okay.  At some point after this incident
23  took place, did you -- did you learn something about
24  what Summers' conflict was or issue with the way

Page 25

1 that Robin Grouette handled this situation?
2         MS. KIRKPATRICK:  Objection.
3         THE WITNESS:  After.
4 BY MS. GURMANKIN:
5     Q   Okay.  And what did you find out after?
6     A   Just that he didn't -- she didn't --
7 because that he didn't like how she handled the
8 conflict with ███████, there was -- I assume there
9 was other things going on, I -- I could not say, and
10 it's been quite a while, so...
11     Q   Sure.  Am I correct that no one told you
12 that you did anything wrong in connection with this
13 incident?
14     A   Nobody said anything, because it was -- I
15 went and told people -- as it was going down, I
16 notified higher-ups.
17     Q   Um-hmm.
18     A   And, also, I made sure I sent an email to
19 ███████ that you want -- stating that he wanted
20 these gift cards and that I would use his credit
21 card, and I do have the email -- I wish I had
22 known -- I have the email that stated that he said
23 yes to purchase the gift cards.
24     Q   By the way, I also forgot to tell you in

Page 26

1 the beginning, if you need a break at any time, you
2 can just let us know and we'll take a break, okay?
3         I think you said shortly after this, ███████
4 ████ tendered his resignation, right?
5     A   Yes.
6     Q   And do you have any knowledge as to
7 whether it was in connection with this incident or
8 any other incident?
9     A   That Christmas, at the Christmas party,
10 when this was all going down, I was telling
11 Ms. Barnes; I did not know what was going down with
12 her, she did not speak of it.  But after I was going
13 through this, she came up to me and she said, if you
14 have the strength enough to do it, I can too.
15         And then I -- it was -- I didn't, at that
16 time, know what she had done, but then she went to
17 speak with somebody of what ███████ had acted or
18 -- issues with ███████.
19     Q   At some point around this time, did she
20 tell you what was going on with her and ███████?
21     A   Only that he was sending texts -- and I
22 think this was way after; I know it was after she
23 had spoke to HR -- that at that Christmas party,
24 that he was with his wife, and Ms. Barnes had a

Page 27

1 gentleman with her at the Christmas party, he was
2 sending her texts -- I do not know what the texts
3 said -- and that she was upset about it.
4     Q   And so if the incident that you testified
5 to with the gift cards, that was around Christmas, I
6 understand you're not certain, but you think 2014?
7     A   I can't remember if it was the 2014
8 Christmas and the beginning of the '15, right
9 there -- I'm thinking it is, but I'm not sure.  If I
10 had the papers, the date would have been on them.
11 But I don't have them.
12     Q   So was it around this time you referenced
13 that Jesse talked to you at the Christmas party;
14 would it have been around the same time?
15     A   It would have --
16         MS. KIRKPATRICK:  Objection, leading.
17 BY MS. GURMANKIN:
18     Q   Go ahead.
19     A   It would have been after the issue with
20 ███████ and David Summers and Robin Grouette, so
21 it would have to have been after January --
22     Q   Okay.
23     A   -- that this went down, that then she
24 talked to HR, or talked to someone that advised her

Page 28

1 to talk to HR.
2     Q   Are you talking the following January?
3     A   In that -- yes.
4     Q   In that time?
5     A   Whatever was going on with me, she said if
6 you can, then she talked to someone and they advised
7 her I can do it, and she did.
8     Q   At some point, did you learn more about
9 the text messages that ███████ was sending?
10     A   I didn't, all I remember is Jesse coming
11 out of a meeting with HR -- it was the end of the
12 day, and Jesse came out of the HR crying her eyes
13 out because they had given her a pamphlet how to
14 conduct herself around men.
15     Q   And based on what you observed, was she
16 upset about that?
17     A   She was devastated.
18     Q   Did she show you the brochure?
19     A   No, she ran out of there.
20     Q   Did she tell you what it said?
21     A   She just said they gave me a brochure to
22 conduct myself -- how to conduct myself around men.
23     Q   At any point before you left Shell, did
24 Jesse tell you anything else about that issue that

7 (Pages 25 to 28)

Page 29

1    she had with ███████
2         A    No.
3         Q    Based on what she told you about HR -- I'm
4    sorry.
5         (Brief interruption.)
6    BY MS. GURMANKIN:
7         Q    Based on what she told you about HR giving
8    her a brochure saying how to conduct yourself around
9    men, did you think that was an appropriate thing for
10   HR to do?
11             MS. KIRKPATRICK:  Objection.
12             THE WITNESS:  Very inappropriate.
13        Very inappropriate.
14   BY MS. GURMANKIN:
15        Q    I'm gonna show you what's been previously
16   marked in this case as Deposition Exhibit 7.
17            MS. KIRKPATRICK:  This is the
18        Complaint?
19            MS. GURMANKIN:  That is the Complaint.
20   BY MS. GURMANKIN:
21        Q    This is the Complaint that Jesse has filed
22   in federal court against Shell.  Am I correct that
23   you have not seen this before?
24        A    Never.

Page 30

1         Q    Okay.  If you can please go to Page 6.
2         A    (Witness complies.)
3         Q    All right.  Do you see Paragraph 28 there?
4         A    (Reviewing document.)
5         Q    Do you see it there, Ms. Robbins?
6         A    Yes.  Yes, I do.
7         Q    All right.  So I want you to read through
8    to yourself Paragraph 28 in its -- in its entirety;
9    it goes from Page 6 through Page 10, and if you can
10   let me know when you're finished.
11            MS. KIRKPATRICK:  I'm objecting to
12        this.  This witness stated that she has never
13        seen this document.  If you're going to ask
14        questions about whether these events occurred,
15        these are all leading questions; you are
16        feeding information to the witness before
17        asking her what her independent recollection
18        is, and this would all be inadmissible at
19        trial, and I'm objecting to it.
20            MS. GURMANKIN:  Okay, you can make
21        objections to form, but not speaking
22        objections, and we're not at trial right now,
23        so if you can --
24            MS. KIRKPATRICK:  I will make whatever

Page 31

1    objections I need to make.
2             MS. GURMANKIN:  You should make them
3         in complaints with the federal rules.
4             MS. KIRKPATRICK:  You are feeding this
5         witness information instead of asking her what
6         she knows independently.
7    BY MS. GURMANKIN:
8         Q    Let me know when you're done, Ms. Robbins.
9         A    May I speak?
10        Q    Of course.
11        A    What I spoke of with ███████ has nothing
12   to do with what she spoke of with Mr. Turney, that's
13   totally different.
14            MS. KIRKPATRICK:  Understood.
15            MS. GURMANKIN:  That's fine.  You can
16        read through Paragraph 28.  Thank you.
17            THE WITNESS:  Okay.
18            THE VIDEOGRAPHER:  We're now going off
19        the record.  The time on the camera is 1:39 p.m.
20            (Off the record.)
21            THE VIDEOGRAPHER:  We are now back on
22        the record at 1:43 p.m.
23   BY MS. GURMANKIN:
24        Q    All right, you've had an opportunity to

Page 32

1    read through Paragraph 28, correct?
2         A    (Witness nods head.)
3             THE COURT REPORTER:  Is that a yes?
4             THE WITNESS:  Yes.
5    BY MS. GURMANKIN:
6         Q    Okay.  Based on your experience at Shell,
7    do Jesse's allegations in Paragraph 28 surprise you?
8             MS. KIRKPATRICK:  Objection.
9             THE WITNESS:  No.
10   BY MS. GURMANKIN:
11        Q    Why not?
12            MS. KIRKPATRICK:  Objection.
13            THE WITNESS:  In that building that we
14        were in, there was very few women on the
15        production side.  None of this happened to me;
16        I'm an old lady and I'm more like a mother
17        figure.
18            There was -- I can only remember, in
19        that office, maybe three, four.  Jesse was a
20        young lady and she is pretty, but she did not
21        wear clothes that were prerogative [verbatim]
22        -- I mean that enhanced her, you know,
23        showed cleavage --
24   BY MS. GURMANKIN:

8 (Pages 29 to 32)

Page 33

1　　　Q　Provocative, is that what --
2　　　A　Provocative, I guess that's what I want to
3　say, I'm sorry.
4　　　Q　That's okay.
5　　　A　Provocative. She was in FR clothing. If
6　you know what FR clothing is, we're talking blue
7　jeans, it was required to have long sleeves,
8　jackets. She was out in the field, if she went out
9　in the field, with a hat on because it was cold.
10　She did not wear makeup when she went outside or
11　when it was hot. There was no sense in it, it would
12　run or whatever.
13　　　　She conducted herself when she was around
14　me in a professional way. The incidents on here, I
15　was not there. I know where it was. There was --
16　and I have no idea, I do not believe Ms. -- I don't
17　know.
18　　　　This was at the golf course, the Shell
19　tournament, whatever -- I do not know what year,
20　whatever -- they required us to help out. And I'm
21　sure she did as she was told, to man the -- they
22　had -- production would have a hole, you know, and
23　they would have to furnish fruits, liquor, whatever
24　at that hole.

Page 34

1　　　　I can personally tell you that I've never
2　seen Jesse in a pair of shorts at the workplace.
3　That day, they would go from home to there, so I
4　really wouldn't know what she wore. I know what
5　some of the others wore because I seen pictures,
6　so...
7　　　　You're talking -- when you're talking
8　gentlemen that's been there all day long and each
9　hole was liquor, and I seen what some of it was
10　purchased, it wasn't just beer, it was hard liquor
11　that was served at this. So I'm sure some of the
12　gentlemen got out of hand. But I was never there, I
13　would not go there.
14　　　Q　So you were not at this golf tournament?
15　　　A　Tournament, I would not. But she did
16　speak of that. She told me of this time. I can't
17　tell you which tournament it was.
18　　　Q　And you said that you would not go to
19　that. How come?
20　　　A　I'm not a golfer, for one thing. I did
21　not -- I don't enjoy going to places that have a lot
22　of people, groups of people, and I don't serve beer
23　and alcohol. I mean, it's not against -- and I've
24　drank, but I just don't enjoy it, don't -- I'm not

Page 35

1　one -- they'll tell you all, I just didn't enjoy it.
2　　　Q　So was it around this time that Jesse told
3　you that something happened at the golf tournament?
4　　　　MS. KIRKPATRICK: Objection.
5　　　　THE WITNESS: It would have been
6　　　after -- it would have --
7　BY MS. GURMANKIN:
8　　　Q　Go ahead.
9　　　A　-- been after. This golf tournament is in
10　June of every year; it used to be a two-day
11　tournament, a Friday and a Saturday. It has gone
12　down to a one-day. But I do know that had got out
13　of hand at times.
14　　　Q　And what had you heard about it getting
15　out of hand at times?
16　　　A　Alcohol. I can't tell you any incidents
17　or anything. A lot of alcohol and carrying people
18　out, people driving that shouldn't have been.
19　　　Q　Do you know of any names?
20　　　A　No, I wouldn't, I...
21　　　Q　So what did Jesse tell you about this?
22　　　A　It would have been around that time
23　afterwards.
24　　　Q　Um-hmm.

Page 36

1　　　A　Like I said, it was in June, so it was
2　shortly there afterwards she would have said
3　something to me. I remember her saying that --
4　about the shorts, you know, because the other girls
5　had wore summer outfits.
6　　　Q　All right. So if you go back to
7　Exhibit 7, Page 6, the first subparagraph, A, do you
8　see where I am?
9　　　A　Yes.
10　　　Q　All right. It says: (As read.) At an
11　outdoor work event, several male supervisors and
12　male coworkers asked Plaintiff why she was not
13　wearing shorts, and asked Plaintiff if Turney could
14　cut her pants into shorts.
15　　　　MS. KIRKPATRICK: Objection.
16　　　　MS. GURMANKIN: I haven't asked the
17　　　question yet.
18　BY MS. GURMANKIN:
19　　　Q　Does this allegation sound similar to what
20　Jesse told you --
21　　　A　Yes.
22　　　Q　-- at around that time?
23　　　A　Yes.
24　　　　MS. KIRKPATRICK: Objection.

9　(Pages 33 to 36)

Page 37

BY MS. GURMANKIN:

1  
2     Q    Okay.  And the next paragraph,
3  subparagraph B says:  (As read.)  At the same event,
4  male supervisors took a picture of Plaintiff's
5  buttocks, without her consent, and saved the photo
6  on their phones.
7           Did Jesse tell you that about that time?
8           MS. KIRKPATRICK:  Objection.
9           THE WITNESS:  No.
10 BY MS. GURMANKIN:
11    Q    Okay.  Subparagraph C:  (As read.)  Turney
12 commented that another female at the same event was
13 wearing shorts and kissed him on the cheek,
14 suggesting that Plaintiff should do the same.
15          Do you remember if Jesse told you about
16 that at around this time?
17    A    No.
18          MS. KIRKPATRICK:  Objection.
19 BY MS. GURMANKIN:
20    Q    Any of the other allegations that you read
21 as part of Paragraph 28, do you recall Jesse telling
22 you about any of those?
23          MS. KIRKPATRICK:  Objection.
24          THE WITNESS:  E.

Page 38

BY MS. GURMANKIN:

1  
2     Q    All right, that says:  (As read.)  Turney
3  showed Plaintiff a photo he took of himself in his
4  underwear.
5           Is that the one?
6     A    Yes.
7     Q    Okay.  Do you remember when Jesse told you
8  about that?
9     A    I do believe --
10          MS. KIRKPATRICK:  Objection.
11          THE WITNESS:  I could be totally
12      wrong, could have been mixed up, it's been a
13      while.  I do believe it's when her, Turney,
14      Foreman were in Canada at a training, she was
15      learning more about her maintenance analyst
16      job, the three of them went up, and that was --
17      and when she came back, she mentioned this.
18      But did not say much, did not go into detail.
19 BY MS. GURMANKIN:
20    Q    Do you remember her telling you anything
21 other, basically, than Turney showed her a picture
22 he took of himself in his underwear?
23    A    Not at that time, but the touching the
24 arms, this kind of stuff, yes, she did.  And I know

Page 39

1  at the time, it got -- she would get so upset that I
2  went to Mr. Blakley, Hondo Blakley -- it was either
3  Thursday and I had Friday off, or it was a Friday,
4  because that next Monday, I asked -- I went in to
5  Mr. Blakley, I said, please talk to Mr. Turney, I
6  said, well, he is -- tell him to stop it, he is
7  really, really upsetting her, and he said, I will.
8           Monday I came in and I went to Hondo, I
9  said, did you talk to him?  He says, yes, but all
10 it's gonna do is make me make -- or have to do more
11 paperwork.
12    Q    So Jesse had talked to you about Turney
13 touching her?
14          MS. KIRKPATRICK:  Objection.
15          THE WITNESS:  Yes, about the touching
16      of the hands, on her hair, on her arm, yes, in
17      front of other male coworkers in her department.
18 BY MS. GURMANKIN:
19    Q    That he was doing this in front of
20 other --
21    A    Yes.
22    Q    -- male coworkers?
23    A    Yes.  Yes.
24          MS. KIRKPATRICK:  Objection.

Page 40

BY MS. GURMANKIN:

1  
2     Q    And she talked to you about this
3  repeatedly?
4     A    Yes.
5           MS. KIRKPATRICK:  Objection.
6           THE WITNESS:  And that's when I asked
7       Mr. Blakley to pointblank to talk to him to
8       make him stop her -- the touching, the cutting
9       her down in front of her coworkers.
10 BY MS. GURMANKIN:
11    Q    Why did you go to Mr. Blakley about this?
12    A    I do believe at the time, Mr. Blakley may
13 have been his supervisor, but I'm not positive.  I
14 do know Will Turney sat one here and -- sat right
15 next to Mr. Blakley.  But I think he was his
16 supervisor at the time.
17    Q    Blakley was Turney's supervisor?
18    A    Yes.
19    Q    Do you remember when this was that you go
20 to Blakley?
21    A    It had to be in the fall of 2016, because
22 I do believe in 2017 is when it all came to head and
23 she was put into the job that she had --
24 environmental or safety or something -- after that.

10  (Pages 37 to 40)

Page 41

1    Q    So if it helps you, and we'll go over this
2  shortly, but at some point, you met with Megan
3  Kloosterman, right?
4    A    Yes, and that had to have been the code of
5  conduct -- the reason I know, because I had to set
6  up these meetings; I was the person that set up the
7  room for all these meetings with Megan, and then I
8  was also called in to testify or to speak with Megan
9  about these issues.
10   Q    Okay.  So Kloosterman's notes I can
11 represent to you indicate that she met with you on
12 December 7, 2016.
13   A    Okay.
14   Q    Okay.
15   A    I didn't know when it was.
16   Q    So it would have been in the fall of 2016
17 that you talked to Blakley?
18   A    Yes.
19   Q    Okay.  And when you spoke with him on the
20 Thursday or the Friday --
21   A    Friday, yeah.
22   Q    -- did he say anything to you?
23   A    I will.
24   Q    Okay.

Page 42

1    A    Because I had spoken to him before, I
2  said, you gotta do something, just make him lay off.
3    Q    And when you spoke with Blakley, were you
4  conveying to him that you believed that Turney was
5  engaging in inappropriate conduct towards Jesse?
6        MS. KIRKPATRICK:  Objection.
7        THE WITNESS:  I believe that he was
8    aggravating her so much and upsetting her so
9    much each day in front of her coworkers.
10 BY MS. GURMANKIN:
11   Q    And in your conversation with Blakley, did
12 you tell him that he needed to get Turney to stop
13 touching Jesse?
14   A    I did not say, I just said --
15       MS. KIRKPATRICK:  Objection.
16       THE WITNESS:  -- you need to talk to
17   him to tell him to stop aggravating her so
18   much.
19 BY MS. GURMANKIN:
20   Q    Did he ask you for any details?
21   A    No.  He knew.
22   Q    What makes you say that?
23   A    Because they talked.
24   Q    Who talked?

Page 43

1    A    Hondo and Turney.  They talked a lot.  I
2  -- this is a room that had cubicles.
3    Q    Um-hmm.
4    A    Not rooms.
5    Q    This was in Wellsboro?
6    A    This is in Wellsboro.
7    Q    And do you believe that Blakley observed
8  some of the things that Turney was doing to Jesse
9  that you believed were aggravating her?
10       MS. KIRKPATRICK:  Objection.
11       THE WITNESS:  The reason I'm saying
12   yes is because after the HR meetings with
13   Megan, one day I was going over to speak with
14   Jesse, see how her day was going, and
15   Mr. Blakley was over there.  I turned around
16   and I left.
17       When I went to see her again, I said,
18   what, Hondo's talking to you now?  And she
19   goes, he's apologizing for letting things go
20   the way they did.
21 BY MS. GURMANKIN:
22   Q    When you talked to -- when you went in to
23 check back with Blakley on the following Monday
24 after your initial conversation with him, did he say

Page 44

1  anything to you other than something to the effect
2  of he didn't want to do anything because it would
3  make more paperwork for him?
4    A    He would have to --
5        MS. KIRKPATRICK:  Objection.
6        THE WITNESS:  -- do paperwork.
7  BY MS. GURMANKIN:
8    Q    Okay.  Did he say anything other than
9  that?
10   A    He'd talked to him.
11   Q    He --
12   A    That he had talked to him, it was just
13 gonna cause him paperwork.
14   Q    And based on what you observed of your
15 conversations with Jesse, did Turney's conduct
16 change --
17   A    No.
18   Q    -- after that?
19   A    Well, it was -- I'd have to say at that
20 time, after the HR meetings, the code of conduct
21 refresher courses that we had to all go through, and
22 then she was moved to a different department as of
23 -- I can bring it up here where I asked Jesse where
24 she had -- you know, how her new position, and that

11 (Pages 41 to 44)

Page 45

1    was in February, that he stayed away from her. I
2    mean, he was no longer her supervisor, she was put
3    in another position, somebody else was put in hers.
4        Q    But in between your conversations with
5    Blakley in the fall of 2016 and the HR
6    investigations which the records indicate happened
7    in December of 2016, based on your observations or
8    what Jesse told you, did anything change about
9    Turney's conduct?
10       A    No, because he was still her supervisor --
11           MS. KIRKPATRICK: Objection.
12           THE WITNESS: -- up and until the code
13    of conduct refresher courses, where I can show
14    you where I set up the meetings, and until she
15    was given her new position, he was still her
16    supervisor, and yes, it was still -- and I know
17    she would come in and say I've got a migraine,
18    I can -- it's still going on, you know, it was
19    still upsetting her, stressing her out having
20    to work with him and what he was talking and
21    doing in front of his other -- the other
22    coworkers, it was still upsetting her a great
23    deal.
24    BY MS. GURMANKIN:

Page 46

1        Q    Did she give you specifics?
2        A    He would cut her down, you know, you're
3    not doing the job, or, you know, you can do better
4    than that, or all the blonde comments.
5        Q    What did he say about blonde?
6        A    Just that she was blonde; she was a woman
7    and she was blonde.
8        Q    This is from her, or you heard this from
9    him?
10       A    He -- he -- no, no, I did not hear it from
11    his mouth; she would say, you know, he keeps telling
12    me that I'm a woman and I'm blonde and I don't, you
13    know, the pay was so much less and...
14       Q    What did she tell you he said about the
15    pay being less?
16       A    'Cause she was a woman.
17       Q    So Jesse told you that Turney said to her
18    that her pay was less because she's a woman?
19           MS. KIRKPATRICK: Objection.
20           THE WITNESS: Yes.
21    BY MS. GURMANKIN:
22       Q    Looking -- going back to Exhibit 7, which
23    is the Complaint, was there anything else in
24    Paragraph 28 that you read that you remember Jesse

Page 47

1    talking to you about --
2           MS. KIRKPATRICK: Objection.
3    BY MS. GURMANKIN:
4        Q    -- while you were still employed?
5           MS. KIRKPATRICK: Objection.
6           THE WITNESS: Ken Foreman touching her
7    hair.
8    BY MS. GURMANKIN:
9        Q    Okay. And what, what letter are you on?
10    If you look at Page 8, is that subparagraph O?
11       A    Yeah, O.
12       Q    Okay. And this is something that Jesse
13    had talked to you about?
14       A    Yes. Yes. And she --
15           MS. KIRKPATRICK: Objection.
16           THE WITNESS: Jesse hated anybody to
17    touch her.
18    BY MS. GURMANKIN:
19       Q    Okay. What did she tell you about Foreman
20    touching her hair?
21       A    Just that she -- he touched her hair and
22    he'd just -- she didn't like it. I mean, she just
23    -- she wasn't a person that let anybody touch her.
24       Q    Did she talk to you about this more than

Page 48

1    once about Foreman --
2        A    Yes, several times.
3           MS. KIRKPATRICK: Objection.
4           THE WITNESS: Not just Ken Foreman,
5    I'm not gonna say, it was anyone that would
6    touch her, she just didn't like anybody to
7    touch her.
8    BY MS. GURMANKIN:
9        Q    Other than Turney touching her and Foreman
10    touching her hair, did she talk to you about anyone
11    else touching her?
12           MS. KIRKPATRICK: Objection.
13           THE WITNESS: (Witness shakes head.)
14           THE COURT REPORTER: You have to --
15           THE WITNESS: Oh, I'm sorry.
16           No, that -- not that I can remember.
17    BY MS. GURMANKIN:
18       Q    Okay.
19       A    It was the talking down of the other
20    coworkers.
21       Q    Other than Turney cutting her down, did
22    she talk to you about anyone else cutting her down?
23       A    She would tell me that after Will would
24    cut her down, the other coworkers felt that they

12 (Pages 45 to 48)

Page 49

1    could, too.  She did not give names to me.
2        Q    Did you know that her other coworkers were
3    male?
4        A    Yes.
5            MS. KIRKPATRICK:  Objection.
6            THE WITNESS:  Like I said, there was
7        very few women in, in the building.
8    BY MS. GURMANKIN:
9        Q    Who were the other -- I think you said
10   there were three to four women in total?
11       A    On the production side, there was Jill
12   Brueilly, Tina King, I, Robin Houseknecht was there
13   for a while but she left.  We're just talking the
14   production side.
15           Lori Zeaflea, she was in the safety side.
16   This was towards the -- most -- it was basically the
17   production side.  Now, there was more on the
18   completion and drilling side.
19       Q    How many more?
20       A    On that side, they had -- they -- towards
21   the beginning, there was Jennifer Card, her name was
22   Cressman, Peggy Cressman, Julie Wilson was another
23   one, Martina Catherman, a Clark, but they were down
24   in the other building in Mansfield.

Page 50

1            I can't -- Kingdom Tapes is where that --
2        I forgot the water team.  The water team did have
3        women on that, but we didn't mingle with them a lot;
4        they were either at the building in Wellsboro, what
5        used to be the -- the drilling.
6            The drilling department got moved around
7        a lot, drilling, completions, the water team, the
8        land team were up in Wellsboro, and then they ended
9        up going down to Lambs Creek, and then they ended up
10       coming to the main building.  But production, there
11       was like three, four, five.
12       Q    During your employment, do you know who
13   the highest level woman was on the production side?
14       A    Yeah, Robin Grouette.
15       Q    Okay.  General manager?
16       A    Yes.
17       Q    Do you know who the next highest woman
18   was?
19       A    No, I do not.
20       Q    Do you know if any of those women on the
21   production side were still there at the time that
22   you left Shell?
23       A    Tina King is still there.  In Jesse's
24   department, there was an April Heater, a woman.  In

Page 51

1    the land department, there was Lyric Phillips.  And
2    then there was, the communication was Deb Sawyer.
3        Q    Other than Tina King, do you know if any
4    of these women were still there at the time that you
5    left?
6        A    Lyric's gone back to Texas.
7        Q    At Shell, or somewhere else?
8        A    Shell, I do believe.  Tina is there.  I
9    don't know if -- Deb Sawyer, she's communications,
10   so really, I -- I don't know.  And I know April is
11   now a Shell employee.
12       Q    Going back to Paragraph 28 in Exhibit 7,
13   anything else in Paragraph 28 refresh your
14   recollection as to anything that Jesse had talked to
15   you about?
16           MS. KIRKPATRICK:  Objection.
17           THE WITNESS:  I can tell you Ms. --
18       Jesse never spoke about her boyfriends to me.
19       She kept it off limits at the building.
20           If she ever got flowers, you know,
21       Valentine's Day, somebody brought them in, we
22       told her it was the kiss of death, 'cause she
23       never talked to them again.  She just was a
24       very private person, and we always joked about

Page 52

1        that.
2            As of the -- the CPR training course,
3        I do believe the gentleman's name was Coon, and
4        I do remember her coming in, getting angry that
5        he'd said that to her.
6    BY MS. GURMANKIN:
7        Q    Are you talking about sub --
8        A    BB.
9        Q    Okay.  On Page 10?
10       A    Yes.
11       Q    All right.
12       A    I do remember her coming and being upset.
13   I set up all those meetings, the meeting rooms, did
14   the lunches and that kind of stuff, so when I would
15   serve lunches, she said something to me, and she
16   was -- she was pissed off.
17       Q    Do you remember her telling you what's
18   reflected in bb?
19           MS. KIRKPATRICK:  Objection.
20           THE WITNESS:  She told me about that,
21       that's all I remember.
22   BY MS. GURMANKIN:
23       Q    At around the time that it happened?
24       A    Yes, she was just pissed off that they had

13 (Pages 49 to 52)

Page 53

1    said that. Because usually we would only -- I mean,
2    there wasn't that many women, and we had to find --
3    I would set them up, and there was only like one
4    woman in each, each class.
5        Q   Did she tell you both what the male
6    instructor said and then what Turney said when she
7    complained to him?
8            MS. KIRKPATRICK: Objection.
9            THE WITNESS: No, I -- I remember
10       her -- pick her ass up, but I don't remember
11       the other.
12   BY MS. GURMANKIN:
13       Q   Anything else in Paragraph 28 that you
14   remember Jesse talking to you about?
15           MS. KIRKPATRICK: Objection.
16           THE WITNESS: No. It all blends.
17   BY MS. GURMANKIN:
18       Q   Did you ever see Will Turney act in a way
19   or make comments that you thought were inappropriate
20   towards Jesse?
21       A   I remember after -- I'm not -- I'm saying
22   when he came back from a meeting, but one of my
23   other guys came back from the HR with Megan, the HR
24   meeting about the code of conduct, I remember the

Page 54

1    gentleman came back and went to his desk, and
2    Mr. Turney came in and said, oh, so did she say a
3    lot of bad things about me to you? And the other
4    gentleman said, not here.
5        Q   And who was the other gentleman?
6        A   Mark Hoover.
7        Q   Okay.
8        A   And Mr. Blakley was in the area at the
9    time, but he did not say anything.
10       Q   Do you know if Hoover and Turney then had
11   a discussion?
12       A   I have no idea.
13       Q   Okay. Anything else that you observed
14   Will Turney do or say towards Jesse that you thought
15   was inappropriate or off color or anything like
16   that?
17       A   It's been so long, I really could not say
18   of an incident or anything. Mr. Turney, I can tell
19   you one thing about him, and I don't know if you can
20   tell me to stop, he would come in in the morning,
21   they would discuss their evenings or whatever, and
22   he would say, I'm getting tired of my wife asking me
23   if everything was all right with us; I am sick of
24   it, I wish she -- I'm not even gonna say the words

Page 55

1    that he said.
2        Q   I'm sorry if it makes you uncomfortable,
3    we just have to make sure we're as accurate as
4    possible, can you just --
5        A   Just that I wish she would shut her damn
6    mouth.
7        Q   Okay. Did he use the word "damn"?
8        A   No.
9        Q   Okay. Did he use the word known as the
10   "F" word?
11       A   Yes.
12       Q   Okay.
13           MS. KIRKPATRICK: Objection.
14   BY MS. GURMANKIN:
15       Q   Did he actually say the word "fucking"?
16           MS. KIRKPATRICK: Objection.
17           THE WITNESS: Just I wish -- just
18       fuck -- just shut up about that, just shut up
19       about it. Very uncomfortable with it. But
20       then they would, you know, realizing that I was
21       at the other side, it would stop.
22   BY MS. GURMANKIN:
23       Q   Okay. So I just want to make sure we're
24   clear, did he say he wished his wife would shut the

Page 56

1    fuck up?
2            MS. KIRKPATRICK: Objection.
3            THE WITNESS: About that issue, you
4        know, is everything all right with us.
5    BY MS. GURMANKIN:
6        Q   Right.
7        A   I mean, it was -- it was like I can't even
8    tell you how many times he came up there, "I'm just
9    sick of her saying that; I keep telling her yes,
10   everything's fine."
11       Q   Anything else that you saw or heard Turney
12   do that you thought was inappropriate or off color,
13   anything like that?
14           MS. KIRKPATRICK: Objection.
15           THE WITNESS: Not to me.
16   BY MS. GURMANKIN:
17       Q   Did -- other than what Jesse told you, did
18   you hear from anyone else that he did or said
19   anything that you thought was inappropriate, even if
20   you didn't hear it directly?
21       A   No. Like I said, it's been a while, so
22   I...
23       Q   When you spoke with Hondo in the fall of
24   2016 and told him that he needed to talk to Turney

14 (Pages 53 to 56)

Page 57

1  and tell him to stop aggravating Jesse, did you
2  convey to Blakley, even if you didn't use the exact
3  words, that you thought that Turney was acting
4  inappropriately towards Jesse?
5      MS. KIRKPATRICK: Objection.
6      THE WITNESS: No, I just -- I think I
7    just said he's aggravating her, he won't stop
8    aggravating her.
9  BY MS. GURMANKIN:
10     Q  Did you give him any examples?
11     A  No.
12     Q  Okay.
13     A  I -- no.
14     Q  And he did not ask for any, correct?
15     A  No.
16     Q  Did Blakley ever ask you to put in writing
17  how you thought that Turney was aggravating Jesse?
18     A  No.
19     Q  Did you ever put that in writing to anyone
20  at the company?
21     A  No.
22     Q  Did you ever see any other male employees
23  act in ways that you thought were inappropriate or
24  off color, anything like that, at Shell?

Page 58

1      A  Did I see anybody acting inappropriate?
2  No, I did not see anybody acting inappropriate.
3      Q  Did you hear about anyone acting
4  inappropriately?
5      A  What do you mean by inappropriately?
6      Q  Something that you thought was not the way
7  that people should be acting at work or with work
8  colleagues.
9      A  Affairs.
10     Q  Okay.  What have you heard about people
11  having affairs at Shell?
12     A  This gets personal.  Very personal.  My
13  sister-in-law, April, and Ricky Dake.
14     Q  April Heater is your sister-in-law?
15     A  Yes.
16     Q  Okay.  And you heard about her having an
17  affair with Ricky Dake?
18     A  Yes.  It caused the divorce.
19     Q  Okay.
20     A  And they are now living together.  She is
21  now a Shell employee.
22     Q  Were both she and Ricky Dake Shell
23  employees at the time that you learned they were
24  having an affair?

Page 59

1      A  Ricky was.  She was not.
2      Q  Okay.  Do you know if they were both Shell
3  employees at any time while the affair was going on?
4      A  While she was married?  She didn't become
5  Shell until this last year.
6      Q  2018?
7      A  I don't know if it was the end of '18 or
8  first of '19.
9      Q  Okay.  At the time that she became a Shell
10  employee, do you know if they were engaged in an
11  affair?
12     A  They're living together; they have been
13  living together for quite some time.
14     Q  Okay.
15     A  Their divorce was final in '16, I guess.
16     Q  Her divorce with her husband?
17     A  Pardon?
18     Q  Her divorce with her husband was final?
19     A  Yes.
20     Q  Okay.  So at the time that April became a
21  Shell employee, Ricky Dake was already a Shell
22  employee?
23     A  He's always been a Shell employee while I
24  was there.

Page 60

1      Q  Okay.  And at the time that she became a
2  Shell employee, they were, as far as you know,
3  having an affair?
4      A  They've been together ever since they were
5  having the affair.  The husband found out, the
6  girlfriend found out, then there was the divorce, a
7  split with the girlfriend, and then shortly
8  thereafter, they moved in together.
9      Q  Do you know if Ricky Dake had a higher
10  level position than April at the time that April
11  became a Shell employee?
12     MS. KIRKPATRICK: Objection.
13     THE WITNESS: April became a Shell
14   employee after Jesse left Shell.
15  BY MS. GURMANKIN:
16     Q  Um-hmm.
17     A  And so Ricky's high up, he's like a super
18  -- super -- I heard he's gotten a promotion; he's a
19  supervisor now, I do believe.
20     Q  Higher level than April?
21     A  Yes.
22     Q  Okay.  Any other conduct that you heard
23  about directly or saw or heard about from someone
24  else at Shell that you thought was inappropriate?

15 (Pages 57 to 60)

Page 61

1　　A　Heard, hearsay, rumor?
2　　Q　Yep, all of that.
3　　A　There was a lot.
4　　Q　Okay.  What have you heard about?
5　　A　Much went on over to Bradford County, the
6　Bradford asset.
7　　Q　What did you hear about --
8　　A　Robin Grouette --
9　　Q　Um-hmm.
10　　A　-- and several of the -- I don't know,
11　it -- like I said, rumor, hearsay.
12　　Q　You heard rumors that --
13　　A　That she got around.
14　　Q　You heard rumors that Robin Grouette was
15　having affairs with male employees?
16　　　MS. KIRKPATRICK:  Objection.
17　　　THE WITNESS:  Yeah.  Like I said,
18　rumor, hearsay.
19　BY MS. GURMANKIN:
20　　Q　Okay.  Did you hear about these rumors
21　from multiple people?
22　　A　Yes.
23　　　MS. KIRKPATRICK:  Objection.
24　　　THE WITNESS:  And Will Turney was one.

Page 62

1　BY MS. GURMANKIN:
2　　Q　You heard from Will Turney --
3　　A　That she, you know, got close with
4　other --
5　　Q　With other male employees?
6　　A　Yes.
7　　Q　And what was the context in which you
8　would hear about this from Turney, do you remember?
9　　　MS. KIRKPATRICK:  Objection.
10　　　THE WITNESS:  I know when she would
11　call, there would be a lot of hoop of the other
12　gentlemen, "Oh, you got a telephone call from
13　Robin, woo," that type of, you know -- "Oh, he
14　got a" -- "he got a phone call from Robin" --
15　wouldn't just be Turney, it could be somebody
16　else, and it was always a "woo" -- from the
17　guys, not women, of course -- the guys would --
18　cat calls or "hoo-hoo," you know, "wow,"
19　whatever, "what you doing tonight," you know,
20　because they would have meetings, several
21　together.
22　BY MS. GURMANKIN:
23　　Q　Do you know if any --
24　　　MS. KIRKPATRICK:  Let's -- excuse me,

Page 63

1　can I take a short break, bathroom break,
2　please?
3　　　MS. GURMANKIN:  Yeah, let me just
4　finish this one question.
5　BY MS. GURMANKIN:
6　　Q　Do you know if any supervisory level
7　employees were around when Robin would call and the
8　guys would say "woo-hoo" and make the cat calls and
9　the comments?
10　　A　If any of the supervisors?
11　　Q　Yeah, if any supervisors were around.
12　　A　They would be on the other -- they would
13　be -- most of the supervisors at the beginning when
14　Robin Grouette was there were down in Warrendale.
15　So all we would have was maybe like a production
16　supervisor, a maintenance supervisor.
17　　　Will Turney was the production supervisor
18　at the time -- or, no, he's the maintenance
19　supervisor.  The production supervisor at the
20　time -- Hoover.
21　　Q　Hoover was --
22　　A　And whoever was -- Mark Hoover or whoever
23　was before him, and I can't remember who it was.  We
24　had quite a turnover at times.

Page 64

1　　Q　Okay.
2　　　MS. GURMANKIN:  All right, let's take
3　a short break, okay?
4　　　THE WITNESS:  Okay.
5　　　THE VIDEOGRAPHER:  This concludes File
6　Number 1 in the videotape deposition of Penny
7　Robbins in the case of Barnes v. Shell, et al.
8　We are going off the record at 2:20 p.m.
9　　　(Off the record.)
10　　　THE VIDEOGRAPHER:  This will begin
11　File Number 2 in the videotape deposition of
12　Penny Robbins in the matter of Barnes v. Shell,
13　et al.  We are going back on the record at
14　2:35 p.m.
15　BY MS. GURMANKIN:
16　　Q　Was Turney one of the ones who would make
17　the comments when Robin Grouette would call?
18　　　MS. KIRKPATRICK:  Objection.
19　　　THE WITNESS:  Yes, ma'am.
20　BY MS. GURMANKIN:
21　　Q　Mark Hoover?
22　　　MS. KIRKPATRICK:  Objection.
23　　　THE WITNESS:  When they were all
24　together, yes, it was, you know, Robin's

16　(Pages 61 to 64)

Page 65

1    calling again, calling you again.  Just
2    sarcastic.
3    BY MS. GURMANKIN:
4        Q    And the woo-hoo --
5        A    Yeah.
6        Q    -- comments?
7        A    Just -- yeah.
8            MS. KIRKPATRICK:  Objection.
9    BY MS. GURMANKIN:
10       Q    Anyone else other than Turney and Hoover
11   that you remember making those kinds of comments
12   when Robin Grouette would call?
13       A    No.  They were in my area, that's how I
14   heard.
15       Q    And you heard Turney make comments about
16   Robin having affairs with multiple male employees?
17           MS. KIRKPATRICK:  Objection.
18           THE WITNESS:  It was -- it was
19       conversation with several people together
20       around -- now, that -- not that he came out and
21       said that she had had affairs, only that she
22       liked gentlemen.  Like, she was over there and
23       she had had connections with other gentlemen
24       over there.

Page 66

1    BY MS. GURMANKIN:
2        Q    Did you understand --
3        A    Connections or been with.  Been with.
4    No -- no affair or hookups or -- just been with.  So
5    I assumed.
6        Q    Okay.  You understood that -- those kinds
7    of comments to be relating the fact that she had
8    relationships with male employees?
9        A    Yes.
10           MS. KIRKPATRICK:  Objection.
11   BY MS. GURMANKIN:
12       Q    And did you hear Turney make these kinds
13   of comments?
14       A    Yes.
15           MS. KIRKPATRICK:  Objection.
16   BY MS. GURMANKIN:
17       Q    Did you hear anyone else make those kinds
18   of comments?
19       A    In a group; I couldn't say a certain
20   person, but in a group.
21       Q    Okay.  With male employees?
22       A    Yes.
23       Q    Lori -- is it Zeaflea, is that her name?
24       A    Yes.

Page 67

1        Q    Okay.  Did you ever hear rumors, people
2    talk about rumors that she was sleeping around or
3    had relationships with male employees?
4        A    No, ma'am.
5            MS. KIRKPATRICK:  Objection.
6    BY MS. GURMANKIN:
7        Q    Who is Robin Houseknecht?
8        A    Robin Houseknecht, she was like the
9    financial something or other in there.  She was
10   there for -- I can't even tell you how long she was
11   there, three years, four years.
12       Q    Do you know why she left?
13       A    Conflict of interest, I do believe, with
14   Greg Larsen.
15       Q    Do you know what that was about?
16       A    No, I do not --
17       Q    Okay.
18       A    -- personally.
19       Q    Who's Tonia Pugliano?
20       A    She was one that worked in -- down in
21   Warrendale, and she -- she helped me a lot in
22   making sure that invoices got paid, or procurements,
23   that type of thing down there in Warren, and she
24   came up here; she had a lot of conflicts of interest

Page 68

1    with some...
2            She -- I guess that was part of the job,
3    you know, given the negative side to the positive
4    sides to things, and so she had conflicts with that.
5    But then towards the end, she had a lot of conflicts
6    of interest, I think it was with Winters -- I can't
7    think of his, what his first name is now -- but I
8    know she had issues with -- with different people.
9            And she had spoke of these connections
10   with Robin Grouette in Bradford, she was one also
11   that spoke of these.
12       Q    Did Tonia ever talk to you about conflicts
13   that she had with male employees?
14           MS. KIRKPATRICK:  Objection.
15           THE WITNESS:  Oh, definitely, yes.
16   BY MS. GURMANKIN:
17       Q    Was Turney one of them?
18       A    Yes.
19           MS. KIRKPATRICK:  Objection.
20   BY MS. GURMANKIN:
21       Q    What did she talk to you about Turney?
22       A    I really can't remember now, I just know
23   that it was an issue with her and Turney.
24       Q    Okay.  Any other male employees that you

17 (Pages 65 to 68)

Page 69

1 remember her talking to you about that she had
2 conflicts with?
3    A   Per the job, I would think Winters, Hondo
4 -- because they worked together, so they all had,
5 you know, conflicts.
6    Q   Any other male employees?
7    A   Who she worked with?  She worked with,
8 closely, I think -- I'm not sure Larsen was
9 there at that time.  I'm not sure.  I really don't
10 remember.  There was a lot she had conflicts with.
11    Q   Did Tonia ever talk to you about a
12 supervisor that asked her to come to his hotel?
13    A   No.
14    Q   Do you remember --
15    A   If she does, I don't remember her stating
16 it -- yes, there was, she was around -- they had a
17 dinner out, it was a Bradford gentleman, and I can't
18 say who it was -- I really could not say the name --
19 I do remember her saying they went out to dinner,
20 and she was asked at that time to -- invited to his
21 room.
22    Q   Okay.  That he invited her?
23    A   Yes, that he invited her.  I cannot
24 remember the gentleman's name.

Page 70

1    Q   Do you remember when this was that Tonia
2 told you that?
3    A   When Robin Grouette was over in Bradford,
4 and I can't tell you when that was -- before she
5 became general manager, she was supervisor over
6 there, so I -- I really -- or superintendent, I
7 guess, is what...
8    Q   Do you know if it would have been before
9 you talked to Megan Kloosterman about Jesse?
10    A   Yes, it was before that.
11       MS. KIRKPATRICK:  Objection.
12 BY MS. GURMANKIN:
13    Q   Did you tell anyone what Tonia had told
14 you about this male supervisor?
15    A   No, she told everyone.
16    Q   Okay.  How do you know?
17    A   'Cause we were in a group and she talked
18 about it.
19    Q   Who else was in the group when she talked
20 about it?
21    A   Oh, Jesse was there, there was a lot of
22 other guys.  I mean, it was a group, but --
23    Q   Turney?
24    A   I really couldn't tell you whether it was

Page 71

1 or not, if he was there.
2    Q   Do you remember any of the male employees
3 who were around when she said that?
4    A   This is in Mansfield, so I wouldn't -- you
5 know, if they talked with the Bradford guys before
6 we sold the Bradford asset, and they didn't come
7 over, so it would be before that, and I, really, I
8 couldn't tell you.
9       I just remember her -- when Warrendale was
10 going down, you know, they were selling that asset,
11 which was after Bradford, I do believe, she was up
12 and around for a while; she came up two weeks at a
13 time to help with the -- with the transition, and
14 then she had to train her replacement, which was not
15 good, because she didn't feel that she should have
16 lost her job.
17    Q   Do you know if her replacement was male?
18    A   No, it was Kathy Lehman.
19    Q   Okay.  Did Tonia talk to you about why she
20 lost her job?
21    A   She talked a lot about it.  She thought it
22 was conflicts with other supervisors, but yet they
23 were stating because she was a contractor, the --
24 she was only supposed to have a -- being a

Page 72

1 contractor, they state unless they -- I know they
2 have some jargon in there that they're only supposed
3 to have a position for two years unless it's -- I
4 really can't tell you the wording.  But that was
5 what they were trying to fit her into at the time.
6 But she had been there for quite some time over the
7 two years.
8    Q   All right, so just to go back, because I
9 want to make sure this is clear, do you remember,
10 other than Jesse and Tonia, who else was in the
11 group when Tonia told the story about the supervisor
12 who invited her back to his hotel room?
13    A   Yeah, she talked -- I mean, there was
14 probably Houseknecht was there, because we all
15 talked together -- at that time, it was before
16 Houseknecht -- and I think Houseknecht went in
17 September --
18    Q   Um-hmm.
19    A   -- of '16.  I'm not positive there.
20    Q   Okay.  Anyone else that --
21    A   I mean, there was -- not guys, I mean,
22 Will was there, was it just a group.  It was in the
23 cubicles --
24    Q   Um-hmm.

Page 73

1    A   -- you know, we were all just hanging, you
2    know, and she was -- it was usually when that
3    Winters guy was up there, and he wouldn't help or
4    talk with her.
5    Q   Winters was the male employee that she had
6    a conflict with?
7    A   Was her supervisor.
8    Q   Okay.
9    A   And I don't know where he went after the
10   Warrendale.  He may have been to Texas, I'm not
11   sure.  He might have been in Texas and he was her
12   supervisor while she -- until she finished out her
13   contract or whatever.
14   Q   Do you remember a female employee named
15   Katelyn who worked in logistics, does that ring a
16   bell?
17   A   Worked where?
18   Q   A woman named Katelyn who worked in
19   logistics.
20   A   Logistics, Katelyn.  No, I -- I can't
21   remember.
22   Q   That's okay.  If it comes back to you
23   later, let me know.
24       All right.  So I got off track a bit, but

Page 74

1    we were talking in the beginning about your
2    employment history, and we got to you reporting to
3    David Summers for a brief period of time.  Do you
4    remember, after Summers, who you reported to?
5    A   Short period of time was ████████ 'cause
6    Robin Grouette had hired him to replace David
7    Summers.  Then after David Summers, it was temporary
8    for Chris Anderson.  And he was in there while they
9    brought in Steve Craig.
10       I think Steve Craig was -- Larsen was in
11   there, but I can't think, you know, how it went.  I
12   ended up reporting to Larsen.  First it was Steve
13   Craig, then it was Larsen; then after Larsen, it
14   went back to Steve Craig.  I can't remember their
15   titles.  I mean, they all switch so much,
16   supervisor, superintendent, production manager, then
17   it was general manager, something -- but then I --
18   you know, after Larsen, it went back to Steve Craig.
19   Q   At the time that you were terminated, who
20   were you reporting to?
21   A   Steve Craig.
22   Q   Okay.  And who did he report to?
23   A   Tonya Williams.
24   Q   Do you remember how it was that you came

Page 75

1    to talk to Megan Kloosterman in December of 2016?
2    A   Investigation on the code of conducts with
3    Jesse.
4    Q   And how did you find out about that?
5    A   I was making -- I was reserving rooms.
6    Q   For training?
7    A   For -- this was interviews for the code of
8    conduct.
9    Q   Before you reserved rooms for the code
10   of --
11   A   Conduct.
12   Q   I'm sorry, were you reserving rooms for
13   Megan to meet with people?
14   A   Yes.
15   Q   Okay.  Who told you to do that?
16   A   My supervisor at the time, Chris Anderson
17   maybe.  I -- I don't believe it was Steve Craig --
18   Larsen.
19   Q   Greg Larsen?
20   A   Greg Larsen.
21   Q   Did he tell you why?
22   A   No.
23   Q   At some point, you learned that you were
24   going to be interviewed by Megan --

Page 76

1    A   Yes.
2    Q   -- in connection with this investigation?
3    A   Yes.
4    Q   And who told you that?
5    A   Larsen, I do believe.
6    Q   Did he tell you why you were gonna be
7    interviewed?
8    A   No, I -- I can't remember much about the
9    interview with Megan.  She asked me questions, I
10   answered them.
11   Q   Do you remember about how long it was?
12   A   It wasn't that long.  A half hour,
13   perhaps.
14   Q   Where did you meet?
15   A   Room 130.
16   Q   In Wellsboro?
17   A   Yes.
18   Q   So before you met with Megan Kloosterman,
19   you knew that there was an investigation into code
20   of conduct issues in connection with Jesse?
21   A   Yes.
22   Q   Do you remember Larsen or anyone else
23   telling you anything else about the investigation or
24   the issues before you met with Megan Kloosterman?

19 (Pages 73 to 76)

Page 77

1      A    No, only that it was issues about the code
2    of -- I can't remember, it's been so long ago, I
3    really can't.  I don't remember a certain person
4    saying anything other than it was about a code of
5    conduct with a supervisor pertaining with Jesse,
6    that's basically all I knew.
7      Q    Okay.  So do you remember anything about
8    the interview with Megan that you had?
9      A    I really can't.  I mean, she asked
10   questions and I answered them.
11     Q    Do you remember what kinds of questions
12   she was asking?
13     A    No, I can't.  It was that long -- I really
14   cannot answer.  I wish I did, but I didn't have a --
15   what I seen or what I heard.
16     Q    Do you remember if she told you why she
17   was conducting these interviews?
18     A    Just the code of conduct with a
19   supervisor.
20     Q    Did she tell you who the supervisor was?
21     A    No.
22     Q    At some point, did --
23     A    I -- not that I -- I cannot remember.
24   Like I said, I just really cannot remember.

Page 78

1      Q    Did you -- did Megan ever show you any
2    notes or write-up of her interview with you?
3      A    No.
4      Q    Were you ever asked to submit a statement
5    in connection with this investigation?
6      A    I can't remember of typing one or sending
7    one to her.
8      Q    Do you remember if you were asked to?
9      A    No, I can't.
10     Q    Other than Megan Kloosterman, did anyone
11   else at the company talk to you at all about this
12   investigation?
13     A    No.  I was just asked to -- after the
14   first of the year, we were -- I was asked to set up
15   meetings for code of conduct refresher courses.
16     Q    Okay.  Did Larsen ask you to do that?
17     A    I do believe so.
18     Q    Did he tell you --
19     A    Because it's in this book that -- Larsen.
20     Q    What is that book that you have there?
21     A    This was just a -- I had a conflict with
22   Larsen, my evaluation, and they advised me to start
23   writing down what I did during the day with Larsen.
24     Q    Who advised you of that?

Page 79

1      A    I don't remember.  It may be HR.  I don't
2    know, I really don't.
3      Q    Did you complain to someone at the company
4    about your conflict with Larsen?
5      A    No, it was during the evaluations, the
6    evaluation period, I had had, as you know, several
7    different supervisors; they evaluated me between a
8    one down to a nine, which is the average, and he
9    came in and -- I can't even remember when he came
10   in -- I got no midyear review; and in December, or
11   whenever that review was, he came in and sat down
12   and said my performance was lacking.  And I stated
13   that out of all the supervisors I had ever had, he
14   was the only one that made that statement, and he
15   says, they lied to you.
16          So therefore, he talked to Michelle, and I
17   also talked to Michelle.  I tried to get Megan, but
18   they said she was on to another position at the
19   time.  And Megan told me that it was -- how did she
20   put it?  She told me that after Larsen had talked to
21   her for an hour, I talked to her a couple days later
22   and she said it was miscommunications.
23          Mr. Larsen told me personally that it was
24   the worst evaluation one-on-one he had had in

Page 80

1    30 years, because I had conflict with him, and --
2    but we would get on the same page.  And I told him I
3    didn't think we could get on the -- in the same
4    book.
5      Q    All right.  Was this after Megan
6    Kloosterman interviews you in connection with the
7    code of conduct issues regarding Jesse?
8      A    Yes.
9          MS. KIRKPATRICK:  Objection.
10   BY MS. GURMANKIN:
11     Q    Okay.  Do you recall how long after?  So
12   that was in December of --
13     A    That was in December, so it would have
14   been -- the evaluation is right around December.
15   You find out December/January, I can't remember the
16   time, what your -- and then he has to give you your
17   yearly evaluation.  You do your -- yours, he does
18   his, and then he gives you that evaluation.
19     Q    All right.  So you got your evaluation
20   from Larsen after you meet with Megan --
21     A    Yes.
22     Q    -- Kloosterman?
23          MS. KIRKPATRICK:  Objection.
24          THE WITNESS:  Yes, I did.

20  (Pages 77 to 80)

Page 81

BY MS. GURMANKIN:

Q　Do you remember how long it was after you met with Megan?

A　A couple weeks.  If it was in December, it was a couple weeks; it would be before Christmas.

Q　So Megan's records indicate that you met with her on December 7th.  So it would have been a couple weeks later?

MS. KIRKPATRICK:  Objection.

THE WITNESS:  I would think -- I -- it's when they hand them all out, and I want to say it was before Christmas.  It could have been January, I just don't remember.  I just remember it was a [inaudible], and I was devastated.

THE COURT REPORTER:  You just remember --

THE WITNESS:  I'm sorry?

MS. GURMANKIN:  It was a point seven?

THE COURT REPORTER:  I'm sorry?

MS. GURMANKIN:  You said it was a point seven?

THE COURT REPORTER:  Thank you.

THE WITNESS:  It was a point seven.

Page 82

BY MS. GURMANKIN:

Q　A point seven.

All right.  And were you reporting to Larsen at the time that you got your evaluation from him?

A　Yes, ma'am.

Q　And how long had you been reporting to him at that point?

A　He came in -- I can't remember when he came in, but whenever he got that position -- he got a position, he was down to Warrendale, then he was supposed to go to Houston but decided he was better up here in Wellsboro -- should have been in Wellsboro.

Before that, I was, like I said, I was reporting to Steve Craig, and so whenever Steve Craig, he took over that job, I want to say the beginning of the year.  I never got a midyear evaluation from either one, and so it had to be in that year that I was transferred back -- or I was transferred from Steve Craig to Larsen.

Q　In 2016?

A　I do believe it was 2016.

Q　But you don't remember when?

Page 83

A　I don't remember when I was put under him.

Q　Okay.  Do you remember it being long before you got your evaluation?

MS. KIRKPATRICK:  Objection.

THE WITNESS:  It was that year, that's all I can remember.

BY MS. GURMANKIN:

Q　Okay.

A　He should have -- the reason I say that I was not given a midyear evaluation is, he had to have been my supervisor at that time, because I questioned why didn't he at that time give me an evaluation so that I could have changed whatever he felt was not up to par.

Q　You told him that at the year-end evaluation?

A　At the year-end evaluation.

Q　Okay.  So fair to say you thought that your end-of-year 2016 evaluation was unfair?

MS. KIRKPATRICK:  Objection.

THE WITNESS:  Very unfair, because at a point seven, you are supposed to be given a, some kind of evaluation or something -- review all the time.

Page 84

They have to -- I can't think of the word I want to say, but they're supposed to review your performance more thoroughly than a regular person, more -- employee; and he says, oh, we don't have to do that, you're going up to par now, and that was right after the evaluation, that I didn't need to do that because I was doing all right.  And I complained to Steve Craig about it.

BY MS. GURMANKIN:

Q　When Larsen said that to you, you're up to par now, was that --

A　I was getting up to par.

Q　Was that another indication to you that the review itself was unfair?

A　Yes.

MS. KIRKPATRICK:  Objection.

THE WITNESS:  But I did not complain.

BY MS. GURMANKIN:

Q　Well, at some point, you complained about the review?

A　Yeah, I -- in here, I know I spoke with Michelle Priest, and I want to see what the words were said.  (Reviewing document.)  February 8th,

21 (Pages 81 to 84)

Page 85

1   talked with Michelle Priest, like beating a dead
2   horse, accept and move on.
3      Q   Are those your words, or that's what she
4   said to you?
5      A   That was what I wrote down here.  So I
6   don't know if I said -- it's like beating a dead
7   horse, I said that, and she said, accept it and move
8   on.
9      Q   At the time that you get your evaluation
10  and you conclude that it's unfair, what did you
11  attribute Larsen giving that evaluation to you?  Why
12  did you think he was doing it?
13     A   He didn't like me.
14        MS. KIRKPATRICK:  Objection.
15  BY MS. GURMANKIN:
16     Q   Why did you think that was?
17     A   He -- he just -- we never hit it off well.
18  We just didn't.  There's just some people that don't
19  hit it off well.
20     Q   Did you ever, either at the time or
21  looking back, attribute Larsen not liking you to the
22  fact that you're a woman?
23        MS. KIRKPATRICK:  Objection.
24        THE WITNESS:  Yes, definitely.

Page 86

1   BY MS. GURMANKIN:
2      Q   Why do you say that?
3      A   It was the way he acted, and I can say
4   from the, just hearsay from the administrator that
5   he had down to Warrendale, her name was Carmella --
6   I cannot think of her last name, I would have to --
7   she stated the same thing, that we just were not up
8   to par for him; women were just not up to par.
9      Q   Did Carmella tell you this before or after
10  you got your evaluation from him?
11     A   Carmella had --
12        MS. KIRKPATRICK:  Objection.
13        THE WITNESS:  -- left Shell when
14  Warrendale closed up.  She said he wouldn't
15  even offer me a job in Texas.  And then I did
16  keep in contact with Carmella, and when I got
17  that bad evaluation, the day I called her,
18  because I said you didn't even give -- when I
19  was talking to Larsen -- this is way off
20  base -- but when he was talking to Larsen, I
21  said, you didn't even give her a position; he
22  said, I offered her one in Texas.  And I knew
23  it was a lie, because Carmella told me it was
24  not -- she never was given an opportunity.

Page 87

1   BY MS. GURMANKIN:
2      Q   So when she told you, you know, woman are
3   not up to par for Larsen, or words to that effect,
4   was that before or after you got your evaluation
5   from him?
6      A   Before.
7        MS. KIRKPATRICK:  Objection.
8   BY MS. GURMANKIN:
9      Q   When you talked to Michelle Priest about
10  the evaluation issue, did you tell her that you
11  thought that Larsen's treatment was at least, in
12  part, because you're a woman?
13        MS. KIRKPATRICK:  Objection.
14        THE WITNESS:  I wish I had the other
15  paper.  I can't remember if it was because it
16  was a woman or not, it was just -- I said we
17  weren't on the same page.  I did not
18  understand, when I had so many supervisors
19  before and I was getting great evaluations,
20  that he would knock me down so far.
21  BY MS. GURMANKIN:
22     Q   So you don't remember if you told Michelle
23  Priest --
24     A   No.

Page 88

1      Q   -- that --
2      A   That he was a man -- that he put me down
3   because I was a woman, no, I cannot remember saying
4   that.
5      Q   Do you remember if she asked you if that
6   was why you thought that he treated you --
7      A   No.
8      Q   -- differently?
9      A   No, he -- no.
10     Q   Do you remember if he told that to anyone
11  at Shell?
12     A   That I said that?
13     Q   That you thought that Larsen treated you a
14  certain way, in part, because you're a woman?
15        MS. KIRKPATRICK:  Objection.
16  BY MS. GURMANKIN:
17     Q   Do you remember if he said that to anyone
18  at Shell?
19     A   Oh, I said that to several, because I was
20  angry at the time.
21     Q   Who did you say that to at Shell?
22     A   Probably all the guys.
23     Q   Who?
24     A   I said he...

22  (Pages 85 to 88)

Page 89

1      Q   Do you remember any names?
2      A   No, not in particular; at that time, I was
3   angry, I...
4      Q   Do you remember if you -- so you don't
5   remember the name of any of the guys --
6      A   No.
7      Q   -- that you told that to?
8      A   No, it was just...
9      Q   Do you remember if you told it to any
10  supervisory level employees?
11     A   I know I asked Hondo not to intervene, but
12  to give me advice on how to handle the situation.
13     Q   Okay.
14     A   He did not give me any advice.
15     Q   What did he say?
16     A   He ignored me, because he was having his
17  own problems, his own issues with his position.
18     Q   Do you remember if you relayed to Hondo
19  something along the lines of that you thought that
20  Larsen was treating you in a certain way because
21  you're a woman?
22         MS. KIRKPATRICK:  Objection.
23         THE WITNESS:  I remember coming out of
24     that meeting being angry, and I was talking to

Page 90

1   Wayne Fletcher about it, then I went home.
2   Coming back in, and Steve Craig came in and I
3   said, thank you so much for telling me about
4   that bus that was gonna hit me and run me over;
5   and he took me in the conference room and asked
6   me what went on, and I told him.
7          He said, did you explain to him that
8   you were administrator to all the people in the
9   office, not just him?  I said, I tried to.
10  BY MS. GURMANKIN:
11     Q   So -- sorry, I just need to go back -- do
12  you remember if you told Hondo that you thought
13  Larsen was treating you in a certain way because
14  you're a woman, or words to that effect?
15         MS. KIRKPATRICK:  Objection.
16         THE WITNESS:  No.
17  BY MS. GURMANKIN:
18     Q   You don't remember or you --
19     A   No, I do not remember.
20     Q   Did you tell Wayne Fletcher that?
21         MS. KIRKPATRICK:  Objection.
22         THE WITNESS:  No, not I was a woman, I
23     just -- he just didn't like me, period.
24  BY MS. GURMANKIN:

Page 91

1      Q   Did you tell Steve Craig that?
2          MS. KIRKPATRICK:  Objection.
3          THE WITNESS:  I probably said that --
4      I'm not positive, so I probably said he just
5      don't like me.
6   BY MS. GURMANKIN:
7      Q   Why didn't you tell Michelle Priest that
8   you thought that Larsen was treating you in a
9   certain way because you're a woman?
10         MS. KIRKPATRICK:  Objection.
11         THE WITNESS:  We had talked on the
12     phone afterwards when we -- after the
13     evaluation, and I told her exactly how I felt
14     and how he had put my evaluation down and the
15     way he talked to me, I said, but it's a
16     he-said-she-said, and he is higher than I am
17     and I know you guys aren't gonna listen to a
18     word I say, and I remember saying that.
19         I said, but it wasn't -- it's what he
20     said to me, he said they lied.  How could they
21     lie, he didn't know my evaluations back then.
22     And it just went from there.
23  BY MS. GURMANKIN:
24     Q   Do you --

Page 92

1      A   And then Larson retired.
2      Q   Do you remember ever telling Michelle
3   Priest that you thought Larson treated you in a
4   certain way because you're a woman, or words to that
5   effect?
6          MS. KIRKPATRICK:  Objection.  She
7      already said that she did not say that.
8          THE WITNESS:  I do not remember.  I
9      really honestly do not remember.
10  BY MS. GURMANKIN:
11     Q   You don't remember one way or the other?
12     A   No, I do not.
13     Q   Okay.  All right, I'm gonna show you
14  what's been previously marked as Exhibit 25.
15         Do you mind handing -- passing a copy
16  over?
17     A   Certainly.  (Handing.)
18     Q   All right.  These are notes that Megan
19  Kloosterman made of her interview with you.  Have
20  you seen these before?
21     A   Never.
22     Q   Okay.  Can you take whatever time you need
23  and read through them?
24     A   Okay.

23 (Pages 89 to 92)

Page 93

1    Q   Thank you.
2    A   (Reviewing document.)
3        THE VIDEOGRAPHER:  We're now going off
4    the record.  The time on the camera is 3:03 p.m.
5        (Off the record.)
6        THE VIDEOGRAPHER:  We are now back on
7    the record at 3:07 p.m.
8    BY MS. GURMANKIN:
9        Q   You've had an opportunity to review what's
10   been marked as Exhibit 25?
11       A   (Witness nods head.)
12       THE COURT REPORTER:  Is that --
13       THE WITNESS:  Yes.  Yes, ma'am.
14   BY MS. GURMANKIN:
15       Q   And does this help refresh your
16   recollection of the meeting that you had with Megan
17   Kloosterman?
18       A   It helps refresh it, yes, I mean -- but
19   not a lot, it was...
20       Q   Um-hmm.  Do you remember if you told Megan
21   Kloosterman that Jesse told you that Turney would say
22   something to her about her being paid less because
23   she's a woman?
24       MS. KIRKPATRICK:  Objection.

Page 94

1        THE WITNESS:  I remember Jesse saying
2    that to me.  Whether I said it to Megan, I do
3    not know.
4    BY MS. GURMANKIN:
5        Q   Do you know why you wouldn't have said it
6    to Megan?
7        A   I wouldn't have thought of it at the time.
8        Q   Do you remember telling Megan that Jesse
9    had told you that Turney showed her a picture of
10   himself in his underwear?
11       A   I don't know when that came out.  I really
12   cannot.  It had to have been after the Canadian
13   trip, but like I said, Jesse kept a lot to herself,
14   and I don't remember when that specifically came
15   out.  I should, but I cannot remember the time.
16       Q   But do you remember telling Kloosterman
17   about that?
18       A   No.
19       Q   Okay.  Do you remember telling Kloosterman
20   what Jesse had told you about the golf event?
21       A   About the what?
22       Q   The golf tournament.
23       A   No, I do not remember saying that about
24   the golf tournament.  I think the questions were

Page 95

1    specific, and so I answered the specific questions,
2    then if she asked me if I could remember, I probably
3    did not remember specifics.
4        Q   Do you remember telling her that Jesse
5    told you that Turney would touch her?
6        A   I cannot remember.  I wished I'd -- if I'd
7    have done a document and I can't remember it, 'cause
8    I remember Jesse telling me that he'd touch her and
9    would not stop, you know, every once in a while,
10   they'd -- you know, when he was reaching over her
11   desk or on -- by her desk, he would have to touch
12   her, and it bothered her; or if they were around,
13   walking down the hall, he would have to put his arm
14   around her, you know, kind of a -- around the back.
15       Q   This is what Jesse had told you?
16       A   Yes.
17       Q   Is it possible that you told Kloosterman
18   about that?
19       A   Oh, I very well could have told
20   Kloosterman --
21       MS. KIRKPATRICK:  Objection.
22       THE WITNESS:  -- I just don't remember
23   it, being it's been so long ago.  I know I
24   should have said something if it -- if I wrote

Page 96

1    an email, then I would have.  I just cannot
2    remember, that is the truth.
3    BY MS. GURMANKIN:
4        Q   Okay.  Is it possible you told Kloosterman
5    about what Jesse told you about the golf tournament?
6        MS. KIRKPATRICK:  Objection.
7        THE WITNESS:  Oh, most definitely,
8    it -- but I just can't remember, it's been so
9    long ago.
10   BY MS. GURMANKIN:
11       Q   Do you remember if you told Kloosterman
12   that Jesse told you that Foreman touched her hair
13   repeatedly?
14       A   No, I can't.
15       Q   Okay.  You can't remember one way or --
16       A   I just cannot remember.  I think when I
17   get in there, and I just freeze.
18       Q   Okay.  But it's possible you did?
19       A   Oh, most certainly.
20       MS. KIRKPATRICK:  Objection.
21       THE WITNESS:  Most certainly.
22   BY MS. GURMANKIN:
23       Q   Do you remember if Kloosterman asked you
24   any open-ended questions?

24  (Pages 93 to 96)

Page 97

1    A    No, I don't.
2    Q    Okay.  You don't remember one way or the
3  other?
4    A    No, I do not.
5    Q    Do you remember if she gave you the
6  opportunity -- well, strike that.
7       Do you remember if she asked you if you
8  observed any conduct during your employment that you
9  thought was inappropriate towards women or sexist in
10  any way?
11    A    I don't remember her asking that question.
12  I would have known at that time if I had said
13  something, especially about my sister-in-law, I
14  cannot remember.  I remember the first time I said
15  anything about my sister-in-law was to my
16  superintendent at that evaluation when I got angry.
17    Q    Larsen?
18    A    Larsen.
19    Q    What did you say to him about your
20  sister-in-law at that point?
21    A    That there was things going on in the
22  office that he didn't have a clue about.
23    Q    Did you --
24    A    And he asked me what, and I told him.

Page 98

1    Q    About April?
2    A    April and Ricky.
3    Q    Did you tell him about anything else in
4  that context?
5    A    No, I cannot -- well, no, I cannot
6  remember other than that.
7    Q    Okay.  If you go to the first page of this
8  Exhibit 25, and you look on number two under
9  Questions -- do you see where I am?
10    A    (Indicating.)
11    Q    Yep.  All right, so the question as
12  Kloosterman writes it is:  (As read.)  Describe your
13  working relationship with Will Turney and Jesse
14  Barnes, parens, understand not on their team.
15       And if you look at the first bullet point,
16  it looks like, at least according to her notes, that
17  your answer is:  (As read.)  Will -- I do what's
18  asked -- he does not have a lot of requests.  He
19  uses Jesse instead of me, treats her like an admin,
20  parens, orders supplies, whatever frequency that is.
21  He has to sign the timesheets and if I have any
22  questions.
23    A    Yes, he was using -- at the time, she was
24  the material analyst or the -- yes, the maintenance

Page 99

1  analyst -- and that's what she was supposed to be
2  doing was her maintenance analyst and she was going
3  into training for him.  But it seemed like whenever
4  he needed anything else, instead of coming to me to
5  order supplies or anything else they needed, he was
6  going to her like his administrator, like she was
7  his administrator.
8    Q    Like she was his admin?
9    A    Yes, admin.  Admin.  And the timesheets is
10  I would take the timesheets to him and if I had any
11  questions.
12    Q    Based on your experience there, did you
13  observe Turney treating any of his male employees
14  like an admin assistant --
15    A    Never.
16    Q    -- the way he did to Jesse?
17    A    Never.  Jesse used to be one before she
18  became the maintenance analyst.  She would -- there
19  was two of us.
20    Q    But you -- you observed Turney doing this
21  to her after she was maintenance analyst?
22    A    Oh, definitely.  Definitely.
23       MS. KIRKPATRICK:  Objection.
24       THE WITNESS:  Definitely.  That was --

Page 100

1  yes.
2  BY MS. GURMANKIN:
3    Q    If you go to number four, the question is:
4  (As read.)  Did you observe an interaction around
5  October of this year where Will told Jesse she was
6  only right if he allows her to be?
7       And according to Kloosterman's notes, your
8  answer is:  (As read.)  Yes, I can't confirm exactly
9  what was said, I remember the conversation
10  afterwards where she shared her frustration.
11       Do you recall what that was about?
12    A    I remember it was out in the hallway, and
13  I -- I can't remember the conversation.  I just
14  remember she -- the conversation afterwards where
15  she was so frustrated because he always found a
16  reason to say she was wrong.
17    Q    Did you observe him or hear about him
18  doing that to his male employees?
19    A    Never.
20    Q    If you look at number five right under
21  that question, she writes:  (As read.)  Is there
22  anything else you'd like to share related the
23  [verbatim] items we discussed today that hasn't been
24  asked yet?

25 (Pages 97 to 100)

Page 101

```
1        And then according to her notes, you say:
2  (As read.)  She works very hard.
3        You were referring to Jesse there?
4     A   Yes, ma'am.
5     Q   Okay.  Do you remember saying that to
6  Kloosterman?
7     A   Oh, definitely.
8     Q   And then she goes on to write:  (As read.)
9  The woman comment was not okay.
10        Do you know what you told Kloosterman
11  that's reflected there?
12     A   The woman -- because she's a woman, she
13  don't get paid as much.
14     Q   The comment that Jesse had made to you?
15     A   Yes, the -- you know, because she was a
16  woman, she didn't need to be paid as much as a man.
17     Q   And you had relayed that to Kloosterman?
18     A   Yes.
19     Q   Did you tell anyone else that Jesse had
20  told you about that; did you tell anyone else at
21  Shell?
22     A   I think in conversation, probably, with
23  Jennifer Card about that, because we were always in
24  conflict of our pay compared to a male's.
```

Page 102

```
1     Q   Did you feel that you were paid less than
2  male employees?
3     A   Well, I was paid less than a male.
4     Q   Did you think that you were --
5     A   I did my job and I got paid well, but, you
6  know, they got paid more than we did.  And there was
7  really no going up; I mean, if we wanted to stay, we
8  stayed right where we're at.
9     Q   Did you think that you were paid less than
10  males who did comparable work to you?
11     A   There was no person to compare to us.  I
12  mean, the other guys were supervisors or they were
13  the guys that go out in field, out in the field, so
14  there was no -- to compare our wages.
15        We just knew that we were on this level
16  and there was just really no way to get higher, I
17  mean, that was it.  I mean, we just didn't get -- I
18  mean, you got your pay raise, I mean, whatever
19  percentage it was, and we weren't asked if we wanted
20  to be...  And at the bottom of your evaluation every
21  year, I guess they asked you whether or not you
22  wanted to go anywhere.
23     Q   Would you ever indicate that you did?
24     A   No, I said I didn't want to be a
```

Page 103

```
1  supervisor over any of the guys; I just -- I liked
2  what I was doing, it's just that -- we complained.
3     Q   You complained about what?
4     A   The pay that we were getting to compare
5  with what some of the other guys -- I mean, we put
6  in some good hours, we did exactly what we were
7  asked to do, and it just, you know, some people were
8  at certain levels.
9     Q   Who did you complain --
10     A   I mean, I compared myself to, I guess, to
11  the guy that was -- there was a gentleman over to
12  Bradford, and it was a very small building over
13  there, not nearly what we had at ours, his name was
14  Keith Dart, and all of a sudden, there was a job
15  opening in the Appalachia for office manager -- and
16  it wasn't at the Wellsboro office that we had all
17  those people, it was at the Bradford office -- and
18  he got the office manager job and a hefty raise to
19  go with it under Robin Grouette.
20     Q   Before he got the office manager position,
21  do you know what he did?
22     A   What I did.  He was a -- he was an
23  administrative assistant.
24     Q   Do you have any idea what he was making as
```

Page 104

```
1  the administrative assistant?
2     A   I don't know what his wage is, I just know
3  what he got -- higher, when you -- you go up, you
4  get levels, and he went up a level.
5     Q   When he became office manager?
6     A   Manager.
7     Q   You understood that to be a promotion?
8     A   Yes.
9     Q   Did you think, based on your knowledge,
10  that you were qualified to do the position of office
11  manager?
12     A   Yeah, 'cause I remember us saying why
13  isn't there an office manager here at the Wellsboro.
14     Q   Do you know if that position was posted,
15  the one that he got?
16     A   Yes, it was posted, that's how we found
17  out.
18     Q   Okay.  Did you apply for it?
19     A   No, I wasn't going to Bradford.
20     Q   How far is Bradford from Wellsboro?
21     A   Two and a half hours from Wellsboro.
22     Q   And who did you complain to about the pay
23  issue?
24     A   I don't think I complained.  I do remember
```

Page 105

1  talking to, it must have been Danny -- no, it might
2  have been Summers at the time, about office manager,
3  why was there a job opening for office manager at
4  the Bradford office.
5      Q  This was the position that Keith got?
6      A  Yes.
7      Q  And what did Summers or whomever say?
8      A  I don't know, and that was it.
9      Q  How come you didn't ever take that
10 further, like to HR or anyone else at the company?
11     A  I don't know why we didn't, to tell you
12 the truth, why.  I mean, we had so many people in
13 the Wellsboro-Mansfield area, and they wouldn't even
14 offer the office manager job.  I mean, that wasn't
15 even a -- and they did it over there in Bradford,
16 and it was such a small asset, I -- we didn't
17 understand.
18     Q  It didn't make sense to you?
19     A  It did not make sense to us, no.
20     Q  Do you know --
21     A  But at the time, it was under the Robin
22 Grouette superintendent, she was superintendent.
23     Q  Did he -- did Keith Dart report to Robin
24 Grouette in his position of office manager?

Page 106

1      A  I do believe so.
2      Q  Okay.  Do you know if he actually applied
3  for the position?
4      A  No, I do not know any of that.
5      Q  Do you know who else applied for the
6  position?
7      A  No, I do not.
8      Q  All right.  So back to the bottom of
9  page one of Exhibit 25, under number five,
10 Kloosterman's notes say:  (As read.)  He says he is
11 scared of me so he doesn't do it to me.
12     Do you remember --
13     A  Oh, yeah, he says I, you know, the way I
14 talked or conducted, he was scared of me.  So he
15 didn't make comments, 'cause probably I would say
16 something back.
17     Q  You mean the comments that Jesse talked to
18 you about?
19     A  Yes, he wouldn't --
20     MS. KIRKPATRICK:  Objection.
21     THE WITNESS:  -- wouldn't say anything
22 like that to me, 'cause I spoke it right back.
23 BY MS. GURMANKIN:
24     Q  Did you hear him make those types of

Page 107

1  comments to any other women at the company?
2      A  No, I cannot say I did.
3      Q  And are you talking about the comments
4  that Jesse told you about, like talking about her
5  pay, that she's --
6      A  No, I would -- it would be talk about a
7  woman, blonde, touching.  He wouldn't dare touch me
8  because I probably would have -- I would have
9  spoken, you know, said something.
10     Q  Bottom of the last line of -- under number
11 five, Kloosterman's notes say:  (As read.)  He
12 thinks he is a ladies' man.  Him and Robin Grouette
13 would flirt, parens, that is my perception.
14     Do you remember saying that to
15 Kloosterman?
16     A  Yes, I do.
17     Q  What made you conclude that Turney thought
18 that he was a ladies' man?
19     A  The way he conducted himself around any
20 lady that come into the office.  We're not talking
21 the ones that were there at all times, we're talking
22 about the ones that may come up from Warrendale for
23 meetings, and he was always -- my perspective of
24 flirting was he would flirt with Robin Grouette; he

Page 108

1  always made himself accessible, you know, talking on
2  the phone.
3      Q  What would he do that you concluded was
4  flirtatious or acting like a ladies' man?
5      A  Just the way he would touch.
6      Q  He would --
7      A  You know, he would just touch their arm or
8  put his arm around, around them; there was a lot --
9  you know, Tonia Peguliano and... I mean, he would
10 just, when they would come up from Warrendale, he
11 would always make sure that he was presentable.
12     Q  Did you see Turney touch or put his arm
13 around Robin Grouette?
14     A  I cannot -- I will not confirm or deny, I
15 just don't know.  I mean, I know that I must have if
16 he -- but I can't say, yeah, on this date, he
17 touched her.
18     Q  I'm not asking about dates, but that led
19 to your conclusion --
20     A  Yes, that led to my conclusion.
21     MS. KIRKPATRICK:  Objection.
22 BY MS. GURMANKIN:
23     Q  That he was a ladies' man and that --
24     A  Definitely.

27 (Pages 105 to 108)

Page 109

```
1              MS. KIRKPATRICK:  Objection.
2      BY MS. GURMANKIN:
3        Q    And that he would flirt with Robin
4      Grouette?
5        A    Yes.
6        Q    Okay.
7              MS. KIRKPATRICK:  Objection.
8      BY MS. GURMANKIN:
9        Q    Do you remember seeing him touch or put
10     his arm around Tonia Pugliano?
11       A    He flirted with her.
12       Q    By touching her?
13             MS. KIRKPATRICK:  Objection.
14             THE WITNESS:  I can't -- I --
15     flirting, talked with her, was there with her;
16     they would put -- you know, talk or walk down
17     the hall together, be outside and have
18     conferences, or what we thought was meetings or
19     conference outside; yes, he would, like a
20     gentleman, puts his hands on her back, the
21     middle of her back.  Yes.
22     BY MS. GURMANKIN:
23       Q    The way that you saw Turney interact with
24     Jesse, with Tonia Pugliano, with Robin Grouette, was
```

Page 110

```
1      that different from the way that you saw him
2      interact with male employees at Shell?
3        A    Oh, definitely.
4              MS. KIRKPATRICK:  Objection.
5      BY MS. GURMANKIN:
6        Q    Can you explain that?
7        A    He would talk to his male employees with
8      authority, with "I am boss" type of body language or
9      whatever.
10       Q    And was that different from the way that
11     he spoke or interacted with his -- with female
12     employees?
13       A    The ladies, he would sweet talk; he would
14     -- that's how he -- I mean, like I said, walked down
15     the hallway, put, you know, and he would hold the
16     door for the ladies or whatever -- doesn't make him
17     a bad person, I guess, for that -- but it was
18     definitely different.
19       Q    And it was more than holding the door for
20     the females?
21       A    Oh, yes.
22             MS. KIRKPATRICK:  Objection.
23     BY MS. GURMANKIN:
24       Q    What else did --
```

Page 111

```
1        A    Like I said, I mean, no holding hands,
2      putting their hands -- no man gonna hold -- get
3      behind my, you know, middle of my back; I'm a
4      married woman, I wouldn't do that, and I, maybe
5      being the way I am, I thought that was inappropriate.
6        Q    You saw him putting his hand on the middle
7      of --
8        A    Well, like, you know --
9        Q    Right, you saw him putting his hand on the
10     middle of female employees' backs?
11       A    Yeah, yeah, just --
12             MS. KIRKPATRICK:  Objection.
13             THE WITNESS:  -- that type of thing.
14     BY MS. GURMANKIN:
15       Q    And you saw him putting his arm around
16     female employees?
17       A    Oh, yes, yes.
18             MS. KIRKPATRICK:  Objection.
19             THE WITNESS:  Not me, but...  Yes, he
20     did, definitely.
21     BY MS. GURMANKIN:
22       Q    Did you tell that to Megan Kloosterman
23     when she interviewed you?
24       A    I said he was a ladies' man, so I would
```

Page 112

```
1      have -- if she asked me, I would have probably
2      said -- given an example.
3        Q    Do you remember if she asked you?
4        A    Not specifically, but with my saying he
5      was a ladies' man, I would have, if she'd have asked
6      me specifics.
7        Q    You would have told her?
8        A    I would have told her.
9        Q    If you go onto the second page, top of the
10     page, according to her notes, you said:  (As read.)
11     In six years, I have never seen her flirt or be
12     revealing.  She has never worn a dress, worn
13     anything low.  I think she knows how to conduct
14     herself in the work environment.
15             Do you remember saying that to
16     Kloosterman, or something along those lines?
17       A    Definitely.
18       Q    Okay.  And you were refer -- you were
19     referring to Jesse?
20       A    Yes, I was.
21       Q    Okay.  Do you remember why you were saying
22     this to Kloosterman?
23       A    Because I -- Jesse never flirted.  I've
24     never seen her flirt in front of me with anybody.
```

28 (Pages 109 to 112)

Page 113

1   She never wore a dress.  She never wore anything
2   revealing.  And when she was around me, she
3   conducted herself as she should.  I mean, there was
4   no -- anything out of place.
5       Q   Do you remember ever hearing, either as
6   part of this investigation or separately, that there
7   were accusations that Jesse was acting
8   inappropriately in any way?
9       A   Not to me.
10      Q   And during your interactions with Jesse
11  while you both were employed at Shell, did she ever
12  do anything or say anything that you thought was
13  dishonest?
14      A   Not to me.
15      Q   Okay.  All right, before we take a quick
16  break to see if I have anything else, I just -- can
17  you show me what's in the notebook that you brought
18  with you?
19      A   This is just what my responsibilities
20  were --
21      Q   Okay.  Can I see --
22      A   -- because I thought you would ask me what
23  my responsibilities were.  I --
24          MS. KIRKPATRICK:  Is this the same

Page 114

1   thing?
2           THE WITNESS:  It's the same thing.  I
3   must have wrote on one and didn't write on --
4   it's just --
5           MS. GURMANKIN:  Okay.
6           THE WITNESS:  -- the responsibilities
7   that I had at Shell that they asked me to do; I
8   think you do it once a year or whatever.
9           Okay, then here would have been Will
10  Turney's, to buy food or something for a
11  meeting.  That was for a meeting.  For a
12  meeting.  Flowers for Hondo.  His father-in-law
13  had passed.
14          MS. KIRKPATRICK:  This was your
15  personal calendar?
16          THE WITNESS:  Yes, ma'am.
17          And this would be setting up for
18  unconventional walks.  Adam Bird needed a
19  lunch.  And then over time, setting up
20  meetings, production process, counseling
21  meetings for the dates.  Paying the bills.
22  Paying bills so there's no terminations for
23  electric bills.  What I had to order.  Doing
24  Share Point.

Page 115

1   BY MS. GURMANKIN:
2       Q   I'll tell you what, Ms. Robbins, while
3   we're on a break, if we can take that, we can kind
4   of cut this short if we can just make copies of your
5   notes, okay?
6       A   Oh, you most certainly can.
7       Q   All right.  And can --
8       A   But I stopped doing it in the middle,
9   so...
10      Q   Okay.  We'll only make copies of the pages
11  with --
12      A   Okay.
13          MS. KIRKPATRICK:  Can I just ask, when
14  did you first begin --
15          THE WITNESS:  That was the first of
16  the year.  This --
17          MS. KIRKPATRICK:  Of 2017?
18          THE WITNESS:  Yes, this -- it's 2017.
19  This I started after Larsen and I had the
20  disagreement about the -- my evaluation.
21  BY MS. GURMANKIN:
22      Q   Okay.  So we'll take a quick break now,
23  I'll see if I have anything else, and we'll make
24  copies of this, and can you hand me that copy with

Page 116

1   the handwriting?
2       A   I think it's the same thing, but you might
3   want to look it over --
4       Q   Yes, we'll take that.
5       A   -- to make sure that that's the same.
6       Q   Okay.  We'll --
7       A   And this is just the subpoena.
8       Q   Okay.
9       Q   Okay?
10      Q   Okay, great.  Thank you.
11      A   Might have the date on it, or the --
12          MS. GURMANKIN:  All right, let's take
13  a break for a few minutes.
14          THE VIDEOGRAPHER:  We're now going off
15  the record.  The time on the camera is 3:31 p.m.
16          (Off the record.)
17          (Robbins-1, Copy of Pages from
18  Ms. Robbins' Notebook, marked for
19  identification.)
20          THE VIDEOGRAPHER:  We are now back on
21  the record at 3:48 p.m.
22  BY MS. GURMANKIN:
23      Q   Who's Tonya Williams?
24      A   She, I do believe, is the general manager

29 (Pages 113 to 116)

Page 117

1    now.  She's in Texas.  She's above Steve Craig.
2       Q    At some point, did she work where you
3    worked at Shell?
4       A    No.
5       Q    Okay.  Did you ever interact with her?
6       A    Yes.
7       Q    Did you ever hear her make a complaint
8    about the way that she was treated at Shell?
9       A    I have heard later on that she was upset
10   that she wasn't treated correctly.  But I wasn't
11   there at the time, this is just hearsay.
12      Q    And who did you hear that from?
13      A    Probably my sister-in-law.
14      Q    Okay.  Jennifer Card?
15      A    Yes.
16      Q    What do you remember Jennifer Card telling
17   you about that?
18      A    That she didn't feel like she was getting
19   treated fairly or as an equal or whatever, along
20   that lines.
21      Q    According to what Jennifer Card told you,
22   did Tonya Williams say that she wasn't treated
23   fairly or equally based on --
24      A    It was nothing in depth.

Page 118

1       Q    Okay.  Let me just make sure we're clear.
2    According to what Jennifer Card told you, did Tonya
3    Williams say that she felt she wasn't being treated
4    fairly or equally based on her sex or her race?
5          MS. KIRKPATRICK:  Objection.
6          THE WITNESS:  No, that -- no, it was
7       just that she wasn't treated equally or -- that
8       was it.  There was nothing more.
9    BY MS. GURMANKIN:
10      Q    Did Jennifer Card tell you where she got
11   this from?
12      A    No.
13      Q    Was anyone else around when she --
14      A    No.
15      Q    -- said that to you?
16      A    Um-um.
17         THE COURT REPORTER:  Could you just
18      wait until she finishes the question?
19         THE WITNESS:  I'm sorry.
20   BY MS. GURMANKIN:
21      Q    That's okay.
22         After the investigation, after you met
23   with Megan Kloosterman -- and by the way, did you
24   see her taking notes while you were talking to

Page 119

1    her?
2       A    She was in there, she had a notebook in
3    front of her, but I couldn't tell you right now.
4       Q    Okay.  But she had a notebook --
5       A    Yeah.
6       Q    -- in front of her?
7       A    She had something in front of her.
8       Q    Do you recall if it was a notebook or
9    something else?
10      A    Tablet, she might have been making notes.
11   Really, I do not know.  I mean, I just remember her
12   sitting there with a tablet-type thing.
13      Q    And by tablet, are you referring to an
14   electronic tablet or --
15      A    No, no, with a white tablet.
16      Q    Okay.
17      A    Legal size.
18      Q    After that, did Jesse talk to you about
19   how she felt about how she was being treated at the
20   company?
21         MS. KIRKPATRICK:  Objection.
22         THE WITNESS:  The only thing I
23      remember Jesse being upset about at, you know,
24      after the code of conduct, all of that, was

Page 120

1    getting evaluated by Will Turney for the
2    year-end evaluation.  She didn't feel -- I
3    mean, she had made complaints, so why was he
4    the one that was gonna give her her evaluation.
5          She did not feel it was appropriate or
6    right.  And I -- when she said that, I said,
7    then you should talk to Mr. Larsen.  That's all
8    I know.  And he did -- she did talk to him.
9    BY MS. GURMANKIN:
10      Q    She told you that?
11      A    Yes.
12      Q    Did she tell you how that went?
13      A    I do believe that, in the end, Jesse told
14   me that Mr. DeWitt did her evaluation.  She did not
15   tell me what her number was.
16      Q    Did she tell you about her conversation
17   with Larsen?
18      A    I know she wasn't -- when every -- when --
19   I know that Megan was in on the conversations about
20   moving her from her maintenance analyst job to a
21   different position, that it -- that she was angry
22   about some of the options, or why did she have to
23   leave her position and Mr. Turney get nothing.  He
24   still gets to be super -- whatever he was,

Page 121

1    supervisor of production or whatever.
2         Q    Other than the interview with Kloosterman,
3    did you ever hear any rumors or hear anyone else
4    talk about the investigation or the code of conduct
5    issues regarding Jesse?
6         A    Rumors.
7         Q    Okay.  What did you hear?
8         A    Only rumors that we heard was that
9    Mr. Turney was found, I want to say negligent of the
10   code of conduct and that he was -- that he did not
11   get his bonus that year.
12        Q    Who did you hear that from?
13        A    Word of mouth.  I wouldn't -- couldn't
14   tell you which person I heard it from, whether it
15   was in the bunch of guys that were in my group and
16   we were all talking together, but it was just
17   hearsay, that's what it was.
18        Q    Okay.
19             MS. GURMANKIN:  All right, thank you.
20   That's all I have for you right now.
21             THE WITNESS:  Okay.  Thank you.
22                    - - -
23             EXAMINATION
24                    - - -

Page 122

1    BY MS. KIRKPATRICK:
2         Q    Thank you, Ms. Robbins, for your patience
3    today.  I'll try to be as quick as possible.  Do you
4    need to take a break before we begin --
5         A    No.
6         Q    -- or I begin my questions?
7              I just wanted to let you know that if you
8    don't remember something or you don't know
9    something, it's perfectly fine to say that; we don't
10   want you to guess or assume or speculate, and we
11   know that a lot of these events occurred many years
12   ago, I think close to three years ago --
13        A    Yes.
14        Q    -- or more, so if you don't remember,
15   that's a perfectly fine answer and you can say that.
16             Am I correct that you did not personally
17   observe any behaviors -- any of the behaviors that
18   you have told us about that Mr. Turney engaged in
19   that you believe were inappropriate?
20             MS. GURMANKIN:  Objection to form.
21             THE WITNESS:  The hand in the middle
22   of the back of ladies -- Tonia, Grouette --
23        yes, I did see that.
24   BY MS. KIRKPATRICK:

Page 123

1         Q    Other than the hand in the middle of the
2    back --
3         A    Or, you know, around their, you know, like
4    they're shoulder.
5         Q    Back or shoulder, or both?
6         A    You know, first it was this, or you would
7    see him up here.  (Indicating.)
8         Q    Around the shoulders?
9         A    Not touching anything, just shoulder,
10   right here, you know, around the shoulder.
11   (Indicating.)
12        Q    You're indicating around the shoulder?
13        A    Around the shoulder.
14        Q    Behind the neck?
15        A    Behind the neck, onto the shoulder type
16   thing.
17        Q    Okay.  And midback, as well?
18        A    On the middle of the back, like you were
19   pushing someone along --
20        Q    Okay.
21        A    -- guiding someone.
22        Q    Did you ever observe Mr. Turney place his
23   hand on Ms. Barnes' midback or around her shoulders?
24        A    Yes.

Page 124

1         Q    How --
2         A    Up and down the hallway, there was a big,
3    long hallway there, and he would, you know, like,
4    into the room, guide her into a room or, you know,
5    where there was gonna be meetings or something.
6         Q    Was it always a guiding maneuver when he
7    would put his arm around the shoulder --
8         A    He would lay a hand on her --
9              MS. GURMANKIN:  Objection to form.
10             THE WITNESS:  -- on her back or
11        whatever, you know, just -- like I said, he was
12        a ladies' man, he liked to...
13   BY MS. KIRKPATRICK:
14        Q    Would it always be while he was walking,
15   while they were walking?
16        A    Yes, I would say that that was...
17        Q    How many times did you see Mr. Turney
18   place his hands around --
19        A    I could not say that.
20        Q    I'm sorry, I just have to finish the
21   question.  I know you know what I'm going to ask,
22   but the record -- we do need to record our
23   conversations and so the record needs to be clear.
24             How many times did you see Mr. Turney put

31 (Pages 121 to 124)

Page 125

1　his arm around Ms. Barnes' shoulders?
2　　　A　I would not know.
3　　　Q　Can you estimate, without guessing, the
4　number of times that you saw Mr. Turney place his
5　arm or arms around Ms. Barnes' shoulder?
6　　　A　No, I would not venture a guess.
7　　　Q　Can you tell me the dates that Mr. Turney
8　placed his arms around -- that you saw Mr. Turney
9　place his arms around Ms. Barnes' shoulder?
10　　　A　No, I could not venture a guess.
11　　　Q　You don't know the number of times --
12　　　A　No, I do not.
13　　　Q　-- or the dates?
14　　　　　MS. GURMANKIN:　Objection, asked and
15　answered.
16　BY MS. KIRKPATRICK:
17　　　Q　You don't know the number of times or the
18　dates.　Are you sure that you actually observed him
19　place his arms around Ms. Barnes' shoulders?
20　　　A　Yes, I did see it.　I could not tell -- at
21　least once I did see it.　I could not count after --
22　any time after that.　I would not give you dates, I
23　would not know dates.
24　　　Q　Are you able to estimate the number of

Page 126

1　times other than at least once?
2　　　　　MS. GURMANKIN:　Objection to form.
3　She didn't say it was once, she said she didn't
4　know.
5　　　　　THE WITNESS:　No, I could not venture
6　a guess.
7　BY MS. KIRKPATRICK:
8　　　Q　Okay.　And when you would see Mr. Turney
9　place his arm around Ms. Barnes' shoulder, did
10　you -- did you report it to anyone?
11　　　A　No.
12　　　Q　Why not?
13　　　A　It was saw by more than I, and I just did
14　not.
15　　　Q　Why did you not report it?
16　　　A　Because if it happened to me, I would have
17　said something.
18　　　Q　Did you ever see Mr. Turney place his arms
19　or his hand on Ms. Barnes' midback?
20　　　A　Are you asking separately about the arm
21　and then the back?　Because I thought I just
22　answered I could not -- touch her in the back or on
23　the shoulder, I could not give you a time or a date.
24　　　Q　Okay.　Let me step back and try to

Page 127

1　understand.　I thought you said that he would
2　sometimes place his arms around the shoulders and
3　sometimes place his arm on the midback.　Am I
4　correct about that?
5　　　A　He has done both.
6　　　Q　He has done both.　So in the times that
7　you can remember where he touched Plaintiff,
8　Ms. Barnes, do you recall how many times it would
9　have been around the shoulders or the midback?
10　　　A　No.
11　　　Q　Okay.　So you can't -- you don't know the
12　number of times Mr. Turney touched Ms. Barnes,
13　correct?
14　　　　　MS. GURMANKIN:　Objection, asked and
15　answered.
16　BY MS. KIRKPATRICK:
17　　　Q　Whether -- regardless of where on the body
18　it would have been.
19　　　　　MS. GURMANKIN:　Same objection.
20　　　　　THE WITNESS:　I could not tell you
21　that.
22　BY MS. KIRKPATRICK:
23　　　Q　And you don't know any of the dates that
24　you saw Mr. Turney touch Ms. Barnes, regardless of

Page 128

1　where it may have been on the body?
2　　　　　MS. GURMANKIN:　Objection, asked and
3　answered.
4　　　　　THE WITNESS:　No.
5　BY MS. KIRKPATRICK:
6　　　Q　Is that correct?
7　　　　　MS. GURMANKIN:　Same objection.
8　　　　　THE WITNESS:　I said no, I do not, I
9　could not give you dates.
10　BY MS. KIRKPATRICK:
11　　　Q　Do you remember where you were at the --
12　in the -- within the facility when you saw
13　Mr. Turney touch Ms. Barnes?
14　　　A　If I seen Mr. Turney touch Ms. Barnes,
15　shoulder or back, we did not go out in public, we
16　did not entertain afterwards, it would have had to
17　have been in the building, in the office building.
18　　　Q　Do you have a specific recollection of
19　seeing that?
20　　　　　MS. GURMANKIN:　Objection, she's just
21　been testifying.
22　　　　　THE WITNESS:　Not a date or a time.
23　It would have had to have been in the building,
24　perhaps going to a meeting, walking down the

32 (Pages 125 to 128)

Page 129

1       hall going to a meeting.
2       BY MS. KIRKPATRICK:
3          Q   And you're saying "perhaps" or "it would
4       have been," so my question is --
5          A   It would have been --
6          Q   Let me just finish.  As you're sitting
7       here and you're thinking about it in your mind, do
8       you have an actual picture in your mind of a memory
9       of seeing Mr. Turney touch Ms. Barnes?
10         A   It would have been in the office building
11      at Wellsboro.  It would have been going into a
12      meeting.  It would have been going up the hall.
13         Q   And which location was -- did you actually
14      see it occurring, if you recall?  Or you don't
15      recall?
16             MS. GURMANKIN:  Objection to form,
17         she's just been testifying to that.
18             THE WITNESS:  The Wellsboro --
19      BY MS. KIRKPATRICK:
20         Q   Right.
21         A   -- office building.
22         Q   Which -- but I'm saying would it have --
23      do you recall specifically if it occurred while they
24      were going into a meeting or walking down the hall,

Page 130

1       or you're not sure which location it actually
2       occurred, the touching?
3              MS. GURMANKIN:  Objection to form.
4              THE WITNESS:  The location was at the
5          office building.
6       BY MS. KIRKPATRICK:
7          Q   Within the building I'm saying.
8          A   Within the building.  It would never be
9       out, I did not.
10         Q   Right, but do you know specifically, are
11      you clear as to whether it was going into a meeting
12      or in a hall or specifically where within the office
13      building it occurred?  In a cubicle, any other
14      location?
15         A   In an office building, in the conference
16      room; it would have been in the big conference room
17      at a -- we all went to a Thursday morning meeting.
18         Q   So it would have been in the conference
19      room had you remembered seeing it?
20             MS. GURMANKIN:  Objection to form,
21         mischaracterizes her testimony.
22      BY MS. KIRKPATRICK:
23         Q   Is that correct?
24             MS. GURMANKIN:  Same objection.

Page 131

1              THE WITNESS:  It would have been in
2          the office building.  It would have been going
3          into the conference rooms.  There was very few
4          rooms, there were usually cubicles.
5       BY MS. KIRKPATRICK:
6          Q   And did you observe any other behaviors by
7       Mr. Turney that were inappropriate other than the
8       touching that we just talked about?
9          A   No, I did not.
10         Q   Now, you told me that Ms. Barnes reported
11      some complaints about Mr. Turney, one of which was
12      that he would touch her.  Do you remember when she
13      first reported that to you?
14         A   No, I do not.
15         Q   Do you -- can you narrow it to a season or
16      a year or any kind of timeframe?  And if you can't,
17      that's fine, I just want to make sure.
18         A   No, I cannot.
19         Q   And what specifically did Ms. Barnes tell
20      you about the touching?
21         A   That he wouldn't stop touching her arm or
22      her whatever, he wouldn't stop touching her.
23         Q   Did --
24         A   And I'm sure she said to stop.

Page 132

1          Q   Did she say specifically anything more
2       than "he won't stop touching me," that you remember?
3          A   That she was aggravated that he wouldn't
4       stop it.
5          Q   Do you remember any more specifics
6       about --
7          A   No.
8          Q   -- what she said to you other than -- as
9       relates to touching -- other than "he won't stop
10      touching me" and "it aggravates me"?
11         A   No, ma'am.
12         Q   And how many times did she tell you that?
13         A   She complained about Will Turney several
14      times, being very aggravated by him.
15         Q   How many times?
16         A   I could not tell you how many times.
17         Q   Can you estimate the number of times?
18         A   No, I could not.
19         Q   When is the last time -- you told me you
20      didn't remember the first time Ms. Barnes complained
21      to you about Mr. Turney's behavior.  Can you
22      remember the last time she complained about it?
23         A   No, I cannot.
24         Q   Well, you had lunch with her today.  Did

33 (Pages 129 to 132)

Page 133

1  she talk about that today?
2       A   We did not have lunch.
3            MS. GURMANKIN:  Objection to form --
4            MS. KIRKPATRICK:  Oh.
5            MS. GURMANKIN:  -- mischaracterizes
6       her testimony.
7  BY MS. KIRKPATRICK:
8       Q   I'm sorry, I thought you said that you met
9  with her before today's deposition.
10      A   We said -- no, we did not have lunch
11 today; I had lunch with my husband.  We said hello.
12      Q   My apologies.
13           When did you last talk to Ms. Barnes?  Was
14 it when you said hello today --
15      A   Today was the last time I had seen Jesse
16 since last May -- since May.
17      Q   Have you spoken to Ms. Barnes since last
18 May?
19      A   We have texted, "how ya doin'," "how's the
20 new job," she asked about my granddaughter, how
21 Shell was annoying, asked how people are doing, just
22 little things like that.  I mean, not -- not
23 pertaining to this, other than her lawyer may get in
24 contact with me, that type of thing.

Page 134

1       Q   Do you remember the last time that she
2  complained to you about Mr. Turney?
3       A   It would have to be before I left Shell.
4  I left Shell in June of '18.
5       Q   Okay.  And you also said that -- you
6  talked about a golf tournament.
7       A   A what?
8       Q   The golf tournament or the golf event.
9       A   Yes.
10      Q   And you thought that was in 2014?
11      A   No, '16.
12      Q   2016.  You were not present, correct?
13      A   No.
14      Q   And you never went to any of the golf
15 tournaments, correct?
16      A   Never.
17      Q   And you said that she said that he took a
18 photograph?
19      A   No, I did not say that.
20      Q   Okay.  Well, what specifically did she
21 tell you about the golf tournament?
22      A   The shorts.  She did not wear shorts, she
23 wore pants.
24      Q   She told you that -- what did she tell you

Page 135

1  he said at the golf tournament?
2       A   Why was she wearing pants and not shorts.
3       Q   Did Ms. Barnes say anything else to you
4  about the golf tournament other than Mr. Turney said
5  why weren't you wearing shorts?
6       A   No, ma'am, not that I can remember.
7       Q   When did she tell you this?
8       A   It had to have been right after it.
9       Q   Why do you --
10      A   So it would be, say, in June '16 --
11      Q   Why do you --
12      A   -- because that's when the tournament was.
13      Q   Why do you think she relayed this to you
14 right after the tournament?
15      A   She probably thought it was inappropriate.
16      Q   No, I'm saying in terms of timing, why do
17 you believe that she relayed it to you shortly after
18 the tournament as opposed to another time?
19      A   She was getting aggravated with him.
20      Q   Did you report what Mr. Turney said about
21 the shorts at the golf tournament to anyone?
22      A   No.
23      Q   Why?
24      A   I just did not.

Page 136

1       Q   Did you believe it was inappropriate at
2  the time?
3       A   Yes.
4       Q   And you did not relay any information
5  about the golf tournament to Ms. Kloosterman; is
6  that correct?
7            MS. GURMANKIN:  Objection to form.
8            THE WITNESS:  I don't remember.  I do
9       not believe so.  I do not remember.
10 BY MS. KIRKPATRICK:
11      Q   And in speaking of Ms. Kloosterman's
12 interview notes, which you have which was marked as
13 28, previously marked as Exhibit 28 --
14           MS. GURMANKIN:  25.
15 BY MS. KIRKPATRICK:
16      Q   -- 25, you took your time to read this,
17 correct?  This was your -- it was a two-page
18 document that Ms. Kloosterman wrote, correct?
19      A   (No verbal response.)
20      Q   You read this document --
21      A   Yes, ma'am.
22      Q   -- during this deposition, correct?
23      A   Yes, ma'am.
24      Q   Exhibit 25.  Was anything in this document

34  (Pages 133 to 136)

Page 137

1  inaccurate?
2          MS. GURMANKIN:  Objection to form.
3          THE WITNESS:  No.
4  BY MS. KIRKPATRICK:
5      Q   Do you have any reason to believe that
6  Ms. Kloosterman would have -- would have omitted any
7  information that you may have said to her?
8          MS. GURMANKIN:  Objection to form.
9          THE WITNESS:  I would not know.
10 BY MS. KIRKPATRICK:
11     Q   And you were asked a question, number
12 five:  (As ead.)  Is there anything else you'd like
13 to share related to the items discussed today that
14 hasn't specifically been asked of you?
15         MS. GURMANKIN:  Objection to form.
16 BY MS. KIRKPATRICK:
17     Q   Is -- do you know why you may not have
18 mentioned these other incidents that you talked
19 about today?
20         MS. GURMANKIN:  Objection to form.
21         THE WITNESS:  I did not think of them
22     at that time.
23 BY MS. KIRKPATRICK:
24     Q   Did you know about them at that time?

Page 138

1      A   Like I said, I assume that she had told
2  me, I am -- after the tournament -- but I may have
3  forgotten it by the time Megan did the interview.
4      Q   Is it possible that you learned some of
5  Ms. Barnes' complaints about Mr. Turney after you
6  had the interview with Ms. Kloosterman and that's
7  why they're not in here?
8      A   No.  I mean, she would have told me -- I
9  do not believe so.
10     Q   Is it possible that you learned of some of
11 Ms. Barnes' complaints about Mr. Turney in January
12 of 2017 or after?
13     A   I do not believe so.
14     Q   And why do you think it would have been
15 before that?
16     A   Because of all the code of conduct
17 meetings that we were having to have to refresh our
18 -- our conducts at the building.
19     Q   But you don't remember when Ms. Barnes
20 relayed any of these complaints to you, other than
21 the golf tournament complaint, which was right after
22 it occurred?
23         MS. GURMANKIN:  Objection to the form.
24         THE WITNESS:  And the -- the one when

Page 139

1  she came back from Canada.
2  BY MS. KIRKPATRICK:
3      Q   And what specifically did she say to you
4  about what happened in Canada?
5      A   Not much, she was very private, only that
6  that was very inappropriate.
7      Q   What did she say when she described what
8  happened specifically?
9      A   She didn't say much.  She was aggravated
10 and then she -- she went to HR.
11     Q   So after the Canada trip, she said she was
12 aggravated?
13     A   No, she did not say; I said she was
14 aggravated.
15     Q   Okay.  I'm just asking what she
16 specifically said to you.
17     A   I really can't remember that far back.
18     Q   Do you remember any of the specifics of
19 what Ms. Barnes said to you about what happened in
20 Canada?
21     A   No.
22     Q   Did you report any of what she said to
23 anyone?
24     A   No, because I do believe she, at that

Page 140

1  time, she was going to speak with someone, 'cause I
2  remember "you've gotta speak with someone," stating
3  you have to talk with somebody about this.
4      Q   That's what you said to her?
5      A   Yes.  And I think -- I think I said that
6  quite often to her, "you have to speak with
7  somebody."
8      Q   When did you first begin telling
9  Ms. Barnes that she should speak to someone?
10     A   Probably at the golf tournament.
11     Q   Around June of 2016?
12     A   Yeah, and -- but I can't tell you when the
13 Canada -- if the Canada was before or the Canada --
14 "you have to speak with somebody," "get ahold of
15 somebody in HR."
16     Q   Do you have any understanding as to why
17 she didn't speak to someone at that time?
18         MS. GURMANKIN:  Objection to form.
19         THE WITNESS:  I wouldn't know if she
20     didn't.
21 BY MS. KIRKPATRICK:
22     Q   You also said that Ms. Barnes reported
23 that Mr. Turney would comment that she had blonde
24 hair, or something to that effect?

35 (Pages 137 to 140)

Page 141

1    A    I didn't say she reported it, she stated
2 it to me.
3    Q    What exactly did she say?
4    A    That she was a woman and she had blonde
5 hair.
6    Q    She said Mr. Turney said you're a woman
7 and you have blonde hair?
8    A    In the statement, that, you know, she's a
9 woman and she has blonde hair, so...
10   Q    Was there anything else that Ms. Barnes
11 said that Mr. Turney said to her as it relates to
12 blonde hair, other than you're a woman and you have
13 blonde hair; is that it?
14   A    I -- that was it at the time.  She would
15 -- yeah, at that time.
16   Q    And how many times did Ms. Barnes tell you
17 that Mr. Turney said this to her about the blonde
18 hair?
19   A    I couldn't give you a number.
20   Q    Do you remember when Ms. Turney --
21 Ms. Barnes said that Mr. Turney said you're a woman
22 and you have blonde hair?
23   A    No, I could not tell you how many times.
24   Q    And you also said that Ms. Barnes said

Page 142

1 that Mr. Turney said she was paid less because she
2 was a woman; is that what you said?
3    A    I stated that's what Jesse said Mr. Turney
4 said.
5    Q    And when did she tell you this?
6    A    I would not know.
7    Q    Can you estimate when she told you this?
8    A    No, I cannot.
9    Q    Did you report it to anyone?
10   A    No, I did not.
11   Q    How many times -- or was it more than once
12 that Ms. Barnes told you that Mr. Turney told her
13 that she was paid less because she was a woman?
14   A    I would not know.
15   Q    It could have been one time?
16       MS. GURMANKIN:  Objection to form.
17 She just testified she doesn't know.
18       THE WITNESS:  I would not know.
19 BY MS. KIRKPATRICK:
20   Q    Now, you said that Ms. Barnes told you
21 that Mr. Foreman touched her hair; is that correct?
22   A    Yes.
23   Q    How many times did she tell you that?
24   A    I would not know how many times.

Page 143

1    Q    It's possible it was only one time?
2       MS. GURMANKIN:  Objection to form.
3 She just said she doesn't know.
4       THE WITNESS:  I would not know how
5 many times.
6 BY MS. KIRKPATRICK:
7    Q    Is that because you don't remember?
8    A    I do not remember, correct.
9    Q    And what specifically did she tell you
10 when she said that he touched her hair?
11   A    That he touched her hair.
12   Q    That's it?
13   A    And she was -- didn't like it.
14   Q    She was not specific as to how he touched
15 her hair or what part of the body he used to touch
16 her hair or anything like that?
17   A    No.
18   Q    Did you report that?
19   A    No.
20   Q    Are you aware of Ms. Barnes having sexual
21 relations with any Shell employees?
22   A    No.
23   Q    Do you know who TJ Hall is?
24   A    No.

Page 144

1    Q    Do you know who Clint Slocum is?
2    A    Yes, I do.
3    Q    Are you aware of Clint Slocum and
4 Ms. Barnes having any sort of a sexual relationship?
5    A    No, I don't know about a sexual
6 relationship; I know they dated previously of her
7 going to Shell.
8    Q    Was she a contractor for Shell at the time
9 that she dated Mr. Slocum?
10   A    That, I don't know.  She came on as a
11 contractor when she first came into Shell, and I
12 assumed -- I do not know.  I know he dated her, but
13 I do believe it was before she came into Shell.
14   Q    Do you know of any Shell employees that
15 Ms. Barnes dated other than Clint Slocum?
16   A    She was very private.  No, she did not
17 tell me.
18   Q    Do you know who Matt Bedrich is?
19   A    No, I do not, ma'am.
20   Q    Now, you said before that Ms. Barnes
21 talked to you about ███████ actions towards her,
22 and I wanted to ask you about that.
23       Did you ever actually see any of the text
24 that Ms. Barnes claims Mr. ██ sent to her?

36 (Pages 141 to 144)

Page 145

1      A   No.
2      Q   Do you have any personal knowledge of any
3  of Mr. █████ actions towards Ms. Barnes?
4      A   No.
5      Q   Solely based on what she has told you,
6  correct?
7      A   Correct.  Only what -- coming out of HR
8  and stating that she got the pamphlet on how to
9  conduct herself.
10     Q   And you never saw this pamphlet?
11     A   No, I did not, ma'am.
12     Q   Did Ms. Barnes tell you what the text
13  messages said to her that were sent to her from
14  Mr. █████
15     A   I do not remember.
16     Q   What specifically did Ms. Barnes tell you
17  Mr. █████ did to her?
18     A   That he was texting her when she was
19  sitting at the party, at the Christmas party, with
20  his wife right next to her, and she had a date.
21     Q   Did Ms. Barnes tell you anything else
22  about Mr. █████ behavior other than that he was
23  texting her while he was sitting next to her at the
24  Christmas party?

Page 146

1           MS. GURMANKIN:  He was sitting next to
2      his wife.
3           THE WITNESS:  He was sitting next to
4      his wife, and she was having a date -- and she
5      had a date, and he was texting her.
6  BY MS. KIRKPATRICK:
7      Q   Okay.  Did Ms. Barnes tell you anything
8  else about Mr. █████ actions towards her other than
9  that he was texting her at a Christmas party while
10  he was sitting with his wife and she had a date?
11     A   If she did, I do not remember the exact
12  conversation.
13     Q   Is there anything else that Ms. Barnes
14  told you about Mr. █████ behavior other than what we
15  just talked about?
16     A   Not that I remember exactly.
17     Q   And you were not part of the investigation
18  to look into that behavior, correct?
19     A   [Inaudible], no.
20          THE COURT REPORTER:  I'm sorry, I
21      couldn't hear your answer.
22          MS. KIRKPATRICK:  I said you were not
23      part of the --
24          THE COURT REPORTER:  I couldn't hear

Page 147

1  her answer.
2           MS. KIRKPATRICK:  I don't think she
3      remembers the answer if she doesn't remember
4      the question.
5           THE COURT REPORTER:  Oh, I said -- the
6      question was:  (As read.)  And you were not
7      part of the investigation to look into that
8      behavior, correct?
9           And then I couldn't hear your answer.
10          THE WITNESS:  No, I was not.
11          THE COURT REPORTER:  Thank you.
12  BY MS. KIRKPATRICK:
13     Q   So when you stated that it was
14  inappropriate for HR to have handled it the way they
15  did, you didn't have full information that the
16  entire investigation had; is that correct?
17          MS. GURMANKIN:  Objection to form.
18          THE WITNESS:  Correct.
19  BY MS. KIRKPATRICK:
20     Q   We just got these copies back from your
21  notebook, so I'll give that back to you.  Do you
22  know, and I don't want you to sit here and read it,
23  but without reading it, do you know if there are any
24  notations in here that talk about any inappropriate

Page 148

1  behavior at Shell?
2      A   No.
3      Q   This calendar and notes that you kept was
4  for the purpose of your interactions with
5  Mr. Larsen.
6      A   Correct, and my own --
7      Q   For your work?
8      A   Yes.
9      Q   Did you ever document any of the
10  information that you heard about Mr. Turney's
11  behavior?
12     A   No.
13     Q   And do you have any personal knowledge of
14  any other employee, other than Mr. Turney, treating
15  Ms. Barnes inappropriately?
16     A   The only ones I knew were Turney and █████
17  █████
18     Q   Now, you said that Mr. Turney was
19  aggravating Ms. Barnes.  She reported that to you?
20     A   Yes.
21     Q   Did you see/observe any of the behavior
22  that was the basis for Ms. Barnes claiming that he
23  was aggravating her?
24          MS. GURMANKIN:  Other than touching?

37 (Pages 145 to 148)

Page 149

1        THE WITNESS: Her -- her department
2    was at the other end, so unless it was the
3    touching, no, I did not see the other.
4    BY MS. KIRKPATRICK:
5        Q    Did Ms. Barnes tell you specifically what
6    it was that Mr. Turney did that was aggravating to
7    her?
8        MS. GURMANKIN: Objection to form.
9    It's been testified to.
10        THE WITNESS: Not specifics.
11    BY MS. KIRKPATRICK:
12        Q    And you were located at one end of the
13    building and maintenance was at the other end of the
14    building?
15        A    Mr. Turney was right next to my cubicle,
16    and her -- the maintenance department was up about
17    three-quarters of the way up the other end of the
18    building.
19        Q    So Mr. Turney was not -- his desk was not
20    located with the other maintenance employees?
21        A    No.
22        Q    How often would you see Mr. Turney and
23    Ms. Barnes interact?
24        A    They would've had -- I would assume, I'm

Page 150

1    not sure, you would have to -- he was the head of
2    maintenance, he would have to speak with her every
3    day.
4        Q    But my question is how often would you see
5    them interact?
6        A    I would walk by them every day if they --
7    if they had a -- we had a morning meeting, I would
8    see them -- morning meetings on a Thursday would be
9    everyone had to be together. Or a morning meeting,
10    he would have his maintenance people maybe in the
11    maintenance department or in this group. He had
12    maintenance guys that came in and out, and he would
13    have to have morning meetings with them, and I may
14    walk by while she was at the computer with her
15    maintenance, there was a scheduler.
16        Q    The meetings were every Thursday morning?
17        A    Those were the production meetings.
18        Q    Were there other meetings?
19        A    I'm sure he had meetings every day for his
20    -- to schedule his maintenance on the well sites.
21        Q    I'm talking about meetings that you would
22    participate in.
23        A    That Thursday morning -- with Jesse and
24    him, or just...

Page 151

1        Q    Meetings that you would participate in
2    that Ms. Barnes and Mr. Turney would also
3    participate in.
4        A    In the Thursday morning meetings, they
5    were the ones that everyone -- that was mandatory.
6    If, for some reason, they had another meeting that
7    needed to be -- for the whole production, I would
8    have to go in that with them.
9        So it wouldn't be -- it would be odd. I
10    mean, the Thursday morning was one that was
11    mandatory, everyone had to go to that one. Other
12    ones could be any time.
13        Q    So you would see Mr. Turney and Ms. Barnes
14    interact at these Thursday morning meetings
15    sometimes?
16        A    I would see them -- I would -- they would
17    be in the same room.
18        Q    Okay.
19        A    They would not sit together, they were
20    just in the same room.
21        Q    Were there any other regular occasions or
22    events where you would be in the same room or in the
23    same vicinity as Mr. Turney and Ms. Barnes?
24        A    You could at any time, because they would

Page 152

1    have their meetings and I might have to go up and
2    ask a question. I don't -- it would be at any time,
3    'cause these were not -- if they would have their
4    meetings, it may be in the conference room, it may
5    be right where their cubicles where he had all his
6    maintenance men or people.
7        Q    So can you estimate how often you would
8    see Mr. Turney and Ms. Barnes interact?
9        A    I couldn't give you a number; they -- they
10    would have to interact every day, but I didn't see
11    them every day.
12        Q    And you can't estimate how often --
13        A    No, I could not.
14        Q    -- you would see them?
15        Now, you said earlier that you complained
16    to Michelle Priest that you were treated
17    differently; is that correct?
18        A    With Larsen.
19        Q    Do you remember when you made that
20    complaint?
21        A    Around the time we were getting
22    evaluated -- I don't have the paperwork --
23    evaluated, our yearly evaluation. December/January,
24    so it would have to be December of '16 or

38 (Pages 149 to 152)

Page 153

1   January '17.
2      Q  At any point before --
3      MS. KIRKPATRICK:  Okay, you can go
4   ahead and do it.
5      THE VIDEOGRAPHER:  This will conclude
6   File Number 2 in the videotape deposition of
7   Penny Robbins in the case of Barnes v. Shell,
8   et al.  We're going off the record at 4:26 p.m.
9      (Off the record.)
10      THE VIDEOGRAPHER:  This will begin
11   File Number 3 in the videotape deposition of
12   Penny Robbins in the matter of Barnes v. Shell,
13   et al.  We're going back on the record at
14   4:32 p.m.
15   BY MS. KIRKPATRICK:
16      Q  Ms. Robbins, when did you first start to
17   think that Mr. Larsen treated you different?
18      A  He never came around me that much at all,
19   I mean, even before; I was under Steve Craig's -- I
20   was under him.  Whenever he asked something, I would
21   do it.
22      I guess I didn't come clearly into it
23   until we did the evaluation.  You always felt like
24   he was off, he didn't want me to do anything for

Page 154

1   him.  If he asked, I would do it.  But it wasn't
2   until the evaluation.
3      Q  The negative evaluation --
4      A  The negative evaluation when he put me
5   down, and he hadn't even, you know, midyear, he
6   hadn't mentioned [inaudible].
7      THE COURT REPORTER:  Midyear, he
8   hadn't mentioned what?
9      THE WITNESS:  He hadn't mentioned
10   anything, that I was doing anything wrong.
11   BY MS. KIRKPATRICK:
12      Q  Did Mr. Larsen have his favorite employees
13   and less-liked employees?
14      MS. GURMANKIN:  Objection to the form.
15      THE WITNESS:  I wouldn't know.
16   BY MS. KIRKPATRICK:
17      Q  Was there anyone else that he didn't hit
18   it off with other than you?
19      MS. GURMANKIN:  Objection to the form.
20      THE WITNESS:  Him and Houseknecht.
21   BY MS. KIRKPATRICK:
22      Q  Now, you also said that Mr. Turney
23   interacted differently with men, and one of the
24   things you said was because of his sweet talk.  Can

Page 155

1   you give me some examples of the sweet talk that you
2   actually witnessed?
3      A  No, I cannot.
4      Q  Okay.  Were there any other bases for
5   stating that Mr. Turney interacted differently with
6   men other than that he would do sweet talk with
7   ladies?
8      MS. GURMANKIN:  Objection,
9   mischaracterizes her testimony.
10      THE WITNESS:  No.
11      MS. KIRKPATRICK:  Okay, I have no
12   further questions.
13      THE WITNESS:  Thank you.
14      MS. GURMANKIN:  Just one very quickly,
15   Ms. Robbins.
16      - - -
17      FURTHER EXAMINATION
18      - - -
19   BY MS. GURMANKIN:
20      Q  You testified in response to
21   Ms. Kirkpatrick's questions that you did not report
22   what Jesse told you about -- or about what you saw
23   about Turney touching her, putting his arm around
24   her shoulder and putting his hand in the middle of

Page 156

1   her back, in part because this was seen by more than
2   you.
3      Who else, to your knowledge, saw Turney
4   touch Jesse that way?
5      MS. KIRKPATRICK:  Objection.
6      THE WITNESS:  When I would see him do
7   that, that would be when they were on the way
8   to their Thursday morning meeting, so it would
9   be anyone in the building.  If it was down the
10   hallway, it would be anybody in the building
11   could have seen it.
12   BY MS. GURMANKIN:
13      Q  So who would that include?
14      A  The entire production side, supervisors,
15   coworkers.
16      Who would be the supervisors who would see
17   that?
18      A  On the Thursday morning meeting, it was
19   anyone in -- we're talking superintendents,
20   production supervisor, maintenance supervisors, each
21   head of the department, anyone.
22      Q  So would that include Steve Craig?
23      A  Definitely.
24      Q  Would that include Hondo Blakley?

39 (Pages 153 to 156)

Page 157

1      A   Yes.
2      Q   Any other supervisory level employees who
3   that would include?
4      A   As it got -- it would be Larsen --
5      Q   Um-hmm.
6      A   -- I mean, he would be in there.  But as
7   a reporting, I did say something to Hondo about
8   this.
9      Q   About the touching?
10     A   I told him how aggravated she was getting
11  with Turney.  I did tell him.
12     Q   And that's what -- he didn't ask you any
13  questions about it, right?
14         MS. KIRKPATRICK:  Objection.
15         THE WITNESS:  No, he did not.
16  BY MS. GURMANKIN:
17     Q   Is it possible you mentioned to Blakley
18  about what you saw about Turney touching Jesse?
19     A   Could have possibly.  I do not remember.
20         MS. GURMANKIN:  Okay, thank you.
21  That's all I have.
22         THE WITNESS:  You're welcome.
23         MS. KIRKPATRICK:  Ms. Robbins, I just
24  have some follow-up.

Page 158

1              - - -
2          FURTHER EXAMINATION
3              - - -
4   BY MS. KIRKPATRICK:
5      Q   Before, you told us that you told Blakley
6   that Ms. Barnes was aggravating --
7      A   Was aggravated.
8      Q   -- was aggravated by Mr. Turney in the
9   fall of 2016, correct?
10     A   I do believe it was.  I mean, it was --
11     Q   And you said that you did not give
12  specifics to Mr. Blakley as to --
13     A   No, I did not.
14     Q   So you never told Mr. Blakley that
15  Mr. Turney was touching or had touched Ms. Barnes?
16         MS. GURMANKIN:  Objection to form,
17         mischaracterizes her testimony.
18         THE WITNESS:  No.  I told him she was
19         aggravated.
20  BY MS. KIRKPATRICK:
21     Q   You didn't say she was touched?
22     A   I did not give him specifics.
23     Q   And you don't know whether Mr. Craig,
24  Mr. Blakley, Mr. Larsen, or anyone else actually saw

Page 159

1   Ms. Barnes being touched, correct?
2      A   I could not say.
3      Q   Okay.
4          MS. KIRKPATRICK:  I have no other
5   questions.
6          MS. GURMANKIN:  Sorry, one more,
7   Ms. Robbins.
8              - - -
9          FURTHER EXAMINATION
10             - - -
11  BY MS. GURMANKIN:
12     Q   Did you ever tell Mr. Blakley that any
13  other male employees were aggravated by [inaudible]?
14         THE COURT REPORTER:  I'm sorry, I
15         couldn't hear that.
16  BY MS. GURMANKIN:
17     Q   Did you ever tell Hondo Blakley that male
18  employees were aggravated by Mr. Turney?
19     A   No.
20     Q   Okay.
21         MS. GURMANKIN:  Thank you.
22         MS. KIRKPATRICK:  You're finished.
23         THE WITNESS:  Thank you.
24         THE VIDEOGRAPHER:  This will conclude

Page 160

1   File Number 3 in the videotape deposition of
2   Penny Robbins in the matter of Barnes v. Shell,
3   et al.  We are going off the record at 4:38 p.m.,
4   concluding the deposition for today.
5              - - -
6          (The deposition concluded at 4:38 p.m.)
7          (Signature reserved.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

40 (Pages 157 to 160)

Page 161

1                        CERTIFICATE
2     COMMONWEALTH OF PENNSYLVANIA  )
                                    ) ss:
3     COUNTY OF LYCOMING            )
4
5              I, Kelly M. Bradley, do hereby certify that
      before me, a Notary Public in and for the Commonwealth
      aforesaid, personally appear PENNY ROBBINS, who then
6     was by me first duly cautioned and sworn to testify
      the truth, the whole truth, and nothing but the
7     truth in the taking of his oral deposition in the
      cause of aforesaid; that the testimony then given by
8     him as above set forth was by me reduced to
      stenotypy in the presence of said witness, and
9     afterwards transcribed by means of computer-aided
      transcription.
10
11             I do further certify that this deposition was
      taken at the time and place in the foregoing caption
12    specified, and was completed without adjournment.
13             I do further certify that I am not a
      relative, counsel or attorney of either party, or
14    otherwise interested in the even of this action.
15             IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my seal of office in Williamsport,
16    Pennsylvania, on this 1ST day of OCTOBER, 2019.
17
18    _____
19
20    Kelly M. Bradley, RPR, Notary Public
      In and for the Commonwealth of Pennsylvania
20    My commission expires May 17, 2020
21
22                         - - -
23
24

Page 163

1                        ERRATA SHEET
2     Attach to Deposition of:  Penny Robbins
      Taken on:  September 19, 2019
3     In the matter of:  Barnes v. Shell Exploration, et al.
4     PAGE        LINE NO.      CHANGE         REASON
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____

Page 162

1          INSTRUCTIONS TO THE WITNESS
2              Read your deposition over carefully
3     It is your right to read your deposition and make
4     changes in form or substance.  You should assign a
5     reason in the appropriate column on the errata
6     sheet for any change made.
7              After making any changes in form or
8     substance which have been noted on the following
9     errata sheet along with the reason for any change,
10    sign your name on the errata sheet and date it.
11             Then sign your deposition at the
12    end of your testimony in the space provided.  You
13    are signing it subject to the changes you have
14    made in the errata sheet, which will be attached
15    to the deposition before filing.  You must sign it
16    in front of a witness.  Have the witness sign in
17    the space provided.  The witness need not be a
18    notary public.  Any competent adult may witness
19    your signature.
20             Return the original errata sheet to
21    your counsel promptly.  Court rules require filing
22    within thirty days after you receive the
23    deposition.
24

Page 164

1               SIGNATURE PAGE
2
3                    - - -
4
5              I hereby acknowledge that I have
6     read the aforegoing transcript, dated September 19,
7     2019, and the same is a true and correct
8     transcription of the answers given by me to the
9     questions propounded, except for the changes, if
10    any, noted on the Errata Sheet.
11
12                   - - -
13
14
15
16
17    SIGNATURE:  _____
                  Penny Robbins
18
19    DATE:  _____
20
21    WITNESSED BY:  _____
22
23
24

# Exhibit 29

Plaintiff has redacted this exhibit for filing via ECF due to the parties' Confidentiality Stipulation and Order (Docket No. 27).

Plaintiff will submit this Exhibit separately to the Court.

# Exhibit 30

Plaintiff has redacted this exhibit for filing via ECF due to the parties' Confidentiality Stipulation and Order (Docket No. 27).

Plaintiff will submit this Exhibit separately to the Court.

Exhibit 31

Message

| | |
|---|---|
| **From:** | Turney, William E SEPCO-UPU/N/EO [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=WILLIAM.TURNEY] |
| **Sent:** | 11/23/2016 1:08:41 PM |
| **To:** | Priest, Michelle L SEPCO-HRN/AT [michelle.priest@shell.com] |
| **CC:** | Craig, Steve SEPCO-UPU/N/EO [steve.craig@shell.com] |
| **Subject:** | Potential Employee Issue |
| **Importance:** | High |

Michelle,

Monday afternoon (11/21/2016) I called Jesse Barnes into room 120A to have a one on one discussion about recent performance concerns. After talking with her few a few minutes she started saying that I was the problem. I asked why I was problem and she stated that I always put her down, telling her nothing was ever done correctly etc....After only a few minutes into this, I asked her to hold tight until I went and got Steve. She agreed to this and Steve joined the conversation. Talking with Steve today, I don't want to let this go. I haven't (In my opinion) ever done anything wrong. Now, I know I have said some things that I shouldn't have but apologized for saying it...I guess what I'm wondering is if we can discuss this. Everything has been fine this week (between her and me) and far as business goes. I don't want this to get out of hand or I fear that I cannot coach her because of this. Anyway, let's discuss Michelle when you return to work. Thank you very much.

Thanks,

## William Turney

Shell Appalachia
Operations Field Support Supervisor
12880 State Route 6
Wellsboro, PA 16901
Cell: 570-404-8901
Office (Soft Phone): 570-662-9744
William.Turney@Shell.com



EXHIBIT

055

Exhibit 32

| | |
|---|---|
| **From**: | Priest, Michelle L SEPCO-HRN/AT [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USMPR9] |
| **Sent**: | 11/30/2016 11:33:53 PM |
| **To**: | Kloosterman, Megan SEPCO-HRN/AT [megan.kloosterman@shell.com] |
| **Subject**: | E&C complaint - Barnes concerns |
| **Attachments**: | Potential Employee Issue.msg; Confidential issue question.msg; ACTION_ GLOBAL COMPLIANCE CASE SHELL-16-11-0050.msg |

**Michelle Priest**

HR Account Manager, Unconventionals

Address: 150 N. Dairy Ashford, Houston, TX 77079 – F0396B
Phone: +1 281 544 7474 (Click here to call me on Communicator)
Email: Michelle.Priest@shell.com
Internet: http://www.shell.com/global/future-energy/natural-gas.html

This mail has attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorised persons and deleted after its legitimate use.

EXHIBIT
015

Shell_0000345

| | |
|---|---|
| **From**: | Turney, William E SEPCO-UPU/N/EO [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=WILLIAM.TURNEY] |
| **Sent**: | 11/23/2016 1:08:41 PM |
| **To**: | Priest, Michelle L SEPCO-HRN/AT [michelle.priest@shell.com] |
| **CC**: | Craig, Steve SEPCO-UPU/N/EO [steve.craig@shell.com] |
| **Subject**: | Potential Employee Issue |
| **Importance**: | High |

Michelle,

Monday afternoon (11/21/2016) I called Jesse Barnes into room 120A to have a one on one discussion about recent performance concerns. After talking with her few a few minutes she started saying that I was the problem. I asked why I was problem and she stated that I always put her down, telling her nothing was ever done correctly etc....After only a few minutes into this, I asked her to hold tight until I went and got Steve. She agreed to this and Steve joined the conversation. Talking with Steve today, I don't want to let this go. I haven't (In my opinion) ever done anything wrong. Now, I know I have said some things that I shouldn't have but apologized for saying it...I guess what I'm wondering is if we can discuss this. Everything has been fine this week (between her and me) and far as business goes. I don't want this to get out of hand or I fear that I cannot coach her because of this. Anyway, let's discuss Michelle when you return to work. Thank you very much.

Thanks,

**William Turney**

Shell Appalachia
Operations Field Support Supervisor
12880 State Route 6
Wellsboro, PA 16901
Cell: 570-404-8901
Office (Soft Phone): 570-662-9744
William.Turney@Shell.com



| | |
|---|---|
| **From**: | Craig, Steve SEPCO-UPU/N/EO [/O=SHELL/OU=MSXSEPC/CN=RECIPIENTS/CN=CAI+CRA1] |
| **Sent**: | 11/22/2016 8:44:11 AM |
| **To**: | Orr, Jared K SEPCO-HRN/AT [jared.orr@shell.com] |
| **CC**: | Priest, Michelle L SEPCO-HRN/AT [michelle.priest@shell.com] |
| **Subject**: | Confidential issue question |

Jared

I had a meeting yesterday with Jesse Barnes who has formally submitted an online complaint to HR regarding harassment in the workplace.  Can you provide me any guidance on next steps that will be initiated by HR or follow up that I need to take?  I was only made aware of this yesterday and have not discussed with Michelle yet.

It was reported on 11/15/2016.  The report # is : SHELL-16-11-0050

Thanks

Steve

Steve Craig

Production Superintendent

Shell Appalachia

12880 Route 6

Wellsboro, PA 16901

Phone (570)662-9446

Mobile (570)404-6818

Email: steve.craig@shell.com

**APPALACHIA PRODUCTION SYSTEM**

Developing our People - Improving our Processes

| | |
|---|---|
| **From**: | Otto, Cari E SHLOIL-HRN/AB [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=CG202187] |
| **Sent**: | 11/28/2016 9:58:06 AM |
| **To**: | Priest, Michelle L SEPCO-HRN/AT [michelle.priest@shell.com] |
| **CC**: | Otto, Cari E SHLOIL-HRN/AB [cari.otto@shell.com] |
| **Subject**: | ACTION: GLOBAL COMPLIANCE CASE SHELL-16-11-0050 |
| **Attachments**: | SHELL-16-11-0050 _UA.pdf |

Michelle,

We received the attached Global Compliance Hotline case in which the Caller is alleging harassment, specifically name calling, belittling, inappropriate touching and commentS. I have attached the case for your review.

Please let me know who will be investigating this incident, and then have that person respond with his/her notes, findings, and any recommendations by **Dec. 23.** I will correspond with the investigator going forward once identified.


Thank you,
Cari

# CASE DETAILS
## SHELL-16-11-0050

### CONFIDENTIAL MEMORANDUM

| | | | | |
|---|---|---|---|---|
| **Report Initiated** | 2016-11-15 13:38 GMT | **Primary Priority** | C | |
| **Scheduled Follow-up** | | **Case Indicator** | | |
| **Source** | Web Submission | **Current Status** | Open | 2016-11-15 |
| **Awareness Resource** | Declined | **Case Opened** | 2016-11-15 | |
| **Language** | English | **Case Closed** | | |
| **Documented by** | WEBALLEGATIONSUBMIT | **Days Open** | 13 days | |
| | | **Case Due Date** | 2017-01-14 | |

| Allegation | Class | Priority | Primary |
|---|---|---|---|
| Harassment | People and Safety | C | Yes |

| Location | Location Geography | Location Function |
|---|---|---|
| United States | Region:Americas | |
| Shell Appalachia &#xd;&#xa;12880 Route 6, Wellsboro, PA 16901 | | |

| Parties Involved | Party Type | Job Title | Description |
|---|---|---|---|
| Jesse Barnes | Caller | Maintenance Analyst | |
| Other (570) 404 0862 | | | |
| jesse.a.barnes@shell.com | | | |
| William Turney | Subject | Maintenance Supervisor | |

### Issue Summary

I have been dealing with harassment issues, specifically name calling, belittling, inappropriate touching and comments.

### Issue Details

Since I have started working under my direct supervisor there has been issues with harassment and a hostile work environment.

I put in a list form below of the incidents I have been dealing with.

I have been shown a "selfie" of my supervisor in his underwear by him.

I have been brought into situations with a employee that were not necessary because my supervisor thought it was funny that the other employee and myself did not like each other.

I have received non work related text messages.

I was told in my mid-year review that I make good money for a woman and should not be upset with my pay grade by my supervisor.

I was told I work well with male employees because I am a woman by my supervisor.

I was told I am a hot blonde by my supervisor.

I am continuously asked about my personal life by my supervisor.

My supervisor has referred to my significant other as a nerd.

During a pulse survey meeting, when I spoke up about an opinion I had, I was told the meeting was not about me by my supervisor.

At a work charity golf tournament I was asked more than once why I was not wearing shorts at this event and if my supervisor could cut my pants into shorts as well as other supervisors joined in and took a picture of my backside (buttock) and saved on phone.

I was informed to "bullshit" my superintendent on what my position competency by my supervisor.

My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one.

I was told I am only right if my supervisor allows me to be by my supervisor.

I have addresses my supervisor about an issue I was having with a co-worker and was told that is the way it was going to be. This co-worker had lied to me saying that my supervisor was mad at me because I was falling behind on work. When I asked my supervisor what I needed to catch up on he denied that he had said anything.

My supervisor told me I was intended to be a pay grade 7 but was told by OM that I would be an 8 with no explanation.

My supervisor said he thinks it's funny when I get into a disagreement with other women co workers. Supervisor gestures cat claws and makes a hissing noise.

I expressed a concern to my supervisor a CPR trainer that instructed at our office that when I was performing CPR the instructor told me to "pick my ass up" in front of male colleges. My supervisor said "well did you pick it up?" in a laughing manner.

In my goals on HR online I entered I would attempt to visit the field every quarter for I am office based and want to gain knowledge of the field. When I asked permission to spend the day in the field with a female colleague I was told by my supervisor I was only allowed to go for 4 hours. When I asked why and/or if he needed me for something that prevented me from spending an 8 hour day in the field, he responded with no I just don't think you need to spend the whole day in the field.

I have been called a bitch by numerous people in the office.

I was told when I voiced some of my concerns that "I need to stop playing the victim".

I have been told by co workers that maybe if they wore tight pants and batted their eyes they could get what they wanted, suggested that this is what I do.

I have been referred to as a "window licker", which I believe was to insult my intelligence.

Superintendent had written me a note to tell me he thought I did a good job regarding certain projects and CC's my supervisor on the email. I was then taken a side by my supervisor and a door was closed so the superintend could not hear supervisor talk down to the things the superintendent just gave me recognition for.

I have been asked by my supervisor multiple times if I thought about him over the weekends.

I supervisor has told me that he has thought about me while showering.

My supervisor encourages arguments among my team.

I was told I was not smart enough by a supervisor to be able to do something.

A co worker had put his hands through my hair without permission.

My supervisor mocks me when I have informed people I do not like to be touched.

My supervisor has mocked me when I told him I do not come to work to hear that I am pretty when a co worker referred to be as pretty. My supervisor kept saying it when I addressed him "I don't come to work to hear I am pretty" he would say to me.

I feel like I am being bullied at work. On a daily basis I feel upset and frustrated.I have become very unhappy while at work. My motivation level has decreased and my communication is lacking. This is affecting my work and personality at work.

---

| Additional Questions | Answers |
| --- | --- |
| What is your relationship to Shell? | Shell Employee |

Confidential

| | |
|---|---|
| Did you choose to remain anonymous? | No |
| If you would rather remain anonymous, would you instead be willing to communicate with just one individual in Shell without having your name documented? | N/A |
| If you are not comfortable with this would you be prepared to communicate via an independent Third Party? | N/A |
| If you are willing to do this Shell will respond to your issue with a contact name/number for you to receive on your follow up call. | N/A |
| Are you reporting an issue in the United States or outside the US? | Inside the US |
| For which business unit or area of operations does the subject of this report work [if the caller does not know, ask which business unit he/she works for]. | Shell Oil Products US (SOP US) (also includes Chemical Manufacturing at Deer Park, Geismar or Norco) |
| If you do not work for one of these units, what is the name of your operating unit? | N/A |
| To which Shell company does this issue refer? | N/A |

---

**Communication with Reporter**

| Type | Date Entered | Entered By | Reply Given to Reporter | Language |
|---|---|---|---|---|
| Follow-up | 2016-11-16 13:30 GMT | webAllegationSubmit | No | English |

WPA Follow-Up

The user has not provided any additional details for this report.

| Type | Date Entered | Entered By | Reply Given to Reporter | Language |
|---|---|---|---|---|
| Reply | 2016-11-15 19:05 GMT | Connie Olivarez | Yes | English |

Investigation Pending

Dear Reporter:

Thank you for your submission. Your report has been received and is now being assessed accordingly.


Regards,
Business Integrity Department


**Other Background Details**

| | |
|---|---|
| **Shell Business (Level 1)** | Upstream |
| **Shell Business (Level 2)** | UPU - Unconventionals |
| **Report Type** | Allegation |
| **BID Investigation** | No, HR/HSSE |
| **Report Name** | HR |
| **CMS Case Number** | |
| **Origin of Report** | Helpline |
| **Allegation against** | Shell Employee |
| **Location of case material** | |
| **Date set to Pending** | |
| **Referred to Law Enforcement** | |
| **Job Grade of Subject 1** | |

**Job Grade of Subject 2**
**Job Grade of Subject 3**
**# Employees terminated**
**# Contractors terminated**
**# Employees disciplined**
**# Contractors disciplined**

| Assignee | Assignment Type | Complete/Removed | Date Assigned | Assigner |
|----------|-----------------|------------------|---------------|----------|
| Cari Otto | Lead Investigator | | 2016-11-15 19:01 GMT | Connie Olivarez |
| Doug Schlegel | View-Only | | 2016-11-15 19:01 GMT | Connie Olivarez |
| Joseph Montemayor | View-Only | | 2016-11-15 19:01 GMT | Connie Olivarez |
| Matthew D Griffiths | View-Only | | 2016-11-15 19:01 GMT | Connie Olivarez |

| Assignment Notes | | Date Entered | Entered By |
|------------------|--|--------------|-----------|
| No Case Assignment Notes found for this call report. | | | |

**Investigation Notes**
**Date Entered**                                    **Entered By**

No Case Investigation Notes found for this call report.

**Other Investigation Details**

**Date of Incident**            N/A

**External Investigator Cost:**                Currency

**Real loss:**                                 Currency

**Potential loss:**                            Currency

**Case Indicator**

**Legally Privileged**
**Potential Report to SEC**
**Up the Ladder**

| Related Case | Same Case | Date Added | Added by |
|--------------|-----------|------------|----------|
| No Related case found for this call report. | | | |

**Resolution Details**

No Resolution found for this call report.
**Executive Summary**     Reporter alleges harassment in the workplace.

**Other Resolution Details**

## Attachments

| File Name | Date Added | Uploaded By |
|-----------|-----------|-------------|

No Case Upload Files found for this call report.

*Client agrees and understands that NAVEX Global neither warrants, vouches for, nor authenticates the reliability of the allegations provided in this report. Client agrees that it shall have the sole responsibility for investigating or otherwise evaluating these allegations and other information provided and to comply with all local, state and federal laws pertaining to the investigation and protection of such information, as well as the protection of all rights of any person or persons accused of any wrongdoing.

Exhibit 33

Message

| From: | Priest, Michelle L SEPCO-HRN/AT [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USMPR9] |
|---|---|
| Sent: | 12/5/2016 11:12:54 PM |
| To: | Kloosterman, Megan SEPCO-HRUP/D [megan.kloosterman@shell.com] |
| CC: | Soudelier, Kelly H SEPCO-HRN/AT [kelly.soudelier@shell.com] |
| Subject: | CONF: Tioga Updates |
| Attachments: | SHELL-14-03-0058_Harassment_PENN.PDF; Summary - ██████ 2.docx |

Megan,

In Appalachia Operations, there was an investigation involving an employee who was Field Supervisor in Tioga (█████ ██), and announced that he would become Superintendent in Q1/2 2014. Jesse Barnes was an admin assistant contractor at the time, and would have reported directly to this person once he became superintendent. She raised a complaint regarding ████████ in February 2014 to the current/outgoing superintendent, David Summers. While Mr. ██ did sent text messages of questionable intent and of poor judgment, he acknowledged giving hugs to her and explained his behaviors as "friendly" and "how he treats everyone—male or female". His supervisor, the Ops Manager at the time, did not agree with a written warning, and gave him a verbal warning only. We also asked him to apologize to Jesse for making her feel uncomfortable. She said that she would not be comfortable with him 1:1, but would be comfortable with Will Turney present.

In March 2014, a Staff Associate raised a complaint to the Ethics & Compliance hotline alleging that past incidents were "swept under the rug", mentioning that Jesse Barnes continues to feel uncomfortable around ████████ (Though the attached PDF does not name names, this is who I recall the complaint is referring to.) ████████ was the subject of several other investigations and left Shell in Q2 2014 around the time this hotline call was received. As some of the concerns listed in the actual complaint attached had already investigated and responded to, BID was brought in to review. From the BID investigation, new allegations were subsequently raised during some of the interviews and 4 employees ultimately received discipline. None of those 4 who received disciplines based on the findings were related to Jesse Barnes' complaint, Jesse herself, nor Will Turney. 3 of the 4 individuals who received discipline are no longer with the asset.

Michelle

**Michelle Priest**
HR Account Manager, Unconventionals

Address: 150 N. Dairy Ashford, Houston, TX 77079 – F0396B
Phone: +1 281 544 7474 (Click here to call me on Communicator)
Email: Michelle.Priest@shell.com
Internet: http://www.shell.com/global/future-energy/natural-gas.html

This mail has attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorised persons and deleted after its legitimate use.

EXHIBIT

016

Exhibit 34

# Interview Questions: Shane Sollinger

**Attendees:** Shane Sollinger, Megan Kloosterman (HR)
**Date:** 12/7/2016

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- Allegations have not been made against you specifically, but you were identified as someone that may have information that will help me understand the overall picture
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Questions

1. Describe your current role and responsibilities.
2. Describe your working relationship with Will Turney and Jesse Barnes (understand not on their team). Will – it's all just at work; our functions cross each other, things I do drive what he does. We find what needs to be fixed and then his team fixes it. I have been disappointed in the way he conducts his business and things he talks about. Nothing serious, but one of my team members he has taken it out of context and I confronted it. He backed down. He has a tendency to talk about his people to other people, even in negative ways. I don't think he was trained properly as a supervisor. He is a little blunt with is people instead of being understanding. I heard a lot from his employees. They will say I can't stand working for that guy.

   Jesse Barnes – SAP stuff, but a notification or something. I know Jesse because my daughter knows her. I haven't seen her outside of work. Good working relationship with Jesse. Talking to her, she always takes care of stuff really well.

3. What are your observations/perceptions of the work dynamics on that team? What are your perceptions of their working relationship? Have you overheard any conversations/interactions amongst them? (Jesse said he was shaking his head).

   The team doesn't like Will very much – trying to drive costs down, it doesn't sit very well. I think there is more to it than just that. He likes to talk down instead of listening. He talks down instead of to. I think that's what creates his problems for him. Some of the people don't work for him anymore – 4-5 people have expressed they don't like working for him.

   He particularly talks down to Will and Jesse does not like him. Belittle the other person- I'm the boss. I haven't heard anything that's inappropriate, like male/female relationship.

4. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet?
5. Is there anyone specifically you think I should talk to regarding the concerns raised?

EXHIBIT

028

6. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

## <u>Conclusion</u>

- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 35

<p style="text-align: center;">**Interview Questions: Dan Krise**</p>

**Attendees:** Dan Krise, Megan Kloosterman (HR)
**Date:** 12/7/2016

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- Allegations have not been made against you specifically, but you were identified as someone that may have information that will help me understand the overall picture
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Questions

1. Describe your current role and responsibilities.

Maintenance planner – pipeline operations – 2 years. Worked for East Resources – 5 years; Operational Readiness prior.

2. Describe the work environment and team dynamics on your immediate team (i.e. direct reports of Will). There are two teams – the tech's in the field who aren't here very often; and guys who are in cubicle team awesome; things have been tough and we have been working hard.

   A lot of men work here; it doesn't surprise me – no specifics come to mind. It is a men dominated environment.

3. Describe your working relationship with Will Turney and Jesse Barnes.

   Will is an interesting supervisor, Steve asked for feedback on Will. I told him I would not want to be Will's boss but I like working for him. He is always pushing back. For us, he is overworked, I think. But they have made changes, he has less direct reports. At the time it was hard to get with him. Multiple times a day I need to get with him, something is always happening.

   Jesse – our relationship is tenuous at best; I am extroverted, like to interact with people; jesse and I – we have a weird relationship. It is strained, which is fine, I am used to that. No relationship outside of just work, hello, goodbye, etc..

   There was a day when she was just "I don't want to talk today" - don't remember when – don't remember what happened that day – she just wasn't in a good mood. I asked how things were. And she didn't want to talk. And from then on I got the message, it's just about work.We interact for our positions – working relationship is fine.

   a. What are your views on Will as a leader?

EXHIBIT

024

Will wants to be the best, and he will tell you that. wants our team to be the best; very driven; as far as leader goes, he is good at feedback, he is always looking for feedback. Most of the time he is a good boss, he is the most accessible boss I have had when it comes to issues.

b. What are your observations/perceptions of their relationship?
I don't see anything – we are back to back, I haven't noticed anything. There are planner/scheduler specific meetings that she is not a part of so I don't see anything.

He has a way of what he wants, it's in his head, but to get you to do what he wants it doesn't always translate until the 5th time. There is back and forth, I want to see this instead, fix it. It happens with me too, but it happens more with her because he is getting reports from her.

4. Have you noticed anyone teasing Jesse and her getting upset?
She is ok with teasing, she doesn't get upset. Other than that nothing comes to mind with her.

5. Have you made jokes regarding being a woman in the workplace towards Jesse?

a. Example of batting eyelashes and wearing tight pants to get what you want.
I don't remember saying that or hearing it.

6. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet?

In general, I think it is a tough work environment for women.  Just generally, it could be a respect issue, culturally, socio-economically. Feeling respected, it might be the type of environment where if you were a man you would be treated differently.

7. Is there anyone specifically you think I should talk to regarding the concerns raised?

8. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

## Conclusion

- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 36

**Interview Questions: Kelvin Flynn**

**Attendees:** Kelvin Flynn, Megan Kloosterman (HR)
**Date:** 12/7/2016

<u>**Introduction**</u>
- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- Allegations have not been made against you specifically, but you were identified as someone that may have information that will help me understand the overall picture
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

<u>**Questions**</u>
1. Describe your current role and responsibilities.

   Well integrity – 4 years. eWIMS is electronic program that manages the data. Manage inspections, servicing of well heads, manage mechanical integrity assessments. Servicing wells and doing inspections. Specific to wells.

2. Describe the work environment and team dynamics on your immediate team (i.e. direct reports of Will).

   My best description would be dynamic, it changes quite a bit. There are a lot of different personalities, sometimes you will see friction, they get along most of the time. My outlook on a lot of things is different than others in the office, I was born and raised on a farm. I have a strong work ethic.

   On the surface they get along, sometimes you wonder why someone said something or so on.

3. Describe your working relationship with Will Turney and Jesse Barnes.

Will – I don't consider it a bad relationship, consider it strictly a working relationship; there are a lot of things I respect and I don't respect. It's my personal views though. We have a good working relationship. I am open with him in 1:1s, if I think he is doing something I don't think he should. I requested he do the same thing for me. We communicate on a daily basis (morning meetings), as far as having to request info I may go several days or a week working independently. Does not micromanage what I do.

Jesse – she helps with setting up some of the maintenance programs for well integrity system, SAP uploads, managing work orders. At least weekly; positive work relationship. Prior to Shell I was with East Resources, her mother worked with ER. I had a good relationship with her mother, she is a friend. I have more of a tie to Jesse. She is a good kid and good worker, I like her a lot. I respect her.

   a. What are your observations/perceptions of their relationship?

<div style="border:2px solid black; display:inline-block; padding:8px; text-align:center;">

**EXHIBIT**

027

</div>

I think he underestimates or takes for granted at the same time – throwing work things at her constantly. Will has a simplistic view of getting things done. We had a project in the field and the guys were having a hard time getting it done, - underestimates what it takes to get things done. Doesn't realize the amount of work in his requests. I see him doing that towards Jesse more than others, but it might be because I see her more than others.

They talk back and forth, I never have seen her protest how much work she takes on. She says yes. I think she has a lot of frustration for the amount of work.

I have never seen anything be negative about their relationship.

I think she has a good working relationship with the team, it seems like everything is easy going, people request things and she will do it; general comments that are made the team has a good opinion of what she does.

*I would like to review a few specific examples of their work relationship with you. Please share any information or perspective you have related to these matters.*

| Claim | Timing (from Jesse) | Test whether you see this amongst Will and others on the team (self) or just between Jesse. |
|---|---|---|
| • I am continuously asked about my personal life by my supervisor. | He asked about my significant other recently in November 2016 | Haven't noticed that a lot; |
| My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one. | This is ongoing, continues to happen even when I've asked him to stop. | No |
| • Supervisor gestures cat claws and makes a hissing noise. | on-going | Once in a while. |

| | | |
|---|---|---|
| • I have been asked by my supervisor multiple times if I thought about him over the weekends. | Aug-16 | no |
| • My supervisor encourages arguments among my team. | In meetings and team discussions. | General working environment seems light hearted;<br><br>I don't think he would encourage arguments |
| I have been called a bitch by numerous people in the office. | More near the beginning of 2016 | I have not; that would have stuck in my mind. |

Personal opinion - With Will, I view Will as an extremely goal oriented, type A overachiever, he has to be the best at everything. If there is something going on he has to be the top one. He wants his group to be 100%. He has to be – his SAP score – got to be the best. He seems to be more driven by what people think of him, materialistic, image-wise, his appearance. His value of the people in his team is- he values them in how much they can help him be the best in his- support his goals. That's why I have a free working relationship because I work hard and get my stuff done. He doesn't want to be bothered with it unless its value to him. We had to let go some part time people that were temporary workers. Once we knew they weren't going to be here it was like they didn't mean anything to him. This is one of my issues with him.

There is a lot of light-hearted – nothing has caught my attention that is inappropriate. If something is offending her, she is pretty good about keeping it internalized or I am not noticing. She is a quieter person; she wouldn't confront someone in front of the group. She is more quiet and reserved. Knowing her mother and the way she was, I can see she was probably more respectful and reserved.

Every once in a while people will joke back and forth, and occasionally things will get said that I don't think is appropriate for an office environment. They cross the line sometimes, not too often, but sometimes. I can't recall a specific example. Once or twice have been about women, probably.

4. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet?

She is the only female up where we sit, she is younger, and she is attractive. It is not uncommon to stop and visit with her. More people stop casually with her than they do with anyone else up there.

I have not seen anything directly aimed at Jesse that I thought was extremely excessive or out of place, but she might be more sensitive. However, I am hard of hearing and I might not hear everything. But I hadn't noticed anybody or actions in particular being overtly offensive to Jesse.

5. Is there anyone specifically you think I should talk to regarding the concerns raised?
6. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

## Conclusion

- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 37

**Interview Questions: Mark Hoover**

**Attendees:** Mark Hoover, Megan Kloosterman (HR)
**Date:** 12/14/2016

<u>**Introduction**</u>
- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment and team dynamics
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

<u>**Questions**</u>
1. Describe your current role and responsibilities.
   Operations Supervisor in Tioga, I oversee the day to day operations, the flowing wells of this asset, the operators are my direct reports. There are about 23 direct reports. In role try to be out in the field but due to meetings it's not always possible. Lead operators, control room operators, etc.

   Huge overlap with maintenance. Maintenance and operations go hand in hand, we have problems that are not a quick fix or something that needs some specialized equipment, like a truck crane or something. Then we will interface with maintenance. If it is causing deferment or lost gas/revenue. We will try to work on it. Sometimes in conversation we talk about it.

2. Describe your working relationship with Jesse Barnes as the Maintenance Analyst and how your role interacts with hers. How would you describe the nature of your relationship?

   Always had a good relationship with her, I have known her for at least 4.5 years. The interaction there is – there is some interaction due to scheduling, we might talk about who will do what next week. PMs that fire through the SAP system. If operators are not up to getting paperwork in, then we will talk about that.

   a. Working relationship with Will Turney as Maintenance Supervisor?

      Primarily interface with him as supervisor – our working relationship is outstanding, we have a strong relationship, we aren't butting heads.

   b. Do you have any observations of the team dynamic for the Maintenance team?

      From what I have seen – the maintenance planners, schedulers, field guys, they have their own separate meetings that I usually don't attend. From what I have seen they function very well. they get a lot of accolades across UPU for things they've done over the past year, year and a half.

*I would like to review a few specific examples of the work environment and team environment with you. Please share any information or perspective you have related to these matters.*

EXHIBIT

021

| Claim | Timing (from Jesse) | Mark Hoover Response |
|---|---|---|
| • I was told I was not smart enough by a supervisor to be able to do something. | Apr-16 | If I did, it was most certainly in a joking manner. We've pretty much had a back and forth joke with one another, throughout the – once we got to know each other. We do jabs back and forth. We are both somewhat sarcastic people, not in a negative way. We like to laugh and jab. I always thought it made the day pass. I understand there are limitations – I don't remember this specifically, but it would not surprise me. |
| have been referred to as a "window licker", which I believe was to insult my intelligence. | Jul-16 | Yes, I did do that. We were – it was probably similar or maybe the same instance about being not smart enough to do something, I think that may have been what it was. She laughed and called me oen right back, or soemthing similar. Or just said Mark Hoover, you're a pain or whatever. |
| I have been called a bitch by numerous people in the office. | More near the beginning of 2016 | Bitchy – yes. It was strictly in a joking manner. It was never, there was no malous or meanus involved. |

I never sensed she was upset by any comments. The way I see it, if it was one of those days where she was overwhelmed or busy, if the conversation started that way, or it was pretty obvious that she didn't want to joke around then I wouldn't have. If I had the impression that I set her off I would have apologized. I think she is nice a smart and I wouldn't want to do that.

Most certainly she has made jokes to me as well. I've had Jesse tell me to go "F" myself. It was banter, I don't remember why she told me. It might have been one of those times where the pressure was there a little bit. I don't know what I said to be honest. It had to do with scheduling or something, she said Mark Hoover go F yourself. And I said ok, I'm good. Right now specifics, honestly, I can't nail down where i could give you verbatim.

I don't interact with her enough, any conversations we have had about scheduling we were able to straighten out issues we've had with scheduling. I always felt we had a friendly working relationship and no problems to speak of. I would have hoped it would have been brought forward. She can be outspoken, I felt strongly if I did something she would let me know and I would make sure it didn't happen again. I never felt a strained relationship with her at all.

3. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet?

I've always enjoyed working with her, I don't work with her on a regular basis. There is an overlap and it's not as big from my perspective, but I've worked with her for quite a long time. We have shared stories of going to concerts and have laughed and joked. I give her the back in the day stories and we laugh about it. I always thought it was quite good.

4. Is there anyone specifically you think I should talk to regarding the concerns raised?

5. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

## Conclusion

- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 38

EXHIBIT
005

**Attendees:** Hondo Blakley Megan Kloosterman (HR)
**Date:** 12/7/2016

## Introduction

- Introduction of myself
- Purpose of meeting is to follow up on the concerns raised regarding the work environment
- Allegations have not been made against you specifically, but you were identified as someone that may have information that will help me understand the overall picture
- At this time I don't have any conclusions, we take these allegations seriously and are in the process of gathering information
- Ask that you be honest and transparent in your responses so we can gather the information needed to complete a thorough investigation
- Please keep the information we discuss here confidential, I will as well – only sharing on an absolute need to know basis

## Questions

1. Describe your current role and responsibilities.

   Process Improvement Lead – improving processes on a regular basis – manage the pipeline maintenance group. I manage flowback, contractors. Water systems and team that moves water in the field.

2. Describe your working relationship with Will Turney and Jesse Barnes.

   Will Turney – interface with Will on a daily basis – not on maintenance team, but how work gets done on a daily basis I utilize his planners/schedulers to get work done. Always looking for ways to save money, plan work at the same time, trade work back and forth. I relieve the superintendent when Steve is not here, and I work with Will on that level. We have a good working relationship. Open relationship – work with him on a daily basis. – Sometimes down to the hours.

   Jesse Barnes – I don't interface as much, she helps me get work orders from the system, has helped me with SAP, I would say most of the time it is daily but not consistently. I think it's a good relationship, she has come to me before in the past with other issue for advice and I have helped her through stuff.

   PERCEPTIONS OF THE TEAM/WORK ENVIRONMENT – for the most part, to be honest, most of them don't have too many issues. In some cases I see Jesse has issues with some of the schedulers – it seems like there is always a riff between Dan/Jesse. I don't know why but they don't get along. The team as a whole isn't too bad – in the past I have tried to coach Will to get higher up than he was – trying to be friends. Too chummy maybe with the employees. On a regular basis – with Dan, I think it's a personality conflict.

   a. Jesse shared that you have coached her to control her temper – can you share details on this?

   She has come to me when she has issues with Will, she was upset because he would just tell her things that were wrong. She got so angry one time that she got sent home to take a break. She was so angry she was crying when talking to me. Coaching was to try not to cry, if she doesn't understand something, make sure she understand it and be clear. Participate in meetings, she doesn't participate in much. We were talking

about the SPS and trying to get people to give feedback, and she was on her phone the whole time. I coached her that she should participate in those meetings. Have a voice in the room.

Some conversations I've had with Will is you need to help her more. His response is I might have done it myself. Say repeat to me what I want you do to so I know you understand it.

I see a lot of banter back and forth – joking – friendly.

INNAPROPRIATE? Talking about personal life, boyfriend; she recently bought a jeep, was pretty proud. I said good job, there was a statement made whether her boyfriend gave her permission. Getting pretty personal.

GETTING HIRED – Will pushed for her to get hired, she showed ability to get hired; to be honest I think she is one of the sharpest employees as far as ability, but she lacks energy/motivation for some reason. She was angry about the woman statement (getting paid well).

*I would like to review a few specific examples of their work relationship with you. Please share any information or perspective you have related to these matters.*

| Claim | Timing (from Jesse) | Test whether you see this amongst Will and others on the team or just between Jesse. |
|---|---|---|
| • I am continuously asked about my personal life by my supervisor. | He asked about my significant other recently in November 2016 | I've seen it a little more with her, but it is common.<br><br>It is not unique that he does that – it is unique because he is a supervisor – but a normal employee back and forth, it's not as unique. But once you get to that level that is when it is getting unique. I believe there needs to be a separation. If everyone is going to the bar on Friday you don't go.<br><br>I've coached him on this, and he has tried to change; I told him it's too personal, you need to make that separation. He has started to try to do that. I've seen improvement over last few months but he was losing a bit of control. It was tough to draw the line of friend/supervisor – 360 feedback was in the summer. |
| My supervisor touches my arm and or leg the majority of the time I have a meeting or talk to him one on one. | This is ongoing, continues to happen even when I've asked him to stop. | I have – scooting up close to look at the computer – two legs touching, touching an arm/leg , but not other direct reports. Nothing inappropriate like rubbing her back. |

| | | |
|---|---|---|
| • Supervisor gestures cat claws and makes a hissing noise. | on-going | Yes I have; any time there is a bit of an issue between two people, he tries to do it to lighten the situation… to avoid confrontation. It is frequent, common when there is a conflict. |
| • I have been asked by my supervisor multiple times if I thought about him over the weekends. | Aug-16 | "Did you miss me" – I have heard him say that to all people |
| • My supervisor encourages arguments among my team. | In meetings and team discussions. | He plays it off if he is the person that is in the wrong. I have seen that he is recently trying to improve that. He plays it off as a joke when he has done something wrong. |
| I have been called a bitch by numerous people in the office. | More near the beginning of 2016 | I have heard Mark Hoover – I was not there when it originally took place; I knew it happened because it came back up. Mark was talking a week later, and he stopped me and said she had started on him first on being grouchy and was giving him a hard time, and I just told her she was being a you-know-what. They were going at each other. She followed up after the fact. At the time I perceived it as a joke back and forth. But I did tell him to be careful doing that stuff. |

| I was told when I voiced some of my concerns that "I need to stop playing the victim". – She mentioned you have coached her on this as well. | October 17th, 2016 | It was based on work when I told her that. when she lost her temper or got angry, it was always someone else's fault. That is the victim mentality; |
|---|---|---|

When she got hired, we had a conversation with her, you made it. Coaching that you have to bring it to the next level. Chris Andersen cautioned hiring her, because she is 'trouble' and we will all end up in the same position as the last guy. Biggest reason to hire her was her performance; she was driven and would do a lot of work for everyone. When she became an MA he would try to get people to stop because she was the go-to person. I think he felt bad for how he was treated in the past. He never told me that, but maybe.

As the year went on, I noticed and spending time, giving advice. Every time I asked her I couldn't figure out what it was. I was trying to coach her.

3. Understand you had observed an instance in March of this year when Will referred to Jesse as a hot blonde – share your perception of this event. Confirmed, made a statement about it.

4. Understand you were at the golf tournament this past summer with Jesse and Will. What were the group dynamics at this event? Do you recall Will and others asking Jesse why she was not wearing shorts? Did you take a picture of her back-side at this event? No recollection – the whole golf tournament, I remember a lot of booze, she had a friend acting in appropriately. No recollection, but everyone was taking picture. I'm sure there were pictures of her in it.

5. I understand Jesse has shared this information with you previous. What has she shared with you? Did she share how this behavior was impacting her? What was your response? Why didn't you escalate to HR or leadership?

You could tell she was visibly frustrated, and I was trying to help her through it. Trying to give her some stuff that I've learned through the years. Coaching; I told her if you are not getting help from Will and we aren't helping, talk to Steve/Greg. If you have a problem with Will and I am not helping. Hindsight is always 20/20, there was nothing I saw that told me to escalate it. I have had some conversations with Steve about it, because we would talk about employees in general. Nothing was a huge red flag.

6. Is there anything else you'd like to share related the items we discussed today, that hasn't been asked yet?

In working with both of them, it was always assumed as harmless banter, she dealt as much as she received. In some situations, she started it. It seemed a joking banter back and forth. He has done that stuff, or still does, trying to keep the stress low. People are frustrated, our SPS is low. Trying to find ways to keep morale up. He tried to make people laugh, joke, etc. At the time you go back and forth. That is how I

perceived it, it never was intentional, it seemed as harmless. He tried to work equally as hard to make sure she was successful.

7. Is there anyone specifically you think I should talk to regarding the concerns raised?
8. Please send me any supporting documentation (emails, text messages, etc.) that may be useful for us to reference as part of our investigation.

## **Conclusion**
- Please keep this conversation and the information we discussed confidential and do not share others
- We will maintain confidentiality as well and will only be shared on a need to know basis
- As a reminder, we do not tolerate retaliation for submitting a complaint nor participating in investigatory interviews – if you have any concerns related to retaliation, please let us know
- Feel free to contact us should you think of anything else after our meeting
- We take these complaints seriously and as a reminder, we will not draw any conclusions until the investigation has been completed

Exhibit 39

| | |
|---|---|
| **From:** | Barnes, Jesse A SEPCO-UPS/U/UE [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=JESSE.A.BARNES] |
| **Sent:** | 2/21/2017 6:31:07 AM |
| **To:** | Priest, Michelle L SCC-HRD/LC [michelle.priest@shell.com] |
| **Subject:** | RE: follow up |
| **Attachments:** | 20170220145226608.pdf |

Michelle,

I was unaware of Managers willing to submit before the Employee was able to review it with the Manager. Steve Ellis gave me the written review so I do not need it now but the part that talk about my "attitude" was a direct result of what I was having to deal with and go thru so I'm not sure how that is a reliable reasoning. What was I expected to do in this case?

Thanks,
Jesse

---

**From:** Priest, Michelle L SEPCO-HRN/AT
**Sent:** Monday, February 20, 2017 7:16 PM
**To:** Barnes, Jesse A SEPCO-UPS/U/UE
**Subject:** RE: follow up

Hi Jesse,

Some managers show their reports the write up in Word or email first, others put it directly in HR Online. Perhaps Greg thought you had already seen or discussed it and just needed a copy. I have shared some of the feedback Greg and Steve gave to me and you have had separate conversations with them. Are you requesting to see the written feedback before it is loaded in HR Online?

Michelle

**Michelle Priest**
HR Account Manager, Unconventionals

Address: 150 N. Dairy Ashford, Houston, TX 77079 – F0396B
Phone: +1 281 544 7474 (Click here to call me on Communicator)
Email: Michelle.Priest@shell.com
Internet: http://www.shell.com/global/future-energy/natural-gas.html

This mail has attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorised persons and deleted after its legitimate use.

---

**From:** Barnes, Jesse A SEPCO-UPS/U/UE
**Sent:** Thursday, February 16, 2017 5:21 PM
**To:** Priest, Michelle L SEPCO-HRN/AT
**Subject:** Fwd: follow up

Michelle,

Thank you for your follow up email. I appreciate you sending me the helpful links.

**EXHIBIT**
068

Below is a request I made today. I thought normally it's within my right to go over the written review before it's loaded to my profile? At this point I still am unaware of any feedback.

Thanks,
Jesse


Sent from my iPad

Begin forwarded message:

> **From:** "Larsen, Greg L SEPCO-UPU/N/EO" <G.Larsen@shell.com>
> **Date:** February 16, 2017 at 4:51:24 PM EST
> **To:** "Barnes, Jesse A SEPCO-UPS/U/UE" <Jesse.A.Barnes@shell.com>
> **Subject: RE: follow up**
>
> Jesse,
>
> While I'm more than happy to continue to discuss this, the best use of our time might be to assure your development is proceeding. I've talked with Steve Ellis and he seems to think your work schedule is well loaded and delivering value. Taking over the E&S inspection work and showing that the work can be done in much less time than was previously needed is certainly a positive differentiator.
>
> I'm not sure why your 2016 performance write up is not yet loaded. I have requested this be loaded by HR.
>
> Greg
>
> ---
>
> **From:** Barnes, Jesse A SEPCO-UPS/U/UE
> **Sent:** Thursday, February 16, 2017 3:29 PM
> **To:** Larsen, Greg L SEPCO-UPU/N/EO
> **Subject:** RE: follow up
>
> Hi Greg,
>
> Thank you for the follow up email. I never received the written narrative that goes along with my IPF, can you please send that to me?
> I want to be prepared to discuss with you and make the most of our meeting together.
>
> Thanks,
> Jesse
>
> ---
>
> **From:** Larsen, Greg L SEPCO-UPU/N/EO
> **Sent:** Thursday, February 09, 2017 6:01 PM
> **To:** Barnes, Jesse A SEPCO-UPS/U/UE
> **Cc:** Ellis, Steve E SEPCO-UPS/U/UE
> **Subject:** follow up
>
> Jesse,
>
> Sorry I didn't get something scheduled this week to talk with you. I will be traveling on Friday and in Houston next week. I will schedule something with you the following week, if that fits.

Greg Larsen

Operations Manager - Appalachia
Upstream Americas Unconventionals
12880 Route 6,  Wellsboro, PA  16901

**Tel:** Mobile +1 307 231 5041
**Email:** g.larsen@shell.com

Confidential

2016 Year-end Review – Jesse Barnes

General comments:

Jesse was the Maintenance Analyst for Appalachia's Tioga Operations in 2016. Jesse continued to grow and develop in the role and has worked to complete her assigned tasks. She also supported a few extra activities. Examples include creating a 'Z6 Tracker' for work order changes, tracking scheduling conflicts, reducing the number of standing orders to achieve better cost control and conducting a PM review that was able to reduce ~ 400 hours of unnecessary work. Jesse received three High 5's in 2016 for work aligned to our Unconventional Behaviors. In the area of Safety, Jesse met her target of one BBSM observation per month.

Opportunities:

Jesse is meeting expectations in 'Performance' as a Maintenance Analyst, however additional contribution opportunities were not fully realized. At times Jesse is seen as not working well with others and appeared isolated which can contribute to lower productivity of the Planning and Scheduling department. Jesse can also become frustrated in her job and has missed work as a result. Being open to others assistance and ideas, actively participating in meetings, and looking for opportunities to collaborate with others may help improve this gap.

Shell_0000736

Exhibit 40

| From: | Larsen, Greg L SEPCO-UPU/N/EO [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=GREG.LARSEN] |
|---|---|
| Sent: | 1/27/2017 5:42:16 PM |
| To: | Craig, Steve SEPCO-UPU/A/O [steve.craig@shell.com] |
| CC: | Priest, Michelle L SCC-HRD/LC [michelle.priest@shell.com] |
| Subject: | FW: 2017 GPA/Performance Contract CONFIDENTIAL |
| Attachments: | Jesse Barnes 2015 End of Year Review.docx |

**From:** Turney, William E SEPCO-UPU/N/EO
**Sent:** Wednesday, January 25, 2017 2:40 PM
**To:** Larsen, Greg L SEPCO-UPU/N/EO
**Subject:** FW: 2017 GPA/Performance Contract CONFIDENTIAL

Greg,
I have attached what I sent Steve though you may have already seen this already.

Missed Opportunities for Jesse Barnes:
- Actively participate in meetings (MIE/HWGD – Daily YTT, Notifications, scheduling etc.) – Was asked to stop going because she didn't act like she wanted to be there and wasn't participating.
- KPI Reporting – Jesse would know about certain KPI's, but failed to send to me or the group unless reminded about it. Didn't dig into information enough for us to find solutions to problems.
- Jesse had a hard time letting work go. When I wanted to get the maintenance folks to close out their own CATS, Jesse was against it. She said they would mess things all up. When we trained them, it went very well. A few small hiccups but nothing major. Once we starting this new procedure, we noticed that we weren't capturing the hours correctly. Jesse was just putting what was on the WO instead of actual hours worked. Same thing with the damage codes. This was an eye opener.
- Jesse never wanted any help from the other staff. She also said they would screw things up and she would have to fix it. This is why she left work a few times because I had Ken Foreman helping her get caught up.

These key components in the HWGD process can make the department suffer if not applied. Let me know if you need anything else. I hope I have explained it well enough for you.

Will

**From:** Turney, William E SEPCO-UPU/N/EO
**Sent:** Wednesday, December 21, 2016 2:23 PM
**To:** Craig, Steve SEPCO-UPU/N/EO <Steve.Craig@shell.com>
**Subject:** RE: 2017 GPA/Performance Contract CONFIDENTIAL

Steve,
I have also attached Jesse's 2015 EOY Performance Summary, just for awareness!

Will

Jesse Barnes – 2016 E.O.Y Performance review
Jesse has worked as Tioga's maintenance Analyst for over a year now. She has interacted with many different groups and assets over the past year. She has gained more knowledge and competencies for her role. Jesse h̶͟͟͟͟
different vendors and contractors for work based in the office (Slaven Const., McClure Co., Wolfe etc)
worked on some LEAN initiatives with our support group form Calgary and in-house stuff with our Lea

**EXHIBIT**

**047**

has completed and stays caught up on her CBT's and other related safety training. She is diligent in providing information (Reports, KPI's etc) when needed.

Jesse can allow her frustration of certain things affect her ability to work effectivity (Anger with another staff member, business decision etc). She can get frustrated when challenged to explain herself on certain tasks she has completed. I think it's difficult for her to create and imagine what you may be looking for unless it's a document you can grab for SAP or other resources readily available. Jesse doesn't engage in meetings (Safety, common day or MIE).

Overall Jesse performs at her role.

---

**From:** Craig, Steve SEPCO-UPU/N/EO
**Sent:** Tuesday, December 20, 2016 3:46 PM
**To:** Turney, William E SEPCO-UPU/N/EO
**Subject:** FW: 2017 GPA/Performance Contract CONFIDENTIAL

Will:
I had a discussion with Jesse today. I reviewed her attached accomplishments and did a year end discussion as best I could. Could you please give me a paragraph or two based on her performance from your point of view that I can use to help frame up what will go into HR Online. Align with her IPF. If you don't remember what it was please come and see me.
Steve

---

**From:** Barnes, Jesse A SEPCO-UPU/N/EO
**Sent:** Tuesday, December 20, 2016 2:19 PM
**To:** Craig, Steve SEPCO-UPU/N/EO
**Subject:** RE: 2017 GPA/Performance Contract

---

**From:** Craig, Steve SEPCO-UPU/N/EO
**Sent:** Tuesday, December 20, 2016 2:15 PM
**To:** Barnes, Jesse A SEPCO-UPU/N/EO
**Subject:** RE: 2017 GPA/Performance Contract

Can you please forward me your 2016 accomplishments sheet.
Thanks
Steve

---

**From:** Barnes, Jesse A SEPCO-UPU/N/EO
**Sent:** Tuesday, December 20, 2016 12:58 PM
**To:** Craig, Steve SEPCO-UPU/N/EO
**Subject:** FW: 2017 GPA/Performance Contract
**Importance:** High

Hi Steve,

Megan from HR wanted me to connect with you on how I should proceed with this. I will be on vacation Dec.21st- Jan. 3rd.
I would prefer to go thru my end of the year with just you but I realize that may not be possible.

Let me know your thoughts.
Jesse

**From:** Turney, William E SEPCO-UPU/N/EO
**Sent:** Tuesday, December 13, 2016 2:30 PM
**To:** Krise, Daniel W SEPCO-UPU/N/EO; Foreman, Kenneth L SEPCO-UPU/N/EO; Flynn, Kelvin D SEPCO-UPU/N/EO;
Barnes, Jesse A SEPCO-UPU/N/EO; Greene, Jeremy M SEPCO-UPU/N/EO
**Subject:** 2017 GPA/Performance Contract
**Importance:** High

All,
Here is my 2017 GPA and Performance Contract. These two documents were combined last year. You can combine them
for simplicity. If you all could  review and create your own by the end of December that would be great. I'd also like for
you to review your IDP. I will be setting up your end of year performance reviews so they are completed by end of
December. We can review and discuss any gaps, concerns or issues with your GPA/IDP at that time. If you have any
questions or concerns, please get with me. I will send this out to the hourly folks as a separate email.

Thanks,

**William Turney**

Shell Appalachia
Operations Field Support Supervisor
12880 State Route 6
Wellsboro, PA 16901
Cell: 570-404-8901
Office (Soft Phone): 570-662-9744
William.Turney@Shell.com



Confidential

Exhibit 41

| | |
|---|---|
| **From:** | Dunlop, Leslie SCAN-LSX/W [/O=SHELL/OU=MSXSEPC/CN=RECIPIENTS/CN=LESLIE.DUNLOP] |
| **Sent:** | 3/13/2017 12:20:47 PM |
| **To:** | Barnes, Jesse A SEPCO-UPU/S/UE [jesse.a.barnes@shell.com] |
| **CC:** | Priest, Michelle L SCC-HRD/LC [michelle.priest@shell.com] |
| **Subject:** | RE: Appalachia Visit |

Hi, Jesse

Sorry for the delay in responding – I needed to follow up with Michelle, who had looked at your concerns again. She explained to me that she created a timeline and was satisfied that there did not appear to have been retaliation against you by reducing your IPF. The IPFs were decided in late October/early November, which was before you raised your initial complaint. She explained to me that the feedback from supervisors at the time that the IPF was determined was related to behaviours and not to your work responsibilities, and that the IPF ranking was appropriate using the 9 box model.

Your concern about not getting the feedback in writing before it was put into HR Online seems to unfortunately be a breakdown in communication. Greg and the various supervisors involved all thought that the others had given you the feedback in writing, and as a result none of them did it. While unfortunate, this can happen when you change supervisors late in the year. I had a similar thing happen to me this past year as a former supervisor closed out my GPA in HR Online with no feedback in it and the two supervisors I had over year end weren't sure who was supposed to put feedback in. We ended up having to reopen my GPA after the deadline to get any feedback in there at all.

I know that when you have lost trust in your leaders, it is hard to see any of their actions in an innocent light, but I know Michelle did look at your situation carefully and I can agree that it does not appear to be retaliation based on the explanations she provided. I know that is not the answer you wanted to hear. If you encounter specific incidents that feel like they could be retaliation in the future, please contact me again and we will look into them.

Michelle will touch base to answer any specific questions that you may have.

Kind Regards,
Leslie

*Leslie Dunlop, CPA, CMA*
Ethics & Compliance Manager – Unconventionals, Mexico, and New Energies

403-691-2672

---

**From:** Barnes, Jesse A SEPCO-UPS/U/UE
**Sent:** March-07-17 11:14 AM
**To:** Dunlop, Leslie SCAN-LSX/W <Leslie.Dunlop@shell.com>
**Subject:** Re: Appalachia Visit

Hi Leslie,

I am writing to follow up about our conversation last week. We talked about my IPF and my concerns that throughout 2016 I was working under leadership that was in violation of the code of conduct. I appreciate you taking the time to talk with me, unfortunately, I have not heard back from Michelle yet. I am reaching out to you per our conversation and your suggestion to follow up with you if nobody contacted me.

What should my next steps should be in addressing my IPF and a section of the written feedback?

Thanks in advance for your help,
Jesse Barnes

EXHIBIT
057

On Feb 20, 2017, at 6:57 PM, Dunlop, Leslie SCAN-LSX/W <Leslie.Dunlop@shell.com> wrote:

Hi, Jesse

Thanks for contacting me.  I in Mexico in meetings this week, but my calendar for next week is up to date.  Please set up a meeting anytime that is free and works for you and we can speak then.

Kind Regards,
Leslie


Leslie Dunlop

403-691-2672

**From:** Barnes, Jesse A SEPCO-UPS/U/UE
**Sent:** February-20-17 1:09 PM
**To:** Dunlop, Leslie SCAN-LSX/W <Leslie.Dunlop@shell.com>
**Subject:** Appalachia Visit

Hi Leslie,

Recently, you visited us here at Appalachia and provided a code of conduct review. I was wondering if you had some time to talk about an incident I am dealing with and offer some guidance, if you can. Please let me know when a good time for you would be.

Thanks,
Jesse

Jesse A. Barnes
Safety & Environmental Support
Shell Appalachia
12880 Route 6, Wellsboro, Pa 16901
Office: (570) 662-9547
Cell: (570) 404-0861
Email: Jesse.A.Barnes@Shell.com

Exhibit 42

| From: | Barnes, Jesse A SEPCO-UPU/N/EO [/O=SHELL/OU=AG1-SHELL/CN=RECIPIENTS/CN=JESSE.A.BARNES] |
|---|---|
| Sent: | 1/24/2017 8:19:46 AM |
| To: | Larsen, Greg L SEPCO-UPU/N/EO [g.larsen@shell.com]; Craig, Steve SEPCO-UPU/N/EO [steve.craig@shell.com] |
| CC: | Kloosterman, Megan SEPCO-HRUP/D [megan.kloosterman@shell.com]; Priest, Michelle L SEPCO-HRN/AT [michelle.priest@shell.com] |
| Subject: | IPF |
| Attachments: | ^SAP Data Z6 needs.xlsx; Schedule Conflicts Analysis.xlsx; PM Review.xlsx; Schedule Compliance.docx; 2016 Accomplishments.docx; How to Creat Z1 Notification.docx; Work Order.docx; Create attachment.docx; CAT2 Job Aide.docx |

Hello,

I have put together documentation that shows I went above and beyond my role as a Maintenance Analyst. I feel it is necessary to communicate my accomplishments correctly, given the issues that I recently have had with my Supervisor. Keep in mind the struggles I had to work with all while completing this work. I avoided my Supervisor and one other Supervisor in any way possible and still was able to complete these tasks. Also, there would have been more savings in the PM review but I was told I needed to make sure the Leads time (which I needed for the review) was scheduled, so I put notifications in for the Leads time and the scheduler kept pushing my order out, when I asked why, his response was because we had lost our contractors and needed the Leads to do more field work.

I have attached our schedule compliance for your review so you can see how much the scorecards have dropped in my absence.
I attached job aides to help Operators, Techs, etc... that I have created and my schedule conflict tracker.

Please review and let me know your thoughts. I am having an extremely hard time accepting I am only ranked as a .8 when I was told I was doing very well in my role up until this point, now I am being labeled as an underperformer.

Thanks,
Jesse


Jesse A. Barnes
HSSE Analyst
Shell Appalachia
12880 Route 6, Wellsboro, Pa 16901
Office: (570) 662-9547
Cell: (570) 404-0861
Email: Jesse.A.Barnes@Shell.com

EXHIBIT

046

Document Produced in Native Format

Document Produced in Native Format

| Date | Priority | Need | Who | Complete? | Details | Comments/More information needed | Follow up |
|------|----------|------|-----|-----------|---------|----------------------------------|-----------|
| 11/1/14 | Medium | Add AL Jaggie workcenter to SAP, 180825 | Jesse | 1-Jan-15 | completed | | |
| 11/1/14 | High | Add Bradford folks to SAP work centers | Keith | 1-Nov-15 | Keith Dart submitted Z6- Completed | | |
| 11/1/14 | High | Get permissions for Bradford folks to access SAP | | 10-Feb-15 | Completed per Jenn Radford | | |
| 11/1/14 | Low | Add Brandon Fletcher to workcenter to SAP | Jesse | 1-Dec-14 | Completed | | |
| 11/1/14 | Low | Change Wayne's workcenter to LOPOPB, others also | | 10-Feb-15 | Completed | | |
| 11/1/14 | Medium | Check / Change workcenters so they charge to SAP properly | Jesse | 10-Feb-15 | Completed | | |
| 11/1/14 | Medium | Update all the employees factory calenders | | 10-Feb-15 | Completed | | |
| 11/1/14 | Medium | Change the hours on  Dump valve pm, Choke pm and intermitter pm | Jesse/Jenn | 11-Feb-15 | Take into acocunt pack type and number of wells. 14749469 | | |
| 11/1/14 | High | Change start dates on the  Dump valve pm, Choke pm and intermitter pm | Mike A | 9-Apr-15 | Start date sheet - Tue 1/20/2015 3:22 PM Email-started spreadsheets | | |
| 11/1/14 | Low | Need to add a procedure to the Dump valve pm, Choke pm and intermitter pm | | 12-Feb-15 | OCA? | | |
| 11/5/14 | Low | Need a workcenter APA completions | Jesse | 12-Feb-15 | Started Z6 notification (JB), Will Green Flagged, completed | | |
| 11/6/14 | Low | Change the orfice plate inspection pms to 1 hour per well | Jesse | 1-Dec-15 | 1 HR on POTH and .5 Hr on the JWW | | |
| 11/11/14 | Medium | Need to get rid of all blanks and 104 OWBS elements in SAP structure | Mike A | 9-Apr-15 | IH06, WBS blank or 104 needs to be deleted, 14825382 created for blanks 14826526 for "104" | | |
| 11/14/14 | Medium | YR-VIBRATION MONITORING TRIP PROTECTION | Brian G/Jesse | | Needs to have start dates aligned, See Brian G for dates | | |

| Date | Priority | Need | Who | Complete | Details | Comments/More information / Follow up |
|---|---|---|---|---|---|---|
| 1/22/15 | Low | Compressor ESD stroke tests need to have IAP flag checked on creation | | | Find task list | |
| 1/22/15 | Low | 1 cathodic protection pm needs to be aligned with others = LAFD in Ian | Ken | | 100359921 - 5100447488, needs maint plan and date changed. 3 plan #'s please! | |
| 1/22/15 | High | Change start dates on UT pms to be in the proper a week | | | Start dates, and task list -14807940 | |
| 1/22/15 | Low | Change person responsible on Brad Smiths' workcenter to TI1 | | 25-Jan-15 | BS208455 | |
| 1/22/15 | Low | Remove the 2nd ESD valve from the wellheads on butler 127 wells - one per wellhead | Mike A | 22-Mar-15 | Remove 6 func locations from the object list and delete 6 func locations | |
| 1/22/15 | Low | NWP Orific plate inspections in AT* filter /Filters  Needs to be in NWP | Mike A | 25-Mar-15 | TIPEOPR5 - 3 | |
| 1/23/15 | High | Call missing gas meter calibration orders | Jesse/Jenn/Ken | 12-Feb-15 | Get accurate schedules with SAP. Start date alignments. Need orders - waiting on Ken | |
| 1/23/15 | Medium | Finish work center Add sheet | Jesse | 25-Mar-15 | Ken sent spreadsheet the Jesse, in progress | |
| 1/23/15 | Low | Change person responsible on Brian Gillespie workcenter to TI1 | | 25-Jan-15 | BG196500 | |
| 1/23/15 | Medium | Change Oil pm | Chris A / Steve C. | 14-Jun-16 | Oil PM assigned to Kyle Vessel | |
| 1/23/15 | Medium | Change the start dates and hours on the gell cell pms | Carlton | | Align with Electric people's schedules | |
| 1/23/15 | Low | TICLSDX5 - 1 has work center as APAMCH, needs to be APAINS | Mike A | 22-Mar-15 | | |
| 1/24/15 | Low | Delete MP and MI - Not needed no cathodic protection on the water tank | | 22-Apr-15 | 100489191 and 5100603097; Change template delete PM, attach 100489191. | |
| 1/24/15 | High | Need to restart the charcoal filter pms on all the compressor sites with charcoal filters | On hold | On hold? | Make 3M frequency | |
| 1/29/15 | Low | Add Eggelston heat trace to the structure | Dave/Jesse | | CHECK  and approve Z6 13861355, there are mistakes on the load sheet, 06/14/2016, email Soraya/Khalid on what is going on with this. Email Dave M to see if this still needs to happen 07/18/2016 | |
| 2/1/15 | High | Sock filters need to have the frequency changed. Some are going to be monthly | Jesse | 14-Jun-16 | Submitted Z6- W1 = 1 M, W8 = 1M, K1 = 36" - , 48" - 1M for both, K4 = 1M on both rebollers, TX720 and Tx722 both = 1 month. These are on a weekly schedule. | |
| 2/1/15 | High | Need to start the all of the filter pms on the 805, 878, 820, & 832(Coal) | On hold | On hold? | Can we create a PM that states we need a .3 micron filter on the outlet filter when we have the PM fire? Frequency? TASK LIST / counter- TIFGEK2/2 | |
| 2/2/15 | Medium | Need to add pipeline valves to structure. TXC, WLB, NWT, MAR | Ben | 14-Jun-16 | Ben Goben is gathering information, spoke with Matt E, 90% completed. | |
| 2/2/15 | Medium | Need a LDAR pm - 2 week offset to start date pm. 1YR on pad 1M and 3M on compressors.Need to add all the LDAR inspection flocs to the structure | Jesse / Rory | 29-Apr-15 | Will is following up with Rory. Submitted Z6.13819558 Fixing Start dates, complete | |
| 2/2/15 | Low | Need to take the 30 day pm for the trimble Emergency start out of the system. Runs all the time. DELETE | Jesse/Ken | Completed | 5100600541, Easy | |
| 2/4/15 | Low | Change WLB outlet  coelescing filters to 1 year frequency | On hold | On hold? | 2 PM's, | |
| 2/6/15 | Low | OI pms do not generating in a week | Soraya | | 100392842, they are weekly MP's | |
| 2/6/15 | Low | vacation pms not generating in a week | Soraya | Completed | 100502036, generated EXEC | |
| 2/10/15 | Low | Manage pumpdown PM, not generating in a week | Soraya | Completed | 27281985 | |
| 2/6/15 | High | Add all the plunger lift systems to the structure | Khalid / Ken / Chaya | | Check if correct information is okay to clone all plunger lift | |
| 2/6/15 | Low | Add all the marshland equipment to the structure | Jesse | In process | On Khalid's list to do | |
| 2/6/15 | Low | Russ Beals needs a workcenter | Jesse | 2-Feb-15 | Complete | |
| 2/6/15 | Low | Timble gen pm has TX2 on it. Floc Description problem | | | | |
| 2/7/15 | High | 719 does not have a wear check pm | Jesse/Jenn | 11-Feb-15 | TIVACVX2, 26 or 27 (clone this 100419934)  US.APP.TXC-719-PAD-719-CNP and will need object list/start date | 14751250 |
| 2/7/15 | High | 433 and 502 do not have burner pm | Jesse/Jenn | 25-Mar-15 | TIHGFIX2, 10 | |
| 2/7/15 | High | Marshlands pig and batch confirmation pm needs to be started | Soraya | | create .CNP US.APP.TGAF-MNR-CNP (superior floc US.APP.TGAF-MAR) , US.APP.TGAF-MNR-CNP-PC, US.APP.TGAF-MNR-CNP-PIPELINE_INTEG and apply USPIFL12 COUNTER 11, in SAP okay. | |
| 2/8/15 | High | Sock/Coalescing filter orders need to  come out with parts on them | On hold | On hold? | | |
| 2/8/15 | Medium | YR-change filters on metering sites. Empire, mainsburg, gee, wellsboro, troy, ECT | On hold | On hold? | TIFGEX2, 6, Ken F is working n frequency changes? | |
| 2/8/15 | Medium | Workcenter capacities and schedule are still wrong | | 10-Feb-15 | Completed per Jenn Radford | |
| 2/8/15 | Low | MI's have wrong planner group, these two and other 3 month orifice plat inspections | | 10-Feb-15 | Complete | |
| 2/9/15 | High | Need to start glycol sampling pms in the marshlands area. | on hold | on hold? | TISAMPX5, 1  - on hold untill we get structure. Aprox September 2015. Ken will add these rebollers to other Wos in the meantime | |
| 2/10/15 | High | Visions VS. SAP with AI | Soraya/Will | 14-Jun-16 | Possible utilize Soraya's team / Will to double check with AI, not using visions anymore(CIMS) | |
| 2/16/15 | Medium | Need a pm to calibrate the meters on the water withdraw points | Jesse / Ken / Dave | | Dave Martin has the details  Mon 2/16/2015 4:04 PM | |
| 2/17/15 | Medium | Change the frequency on the witness pms and devide by meter not area | Roachell, Micah | | See Don Anthony for details, Krause area = 3M and others, talk to Mich about frequency change, Ken F. is working on the frequencies. | |
| 2/18/15 | | Red lined procedure for 4M- filter fuel gas and 3M-6M coalescing filter- step 1- open bypass valve, Schedule start date in warm months | Matt and Jesse | | David Martin - 6M coalescing PM - start date @ 5100522437 / Create a Z6 | Is this something still in need? |
| 2/19/15 | | Create a PM to turn off foamer and turn on Solvent to flush cap string every 3 months, foamer turned on today 2/17/2015. See procedure. | Jesse/ Rob S | Completed | notification # 14759780- need to create 3M- turn foamer off / flush with solvent PM for the Buckwalter SHM Ken Foreman and Matt skelny have the procedure in email from Rob skolny. This is an operators task. .5hr.  Task Tue 2/17/2015 2:10 PM | |
| 2/20/15 | | Need a pm tp change the oil in the FWI pumps every three weeks | Matt and Jesse | | | Matt S? |
| 2/20/15 | | Yunwirth 307 missing FWI flocs | Matt and Rhald | 14-Jun-16 | Notification # 13857102 and 13859867 have the pattern, khalid added into SAP hierarchy | |
| 2/20/15 | | Knowlton 303 missing FWI flocs | Matt and Khalid | 14-Jun-16 | Notification # 13857102 and 13859867 have the pattern, khalid added into SAP hierarchy | |
| 2/20/15 | | Knowlton has two ESD's per wellhead in the structure, Delete one ESD | Jesse | 3/25/2015 | 303   14807919 | |
| 2/20/15 | | Add Detweiller impoundment and equipment to the structure | Khalid / Dave | | We need to do pms per Dave Martin / Dave martin to provide drawings | |
| 2/20/15 | | Add the Egleston water draw to SAP | Khalid / Dave | 25-Mar-15 | CANCELLED AS KEN DUPLICATE -CHECK  and approve Z6 13861355, there are mistakes on the load sheet | |
| 2/20/15 | | Add Avery and other impoundments to SAP | Khalid / Dave | | We need to do pms per Dave Martin / Dave martin to provide drawings | |
| 2/21/15 | Low | Sharretts compressor is under the well pad, change to compressor site | Khalid | 14-Jun-16 | Khalid made changes | |
| 2/21/15 | | Add Kjelgard 802 and Thomas 808 compressor to the structure | Khalid | 14-Jun-16 | thomas is in Hierarchy, Kjelard does not exist anymore | |
| 2/21/15 | | Change the Thomas compressor to 808 from MLT1 | Khalid | | US.APP.TGAF-MAR-WELLS-PAD-MLT1, would have to delete floc and create new, need? | |
| 2/21/15 | | Make sure the heat trace sites are in the structure | | 2-Feb-15 | Parthemer, shelman,shaw and stock | |
| 2/21/15 | | Add drain tank to the krause, shaw and 900 compressor site structure | Khalid | 14-Jun-16 | David Martin to provide drawings (check if they are in sharepoint first), 900 Comp is in hierarchy, shaw comp is in hierarchy, drain tank in SAP. | |
| 2/21/15 | | Shaw fuel gas is not in the structure | Khalid | | David Martin to provide drawings (check if they are in sharepoint first) | |
| 2/21/15 | | Miller and Breon have purchase power, needs to be updated in the structure | Khalid/ danielle Baughman | | David Martin to provide drawings (check if they are in sharepoint first), MOC in for Miller 116, Breon done, needs updated in SAP | |
| 2/21/15 | | Clegg compressor Retrofit changes are not in the structure | Khalid/ danielle Baughman | | David Martin to provide drawings (check if they are in sharepoint first) | |
| 2/21/15 | | 303 and 307 generators need to have the desiccant dryers added to the structure | Khalid | | David Martin to provide drawings (check if they are in sharepoint first) | |
| 2/21/15 | | Delete bumper spring pms | Jesse / Ken | 12-May-15 | ZYR USWCID74-2 is already done. See below. Change of plans per Chhaya. | |
| 2/21/15 | | Add perc bottle pms / Add this as a item on the wear check pms | Jesse / Ken | 14-Jun-16 | Mon 6/16/2014 3:38 PM | |
| 2/22/15 | | All production equipment is missing on the 900 pad in the structure | Khalid | 25-Mar-15 | | |
| 2/22/15 | | Matz meter site has the wrong tag numbers | Khalid | | Thu 12/4/2014 4:01 PM / Forwarded to khalid | |
| 2/22/15 | | Wellsboro domion innerconnect is not in the structure | Khalid | | they connect 2 pipelines together. AT6 | |
| 2/22/15 | | Shugart 534 is not in the structure | Khalid | 14-Jun-16 | Pad only? Ken?, In SAP Structure | |
| 2/22/15 | | Need a winterization pm | Jesse, Dave M. Matt s. | | | |
| 2/22/15 | | Trimble compressor station -  purchase power and retrofitted equipment is not in the structure | Khalid/ danielle Baughman | | | |
| 2/23/15 | | Krause meter site equipment is not in SAP | Khalid | | David Martin to provide drawings (check if they are in sharepoint first), KRS meter is in SAP with children floc, should there be more? | |
| 2/23/15 | | Lick run compressor is really the Hillside 804 | Khalid | 19-May-15 | | |
| 2/24/15 | | Add 1490 missing psv's to structure | on hold | on hold? | Thu 11/20/2014 1:42 PM from Eddie patel | |
| 2/24/15 | | 822 - State - Tract pad mix up in the structure needs to be fixed | | | See ken for details | |
| 3/2/15 | | Change workcenter on oil change pms to APAMCH not APACON | Mike A | 25-Mar-15 | TIXXXXR1 / 1 | |
| 3/11/15 | | Make a workcenter for Aaron Moore, Steven Kling and April Heater/Josh Strang | Jesse | 25-Mar-15 | Aaron & Steven- Done April/Josh - In process | |
| 3/15/15 | | Marshlands needs to have glycol and gas filter pms | On hold | on hold? | TIFGEX1 - 20 and others | |
| 3/17/15 | | Convert the Operator Contractor conversions over to Shell workcenters | Jesse | 27-Mar-15 | 140807911-Complete | |
| 3/17/15 | | Make chemical SD's by well for all the wells in the field | Mike A | 25-Mar-15 | yearly MP, | |
| 3/17/15 | | Make pumpdown so's by well for all the wells in the field. | Mike A | 25-Mar-15 | yearly MP | |
| 3/17/15 | | Delete Nestor SH well from SAP - it has been plugged and abandoned | Jesse/Mike A | 25-Mar-15 | 14807963 | |
| 3/18/15 | | Need a workcenter for the crane truck, minx hoe, dump truck and trailer | Jesse | 25-Mar-15 | Submitted Z6, completed | |
| 3/19/15 | | Yaggie generator has Trimble in the discription of the Floc | Jenn | 25-Mar-15 | | |
| 3/24/15 | | Pm for instrumentation crew to run anti-virus on computers | Mike A | 24-Mar-15 | | |
| 3/25/15 | | Create a pm to AVO 4 compressor sites in the marshlands | Jesse / Rory | 27-Mar-15 | Meeting May 7th with Rory to work on a schedule, Daxa created PM's | |
| 3/30/15 | | Create flocs for all the chemical injection / addition skids | Soraya/Ken | 14-Jun-16 | Chem injec PM's in SAP | |
| 3/31/15 | | TIPIPRX2 - 30 vibration pm has 2 hrs and .2 hours | Jesse | | Vibration surveys, hours are .1, is this wrong? | |
| 4/3/15 | | ZY-PlungerLft Bmpr Sprng Repl | Mike A | 23-Apr-15 | Cancel these pms - USWCID74-2 Z6 14843558 | |
| 4/6/15 | | Some RTU orders are missing | Ken? | | TICLSDX5 - 1 | |
| 4/6/15 | | Need oil filters on the flowback men | Jesse | 7-Apr-15 | Completed | |
| 4/7/15 | | Need to remove the "V" cone meters from the JWW pack sites for calibration PM | Ken/ | | | |
| 4/7/15 | | us.app.mar-pad-802-well-802-6H has a discription of 4H | Mike A | 25-Apr-15 | Z6 14843528 | |
| 4/9/15 | | Need maintenance plans for 116 FWI heat trace and PSV's | Ken/Jesse | | 100553388, 100553448 are against the FWI 116 floc. Is there a MP that can be cloned? | |
| 4/11/15 | | We are getting duplicate orders for "3m-orific plat inspection" and calibrations | Ken | 14-Jun-16 | 1003 and 1404 pads, NWP and AT1 planner groups. TIPEOPR5 - 3 (X-100489477) & (100489492) & (100489506), All 3M MP's should be deleted | |
| 4/27/15 | | Vandergrift 290 ESD stroke test PM, does not have a 2H or SH on site to check | Mike A | 12-May-15 | MI: 5100597905, Order # 27247284  Z6 14867796 | |
| 4/28/15 | | Lopatofsky 287 does not have a 4, or 6H's | Mike A | 12-May-15 | MI: 5100597904  Order # 27264753  Z6 14867796 | |
| 4/28/15 | | Create a pm for all the pigging | Jesse/Mike A | 25-May-15 | See Matt Empson for details- Started Z6 template | |
| 4/29/15 | | 3M - Pipeline Leak Survey - 900 | | | Needs to have a start date end of March June Sept or Dec, 900 leak survey was deleted 100489194 | |

| Date | Description | Person | Date 2 | Notes | Comment |
|---|---|---|---|---|---|
| 4/30/15 | Change PM,APPOLD F #493-8H    US.APP.XRS-493-QAY-8H    Initial start date – 10/30/17,APPOLD F #493-3H    US.APP.KRS-493-QAY-3H    Initial start date – 10/30/17 | Mike A | 12-May-15 | Need new start dates.  Z6  14867749 to update the start dates to 10/30/2017 | |
| 5/18/15 | Create Buckwalter 5H PM- Rob S wants | Jesse | 28-May-15 | Notific. #:14759780--order # 27301167-Submitted Z6, notif # 14887819 | |
| 5/19/2015 | Fix vacation MP | Soraya | 14-Jun-16 | 180 day call, prereleased, EXEC, in a network week, operation 10 populated with generic properly | |
| 5/26/15 | Delete this floc it was never purchased | Jesse/Mike A | 29-May-15 | US.APP.TGAF-MAR-WELLS-PAD-ML, submitted Z6 | |
| 5/27/15 | Need a workcenter for Chhaya Ramlakhan | Jesse | 21-Jan-16 | | |
| 5/27/15 | Add fresh water injection oil change pms to SAP | | | Every 21 days recommended | |
| | Need to get the sales meter verification pms fixed. | Mike Andersen | 14-Jun-16 | Don Anthony has the info, Hours fixed/start dates, Mike Andersen submitted Z6 for start date alignments | |
| | Need to cancel pm for 832 fence inspection (no Fence) | Ken | 14-Jun-16 | MI - 5100631151- part of a 5Y building inspection PM | |
| | US.APP.NWT-AL01-QAY-AL01 | Jesse | | Needs to be deleted - well plugged and abandoned | |
| | US.APP.NWT-AL01-PAD-AL01-WELL-AL01 | | | Needs to be deleted - well plugged and abandoned | |
| | US.APP.WLB-134-PAD-134_WELL-134-1V | Jesse | 18-Jul-16 | Needs to be deleted - well plugged and abandoned - All children deleted also | |
| | Add 3 month gen engine pm | Ken | | ask Brian | |
| | Elk Run Meter station order - MP does not exist | | | | |
| | WO# 27310664. No BMS to test. Delete pm | Jesse | | 100488572 & pierson 801 | |
| 6/28/15 | Need to change the planner group to NWP on MI - 5100603608 | Jesse | 14-Jun-16 | Done when checked | |
| 6/28/15 | gas meter witness pms need added, deleted, seperated, dated correctly | Mike Andersen | 14-Jun-16 | Mike andersen submitted Z6 to correct | |
| 6/28/15 | US.APP.TGAF-NNR-CNP-PIPELINE_INTEG | | | Should be -MAR- , Change pms to new floc also, would have to delete all flocs, need? | |
| 6/28/15 | 100479997 Needs to be deleted, we do not do these pms USAC does | | | These were deleted during the PM blitz / these were inputted after the Blitz | |
| 6/28/15 | 100420899 Needs to be deleted, we do not do these pms USAC does | | | These were deleted during the PM blitz / these were inputted after the Blitz | |
| 6/29/15 | Need to add another coelecing filter at the Matz meter site & PMS | | | Yearly pm same start date as the present filter, ask Mike Chambers? Is this still needed? | |
| 6/30/15 | Change the OWBS element on the 287-23H floc to O.US.TGA.WBO.002.71300 | Jesse | 14-Jun-16 | O.US.TGA.WBO.002.71300, says 23H WBS - O.US.TGA.WBO.002 | |
| 7/7/15 | Delete Flack 502 Orifice Plate Inspection per Don Anthony | Jesse | 7-Jul-15 | AWAP Z6 Staus | |
| 7/7/15 | Delete EM. Lighting PM for Groff 720 | Jesse | 7-Jul-15 | Feedback from Mike Wilson, no em lighting on site. Spoke to Carlton/Ken decided to delete PM. AWAP Z6 Status | |
| | Spring heat trace PM | Brent/Jesse | 14-Jun-16 | See Ken for details | |
| 7/13/15 | Create Lawton Gen. oil change PM | Jesse | 13-Jul-15 | Submitted notification #14947421. | |
| 7/13/15 | Change Ed Haladay's Employee number on workcenter- 234237 | Jesse | 20-Jul-15 | | |
| 7/13/15 | Remove witness from system per Don Anthony. WO# 27421683 | Jesse | 13-Jul-15 | Submitted notification #14947740 | |
| 7/16/15 | Create Nathan Barnes SGS Tech a Workcenter | Jesse | 16-Jul-15 | Submitted notification #14952025 | |
| 7/21/15 | Get Steve Craig's workcenter working | Jesse | 23-Jul-15 | Completed SC137739 | |
| 7/21/15 | Allegahny 900 change to MAR planner group AT2. Compressor & pad | Jesse | 1-Nov-15 | | |
| 7/21/25011 | Reetz 1921 has been P&Aed. Remove all Flocs and Maintenance plans from SAP | Jesse | 3-Aug-15 | Submitted Z6 #14972436- AWAP status(Chad) | |
| 7/28/15 | Duplicate order for LDAR KRS Meter Station need deleted | Jesse | 21-Jan-16 | 100521353 | |
| 7/28/15 | K1 Compressor LDAR Insp missing | Jesse | 10-Aug-15 | next start date 10/26/2015, submitted Z6 # 14980324 | |
| 8/3/15 | Vibration Insp PM needed for NW805 | Jesse | 3-Aug-15 | Completed-maint plan- 100543331 | |
| 7/29/15 | Ken Shadle workcenter is still contractor | Jesse | | Shell Emp. # 234346, a part of Shell conversion Z6 below | |
| 8/17/15 | 5100627470 has the same problem as line 114 on this sheet | Ken? | | What? | |
| 8/17/15 | 5100487598 has the same problem as line 114 on this sheet | Ken? | | What? | |
| 8/17/15 | reschedule the gas sample pms to come out in the proper weeks | Mike Andersen | 14-Jun-16 | See Email 8/20/2015 2:20 pm | |
| 8/20/15 | Need a proceedure for MI 5100652701 - 3M chemical leave on cap string | Jesse | 14-Jun-16 | CHANGE MP? | |
| 8/24/15 | M! # 5100603360, Start dates 09/30/2015, 90 day outlook | | | This is deleted | |
| 8/24/15 | Delete the witness pm for the Wellsboro compressor | Ken | 14-Jun-16 | See Email 8/20/2015 2:20 pm | |
| 8/24/15 | Delete all the Neal 134-1V(D) pms | Jesse | 14-Jun-16 | Well has been P&Aed, 100399542 & 100413937- these 2 deleted | |
| 8/24/15 | Start date all wrong on MP#100484801 | Jesse | 14-Jun-16 | 10/30/2016 | |
| 8/25/15 | Schedule PT Calibrations every 3 years. 1 year PM right now, need to be 3. | Jesse/Dave/Carlton | 14-Jun-16 | Need more information from Dave Martin to identify wells. | |
| 8/28/15 | Change the start date of MP 100486731 to 10/30/2016 | Jesse | 14-Jun-16 | This is deleted | |
| 8/28/15 | US.APP.TXC-704-QAY-6H, US.APP.TXC-704-QAY-3H & US.APP.TXC-704-QAY-5H and their children can be deleted - These wells have been plugged and abandoned. | Jesse | 14-Jun-16 | Kill all pms also | |
| 8/31/15 | 27510790- W1 orifice plate insp. PM-needs deleted | Jesse | 14-Jun-16 | PM alignments being made by Ken Foreman | |
| 9/11/15 | Change shugart 490 1V discription  to the Dietz 490 1V | Jesse | 7-Sep-15 | | |
| 9/14/15 | Delete this MI - per Don Anthony we do not witness this calibration | Ken | 14-Jun-16 | 5100627803 | |
| 9/21/15 | Gas Dection PM had wrong pad in the description. Needs changed from W4 to W8 | Ken | 14-Jun-16 | 27389104, already done when checked | |
| 9/21/15 | Need Gee Compressor (NW832) 3M-LEL Gas (Point) Detection Test PM | Jesse | 14-Jun-16 | group #: USDEGDIS- this has been deleted;100512603 | |
| 9/24/15 | Guillome 715 wells 2H, 4H and 6H do not exist in the field | | | Delete from SAP along with MPs | |
| 9/27/15 | Flack 502 has duplicated WIT maintenance plans | Jesse/ Ken? | 14-Jun-16 | Joey Funk duplicate plans for 2H,4H,6H,100458748,100458749,100458750 | |
| 9/27/15 | vacation pms not generating in a week | Ken | Completed | Sherri D is following up | |
| 9/28/15 | 1Y-LDAR PM needed for Lovell Meter Station | Jesse | completed | submitted notification # 15043151 | |
| 9/30/15 | TX4 3M- LDAR inspection short text error, says 1Y-LDAR | Jesse | 2-Feb-16 | Check frequencies, deleted | |
| 9/30/15 | Cruttenden 846- description error, needs to be 1Y- LDAR Inspection | Jesse | 2-Feb-16 | Check frequencies,  Daxa change group counter to 8 | |
| 9/30/15 | Wrong descrption on Empire Meter Station LDAR Inspection | Jesse | 14-Jun-16 | 100541982, | |
| 10/9/15 | Remove the trucks we no longer have from the structure | | | | |
| 10/12/15 | Not generating in a network week | | | 100392842  OI PM | |
| 10/12/15 | Fix the calibrate pms for the pressure transmitters | Ken | 14-Jun-16 | E - mail | |
| 10/13/15 | Change the start date of MP 100486731 to 10/30/2016 | Jesse | 14-Jun-16 | This is deleted | |
| 10/14/15 | Change the start date of MP 100521794 to 4/11/2016 | Jesse | 14-Jun-16 | Cruttenden wear checks, 04/13/2017 is the next start date, close enough to 4/11 or? | |
| 10/19/15 | Make a workcenter - APAELCON | Jesse | 26-Oct-15 | Electrical contractor | |
| 10/20/15 | MP #100420470 needs to have a start date of 5/2/2016 | Ken | 14-Jun-16 | Checked for 2017, is okay | |
| 10/27/15 | Need to change the planner group to NWP on MI - 5100603608 | Ken | 14-Jun-16 | NWP when checked | |
| 10/27/15 | Check for duplicates 27594463 | | | Need LAFD extention b/c simops happening on site. Could not rig up. See Chhaya for clarity | |
| 10/27/15 | 27502026 | | | | |
| | 27502027 | | | | |
| | 27502028 | | | | |
| 10/28/15 | Need to make a pm to have the harnesses inspected yearly | | | See Wayne Fletcher | |
| | Need to change the start date of the transmitter calibration for Dave Hartman | Ken | | See Ken Foreman for details | |
| 10/29/15 | 100359926 - Start date of February 28, 2016 | Jesse | | May need a different start date than requested. See Ben Goben. This is deleted when I checked-JB | Deleted when check on MP, |
| 10/29/15 | 100458745 - start date of 10/31/2016 | Jesse | 18-Jul-16 | Z6 # 15382372 | |
| 10/29/15 | 100483553 Change start date on pm to 11/28/2016 | Jesse | Done | Completed | |
| 10/31/15 | Add a workcenter - APAGREAS | Jesse | 21-Jan-16 | Greaser | |
| 11/2/15 | Change start date of MP #100521790 | Jesse | 18-Jul-16 | Needs to be 1/11/2016- completed 1/28/2016, next start date 04/15/2017, changed to 1/11/2017 | |
| | Add a maintenance plan to calibrate meter on the 805. | | | Group TIPEOP85,Counter # 1, Start date 1/4/2016 | |
| 11/2/15 | Change start date of MP #100489493 | Jesse | 2-Feb-16 | Needs to be 2/29/2016 | |
| 11/2/15 | Maintenance plan #100489559 is DEL needs to be reactivated | | | start date 12/8/2015 | |
| 11/2/15 | Change start date of MP #100507611 | Jesse | 2-Feb-16 | start date 12/8/2015 changed to 12/08/2016 | |
| 11/2/15 | Change start date of MP#100507631 | Jesse | 2-Feb-16 | Start date 3/28/2016, 03/27/2016 AKA close enough | |
| 11/2/15 | Change start date of MP#100509245 | Jesse | 18-Jul-16 | start date 6/13/2015 | |
| 11/2/15 | Align the marshlands pig and batch confirmation with the other areas | Ken | 18-Jul-16 | This is corrected | |
| 11/2/15 | Delete MP 100509776 | ? | 18-Jul-16 | We do not witness UGI calibration at the Wellsboro compressor site,deleted | |
| 11/2/15 | Make a workcenter for Jignesh Patel/Sergey/Chhaya | Jesse | 26-Jan-16 | Notif. # - 15187662 | |
| 11/3/15 | DEL maintenance plan 100486755, this generator runs 24/7 | Jesse | 2-Feb-16 | This pm is for backup gen sets | |
| 11/4/15 | Workcenter discription | Jesse | 1-Dec-16 | Get rid of Don Ucoolidge make it Don Coolidge | |
| 11/15/15 | Delete MP #100480010 | Jesse | 2-Feb-16 | Spellings, all caps, first name first....ect. | |
| 11/7/15 | New workcenter APAINT | Jesse | 18-Jul-16 | Painters | |
| 11/8/15 | Delete the LDAR pm for the Lovell meter site | Jesse | 2-Feb-16 | Not needed, no gas controlled valves. 100529317 | |
| 11/15/15 | Delete MP #100480010 | Jesse | 2-Feb-16 | Not needed, more damage is done by doing the pm than it prevents | |
| 11/16/15 | Change the planner group to NWP | Jesse | 2-Feb-16 | Maintenance plan #100489492, already NWP when checked 02/02/2016 | |
| 12/4/15 | Gee compressor needs to have a MP for the fire and gas system | | | usdegdi5/5 | |
| 12/4/15 | Marshlands SMS | | | Need to add Witness | |
| 12/7/15 | 100512600 needs to be deleted does not exist in the field | Jesse | 2-Feb-16 | | |
| 12/15/15 | 100529938 Needs to be deleted it is the same MP as 100546262 | Jesse | 2-Feb-16 | | |
| 12/15/15 | 100507611 Needs to have a start date of 12/12/2016 | Jesse | 2-Feb-16 | | |
| 12/16/15 | Need a workcenter for Dave Martin | Jesse | 26-Jan-16 | Notif. # - 15187662 | |
| 12/22/15 | All of the following FLOCs need a child FLOC for the "level controller" US.APP.WLB-144-2AY-3020_MBD-3021    2 Phase Seperator  US.APP.WLB-144-2AY-3020_MBD-3022    2 Phase Seperator  US.APP.WLB-144-2AY-3020_MBD-3023    2 Phase Seperator  US.APP.WLB-144-2AY-3020_MBD-3024    2 Phase Seperator  US.APP.WLB-144-2AY-3020_MBD-3025    2 Phase Seperator    Also each  US.APP.WLB-144-2AY-3020_MBD-3026    2 Phase Seperator  of the newly created FLOCs needs to have BOM #2510253612 attached | Jeremy/ Jesse,workflow portal | completed | Jeremy Greene for details | |
| 12/29/15 | 805 calibration pm has the wrong start date | Jesse | | 1/4/20167 - 2017 | MP # please! |
| 12/29/15 | Start date needs to changed to 6/13/2017. Lafd extension for 27850288 6/13/2016 | Jesse | 2-Feb-16 | 100509238 - changed start date | |

| Date | Requested By | Priority | Approx. Time | Request | Completed By | Completed | Details | Comments/More information needed | Follow up |
|---|---|---|---|---|---|---|---|---|---|
| 1/1/16 | | | | Change FLOC on these MP's to the sharrets compressor site. | | | 100555942 | | |
| | | | | US.APP.TGAF-NWT-FCS-805 | | | 100555943 | | |
| | | | | Have the orders called - 2016 sheet is blank on the 805 compressor | | | 100555944 | | |
| | | | | These are duplicated Thomas compressor mp now. | | | 100555945 | | |
| | | | | | | | 100555946 | | |
| | | | | | | | 100555947 | | |
| | | | | | | | 100555948 | | |
| | | | | | | | 100555949 | | |
| 1/2/16 | | | | cancel these MPs - pads are no longer inactive | Jesse | 2-Feb-16 | 100498248 | | |
| | | | | | Jesse | 2-Feb-16 | 100498249 | | |
| | | | | | Jesse | 2-Feb-16 | 100498258 | | |
| | | | | | Jesse | 2-Feb-16 | 100498283 | | |
| | | | | | Jesse | 2-Feb-16 | 100498320 | | |
| | | | | | Jesse | 2-Feb-16 | 100498234 | | |
| 1/2/16 | | | | No orders from these MPs - Why? | Jesse | 2-Feb-16 | 100507640 | | |
| | | | | | Jesse | 2-Feb-16 | 100507641 | | |
| | | | | | Jesse | 2-Feb-16 | 100507642 | | |
| | | | | | Jesse | 2-Feb-16 | 100507643 | | |
| | | | | | Jesse | 2-Feb-16 | 100507644 | | |
| | | | | | Jesse | 2-Feb-16 | 100552370 | | |
| | | | | | Jesse | 2-Feb-16 | 100552371 | | |
| | | | | | Jesse | 2-Feb-16 | 100552372 | | |
| | | | | | Jesse | 2-Feb-16 | 100552373 | | |
| | | | | | Jesse | 2-Feb-16 | 100552374 | | |
| 1/4/16 | | | | Make a pm to inspect the hoses we use in the field. | Jesse/Matt E | 18-Jan-16 | | | |
| 1/4/16 | | | | The OW8S element on the 287 23H is wrong, change it to -> | Jesse | Completed | O.US.TGA.WBO.002.71300 | | |
| 1/5/16 | | | | 2801769t- Delete PM per Don Anthony | Jesse | 2-Feb-16 | | | |
| 1/5/16 | | | | Need a workcenter for Jordan Dandey | Jesse | | | Do we realy need? | |
| 1/5/16 | | | | US.APP.TGAF-TXC-WELLS-PAD-376-WATER_INJ and all of it's children have a Barner OW8S | Jesse | 14-Jun-16 | Needs to be O.US.TGA.UMA.233- this FLOC is Deleted | | |
| 1/5/16 | | | | Delete pm, no BMS | Jesse | 21-Jan-16 | 100557400 | | |
| 1/9/16 | | | | Everything for the Kretzer 21H has the wrong OW8S element in SAP | Jesse/Ken? | 14-Jun-16 | O.US.TGA.KRS.155.71300   Kreitzer 505-21H Well/Facil Oper; wrong W8S, it's not accepting | Not accepting O.US.TGA.KRS.155.71300  as a WBS | |
| 1/11/16 | | | | 100489492 has the wrong planner group | Jesse | 21-Jan-16 | Should be NWP | | |
| 1/11/16 | | | | 5100521853 duration is not correct. | Jesse | 14-Jun-16 | It should be 2.0 not .2 | | |
| 1/11/16 | | | | Brain Gillespie  has the wrong workcenter type - Not valid in 2016 | Jesse | | BG09626? | | |
| 1/11/16 | | | | wrong workcenter type - Not valid in 2016 | Jesse | 1-Aug-16 | ME910621 & CS910620 - All AI crew workcenters, apart of Shell conversion Z6 below | | |
| 1/11/16 | | | | Needs to have workcenter APAOPP | | | 5100668433 | | Why DPF? Isn't this an AI task? |
| 1/11/16 | | | | Needs to have workcenter APAINP | | | 5100650971 | | This is deleted when check |
| 1/11/16 | | | | Check for dups on walkdown PMs | Jesse | Completed | Found dups on Avery/Sampson | | |
| 1/11/16 | | | | Check for dups on Generator Oil changes | Jesse | Completed | All PMs are on a 3Week schedule, TIXXXXR1 | | |
| 1/15/16 | | | | Cancel these MPs - MPs are duplicated | Jesse | | 100516030-832 | | |
| 1/15/16 | | | | | | | 100516633-900 | | |
| 1/15/16 | | | | Change MI header text. 5100635197 | Jesse | 2-Feb-16 | 50 Chemical: WELL KJELGAARD ML802KJ-4H         should read 6H | | |
| 1/19/16 | | | | Change the start date to the first of the year | Jesse | 18-Jul-17 | 100565010 - already called when checked on 02/02/2016, for 2016 | | |
| | | | | | | | 100565011 | | |
| | | | | | | | 100565012 | | |
| | | | | | | | 100565013 | | |
| | | | | | | | 100565014 | | |
| | | | | | | | 100565015 | | |
| | | | | | | | 100565016 | | |
| | | | | | | | 100565017 | | |
| | | | | | | | 100565018 | | |
| | | | | | | | 100565019 | | |
| | | | | | | | 100565020 | | |
| 1/28/16 | | | | Need to make a MP to Witness the Elk run meter site on a monthly basis | | | US.APP.TGAF-MAR-SMS, TIQMADRS, 1 - start date 4/11/2016, MI headertxt =  1M-WITNESS GAS METER ELK RUN | | |
| 1/29/16 | | | | US.APP.MAR-WELL-903-5H-ARTLIFT - SYSTEM-ARTIFICIAL LIFT APPOLD 903-5H | Jesse | | Appold needs to be Mitchell | | Saying FLOC doesn't exist, need correct FLOC or already complete? |
| 4/22/16 | | | | Need to add an operation to the walkdown pm | | | APASCH - Snip all pending work orders for site and attach to the shop papers .2 hours | | why and for who? |
| 4/22/16 | | | | Update the tacklist of the tank inspection pm both tanks | Ken | | KEN - Email from Dave Martin 4/19/2016 - 7:32 pm | | |
| 4/22/16 | | | | Change the call horizon for the Vacation pm to one year | | 11-Aug-16 | Weekly Vacation orders exist, MP 100502036 | Not needed | |
| 4/25/16 | | | | The AED pm is only for the mansfield office | | | Need a floc and a pm for the college office and the stockroom - TISEFAK2 10, add to object list | | |
| 4/25/16 | | | | MI 5100484108 is not generating in a network week | | | MO-First Aid Equipment PML | | |
| 4/25/16 | | | | MI 5100521104is not generating in a network week | | | 6M-UPS INSPECTION RCNP-PML | | |
| 4/25/16 | | | | MI 5100521103 is not generating in a network week | | | YR 1Y-GELL CELL INSPECTION PML | | |
| 4/25/16 | | | | MI 5100605971 is not generating in a network week | | | 3M-EMERGENCY LIGHTING FUNCTION CHECK | | |
| 7/5/16 | David Martin | | 1.5HRS | Mo-glycol testing PM Creation | Jesse | | Dave emailed task list, did not like the TL. | | |
| 7/18/16 | Will Turney | Med | 2HRS | Shell conversion workcenters | Jesse | 1-Aug-16 | sent out email for employee numbers | | |
| 7/18/16 | Will Turney | | | Create April's water sample PM's | Jesse | DELETED | 2 out of 4 Z6's in APPR status | | |
| 7/18/16 | Hondo Blakley | | | Create Pipeline Operations PM's | Jesse/ Matt E | In progress | Sent spreadhseet to Matt to fill in blank areas for pigging, gathering info, started Eq.Cats | | |
| 7/18/16 | Jeremy Greene | Low | 30 Mins | *706**720**721**723* Greasing PM's 180 cal horizon | Jesse | 18-Jul-16 | Changed to 180 day call horizon | | Told Jeremy completed |
| 7/18/16 | Don Anthony | Low | 1.5 HRS | 1Y Gas Samples missing 501,500,602,504,508 | Jesse | 24-Aug-16 | Group: TIQMXXR5/1; MP's in system , 100489336,100489342,100489343,100489459,100489461 | | |
| 7/18/16 | Brian Gillespie | Low | 2 HRS | adding the USA Comp unit numbers into SAP | Jesse | 16-Aug-16 | Group: TICOREX1 | Added Unit #'s, Z6 #: 15418199 | Emailed Brian G |
| 7/19/16 | Kelvin Flynn | Med | 1 HR | Please remove any PMs for it from SAP- 714 WIT | Jesse | 21-Jul-16 | 28105847, 100413865 | Z6 # 15388955 | Emailed Kelvin |
| 7/14/16 | Carlton Tyre | Med | 30 Mins | LAFD extension, 27381875 | Jesse | 20-Jul-16 | Extended to 12/01/2016. This order has been extended twice. | | Emailed Calrton |
| 7/20/16 | Jeremy Greene | Med | 30 Mins | Change Delaney Wear checks start date to week 40 | Jesse | 3-Aug-16 | | | Emailed Jeremy |
| 7/21/16 | Riley Woodruff | Low | 40 HRS | Sight tube samples PM creation | Jesse | Cancelled | Waiting for TL for Riley or April, got task list, waiting on frequency changes from Riley | Meeting 09/01 to discuss; waiting on Will to make decision | |
| 7/25/16 | Carlton Tyre | Low | 30 Mins | Delete MP's of Escape lighting PM's for K1, K3, TK2, TK4, TK6, WB | Jesse | 31-Aug-16 | Z6 awaiting approval, complete | | |
| 7/25/16 | Jeremy Greene | Med | 30 Mins | LAFD Extension 28347364 | Jesse | 26-Jul-16 | Wrong risk ranking/ bundiling work oppurtunity | 07/31/2017 new LAFD | Emailed Jeremy |
| 7/25/16 | Jeremy Greene | Low | 1 HR | Adjust hours on wear checks | Jesse | | Jeremy emailed sites | | |
| 7/26/16 | Rob Skolny | Low | 2 HRS | Yungwirth 307 has no heater/chokes in the structure | Jeremy/Jesse | | Changed FLOC description from "Production Skid" to "Heater Skid" (Jeremy's half butt idea) | | |
| 7/27/16 | Jeremy Greene | Med | 30 mins | LAFD extention 28097803 | Jesse | 28-Jul-16 | Brian M is working on BOM for job | | Emailed Jeremy |
| 7/28/16 | Dan Krise | Med | 30 Mins | LAFD Extension 28346110 | Jesse | 1-Aug-16 | Extended LAFD to 10/31/2016 | | Emailed Dan |
| 8/10/16 | Matt Skolny | Low | 45 Mins | Delete Gee Compressor PM's - Compressor not there | Jesse | 10-Aug-16 | 28292130, submitted Z6, check for other MPs | | |
| 8/10/16 | Brian Mederios | Low | | Change start dates of HT PM's. Missing 394,sawyer,bailey,egelston,matz meter | Brian Mederios | | September 1st as new start date, Brian working, Z6: 15420833 | | |
| 8/10/16 | Chhaya R | Low | 2 HRS | Create Quarterly Well Testing PM for Ricky | Jesse | 16-Aug-16 | Z6: 15322587, Kenny started, MIRQ'd by CMFT team. Filled in missing information. | MP: 100603442 | Email Chhaya |
| 8/16/16 | Aaron Moore | High | 30 mins | Duplicate MP 100484809 for 703 ESD Logic Solver | Jesse | 11-Aug-16 | Piggy backed of Gee Fire Ext Z6 | Not a duplicate Mp in system per Daxa Patel | |
| 8/17/16 | Jeremy Greene | Med | 35 Mins | LAFD Extentions (7) orders | Jesse | 18-Aug-16 | LAFD of 03/31/2017 | | Emailed Jeremy |
| 8/18/16 | Will Turney | High | | MOC-Build Hierarchy for back up generator(Medeiros) | Soraya | | Soraya in process of building Hierarchy/PM's with Brian M. | | |
| 8/19/16 | Jeremy Greene | Low | 35 mins | Change mainwork center on annual inspection to APAPOP | Jesse | 26-Sep-16 | | | |
| 8/22/16 | Wayne Fletcher | Med | 30 Mins | Change frequency on Emergency Line Check MP, 100597141 | Jesse | 24-Aug-16 | Z6 #: 15426962 | | |
| | Jesse Barnes | High | 10 HRS | Correct Main Workcenters on PM's (cost allocations) | Jesse | In Progress | Started, sent out meeting notice, had meeting, waiting on Will's approvals | Waiting on Will | |
| 8/25/16 | Jesse Barnes | Low | 30 Mins | Change hours on MOC Health Analysis from 16 hrs to 1 hr | Jesse | 31-Aug-16 | Completed | Feed back from David Martin | |
| 8/29/16 | Ken Foreman | Med | 1.5 HRS | Create PM for Well Pressure Monitoring | Jesse | | Requested task list from Kelvin, he wanted to discuss with Will | | |
| 8/29/16 | Aaron Moore | Med | 35 Mins | Change hours on TIEGGERS/1 from .5 to 1.5 | Jesse | 30-Aug-16 | TL was for 1 hour, changed to 1.5 hours | | |
| 8/30/16 | Don Anthony | Low | 30 Mins | Change 1M-WITNESS GAS METER VERIFICATION MATZ to 3M frequency | Jesse | 30-Aug-16 | | | Told Ken completed |

| Date | Name | Priority | Duration | Description | Assigned | Date2 | Notes | Extra |
|---|---|---|---|---|---|---|---|---|
| 9/6/16 | Don Anthony | Med | 15 Mins | MAR calibration, inspections & sample PM's ? | Jesse | 12-Sep-16 | Emailed Soraya 09/08-waiting for response, MP's are in system. Needed to Call. | |
| 9/8/16 | Ken Foreman | Med | 1 HR | Delete Compressor Vibration PM's USDEVDIO/1 | Jesse/Brian G | 14-Sep-16 | Need TA2 approval, sent Brian G an email, assurance task cannot delete | |
| 9/8/16 | Ken Foreman | Med | 1 HR | Delete MP's for 112 & DE01 wear checks, heater pm, & walkdowns | Jesse | 28-Sep-16 | Wells are inactive | |
| 9/13/16 | Ken Foreman | Med | | Add operation to certain wear check MP's | Jesse | | Waiting on Ken to get specific sites | |
| 9/19/16 | Kelvin Flynn | Med | 1 HR | Change WIT frquency from 2YR to 4YR/change start date to 10/30/2019 | Jesse | 3-Oct-16 | Z6:15472172 | |
| 9/21/16 | Ken Foreman | Low | 1.5 HRS | Stray gas by area,Weekly Admin order | Jesse | | Possibly 2W order since we're sort on manpower? | |
| 9/22/16 | Ken F/April H | Low | 30 Mins | TIXXXXRS/17, change hour from 4 to 1 | Jesse | 26-Sep-16 | Made changes to task list | |
| 9/23/16 | Ken Foreman | | | Move all 121 of the burner pms to Sept and Oct  TIHGFIX2/10 | | | Start dates? | |
| 9/26/16 | Brad Smith | Low | 30 Mins | Change start date on 04/30/2017 MP: 100419979 | Jesse | 19-Oct-16 | | |
| 9/26/16 | Jesse Barnes | Med | 30 Mins | Delete Jason Logsdon and Carlton Tyre Workcenters | Jesse | 26-Sep-16 | Z6 submitted: 15464118. | |
| 9/26/16 | Matt S/Brian M | Low | Cancelled | Change frequency on Batteries in sercurity system panels to 5YR | Jesse | Cancelled | USELUPID/2/5 - Sent email to TA2 for approval, wrong information provided, not what was needed. | |
| 9/29/16 | Ken Foreman | Med | 1 HR | Add Fire extingusher pm to the 805 compressor | Jesse | 1-Nov-16 | USFFFBI5/1 | |
| 10/3/16 | Ken Foreman | Low | 30 Mins | Change hours on wear check - 2.5 hours on each operation not 12 | Jesse | 4-Oct-16 | 5100642321 | |
| 10/5/16 | Ken Foreman | Low | 30 Mins | Add a pm for the Rail road and highway crossings on the WLB pipline | Jesse | 12-Oct-16 | Object list = WBD-002, 006 and WBW--002, 007, - JB- OBJECT LIST ON PM | Emailed Matt Empson, YR exsiting PM:100489019 due 06/2017 |
| 10/10/16 | Ken Foreman | Med | 1 HR | Add a pm to generate an admin order each week | Jesse | 7-Nov-16 | | |
| 10/10/16 | Will Turney | Low | 15 Mins | Delete Danny Rumsey's workcenter D4974288 | Jesse | 13-Oct-16 | | |
| 10/11/16 | Ken Foreman | | | The Wellhead ESD stroke test is 6M - should be 1Y | | | The operator and the instrument tech are to do stroke tests every year - this makes the stroke test 6M | WHAT! |
| 10/11/16 | Jignesh Patel | Med | 2 HRS | Create TL & MP's for KK Maintenance PM's | Jesse | 26-Oct-16 | | |
| 10/11/16 | Kelvin Flynn | Med | 1 HR | Delete FLOCs & MP's that have been P&A'd | Jesse | 13-Oct-16 | Z6 # 15484171 | |
| 10/12/16 | Ken Foreman | Low | 1 HR | NW6 change the ESD stroke test to week 33, 2017 | Jesse | 16-Nov-16 | Z6#: 15524466 | |
| 10/13/16 | Ken Foreman | Low | 30 Mins | Delete MI # 5100676083 - this pack does not have a BMS | Jesse | 16-Nov-16 | | |
| 10/17/16 | Will Turney | High | 1 HR | WK/MO-01 ALARM RED MP cancellation until 2017 | Jesse | 17-Oct-16 | Waiting for Will's approval, approved. | |
| 10/24/16 | Ken Foreman | Low | 30 Mins | 5100673979 delete, no LDAR equipment to check | Jesse | 1-Nov-16 | | |
| 10/18/16 | Brian Mederios | Low | 1 HR | Change TL hours on (3) separate TL's per feedback on shop papers | Jesse | 16-Nov-16 | completed | |
| 10/25/16 | April Heater | Low | 1 HR | Add 1 MO-AVD for the Clegg & Krause Comp | Jesse | 22-Nov-16 | TIXXXXRS/17 | |
| 11/7/16 | Jignesh Patel | Low | 2 HRs | Add missing Kold Katchers in hierarchy | Jesse | 23-Nov-16 | Jignesh sent email | |
| 11/8/16 | Kelvin Flynn | Low | 30 Mins | Change func location description for 660 warehouse | Jesse | 14-Nov-16 | US:APP:TGAF-RCNP-BU-OFFMAIN add 660 in description | |
| 11/10/16 | Jeremy Greene | Low | 45 Mins | Create workcenter for Levi Gardner | Jesse | 22-Nov-16 | | |
| 11/10/16 | Jeremy Greene | Low | 30 Mins | Change manual isolation valve testing to APAPOP main workcenter | Jesse | 17-Nov-16 | | |
| 11/15/16 | Jeremy Greene | Low | | Add the FLOC for the K1 C-building suction control valve | | | Just clone the existing FLOCs of the A&B inlet suction control valves | |
| 11/17/16 | Jignesh Patel | Low | | Add YR PM review the meter asset registar by HCMA focal point | | | APAENG- workcenter, 2HRS - 1 operation, start date of 08/01/2017, normal priority(3) | |
| 11/17/16 | Jeremy Greene | Low | | Delete 3M coal filters | | | Running to fail vs. 3M change out | |
| 11/18/16 | Jeremy Greene | High | 1 day | update the calibration PMs to match maintenance PM schedule | | | All of the calibration PMs for Don A. need to be moved to match up with the start dates on the work center cheat sheet. Also need to indentify which sites will go over one year since the last set of PMs have been done. Jignesh has record of the last time each of these PMs have been done. Base this off from the annual calibration PMs. | |
| 11/18/16 | Jeremy Greene | low | 1 day | Create PMs for all sites within the asset that has a tank to inspect the grounding cable . | | | Brian Mederios is requesting this and he will be the one to answer any questions. | |
| 11/21/16 | April Heater | High | 1.5 HRs | Create TL, MP, and Z6 to create a MP for April's water sample collections | Jesse | 22-Nov-16 | | |
| 12/14/16 | Ken Foreman | Low | | Create floc for generator at the college office | Khalid? | 20-Dec-16 | Brian Mederios is requesting this and he will be the one to answer any questions. | |
| 1/11/17 | Brian Mederios | medium | 3 hrs | create PMs for office generators | | | Brian Mederios will be point of contact for this work. | |
| 1/12/17 | Ken Foreman | Medium | | Verify that all the annual well greasing pad pms are aligned with proper start dates | | | Check Apains and Apaele pms first | |
| 1/12/17 | Ken Foreman | Low | | 2Y bumper spring pms need to be canceled - Change to single cycle | | | | |
| 1/12/17 | Ken Foreman | High | | Create a weekly admin training pm - 1yr call horizon | | | | |
| 1/12/17 | Ken Foreman | High | | Create a weekly stray gas pm - 1yr call horizon | | | One per area / week | |
| 1/12/17 | Ken Foreman | Highest | | Create a tank pm to do inspections on all the tanks for DEP | | | The work center needs to be APAOPF - task list is Mark's Check sheet | |
| 1/14/17 | Ken Foreman | Low | | Set the frequency right for the 1M-witness Meter verification pm | | | TIQMADRS - 1 | |
| 1/17/17 | Dave Martin | low | 1hr | Create PM for Krause A B and C discharge PRV to remove plug and bleed out moisture every October | | | Dave Martin will be point of contact for more information on this request | |
| 1/17/17 | Ken Foreman | Low | 2 HRs | Check to make sure all the active wells have standing orders | | | Some are listed as inactive, some inactives have been plugged, some are duplicated | |
| 1/19/17 | April Heater | medium | 2 hrs | create a monthly PM for AVD @ Netterman, Shelman and Lawton CS | | | Clone existin AVD PMs for these three new sites | |
| 1/22/17 | Ken Foreman | Low | | Delete flocs for trucks - add flocs for trailers | | | Keep the crane truck | |
| 1/22/17 | Ken Foreman | Low | | Add a pm to test all the valves on the bulk test manifolds 2Y | | | Dave Martin - pm upgrade folder - sent 1/18/2017 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Document Produced in Native Format

Document Produced in Native Format

| Week | Order | # of Operations | Job Description | Reason | Result | Scorecard Impact |
|------|-------|-----------------|-----------------|--------|--------|------------------|
| Week 44 | 27643835 | 2 | 906 LDAR Inspection | Paul 906 has no pressure | Pushed to week 47 per Ken Foreman | Schedule compliance |
| Week 44 | 27521130 | 2 | eWIMS right-outer A ann valve failure | Outer casing valve the inside one was leaking by | Close per Kelvin Flynn | N/A |
| Week 44 | 27646800 | 2 | clegg 4h dump line support issues | Incorrect materials to complete job | Pushed to week 48 per Ken Foreman | Schedule compliance |
| Week 44 | 27859227 | 3 | Egleston electrical repair | On going job/Several days to complete. | Pushed to week 45 per Carlton Tyre | Schedule compliance |
| Week 44 | 27772742 | 3 | PigTreat Kenton to Button comp 102615 | Crane lift at Button Comp | Pushed to week 45 per Matt Empson | Schedule compliance |
| Week 44 | 27744029 | 4 | Pig Treat Deter Co to Butler 127 103015 | Operators scheduled for Super Safety | Pushed to week 45 | Schedule compliance |
| Week 44 | 27744032 | 5 | Pig Treat Johnson Com to Deter Co 11/5 | Operators scheduled for Super Safety | Pushed to week 45 | Schedule compliance |
| Week 44 | 27744033 | 5 | Pig Treat Lawton Com to Johnson 11/5 | Operators scheduled for Super Safety | Pushed to week 45 | Schedule compliance |
| Week 45 | 27840071 | 1 | Replace 1" ball valve on belly dump line 839-815 tract | Wells will be down next week | Pushed to week 46 per Don Coolidge | Schedule compliance |
| Week 45 | 27255959 | 2 | Sawyer FW Tank Heater Failure | Scheduled past LAFD | | CM compliance |
| Week 45 | 27845560 | 3 | Detweiler Impoundment-Sed Sock Removal | Scheduled past LAFD | | CM compliance |
| Week 45 | 27493565 | 2 | 6M-Dump & Choke Valve Test/Inspect PML | Scheduled past LAFD | | CM compliance |
| Week 45 | 27845578 | 1 | AVO-147-Taylor choke needs packing | Scheduled past LAFD | | CM compliance |
| Week 45 | 27845579 | 1 | AVO-147-Taylor choke needs packing | Scheduled past LAFD | | CM compliance |
| Week 45 | 27736421 | 2 | soderberg 501 needs 6 regulators intermi | Scheduled past LAFD | | CM compliance |
| Week 45 | 27883900 | 3 | Replace maneval 1H Circuit Piping | Wrong parts per Del Schriner | Push | Schedule compliance |
| Week 45 | 27853928 | 1 | wellsboro comp winterization | No parts at warehouse per Luke Starkweather | Push | Schedule compliance |
| Week 45 | 27853929 | 1 | parthemer comp winterization | No parts at warehouse per Luke Starkweather | Push | Schedule compliance |
| Week 45 | 27536301 | 3 | Pierson 801 MU1 - install B annulus vent | Need truck scheduled while job is being completed | Pushed Week 47 per Ken Foreman | Schedule compliance |
| Week 45 | 27772759 | 6 | Pig Treat Taylor to Lovell 11/12/15 | | Pushed to week 46 | Schedule compliance |
| Week 45 | 27392879 | 3 | Install Isolation Kits and wiring | Drillin on site | Pushed to week 48 | Schedule compliance |
| Week 46 | 27687344 | 1 | Witness for Dominion in NWT | Waiting on Dominion | Pushed to Week 47 per Don Anthony | Schedule compliance |
| Week 46 | 27702325 | 1 | 3M-ORIFIC PLAT INSPECTION | Pull in Order per Don Anthony | Pulled in Order per Don Anthony | Schedule compliance |
| Week 46 | 27702327 | 1 | 3M-ORIFIC PLAT INSPECTION | Pull in Order per Don Anthony | Pulled in Order per Don Anthony | Schedule compliance |
| Week 46 | 27796059 | 1 | Trimble Comp. A Inside Beacon | Scheduled past LAFD | | CM compliance |
| Week 46 | 27796141 | 1 | Trimble Comp. C side Beacon | Scheduled past LAFD | | CM compliance |
| Week 46 | 27769410 | 2 | K1- Replace Y strainer w/ basket strainer | Scheduled past LAFD | | CM compliance |
| Week 46 | 27869219 | 2 | Yungwirth 307 Pigging Project | | Pushed to Week 47 | Schedule compliance |
| Week 46 | 27797562 | 1 | W1- Kimrays need Snake bags | Do not have the snake bags at warehouse | Push to 11/23/2015 | Schedule compliance |
| Week 46 | 27797563 | 1 | W12- Kimrays need Snake bags | Do not have the snake bags at warehouse | Push to 11/23/2015 | Schedule compliance |
| Week 46 | 27797564 | 1 | W3- Kimrays need Snake bags | Do not have the snake bags at warehouse | Push to 11/23/2015 | Schedule compliance |
| Week 46 | 27797565 | 1 | W4- Kimrays need Snake bags | Do not have the snake bags at warehouse | Push to 11/23/2015 | Schedule compliance |
| Week 46 | 27797602 | 1 | w2- FG Kimrays need Snake bag insulation | Do not have the snake bags at warehouse | Push to 11/23/2015 | Schedule compliance |
| Week 46 | 27693260 | | install block and test port on prvs - state | Needs MOC per Hondo Blakley | | Schedule comiliance |
| Week 46 | 27898099 | 1 | Button water sample ports | Weather not permitting | Push | Schedule compliance |
| Week 46 | 27828280 | 2 | Thomas reboiler A needs roof sealed | Weather not permitting | Push | Schedule compliance |
| Week 46 | 27898097 | 1 | Pierson 810 water sample ports | Completed notifications per Ken Foremans request | Push | Schedule compliance |
| Week 46 | 27380857 | 2 | update all the bad piping | Completed notifications per Ken Foremans request | Push | Schedule compliance |
| Week 46 | 27738418 | 1 | 719 6H,belly dump elbow is bad | Wrong parts | Push to week 48 | Schedule compliance |
| Week 47 | 27720059 | 1 | 3M-ORIFIC PLAT INSPECTION | Pull in Order per Don Anthony | Unscheduled Fill in | Schedule compliance |
| Week 47 | 27720061 | 1 | 3M-ORIFIC PLAT INSPECTION | Pull in Order per Don Anthony | Unscheduled Fill in | Schedule compliance |
| Week 47 | 27720063 | 1 | 3M-ORIFIC PLAT INSPECTION | Pull in Order per Don Anthony | Unscheduled Fill in | Schedule compliance |
| Week 47 | 27720065 | 1 | 3M-ORIFIC PLAT INSPECTION | Pull in Order per Don Anthony | Unscheduled Fill in | Schedule compliance |
| Week 47 | 27769289 | 1 | Repair PW Circuit Pipe Support | Scheduled past LAFD | | CM compliance |
| Week 47 | 27869208 | 1 | Miller 2H- Fuel/gas to heater freezes | Scheduled past LAFD | | CM compliance |
| Week 47 | 27786395 | 1 | 116 FWI tank label min fluid level 48" | Scheduled past LAFD | | CM compliance |
| Week 47 | 27872014 | 1 | EWD Clean grease chokes 426 | Scheduled past LAFD | | CM compliance |
| Week 47 | 27502419 | 3 | Pad work Neal 134 | Scheduled past LAFD | | CM compliance |
| Week 49 | 27900027 | 1 | bradford481-truck ground not pulling out | Not completed before LAFD | | CM compliance |
| Week 49 | 27925353 | 1 | AVO-State-1" ball valve on fuel line | Scheduled past LAFD | | CM compliance |
| Week 49 | 27917945 | 2 | tank leaking on top of flange | Cannot complete in week per Ryan Lampman | Push | Schedule compliance |
| Week 49 | 27917839 | 1 | wear check on packs-902 | Cannot complete in week per Don Coolidge | Push to Week 50 | Schedule compliance |
| Week 50 | 27638261 | 1 | BBSM-W8 Comp E-Gate Repair and blockage | Scheduled past LAFD | | CM compliance |
| Week 50 | 27704309 | 1 | Man gate won't latch Wellsboro | Scheduled past LAFD | | CM compliance |
| Week 50 | 27255959 | 2 | Sawyer FW Tank Heater Failure | Scheduled past LAFD | | CM compliance |
| Week 50 | 27765507 | 1 | Replace FW HTR at Know 303 | Scheduled past LAFD | | CM compliance |
| Week 50 | 27786386 | 2 | Replace FW HTR at Barner 709 | Scheduled past LAFD | | CM compliance |
| Week 50 | 27786389 | 2 | Replace FW HTR at Groff 720 | Scheduled past LAFD | | CM compliance |
| Week 50 | 27883781 | 2 | AVO Shaw station 2nd fuel regulator leak | Scheduled past LAFD | | CM compliance |
| Week 50 | 27797493 | 1 | winter- K4 generator fuel Line | Scheduled past LAFD | | CM compliance |
| Week 50 | 27797573 | 1 | winter- TX6 generator fuel Line | Scheduled past LAFD | | CM compliance |
| Week 50 | 27797574 | 1 | winter- 303 generator fuel line | Scheduled past LAFD | | CM compliance |
| Week 50 | 27797572 | 1 | winter- TX1 generator fuel Line JC | Scheduled past LAFD | | CM compliance |
| Week 50 | 27255959 | 2 | Sawyer FW Tank Heater Failure | Move per Carlton Tyre | Push to week 51 | Schedule Compliance |
| Week 50 | 27786389 | 2 | Replace FW HTR at Groff 720 | Move per Carlton Tyre | Push to week 51 | Schedule Compliance |
| Week 50 | 27793610 | 1 | 3M-LEL Gas (Point) Detection Test | | | |
| Week 50 | 27793612 | 1 | 3M-LEL Gas (Point) Detection Test | | | |
| Week 50 | 27793620 | 1 | 3M-LEL Gas (Point) Detection Test | | | |
| Week 50 | 27793621 | 1 | 3M-LEL Gas (Point) Detection Test | | | |
| Week 51 | 27933460 | 3 | Passing vavle on comp B 1st stage PRV | Wrong part and equipment | Move to week 1 | Schedule compliance |
| Week 51 | 27255959 | 2 | Sawyer FW Tank Heater Failure | ? | | CM&sch.compliance |
| Week 51 | 27786389 | 2 | Replace FW HTR at Groff 720 | ? | | CM&sch.compliance |
| Week 51 | 27797571 | 1 | Winter- TX6 suction make up valves | ? | | CM&sch.compliance |
| Week 51 | 27901227 | 2 | EWD steps to poly tank stot 255 | Schedule past LAFD | | CM compliance |
| Week 51 | 27945073 | 1 | Breon Compressor-LDAR Leak KimRay-FG | Schedule past LAFD | | CM compliance |
| Week 51 | 27751298 | 3 | 6M-Dump,Choke & Intermit Valve Test PML | Needs pushed per Eric P | | Schedule compliance |
| Week 52 | 27797567 | 1 | Winter-WLB-DTI intercon freezing issue | Scheduled past LAFD | | CM compliance |
| Week 52 | 27539314 | 1 | replace operator on 6" ML valve | Scheduled past LAFD | | CM compliance |
| Week 52 | 27885545 | 3 | Shaw- 48" reboiler pump A | Scheduled past LAFD | | CM compliance |
| Week 52 | 27945074 | 2 | Replace 1H PW Circuit Piping | Scheduled past LAFD | | CM compliance |
| Week 52 | 27868837 | 2 | york 2h door hinges | Scheduled past LAFD | | CM compliance |
| Week 52 | 27994694 | 1 | Methanol storage tank needs grounded-52 | Need PA1 Call | Pushed to Week 0001 | Schedule Compliance |
| Week 52 | 27933462 | 1 | No ground at unload station W2 | Scheduled after shop papers printed, steve was unaware of job | Pushed to week 002 | Schedule Compliance |

| Week | Order | # of Operations | Area | Job Description | Reason | Category of Problem | Result | Schedule Compliance | CM Compliance | PM Compliance | SC Cumulative | CM Cumulative | PMC Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week 01 | 27869217 | 3 | KRS | Pazzaglia 507 Pigging Project | Couldn't complete per Matt Germino | Scheduled in Conflict | Pushed to Week 2 | Yes | No | No | 1 | 0 | 0 |
| Week 01 | 27922361 | 1 | MAR | 1M-FIRE EQUIPMENT/EXTINGUISHERS CHEC | Rob S said Randy will complete Tuesday afternoon | Operator PM | Pushed to Week 2 | Yes | No | No | 2 | 0 | 0 |
| Week 01 | 27994689 | 2 | WLB | AVO-433- 1H dump packing | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 2 | 1 | 0 |
| Week 01 | 27998362 | 1 | WLB | PV - 2" ball valve cut Courtney 255 | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 2 | 2 | 0 |
| Week 02 | 27777178 | 2 | KRS | Shaw Wear checks | More wear checks than expected per Eric P | Work Plan Description | Moved to week 4 | Yes | No | No | 3 | 2 | 0 |
| Week 02 | 27772747 | 3 | MAR | PigTreat Pierson 810 to Button ML 123115 | Waiting on small projects per Matt E | Scheduled in Conflict | | Yes | No | No | 4 | 2 | 0 |
| Week 02 | 27979391 | 2 | NWT | Install Bruest Htr on dehy Fuel Gas 832 | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 4 | 3 | 0 |
| Week 02 | 27926830 | 1 | NWT | bradford add grating to the skid | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 4 | 4 | 0 |
| Week 02 | 27979391 | 2 | NWT | Install Bruest Htr on dehy Fuel Gas 832 | Not completed per Carlton | Work Plan Description | Moved to week 4 | Yes | No | No | 5 | 4 | 0 |
| Week 02 | 27915548 | 4 | WLB | Neal 815 Tank Level Transmitter | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 5 | 5 | 0 |
| Week 02 | 27632375 | 4 | WLB | W12- retro fit reboiler skids | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 5 | 6 | 0 |
| Week 02 | 27599743 | 7 | | eWIMS UMV failed function/LOT- 800AM | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 5 | 7 | 0 |
| Week 03 | 28048121 | 3 | NWT | Egl. Impd B Pmp 2 Not Maint. Purge- BI | Move per Carlton Tyre | Work Plan Description | | Yes | No | No | 6 | 7 | 0 |
| Week 03 | 27928474 | 1 | TXC | 376- Snake wrap FW poly tank | Scheduled after LAFD | Scheduled past LAFD | | No | yes | No | 6 | 8 | 0 |
| Week 03 | 27978039 | 1 | WLB | Replace water sample port | Needs to be done in summer months per Del S | Seasonal Constraints | | Yes | No | No | 7 | 8 | 0 |
| Week 04 | 28003841 | 1 | KRS | Detweiler Impoundment- replace parts | Scheduled after LAFD | Scheduled past LAFD | | No | yes | No | 7 | 9 | 0 |
| Week 04 | | 2 | MAR | Peirson Burner inspection | Didn't start pad up | Operations Constraints | Pushed | Yes | No | No | 8 | 9 | 0 |
| Week 04 | 27933414 | 2 | NWT | sample port needs moved outside GPU832 | Scheduled after LAFD | Scheduled past LAFD | | No | yes | No | 8 | 10 | 0 |
| Week 04 | 27979391 | 2 | NWT | Install Bruest Htr on dehy Fuel Gas 832 | Scheduled after LAFD | Scheduled past LAFD | | No | yes | No | 8 | 11 | 0 |
| Week 04 | 28049619 | 2 | NWT | Install water sample port 832 2H | Worng parts and tools | Materials | Pushed | Yes | No | No | 9 | 11 | 0 |
| Week 04 | 27957718 | 2 | NWT | 878 install well barriers | Not enough gates, can't comeplete job per Luke S | Materials | Completed | No | No | No | 9 | 11 | 0 |
| Week 04 | 27957716 | 2 | NWT | 805 install well barriers | Not enough gates, can't comeplete job per Luke S | Materials | Pushed | Yes | No | No | 10 | 11 | 0 |
| Week 04 | 27900036 | 1 | TXC | TX1 - MOC 7215/Approved Inst Gas Relocat | Scheduled after LAFD | Scheduled past LAFD | | No | yes | No | 10 | 12 | 0 |
| Week 04 | 28041021 | 1 | TXC | groff scortron chem pump not working | Need to order parts | Materials | | Yes | yes | No | 10 | 13 | 0 |
| Week 04 | 28025056 | 1 | TXC | 376 install smaller flow splitters | Chuck is on vacation | Scheduled in Conflict | Pushed to Week 7 | Yes | No | No | 11 | 14 | 0 |
| Week 05 | 27574201 | 4 | MAR | 808 remove low bleeds | Pierson start up | Operations Constraints | Pushed to Week 06 | Yes | No | No | 12 | 14 | 0 |
| Week 05 | 27925358 | 2 | MAR | 902-Replace air hose with stainless | No parts | Materials | Pushed to Week 07 | Yes | No | No | 13 | 14 | 0 |
| Week 05 | 27586807 | 2 | TXC | install iso kit suction TX4 1/28/2016 | Scheduled past LAFD | | | No | yes | No | 14 | 14 | 0 |
| Week 06 | 27574201 | 4 | MAR | 808 remove low bleeds | No parts on order | Materials | | Yes | yes | No | 14 | 15 | 0 |
| Week 06 | 27821862 | 1 | NWT | 824 3M-ORIFIC PLAT INSPECTION | Matz down | Operations Constraints | scheduled past LAFD | No | yes | No | 15 | 16 | 0 |
| Week 07 | 28076256 | 2 | KRS | Chapman 6h motor Body washing out | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 15 | 17 | 0 |
| Week 07 | 27979391 | 2 | NWT | Install Bruest Htr on dehy Fuel Gas 832 | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 15 | 18 | 0 |
| Week 07 | 27957716 | 2 | NWT | 805 install well barriers | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 15 | 19 | 0 |
| Week 07 | 27957716 | 2 | NWT | 805 install well barriers | Parts ordered later than schedule start date | Materials | Completed | No | No | No | 15 | 20 | 0 |
| Week 07 | 27994691 | 4 | TXC | Sawyer1h Flow line has salt on it | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 15 | 20 | 0 |
| Week 07 | 28066015 | 2 | TXC | westerbaan 2H dump actuator need pulled | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 15 | 21 | 0 |
| Week 07 | 27957708 | 3 | WLB | W1- reboiler burner assembly | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 15 | 22 | 0 |
| Week 07 | 28038248 | 3 | KRS | Detweiler 1H - Sight glass broke | Wrong parts | Materials | Push week 10 | Yes | No | No | 15 | 23 | 0 |
| Week 07 | 27910863 | 1 | WLB | 3M-ORIFIC PLAT INSPECTION - W8 | Cole & Sherman new meter installations- priority | Impact from Break-In | Push to next Friday | Yes | No | No | 16 | 23 | 0 |
| Week 07 | 27910862 | 1 | WLB | 3M-ORIFIC PLAT INSPECTION-448 | Cole & Sherman new meter installations- priority | Impact from Break-In | Push to next Friday | Yes | No | No | 17 | 23 | 0 |
| Week 07 | 27910848 | 1 | WLB | 1M-WITNESS Matz, shrretts, Elk run | The witness was rescheduled by Dominion | Scheduled in Conflict | Push to next Wednesday | Yes | No | No | 18 | 23 | 0 |
| Week 08 | 28097815 | 1 | WLB | W1 bruest heater 3rd cut FG | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 19 | 23 | 0 |
| Week 08 | 28099493 | 1 | NWT | redirect reboiler PRV exhaust piping dow | Waiting on MOC | Operations Constraints | Pushed to Week 14 | Yes | No | No | 19 | 24 | 0 |
| Week 08 | 28077564 | 2 | WLB | West 299 3 fountain 833284 | Did not have time b/c schedule switched | Impact from Break-In | | Yes | No | No | 20 | 24 | 0 |
| Week 08 | 28077567 | 2 | WLB | Knowlton 303 3 Fountain 833284 | Did not have time b/c schedule switched | Impact from Break-In | | Yes | No | No | 21 | 24 | 0 |
| Week 08 | 28077607 | 2 | WLB | Vandergrift 290-6 fountain 833284 | Did not have time b/c schedule switched | Impact from Break-In | | Yes | No | No | 22 | 24 | 0 |
| Week 08 | 28097815 | 1 | WLB | W1 bruest heater 3rd cut FG | There is a short distance that needs to be trenched | Work Plan Description | Pushed to Week 11 | No | yes | No | 23 | 24 | 0 |
| Week 08 | 28036889 | 1 | KRS | 505 install solenoid on ESD | Do not know where the valves are | Materials | Pushed to week 11 | Yes | No | No | 24 | 24 | 0 |
| Week 08 | 28036885 | 1 | KRS | 287 install solenoid on ESD | Do not know where the valves are | Materials | Pushed to week 11 | Yes | No | No | 25 | 24 | 0 |
| Week 08 | 27910925 | 1 | TXC | 3M-LDAR Compressor Inspection | TX720 is down | Operations Constraints | Pushed to week 09 | Yes | No | No | 26 | 24 | 0 |
| Week 08 | 27922319 | 1 | MAR | 3M-LDAR Compressor Inspection | Scheduled for mandatory CPR Training | Scheduled in Conflict | Pushed to week 09 | Yes | No | No | 27 | 24 | 0 |
| Week 08 | 27922320 | 1 | MAR | 3M-LDAR Compressor Inspection | Scheduled for mandatory CPR Training | Scheduled in Conflict | Pushed to week 09 | Yes | No | No | 28 | 24 | 0 |
| Week 08 | 27922321 | 1 | MAR | 3M-LDAR Compressor Inspection | Scheduled for mandatory CPR Training | Scheduled in Conflict | Pushed to week 09 | Yes | No | No | 29 | 24 | 0 |
| Week 08 | 27910913 | 1 | KRS | 1M-WITNESS GAS METER Empire | Empire rescheduled | Scheduled in Conflict | Closed,another order in 09 | No | yes | No | 30 | 24 | 0 |
| Week 09 | 28097815 | 1 | WLB | W1 bruest heater 3rd cut FG | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 30 | 25 | 0 |
| Week 09 | 27973124 | 1 | KRS | 1M-WITNESS GAS METER Empire | Empire rescheduled | Scheduled in Conflict | Pushed to week 10 | Yes | No | No | 31 | 26 | 0 |
| Week 09 | 28113301 | 2 | WLB | 307-EWD Bruest heater won't stay lit | Heater need capilliary or repalced | Materials | Pushed to week 12 | Yes | No | No | 32 | 26 | 0 |
| Week 10 | 27574201 | 4 | MAR | 808 remove low bleeds | Wrong parts | Materials | Pushed to week 12 | Yes | No | No | 33 | 26 | 0 |
| Week 10 | 28094304 | 1 | WLB | Tioga Greer Withdrawl Sampling | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 33 | 27 | 0 |
| Week 10 | 28097597 | 2 | KRS | Pazzaglia 2h hammer union leaking | Didn't complete until Thursday, sch. Monday | Scheduled in Conflict | Past LAFD | Yes | No | No | 33 | 28 | 0 |
| Week 10 | 28097864 | 2 | KRS | Pazzaglia 6H hammer union leaking | Didn't complete until Thursday, sch. Monday | Scheduled in Conflict | Past LAFD | Yes | No | No | 33 | 29 | 0 |
| Week 10 | 28122954 | 1 | WLB | T-Shoot Deadband issues at Miller 394 | Aaron said he couldn't complete until Week 11 | Work Plan Description | Pushed to Week 11 | Yes | No | No | 34 | 29 | 0 |
| Week 11 | 28134581 | 1 | WLB | AVO 448-1" drain ball valve leaking | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 34 | 30 | 0 |
| Week 11 | 28141968 | 1 | MAR | remove rupture disc on the 901 | Busy with Break-in | Impact from Break-In | Pushed to week 14 | Yes | No | No | 35 | 30 | 0 |
| Week 11 | 28157365 | 1 | TXC | clegg 4h poly tank camlock ear broken | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 35 | 31 | 0 |
| Week 13 | 28077547 | 2 | KRS | Delaney 651 6 - Fountain 833284 | Tim said they couldn't complete that week | Scheduled in heavy | Pushed to Week 14 | Yes | No | No | 36 | 31 | 0 |
| Week 14 | 28157388 | 4 | NWT | Replace 832 PW Circuit Piping - Monday | Spool piece missing on WO | Materials | | No | yes | No | 36 | 32 | 0 |
| Week 14 | 28099581 | 2 | NWT | 878-MOC-Install 1" valve on flash tank | wrong materials, UGI needed to be notified of job | Materials | complete in week 14 | No | No | No | 36 | 32 | 0 |
| Week 14 | 28172449 | 1 | KRS | AVO 480 5h railroad union leaking salt | Del ran out of time per Tim | Scheduled in heavy | Pushed to week 15 per Ken | No | No | No | 37 | 33 | 0 |
| Week 15 | 28061175 | 2 | NWT | Husted - Winterize Worker/Monitor Valves | Can't do with snow on the ground per Carlton | Seasonal Constraints | Pushed to Week 20 | Yes | No | No | 38 | 33 | 0 |
| Week 15 | 28169385 | 1 | WLB | Hiland tank level indicator not working | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 38 | 34 | 0 |

| Week | ID | Pri | Code | Description | Reason | Category | Push Note | C1 | C2 | C3 | N1 | N2 | N3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week 15 | 28169385 | 1 | WLB | W8 tank lev indicator not working BI-JC | Scheduled past LAFD | Scheduled past LAFD | JC | No | yes | No | 38 | 35 | 0 |
| Week 15 | 28193989 | 1 | WLB | LDAR Leak Parthemer Compressor-Norriseal | Wrong parts | Materials | Pushed to week 16 | Yes | yes | No | 39 | 36 | 0 |
| Week 15 | 28113301 | 2 | WLB | 307-EWD Bruest heater won't stay lit | Drilling was on pad per Luke | Operations Constraints | Pushed to week 20 | Yes | No | No | 40 | 36 | 0 |
| Week 15 | 28135782 | 2 | TXC | Inner sales valve wont close 376 5H | Not enough manpower | Scheduled in heavy | Pushed to Week 17 | Yes | No | No | 41 | 36 | 0 |
| Week 15 | 28032958 | 1 | TXC | 3M-ORIFIC PLAT INSPECTION | 708 is down | Operations Constraints | Pushed to Week 18 per Ken | Yes | No | No | 42 | 36 | 0 |
| Week 15 | 28032955 | 1 | TXC | YR 1Y-CALIBRATE METER RUN TRANSMITTER | 708 is down | Operations Constraints | Pushed to Week 18 per Ken | Yes | No | No | 43 | 36 | 0 |
| Week 15 | 28016269 | 1 | TXC | YR 1Y-REG GAS SAMPLE | 708 is down | Operations Constraints | Pushed to Week 18 per Ken | Yes | No | No | 44 | 36 | 0 |
| Week 16 | 28172449 | 1 | KRS | AVO 480 5h railroad union leaking salt | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 44 | 37 | 0 |
| Week 16 | 28193989 | 1 | WLB | LDAR Leak Parthemer Compressor-Norriseal | Scheduled past LAFD | Scheduled past LAFD | | No | yes | No | 44 | 38 | 0 |
| Week 16 | 28204851 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION 504 | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 45 | 38 | 0 |
| Week 16 | 28204852 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 46 | 38 | 0 |
| Week 16 | 28204855 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 47 | 38 | 0 |
| Week 16 | 28204856 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 48 | 38 | 0 |
| Week 16 | 28204857 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 49 | 38 | 0 |
| Week 16 | 28204858 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 50 | 38 | 0 |
| Week 16 | 28204859 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 51 | 38 | 0 |
| Week 16 | 28204860 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 52 | 38 | 0 |
| Week 16 | 28204861 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 53 | 38 | 0 |
| Week 16 | 28204862 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 54 | 38 | 0 |
| Week 16 | 28204871 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 55 | 38 | 0 |
| Week 16 | 28204872 | 3 | KRS | TY RELIEF VALVE REPLACE/RECERTIFICATION | Not enough time per Brad/Eric/Del, not tested | Scheduled in heavy | Pushed to Week 20 | Yes | No | No | 56 | 38 | 0 |
| Week 17 | | | | Jesse was in Calgary | | | | No | No | No | 56 | 38 | 0 |
| Week 18 | 28193799 | 3 | NWT | 832 - Inspect comp suction line for H20 | moving compressor | Operations Constraints | | Yes | No | No | 57 | 38 | 0 |
| Week 18 | 28018968 | 2 | KRS | 2Y HEPLER D #235-5H 2YR-WIT | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 58 | 38 | 0 |
| Week 18 | 28018969 | 2 | KRS | 2Y HEPLER D #235-7H 2YR-WIT | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 59 | 38 | 0 |
| Week 18 | 28018970 | 2 | KRS | 2Y HEPLER D #235-2H 2YR-WIT | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 60 | 38 | 0 |
| Week 18 | 28018967 | 2 | KRS | 2Y HEPLER D #235-3H 2YR-WIT | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 61 | 38 | 0 |
| Week 18 | 28033920 | 2 | KRS | 2Y HEPLER D #602-4H 2YR-WIT | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 62 | 38 | 0 |
| Week 18 | 28033921 | 2 | KRS | 2Y HEPLER D #602-2H 2YR-WIT | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 63 | 38 | 0 |
| Week 18 | 28046528 | 2 | KRS | 2Y HEPLER D #602-1H 2YR-WIT | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 64 | 38 | 0 |
| Week 18 | 28001716 | 2 | KRS | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 65 | 38 | 0 |
| Week 18 | 28001717 | 2 | KRS | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 66 | 38 | 0 |
| Week 18 | 28001715 | 2 | KRS | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 67 | 38 | 0 |
| Week 18 | 28018972 | 2 | KRS | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 68 | 38 | 0 |
| Week 18 | 28033927 | 2 | KRS | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 69 | 38 | 0 |
| Week 18 | 28033926 | 2 | KRS | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 70 | 38 | 0 |
| Week 18 | 28046532 | 2 | KRS | YR-Wellhead Greasing all Valves | Not enough time to complete per Chris Catherman | Scheduled in heavy | Pushed to week 20 | Yes | No | No | 71 | 38 | 0 |
| Week 18 | 28016267 | 1 | TXC | YR 1Y-REG GAS SAMPLE 705 | 705 was down | Operations Constraints | Pushed to week 19 | Yes | No | No | 72 | 38 | 0 |
| Week 18 | 27574201 | 4 | MAR | 808 remove low bleeds | Wrong parts | Materials | Pushed to week 21 | Yes | No | No | 73 | 38 | 0 |
| Week 19 | | | | Jesse on Vacation | | | | No | No | No | 73 | 38 | 0 |
| Week 20 | 28116428 | 1 | NWT | 820 Site Walkdown | Not enough time in Rob's schedule to allow | Operations Constraints | Pushed to week 22 | Yes | No | No | 74 | 38 | 0 |
| Week 20 | 28105348 | 1 | MAR | LDAR Compressor Inspection MLT1 | Compressor not running | Operations Constraints | Pushed to week 23 | Yes | No | No | 75 | 38 | 0 |
| Week 20 | 28273016 | 3 | KRS | Shaw comp= Generator start up | Waiting on parts to complete per Brain Gillespie | Work Plan Description | Pushed to week 22 | Yes | No | No | 76 | 38 | 0 |
| Week 21 | 28261672 | 2 | MAR | mitchell 5 flow line leaking by wellhead | Didn't have the correct parts needed | Materials | Pushed to week 23 | Yes | No | No | 77 | 38 | 0 |
| Week 21 | 28091901 | 1 | MAR | MU3 gas port install | Mitchel flowline job tooker longer than planned | Scheduled in heavy | Pushed to Week 24 | Yes | No | No | 78 | 38 | 0 |
| Week 21 | 28091902 | 1 | MAR | MU1 gas port install | Mitchel flowline job tooker longer than planned | Scheduled in heavy | Pushed to Week 24 | Yes | No | No | 79 | 38 | 0 |
| Week 21 | 28091903 | 1 | MAR | Thomas gas port install | Mitchel flowline job tooker longer than planned | Scheduled in heavy | Pushed to Week 24 | Yes | No | No | 80 | 38 | 0 |
| Week 21 | 28091904 | 1 | MAR | Bergey gas port install | Mitchel flowline job tooker longer than planned | Scheduled in heavy | Pushed to Week 24 | Yes | No | No | 81 | 38 | 0 |
| Week 21 | 28091905 | 1 | MAR | 906 gas port install | Mitchel flowline job tooker longer than planned | Scheduled in heavy | Pushed to Week 24 | Yes | No | No | 82 | 38 | 0 |
| Week 21 | 28091908 | 1 | MAR | 904 gas port install | Mitchel flowline job tooker longer than planned | Scheduled in heavy | Pushed to Week 24 | Yes | No | No | 83 | 38 | 0 |
| Week 21 | 28299057 | 2 | TXC | Yaggie Comp Sta Flame Detector | Ongoing work per Carlton | Work Plan Description | Pushed to week 23 | Yes | No | No | 84 | 38 | 0 |
| Week 22 | 28253080 | 2 | WLB | 1Y-Smoke Detection Test | Need to hire vendor to test | Work Plan Description | Pushed to week 23 | Yes | yes | No | 85 | 39 | 0 |
| Week 22 | 28254292 | 2 | WLB | 1Y-Smoke Detection Test | Need to hire vendor to test | Work Plan Description | Pushed to week 23 | Yes | yes | Test | 86 | 40 | 0 |
| Week 22 | 28254291 | 2 | WLB | 1Y-Smoke Detection Test | Need to hire vendor to test | Work Plan Description | Pushed to week 23 | Yes | yes | Test | 87 | 41 | 0 |
| Week 22 | 28253076 | 2 | WLB | 1Y-Heat Detection Test | Need to hire vendor to test | Work Plan Description | Pushed to week 23 | Yes | yes | No | 88 | 42 | 0 |
| Week 23 | 28074045 | 1 | NWT | YR 1Y-LDAR Inspection Matz | SIMOPS on location, too much activity per April | Operations Constraints | Pushed to Week 24 | Yes | No | No | 89 | 42 | 0 |
| Week 23 | 28131094 | 2 | WLB | YR 1Y-Wellhead Valve Greasing PM 448 | Not enough time to complete schedule | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 90 | 42 | 0 |
| Week 23 | 28299207 | 2 | WLB | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete schedule | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 91 | 42 | 0 |
| Week 23 | 28299208 | 2 | WLB | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete schedule | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 92 | 42 | 0 |
| Week 23 | 28299209 | 2 | WLB | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete schedule | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 93 | 42 | 0 |
| Week 23 | 28299210 | 2 | WLB | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete schedule | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 94 | 42 | 0 |
| Week 23 | 28299211 | 2 | WLB | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete schedule | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 95 | 42 | 0 |
| Week 23 | 28299212 | 2 | WLB | YR 1Y-Wellhead Valve Greasing PM | Not enough time to complete schedule | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 96 | 42 | 0 |
| Week 23 | 28091923 | 1 | KRS | 515 gas port install | Broken drill bit per Tim | Materials | Pushed to week 25 | Yes | No | No | 97 | 42 | 0 |
| Week 23 | 28091929 | 1 | KRS | 482 gas port install | Broken drill bit per Tim | Materials | Pushed to week 25 | Yes | No | No | 98 | 42 | 0 |
| Week 23 | 28061175 | 3 | NWT | Husted - Winterize Worker/Monitor Valves | Not complete per Ed & Steve | Work Plan Description | Pushed to week 25 | Yes | No | No | 99 | 42 | 0 |
| Week 23 | 28307945 | 1 | KRS | Pannebaker Frac tank transmitter | Not complete per Aaron | Work Plan Description | Pushed to week 25 | Yes | No | No | 100 | 42 | 0 |
| week 24 | 28324407 | 2 | MAR | 810- replumb reboiler and dehy | Not completed per Steve Craig | Operations Constraints | Pushed week 25 | Yes | No | No | 101 | 42 | 0 |
| Week 24 | 28309964 | 2 | TXC | YR 1Y-Wellhead Valve Greasing PM 0112 | Tim's has lock on, he is on vacation | Scheduled in Conflict | Pushed to week 26 | Yes | No | No | 102 | 42 | 0 |
| Week 24 | 28176142 | 1 | TGAF | WK/MO-OI ALARM REDUCTION/SUSTAIN MTG. | Kyle is on vacation | Scheduled in heavy | Pushed to week 25 | Yes | No | No | 103 | 42 | 0 |
| Week 24 | 28163616 | 1 | WLB | 3M-PIPELINE CORROSION ASSESSMENT | Wrong start dates per Ben Goben | SAP Misalignment | Pushed to week 30 | Yes | No | No | 104 | 42 | 0 |
| Week 24 | 28163614 | 1 | NWT | 3M-PIPELINE CORROSION ASSESSMENT | Wrong start dates per Ben Goben | SAP Misalignment | Pushed to week 30 | Yes | No | No | 105 | 42 | 0 |

| Week | | | Code | Description | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week 24 | 28163615 | 1 | TXC | 3M-PIPELINE CORROSION ASSESSMENT | Wrong start dates per Ben Goben | SAP Misalignment | Pushed to week 30 | Yes | No | No | 106 | 42 | 0 |
| Week 24 | 28163617 | 1 | KRS | 3M-PIPELINE CORROSION ASSESSMENT | Wrong start dates per Ben Goben | SAP Misalignment | Pushed to week 30 | Yes | No | No | 107 | 42 | 0 |
| Week 25 | 28326196 | 1 | NWT | Sharretts 805 Tank 3050 LT Neg Value | No parts for job | Materials | Carlton moved | Yes | No | No | 108 | 42 | 0 |
| Week 25 | | 1 | | 2 Walkdowns | Rob didn't have enough time | Operations Constraints | | Yes | No | No | | | |
| Week 26 | | | KRS | 234 sight glass | Over scheduled, missing materials | Materials | | Yes | No | No | | | |
| Week 27 | | 2 | | SIMPOS | | Operations Constraints | Pushed to week 31 | Yes | No | No | | | |
| Week 27 | 28322300 | 1 | KRS | 504 desicant bottle restricted | Not the right tools available | Work Plan Description | Pushed to week 30 | Yes | No | No | | | |
| Week 27 | 28134654 | 4 | MAR | pierson 801 Poly tank measuring | Shortage of materials | Materials | Pushed to week 29 | Yes | No | No | | | |
| Week 28 | 28176058 | 1 | TXC | YR-CATHODIC PROTECT. ADJUSTIVE SURVEY TXC | Takes longer than 40 HRS to complete | Scheduled in heavy | Pushed to week 29 | Yes | No | No | | | |
| Week 29 | 28335287 | 1 | KRS | Cole 236 4H, suck out cellar, add gravel | Took longer than planned | Work Plan Description | Pushed to week 33 | Yes | No | No | | | |
| Week 29 | 28335289 | 1 | KRS | Cole 236 5H, suck out cellar, add gravel | Took longer than planned | Work Plan Description | Pushed to week 33 | Yes | No | No | | | |
| Week 29 | 28398416 | 1 | WLB | Vandergrift 6H tubing transmitter | Pull in work that did not get completed | Scheduled in heavy | Pushed to week 33 | Yes | No | No | | | |
| Week 30 | 28402391 | 2 | WLB | Johnson 435 insulate fusible link | Not enough parts | Materials | Pushed to week | Yes | No | No | | | |
| Week 30 | 28228137 | 1 | KRs | YR 1Y-Fired Heater Clean & Flame Arrest- | Not enough time b/c of lean events | Scheduled in heavy | Pushed | Yes | No | No | | | |
| Week 30 | 28402258 | 2 | KRS | Chapman3H-Dumpline broke | | Scheduled in heavy | Pushed | Yes | | | | | |
| Week 31 | 28398373 | 1 | TXC | TxC W&P Area Reboil/Line Htr HiTemp Wire | 30 hour job per Aaron Moore | Scheduled in heavy | Pushed to week 31 | Yes | | | | | |
| Week 30 | 28398374 | 1 | TXC | TxCrk Area RTUs Main DC Power Fuse | 30 hour job per Aaron Moore | Scheduled in heavy | Pushed to week 31 | Yes | | | | | |
| Week 31 | 28281235 | 1 | WLB | 2Y MILLER #394-23H 2YR-WIT | no tubing per Kelvin Flynn | Work Plan Description | Pushed to week 40 | Yes | No | No | | | |
| Week 31 | 28281236 | 1 | WLB | 2Y MILLER #394-25H 2YR-WIT | no tubing per Kelvin Flynn | Work Plan Description | Pushed to week 40 | Yes | No | No | | | |
| Week 31 | 28271912 | 1 | NWT | Door on tank has salt on bolts for door | couldn't complete per Tim B | Materials | Pushed to week 33 | Yes | | | | | |
| Week 31 | 28398409 | 2 | WLB | Replace 2" valves up & down dump valve | Overlooked # of valves on site | Scheduled in heavy | Pushed to week 33 | Yes | | | | | |
| Week 31 | 28398410 | 2 | WLB | Replace 2" valves up & down dump valve | Overlooked # of valves on site | Scheduled in heavy | Pushed to week 33 | Yes | | | | | |
| Week 32 | 28291526 | 1 | | YR-UT Pipework Inspection | | Scheduled in heavy | Pushed to week 33 | Yes | | | | | |
| Week 32 | 28303525 | 1 | | YR-UT Pipework Inspection | | Scheduled in heavy | Pushed to week 33 | YES | | | | | |
| Week 32 | 28350762 | | | 822-Replace 2H PW Piping | | | | | | | | | |
| Week 32 | 28398374 | | | TxCrk Area Main DC Power Fuse | Continous work | | | | | | | | |
| Week 32 | 28398278 | | | k4 dew point analyzer fault | Wrong start date | | | | | | | | |
| Week 32 | 28398373 | | | TxC W&P Area Reboil/Line Htr HiTemp Wire | Continous work | | | | | | | | |
| Week 33 | 28268533 | 1 | | YR 1Y-Site equipment walk down 374 | Brandon did not  have time to complete | Scheduled in heavy | Pushed to week 35 | Yes | | | | | |
| Week 33 | 28280202 | 1 | | YR 1Y-Site equipment walk down 703 | Brandon did not  have time to complete | Scheduled in heavy | Pushed to week 35 | Yes | | | | | |
| Week 33 | 28280174 | 1 | | YR 1Y-CALIBRATE METER RUN TRANSMITTER 433 | Don couldn't close valve on sales line | Other | Pushed to week 37 | Yes | | | | | |
| Week 35 | 28387165 | 1 | | Greenwood, Guillame frac tank reduction | Takes weeks to finish | | Pushed to week 37 | Yes | | | | | |
| Week 35 | 28387161 | 1 | | Sherman, shaw frac tank reduction | Takes weeks to finish | | Pushed to week 39 | Yes | | | | | |
| Week 35 | 28427184 | 1 | KRS | Cole 236, 1H choke will not turn | No parts | Materials | Pushed | Yes | | | | | |
| Week 35 | 28427185 | 1 | KRS | Cole 236, 2H choke will not turn | No parts | Materials | Pushed | Yes | | | | | |
| Week 35 | 28427186 | 1 | KRS | Chapman 237, 2H choke will not turn | No parts | Materials | Pushed | Yes | | | | | |
| Week 36 | 28303529 | 2 | TXC | 6M-Dump & Choke Valve Test/Inspect 374 | Don couldn't complete | Scheduled in heavy | Pushed to week 38 | Yes | | | | | |
| Week 36 | 28387164 | 1 | TXC | Repair Sawyer 376 Ele Meter panel | Aaron completed BOM for job, but did not complete | Other | Pushed to week 39 | Yes | | | | | |
| Week 37 | 28398365 | 1 | NWT | Tank reduction/ recalibrate meters 820 | | | Pushed to week 40 | Yes | | | | | |
| Week 37 | 28369200 | 1 | | YR-UT PIPEWORK INSPECTION-718-PML | Brad said he couldn't complete in 37 | | Pushed to Week 38 | Yes | | | | | |
| Week 37 | 28383219 | 1 | | YR-UT Pipework Inspection-715-PML | Brad said he couldn't complete in 37 | | Pushed to Week 38 | Yes | | | | | |
| Week 38 | 28457037 | 1 | NWT | test portable line heaters DW 848 | Duwane did not have enough time to complete | Impact on Break-In | Pushed to Week 40 | Yes | | | | | |
| Week 39 | 28415505 | 1 | MAR | bergey 3h multi variableswitch TS/Repair | Parts not delivered yet | Materials | | Yes | | | | | |
| Week 40 | 28257827 | 4 | KRS | 486-SWEPI sign post broken @ entrance | Took longer than planned for | Scheduled in heavy | Pushed to week 42 | Yes | | | | | |
| Week 41 | 28549069 | 1 | | Replace light bulbs | Need more parts | Materials | Pushed to week 43 | Yes | | | | | |
| Week 41 | 28519078 | 1 | TXC | 4H Burner Malfunction | | | Pushed to week 43 | Yes | | | | | |
| Week 41 | 28494907 | 1 | WLB | 303- JW burner PM | | | Pushed to week 43 | Yes | | | | | |
| Week 41 | 28424797 | 1 | | YR-UT Pipework Inspection-427-PML | Brad couldn't find site | Other | Pushed to week 43 | Yes | | | | | |
| Week 42 | 28549064 | 2 | NWT | 832 Install 2H sales line drain to dump | Small projects | Operations Constraints | Pushed to week 43 | Yes | | | | | |
| Week 42 | 28281235 | 1 | WLB | 2Y MILLER #394-23H 2YR-WIT | Waiting on work needing to be done before WIT | Scheduled in Conflict | Pushed to Week 45 | Yes | Yes | | | | |
| Week 42 | 28281236 | 1 | WLB | 2Y MILLER #394-25H 2YR-WIT | Waiting on work needing to be done before WIT | Scheduled in Conflict | Pushed to Week 45 | Yes | Yes | | | | |
| Week 43 | 28549069 | 1 | | Replace light bulbs | Ran out of time | same day work took longer | Pushed to week 46 | Yes | | | | | |
| Week 43 | 28281235 | 1 | WLB | 2Y MILLER #394-23H 2YR-WIT | Waiting on work needing to be done before WIT | Scheduled in Conflict | Pushed to Week 45 | Yes | | | | | |
| Week 43 | 28281236 | 1 | WLB | 2Y MILLER #394-25H 2YR-WIT | Waiting on work needing to be done before WIT | Scheduled in Conflict | Pushed to Week 45 | Yes | Yes | | | | |
| Week 43 | 28481803 | 1 | MAR | 802 add piping support on sales line | Wrong clamp style | Materials | Pushed to week 46 | Yes | | | | | |
| Week 43 | | 5 | | flowlinework 394-23&25 | Email from Ken F | | | Yes | | | | | |
| Week 43 | 28577031 | 1 | | 1Y-Pipeline Leak Survey-Highway & R | | | | Yes | | | | | |
| Week 43 | 28473434 | 3 | NWT | Matz Station Tank LT inaccurate | Scheduled same day as Guidry luncheon | Scheduled in Conflict | Pushed to Week 46 | Yes | | | | | |
| Week 44 | 28346150 | 5 | MAR | PigTreat Pierson 801 to Thomas Com | Small projects on site - retrofit | Scheduled in Conflict | | Yes | | | | | |
| Week 44 | 28598570 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598572 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598573 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598574 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598575 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598576 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598577 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598578 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598680 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598681 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598682 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598683 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |
| Week 44 | 28598684 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | | | | |

| Week 44 | 28598685 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | |
| Week 44 | 28598686 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | |
| Week 44 | 28598688 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | |
| Week 44 | 28598689 | 1 | NWT | VESSEL EXTERNAL INPSPECTION | | | Pushed to Week 45 | Yes | | |
| Week 44 | 28587472 | 1 | | | Higher priority break in | | | | | |



Scheduled in Conflict 18
Scheduled in light 0
Scheduled in heavy 57
Scheduled past LAFD 28
Materials 30
Work Plan Description 18
Operations Constraints 18
Impact from Break-In 7
Operator PM 1
Seasonal Constraints 2
Other 3
SAP Misalignment 4





Category of Problems
Scheduled in Conflict
Scheduled in light
Scheduled in heavy
Scheduled past LAFD
Materials
Work Plan Description
Operations Constraints
Impact from Break-In
Operator PM
Seasonal Constraints
Other
SAP Misalignment

Confidential

| Review Date: | Reviewed by: | Area: | Description: | Frequency | WO#: | Overview of discrepancies found: | Approval: | Submitted by: | Submitted Z6 Date: | Notification # | Structural Change Type: | Hours: | ighted Ho | Z6 Completed: | Completed by: | Comments: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/18/2016 | Steve Craig/William Turney | | Walkdowns | 1 | | Add 1500 foot radius inspection to task list ; "Use google maps or other satellite view to review the 1500 foot radius rule and count structures within this boundary." Leads said to adjust hours from 2 hrs to 1 hr. | William Turney | Jesse Barnes | 4/18/2016 | 15283047 | Task List, hours | -1 | -1 | 4/25/2016 | Daxa Patel | |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 805 Wear checks | 2.0 | 27142179 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | William Turney | Jesse Barnes | 4/29/2016 | 15296952 | Task List, Hours | -2 | -4 | 4/29/2016 | Jesse Barnes | |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 815 Wear checks | 2.0 | 27104757 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection | William Turney | Jesse Barnes | | 15296952 | Task List, Hours | + 1 | 2 | | | Need to create a new task list for POTH |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 820 Wear checks | 2.0 | 27434070 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | William Turney | Jesse Barnes | 4/29/2016 | 15296952 | Task List, Hours | -1 | -1 | 4/29/2016 | Jesse Barnes | |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 822 Wear checks | 2.0 | 27614400 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection | William Turney | Jesse Barnes | | 15296952 | Task List, Hours | -4 | -8 | | | Need to create a new task list for POTH |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 823 Wear checks | 2.0 | 27449476 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection | William Turney | Jesse Barnes | | 15296952 | Task List | | 0 | | | Need to create a new task list for POTH |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 824 Wear checks | 2.0 | 26968857 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, missing any work description for choke inspections | William Turney | Jesse Barnes | | 15296952 | Task List | | 0 | | | Need to create a new task list for POTH |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 832 Wear checks | 2.0 | 27294207 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, missing 1 choke and 1 dump on object list | William Turney | Jesse Barnes | | 15296952 | Task List, Hours | -2 | -4 | | | Need to create a new task list for POTH |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 846 Wear checks | 2.0 | 28204777 | Work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list, missing 22H1 & 24H1 on object list | William Turney | Jesse Barnes | | 15296952 | Task List | | 0 | | | |
| 4/26/2016 | Jesse Barnes/Luke Starkweather | NWT | 878 Wear checks | 2.0 | 27142188 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | William Turney | Jesse Barnes | 4/29/2016 | 15296952 | Task List, Hours | -2 | -4 | 4/29/2016 | Jesse Barnes | |
| 6/1/2016 | Tim Brueilly | TXC | DE01 Wear Checks | 2.0 | | Well is shut in at this time, wear checks not needed | William Turney | Jesse Barnes | 6/2/2016 | 15333884 | Delete MP | -4 | -7 | 6/8/2016 | Daxa Patel | |
| 6/1/2016 | Tim Brueilly | TXC | 112 Wear Checks | 2.0 | | Well is shut in at this time, wear checks not needed | William Turney | Jesse Barnes | 6/2/2016 | 15333884 | Delete MP | -6 | -12 | 6/8/2016 | Daxa Patel | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 303 Wear checks | 2.0 | 27763049 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, Hours | 2 | 4 | | Jesse Barnes | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 212 Wear checks | 2.0 | 27719346 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, Hours | +3 | 6 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 299 Wear checks | 2.0 | 27719358 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, Hours | -2 | -4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 296 Wear checks | 2.0 | 27655758 | Work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task List | | 0 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 287 Wear checks | 2.0 | 27628966 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, Hours | -2 | -4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 292 Wear checks | 2.0 | 27628972 | Work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list | | 0 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 291 Wear checks | 2.0 | 27628969 | Work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list | | 0 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 301 Wear checks | 2.0 | 27628975 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, Hours | -2 | -4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 460 Wear checks | 2.0 | 27526468 | Wrong hours, needs both procedures for POTH and JWW, says to check intermitter valve in which maintenance is not required to do anymore | | Jesse Barnes | | | Task list, Hours | +2 | 4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 429 Wear checks | 2.0 | 27493550 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, Hours | -1 | -2 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 307 Wear checks | 2.0 | 27467382 | Work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list | | 0 | | | |

| Date | Name | Code | Description | Hours | Number | Work description | | Name | Date | Number | Category | Val1 | Val2 | Date | Name | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 461 Wear checks | 2.0 | 27526470 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | -3 | -6 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 144 Wear checks | 2.0 | 27481974 | Work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list | | 0 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 448 Wear checks | 2.0 | 27643253 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, hours | +2 | 4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 448 Wear checks | 2.0 | 27643253 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, hours | +2 | 4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 127 Wear checks | 2.0 | 27509926 | Work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list | | 0 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 435 Wear checks | 2.0 | 27674039 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | -3 | -6 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 290 Wear checks | 2.0 | 27493565 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, hours | -2 | -4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 283 Wear checks | 2.0 | 27701882 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | -2 | -4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 426 Wear checks | 2.0 | 27674037 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, hours | -2 | -4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 551 Wear checks | 2.0 | 27687013 | Wrong hours, work description says to wear check intermitters in which maintenance is not required to do anymore, add change perc bottle fluid into task list | | Jesse Barnes | | | Task list, hours | -2 | -4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 433 Wear checks | 2.0 | 27674038 | Needs both procedures for POTH and JWW, says to check intermitter valve in which maintenance is not required to do anymore | | Jesse Barnes | | | Task list | | 0 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 255 Wear checks | 2.0 | 27643250 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | +1 | 2 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 129 Wear checks | 2.0 | 27643251 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | +1 | 2 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 134 Wear checks | 2.0 | 27643252 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | +1 | 2 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 461 Wear checks | 2.0 | 27763046 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | +1 | 2 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 284 Wear checks | 2.0 | 27763042 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | +2 | 4 | | | |
| 6/29/2016 | Jesse Barnes/Luke Starkweather | WLB | 147 Wear checks | 2.0 | 27751298 | Work description says to wear check intermitters in which maintenance is not required to do anymore, wrong procedure for POTH choke inspection, wrong hours | | Jesse Barnes | | | Task list, hours | +2 | 4 | | | |
| 3/21/2016 | Aaron Moore | KRS | K1 Escape Lighting Check | 1.0 | 28016219 | No escape lighting on site to check | William Turney | Jesse Barnes | 6/27/2016 | 15362352 | Deletion | -1 | -1 | 6/28/2016 | Jennifer Schmitz | |
| 6/8/2016 | Ken Foreman | | PT Calibrations frequency | 0.3 | | Change from 1Y to 3Y frequency | William Turney | Ken Foreman | 6/8/2016 | 15340424 | Frequency | | 0 | 6/28/2016 | Data Patel | |
| 6/27/2016 | Ken Foreman | | WK/MO-OI ALARM REDUCTION/SUSTAIN MTG. | 52.0 | | Change hours from 8 to .5 | William Turney | Ken Foreman | 6/27/2016 | 15362393 | Hours | -7.5 | -390 | 6/28/2016 | Jesse Barnes | |

| Review Date: | Reviewed by: | Area: | Description: | WO#: | Overview of discrepancies found: | Approval: | Submitted by: | Submitted Z6 Date: | Notification # | Structural Change Type: | Hours: | Z6 Completed: | Completed by: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/28/2016 | Ken Foreman | KRS | Functional Location Description | N/A | US.APP.KRS-651-PAD-651_WELL-24H; Needs to be 24H in the discription not 22H | Ken Foreman/Jesse Barnes | Jesse Barnes | 4/28/2016 | 15295609 | Functional location description | | 4/28/2016 | Jesse Barnes |
| 5/2/2016 | | | Create Workcenter | N/A | Need workcenter for new employee, Nathan Smelser | William Turney | Jesse Barnes | 5/2/2016 | 15299671 | Creation | | 5/6/2016 | Daxa Patel |
| 6/1/2016 | Jeremy Greene | MAR | LAFD extension | 28259298 | No retrofit list completed | Matt Skolny | Jesse Barnes | 6/1/2016 | | LAFD Extension | | 6/1/2016 | Jesse Barnes |
| 6/1/2016 | Jeremy Greene | MAR | Wrong Planner Group | 28246936 | 900 still has NWT planner group | William Turney | Jesse Barnes | 6/1/2016 | | Planner Group | | 6/1/2016 | Jesse Barnes |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| | Total Hours Changed | Implemented | Unimplemented |
|---|---|---|---|
| | 434 | 416 | 18 |
| Savings | $17,360 | $16,640 | $720 |





| Asset Hierarchy | IAP for ME Measures | 44.2016 | 45.2016 | 46.2016 | 47.2016 | 48.2016 | 49.2016 | 50.2016 | 51.2016 | 52.2016 | 01.2017 | 02.2017 | 03.2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ⊞ TIOGA | %Schedule Compliance | 87.44 | 74.04 | 76.65 | 91.07 | 89.35 | 80 | 82.14 | 30 | 42.45 | 41.59 | 50.74 | |
| | %Fill In Work | 14.07 | 22.12 | 8.38 | 7.14 | 4.73 | 10 | 16.43 | 21.25 | 12.26 | 52.21 | 44.85 | |
| | %Emergency Work | 6.03 | 9.62 | 7.19 | | 4.73 | 7.78 | 10.71 | 2.5 | 5.66 | 2.65 | 8.09 | |

Confidential

**2016 Accomplishments- Jesse Barnes**

- 89 Z6 submitted, completed- this includes anything from changing hours to creating PM's, deleting PM*see Z6 needs cheat
- Streamlined and initiated management of Z6 needs sheet and all Z6 entries – this I had to fight for for months with Will to be able to manage all though it was a part of my job
- Creation of 400 water sample maintenance plans – 3 Months of work
- Handover from AI to Pipeline Ops Task List created and Equipment Calibration PM's created
- Kold Katcher, MOC Health Check, Well validation PM's per Engineering request created
- F2F Analyst Training at Caroline Plant
- Started PM review/redlining with Leads, **16K in potential savings thus far**- I brought this back from my Analyst training at the Carolina Plan
- Obtained permissions/training from CMFT to make SAP data changes/LAFD extensions on site – traveled to Canada 2 days early to have this one on one trainingt
- Corrected cost reports with Joe Rathburn by changing main workcenters/timewriting for operators
- Filled in for notification review when planner was off from surgery and also helped when Scheduler was off from motorcycle accident
- Created Z1 notification, CATS Timewriting, Attached Document to Notification job aides
- Incorporated notification training in Onboarding process with Tom Underholt – had Tom send new employees to train on how to enter a notification
- Trained Maintenance Technicians and I & E Tech on CATS Timewriting
- Assisted in IW21 role out which saved money converting super users into light users
- Whiteboard updates/pareto charts for lean initiatives
- Scheduled and planned building maintenance PM and CM's with McClure's, Wolfe Communications, Slavin's Construction
- Requested PO's for specific jobs for the building
- Incorporated 1 field visit with April Heater/1 Rig visit with Jen Card
- PDS training with Shawn Dueitt, requested specific report to be created , helped Shawn several times on how the costs in WO/SAP works
- Organized Operations Golf Tournament Tent
- One on One JSA training with Wayne Fletcher to be able to review JSA's with building vendors
- Submitted a BBSM for each month
- Created Equipment Tracker system with Luke S. and Matt Furstoss, went out and found all equipment with Luke and marked equipment for tracking
- Reduced by over 1200 orders standing order list for 2017 for better cost control